## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAMIEN GUEDES,** *et al.,* | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | Civil Action No. 1:18-cv-2988 |
| | : | |
| **BUREAU OF ALCOHOL, TOBACCO,** | : | |
| **FIREARMS AND EXPLOSIVES,** *et al.* | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................ 1

II.   Statement of Facts ............................................................................................ 2

III.  Argument ........................................................................................................... 9

    a.   Plaintiff is Likely to Succeed on the Merits.................................................. 10

        i.    *Matthew Whitaker is an Improper Party to Implement a New Rule Under the Administrative Procedures Act* ........................................................... 10

        ii.   *Governing Law Applicable to the APA, GCA and NFA* ........................... 11

        iii.  *ATF's Prior Determinations* ..................................................................... 12

        iv.   *ATF is Barred from Circumventing Congress to Redefine a Statutory Term* ........... 14

            **1.   Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun** ................................................. 15

        v.    *ATF's Violations of the Administrative Procedures Act in Promulgating This Final Rule* ........... 19

            **1.   ATF's Failure to Provide Underlying Documents** ................................ 20

            **2.   ATF's Failure to Provide a 90 Day Comment Period** ......................... 22

            **3.   The Final Regulation is Arbitrary and Capricious** ............................... 25

                i.    *ATF's New Interpretation is Novel but Unpersuasive* ........................... 26

                ii.   *ATF's "Alternatives" to Bump Stocks Create the Same Result with Different Mechanisms* ........... 27

                iii.  *Jerry Miculek* ........................................................................................ 29

                iv.   *A Bump Stock is not a Machine Gun* ...................................................... 30

    b.   Plaintiffs are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief .... 36

    c.   The Balance of Equities Tips in the Plaintiff's Favor................................... 37

    d.   An Injunction is in the Public Interest......................................................... 38

    e.   No Bond or Other Security Payment is Required as a Condition of Relief.... 39

IV.   Conclusion ........................................................................................................ 39

## **TABLE OF AUTHORITIES**

**Cases**

*American Medical Ass'n, v. Reno,* 57 F.3d 1129 (D.C. Cir. 1995) ............................................... 20

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (2017 D.C. Cir.).................................... 25

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................... 9, 36

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .......... 17

*City of Arlington, Tex. V. F.C.C.*, 569 U.S. 290 (2013)................................................................ 17

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir.1995)........................ 9

Colautti v. Franklin, 439 U.S. 379, 392–393, n. 10 (1979) .......................................................... 17

*Connecticut Light & Power Co. v. NRC*, 673 F.2d 525 (D.C. Cir. 1982) .................................... 20

Council on American–Islamic Rels. v. Gaubatz, 667 F.Supp.2d 67 (D.D.C.2009) .................... 39

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288 (D.C.Cir.2009) ......................................... 9

DSE, Inc. v. United States, 169 F.3d 21 (D.C.Cir.1999)............................................................... 39

*East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.,* No. 18-17274, 2018 WL 6428204 (9th Cir. Dec. 7, 2018)........................................................................................... 14

*Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177 (D.C. Cir. 1994) ......................................................... 20

*Fleming v. Moberly Milk Products Co.*, 160 F.2d 259 (D.C. Cir. 1947)....................................... 38

*Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20 (D.D.C. 2009)................................................................................................................... 36

*Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142 (D.D.C. 1993) ................................................. 38

*Garnett v. Zellinger*, 313 F.Supp.3d 147 (D.D.C. 2018) ............................................................. 38

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,* 407 F.3d 1250 (D.C. Cir. 2005)............................................................................................................ 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ..................... 25

*Portland Cement Ass'n v. Ruckelshaus,* 486 F.3d 375 (D.C. Cir. 1973)...................................... 20

*Staples v. United States*, 511 U.S. 600 (1994) ............................................................................. 18

*States of New York, Connecticut, New Jersey, Rhode Island, and Washington, and Commonwealths of Massachusetts and Virginia v. United States Department of Justice and Matthew G. Whitaker,* No. 1:18-cv-06471-ER, *31 (S.D.N.Y. Nov. 30, 2018) ...................... 14

*Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302 (2014) ...................... 14, 17

**Statutes**

18 U.S.C. § 3571 ............................................................................................................. 37

18 U.S.C. § 921 ................................................................................................... 1, 11, 15

18 U.S.C. § 926(b) ............................................................................................... 6, 7, 22

18 U.S.C. 921 ....................................................................................................... 13, 31

18 U.S.C. 926(a) ...................................................................................................... 17

26 U.S.C. § 5801 ........................................................................................................... 1

26 U.S.C. § 5861 ......................................................................................................... 37

26 U.S.C. § 5872 ......................................................................................................... 37

26 U.S.C. 5845 .......................................................................................... 11, 13, 16, 31

28 U.S.C. § 508 ................................................................................................. 1, 10, 11

5 U.S.C. § 3347 ........................................................................................................... 10

5 U.S.C. § 500 ............................................................................................................... 1

5 U.S.C. § 706 ....................................................................................................... 11, 19

Pub. L. 99-308, 110 Stat. 449 (1986) .......................................................................... 14

**Other Authorities**

George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973) ................... 19

John Quick, Ph.D., Dictionary of Weapons and Military Terms 40 (McGraw-Hill 1973) .......... 19

**Regulations**

27 C.F.R. § 478.11 ................................................................................................... 3, 16

27 C.F.R. § 479.11 ................................................................................................... 3, 16

Plaintiffs Damien Guedes (hereinafter "Mr. Guedes"), Firearms Policy Coalition, Inc., (hereinafter "FPC"), Firearms Policy Foundation (hereinafter "FPF"), and Madison Society Foundation, Inc. (hereinafter "MSF"), or collectively "Plaintiffs," by and through their counsel, hereby submits this Memorandum of Points and Authorities in Support of their Motion for Preliminary Injunction.

## I.        Introduction

Plaintiffs have filed suit, complaining, *inter alia*, that Matthew Whitaker lacks the legal authority to execute and implement the Final Rule, or in the alternative, the Defendants have implemented a new rule in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 500, *et seq.*, and in excess of the scope in which ATF may define a term previously defined by the Congress.

Ignoring the will of Congress by subverting the Attorney General Succession Act ("AGSA"), 28 U.S.C. § 508, President Donald J. Trump unlawfully appointed Matthew Whitaker as Acting Attorney General, in spite of clear statutory direction that Rod J. Rosenstein as Deputy Attorney General was to assume the duties and responsibilities of Attorney General. As such, Final Rule promulgated and executed by Matthew Whitaker on December 18, 2018 is unlawful and invalid. Further, despite Congress expressly defining the term "machinegun" in the Gun Control Act, 18 U.S.C. § 921, *et seq.* ("GCA") and the National Firearms Act, 26 U.S.C. § 5801, *et seq.* ("NFA"), along with ATF's prior acknowledgement that a bump stock was not a "machinegun" nor subject to regulation under the GCA and NFA, Defendants have implemented a final rule in an arbitrary and capricious manner which denies Plaintiffs, and those similarly situated, the ability to retain a bump stock, despite reliance on prior determinations made by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Accordingly, a preliminary

injunction is warranted and necessary to prevent ATF from enforcing this new rule during the

pendency of this litigation.

