Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@CivilRightsDefenseFirm.com

Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@CivilRightsDefenseFirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 (t)
(610) 400-8439 (f)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAMIEN GUEDES** | : | |
| Civil Rights Defense Firm, P.C. | : | |
| 646 Lenape Road | : | |
| Bechtelsville, PA 19505 | : | |
| | : | Civil Action No. 1:18-cv-2988 |
| **SHANE RODEN** | : | |
| Civil Rights Defense Firm, P.C. | : | |
| 646 Lenape Road | : | |
| Bechtelsville, PA 19505 | : | |
| | : | |
| **FIREARMS POLICY FOUNDATION** | : | |
| 4212 North Freeway Boulevard | : | |
| Suite 6 | : | |
| Sacramento, CA 95834 | : | |
| | : | Complaint – Violations of the |
| **MADISON SOCIETY FOUNDATION, INC.** | : | Administrative Procedures Act, |
| 210 South Sierra Avenue, Suite 204 | : | U.S. Constitution and Statutory law |
| Oakdale, CA 95361 | : | |
| | : | |
| **and** | : | |
| | : | |
| **FLORIDA CARRY, INC.** | : | |
| P.O. Box 1024 | : | |
| Lehigh Acres, FL 33970-1024 | : | |
| | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |

**BUREAU OF ALCOHOL, TOBACCO,**                                    :
**FIREARMS AND EXPLOSIVES,** an agency   :
of the Department of Justice                                       :
          99 New York Avenue, N.E.,               :
          Washington, DC 20226                    :
                                                               :
**MATTHEW WHITAKER,** in his official      :
  capacity as Acting Attorney General        :
  of the United States                              :
          United States Department of Justice  :
          950 Pennsylvania Avenue, NW        :
          Washington, DC 20530                   :
                                                               :
**THOMAS E. BRANDON,** Acting Director     :
Bureau of Alcohol, Tobacco, Firearms, and   :
Explosives                                                        :
          99 New York Avenue, N.E.,               :
          Washington, DC 20226                    :
                                                               :
**UNITED STATES OF AMERICA,**              :
          United States Attorney's Office        :
          555 4th Street, NW                         :
          Washington, DC 20530                   :
                                                               :
              **Defendants**               :

## AMENDED COMPLAINT

COMES NOW the Plaintiffs Damien Guedes, Shane Roden, Firearms Policy Foundation ("FPF"), Madison Society Foundation, Inc. ("MSF"), and Florida Carry, Inc. ("Florida Carry") by and through their attorneys, Adam Kraut, Esq. and Joshua Prince, Esq., of Firearms Industry Consulting Group, a division of Civil Rights Defense Firm, P.C., and complain of Defendants as follows:

## INTRODUCTION

1.     This is an action challenging the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") implementation and enforcement of an agency regulation under Docket No. ATF-2017R-22 ("Final Rule"), designed to prohibit as criminal the ownership,

possession or transportation of "bump-stock-type" devices by redefining them as "machineguns" for purposes of the criminal proscriptions under the National Firearms Act ("NFA") 26 U.S.C. § 5841, *et seq*., and the Gun Control Act ("GCA") 18 U.S.C. § 921, *et seq. See* 83 Fed.Reg. at 13442; https://www.regulations.gov/document?D=ATF-2018-0002-0001. Indeed, the effect of the Final Rule is that all "current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the [F]inal [R]ule." 83 Fed. Reg. at 13442.

2.      ATF's Notice of Proposed Rulemaking comes after years of public pronouncements and formal rulings in which the agency declared these very same types of devices are *not* "machineguns" and therefore are *not* subject to the criminal regulation that ATF now seeks to establish. These were representations of a government agency on which the public was entitled to do and did reasonably rely in purchasing, possessing, and using these devices.

3.      ATF's abrupt about-face on this issue in promulgating and implementing the Final Rule to criminalize that which it had for years expressly deemed legal under the law of Congress inherently smacks of agency abuse or dereliction of duty in following the law. *See Center for Science in Public Interest v. Department of Treasury*, 573 F. Supp. 1168, 1172 (D.C. 1983) ("sudden and profound alterations in an agency's policy constitute 'danger signals' that the will of Congress is being ignored").

4.      And, in fact, as Plaintiffs' complaint demonstrates, ATF's Final Rule is the product of serious, multi-dimensional legal violations rendering the process and the rule invalid, including, *inter alia*: ATF's procedural process violated the Administrative Procedure

Act ("APA"), 5 U.S.C. § 500, *et seq*., in numerous material ways; ATF's Final Rule significantly exceeds its statutory authority to promulgate regulations for purposes of implementing or enforcing the NFA or the GCA; any implementation or enforcement of the Final Rule would violate the fundamental constitutional protections against retroactive imposition of criminal punishment under *ex post facto* principles; it would constitute an unconstitutional taking without just compensation; and it would amount to a violation of the Contracts Clause by destroying the very reasonable investment-backed expectations that ATF itself established through its previous contrary determinations that the devices at issue are not "machineguns."

5.      What is more, in connection with its failure or refusal to provide for the proper form of public discourse before adopting the Final Rule (as one of the many ways in which ATF flouted the requirements of the APA), ATF failed or refused to respond to Plaintiff FPF's valid request for pertinent information under the Freedom of Information Act ("FOIA"), such that this Court's intervention is also necessary to compel ATF to produce the records it was legally required to produce not only during the rulemaking process but also in response to the FOIA request.

6.      Accordingly, the declaratory, injunctive, and other relief requested herein is necessary to prevent the implementation or enforcement of this illegal regulation or, at a minimum, to fairly compensate for the effective destruction of the property rights that any implementation or enforcement would cause in forcing the dispossession of bump-stock-type devices that ATF itself previously sanctioned as *lawful* firearm devices.

## PARTIES

7.  Plaintiff Damien Guedes is a natural person, a citizen of Whitehall, Pennsylvania and the United States, and a member of institutional Plaintiff FPF. Mr. Guedes purchased an AR15 BFSystem bump stock on October 30, 2014, from Bump Fire Systems ("BFSystem") in reasonable reliance upon one of ATF's previous letter rulings expressly determining that "bump-stock" devices of that type do *not* convert semiautomatic firearms into "machineguns" under the NFA and GCA. Plaintiff Guedes desires, and asserts that he would be entitled, to continue lawful possession and/or transportation of this bump-stock device but for the Final Rule.

8.  Plaintiff Representative Shane Roden is a natural person, who is the duly elected state representative for District 111 of the Missouri House of Representatives, a citizen of Cedar Hill, Missouri and the United States, and a member of institutional Plaintiff FPF. Furthermore, Representative Roden in addition to being a fulltime firefighter/paramedic since 2003, is a reserve sheriff deputy, and who, since 2004, has worked as a SWAT operator/medic, initially for the Franklin County Sheriff's Office and thereafter, since 2010, for the Camden County Sheriff's Office. In August of 2016, Representative Roden purchased a Slide Fire SSAR-15 at a cost of $150.00 in reasonable reliance upon ATF's previous determinations expressly determining that "bump-stock" devices of that type do *not* convert semiautomatic firearms into "machineguns" under the NFA and GCA. Plaintiff Roden desires, and asserts that he would be entitled, to continue lawful possession and/or transportation of this bump-stock device but for the Final Rule.

