**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAMIEN GUEDES,
*et al.*

Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO
FIREARMS, AND EXPLOSIVES ("ATF"),
*et al.*

Defendants.

Case No.  1:18-cv-02988-DLF

Judge Friedrich

FIREARMS POLICY COALITION, Inc.

Plaintiff,

v.

MATTHEW WHITAKER,
*et al.*

Defendants.

Case No.  1:18-cv-03083-DLF

**MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................ 1

LEGAL BACKGROUND ............................................................................................................... 4

    A. Statutory Framework for Regulations of Firearms ........................................................ 4

    B. Regulatory Interpretation of Machine Gun Definition in Firearms Statutes ............................ 7

        1. Past Regulation of Bump Stocks. ................................................................................ 7

        2. Development of the Challenged Final Rule. ............................................................... 8

        3. The Final Rule. ........................................................................................................... 9

    C. The Appointments Clause ......................................................................................... 11

    D. Federal Vacancy Statutes .......................................................................................... 12

STANDARD OF REVIEW ........................................................................................................... 14

ARGUMENT ................................................................................................................................ 14

    I. Plaintiffs Have Not Established a Likelihood of Success on Their Claims .............................. 14

        A. The Final Rule States the Best Interpretation of the Terms "Single Function of the Trigger" and "Automatically" and Reasonably Applies Those Terms to Bump Stocks ... 15

            1. The Final Rule Interprets "Automatically" and "Single Function of the Trigger" In a Manner Consistent With Their Ordinary, Accepted Meaning ...................................... 16

            2. The Final Rule Reasonably Applies Its Interpretations of "Automatically" and "Single Function of the Trigger" To Conclude That Bump Stocks Are Machine Guns Within the Meaning of the Statute ........................................................................ 20

                i. Contact between the shooter's finger and the trigger ............................................. 24

                ii. Movement by the shooter's finger during the firing sequence ............................... 25

                iii. Involvement of shooter in channeling recoil energy .............................................. 25

        B. The Final Rule Reflects an Appropriate Exercise of DOJ's Interpretive Authority and Is Procedurally Proper. ........................................................................................ 27

            1. FOPA Does Not Deprive ATF or DOJ of Interpretive Authority Over the Definition of Machine Gun .................................................................................... 27

2. The Agency Has the Authority to Adopt Definitions of Ambigious and Undefined Terms, Including "Automatically" and "Single Function of the Trigger" ..................29

3. The Final Rule Reasonably Explains the Change From Previous ATF Classification Decisions Regarding Bump Stocks ..................................................................31

4. In Promulgating the Final Rule, the Department Complied With The Public Hearing and 90-Day Comment Provisions Identified by Plaintiffs ...............................34

C. Plaintiffs' Freedom of Information Act Request Provides No Basis for a Preliminary Injunction ..................................................................................................38

D. The FVRA Authorizes the President's Designation of Acting Attorney General Whitaker to Temporarily Exercise the Powers and Duties of the Office of Attorney General .......40

1. The FVRA's plain text applies to the Attorney General's vacancy...............................40

2. Section 508 operates alongside, and does not displace, the FVRA..............................42

a. The FVRA specifies that it is nonexclusive, rather than inapplicable, when statutes like section 508 also apply....................................................................42

b. Principles of statutory construction preclude Plaintiffs' interpretation of the FVRA's relationship with section 508 ............................................................48

c. Office-specific vacancy statutes comparable to section 508 have never before been interpreted to displace the FVRA..........................................................51

E. The Presidential designation of Mr. Whitaker as Acting Attorney General does not violate the Appointment Clause ....................................................................................52

1. Precedent from all three branches demonstrate that acting agency heads need not to be Senate confirmed..........................................................................................53

a. Several acts of Congress passed in three different centuries have authorized the designation of acting principal officers who are not Senate confirmed..................53

b. The Executive Branch has repeatedly designated acting principal officers who are not Senate confirmed ...........................................................................56

c. Supreme Court precedent has ratified the designation of acting principal officers who are not Senate confirmed ...............................................................60

d. Serious practical consequences and constitutional concerns militate against requiring Senate confirmation for temporary acting service in a principal office ..................................................................................................61

2.  Plaintiffs' aruguments for narrowing the scope of non-Senate-confirmed officials who can serve as acting agency heads have no basis in the text of the Appointments Clause and are contrary to precedent from all three branches ....................................63

a. Plaintiffs' argument that the Constitution requires a non-Senate-confirmed acting agency head to either be the first assistant or a replacement for an unavailable first assistant lacks merit. ............................................................................64

b. Plaintiffs' argument that the Constitution prohibits Mr. Whitaker from serving as Acting Attorney General because he is an employee lacks merit.........................67

II.  The Balance of Equities Does Not Tip in Plaintiffs' Favor..................................................71

III. An Injunction is Not in the Public Interest..........................................................................73

CONCLUSION............................................................................................................................74

## Table of Authorities

**Cases**

*Akins v. United States,*
  312 F. App'x. 197 (11th Cir. 2009) ..................................................................7, 8, 19, 30

*Al-Fayed v. CIA,*
  2000 WL 34342564 (D.D.C. Sept. 20, 2000) .........................................................38, 39

*Alden v. Maine,*
  527 U.S. 706 (1999) ....................................................................................................54

*Am. Fed'n of Gov't Emps., Local 3295 v. FLRA,*
  46 F.3d 73 (D.C. Cir. 1995) .........................................................................................49

*Am. Mail Line, Ltd. v. Gulick,*
  411 F.2d 696 (D.C. Cir. 1969) .....................................................................................38

*Am. Med. Ass'n v. Reno,*
  57 F.3d 1129 (D.C. Cir. 1995) .....................................................................................39

*Auffmordt v. Hedden,*
  137 U.S. 310 (1890) ....................................................................................................53

*Balt. Gas & Elec. Co. v. Nat. Res. Def Council,*
  462 U.S. 87 (1983) ......................................................................................................17

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ........................................................................................................11

*Burrage v. United States,*
  571 U.S. 204 (2014) ....................................................................................................29

*Burrow-Giles Lithographic Co. v. Sarony,*
  111 U.S. 53 (1884) ......................................................................................................55

*Butte Cty. v. Hogen,*
  613 F.3d 190 (D.C. Cir. 2010) .....................................................................................17

*Christmann & Welborn v. Dep't of Energy,*
  589 F. Supp. 576 (N.D. Tex. 1984) ..............................................................................23

*Citizens Telecomms. of Minn. v. FCC,*
  901 F.3d 991 (8th Cir. 2018) .......................................................................................36

*City of Joliet v. New West, L.P.,*
  562 F.3d 830 (7th Cir. 2009) .......................................................................................29

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir. 1995) .......................................................................................14

*Cobell v. Norton,*
  391 F.3d 251 (D.C. Cir. 2004) .....................................................................................14

*Colautti v. Franklin,*
  439 U.S. 379 (1979) ....................................................................................................31

*Conn. Light & Power Co. v. NRC,*
  673 F.2d 525 (D.C. Cir. 1982) ................................................................................39, 40

*Davis v. Mich. Dep't of Treasury*,
  489 U.S. 803 (1989) ........................................................................................16

*Davis v. Pension Benefit Guaranty Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ....................................................................14

*De Beers Consol. Mines v. United States*,
  325 U.S. 212, (1945) ......................................................................................38

*Demko v. United States*,
  44 Fed. Cl. 83 (1999) .....................................................................................30

*Detweiler v. Pena*,
  38 F.3d 591 (D.C. Cir. 1994) ........................................................................49

*Dun & Bradstreet Corp. Found. v. U.S. Postal Service*,
  946 F.2d 189 (2d Cir. 1991) ..........................................................................32

*Edmond v. United States*,
  520 U.S. 651 (1997) ...........................................................................61, 62, 69

*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018) .................................................46, 47, 49

*F.J. Vollmer Co. v. Higgins*,
  23 F.3d 448 (D.C. Cir. 1994) ..........................................................................7

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .......................................................................................32

*Fed./Postal/Retiree Coal., AFGE v. Devine*,
  751 F.2d 1424 (D.C. Cir. 1985) ....................................................................15

*Fla. Power & Light, Co. v. Lorion*,
  470 U.S. 729 (1985) .......................................................................................39

*Franks v. Salazar*,
  816 F. Supp. 2d 49 (D.D.C. 2011) ................................................................17

*Golan v. Holder*,
  565 U.S. 302 (2012) .................................................................................54, 55

*Gun South Inc. v. Brady*,
  877 F.2d 858 (11th Cir. 1989) .................................................................32, 35

*Honeywell, Int'l v. EPA*,
  372 F.3d 441 (D.C. Cir. 2004) ......................................................................40

*Hooks v. Kitsap Tenant Support Services, Inc.*,
  816 F.3d 550 (9th Cir. 2016) ...................................................................45, 46

*Howard v. Pritzker*,
  775 F.3d 430 (D.C. Cir. 2015) ......................................................................48

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) ......................................................................14

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) .......................................................................................50

*J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l Inc.,*
 534 U.S. 124 (2001) ........................................................................................ 48, 49

*Johnson v. Exec. Ofc. for U.S. Attorneys,*
 310 F.3d 771 (D.C. Cir. 2002) ................................................................................ 38

*Judicial Watch, Inc. v. U.S. Dept. of Homeland Sec.,*
 514 F. Supp. 2d 7 (D.D.C. 2007) ............................................................................ 38

*Kerner v. Celebrezze,*
 340 F.2d 736 (2d Cir. 1965) .................................................................................... 36

*Lee v. Christian Coalition of America, Inc.,*
 160 F. Supp. 2d 14 (D.D.C. 2001) .......................................................................... 71

*Lucia v. SEC,*
 138 S. Ct. 2044 (2018) ............................................................................................ 11

*Mary V. Harris Found. v. FCC,*
 776 F.3d 21 (D.C. Cir. 2015) .................................................................... 31, 32, 33

*Mazurek v. Armstrong,*
 520 U.S. 968 (1997) ................................................................................................ 14

*Miles v. Apex Marine Corp.,*
 498 U.S. 19 (1990) .................................................................................................. 49

*Morrison v. Olson,*
 487 U.S. 654 (1988) .................................................................................... 53, 61, 69

*Morton v. Mancari,*
 417 U.S. 535 (1974) ................................................................................................ 49

*Morton v. Ruiz,*
 415 U.S. 199 (1974) ................................................................................................ 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) .................................................................................................. 17

*Murphy v. Smith,*
 138 S. Ct. 784 (2018) .............................................................................................. 50

*Nat'l Org. for Women v. Scheidler,*
 510 U.S. 249 (1994) ................................................................................................ 29

*Nat'l Rifle Ass'n v. Brady,*
 914 F.2d 475 (4th Cir. 1990) ............................................................................ 29, 30

*Nevada v. Dep't of Energy,*
 457 F.3d 78 (D.C. Cir. 2006) ............................................................................ 36, 37

*New England Power Generators v. FERC,*
 879 F.3d 1192 (D.C. Cir. 2018) .............................................................................. 31

*Nken v. Holder,*
 556 U.S. 418 (2009) ................................................................................................ 73

*NLRB v. Noel Canning,*
 134 S. Ct. 2550 (2014) ............................................................................................ 53

*NLRB v. SW General, Inc.*,
   137 S. Ct. 929 (2017) .......................................................................... 54, 69
*NRDC v. EPA*,
   822 F.2d 104 (D.C. Cir. 1987) .............................................................. 39
*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
   342 F.3d 1170 (10th Cir. 2003) ............................................................ 74
*Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of State of Wash. v. United States*,
   279 U.S. 655 (1929) .............................................................................. 53
*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999) .............................................................................. 29
*Ozark Auto. Distribs., Inc. v. NLRB*,
   779 F.3d 576 (D.C. Cir. 2015) .............................................................. 35
*Penn. v. Mimms*,
   434 U.S. 106 (1977) .............................................................................. 73
*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011) .............................................................................. 49
*Printz v. United States*,
   521 U.S. 898 (1997) .............................................................................. 54
*Proctor v. Dist. of Columbia*,
   310 F. Supp. 3d 107 (D.D.C. 2018) ...................................................... 72
*Pursuing America's Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) .............................................................. 73
*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) .......................................................................... 48, 49
*Revenue of Mo. v. CoBank ACB*,
   531 U.S. 316 (2001) .............................................................................. 44
*Russello v. United States*,
   464 U.S. 16 (1983) ................................................................................ 44
*Safari Club Intern. v. Salazar*,
   852 F. Supp. 2d 102 (D.D.C. 2012) ...................................................... 72
*Sai v. TSA*,
   54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................ 38
*Seeger v. Dep't of Defense*,
   306 F. Supp. 3d 265 (D.D.C. 2018) ...................................................... 73
*Shaffer v. Defense Intelligence Agency*,
   102 F. Supp. 3d 1 (D.D.C. 2015) .......................................................... 23
*Sig Sauer, Inc. v. Jones*,
   133 F. Supp. 3d 364 (D.N.H. 2015) ...................................................... 17
*Singh v. Carter*,
   185 F. Supp. 3d 11 (D.D.C. 2016) ........................................................ 14

*Staples v. United States,*
   511 U.S. 600 (1994) ........................................................................................................18

*U.S. ex rel. Totten v. Bombardier Corp.,*
   380 F.3d 488 (D.C. Cir. 2004) ......................................................................................16

*United Gas Improvement Co. v. Callery Properties,*
   382 U.S. 223 (1965) ........................................................................................................32

*United States v. Apel,*
   571 U.S. 359 (2014) ........................................................................................................29

*United States v. Denny,*
   441 F.3d 1220 (10th Cir. 2006) ....................................................................................73

*United States v. Dodson,*
   519 F. App'x 344 (6th Cir. 2013) ..................................................................................7

*United States v. Dunn,*
   946 F.2d 615 (9th Cir. 1991) ..........................................................................................5

*United States v. Eaton*
   169 U.S. 331 (1898) ...............................................................................................passim

*United States v. Fla. E. Coast Ry. Co.,*
   410 U.S. 224 (1973) ........................................................................................................36

*United States v. Fleischli,*
   305 F.3d 643 (7th Cir. 2002) .............................................................................. 18, 19

*United States v. Haney,*
   264 F.3d 1161 (10th Cir. 2001) ......................................................................................7

*United States v. Jennings,*
   195 F.3d 795 (5th Cir. 1999) ........................................................................................15

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ............................................................................... 37, 38

*United States v. Newman,*
   134 F.3d 373 (6th Cir. 1998) ........................................................................................16

*United States v. Olofson,*
   563 F.3d 652 (7th Cir. 2009) ............................................................................... 19, 27

*United States v. One TRW, Model M14, 7.62 Caliber Rifle,*
   441 F.3d 416 (6th Cir. 2006) ........................................................................................30

*United States v. Peters*
   2018 WL 6313534 (E.D. Ky. Dec. 3, 2018) ..............................................................15

*United States v. RX Depot, Inc.,*
   297 F. Supp. 2d 1306 (N.D. Okla. 2003) ..................................................................74

*United States v. Smith*
   2018 WL 6834712 (W.D.N.C. Dec. 28, 2018) ..........................................................15

*United States v. Valencia,*
   No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018)..........................15

*Util. Air Regulatory Grp. v. EPA*,
   572 U.S. 302 (2014) ................................................................................30
*Via Christi Regional Med. Ctr. v. Leavitt*,
   2006 WL 2773006 (D. Kan. Sept. 25, 2006) ................................. 22, 23
*Walshire v. United States*,
   288 F.3d 342 (8th Cir. 2002) ...............................................................29
*Weiss v. United States*,
   510 U.S. 163 (1994) ..................................................................53, 63, 64
*Williams Gas Processing-Gulf Coast Co. v. FERC*,
   475 F.3d 319 (D.C. Cir. 2006) ........................................................ 31, 32
*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................ 14, 72
*Wisc. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .............................................................71
*York v. Sec'y of Treasury*,
   774 F.2d 417 (10th Cir. 1985) ......................................................... 7, 31

**Statutes**

5 U.S.C. app. 1 ........................................................................................51
5 U.S.C. § 553(b) ....................................................................................39
5 U.S.C. § 706(2)(A) ...............................................................................17
5 U.S.C. § 3345 ................................................................................passim
5 U.S.C. § 3346 .......................................................................................50
5 U.S.C. § 3347 ................................................................................passim
5 U.S.C. §§ 3345–3349d .........................................................................13
10 U.S.C. § 132(b) ..................................................................................51
12 U.S.C. § 4512(f) .................................................................................56
12 U.S.C. § 5491(b)(5) ...................................................................... 46, 56
15 U.S.C. § 633(b)(1) ..............................................................................51
18 U.S.C. Chapter 44 ................................................................................4
18 U.S.C. § 921 .....................................................................6, 7, 10, 11
18 U.S.C. § 922 ................................................................................passim
18 U.S.C. § 926 ................................................................................passim
20 U.S.C. § 3412(a)(1) ....................................................................... 51, 56
21 U.S.C. § 1703(a)(3) .............................................................................56
22 USC § 2651a(a) ..................................................................................42
26 U.S.C. Chapter 53 ................................................................................4
26 U.S.C. § 5822 ................................................................................ 4, 5
26 U.S.C. § 5841 .......................................................................................5
26 U.S.C. § 5845 ..............................................................................passim
26 U.S.C. § 7801 ................................................................................ 5, 7

28 U.S.C. § 508.................................................................................................passim
28 U.S.C. § 599A(c)(1).................................................................................................5
29 U.S.C. § 552.................................................................................................38, 42, 51
31 U.S.C. § 301(c)(2).................................................................................................51
31 U.S.C. § 502(f).................................................................................................56
38 U.S.C. § 304.................................................................................................56
40 U.S.C. § 302(b).................................................................................................56
42 U.S.C. § 7132(a).................................................................................................51, 58
44 U.S.C. § 2103(c).................................................................................................56
49 U.S.C. § 102(e).................................................................................................56
50 U.S.C. § 3037(a).................................................................................................56
N.Y. Penal Law § 265.00(21) (McKinney 2018).................................................................................................11
Ohio Rev. Code Ann. § 2923.11(D) (West 2017).................................................................................................11
Pub. L. No. 785.................................................................................................6
Pub. L. No. 90-351.................................................................................................6
Pub. L. No. 99-308.................................................................................................4, 6, 28
Pub. L. No. 107-296.................................................................................................4
Pub. L. No. 100-398.................................................................................................12, 55
U.S. Const. art. II.................................................................................................11, 58
U.S.C. § 153(d).................................................................................................45

## Regulations

27 C.F.R. § 447.11.................................................................................................3, 9
27 C.F.R. § 478.11.................................................................................................31
28 C.F.R. § 0.130.................................................................................................4, 7
33 Fed. Reg. 18.................................................................................................30
34 Cong. Rep. C.C. 44, 1857 WL 4155 (1857).................................................................................................60, 61, 65
63 Fed. Reg. 35.................................................................................................30

71 Fed. Reg. 20333 (Apr. 17, 2006).................................................................................................67
73 Fed. Reg. 54487 (Sept. 18, 2008).................................................................................................67
76 Fed. Reg. 33613 (June 6, 2011).................................................................................................67
77 Fed. Reg. 31161 (May 21, 2012).................................................................................................67
78 Fed. Reg. 59161 (Sept. 20, 2013).................................................................................................67
81 Fed. Reg. 54715 (Aug. 12, 2016).................................................................................................67
81 Fed. Reg. 54717 (Aug. 12, 2016).................................................................................................67
81 Fed. Reg. 96335 (Dec. 23, 2016).................................................................................................67
82 Fed. Reg. 7625 (Jan. 13, 2017).................................................................................................68
82 Fed. Reg. 7627 (Jan. 13, 2017).................................................................................................68
82 Fed. Reg. 60929.................................................................................................8, 9
83 Fed. Reg. 66514.................................................................................................passim

## Other Authorities

1954 U.S.C.C.A.N. 4017 ...........................................................................................................5

1986 U.S.C.C.A.N. 1327 ................................................................................................... 6, 15

*Appointment of Consuls,*
    7 Op. Att'y Gen. 242 (1855) ...................................................................................... 61, 69

ATF Rul. 2006-2 ..................................................................................................................8

*Designation of Acting Director of the Office of Management and Budget,*
    27 Op. O.L.C. 121 (2003) ..............................................................................................52

Executive Order 13612 .......................................................................................................67

Executive Order 13735 .......................................................................................................68

Executive Order 13736 .......................................................................................................68

*Implementing the Right to Keep and Bear Arms for Self-Defense,*
    56 UCLA L. Rev. 1443 (2009) .....................................................................................16

*Nat'l Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session,*
    H.R. 9066....................................................................................................... 8, 18, 19

*Office and Duties of Atty. Gen.,*
    6 Op. Att'y Gen. 326 (1854) ........................................................................................59

*Providing an Order of Succession Within the Department of Defense,*
    Exec. Order No. 13,394 .................................................................................................51

*Providing an Order of Succession Within the Department of Defense,*
    Exec. Order No. 13,533 .................................................................................................51

*Pay of Secretary of the Treasury ad Interim,*
    4 Op. Att'y Gen. 122 (1842) ........................................................................................66

S. Rep. No. 105-250 (1998), 1998 WL 404532 ..................................................................44

*The Firearms Owners' Protection Act: A Historical and Legal Perspective,*
    17 Cumb. L. Rev. 585 (1987)..........................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Department of Justice ("DOJ") issued the Final Rule at issue in these cases, *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018), to ensure that "bump stocks"—firearms attachments that, when employed, permit semi-automatic rifles to function as machine guns—are not used to circumvent 18 U.S.C. § 922(o), the statute prohibiting the manufacture and sale of new machine guns to the public.  By acting on a presidential instruction to propose this rule, DOJ has corrected a confusing and erroneous agency interpretation of Section 922(o), to the expected benefit of public safety.  Prior to consolidation of these two actions into a single case, the Plaintiffs in each case sought a preliminary injunction to keep DOJ from enacting the rule, claiming that DOJ's actions are arbitrary and capricious under the Administrative Procedure Act ("APA"), violate procedural requirements of that Act and other statutes, and that Acting Attorney General Whitaker lacks authority to promulgate the Final Rule.  Plaintiffs cannot satisfy the high standards necessary for a preliminary injunction because they cannot demonstrate a likelihood of success on any of their claims, nor that an injunction serves the public interest.  Plaintiffs' motions should therefore be denied.[1]

## INTRODUCTION

A bump-stock-type device ("bump stock") is an apparatus used to replace the standard stock on an ordinary semi-automatic firearm, thereby allowing a shooter to use the weapon at a rate of fire similar to that of an automatic weapon, like a machine gun.  *See* Department of Justice, *Bump-Stock-Type Devices* at 5, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Final Rule").  Over the last decade, DOJ's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has issued classification

---

[1] Plaintiffs in *Guedes* moved for a preliminary injunction, ECF No. 2, on December 18, 2018, prior to the December 26, 2018 filing of the Amended Complaint in that action, ECF No. 9.  In light of the subsequent procedural history of this action, the parties agreed that, rather than require a revised filing by the *Guedes* Plaintiffs, Defendants would respond to the existing motion for preliminary injunction.  Plaintiff Firearms Policy Coalition ("FPC") moved for a preliminary injunction on December 26, 2018.  Pursuant to this Court's Minute Order consolidating the two actions (Jan. 8, 2019), Defendants hereby respond to both motions.

determinations concluding that certain models of these devices are lawful firearms parts, unregulated at the federal level.  Subsequently, many bump stocks have been readily available for private purchase, and hundreds of thousands have been sold.  On October 1, 2017, several rifles with attached bump stocks were used in a horrific crime in Las Vegas, Nevada, in which hundreds of rounds of ammunition were rapidly fired by the perpetrator at a large crowd attending an outdoor concert, killing 58 people and wounding approximately 500.

