**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FIREARMS POLICY COALITION, INC., | * | |
| | | |
| *Plaintiff*, | * | |
| | | |
| v. | * | Case No. 18-cv-3083 |
| | | Lead Case No. 18-cv-2988 |
| MATTHEW G. WHITAKER, IN HIS | * | |
| OFFICIAL CAPACITY, *et al.*, | | |
| | * | |
| *Defendants*. | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, OR, IN THE
ALTERNATIVE, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

# TABLE OF CONTENTS

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT........... 1

I.  The President's Designation Of Matthew Whitaker Was Unconstitutional .......................... 3

  A.  The President Impermissibly Designated An Employee To Perform The Functions Of An Officer ......................................................................................... 3

  B.  The President Impermissibly Designated A Non-Confirmed Official Other Than The Available First Assistant To Perform The Functions Of A Principal Officer ................................................................................................................... 9

    1.  The Government Has No Answer To The Fact That During His Appointment Mr. Whitaker Has No Relationship With Any Superior Officer ............................................................................................................ 9

    2.  The Designation Of Mr. Whitaker Cannot Be Reconciled With *Eaton* ............... 10

    3.  The Government's Historical Examples All Demonstrate That An Available Second In Command Is The Only Non-Senate Confirmed Officer Who May Temporarily Perform The Functions Of A Principal Officer ............................................................................................................ 11

II. The President's Designation Of Matthew Whitaker Was Contrary To Statute ................... 17

  A.  Plaintiff Has The Best Reading Of The Statutory Text ............................................... 17

  B.  The Government's Argument That The Vacancies Act May Apply To The Attorney General Is Misdirection ............................................................................... 20

  C.  The Government's Interpretation Is Implausible ......................................................... 21

  D.  The Government's Reliance On Presidential Designations Is Misplaced ................... 23

CONCLUSION........................................................................................................................ 25

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, OR, IN THE
ALTERNATIVE, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

The President's designation of Matthew Whitaker as Acting Attorney General violated both the Constitution and the applicable statutes. Mr. Whitaker—who is not a constitutional officer—is exercising all of the powers of a principal officer, the Attorney General. He is doing so despite an on-point statute requiring the Attorney General's first assistant—the Deputy Attorney General—to do just that. This Court can uphold Mr. Whitaker's role only if it accepts the Government's position that the restrictions imposed on the President by the Appointments Clause and the governing statutes are essentially meaningless.

The Government rests its argument on the extraordinary claim that the Constitution permits the President to remove and replace every officer—including every principal officer—with "any person," including someone who is not even a government employee. Defs.' Opp. to Pl.'s Mot. for PI (Defs.' Opp.), No. 18-cv-2988 ECF 16 at 70-71. The President need only state that this person will serve "temporarily," in the purely formalistic sense that s/he will not be submitted for Senate confirmation. *Id.* at 53-54, 61-62, 69. That breathtaking position cannot be reconciled with the Supreme Court's holding that the Appointments Clause is essential to the separation of powers, and in particular with its holding that an available first assistant—who is an officer—is the non-confirmed official who may temporarily exercise the powers of a principal officer. *See Edmond v. United States*, 520 U.S. 651, 659-60 (1997); *Freytag v. Comm'r*, 501 U.S. 868, 882-83 (1991); *United States v. Eaton*, 169 U.S. 331, 341-42 (1898).

This Court can and should avoid those serious constitutional doubts about Mr. Whitaker's designation by holding that the applicable statutes did not authorize it in the first place. The Government argues in favor of its interpretation but does not even *claim* that Plaintiff's reading is

impermissible. How could it? The Executive Branch itself originally adopted it. *See* Pl.'s Mem. in Support of Mot. for PI (Pl.'s Mem.), No. 18-cv-3083 ECF 2-1 at 9, 25-26 & n.2.

In fact, Plaintiff's reading is far superior. The implausible premise of the Government's position is that Congress, with no discussion, negated dozens of office-specific statutes it had enacted over the course of more than a century, by adopting the Vacancies Act to authorize the President to designate any of thousands of employees as, for example, the Attorney General, the Secretary of Defense, and the Chairman of the Joint Chiefs of Staff. In fact, the Vacancies Act says the opposite: it contains an explicit exception when another, office-specific statute "designates" an acting official. The Government's bald assertion that the President can simply choose between the two statutory schemes cannot be right: the express purpose of the office-specific statutes is to forbid that choice, and no provision of the Vacancies Act authorizes it.

The Government's remaining arguments are misdirection, pure and simple. First, the Government argues that the Appointments Clause does not categorically prohibit the President from designating a non-Senate confirmed official to temporarily perform the functions of a principal officer. Plaintiff does not argue otherwise. But as the Supreme Court's precedent and the Government's own examples of Chief Clerks demonstrate, only a *specific* non-confirmed official may play that role: the officer's second in command—the so-called "first assistant." Second, the Government argues that Congress contemplated that the Vacancies Act could sometimes apply to the Office of the Attorney General. Again, Plaintiff does not argue otherwise. But the Vacancies Act applies only in a specific circumstance: when the Attorney General Succession Act (AG Act) does not "designate" the Acting Attorney General because the mandatory successors specified by the AG Act are unavailable. Here, the Attorney General's first assistant—the Deputy Attorney

General—is available and therefore is the Acting Attorney General both under the Constitution and by statute.

## I. THE PRESIDENT'S DESIGNATION OF MATTHEW WHITAKER WAS UNCONSTITUTIONAL.

The President's designation of Matthew Whitaker violated the Appointments Clause for two distinct reasons. First, the President may not temporarily designate an employee to perform the functions of an officer. Second, the non-confirmed official who the President may designate to temporarily perform the functions of a principal officer is that officer's "first assistant."

