## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAMIEN GUEDES**, *et al*., | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | Case No. 1:18-cv-02988-DLF |
| **v.** | : | |
| | : | Judge Friedrich |
| **BUREAU OF ALCOHOL, TOBACCO,** | : | |
| **FIREARMS, AND EXPLOSIVES**, *et al*., | : | |
| | : | |
| **Defendants** | : | |

| | | |
|---|---|---|
| **FIREARMS POLICY COALITION, Inc.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | Case No. 1:18-cv-03083-DLF |
| **v.** | : | |
| | : | Judge Friedrich |
| **MATTHEW WHITAKER**, *et al*., | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFFS'[1] REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIRMOTION FOR PRELIMINARY INJUNCTION

---

[1] This is the Reply Memorandum of Plaintiffs Guedes, Shane Roden, Firearms Policy Foundation, Madison Society Foundation, Inc., and Florida Carry, Inc., who are the Plaintiffs in case number 1:18-cv-2988. As docket numbers 1:18-cv-2988 and 1:18-cv-3083 have been consolidated pursuant to the Minute Order of January 8, 2019 but the Plaintiffs in each respective matter are separate and distinct, including being represented by different counsel, it is anticipated that Plaintiff Firearms Policy Coalition, who is the Plaintiff in case number 1:18-cv-3083, through its counsel, will submit its own reply memorandum.

# Table of Contents

I.   ARGUMENT ............................................................................................................. 1

    A.   Standard of Review ............................................................................................. 1

    B.   Plaintiffs Are Likely to Succeed on the Merits.................................................. 2

        i.   *Violations of the Administrative Procedures Act* ....................................... 2

            ***a.   The Government Admits That The Final Rule Was The Result of The Presidential Fiat That DOJ Ban Bump-Stock Devices*** ........................ 2

            ***b.   The Government Admits That It Is Expanding The Congress's "Narrow" Definition Of Machinegun, Which It Has No Power or Authority To Do*** ............................................................................ 4

            ***c.   The Government Admits That "Automatically" And "Single Function Of The Trigger" Are Not Ambiguous; Therefore, It Lacks The Power And Authority To Regulate Them*** ................................. 6

            ***d.   Procedural Violations*** ................................................................. 7

                1.   Government's Failure to Provide Underlying Documents .................... 7

                2.   The Government Admits That it Failed to Provide a 90 Day Comment Period .............................................................................. 8

                3.   Government is Required to Provide a Hearing ................................... 8

            ***e.   The Final Rule Is Arbitrary and Capricious*** ................................ 10

                1.   Failure to Address Videos and Expert Vasquez's Declaration in the Final Rule .......................................................................... 10

                2.   The Undisputed Bump Stock Analytical Video, the Definition of Semiautomatic Rifle, and the Necessary Resultant Outcome ............ 11

                3.   Bump Stock Devices Do Not Operate "Automatically"..................... 15

    C.   The Government Concedes That The Plaintiffs Will Suffer Irreparable Harm .......... 17

    D.   Balance Of The Equities ................................................................................. 18

    E.   An Injunction Is In The Public's Interest ......................................................... 19

II.   CONCLUSION......................................................................................................... 19

# Table of Authorities

## Cases

*Butte Cty v. Hogen*, 613 F.3d 190 (D.C.Cir. 2010).................................................................... 10

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............. 6

*East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.,* No. 18-17274, 2018 WL 6428204 (9th Cir. Dec. 7, 2018) ......................................................................... 3

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1997)................................................ 19

*Kisor v. Wilkie*, No. 18-15 ......................................................................................................... 13

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,512 U.S. 218 (1994) .......................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) .................... 10

*Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000)............................................... 19

*N. Mariana Islands v. United States*, 686 F. Supp.2d 7 (D.D.C. 2009)....................................... 19

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................... 19

*Perrin v. United States*, 444 U.S. 37 (1979) .............................................................................. 16

*Staples v. United States*, 511 U.S. 600 (1994)............................................................................ 13

*U.S. v. Olofson*, 563 F.3d 652 (7th Cir. 2009) ...................................................................... 16, 17

*Util. Air Regulatory Grp. v. E.P.A.*, 572 U.S. 302 (2014) ............................................................ 5

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................ 1

## Statutes

18 U.S.C. § 921(a)(28)............................................................................................................. 5, 11

18 U.S.C. § 926(b) ..................................................................................................................... 8, 9

**Other Authorities**

*National Firearms Act: Hearings Before the Committee on Ways and Means*, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934) ................................................................................. 5

OXFORD ENGLISH DICTIONARY (2d ed.1989) ...................................................................... 17

OXFORD ENGLISH DICTIONARY (1933) .............................................................................. 17

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed.1934) .................................... 17

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ................................. 17

Consistent with LCvR 7(d) and this Court's Order of January 11, 2019, Plaintiffs [2] file

this Reply Memorandum in support of their Motion for a Preliminary Injunction.


