APPEAL,CONSOL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:18–cv–02988–DLF</u>

| | |
|---|---|
| GUEDES et al v. BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES et al | Date Filed: 12/18/2018 |
| | Jury Demand: None |
| Assigned to: Judge Dabney L. Friedrich | Nature of Suit: 890 Other Statutory |
| Member case: | Actions |
|    1:18–cv–03083–DLF | Jurisdiction: U.S. Government Defendant |
|  Case:  1:18–cv–03086–DLF | |

Cause: 05:551 Administrative Procedure Act

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **DAMIEN GUEDES** | represented by | **Joshua G Prince** |
| | | CIVIL RIGHTS DEFENSE FIRM, P.C. |
| | | 646 Lenape Rd. |
| | | Bechtelsville, PA 19505 |
| | | 888–202–9297 |
| | | Fax: (610) 400–8439 |
| | | Email: <u>Joshua@CivilRightsDefenseFirm.com</u> |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Adam J. Kraut** |
| | | PRINCE LAW OFFICES, P.C. |
| | | 646 Lenape Road |
| | | Bechtelsville, PA 19505 |
| | | (610) 845–3803 |
| | | Fax: (610) 845–3903 |
| | | Email: <u>akraut@princelaw.com</u> |
| | | *ATTORNEY TO BE NOTICED* |

**<u>Plaintiff</u>**

| | | |
|---|---|---|
| **FIREARMS POLICY COALITION, INC.** | represented by | **Joshua G Prince** |
| *CA 18–3083* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Thomas C. Goldstein** |
| | | GOLDSTEIN & RUSSELL P.C. |
| | | Partner/Owner |
| | | 7475 Wisconsin Avenue |
| | | Suite 850 |
| | | Bethesda, MD 20814 |
| | | (202) 362–0636 |
| | | Email: <u>tgoldstein@goldsteinrussell.com</u> |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Daniel H. Woofter**
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362–0636
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam J. Kraut**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**FIREARMS POLICY FOUNDATION**    represented by  **Joshua G Prince**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Kraut**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**MADISON SOCIETY**    represented by  **Joshua G Prince**
**FOUNDATION, INC.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Kraut**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**SHANE RODEN**    represented by  **Joshua G Prince**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Kraut**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**FLORIDA CARRY, INC.**    represented by  **Joshua G Prince**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Kraut**

2

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND
EXPLOSIVES**

represented by  **Chetan A. Patil**
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L Street, NW
Room 12518
Washington, DC 20530
(202) 305–4968
Fax: (202) 616–8470
Email: chetan.patil@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J. Soskin**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 353–0533
Fax: (202) 616–8470
Email: eric.soskin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hashim M. Mooppan**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 307–5906
Email: hashim.mooppan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**MATTHEW WHITAKER**
*in his official capacity as Acting Attorney
General of the United States*

represented by  **Chetan A. Patil**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J. Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hashim M. Mooppan**
(See above for address)
*ATTORNEY TO BE NOTICED*

3

**Defendant**

| | | |
|---|---|---|
| **THOMAS E. BRANDON** | represented by | **Chetan A. Patil** |
| *in his official capacity as Acting Director* | | (See above for address) |
| *of the Bureau of Alcohol, Tobacco,* | | *LEAD ATTORNEY* |
| *Firearms and Explosives* | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Eric J. Soskin** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Hashim M. Mooppan** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **Chetan A. Patil** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Eric J. Soskin** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Hashim M. Mooppan** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/18/2018 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090–5846088) filed by FIREARMS POLICY FOUNDATION, FIREARMS POLICY COALITION, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC.. (Attachments: # 1 Notice of Exhibits, # 2 Exhibit A Part I, # 3 Exhibit A Part II, # 4 Corporate Disclosure Statement, # 5 Civil Cover Sheet, # 6 Summons, # 7 Executed Final Rule)(Kraut, Adam) (Entered: 12/18/2018) |
| 12/18/2018 | 2 | | MOTION for Preliminary Injunction by FIREARMS POLICY COALITION, INC., FIREARMS POLICY FOUNDATION, DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Brandon Combs, # 3 Text of Proposed Order, # 4 Certificate of Service)(Kraut, Adam) (Entered: 12/18/2018) |
| 12/18/2018 | 3 | | NOTICE of Appearance by Joshua G Prince on behalf of All Plaintiffs (Prince, Joshua) (Entered: 12/18/2018) |
| 12/19/2018 | 4 | | STIPULATION *of Extension of Briefing Schedule for Plaintiffs' Motion for Preliminary Injunction, ECF No. 2,* by THOMAS E. BRANDON, BUREAU |

| | | |
|---|---|---|
| | | OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER. (Attachments: # 1 Text of Proposed Order)(Soskin, Eric) (Entered: 12/19/2018) |
| 12/20/2018 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by FIREARMS POLICY COALITION, INC., FIREARMS POLICY FOUNDATION, DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC. (Kraut, Adam) (Entered: 12/20/2018) |
| 12/20/2018 | | Case Assigned to Judge Dabney L. Friedrich. (zmd) (Entered: 12/20/2018) |
| 12/21/2018 | 6 | SUMMONS (4) Issued Electronically as to THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsb) (Entered: 12/21/2018) |
| 12/21/2018 | | MINUTE ORDER. The parties have jointly requested that the Court extend the time for briefing on the plaintiffs' 2 Motion for Preliminary Injunction. *See* Stipulated Extension of Briefing Schedule for Plaintiffs' Motion for Preliminary Injunction, Dkt. 4. In light of the parties' stipulation, it is ORDERED that the defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction shall be filed on or before December 31, 2018, and the plaintiffs' Reply in Support of the Motion for Preliminary Injunction shall be filed on or before January 7, 2019. Consistent with the parties' proposal, the Court also ORDERS that the parties appear for a hearing on the preliminary injunction at 10:00 a.m. on January 11, 2019. Because the parties have consented to a hearing on this date, the Court finds that holding the hearing on January 11, 2019 will not prejudice the parties within the meaning of Local Rule 65.1(d). Signed by Judge Dabney L. Friedrich on December 21, 2018. (lcdlf2) (Entered: 12/21/2018) |
| 12/26/2018 | | Set/Reset Deadlines/Hearings: Response to Motion for Preliminary Injunction due by 12/31/2018. Reply to Motion for Preliminary Injunction due by 1/7/2019. Preliminary Injunction Hearing set for 1/11/2019 at 10:00 AM in Courtroom 12 before Judge Dabney L. Friedrich. (kh) (Entered: 12/26/2018) |
| 12/26/2018 | 7 | MOTION to Stay *Proceedings in Light of Lapse of Appropriations* by THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER (Attachments: # 1 Text of Proposed Order)(Soskin, Eric) (Entered: 12/26/2018) |
| 12/26/2018 | 8 | NOTICE of Voluntary Dismissal re Firearms Policy Coalition, Inc. (Kraut, Adam) (Entered: 12/26/2018) |
| 12/26/2018 | 9 | AMENDED COMPLAINT against All Defendants filed by FIREARMS POLICY FOUNDATION, DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN, FLORIDA CARRY, INC.. (Attachments: # 1 Exhibit A Part I, # 2 Exhibit A Part II, # 3 Declaration of Sean Caranna, # 4 Declaration of Jonathan Jensen, # 5 Declaration of the Honorable Shane Roden)(Kraut, Adam) (Entered: 12/26/2018) |
| 12/26/2018 | 10 | NOTICE of Appearance by Joshua G Prince on behalf of All Plaintiffs (Prince, Joshua) (Entered: 12/26/2018) |

| 12/27/2018 | | | MINUTE ORDER dismissing plaintiff Firearms Policy Coalition, Inc. in light of the plaintiffs' 8 Notice of Voluntary Dismissal. *See* Fed. R. Civ. P. 41(a). Signed by Judge Dabney L. Friedrich on December 27, 2018. (lcdlf2) (Entered: 12/27/2018) |
| --- | --- | --- | --- |
| 12/27/2018 | | | MINUTE ORDER granting the defendants' 7 Motion for a Stay of All Proceedings in Light of Lapse of Appropriations. Accordingly, it is ORDERED that all proceedings in this matter are STAYED until Congress has restored appropriations to the Department of Justice. It is further ORDERED that the defendants shall promptly notify the Court as soon as appropriations are restored, and at that time, the parties shall file a joint status report proposing a revised briefing schedule. Signed by Judge Dabney L. Friedrich on December 27, 2018. (lcdlf2) (Entered: 12/27/2018) |
| 12/31/2018 | 11 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by FLORIDA CARRY, INC. (Kraut, Adam) (Entered: 12/31/2018) |
| 12/31/2018 | 12 | | MOTION to Lift Stay by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support)(Kraut, Adam) (Entered: 12/31/2018) |
| 12/31/2018 | 13 | | Memorandum in opposition to re 12 MOTION to Lift Stay filed by THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER. (Soskin, Eric) (Entered: 12/31/2018) |
| 01/03/2019 | | | MINUTE ORDER scheduling a telephonic status conference on the plaintiffs' 12 Motion to Lift Stay of Proceedings for 11:00 a.m. on January 8, 2019. Signed by Judge Dabney L. Friedrich on January 3, 2019. (lcdlf2) (Entered: 01/03/2019) |
| 01/03/2019 | | | Set/Reset Deadlines/Hearings: Telephone Conference set for 1/8/2019 at 11:00 AM in Courtroom 12 before Judge Dabney L. Friedrich. (jl) (Entered: 01/03/2019) |
| 01/08/2019 | | | MINUTE ORDER. It is hereby ordered that this case be consolidated with *Firearms Policy Coalition, Inc. v. Whitaker* (No. 18–3083). Once the stay is lifted, the Court will issue a briefing schedule to address the plaintiffs' pending motions for a preliminary injunction. Signed by Judge Dabney L. Friedrich on January 8, 2019. (lcdlf2) (Entered: 01/08/2019) |
| 01/08/2019 | | | Cases consolidated. Cases 18–cv–2988 and 18–cv–3083 have been consolidated pursuant to Minute Order entered on 1/8/2019. All filings shall be made only in the LEAD CASE No. 18–cv–2988 and parties shall NOT elect to spread text when filing on ECF, as this will result in repetitive docketing. (tth) (Entered: 01/09/2019) |
| 01/08/2019 | | | Minute Entry for proceedings held before Judge Dabney L. Friedrich: Telephone Conference held on 1/8/2019. MOTION 5 in related case (18–CV–3083) GRANTED by Oral Order of the Court. (Court Reporter: Sara Wick.) (jl) (Entered: 01/09/2019) |
| 01/11/2019 | | | MINUTE ORDER granting in part the plaintiffs' 12 Motion to Lift Stay of Proceedings. The stay of all proceedings is hereby VACATED. As discussed |

| | | | |
|---|---|---|---|
| | | | during the telephonic status conference on January 8, 2019, the government shall file an opposition to the plaintiffs' motions for preliminary injunction on or before January 22, 2019, and the plaintiffs may file a reply on or before January 29, 2019. It is further ORDERED that the parties shall appear for a hearing on the plaintiffs' motions at 2:00 p.m. on February 6, 2019. Signed by Judge Dabney L. Friedrich on January 11, 2019. (lcdlf2) (Entered: 01/11/2019) |
| 01/11/2019 | | | Set/Reset Deadlines/Hearings: Government's opposition to the plaintiffs' motions for preliminary injunction due by 1/22/2019. Plaintiff's reply due by 1/29/2019. Motion Hearing set for 2/6/2019 at 2:00 PM in Courtroom 12 before Judge Dabney L. Friedrich. (jl) (Entered: 01/11/2019) |
| 01/15/2019 | 14 | | Consent MOTION for Leave to File Excess Pages *For Consolidated Brief in Opposition to Motions for Preliminary Injunction* by THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER (Attachments: # 1 Text of Proposed Order)(Soskin, Eric) (Entered: 01/15/2019) |
| 01/15/2019 | | | MINUTE ORDER granting the defendants' 14 Consent Motion for Enlargement of the Page Limit for Consolidated Opposition to Plaintiffs' Respective Motions for Preliminary Injunction. It is ORDERED that the defendants may file a consolidated brief in opposition to the pending motions for preliminary injunction not to exceed 75 pages in length. Signed by Judge Dabney L. Friedrich on January 15, 2019. (lcdlf2) (Entered: 01/15/2019) |
| 01/17/2019 | 15 | | AFFIDAVIT OF MAILING of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 01/17/19. (Goldstein, Thomas); Modified event on 1/24/2019 (tth). (Entered: 01/17/2019) |
| 01/22/2019 | 16 | | Memorandum in opposition to re 2 MOTION for Preliminary Injunction *and Motion for Preliminary Injunction Filed in Case No. 18−cv−3083 as Dkt. No. 2* filed by THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER. (Attachments: # 1 Exhibit 1 − 2018 OLC Opinion)(Soskin, Eric) (Entered: 01/22/2019) |
| 01/28/2019 | 17 | | REPLY to opposition to motion re 2 MOTION for Preliminary Injunction *Only as to ECF 2 in Case No. 18−cv−3083* filed by FIREARMS POLICY COALITION, INC.. (Goldstein, Thomas) (Entered: 01/28/2019) |
| 01/28/2019 | 18 | | MOTION for Leave to File Amended Complaint *as to ECF 1 in Case No. 18−cv−3083* against All Defendants filed by FIREARMS POLICY COALITION, INC.. (Attachments: # 1 Amended Complaint, # 2 Amended Complaint Redline)(Goldstein, Thomas); Modified event on 1/29/2019 (tth). (Entered: 01/28/2019) |
| 01/29/2019 | 19 | | REPLY to opposition to motion re 2 MOTION for Preliminary Injunction *Only as to ECF 2 in Case No. 18−cv−2988* filed by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN. (Prince, Joshua) (Entered: 01/29/2019) |
| 01/30/2019 | 20 | | ERRATA *CORRECTING NUMBERING* by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON |

| | | | |
|---|---|---|---|
| | | | SOCIETY FOUNDATION, INC., SHANE RODEN 9 Amended Complaint, filed by MADISON SOCIETY FOUNDATION, INC., FLORIDA CARRY, INC., SHANE RODEN, FIREARMS POLICY FOUNDATION, DAMIEN GUEDES. (Kraut, Adam) (Entered: 01/30/2019) |
| 02/05/2019 | 21 | | NOTICE of Appearance by Hashim M. Mooppan on behalf of All Defendants Associated Cases: 1:18–cv–02988–DLF, 1:18–cv–03083–DLF(Mooppan, Hashim) (Entered: 02/05/2019) |
| 02/06/2019 | | | Minute Entry for proceedings held before Judge Dabney L. Friedrich: Hearing held on 2/6/2019 re 2 Motion for Preliminary Injunction. Motion heard and taken under advisement. (Court Reporter: Sara Wick) (zcdw) (Entered: 02/07/2019) |
| 02/08/2019 | 22 | | Unopposed MOTION for Leave to File *Exhibits B and C to Plaintiffs' Amended Complaint and Motion for Preliminary Injunction* by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Text of Proposed Order)(Prince, Joshua). (Entered: 02/08/2019) |
| 02/13/2019 | 23 | | NOTICE OF SUPPLEMENTAL AUTHORITY by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN (Prince, Joshua) (Entered: 02/13/2019) |
| 02/14/2019 | | | MINUTE ORDER. The parties shall file a joint status report by 3:00 p.m. tomorrow, February 15, 2019, that briefly addresses whether the confirmation of William P. Barr as Attorney General affects the pending motions in this case. Signed by Judge Dabney L. Friedrich on February 14, 2019. (lcdlf2) (Entered: 02/14/2019) |
| 02/15/2019 | 24 | | NOTICE of Appearance by Chetan A. Patil on behalf of THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER (Patil, Chetan) (Entered: 02/15/2019) |
| 02/15/2019 | 25 | | Joint STATUS REPORT by THOMAS E. BRANDON, BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, UNITED STATES OF AMERICA, MATTHEW WHITAKER. (Patil, Chetan) (Entered: 02/15/2019) |
| 02/25/2019 | | | MINUTE ORDER granting plaintiff Guedes's 22 Unopposed Motion to Supplement Amended Complaint and Motion for Preliminary Injunction. Signed by Judge Dabney L. Friedrich on February 25, 2019. (lcdlf2) (Entered: 02/25/2019) |
| 02/25/2019 | 26 | 12 | ORDER denying the plaintiffs' motions for a preliminary injunction. See text for details. Signed by Judge Dabney L. Friedrich on February 25, 2019. (lcdlf2) (Entered: 02/25/2019) |
| 02/25/2019 | 27 | 14 | MEMORANDUM OPINION regarding the plaintiffs' motions for a preliminary injunction. See text for details. Signed by Judge Dabney L. Friedrich on February 25, 2019. (lcdlf2) (Entered: 02/25/2019) |
| 02/25/2019 | | | |

|  |  |  | MINUTE ORDER directing the parties to propose a schedule for further proceedings on or before March 18, 2019. Signed by Judge Dabney L. Friedrich on February 25, 2019. (lcdlf2) (Entered: 02/25/2019) |
|---|---|---|---|
| 02/25/2019 | 28 | 10 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 27 Memorandum & Opinion, 26 Order on Motion for Preliminary Injunction by FIREARMS POLICY FOUNDATION, FLORIDA CARRY, INC., DAMIEN GUEDES, MADISON SOCIETY FOUNDATION, INC., SHANE RODEN. Filing fee $ 505, receipt number 0090−5965917. Fee Status: Fee Paid. Parties have been notified. (Kraut, Adam) (Entered: 02/25/2019) |
| 02/25/2019 | 29 |  | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 27 Memorandum & Opinion, 26 Order on Motion for Preliminary Injunction by FIREARMS POLICY COALITION, INC.. Filing fee $ 505, receipt number 0090−5965926. Fee Status: Fee Paid. Parties have been notified. (Goldstein, Thomas) (Entered: 02/25/2019) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DAMIEN GUEDUES,** *et al.*, | **:** | |
| | **:** | |
| | **:** | |
| **Plaintiffs** | **:** | |
| | **:** | Case No. 1:18-cv-02988-DLF |
| **v.** | **:** | |
| | **:** | Judge Friedrich |
| **BUREAU OF ALCOHOL, TOBACCO,** | **:** | |
| **FIREARMS, AND EXPLOSIVES,** *et al.*, | **:** | |
| | **:** | |
| **Defendants** | **:** | |

## Notice of Appeal

PLEASE TAKE NOTICE that Plaintiffs Guedes, Shane Roden, Firearms Policy

Foundation ("FPF"), Madison Society Foundation, Inc., and Florida Carry, Inc. hereby appeal to

the United States Court of Appeals for the District of Columbia from the Court's Order and

Memorandum entered on February 25, 2019 [ECF Doc. 26 and Doc. 27].

Dated: February 25, 2019                                        Respectfully submitted,

/s/ Adam Kraut                                                        /s/ Joshua Prince
Adam Kraut, Esq.                                                   Joshua Prince, Esq.
D.C. Bar No. PA0080                                             D.C. Bar No. PA0081
Civil Rights Defense Firm, P.C.                             Civil Rights Defense Firm, P.C.
646 Lenape Rd                                                       646 Lenape Rd
Bechtelsville, PA 19505                                         Bechtelsville, PA 19505
610-845-3803 (t)                                                    610-845-3803 (t)
610-845-3903 (f)                                                    610-845-3903 (f)
AKraut@princelaw.com                                       Joshua@princelaw.com
Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

I, Adam Kraut, Esq., of Civil Rights Defense Firm, P.C. hereby certify that I served a

copy of the *Notice of Appeal* through the Court's ECF system, as follows:

Eric Soskin
eric.soskin@usdoj.gov

Hashim M. Mooppan
hashim.mooppan@usdoj.gov

**Civil Rights Defense Firm, P.C.**

Date: February 25, 2019                    By:

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. PA0080
Civil Rights Defense Firm, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505
610-845-3803 ext 81115
610-845-3903 (fax)
AKraut@princelaw.com

DAMIEN GUEDES, *et al.*,

    *Plaintiffs*,

  v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES, *et al.*,

    *Defendants.*

No. 18-cv-2988 (DLF)

DAVID CODREA, *et al.*,

    *Plaintiffs*,

  v.

WILLIAM P. BARR,[1] Attorney General, *et al.*,

    *Defendants.*

No. 18-cv-3086 (DLF)

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is

**ORDERED** that plaintiff Damien Guedes's Motion for a Preliminary Injunction, Dkt. 2,

No. 18-cv-2988, is **DENIED**;

**ORDERED** that plaintiff Firearms Policy Coalition's Motion for a Preliminary

Injunction, Dkt. 2, No. 18-cv-3083, is **DENIED**; and

---

[1] When this suit began, Matthew G. Whitaker was the Acting Attorney General. When William P. Barr became Attorney General, he was automatically substituted. *See* Fed. R. Civ. P. 25(d).

**ORDERED** that plaintiff David Codrea's Motion for a Preliminary Injunction, Dkt. 5,

No. 18-cv-3086, is **DENIED**.

_____
DABNEY L. FRIEDRICH
United States District Judge

February 25, 2019

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAMIEN GUEDES, *et al.*,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS, AND EXPLOSIVES, *et al.*,<br><br>      *Defendants.* | No. 18-cv-2988 (DLF) |

| | |
|---|---|
| DAVID CODREA, *et al.*,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>WILLIAM P. BARR,[1] Attorney General, *et al.*,<br><br>      *Defendants.* | No. 18-cv-3086 (DLF) |

## MEMORANDUM OPINION

On October 1, 2017, a lone gunman fired several hundred rounds of ammunition at a crowd gathered for an outdoor concert in Las Vegas, killing 58 people and wounding hundreds more. According to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the gunman used multiple "bump stocks" in the attack, which increased his rate of fire. In response to this tragedy, the President, Members of Congress, and others urged ATF to reconsider its prior

---

[1] When this suit began, Matthew G. Whitaker was the Acting Attorney General. When William P. Barr became Attorney General, he was automatically substituted. *See* Fed. R. Civ. P. 25(d).

position that a bump stock is not a "machinegun" within the meaning of the National Firearms Act of 1934 (NFA). On December 26, 2018, ATF issued a final rule amending the regulatory definition of "machinegun" to include "bump-stock-type devices." As a result, if the rule becomes effective on March 26, 2019, as scheduled, bump stocks will be banned under the Firearms Owners' Protection Act of 1986 (FOPA).

To prevent the rule from taking effect, the plaintiffs—Damien Guedes, the Firearms Policy Coalition, David Codrea, and their co-plaintiffs—filed three motions for a preliminary injunction in which they raised overlapping statutory and constitutional challenges. All of the plaintiffs contend that ATF violated the Administrative Procedure Act (APA) when it promulgated the rule. Guedes also argues that ATF violated certain procedural requirements in 18 U.S.C. § 926(b), which grants the agency rulemaking authority. Codrea further argues that the rule violates the Takings Clause of the Fifth Amendment. And all of the plaintiffs contend that then–Acting Attorney General Matthew Whitaker lacked authority to promulgate the rule under either the Appointments Clause of the Constitution or 28 U.S.C. § 508 (the AG Act), a succession statute specific to the Office of the Attorney General. Because none of the plaintiffs' arguments support preliminary injunctive relief, the Court will deny all three motions.

Most of the plaintiffs' administrative law challenges are foreclosed by the *Chevron* doctrine, which permits an agency to reasonably define undefined statutory terms. *See Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). Here, Congress defined "machinegun" in the NFA to include devices that permit a firearm to shoot "automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C. § 5845(b), but it did not further define the terms "single function of the trigger" or "automatically." Because both terms are ambiguous, ATF was permitted to reasonably interpret them, and in light of their ordinary

2

meaning, it was reasonable for ATF to interpret "single function of the trigger" to mean "single pull of the trigger and analogous motions" and "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." ATF also reasonably applied these definitions when it concluded that bump stocks permit a shooter to discharge multiple rounds automatically with a single function of the trigger. That this decision marked a reversal of ATF's previous interpretation is not a basis for invalidating the rule because ATF's current interpretation is lawful and ATF adequately explained the change in interpretation.

The Court also rejects the plaintiffs' procedural challenges. ATF adequately responded to the objections raised by the plaintiffs during the comment period, and ATF was not required to disclose evidence on which it did not rely when it promulgated the rule. Nor did ATF violate § 926(b) by refusing to hold an oral hearing. Finally, any error ATF may have committed by failing to extend the comment period by five days because of technical glitches was harmless.

As for the Takings Clause challenge, the plaintiffs have not shown that preliminary injunctive relief rather than future compensation is appropriate.

The plaintiffs' statutory and constitutional challenges to Whitaker's authority fare no better. As a statutory matter, the plaintiffs argue that the AG Act requires the Deputy Attorney General to serve as Acting Attorney General when there is a vacancy and that nothing in the Federal Vacancies Reform Act (FVRA) empowers the President to change that result. The plain text and structure of both statutes, however, demonstrate that they were intended to coexist: the AG Act provides a line of succession, and the FVRA gives the President discretion to depart from that line, subject to certain limitations met here.

3

As a constitutional matter, the plaintiffs argue that the Appointments Clause generally requires an acting principal officer to be either the principal officer's first assistant or appointed by the President with the advice and consent of the Senate. But that theory is foreclosed by Supreme Court precedent and historical practice, both of which have long approved temporary service by non-Senate confirmed officials, irrespective of their status as first assistants.

Separately, the plaintiffs argue that the Appointments Clause at a minimum requires the role of an acting principal officer to be filled by an inferior officer and not a mere employee. Whitaker, the plaintiffs contend, was not an officer because the FVRA did not authorize the President to "appoint" him and because his role as an acting official was temporary. The Court disagrees. Whitaker's designation under the FVRA was a Presidential appointment. And if the temporary nature of Whitaker's service prevented him from becoming an officer, then the President was not constitutionally obligated to appoint him at all.

## I.    BACKGROUND

### A.  Procedural History

On December 18, 2018, Guedes, Firearms Policy Coalition (the Coalition), Firearms Policy Foundation, and Madison Society Foundation filed a complaint and a motion for a preliminary injunction. Guedes's Compl., Dkt. 1, No. 18-cv-2988; Guedes's Mot., Dkt. 2, No. 18-cv-2988. Although their complaint contained eight claims, they moved for a preliminary injunction only on the grounds that (1) ATF's rule violated the APA and 18 U.S.C. § 926(b), and (2) Whitaker lacked authority to promulgate the bump stock rule. *Compare* Guedes's Compl., *with* Guedes's Br., Dkt. 2-1, No. 18-cv-2988. At the parties' request, the Court extended the time for briefing and held a hearing on the motion for a preliminary injunction on January 11, 2019. Minute Order, Dec. 21, 2018, No. 18-cv-2988.

4

Less than a week after filing the motion, Guedes and the Coalition elected to pursue separate lawsuits. On December 26, 2018, the Coalition voluntarily dismissed its claims, Notice of Voluntary Dismissal at 2, Dkt. 8, No. 18-cv-2988, and Guedes filed an amended complaint that alleged the original eight causes of action minus the challenge to Whitaker's authority, Guedes's Am. Compl., Dkt. 9, No. 18-cv-2988. The Coalition simultaneously filed a new complaint in this District that elaborated on the original challenge to Whitaker's authority and raised several additional claims based on Whitaker's allegedly infirm designation as Acting Attorney General. *See* Firearms Pol'y Coal.'s Compl., Dkt. 1, No. 18-cv-3083. The Coalition also filed a motion for a preliminary injunction. Firearms Pol'y Coal.'s Mot., Dkt. 2, No. 18-cv-3083.

In response to the recent government shutdown, the government filed unopposed motions to stay in each case in late December. *See* Gov't's Mot. for a Stay in *Guedes*, Dkt. 7, No. 18-cv-2988; Gov't's Mot. for a Stay in *Firearms Pol'y Coal.*, Dkt. 8, No. 18-cv-3083. Both motions were granted. Minute Order in *Guedes*, Dec. 27, 2018, No. 18-cv-2988; Minute Order in *Firearms Pol'y Coal.*, Dec. 27, 2018, No. 18-cv-3083.

On January 3, 2019, *Firearms Policy Coalition* was transferred to the undersigned as a related case and, with the consent of the parties, consolidated with *Guedes*. *See* Reassignment of Civil Case in *Firearms Pol'y Coal.*, Dkt. 12, No. 18-cv-3083; Minute Order in *Guedes*, Jan. 8, 2019, No. 18-cv-2988. A few days later, the Court granted the plaintiffs' motion to lift the stay and set a revised briefing schedule. Minute Order in *Guedes*, Jan. 11, 2019, No. 18-cv-2988.

Meanwhile, on December 27, 2018, Codrea filed yet another action challenging the bump stock rule, and he moved for a preliminary injunction several weeks later on January 18, 2019. *See* Codrea's Compl., Dkt. 1, No. 18-cv-3086; Codrea's Mot., Dkt. 5, No. 18-cv-3086. Like the

other plaintiffs, Codrea seeks to enjoin the rule on the grounds that ATF violated the APA and Whitaker lacked authority to promulgate the rule. Codrea's Br. at 13–14, Dkt. 5-1, No. 18-cv-3086. Codrea also argues that a preliminary injunction is appropriate because ATF violated the Takings Clause of the Fifth Amendment. *Id.* at 13. *Codrea* was transferred to the undersigned as a related case, *see* Reassignment of Civil Case in *Codrea*, Dkt. 14, No. 18-cv-3086, but at the request of the parties, the Court did not consolidate *Codrea* with *Guedes*.

On February 6, 2019, the Court held a hearing in *Guedes*. On February 19, 2019, after briefing was complete, the Court held a second hearing in *Codrea*. This opinion resolves all three of the pending motions for a preliminary injunction.

## B. The Statutory Framework and Regulatory History of Bump Stock Prohibitions

The National Firearms Act of 1934 (NFA) and the Firearm Owners Protection Act of 1986 (FOPA) provide the statutory basis for the bump stock rule. The NFA provides the following definition for the term "machinegun":[2]

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). Congress later passed the FOPA, which generally makes it "unlawful for any person to transfer or possess" a newly manufactured "machinegun," 18 U.S.C. § 922(o), and incorporates the NFA's definition of that term, 18 U.S.C. § 921(a)(23) ("The term 'machinegun' has the meaning given such term in . . . the National Firearms Act."). The FOPA also amended a

---

[2] The U.S. Code uses an uncommon spelling of "machinegun." *See United States v. Carter*, 465 F.3d 658, 661 n.1 (6th Cir. 2006) (discussing the spelling of machine gun). Except when quoting the relevant statutes, the Court uses the more common, two-word spelling of machine gun.

previous grant of rulemaking authority to provide that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." 18 U.S.C. § 926(a); *see also Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 478 (4th Cir. 1990) (discussing the statutory change). The key question here is whether the NFA's definition of "machinegun" encompasses devices that are colloquially referred to as "bump stocks."