## II.        Statement of Facts

On December 26, 2017, ATF published an Advanced Notice of Proposed Rulemaking

("ANPRM") in the Federal Register and on federalregister.gov, [1] seeking public input from

manufacturers, retailers, and consumers in relation to bump stocks. ATF sought a variety of

information pertaining to bump stocks including, but not limited to, 1) calendar years produced,

economic impact of ATF classifying bump stocks as machine guns, use(s) for which the device

was marketed, number of bump stocks sold, and purposes bump stocks are used for. The

comment period for this ANPRM closed on January 25, 2018. [2]

On March 29, 2018, ATF published a Notice of Proposed Rulemaking ("NPRM") in the

Federal Register and on federalregister.gov. [3] In its NPRM, ATF stated, *inter alia*, that:

> 1) When a bump-stock-type device is affixed to a semiautomatic firearm,
> however, the device harnesses the recoil energy to slide the firearm back and
> forth so that the trigger automatically re-engages by "bumping" the shooter's
> stationary trigger finger without additional physical manipulation of the
> trigger by the shooter. The bump-stock-type device functions as a self-acting
> and self-regulating force that channels the firearm's recoil energy in a
> continuous back-and-forth cycle that allows the shooter to attain continuous
> firing after a single pull of the trigger so long as the trigger finger remains
> stationary on the device's extension ledge (as designed). No further physical
> manipulation of the trigger by the shooter is required; [4]

---

[1] 82 Fed.Reg. 60929. *See also* https://www.federalregister.gov/documents/2017/12/26/2017-27898/application-of-the-definition-of-machinegun-to-bump-fire-stocks-and-other-similar-devices
[2] *Id.*
[3] 83 Fed.Reg. 13442. *See also* https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices
[4] 83 Fed.Reg. 13443.

2) Between 2008 and 2017, however, ATF also issued classification decisions concluding that other bump-stock-type devices were not machineguns, including a device submitted by [Slide Fire Solutions]; [5]

3) These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire; and [6]

4) [I]ndividuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that individuals are capable of doing so, this would be their alternative to using bump-stock-type devices. [7]

The NPRM also contained proposed amendments for the definition of the term "machine gun" as found in 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11. In either case, the proposed amendment would amend the definition of "machine gun" by adding two sentences at the end of the definition to read as follows:

> * * * For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

Comments were required to be submitted on or before June 27, 2018. [8]

---

[5] *Id.*
[6] *Id.* at 13446.
[7] *Id.* at 13454.
[8] *Id.* at 13446.

3

On March 30, 2018, a day after ATF published the NPRM, FPF submitted an expedited

FOIA Request for "for all ATF determinations relative to devices referred to as 'bump stocks'

and 'bump-fire stocks' by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52,

Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-

0001), as well as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms

relative to each determination, and any versions or drafts of the determinations, which were

different than the final determination" since ATF failed to include these, or any other

"supporting documents," in the docket folder." [9] [10] As of the filing of FPC's and FPF's comment,

which occurred on June 19, 2018, ATF did not made public any of the requested and necessary

supporting documents – *especially its own determinations that bump stocks and bump-fire stocks*

*do not constitute firearms, let alone machineguns* [11] – and has additionally failed to respond to

FPF's expedited FOIA or even assign a number to it during the rulemaking period and as of the

filing of this action. [12] In the NPRM, ATF also admitted that it has received "correspondence[s]

from members of the United States Senate and the United States House of Representatives, as

well as nongovernmental organizations, requesting that ATF examine its past classifications and

---

[9] Any references to Exhibit A contained within this Memorandum of Points and Authorities is in reference to Exhibit A filed with the Complaint in this matter. As the Complaint, Exhibit, Motion for Preliminary Injunction and this Memorandum are being filed in a contemporaneous manner, there is no ECF document number to reference.

[10] As reflected in the FOIA Request, "[t]he use of the word 'determinations' shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF." *See* Exhibit A at 75-78.

[11] ATF admitted that there are at least "ten letter rulings between 2008 and 2017" (83 Fed. Reg. at 13445); none of which have been made available by ATF. 83 Fed. Reg. at 13445.

[12] FPC's comment was posted publicly on Regulations.gov on June 26, 2018. *See* https://www.regulations.gov/document?D=ATF-2018-0002-61777 and https://www.regulations.gov/document?D=ATF-2018-0002-61778.

determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition," [13] yet failed to provide any of those documents in the docket.

Immediately, upon the publication of the NPRM on March 29, 2018, the following advisory appeared on federalregister.gov:[14] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience." [15] Moreover, not only was the website not accepting comments to be submitted, but when individuals submitted complaints to the Federal Register regarding their inability to submit their comments, the Federal Register responded that they could not be of any help. [16] It is believed that it was not until April 2, 2018 (*i.e.* five days into the comment period) that the declaration that "COMMENT PERIOD CLOSED" was removed from federalregister.gov by ATF and that interested individuals were able to submit comments. Unfortunately, upon information and belief, numerous individuals, due to the declaration on federalregister.gov "COMMENT PERIOD CLOSED," were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never informed, after ATF removed the declaration and permitted comments to be filed, that they could then submit comments. Even more disconcertingly, while the public was directed to federalregister.gov as a resource for all relevant information and as a vehicle through which to submit comments regarding the Final Rule, the website's content was confusing and convoluted. The NPRM identified the rulemaking procedures under "Docket No. 2017R-22," but the information on the website related to these

---

[13] 83 Fed. Reg. at 13446
[14] The website address where this advisory appeared was https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices, which has since been fixed, as discussed *infra*. *See also* Exhibit A at 17.
[15] *See* Exhibit A at 17.
[16] *See* Exhibit A at 17-18.

proceedings made no mention of this docket number. Instead, it referred to two *different* docket numbers (ATF-2018-0002 and ATF-2018-0002-0001), and these dockets concerned the ANPRM, for which the comment period had closed in January. [17] The confusing and convoluted display of the information on federalregister.gov was documented in an article published by Carl Bussjaeger on April 2, 2018, titled "*[Update] Bumbling Machinations on Bump Stocks?*" [18] When Mr. Bussjaeger inquired of ATF about the issues, an ATF Senior Industry Operations Investigator responded that he should refer to https://www.regulations.gov/document?D=ATF-2018-0002-0001, which contains the ANPRM and the NPRM, including information on the submission of comments. However, ATF failed to supply this or any other clarifying information to the public at large concerning where to locate the relevant material and how to submit their comments.

On June 19, 2018, FPC and FPF submitted a comment in opposition to the NPRM, which was posted on Regulations.gov on June 26, 2018, in which they documented numerous deficiencies regarding ATF's NPRM, including, but not limited to: 1) ATF exceeding its statutory authority, 2) ATF's proposal being arbitrary and capricious, 3) ATF's proposal being overly vague and contradictory, 4) ATF failing to consider precedential alternatives, 5) ATF's failure to include the necessary supporting documents in the docket, thereby denying interested parties an opportunity to fully consider the claims made by ATF for the basis of the NPRM, and 6) demanded a hearing pursuant to 18 U.S.C. § 926(b) and under ATF's offer in the NPRM itself. The Comment also contained the verified declarations of Matthew Thompson and Plaintiff

---

[17] *See* Exhibit A at 18.
[18] *See* Exhibit A at 164-173; *see also,* http://zelmanpartisans.com/?p=5071 and http://zelmanpartisans.com/?p=5055 for copies of this publication.

Guedes. Specific to Mr. Guedes, in 2014, he became interested in a bump stock device. [19] Before purchasing such a device, Mr. Guedes accessed BFSystems's website to determine whether ATF had approved the particular device he sought to purchase. BFSystems's website stated that ATF had approved the device in a written determination letter dated April 2, 2012. [20] Relying upon this determination from ATF, Mr. Guedes purchased an AR15 BFSystem for $99.99, which he still possesses today. [21] Specific to Mr. Thompson, in 2017, became interested in a bump stock device. [22] Before purchasing such a device, Mr. Thompson accessed Slide Fire's website to determine whether ATF had approved the particular device he sought to purchase. [23] Slide Fire's website stated that ATF had approved the device in a written determination letter dated June 7, 2010. [24] Relying upon this determination from ATF, Mr. Thompson purchased a Slide Fire bump stock for $134.00, which he still possesses today. [25]

Furthermore, in their Comment, FPC and FPF requested an opportunity to be heard at a hearing before ATF implemented any rule or regulation in relation to the NPRM, pursuant to 18 U.S.C. § 926(b), and additionally included a copy of their letter requesting a hearing. [26] Nevertheless, ATF never granted FPC or FPF any such process, and never even responded to the request for a hearing.