9.  Plaintiff FPF is a 501(c)(3) non-profit organization incorporated under the laws of Delaware. FPF's mission is to protect and defend the Constitution of the United States

and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms, and any related charitable and educational activities as permissible under law. On June 19, 2018, by and through counsel, FPF submitted comments in response and opposition to Defendant ATF's NPRM concerning the Final Rule. FPF is also the party who filed the FOIA request regarding the Final Rule, to which ATF never responded. FPF represents its members and supporters, including those who own and possess, or would own and possess, "bump-stock" devices that are or would be subject to the challenged Final Rule, and FPF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public, including Plaintiff Guedes.

10. Plaintiff MSF is a (501)(c)(3) non-profit organization incorporated under the laws of Nevada. MSF's mission is to promote and preserve the purposes of the Constitution of the United States, in particular the right to keep and bear arms, for its members and all citizens. MSF believes that individual constitutional rights should not be infringed to deny citizens their life, liberty, and pursuit of happiness. MSF is headquartered in Stanislaus County, California. The focus of MSF's litigation efforts is challenging violations of the right to keep and bear arms. Defendants' actions and failures alleged herein have caused MSF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action.

11. Plaintiff Florida Carry is a Florida not-for-profit corporation existing under the laws of Florida with its principal office in Lehigh Acres, Florida.  Florida Carry has over 30,000

registered members and supporters, including members residing in all counties through the state of Florida and in other states. Florida Carry's purpose is to defend and advance the fundamental civil right to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution and the Constitution of Florida, Declaration of Rights. Florida Carry owns a Slide Fire bump stock device, which is currently retained in Alabama. Florida Carry brings this action on behalf of itself and its members, including itself and those who own and possess "bump stock" devices that are or would be subject to the challenged Final Rule, and Florida Carry brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public.

12.    Defendant ATF is the federal government agency responsible for promulgating and enforcing regulations under the statutory provisions of the GCA and the NFA on which ATF has relied as the ostensible basis for its authority to issue the Final Rule.

13.    Defendant Matthew Whitaker ("Attorney General" or "Whitaker"), the Acting Attorney General of the United States, is sued in that official capacity. The Attorney General is responsible for executing and administering the laws, regulations, customs, practices, and policies of the United States including the implementation and enforcement of the Final Rule. The Attorney General is ultimately responsible for supervising the functions and actions of the United States Department of Justice, including the ATF, which is an arm of the Department of Justice.

14.    Defendant Thomas E. Brandon ("ATF Director" or "Brandon") is the Acting Director of the Bureau of ATF, and he is sued in the that official capacity. ATF is responsible for, *inter alia*, regulating and licensing the sale, possession, transfer, and transportation of

firearms and ammunition in interstate commerce, including "machineguns" as that term is

defined under the NFA, GCA, and any purported agency regulations of ATF. As Acting

Director of ATF, Defendant Brandon is responsible for the creation, implementation,

execution, and administration of the laws, regulations, customs, practices, and policies of

the United States, including implementation and enforcement of the Final Rule.

15.     Defendant United States of America ("United States") is a proper party in this action

pursuant to 5 U.S.C. §§ 702, 703.

## JURISDICTION AND VENUE

16.     This case concerns certain subject matter under the original and exclusive jurisdiction of

the federal courts of the United States of America.

17.     This action seeks relief pursuant to 5 U.S.C. §§ 552, 702, 703, 704; 26 U.S.C. § 7805;

and 28 U.S.C. §§ 1331, 1343, 1346, 2201, 2202, and 2412. Therefore, jurisdiction is

founded on 5 U.S.C. §§ 702 and 704 and 28 U.S.C. § 1331, as this action arises under the

Administrative Procedure Act, as well as the Constitution and laws of the United States.

18.     This Court has authority to award costs and attorney fees pursuant to 18 U.S.C. § 924, 5

U.S.C. § 552(a)(4)(E)(i), and 28 U.S.C. §§ 1920, 2412.

19.     Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2),

(e)(1)(B), as a substantial part of the events and omissions giving rise to the claims

occurred in the District of Columbia.

## STATEMENT OF FACTS COMMON TO ALL DEFENDANTS

*Publication of the ANPRM*

20.   On December 26, 2017, ATF published the ANPRM in the Federal Register and on

federalregister.gov, seeking public input concerning its proposed new treatment of

"bump-stock-type" devices under the Final Rule. 82 Fed. Reg. at 60929;

https://www.federalregister.gov/documents/2017/12/26/2017-27898/application-of-the-

definition-of-machinegun-to-bump-fire-stocks-and-other-similar-devices.

21.   In the ANPRM, ATF sought certain information pertaining to bump stocks including, but

not limited to: calendar years produced; economic impact of ATF classifying bump

stocks as machine guns; use(s) for which the device was marketed; number of bump

stocks sold; and purposes bump stocks are used for.

*Publication of the NPRM*

22.   On March 29, 2018, ATF published its NPRM concerning the Final Rule in the Federal

Register and on federalregister.gov. 83 Fed. Reg. at 13442;

https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-

devices.

23.   In the NPRM, ATF stated, *inter alia*, that

> When a bump-stock-type device is affixed to a semiautomatic firearm, however,
> the device harnesses the recoil energy to slide the firearm back and forth so that
> the trigger automatically re-engages by "bumping" the shooter's stationary trigger
> finger without additional physical manipulation of the trigger by the shooter. The
> bump-stock-type device functions as a self-acting and self-regulating force that
> channels the firearm's recoil energy in a continuous back-and-forth cycle that
> allows the shooter to attain continuous firing after a single pull of the trigger so
> long as the trigger finger remains stationary on the device's extension ledge (as
> designed). No further physical manipulation of the trigger by the shooter is
> required.
>
> …

These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

83 Fed. Reg. at 13443, 13446.

24.     ATF announced that its intention behind the new rule was "to clarify that 'bump fire' stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are 'machineguns' as defined by the [NFA] and the [GCA], because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of a trigger." 83 Fed. Reg. at 13442. Both the NFA and GCA define "machinegun" to include any "weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," as well as the frame or receiver of such a weapon or any parts or combination of parts that could be converted or assembled into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. At the time of the NPRM, the regulations under 27 C.F.R. §§ 478.11 and 479.11 contained the same general definition of "machinegun." ATF's new rule would amend these to specifically define "single function of the trigger" to mean "single pull of the trigger," and to define "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 Fed. Reg. at 13442.

25.     ATF acknowledged it had made a series of previous determinations over the last decade that declared the same kind of "bump-stock-type" devices – operating with the same sort of functionality that the new rule seeks to prohibit – did *not* constitute "machineguns"

within the meaning of the governing law. Specifically, ATF admitted that between 2008 and 2017, it issued classification decisions and letter rulings concluding that "'bump-stock-type' devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter, do not fire 'automatically'" within the meaning of a "machinegun" as that term is defined under the law. 83 Fed. Reg. at 13443, 13445.

26.    Further, although now seeking to prohibit "all bump-stock-type devices" through the Final Rule on the basis that additional "legal analysis" supports the opposite conclusion that they convert the firearm into a prohibited "machinegun," 83 Fed. Reg. at 13443, ATF's NPRM at the same time conceded that such devices are neither essential nor necessary to this functionality of a firearm because individuals can "replicate the effects of bump-stock-type devices" through myriad other means, such as by "us[ing] rubber bands, belt loops, or otherwise train[ing] their trigger finger to fire more rapidly," *id.* at 13454.