Machine guns have long been regulated under the National Firearms Act of 1934, and since passage of the Firearm Owners Protection Act of 1986, the sale of new machine guns to members of the public has been prohibited.  This does not mean that members of the public are uninterested in acquiring machine guns, however, and the price of "pre-1986 machine guns"—which remain lawful for private persons to own and transfer—has steadily risen.  Along with that price increase has come a rise in interest in the manufacture and acquisition of lawful substitutes for machine guns that allow firearms users to fire their weapons at near-automatic rates.  Bump stocks are designed to be such a substitute, and ATF, which is charged with determining the lawfulness of firearms, has worked diligently to apply the definition of machine gun consistently to bump stocks.  In 2006, ATF concluded that one model of bump stock, the "Akins Accelerator," was not a machine gun, then quickly recognized that its determination was in error and reversed itself.  Between 2008 and 2017, ATF issued classification decisions concluding that other bump stocks—which lacked a mechanical spring (or similar device) instrumental to the operation of the Akins Accelerator—were not machine guns.  These decisions included one classification of a device submitted by the same manufacturer as the bump stocks used by the Las Vegas perpetrator.

After the Las Vegas attack, members of Congress and the public asked ATF to re-examine its past classification decisions for bump stocks to determine whether those decisions were correct. In addition, President Trump instructed the Attorney General "to dedicate all available resources to . . . propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  Presidential Memorandum, *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 83 FR 7949 (Feb. 20, 2018) ("Definition of Machinegun").  The

Department proceeded to issue a notice of proposed rulemaking ("NPRM"), collect and review over 186,000 comments, and ultimately, to announce the Final Rule, which amends the regulatory definition of "machinegun."[2]

The Department's actions are fully consistent with the APA and no injunction should issue. The statutory terms interpreted in the Final Rule ("automatically" and "single function of the trigger") are undefined in the statute, and the Department has reasonably interpreted those terms. Although ATF previously interpreted the statutory language differently, an agency may correct errors in light of subsequent experience, as DOJ has done here. The Final Rule is therefore within DOJ's rulemaking authority and the contents of the rule are neither arbitrary nor capricious. DOJ and ATF also complied with the procedural requirements of the APA and 18 U.S.C. § 926(b). Although there was some confusion regarding the instructions and location for submitting comments electronically at the beginning of the 90-day comment period, it remained technically possible to submit comments throughout the 90-day period and the technical possibility that some commenters were confused does not rise to the level of a statutory violation. Moreover, any such problem was harmless in light of the 85 days remaining in the comment period after this issue was resolved, the total number of comments received, and DOJ's thorough efforts to address those comments. Nor are Plaintiffs correct that an oral hearing is a requirement of the statutes: to the contrary, the agency is only required to provide interested parties an opportunity to request a hearing, and retains discretion to conclude a hearing would be of no benefit, as it did here.

As to Plaintiffs' Freedom of Information Act ("FOIA") claim, preliminary injunctions are disfavored in the FOIA context, where it is well-established that agencies may obtain an appropriate schedule by which to produce responsive non-exempt documents. Moreover, even if Plaintiffs could establish a need for a preliminary injunction in the FOIA context, the scope of such

---

[2] In this brief, except where directly quoting the statute or derivative interpretations, Defendants will use the ordinary spelling of "machine gun" as two words, rather than the single-word spelling used in federal statutes and regulations: "machinegun." *See, e.g.*, 26 U.S.C. § 5845(b); 27 C.F.R. § 447.11.

injunction would be limited to an order to produce responsive, non-exempt documents, because that remedy is the full available remedy under the statute.

Finally, the issuance of the rule by the Acting Attorney General creates no infirmity. Pursuant to the President's well-settled authority under the Federal Vacancies Reform Act ("FVRA"), President Trump validly designated Mr. Whitaker to temporarily perform the functions and duties of the Office of the Attorney General, including issuance of final rules, upon the resignation of Jefferson B. Sessions III.

In sum, Plaintiffs have not demonstrated a likelihood of success on the claims forming the basis for their preliminary injunction motion.  Plaintiffs have also not established that the other factors required for entry of a preliminary injunction have been met.  Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

## LEGAL BACKGROUND

### A.  Statutory Framework for Regulation of Firearms

Over the last century, Congress has imposed increasingly strict regulations on machine guns as part of the interconnected framework of federal laws regulating the interstate firearm market. The Final Rule interprets provisions of three major firearms statutes: the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44; the National Firearms Act of 1934 ("NFA"), 26 U.S.C. Chapter 53; and the Firearm Owners Protection Act, (FOPA), Pub. L. 99-308, 100 Stat. 449.  Together, these statutes prohibit the possession by members of the public of newly-manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA, the lawful possession of which Congress has permitted to continue.  *See* 18 U.S.C. § 922(o). These statutes share a common definition of machine guns, and this case challenges DOJ's revision of that definition to clarify that the definition includes bump stocks.[3]

---

[3] The Final Rule amends the regulations of ATF, which is charged with the administration and enforcement of the GCA and the NFA.  The Final Rule was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF.  *See* 28 C.F.R. § 0.130(a)(1).  NFA provisions still refer to the "Secretary of the Treasury."  *See* 26 U.S.C. Ch. 53.  However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the

The NFA, the first major federal statute to regulate guns, required all persons engaged in the business of selling "firearms" (including machine guns)[4] and all firearms owners to register with the Collector of Internal Revenue, subjected all regulated firearm sales to a special tax, and required that transactions of regulated firearms be conducted using written order forms.[5]  It also required that each maker of a regulated firearm "shall, prior to . . . making [it] . . . obtain authorization in such manner as required by this chapter."  26 U.S.C. § 5841.[6]   Congress enacted the NFA to target "lethal weapons . . . [that] could be used readily and efficiently by criminals or gangsters."  H.R. Rep. No. 83-1337, at A395, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4542.  Under the NFA, a "machinegun" is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

---

Department of the Treasury to the Department of Justice, under the general authority of the Attorney General.  26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

[4] Although the NFA applies to "firearms," the term "firearms" is defined in the statute as a narrow set of dangerous weapons, not the full class of weapons encompassed by the meaning of "firearms" in ordinary English.  *See* 26 U.S.C. § 5845.  "Firearms" includes machine guns, short-barreled shotguns, short-barreled rifles, and several items that would not ordinarily be considered "firearms," such as silencers, rockets, and grenades.  Thus, as a general matter, standard-length shotguns and rifles (including all semi-automatic rifles) and non-automatic handguns, are not "firearms" within the NFA's definition.  *See United States v. Dunn*, 946 F.2d 615, 621 (9th Cir. 1991) (noting Congress has found weapons classified by the NFA as firearms "to be inherently dangerous and generally lacking usefulness, except for violent and criminal purposes").

[5] Consistent with these taxing provisions, Congress passed the NFA pursuant to its taxation powers, and the NFA is contained in the Internal Revenue Code ("Revenue Code").

[6] Specifically, before a machine gun or other NFA weapon may be made, the maker must: (1) file "a written application . . . to make and register the firearm"; (2) pay "any tax payable"; (3) "identif[y] the firearm to be made"; (4) "identif[y] himself in the application form"; and (5) obtain the approval of ATF "to make and register the firearm" with "the firearm application form show[ing] such approval."  26 U.S.C. § 5822.

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime." *See* 18 U.S.C. § 921 *et seq*.; S. Rep. No. 89-1866, at 1 (1966). The GCA supplanted some prior firearms regulations, but exists alongside the NFA. *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968). The GCA followed on the heels of other federal legislation that stressed Congress's findings of an extensive interstate commerce in firearms and the need for adequate federal control over such traffic. *See* Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 197 (1968).

In 1986, Congress again turned its attention to firearms, addressing, *inter alia*, the hazards of machine guns. *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns"); *id.* at 4, 1986 U.S.C.C.A.N. at 1330 (describing machine guns as "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"). Congress therefore enacted the Firearms Owners' Protection Act of 1986 ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, intended "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime." H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327. Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA. Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2). The FOPA and GCA define the term "machinegun" by incorporating the NFA's definition of the term. *See* 18 U.S.C. § 921(a)(23).[7]

### B. Regulatory Interpretation of Machine Gun Definition in Firearms Statutes

The circumstances that give rise to this litigation arise in part from ATF's efforts to interpret the NFA terms "automatically" and "single function of the trigger" in the context of bump stocks, pursuant to delegated authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a); *see* 28 CFR 0.130(a)(1)-(2). Courts have recognized the leading regulatory role of DOJ and ATF with respect to machine guns, including in the specific context of decisions classifying devices as machine guns. *See, e.g., F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding an ATF determination regarding machine gun receivers); *United States v. Dodson*, 519 F. App'x 344, 348-49 & n.4 (6th Cir. 2013) (acknowledging ATF's role in interpreting the definition of "machinegun"); *York v. Sec'y of Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985).

### 1. Past Regulation of Bump Stocks

In 2002 and 2004, a Florida inventor asked ATF to determine whether the Akins Accelerator, a specific model of a bump stock that "uses an internal spring and the force of recoil to reposition and refire the rifle," would be classified as a machine gun under the NFA. *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009). ATF tested a prototype of the device and, based on its interpretation of the statutory term "single function of the trigger" to refer to a single physical movement of the trigger, concluded it did not constitute a machine gun. *Id.* After receiving further requests to classify similar devices, ATF reversed its view, classifying the device as a machine gun.

---

[7] The legislative history of the specific amendment that added § 922(o) is limited. Because "§ 922(o) is closely intertwined with other federal gun legislation," however, the Courts of Appeals "have referred to legislative history not only of § 922(o) itself, but also of other federal gun legislation generally," finding that Congress need not "rearticulate its old findings every time it adds an additional provision." *United States v. Haney*, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001); *see generally* David T. Hardy*, The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589-605 (1987).

In correcting its error, ATF determined that the phrase "single function of the trigger" is best interpreted to mean a "single pull of the trigger," by the shooter rather than a single physical movement of the trigger itself.  ATF Rul. 2006-2, at 2 (citing *Nat'l Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session H.R. 9066*, 73rd Cong., at 40 (1934)), available at: https://go.usa.gov/xEDCC (last visited Jan. 9, 2019).   ATF therefore ordered the inventor "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x at 199, and issued a policy statement concluding that "devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns."  Final Rule, 83 FR 66516.  The inventor sued, and ATF prevailed.  *Akins*, 312 F. Appx. at 198.

ATF soon received classification requests for other devices that, unlike the Akins Accelerator, did not include internal springs.  In a series of classification decisions between 2008 and 2017, ATF concluded that such devices, including one submitted by the manufacturer of the bump stocks used by the Las Vegas perpetrator, were not machine guns because, in the absence of internal springs or similar mechanical parts that would channel recoil energy, the bump stocks did not fire "automatically."  Final Rule, 83 FR 66517.  A consequence of this conclusion is that bump stocks fell outside the scope of federal firearms regulations, *see id.*, and became popular, with an estimated 520,000 bump stocks sold at an estimated average price of approximately $300.  *See id.* at 66538.

## 2.  Development of the Challenged Final Rule

The public attention given to bump stocks in the wake of their use by the Las Vegas perpetrator led the Department to revisit its prior analysis of the terms used to define machine gun in 26 U.S.C. 5845(b), along with whether bump stocks properly should be classified as machine guns.  *See* Final Rule, 83 FR 66516-17.  As an initial step, ATF published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register.  *See Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017).  The ANPRM solicited comments concerning the market for bump stocks.  *See id.*  Specifically, the Department asked a series of questions of manufacturers, consumers, and retailers regarding the cost of bump

stocks, the number of sales, the volume and cost of manufacturing, and input on the potential effect of a rulemaking prohibiting bump stocks.  *See id.* at 60930-31.  Public comment on the ANPRM concluded on January 25, 2018.  *Id.* at 60929.

On February 20, 2018, the President issued a memorandum to then-Attorney General Jefferson B. Sessions III concerning bump stocks.  *See Definition of Machinegun*, 83 FR 7949.  The memorandum instructed the Department of Justice, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id.*  Carrying out that directive, on March 29, 2018, the Department published an NPRM, proposing changes to the regulations in 27 CFR 447.11, 478.11, and 479.11 that would interpret the meaning of the terms "single function of the trigger" and "automatically."  *See Bump-Stock-Type Devices*, 83 FR 13442 (Mar. 29, 2018).  Between the publication of the NPRM and the closing date for comments, June 27, 2018, DOJ received over 186,000 comments on the NPRM.  *See Final Rule*, 83 FR 66519.  DOJ then drafted the Final Rule, addressing the comments raised.  *See generally id.* at 66514; 66519-43.  On December 18, 2018, Acting Attorney General Whitaker announced the Final Rule, which was published in the Federal Register on December 26, 2018.  *See id.* at 66514; *DOJ Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018), *available at*: https://go.usa.gov/xEDrx (last visited Jan. 15, 2019).

### 3.  The Final Rule

The Final Rule sets forth the Department's interpretations of the terms "single function of the trigger" and "automatically," clarifies for members of the public that bump stocks are machine guns, and overrules ATF's prior, erroneous classification decisions treating bump stocks as unregulated firearms parts.  *See Final Rule*, 83 FR 66516; 66531 (explaining that "the previous classification[s] . . . relied on the mistaken premise that . . . such devices do not enable 'automatic' firing").  The Final Rule also instructs "current possessors" of bump stocks "to undertake

destruction of the devices" or to "abandon [them] at the nearest ATF office." *Id.* at 66549.  Current

owners of bump stocks have 90 days to comply in order to "avoid criminal liability."[8]  *Id.* at 66530.

The analysis in the Final Rule mirrors that in the NPRM.  First, consistent with ATF's

position since 2006, the Final Rule explains that the Department is interpreting the phrase "single

function of the trigger" to mean a "single pull of the trigger" as well as "analogous motions."  *Id.* at

66515.  In addition, to account for the manner in which firing is initiated by a single pull of the

trigger, the Final Rule explains that it is clarifying the term "automatically."  *Id.*  Under the

Department's interpretation set forth in the Final Rule, "automatically," in the context of the

statutory definition of machine gun, means "as the result of a self-acting or self-regulating

mechanism that allows the firing of multiple rounds through a single pull of the trigger."  *Id.* at

66554.  The Final Rule explains that these definitions are being adopted because they "represent the

best interpretation of the statute."  *Id.* at 66521.

Relying on these definitions, the Final Rule sets forth the conclusion that "[t]he term

'machine gun' includes a [bump stock]."  *Id.* at 66554.  As the Final Rule explains, this expansion of

the definition is appropriate because the firing sequence is "automatic."  *Id.* at 66531.  This

conclusion is based on the determination that, as long as: 1) the trigger finger remains stationary on

the ledge provided by the design of the device; 2) the shooter maintains constant rearward pressure

on the trigger; and 3) the shooter engages in constant forward pressure with the non-trigger hand on

the rifle through the barrel-shroud or fore-grip; then, the firearm's recoil energy is harnessed in a

continuous back-and-forth cycle.  *Id.* at 66532.  In this way, a bump stock constitutes a "self-

regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a

single pull of the trigger.  *Id.*  Thus, bump stocks are machine guns because they convert an

otherwise ordinary semiautomatic firearm[9] into a machine gun by functioning as a self-acting or self-

---

[8] This 90 day period began upon publication in the Federal Register on December 26, 2018.

[9] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a
firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a
separate pull of the trigger to fire each cartridge."  18 U.S.C. § 921(a) (28).  The term "semi-
automatic firearm," is not specifically defined in federal law, but generally refers to any weapon that

regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter, so long as the shooter also maintains constant rearward pressure on the trigger and constant forward pressure with the non-trigger hand on the rifle through the barrel-shroud or fore-grip.  *See id.* at 66514, 66516.

In addition to setting forth the analysis above, the Final Rule describes and provides responses to the 186,000+ comments received on the NPRM.  *See* 83 FR at 66519-43.  It includes responses to the comments made by some of the Plaintiffs here and the claims they raised.  *Compare, e.g.,* Comment ID ATF-2018-0002-61777 (FPC Comment ATF 2017R-22) at 7-8 (June 26, 2018), regulations.gov, https://go.usa.gov/xEDrN, *with* Final Rule, 83 FR 66528-29 (responding to comment).  Plaintiffs do not assert a claim alleging that the Final Rule fails to respond to their comments.

## C.  The Appointments Clause

The Appointments Clause of Article II of the U.S. Constitution prescribes the method of appointment for all "Officers of the United States" whose appointments are not otherwise provided for in the Constitution.  U.S. Const. art. II, § 2, cl. 2; *see Buckley v. Valeo*, 424 U.S. 1, 125-26, 132 (1976) (per curiam).  "Officers" are those persons who hold a "continuing and permanent" federal position and exercise "significant authority pursuant to the laws of the United States."  *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).  Pursuant to the Clause, the President, with the advice and consent of the Senate, nominates principal officers, such as the Attorney General.  Congress may vest the power to select "inferior Officers," however, "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  Neither the Appointments Clause nor any

---

after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger.  *See, e.g.,* Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger"); N.Y. Penal Law § 265.00(21) (McKinney 2018) ("'Semiautomatic' means any repeating rifle, shotgun or pistol . . . which utilizes a portion of the energy of a firing cartridge or shell to extract the fired [round] . . . and chamber the next round, and… requires a separate pull of the trigger to fire each cartridge or shell").

other provision of the Constitution expressly addresses whether and in what circumstances an individual may serve in an acting capacity for a principal officer.

### D.  Federal Vacancy Statutes

Since 1792, Congress has provided for the designation of individuals to serve temporarily as acting principal officers.  *See, e.g.*, An Act Making Alterations in the Treasury & War Departments, ch. 378 § 8, 1 Stat. 279, 281 (authorizing "any person or persons" to fill certain vacancies in the Departments of State, Treasury, and War, including vacancies in the position of Secretary) (1792) ("1792 Act").  In 1863, Congress extended the 1792 Act to all vacancies in the office of "the head of any Executive Department of the Government, or of any officer of either of the said Departments whose appointment is not in the head thereof."  An Act temporarily to supply Vacancies in the Executive Departments in Certain Cases, ch. 45, § 1, 12 Stat. 656, 656 (1863) ("1863 Act").  Shortly thereafter, Congress enacted the Vacancies Act of 1868, which provided as a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head."  Act of July 23, 1868, ch. 227, § 1, 15 Stat. 168 (1868).  The Vacancies Act further authorized the President to bypass the "first assistant" default rule and designate a different official to fill the vacancy.  *See id.*  Between 1868 and 1988, Congress amended the Vacancies Act to extend the time limits for permissible acting service and include the vast majority of executive offices within its scope of coverage.  *See, e.g.*, Pub. L. No. 100-398, § 7(b), 102 Stat. 985, 988 (1988).

In addition to the Vacancies Act, Congress also enacted myriad agency-specific vacancy statutes, including, 28 U.S.C. § 508(a) which provides that in the case of a vacancy in the office of Attorney General, "the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 [then the Vacancies Act and now the FVRA] the Deputy Attorney General is the first assistant to the Attorney General."  28 U.S.C. § 508(a).  If the offices of Attorney General and Deputy Attorney General are both vacant, "the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General."  *Id.*

12

§ 508(b).  Notably, the President's authority in the Vacancies Act to bypass the statute's default rule

was expressly made inapplicable "to a vacancy in the office of Attorney General."  5 U.S.C. § 3347

(1994); see Rev. Stat. § 179 (1st ed. 1875) (harmonizing the Department of Justice's organic statute

enacted in 1870 with the Vacancies Act of 1868); Rev. Stat. § 179 (2d ed. 1878) (same).

In 1998, Congress enacted the FVRA, 5 U.S.C. §§ 3345–3349d to replace the Vacancies Act

and provide comprehensive procedures for the President to designate an acting official to perform

the duties of an executive officer whose appointment is subject to Senate confirmation whenever the

incumbent "dies, resigns, or is otherwise unable to perform the functions and duties of the office."