The Government's contrary arguments are not persuasive. Instead, they put the Government on the horns of a dilemma from which it cannot escape. If Mr. Whitaker is merely temporarily performing the functions of the Attorney General in the course of his role as Chief of Staff, then he remains an employee and may not exercise the powers of an officer. If instead the President "appointed" Mr. Whitaker as an officer, then he is a principal officer because he will never report to anyone other than the President during his appointment. So he could serve only if he was first confirmed by the Senate. One way or the other, the designation violates the Appointments Clause.

### A. The President Impermissibly Designated An Employee To Perform The Functions Of An Officer.

In a bare footnote, the Government asserts that "the President's designation of Mr. Whitaker as Acting Attorney General satisfies the Appointments Clause's requirements for an inferior officer." Defs.' Opp. 53 n.30. It provides no explanation, instead just citing page 9 of the OLC Opinion on the Whitaker designation. There, OLC asserts (in another lone, unelaborated sentence): "Mr. Whitaker was appointed in a manner that satisfies the requirements for an inferior officer: He was appointed by Attorney General Sessions, who was the Head of the Department, and the President designated him to perform additional duties." *Designating an Acting Attorney*

*General*, 42 Op. O.L.C. __, at 9 (Nov. 14, 2018), slip op. (*Whitaker OLC Op.*), http://bit.ly/2B3ilF8. In support, OLC cites its own assertion in a prior Opinion involving the Office of Management and Budget (OMB) that because the President is the person who designates an employee under the Vacancies Act, Congress in that statute "employed one of the modes by which it may provide for an appointment of an inferior officer." *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 124-25 (2003) (*OMB OLC Op.*). Notably, none of these assertions draws any support from any judicial opinion by any court interpreting the Appointments Clause.

The two arguments in the two OLC Opinions are inconsistent. In the *Whitaker OLC Opinion*, OLC asserts that, in his role as Chief of Staff, Mr. Whitaker was already an officer appointed by the Attorney General, without regard to the fact that the President later designated him under the Vacancies Act. In the previous *OMB OLC Opinion*, OLC asserted that under the Vacancies Act, the President "appoints" an employee to serve as an officer. The Government's discussion of the issue in this Court is so opaque and terse that it is not possible to tell which argument it is making now. But it doesn't matter. Both are meritless.

The assertion of the *Whitaker OLC Opinion* that the Chief of Staff is an "officer" is frivolous. In parallel litigation, the Government has correctly conceded that before the President designated Mr. Whitaker, he was an employee. *See* Pl.'s Mem. 17. The mere fact that the Attorney General personally hires his Chief of Staff (*see Whitaker OLC Op.* 9)—the way the Attorney General hires a personal assistant—is nowhere near sufficient to establish that position as an officer. Plaintiff's Memorandum detailed—and the Government does not dispute—how the Chief of Staff lacks the defining characteristic of an officer: he has no substantive authority to administer

4

the laws of the United States. Pl.'s Mem. 17; *see also id.* at 2 (citing *Lucia v. SEC*, 138 S. Ct. 2044, 2051-52 (2018)).

Plaintiff's Memorandum also anticipated the assertion of the *OMB OLC Opinion* that the Vacancies Act "appoints" an employee as an officer, as well as the Government's attempt to distinguish the Supreme Court's decision in *Weiss v. United States*, 510 U.S. 163 (1994). Defs.' Opp. 53 n.30. The Vacancies Act—and Presidential orders under the Act—merely "designate" an official to perform additional responsibilities within the context of his or her existing job. Pl.'s Mem. 17-19. The Act and orders expressly distinguish that designation from the distinct "appointment" of an official to serve permanently in the position. *Id.* Under *Weiss*, such a statutory designation does not amount to an appointment. *Id.* at 18-19. Nothing about the Supreme Court's reasoning in *Weiss* is limited to the context of "military judges serving on courts martial." *Contra* Defs.' Opp. 53 n.30.

Importantly, the Government also ignores the second reason that the President's designation of Mr. Whitaker cannot fairly be read as to appoint him as an officer: a temporary assignment of an official does not amount to an appointment. Pl.'s Mem. 20. The Government's Opposition stresses—dozens of times—that the President only designated Mr. Whitaker temporarily to perform the Attorney General's responsibilities. But an "officer" must be a permanent position. That is the holding of *United States v. Germaine*, 99 U.S. 508 (1878), which involved a doctor hired by the Commissioner of Pensions on a temporary basis to examine pensioners. *Id.* at 508. The doctor was charged with committing extortion as an officer of the United States. *Id.* at 509. But the Supreme Court held that under the Appointments Clause he was only an employee. *Id.* The Court looked to "the nature of [his] employment," holding that the duties of an "officer" must be "continuing and permanent, not occasional or temporary." *Id.* at

511-12. The Supreme Court, citing *Germaine*, has repeatedly reaffirmed that an officer must hold a "continuing" position that exercises permanent, not "temporary," responsibilities. *Lucia*, 138 S. Ct. at 2051; *see also Freytag*, 501 U.S. at 881. Mr. Whitaker does not.

The Government seemingly argues in the alternative that the Appointments Clause permits an employee to perform the functions of an officer. Defs.' Opp. 70-71. So far as we are aware, the Government has never before taken this position, and—as the *Whitaker* and *OMB OLC Opinions* show—the Office of Legal Counsel has carefully avoided ever making such an assertion. This new litigation position is thus so bad that it was not even a basis on which the Office of Legal Counsel originally attempted to justify Mr. Whitaker's designation.