I.   **ARGUMENT**

For the reasons specified herein, including the numerous admissions that Government

makes, the Plaintiffs are entitled to a preliminary injunction precluding implementation and

enforcement of the Final Rule, during the pendency of this litigation and any appeals.


A.   Standard of Review

While the Government questions the D.C. Circuit's "sliding scale approach to evaluating

preliminary injunctions" in reliance on the U.S. Supreme Court's pronouncement in *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (Doc. 16 at 14 and fn. 10), it fails to mention

that the Court's decision in *Winter* only held that a court could "never [grant a] preliminary

injunction based *only* on a *possibility* of irreparable harm." (emphasis added). In fact, nothing

within the *Winter* decision holds that sliding scale approaches are improper and the Dissent of

Justice Ginsburg, joined by Justice Souter, declares that "[t]his Court has never rejected that

[sliding scale] formulation." *Id.* at 51.

In this matter, the Plaintiffs have shown that they are entitled to relief under all four

prongs of the applicable test, regardless of whether this Court utilizes a sliding scale, and the

Defendants admit that Plaintiffs will suffer irreparable harm as a result of the Final Rule's

implementation and enforcement – not that it is a mere possibility. Specifically, after the

Government declares that "Defendants do not contest Plaintiffs' contention that implementation

of this Final Rule will force the Plaintiffs and others like them to dispose of their property and

---

[2] *See*, Fn. 1.

that destroyed bumpstocks would be almost impossible to replace given the unavailability of replacement products," they "concede that Plaintiffs have met the irreparable harm prong of the preliminary injunction standard." Doc. 16 at 71, fn. 40.

      B.    <u>Plaintiffs Are Likely to Succeed on the Merits</u>

For all the reasons specified in Plaintiff's Brief (Doc. 2-1, pgs. 10-36) and the reasons specified herein, the Plaintiffs are likely to succeed on the merits.

      i.    *Violations of the Administrative Procedures Act*

      ***a.    The Government Admits That The Final Rule Was The Result of The Presidential Fiat That DOJ Ban Bump-Stock Devices***

The Government candidly admits: "On February 20, 2018, the President issued a memorandum to the Attorney General concerning 'bump fire' stocks and similar devices...The President then directed the Department of Justice, working within established legal protocols, 'to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.'" 83 Fed. Reg. at 66516-66517; Doc. 16 at 2, 9. And let there be no mistake, President Trump directed the ATF, through the Attorney General, to ban bump-stock devices, before the notice and comment period was even initiated and without consideration for the legal authority of ATF to regulate bump-stock devices, or the public, including Plaintiffs, being afforded an unbiased review of their comments. *See,* https://www.cnn.com/2018/02/20/politics/donald-trump-bump-stocks/index.html.

As noted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the Cato Institute, the rulemaking process, before its inception, "was a fait accompli" and President Trump

admitted that he would "write out" bump-stock devices through executive action and even stated, "I'll do that myself because I'm able to." [3]  Directly on point, the Cato Comment recounts that moments before the rulemaking was announced, "President Trump tweeted: … As I promised, today the Department of Justice will issue the rule banning BUMP STOCKS with a mandated comment period. We will BAN all devices that turn legal weapons into illegal machine guns." *Id.*

As explained by Josh Blackman, *Presidential Maladministration*, 2018 Il. L. Rev. 397 at 405,

> To be clear, there is no problem when the president exercises his constitutional authority to direct the actions of his principal officers. There can be a problem, however, when those actions *reverse* past executive actions by *discovering* new authority in old statutes. One of us has referred to the former phenomenon as *presidential reversals* and the latter as *presidential discovery*. When interpreting an unambiguous statute, courts should hesitate before deferring to exercises of reversal coupled with discovery.

In this matter, there can be no dispute that this stark, about-face change in position regarding whether bump-stock devices constitute machineguns is the result of President Trump's directive by fiat [4] and not an unbiased and reasoned review by ATF of its past determinations. In no better point of fact, the Government admits that it "[c]arr[ied] out that directive." Doc. 16 at 9.

Further reflecting that the change in position was the result of the order by the President to ban bump-stock devices instead of reasoned analysis, the Government admits that "agency leadership," who are still employed by the agency, determined that "a bump stock 'does not fire automatically with a single pull,' in part because 'it requires a thought process of the individual to continually pull the trigger." Doc. 16 at 23. Yet, it now attempts to argue that bump-stock

---

[3] *See*, Comments to the Bureau of Alcohol, Tobacco, Firearms and Explosives, *In the Matter of* The Language of the National Firearms Act and Definition of "Machinegun" submitted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the Cato Institute, *available at* https://www.regulations.gov/document?D=ATF-2018-0002-65898.