The parties do not dispute the basic mechanics of standard bump stock devices. A bump stock replaces a semiautomatic rifle's standard stock—the part of the rifle that rests against the shooter's shoulder—and enables the shooter to achieve a faster firing rate. To use a bump stock as intended, the shooter must maintain forward pressure on the barrel and, at the same time, pull the trigger and maintain rearward pressure on the trigger. Once the shooter pulls the trigger, a bump stock helps harness and direct the firearm's recoil energy, thereby forcing the firearm to shift back and forth, each time "bumping" the shooter's stationary trigger finger. In this way, the shooter is able to reengage the trigger without additional physical manipulation, though the process may cause small involuntary movements of the trigger finger.

ATF first began to regulate bump stocks in 2006 when it determined that the term "machinegun" encompassed the "Akins Accelerator," a specific bump stock model with an internal spring that pushed the firearm forward after the shooter pulled the trigger. *See Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam). ATF initially determined in 2002 and again in 2004 that the Akins Accelerator did not qualify as a "machinegun" because it did not permit a shooter to discharge multiple rounds with a "single function of the trigger." *Id.* at 199. But the agency reversed course in 2006, when it reinterpreted a "single function of the trigger" to mean a "single pull of the trigger." *Id.* at 200. Under that new interpretation, ATF determined that the Akins Accelerator qualified as a "machinegun" because the device enabled

7

the shooter to discharge multiple rounds with only one "pull," even though the trigger mechanically reset between rounds. *Id.* The Eleventh Circuit later upheld ATF's decision, reasoning that ATF's interpretation of "single function of the trigger" was "consonant with the [NFA] and its legislative history." *Id.*

For years, ATF declined to classify as "machineguns" other standard bump stock models that did not include an internal spring. 83 Fed. Reg. at 66517. ATF reasoned that, although standard bump stock devices permit a shooter to discharge multiple rounds with a single function of the trigger, they do not operate "automatically." *Id.* But ATF's interpretation of the term "automatically" remained unclear. At times, ATF focused on whether a given bump stock device "initiate[d] an automatic firing cycle that continue[d] until either the finger [wa]s released or the ammunition supply [wa]s exhausted." *Id.* at 66518 (internal quotation marks omitted). Other times, it focused on whether the device had "automatically functioning mechanical parts or springs" or "performed . . . mechanical functions when installed." *Id.* (alterations adopted and internal quotation marks omitted).

### C. The Final Bump Stock Rule

The call for action in the wake of the 2017 mass shooting in Las Vegas, Nevada was immediate and widespread. Members of Congress and others requested that ATF reconsider its position with respect to standard bump stock devices. *Id.* at 66516. And after ATF issued an Advance Notice of Proposed Rulemaking, President Trump released a memorandum urging the Attorney General, "as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns." *Id.* at 66517 (quoting Application of Machinegun to 'Bump Fire' Stocks and Other Similar Devices, 83 Fed. Reg. 7949 (Feb. 20, 2018)).

8

On March 29, 2018, ATF proposed the bump stock rule and formally provided the public with 90 days, as required by 18 U.S.C. § 926(b), to submit written comments online, by mail, or by facsimile. Bump-Stock-Type Devices, 83 Fed. Reg. at 13442 (proposed Mar. 29, 2018). The first few days of the comment period did not go smoothly. According to Guedes, several commenters faced technological difficulties that prevented them from submitting online comments. Guedes's Br. at 22–25. Some online users, for example, received a "Comment Period Closed" notification on the proposed rule's FederalRegister.gov page—though the page also included a contradictory notice stating that the proposed rule had a comment period that would end several days in the future. Guedes's Am. Compl. Ex. A, at 14, Dkt. 9-1, No. 18-cv-2988. Meanwhile, a search for "bump stock" on another rulemaking website, Regulations.gov, directed commenters to the correct page, and ATF did in fact receive comments submitted during the first few days of the comment period. 83 Fed. Reg. at 66542. In addition to submitting written comments, a few of the plaintiffs sought an opportunity to participate in a public, oral hearing, Guedes's Br. at 6, but ATF refused those requests, 83 Fed. Reg. at 66542. ATF explained that "a public hearing would [not] meaningfully add data or information" that would assist the agency in drafting the final rule. *Id*.

In the final rule published on December 26, 2018, ATF reversed its earlier position and concluded that a standard bump stock device is a "machinegun" as defined in the NFA. *Id.* at 66543, 66553. Consistent with its 2006 Akins Accelerator determination, ATF interpreted the term "single function of the trigger" to mean a "single pull of the trigger." *Id.* at 66553. ATF also interpreted "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id*. Based on these definitions, ATF added a sentence to the regulatory definition of "machinegun"

to make clear that the term "machinegun" in the NFA includes "bump-stock-type device[s]," which "allow[] a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66553–54. Under the rule, "current possessors" of bump stocks must either destroy them or abandon them at an ATF office. *Id.* at 66530. The rule is set to become effective on March 26, 2019.

### D. The Constitutional and Statutory Framework for the Designation of Acting Attorneys General

The Constitution's Appointments Clause provides that the President "shall appoint . . . Officers of the United States" "by and with the Advice and Consent of the Senate," but "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The Constitution does not provide clear guidance about whether and when an individual may temporarily serve as an acting principal officer without Senate confirmation. Instead, a series of statutes provide the primary framework for the designation of acting officers. *See NLRB v. SW Gen.*, 137 S. Ct. 929, 934 (2017).

In 1868, Congress enacted the first Vacancies Act, a predecessor to the Federal Vacancies Reform Act (FVRA). Act of July 23, 1868, ch. 227, 15 Stat. 168 (1868). The Vacancies Act, which established the basic statutory framework that continues to operate today, created a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head until a successor be appointed, or such absence or sickness shall cease." *Id.* § 1, 15 Stat. at 168. But the Vacancies Act also permitted the President to override that first-assistant default rule and

designate another Senate-confirmed official to serve temporarily on an acting basis. *Id.* § 3; *see also SW Gen.*, 137 S. Ct. at 935. Until recently, with the enactment of the modern FVRA, the President could not invoke the override authority established in the Vacancies Act to designate an Acting Attorney General; the first-assistant default rule always applied. 5 U.S.C. § 3347 (1994) (providing that the President's authority to designate acting officials under the FVRA "d[id] not apply to a vacancy in the office of the Attorney General").

In addition to the Vacancies Act, Congress has enacted a series of agency-specific statutes, including the AG Act, 28 U.S.C. § 508. The AG Act provides that "[i]n case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose [of the first-assistant default rule] the Deputy Attorney General is the first assistant to the Attorney General." *Id.* § 508(a). The AG Act then provides a further order of succession: "When by reason of absence, disability, or vacancy in office, neither the Attorney General nor the Deputy Attorney General is available to exercise the duties of the office of Attorney General, the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General." *Id.* § 508(b).

In 1998, Congress enacted the FVRA. Like the earlier Vacancies Act, the FVRA includes a first-assistant default rule, but it permits the President to override that rule in one of two ways. 5 U.S.C. § 3345(a)(1). First, "the President . . . may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily." *Id.* § 3345(a)(2). Second, "the President . . . may direct an officer or employee of such Executive

11

agency to perform the functions and duties of the vacant office temporarily" if that individual has served in the agency for at least 90 days in the 365–day period preceding the vacancy in a position that receives pay "equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule."  *Id.* § 3345(a)(3).  In a break from the earlier Vacancies Act, the FVRA also eliminated the exception for the Office of the Attorney General, so the President can override the first-assistant default rule even for that Office.  *Compare* 5 U.S.C. § 3347 (1994), *with* 5 U.S.C. § 3347 (2018).  And the FVRA increased the amount of time during which an acting official may serve to 210 days, subject to certain statutory exceptions.  *See id.* § 3346; *see also SW Gen.*, 137 S. Ct. at 935–36.

The FVRA includes an exclusivity provision that explains how the FVRA interacts with agency-specific statutes like the AG Act.  Under § 3347(a), the FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate, unless . . . a statutory provision expressly" either "authorizes the President, a court, or the head of an Executive department, to designate an officer or employee" to serve in an acting capacity or "designates an officer or employee" to serve in an acting capacity.  5 U.S.C. § 3347(a).

### E.  The Designation of Matthew Whitaker to Serve as Acting Attorney General

On November 7, 2018, the Attorney General, Jefferson B. Sessions, III, resigned. Guedes's Compl. ¶ 50–51.  The next day, the President invoked his authority under the FVRA and "directed" Whitaker, then the Attorney General's Chief of Staff, to "perform the functions and duties of the office of Attorney General, until the position is filled by appointment or subsequent designation."  Firearms Pol'y Coal.'s Mot. App. A, Dkt. 2-2, No. 18-cv-3083. Whitaker served as Acting Attorney General until Barr was confirmed as Attorney General on

February 15, 2019. *See* 165 Cong. Rec. S1397 (daily ed. Feb. 14, 2019). While serving as Acting Attorney General, Whitaker issued the bump stock rule at issue here. *See* 83 Fed. Reg. at 66554.

## II.     LEGAL STANDARDS

### A. Preliminary Injunctions

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks omitted). If the plaintiff fails to establish a likelihood of success on the merits, the court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). The plaintiff cannot prevail without a "substantial indication of likely success on the merits." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017) ("[A]bsent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." (internal quotation marks omitted)), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018).

### B. Judicial Review of Agency Action

The APA provides that a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under the familiar *Chevron* framework, "[i]f

13

Congress has directly spoken to [an] issue, that is the end of the matter." *Confederated Tribes of Grand Ronde Cmty. v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016) (discussing *Chevron*, 467 U.S. 837). "[T]he court, as well [as] the agency, must give effect to the unambiguously expressed intent of Congress." *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 842–43). But if the text is silent or ambiguous, courts must "determine if the agency's interpretation is permissible, and if so, defer to it." *Confederated Tribes of Grand Ronde Cmty.*, 830 F.3d at 558. "This inquiry, often called *Chevron* Step Two, does not require the best interpretation, only a reasonable one." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 492 (D.C. Cir. 2016) (internal quotation marks omitted); *see also id.* ("We are bound to uphold agency interpretations regardless [of] whether there may be other reasonable, or even more reasonable, views." (alteration adopted and internal quotation marks omitted)).

Further, even when an interpretation is reasonable under *Chevron*, "agency action is always subject to arbitrary and capricious review under the APA." *Confederated Tribes of Grand Ronde Cmty.*, 830 F.3d at 559. An interpretation is arbitrary and capricious if the agency "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation" that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). Put simply, "[t]he agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2019 WL 405020, at *5 (D.C. Cir. Feb. 1, 2019) (quoting *State Farm*, 463 U.S. at 43).

14

Often the inquiry under *Chevron* Step Two overlaps with arbitrary and capricious review because "under *Chevron* step two, the court asks whether an agency interpretation is arbitrary and capricious in substance." *Agape Church*, 738 F.3d at 410 (alteration adopted) (quoting *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)). At bottom, a reviewing court must decide whether an agency action is "within the scope of [the agency's] lawful authority" and supported by "reasoned decisionmaking." *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006) (internal quotation marks omitted); *see also id.* ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (internal quotation marks omitted)).

When an agency changes its position, it must "display awareness" of the change, but it is not required to meet a "heightened standard for reasonableness." *Mary V. Harris Found. v. FCC*, 776 F.3d 21, 24 (D.C. Cir. 2015) (internal quotation marks omitted). "A reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Nat'l Lifeline Ass'n*, 2019 WL 405020, at *6 (alteration adopted and internal quotation marks omitted). But "[s]o long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating that [an] earlier decision should be altered or abandoned." *New England Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018). Put differently, the agency need only "show that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" than the previous policy. *Mary V. Harris Found.*, 776 F.3d at 24–25 (emphasis and internal quotation marks omitted).

15

## III. ANALYSIS

None of the plaintiffs' challenges merit preliminary injunctive relief: the plaintiffs are unlikely to succeed on the merits of their administrate law challenges; preliminary injunctive relief is not available for Codrea's Takings Clause challenge; and the plaintiffs are unlikely to succeed on the merits of their statutory and constitutional challenges to the authority of then–Acting Attorney General Whitaker.

### A. Likely Success on the Merits of the Plaintiffs' Administrative Law Challenges

The Court considers and rejects each of the plaintiffs' administrative law challenges in turn. First, it determines that ATF reasonably interpreted and applied the NFA's definition of "machinegun." Second, it explains that the agency did not violate the APA either by reversing its previous position that bump stocks were not machine guns or by failing to provide its previous interpretations in the rulemaking docket. Third, it explains that ATF did not deny commenters a meaningful opportunity to comment or adequate responses to their comments. Finally, it concludes that ATF did not violate 18 U.S.C. § 926(b) by refusing to hold an oral hearing and that any error it may have made by refusing to extend the comment period by five days was harmless.

### 1. *ATF's Interpretation of the NFA's Definition of "Machinegun"*

As noted, the NFA defines "machinegun" as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, *automatically* more than one shot, without manual reloading, by a *single function of the trigger*. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added). Congress did not shed further light on the definition of "machinegun" in 1934, when it enacted the NFA, or in 1986, when it incorporated the NFA's

16

definition into the FOPA, *see* 18 U.S.C. § 921(a)(23) ("The term 'machinegun' has the meaning given such term in . . . the National Firearms Act.").

Invoking its general rulemaking authority under § 926(a), ATF promulgated the bump stock rule based on its interpretation of "single function of the trigger" and "automatically," two terms that Congress left undefined. ATF defined the phrase "single function of the trigger" to mean a "single pull of the trigger and analogous motions." 83 Fed. Reg. at 66553. And it defined "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." *Id.* Applying these definitions, it added a sentence to the regulatory definition of "machinegun" that explicitly states that the term "includes a bump-stock-type device," which "allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66553–54.

The plaintiffs suggest that ATF lacked the authority to state explicitly that the NFA's definition of "machinegun" includes bump stocks, and they take particular issue with the possibility that policy considerations may have influenced ATF's legal interpretation. Guedes's Br. at 17; Guedes's Reply at 3–5, Dkt. 5-1, No. 18-cv-2988; Codrea's Br. at 4; Codrea's Reply at 6–7, Dkt. 18, No. 18-3086. But these arguments are premised on a misunderstanding of the *Chevron* doctrine. Under *Chevron*, courts "presume that when an agency-administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve the ambiguity." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 315 (2014). Agencies are therefore entitled to deference when they reasonably define ambiguous terms—including ambiguous terms

17

in a statutory definition—and apply those terms to new circumstances. *See Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) ("Under *Chevron*, we must accept an agency's authoritative interpretation of an ambiguous statutory provision if the agency's interpretation is reasonable."); *see also, e.g.*, *Whitaker v. Thompson*, 353 F.3d 947, 950–52 (D.C. Cir. 2004) (deferring to the Food and Drug Administration's interpretation of statutory definitions in the Federal Food, Drug, and Cosmetic Act). Courts must defer even when agencies "make policy choices in interpreting [a] statute," "as long as [they] stay[] within [Congress'] delegation [of authority]." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995); *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55–56 (2011) ("*Chevron* recognized that the power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." (alterations adopted and internal quotation marks omitted)).