On November 7, 2018, President Donald J. Trump requested that Jefferson B. Sessions, III, the Attorney General at the time, tender his resignation. Mr. Sessions acquiesced to President Trump's request and resigned via letter. Upon receiving Mr. Sessions resignation, President

---

[19] *See* Exhibit A at 274-75.
[20] *Id.* at 277-78.
[21] *Id.* at 280.
[22] *Id.* at 282-83.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *See* Exhibit A at 913

Trump announced via Twitter that Matthew Whitaker would assume the role of Acting Attorney General, despite the fact that Rod J. Rosenstein was the current Deputy Attorney General and statutorily required to assume the responsibilities and duties of Attorney General until a new one was appointed by the President and confirmed by the Senate.

On December 18, 2018, purported Attorney General Matthew Whitaker executed the Final Rule; thereby, purportedly making effective the Final Rule, RIN 1140-AA52, Docket No 2018R-22F. The Final Rule, executed by purported Attorney General Whitaker, was published and otherwise made available online on December 18, 2018 and all Plaintiffs obtained and reviewed the Final Rule on December 18, 2018. The Final Rule, spanning 157 pages, implements changes to 27 C.F.R. ¶¶ 447.11, 478.11, 479.11, almost identical to the proposed changes in the NPRM.

Specifically, it modifies the definition of "Machinegun" in Section 447.11 such that, pursuant to the Final Rule, it will provide:

> A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person. For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

Furthermore, it modifies the definition of "Machine gun" in Section 478.11 and 479.11 such than, pursuant to the Final Rule, it will provide:

For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

Upon Plaintiffs reviewing the Final Rule executed by purported Attorney General

Whitaker on December 18, 2018, this action followed.


III.      **Argument**

To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).


"A district court must 'balance the strengths of the requesting party's arguments in each

of the four required areas.'" *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747

(D.C. Cir.1995) "If the showing in one area is particularly strong, an injunction may issue even if

the showings in other areas are rather weak." *Id.*


The District of Columbia Circuit has further stated that

if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success. Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.

*Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C.Cir.2009) (internal

quotation marks and citations omitted).

    a. <u>Plaintiff is Likely to Succeed on the Merits</u>

        *i. Matthew Whitaker is an Improper Party to Implement a New Rule Under the Administrative Procedures Act*

28 U.S.C. § 508(a), in the pertinent part, provides the following, "[i]n case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office…" Rod J. Rosenstein was sworn in as Deputy Attorney General on April 26, 2017. Since Mr. Rosenstein was sworn in as Deputy Attorney General, he has remained in that position.

The statutory language is exactingly clear in relation to succession of the role of Attorney General – that being that the Deputy Attorney General assumes the duties of that office. There is no mechanism for the President to arbitrarily appoint a new individual to the role of Acting Attorney General when a vacancy appears, especially when there is an individual sitting in one of the designated offices, which are specifically enumerated to fill that void until a new Attorney General is appointed by the President and confirmed by the Senate.

Moreover, to the extent that the Government believes or argues that the appointment of Mr. Whitaker is proper under the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. §§ 3345-49d, they are wrong. The FVRA generally allows for the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of" any Senate-confirmed officer in every executive agency (other than the Government Accountability Office). 5 U.S.C. § 3347(a). However, when another "statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," there is no allowance. *Id*. § 3347(a)(1)(B).

Read together, neither the AGSA nor the FVRA allow for President Trump to appoint an Acting Attorney General. Under the FVRA, the President is unable to authorize an individual to serve as Acting Director because there is a statutory provision which expressly designates an officer or employee to perform the functions of the office. Under the AGSA, the Deputy Attorney General is expressly selected to exercise the duties of the Office of Attorney General in the event of a vacancy.[27] Accordingly, this Honorable Court should find that any action – including, but not limited to, the signing, execution or implementation of the Final Rule – taken by Matthew Whitaker as the purported Acting Attorney General is invalid and unlawful. As such, the Final Rule must be declared invalid.

> ii.   *Governing Law Applicable to the APA, GCA and NFA*

5 U.S.C. § 706(2)(A) provides the following:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> …
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

18 U.S.C. § 921(a)(23) provides the following:

"The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."

---

[27] AGSA goes so far to even name the Associate Attorney General as the successor to the Deputy Attorney General and that the Solicitor General and Assistant Attorney Generals may be further named as successors by the Attorney General. *See* 28 U.S.C. § 508(b).

26 U.S.C. § 5845(b) provides the following:

**Machinegun**

The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

### iii.   ATF's Prior Determinations

ATF previously held, at least ten (10) times, that a bump stock or bump-fire stock was *not* a firearm or a machinegun as defined by the GCA or NFA.[28] On June 7, 2010, ATF issued a determination letter to Slide Fire, holding that

The stock has *no automatically functioning mechanical parts or springs* and *performs no automatic mechanical function* when installed. In order to use the installed device, *the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand*. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.[29]

On April 2, 2012, ATF issued a determination letter to Bump Fire Systems, declaring that:

The FTB live-fire testing of the submitted devices indicates that if, as a shot is fired, an <u>intermediate</u> amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary

---

[28] *See* Exhibit A at 264-268.
[29] *See* Exhibit A at 264. (emphasis added).

firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*.

…

Since your device is *incapable of initiating an automatic firing cycle* that continues until either the finger is released or the ammunition supply is exhausted, FTB find that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23). [30]

In an April 16, 2013 letter to Congressman Ed Perlmutter, ATF stated:

> In the course of examining a number of bump- fire stocks, A TF found that none of these devices could shoot nor did they constitute firearm frames or receivers; therefore, the first portion of the machinegun definition can not apply. Those bump-fire stocks which were found to convert a weapon to shoot automatically were classified as machineguns and regulated accordingly- most notably, the Akins Accelerator. Other bump-fire stocks (such as the SlideFire Solutions stock) that ATF determined to be unable to convert a weapon to shoot automatically were not classified as machineguns. [31]

ATF further declared that "…the Slide Fire Solutions stock requires continuous multiple inputs by the user for each successive shot." [32]

In addition to ATF penning several determination letters, which explained that bump stocks were legal and unable to be regulated under the GCA and NFA, along with writing a member of Congress that bump stocks were not subject to regulation under the law, ATF also took such a position in federal court.

As reflected on page 20 of the U.S. Government's Brief in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in *Freedom Ordnance Mfg., Inc., v. Thomas E. Brandon*:

> An ATF expert testified that a true trigger activating devices [i.e. bump-stock-devices], although giving the impression of functioning as a machine gun, are not

---

[30] *See* Exhibit A at 265-266 (italics in original, bold and underline emphasis added).
[31] *See* Exhibit A at 267-268.
[32] *Id.*

classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*.

(Emphasis added.) [33]

Now the Government finds itself in an untenable position of claiming that bump stock devices are themselves machine guns, even after it issued multiple determinations, correspondences to Congress, and sworn testimony in federal court to the contrary.

### iv.   ATF is Barred from Circumventing Congress to Redefine a Statutory Term

"The separation of powers acts as a check on tyranny and the concentration of power." *States of New York, Connecticut, New Jersey, Rhode Island, and Washington, and Commonwealths of Massachusetts and Virginia v. United States Department of Justice and Matthew G. Whitaker,* No. 1:18-cv-06471-ER, *31 (S.D.N.Y. Nov. 30, 2018). "Under our system of government, Congress makes laws and the President, acting at times through agencies [], "faithfully execute[s]" them." *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 327 (2014). (Internal citations omitted). "Just as [the Judiciary] may not [], 'legislate from the bench,' neither may the Executive legislate from the Oval Office." *East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.,* No. 18-17274, 2018 WL 6428204, *51 (9th Cir. Dec. 7, 2018).