27.    Comments were required to be submitted on or before June 27, 2018. Fed. Reg. at 13446. Plaintiff FPF submitted its comment on June 19, 2018.[1] In its Comment, FPF documented numerous deficiencies regarding ATF's NPRM, including, but not limited to, several of the procedural and substantive violations giving rise to the causes of action

---

[1] This comment was posted publicly on Regulations.gov on June 26, 2018. *See* https://www.regulations.gov/document?D=ATF-2018-0002-61777 and https://www.regulations.gov/document?D=ATF-2018-0002-61778. The comment was broken into two separate sections due to the size. Certain media submitted as part of the comment are unavailable for public viewing because the website is incapable of hosting or displaying the content. A copy of the comment and its supporting exhibits are attached hereto and incorporated herein as Exhibit A. Any exhibits that cannot be filed via the Court's ECF system due to their electronic nature will be included on a notice as required by Local Rule 49(e)(1) and are referred to herein by the exhibit number it was assigned in the comment. In any instance where it is possible to link to another source where the material may be found, the undersigned has done so.

in this case: 1) ATF's exceeding its statutory authority in the promulgation of the Final

Rule; 2) the arbitrary and capricious nature of the Final Rule; and 3) ATF's failure to

provide the necessary supporting documents in the rulemaking process, thereby denying

interested all parties an opportunity to fully consider and respond to the claims made by

ATF in support of the Final Rule.[2]

*Execution of the Final Rule*

28.     On December 18, 2018, Defendant Matthew Whitaker executed the Final Rule; thereby,

        purportedly making effective the Final Rule, RIN 1140-AA52, Docket No 2018R-22F.

29.     The Final Rule, executed by Defendant Whitaker, was published and otherwise made

        available online at https://www.justice.gov/opa/pr/department-justice-announces-bump-

        stock-type-devices-final-rule [3] and www.atf.gov/rules-and-regulations/bump-stocks [4] [5] on

---

[2] According to Regulations.gov, ATF received a total of 193,297 comments about the NPR. It is unclear whether this number reflects the number of comments actually received and published by ATF or whether it excludes any comments that ATF may have refused to accept for some reason (e.g., profane content). *See* https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices (where ATF declared that it would "not consider, or respond to, comments that do not meet these requirements or comments containing profanity," even though such speech is protected by the First Amendment to the U.S. Constitution).

[3] On DOJ's website, it declares: "Today, Acting Attorney General Matthew Whitaker announced that the Department of Justice has amended the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), clarifying that bump stocks fall within the definition of "machinegun" under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."

[4] On ATF's website, it specifies: "On December 18, 2018, Acting Attorney General Matthew Whitaker announced that the Department of Justice has amended the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), clarifying that bump stocks fall within the definition of "machinegun" under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."

[5] The link to download the Final Rule on both DOJ's and ATF's websites is www.justice.gov/opa/press-release/file/1120876/download.

December 18, 2018 and all Plaintiffs obtained and reviewed the Final Rule on December

18, 2018.

30.   On December 21, 2018, a link was published on the Federal Register website –

https://www.federalregister.gov/documents/2018/12/26/2018-27763/bump-stock-type-

devices – to download a copy of the Final Rule.

31.   On December 26, 2018, the Final Rule was published in the Federal Register.

https://www.govinfo.gov/content/pkg/FR-2018-12-26/pdf/2018-27763.pdf

32.   The Final Rule, spanning 157 pages, implements changes to 27 C.F.R. ¶¶ 447.11, 478.11,

479.11, almost identical to the proposed changes in the NPRM.

33.   Specifically, modifies the definition of "Machinegun" in Section 447.11 such that,

pursuant to the Final Rule, it will provide:

> A "machinegun", "machine pistol", "submachinegun", or "automatic rifle" is a
> firearm which shoots, is designed to shoot, or can be readily restored to shoot,
> automatically more than one shot, without manual reloading, by a single function
> of the trigger. The term shall also include the frame or receiver of any such
> weapon, any part designed and intended solely and exclusively, or combination of
> parts designed and intended, for use in converting a weapon into a machinegun,
> and any combination of parts from which a machinegun can be assembled if such
> parts are in the possession or under the control of a person. For purposes of this
> definition, the term "automatically" as it modifies "shoots, is designed to shoot, or
> can be readily restored to shoot," means functioning as the result of a self-acting
> or self-regulating mechanism that allows the firing of multiple rounds through a
> single function of the trigger; and "single function of the trigger" means a single
> pull of the trigger and analogous motions. The term "machinegun" includes a
> bump-stock-type device, i.e., a device that allows a semiautomatic firearm to
> shoot more than one shot with a single pull of the trigger by harnessing the recoil
> energy of the semi-automatic firearm to which it is affixed so that the trigger
> resets and continues firing without additional physical manipulation of the trigger
> by the shooter.

83 Fed. Reg. at 66553-66554.

34.   Specifically, modifies the definition of "Machine gun" in Section 478.11 such that,

pursuant to the Final Rule, it will provide:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

35. Specifically, modifies the definition of "Machine gun" in Section 479.11 such that, pursuant to the Final Rule, it will provide:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

*ATF's Failure to Respond to FPF's FOIA and Comply with APA Requirements*

36. In connection with its NPRM, ATF failed to include in the agency docket folder any supporting documentation for its newly formed determination that its previous, directly opposite conclusion about bump-stock-type devices "does not reflect the best interpretation of 'machinegun'" under the NFA and GCA. 83 Fed. Reg. at 13443. [6]

---

[6] Interestingly, in support of the Final Rule, ATF referred to a number of documents, which were never provided to the public. *See* 83 Fed. Reg. at 66518 FN 4 "Examples of recent ATF

37.     As a result, on March 30, 2018, the day after ATF published the NPRM, Plaintiff FPF

        submitted an expedited FOIA Request seeking the following documentation: "all ATF

        determinations relative to devices referred to as 'bump stocks' and 'bump-fire stocks' by

        ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No.

        2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well

        as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms relative to

        each determination, and any versions or drafts of the determinations, which were

        different than the final determination."[7] ATF also received "correspondence[s] from

        members of the United States Senate and the United States House of Representatives, as

        well as nongovernmental organizations, requesting that ATF examine its past

        classifications and determine whether bump-stock-type devices currently on the market

        constitute machineguns under the statutory definition." 83 Fed. Reg. at 13446.

38.     These requests were made several months ago now and yet, to date, ATF has not

        responded at all to the FOIA request, and it has not otherwise made available to the

        public in the docket folder or elsewhere any of the requested documents or any other

        documentation in support of its Final Rule. Most notably, ATF has not disclosed any of

---

classification letters relying on the 'single pull of the trigger' interpretation to classify submitted devices as machineguns include the following…" (citing to April 13, 2015 ATF determination letter and an October 7, 2016 ATF determination letter). *See also* 83 Fed. Reg. at 66519 (referencing rulings from 2008-2017 which were never provided to the public in relation to the NPRM). By ATF's failure to even mention these documents in the ANPRM and NPRM, let alone provide them in the docket, Defendants precluded the public, including Plaintiffs, from reviewing these determinations and commenting on their applicability; thereby, denying the public, including Plaintiffs, an opportunity for meaningful review.