5 U.S.C. § 3345(a).  The FVRA provides three options.  First, absent any other presidential

designation, the "first assistant" to the vacant office shall perform its functions and duties.  *Id.*

§ 3345(a)(1).  Second, the President may depart from that default course by directing another Senate-

confirmed presidential appointee to perform the vacant office's functions and duties.  *Id.*

§ 3345(a)(2).  And third, the President may designate an officer or employee within the same agency

to perform the vacant office's functions and duties, provided that he or she has been in the agency

for at least 90 days in the 365 days preceding the vacancy, in a position for which the rate of pay is

equal to or greater than the minimum rate for GS-15 of the General Schedule.  *Id.* § 3345(a)(3).  This

third option is available even where the vacant office is the agency head.  *Cf. id.* § 3348(b)(2) (special

rule applicable for vacancies other than the agency head).  An acting official designated under the

FVRA can generally serve no longer than 210 days, subject to certain extensions depending on the

Senate calendar and the status of nominations to fill the position.  *See id.* § 3346.

The FVRA also contains a short list of specific offices to which it does not apply.  *Id.*

§ 3349c.  The office of Attorney General is not one of those offices.  Indeed, in enacting the FVRA,

Congress eliminated the previous exception that existed for the office of Attorney General in the

Vacancies Act, *see id.*, but retained section 508's preexisting "first assistant" designation for purposes

of section 3345, *see* 28 U.S.C. § 508(a).  Finally, the FVRA is by default the "exclusive means for

temporarily authorizing an acting official to perform the functions and duties of any office [requiring

Senate confirmation] of an Executive agency."  5 U.S.C. § 3347(a).  The FVRA is not exclusive,

however, where there is a relevant office-specific vacancy statute, such as section 508. *Id.* §
3347(a)(1).

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be
granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v.
Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up); *see Cobell v. Norton*, 391 F.3d 251, 258
(D.C. Cir. 2004). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def.
Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and "a plaintiff seeking a preliminary injunction
must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in
the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction
is in the public interest." *Id.* at 20, 24. A plaintiff cannot prevail without some showing on each
of those factors. *See id.* at 23-24, 31-32 (holding that "proper consideration of" balance of equities
and public interest "alone requires denial of the requested injunctive relief" and thus finding no need
to address likelihood of success).[10]

## ARGUMENT

### I.   Plaintiffs Have Not Established a Likelihood of Success on Their Claims.

The Final Rule sets forth thirty densely-reasoned pages of analysis that persuasively explain
why the "best interpretation" of the statutory definition of "machinegun" is one that includes bump
stocks. 83 FR 66514. In this analysis, the Department addressed the issues raised by tens of thousands
of commenters, including arguments identical to the interpretive challenges and procedural criticisms
raised in this action, as well as objections based on the agency's reversal of its previous classification

---

[10] The D.C. Circuit "has, in the past, followed the 'sliding scale' approach to evaluating preliminary
injunctions . . . . The continued viability of the sliding scale approach is highly questionable,
however, in light of the Supreme Court's holding in *Winter* . . ." *Singh v. Carter*, 185 F. Supp. 3d 11,
16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013)); *see also Davis v.
Pension Benefit Guaranty Corp*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J.,
concurring). Plaintiffs nevertheless contend that the sliding scale approach should be used, relying
on authority that predates *In re Navy Chaplaincy.* *See* Pls.' Mot. in Support of Prelim. Inj. ("Mot.") at
9, ECF No. 2-1 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir.
1995); *Davis* 571 F.3d at 1291–92).

decisions.  Plaintiffs' arguments add little to the prior comments and do not establish a substantial likelihood of success.  Nor are they likely to succeed in the single, novel claim presented here: the only courts to have ruled on the question have concluded that Acting Attorney General Whitaker's designation is valid.  *See U.S. v. Smith*, No. 1:18-CR-0015-MR-WCM, 2018 WL 6834712, at *3 (W.D.N.C. Dec. 28, 2018); *U.S. v. Peters*, 6:17-CR-55-REW-HAI-2, 2018 WL 6313534, at *1 (E.D. Ky. Dec. 3, 2018); *U.S. v. Valencia*, No. 5:17-CR-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018).

### A. The Final Rule States the Best Interpretation of the Terms "Single Function of the Trigger" and "Automatically" and Reasonably Applies Those Terms to Bump Stocks.

There can be no doubt that Congress did not intend for dangerous, automatic weapons that readily produce high effective rates of fire to be unregulated.  Congress concluded at the time it adopted the NFA that "there is no reason why anyone except a law officer should have a machine gun."  H.R. Rep. No. 73-1780, at 1 (1934); *see also* S. Rep. No. 82-1495, at 1-2 (1952) (explaining that the NFA had as its "principal purpose . . . to control the traffic in machine guns and sawed-off shotguns, the type of firearms commonly used by the gangster element").  Congress held the same view at the time of enactment of the GCA.  *See United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) (noting Congress's "specific declaration and finding that . . . machine guns . . . are primarily weapons of war" (quoting S. Rep. No. 90-1501, at 28 (1968))), *reh'g denied*, 204 F.3d 1119 (5th Cir. 1999).  And in adopting the FOPA in 1986, Congress continued to pay heed to the fact that law enforcement officers required "more effective protection . . . from the proliferation of machine guns."  H.R. Rep. No. 99-495, at 2, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1328, 1333.[11]

---

[11] At the time, machine guns were being increasingly "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime."  H.R. Rep. No. 99-495 at 4, 1986 U.S.C.C.A.N. at 1330.  The strictures of the NFA and GCA had proven inadequate to protect the public from these weapons.  As one senator explained, "[what] has changed . . . since the 1968 act . . . is that machine guns have become a far more serious law enforcement problem."  132 Cong. Rec. 9,602 (1986) (statement of Sen. Kennedy).  Although some Members of Congress assert today that Congress did not intend to ban all devices that operate like machine guns, *see, e.g.*, Mot. at 15, n.34 (citing statement of Sen. Feinstein), "subsequent statements by members of Congress do not constitute reliable evidence as to what Congress intended in the past."  *Fed./Postal/Retiree Coalit., AFGE v. Devine*, 751 F.2d 1424, 1429 n.9 (D.C. Cir. 1985).

Congress repeatedly singled out machine guns for special regulatory treatment, because "[m]achine guns are more dangerous in their likely effects" than other firearms: "[t]hey not only fire very quickly, but they are harder to shoot in a discriminating way, at least in their fully automatic mode." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1482 (2009).  If bump stocks continue to be misclassified as unregulated items, the result would be to permit continued, lawful possession in private hands of hundreds of thousands of devices that can convert an ordinary, semi-automatic rifle into a weapon with unhindered automatic firing capability—the very danger that the NFA and FOPA were intended to protect against.  *See* Final Rule, 83 FR at 66520-21; *United States v. Newman*, 134 F.3d 373 (6th Cir. 1998) (unpublished) ("Although the National Firearms Act is ostensibly a revenue-generating statute enacted under Congress's taxation power . . . close analysis of the relevant provisions reveals an unmistakable intent to prohibit possession of any machine gun the manufacture or importation of which was not explicitly authorized by [ATF].")

To be sure, Congress's purpose would be "irrelevant to the interpretation" of the statute if the statutory text clearly excluded bump stocks.  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 808–09 n. 3 (1989); *see U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) ("resort to legislative history is not appropriate in construing plain statutory language").  However, the Final Rule makes clear that this is not what the agency has done: the terms "automatically" and "single function of the trigger" contained in the definition of "machinegun" in the NFA *are* undefined, and the best interpretation of these terms includes bump stocks, because they serve as a self-acting mechanism that harnesses recoil energy to allow the trigger of a firearm to reset and continue firing without additional physical manipulation of the trigger by the shooter, so long as the shooter maintains continued rearward pressure on the trigger and forward pressure on the barrel shroud or forestock.  *See* 83 FR 66532.  Plaintiffs' arguments fail to demonstrate otherwise.

1. **The Final Rule Interprets "Automatically" and "Single Function of the Trigger" In a Manner Consistent With Their Ordinary, Accepted Meaning.**

To succeed in their claims challenging the substance of the Final Rule, Plaintiffs must

establish that the reasoning or conclusions in the Final Rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  To do so, Plaintiffs must demonstrate either that the Department has improperly interpreted the definitions of "automatically" and "single function of the trigger" as components of the definition of "machinegun" under the NFA, or that bump stocks do not fall within this interpretation of the statute.  Plaintiffs' arguments do not accomplish this objective, and therefore do not establish a likelihood of success on the merits.

The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "The agency's statement must be one of reasoning; it must not be just a conclusion; it must articulate a satisfactory explanation for its action," that does not "ignore evidence contradicting its position." *Butte Cty v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citation omitted).  When, as here, the question at bar requires analysis of a scientific or mechanical device, such "'scientific determinations' . . . [are] presumed to be the product of agency expertise." *Franks v. Salazar*, 816 F. Supp. 2d 49, 55 (D.D.C. 2011) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def Council*, 462 U.S. 87, 103 (1983)); *see Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 371 (D.N.H. 2015) (classification decisions "require expertise that is well within the ATF's grasp").

The Final Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger," along with "analogous motions," explaining that this "is the best interpretation of the statute" and "reflect[s] ATF's position since 2006."  83 FR 66518; *see also* 83 FR 66514 (explaining that ATF's past conclusions "did not reflect the best interpretation of 'machinegun' under the NFA and GCA").  "Pull the trigger" is the ordinary, accepted terminology in common use for how to discharge a firearm today, as it was in the era when the NFA was enacted.  *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); (Dwight D. Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a

trigger"). And this phrase has made it into common parlance as an idiom meaning "to make a final decision." *See* Idioms, The Free Dictionary, "pull the trigger," *available at:* https://idioms.thefreedictionary.com/pull+the+trigger (last visited Jan. 15, 2019). Recognizing the ubiquity of this usage, the Supreme Court has described a machine gun within the NFA's definition as one that "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

Adopting this interpretation of "single function of the trigger" accords with the ordinary meaning of the term "function," which includes "any of a group of related actions contributing to a larger action." Webster's Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College Edition, 297 (1984) (a synonym of function is "act"). With regard to a bump stock under the Final Rule, the action or act is a "pull of the trigger," which is the step that ultimately leads to automatic firing of what would otherwise be a semi-automatic firearm. In *United States v. Fleischli*, 305 F.3d 643, 654-56 (7th Cir. 2002) (superseded by statute for other reasons), the Seventh Circuit recognized that the definition of "single function of the trigger" reasonably encompassed "an electronic on-off switch rather than a more traditional mechanical trigger," thereby concluding that a "minigun" was a machinegun. In doing so, the Court rejected arguments that the minigun was not a machine gun because it was not fired by pulling a traditional trigger: "[the] electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun as defined in the National Firearms Act." *Id.* at 656.

This interpretation is also consistent with how the phrase "single function of the trigger" was understood at the time of the NFA's enactment in 1934. Prior to enacting the NFA, Congress received testimony that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934) (reproduced at Compl. Ex. A, p.

761).  In *Akins*, the Eleventh Circuit relied on these sources to conclude that ATF's interpretation of "single function of the trigger" to mean a "single pull of the trigger" "is consonant with the statute and its legislative history." *Akins*, 312 F. App'x at 200.[12]

The Final Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger" likewise accords with the plain meaning of that term.  83 FR 66553-54.  As the Final Rule explains, "'automatically' is the adverbial form of 'automatic,' meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]'" 83 FR 66519 (quoting Webster's New International Dictionary 187 (2d ed. 1934); 1 Oxford English Dictionary 574 (1933) (defining "automatic" as "[s]elf-acting under conditions fixed for it, going of itself.")).  This is consistent with the definition employed by the Seventh Circuit Court of Appeals in interpreting the definition of machine gun in *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009).  There, the Court explained that the statutory definition "delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading."  *Id.*  This use of the term "automatically"—to describe a device that assists in the channeling of energy into the subsequent operation of the trigger, but nevertheless includes some degree of manual input—is no different than other common uses of the term "automatic."[13]  For example, in a car, an "automatic"

---

[12] As the Final Rule explains, rather than narrowing the definition of "single function of the trigger" to be only a "single pull of the trigger," as proposed in the NPRM, DOJ is interpreting "pull" broadly to encompass other, analogous types of "functions" of the trigger that are analogous to a "pull," and would otherwise be excluded by adoption of a narrow interpretation of "single function of the trigger."  83 FR 66518 n.5; 83 FR 66534-35.  Such "analogous motions" include a "push," the "flipping of a switch," or other reasonable interpretations.  *See id.*  This is necessary to avoid "the absurd result of enabling persons to avoid the NFA" and ATF's post-2006 interpretation of the phrase "single function of the trigger" by reversing a trigger so that it is operated with a push or installing a switch or button to operate the trigger instead.  83 FR 66518 n.5 (citing *Fleischli*, 305 F.3d at 655-56).

[13] The dictionary definition of "machine gun" as an "arm operated by a mechanism, able to deliver rapid and continuous fire as long as the trigger is pressed," Mot. at n.38, has no bearing on the Final Rule interpretation of "single function of the trigger" and "automatically."  As Plaintiffs

transmission in a car relieves a driver from a portion, but not all, of the burdens of a manual gearshift.

### 2. The Final Rule Reasonably Applies Its Interpretations of "Automatically" and "Single Function of the Trigger" To Conclude That Bump Stocks Are Machine Guns Within the Meaning of the Statute.

The second component of the Final Rule, the addition of bump stocks to the regulatory definition of machine gun, is also reasonable. As the Department explained, incorporating the Final Rule's interpretations of "automatically" and "single function of the trigger" into Congress's definition of machine gun logically supports the Final Rule's clarification of the definition of "machine gun" to make clear that a machine gun includes a bump stock. To understand this conclusion requires examination of the actual mechanics of a bump stock, as installed on a commonly-owned semi-automatic firearm, a demonstration of which is already in the record *See* Compl. at Ex. 28 to Ex. A (video demonstrating bump stock operation).

The Final Rule sets forth these mechanics. "When a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger," that action helps to initiate "a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger." 83 FR 66519. As the Final Rule explains, this cycle requires several components to ensure that "a firing sequence that produces more than one shot" occurs. *Id.* One is that "the trigger finger remains stationary on the device's ledge." *Id.* Another is that "constant forward pressure" is maintained "with the non-trigger hand" on the appropriate part of the rifle. 83 FR 66518, 66532. When those conditions are satisfied and "a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot." 83 FR 66519. The "single pull of the trigger" is the shooter's initial, conscious finger movement to initiate the firing sequence. 83 FR 66532. The "automatic" element is the assistance the bump stock provides in "directing the recoil energy of the discharged rounds into the space created by the sliding stock." *Id.* The self-acting or self-regulating mechanism

acknowledge, *Congress* has supplied a definition of "machine gun," *see, e.g.*, Mot. at 14-15, and the interpretations in the Final Rule are of the component terms in that definition.

is the combination of the shooter's inputs on the trigger, the extension ledge, and the barrel shroud or fore-grip, along with the aforementioned "space" that provides a "constrained linear rearward and forward path[]." *Id.* Using this analysis, the Final Rule reasonably concludes that a bump stock is a machine gun.

Plaintiffs challenge this conclusion on a number of grounds; none have merit. First, Plaintiffs contend that because "bump-firing . . . is a technique" that "can be done with a belt loop, a rubber band, or just one's finger," the bump stock does nothing to change the "intrinsic capabilities" of a semi-automatic firearm and therefore is not appropriately classified as a machine gun. Mot. at 25-28. As the Final Rule explains, however, a bump stock does do something more than a shooter's finger, a belt loop, or a rubber band—it provides an empty space, and this space functions as a self-regulating mechanism that helps a shooter channel recoil energy that can then be used in resetting the trigger for the purpose of rapidly firing another round. *See* 83 FR 66531-32. "The very purpose of a bump-stock-type device is to eliminate the need for the shooter to manually capture, harness, or otherwise utilize [the recoil] energy to fire additional rounds, as one would have to do" without any assistance using one's finger. *Id.* Further, unlike a belt loop or a rubber band, bump stocks are "designed to be affixed" to a semiautomatic firearm. *Id.* at 66515, 66533. There is nothing arbitrary or capricious about a regulation that distinguishes among items *designed* to be paired with a regulated firearm, and those being repurposed from other uses, such as a belt loop or a rubber band.[14]

Second, Plaintiffs challenge the statement in the Final Rule that bump stocks "accelerate the firearm's cyclic firing rate to mimic automatic fire," asserting that this is incorrect. Mot. at 35; *see also*

---

[14] Plaintiffs also object to the purportedly-inconsistent treatment of "binary triggers" under the Final Rule because a binary trigger is a device that they contend permits two rounds to be fired with a single pull of the trigger. *See* Mot. at 32, n.66. When a binary trigger is installed in a weapon, one round is fired when the trigger is pulled, and another is fired when the trigger is released. *See id.* The Final Rule addresses the difference: "Even if [the trigger] release results in a second shot being fired [from a binary trigger] . . . it is as the result of a separate function of the trigger." 83 FR 66534. This is because "single pull of the trigger" includes both a pull of the trigger and an analogous motion, which can reasonably be interpreted to include the release of the trigger. *Id.* Thus, although a binary trigger does permit two rounds to be fired with a single *pull* of the trigger, only one round is being fired with a single function of the trigger.

Compl., Ex. A, Ex. 32 at ¶¶ 9-10 ("The cyclic rate of a firearm is neither increased nor decreased by the use of a bump stock . . . [a] factory semi-automatic and fully-automatic . . . firearm . . . will have identical cyclic rates").  But Plaintiffs misread the Final Rule.  As the Final Rule explains, the agency's emphasis in that sentence is on how *shooters use* bump stocks—and a shooter who uses a bump stock typically does so to accelerate the firing rate *he* or *she* can attain relative to his or her use without a bump stock.  *See id.*; 83 FR 66516 ("Shooters use [bump stocks] . . . to accelerate the . . . cyclic firing rate").  Although the "cyclic rate of both the semi-automatic and fully automatic versions of a firearm are identical (and thus cannot be accelerated)," as Plaintiffs explain, this does not invalidate the "entire premise" of the Final Rule.  Mot. at 35-36.  Rather, the agency's focus is on the "increased rate of fire that a particular shooter may achieve," and the "rate of fire is not relevant to [the] determination" of whether a bump stock is a machine gun.  83 FR 66533.

Finally, Plaintiffs assert that a series of videos submitted as exhibits to their Complaint, the interpretation of one such video (*Bump Stock Analytical Video*, *see* Compl. at Ex. 28 to Ex. A, *also available at*: https://youtu.be/1OyK2RdO63U)[15] by a former ATF official (the ex-Acting Chief of the Firearms Technology Branch Rick Vasquez), and disagreement with the Final Rule by that official, demonstrate that bump stocks do not satisfy the Department's revised definitions of "single function of the trigger" and "automatically."

Although Mr. Vasquez served in a critical agency function, his views now are entitled to minimal weight.  Congress has conferred on the agency, not its former officials, the responsibility of interpreting ambiguous terms in the firearms laws, including the responsibility of weighing competing risks and priorities, and determining the appropriate course of action.  *See Via Christi Regional Med. Ctr. v. Leavitt*, 2006 WL 2773006 (D. Kan. Sept. 25, 2006) ("opinion testimony . . . [of]

---

[15] This video contains several sequences, at regular speed and in slow motion, of the firing of what Plaintiffs characterize as a Slide Fire SSAR-15 SBS, a type of bump stock.  The video depicts a comparison of the operation of a "bump-stock equipped firearm with the stock in the locked position," with its operation one-handed after "unlock[ing] the stock so that it can move freely on the buffer tube," and with its operation as used in its intended bump firing mode: with the shooter maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle.  *See* Mot. at 34-35.

former agency officials . . . is of limited value . . . [because] the personal opinion of such officials as to what the regulations were intended to mean . . . does not bind the agency"); *cf. Shaffer v. Defense Intelligence Agency*, 102 F. Supp. 3d 1, 13, n. 14 (D.D.C. 2015) ("former CIA employee's personal opinion did not undermine the Government showing that the information was classified").  Nor is it relevant that Mr. Vasquez himself determined, with the input of agency leadership, that a bump stock "does not fire automatically with a single pull," in part because "it requires a thought process of the individual to continually pull the trigger."  *See* Mot. at 28, 33 and Compl. at Ex. 32 to Ex. A. This may have seemed the correct conclusion at the time, but Mr. Vasquez and others at the agency reached these conclusions without the benefit of the definition of "automatically" set forth in the Final Rule, and in any event, that past conclusion cannot substitute for the Department's official determination today. *See Christmann & Welborn v. Dep't of Energy*, 589 F. Supp. 576, 581 (N.D. Tex. 1984) ("former government officials' personal opinions as to intent of an agency [cannot] bind the government").[16]

As to the substance of Mr. Vasquez's analysis and Plaintiffs' videos, Plaintiffs appear to be using these videos to establish three facts about the operation of bump stocks:[17]

- The shooter's finger does not remain in contact with the trigger throughout the firing sequence.  *See* Compl., Ex. A, Ex. 32, ¶ 9(a) & n.1.

- The shooter's finger does not remain fixed throughout the firing sequence.  *See id.* at ¶ 9(c).

- The bump stock does not "absorb the recoil and use the [recoil] energy to activate" the trigger without the involvement of the shooter.  *Id.* at  ¶ 9(e).

---

[16] One interview with Mr. Vasquez cited by Plaintiffs is particularly irrelevant, as it predates the issuance of, and analysis in, the NPRM as well as that of the Final Rule.  *See* Mot. at 28 (citing Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube (Oct. 11, 2017), https://www.youtube.com/watch?v=kryIJIrD5eQ&t)).

[17] Defendants do not dispute that, as Mr. Vasquez explains, the video "fully, explicitly, and accurately depicts the function of [the bump stock demonstrated therein], including, but not limited to, the function and operation of the firearm's trigger."  Mot. at 34.

All of these are true statements about the operation of a rifle fitted with a bump stock.  However, none of these facts invalidates the conclusion of the Final Rule that a bump stock allows a shooter "to initiate a continuous firing cycle with a single pull of the trigger . . . by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy . . . [by] allow[ing] the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter."  83 FR 66515.  The relevance of each fact can be dismissed in turn.