The Government's sole argument is that "[t]he 1792 and 1795 [Vacancies] Acts authorized the President to choose 'any person'—not just a federal employee, but even those with no prior relationship to the Federal Government—to fill a vacancy" temporarily in three Departments. Defs.' Opp. 70. This is the jaw-dropping claim that the Constitution imposes no limits *at all* on who the President designates for acting service, because the President can select any human being on the planet. To be clear, the Government's argument is that because those statutes did not expressly limit who the President could designate, then the Constitution imposes no limits either. The Government apparently believes that the Nation's founders thought there was only a single qualification for exercising the powers of, for example, the Secretary of War during the War of 1812: the acting officeholder must be a human being. That is, of course, absurd.

Preliminarily, the Government's argument is self-defeating. It fails to acknowledge that the critical 1792 statute did not allow the President to designate anyone in the case of the resignation or dismissal of a principal officer. Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 (authorizing President to designate certain acting officers in specific departments *only* in the case of "death,

absence from the seat of government, or sickness"). If the statute actually embodies the requirements of the Appointments Clause, then the President's designation of Mr. Whitaker in the wake of Mr. Sessions' resignation is unconstitutional on that basis alone.

More broadly, the Government's reliance on 1792 and 1795 statutes is obviously flawed, given the Supreme Court's decision in *Eaton*. If the Government is right, *Eaton* must be wrongly decided because it did not hold that any person may temporarily perform the functions of a principal officer. Instead, the Supreme Court held that the principal officer's available second in command—who is an inferior officer—is the non-confirmed official who may do so, and only in response to special and temporary conditions. *See infra* at 10-11.

Contemporary practice shows that Congress did not intend the 1792 and 1795 statutes to reflect the boundaries of the President's authority under the Appointment Clause. If it did, then Presidents repeatedly and consistently would have designated ordinary employees, or even persons with no relationship to the government, to perform the functions of principal officers. But they manifestly did not. Presidents instead consistently designated either another Senate-confirmed officer (generally a department head) or the principal officer's second in command—the Chief Clerk. All of those temporary designees were constitutional officers. *See* Pl.'s Mem. 3-5 (citing *Edmond*, 520 U.S. at 663-64; *Eaton*, 169 U.S. at 343). As discussed in the Memorandum, the Office of Legal Counsel's own argument for why the designation of Mr. Whitaker is consistent with historical practice is that "clerks, who were not Senate-confirmed, were routinely authorized to serve as acting officers under the 1792 and 1795 statutes." *Whitaker OLC Op.* 24 & n.16.

There are only two counter-examples in all of American history, both involving President Andrew Jackson: Jackson "designated James A. Hamilton (Alexander Hamilton's son), who was neither a federal employee nor [an] officer, to perform the duties of the vacant office of the

Secretary of State" for three weeks; and he "named William B. Lewis, who held no federal position, as Acting Secretary of War" for brief periods. Defs.' Opp. 70.[1] Neither designation was challenged in court. Neither appears to have been based on any consideration of the requirements of the Appointments Clause. Instead, both Hamilton and Lewis were close friends of Jackson, who was notorious and contemporaneously criticized for relying on the advice and services of a few confidants over actual officers. *See* Louis R. Harlan, *Public Career of William Berkeley Lewis*, Tennessee Historical Quarterly, Vol. 7, No. 1 at 27-31 (March 1948). These two designations by a single President, occurring within months of each other—weighed against a uniform, established practice of service by Chief Clerks in several departments under multiple Presidents—are not informative of the Appointments Clause's meaning. They are therefore hardly substantial evidence of how the Appointments Clause is properly read. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2611 (2014) (Scalia, J., concurring in the judgment) (a "handful" of examples "that lack any contemporaneous explanation," even from the founding era, "are not convincing evidence of the [Appointments Clause]'s original meaning").[2]

The designation of Mr. Whitaker accordingly violated the Appointments Clause because he is an employee performing the functions of an officer.

---

[1] The Government's use of "[f]or example" to introduce those meager and isolated historical examples (Defs.' Opp. 70) is inappropriate, because that phrase only serves to mislead the reader into believing that there are others, when there are not.

[2] Although the "vice-consul-general" in *Eaton* was previously a missionary (Defs.' Opp. 70-71), he was properly named to that governmental position while the consul general was still serving. *See Eaton*, 169 U.S. at 341.

**B.    The President Impermissibly Designated A Non-Confirmed Official Other Than The Available First Assistant To Perform The Functions Of A Principal Officer.**

**1.    The Government Has No Answer To The Fact That During His Appointment Mr. Whitaker Has No Relationship With Any Superior Officer.**

The Memorandum demonstrated that, assuming that the President did in fact appoint Mr. Whitaker as an officer, he is serving as a principal officer. In the course of this "appointment," Mr. Whitaker does not have a relationship with any other, superior officer. Instead, he reports only to the President. He is accordingly a principal officer, who first must be confirmed by the Senate. *Edmond*, 520 U.S. at 662; *see also* Sadie Gurman, *Attorney General Nominee Barr Contemplates Future Role for Whitaker*, Wall St. J. (Jan. 28, 2019), https://on.wsj.com/2MHyky4 (giving no indication that Mr. Whitaker will continue as Chief of Staff once a permanent nominee is confirmed, whereas first assistants continue in their subordinate roles).

The Government never addresses this foundational flaw in its argument. It only hints at a response when it intones that Mr. Whitaker's service is "temporary." That is no answer. The "appointment" of a principal officer requires Senate confirmation—full stop. There is no authority for the proposition that a "temporarily appointed" principal officer is immune from confirmation. Indeed, there is no such thing as a "temporary" officer at all. *See supra* at 5-6. If the President appoints an Attorney General, explicitly stating that the appointee will serve only for one day, confirmation is still required. Pl.'s Mem. 23.