[4] *See*, *East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.*, No. 18-17274, 2018 WL 6428204, *51 (9th Cir. Dec. 7, 2018) (declaring that "[j]ust as [the Judiciary] may not [], 'legislate from the bench,' neither may the Executive legislate from the Oval Office").

devices fire automatically with a single pull of the trigger (Doc 16 at 20) – the completely

opposite position of "agency leadership" and in direct contravention of physics, as further

discussed *infra*.

>    b.    ***The Government Admits That It Is Expanding The Congress's
>          "Narrow" Definition Of Machinegun, Which It Has No Power
>          or Authority To Do***

In no better undisputed example that Plaintiffs will succeed on the merits, the

Government admits that the Congress defined "machinegun" (Doc. 16 at 30) with "a definition

which declares what ['machinegun'] means" (*id*. at 31 (alteration in original)) and in doing so

sought to include only a "narrow set of dangerous weapons" (*id*. at 17, fn. 4), such that

"Plaintiffs are correct that the Department lacks authority to 'expand the definition' of

machinegun" *(id*. at 31). [5] But the Government unabashedly admits that it is doing just that –

expanding the definition. For example, the Government declares "[a]s the Final Rule explains,

this *expansion* of the definition is appropriate…" *Id*. at 10 *citing* 83 Fed. Reg. at 66531

(emphasis added). [6] In that same vein, the Government concedes that "[a]bsent the revised

definition of 'automatically' to encompass the initiation of a self-regulating firing sequence with

a single pull of the trigger, it was indeed true that ATF could not 'restrict [bump stocks'] lawful

possession, use or transfer.'" *Id*. at 33. [7] Perhaps even more importantly, in the Final Rule, the

---

[5] *See also,* Exhibit A at 268, 891 reflecting admissions by ATF that it lacked the power and authority regulate bump-stock devices.

[6] *See also*, Doc. 16 at 19, fn. 12 declaring: "As the Final Rule explains, rather than *narrowing* the definition of 'single function of the trigger' to be only a 'single pull of the trigger,' as proposed in the NPRM, DOJ is interpreting 'pull' *broadly* to encompass other, analogous types of 'functions' of the trigger that are analogous to a 'pull,' and would otherwise be excluded by adoption of a narrow interpretation of 'single function of the trigger.'" (emphasis added).

[7] *See also*, the Government's statement that if the Final Rule were not enacted "the result would be        **contd.**

4

Government admits "the statutory definition *alone* determines whether a firearm is a machinegun." 83 Fed. Reg. at 66533-34 (emphasis added).

Thus, the Government concedes that bump-stock devices are *not* machineguns under the definition enacted by the Congress, wherein the Congress declared what constitutes a machinegun, and admits that the Final Rule expands the definition of machinegun – which the Congress sought to limit and which only the Congress has the power and authority to do. [8] *See*, *Util. Air Regulatory Grp. v. E.P.A.*, 572 U.S. 302, 328 (2014).

Nevertheless, even setting aside this impermissible expansion of the Congress's definition of "machinegun," the Final Rule conflicts with the definition of "semiautomatic rifle" that the Congress defined in 18 U.S.C. § 921(a)(28), as the Government's definition of "machinegun" would either result in bump-stock devices not constituting a "machinegun" [9] or all "semiautomatic rifles" constituting machineguns under the law, which is directly contrary to the Congress's intent. [10] In Section 921(a)(28) the Congress defined a "semiautomatic rifle" as "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to

---

to permit continued, *lawful* possession in private hands of hundreds of thousands of [bump-stock] devices." *Id*. at 16 (emphasis added).

[8] *See*, 83 Fed. Reg. at 66540 (declaring that "[t]he NFA is a statute, which only Congress may repeal or alter.")

[9] As discussed *infra*, since a semiautomatic rifle and a semiautomatic rifle with a bump-stock device installed on it function identically pursuant to the definition of "semiautomatic rifle" of Section 921(a)(28), they must be treated the same, consistent with the Congress's intent. *See*, Exhibit 32 to Exhibit A declaring in ¶ 9., d., that a semiautomatic firearm with a bump-stock device installed functions "no differently than any factor semi-automatic firearm." It is important to note that the Government has not submitted any evidence or argument contradicting Expert Vasquez's Declaration in this regard.

[10] *See*, Exhibit 29 to Exhibit A of the Amended Complaint, *National Firearms Act: Hearings Before the Committee on Ways and Means*, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934), where it was declared:

> The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and *such guns are not properly designated as machineguns*. A gun…which is capable of firing more than one shot by single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun. (emphasis added).

fire each cartridge." As reflected in the bump stock analytical video and discussed in detail *infra*
in Section B., i., e., 2., it cannot be disputed that even when a bump-stock device is installed on a
firearm, the firearm continues to operate as a "repeating rifle, which utilizes a portion of the
energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and
which requires a separate pull of the trigger to fire each cartridge." Accordingly, as the
Government contends in the Final Rule that bump-stock devices constitute machineguns under
the Final Rule, there can be no dispute that the Government Defendants are attempting to usurp
the Congress's power, as the Final Rule seeks to eviscerate the definition of "semiautomatic
rifle" by supplanting it with the Final Rule's new definition of machinegun; whereby, all
semiautomatic rifles would become machineguns overnight.