That is why courts have regularly recognized ATF's authority to interpret and apply the statutes that it administers, including the NFA's definition of "machinegun." *See, e.g.*, *Akins*, 312 F. App'x at 200 (deferring to ATF's decision to classify the Akins Accelerator as a machine gun); *see also York v. Sec'y of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985) (upholding ATF's decision to classify a particular firearm as a machine gun); *cf. Brady*, 914 F.2d at 480 (holding that ATF has discretion to define the term "business premises" in another firearms statute).

The question is therefore not whether ATF considered the policy implications when it formulated the bump stock rule, but whether ATF exceeded its authority by either contravening

the plain meaning of the NFA under Step One of the *Chevron* doctrine or adopting an unreasonable interpretation of ambiguous terms under Step Two.[3]

To determine "whether a statute is ambiguous" and "ultimately . . . whether [an] agency's interpretation is permissible or instead is foreclosed by the statute," courts "employ all the tools of statutory interpretation." *Loving*, 742 F.3d at 1016. Most importantly, courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration adopted and internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted."). Generally, courts rely on dictionaries from the time statutes became law to interpret the words of a statute. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 228 (1994); *PHH Corp. v. CFPB*, 881 F.3d 75, 130 (D.C. Cir. 2018) (en banc) (Griffith, J., concurring in the judgment) (collecting cases demonstrating that the Supreme Court "generally begins [an interpretive task] with dictionaries").

     a. A "Single Function of the Trigger"

Unfortunately, dictionaries from the time of the NFA's enactment are of little help in defining a "single function of the trigger." The 1933 version of *Webster's New International*

---

[3] Despite ATF's clear authority to interpret and administer the NFA and the FOPA, Guedes suggests that the congressional findings in the FOPA limit ATF's authority to interpret the definition of "machinegun." Guedes's Br. at 14–15. The general findings to which Guedes refers do not come close to stripping ATF of its authority to define terms included in the statutory definition of "machinegun"—a type of firearm expressly banned with few exceptions by the FOPA. 18 U.S.C. § 922(o). And even if the findings were more concrete and specific to the issues presented here, a "statement of congressional findings is a rather thin reed upon which to base a requirement . . . neither expressed nor . . . fairly implied in the operative sections of [a statute]." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 260 (1994).

*Dictionary* defines "function" as "[t]he natural and proper action of anything." *Webster's New International Dictionary* 876 (1933). Similarly, the 1933 *Oxford English Dictionary* defines the term to mean "[t]he special kind of activity proper to anything; the mode of action by which it fulfills its purpose." 4 *Oxford English Dictionary* 602 (1933). Neither definition sheds any light on the key question here: whether, as the plaintiffs argue, a "single function of the trigger" means a mechanical act of the trigger, or whether, as ATF argued in the rule, a "single function of the trigger" means a single pull of the trigger from the perspective of the shooter. Under the first interpretation, each trigger function ends when the trigger resets. Under the second interpretation, a single act by the shooter—a single pull—is a "function." Because the statute does not provide any additional guidance on the correct interpretation, the Court concludes that the term is ambiguous.

The question then becomes whether ATF's interpretation was reasonable. To be sure, the interpretation offered by the plaintiffs is reasonable. But the same is true of ATF's interpretation. Indeed, in 2009, the Eleventh Circuit upheld ATF's decision to treat Akins Accelerators as machine guns because "a single application of the trigger by a gunman"—a single pull—caused the gun with the affixed bump stock to "fire continuously . . . until the gunman release[d] the trigger or the ammunition [wa]s exhausted." *Akins*, 312 F. App'x at 200.

Tellingly, courts have instinctively reached for the word "pull" when discussing the statutory definition of "machinegun." The Supreme Court, for example, has explained that the statutory definition encompasses a weapon that "fires repeatedly with *a single pull of the trigger*," meaning "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) (emphasis added). The Court then contrasted automatic machine guns with

20

semiautomatic weapons that "fire[] only one shot with each pull of the trigger" and "require[] no manual manipulation by the operator to place another round in the chamber after each round is fired." *Id.* Likewise, the Tenth Circuit has held that a uniquely designed firearm was "a machine gun within the statutory definition" because "the shooter could, *by fully pulling the trigger*, and it only, at the point of maximum leverage, obtain automation with a single trigger function." *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (emphasis added).

Based on the above contemporaneous dictionary definitions and court decisions, the Court concludes that ATF acted reasonably in defining the phrase "single function of the trigger" to mean a "single pull of the trigger and analogous motions." 83 Fed. Reg. at 66553.

      b.  <u>"Automatically"</u>

Dictionary definitions of "automatically" are only marginally more helpful. The 1933 *Webster's New International Dictionary* provides that "automatically" is the adverbial form of "automatic," *Webster's New International Dictionary*, *supra*, at 157, and it defines the related, adjectival form as "self-acting or self-regulating," especially as applied "to machinery or devices which perform parts of the work formerly or usually done by hand," *id.* at 156. The 1933 *Oxford English Dictionary* likewise defines "automatic" as "[s]elf-acting under conditions fixed for it, going of itself," especially as applied to "machinery and its movements, which produce results otherwise done by hand." 1 *Oxford English Dictionary*, *supra*, at 574. Applying these definitions to the NFA's definition of "machinegun," the Seventh Circuit concluded that the "adverb 'automatically,' as it modifies the verb 'shoots,' delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . that is set in motion by a single function of the trigger and is accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (footnote omitted). Consistent with these contemporaneous dictionary definitions and the Seventh Circuit's decision in *Olofson*, ATF

21

correctly defined "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." 83 Fed. Reg. at 66553.

But even this definition retains a key ambiguity: how much of the "work formerly or usually done by hand" must be performed by the "self-acting or self-regulating device" for the automatic label to apply? *Webster's New International Dictionary*, *supra*, at 156. According to *Webster's New International Dictionary*, the "automatic" label applies when a device performs only "parts"—not all—of the work otherwise performed by hand. *Id*. And that definition comports with everyday experience. Automatic devices regularly require *some* degree of manual input. An automatic sewing machine, for example, still requires the user to press a pedal and direct the fabric. Because the statute does not specify how much manual input is too much, the Court concludes that the term "automatically" is ambiguous, with or without the gloss added by the rule. And as discussed below, ATF reasonably interpreted this ambiguous term to describe bump stocks.

      c.   ATF's Application of the NFA's Definition of "Machinegun" to Bump Stocks

After defining a "single function of the trigger" to mean a "single pull of the trigger" and "automatically" to mean "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger," 83 Fed. Reg. at 66553, ATF added a sentence to the regulatory definition of "machinegun" to clarify that ATF considered bump stocks to be machine guns, *id.* at 66553–54. The plaintiffs advance two primary arguments to attack the reasonableness of this interpretation. Neither is persuasive.

*First*, the plaintiffs suggest that bump stocks do not operate with a "single function of the trigger" because a shooter must still "manipulate" the trigger to discharge multiple rounds. Unless the trigger makes repeated contact with the shooter's finger, they assert, the firearm will

not reset between rounds and fire multiple times. Guedes's Reply at 14; *see also id.* at 12; Codrea's Br. at 16. Repackaging the same argument, Guedes further argues that ATF's interpretation would bring all "semiautomatic" rifles, as that term is defined by statute, within the NFA's definition of "machinegun." Guedes's Reply at 5–6. In support, Guedes cites the Crime Control Act of 1990, which defines "semiautomatic rifle" to mean "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." Pub. L. No. 101-647, § 2204(a)(28), 104 Stat. 4789, 4857 (Nov. 29, 1990) (codified at 18 U.S.C. § 921(a)(28)).

The Court concludes that it was reasonable for ATF to determine that a bump stock operates with a single "pull" of the trigger because a bump stock permits the shooter to discharge multiple rounds by, among other things, "maintaining the trigger finger on the device's extension ledge with constant rearward pressure." 83 Fed. Reg. at 66532 (internal quotation marks omitted). Although operating a bump stock may cause slight movements of the trigger finger, it does not require a shooter to consciously and repeatedly exert force to depress the trigger multiple times. After the initial exertion of force, a shooter is able to discharge multiple rounds by maintaining constant pressure on the trigger. And contrary to Guedes's claim, ATF's determination will not bring all semiautomatic rifles within the NFA's definition of "machinegun" because, without a bump stock or similar device attached, semiautomatic rifles *do* "require[] a separate pull of the trigger to fire each cartridge." 18 U.S.C. § 921(a)(28).

*Second*, the plaintiffs argue that ATF acted unreasonably because a bump stock does not operate "automatically." *See, e.g.*, Codrea's Reply at 12–13. Although this is a closer question, the Court also concludes that it was reasonable for ATF to determine that a bump stock relieves a

shooter of enough of the otherwise necessary manual inputs to warrant the "automatic" label. To be sure, a firearm with an affixed bump stock requires *some* manual inputs: the shooter must "maintain[] constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintain[] the trigger finger on the device's extension ledge with constant rearward pressure." 83 Fed. Reg. at 66532 (internal quotation marks omitted). But as noted, the definition of "automatically" does not mean that an automatic device must operate spontaneously without any manual input. ATF reasoned that a bump stock permits a firearm to function automatically by "directing the recoil energy of the discharged rounds into the space created by the sliding stock . . . in constrained linear rearward and forward paths" so that the shooter can maintain a "continuous firing sequence." *Id.* at 66532 (internal quotation marks omitted). And it explained that "without [such a] device," the shooter would have to "manually capture, harness, or otherwise utilize th[e] [recoil] energy to fire additional rounds" and "bump fire" a gun. *Id*. In other words, the bump stock makes it easier to bump fire because it controls the distance the firearm recoils and ensures that the firearm moves linearly—two tasks the shooter would ordinarily have to perform manually. In this way, a bump stock creates a "self-acting mechanism" that permits "the discharge of multiple rounds" with "a single function of the trigger . . . without manual reloading." *Olofson*, 563 F.3d at 658 (defining the term "automatically" in the NFA's definition of "machinegun").

Of course, even if an interpretation is reasonable under *Chevron*, all final agency actions must still survive review under the APA's arbitrary and capricious standard. *See Confederated Tribes of Grand Ronde Cmty.*, 830 F.3d at 559. Often, "[t]he analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is . . . 'the same, because under *Chevron* [S]tep [T]wo, the court asks whether an agency interpretation is arbitrary or capricious

in substance.'" *Agape Church*, 738 F.3d at 410 (alteration adopted) (quoting *Judulang*, 565 U.S. at 52 n.7). But in addition to the substantive reasonableness already addressed, the arbitrary and capricious standard also requires an agency to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Nat'l Lifeline Ass'n*, 2019 WL 405020, at *5. The Court therefore turns to the plaintiffs' remaining challenges to the adequacy of ATF's explanation for the bump stock rule.

 2. *ATF's Treatment of Prior Interpretations*

The plaintiffs characterize ATF's new position as an unlawful departure from its previous interpretations, which excluded standard bump stocks from the NFA's definition of "machinegun." *See, e.g.*, Guedes's Br. at 12–14, 19, 26–27, 30–31; Codrea's Reply at 12; *see also generally* Guedes's Compl. Ex. B, Dkt. 22-1, No. 18-cv-2988. Guedes further challenges the lawfulness of ATF's rulemaking process on the ground that ATF failed to make public its previous interpretations. *See* Guedes's Br. at 21; Guedes's Reply at 7–8. Neither argument is persuasive.

It is well established that an agency may change its prior policy if "the new policy [is] permissible under the statute, and the agency . . . acknowledge[s] it is changing its policy and show[s] that there are good reasons for the new policy and that the agency believes it to be better, which the conscious change of course adequately indicates." *Nat'l Lifeline Ass'n*, 2019 WL 405020, at *6 (emphasis and internal quotation marks omitted); *see also Mary V. Harris Found.*, 776 F.3d at 24 ("What the [agency] did in the past is of no moment . . . if its current approach reflects a permissible interpretation of the statute."). ATF acknowledged in the final rule that it was "reconsider[ing] and rectify[ing]" its previous classification decisions based on its legal analysis of the statutory terms "automatically" and "single function of the trigger." 83 Fed. Reg. at 66516 (quoting *Akins*, 312 F. App'x at 200). It discussed the history of its

25

regulation of Akins Accelerators and the Eleventh Circuit's decision in *Akins*. *Id.* at 66517. It also explained that it had previously determined that "semiautomatic firearms modified with [standard] bump-stock-type devices did not fire 'automatically,' and thus were not 'machineguns.'" *Id.* at 66516. The mass shooting in Las Vegas then prompted ATF to reconsider its prior interpretations, *id.* at 66528–29, none of which provided "extensive legal analysis of the statutory terms 'automatically' or 'single function of the trigger,'" *id.* at 66516. Accordingly, ATF reviewed dictionary definitions of "automatically," relevant judicial decisions—including *Staples*, *Olofson*, and *Akins*—and the NFA's legislative history to determine whether standard bump stocks constitute machine guns. *Id.* at 66518–19. It then concluded that its previous interpretations "did not reflect the best interpretation of 'machinegun,'" *id.* at 66514, and that the rule's interpretations of "automatically" and "single function of the trigger" better "accord with the plain meaning of those terms," *id.* at 66527. This record reveals that ATF satisfied its obligation to "reasonably explain[]" its change of position. *New England Power Generators Ass'n*, 879 F.3d at 1201.

Guedes's argument that ATF was required to release its previous interpretations as part of the rulemaking process is no more persuasive. True, the APA requires agencies to "ma[k]e public in the proceeding and expose[] to refutation" "the most critical factual material that is used to support the agency's position on review." *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (internal quotation marks omitted); *see also, e.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530–31 (D.C. Cir. 1982) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."). But ATF's explanations for its prior legal interpretations are not "critical factual material[s]" that were "used to support the agency's

39

position." *Chamber of Commerce*, 443 F.3d at 900 (internal quotation marks omitted). This case does not turn on any factual dispute; the parties agree about how a bump stock operates. And ATF's prior legal interpretations *contradict* rather than support its current interpretation. Thus, ATF was not required to release its prior opinions during the rulemaking process.

       3.     *ATF's Responses to Comments and Its Consideration of Other Evidence*

       The plaintiffs next raise a series of arguments challenging the transparency of ATF's rulemaking process and ATF's failure to consider other evidence. *First*, they argue that ATF relied on evidence that bump stocks were used in the Las Vegas shooting without releasing that evidence or any other evidence suggesting that bump stocks have been used to commit crimes. *See, e.g.*, Codrea's Reply at 9; Guedes's Br. at 21, 28. As explained, however, the bump stock rule was based on a legal, rather than a factual, determination; crime statistics did not play any role in ATF's analysis. The Las Vegas attack served as the impetus for ATF's decision to reconsider its legal interpretation of "machinegun," but it did not provide a factual basis for the rule. And under the APA, ATF was required to make public only "critical factual material." *Chamber of Commerce*, 443 F.3d at 900 (internal quotation marks omitted).