Congress has, in fact, legislated to *limit* the authority of ATF to impose more burdens on law-abiding citizens. Congress was aware of ATF's over-zealous interpretation of the NFA when it enacted the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 110 Stat. 449 (1986). It would be an understatement to say that Congress thought ATF had reached the maximum boundary of its rulemaking and enforcement authority. Well aware of ATF's history, Congress

---

[33] *See* Exhibit A at 689.

made clear in FOPA that ATF's regulation and enforcement activities of *legal* owners of firearms – like those who seek to register firearms under the NFA – had already gone too far. Congress found that not only were statutory changes needed to protect *lawful* owners of firearms, but that "enforcement policies" needed to be changed as well. FOPA § 1(b). In doing so, Congress reaffirmed that "it is not the purpose of this title to place *any undue or unnecessary* Federal *restrictions or burdens* on law-abiding citizens with respect to the acquisition, possession, or use of firearms," *Id*. (emphasis added), signaling in the strongest possible language that ATF should not impose yet additional burdens on law-abiding citizens, especially in light of the existing criminal laws prohibiting, *inter alia*, murder, manslaughter, aggravated assault, *etc*. Yet, that is precisely what ATF's final rule would do.

### 1. Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun

Even without consideration of FOPA, Congress precluded ATF from formulating the final rule, as Congress, itself, defined what constitutes a machinegun when enacting the NFA in 1934 and the GCA in 1968. Moreover, numerous members of Congress have acknowledged this and stated that ATF lacks the authority to redefine what constitutes a machinegun.[34] As an administrative agency cannot override a congressional enactment, ATF lacks authority and jurisdiction to amend or otherwise modify the definition of a machinegun as enacted by the Congress.

In the original NFA as enacted in 1934, and reaffirmed in enacting the GCA in 1968, the Congress expressly defined what constitutes a machinegun. 18 U.S.C. § 921(a)(23) states "[t]he

---

[34] Senator Diane Feinstein declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." *See* Exhibit A at 262.

term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms

Act (26 U.S.C. 5845(b))." 26 U.S.C. § 5845(b) declares:

> The term "machinegun" *means* any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

(Emphasis added).

ATF proposes to expand the definition of what a "machinegun" means by adding the

following two sentences to the end of the current definition found in 27 C.F.R. §§ 478.11 and

479.11. [35]

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 13457.

Noteworthy is ATF's admission to Congress that it "does not have authority to restrict

[bump-stock devices'] lawful possession, use or transfer." [36] In testimony before the Senate

Judiciary Committee, J. Thomas Manger, President of the Major Cities Chiefs Association and

---

[35] The definition of "machinegun" contained in 27 C.F.R. §§ 478.11 and 479.11 mirrors the definition Congress gave the term in 26 U.S.C. § 5845(b).

[36] *See* Exhibit A at 268.

Chief of Police of Montgomery County, stated that ATF Acting Director Thomas Brandon admitted "ATF does not now have the authority under Federal law to bar [bump-stock-devices] and *new legislation is required to do so*."[37]

Even the courts have agreed that such an alteration is beyond the power of ATF. The "core administrative-law principle" is that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. E.P.A.*, 572 U.S. 302, 328 (2014).  "As a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." *Colautti v. Franklin,* 439 U.S. 379, 392–393, n. 10 (1979). Congress clearly defined the meaning of the term "machinegun" as evidenced by its use of the phrase "[t]he term 'machinegun' *means*."[38] Even if ATF could define the terms "automatically" and "single function of the trigger," which is disputed, ATF lacks the authority to unilaterally declare an item to be a machine gun when it falls outside the statutory parameters, particularly by incorporating it into the definition itself.[39]

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. V. F.C.C.*, 569 U.S. 290, 296 (2013).

---

[37] *See* Exhibit A at 891 (emphasis added).

[38] Even Dictionary.com defines the term "Machine Gun" to mean "a small arm operated by a mechanism, able to deliver rapid and continuous fire as long as the trigger is pressed." *Available at:* http://www.dictionary.com/browse/machine-gun. ATF taking such a nuanced approach to parsing specific terms to shoehorn a particular group of accessories into the definition flies in the face of the statutory text's plain meaning.

[39] *See* 18 U.S.C. 926(a) "The Attorney General may prescribe *only such rules and regulations* as are *necessary* to carry out provisions of this chapter…" (Emphasis added).

Here, there can be no question that the intent of Congress was clear. Congress sought to regulate firearms that: 1) shoot, 2) were designed to shoot, or 3) can be readily restored to shoot, 4) automatically more than one shot, without manual reloading, 5) by a single function of the trigger. This can be gleaned from an analysis of the debate surrounding the passage of the legislation.

> Mr. Frederick.[] The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and *such guns are not properly designated as machineguns*. A gun…which is capable of firing more than one shot by single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun."

Exhibit 29 (National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934)) (emphasis added).

For the purposes of this analysis, a machinegun can be distilled down to: a firearm which shoots automatically more than one shot, without manual reloading, by a single function of the trigger. Congress also sought to regulate the frames or receivers of such weapons, along with any parts that could be used to make or convert a firearm into a machinegun. Such an interpretation is directly in line with prior court and agency decisions. *See Staples v. United States*, 511 U.S. 600 (1994) ("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also Id*. at n1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will

automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act."). [40]

Moreover, the Government has previously argued to a Federal Court that a bump-stock-device was not a machinegun. "While the shooter receives an assist from the natural recoil of the weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is *contingent on shooter input* in pushing the weapon forward, rather than mechanical input, and is *thus not an automatic function of the weapon.*" [41]

The statutory language is explicitly clear as to what constitutes a machinegun and is inclusive of parts designed and intended *solely and exclusively* for use in converting a firearm into a machinegun. ATF acknowledges that bump-stock-devices are not currently able to be regulated as machineguns because it seeks to amend the definition to specifically include them and other firearms and devices covered by the NPRM.

  v. *ATF's Violations of the Administrative Procedures Act in Promulgating This Final Rule*

A reviewing court may "hold unlawful and set aside agency action … found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." [42] The rulemaking process was littered with examples of ATF's failure to operate within the confines of

---

[40] *See also* ATF Rul. 2004-5 quoting George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973) (the term "automatic" is defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device – in other words, a machine gun"); Webster's II New Riverside-University Dictionary (1988) (defining automatically as "acting or operating in a manner essentially independent of external influence or control"); John Quick, Ph.D., Dictionary of Weapons and Military Terms 40 (McGraw-Hill 1973) (defining automatic fire as "continuous fire from an automatic gun, lasting until pressure on the trigger is released").
[41] *See* Exhibit A at 710.
[42] 5 U.S.C. § 706(2)(A).

the law in addition to the final rule being arbitrary and capricious.

### 1.  ATF's Failure to Provide Underlying Documents

It has long been understood that "[t]he process of notice and comment rule-making is not to be an empty charade. It is to be a process of reasoned decision-making. One particularly important component of the reasoning process is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 528 (D.C. Cir. 1982). "If the [NPRM] fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Id*. at 530. Providing access to materials like FPC requested – in addition to those that ATF has acknowledged in the NPRM as the basis for the rulemaking – has long been recognized as essential to a meaningful opportunity to participate in the rulemaking process.

The APA "'requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule.'" *American Medical Ass'n, v. Reno,* 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) (quoting *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C. Cir. 1994)). In order to ensure that rules are not promulgated on the basis of data that to a "critical degree, is known only to the agency," the agency must make available the "methodology" of tests and surveys relied upon in the NPR. *Portland Cement Ass'n v. Ruckelshaus,* 486 F.3d 375, 392-93 (D.C. Cir. 1973).