[7] For purposes of the FOIA Request, "[t]he use of the word 'determinations' shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF." *See* Exhibit A at 75-78.

the prior classification decision or letter rulings that concluded bump-stock-type devices <u>do not</u> constitute firearms, let alone "machineguns" under the law.

*ATF's Failure or Refusal to Grant FPF's Request for Hearing*

25.   In their comment, FPF also requested an opportunity to be heard at a hearing before ATF implemented any rule or regulation in relation to this NPRM, pursuant to U.S.C. section 926(b). [8] 83 Fed. Reg. at 13456. The NPRM stated that "[a]ny interested person who desires an opportunity to comment orally at a public hearing should submit his or her request, in writing, to the Director of ATF within the 90-day comment period." 83 Fed. Reg. at 13456. However, ATF also declared, in violation of Section 926(b), that the matter of granting such a hearing was left to the discretion of the ATF Director as to whether it was "necessary." *Id.*

26.   Out of an abundance of caution, FPF also sent a separate letter on June 15, 2018 to Acting Director Brandon, which requested a hearing, and included a copy of the letter as Exhibit 34 to its Comment. *See* Exhibit A at 913.

27.   Nevertheless, ATF never granted FPF any such process, and never even responded to the request for such a hearing, other than to simply refuse to provide FPF with a hearing in the Final Rule, without even addressing 18 U.S.C. § 926(b)'s mandate that ATF "*shall* afford interested parties opportunity for hearing, *before* prescribing…rules and regulations." 83 Fed. Reg. at 66542.

---

[8] This statute provides: "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."

*Procedural Irregularities with Comment Period*

39.    Not only did ATF fail to provide the material supporting documentation despite the formal requests for it, the comment period was littered with additional procedural irregularities and errors.

40.    Immediately upon the publication of the NPR on March 29, 2018, the following advisory appeared on federalregister.gov:[9] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience." Exhibit A at 17.

41.    And, in fact, the website was not accepting comments. When people complained to the Federal Register that they could not submit their comments online, the Federal Register responded that they could not be of any help. *See* Exhibit A at 17.

42.    Upon information and belief, it was not until April 2, 2018 (*i.e.* five days into the comment period) that the declaration that "COMMENT PERIOD CLOSED" was removed from federalregister.gov by ATF and that interested individuals were able to submit comments. Unfortunately, upon information and belief, numerous individuals, due to the declaration on federalregister.gov "COMMENT PERIOD CLOSED," were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never informed, after ATF removed the declaration and permitted comments to be filed, that they could then submit comments.

43.    Further, while the public was directed to federalregister.gov as a resource for all relevant information and as a vehicle through which to submit comments regarding the Final Rule,

---

[9] The website address where this advisory appeared was https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices.

the website's content was confusing and convoluted. The NPRM identified the

rulemaking procedures under "Docket No. 2017R-22," but the information on the website

related to these proceedings made no mention of this docket number. Instead, it referred

to two *different* docket numbers (ATF-2018-0002 and ATF-2018-0002-0001), and these

dockets concerned the ANPRM, for which the comment period had closed in January.

44.     The confusing and convoluted display of the information on federalregister.gov was

documented in an article Carl Bussjaeger on April 2, 2018, titled *[Update] Bumbling*

*Machinations on Bump Stocks?* Exhibit A at 164-173; *see*

http://zelmanpartisans.com/?p=5071 and http://zelmanpartisans.com/?p=5055 for copies

of this publication.

45.     When Mr. Bussjaeger inquired of ATF about the issues, an ATF Senior Industry

Operations Investigator responded that he should refer to

https://www.regulations.gov/document?D=ATF-2018-0002-0001, which contains the

ANPRM and the NPRM, including information on the submission of comments.

However, ATF failed to supply this or any other clarifying information to the public at

large concerning where to locate the relevant material and how to submit their comments.

46.     In the Final Rule, the Government admits to there being procedural issues with the

comment period and declares that (1) "[t]he Department acknowledges that upon

publication of the NPRM on March 29, 2018, there was some confusion within the first

24 to 48 hours about submitting comments through the Federal eRulemaking Portal," (2)

"that on March 29, 2018, when the comment period opened for the NPRM, the link for

submitting comments to the NPRM had been inadvertently connected to the

Regulations.gov Docket ID number 2018–0001–0001, which had been used by the

Regulations.gov website for the ANPRM comment period, December 26, 2017, through January 25, 2018," and (3) that ATF "acknowledges that there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM." 83 Fed. Reg. at 66541-42.

47.    On information and belief, Plaintiffs allege that, as a result of these technical irregularities and errors in ATF's rulemaking process, numerous people were precluded from being able to timely submit their comments and ATF ultimately never received or actually considered all the comments submitted under the different docket numbers.

### STATEMENT OF FACTS CONCERNING PLAINTIFF GUEDES

48.    In 2014, Mr. Guedes became interested in a bump stock device. Exhibit A at 274-75. Before purchasing such a device, Mr. Guedes accessed BFSystems's website to determine whether ATF had approved the particular device he sought to purchase. BFSystems's website stated that ATF had approved the device in a written determination letter dated April 2, 2012. *Id.* at 277-78.

49.    Relying upon this determination from ATF, Mr. Guedes purchased an AR15 BFSystem for $99.99, which he still possesses today. *Id.* at 280.

### STATEMENT OF FACTS CONCERNING PLAINTIFF RODEN

50.    Representative Roden is the duly elected state representative for District 111 of the Missouri House of Representatives, having been initially elected, by the citizens of District 111, in 2014, and since, reelected every two years; whereby, he is currently serving his third term as state representative.

51.   Since 2003, Representative has worked fulltime as a firefighter/paramedic, in addition to being a reserve deputy Sheriff.

52.   In 2004, Representative Roden attended the Missouri Sheriffs' Association Training Academy, where he graduated with a POST class A license, which he has maintained since issuance; thereby resulting in him being a reserve sheriff deputy.

53.   From 2004 through 2009, Representative Roden worked at the Franklin County Sheriff's Office and from 2010 through the present, he works at the Camden County Sheriff's Office as a reserve assigned to road patrol and a SWAT operator/medic.

54.   In August of 2016, he purchased a Slide Fire SSAR-15 at a cost of $150.00, only after becoming aware that ATF issued several determinations that bump-stock-devices do not constitute machine guns nor firearms, under the GCA or NFA.

55.   Representative Roden still possess his Slide Fire SSAR-15, today.

## STATEMENT OF FACTS RELATED TO MATTHEW THOMPSON

56.   In 2017, Matthew Thompson ("Mr. Thompson") became interested in a bump stock device. Exhibit A 282-83.

57.   Before purchasing such a device, Mr. Thompson accessed Slide Fire's website to determine whether ATF had approved the particular device he sought to purchase. Slide Fire's website stated that ATF had approved the device in a written determination letter dated June 7, 2010. *Id.*

58.   Relying upon this determination from ATF, Mr. Thompson purchased a Slide Fire bump stock for $134.00, which he still possesses today. *Id.*

## COUNT I: ADMINISTRATIVE PROCEDURE ACT VIOLATIONS

59.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

60.   A reviewing court may "hold unlawful and set aside agency action … found to be –
      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."
      5 U.S.C. § 706(2)(A).