### i.   Contact between the shooter's finger and the trigger.

Plaintiffs contend that because, as documented in their video, a bump stock "actually requires over-releasing of the trigger . . . by approximately a half-inch," a bump stock is operating through multiple trigger pulls, not a single pull or single function of the trigger.  Compl., Ex. A, Ex. 32 at ¶ 9(a) & n.1; *see* Mot. at 34, n.76.  This places too much weight on the physical separation between trigger and finger.  The verb pull means:

> To exert upon (something) a force which tends to draw, drag, or snatch it towards oneself, or away from its present position (whether or not movement takes place as a result); to drag or tug at."

"Pull, v." *OED Online*. Oxford University Press, December 2018, http://www.oed.com/view/Entry/154317?rskey=QI8tWH (last visited Jan. 8, 2019).  This definition makes clear that the relevant elements are the overall "exert[ion]" and its direction with regard to "its present position." *Id.*  And because it is immaterial to the definition whether or not movement takes place as a result, the fact that a shooter's finger is discontinuously touching the trigger also does not limit whether a single pull is occurring, as long as it is all a part of a single "exert[ion]."  Here, even though the trigger loses contact with the finger—described by Plaintiffs as "travel[ing] past the trigger reset by approximately a half-inch"—so that it can "be fully released [and] reset," Mot. at 34 n.76 (quoting Final Rule at 66517), there is a constant exertion on the bump stock which corresponds to constant intent by the shooter to continue to pull on the trigger, permitting the movements of the trigger to be classified properly as a "single pull of the trigger."[18]  *See* 83 FR 66533 (recognizing that the trigger

[18] A comparable example would include the pulling of a long rope using a hand-over-hand motion. For example, if a boater brings aboard a line that is trailing in the water, he might employ both

finger releases and re-engages the trigger, and noting that a bump stock "allows for a single pull, and the self-acting or self-regulating device automatically re-engages the trigger finger").

### ii.   Movement by the shooter's finger during the firing sequence.

Plaintiffs also contend that because the shooter's finger does not remain in a fixed position while it pulls the trigger during the firing sequence, the Final Rule is in error in its conclusion that "the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." 83 FR 66515; *compare* Mot. at 34.  This is simply a disagreement with the interpretation that the Final Rule assigns to the actions of the shooter in pulling the trigger – the Department has concluded that the movement of the shooter's finger does not equate to a separate pull and release of the trigger or additional physical manipulation.  Review of the video illustrates that the bump stock is indeed facilitating an automatic firing sequence by enabling the shooter to continue the firing sequence with the "release, reset, and pull[]" of the trigger for the follow-on shots without conscious input or direction to the trigger finger.  *See* Mot. at 35; *Bump Stock Analytical Video* at 3:47-4:01, Compl. at Ex. 28 to Ex. A, *also available at*: https://youtu.be/1OyK2RdO63U.  This is in contrast to other videos illustrating the activities of expert shooters without bump stocks, which demonstrate that "skilled shooters may be able to fire more rapidly than a shooter [with] a [bump stock] . . . by pulling and releasing the trigger for each shot fired." 83 FR 66533; *compare, e.g.*, Pls. Ex. 3 ("Worlds Fastest Shooter vs Bump Fire").  That the agency and Plaintiffs reach different conclusions regarding whether slight motion by the trigger finger between the firing of each round constitutes "additional physical manipulation" or a second "pull of the trigger" does not undercut the Final Rule's conclusion that the bump stock facilitates a self-acting, *i.e.*, automatic, firing sequence.

### iii.  Involvement of shooter in channeling recoil energy.

Finally, Plaintiffs rely on the video and Mr. Vasquez's analysis to challenge the agency's conclusion that a firearm fitted with a bump stock is firing automatically, because the video

---

hands in sequence as he coils it.  Neither hand remains in constant contact with the rope, but it would be appropriate to describe his actions as pulling the line aboard in a single pull.

demonstrates that the shooter, and not the bump stock alone, is "harnessing the recoil energy" of the firearm.  Mot. at 35.  However, the Final Rule acknowledges the fact that the channeling of recoil energy relies on "the shooter's maintenance of pressure (typically constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger)," and not on an "internal spring" or other similar, energy-absorbing mechanism contained within the bump stock.  83 FR 66516.  The term "automatically" does not require that a mechanism like a bump stock function without shooter involvement, but only that it do so with "*little . . . human control.*"  *See* "automatic, adj." *OED Online.* Oxford University Press, December 2018 (last visited Jan. 11, 2019) ("2b. a machine, appliance, etc.: that does not require an operator; that works by itself under fixed conditions, with little or no direct human control.").  Indeed, the Final Rule explains that this is the error made in the previous analysis: "[I]n the Department['s] previous classification of some [bump stocks] as non-machineguns, it relied on the mistaken premise that the need for 'shooter . . . input' for firing . . . means that such devices do not enable 'automatic' firing."  83 FR 66531.

In essence, Plaintiffs' disagreement with this aspect of the Final Rule is one of degree: how much human intervention is necessary to require that a bump stock not be treated as a "self-acting" or "self-regulating" mechanism.  In the Final Rule, the Department has reasonably set forth its answer: a bump stock is a self-acting or self-regulating mechanism because it reduces to "little" the required degree of shooter involvement when it "direct[s] the recoil energy of the discharged rounds" through the guidance of the shooter's arms and "into the space created by the sliding stock in constrained linear rearward and forward paths."  *Id.* at 66518.[19]  As the Final Rule explains, this

---

[19] If read in isolation, certain statements in the Final Rule could be misinterpreted to suggest that the classification of bump stocks as machineguns relies on the absence of human involvement in the harnessing of recoil energy.  *See, e.g.*, 83 FR 66518 ("[T]he device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire"); *Id.* at 66532 (the bump stock "design eliminates the requirement that a shooter manually capture and direct recoil energy"); 83 FR 66533 ("bump stocks . . . are specifically designed to capture the recoil energy").  However, the context makes clear that the agency understands that humans play the primary role in absorbing and releasing the recoil energy.  *See, e.g.*, *Id.* at 66518 ("Shooters . . . direct[] the recoil energy of the

degree of human involvement is consistent with the analysis set forth by the Seventh Circuit: "[*U.S. v.*] *Olofson* . . . requires only that the weapon shoot multiple rounds with a single function of the trigger 'as the result of a self-acting mechanism,' *not* that the self-acting mechanism produces the firing sequence without any additional action by the shooter." *Id.* at 66519 (quoting 563 F.3d 652, 658 (7th Cir. 2009)) (emphasis added).  Plaintiffs have not established that the Final Rule's line-drawing decision is unreasonable, arbitrary, or capricious.

Ultimately, Plaintiffs' video evidence demonstrates that the primary purpose of a bump stock is to accelerate the rate of firing that a typical shooter can attain to a rate that is comparable to that of a traditional machine gun or to the "Worlds Fastest Shooter." *See, e.g.*, Pls. Ex. 3 ("Worlds Fastest Shooter vs Bump Fire"); Pls. Ex. 28 ("Bump Stock Analytical Video, June 14, 2018).  The videos further demonstrate that this process is automatic: even though the shooter's finger is neither perfectly still nor in continuous contact with the trigger, and the shooter must engage in constant forward and rearward pressure, the result is a more automatic process of repeat fire by a single pull of the trigger than would exist without the presence of the bump stock.

## B.  The Final Rule Reflects an Appropriate Exercise of DOJ's Interpretive Authority and Is Procedurally Proper.

Plaintiffs' procedural attack on the Final Rule under the APA has two parts: first, Plaintiffs assert that Defendants may not interpret the meaning of the term "machine gun" because Congress has already defined the term and because the FOPA deprives DOJ and ATF of interpretive authority over that definition in some unspecified way.  *See* Mot. at 14-18.  Second, Plaintiffs claim that purported procedural irregularities in the notice-and-comment process require invalidation of the Final Rule.  *See* Mot. at 19-24.  Plaintiffs have not established a reasonable likelihood of success regarding any of these arguments.

### 1.  FOPA Does Not Deprive ATF or DOJ of Interpretive Authority Over the Definition of Machine Gun.

Plaintiffs postulate that, by enacting FOPA, Congress has "legislated to limit the authority of

---

discharged rounds into the space created by the sliding stock"); *id.* at 66532 ("the shooter . . . direct[s] the recoil energy . . . .").

ATF to impose more burdens on law-abiding citizens." Mot. at 14. Plaintiffs' argument appears to rely solely on the "Congressional Findings" section of FOPA, and not on any actual operative text in that statute. *See* Mot. at 14-15 (citing FOPA § 1(b)). It is true that, in FOPA, Congress stated that it "finds that":

> (1) the rights of citizens —
> (A) to keep and bear arms under the second amendment to the United States Constitution . . .
> (C) against uncompensated taking of property, double jeopardy, and assurance of due process of law under the fifth amendment . . .;
> require additional legislation to correct existing firearms statutes and enforcement policies; and
> (2) additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law–abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law–abiding citizens for lawful purposes."

Pub. L. No. 99-308, 100 Stat. 449. But the operative language of FOPA makes clear that Congress intended, through that statute, to bar the private possession of newly-manufactured machine guns absent one of the specified exceptions. Section 102 of FOPA does so explicitly, notwithstanding the Findings section, by adding subsection "o" to 18 U.S.C. § 922, and thereby making it "unlawful for any person to transfer or possess a machinegun" except if done "by or under the authority of, the United States or any department or agency thereof or a State . . ." or with regard to a machine gun "lawfully possessed before the date [the] subsection takes effect." *Id.* § 102(9). In contrast, there is no operative language in FOPA that strips interpretive authority from ATF, and indeed, Section 106 of FOPA strongly implies that ATF does have such interpretive authority, because it mandates that ATF provide "ninety days public notice" and "afford interested parties opportunity for hearing" before promulgating rules and regulations "necessary to carry out" the ban on machine guns and other GCA provisions. FOPA § 106; 18 U.S.C. 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter").

It is well-established that, in the absence of operative statutory language, a "quoted statement of congressional findings is a rather thin reed" on which to imply statutory requirements that are "neither expressed nor fairly implied in the . . . operative sections" of a statute. *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 260 (1994); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 620-21 (1999) (Thomas, J., dissenting) ("congressional findings, . . . written in general, hortatory terms . . . provide little guidance to the interpretation of the specific language" in a statute). This is because "'Findings' and 'purpose' clauses [that] are common in federal statutes . . . are usually sweeping in scope . . . [,] [b]ut in legislation details matter." *City of Joliet, Ill. v. New West, L.P.*, 562 F.3d 830, 836 (7th Cir. 2009). As in *Scheidler*, "Congress could easily have narrowed the sweep" of ATF's authority by placing an explicit limitation on the agency's rulemaking power. *Scheidler*, 510 U.S. at 260-61. Instead, Congress imposed only additional procedural requirements on ATF's exercise of its authority—a 90-day notice provision and an "opportunity for hearing" requirement—not a broader bar. FOPA § 106.

### 2. The Agency Has the Authority to Adopt Definitions of Undefined or Ambiguous Terms, Including "Automatically" and "Single Function of the Trigger."

"The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Where Congress has "fail[ed] to define a term," or left the term open to multiple interpretations, there is "an implicit legislative delegation of authority to . . . clarify the undefined term." *Walshire v. United States*, 288 F.3d 342, 347 (8th Cir. 2002). These general principles apply even to interpretations of criminal statutes that are not entitled to deference, so long as the terms are given their "ordinary, accepted meaning." *Burrage v. United States*, 571 U.S. 204, 216 (2014); *see United States v. Apel*, 571 U.S. 359, 369 (2014) (Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference").

As an initial matter, because the GCA "authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to

determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990).[20] ATF has routinely provided regulatory definitions of the terms that Congress did not define in the GCA and NFA. *See, e.g.*, 33 FR 18555 (Dec. 14, 1968); 63 FR 35520 (June 30, 1998); 81 FR 2658 (Jan. 15, 2016) (defining "frame or receiver" and "manual reloading," terms in the NFA that Congress did not define); *see United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 419 (6th Cir. 2006) (noting that the NFA does not define the phrases "designed to shoot" or "can be readily restored" in the definition of "machinegun"). And federal courts have recognized ATF's authority to classify devices as "firearms" under Federal law. *See, e.g., Demko v. United States*, 44 Fed. Cl. 83, 93 (1999) (destructive device); *Akins*, 312 F. App'x 197 (machine gun).

Contrary to Plaintiffs' suggestion that the statute is unambiguous and thus, that the agency lacks authority to "rewrite clear statutory terms," Mot. at 17 (quoting *Util. Air Regulatory Grp. v. EPA*, 572 U.S. 302 (2014)), courts have held otherwise. The *Akins* case is instructive, as the court there recognized ATF's interpretive authority—postdating enactment of the FOPA, *see* 100 Stat. 449 (1986)—to interpret the term "single function of the trigger" as part of the definition Congress provided for machine gun. *See Akins*, 312 F. App'x at 200. The Court implicitly accepted ATF's *authority* to issue an interpretation of the statutory term, and then assessed whether ATF's conclusion that "the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Id.*[21] The Court's conclusion is consistent with the fact that, although Congress defined "machinegun" in the NFA, 26 U.S.C. 5845(b), it did not further define the components of that definition. *See, e.g., One TRW*, 441 F.3d 419. Courts have likewise recognized that ATF has the authority to issue rulings defining "automatically" in the statutory

---

[20] To the extent Plaintiffs contend that the Final Rule is not a "rule and regulation[] . . . necessary to carry out provisions of the GCA and NFA," *see* Mot. at 17 n. 39 (quoting 18 U.S.C. § 926(a)), the Final Rule explains why this argument is in error, with specific reference to *Brady*. *See* 83 FR 66527. Definitions of "terms . . . that Congress did not define" are "necessary to explain and implement the statute." *Id.* (citing, *e.g.*, *Akins*, 312 F. App'x 197).

[21] This example illustrates the error in Plaintiffs' assertion that because "Congress clearly defined the meaning of the term 'machinegun,'" the Department lacks authority to further define terms Congress used in that definition, *i.e.*, "single function of the trigger" and "automatically." Mot. at 17.

definition.  *See York v. Sec'y of the Treasury*, 774 F.2d 417, 419-20 (10th Cir. 1985).  Thus, even though

Congress has provided "a definition which declares what ["machinegun"] means," Mot. at 17

(quoting *Colautti v. Franklin*, 439 U.S. 379, 392-93 n.10 (1979)), Defendants may appropriately

interpret the components of that definition that Congress has not further defined.

The Department's authority to address the ambiguity in the statutory definition of machine

gun extends to the inclusion of the last two sentences of the definitions in 27 C.F.R. §§ 478.11 and

479.11.  Plaintiffs are correct that the Department lacks authority to "expand[] the definition" of

machine gun, but these sentences do not do so: rather, they clarify the application of the definition

of machine gun to bump stocks.  *Compare* Mot. at 16 *with* Final Rule, 83 FR at 66519.

### 3.   The Final Rule Reasonably Explains the Change From Previous ATF Classification Decisions Regarding Bump Stocks.

Plaintiffs make much of the contrast between the Final Rule and previous ATF classification

decisions regarding bump stocks that the Final Rule reverses, as well as the communication of ATF's

prior position regarding bump stocks to Members of Congress and in litigation.  But the Final Rule

makes no secret of the fact that the application therein of the definitions of "single function of a

trigger" and "automatically" to bump stocks represent a "change [in] course" that requires the

Department "to reconsider and rectify its past classifications."  83 FR 66531.  In such circumstances,

"[s]o long as any change is reasonably explained, it is not arbitrary and capricious for an agency to

change its mind in light of experience, . . . new or additional evidence, or further analysis or other

factors indicating that the agency's earlier decision should be altered or abandoned."  *New England*

*Power Generators v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018); *see Harris Found. v. FCC*, 776 F.3d 21,

24 (D.C. Cir. 2015) ("An agency must . . . display awareness that it is changing position; it cannot

depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").  The Final

Rule *does* "display awareness" of the change and reasonably explains the change in course.

"[I]t is well understood that [a]n agency is free to discard precedents or practices it no longer

believes correct.  Indeed we expect that an[ ] agency may well change its past practices with advances

in knowledge in its given field or as its relevant experience and expertise expands."  *Williams Gas*

*Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006). Thus, "agencies must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (quoting *State Farm*, 463 U.S. at 42). This avoids the inflexibility that would result if an "initial agency interpretation [were] instantly carved in stone" and an agency could not "consider varying interpretations and the wisdom of its policy on a continuing basis." *Harris Found.*, 776 F.3d at 24 (quoting *State Farm*, 463 U.S. at 42).

The Department's explanation for the change in course is straightforward. In light of the use of bump stocks by the Las Vegas perpetrator and the large number of casualties in that mass murder, the Department acted on requests from the public and Members of Congress and instructions from the President and revisited the past classification decisions and analysis. *See* Final Rule, 83 FR 66528-29. Upon doing so, the agency recognized that it had erred in the application of the statutory definition, resulting in the misclassification of some bump stocks. *See id.* at 66531. In light of this misclassification, the Department concluded that the statutory definition and its application needed to be clarified to provide the "best interpretation" of the statutory terms, and this rulemaking ensued. [22]  *See id.*

As to the application of the clarified definitions of "single function of the trigger" and "automatically" to reverse previous ATF classification decisions, it is axiomatic that the Department and ATF possess the authority "to reconsider and rectify errors" because an "agency, like a court, can undo what is wrongfully done by virtue of its order." *Gun South Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989) (quoting *United Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229 (1965)); *see also Dun & Bradstreet Corp. Found. v. U.S. Postal Service*, 946 F.2d 189, 193 (2d Cir. 1991) ("It is widely accepted that an agency may, on its own initiative, reconsider its interim or even its final decisions, regardless of whether the applicable statute and agency regulations expressly provide for such

---

[22] The past classification decisions cited by Plaintiffs are directly affected by the Final Rule's interpretations of "automatically" and "single function of the trigger." For example, both the June 7, 2010 determination letter to Slide Fire and the April 2, 2012 letter to Bump Fire Systems relied on ATF's interpretation of the term "automatically." Mot. at 12-13. The latter also relied on ATF's interpretation of the term "single trigger function." *Id.* at 13.

review").  The now-reversed classification decisions, along with ATF's past statements regarding its authority to regulate bump stocks, amount to such errors.  *See* Final Rule, 83 FR 66531.  Absent the revised definition of "automatically" to encompass the initiation of a self-regulating firing sequence with a single pull of the trigger, it was indeed true that ATF could not "restrict [bump stocks'] lawful possession, use or transfer," Mot. at 16 (quoting Apr. 16, 2013 Letter from ATF to Rep. Ed Perlmutter, Compl., Ex. A, at p. 267), because ATF was mistakenly failing to treat these devices as machine guns.  Plaintiffs suggest that the repetition of that error "at least ten [] times" and the official communication of that position to Congress affects the agency's ability to correct the error. Mot. at 12-13.  But the agency's authority to reconsider "the wisdom of its policy," *Harris Found.*, 776 F.3d at 24, is unaffected by the fact that it took years until the first substantiated unlawful use of a bump stock occurred, or by the fact that during that time, bump stocks became popular among some firearms owners and hundreds of thousands were purchased by the public.  *See* Final Rule, 83 FR 66529 (noting it was "the Las Vegas shooting [that] illustrated the particularly destructive capacity" of bump stocks in similar circumstances).

Nor does ATF's past, inconsistent treatment of the meaning of the terms "single function of the trigger" or "automatically" undercut the Final Rule.  Much of ATF's past analysis has focused, not on the meaning of the word "automatically" or on whether a bump stock (when combined with a semiautomatic firearm) created a self-regulating system, but rather, whether particular parts (that would conclusively establish that the "automatically" condition was met) were present.  *See* Final Rule, 83 FR 66518 ("none of [ATF's past classification decisions] extensively examined the meaning of 'automatically.'").  Thus, in classification decision 3311/2010-434 (June 7, 2010), which ATF issued to Slide Fire, ATF assessed whether the stock had "automatically functioning mechanical parts or springs" or whether the stock itself "perform[ed] [an] automatic mechanical function when installed."  Compl., Ex. A at 264; *see* Mot. at 12.  Similarly, in its April 16, 2013 letter to Rep. Perlmutter, ATF contrasted its evaluation of bump stocks with the Akins Accelerator, and focused on whether the devices "incorporated a mechanism to automatically reset" the firearm.   Compl. Ex. A at 267.  In other cases, although ATF correctly focused on the system created by an installed

bump stock, ATF did not consider the meaning of the term "automatic" or "automatically" and simply concluded that the fact that a shooter must manually "pull[] the firearm forward to fire each shot" with the non-shooting hand was sufficient to render the device non-automatic. *See* ATF Class. Decision 3311/2012-196 (Apr. 2, 2012) (to Bump Fire Systems), Compl. Ex. A at 277-78.[23]

To be sure, the Department has previously distinguished bump stocks from machine guns by arguing that a bump stock "shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like." Compl., Ex. A, at 708 (quoting Br. in Support of Cross Motion for Summary Judgment, *Freedom Ordnance Mfg., Inc., v. Brandon*, Case No. 3:16-cv-00243 (S.D. Ind. July 27, 2017). This argument, however, did not reflect the correct definition of the term "automatically" as published in the Final Rule. Because the "best interpretation" of the term "automatically" in conjunction with a "separate[] pull of the trigger" is "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," the correct understanding of the functioning of a bump stock under the Final Rule is that a "separate[] pull [of] the trigger" is not in fact required for each firing of the gun. Rather, the space in a bump stock serves as a self-regulating mechanism into which the shooter can channel recoil energy. The presence of that self-regulating mechanism belies Plaintiffs' efforts to rely on the "shooter input in pushing the weapon forward" as a "contingent" step that defeats a finding of automation. *See* Mot. at 14.

### 4. In Promulgating the Final Rule, the Department Complied With The Public Hearing and 90-Day Comment Provisions Identified by Plaintiffs.