Inescapably, by "temporary," the Government simply means that the President has not submitted Mr. Whitaker for Senate confirmation. But that describes the constitutional *violation*, not a *justification*. The Government's contrary view renders meaningless the Appointments Clause's explicit and essential requirement that a principal officer must be confirmed by the Senate. According to the Government, whenever a person is not submitted for confirmation,

violating the Constitution's plain text, the appointment is "temporary" and *ipso facto* constitutional.

### 2.      The Designation Of Mr. Whitaker Cannot Be Reconciled With *Eaton*.

The Memorandum demonstrated that the President's designation of Mr. Whitaker as a principal officer is unconstitutional under the Supreme Court's decision in *Eaton*. The Court held that the second in command may temporarily perform the functions of a principal officer. That subordinate's job responsibilities include filling in for the principal officer. When the principal officer is again available, the second in command continues on in his or her subordinate role. The Court reasoned that this subordinate may act "for a limited time and under special and temporary conditions" in order to ensure "the unbroken performance of [the principal officer's] duties." 169 U.S. at 343; *see* Pl.'s Mem. 3-4.

By contrast, the job responsibilities of the Chief of Staff do not involve performing the functions of the Attorney General. Indeed, the Chief of Staff and other employees are forbidden to do so by statute. 28 U.S.C. § 508. The President's order nonetheless designating Mr. Whitaker to do so does not maintain the Department of Justice's unbroken operations—it breaks them. And when the Deputy Attorney General is available—as in this case—there is no exigency necessitating designating anyone else.

The Government's effort to distinguish *Eaton* is unpersuasive. It asserts that *Eaton*'s "holding was not limited to the exigencies of Lewis Eaton's particular appointment," but rather "extended well beyond the particular facts presented in that case." Defs.' Opp. 68. But the Government then immediately concedes that "the 'special and temporary conditions' recognized in *Eaton* were . . . the limits of the then-regulatory scheme." *Id.* That is exactly right. But the "regulatory scheme" in question was the job responsibilities of the vice-consul, which included filling in for an absent consul general. 169 U.S. at 336 (noting that by statute, "'[v]ice consuls . . .

shall be substituted, temporarily, to fill the places of consuls general . . . when they shall be temporarily absent or relieved from duty'") (quoting Rev. Stat. § 1674). That is precisely the feature missing here: the statutory scheme makes the Deputy Attorney General, not the Chief of Staff, the official who acts as Attorney General during the temporary absence of the principal officer.

The Government's only other argument is that "the Supreme Court's subsequent decisions . . . . have cited [*Eaton*] repeatedly for the proposition that temporarily performing the duties of a principal office does not make one a principal officer." Defs.' Opp. 69. That is misdirection. The point is that a *particular* inferior officer may temporarily perform a principal officer's responsibilities: the first assistant (in *Eaton*, the vice consul). The Government's passing citations are consistent with that conclusion. *Edmond* stated that in *Eaton* "a vice consul charged temporarily with the duties of the consul" was an inferior officer. 520 U.S. at 661. *Morrison* repeated the same characterization, notably restating the requirement that the subordinate act "for a limited time and under special and temporary conditions." 487 U.S. at 672-73.

### 3. The Government's Historical Examples All Demonstrate That An Available Second In Command Is The Only Non-Senate Confirmed Officer Who May Temporarily Perform The Functions Of A Principal Officer.

Plaintiff's Memorandum anticipated the Government's principal argument: that historically, non-confirmed officials repeatedly served as principal officers in an acting capacity. *See* Defs.' Opp. 56-60. Plaintiff's constitutional argument does not turn on the fact that the Deputy Attorney General is confirmed by the Senate—although that is strong evidence that as a statutory matter Congress did not intend to allow the President to designate an ordinary employee. Rather, Plaintiff's point is that the examples cited by the Government involve one very specific non-confirmed official: the department's Chief Clerk.

11

The parties agree on the history in which President's consistently designated a single non-confirmed official—the Chief Clerk—but disagree on its modern implications. According to the Government, that practice establishes that the President can designate any non-confirmed person, even someone who does not work for the government. According to Plaintiff, by contrast, the critical feature of the Chief Clerk was that this official was the department's second in command. *See, e.g.*, Official Register of the United States, at 9-15 (1817), https://bit.ly/2MyJncI. The history thus shows that it was accepted that a principal officer's second in command could step in during the principal's absence. In appointments law, the second in command is known as the "first assistant." Here, that person is the Deputy Attorney General. Plaintiff's understanding is obviously superior.

The term "first assistant" has been included expressly in the Vacancies Act since 1868. Act of July 23, 1868, ch. 227, 15 Stat. 168 (the "first or sole assistant" shall step in for the head of an executive department "in case of . . . death, resignation, absence, or sickness," unless the President designates another Senate-confirmed officer within the department or "the head of any other executive department"). It has encompassed offices with varying titles—initially the Chief Clerk. Later, Congress assigned that role to other officials, including an Assistant, Deputy, Undersecretary, and (for a time in the Department of Justice) Solicitor General. *See, e.g.*, 15 Op. Att'y Gen. 3, 4 (1880) (recognizing that Congress had abolished the chief clerk positions in the bureaus of comptroller, customs, auditor, and register and "devolved" their duties upon new Senate-confirmable "deputies" of the same offices) (citing Act of Mar. 3, 1875, ch. 130, 18 Stat. 371).