> **c.      The Government Admits That "Automatically" And "Single
> Function Of The Trigger" Are <u>Not</u> Ambiguous; Therefore, It
> Lacks The Power And Authority To Regulate Them**

In the Final Rule, immediately after acknowledging that it lacks the power to regulate
unambiguous terms pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837, 842–43 (1984), the Government conceded that "automatically" and "single
function of the trigger" in the statutory definition of machinegun are unambiguous as they
"accord with the plain meaning of those terms."  83 Fed. Reg. at 66533. Similarly, as discussed
*supra*, the Government admits that bump-stock devices do not constitute machineguns under the
current definition of machinegun enacted by the Congress. It follows then that, under the plain
meaning of those terms, bump-stock devices do not constitute "machineguns" and the
Government Defendants lack the power and authority to redefine "automatically" and "single
function of the trigger" in an effort to change the law.

#### d.      Procedural Violations

1.      <u>Government's Failure to Provide Underlying Documents</u>

Although the Government attempts to paint the Plaintiffs' APA violation claim, based on ATF's failure to provide the underlying documents during the rulemaking, as a request for a preliminary injunction requiring the Government to produce the documents, the Government misses the mark. [11] Doc. 16 at 38-39. As explicitly set forth in Plaintiffs' principal brief (Doc. 2-1 at 20-22), Plaintiffs contend that the Government's failure to provide the underlying documents relied upon by ATF in the rulemaking process denied the public, including the Plaintiffs, a meaningful opportunity to participate in the rulemaking process. As Plaintiffs set forth in ¶ 36 of their Complaint, "[i]n connection with its NPRM, ATF failed to include in the agency docket folder any supporting documentation for its newly formed determination that its previous, directly opposite conclusion about bump-stock-type devices 'does not reflect the best interpretation of 'machinegun'' under the NFA and GCA." Moreover, as specified in fn. 6 of the Complaint:

> Interestingly, in support of the Final Rule, ATF referred to a number of documents, which were never provided to the public. *See* 83 Fed. Reg. at 66518 FN 4 "Examples of recent ATF classification letters relying on the 'single pull of the trigger' interpretation to classify submitted devices as machineguns include the following…" (citing to April 13, 2015 ATF determination letter and an October 7, 2016 ATF determination letter). *See also* 83 Fed. Reg. at 66519 (referencing rulings from 2008-2017 which were never provided to the public in relation to the NPRM). By ATF's failure to even mention these documents in the ANPRM and NPRM, let alone provide them in the docket, Defendants precluded the public, including Plaintiffs, from reviewing these determinations and commenting on their applicability; thereby, denying the public, including Plaintiffs, an opportunity for meaningful review.

---

[11] While Count VII of the Amended Complaint is a count relating to FOIA, Plaintiffs have not sought a preliminary injunction in relation to it, nor have Plaintiffs sought a preliminary injunction in relation to Counts III, IV, V, and VI of the Amended Complaint.

Thus, Plaintiffs are not, as Defendants contend, seeking a preliminary injunction requiring Defendants to produce the documents that were requested pursuant to FPF's FOIA request. Rather, they are contending that due to ATF's failure to provide the underlying documents in the docket, the Government denied the public, including Plaintiffs, a meaningful opportunity to participate in the rulemaking process in violation of the APA.

2.      The Government Admits That it Failed to Provide a 90 Day Comment Period

As set forth in Plaintiffs' principal brief (Doc. 2-1 at 22-25), although 18 U.S.C. § 926(b) requires that a 90 day comment period be provided, at best, the Government only provided an 85 day comment period. The Government readily acknowledges that technological issues precluded commenters from commenting for the first five days but declares the public "had a full 85 additional days in which to submit their comments." Doc. 16 at 37. Regardless of whatever common-core mathematics the Government employs, 85 days is not equivalent to the congressionally mandated period of 90 days. Furthermore, as Plaintiffs detailed in their brief and conceded to by the Government, ATF was acutely aware of the issues and failed to take any corrective action to mitigate the harm, such as extending the comment period by an additional 5 days, republishing notice in the Federal Register of the new comment period, and/or contacting those whom ATF knew had attempted to but were precluded from filing comments.