       *Second,* Guedes argues that the "underlying premise" of the rule is "completely arbitrary and capricious" because certain "individuals can achieve, with greater accuracy, faster cyclic rates than [other individuals] utilizing bump-stock-devices." Guedes's Br. at 29. As noted, however, the "premise" of the rule was not the relative firing rates of guns with attached bump stocks (or any other factual determination for that matter); the rule change was based on ATF's legal interpretation of the statutory term "machinegun." *See* 83 Fed. Reg. at 66533 ("[ATF] disagrees with any assertion that the rule is based upon the increased rate of fire. While bump-stock-type devices are intended to increase the rate at which a shooter may fire a semiautomatic firearm, this rule classifies these devices based upon the functioning of these devices under the

27

statutory definition.").  Moreover, ATF did not represent that bump stocks *always* produce a faster rate of fire; it stated merely that bump stocks are used by individual shooters to produce a *relatively* faster rate of fire.  *Id.*

*Third*, Guedes takes issue with ATF's failure to respond to statements made by former ATF official Rick Vasquez and to an analytical video demonstrating how bump stocks operate. Guedes's Reply at 10–13.  But although an agency must "respond to relevant and significant public comments," *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (internal quotation marks omitted), it "is not required to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (alteration adopted and internal quotation marks omitted).  An agency "need only enable [a reviewing court] to see what major issues of policy were ventilated and why the agency reacted to them as it did."  *Id.* (alteration adopted and internal quotation marks omitted). The record reveals that ATF adequately addressed Guedes's arguments, including the argument that a bump stock requires the shooter to manipulate the trigger to discharge multiple rounds. For example, ATF explained in the rule that it "disagrees that a shooter repeatedly actuates, functions, or pulls the trigger of a semiautomatic firearm using a bump-stock-type device"; instead, "the shooter 'pulls' the trigger once and allows the firearm and attached bump-stock-type device to operate until the shooter releases the trigger finger or the constant forward pressure with the non-trigger hand."  83 Fed. Reg. at 6532.[4]

---

[4] To the extent Guedes argues that Vasquez's views are entitled to special weight because he is a former ATF official, Guedes is incorrect.  The deference afforded under *Chevron* extends only to the agency's official interpretations, not to the views of its former officials.  *See Via Christi Reg'l Med. Ctr. v. Leavitt*, No. 04-1026, 2006 WL 2773006, at *13 n.3 (D. Kan. Sept. 25, 2006), *aff'd*, 509 F.3d 1259 (10th Cir. 2007).

*Fourth*, the plaintiffs argue that the agency acted arbitrarily and capriciously because a shooter can also bump fire a gun using a rubber band or a belt loop. Guedes's Br. at 27; *see also* Codrea's Reply at 8.[5] ATF did not specifically include such everyday items in the rule, as it did bump stocks, but it has not yet made a formal determination about whether they fall within the NFA's definition of "machinegun." *See* Feb. 6, 2019 Hr'g Tr. at 30. To the extent the plaintiffs are arguing that the agency failed to respond adequately and reasonably to comments highlighting the similarities between bump stocks and household objects that can be repurposed to facilitate bump firing, the Court disagrees. ATF explained in the rule that bump firing using a rubber band or belt loop does not involve automatic fire because "no device is present to capture and direct the recoil energy; rather, the shooter must do so." 83 Fed. Reg. at 66533. In other words, unlike a bump stock, a "belt loop or a similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils." *Id.* Although Guedes and Codrea "attack the merits of [ATF's] responses, [ATF] clearly thought about [their] objections and provided reasoned replies," which is "all the APA requires." *City of Portland*, 507 F.3d at 714.

The related argument that ATF unreasonably distinguished between binary triggers and bump stocks, *see, e.g.*, Codrea's Br. at 6–7; Codrea's Reply at 7, fails for a similar reason. As ATF explained, binary triggers discharge one round when the shooter pulls the trigger and another when the shooter releases the trigger. Gov't's Opp'n in *Codrea* at 18, Dkt. 16, No. 18-cv-3086; Codrea's Br. at 6. ATF defined a "single function of the trigger" to mean a pull and

---

[5] Guedes also argues that a shooter can achieve the same effect by "train[ing] [his] trigger finger to fire more rapidly." Guedes's Br. at 27 (internal quotation marks omitted). As discussed above, however, the rates at which a shooter can fire a gun with and without a bump stock are irrelevant. Even the most skilled shooter cannot discharge multiple rounds "automatically" with a "single function of the trigger."

29

analogous motions, such as pushing a button or flipping a switch. 83 Fed. Reg. at 66515, 66534–35, 66553. It then reasonably distinguished binary triggers, which in ATF's view require two functions of the trigger—a pull and a release—to discharge multiple rounds. *See id.* at 66534. In sum, ATF adequately and reasonably responded to comments arguing that the "proposed regulatory text encompasses . . . binary triggers." *Id.*

      4.      *The Length of the Comment Period and the Necessity of a Hearing*

Guedes makes two final procedural arguments based on the text of 18 U.S.C. § 926(b), which provides that "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing . . . rules and regulations." Guedes argues that ATF violated § 926(b) by failing to provide commenters with a public hearing and by failing to provide an additional five days for public comment after some commenters experienced technical difficulties at the beginning of the scheduled comment period. Guedes's Br. at 22–25; Guedes's Reply at 8–10. The Court disagrees.

*First*, Guedes assumes that all "hearings" must be oral hearings, but "[t]he term 'hearing' in its legal context . . . has a host of meanings," including the mere opportunity to submit written comments. *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 239 (1973); *see also id.* at 241–42. And it is well established that the requirement for a "hearing," as opposed to a "hearing on the record," generally does not require a formal, oral hearing. *See id.* at 251; *Nat'l Classification Comm'n v. United States*, 765 F.2d 1146, 1150 (D.C. Cir. 1985) ([U]nder *Florida East Coast* there is a strong presumption that the procedural guarantees of [the notice-and-comment provisions] of the APA are sufficient unless Congress specifically indicates to the contrary."); *Mobil Oil Corp. v. Fed. Power Comm'n*, 483 F.2d 1238, 1250 (D.C. Cir. 1973) (Although "[t]here is some danger in according too much weight to magic words such as 'on the record[,]' . . . *Florida East Coast* . . . emphasized the importance of this phrase and virtually established it

as a touchstone test of when [formal, oral] proceedings are required.").  Indeed, the Fourth

Circuit has held that the hearing requirement in § 926(b) requires only that the Secretary

"provide interested parties with the opportunity to submit written comments."  *Brady*, 914 F.2d

at 485.  The Court sees no reason to depart from that interpretation here.

*Second*, any error ATF may have made by refusing to extend the comment period by five

days was harmless.  Section 706 of the APA requires courts to take "due account . . . of the rule

of prejudicial error."  5 U.S.C. § 706.  The D.C. Circuit has therefore held that "[i]f [an] agency's

mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to

vacate and remand for reconsideration."  *PDK Labs. v. DEA*, 362 F.3d 786, 799 (D.C. Cir.

2004); *see also Ozark Auto. Distributors v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) ("In

administrative law, as in federal civil and criminal litigation, there is a harmless error rule . . . ."

(internal quotation marks omitted)).  Despite the technical difficulties some online commenters

faced during the first five days of the comment period, it is undisputed that a search for the term

"bump stock" on Regulations.gov brought commenters to the correct web page; some online

commenters submitted comments during the first five days; frustrated online users were able to

submit comments during the remaining 85 days of the comment period; and finally, commenters

were able to submit comments by mail and facsimile throughout the comment period.  In light of

these undisputed facts, it is unsurprising that Guedes does not even attempt to show that he was

prejudiced by the technical problems.  Without a showing of prejudice, Guedes's procedural

challenge fails.

### B.  The Availability of Injunctive Relief for Codrea's Takings Clause Challenge

Codrea also asserts that the bump stock rule violates the Takings Clause because it fails

to provide compensation to current bump stock owners who must destroy or abandon their

31

property.  Codrea's Br. at 17.  Regardless of the merits of Codrea's takings challenge, however, it does not justify preliminary injunctive relief.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  It "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 315 (1987).  It follows that, "in general, 'equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to that taking.'"  *Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 99 (D.C. Cir. 2001) (alteration adopted) (quoting *United States v. Riverside Bayview Homes*, 474 U.S. 121, 127–28 (1985)).  Indeed, "the Fifth Amendment does not require that just compensation be paid in advance of or even contemporaneously with the taking."  *Preseault v. ICC*, 494 U.S. 1, 11 (1990).  It requires only "the existence of a reasonable, certain and adequate provision for obtaining compensation at the time of the taking."  *Id.* (internal quotation marks omitted).  The plaintiffs have made no showing that a suit for compensation under the Tucker Act, 28 U.S.C. § 1491(a)(1), or the Little Tucker Act, 28 U.S.C. § 1346(a)(2), is inadequate to satisfy the demands of the Fifth Amendment—or that any other doctrinal exception applies.  Preliminary injunctive relief is therefore unavailable.

### C. Likely Success on the Merits of the Challenges to Whitaker's Authority as Acting Attorney General

The plaintiffs, led by the Coalition,[6] conclude by challenging the authority of then–

Acting Attorney General Whitaker to promulgate the bump stock rule on statutory and

constitutional grounds. The Court divides its analysis of this final challenge into two parts.

First, it concludes that the AG Act did not bar Whitaker's selection under the FVRA. Second, it

concludes that the President's designation of Whitaker to serve as Acting Attorney General did

not violate the Appointments Clause.[7]

### 1. *The Statutory Challenge to Whitaker's Designation*

The parties' statutory dispute turns on when the FVRA and the AG Act apply to

vacancies in the Office of the Attorney General. The statutory provisions most relevant to this

issue are §§ 3345 and 3347 of the FVRA and § 508 of the AG Act.

Section 3345(a) of the FVRA creates a default rule that applies whenever an official

otherwise subject to the advice and consent of the Senate "dies, resigns, or is otherwise unable to

perform the functions and duties of the office." 5 U.S.C. § 3345(a). In such a case, the FVRA

provides that "the first assistant to the office of such officer shall perform the functions and

duties of the office temporarily in an acting capacity," subject to certain time limitations. *Id.*

§ 3345(a)(1). The FVRA further provides that "the President . . . may direct an officer or

---

[6] Because the Coalition advances the most comprehensive challenge to Whitaker's authority, the Court refers only to the Coalition's arguments in this section.

[7] This Court is not the first to reject a challenge to Whitaker's designation as Acting Attorney General. Three other district courts have already upheld the President's statutory and constitutional authority to designate Whitaker as Acting Attorney General, though those decisions did not consider the precise theories advanced here. *See United States v. Smith*, No. 18-cr-0015, 2018 WL 6834712, at *1–4 (W.D.N.C. Dec. 28, 2018); *United States v. Peters*, No. 17-cr-55, 2018 WL 6313534, at *2–5 (E.D. Ky. Dec. 3, 2018); *United States v. Valencia*, No. 17-cr-882, 2018 WL 6182755, at *2–4 (W.D. Tex. Nov. 27, 2018).

33

employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity" so long as that individual served in the agency for at least 90 days in the 365-day period preceding the vacancy in a position compensated at a rate "equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule." *Id.* § 3345(a)(3). The same time limitations that govern the default rule also apply here. *Id.*

Section 3347(a) of the FVRA, the Act's "exclusivity" provision, explains how the FVRA interacts with agency-specific statutes: it is the "exclusive means for temporarily authorizing an acting official" to serve in a position otherwise subject to the advice and consent of the Senate "unless . . . a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a).

Section 508(a) of the AG Act, the agency-specific statute for the Department of Justice, provides that "[i]n case of a vacancy in the office of Attorney General, . . . the Deputy Attorney General may exercise all the duties of that office." 28 U.S.C. § 508(a). It also provides that when "neither the Attorney General nor the Deputy Attorney General is available . . ., the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General." *Id.* § 508(b).

The parties do not dispute that Whitaker satisfies the eligibility criteria in the FVRA and that both the FVRA and the AG Act apply to the Office of the Attorney General. They disagree only about *when* each statute applies. The government argues that the statutes operate "alongside" each other: the President may choose to select an Acting Attorney General under the FVRA, or the Deputy Attorney General "may" assume those duties as soon as a vacancy arises. Gov't's Opp'n in *Codrea* at 24. The government maintains that the President lawfully selected

34

Whitaker under the FVRA, even though the Deputy Attorney General was available to fill the vacancy under the AG Act.

The Coalition, by contrast, argues that the AG Act displaces the FVRA unless and until the line of succession set forth in the AG Act has been exhausted. In the Coalition's view, the President may select an Acting Attorney General under the FVRA, but only if all of the successors listed in the AG Act are "unavailable." Firearms Pol'y Coal.'s Br. at 13, Dkt. 2-1, No. 18-3083. Under this interpretation, Whitaker could not lawfully assume the responsibilities of Attorney General because the Deputy Attorney General was available to serve as Acting Attorney General.

In determining which party has the better reading of the statutes, the Court begins, as it must, with the text of the FVRA. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)). The plain language of the FVRA, and its exclusivity provision in particular, substantially undercuts the Coalition's exhaustion theory. Under § 3347(a), the FVRA is the "exclusive" means of selecting an acting official "unless" an agency-specific statute designates a successor. 5 U.S.C. § 3347(a). Where, as here, an agency-specific statute designates a successor, the FVRA is no longer the *exclusive* means of filling a vacancy, but it remains *a* means of filling the vacancy. When faced with a vacancy in the Office of the Attorney General, the President may choose to invoke the FVRA and select an Acting Attorney General, or the President may permit the Deputy Attorney General to assume the responsibilities of Attorney General under the AG Act.

35

This reading of the statute is consistent with the decisions of other courts interpreting the FVRA. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (where the FVRA and an agency-specific statute apply, "the President is permitted to elect between the[] two statutory alternatives" to fill the vacancy); *English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018) ("[T]he FVRA's exclusivity provision makes clear that it was generally intended to apply alongside agency-specific statutes, rather than be displaced by them."), *appeal dismissed*, No. 18-5007, 2018 WL 3526296 (D.C. Cir. July 13, 2018).

The Coalition unpersuasively attempts to distinguish *Hooks* and *English* by highlighting insignificant factual distinctions. It argues that *Hooks* is distinguishable because, unlike the AG Act, the agency-specific statute in that case did not designate a first assistant. Firearms Pol'y Coal.'s Br. at 33. The statute stated simply that the President was "authorized" to designate an official to serve in an acting capacity. 29 U.S.C. § 153(d). As a result, the President invoked a different provision of the FVRA, 5 U.S.C. § 3347(a)(1)(A), under which the FVRA is "exclusive . . . unless . . . a statutory provision expressly . . . authorizes the President . . . to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." This authorization provision contrasts slightly with the designation provision at issue here, 5 U.S.C. § 3347(a)(1)(B), under which the FVRA is "exclusive . . . unless . . . a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." But as another judge on this Court has explained, this subtle difference did not affect the analysis of the *Hooks* court. *See English*, 279 F. Supp. 3d at 320 ("[T]here is nothing in *Hooks* to suggest that the court's interpretation of the FVRA would turn on this distinction, nor does the text of the FVRA provide any reason to

36

think so.").  In reaching its conclusion, the *Hooks* court relied instead on the "exclusive . . . unless" structure that is common to both provisions of the FVRA.  *See Hooks*, 816 F.3d at 556.