An agency commits serious procedural error when it fails to reveal the basis for a proposed rule in time to allow for meaningful commentary. *Connecticut Light & Power,* 673 F.2d at 530-31. The notice and comment requirements

> are designed (1) to ensure that agency regulations are tested via
> exposure to diverse public comment, (2) to ensure fairness to
> affected parties, and (3) to give affected parties an opportunity to
> develop evidence in the record to support their objections to the
> rule and thereby enhance the quality of judicial review.

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,* 407 F.3d

1250, 1259 (D.C. Cir. 2005).

In this rulemaking proceeding, ATF not only refused to make available its own prior

determinations that "bump stocks", "bump-fire stocks", and "bump-stock-devices" were not

firearms – *let alone*, machineguns – and communications received from Congress and other

organizations, but more importantly, ATF has failed to provide any evidence that a "bump

stock", "bump-fire stock", or a "bump-stock-device" was ever utilized in a single crime. As the

putative use of a bump stock in the Las Vegas shooting is the purported underlying basis for this

rulemaking (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454) the lack of evidentiary

support is mind-boggling and constitutes a serious procedural error, as the absence of such

evidence supports that there are no verified instances of a bump stock being utilized criminally

and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. [43]

The lack of access to these materials has seriously hindered the ability of interested

persons to address everything that underlies the apparent unsupported assertions in the NPR. As

---

[43] An expedited Freedom of Information Act request was submitted to both ATF and FBI
requesting "Any and all records documenting the use of a bump-fire type stock being used by
anyone on or about October 1, 2017 at the Mandalay Bay shooting incident in Las Vegas,
Nevada; and Any and all records documenting the use of a bump-fire type stock used during the
commission of any crime to date." To date, neither ATF nor FBI has confirmed the use of a
bump fire stock in the commission of any crime. *See* "Analysis and Commentary Regarding:
Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices", ID: ATF-2018-0002-31210,
Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63, *available electronically at* –
https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic
Arms) rec 5-29-18 – Part4" as pdf pages 1 – 2.

such, ATF has committed a serious procedural error.

## 2.   ATF's Failure to Provide a 90 Day Comment Period

18 U.S.C. § 926(b) requires that ATF provide "not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations." In the rulemaking proceeding, numerous procedural irregularities and issues arose which precluded the public a meaningful opportunity to respond and caused some to believe that the comment period was closed since the very start of the comment period; thus, depriving the public of the ninety day comment period that is required by law.

Upon the publication of the NPRM on March 29, 2018, numerous individuals were advised on FederalRegister.gov [44] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience." [45]

As reflected in Exhibit A at 17, the notice that the comment period was closed was in relation to this proposed rulemaking regarding Bump-Stock-Type devices of "03/29/2018" and also reflects that the comment period was not supposed to end until "06/27/2018"; however, individuals were denied the opportunity to comment, as the website would not accept any comments to be filed. Even when individuals reached out to the Federal Register via electronic means, the Federal Register responded that it was beyond their control. [46] It is believed that it was not until April 2, 2018 (*i.e.* five days into the comment period) that the declaration that

---

[44] The specific link is https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices
[45] *See* Exhibit A at 17.
[46] *See* Exhibit A at 18.

"COMMENT PERIOD CLOSED" was removed from federalregister.gov by ATF and that

interested individuals were able to submit comments. Unfortunately, upon belief, numerous

individuals, due to the declaration on federalregister.gov "COMMENT PERIOD CLOSED,"

were led to believe that they were unable to submit comments in relation to this rulemaking and

were therefore deprived of an opportunity to be heard, since they were never informed, after

ATF removed the declaration and permitted comments to be filed, that they could then submit

comments.

To add to the confusion, there were three separate dockets that were attributed to the

NPR. On April 2, 2018, Mr. Carl Bussjaeger published an article, which was later updated,

*[Update] Bumbling Machinations on Bump Stocks?* [47] In his article, he detailed the trials and

tribulations of trying to find the appropriate docket, based on the NPR in this matter, and the

differing number of comments allegedly submitted and available for review between three

separate dockets. Even after inquiring with ATF as to the issue, ATF Senior Industry Operations

Investigator Katrina Moore responded that he should use

https://www.regulations.gov/document?D=ATF-2018-0002-0001, but failed to relay that

information to the public at large or place notices on the other two related dockets informing

interested individuals of the location where they can submit their comments.

When other federal administrative agencies have failed to provide a statutorily mandated

comment period or issues arose during the comment period, whereby the comment period was

thwarted by technological or other delays, those agencies have extended the applicable comment

periods. *See, e.g.,* Department of the Interior -- Fish & Wildlife Service, *Endangered and

Threatened Wildlife and Plants; Extending the Public Comment Periods and Rescheduling*

---

[47] *See* Exhibit A at 164-173.

*Public Hearings Pertaining to the Gray Wolf (Canis lupus) and the Mexican Wolf (Canis lupus baileyi),* 78 Fed. Reg. 64192 (Oct. 28, 2013); Environmental Protection Agency, *Extension of Review Periods Under the Toxic Substances Control Act; Certain Chemicals and Microorganisms; Premanufacture, Significant New Use, and Exemption Notices, Delay in Processing Due to Lack of Authorized Funding,* 78 Fed. Reg. 64210 (Oct. 28, 2013); Department of the Interior -- Fish & Wildlife Service, *New Deadlines for Public Comment on Draft Environmental Documents,* 78 Fed. Reg. 64970 (Oct. 30, 2013); Department of Labor -- Occupational Safety and Health Administration, *Occupational Exposure to Crystalline Silica; Extension of Comment Period; Extension of Period to Submit Notices of Intention to Appear at Public Hearings; Scheduling of Public Hearings,* 78 Fed. Reg. 35242 (Oct. 31, 2013); Department of Agriculture -- Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations; Extension of Comment Period,* 78 Fed. Reg. 65515 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 65601 (Nov. 1, 2013); Federal Trade Commission, *Ganley Ford West, Inc.; Timonium Chrysler, Inc.; TRENDnet, Inc.; Pinnacle Entertainment, Inc.; Honeywell International, Inc.; Nielsen Holdings, Inc., et al.; Polypore International, Inc.; Mylan, Inc., et al.; Actavis, Inc., et al.; Agency Information Collection Activities (Consumer Product Warranty Rule, Regulation O, Affiliate Marketing Rule),* 78 Fed. Reg. 65649 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,*78 Fed. Reg. 66002 (Nov. 4, 2013).

By refusing to extend the comment period and failing to notify interested parties of the correct docket for filing comments, ATF failed to mitigate the harm caused by these procedural

irregularities and issues that were resultant from ATF's own conduct and actions. Thus, ATF has failed to provide the statutorily-mandated public comment period and caused public confusion as to whether or not the comment period was open or closed and the appropriate docket for the filing of comments. More disconcerting is that this is not the first time that ATF has acted in this manner during the rulemaking process. [48]

### 3.   The Final Regulation is Arbitrary and Capricious

"Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (2017 D.C. Cir.) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Contrary to the contention in the proposed rulemaking, bump-firing is neither the result of any particular firearm accessory, device or part nor the modification thereof. Rather, it is a technique that can be utilized with the intrinsic capabilities of most *factory* semi-automatic firearms, including the rifles, such as the AR-15, and pistols, such as the 1911. As reflected *infra* and admitted by ATF (83 Fed. Reg. 13454), bump-firing can be done with a belt loop, a rubber band, or just one's finger. More importantly, no device – whether bump stock, belt loop, rubber band or finger –

---

[48] *See*, Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, *available at* https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section I the numerous procedural irregularities and issues that denied interested persons a meaningful opportunity to comment on the proposed rulemaking. For brevity, FPC incorporates into this Brief all exhibits attached to the Comment of Firearms Industry Consulting Group in the response to ATF-41P. All of Firearms Industry Consulting Group's exhibits in response to ATF-41P are available at https://www.regulations.gov/document?D=ATF-2013-0001-8364.

changes the intrinsic capability of the firearm to be bump-fired. This is made explicitly evident by Jerry Miculek, who can not only shoot faster than an individual employing bump-fire but can shoot far more accurately. [49]

Thus, the final rule in this matter is so completely arbitrary and capricious for the reasons discussed *infra* that it will not withstand scrutiny. *See, Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*, 463 U.S. 29, 42-44 (1983).