*Failure to Provide the Underlying Documents*

(Plaintiff FPF Against All Defendants)

61.   The APA imposed upon ATF the affirmative duty to respond to "any request for records
      which (i) reasonably describes such records and (ii) is made in accordance with published
      rules" by "mak[ing] the records promptly available" to the requester. 5 U.S.C. §
      522(a)(3)(A). An agency's failure to properly discharge this duty gives rise to a cause of
      action in the nature of the claim Plaintiffs have brought here, through which the district
      court is empowered to compel disclosure of the records improperly withheld, 5 U.S.C. §
      552(a)(4)(B), and to assess "reasonable attorney fees and other litigation costs reasonably
      incurred in any case under this section in which the complainant has substantially
      prevailed," 5 U.S.C. § 552(a)(4)(E)(i).[10]

62.   Here, despite proper requests by FPF "made in accordance with published rules" several
      months ago now concerning the NPRM, and even a separate formal FOIA request by
      FPF, Exhibit A at 75-77, ATF has failed or refused to provide any of the requested
      records, or any other supporting documents, to FPF or the public. Moreover, in support of

---

[10] In such situations, if "the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding." 5 U.S.C. § 552(a)(4)(F)(i).

the Final Rule, ATF referred to a number of documents, which it admits were never provided to the public nor were they even mentioned in the ANPRM or NPRM. *See* 83 Fed. Reg. at 66518 FN 4 "Examples of recent ATF classification letters relying on the 'single pull of the trigger' interpretation to classify submitted devices as machineguns include the following…" (citing to April 13, 2015 ATF determination letter and an October 7, 2016 ATF determination letter). *See also* 83 Fed. Reg. at 66519 (referencing rulings from 2008-2017 which were never provided to the public in relation to the NPRM). By ATF's failure to even mention these documents in the ANPRM and NPRM, let alone provide them in the docket, Defendants precluded the public, including Plaintiffs, from reviewing these determinations and commenting on their applicability; thereby, denying the public, including Plaintiffs, an opportunity for meaningful review. As such, the agency has failed or refused to justify or supply any basis for the ostensibly "extensive legal analysis" motivating its decision to criminalize all "bump-stock-type devices" as prohibited "machineguns" under its Final Rule. Fed. Reg. at 13443.

63.    ATF's failure to discharge its statutorily-imposed duty to make the requested record "*promptly* available" in response to the request of FPF improperly deprived them, and ultimately the rest of the public, of their important statutorily-created opportunity to fully consider and participate in the APA's public comment process, which is designed to ensure government transparency and a properly informed citizenry in the establishment of agency regulations.

64.    Wherefore, Plaintiff FPF is entitled to the relief prayed for herein.

### *Failure to Provide 90-Day Comment Period*

(All Plaintiffs Against All Defendants)

65.  Under 18 U.S.C. § 926(b), ATF was statutorily obligated to provide at least a 90-day public comment period to facilitate the public discourse intended under the APA.

66.  Nevertheless, in addition to failing to provide any supporting documents to the public at large – or even to FPF in response to its properly presented formal record requests – ATF failed or refused to provide for this crucial public comment process.

67.  As described above, immediately upon the publication of the NPR, the portal through which concerned citizens were directed to submit online comments, was shut down and the website specifically declared that the comment period was "closed."

68.  As a result, for a minimum of five days of the statutorily required ninety-day comment period, interested individuals were deprived of their ability to submit comments.

69.  Even ATF admits "that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal," and that "there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM." 83 Fed. Reg. at 66541-42.

70.  Furthermore, numerous individuals, due to the declaration on federalregister.gov, were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never informed, after ATF removed the declaration and permitted comments to be filed, that they could now submit comments.

71.  Wherefore, Plaintiffs are entitled to the relief prayed for herein.

*Failure to Consider Cost-Impact and Erroneous Cost Estimate*

(All Plaintiffs Against All Defendants)

72.  ATF flat out ignored any analysis in relation to a cost impact, as the proposed rule fails to provide information on how the Government will fulfill its obligation to compensate affected individuals for the taking.

73.  As reflected in the NPRM, ATF assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. 13451. The proposal then declares the primary estimated cost to be $96,242,750.00 based on ATF's primary estimate of 520,000 bump-stock-devices having been produced. *Id*.

74.  However, multiplying ATF's stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not $96,242,750.00 as stated in Table 3 of NPRM.

75.  Moreover, by averaging the acknowledged prices for bump-stock-devices, a proper average sale price should be $302.95, which would result in a primary estimated cost of $157,534,000.00 in just compensation being due.

*Failure to Provide Plaintiff FPF a Hearing*

(Plaintiff FPF Against All Defendants)

76.  Under 18 U.S.C. § 926(b), ATF was also expressly required to "afford interested parties opportunity for hearing, before prescribing such rules and regulations."

77.  In contravention of the clear mandate that the agency "*shall* afford" such hearings, ATF purported to transform this mandatory obligation into a discretionary option for itself, by declaring in the NPRM that such hearings ultimately would be granted only if the

Director found it "necessary" to do so. 83 Fed. Reg. at 13456. The NPRM included no objective standards or criteria controlling or limiting the Director's determination here and therefore essentially vested the Director with unbridled discretion to deny hearings.

78.   Moreover, in an apparent exercise of this unchecked discretion that the agency purportedly created for itself in violation of section 926(b), ATF failed and refused to provide FPF any opportunity for a hearing before implementing the Final Rule despite the organizations' formal requests for such a hearing.

79.   Wherefore, Plaintiff FPF is entitled to the relief prayed for herein.

## *The Final Rule is Arbitrary and Capricious*

80.   "On February 20, 2018, the President issued a memorandum to the Attorney General concerning 'bump fire' stocks and similar devices...The President then directed the Department of Justice, working within established legal protocols, 'to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.'"   83 Fed. Reg. at 66516-66517.

81.   Let there be no mistake, President Trump directed the ATF, through the Attorney General, to ban bump-stock devices, before the notice and comment period was even initiated and without consideration for the legal authority of ATF to regulate bump-stock devices or the public, including Plaintiffs, being afforded an unbiased review of their comments. *See*, https://www.cnn.com/2018/02/20/politics/donald-trump-bump-stocks/index.html.

82.    As noted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the Cato Institute in

their comment, Comments to the Bureau of Alcohol, Tobacco, Firearms and Explosives,

*In the Matter of* The Language of the National Firearms Act and Definition of

"Machinegun" submitted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the

Cato Institute, *available at* https://www.regulations.gov/document?D=ATF-2018-0002-

65898, the rulemaking process, before its inception, "was a fait accompli" and that

President Trump admitted that he would write out bump-stock devices through executive

action and even stated, "I'll do that myself because I'm able to."  Directly on point, the

Cato Comment recounts that moments before the rulemaking was announced, "President

Trump tweeted: … As I promised, today the Department of Justice will issue the rule

banning BUMP STOCKS with a mandated comment period. We will BAN all devices

that turn legal weapons into illegal machine guns."