Plaintiffs identify three purported procedural errors in the promulgation of the Final Rule, alleging that Defendants have not complied with provisions of 18 U.S.C. § 926(b) concerning public hearings and a 90-day comment period, or with requirements of the FOIA. There is no requirement of a public hearing, however, only a requirement that Plaintiffs have an opportunity to request a

---

[23] The Department's revised definitions of "single pull of the trigger" and "automatically" illustrate why Plaintiffs' citations to, *inter alia*, DOJ's past legal positions, testimony to Congress, and statements of law enforcement personnel have no bearing on whether the Department has "authority to restrict . . . possession, use, or transfer" of bump stocks. *See* Mot. at 13-17.

public hearing, which they have had.  In addition, the Department believes that commenters did have a full ninety days from publication to comment on the Final Rule.  And even if the agency made any procedural error in adopting the Final Rule, Plaintiffs have not demonstrated prejudice caused by that error, and thus, such error provides no basis to enjoin the Final Rule.  *See Ozark Auto. Distrib., Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) ("In administrative law . . . there is a harmless error rule: § 706 of the APA, 5 U.S.C. § 706, instructs reviewing courts to take 'due account . . . of the rule of prejudicial error'") (citation omitted).

18 U.S.C. § 926(b) provides that "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing [] rules and regulations" interpreting the GCA and NFA.  Several parties, including some of the Plaintiffs here, "requested a hearing pursuant to the NPRM because they want the opportunity to be heard." Final Rule, 83 FR 66542.  In the Final Rule, the Department rejected those requests, explaining that the comprehensive public record from comments suggests that "a public hearing would [not] meaningfully add data or information germane to the examination of the merits of the proposal or . . . provide substantive factual information that would assist the Department in improving the rule in material ways." *Id.*

Under these circumstances, there is no legal requirement of an oral hearing.  The Fourth Circuit has explained that, notwithstanding Plaintiffs' interpretation of its text, 18 U.S.C. § 926(b) is not a:

> provision guaranteeing interested parties the right to an oral hearing. . . . It is well-settled that the requirement of a hearing does not necessitate that the hearing be oral. Here, the Secretary, pursuant to regulation, reserved for himself the right to determine whether an oral hearing should be held.  He ultimately determined that an oral hearing was unwarranted, but did provide interested parties with the opportunity to submit written comments.  This is all the hearing requirement in § 926(b) demands.

*Brady*, 914 F.2d at 485 (citations omitted).  The statutory "opportunity" for a hearing has thereby been interpreted as the opportunity for the agency to field requests for an oral hearing and

determine whether one would materially advance the rulemaking.  *Id.*; *see generally United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224 (1973) (question of whether a formal hearing is necessary turns on the meaning of the particular statute involved).  Here, as in *Brady*, the Department has made the determination that an oral hearing is unnecessary.  *See* Final Rule, 83 FR 66542 ("A comprehensive public record has already been established through the comment process . . . [and] a public hearing would not meaningfully add data or information germane to the examination").

Importantly, Plaintiffs have not identified any purpose that would be served by a hearing, such as evidence or argument that would be provided to the agency beyond that which appears in the tens of thousands of unique comments.  For example, Plaintiffs do not contend that the agency might have reached a different result had Plaintiffs or their counsel appeared at the hearing with a mechanical model of a bump stock in order to demonstrate the physical principles of its operation.  Absent some value to be accomplished at an oral hearing, the APA does not require this Court to order "a meaningless gesture . . . [that] would accomplish nothing "save further expense and delay." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) (quoting *Kerner v. Celebrezze*, 340 F.2d 736, 740 (2d Cir. 1965); *but see Citizens Telecom of Minn. v. FCC*, 901 F.3d 991, 1005-06 (8th Cir. 2018) ("[r]equiring more than a procedural violation . . . in order to find prejudice would risk virtually repealing the APA's procedural requirements").

As to the 90-day comment period requirement, the Department has "acknowledge[d] that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal."  Final Rule, 83 FR at 66541.  The Final Rule addressed one such source of confusion: an error made by the third-party managers of the Regulations.gov website, who placed the link for providing comments under the "Docket ID" for a different, already-closed rulemaking activity: the ANPRM that ATF had issued in advance of the NPRM.  *See id.* at 66542 (explaining that "the ANPRM link . . . was prominently situated on the homepage of the *Regulations.gov* website even though that link was no longer able to accept comments").  The Final Rule explained, however, that the Department believes that commenters did have a 90-day period in which to provide comments: "a simple search for 'bump

stock' in the main search bar on *Regulations.gov* during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments," *id.*, and common sense suggests that this is a technique most interested commenters would likely have used to locate the link at which to comment.

To be sure, Plaintiffs' June 19, 2018 comment, as reproduced in Exhibit A, appears to identify a *different* problem with the comment submission system that the Department did not address in the Final Rule.  Plaintiffs provided an image of the NPRM docket during the comment period with an error message they apparently received, stating "Comment Period Closed," and "comments are no longer being accepted."  Compl., Ex. A, at 17.  However, that image reveals that some "35,586 public comments" had already been received with "89 days" remaining, notwithstanding the technical difficulties that prevented Plaintiffs' comment from being submitted at that particular time.  This confirms the conclusion set forth by the Department in the Final Rule: "ATF received numerous comments from the very beginning of the comment period."  Final Rule, 83 FR 66542.  Plainly, even if there were some technical or administrative issues that affected the ability of some commenters to comment, the opportunity to comment nevertheless existed throughout the comment period.  *See Nevada*, 457 F. 3d 90 ("The many comments submitted in response to the [notice] manifest that the public had sufficient information to comment").

Finally, because even Plaintiffs acknowledge that any disruption associated with the website ended "five days into the comment period," Mot. at 22, any commenters who were turned away during those five days had a full 85 additional days in which to submit their comments.  There is therefore no reason to believe that there was any prejudice associated with these technical difficulties, nor any reason to think that "extend[ing] the applicable comment period[]," as Plaintiffs suggest, would have materially affected the outcome of the rulemaking.[24]  Mot. at 23-24; *see United States v. Johnson*, 632 F.3d 912, 932 (5th Cir. 2011) (failing to solicit comments on a rule "not

---

[24] As set forth in the Final Rule, the handful of examples of agencies extending comment periods were not the result of similar technical difficulties, but instead, "were apparently all the result of the lapse in government funding that occurred in October 2013."  83 FR at 66542; *compare id. with* Mot. at 23-24 (citing extended comment periods from October and November, 2013).

prejudicial" where "[t]here is no suggestion that, if given the opportunity . . . [comments] would have presented an argument the [agency] did not consider").

**C. Plaintiffs' Freedom of Information Act Request Provides No Basis for a Preliminary Injunction.**

Plaintiffs also rely on their claims based on the agency's failure to comply with its FOIA obligations, *see* Am. Compl. at ¶¶ 61-64; 125-28 (citing 5 U.S.C. § 552(a)), as part of their motion to preliminarily enjoin the Final Rule. A preliminary injunction, however, only grants "intermediate relief of the same character as that which may be granted finally," *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220, (1945), and an injunction against the Final Rule would not be available as relief under FOIA. *See generally Am. Mail Line, Ltd. v. Gulick*, 411 F.2d 696, 701 (D.C. Cir. 1969).

Plaintiffs appear not to recognize the limited scope of relief under FOIA. "FOIA represents . . . a comprehensive scheme, which provides requesters with the potential for injunctive relief only . . . to enjoin the withholding of documents or to compel production of agency records." *Johnson v. Exec. Ofc. for U.S. Attorneys*, 310 F.3d 771, 777 (D.C. Cir. 2002). An injunction that bars Defendants from making effective the Final Rule and thereby classifying bump stocks as machine guns is not of the "same character" as an order requiring Defendants to produce documents. *De Beers*, 325 U.S. at 220; *Sai v. TSA*, 54 F. Supp. 3d 5, 8-9 (D.D.C. 2014) ("a preliminary injunction may not issue when it is not of the same character as that which may be granted finally and when it deals with matter outside the issues in the underlying suit" (quoting 11A C. Wright, A. Miller, & M. Kane, Fed. Practice & Procedure § 2947 (3d ed.))).

Moreover, it is generally the case that preliminary injunctions are not appropriate in FOIA cases, and requests for preliminary injunctive relief for claims brought under the FOIA are routinely denied. *See Judicial Watch, Inc. v. U.S. Dept. of Homeland Sec.*, 514 F. Supp. 2d 7, 11 (D.D.C. 2007) (denying motion for preliminary injunction to compel immediate disclosure of records); *Al-Fayed v. CIA*, No. Civ.A. 00-2092 CKK, 2000 WL 34342564 at *6 (D.D.C. Sept. 20, 2000) (finding that "upon consideration of the parties' arguments, the statutory and regulatory context, and the applicable case law," emergency relief was not warranted despite the agency's delay in responding to

FOIA requests).  A preliminary injunction in the FOIA context would be particularly inapposite here in conjunction with Plaintiffs' APA claims on the merits.  This is because, in resolving APA claims "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the . . . court." *Fla. P&L v. Lorion*, 470 U.S. 729, 743-44 (1985).  Litigation of Plaintiffs' claims on the merits is thereby likely to lead to the record that Plaintiffs are seeking through FOIA, and thereby to obviate the need for relief on those claims.[25]

Finally, it is not the case that, by failing to respond to Plaintiffs' FOIA request, the agency has "fail[ed] to provide an accurate picture" of its reasoning in adopting the Final Rule or omitted "the data the agency used to develop the proposed rule." Mot. at 20 (quoting *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 528 (D.C. Cir. 1982); *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995)).  The APA provides for the NPRM to set forth "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).  Here, the NPRM did so by "articulat[ing] the reasons for [the] proposed change in the classification of [bump stocks]," and "provid[ing] detailed descriptions and explanations." 83 FR 66541.  Although the agency's rulemaking referenced the Las Vegas attack as having caused the agency to take a fresh look at its past analysis, the Final Rule is clear that the agency did not rely on data about crime or other materials, and relied only on the legal analysis provided in the Final Rule and the agency's understanding of the method by which bump stocks function.  Thus, because the NPRM itself "provide[d] sufficient factual detail and rationale for the rule to permit interested parties to comment

---

[25] At this preliminary relief stage, the agency has not yet compiled the administrative record on which such a decision would be made.  Once the administrative record is provided, however, Plaintiffs will be able to see, *inter alia*, whether the Department relied on evidence that a bump stock device "was ever utilized in a single crime," including "in the Las Vegas shooting," Mot. at 21.  With respect to that issue, however, the Final Rule explains that the Las Vegas perpetrator did "us[e] several AR-type rifles with attached bump-stock-type devices," and that "[t]he bump-stock-type devices recovered from the scene included two distinct, but functionally equivalent, model variations from the same manufacturer."  Plaintiffs have provided no reason to doubt these facts, which are entitled to the presumption of regularity accorded agency rulemaking.  *NRDC v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

meaningfully," *Honeywell, Int'l v. EPA*, 372 F.3d 441, 445 (D.C. Cir. 2004)—and they did, supplying tens of thousands of unique comments, *see* 83 FR 66519, 66521—the lack of response to Plaintiffs' FOIA request does not invalidate the rulemaking.[26]

For these reasons, Plaintiffs cannot demonstrate a substantial likelihood of success on their claims that the Final Rule has been procedurally improper in violation of the APA.

**D.  The FVRA Authorizes the President's Designation of Acting Attorney General Whitaker to Temporarily Exercise the Powers and Duties of the Office of Attorney General.**

The plain text and structure of the FVRA's applicability and exclusivity provisions compel the conclusion that the President lawfully exercised his authority under the FVRA.  *See* 5 U.S.C. §§ 3347, 3349c.  This conclusion is confirmed by every relevant canon of statutory construction and the long and unbroken history of the FVRA's application to the many other agency-specific statutes that, like section 508, authorize a deputy to act in a vacant office.

**1.  The FVRA's plain text applies to the Attorney General's vacancy.**

The FVRA on its face applies to vacancies in the office of Attorney General.  The FVRA expressly authorizes the President to fill a vacancy arising by "resignation" in a covered Senate-confirmed position by designating, among other individuals, "an officer or employee" within the same agency "to perform the functions and duties of the vacant office."  5 U.S.C. § 3345(a)(3).  The statute specifies the criteria such employees must satisfy to be eligible for designation: he or she must have been in the agency for at least 90 days in the 365-day period preceding the resignation, in

---

[26] Plaintiffs suggest they are particularly interested in ATF's prior "determinations that bump stocks . . . do not constitute firearms, let alone machineguns," Mot. at 4 (emphasis omitted), but these determinations are not necessary "to provide an accurate picture" of the Department's current reasoning, *Conn. Light*, 673 F.3d at 528, which the Final Rule acknowledges is a "change [in] course" that requires the Department "to reconsider and rectify its past classifications."  83 FR 66531; *see also* 83 FR 66523 ("This rulemaking procedure is specifically designed to notify the public about changes in ATF's interpretation of the NFA and GCA").  Indeed, Plaintiffs are already aware of "at least ten [] times" when ATF determined a bump stock was not a firearm.  Mot. at 12; *see* Compl., Ex. A, 264-68.  The Final Rule explicitly recognizes that as many as 520,000 owners of bump stocks relied on the past classification decisions made by ATF, but those classification decisions are relevant only to the costs of the Final Rule and not to any of the legal issues raised by Plaintiffs.  *See* 83 FR 66538; *accord* Compl., Ex. A, at 280.

a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule.  *See id.*

Moreover, the Senate-confirmed positions covered by the FVRA generally include those positions at all "Executive agenc[ies]."  *Id.* § 3345(a); *see id.* § 105 (defining "Executive agency"). Where Congress intended to exclude an office from the FVRA's scope, it said so expressly, delineating a short list of particular offices in particular agencies to which the FVRA "shall not apply."  *Id.* § 3349c.  The office of Attorney General is not among those few offices, and the President may thus rely on the FVRA to fill an Attorney General vacancy.  Indeed, the FVRA eliminated altogether the Vacancies Act's exclusion of the office of Attorney General, while retaining section 508's specification that the Deputy Attorney General is the "first assistant" under section 3345, the operative FVRA section here.  And under the FVRA's terms, Mr. Whitaker's designation falls squarely within 5 U.S.C. § 3345(a)(3), as he satisfies all of the eligibility criteria.

Plaintiffs suggest that Congress could not have possibly intended section 3345(a)(3) to apply to agency heads, such as the Attorney General or Secretary of Defense.  *See* Pls. Mem. in Supp. of Mot. for Prelim. Inj. ("FPC Br.") 17, 24, 26-27, ECF No. 2-1.  Specifically, Plaintiffs argue that, in enacting the FVRA, Congress could not have given the President the power to fill the vacant office of an agency head with a GS-15 senior employee within that agency.  *See id.*  But this rhetorical argument is foreclosed by the text and structure of the FVRA.  The FVRA expressly contemplates that a vacant office not excluded by section 3349c may be the agency head.  For example, the FVRA provides specific instructions on how to address vacancies in an "office other than the office of the head of an Executive agency" when the statutory time limits expire, *see id.* § 3348(b), but does not create such distinction for purposes of the applicability of the designation methods in section 3345. As such, by its own terms, the FVRA makes clear that section 3345(a)(3) is available even where the vacant office is the agency head.

Plaintiffs make clear that they perceive the designation of an employee to perform the functions of an agency head pursuant to section 3345(a)(3) to be an undesirable policy result.  They suggest this result could be avoided by construing the FVRA to be inapplicable where there are

"office-specific succession provisions."  FPC Br. at 24.  As a threshold matter, Plaintiffs' argument

starts from a flawed premise.  There are cabinet departments that do not have office-specific

succession provisions or vacancy statutes (*e.g.*, the Department of State, *see* 22 USC § 2651a(a)

(establishing the Secretary of State and Deputy Secretary of State)).  Thus, even accepting Plaintiffs'

proposed interpretation of the FVRA would not prevent the possible designation of a senior

employee as an acting agency head.  Moreover, Plaintiffs themselves concede that the FVRA applies

to agency heads where the officers designated to serve as acting in office-specific succession

provisions are themselves unavailable, as will often be the case for statutes listing only a single acting

designee.  *See, e.g.*, 12 U.S.C. § 5491(b)(5) (designating Deputy Director of Consumer Financial

Protection Bureau as Acting Director); 29 U.S.C. § 552 (designating Deputy Secretary of Labor as

Acting Secretary).  In all events, and more fundamentally, Plaintiffs' argument that office-specific

succession provisions displace the FVRA fails as a legal matter under basic principles of statutory

interpretation, as discussed below in detail.

### 2.  Section 508 operates alongside, and does not displace, the FVRA.

Plaintiffs contend that Congress made the FVRA inapplicable to the office of the Attorney

General by virtue of 28 U.S.C. § 508.  That statute provides that when there is "a vacancy in the

office of Attorney General . . . the Deputy Attorney General *may* exercise all the duties of that

office."  28 U.S.C. § 508(a) (emphasis added).  According to Plaintiffs, this provision, which long

predates the FVRA, deprives the President of his FVRA authority to select someone other than the

Deputy Attorney General to serve as Acting Attorney General.  Plaintiffs' position is contrary to the

FVRA's plain text and well-settled principles of statutory interpretation.

### a.  The FVRA specifies that it is nonexclusive, rather than inapplicable, when statutes like section 508 also apply.

**i.** In enacting the FVRA, Congress recognized the existence of office-specific vacancy

statutes, and prescribed how these statutes intersect with the FVRA.  By default, the FVRA is the

"*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of

any office [requiring Senate confirmation] of an Executive agency."  5 U.S.C. § 3347(a) (emphasis

added).  But where "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," such as section 508, Congress provided that the FVRA is not "exclusive."  *Id.* § 3347(a)(1)(B).  In other words, section 3347 makes an exception for, and leaves in effect, office-specific statutes such as section 508, which are then treated as exceptions from the FVRA's generally exclusive applicability, and not as provisions that supersede or displace the FVRA in whole or in part.

The structure of the statute further corroborates Defendants' interpretation of the statutory text.  Section 3347's proviso that the FVRA is not the "exclusive" means of addressing vacancies stands in marked contrast with section 3349c, which provides that the FVRA "shall not apply" to specified offices.  Had Congress wanted to make the FVRA inapplicable to offices for which an office-specific statute designated an acting official, it would have listed such statutes in section 3349c (entitled "Exclusion of certain offices"), not section 3347 (entitled "Exclusivity").  Neither section 508 nor the office of Attorney General appear in section 3349c. At a minimum, even if Congress for some reason wanted to list FVRA exclusions for different offices in different sections of the statute, it at least would have used parallel language throughout:  it would have provided in section 3347, as it did in section 3349c, that the FVRA was not "applicable" where office-specific statutes exist, rather than that it was not "exclusive."

**ii.** This conclusion is confirmed by the FVRA's statutory history.  Under the Vacancies Act of 1868 (the FVRA's predecessor), the first assistant was also the default choice for filling a vacant Senate-confirmed position, and the President was generally able to depart from that default by selecting another Senate-confirmed officer.  5 U.S.C. § 3347 (1994).  That additional presidential authority contemplated in the Vacancies Act was expressly made inapplicable "to a vacancy in the office of Attorney General."  *Id.*; *see also* Rev. Stat. § 179 (2d ed. 1878).  That provision—not section 508—made the prior Vacancies Act inapplicable to the office of the Attorney General; indeed, that provision would have been superfluous if section 508 itself made other vacancy statutes inapplicable, as Plaintiffs now contend.

Notably, in the process of drafting the FVRA, Congress considered whether the office of Attorney General would also be excluded from the additional authorities vested in the President by the FVRA. An earlier provision in the FVRA, as reported in the Senate Committee Report accompanying the bill that was the basis for the FVRA, would have provided that "[w]ith respect to the office of the Attorney General . . . the provisions of section 508 of title 28 shall be applicable," *see* S. Rep. No. 105-250, at 15 (1998), 1998 WL 404532, at 25 ("Senate Report"), which the Report stated would have limited the President's authority to designate a person to perform the functions and duties of the Attorney General via the FVRA, see *id.* at 13. But Congress omitted that provision from the final version of the Act and indeed did away altogether with the Vacancies Act's exclusion for the office of Attorney General. *See* 5 U.S.C. §§ 3345, 3347, 3349c. Nothing in the FVRA bars the President from designating someone to act as Acting Attorney General under that law. Given the deletion of this key language, the Court should "have no trouble concluding that" Congress acted intentionally in eliminating the exclusion of the office of Attorney General from the FVRA as enacted. *Dir. of Revenue of Mo. v. CoBank ACB*, 531 U.S. 316, 324 (2001); *see also Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.").

**iii.** The FVRA's legislative history underscores that statutes like section 508 have long been understood to work in conjunction with—not to displace—the FVRA. The Senate Committee Report expressly disavows the view that, where an office-specific vacancy statute is available, the FVRA is no longer an option. *See* Senate Report at 17. Accompanying the bill that was the basis for the FVRA, the Report listed then-existing, office-specific vacancy statutes, including section 508, that the FVRA would "retain." *Id.* With respect to these statutes, the Senate Report makes clear that the FVRA "would continue to provide an *alternative* procedure for temporarily occupying the office." *Id.* (emphasis added). That statement relied on a proposed provision, *see id.* at 26 (proposed 5 U.S.C. § 3347(a)(2)(A) & (B)), that parallels the language ultimately enacted as subparagraphs (A) and (B) of 5 U.S.C. § 3347(a)(1). The Senate Report thus confirms that the FVRA and the listed statutes would be available as alternative mechanisms for addressing a vacancy in a covered office.