The 1868 statute thus provided for the automatic succession of a deputy "or if there be no deputy, *then the chief clerk* of such bureau." Act of July 23, 1868, ch. 227, 15 Stat. 168 (emphasis

added). Congress, in debating that Act used the term "first assistant" to "provide[], whenever there is a vacancy in the secretaryship of any of the Departments or in the headship of any of the bureaus by operation of law, that then the person next in office shall take charge and perform the duties; in case of the Secretary, the Assistant Secretary, or in case of the head of a bureau, *the chief clerk*." 40 Cong. Globe 3765 (1868) (emphasis added).

The practice in various departments illustrates the evolution of first assistants from Chief Clerks to other officials, including Deputies. The Secretary of State is illustrative. Before 1853, the Department had one explicitly provided "inferior officer": the "chief clerk." *See* Act of July 27, 1789, ch. 1, § 2, 1 Stat. 28-29. That person routinely stepped in during a vacancy in the principal office. *See, e.g.*, Office of the Historian, Dep't of State, *Secretaries of State Ad Interim*, https://bit.ly/2RS8Bsn (last visited Jan. 28, 2019) (John Graham (Chief Clerk), March 4 to 9, 1817; Daniel Carroll Brent (Chief Clerk), March 4 to 7, 1825; William S. Derrick (Chief Clerk), June 21 to 23, 1843; William Hunter (Chief Clerk), March 4 to 7, 1853). When Congress amended the statute, first in 1853, to add other inferior officers above the Chief Clerk, those individuals instead stepped in during a vacancy in the principal office by virtue of a common understanding as to who was the "first assistant" at the time. *See, e.g.*, *id.* (William Fisher Wharton (Assistant Secretary of State), June 4 to 29, 1892, and February 24 to March 6, 1893; Robert Lansing (Counselor), June 9 to 23, 1915; Frank Lyon Polk (Under Secretary of State), February 14 to March 14, 1920; Harrison Freeman Matthews (Deputy Under Secretary of State), January 20 to 21, 1953; Livingston Tallmadge Merchant (Under Secretary for Political Affairs), January 20 to 21, 1961; and Kenneth Rush (Deputy Secretary of State), September 3 to 22, 1973).

The Department of the Interior is illustrative as well. In 1849, Congress created the Department, including the position of Chief Clerk. Act of Mar. 3, 1849, ch. 108, 9 Stat. 395. The

Chief Clerk repeatedly served as Acting Secretary of the Interior. The final time was in 1861. *Compare* John Bassett Moore, *The Works of James Buchanan* 100 (1910 ed. 12), http://bit.ly/2CTwJ3o (accepting resignation of Secretary of Interior on January 9, 1861), *with* Biographical Congressional Directory, *Executive Officers, 1789-1911*, at 15 (1913) ("Moses Kelly (Chief Clerk), *ad interim* Secretary of the Interior, January 10 to March 4, 1861."). In 1862, Congress created the Senate-confirmed position of Assistant Secretary. Act of Mar. 14, 1862, ch. 41, § 6, 12 Stat. 369. The Chief Clerk never served again on an acting basis.

Contrast the Department of Agriculture. It had a Chief Clerk, but no Assistant or Deputy. Act of May 15, 1862, ch. 72, 12 Stat. 387. The Chief Clerk then served as Acting Commissioner. *E.g.*, Dep't of Agriculture, *Report of the Commissioner* 434, 446, 456, 475 (1885), http://bit.ly/2CTIBTk (showing letters and official documents bearing the signatures of E.A. Carman, Chief Clerk from 1877 to 1885, and F.C. Nesbit, Chief Clerk from 1885 to 1889, both of whom served as Acting Commissioner of Agriculture on multiple occasions).

The Supreme Court in *Eaton* approved first assistants serving on an acting basis precisely because the second in command is the official most likely to ensure the Department's uninterrupted operations during the principal's unavailability. Further, the fact that first assistants stepped in automatically meant that they were not serving as principal officers when the principal office was vacant altogether. Historically, another official—such as a chief of staff—neither stepped in automatically nor was designated by the President, with only trivial exceptions. *See supra* at 7-8.

The fact that the first assistant is the second in command is also a critical limiting principle that prevents the President from evading the Appointments Clause. This case is the perfect example. Congress designated the Deputy Attorney General as the first assistant. That official is deeply familiar with the operations of the Department of Justice. Indeed, Congress required that

the Deputy be confirmed by the Senate, in anticipation that s/he might serve as Acting Attorney General. By contrast, the Government's position here is that the Appointments Clause permits the President to confer all the vital powers and responsibilities of the Attorney General on, literally, "any person" he might want in the moment for his own personal reasons.

There is no merit to the Government's contrary argument that Chief Clerks were not early "first assistants"—and are not the equivalent of the Deputy Attorney General, in particular. First, the Government notes that "it was well established at the time when the chief clerks were selected to serve as acting heads they were performing *additional* duties in a wholly *new* capacity as acting or ad interim Secretary." Defs.' Opp. 65. The Government also argues that "the temporary designation of these non-Senate-confirmed chief clerks was not limited to exigent circumstances." *Id.* at 66. But those are no distinctions at all: the same is true of all first assistants, including the Deputy Attorney General.[3]

The Government next asserts that "the distinct and separate office of Acting Secretary or Secretary ad interim was conferred on the chief clerks as a matter of presidential discretion and not because the position of Acting Secretary or Secretary ad interim pertained to the chief clerks as part of their defined job responsibilities and powers." Defs.' Opp. 66. That is certainly false in material respects. The Office of Legal Counsel collected numerous instances in which Chief Clerks