3.      Government is Required to Provide a Hearing

In response to Plaintiffs' claims that ATF was required to provide FPF with a hearing, after the Government admits that "[s]everal parties, including of the Plaintiffs here, 'requested a

hearing pursuant to the NPRM because they want[ed] the opportunity to be heard," it takes the radical position that the explicit statutory text does not mean what it says and the authority of whether or not to conduct a hearing is discretionary. Doc. 16 at 35. 18 U.S.C. § 926(b) provides that "[t]he Attorney General *shall* give not less than ninety days public notice, and *shall* afford interested parties opportunity for hearing, *before* prescribing such rules and regulations." (emphasis added). Nowhere within Section 926(b) is the discretionary word "may" utilized. Rather, the congressionally mandated language utilizes the word "shall" in relation to both providing a 90-day comment period and an opportunity for hearing. The Government asks this Court to conflate the two separate and distinct provisions of Section 926(b); thereby, eviscerating the second provision. There simply is no reason for the Congress to have included the second provision requiring an opportunity for hearing, especially utilizing the word "shall," if it intended for the right to a hearing to be discretionary. Moreover, as the APA already provides individuals with the right to notice and comment in relation to notices of proposed rulemaking, to the extent the Government argues that the second provision is merely the Congress granting the public an opportunity to submit comments during the 90-day notice period, such is absurd, as the APA already provides that substantive right.

While the Government also relies on the unsupported and speculative argument that "a public hearing would [not] meaningfully add date or information germane to the examination of the merits of the proposal or…provide substantive factual information that would assist the Department in improving the rules in material ways," (Doc. 16 at 35) such is only true, if the rulemaking was by Presidential fiat, as discussed *supra*. More importantly, if FPF had been provided a public hearing as required by law, it intended to have its experts, including former Acting Chief Richard Vasquez of the ATF Firearms Technology Branch, testify and to address

the bump stock analytical video that it had produced, [12] the numerous other videos that were submitted in support, and Expert Vasquez's Declaration. [13] Plaintiffs believe this hearing would have been extremely important in relation to the Final Rule, especially in light of the fact that nowhere within the Final Rule does the Government address Expert Vasquez's Declaration, FPF's bump stock analytical video, or any of the other videos.

### e.      The Final Rule Is Arbitrary and Capricious

As discussed in Plaintiffs' principal brief (Doc. 2-1 at 25-36), as well as for the reasons specified *infra*, the Final Rule is arbitrary and capricious as it "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

### 1.      Failure to Address Videos and Expert Vasquez's Declaration in the Final Rule

As held by the D.C. Circuit, "[t]he agency's statement must be one of reasoning; it must not be just a conclusion; it must articulate a satisfactory explanation for its action," that does not "ignore evidence contradicting its position." *Butte Cty v. Hogen*, 613 F.3d 190, 194 (D.C.Cir. 2010) (citation omitted).

In this matter, there can be no dispute that Final Rule fails to address Expert Vasquez's Declaration, FPF's bump stock analytical video, or any of the other videos, as discussed *supra*, which are evidence contrary to the Government's position. In fact, as discussed *infra*, the

---

[12] *See*, Exhibit 28 to Exhibit A of the Amended Complaint, *also available at* https://youtu.be/1OyK2RdO63U.

[13] *See*, Exhibits 3, 4, 11, 12, 13, 14, 17, 18, and 26.

Government even admits in its brief that the conclusions of Expert Vasquez's and "agency leaderships" about bump-stock devices are contrary to its current position. Doc. 16 at 22.

2.      The Undisputed Bump Stock Analytical Video, the Definition of Semiautomatic Rifle, and the Necessary Resultant Outcome

During the rulemaking process, FPF had a video produced of the actual function of a bump-stock device. The video was titled "Bump Stock Analytical Video" and was submitted as Exhibit 28 to its Comment. [14] In the Government's brief, they concede that "the video 'fully, explicitly, and accurately depicts the function of [the bump stock demonstrated therein], including, but not limited to, the function and operation of the firearm's trigger.'" Doc. 16 at 23, fn. 17; *see also*, pgs. 20, 22, fn 15.

As there is no dispute that the bump stock analytical video properly depicts the function of a bump-stock device on a firearm (Doc. 16 at 20), let us first look at it through the lens of the definition of a "semiautomatic rifle" as defined in 18 U.S.C. § 921(a)(28), which provides "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."

In turning to the first portion of the definition, there is no dispute that the video clearly depicts a repeating rifle, which is utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round. Specifically, in Exhibit 28 to Exhibit A of the Amended Complaint at the 3:33 mark, [15] one observes the trigger being depressed and the

---

[14] The video is Exhibit 28 of Exhibit A to the Amended Complaint.

[15] *See*, 3:48 for the opposite side view.

11

firearm firing, with the bolt traveling reward to eject the spent cartridge at 3:34, with the empty cartridge being ejected at 3:36, [16] and a new cartridge being chambered by 3:37.

In turning to the second portion of the definition, there can be no argument that "a separate pull of the trigger" is required to fire another cartridge. This can clearly be seen, picking up where we left off, at 3:37. [17] As one observes, at 3:38, [18] the trigger must be "pulled" to cause the firearm to fire a subsequent cartridge, where the process explained previously repeats, until either the user stops or all the cartridges are depleted.