As for *English*, the Coalition argues that the factual circumstances of that case were "extremely unusual" and that the court's decision relied on an express-statement requirement in the agency-specific statute at issue.  Firearms Pol'y Coal.'s Br. at 33.  But the "unusual" facts of *English* did not affect the court's reasoning.  Nor did the court's analysis of the agency-specific statute affect the court's analysis of the text of the FVRA.  The court made clear that the FVRA's text demonstrates "that it was generally intended to apply alongside agency-specific statutes, rather than be displaced by them."  *English*, 279 F. Supp. 3d at 319.[8]

The statutory structure of the FVRA further confirms this interpretation.  *See Util. Air Regulatory Grp.*, 573 U.S. at 320 (explaining that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (internal quotation marks omitted)).  Section 3349c of the FVRA explicitly excludes several offices from the FVRA.  It provides, for example, that the FVRA "shall not apply" to certain multi-member commissions and members of the Surface Transportation Board.  5 U.S.C. § 3349c.  Congress could have chosen to exclude the Office of the Attorney General by using similar language, but it did not.

Moreover, far from seeking to exclude the Office of the Attorney General from the FVRA's coverage, the statutory history reveals that Congress affirmatively acted to bring the

---

[8] As the Coalition notes, Firearms Pol'y Coal.'s Br. at 33, the *English* court acknowledged that the plaintiff there would have had a stronger case for displacement if Congress had used the term "vacancy" in the agency-specific statute at issue, and the court specifically cited the AG Act to show that Congress knew how to use that term, *see English*, 279 F. Supp. 3d at 322.  But the *English* court did not go so far as to suggest that the AG Act and every other agency-specific statute that uses the term "vacancy" displaces the FVRA.

Office *within* the scope of the FVRA.  Prior to the FVRA's enactment, § 3347 provided that the President's authority to override the first-assistant default rule "d[id] not apply to a vacancy in the office of the Attorney General."  5 U.S.C. § 3347 (1994).  Congress eliminated that restriction when it enacted the FVRA, thus making clear that the President has the authority to override the first-assistant default rule when a vacancy arises in the Office of the Attorney General.  The Court will not assume that "Congress . . . intend[ed] *sub silentio* to enact statutory language that it . . . earlier discarded in favor of other language."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987); *see also Murphy v. Smith*, 138 S. Ct. 784, 789 (2018) (similar).

Nothing in the AG Act, which predates the FVRA, suggests otherwise.  Indeed, the AG Act includes a cross-reference to the FVRA that suggests that Congress intended the two statutes to operate alongside one another.  Specifically, the AG Act provides that, "for the purpose of section 3345 of title 5[,] the Deputy Attorney General is the first assistant to the Attorney General."  28 U.S.C. § 508(a).  Under the Coalition's reading, this provision is nonsensical because the FVRA will only ever apply when the Deputy Attorney General is unavailable.  A more sensible reading is that Congress included a cross-reference in the AG Act because it intended the two statutes to operate alongside one another: the FVRA establishes a first-assistant default rule that operates in tandem with the AG Act, but it also permits the President to override the AG Act when a vacancy arises in the Office of the Attorney General by using one of the presidential selection provisions in the FVRA.  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (internal quotation marks omitted)).

38

Even if the text of the two statutes did not suggest that Congress intended the FVRA and the AG Act to operate alongside each other, the Court has an affirmative duty to adopt such an interpretation because "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) (quoting *J.E.M. Ag Supply v. Pioneer Hi–Bred Int'l,* 534 U.S. 124, 143–44 (2001)); *see also id.* ("The courts are not at liberty to pick and choose among congressional enactments." (quoting *Morton v. Mancari,* 417 U.S. 535, 551 (1974))). The AG Act provides that the Deputy Attorney General "may" assume the responsibilities of the Attorney General during a vacancy, not that he "must" or "shall" assume those responsibilities. And "[t]he word 'may' customarily connotes discretion," rather than a mandatory requirement. *Jama v. ICE*, 543 U.S. 335, 346 (2005). Although the AG Act states that when "neither the Attorney General nor the Deputy Attorney General is available . . ., the Associate Attorney General *shall* act as Attorney General," 28 U.S.C. § 508(b) (emphasis added), that provision by itself does not prove that the two statutes are incapable of coexistence; it merely suggests that if the President does not exercise his authority under the FVRA, then the Associate Attorney General must step in if the Deputy Attorney General is unavailable. And, as discussed, another judge on this Court has held that even an agency-specific statute that provides that the *first*-in-line successor "shall" serve during a vacancy operates alongside the FVRA because that statute's "shall" is "implicitly qualified by the FVRA's 'may.'" *English*, 279 F. Supp. 3d at 323. By comparison, the AG Act's use of the word "shall" when listing a *second*-in-line successor provides little reason to adopt a "disfavored construction" of an irreconcilable conflict between the two statutes. *Howard*, 775 F.3d at 437 (internal quotation marks omitted).

39

Faced with the text and structure of the FVRA and the AG Act, the Coalition cannot argue that the FVRA *never* applies to the Office of the Attorney General. Instead, it argues that the AG Act imposes an exhaustion requirement such that the FVRA applies if and only if none of the successors identified in the AG Act are available. According to the Coalition, this miniscule role for the FVRA explains why, for example, Congress did not list the Office of the Attorney General in § 3349c, the "applicability" provision that excludes certain offices from the FVRA. But the Coalition's interpretation lacks textual support and relies primarily on inapplicable contextual and substantive canons.

As evidence of textual support, the Coalition stresses that the FVRA's exclusivity provision, 5 U.S.C. § 3347, includes the word "designates," which means to "choose." Firearms Pol'y Coal.'s Br. at 28 (quoting *Black's Law Dictionary* 541 (10th ed. 2014)). According to the Coalition, the FVRA must be inapplicable because the AG Act automatically "chooses" the acting official. But the Coalition's own theory proves that the word "designates" cannot bear that weight. Under the Coalition's interpretation, the AG Act would always "designate" or "choose" the First Assistant—or another successor listed in the AG Act—and the FVRA would never apply, even when all of the AG Act successors are unavailable. The Coalition concedes that, at least in those circumstances, the text of the FVRA permits the President to select an Acting Attorney General, but it cannot explain why. The more sensible interpretation of § 3347 takes into account the "exclusive . . . unless" structure and recognizes that the FVRA is *nonexclusive*, but not *inapplicable*, when read in conjunction with an agency-specific statute, such as the AG Act. The President may elect to fill a vacancy by invoking the FVRA, or, if he fails to do so, the successors listed in the AG Act may serve as Acting Attorney General.

40

The Coalition also invokes the "well established canon of statutory interpretation" that "the specific governs the general," *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotation marks omitted), to support its argument that the AG Act should be given effect over the more general FVRA, Firearms Pol'y Coal.'s Br. at 28. Although this canon is usually applied where a general statute and a specific statute directly contradict each other, "the canon has full application as well to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel*, 566 U.S. at 645. In that circumstance, "the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one." *Id.* But here, the AG Act is hardly "swallowed" by the FVRA. Each of the statutes imposes unique requirements that provide alternative mechanisms for filling a vacancy. The AG Act establishes a specific order of succession based on title and does not limit the length of time an individual may serve in an acting capacity. By contrast, the FVRA defines eligibility based on other criteria. For example, under the FVRA, a nominee to fill a vacancy is generally prohibited from serving in an acting capacity, *see* 5 U.S.C. § 3345(b)(1), and any individual appointed under § 3345(a)(3) of the FVRA must have served in the agency for 90 of the preceding 365 days in a position that receives pay equal to or greater than the minimum rate for GS-15 of the General Schedule. The FVRA also imposes specific time limits on acting service. *See id.* § 3346. As a result, some individuals who are eligible to serve in an acting capacity under the AG Act may not be eligible under the FVRA, and vice versa.

Because "the text is clear," the Court "need not consider [the] extra-textual evidence" cited by the Coalition. *SW Gen.*, 137 S. Ct. at 942. Nevertheless, the Court briefly considers and rejects the Coalition's remaining arguments. The Coalition argues that "there is no serious

reason Congress would want to permit the President" to override the AG Act by invoking the FVRA. Firearms Pol'y Coal.'s Br. at 30. It further contends that the "purpose" of the FVRA was to limit the President's authority to select acting officers, not to expand it. *Id.* And it states that had Congress desired to give the President a choice between two statutory schemes "it would have done so expressly," Firearms Pol'y Coal.'s Reply at 18, Dkt. 17, No. 18-cv-2988, or at least indicated as much in some piece of legislative history, *id.* at 21–23.

Regardless of the myriad policy reasons that might support or oppose the result here, Congress spoke clearly enough in the text of the FVRA. The exclusivity provision and the statutory history of the FVRA show that Congress understood, when it enacted the FVRA, that it was creating a new vacancies statute with its own allowances and restrictions that would apply to the Office of the Attorney General. Moreover, Congress did discuss this very issue in a Senate Report that accompanied a failed 1998 bill that preceded the FVRA. In considering language similar to the current exclusivity provision, the Report stated that the bill would retain several agency-specific statutes but that "the Vacancies Act would continue to provide an alternative procedure for temporarily occupying the office." S. Rep. No. 105-250, at 17 (1998). The legislative history not only speaks to the issue; it confirms the government's interpretation. Agency-specific statutes like the AG Act were expected to operate alongside the FVRA, not to displace it.

The Coalition accuses the government of misrepresenting the Senate Report because the cited statement refers to what "would" occur if Congress were "to repeal [agency-specific] statutes in favor of the procedures contained in the Vacancies Act." Firearms Pol'y Coal.'s Reply at 23 (quoting S. Rep. No. 105-250, at 17). But the Report explains that "various authorizing committees" might consider whether to repeal the different agency-specific statutes

42

in the future, and that "in any event," the FVRA will "continue to provide an alternative procedure." S. Rep. No. 105-250, at 17. In context, it is clear that the cited statement from the Report refers to the 1998 bill.

The Coalition next cites an introductory section of the Senate Report that refers to a variety of "express exceptions" to the FVRA and states that "current [agency-specific] statutes . . . are maintained." *Id.* at 2. The Coalition argues that by referring to these statutes as "exceptions," the Report suggests that the FVRA does not operate alongside agency-specific statutes. Firearms Pol'y Coal.'s Reply at 23. But this interpretation does not even comport with the Coalition's own theory, which purports to retain a role for the FVRA if and when the individuals in the AG Act's line of succession are unavailable. Regardless, this general and vague discussion is a weak basis for discounting more specific language in the same Report.

In passing, the Coalition also mentions that a footnote from a 2001 White House Counsel memorandum adopted the Coalition's interpretation. *See* Memorandum from Alberto R. Gonzales, Counsel to the President, to the Heads of Fed. Exec. Dep'ts. & Agencies & Units of the Exec. Off. of the President, Re: Agency Reporting Requirements Under the Vacancies Reform Act 2 n.2 (Mar. 21, 2001). In this context, however, as the Coalition itself acknowledges, the legal positions of the Executive Branch are not entitled to deference from this Court, and even if they were, subsequent Office of Legal Counsel opinions reached the opposite conclusion. *See* Firearms Pol'y Coal.'s Reply at 24–25.[9]

---

[9] For its part, the government places considerable weight on the history of presidential designations under the FVRA, arguing that "Presidents have consistently and explicitly invoked their FVRA authority to make acting-officer designations that would be barred if [agency]-specific statutes were read to set out exclusive, mandatory succession plans." Gov't's Opp'n in *Guedes* at 51. But the FVRA was enacted a mere two decades ago, and the government identifies only a few designations that bypassed a first assistant. *Id.* at 51–52 & n.29. "In this

43

The Coalition places the most weight on the constitutional-avoidance canon, arguing that the Court should adopt its interpretation because it is at least doubtful whether the President may constitutionally designate a non-confirmed official to serve in an acting capacity when a first assistant is available. Firearms Pol'y Coal.'s Br. at 25. The problem for the Coalition, however, is that the government's reading does not raise a "serious doubt" about the FVRA's constitutionality. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (internal quotation marks omitted). As discussed below, the constitutional legitimacy of acting officers has long been settled. And the avoidance canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* (internal quotation marks omitted). As demonstrated above, the Coalition's interpretation is foreclosed by "ordinary textual analysis." *Id.* (internal quotation marks omitted); *see also id.* at 836 ("[A] court relying on [the avoidance] canon still must *interpret* the statute, not rewrite it.").

2. *The Appointments Clause Challenge to Whitaker's Designation*

The Appointments Clause requires the President to "nominate, and by and with the Advice and Consent of the Senate, . . . appoint" all "Officers of the United States," but it permits Congress "by Law" to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

For Appointments Clause purposes, federal officials fall into three categories: (1) "principal officers," who must be appointed by the President with the advice and consent of

---

context, Congress's failure to speak up does not fairly imply that it has acquiesced in the [government's] interpretation." *SW Gen.*, 137 S. Ct. at 943 (rejecting a similar argument based on "post-enactment practice" under the FVRA).

the Senate; (2) "inferior officers," who, by default, must be appointed by the President with the advice and consent of the Senate, but whose appointment Congress may choose to vest solely in the President, department heads, or courts; and (3) "employees," who can be hired without any particular process mandated by the Appointments Clause. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 & n.3 (2018).

The Appointments Clause "is more than a matter of etiquette or protocol; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (internal quotation marks omitted). "The Framers envisioned it as 'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters from family connection, from personal attachment, or from a view to popularity.'" *SW Gen.*, 137 S. Ct. at 935 (alteration adopted) (quoting The Federalist No. 76, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). "By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Edmond*, 520 U.S. at 660.

Yet "[t]he constitutional process of Presidential appointment and Senate confirmation . . . can take time." *SW Gen.*, 137 S. Ct. at 935. And neither the President nor the Senate "may desire to see the duties of [a] vacant office go unperformed in the interim." *Id.* Thus, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions" of offices that otherwise require Senate confirmation. *Id.* Congress provided this limited authority in 1792 and has refined it in various ways through the years, including in 1998, when it enacted the FVRA. *See id.* at 935–36.

45

The Coalition argues that the Appointments Clause generally prevents the President from designating a non-Senate-confirmed official other than the first assistant to serve as an acting principal officer in the event of a vacancy. *See, e.g.*, Firearms Pol'y Coal.'s Br. at 11–12. Alternatively, the Coalition argues that the Appointments Clause at least requires an acting principal officer to be appointed as an inferior officer and that Whitaker's designation as Acting Attorney General under the FVRA did not qualify as an "appointment." *See, e.g.*, *id.* at 11. The Court considers and rejects each argument in turn.

          a.   <u>President Trump's Decision to Designate Whitaker Without Obtaining the Advice and Consent of the Senate</u>

Conveniently, both parties agree that the President may sometimes direct a person to perform the duties of a principal office temporarily without first obtaining the Senate's advice and consent. *See* Firearms Pol'y Coal.'s Reply at 12; Gov't's Opp'n in *Guedes* at 53, Dkt. 16, No. 18-cv-3083.[10] But they disagree about why, and how to reconcile this settled practice with the Appointments Clause.