### i.   ATF's New Interpretation is Novel but Unpersuasive

As reflected in the expert report of former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, bump-stock-devices do not constitute a machinegun, as they are not designed to shoot more than one shot by a single function of the trigger. [50] Specifically, he declares that a "Slide Fire [stock] does not fire automatically with a single pull/function of the trigger" and as a result, "ATF could not classify the slide fire as a machinegun or a machinegun conversion device, as it did not fit the definition of a machinegun as stated in the GCA and NFA." [51] More importantly, although ATF has failed to disclose it in the NPRM or docket, the Slide Fire determination "was sent to Chief Counsel and higher authority for review. After much study on how the device operates, the opinion, based on definitions in the GCA and NFA, was

---

[49] *See* Exhibits 3 and 4 to Exhibit A. Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

[50] *See* Exhibit A at 900-908.

[51] *Id.*

that the Slide Fire was not a machinegun nor a firearm, and, therefore, did not require any regulatory control." [52]

Further, its new interpretation is in direct contradiction to prior determination letters, correspondences with members of Congress and even testimony offered in federal court, as discussed *supra*.

        ii.   *ATF's "Alternatives" to Bump Stocks Create the Same Result with Different Mechanisms*

Reflecting the absolutely arbitrary and capricious nature of this rulemaking, ATF admits – albeit at the end of the proposal in the "Alternatives" section – that an individual does not require a bump-stock-device in order to bump-fire a factory semi-automatic firearm. 83 Fed. Reg. 13454. In fact, ATF readily acknowledges that bump-firing can be lawfully achieved through the "use [of] rubber bands, belt loops, or [to] otherwise train their trigger finger to fire more rapidly," in a clear statement of its intent to unequally apply the law. *Id*.

Numerous videos and articles are available reflecting individuals bump-firing with everything from their finger to belt loops and rubber bands. For example, P.M.M.G. TV posted a video in 2006 of a rubber band being utilized to bump fire a factory semi-automatic firearm. [53] In 2011, StiThis1, posted a video of him utilizing his belt loop to bump-fire his AK-47. [54]

More importantly, reflecting that no device is necessary to bump-fire a factory semi-automatic firearm, ThatGunGuy45 posted a video of him bump-firing an AK-47 style rifle with

---

[52] *Id.*

[53] *See* Exhibit 11 to Exhibit A. A copy of the video is also available online – Shooting Videos, *Rapid manual trigger manipulation (Rubber Band Assisted)*, YouTube (Dec. 14, 2006), https://www.youtube.com/watch?v=PVfwFP_RwTQ&t.

[54] *See* Exhibit 12 to Exhibit A. A copy of the video is also available online – StiThis1, *AK-47 75 round drum Bumpfire!!!*, YouTube (Sept. 5, 2011), https://www.youtube.com/watch?v=-03y3R9o6hA.

his finger. [55] Similarly, M45 posted a video of him bump-firing both an AK-47 and AR-15 solely

with his finger. [56] In no better example, former ATF Acting Chief of the Firearms Technology

Branch Rick Vasquez, who previously reviewed bump-stock-devices – specifically the Slide Fire

bump-stock – while with ATF, after declaring that a bump-stock-device is not statutorily or

regulatorily a machinegun, [57] demonstrates the ability of a factory semi-automatic AR-15 and

AK-47 to bump-fire solely with his finger. [58] Expert Vasquez then goes on to declare, in

response to a question of what if Congress bans bump-fire devices, "[w]hat are they going to

ban? If they come out today and say the Slide Fire Stock or the binary trigger by name is made

illegal, they're going to have to make illegal the operating principle." *Id.*

Beyond showing that the proposed rulemaking in this matter is completely arbitrary and

capricious, as no device is even necessary to bump-fire a factory semi-automatic firearm, these

videos and others that are available on YouTube and other social media platforms, reflect that

law-abiding citizens have been "bump-firing" without the use of bump stock devices. Further,

ATF cannot produce a single shred of evidence of a bump-stock-device *ever* having been utilized

in a crime.

---

[55] *See* Exhibit 13 to Exhibit A. A copy of the video is also available online – ThatGunGuy45, *'Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45*, YouTube (Oct. 13, 2017), https://www.youtube.com/watch?v=-9fD_BX-afo&t.
[56] *See* Exhibit 14 to Exhibit A. A copy of the video is also available online – M45, *How to bumpfire without bumpfire stock*, YouTube (Oct. 8, 2017), https://www.youtube.com/watch?v=7RdAhTxyP64&t. *See also*, wrbuford13, How To: Bump fire a semi-automatic rifle from the waist, YouTube (May 25, 2011), https://www.youtube.com/watch?v=wZCO-06qRgY.
[57] During his interview, he declares "[i]f Congress wants to change the law and come up with a new interpretation, then ATF will follow that new interpretation. But until they do that, they have to go by the [law] they have today." *See* Exhibit 17 to Exhibit A. A copy of the video is also available online – Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube (Oct. 11, 2017), https://www.youtube.com/watch?v=kryIJIrD5eQ&t.
[58] *Id.*

iii.  *Jerry Miculek*

To put the absurdity of ATF's argument in perspective, a look at competitive sport shooter Jerry Miculek is necessary. Mr. Miculek not only can shoot faster than an individual employing a bump-stock-device but can shoot far more accurately.[59] Even more evident of the completely arbitrary and capricious nature of this proceeding is the video compendium of Mr. Miculek's abilities and achievements, which depicts that "he did it. He did 8 rounds in one second, on one target. He did 8 rounds on four targets in 1.06 [seconds]. Six shots and reload and six shots in 2.99 seconds."[60] Thus, as individuals can achieve, with greater accuracy, faster cyclic rates than those utilizing bump-stock-devices, the underlying premise of this proceeding is completely arbitrary and capricious.

To the extent ATF contends that it was carrying out some unverified and unsupported contention of Congress to ban anything mimicking the rate of fire of a machinegun[61] (83 Fed. Reg. 13447) – a rate of which varies greatly[62] and neither has a commonly accepted average rate nor a proposed rate by ATF – Mr. Miculek would seemingly be looking at some potential legal

---

[59] *See* Exhibits 3 and 4 to Exhibit A. Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

[60] *See* Exhibit 18 to Exhibit A. A copy of the video is also available online – *Fastest Shooter OF ALL TIME! Jerry Miculek | Incredible Shooting Montage*, DailyMotion (2014), https://www.dailymotion.com/video/x2y1eb8.

[61] In fact, ATF's assertion is contradicted by the testimony in enacting the NFA – previously cited to by ATF in federal court proceedings – which reflects the Congress' intent that guns which "require a separate pull of the trigger for every shot fired, … *are not property designated as machineguns.*" Exhibit A at 761.

[62] For example, the Metal Storm gun has a cyclic rate of fire of 1,000,000 rounds (that is not a typo), per minute (*see*, http://www.businessinsider.com/worlds-fastest-gun-2016-2), a minigun has a rate of fire of 6,000 rounds, per minute (*id.*), and some have as slow of a cyclic rate as 200 rounds, per minute (*see*, https://encyclopedia2.thefreedictionary.com/Cyclic+rate).

issues, in violation of his Constitutional Rights and reflecting the sheer absurdity of this final rule.