83.    The Cato Comment then continues on, citing to Josh Blackman, *Presidential*

*Maladministration*, 2018 Il. L. Rev. 397 at 405, [11] that:

> To be clear, there is no problem when the president exercises his constitutional
> authority to direct the actions of his principal officers. There can be a problem,
> however, when those actions *reverse* past executive actions by *discovering* new
> authority in old statutes. One of us has referred to the former phenomenon as
> *presidential reversals* and the latter as *presidential discovery*. When interpreting
> an unambiguous statute, courts should hesitate before deferring to exercises of
> reversal coupled with discovery.

84.    As previously noted, a reviewing court may "hold unlawful and set aside agency action

… found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and

---

[11] "The first species of presidential maladministration is by far the most commonplace: when the
incumbent administration abandons a previous administration's interpretation of a statute. Every
four to eight years, to comply with the new President's regulatory philosophy, political
appointees in agencies alter certain interpretations of the law."

capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (2017 D.C. Cir.) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43).

85.   Here, given its failure or refusal to produce any records in support of the Final Rule, ATF has presented *no* evidence in support of its "legal analysis" leading to the unprecedented conclusion that bump-stock-type devices are "machineguns" because "they convert a semiautomatic firearm into a firearm that shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 83 Fed. Reg. at 13443. And all the *known* evidence runs directly counter to this conclusion.

86.   Experts opining *on behalf of* ATF have consistently concluded that commonly used bump-stock-type devices manufactured by Slide Fire and Bump Fire Systems do *not* function so as to convert the associated firearm into a "machinegun" because, in fact, the shooter must still separately pull the trigger to fire each successive shot. *See* Exhibit A at 901 and 908 (expert report of Rick Vasquez, former Acting Chief of Firearms Technology Branch); *id.* at 708 (expert testimony of Thomas E. Brandon, ATF Deputy Director, in *Freedom Ordnance Mfg. v. Thomas E. Brandon*).

87.   Additionally, FPF placed before the agency, as part of its comment, compelling video evidence in which an AR-15 type of firearm fitted with a Slide Fire bump stock device was fired in multiple ways,[12] Exhibit 28 to Exhibit A,[13] including in precisely the same

---

[12] The video depicts the firearm being shot in three different manners: first with the stock in a "locked" position (meaning that the stock does not move); second with the stock unlocked (so that the stock may move freely); and finally, again with the stock unlocked but in the manner

manner that the NPRM emphasizes as creating "machinegun" functionality – *i.e.*, where the shooter maintains "constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger," 83 Fed. Reg. at 13444. As this evidence clearly demonstrates, in all methods of firing, the bump stock device does not, as ATF claims in the NPRM, function as "a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 Fed.Reg. at 1344. Rather, the video shows that each shot requires a *separate* pull of the trigger. Exhibit 28 to Exhibit A. This most notably includes the form of firing on which ATF relies to make its claim, as the video plainly and indisputably illustrates that, even when fired in this manner, the trigger must be released, reset, and pulled completely rearward before the next shot can be fired. *Id.* [14] Thus, at no point does the firearm fire more than one round, by a single function of the trigger. *Id*. Moreover and consistently, the close-ups reveal, contrary to ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the trigger by the shooter" *is necessary* for subsequent rounds to be discharged. *Id.*

88.    Indeed, Mr. Vasquez, the former Acting Chief of FTB, viewed the *Bump Stock Analytical* video and attested it "fully, explicitly, and accurately depicts the function of bump-stock-devices, including, but not limited to, the function and operation of the firearm's trigger,

---

described in the NPR itself (maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure").

[13] This video can also be viewed online at the following link: https://youtu.be/1OyK2RdO63U (Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*).

[14] *See* 83 Fed. Reg. at 66534 declaring that "[w]hile semiautomatic firearms may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired." The operation of a bump-stock-type device is no different than another other semiautomatic firearm as depicted in the video exhibit, Exhibit 28 to Exhibit A.

which is exactingly consistent with my evaluation and review of the Slide Fire stock

during my tenure with ATF and my Slide Fire Analysis." Exhibit A at 901.

89.     As Mr. Vasquez further explained (Exhibit A at 903):

> The bump-stock-device does not permit automatic fire by harnessing the recoil
> energy of the firearm. Harnessing the energy would require the addition of a
> device such as a spring or hydraulics that could automatically absorb the recoil
> and use this energy to activate itself. If it did harness the recoil energy, the bump-
> stock equipped firearm in the video would have continued to fire, while the
> shooter's finger remained on the trigger, after pulling it rearwards without
> requiring the shooter to release and reset the trigger and then pull the trigger
> completely reward for a subsequent round to be fired.

90.     Moreover, *even assuming* bump-stock-type devices do or could produce such

machinegun-like effects (something Plaintiffs do not concede given the evidence clearly

demonstrating otherwise), ATF's own analysis in the NPRM tellingly undermines the

validity of the conclusion on which its new rule is based, because it reveals the

underlying rationale is capricious, absurd, and invites total arbitrariness.

91.     As noted, because bump-firing is produced by a *technique* and not a particular device,

ATF admits that this method of firing can be produced by myriad means totally unrelated

to any bump-stock-style device, such as through certain fashioning of rubber bands or

belt loops, or by simply training one's trigger finger to fire more rapidly. 83 Fed. Reg. at

13454. This acknowledgement can lead to one of only two untenable conclusions: First,

ATF is *explicitly approving* the use of such techniques to produce machinegun-like

effects, which cannot reasonably be squared with its claim that regulation of bump-stock-

type devices is urgently necessary prevent mass-shooting mayhem.[15] Second, ATF is

---

[15] One could draw this inference from ATF's statement that, for those individuals who seek to do
so, these manual manipulations of semiautomatic firearms "would be their alternatives to using
bump-stock-type devices," 83 Fed. Reg. at 13454, which arguably implies that while attempting

declaring that *any* such manipulations of a semiautomatic firearm to produce this shooting capability is subject to regulation under the Final Rule just the same as if the firearm were a "machinegun." This *does* square logically with the thesis of ATF's NPRM that this *functionality* of firearms, in general, must be stamped out to prevent mass shootings, *but* such a rationale leads to the absurd result that people could be arrested, prosecuted, and convicted of illegal "machinegun" possession, and additionally lose not only their firearms but their Second Amendment rights pursuant to 18 U.S.C. § 922(g)(1), simply because they employed a *technique* on some occasion that happened to produce a "bump-fire" effect.

92.  Either way, all the known evidence (as well as logic and common sense) before ATF and elsewhere concerning the *actual* functionality and utility of bump-stock-type devices, runs diametrically counter to the conclusion on which ATF's Final Rule rests. Therefore, the Final Rule cannot be sustained and instead must be stricken as invalid. *Stand Up for California! v. United States DOI*, 204 F. Supp. 3d 212, 245 (D.C. 2016) (quoting *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1021, 338 U.S. App. D.C. 168 (D.C. Cir. 1999) (When an agency '"fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'").

93.  Wherefore, Plaintiffs are entitled to the relief prayed for herein.

---

to use *bump-stock* devices to produce such effects is *not* acceptable, these "alternatives" *are* acceptable.