**iv.** In light of the FVRA's text, structure, and statutory and legislative history, the courts that have addressed the question have unsurprisingly concluded that office-specific vacancy statutes do not displace the President's FVRA authority. In *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550 (9th Cir. 2016), the Ninth Circuit rejected the argument that the FVRA was inapplicable because an office-specific statute "provide[d] the exclusive means for the President to appoint an Acting General Counsel" of the National Labor Relations Board ("NLRB"). *Id.* at 555-56 (discussing 29 U.S.C. § 153(d)). The court concluded that "the text of the respective statutes" "belied" any such argument. *Id.* at 555. Examining the FVRA's exclusivity provision, 5 U.S.C. § 3347, it concluded that the National Labor Relations Act qualified as "another statute [that] expressly provides a means for filling" a vacancy within the meaning of that provision. *Id.* at 556. In addition to the text, the court relied on the FVRA's Senate Report to conclude "that the FVRA retains the vacancy-filling mechanisms in forty different [office-specific vacancy] statutes." *Id.* at 556 (citing Senate Report at 17). Therefore, "neither the FVRA nor the [National Labor Relations Act] is the *exclusive* means of appointing an Acting General Counsel of the NLRB." *Id.* Both statutes are available to fill the vacancy.

Plaintiffs attempt to distinguish *Hooks* on the ground that the NLRB statute merely authorized the presidential designation of a particular acting official, whereas section 508 directly designates such an official and does not permit a presidential designation. *See* FPC Br. at 33. But the Ninth Circuit's reasoning in no way turned on Plaintiffs' proposed direction. The FVRA's exclusivity provision expressly covers both types of office-specific vacancy provisions: authorization provisions in section 3347(a)(1)(A) (*e.g.*, the NLRB statute), and designation provisions in section 3347(a)(1)(B) (*e.g.*, section 508). Again, if Congress intended designation provisions, such as section 508, to render the FVRA inapplicable, it would have included them in section 3349c's exceptions to applicability rather than section 3347(a)(1)(B)'s exception to exclusivity. And Plaintiffs' proposed distinction fails on its own terms for the additional reason that section 508 does *not* designate that the Deputy Attorney General "must" or "shall" serve as Acting Attorney General, only that he "may" do so, and thus it is not distinguishable from the permissive NLRB statute at issue in *Hooks*.

An analogous attempt to distinguish *Hooks* was recently rejected by another judge of this district, who upheld the FVRA's coexistence with a designation provision in an office-specific vacancy statute. *See English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018), *appeal dismissed,* No. 18-5007, 2018 WL 3526296 (D.C. Cir. July 13, 2018).  In *English*, the court rejected the argument that the FVRA is displaced by an office-specific statute (there, a provision in the Dodd-Frank Act relating to the Consumer Financial Protection Bureau ("CFPB")).  *Id.* at 331.  Indeed, the CFPB-specific statute, which post-dated the FVRA, provides that the CFPB Deputy Director "*shall . . .* serve as acting Director in the absence or unavailability of the Director."  12 U.S.C. § 5491(b)(5) (emphasis added).  The court nevertheless held that this mandatory, newer language coexists with, and is implicitly qualified by, the FVRA's permissive language providing that the President also "*may* direct*" certain eligible officials to serve in an acting capacity.  *English*, 279 F. Supp. 3d at 317, 323-24 (emphasis added).  The court correctly concluded that the President could invoke its FVRA authority to designate someone to serve as Acting CFPB Director.  *Id.* at 333.

Plaintiffs' attempts to distinguish *English* fail on their face.  Plaintiffs first argue that *English* involved an unusual set of facts in which the CFPB Director appointed a Deputy Director on the day he resigned so that the Deputy Director could serve as Acting Director.  *See* FPC Br. at 33.  The holding and rationale of *English* did not turn on those specific facts and Plaintiffs do not argue otherwise.  To the contrary, *English* focused in relevant part on the text, structure, and legislative history of the FVRA.  Plaintiffs also argue that the district court listed section 508 as an example of a statute that displaces the FVRA.  *See* FPC Br. at 33.  But Plaintiffs misread *English*.  No court has ever found an office-specific statute to displace the FVRA.   And far from stating that section 508 displaces the FVRA as a whole, the *English* court only listed section 508 as an example of a statute that explicitly refers to a "vacancy."  *English*, 279 F. Supp. 3d at 322.  Notably, it is listed next to the NLRB General Counsel statute at issue in *Hooks*, which *English* identifies as an example of a statute that coexists with, rather than displaces, the FVRA.  *Id.*  If anything, *English* recognizes that section 508 is on equal footing with the NLRB statute in *Hooks*.

Moreover, *English* held that the President could designate an acting CFPB Director under the FVRA *notwithstanding* that the CFPB Deputy Director provision both contained mandatory language (*i.e.*, "shall") and post-dated the FVRA. This is therefore an *a fortiori* case, which Plaintiffs cannot overcome. Plaintiffs instead erroneously argue that section 508 *requires* the Deputy Attorney General to be the acting Attorney General, notwithstanding that section 508 says nothing about the President's authority to designate an acting officer, and says only the Deputy Attorney General "may" serve in that role. Unlike the Dodd-Frank Act in *English*, section 508 long predates the enactment of the FVRA, and thus it is even clearer that it is intended to coexist with the FVRA pursuant to the FVRA's exclusivity proviso. 5 U.S.C. § 3347(a)(1).

**v.** Given that the FVRA clearly co-exists with office-specific vacancy statutes, Plaintiffs acknowledge that fact but then try to artificially narrow the circumstances in which the FVRA applies. Specifically, Plaintiffs argue that, where an office-specific vacancy statute exists, the FVRA applies if and only if the line of succession in the office-specific vacancy statute is exhausted because, unlike here, none of the individuals listed are available to serve. *See* FPC Br. at 27-28. Plaintiffs' atextual reading of the FVRA lacks merit.

To begin, nothing in section 3345(a)(2)-(3) limits the applicability of those designation methods to circumstances where the individuals identified in office-specific vacancy statutes are unavailable. Section 3347(a) likewise says no such thing. As discussed above, Congress simply made the FVRA "exclusive . . . unless" there is an office-specific vacancy statute. 5 U.S.C. § 3347(a). Congress did not provide that the FVRA would be inapplicable unless an office-specific statute was exhausted; nor did it provide that an office-specific statute would be exclusive unless it was exhausted. Were Congress trying to enact the rigid order of operations that Plaintiffs propose, it would have said so. Instead, Congress specifically removed the office of Attorney General from the list of offices to be excluded altogether from the FVRA's applicability, specified that office vacancy statutes like section 508 are merely an exception to the FVRA's general exclusivity (not its applicability) without mention of whether they are exhausted, and retained section 508's instruction that the Deputy Attorney General is the "first assistant to the Attorney General" for purposes of 5

U.S.C. § 3345, which is the first section of the FVRA.  Finally, it warrants emphasis that, if Plaintiffs' rigid order of operations were correct, then President George W. Bush's designation pursuant to the FVRA of Peter D. Keisler to serve as the Acting Attorney General was unlawful, because Solicitor General Paul Clement was available to serve under the Attorney General succession order promulgated pursuant to section 508.  *See Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208, 208 (Sept. 17, 2007) ("2007 OLC Op.").

In conclusion, where one of the section 3347(a) exceptions applies—such as here, where section 3347(a)(1)(B) applies by virtue of section 508—the FVRA is no longer the "exclusive means" of designating an acting officer, but it remains an "applicable" option under sections 3345 and 3349c.  There are thus two mechanisms for filling a vacancy in the office of Attorney General: (1) the FVRA's designation methods in section 3345; and (2) the line of succession in section 508.

### b. Principles of statutory construction preclude Plaintiffs' interpretation of the FVRA's relationship with section 508.

Multiple canons of statutory construction confirm the foregoing textual analysis.  First, the harmonious-reading canon favors Defendants' interpretation here.  Plaintiffs try to drum up a conflict between section 508's permissive language that the Deputy Attorney General "may" serve as Acting Attorney General and the FVRA's permissive language that the President also "may direct" certain eligible officials to serve in an acting capacity.  But no real conflict exists between these statutes, let alone an "irreconcilable" one, as Plaintiffs must show.  *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred*, 534 U.S. 124, 141 (2001); *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) ("Statutes are to be considered irreconcilably conflicting where 'there is a positive repugnancy between them' or 'they cannot mutually coexist.'") (quoting *Radzanower v. Touche Ross Co.*, 426 U.S. 148, 155 (1976)).

Plaintiffs simply say that only one of the two statutes can apply under the current circumstances because each statute produces a different result.  *See* FPC Br. at 28.  But "[i]t is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem.  Rather, 'when two statutes are capable of co-existence, it is the duty of the courts … to regard each as effective.'"  *Radzanower*, 426 U.S. at 155

(quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also PLIVA v. Mensing*, 564 U.S. 604, 622 (2011) ("[I]f by any fair course of reasoning the two [statutes] can be reconciled, both shall stand.").

The foregoing textual analysis demonstrates that section 508 and the FVRA's designation options are far more than simply "capable of coexistence" in this case and thus the Court must "regard each as effective." *J.E.M. Ag. Supply*, 534 U.S. at 143-44. To be clear, the FVRA itself speaks in mandatory terms. It provides that the first assistant to a vacant office covered by the FVRA "shall perform the functions and duties of the office temporarily in an acting capacity" but that the President "may" direct certain other persons to perform those functions and duties, "notwithstanding" that rule. 5 U.S.C. § 3345(a) (emphasis added). Given this unequivocal language, the FVRA and section 508 should be construed to operate alongside each other.

Nor does the principle that the specific governs the general, upon which Plaintiffs place so much weight, *see* FPC Br. at 28, support their position. This principle is "not appropriately invoked in this case" because it applies "only in the face of irreconcilably conflicting statutes." *English*, 279 F. Supp. 3d at 325 (quoting *Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994)). As shown above, there is no such conflict here.

Further, the related statutory-construction principle "that Congress legislates with a full understanding of existing law[]" also undermines any argument that the FVRA is inapplicable to a vacancy in the office of Attorney General. *Am. Fed'n of Gov't Emps., Local 3295 v. FLRA*, 46 F.3d 73, 78 (D.C. Cir. 1995), amended, (D.C. Cir. Feb. 27, 1995); *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (applying presumption even when existing law was a well-established judicial "gloss" on statutory language). Congress knew that certain provisions in the Vacancies Act were expressly made inapplicable "to a vacancy in the office of Attorney General," 5 U.S.C. § 3347 (1994), and even contemplated in an earlier bill that the Attorney General would continue to be excluded from the additional authorities vested in the President by the FVRA, *see* Senate Report at 25. Nonetheless, Congress eliminated the exclusion altogether and rejected the proposed limitation to the President's authority to designate an Acting Attorney General. *See id.* at 26. The deletion of that limitation means that the office of Attorney General is within the category of offices referred to in 5

U.S.C. § 3347(a)(1)(A) and (B) for which the FVRA is an alternative to the agency-specific statute. Indeed, as discussed above, 28 U.S.C. § 508 was included in the Senate Report's list of then-existing agency-specific statutes retained by the FVRA and that Congress intended to operate alongside each other. *See* Senate Report at 16.

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-443 (1987) (citation omitted). Because the FVRA omitted—and therefore eliminated—the prior limitation of the Vacancies Act, Congress's choice not to limit the President's authority to designate an Acting Attorney General must be given effect as written in the FVRA. *See, e.g.*, *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018) (giving effect to Congress's purposeful omission of prior statutory language).

In addition, the FVRA's application to the office of the Attorney General does not render section 508 superfluous, as Plaintiffs appear to suggest. Rather, section 508 serves at least three purposes not served by section 3345(a)(1) of the FVRA. First, it allows the Deputy Attorney General to serve as Acting Attorney General beyond the FVRA's time limitations. *See* 5 U.S.C. § 3346; Senate Report at 17 ("Most of these retained statutes[, including sec. 508,] do not place time restrictions on the length of [service of] an acting officer."). Second, it allows the Deputy Attorney General (and others in the line of succession) to fill a vacancy in situations where the FVRA itself would not authorize it. *See* 5 U.S.C. § 3345(b). Third, it eliminates potential confusion over who the "first assistant" is in DOJ for purposes of the FVRA's default rule in section 3345(a)(1). *See Guidance on the Application of FVRA of 1998*, 23 Op. O.L.C. 60, 63 (1999) ("FVRA Guidance") (noting that the FVRA "does not define the term 'first assistant'" and indicating some cause for doubt that an official "not designated by statute or regulation" could "qualify as first assistants").

Because Plaintiffs argue that section 508 exclusively governs the mechanism for filling a vacancy in the office of Attorney General, Plaintiffs have no option but to ignore the significance of the phrase "first assistant" in section 508. But, the provision is important, if not necessary, for purposes of the FVRA's default rule. *See* FVRA Guidance, 23 Op. O.L.C. at 63. The reference

shows that Congress understood the statute to operate alongside the FVRA.  Plaintiffs' proposed interpretation renders language in section 508 wholly superfluous and therefore must be rejected.

### c. Office-specific vacancy statutes comparable to section 508 have never before been interpreted to displace the FVRA.

The Attorney General is simply one of many heads of departments forming the President's Cabinet (along with other cabinet-rank officials) who is subject to an office-specific vacancy statute providing that its deputy (and others in the Department) "may" or "shall" serve as the acting head in the event of a vacancy.  28 U.S.C. § 508.[27]  No court has ever found that any of these statutes in fact remove the offices they cover from the scope of the FVRA, even though they all unambiguously address vacancies.  Plaintiffs cite no authority to the contrary.

Presidents have consistently and explicitly invoked their FVRA authority to make acting-officer designations that would be barred if the office-specific statutes were read to set out exclusive, mandatory succession plans, as Plaintiffs suggest.  Using their FVRA authority, multiple Presidents have long provided for orders of succession for offices covered by office-specific statutes and individually designated someone other than the deputy designated in an office-specific statute to serve as the acting agency head.[28]  Notably, such FVRA designations have even bypassed the extant

---

[27] *See, e.g.*, 5 U.S.C. app. 1, Reorganization Plan No. 1 of 1953 § 2 (Health and Human Services); 5 U.S.C. app. 1, Reorganization Plan No. 3 of 1970 § 1(c) (Environmental Protection Agency); 10 U.S.C. § 132(b) (Secretary of Defense); 15 U.S.C. § 633(b)(1) (Small Business Administration); 20 U.S.C. § 3412(a)(1) (Education); 29 U.S.C. § 552 (Labor); 31 U.S.C. § 301(c)(2) (Treasury); 42 U.S.C. § 7132(a) (Energy).

[28] *See, e.g.*, *Providing an Order of Succession Within the Department of Defense*, Exec. Order No. 13,394, 70 Fed. Reg. 76,665 (Dec. 22, 2005); *Providing an Order of Succession Within the Department of Defense*, Exec. Order No. 13,533, 75 Fed. Reg. 10,163 (Mar. 1, 2010); 5 U.S.C. § 3345 note (listing succession plans established under the FVRA for the Departments of Labor, Treasury, Health and Human Services, the Environmental Protection Agency, the Office of Personnel Management, the Office of the Director of National Intelligence, and the National Archives and Records Administration); *see also* Presidential Designations of John Whitmore (Small Business Administration, Feb. 2, 2001), Marianne Horinko (Environmental Protection Agency, July 11, 2003, effective July 12, 2003), James Lambright (Export-Import Bank, July 14, 2005, effective July 21, 2005), Beth Cobert (Office of Personnel Management, July 10, 2015), Joseph Loddo (Small Business Administration, Jan. 17, 2017, effective Jan. 20, 2017), Grace Bochenek (Energy, Jan. 17, 2017, effective Jan. 20, 2017), Norris Cochran (Health and Human Services, Jan. 17, 2017, effective Jan. 20, 2017), Edward Hugler (Labor, effective

deputy designated in the office-specific statute.[29]  Of particular relevance to this case is the fact that, as previously discussed, President Bush designated Assistant Attorney General Keisler to act as Attorney General, even though Solicitor General Clement was available to serve under the section 508 succession order.  *See* 2007 OLC Op., 31 Op. O.L.C. 208.

This record of executive practice is consistent with the Office of Legal Counsel's longstanding and publicly expressed interpretation of the FVRA.  *See, e.g.*, Mem. from Steven A. Engel, Asst. Att'y Gen., to Emmett T. Flood, Counsel to the President, *Designating an Acting Attorney General*, at 2-6 (Nov. 14, 2018) ("2018 OLC Op.") (attached as Ex. 1); Mem. from Steven A. Engel, Asst. Att'y Gen., to Donald F. McGahn II, Counsel to the President, *Designating an Acting Director of the Bureau of Consumer Financial Protection*, at 4-8 & nn. 2-3 (Nov. 25, 2017); *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 121 n.1 (2003).  On four occasions in the past fifteen years, OLC has formally opined in published opinions that office-specific vacancy statutes provide a route to designate an acting officer without displacing the President's FVRA options.  OLC's conclusion that section 508 does not preclude the President's authority to designate Mr. Whitaker under the FVRA is firmly rooted in the office's well-established precedent, including its 2007 opinion on the President's authority to name an Acting Attorney General.

In conclusion, section 508 and the FVRA must be read in harmony, not in tension, and to allow the President to designate an Acting Attorney General.  The President validly exercised that authority here and Mr. Whitaker is a permissible designee under the terms of the FVRA.

### E.  The Presidential designation of Mr. Whitaker as Acting Attorney General does not violate the Appointments Clause.

Plaintiffs argue that the President's designation of Mr. Whitaker as Acting Attorney General

---

Jan. 20, 2017), Adam Szubin (Treasury, Jan. 17, 2017, effective Jan. 20, 2017), John "Mick" Mulvaney (CFPB, Nov. 24, 2017, effective Nov. 25, 2017).

[29] For example, on August 11, 2008, the President designated Michael Hager, Assistant Secretary of Veterans Affairs, to serve as Acting Director of the Office of Personnel Management, notwithstanding that Howard Weizman was Deputy Director.  Similarly, on August 13, 2008, the President designated Santanu Baruah, Assistant Secretary of Commerce for Economic Development, as Acting Administrator of the SBA, notwithstanding that Joyita Carranza was Deputy Administrator.

under the FVRA violates the Appointments Clause because the clause prohibits the President from designating a non-Senate-confirmed person to perform temporarily the functions of Attorney General.  Under the current circumstances, Plaintiffs argue that the President has no authority at all and the Deputy Attorney General must serve as acting.  Plaintiffs are mistaken.

It is undisputed that the Appointments Clause requires principal officers to be Senate-confirmed and that the Attorney General is a principal officer because he holds a continuing office and reports only to the President.  But none of that answers the question a here because it does not inevitably follow that an individual who *temporarily* performs the functions of a principal office in an *acting* capacity is also a principal officer.   Given the absence of any express instruction in the Appointments Clause, "historical practice" on this question implicating the separation of powers is entitled to "significant weight."  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014); *see also Okanogan, Methow, San Poelis[], Nespelem, Colville, and Lake Indian Tribes . . . v. U.S.*, 279 U.S. 655, 689 (1929).  And here, there is ample—indeed, decisive—historical practice and precedent from *all three* branches of government that, regardless of who is available to serve within a given agency, a temporary designation of an individual, such as an agency chief of staff, to serve as acting agency head does not require the Senate's advice and consent because the individual does not thereby become a principal officer.[30]

1. **Precedent from all three branches demonstrate that acting agency heads need not be Senate confirmed.**

   a. **Several acts of Congress passed in three different centuries have authorized the designation of acting principal officers who are not Senate confirmed.**

Starting almost immediately after the Founding, Congress repeatedly has "authoriz[ed] the

---

[30] This Court need only decide that a person performing temporarily the duties of a principal officer is not himself a principal officer.  Because the President's designation of Mr. Whitaker as Acting Attorney General satisfies the Appointments Clause's requirements for an inferior officer, *see* 2018 OLC Op. at 9, it is unnecessary to further decide whether the temporary nature of the position renders it an inferior office, *cf. Morrison v. Olson*, 487 U.S. 654, 672 (1988), or not an office at all, *cf. Auffmordt v. Hedden*, 137 U.S. 310, 326-27 (1890).  Plaintiffs cite *Weiss v. U.S.*, 510 U.S. 163 (1994), to assert that Mr. Whitaker continues to be an employee as Acting Attorney General.  Such reliance is misplaced.  *Weiss* involved specific statutory language governing military officers that disclaimed the need for a separate appointment for military judges serving on courts martial.  At no point did *Weiss* discuss the President's authority to fill vacancies under any vacancy statute, nor did it address the constitutional status of persons directed to perform temporarily the duties of a vacant principal office.

President to direct certain officials to temporarily carry out the duties of a vacant PAS office [*i.e.*, one requiring Presidential Appointment and Senate confirmation] in an acting capacity, without Senate confirmation." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 934 (2017).  The first of these statutes was enacted in 1792 when Congress provided "[t]hat in case of the death, absence from the seat of government, or sickness of the Secretary of State, Secretary of the Treasury, or of the Secretary of the War," the President could choose "*any* person . . .  at his discretion to perform the duties of said respective [principal] offices." Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 (emphasis added).   The statute thus authorized the President to choose "any person" to fill such a vacancy in a principal office—regardless of whether the "person" had been Senate-confirmed or even held any federal office—"until the permanent officeholder could resume his duties or a successor was appointed." *SW General*, 137 S. Ct. at 935.

In 1795, Congress enacted a second statute to "impose[ ] a six-month limit on acting service," *id.* (citing Act of Feb. 13, 1795, ch. 21, 1 Stat. 415).  In addition to this time limitation, the 1795 Act expanded the President's authority to fill vacancies in the three departments covered by the 1792 Act.  Under the 1795 Act, the President's authority to choose "any person" was not limited to cases involving "death, absence from the seat of government, or sickness", but also applied "in case of vacancy in the office of the Secretary of the[se] department[s]." Act of Feb. 13, 1795, 1 Stat. 415.

The 1792 and 1795 Acts are of special importance, as "early congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'" *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (quoting *Printz v. United States*, 521 U.S. 898, 905 (1997)).  "[T]he 'construction placed upon the Constitution'" by the Second Congress in the 1792 Act, "'many of whom were members of the convention which framed it, is of itself entitled to very great weight.'" *Golan v. Holder*, 565 U.S. 302, 321 (2012) (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884)).  Here, the enactment of the 1792 and 1795 Acts reflects a clear understanding that the Constitution does not compel Senate confirmation for persons who are merely authorized to temporarily carry out the duties of a vacant principal office in an acting capacity.