---

[3] The Government notes that chief clerks initially received a higher salary for their acting service. Defs.' Opp. 65. But it omits that Congress prohibited such additional compensation after those individuals' acting periods of service. *See* Act of Aug. 26, 1842, ch. 202, § 12, 5 Stat. 523, 525 ("[N]o allowance or compensation shall be made to any clerk or other officer, by reason of the discharge of duties which belong to any other clerk or officer in the same or any other department."). The Government does not and cannot argue that this change somehow altered the constitutional character of such service. And more importantly, the Government never explains why a payroll practice has constitutional significance. If it were relevant, it would seemingly disqualify Mr. Whitaker who—so far as Plaintiff is aware—has not received a raise for his service as Acting Attorney General.

automatically served on an acting basis for temporarily unavailable department heads, without any designation by the President; notably, if the Chief Clerk was available, no other department official did so. *See Whitaker OLC Op.* 13-14 & n.6. The Government also fails to recognize that multiple statutes in fact expressly designated the Chief Clerk to fill in for the Secretary. *See* Act of July 4, 1836, ch. 357, § 2, 5 Stat. 117-18 (Commissioner of Patents); Act of May 15, 1862, ch. 72, § 4, 12 Stat. 387 (Secretary of Agriculture, if the office of Commissioner was vacant).

The Government misstates the reason that Presidents originally designated Chief Clerks during a vacancy, whereas now the first assistant serves automatically. It has nothing to do with a difference between the jobs. The reason is that Congress enacted statutes mandating that result by providing that first assistants will serve automatically. *E.g.*, 5 U.S.C. § 3345(a); 5 U.S.C. § 3345 (1988); 5 U.S.C. § 3345 (1966); Rev. Stat. §§ 177-182 (1874); Act of July 23, 1868, ch. 227, 15 Stat. 168 (1868).

The Government argues in the alternative that the modern chief of staff is the equivalent of the early Chief Clerk. Defs.' Opp. 67. It asserts that "chief clerks are arguably the closest historical analogue to a modern chief of staff," because they "are especially close to their respective principals, are intimately familiar with the duties and responsibilities of the principal office, and possess a comprehensive and general understanding of how the agency operates as a whole." *Id.* This is a testable claim. The relevant question is, before this Administration, how many times did the President designate a chief of staff to serve on an acting basis? The answer is unambiguous: zero. It never happened, in all of American history. Nor did any vacancies act ever enacted by Congress recognize a role for a chief of staff.[4]

---

[4] Even this President only previously did it once. He designated Peter O'Rourke to serve briefly as Acting Secretary of Veterans Affairs while the nomination of the prior Acting Secretary to serve permanently was pending before the Senate.

The Government notes a few instances in which presidents "used their authority under the [Federal Vacancies Reform Act (FVRA)] to place chiefs of staff in the lines of succession to be acting heads of executive agencies." Defs.' Opp. 67. But it too-conveniently omits the most important fact: that in *every* instance, those executive orders authorized chiefs of staff to serve *only* if the first assistant was unavailable. Indeed, the chief of staff was almost uniformly designated after other officers. And the chief of staff has never in fact served under those orders.

Accordingly, if the President did "appoint" Mr. Whitaker as Acting Attorney General, he is serving as a principal officer who must be confirmed by the Senate.

## II.     THE PRESIDENT'S DESIGNATION OF MATTHEW WHITAKER WAS CONTRARY TO STATUTE.

The Government does not dispute that this case is subject to the canon of constitutional avoidance. At the very least, Plaintiff has identified both (1) a significant constitutional doubt regarding the President's designation of Mr. Whitaker, and (2) a reasonable reading of the statutes under which the Deputy Attorney General is the Acting Attorney General. That reading accordingly must be adopted. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204-05 (2009) (applying constitutional avoidance to limit coverage of Voting Rights Act in order to avoid deciding constitutional challenge to another provision of the Act, notwithstanding that the constitutional challenge would still arise in other later cases involving different facts); *see also Shelby County v. Holder*, 570 U.S. 529, 540-41 (2013) (later case deciding the constitutional challenge on different facts).

### A.     Plaintiff Has The Best Reading Of The Statutory Text.

The Vacancies Act is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [Senate-confirmed] office . . . unless, a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a

specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(B). Looking myopically at the word "exclusive," the Government baldly asserts that all of the exclusions from the Vacancies Act necessarily function as "exceptions from the FVRA's generally exclusive applicability, and not as provisions that supersede or displace the FVRA in whole or in part." Defs.' Opp. 43; *see also id.* at 48. From that premise, the Government also leaps to the conclusion that the President may choose between the Vacancies Act and office-specific designation statutes.

The Memorandum demonstrated that the Government's premise and its conclusion are both incorrect. The Government does not respond to *any* of the Memorandum's points, because there is no answer:

(1) Reading the provision as a whole, the exception applies when the other statute "designates"—*i.e.*, chooses—the acting official. The provision takes the form: "The Vacancies Act is the exclusive means to designate an acting official, unless an office-specific statute designates the acting official." The ordinary reading of that provision is that the Vacancies Act recognizes and accepts the office-specific designation, which controls, not that the President may choose between the statutes. Pl.'s Mem. 28. If the Government were correct, the Vacancies Act would refer instead to office-specific statutes that "otherwise would designate" the acting official.

(2) Even if the Vacancies Act is merely "non-exclusive" with the AG Act when the exception applies, that only means that the more specific provision—here, the AG Act—controls. If Congress intended to give the President the power to choose between the statutory schemes, it would have done so expressly. Several statutory provisions provide for such a choice; this one does not. Nor is there a provision addressing the obvious and recurring circumstance in which the President does nothing. *See* Pl.'s Mem 29.