This semiautomatic rifle function of all installed bump-stock devices is further supported by the Declaration of Expert Vasquez . *See*, Exhibit 32 of Exhibit A to the Complaint. [19] After not responding to Expert Vasquez's Declaration in the Final Rule, the Government also fails to respond in its brief (Doc. 16) with any allegations that his factual averments or conclusions are incorrect or evidence contradicting his factual averments or conclusions. Rather, without addressing how firearms with bump-stock devices installed do not constitute semiautomatic rifles, the Government's sole argument is that it has now *expanded* the definition of machinegun to encompass firearms that were not previously machineguns and as such, although Expert Vasquez's and "agency leadership" were correct at the time, they are no longer correct given the expanded definition. Doc. 16 at 23. [20] It is also worth noting that the Government concedes that

---

[16] *See*, 3:50 for the opposite side view.

[17] *See*, 3:50 for the opposite side view.

[18] *See*, 3:52 for the opposite side view.

[19] For example, *see* ¶¶ 8 - 9. Most importantly, *see* ¶ 9 d. that a semiautomatic firearm with a bump-stock device installed functions "no differently than any factor semi-automatic firearm."

[20] While the Government contends that Expert Vasquez's testimony should only be afforded "minimal weight" because he is a "former official," it fails to address the fact that "agency leadership" has not changed since the issuance of the bump-stock device determinations and, as such, if deference is to be provided to ATF, then those at least ten determinations that bump-stock devices do not constitute machineguns (Doc. 16 at 40, fn. 26) should be given far more weight than a single contrary determination – the Final Rule – issued by Presidential fiat.     **contd.**

as "the 'cyclic rate of both the semi-automatic and fully automatic versions of a firearm are

identical (and thus cannot be accelerated)'", a bump-stock device does not accelerate or

otherwise increase the cyclic rate of any firearm. *Id*. at 22.

Nevertheless, even setting aside Expert Vasquez's Declaration and the Government's

failure to contradict it with any testimony or evidence, the completely arbitrary and capricious

nature of the Final Rule is reflected in the Government's explanation of a "binary trigger," which

does not constitute a machinegun. As the Government explains,

> When a binary trigger is installed in a weapon, one round is fired when the trigger is
> pulled, and another is fired when the trigger is released. *See id*. The Final Rule addresses
> the difference: "Even if [the trigger] release results in a second shot being fired [from a
> binary trigger] . . . it is as the result of a separate function of the trigger." 83 FR 66534.
> This is because "single pull of the trigger" includes both a pull of the trigger and an
> analogous motion, which can reasonably be interpreted to include the release of the
> trigger. Id. Thus, although a binary trigger does permit two rounds to be fired with a
> single pull of the trigger, only one round is being fired with a single function of the
> trigger.
>
> Doc. 16 at 21, fn. 14.

As depicted and discussed immediately above in relation to the bump stock analytical

video, based on the Government's own explanation, a bump-stock device is two levels removed

from being a machinegun, [21] as only one round is fired when the trigger is pulled and released;

whereas, with a binary trigger – which also is not a machinegun and is only one level removed

---

In relation to whether any deference should be provided to ATF, Plaintiffs respectfully notify the Court of the U.S.
Supreme Court's grant of certiorari in *Kisor v. Wilkie*, No. 18-15, where the Court is considering whether to overrule
prior precedent granting administrative agencies deference in interpreting their own regulations. Additionally, as
discussed *supra*, since the Government failed to provide any of the underlying determinations in the docket or
respond to FPF's FOIA, it is very possible that there are significantly more determinations holding that bump-stock
devices do not constitute machineguns.

[21] It must be noted that the Final Rule's definition of a machinegun is directly contrary to the U.S. Supreme Court's
holding in *Staples v. United States*, 511 U.S. 600, 603, fn.1 (1994), where it defined a machinegun as a firearm that
"once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the
ammunition is exhausted" and a semiautomatic firearm as "a weapon that fires only one shot with each pull of the
trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each
round is fired."

from being such – one round is fired when the trigger is pulled and another round is fired when the trigger is released.