The government argues that it is the limited *duration* of acting service that makes it permissible under the Appointments Clause. *See, e.g.*, Gov't's Opp'n in *Guedes* at 53. In the government's view, as long as an official performs the duties of a principal office only temporarily, in an acting capacity, the official may do so without actually becoming the principal officer. This understanding, the government argues, is reflected not only in binding Supreme Court precedent but also in the longstanding historical practice of the political branches. *Id.*

The Coalition acknowledges the same precedent and history but seeks to explain it in terms of *supervision*. *See, e.g.*, Firearms Pol'y Coal.'s Br. at 20–21. According to the Coalition,

---

[10] The parties also agree that the Office of the Attorney General is a principal office. *See* Firearms Pol'y Coal.'s Br. at 2; Gov't's Opp'n in *Guedes* at 11.

what matters is not how long the temporary service lasts but who performs it. In the Coalition's view, the Appointments Clause does not permit just any individual to serve, even temporarily, as an acting principal officer. Rather, it permits one specific person to do so: the first assistant who is generally supervised by the principal officer and whose pre-defined job responsibilities include stepping in when the principal officer becomes unavailable. *Id.* at 3. Because first assistants are supervised both before and after the principal office is vacant, the Coalition argues, they qualify as "inferior" officers whose inferior status remains unaltered even when their superior is sick or away, or has resigned or died. *Id.* at 21. It follows, according to the Coalition, that the FVRA becomes unconstitutional if and when the President uses it to displace an available first assistant and directs someone who is neither a first assistant nor a Senate-confirmed appointee to perform the duties of a principal office. *Id.* at 25.

These competing explanations lead to different results in this case because, although Whitaker's service as Acting Attorney General was temporary,[11] Whitaker was neither the first assistant to the previous Attorney General nor Senate confirmed at the time of his designation under the FVRA.

Important as this debate may be, it has long been settled by Supreme Court precedent and historical practice. Beginning with precedent, the Supreme Court has repeatedly embraced the government's view that it is the temporary nature of acting duties that permits an individual to perform them without becoming a principal officer under the Appointments Clause. The Court first addressed the constitutionality of acting service in *United States v. Eaton*, 169 U.S. 331 (1898). In *Eaton*, the "consul general" to Siam—a principal officer—had fallen ill and decided

---

[11] Whitaker's service ended on February 15, 2019 when Barr became the Attorney General. *See* 165 Cong. Rec. S1397 (daily ed. Feb. 14, 2019).

to return to America, where he expected to die. *Id.* at 331–32. To "protect the interests of the government during his absence, and until the . . . expected arrival" of his replacement, he asked a local missionary, Lewis Eaton, "to take charge of the consulate." *Id.* Less than a month before the consul general left for America, he swore Eaton in as "vice consul general," *id.* at 332, and charged him "with the duty of temporarily performing the functions of the consular office," *id.* at 343. When the consul general departed a few weeks later, Eaton took over as acting consul for a period of 310 days. *Id.* at 333–34.

In the course of ruling that Eaton was entitled to compensation for that period, the Court determined that his acting service was consistent with the Appointments Clause. *Id.* at 343–44. Specifically, the Court held that a subordinate "charged with the performance of the duty of the superior *for a limited time*, and *under special and temporary conditions*" is not "thereby transformed into the *superior and permanent* official." *Id.* at 343 (emphases added).

In reaching that conclusion, the Court relied on evidence of the prevailing historical practice. It acknowledged that the role of "vice consul" had not always been a temporary position. *Id.* at 344. In "earlier periods of the government," vice consuls "were not *subordinate* and *temporary*"—like Eaton—but were instead "*permanent* and in reality *principal* officials." *Id.* (emphases added). They were therefore appointed with the advice and consent of the Senate. *Id.* But even when "the office of vice consul was considered as an independent and separate function, requiring confirmation by the senate, where a vacancy in a consular office arose by death of the incumbent, and the duties were discharged by a person who *acted temporarily, without any appointment whatever*," the "practice prevailed of paying such officials as de facto officers." *Id.* (emphasis added).

48

The Court found this historical practice compelling and quoted at length from an opinion by Attorney General Taney on "whether the son of a deceased consul"—who had no apparent government position but had "remained in the consular office, and discharged its duties"—was entitled to compensation for his temporary service. *Id.* Taney concluded that the son "was the de facto consul for the time" and that "[t]he practice of the government sanction[ed]" paying him accordingly. *Id.* (quoting *Provision for Widows of Consuls Who Die in Office*, 2 Op. Att'y Gen. 521, 523 (1832)). After all, Taney observed, "[t]he public interest requires that the duties of the office should be discharged by some one; and where, upon the death of the consul, a person who is in possession of the papers of the consulate enters on the discharge of its duties, and fulfills them to the satisfaction of the government," there is no reason "why he should not be recognized as consul for the time he acted as such." *Id.* (quoting 2 Op. Att'y Gen. at 524). Relying on this opinion and the historical practice it reflected, the Court adopted "the theory that a vice consul is a mere subordinate official" and upheld the constitutionality of Eaton's service. *Id.*

The Coalition insists that *Eaton* is consistent with its position because the Court merely permitted a first assistant—the "vice consul"—to take on the duties of his superior. *See, e.g.*, Firearms Pol'y Coal.'s Reply at 7, 10–11, 14. But to the extent *Eaton* involved a first assistant at all, it involved one only in the most superficial and formalistic sense. Eaton was a missionary with no evident prior government experience who was sworn in as vice consul for the sole and express purpose of assuming the consul general's duties when the consul left for America less than a month later. There is no hint in the Court's decision that Eaton was ever subjected to the consul general's direction or control, or that the potential for such supervision played any role in the Court's analysis. Indeed, the Court expressly relied on Attorney General Taney's opinion approving the temporary performance of consular duties by a consul's son, who evidently was

49

*not* the vice consul and whose qualifications consisted of being physically present and "in possession of the papers." *Eaton*, 169 U.S. at 344.

To be sure, the *Eaton* Court did identify the core feature that made vice consuls inferior officers. But it was not their supervision by the consul general or their status as second in command. It was the fact that Congress had chosen to "limit" their "period of duty" and "thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word." *Id.* at 343.

The Supreme Court has since reaffirmed *Eaton*, and each time it has described *Eaton*'s holding in durational terms without ever suggesting that it is limited to first assistants. In *Morrison v. Olson*, the Court expressly weighed the "temporary" duration of the Office of Independent Counsel as a factor in assessing whether the office required Senate confirmation. 487 U.S. 654, 672 (1988). In justifying that approach, the Court cited *Eaton* and described it as approving regulations that permitted executive officials "to appoint a 'vice-consul' during the *temporary* absence of the consul." *Id.* (emphasis added). The Court went on to quote *Eaton*'s core holding that a subordinate officer who performs the duties of a principal office "for a limited time and under special and temporary conditions" is not "transformed into the superior and permanent official." *Id.* (quoting *Eaton*, 169 U.S. at 343).

And when the Court later refined the test for identifying principal officers in *Edmond*, it again cited *Eaton* favorably and described it as holding that "a vice consul charged *temporarily* with the duties of the consul" was an inferior officer. 520 U.S. at 661 (emphasis added). Although the Court clarified that, "[g]enerally speaking," the test for identifying an inferior

50

officer is "whether he has a superior," *id.* at 662, it did not disturb *Eaton*'s 99-year-old holding approving temporary, acting service during a principal office vacancy, *see id.* at 661.[12]

In short, the Supreme Court has held and subsequently reaffirmed that an official designated to perform the duties of a principal office temporarily, on an acting basis, need not undergo Senate confirmation. The Court has never suggested that such temporary service must be performed by a first assistant, if available.

This understanding, binding on this Court, is further confirmed by an unbroken string of legislative enactments. *See NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (courts "put significant weight upon historical practice" when interpreting constitutional provisions that concern "the allocation of power" between Congress and the Executive Branch). In 1792, the Second Congress authorized the President to appoint "*any person . . . at his discretion* to perform the duties" of the Secretaries of State, Treasury, or War in the event of a death, absence, or illness "until a successor be appointed, or until such absence or inability by sickness shall cease." Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 (emphasis added). Three years later, in 1795, Congress extended this authority to apply to any "vacancy" in those departments—regardless of the cause—while simultaneously limiting the duration of acting service to six months. Act of

---

[12] Individual Justices have likewise understood *Eaton* to permit temporary, acting service. In *SW General*, Justice Thomas expressed constitutional concerns with using the FVRA to accomplish effectively permanent appointments. *See* 137 S. Ct. at 946 n.1 (Thomas, J., concurring). But even in that context, he took *Eaton*'s durational holding as a given and took pains to distinguish it, concluding that there was "nothing 'special and temporary'" about the appointment in *SW General*, which had lasted "more than three years in an office limited by statute to a 4-year term." *Id.* (quoting *Eaton*, 169 U.S. at 343). Then-Judge Kavanaugh described *Eaton*'s holding even more unequivocally in *Free Enterprise Fund*, explaining that "[t]he temporary nature of the office is the . . . reason that acting heads of departments are permitted to exercise authority without Senate confirmation." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 708 n.17 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (emphasis omitted) (citing *Eaton*, 169 U.S. at 343), *aff'd in part, rev'd in part, and remanded*, 561 U.S. 477 (2010).

51

Feb. 13, 1795, ch. 21, 1 Stat. 415, 415. Notably absent from these early congressional

enactments is any limitation on whom the President could authorize to perform acting duties—

much less any hint that the President was required to choose the first assistant. This early

legislative practice, in force from President Washington's first term until the middle of the Civil

War, "provide[s] contemporaneous and weighty evidence of the Constitution's meaning." *Alden

v. Maine*, 527 U.S. 706, 743–44 (1999) (internal quotation marks omitted)); *see also Golan v.

Holder*, 565 U.S. 302, 321 (2012) ("[T]he construction placed upon the Constitution" by

members of the early Congresses, "many of whom were members of the convention which

framed [the Constitution], is of itself entitled to very great weight." (internal quotation marks

omitted)).

The Coalition minimizes these enactments by suggesting that Congress must have

assumed that the President's broad statutory discretion would be narrowed by the Constitution.

Firearms Pol'y Coal.'s Reply at 6–7. But if that is true, early courts did not get the message. In

the words of one court, "it was doubtless considered when the act of 1792 was passed that it was

expedient to allow to the President an unlimited range of selection, and hence the use of the

broad and comprehensive language of [the 1792] act." *Boyle v. United States*, 1857 WL 4155, at

\*4 (Ct. Cl. Jan. 19, 1857). This "unlimited" authority, granted at such an "early day in the

history of the federal constitution," was considered "safely . . . entrusted to [the President]" not

because it was subject to unspecified further limits under the Appointments Clause but because

the President was "in the daily exercise of higher and much more important powers" and could

therefore be trusted to fill temporary vacancies. *Id.*

Eventually, Congress did set limits on whom the President could appoint as an acting

principal. But even then, it did not require the President to choose the first assistant. In 1863,

Congress narrowed the President's options from "any person," Act of May 8, 1792, § 8, 1 Stat. at 281, to any department head or "other officer" whose "appointment is vested in the President," Act of Feb. 20, 1863, ch. 45, § 1, 12 Stat. 656, 656. Five years later, in 1868, Congress passed the Vacancies Act, which curbed the President's temporary appointment power in significant ways. *See* Act of July 23, 1868, 15 Stat. 168. For vacancies caused by death or resignation, Congress limited the term of acting service to a mere ten days. *Id.* § 3, 15 Stat. at 168. And for the first time, Congress provided that the first assistant would automatically perform the duties of the department head in the event of a vacancy. *See id.* § 1. But like its predecessors, the Vacancies Act still authorized the President to choose someone other than the first assistant if he wished, specifically, any department head or other Senate-confirmed officer. *Id.* § 3.

This new pool of already-confirmed candidates may have been narrow, but the Coalition's theory cannot explain it. Although an officer's prior appointment may have been important to Congress, it would have been irrelevant for purposes of the Appointments Clause unless the officer's new acting duties were somehow "germane to the office[] already held." *Shoemaker v. United States*, 147 U.S. 282, 301 (1893). That would plainly not be the case for department heads tapped to lead other, unrelated departments, which the Vacancies Act expressly allowed. *See* Act of July 23, 1868, § 3, 15 Stat. at 168. Nor could the President's authority to direct department heads to lead other departments be explained in terms of supervision or pre-existing duties. By definition, a department head is not supervised by anyone but the President. And the remote possibility of filling in for a fellow principal officer at the President's request cannot plausibly be considered one of the routine responsibilities of leading a department.

53

Over the next 130 years, Congress made minor adjustments to the President's temporary appointment authority, for the most part expanding the length of acting service. *See, e.g.*, Act of Feb. 6, 1891, ch. 113, 26 Stat. 733, 733 (extending ten-day limit to thirty days); Presidential Transitions Effectiveness Act, Pub. L. No. 100-398, § 7(b), 102 Stat 985, 988 (1988) (extending limit to 120 days). Finally, in 1998, Congress passed the FVRA, which explicitly authorized the President to designate certain inferior officers and senior employees to serve as acting principal officers. *See* 5 U.S.C. 3345(a)(3).

Thus, from the time of the founding to today, Congress has continuously authorized the President to direct persons who are not first assistants and who lack any constitutionally relevant Senate confirmation to perform the duties of a principal office temporarily on an acting basis. This unbroken legislative practice confirms *Eaton*'s holding that it is the "special and temporary conditions" of acting service, *Eaton*, 169 U.S. at 343—and not the identity of the acting official—that makes such service constitutional. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 327–28 (1936) ("A legislative practice . . . marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice.").

This understanding is further confirmed by the longstanding practice of the Executive Branch. *See The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions . . . ."). As both parties acknowledge, a practice emerged early on in our Nation's history of appointing a non-Senate confirmed "chief clerk" to serve as the Acting Secretary—or Secretary "ad interim"—when the principal Office of Secretary had become vacant. Gov't's Opp'n in *Guedes* at 56–57; Firearms Pol'y Coal.'s Reply at 12; *see also Designating an Acting Attorney*

*General*, 42 Op. Off. Legal Counsel ——, 2018 WL 6131923, at *8 (2018) (reporting over 100 instances of chief clerks serving as acting principal officers from 1809 to 1860).

The Coalition argues that this practice supports its theory because chief clerks were simply the historical analogue to today's first assistants. *See, e.g.*, Firearms Pol'y Coal.'s Reply at 12. But for chief clerks to have functioned as the Coalition maintains first assistants do, it would have to be true that they stepped in for their superiors automatically and subject to a general form of continual supervision. *See* Firearms Pol'y Coal.'s Br. at 3–4. That description may have been true of some clerks, *see* Firearms Pol'y Coal.'s Reply at 16 (identifying two statutes authorizing the chief clerk to fill in for the principal officer automatically in the event of a vacancy), but it was not true of all of them, or even most of them, *see* 1 *Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors* 575–81 (1868) (hereinafter *Trial of Andrew Johnson*) (listing dozens of examples of Presidents "appoint[ing]," "authoriz[ing]," or "empower[ing]" chief clerks to perform the duties of a Secretary during a vacancy).