> iv.   *A Bump Stock is not a Machine Gun*

In the Summary for the NPRM, ATF claims that bump-stock-devices

> allow a shooter of a semiautomatic firearm to initiate a *continuous firing cycle with a single pull of the trigger*. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun *by functioning as a self-acting or self-regulating mechanism* that harnesses the recoil energy of the semiautomatic firearm in a manner that *allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter*. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with *a single pull of the trigger*.

83 Fed. Reg. 13442 (emphasis added).

A review of prior determinations by ATF may shed some light on the matter. On June 07, 2010, ATF issued a determination letter to Slide Fire, holding that

> The stock has *no automatically functioning mechanical parts or springs* and *performs no automatic mechanical function* when installed. In order to use the installed device, *the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand*. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act. [63]

Thus, ATF has already admitted that the Slide Fire stock does not operate automatically and is neither self-acting nor self-regulating.

About two years later, on April 2, 2012, ATF issued a determination letter to Bump Fire Systems, declaring that

> The FTB live-fire testing of the submitted devices indicates that if, as a shot is fired, an <u>intermediate</u> amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then

---

[63] *See* Exhibit A at 264. (emphasis added).

push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*.

…

Since your device is *incapable of initiating an automatic firing cycle* that continues until either the finger is released or the ammunition supply is exhausted, FTB find that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23). [64]

Once again, now in relation to Bump Fire Systems' bump-stock device, ATF found that bump-stock-devices are incapable of automatic firing and require a mechanical reset of the trigger – no different than any other semi-automatic firearm – and thus, are not capable of a continuous firing cycle with a single pull of the trigger.

This position is not only reflected in determination letters written by ATF but also in federal court. As reflected on page 20 of the U.S. Government's Brief in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in *Freedom Ordinance Mfg., Inc., v. Thomas E. Brandon*:

An ATF expert testified that a true trigger activating devices [i.e. bump-stock-devices], although giving the impression of functioning as a machine gun, are not classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*. [65]

ATF in sworn testimony and pleadings submitted to the United States District Court, Southern District of Indiana, admitted that the function of bump-stock-devices requires the shooter to separately pull the trigger each time he/she fires the gun, which is two-levels removed from being a machinegun. [66]

---

[64] *See* Exhibit A at 265-266. (emphasis in original, emphasis added).
[65] *See* Exhibit A at 708. (emphasis added).
[66] The use of the terminology two-levels removed from being a machinegun is in relation to the explicit definition of machinegun that was enacted by the Congress in 26 U.S.C. § 5845(b),

In response to the NPRM, a video was recorded depicting the actual function of a bump-stock-device. [67] As reflected in the video, a magazine full of ammunition is placed into an AR-15 type firearm that has a bump-stock-device manufactured by Slide Fire [68] installed onto it. The shooter then proceeds to fire the bump-stock equipped firearm with the stock in the locked position. [69] As depicted, the bump-stock-device neither self-acts nor self-regulates and the shooter proceeds to fire several rounds, without the bump-stock automatically firing more than one round, per function of the trigger. [70] [71] The video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. In fact, for a subsequent round to be fired, two single and separate functions of the trigger are necessary – the release of the trigger and the subsequent pull of the trigger, which is no different than any other factory semi-automatic firearm. The shooter then proceeds to unlock the stock so that it can move freely on the buffer tube and fire the gun one handed. Once again, the video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger

which for a firearm to constitute a machinegun, requires it to shoot "automatically more than one shot … by a single function of the trigger." As acknowledged by ATF, since the trigger is pulled (*i.e.* a single function of the trigger) and then released (*i.e.* a second and separate single function of the trigger), before the subsequent round can be fired, a bump-stock-device is two-levels removed from being a machinegun, as it still would not constitute a machinegun, even if a subsequent round was discharged on the release of the trigger. ATF has determined that this is a proper analysis of Section 5845(b) in approving binary triggers, which permit the discharge of a round on both the pull and release of the trigger.

[67] *See* Exhibit 28 to Exhibit A. A copy of the video is also available online – Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, (June 14, 2018), *available at* https://youtu.be/1OyK2RdO63U. *See also* Exhibit A at 910-911.

[68] The actual device is a Slide Fire SSAR-15 SBS.

[69] This position is the same as any other AR-15 type firearm with an adjustable stock.

[70] Thus, contrary to the NPRM, bump-stock-devices do not cause a continuous firing cycle with a single pull of the trigger.

[71] If the bump-stock-device actually turned the firearm into a machinegun, the entire magazine of ammunition would have been expended, when the shooter maintained constant pressure on the trigger. *See* Exhibit 26 to Exhibit A. A copy of the video is also available online – Molon Labe, *hogan 7 m16.wmv*, YouTube (Oct. 25, 2011), is https://www.youtube.com/watch?v=NwQ1aZnVLFA.

being released and reset. At not point does the gun fire more than one round per function of the trigger.

Additionally, the close-ups reveal, contrary to ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the trigger by the shooter" *is necessary* for subsequent rounds to be discharged. Of course, all of this is irrefutably consistent with ATF's prior determinations and sworn testimony and pleadings submitted to the courts.

When the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, while maintaining the trigger finger on the device's extension ledge with constant rearward pressure,[72] after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged – again no different than any factory semi-automatic firearm. Moreover, as evidenced by the close-ups, contrary to ATF's assertion (83 Fed. Reg. 13443, 13447), "bump-stock-type devices [*do not*] allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device," as the shooter in the video specifically maintains pressure on the extension ledge of the device the entire time; and yet, only a single round is discharged each time.

Former Acting Chief of the ATF's Firearms Technology Branch ("FTB") and Plaintiffs' expert Rick Vasquez was responsible for reviewing and making a determination on the Slide Fire stock, when it was submitted to the FTB for evaluation and classification.[73] After concluding that the Slide Fire stock was neither a firearm nor a machinegun under the NFA and GCA, the determination was "reviewed by ATF Chief Counsel and higher authorities within ATF and

---

[72] As described in the NPR. *See* 83 Fed.Reg. 13443.
[73] *See* Exhibit A at 900-908.

affirmed." *Id*. More recently, he reviewed the *Bump Stock Analytical* video [74] and declared that it "fully, explicitly, and accurately depicts the function of bump-stock-devices, including, but not limited to, the function and operation of the firearm's trigger, which is exactingly consistent with my evaluation and review of the Slide Fire stock during my tenure with ATF and my Slide Fire Analysis."[75] He then goes on to explain that as depicted in the video:

    a.   The bump-stock-device neither self-acts nor self-regulates, as the bump-stock never fires, in any of the three possible ways to fire a bump-fire-device, more than one round, per function of the trigger, even while the shooter maintained constant pressure on the extension ledge. In fact, as explicitly and accurately depicted in the slow motion portions, the bump-stock-device requires two functions of the trigger before a subsequent round can be discharged (*i.e.* after the firearm is discharged for the first time, the trigger must be fully released, reset, and then fully pulled rearward for a subsequent round to be discharged); [76]

    b.   Bump-stock-devices do not permit a continuous firing cycle with a single pull of the trigger, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired; [77]

    c.   The bump-stock-device requires additional physical manipulation of the trigger by the shooter, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired;

    d.   Even when the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintains the trigger finger

---

[74] Exhibit 28 to Exhibit A. Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, (June 14, 2018), *available at* https://youtu.be/1OyK2RdO63U.

[75] *See* Exhibit A at 901, ¶ 8.