## COUNT II: VIOLATION OF ATF'S RULEMAKING AUTHORITY

94.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

95.    The "core administrative-law principle" is that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2446 (2014); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

96.    Congress has clearly defined "machinegun" to include only a firearm "which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," and the frame or receiver of such a weapon, or parts or combination of parts that could be converted or assembled into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. The express purpose behind the Final Rule's alteration and expansion of this definition is to capture "*all* bump-stock-type devices" with the law's prohibitive sweep based upon ATF's conclusion – directly countered by all the available evidence and logic – that such devices enable shooters to shoot *automatically* through a "self-acting or self-regulating" firing mechanism.

97.    Because there is no support for ATF's conclusion about the functionality of these devices, it has necessarily exceeded its statutory authority by purporting to expand the law of Congress for the specific purpose of regulating firearms such devices as prohibited "machineguns." Indeed, through its previous formal determinations that bump stock devices are *not* "machineguns," ATF itself has conceded that it lacks the authority to regulate these devices at all. In fact, in a 2013 letter to Congressman Ed Perlmutter, ATF

stated it "does not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." *Id.* at 268. And members of Congress have said the same: ranking Judiciary Committee Member, Senator Diane Feinstein, has declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." Exhibit A at 267.

98.   Moreover, in its Final Rule, ATF admits that it has exceeded the authority granted to it.

99.   "The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes." 83 Fed. Reg. at 66527.

100.   "The NFA is a statute, which only Congress may repeal or alter." 83 Fed. Reg. at 66540.

101.   Perhaps most importantly, "the statutory definition *alone* determines whether a firearm is a machinegun." 83 Fed. Reg. at 66533-34 (emphasis added).

102.   The Final Rule then goes on to declare that the "Department believes that this rule's interpretations of 'automatically' and 'single function of the trigger' in the statutory definition of 'machinegun' accord with the plain meaning of those terms. Moreover, even if those terms are ambiguous, this rule rests on a reasonable construction of them…*Congress thus implicitly left it to the Department to define "automatically" and 'single function of the trigger' in the event those terms are ambiguous.*" *Id.* (emphasis added).

103.   Here, even setting aside ATF's admission that that "the statutory definition alone determines whether a firearm is a machinegun," it takes the untenable position that the statutory language is so clear that the agency is merely "defining those terms in accordance with the plain meaning;" yet, it concedes that it only has the authority to do such when terms are ambiguous and admits that the terms are not ambiguous; thereby,

precluding it from implementing the Final Rule, since it admits that it lacks the legal

authority to define terms that are not ambiguous.

104.    Accordingly, ATF's attempt to redefine the term "machinegun" is in violation of its

regulatory authority and Plaintiffs are entitled to the relief prayed for herein.


## COUNT III: INTERNAL REVENUE CODE VIOLATIONS

105.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

106.    ATF's Final Rule is not only procedurally and substantively invalid as set forth above,

but any implementation or enforcement of the rule against such devices manufactured or

assembled before the date of the NPRM publication would violate 26 U.S.C. § 7805(b).

26 U.S.C. § 7805(b) provides that "no temporary, proposed, or final regulation relating to

the internal revenue laws shall apply to any taxable period ending before … [¶ … ¶] [t]he

date on which any notice substantially describing the expected contents of any temporary,

proposed, or final regulation is issued to the public." ATF has previously acknowledged

the limiting effect of this law on the retroactivity of its firearms regulations, in that it

cannot properly apply a legal reclassification of items produced before this date. *See e.g.*,

ATF Rule 82-8 (in reclassifying SM10 and SM11A1 pistols and SAC carbines as

"machineguns" under the National Firearms Act, ATF acknowledged that the

reclassification was not applicable to those firearms manufactured or assembled before

June 21, 1982, pursuant to 26 U.S.C. § 7805(b)); ATF-41F (81 Fed. Reg. 2658 through

2723) (where ATF cited Section 7805(b) in declining to retroactively apply the final rule

related to the transfer of regulated firearms and acknowledging that the old law would

apply to all transfer applications submitted prior to the effective date of the new rule).

107.   Accordingly, to whatever extent the Final Rule may otherwise legitimately be

implemented or enforced, it cannot be properly be applied to bump stock devices

manufactured before March 29, 2018 – the date of publication of this NPR in the Federal

Register – if not, the date of issuance of the Final Rule.

## COUNT IV: TAKINGS WITHOUT JUST COMPENSATION

108.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

109.   Generally, under the Takings Clause of the Fifth Amendment to the U.S. Constitution,

when government laws or regulations result in the taking or destruction of private

property, the government must provide just compensation for the value of that property.

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425-28 (2015); *Pumpelly v. Green Bay &*

*Mississippi Canal Co.*, 80 U.S. 166, 177 (1871). More specifically, an agency regulation

amounts to such a taking when "denies all economically beneficial or productive use" of

the property or when it "impedes the use of property without depriving the owner of all

economically beneficial use," based upon "a complex of factors, including (1) the

economic impact of the regulation on the claimant; (2) the extent to which the regulation

has interfered with distinct investment-backed expectations; and (3) the character of the

governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

110.   ATF has made no bones about the property-destroying effect of its Final Rule. It has

boldly declared that, upon implementation of the rule, all "manufacturers, current owners,

and persons wishing to purchase [bump-stock-type] devices would be subject to the

restrictions imposed by the GCA and NFA." Reg. Red. At 13448. Thus, all "bump-stock-

type devices currently possessed by individuals would have to be destroyed or turned in

upon implementation of the regulation." *Id.* at 13450." Indeed, given the teeth built into

the criminal statutes that ATF seeks to invoke through this application of the Final Rule, the forced dispossession comes on pain of criminal prosecution for failure to comply.

111.    Unquestionably, the effect of this regulation is to destroy "*all* economically beneficial or productive use" and to destroy *all* the "investment-backed expectations" that ATF itself set up through its previous public pronouncements consistently declaring these very same types of devices *lawful* as *not* constituting "machineguns." And the loss of private interests here is substantial. ATF itself assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. at 13451. It then declares that the primary estimated cost to be $96,242,750.00 based on an estimate of 520,000 affected bump-stock-devices. However, multiplying ATF's stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not $96,242,750.00 as stated in Table 3 of the NPRM. Moreover, by averaging the acknowledged prices for bump-stock-devices, a proper average sale price should be $302.95, which would result in a primary estimated cost of $157,534,000.00 in just compensation being due.

112.    At a minimum, for those like Plaintiffs Guedes and Mr. Thompson with concretely established damages based on the verified purchase price of their bump-stock-type devices, the government should be compelled as a matter of law under the Takings Clause to provide just compensation in the amount of the purchase price.

113.    Moreover, the requirement of just compensation for this destruction of valuable private interests cannot be set aside as a valid exercise of police power, for the simple yet fundamental reason that ATF has not and evidently cannot put forth legitimate support for the core conclusion underlying the Final Rule that these devices constitute

"machineguns." *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 429, n. 11 (1989). ("[T]o be a valid exercise of the police power in the first instance a government regulation must be rationally related to a legitimate state interest.").

114.     Accordingly, implementation of this regulation would violate the Takings Clause of the Fifth Amendment and Plaintiffs are entitled to the relief prayed for herein.