Congress has consistently followed that understanding to this day.  In 1863, Congress extended the act to all vacancies in the office of "the head of any Executive Department of the Government, or of any officer of either of the said Departments whose appointment is not in the head thereof," Act of Feb. 20, 1863, ch. 45, § 1, 12 Stat. 656, 656.  In 1868, Congress enacted the Vacancies Act, which provided that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head." Act of July 23, 1868, ch. 227, § 1, 15 Stat. 168; *see also id.* § 3, 15 Stat. at 168 (specifying a ten-day time limit in cases of death or resignation).  The Vacancies Act further authorized the President to bypass the "first assistant" default rule and designate any Senate-confirmed official to fill the vacancy, while the default rule preserved the possibility that a non-Senate-confirmed person would act as head of an Executive Department.  *See id.*

Over the next 120 years, Congress repeatedly amended the Vacancies Act to extend the time limits for acting service, but never eliminated the possibility that non-Senate-confirmed first assistants could serve as acting agency heads.  In fact, in 1988, Congress amended the statute to cover principal offices that are not in "Departments" and thus are less likely to have Senate-confirmed first assistants.  Pub. L. No. 100-398, § 7(b), 102 Stat. 985, 988 (1988).

As discussed, in 1998, Congress replaced the Vacancies Act with the FVRA, which applies to nearly all executive Senate-confirmed offices, including agency heads.  *See* 5 U.S.C. § 3345(a); *see id.* § 3349c(1)-(3) (excluding only certain members of multi-member boards, commissions, or similar entities).  Out of the three designation methods in the FVRA, two of them unambiguously authorize non-Senate-confirmed individuals to serve as acting principal officers: (1) non-Senate-confirmed first assistants under section 3345(a)(1); and (2) "officer[s] or employee[s]" under section 3345(a)(3).  And in addition to the FVRA, Congress has enacted multiple statutes that enable the temporary service of non-Senate-confirmed individuals when the office of a Senate-confirmed agency head is vacant.[31]  For example, consider the example of the CIA.  The CIA's Deputy Director is not Senate

---

[31] *See, e.g.,* 12 U.S.C. § 4512(f) (Federal Housing Finance Agency); *id.* § 5491(b)(5) (CFPB); 20 U.S.C. § 3412(a)(1) (Education); 21 U.S.C. § 1703(a)(3) (Office of National Drug Control Policy); 31 U.S.C.

confirmed.  *See* 50 U.S.C. § 3037(a).  Thus, when the CIA Director was sworn-in as the Secretary of

State on April 26, 2018, the Deputy Director (who had been appointed by President Trump, without

the Senate's advice and consent) assumed the role of Acting Director.  She continued to perform as

Acting Director until May 21, 2018, when she was sworn-in as Director after Senate confirmation

and appointment.  *See* https://www.cia.gov/news-information/press-releases-statements/2018-

press-releases-statements/gina-haspel-assumes-role-of-acting-director-of-cia.html; https://

www.cia.gov/news-information/blog/2018/gina-haspel-sworn-in-as-first-female-cia-director.html

The uninterrupted legislative practice of authorizing acting officers to perform the duties of

a temporarily vacant principal office without limiting the pool of eligible individuals to those who

already have Senate-confirmed offices strongly supports the constitutionality of Mr. Whitaker's

designation as Acting Attorney General.  Indeed, if only Senate-confirmed officers could temporarily

serve as *acting* principal officers, then Congress's continuous legislative practice at least from 1792

until 2010 would have violated the Constitution.

### b.  The Executive Branch has repeatedly designated acting principal officers who are not Senate confirmed.

The Executive Branch has repeatedly exercised its authority under the statutes enacted by

Congress to fill vacancies in principal offices with individuals other than Senate-confirmed officers.

In fact, in a historical "non-exhaustive survey," OLC identified "over 160 occasions between 1809

and 1860 in which non-Senate-confirmed persons served temporarily as an acting or ad interim

principal officer in the Cabinet."  2018 OLC Op., Ex. 1 at 10.[32]  In 1809, for example, President

---

§ 502(f) (Office of Management and Budget); 38 U.S.C. § 304 (Veterans Affairs); 40 U.S.C. § 302(b) (General Services Administration); 42 U.S.C. § 7132(a) (Energy); 44 U.S.C. § 2103(c) (Archives); 49 U.S.C. § 102(e) (Transportation).

[32] Most of the 161 examples identified in the OLC opinion were listed in the evidence that was admitted during the impeachment trial of President Andrew Johnson.  See 1 *Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors* 575-88 (Washington, GPO 1868).  Although that evidence included more than 161 uses of the statutes, OLC did not include instances that involved persons who already held another Senate-confirmed office, such as Commissioner of Indian Affairs, officer in the Army or Navy, Assistant Secretary of State, or Assistant Secretary of the Treasury (after that position became subject to Senate confirmation in March 1857).

Jefferson designated John Smith, a non-Senate-confirmed chief clerk of the Department of War, to serve in his Cabinet as ad interim Secretary of War.  2018 OLC Op., Ex. 1 at 13 (citing *Biographical Directory of the American Congress, 1774–1971*, at 14 (1971)).  Non-Senate-confirmed chief clerks served temporarily as acting or ad interim heads of the Departments of State, the Treasury, War, the Navy, and the Interior on more than 125 occasions.  *See id.* at 13-14.  And non-Senate-confirmed Assistant Secretaries and Assistant Postmasters General were authorized at least twenty-one times to serve as acting Secretary of the Treasury and four times as ad interim Postmaster General.  *See id.* at 14, 15.  As President Buchanan stated in 1861, the "perfect lawfulness" of these temporary designations— where "[s]ometimes, the temporary officer was the commissioned head of another department," and "*sometimes a subordinate in the same department*"—"ha[d] never, to [his] knowledge, been questioned or denied."  Message from the President of the United States, 36th Cong., 2d Sess., Exec. Doc. No. 2, at 2 (1861) ("Buchanan's 1861 Message") (emphasis added).

Some of the temporary designations in the nineteenth-century lasted only a day or a few days, but others lasted for weeks or even months.  For example, after the resignation of Henry Dearborn, John Smith served as Secretary of War for a 50-day period in 1809.  *See Biographical Directory* at 14.  During the Madison and Monroe Administrations, George Graham, another chief clerk of the Department of War, served as ad interim Secretary of War for more than a year—from October 1816 until December 1817.  *Id.* at 15.  Asbury Dickins, the chief clerk in the Department of the Treasury, served as ad interim Secretary of the Treasury for 48 days in 1831.  *Id.* at 16; *In re Asbury Dickins*, 34th Cong., 1st Sess., Rep. C.C. 9, at 4 (Cl. 1856).  And McClintock Young, another chief clerk in the Department of the Treasury, served as ad interim Secretary of the Treasury for more than two months after the resignation of Secretary John C. Spencer in 1844.  *See Biographical Directory* at 17.  Similarly, periods of *acting* service—that is, those that occurred while the principal officeholder was ill or away from Washington—sometimes lasted several weeks or months.  For instance, Asbury Dickins served three separate stints of more than 40 days as acting Secretary of State in 1835 and 1836.  *See Dickins*, Rep. C.C. 9, at 5.  During at least two of those stints, the incumbent Secretary of State was visiting his home state of Georgia.  *See* Alvin Laroy Duckett, *John*

*Forsyth: Political Tactician* 181, 197 (1962).  At such times, there was no material difference, for purposes of the constitutional analysis, between an acting and an ad interim Secretary.  In either case, there was no principal officer available to supervise how the temporary designee carried out the functions and duties of the office.  Indeed, if the principal were available, there would not have been a need to designate somebody for a temporary period.

Moreover, even when such temporary designations occurred during a recess of the Senate, it is clear that they were not being seen as appointments under the Recess Appointments Clause.  They were not phrased as lasting until "the End of [the Senate's] next Session," as would be the case with a recess appointment.  U.S. Const. art. II, § 2, cl. 3.  Instead, they were described as lasting only until the appointment or arrival of a successor or until the principal's period of unavailability ended.[33]  Indeed, George Graham's October 1816 appointment by President Madison as ad interim Secretary of War occurred during a recess of the Senate, but it was evidently not treated as a recess appointment, because he continued to serve for several months after two entire sessions of the Senate had come and gone.[34]  In addition, when the next permanent appointee was nominated, the position was generally either described as being "vacant," or as being in the place of the previous permanent officeholder rather than the ad interim one.[35]  Thus, President Buchanan was on solid

---

[33] *See, e.g.*, 1 *Trial of Andrew Johnson* at 574-76 (reprinting or paraphrasing orders for Aaron O. Dayton (June 28, 1837), Jacob L. Martin (Oct. 16, 1837), John Boyle (May 12, 1831), and Asbury Dickins (June 21, 1831)).

[34] *See* 1 *Trial of Andrew Johnson* at 594-95 (listing dates of intervening Senate sessions).  John C. Calhoun was recess-appointed as Secretary of War in October 1817, but he did not enter upon the duties of the office until December 10, 1817, ten days into the *third* Senate session after Graham's appointment.  *See id.* at 594; *Biographical Directory* at 15.

[35] When Navy Chief Clerk Charles Hay was serving as ad interim Secretary of the Navy at the beginning of the Jackson Administration, *see Biographical Directory* at 16, President Jackson's nomination of John Branch described the position of Secretary as "being now vacant."  S. Exec. J., 21st Cong., Special Sess. 8 (Mar. 9, 1829).  When Secretary of the Treasury Spencer resigned on May 2, 1844, President Tyler appointed McClintock Young to perform the duties of the Secretary until a successor could be appointed and qualified.  *See Trial of Andrew Johnson* at 579.  When Tyler nominated George M. Bibb, more than six weeks later, to be the Secretary, he specified that Bibb was being nominated "vice John C. Spencer, resigned"—not in place of Young.  *See* S. Exec. J., 28th Cong., 1st Sess. 349 (June 15, 1844).

ground when he explained that Presidents had used their statutory authority to name temporary officials "whether in a vacation or during the session of Congress."  Buchanan's 1861 Message at 2.

The office of Attorney General, while historically unusual in some practical respects, presents no unique features suggesting any different constitutional treatment.  Unlike some of the other members of the President's Cabinet, the Attorney General did not supervise an "executive department" until 1870 when the Department of Justice was established.  *See* Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162.  And because the Attorney General was not head of an "executive department," his office was not subject to the terms of the 1792, 1795, or 1863 statutes, or the Vacancies Act of 1868.  Nonetheless, in 1854, Attorney General Cushing noted that the President had made "temporary appointment[s]" to the office of Attorney General.  *Office and Duties of Atty. Gen.*, 6 Op. Att'y Gen. 326, 352 (1854).  And although it was "questionable" whether the President had the statutory authority, Attorney General Cushing opined that perhaps "the power to make such temporary appointment is a constitutional one."  *Id.*  He recommended that Congress enact a vacancy statute specific to the office of Attorney General, which Congress eventually did when it enacted the predecessor of section 508 as part of the Department of Justice's 1870 organic statute.

In fact, Presidents designated Acting Attorneys General both before and after the 1854 Cushing opinion and some of those designations included non-Senate-confirmed individuals.  In July 1866, for example, non-Senate-confirmed Assistant Attorney General J. Hubley Ashton served as ad interim Attorney General following Attorney General Speed's resignation.  *See* 2018 OLC Op., Ex. 1 at 17 (citing *Acting Attorneys General*, 8 Op. O.L.C. 39, 41 (1984)).[36]  In addition, between 1859

---

[36] As with the other Cabinet positions discussed in the preceding footnote, ad interim Attorneys General were not seen as filling the actual position of Attorney General.  The next permanent Attorneys General were described as being nominated in place of the Attorneys General who had resigned, not of the ad interim Attorneys General.  *See* S. Exec. J., 30th Cong., 1st Sess. 429 (June 15, 1848) (nominating Isaac Toucey "to be Attorney-General of the United States, in the place of Nathan Clifford, resigned"); 3 *The Diary of James K. Polk During His Presidency, 1845 to 1849*, at 393 (Milo Milton Quaife ed. 1910) (diary entry for Mar. 20, 1848, noting appointment of Secretary of the Navy John Y. Mason as "Acting Atto. Gen'l of the U. S. *ad interim*"); S. Exec. J., 39th Cong., 1st Sess. 994 (July 20, 1866) (nominating Henry Stanbery "to be Attorney General of the United States, to fill the vacancy occasioned by the resignation of James Speed," even though Assistant Attorney General Ashton had been serving as ad interim Attorney General since July 17).

and 1868, non-Senate-confirmed Assistant Attorneys General signed several formal legal opinions as "Acting Attorney General" in instances when the incumbent Attorney General apparently was absent or unavailable.  *See id.* at 17-18 & n. 11.  Because the Vacancies Act of 1868 did not authorize the presidential designation of a non-Senate-confirmed Acting Attorney General, *see* 5 U.S.C. § 3347 (1994), there is no Attorney General-specific practice of non-Senate-confirmed officials serving in an acting capacity under that statute.

Ultimately, the office of Attorney General is not constitutionally different from other principal offices, particularly those in the Cabinet and other executive departments.  These principal offices have been subject to the longstanding and consistent executive practice of authorizing their functions to be temporarily performed by non-Senate-confirmed persons, including numerous chief clerks and chiefs of staff.   These presidential designations dating back to 1809 support the constitutionality of Mr. Whitaker's designation.

### c.  Supreme Court precedent has ratified the designation of acting principal officers who are not Senate confirmed.

In the nineteenth century, courts recognized the well-settled legislative and executive practice of authorizing unconfirmed chief clerks to act as heads of departments by approving their entitlement to payment for their temporary services as acting principal officers.  *See, e.g., Dickins*, Rep. C.C. 9, at 17 (finding that chief clerk was entitled to additional compensation for services "as acting Secretary of the Treasury and as acting Secretary of State").

These decisions sometimes considered Appointments Clause issues.  In *In re Cornelius Boyle*, for example, the Court of Claims held that a non-confirmed chief clerk of the Navy properly served as Acting Secretary of the Navy and that, under the Constitution, there was a difference between the office of Secretary and that of Acting Secretary because of the latter's "temporary" character.  34 Cong. Rep. C.C. 44, at 8, 1857 WL 4155, at *1-*3 (1857).  For that reason, the *Boyle* Court concluded that the presidential designation of a non-confirmed "Secretary *ad interim*" to perform the functions of that principal office was "in perfect consistency with the Constitution of the United States."  *Id.*

In 1898, the Supreme Court in *United States v. Eaton* likewise considered whether the Appointments Clause permits the designation of a non-confirmed inferior officer "charged with the duty of temporarily performing the functions" of a principal officer.  169 U.S. 331, 343 (1898).  In that case, Lewis Eaton, a missionary who was not employed by the federal government, was appointed as vice-consul-general and directed to take over the consulate after the consul-general's departure.  *Id.* at 331-32.  Eaton then took charge of the consulate as "acting consul general of the United States at Bangkok" for almost a year.  *Id.* at 332-33.  In a dispute over salary payments, the constitutionality of Eaton's appointment was challenged and the Court upheld both Eaton's appointment and the underlying statutory scheme providing for his appointment.  *Id.* at 334-35, 352.

Specifically, in view of the long history of appointments providing for the *temporary* performance of a principal office, the Supreme Court confirmed the general rule that such appointments do not "transform[ ]" the acting official "into the superior and permanent official" requiring the Senate's confirmation.  *Eaton*, 169 U.S. at 343-44 (relying on Attorney General Cushing's 1855 opinion regarding the longstanding practice on the appointment of consular officials) (citing *Appointment of Consuls*, 7 Op. Att'y Gen. 242, 262 (1855)).  In other words, the *Eaton* Court reached the same conclusion as the *Boyle* court—that temporarily performing the duties of a principal office is not the same as holding the office itself.  Accordingly, the Supreme Court has cited *Eaton* repeatedly for the proposition that temporarily performing the duties of a principal office does not make one a principal officer.  *See, e.g., Edmond v. United States*, 520 U.S. 651, 661-63 (1997); *Morrison v. Olson*, 487 U.S. 654, 672-73 (1988).

### d.  Serious practical consequences and constitutional concerns militate against requiring Senate confirmation for temporary acting service in a principal office.

Although Senate confirmation undoubtedly serves an important constitutional check on the President's selection of individuals to assist him in faithfully executing the laws, *see Edmond*, 520 U.S. at 659, the more-than-two-century-long tradition of temporary service by acting agency heads without Senate confirmation reflects agreement between the political branches that this practice is

not only permissible, but in fact essential to overcome the frequent and unavoidable delays inherent in the confirmation process.

If the Constitution were to require Senate confirmation for all acting officials serving temporarily in principal offices, the proper functioning of the Executive Branch and the President's constitutional responsibility to "take care" that the laws are faithfully executed would be seriously compromised. *Eaton*, 169 U.S. at 343 (explaining that a holding that an acting consul is a principal officer would "seriously hinder[ ]" "the discharge of administrative duties"). For example, during transitions between presidential administrations there are often few, if any, Senate-confirmed officials available to serve. That is precisely one of the reasons why Congress chose to authorize the President to designate non-confirmed individuals as acting principal officers under the FVRA. 144 Cong. Rec. 27496 (Oct. 21, 1998) (statement of Sen. Thompson). But, to be sure, the problems with requiring Senate confirmation extend beyond the beginning of a new presidential administration. In contrast to the Department of Justice, which is staffed by multiple Senate-confirmed officials, many federal agencies are staffed with only one confirmed official. It is certainly possible that, when a vacancy in the top spot of an agency arises, such agency could remain without a head or be forced to rely upon reinforcements from confirmed appointees from other agencies. Indeed, the CFPB is such an agency, and yet, in the recent litigation concerning whether the President permissibly invoked his FVRA authority to designate as Acting CFPB Director OMB Director Mulvaney rather than Deputy CFPB Director English, neither any party nor any court suggested that Ms. English's service would be unconstitutional because she, unlike Mulvaney, was not Senate-confirmed.

Appointing an outside (and perhaps unfamiliar) Senate-confirmed officer could interfere with the efficiency of the agency's operations, thereby evoking Congress's concern "about designating too many Senate-confirmed persons from other offices to serve as acting officers in additional positions." 144 Cong. Rec. 27496 (Oct. 21, 1998) (statement of Sen. Thompson). It is also questionable why designation of an individual confirmed by the Senate to some *other* office, particularly in a *different* agency, would satisfy the purported requirement of Senate confirmation as

acting agency head, at least absent some sort of "germaneness" requirement, *cf. Weiss*, 510 U.S. at 174-75, that would again significantly narrow the pool of possible acting officers.

Moreover, it is certainly possible for non-Senate-confirmed officials in an agency to be more intimately familiar with the responsibilities of the agency head and the agency's operations as a whole than other Senate-confirmed officials within that agency. For example, there can be little doubt that a Chief of Staff and Senior Counselor to the Attorney General is likely to be more apprised with the duties of the office of Attorney General than other confirmed Department officials, such as the Solicitor General or Assistant Attorney General for the Criminal Division. A rule requiring Senate confirmation in all instances would prevent the President from invoking his authority under the FVRA and exercising his discretion to designate his own acting official.

**2.    Plaintiffs' arguments for narrowing the scope of non-Senate-confirmed officials who can serve as acting agency heads have no basis in the text of the Appointments Clause and are contrary to precedent from all three branches.**

In light of the foregoing, Plaintiffs concede, as they must, that non-Senate-confirmed individuals can serve as acting principal officers. *See* FPC Br. at 23 (acknowledging that "non-confirmed official may serve"). In order to nevertheless challenge Mr. Whitaker's designation, Plaintiffs thus must manufacture a constitutional standard with no textual or historical basis that impermissibly limits the circumstances in which a President can designate a non-Senate-confirmed individual an acting principal officer. Plaintiffs make two arguments: (1) the Constitution authorizes a non-Senate-confirmed individual to serve as acting agency head only when designated by statute as "first assistant" or when selected to replace the "first assistant" who is otherwise not available to serve; and (2) the Constitution prohibits the President from designating an employee under the FVRA to temporarily perform the duties of a vacant principal office. Both arguments are fundamentally flawed.

As an initial matter, neither argument has any basis in the text of the Appointments Clause. Plaintiffs cannot show that the constitutional text compels their view of whether and in what circumstances an individual may serve in an acting capacity for a principal officer. Furthermore,

neither argument has any basis in the principled and historically supported theories for why non-Senate-confirmed officials can serve as acting agency heads—namely, that the temporary character of their acting service means that they are either inferior officers who are not subject to Senate confirmation or employees who do not hold a continuing office.  Accordingly, Plaintiffs' attempt to fabricate constitutional limits must fail.

> **a.  Plaintiffs' argument that the Constitution requires a non-Senate-confirmed acting agency head to either be the first assistant or a replacement for an unavailable first assistant lacks merit.**

As discussed above, Plaintiffs' proposed limitation on when non-Senate-confirmed officials may serve as acting agency heads has no basis in the text of the Appointments Clause.  And as discussed below, it is contradicted by precedent of all three branches.