The Government's contrary view that the President can simply choose between two statutes that apply conflicting rules to the same facts cannot be right. Depending on the circumstances, courts resolve those cases based on the principle that, for example, the more-specific or more-recent statute controls. But according to the Government, many of those cases were wrongly decided because they should have been resolved on the basis that the Executive had the power to choose between the provisions. *See, e.g.*, *United States v. Giordano*, 416 U.S. 505, 507-08 (1974) (Attorney General could not choose to delegate wiretap authorization authority using general delegation power when wiretap statute provided AG more specific and limited delegation authority); *Halverson v. Slater*, 129 F.3d 180, 181-82 (D.C. Cir. 1997) (similar for Secretary of Transportation); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 158 (1976) (plaintiff could not choose broad venue provision in Securities Exchange Act when plaintiff brought Exchange Act case against bank association, given narrow venue provision of National Bank Act, even though permitting such choice would not render either provision superfluous).

In passing, the Government also references the provisions of the AG Act stating that the Deputy Attorney General "may" serve as Acting Attorney General and is the "first assistant" for purposes of the Vacancies Act. Defs.' Opp. 42, 47. These drive-by arguments are meritless. The Government does not dispute that the Deputy Attorney General's service under Section 508 is mandatory. The reference to "may" simply reflects the fact that the Associate Attorney General will serve if the Deputy is unavailable. *See* Pl.'s Mem. 32. The Government itself concedes that the "first assistant" provision is "not necessary" on its reading either. Defs.' Opp. 50. It pre-existed Congress's adoption of the Vacancies Act, and never had any substantive effect. Pl.'s Mem. 32.

**B.      The Government's Argument That The Vacancies Act May Apply To The Attorney General Is Misdirection.**

Properly understood, office-specific statutes such as the AG Act are controlling so long as they "designate" an available official. But when they do not because the official is unavailable, the Vacancies Act applies. The Executive Branch initially understood the statutes to work together in exactly this way. *See supra* at 1-2, 17. And Presidents repeatedly applied that same understanding in Executive Orders governing succession in the Office of the Attorney General. *See* Pl.'s Mem. 8-9. That is the best interpretation under the canon of statutory interpretation—which the Government agrees is applicable here—that statutes should be read harmoniously. Defs.' Opp. 48.

The Government responds that "Congress did not provide that the FVRA would be inapplicable unless an office-specific statute was exhausted; nor did it provide that an office-specific statute would be exclusive unless it was exhausted." Defs.' Opp. 47. That is not correct. The statutory exclusion applies in those instances in which "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(B). When the official specified by the office-specific statute is available, it "designates"—*i.e.*, chooses—the acting official; when that official is unavailable, it does not. *Compare id. with* 5 U.S.C. § 3349c (excluding various offices altogether).

Because Plaintiff's reading recognizes circumstances in which the President has the authority to designate an Acting Attorney General under the Vacancies Act, there is no merit to the Government's principal argument: that Congress did not intend to exempt the Attorney General from the Vacancies Act altogether. The Government stresses that the statute categorically excludes other offices (Defs.' Opp. 41, 43 (citing 5 U.S.C. § 3349c)), that the prior statute completely excluded the Attorney General (*id.* at 43, 50 (citing 5 U.S.C. § 3347 (1994))), and that an early draft

of the current statute exempted the Attorney General completely (*id.* at 44 (citing S. Rep. No. 105-250, at 15 (1998)). But all of those provisions would have been inconsistent with the President designating an Acting Attorney General when the officials identified by the AG Act were unavailable.

### C.      The Government's Interpretation Is Implausible.

The Government does not seriously defend the implications of its statutory position either. This Court can sustain Mr. Whitaker's appointment only by concluding that Congress intentionally negated dozens of longstanding statutes that identify specific successors for critical offices—not only the Attorney General, but also the Secretary of Defense, Chairman of the Joint Chiefs of Staff, and Director of National Intelligence—without anyone mentioning it and without the Executive Branch even requesting the incredible new power the Government now claims.

The Government correctly notes that the Vacancies Act contemplates that the President can in some instances choose to designate an employee for an agency head. Defs.' Opp. 41. But again, this is misdirection: that is true when the officials designated by statute are unavailable. It is also true for those agencies that have no such designation statute. The Government has no answer to the fact that for dozens of particularly critical offices, Congress made the judgment to deprive the President of the power to designate someone of his own choosing without Senate confirmation, so long as the first assistant is available.

Undoubtedly, the essential purpose of those statutes is to prevent the President from designating a different official. Each was enacted in parallel with—and operates as an exception to—the President's general authority to displace an officer's first assistant. The Government's position in this case negates all those statutes' fundamental reason for existing. At the very least, if Congress intended that result, someone would have said something.

The Government's answer is that its reading leaves two technical roles for office-specific designation statutes. Defs.' Opp. 50 (arguing that the first assistant (1) may serve beyond the time limits of the Vacancies Act; and (2) may serve in the scenario in which the first assistant is newly hired but the President nonetheless nominates him/her to serve permanently (citing 5 U.S.C. § 3345(b))). That is true *only* so long as the President takes no action under the Vacancies Act and allows the office-specific statute to function. But the statutes exist precisely to *prevent* the President from making the choice in the first place to designate someone for these offices under the general vacancies authority. The Government's reading negates the statute's principal purpose. And whenever the President does designate someone (as in this case), the Government's reading renders the office-specific designation statute meaningless.[5]

The Government also never addresses why Congress would enact the bizarre scheme it imagines. The Vacancies Act would impose restrictions, and office-specific statutes would then allow the President to choose to evade them. Sometimes there are loopholes in statutes, of course. But here the Government says the entire point of one statute is to negate the restrictions in another. That is an exceedingly odd design that it does not even attempt to explain. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) ("[W]e come armed with the 'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute.") (quoting *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988)).