In turning to the explanation of the function of a bump-stock device provided by ATF, the Government contends it is proper to include bump stocks in the definition of machinegun "because they serve as a self-acting mechanism that harnesses recoil energy to allow the trigger of a firearm to reset and continue firing *without additional physical manipulation of the trigger by the shooter*, so long as the shooter maintains continued rearward pressure on the trigger and forward pressure on the barrel shroud or forestock." *Id*. at 16 (citing 83 FR 66532) (emphasis added). It appears that the same common core education that the Government received in relation to mathematics also applies to its physics education. As is reflected in the bump stock analytical video (Exhibit 28 of Exhibit A) from the 3:33 to 4:01 marks, the shooter's finger must physically manipulate the trigger, *each time*, for another round to fire. This is clearly depicted in the following: at 3:47, one can see the shooter's finger beginning to place pressure on the trigger; at 3:48, the trigger is fully depressed causing a round to be fired; at 3:49, the trigger resets; at 3:50, the shooter's finger loses contact with the trigger; at 3:51, the shooter's finger is approximately a ½ inch in front of the trigger; at 3:52, the shooter's finger makes contact for a second time with the trigger; still at 3:52, the trigger is fully depressed causing a round to be fired; at 3:53, the trigger resets; at 3:54, the shooter's finger loses contact with the trigger; at 3:55, the shooter's finger is approximately a ½ inch in front of the trigger; at 3:56, the shooter's finger makes contact for the third time with the trigger; at 3:57, the trigger is fully depressed causing a round to be fired; at 3:58, the trigger resets; still at 3:58, the shooter's finger loses contact with the trigger; and, at 4:00, the shooter's finger is approximately a ½ inch in front of the trigger. And let us not forget that the Government concedes that "the video 'fully, explicitly, and accurately

depicts the function of [the bump stock demonstrated therein], including, but not limited to, the function and operation of the firearm's trigger.'" Doc. 16 at 20, 23, fn. 17. [22]

For all these reasons, there can be no dispute that bump-stock devices do not turn a semiautomatic rifle into a machinegun, as it is undisputed that a semiautomatic rifle with a bump-stock device installed functions as a "semiautomatic rifle" as the Congress defined and the cyclic rate of a firearm with a bump-stock device installed is not accelerated or otherwise increased. As discussed *supra*, if this Court were to allow the Final Rule to stand, in addition to expanding the definition of machinegun, it would eviscerate or otherwise usurp the congressionally enacted definition for a semiautomatic rifle, resulting in all semiautomatic rifles becoming machineguns.

### 3.     Bump Stock Devices Do Not Operate "Automatically"

The Final Rule defines "automatic" as "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." 83 Fed. Reg. 66553-54. In explaining why Expert Vasquez's opinion is immaterial, the Government declares,

> "[n]or is it relevant that Mr. Vasquez himself determined, with the input of agency leadership, that a bump stock 'does not fire automatically with a single pull,' in part because 'it requires a thought process of the individual to continually pull the trigger.' This may have seemed the correct conclusion at the time, but Mr. Vasquez and others at the agency reached these conclusions without the benefit of the definition of 'automatically' set forth in the Final Rule."

---

[22] It bears noting that the Government's discussion of the "single pull" and contact between the shooter's finger and trigger fails to provide any analysis of the fact that when a bump-stock device is fired with only one hand the gun only shoots one round. *See* Exhibit 28 to Exhibit A from 1:44-3:12. The Government then grasps for straws when it describes the shooter's "intent". "[T]here is a constant exertion on the bump stock which corresponds to constant intent by the shooter to continue to pull on the trigger, permitting the movements of the trigger to be classified properly as a 'single pull of the trigger.'" Doc. 16 at 24. As nothing in the statute speaks to the shooter's intent to "continue to pull on the trigger" in relation to determining whether the firearm is a machinegun, the analysis could not be more clear that a bump-stock device does not constitute a machinegun.

Doc. 16 at 23 (internal citations omitted) (emphasis added).

Curiously, the Government's own definition of the term "automatic" defeats their position.  In order to be "automatic" there must be 1) a self-acting or self-regulating mechanism which 2) allows the firing of multiple rounds through a single function of the trigger. As shown in the bump stock analytical video, there is no mechanism in a bump-stock device that is self-acting or self-regulating. This becomes abundantly clear when the shooter unlocks the stock and fires the gun one-handed, which results in only one shot being fired. *See* Exhibit 28 to Exhibit A from 1:44-3:12.  If the device has a mechanism that was self-acting or self-regulating, it would have discharged more than one round, per pull of the trigger.

Jumping down the rabbit hole further, the Government cites to *U.S. v. Olofson*, 563 F.3d 652 (7th Cir. 2009) to further support the degree of human involvement required to function as automatically. *Olofson* provides two important details that need to be addressed. First, the firearm at issue, which was ultimately determined to be a machine gun, fired three rounds in a burst with a single pull of the trigger before jamming. *Olofson*, 563 F.3d at 655. Second, the Seventh Circuit stated "[t]he most relevant time for determining a statutory term's meaning" is the year of the provision's enactment." *Olofson*, 563 F.3d at 658 citing *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 228, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (citing *Perrin v. United States,* 444 U.S. 37, 42–45, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). "Therefore, we examine how "automatically" was commonly used and understood in 1934, the year in which the definition of "machinegun" became law with the passage of the National Firearms." *Id*.