More importantly, the Coalition's account contrasts sharply with how the practice of appointing chief clerks was described and justified at the time. When chief clerks sought compensation for their acting service in federal court, the resulting decisions made clear that the position of Acting Secretary was viewed neither as a continuation of the chief clerk's duties as chief clerk nor as an appointment to become the Secretary, but as a unique and temporary office that arose solely from the President's exercise of discretionary authority under the relevant vacancy statute. *See Boyle*, 1857 WL 4155, at *3–4. As the Court of Federal Claims put it in *Boyle*, "[t]he office of Secretary ad interim" was "a distinct and independent office in itself,

55

when it [wa]s conferred on the chief clerk," and was "so conferred not because it pertain[ed] to him ex officio, but because the President, in the exercise of his discretion, s[aw] fit to appoint him." *Id.* at *4. Thus, while the court explained that the Secretary ad interim "*may* be the chief clerk," he could also be "*any other person*, at the discretion of the President." *Id.* (emphases added). Although "[e]xperience ha[d] taught" that "this discretion" could "be very judiciously exercised by conferring the appointment on the chief clerk," the "broad terms of the [1792] act would fully warrant the President in selecting *any other person*; and it would, moreover, be his duty to do so, if, in his discretion, he should deem it most expedient." *Id.* (emphasis added).

The reason these discretionary appointments were understood not to violate the Appointments Clause was plain: "[t]he office of Secretary ad interim [wa]s *temporary in its character*, whilst that of Secretary [wa]s of a *more permanent nature*." *Id.* at *3 (emphases added). As a result, "the one" was "considered inferior to the other," and did not require the advice and consent of the Senate. *Id.*

Thus, while it is true that Presidents often directed the chief clerk to serve in the event of a vacancy, Presidents made that decision voluntarily, as an exercise of statutory discretion, and not because the chief clerks' existing duties made such service automatic. Moreover, the contemporaneous justification for this accepted practice was found not in the role of chief clerk but in the role of Acting Secretary and its temporary nature.

Given this understanding, it is no surprise that Presidents frequently looked beyond chief clerks to fill temporary vacancies. Indeed, they regularly designated other cabinet members and department heads as acting principal officers. *See Designating an Acting Attorney General*, 2018 WL 6131923, at *8 (reporting that during the Washington, Adams, and Jefferson Administrations, other cabinet members and Chief Justice John Marshall "were used as

56

temporary or 'ad interim' officials"); Letter from James Buchanan, President of the United States, to the Senate of the United States (Jan. 15, 1862), in 5 *A Compilation of the Messages and Papers of the Presidents 1789–1902*, at 3191 (James D. Richardson ed., 1902) (describing Presidents' frequent use of department heads, among others, to fill vacancies in other departments); *Trial of Andrew Johnson*, *supra*, at 575–81 (listing over twenty instances of department heads serving as acting heads of other departments). And again, although these officials had been previously confirmed, their prior confirmations would have been irrelevant for constitutional purposes unless their prior duties were somehow germane to the duties of their new offices. *See Shoemaker*, 147 U.S. at 301 (an existing appointment may authorize additional duties only if those duties are "germane" to the office already held).

In addition, on at least three occasions, a President—each time, President Jackson—authorized someone with no prior government role whatsoever to serve as an acting principal officer. On his first day in office, President Jackson directed James A. Hamilton to "take charge of the Department of State" until then-Governor Martin Van Buren "arrive[d] in the city." *Trial of Andrew Johnson*, *supra*, at 575; *see also Biographical Directory of the American Congress, 1774–1961*, at 16 (1961). And on two other occasions, he directed William B. Lewis to serve as Acting Secretary of War. *See Trial of Andrew Johnson*, *supra*, at 575. Although these examples are few, and limited to a single administration, they comport with the understanding articulated in *Boyle* that it is the temporary nature of an acting appointment—and not the former position of the appointee—that makes it unnecessary for the President to obtain the advice and consent of the Senate before filling a vacancy with an acting official.[13]

---

[13] There appear to be other examples where an individual who was neither the chief clerk nor a Senate-confirmed official stepped in as an acting principal officer. *See Eaton*, 169 U.S. at 344

57

To be sure, the Coalition's position is not without its virtues. For one, it represents an attempt to reconcile *Eaton*'s focus on duration with the now-dominant criterion of supervision. *See Edmond*, 520 U.S. at 662 ("Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President."); *see also Free Enter. Fund*, 537 F.3d at 708 n.17 (Kavanaugh, J., dissenting) (explaining that, "for offices that are not temporary," *Edmond* "controls the inferior-officer Appointments Clause analysis," and noting that *Edmond* "expressly purport[ed] to set forth a definitive test for inferior officer status governing future cases"). For another, it offers a clear constitutional boundary that could minimize manipulation by the Executive Branch.

But despite these virtues, the Coalition's theory suffers from fatal flaws. *First*, as already discussed, it cannot account for the Supreme Court's holding in *Eaton*, an unbroken line of congressional enactments, or the longstanding practice of the Executive Branch (as understood at the time).

*Second*, it rests on a weak conceptual foundation. Doctrinally, it relies on the premise that first assistants are "generally" supervised. *See* Firearm Pol'y Coal.'s Br. at 4, 21. By that, the Coalition appears to mean that they are supervised before and after they serve as acting principal officers.[14] But that is just another way of stating that they are *not* supervised during the

---

(describing a consul's son who served temporarily as consul when his father passed); *Boyle*, 1857 WL 4155, at *5 (describing a "navy agent" who served temporarily as an acting "purser"); Firearms Pol'y Coal.'s Br. at 26 n.2 (acknowledging "several instances, when the first assistant was apparently unavailable," in which "the President designated a non-confirmed subordinate to the first assistant or other senior department officer without objection").

[14] Of course, Whitaker himself was supervised both before and after his designation, as Chief of Staff to the Attorney General and as Senior Counselor in the Office of the Associate Attorney General. *See Whitaker Remains at Justice Dept. but in Different Role*, Wash. Post (Feb. 15, 2019), https://www.washingtonpost.com/politics/whitaker-remains-at-justice-dept-but-in-different-role/2019/02/15/a332f0da-3142-11e9-8781-763619f12cb4_story.html.

58

one window that counts: when carrying out their acting appointment. Although a loose form of ongoing supervision might be said to apply when the principal officer is merely ill or absent, surely any such supervision ceases when the principal officer dies or resigns. Perhaps in these situations the next principal is able to exercise a form of retroactive supervision by ratifying or rejecting the acting official's actions after the fact. But if such anticipated, backward-looking supervision could cure a first assistant's temporary service, it could cure anyone's. It therefore provides no basis for distinguishing first assistants from any other person approved for acting service under the FVRA.

*Third*, the Coalition's position admits of exceptions that lack a coherent or persuasive justification. For example, the Coalition appears to accept that the President can displace an available first assistant with any Senate-confirmed official, *see, e.g.*, *id.* at 5, but it does not explain how that can be the case when the officer's previous position was not "germane" to his new, acting duties, *see Shoemaker*, 147 U.S. at 301 (a prior appointment cannot justify the performance of new responsibilities "dissimilar to, or outside the sphere of" an officer's previous "official duties").[15] In addition, the Coalition appears to suggest that the President may ignore the Appointments Clause altogether if the first assistant is unavailable. *See, e.g.*, Firearms Pol'y Coal.'s Br. at 4, 12, 25–26 n.2. But, again, it is not clear why. If the legal fiction justifying the first assistant's temporary service is that the temporary service is merely a continuation of the first assistant's existing inferior office, *see id.* at 3–4, that justification vanishes once the President chooses some other subordinate in the same department whose predefined job

---

[15] If the answer is merely the functional consideration that requiring a previous confirmation ensures some quality control by the Senate, then it is not clear why Whitaker's previous appointment as a United States Attorney would not suffice. *See* 150 Cong. Rec. S6467 (daily ed. Jun. 3, 2004).

responsibilities cannot realistically be stretched to include stepping in as the acting principal in the event of a vacancy. The Coalition suggests that the unavailability of the first assistant triggers an "exigency" that excuses what would otherwise be a constitutional violation, *see id.* at 25–26 n.2, but the Court is hesitant to embrace a freestanding "exigency" exception with no basis in the constitutional text.[16]

The Coalition insists that adopting the government's interpretation will wreak havoc on the Separation of Powers, *see, e.g.*, *id.* at 1–2, but the Court is not persuaded. Congress has set limits on the President's temporary appointment authority, *see* 5 U.S.C. §§ 3345, 3346, and can expand those limits as it sees fit, *see, e.g.*, Act of July 23, 1868, § 3, 15 Stat. at 168 (imposing a ten-day limit on acting appointments and limiting the President's appointment authority to officials already serving in a Senate-confirmed role). Moreover, the "special and temporary conditions" that *Eaton* requires are no mere formality. 169 U.S. at 343. At some point, courts can and must play a role in policing "acting" appointments that are effectively permanent. *See SW Gen.*, 137 S. Ct. at 946 n.1 (Thomas, J., concurring) (explaining that a three-year appointment to an office with a four-year term was not "special and temporary" under *Eaton* (internal quotation marks omitted)). This case, however, does not concern the pretextual use of

---

[16] This "exigency" exception also appears inconsistent with the Coalition's separate argument that an acting principal officer must at least be an inferior officer and not a mere employee. *See* Firearms Pol'y Coal.'s Br. at 25–26 n.2. The Coalition cites with approval examples of the President designating "a non-confirmed subordinate to the first assistant" and of a consul's son taking charge of the consulate upon his father's death. *Id.* at 26 n.2. But the Coalition does not address the possibility that these scenarios involved individuals who were not officers—and, in the case of the consul's son, not even an *employee*—serving in what the Coalition considers a principal office. As far as the Court can discern, the Coalition's position is that all constitutional bets are off as soon as the first assistant is unavailable, both at the employee/officer boundary and the inferior/principal officer boundary.

the "temporary" label to circumvent the Senate's advice and consent role, and the Coalition has not argued otherwise.

At any rate, the constitutional rule was laid down in *Eaton* and has since been reaffirmed: an official who is "charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions," need not be appointed by the President with the advice and consent of the Senate. *Eaton*, 169 U.S. at 343; *see also Morrison*, 487 U.S. at 672; *Edmond*, 520 U.S. at 661. Whitaker's temporary service as the Acting Attorney General satisfies that test. He served as Acting Attorney General for a mere 100 days during the special circumstance of a vacancy triggered by the resignation of Attorney General Sessions. As a result, he did not become a principal officer under the Appointments Clause.

      b.  Whitaker's Appointment Under the FVRA

The Coalition makes two additional constitutional arguments based on the implicit premise that the Constitution requires the Acting Attorney General to be at least an inferior officer, rather than an employee. First, it argues that the text of the FVRA authorizes the President to "direct" an individual to serve in an acting capacity but does not authorize the President to "appoint" that individual to become an inferior officer. Firearms Pol'y Coal.'s Br. at 17–19.[17] Second, it argues that an employee can never be "appointed" to serve in an acting

---

[17] Although the Coalition cites the word "direct" in § 3345(a)(3) in its motion, *see* Firearms Pol'y Coal.'s Br. at 18–19, it appears to shift its focus to the word "designates" in § 3347(a)(1)(b) in its reply, *see* Firearms Pol'y Coal.'s Reply at 5. The Court assumes that the Coalition intended to continue to argue that the word "direct" creates the constitutional problem. In any event, the Court doubts the difference matters since the terms are synonymous in this context. *See SW Gen.*, 137 S. Ct. at 946 (Thomas, J., concurring) ("When the President 'directs' a person to serve as an acting officer, he is 'assigning' or 'designat[ing]' that person to serve as an officer." (alterations adopted)).

capacity because an acting position is temporary and an officer must hold a permanent position. *Id.* at 19–20.  Neither argument is persuasive.

Assuming without deciding that Whitaker was an employee before his designation and that an employee's service as Acting Attorney General first requires an appointment, the FVRA authorized such an appointment and the President carried it out.  As Justice Thomas recently explained, at the time of the framing, "the verb 'appoint' meant 'to establish anything by decree' or 'to allot, assign, or designate.'"  *SW Gen.*, 137 S. Ct. at 946 (Thomas, J., concurring) (alterations adopted and internal citations omitted).  Therefore, "[w]hen the President 'directs' someone to serve as an officer pursuant to the FVRA, he is 'appointing' that person as an 'officer of the United States' within the meaning of the Appointments Clause."  *Id.* (alterations adopted).

The Supreme Court's decision in *Weiss* is not to the contrary.  *See Weiss v. United States*, 510 U.S. 163 (1994).  In *Weiss*, the Court considered whether military judges assigned to serve as judges by various Judge Advocate Generals under the Uniform Code of Military Justice (UCMJ) were lawfully appointed.  The Court reasoned that the military judges involved were "commissioned officers when they were assigned to serve as judges," so "they had already been appointed by the President with the advice and consent of the Senate."  *Id.* at 170.  It then rejected the petitioners' arguments that "either Congress ha[d], by implication, required a second appointment, or the Appointments Clause, by constitutional command, require[d] one."  *Id.*  In the course of rejecting the first argument, the Court compared other statutes governing the appointment of military officers to the sections of the UCMJ relating to military judges.  It stressed that in the first set of statutes, Congress used the term "appoint," but in "[t]he sections of the UCMJ relating to military judges," it "sp[oke] explicitly and exclusively in terms of 'detail' or 'assign'; nowhere in these sections [wa]s mention made of a separate appointment."  *Id.* at

172. "This difference negate[d] any permissible inference that Congress intended that military judges should receive a second appointment, but in a fit of absentmindedness forgot to say so." *Id.*

The Coalition seizes on this case to argue that the FVRA does not permit the appointment of an acting official because Congress did not use the word "appoint" in the FVRA. *See* Firearms Pol'y Coal.'s Br. at 18–19; Firearms Pol'y Coal.'s Reply at 5. But the discussion in *Weiss* turned on the specific text of various military statutes and placed particular weight on the use of the words "assigned" and "detailed," neither of which are at issue here. Moreover, the question in *Weiss* was whether Congress intended to impose an additional appointment requirement on military judges, not whether a statute designed to permit such appointments failed because it lacked certain magic words. Congress clearly contemplated that the FVRA would confer appointment authority on the President, and its use of the word "direct" was sufficient to confer that authority.

The Coalition's separate argument that Whitaker cannot be an inferior officer because his duties are only temporary fails for a more elementary reason: if the temporary nature of Whitaker's duties prevented him from becoming an officer, then the temporary nature of his duties also prevented him from needing an appointment at all—under the FVRA or otherwise. The Coalition relies primarily on *Lucia*, in which the Supreme Court explained that "an individual must occupy a 'continuing' position established by law to qualify as an officer." *Lucia*, 138 S. Ct. at 2051. But that decision merely established who *must* be appointed by a President, court, or department head; not who *may* be. In any event, Eaton makes clear that the temporary nature of acting duties cures any constitutional problem; it does not create one. To the extent the Coalition contends that officers must hold permanent positions and that there is no

63

exception for acting principal officers, then acting officials are not officers and Whitaker did not need to be appointed at all. *Cf. Peters*, 2018 WL 6313534, at *4 n.11 ("[T]he Supreme Court's delineation of constitutional 'Officer' characteristics suggests that an 'Acting' official could be considered a 'lesser functionar[y]' employee for which 'the Appointments Clause cares not a whit about who named them.'" (quoting *Lucia*, 138 S. Ct. at 2051)). For these reasons, the Coalition is unlikely to succeed on these final challenges to the bump stock rule.

## CONCLUSION

Because the plaintiffs have not met their burden of showing entitlement to a preliminary injunction, the Court denies their motions.

DABNEY L. FRIEDRICH
United States District Judge

February 25, 2019