[76] It must be noted, as made explicitly clear in the slow motion portions of the video, that the bump-stock-device actually requires over-releasing of the trigger, as the shooter's finger travels past the trigger reset by approximately a half-inch, before beginning the sequence to fire a subsequent round (*e.g.* video at 3:46 – 3:51; 3:52 – 3:55; 3:56 – 4:00). Thus, the video makes extremely evident and clear that bump-stock-devices are actually slower than a trained shooter, as a trained shooter, such as Jerry Miculek, would immediately begin the sequence to fire a subsequent round after the trigger resets.

[77] If the device had permitted continuous firing cycle with a single pull of the trigger, the video would depict a scenario identical to Exhibit 26 to Exhibit A (*also available at* https://www.youtube.com/watch?v=NwQ1aZnVLFA), where it clearly and accurately depicts the emptying of the entire magazine, while the shooter maintains constant pressure on the trigger.

on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged. *See* video at 3:47 – 4:01. This is no different than any factory semi-automatic firearm; and,

e. The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.

So where does this leave us? It leaves us with ATF's prior determinations and sworn testimony and pleadings submitted to the courts as being legally and factually indisputable, with the contrary statements in the NPRM being solely designed to carry out a false narrative on the functionality of bump-stock-devices and to appease Former Attorney General Jeff Sessions and President Donald Trump. [78]

In the NPRM, ATF contends that "[s]hooters use bump-stock-type devices with semiautomatic firearms to *accelerate the firearm's cyclic firing rate* to mimic automatic fire" (83. Fed. Reg. 13444)(emphasis added); yet, as supported by Expert Declaration of Vasquez and the Savage Comment, [79] the mechanical cyclic rate of both the semi-automatic and fully-automatic versions of a firearm are *identical* (and thus cannot be accelerated), except where the manufacturer purposely slows the rate of fire for the machinegun-version; whereby, in such instances, the semi-automatic-version can *exceed* the cyclic rate of the machinegun-version.

---

[78] *See* Memorandum of February 20, 2018 to Attorney General Sessions from President Donald Trump, "directing the Department of Justice to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns," *available at* https://www.whitehouse.gov/presidential-actions/presidential-memorandum-application-definition-machinegun-bump-fire-stocks-similar-devices.

[79] *See* Comment of Len Savage III of Historic Arms LLC., *available at* https://www.regulations.gov/document?D=ATF-2018-0002-31210

Accordingly, the entire premise that the Final Rule is based upon is arbitrary and capricious.

*      *      *      *

Thus, as Matthew Whitaker lacks the lawful authority to sign, execute, and implement the Final Rule  and the Final Rule violates the APA in numerous, incurable ways, Plaintiff is likely to succeed on the merits and is entitled to a preliminary injunction precluding the implementation and enforcement of it.

      b.  <u>Plaintiffs are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief</u>

In the absence of an order prohibiting ATF from implementing this final rule, the Plaintiffs will suffer irreparable harm. "To be irreparable, an injury must be 'certain and great,' 'actual and not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

First and foremost, allowing the Executive Branch to appoint an Acting Attorney General, in violation of two statutes which explicitly dictate who and how succession for a vacancy is to be filled, and then for that individual to take action as Attorney General – in essence, impersonating a federal official who is seventh in the line of succession for the U.S. Presidency – constitutes a "certain and great" harm. Furthermore, as Defendant Whitaker lacks the legal authority to sign, execute and implement the Final Rule, there can be no greater harm than to allow unimpeded enforcement of an unlawful and invalid act.

Moreover, the implementation of this Final Rule will force the Plaintiffs and others like them to dispose of their property – in the absence of due process and in violation of the takings clause of the U.S. Constitution – even though ATF committed numerous violations of the APA, proceeded in a manner that was wholly arbitrary and capricious and exceeded its authority in redefining a term that Congress had clearly defined. Further, as Slide Fire Solutions is no longer producing products, it would become almost impossible to replace the item should it be destroyed while attempting to comply with this final rule.

        c.   The Balance of Equities Tips in the Plaintiff's Favor

Absent a preliminary injunction, the Plaintiffs and those similarly situated will either be deprived of their lawfully owned property – by a regulation unlawfully and invalidly enacted by someone only purporting to be Attorney General, as well as, in the absence of due process and in violation of the takings clause of the U.S. Constitution – or face criminal prosecution, where they face the possibility of 10 years in jail, $250,000.00 in fines and forfeiture of the vessel the bumpstock device is found in, per violation. [80]

As ATF noted in the NRPM, its primary estimate of bump-stock-type devices in the hands of the public is 520,000.[81] In requesting a preliminary injunction, the Plaintiffs are merely seeking to preserve the status quo – being able to lawfully manufacture, possess and utilize bump-stock-type devices without threat of criminal charging – until a decision on the merits can be rendered.

Further, an injunction would not harm or prejudice the Defendants in any way. As described *supra*, ATF has not been able to name a single instance where a bump-stock-type

---

[80] *See,* 26 U.S.C. §§ 5861(d), (j), 5872; 18 U.S.C. § 3571.
[81] *See* 83 Fed. Reg. 13451.

device was utilized in a crime and even if, *arguendo*, Defendants could show a single instance of a bump-stock-type device being utilized in a crime, it still would not justify either stripping over half a million individuals of their lawfully obtained property or turning those individuals into criminals, in the absence of review of the legal challenges to the Final Rule by this Court. Thus, the issuance of a preliminary injunction results in the status quo for all Parties.

    d.  <u>An Injunction is in the Public Interest</u>

There is a public interest in enforcing compliance with the law. *Garnett v.* Zellinger, 313 F.Supp.3d 147, 159 (D.D.C. 2018) citing *Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142, 152 (D.D.C. 1993).

Injunctive relief is proper to to enforce compliance with the law and prevent the Executive Branch from running afoul of congressional intent. Further, an injunction is in the Public Interest, as it would defy logic and reason to allow an administrative agency to run amok, creating rules as it sees fit in direct contravention to the clear intent of Congress and in violation of the APA itself. Perhaps the Court of Appeals for the District of Columbia said it best

> Our answer is that when a person affected concretely, substantially and irreparably by administrative action, complains that the action is in direct violation of a statutory prohibition, the courts have power to entertain the complaint, and if it is proved to be well founded in fact and in law, to enjoin the action. The answer flows immediately from the ultimate fundamentals of the Constitution. The legislative power is in the Congress. It can permit and it can delineate its permission with a correlative prohibition. The Executive cannot make law, except in so far as the Congress authorizes him to implement legislation within the bounds of prescribed standards. When the Congress specifically prohibits the Executive from a particular act within the conceivable scope of a general legislative enactment, he has no power to do that act. It is an inherent power of the federal judiciary to enjoin such an act. That there be such power was one of the prime compelling reasons for the creation of the judicial branch as an independent and equal branch of the Government.

*Fleming v. Moberly Milk Products Co.*, 160 F.2d 259, 264 (D.C. Cir. 1947).

e.   No Bond or Other Security Payment is Required as a Condition of Relief

Courts in this Circuit have found the Rule "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States,* 169 F.3d 21, 33 (D.C.Cir.1999), including the discretion to require no bond at all. *Council on American–Islamic Rels. v. Gaubatz,* 667 F.Supp.2d 67, 80 (D.D.C.2009). Given the Defendants would not be harmed by the lack of a bond being posted and that an injunction would not financially harm the Defendants, this Court should waive the bond or security requirement found in Fed. R. Cvi. P. 65(c).

In the alternative, if this Court would disagree, Plaintiffs would respectfully request that any bond be nominal and be set as $1.00 United States currency.

**IV.     Conclusion**

As such, Plaintiffs and those similarly situated respectfully requests this Honorable Court issue a preliminary injunction for the reasons set forth above.

Respectfully Submitted,

_____
Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@CivilRightsDefenseFirm.com
Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@CivilRightsDefenseFirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 (t)
(610) 400-8439 (f)
Attorneys for Plaintiffs