## COUNT V: EX POST FACTO VIOLATION

115.     The foregoing paragraphs are hereby incorporated herein as if set forth in full.

116.     Article I, Section 9, Clause 3 of the U.S Constitution declares that "No Bill of Attainder or ex post facto Law shall be passed." It is well established that this prohibition includes "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action," *Calder v. Bull*, 3 U.S. 386 (1798), and any law that, "in relation to the offence or its consequences, alters the situation of a party to his disadvantage," *Collins v. Youngblood*, 497 U.S. 37, 47 (1990). The specific focus of this proscription is to prevent the retroactive application of laws and regulations whose primary purpose is to impose punishment on the affected citizens or whose impact would be so punitive either in purpose or effect as to negate any claim of a mere intent to effect a civil and nonpunitive regulatory purpose. *See Smith v. Doe*, 538 U.S. 84, 92 (2003); *Johnson v. Quander*, 440 F.3d 489, 500-501 (D.C. Cir. 2006).

117.     Much like the unabashed manner in which ATF attempts to destroy all value and beneficial use of bump-stock-type devices without providing any just compensation, ATF openly admits the harsh criminal consequences flowing from its unsupported about-face on the classification of bump-stock-type devices. As the NPRM states (italics added):

The proposed rule would *replace prior classifications* of bump-stock-type devices, *including* those that ATF previously determined *were* not machineguns. This rule would thus *supplant any prior letter rulings* with which it is inconsistent so that *any* bump-stock device described above qualifies as a machinegun.

83 Fed. Reg. at 13448.

118.   And, as already seen, because all "manufacturers, current owners, and persons wishing to purchase such devices would be subject to the restrictions imposed by the GCA and NFA," 83 Fed. Reg. at 13448, everyone is subject *criminally punitive* sanctions for failing to comply with this new world order of ATF – without exception (except for the small class of individuals exempted from the rule). Indeed, ATF has expressly declared that "there is *no* means by which a possessor may register a firearm retroactively, including a firearm that has been *reclassified*." *Id.* (italics added). So ATF has effectively shackled everyone affected by this new rule, transforming them into criminals based upon their mere possession of any bump-stock-type device *regardless* of whether that device had theretofore been *lawfully* possessed and *regardless of* whether *ATF itself* previously determined the device does *not* to have the capability of converting a firearm into a prohibited "machinegun." This is a prohibited *ex post facto* in the purest sense.

119.   Accordingly, Plaintiffs are entitled to the relief prayed for herein.

## COUNT VI: VIOLATION OF THE CONTRACTS CLAUSE

120.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

121.   "The Contracts Clause restricts the power of States to disrupt contractual arrangements. It provides that '[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts.' U. S. Const., Art. I, §10, cl. 1." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). "To determine when such a law crosses the constitutional line, … [t]he threshold issue is whether the state law has "operated as a substantial impairment of a contractual

relationship." *Id.* at 1821-22. "In answering that question," the primary factors of concerns are "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation." *Id.* And the focus there is "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose." *Id.*

122.   Here, as ATF unabashedly admits throughout its NPRM, the government undeniably created reasonable, investment-backed expectations in the eyes of the affected public about the legality of their acquisition, purchase, possession, and use of the untold number of specifically identified bump-stock-type devices, and all their substantially similar or reasonable equivalents, that ATF deemed lawful in its prior rulings and determinations. And, beyond *substantial impairment*, the Final Rule would *completely eviscerate* those investment backed expectations on which the affected individuals relied to their serious detriment – a detriment so significant that it exposes them to *criminal liability*.

123.   Moreover, for all the reasons already discussed revealing the illegality of the process and substance behind ATF's scheme here, and especially the lack of any demonstrated or even logical basis in support of the Final Rule, the regulation certainly has not been "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. at p. 1822.

124.   Accordingly, this amounts to a violation of the Contracts Clause, and on this basis too Plaintiffs have demonstrated entitled to the relief prayed-for herein.

## COUNT VII: VIOLATION OF FOIA

(Plaintiff FPF Against All Defendants)

125.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

126.   As described above, ATF failed and refused to respond to the properly presented, formal request for production of records submitted several months ago by FPF. The agency neglected to even assign a docketing number to the FOIA request and, to this date, has made no effort to communicate even an intention of complying with the request.

127.   Accordingly, Plaintiff FPF has been improperly and illegally denied access to the requested records, 5 U.S.C. § 552(a)(3)(A), this Court has the power to compel the agency to produce the records in accordance with the law, 5 U.S.C. § 552(a)(4)(B), and it should do so in addition to assessing ATF with reasonable attorney's fees and court costs incurred on account of the need to bring this action, 5 U.S.C. § 552(a)(4)(E)(i).

128.   Wherefore, Plaintiff FPF is entitled to the relief prayed for herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Damien Guedes, Representative Shane Roden, Firearms Policy Foundation, Madison Society Foundation, and Florida Carry, Inc. respectfully requests that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a)   Preliminarily enjoin Defendants, their officers, agents, servants, employees and all persons in active concert or participation with them from enforcing the Final Rule and all related laws, policies, and procedures that would impede or criminalize an individual's exercise of their use, possession, sale, transfer, or other disposition of a bump-stock-type device, as the result of this new regulation;

b)      Declare that Defendants are prohibited from implementing a new regulation, wherein they expand or purport to expand the definition of a "machine gun" as enacted by Congress, on the basis that the Final Rule violates the APA;

c)      Declare that Defendants are prohibited from implementing a new regulation, wherein they expand or purport to expand the definition of a "machine gun" as enacted by Congress, on the basis that the Final Rule violates ATF's statutory authority;

d)      Declare pursuant to 26 U.S.C. § 7805, Defendants are unable to enforce a ban on the possession or use of bump-stock-type devices;

e)      Declare that the Final Rule's enforcement constitutes a violation of Article I, Section 9, Clause 3 of the U.S Constitution (Ex Post Facto Clause);

f)      Declare that the Final Rule's enforcement constitutes a violation of Article I, Section 10, Clause 1 of the U.S Constitution (Contracts Clause);

g)      Declare that Defendant ATF violated 5 U.S.C. § 522(a)(3)(A) by failing to provide a response to Firearm Policy Foundation's FOIA request;

h)      Declare that the circumstances surrounding the withholding of the information raise questions as to whether agency personnel acted arbitrarily or capriciously with respect to the withholding;

i)      Order that Defendant ATF disclose the documents requested by Firearm Policy Foundation's FOIA request, as well as those it was required to produce during the rulemaking process;

j)      Permanently enjoin Defendants, their officers, agents, servants, employees and all persons in active concert or participation with them from enforcing the Final Rule and all related laws, policies, and procedures that would impede or criminalize an individual's

exercise of their use, possession, sale, transfer, or other disposition of a bump-stock-type device, as the result of this new regulation;

k)      In the alternative, declare that the Final Rule constitutes a taking under the Fifth Amendment and order that the Defendants pay just compensation to those affected;

l)      Award Plaintiff costs and attorney fees and expenses to the extent permitted under 5 U.S.C. § 552(a)(4)(E)(i), 18 U.S.C. § 924, and 28 U.S.C. §§ 1920, 2412; and

m)     Grant any and all other equitable and/or legal remedies this Court may see fit.

Respectfully Submitted,

_____

Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@CivilRightsDefenseFirm.com

Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@CivilRightsDefenseFirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-92973 (t)
(610) 400-8439 (f)

Attorneys for Plaintiffs