**i.** To begin with the legislative branch, Plaintiffs' proposed rule is contrary to Acts of Congress passed almost immediately after the Founding.  As discussed above, under the 1792 and 1795 Acts, the President could choose "any person," including non-Senate-confirmed officials, to serve as acting Secretaries of State, Treasury, and War, without regard to whether there was an available "first assistant" in the cabinet department (Senate-confirmed or otherwise).  *See supra* Part E.1.a.  Moreover, the 1795 Act expanded the President's authority under the 1792 Act to choose anyone as acting Secretary, regardless of the reason the vacancy arose.  *Id.* [37]

Congress's judgment in recent decades continues to reflect a legislative intent to afford the President sufficient flexibility to fill vacancies in the Executive Branch.  Under the FVRA, Congress authorized the President to bypass the default rule that the "first assistant" of a federal agency will

---

[37] Consistent with the text of the 1792 and 1795 Acts, Presidents Washington, Adams, and Jefferson routinely selected Senate-confirmed cabinet officers (or Chief Justice John Marshall) as ad interim Secretaries for other cabinet departments.  *See, e.g., Biographical Directory* at 13-14.  Because such designations clearly did not satisfy any plausible "germaneness" standard under the Appointments Clause, *cf. Weiss*, 510 U.S. at 174-75, it follows that their Senate-confirmed status had no connection to their designation as ad interim Secretaries.  Similarly, there can be no dispute that a cabinet Secretary was not the "first assistant" of another department head.  Therefore, Plaintiffs' proposed constitutional rule cannot possibly explain this early historical practice, nor do Plaintiffs attempt to do so.

assume the duties of the vacant principal office and choose either a person serving in a different Senate-confirmed position (even if entirely unrelated) or a senior "officer or employee" working in the same executive agency that satisfies the statutory criteria in section 3345(a)(3).  Just like the early congressional statutes, the FVRA authorizes the President to fill vacancies in appointed principal offices without regard to whether there is someone available to serve as acting or whether the vacancy arises because of a particular exigency.

**ii.** Turning to the executive branch, Presidents historically have chosen non-Senate-confirmed persons to assume temporarily the duties of vacant principal offices, notwithstanding the fact that these persons did not satisfy Plaintiffs' invented constitutional definition of "first assistant." Plaintiffs acknowledge there are hundreds of examples throughout the nineteenth century where the President selected non-confirmed chief clerks in various cabinet departments to serve as acting or ad interim department heads.  Having no other response to this uncontroverted historical reality, Plaintiffs mistakenly assume that these chief clerks were the first assistants of their respective departments whose "defined job responsibilities" included automatically performing the duties of the principal officer if the cabinet Secretary was unavailable or the Secretary's office was vacant.

Chief clerks were not considered "first assistants" because, among other reasons, it was well established at the time when the chief clerks were selected to serve as acting heads they were performing *additional* duties in a wholly *new* capacity as acting or ad interim Secretary.  As the *Boyle* Court noted, "The office of Secretary *ad interim* being a distinct and independent office in itself, when it is conferred on the chief clerk, it is so conferred not because it pertains to him *ex officio*, but because the President, in the exercise of his discretion, sees fit to appoint him."  *Boyle*, Rep. C.C. 44, at 9.  Precisely because the chief clerks were assuming additional duties of an office they did not previously hold, the chief clerks were entitled to additional compensation from the Federal Government for the performance of those additional duties.  *See, e.g.*, *id.* at 8-9; *Dickins*, Rep. C.C. 9, at 17; *Pay of Secretary of the Treasury ad Interim*, 4 Op. Att'y Gen. 122, 122-23 (1842) (concluding that chief clerk had a valid claim for compensation as Secretary of the Treasury ad interim).  If it were true that these chief clerks already had the powers and responsibilities of the principal office as

Plaintiffs suggest here, the chief clerks would not have been entitled to additional compensation. But the chief clerks' indisputable entitlement to compensation shows that the distinct and separate office of Acting Secretary or Secretary ad interim was conferred on the chief clerks as a matter of presidential discretion and not because the position of Acting Secretary or Secretary ad interim pertained to the chief clerks as part of their defined job responsibilities and powers.

In addition, the temporary designation of these non-Senate-confirmed chief clerks as agency heads was not limited to exigent circumstances.  In contrast to ad interim Secretaries, chief clerks were often selected to serve in an *acting* capacity when the agency head was temporarily unavailable on account of absence due to travel or sickness.  *See supra* Part E.1.b. (explaining that Dickins served as Acting Secretary of State while the incumbent Secretary was visiting his home state of Georgia). There was no particular exigency to those routine absences.  With respect to the 32 ad interim Secretaries identified in the 2018 OLC Opinion, approximately 29 were designated after a resignation by the cabinet Secretary, including nine after resignations unrelated to presidential transitions.  *See* 2018 OLC Op., Ex. 1 at 12-18 (identifying specific instances in which chief clerks were designated as acting or ad interim Secretaries) (citing *Biographical Directory* at 13-19; 1 *Trial of Andrew Johnson* at 575-81, 585-91).

Finally, chief clerks were selected to serve as ad interim Secretaries even in instances where the President asked for the resignation of the cabinet Secretary.  During the Jackson Administration, all but one cabinet member resigned as a result of what has become known as the "Petticoat Affair." *See* John F. Marszalek, *The Petticoat Affair*, 157-62 (1997).  Three cabinet Secretaries—Secretary of the Treasury Samuel Ingham, Secretary of War John Eaton, and Secretary of the Navy John Branch— resigned under pressure from President Andrew Jackson.  *See id.*  Although Secretary Eaton tendered his resignation without much controversy, President Jackson had to formally request the resignations of Secretaries Branch and Ingham.  *See id.*  Following their resignations, Chief Clerk Philip G. Randolph replaced Eaton as ad Interim Secretary of War for a period of 30 days, and Chief Asbury Dickins replaced Ingham as ad Interim Secretary of the Treasury for 48 days.  *See* 2018 OLC Op., Ex. 1 at 13-14, 16 & n.6; *Dickins*, Rep. C.C. 9, at 4.  In short, the Petticoat Affair demonstrates

that the historical practice of selecting chief clerks to serve temporarily as cabinet official officials is not limited to any given emergency, but also extends to circumstances in which the President forced the resignation of a cabinet Secretary.

This historical understanding forecloses Plaintiffs' position that these nineteenth-century chief clerks closely resemble the office of Deputy Attorney General in the Department of Justice. Unlike the Deputy Attorney General, chief clerks did not serve as acting or ad interim Secretaries because it was "required by the[ir] pre-defined job responsibilities" or because they already possessed the powers of the Secretary.  Indeed, these chief clerks are arguably the closest historical analogue to a modern chief of staff in a cabinet department or executive agency.  Chief clerks and chiefs of staff are especially close to their respective principals, are intimately familiar with the duties and responsibilities of the principal office, and possess a comprehensive and general understanding of how the agency operates as a whole.

It is no surprise then that Presidents George W. Bush and Barack Obama used their authority under the FVRA to place chiefs of staff in the lines of succession to be acting heads of executive agencies.[38]  In fact, in at least three instances, President Obama placed a chief of staff above a Senate-confirmed officer within the same department.[39]  These modern examples of

---

[38] *See* Memorandum, Designation of Officers of the Social Security Administration, 71 FR 20333 (Apr. 17, 2006); Memorandum, Designation of Officers of the Council on Environmental Quality, 73 FR 54487 (Sept. 18, 2008) (later superseded by 2017 memorandum cited below); Memorandum, Designation of Officers of the Overseas Private Investment Corporation to Act as President of the Overseas Private Investment Corporation, 76 FR 33613 (June 6, 2011); Memorandum, Designation of Officers of the Millennium Challenge Corporation to Act as Chief Executive Officer of the Millennium Challenge Corporation, 77 FR 31161 (May 21, 2012); Memorandum, Designation of Officers of the General Services Administration to Act as Administrator of General Services, 78 FR 59161 (Sept. 20, 2013); Memorandum, Designation of Officers of the Office of Personnel Management to Act as Director of the Office of Personnel Management, 81 FR 54715 (Aug. 12, 2016); Memorandum, Providing an Order of Succession Within the National Endowment of the Humanities, 81 FR 54717 (Aug. 12, 2016); Memorandum, Providing an Order of Succession Within the National Endowment of the Arts, 81 FR 96335 (Dec. 23, 2016); Memorandum, Designation of Officers or Employees of the Office of Science and Technology Policy to Act as Director, 82 FR 7625 (Jan. 13, 2017); Memorandum, Providing an Order of Succession Within the Council on Environmental Quality, 82 FR 7627 (Jan. 13, 2017).

[39] *See* Executive Order 13612, Providing an Order of Succession Within the Department of

executive practice closely resemble the designation of chief clerks throughout the nineteenth century and substantially undermine, if not directly foreclose, Plaintiffs' position here.

**iii.**  As for the judicial branch, the Supreme Court's holding in *Eaton* cannot be construed as narrowly as Plaintiffs would suggest.  Indeed, the holding and rationale of *Eaton* was not contingent on the existence of a particular exigency, such as the circumstances that led to the designation of Lewis Eaton as vice-consul and the unavailability of the consul-general.

First, *Eaton* itself made clear that its holding was not limited to the exigencies of Lewis Eaton's particular appointment.  The Supreme Court stated that if non-confirmed inferior officers were "transformed" into principal officers by virtue of their temporary service, such a holding "would render void any and every delegation of power to an inferior to perform *under any circumstances or exigency* . . . and the discharge of administrative duties would be seriously hindered." *Eaton*, 169 U.S. at 343 (emphasis added).

Second, the reasoning of *Eaton* extended well beyond the particular facts presented in that case.  The *Eaton* Court explained that Congress's "manifest purpose" in distinguishing between consuls and vice-consuls was to "limit the period of duty to be performed by the vice-consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word."  169 U.S. at 343.  Thus, the "special and temporary conditions" recognized in *Eaton* were not the particular exigency presented in that case, but the limits of the then-regulatory scheme, which permitted service in any case of "the absence or the temporary inability of the consul," whatever the cause.  *Id.* at 342-43; *see also id.* at 341.  In view of the long history of appointments providing for the *temporary* performance of a principal office, *Eaton* simply confirmed the general rule that such appointments do not "transform[ ]" the acting official "into the superior and permanent official" requiring the Senate's confirmation.  169 U.S. at 343-44 (relying on Attorney General Cushing's 1855 opinion regarding the longstanding practice on the appointment of consular

Agriculture, 77 FR 31153 (May 21, 2012); Executive Order 13735, Providing an Order of Succession Within the Department of the Treasury, 81 FR 54709 (Aug. 12, 2016); Executive Order 13736, Providing an Order of Succession Within the Department of Veterans Affairs, 81 FR 54711 (Aug. 12, 2016).

officials) (citing *Appointment of Consuls*, 7 Op. Att'y Gen. 242, 262 (1855)).  In other words, the *Eaton* Court reached the same conclusion as the *Boyle* court—that temporarily performing the duties of a principal office is not the same as holding the office itself.  This general rule has applied historically to all sorts of principal officers.

Third, the Supreme Court's subsequent decisions have not read *Eaton* so narrowly as Plaintiffs propose.  Instead, they have cited it repeatedly for the proposition that temporarily performing the duties of a principal office does not make one a principal officer.  *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 661-63 (1997); *Morrison v. Olson*, 487 U.S. 654, 672-73 (1988).  Neither *Edmond* nor *Morrison* characterized *Eaton* in terms of the need for an exigency.  *Morrison*, for example, held that the appointment of the independent counsel in that case was constitutional because he was an inferior officer.  487 U.S. at 670-73.  Relying on *Eaton*, the *Morrison* Court held that the independent counsel was an inferior officer whose appointment did not require Senate confirmation in significant part because of her limited tenure.  *See id.* at 672-73.  Given that there was no exigency precluding Senate confirmation of the independent counsel, *Morrison*'s reliance on *Eaton* would have been improper if *Eaton* truly were limited to the types of emergencies that Plaintiffs propose.

Fourth, Justice Thomas's reference to *Eaton* in his concurrence in *SW General* is not to the contrary.  *See SW General*, 137 S. Ct. at 949 & n.1 (Thomas, J., concurring).  Justice Thomas distinguished *Eaton* on the ground that the acting designation in *SW General* was not "special and temporary" because it had remained in place "for more than three years in an office limited by statute to a 4-year term."  *Id.* at 946 n.1 (Thomas, J., concurring).  At no point did Justice Thomas assert the need for a particular "emergency" to justify the invocation of *Eaton*.  Rather, his observation is consistent with Defendants' view that a presidential designation of an acting principal officer "should not continue beyond a reasonable time."  *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287, 289-90 (1977).  Indeed, *Eaton* upheld the constitutionality of a designation that lasted 310 days.  *Eaton*, 169 U.S. at 332-33.  By comparison, Mr. Whitaker's designation under the FVRA is unquestionably valid, as it is only over two months old, and is subject to section 3346(a)(1)'s 210-day time limitation, subject to potential statutorily permitted

extensions, absent the confirmation of a permanent successor.  Mr. Whitaker's designation is also valid when compared with the six-month limitation authorized early on by the 1795 Act.  Here, any concern with the duration of Mr. Whitaker's temporary designation is particularly chimerical given the President's nomination of William P. Barr to be Attorney General.

In conclusion, Plaintiffs' argument that the Constitution prohibits the President from designating a non-Senate-confirmed official unless there is an emergency where there is no "first assistant" available to serve has no support in the text of the Appointments Clause or the pertinent historical practice.  The President's temporary designation of Mr. Whitaker as Acting Attorney General does not violate the Constitution.

### b. Plaintiffs' argument that the Constitution prohibits Mr. Whitaker from serving as Acting Attorney General because he is an employee lacks merit.

Finally, Plaintiffs argue that, even if non-Senate-confirmed individuals can generally serve temporarily as acting agency heads, there is a particular problem with Mr. Whitaker because he was not an officer prior to his designation, but only an employee.  Again, that limitation has no basis in the text of the Appointments Clause, and it is also contrary to historical practice.

The 1792 and 1795 Acts authorized the President to choose "any person"—not just a federal employee, but even those with no prior relationship to the Federal Government—to fill a vacancy in the offices of Secretary of State, Secretary of the Treasury, or Secretary of the War.  *See* Act of Feb. 13, 1795, ch. 21, 1 Stat. 415; Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281.  These statutes governed temporary appointments of acting Secretaries in these cabinet departments for approximately seventy years.  It was also the case that Presidents would choose persons with no prior position in the Federal Government to serve as acting cabinet heads.  For example, President Andrew Jackson designated James A. Hamilton (Alexander Hamilton's son), who was neither a federal employee nor officer, to perform the duties of the vacant office of Secretary of State "until Governor [Martin] Van Buren should arrive in the city" three weeks later. 1 *Trial of Andrew Johnson* at 575; *see Biographical Directory* at 16.  Similarly, President Jackson twice named William B. Lewis, who held no federal position, as Acting Secretary of War.  *See* 1 *Trial of Andrew Johnson* at 575.  Similarly,

Lewis Eaton, a religious missionary with no ties to any office of the Federal Government, was appointed vice-consul-general in Bangkok for the sole purpose of, as Plaintiffs repeatedly emphasize, serving as acting consul-general of Siam. *Eaton*, 169 U.S. at 332-33.

In light of this history, the President's designation of the Attorney General's chief of staff pursuant to Congress's express authorization under section 3345(a)(3) is plainly permissible.

## II.     The Balance of Equities Does Not Tip in Plaintiffs' Favor.

Plaintiffs contend that the balance of equities tips in their favor because, absent a preliminary injunction, they "will either be deprived of their lawfully owned" bump stocks, "or face criminal prosecution," under which the penalties could include "10 years in jail, $250,000.00 in fines and forfeiture" of property associated with the commission of a crime. Mot. at 37. But Plaintiffs conflate the irreparable harm prong[40] of the preliminary-injunction analysis with the "balance of equities" prong—they make no effort to *balance*, *i.e.*, to weigh the harm to them of the abandonment or destruction of their bump stocks *against* the interests represented by Defendants. And the weight of those interests makes clear that the balance of equities favors Defendants.[41]

---

[40] Defendants do not contest Plaintiffs' contention that "implementation of this Final Rule will force the Plaintiffs and others like them to dispose of their property," and that destroyed bump stocks would be "almost impossible to replace" given the unavailability of replacement products from Slide Fire Solutions. Mot. at 37. The touchstone of irreparable harm is whether "adequate compensatory or other corrective relief will be available at a later date." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotations omitted). However, an "irreplaceable loss," such as an item that is no longer manufactured, may constitute irreparable harm even where a monetary value can be assigned. *See Lee v. Christian Coalition of America, Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001). Thus, Defendants concede that Plaintiffs have met the irreparable harm prong of the preliminary injunction standard. However, the magnitude of such irreparable harm is limited by the principal purpose of bump stocks: for "recreation and fun." *Compare* Final Rule, 83 FR 66546 (describing purposes set forth by commenters) *with* Am. Compl., ECF No. 9 (omitting any discussion of specific purpose for which Plaintiffs use bump stocks).

[41] Plaintiffs appear to suggest that the balancing of equities should take into account a multiplier of the harm for each individual Plaintiff of "520,000," on the basis that ATF's "primary estimate of bump-stock-type devices in the hands of the public" is this number. Mot. at 37. While it is true that the balancing of equities analysis requires "balance[ing] the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24, Plaintiffs can, at most, assert the harm to themselves and their own members. Neither the Amended Complaint nor the Motion states the size of Plaintiffs' membership, but Defendants

The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. 7. Implementation of the Final Rule serves important public values that outweigh the harm to Plaintiffs of the abandonment or destruction of their bump stocks. First, the Final Rule makes clear throughout that it is being implemented to promote public safety. *See* Final Rule, 83 FR 66515 ("a desired outcome of this final rule is increased public safety"); *id.* at 66520 ("this rule reflects the public safety goals of the NFA and GCA"); *accord id.* at 66520 (reported use of bump stocks by Las Vegas perpetrator made "individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions— and made their potential to threaten public safety obvious"). This public safety benefit would no be jeopardized if, during the period of an injunction, another criminal perpetrator could undertake a similar act with lawfully-possessed bump stocks, and thus, public safety tilts the equities in favor of Defendants, particularly here, where public safety is the mandate prescribed by Congress in the NFA and GCA. *See Proctor v. Dist. of Columbia*, 310 F. Supp. 3d 107, 117 (D.D.C. 2018) (public safety justification supported balancing the equities in favor of governmental defendants); *Safari Club Intern. v. Salazar*, 852 F. Supp. 2d 102, 125 (D.D.C. 2012) ("balance of equities tips towards" agency where agency is carrying out its "Congressionally mandated role").[42]

In addition, implementation of the Final Rule reflects a particularized interest in advancing the safety of law enforcement personnel. As the Final Rule noted, "[a] ban [on bump stocks] . . . could result in less danger to first responders when responding to incidents." 83 FR 66551; *see also id.* at 66520 ("[s]everal commenters . . . noted that [bump stocks] are a danger to police forces . . . [and] stated that the rapid fire enabled by [bump stocks] . . . puts police officers who respond at

---

believe it is unlikely that Plaintiffs—especially following the dismissal of one of the original organizational plaintiffs—encompass all, or even a majority, of the owners of bump stocks.

[42] Plaintiffs suggest that this interest is immaterial because "ATF has not been able to name a single instance" other than Las Vegas where a bump stock was used in a crime, Mot. at 37, and has not "confirmed the use of a bump fire stock" in Las Vegas. Mot. at 21, n.43. Defendants note that the Final Rule *does* describe the use of bump fire stocks in Las Vegas, *see* 83 FR 66516, and further notes that many commenters agreed with Defendants regarding "the likelihood that a potential perpetrator will seek out these devices." 83 FR 66520.

greater risk"). The "public[] interest in the safety of . . . law enforcement officials is both legitimate and weighty." *United States v. Denny*, 441 F.3d 1220, 1225-26 (10th Cir. 2006) (quoting *Penn. v. Mimms*, 434 U.S. 106, 110 (1977)). As with the interest in public safety, this interest would not be advanced during the pendency of an injunction, and this tips the balance of the equities in favor of Defendants here.

## III.    An Injunction is Not in the Public Interest.

Plaintiffs also bear the burden of establishing that an injunction is in the public interest, which they have not done. As an initial matter, where the government is the party opposing the preliminary injunction, "the[] final two factors merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and the Court can combine the "balance of equities" and "public interest" analysis. *See, e.g., Seeger v. Dep't of Defense*, 306 F. Supp. 3d 265, 291 (D.D.C. 2018). Under this analytic merger, the interests in public safety and the safety of law enforcement personnel described above demonstrate that the public interest prong of the analysis also favors the Defendants.

Plaintiffs' contrary analysis is brief and conclusory;[43] it is also in error. Plaintiffs assert that "an injunction is in the public interest" because "[t]here is a public interest in enforcing compliance with the law." Mot at 38. The Final Rule documents, however, that its very purpose is to clarify that bump stocks are machine guns within the definition of the law and thereby to assist the public in complying with the law. *See* 83 FR 66521. Moreover, Congress's findings in adopting the GCA and NFA and instituting a ban on the private acquisition of new machine guns illustrate that the public interest is in implementing congressional priorities and stopping the proliferation of machine guns, including bump stocks. *See, e.g., O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1190-91 (10th Cir. 2003) (findings by Congress are important factor in demonstrating

---

[43] The abbreviated nature of Plaintiffs' analysis counsels in favor of denial of their motion. *See Seeger*, 306 F. Supp. 3d at 291 ("The parties present their arguments in abbreviated form and without sufficient detail for the Court to perform the balancing of interests as required before an injunction can be issued. Plaintiffs have therefore failed to demonstrate that the current balance of equities and the public interest favor issuance of an injunction").

public interests affected by preliminary injunction); *United States v. RX Depot, Inc.*, 297 F. Supp. 2d 1306, 1310-11 (N.D. Okla. 2003) (In weighing public interest at preliminary injunction stage, "the Court must enforce the priorities of Congress").  Thus, contrary to Plaintiffs' contention, an injunction would not help enforce compliance with the law.

For these reasons, the public interest prong does not favor Plaintiffs' requested injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.


Dated: January 22, 2019                    Respectfully submitted,

 

JOSEPH H. HUNT
Assistant Attorney General

HASHIM M. MOOPPAN
BRETT A. SHUMATE
Deputy Assistant Attorneys General

JENNIFER D. RICKETTS
Branch Director

JOHN R. TYLER
CHRISTOPHER R. HALL
Assistant Branch Directors

/s/_____
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
CHETAN PATIL
CESAR A. LOPEZ-MORALES
REBECCA CUTRI-KOHART
Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*