---

[5] The Government's argument is thus fundamentally undermined by the principle that Congress legislates against the backdrop of existing law. *See* Defs.' Opp. 49. Congress was aware of the existence of all these statutes—which it treated as exemptions from the Vacancies Act— and would not have silently negated them.

Importantly, the Government does not dispute that its reading inverts the *actual*, explicit purpose of the Vacancies Act. Congress wanted to prevent the President from choosing to use office-specific statutes to evade the limits of the Vacancies Act. *See* Pl.'s Mem. 30. That was particularly true for the Department of Justice. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935-36 (2017). But the Government implausibly reads the statute to confer exactly the kind of power that Congress intended to eliminate.

The Government's response is to quote part of one sentence in one Senate Report, to the effect that the Vacancies Act "would continue to provide an alternative procedure for temporarily occupying the office." Defs.' Opp. 44 (quoting S. Rep. No. 105-250, at 17). If the Government's reading were correct, the issue would have received much more attention than that isolated clause. In fact, the Government misrepresents the Report, which in fact says *expressly* that office-specific statutes are an exception to the Vacancies Act: "The bill applies to all vacancies in Senate-confirmed positions in executive agencies with a few *express exceptions*," including "statutes that themselves stipulate who shall serve in a specific office in an acting capacity." S. Rep. No. 105-250, at 2 (emphasis added). The Senate sponsor and Senator Byrd confirmed that understanding. Pl.'s Mem. 30-31. The Government's squib instead actually refers to what "would" occur if Congress were "to repeal those statutes in favor of the procedures contained in the Vacancies Act." S. Rep. No. 105-250, at 17.

### D.    The Government's Reliance On Presidential Designations Is Misplaced.

The Government's remaining argument is that Presidents have applied its reading of the Vacancies Act. But the fact that the Executive Branch believes it has this power is not evidence that it actually does. We know the Government believes the President can make a designation like this one. The question is whether it is correct.

The Government notes that "multiple Presidents have long provided for orders of succession for offices covered by office-specific statutes." Defs.' Opp. 51 & n.28. But it omits the most important point: that those orders uniformly provide for the officials designated by the office-specific statute to serve first; other officials are designated only if the statutory designees are unavailable. That is of course consistent with Plaintiff's reading.

The Government next notes that Presidents have "individually designated someone other than the deputy designated in an office-specific statute to serve as the acting agency head." Defs.' Opp. 51. Again, the Government omits the most-important fact: that in all the cases it cites but one, the deputy was not available. That is perfectly consistent with Plaintiff's interpretation.

The Government then points to the only two other times in which a President "bypassed the extant deputy designated in the office-specific statute." Defs.' Opp. at 51-52 & n.29.[6] Those two cases—which occurred within 3 days of each other and without any apparent consideration of the Vacancies Act—involved unusual circumstances. Both of the individuals were already Senate-confirmed officials who had been nominated for the permanent position to which they were temporarily designated. The Vacancies Act could be read to permit those designations because it contains multiple specific provisions related to an acting official who has been nominated for a permanent position. *See* 5 U.S.C. §§ 3345(b), 3346. But if not, then those two designations were simply unlawful. Neither was challenged and no court approved them.

The Government also self-referentially cites the opinions of the Office of Legal Counsel endorsing its position. Defs.' Opp. 52. But of course those opinions are not entitled to deference.

---

[6] Once again, the Government's use of "for example" (Defs.' Opp. 52 n.29) to introduce these two isolated examples serves only to give the reader the false impression that there are in fact numerous others. But so far as we are aware, the only other involved the Consumer Financial Protection Board in 2017, which the Government cites in the prior footnote.

Once again, the Government glaringly omits that the Executive Branch initially adopted Plaintiff's reading of the statutes—demonstrating at the least that Plaintiff's reading is reasonable for purposes of the canon of constitutional avoidance. But in fact, the Office of Legal Counsel did not assert that the President had the relevant legal authority—the power to invoke the Vacancies Act in the face of a statute designating a particular acting official—until November 2017, twenty years after Congress adopted the statute. *See Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. __, at 1-2 (Nov. 25, 2017), slip op., http://bit.ly/2CSWgdk.

Accordingly, at the very least, the statutes can and should reasonably be read to provide that the President may not designate an Acting Attorney General under the Vacancies Act when the Deputy Attorney General is available.

## CONCLUSION

The Court should grant Plaintiff's Motion for Preliminary Injunction, or, in the Alternative, Permanent Injunction and Declaratory Judgment.[7]

---

[7] Together with this Reply, Plaintiff has also amended its Complaint to add three requests for declaratory relief. As a formal matter, this Motion accordingly will not resolve all of Plaintiff's claims. But it is very likely that the Court's decision on this Motion will resolve the new requests for declaratory relief as well. Those three claims directly parallel the three substantive bases for this Motion: (1) that Mr. Whitaker is an employee serving as an officer; (2) that the President may not displace an available first assistant with an employee or non-Senate confirmed officer to perform the functions of a principal officer; and (3) that the President's designation of Mr. Whitaker was not authorized by statute. Once the Court rules on this Motion, Plaintiff will promptly consult with the Government and suggest to the Court an appropriate disposition of the Amended Complaint's three requests for declaratory relief.

Dated:  January 28, 2019

Respectfully submitted,

By:  /s/ Thomas C. Goldstein

Thomas C. Goldstein (Bar No. 458365)
TGoldstein@goldsteinrussell.com
Daniel H. Woofter (*Pro Hac Vice*)
DHWoofter@goldsteinrussell.com
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636

*Attorneys for Plaintiff Firearms Policy
Coalition, Inc.*