A leading dictionary from 1934 tells us that "automatically" is the adverbial form of "automatic." WEBSTER'S NEW INTERNATIONAL DICTIONARY 187 (2d ed.1934). The adjectival form of "automatic" is relevantly defined by that dictionary as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]" *Id.* Another contemporaneous dictionary similarly describes "automatic" as "[s]elf-acting under conditions fixed for it, going of itself." OXFORD

ENGLISH DICTIONARY 574 (1933). Thus defined, in § 5845(b) the adverb "automatically," as it modifies the verb "shoots," delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism. That mechanism is one that is set in motion by a single function of the trigger and is accomplished without manual reloading.

*Id.* [23]

The divide between the function of a bump-stock device and the firearm at issue in *Olofson* is rather large – in fact, it is the difference between the congressionally enacted definition of "machinegun" and "semiautomatic rifle". Even setting that issue aside, the Government's own definition and explanation of "automatic" undercut their position that a bump-stock device operates automatically, as it is clear that there is no mechanism in or on a bump-stock device that self-acts or self-regulates. .

\*          \*          \*          \*

For all of these reasons, Plaintiffs are likely to be successful on the merits.

C.      The Government Concedes That The Plaintiffs Will Suffer Irreparable Harm

The Government admits that Plaintiffs will suffer irreparable harm as a result of the Final Rule's implementation and enforcement – not that it is a mere possibility. Specifically, after the Government declares that "Defendants do not contest Plaintiffs' contention that implementation of this Final Rule will force the Plaintiffs and others like them to dispose of their property and that destroyed bumpstocks would be almost impossible to replace given the unavailability of

---

[23] Modern versions of those two dictionaries define "automatic" in the same terms. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (2002); OXFORD ENGLISH DICTIONARY 805 (2d ed.1989). *Olofson*, 563 F.3d 652 at fn 4.

replacement products," they "concede that Plaintiffs have met the irreparable harm prong of the preliminary injunction standard." (Doc. 16 at 71, fn. 40). Accordingly, there is no dispute as to the irreparable harm prong of the analysis.

D.      Balance Of The Equities

As explained in Plaintiffs' principal brief (Doc. 2-1 at 37-38), the balance of equities tips in Plaintiffs' favor, as the Government is unable to show any interest that equals or exceeds that of Plaintiffs, especially in light of the fact that the Government concedes that Plaintiffs risk criminal prosecution, where the penalties include 10 years in jail, $250,000.00 in fines and forfeiture of vessel, where the bump-stock device is maintained. Doc. 16 at 71.

First and foremost, although the Government disingenuously contends in its brief that the Final Rule "is being implemented to promote public safety" (Doc. 16 at 72), the Final Rule explicitly states that "[t]he Department disagrees that ATF seeks to regulate bump-stock-type devices merely because they were, or have the potential to be, used in crime" (83 Fed. Reg. 66528) and rather that the Final Rule "is instead *based only upon* the functioning of the device and the application of the relevant statutory definition." (*Id*. at 66529) (emphasis added).

Even if, *arguendo*, this Court were to ignore the Government's admission in the Final Rule that it is not being implemented for public safety purposes, unlike the Governments' speculative claims in their brief of remotely possible harm (for which there is no evidence of record), the Plaintiffs' have documented their concrete harm of subjection to criminal prosecution and potential incarceration, which Defendants do not dispute. Thus, it is an impossibility for the balance of equities to tip in the Defendants' favor.

E.        An Injunction Is In the Public's Interest

As explained in Plaintiffs' principal brief (Doc. 2-1 at 38), an injunction is in the public interest, as there is a public interest in enforcing compliance with the law. As held by this Court, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp.2d 7, 21 (D.D.C. 2009). Indeed, "[t]here is an overriding public interest…in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1997). [24]

Even if this Court merges the analysis of balancing the parties' respective equities with the public's interest in an injunction, as the Government suggests based upon *Nken v. Holder*, 556 U.S. 418, 435 (2009), *et al.*, (Doc. 16 at 73), the outcome is no different, as the Plaintiffs have established numerous violations of law and have identified concrete harm – including criminal prosecution and incarceration – where the Government, at best, has only identified speculative harm.

## II.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin the Defendants from implementing and enforcing the Final Rule or, pursuant to Fed.R.C.P. 65(a)(2), enter judgment in their favor.

---

[24] *See also*, *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000) (declaring that "[i]t is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers").

Respectfully Submitted,

Date:   January 29, 2019

Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@civilrightsdefensefirm.com

Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@civilrightsdefensefirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
888-202-9297
610-400-8439 (fax)
Attorneys for Plaintiffs [25]

---

[25] Those Plaintiffs identified in fn. 1.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of January 2019, I served the foregoing on

Department of Justice attorney, Eric Soskin, via email at eric.soskin@usdoj.gov.


Respectfully Submitted,



_____
Joshua Prince, Esq.
D.C. Bar No. PA0081

Joshua@CivilRightsDefenseFirm.com
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-92973 (t)
(610) 400-8439 (f)
Attorney for Plaintiffs