```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3    DAMIEN GUEDES, et al.,            .
                                        .
 4             Plaintiffs,              .
                                        .  Case Number 18-CV-2988
 5        vs.                           .
                                        .
 6    BUREAU OF ALCOHOL, TOBACCO,       .
      FIREARMS, AND EXPLOSIVES,         .
 7    et al.,                           .
                                        .
 8             Defendants.              .  Washington, D.C.
      - - - - - - - - - - - - - - - - -    February 6, 2019
 9    FIREARMS POLICY COALITION, INC., .   2:03 p.m.
                                        .
10             Plaintiff,               .
                                        .
11        vs.                           .  Case Number 18-CV-3083
                                        .
12    MATTHEW WHITAKER, et al.,         .
                                        .
13             Defendants.              .
      - - - - - - - - - - - - - - - - - -
14

15         TRANSCRIPT OF PRELIMINARY INJUNCTION MOTION HEARING
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
16                   UNITED STATES DISTRICT JUDGE

17
      APPEARANCES:
18
      For the Guedes Plaintiffs:    JOSHUA PRINCE, ESQ.
19                                  ADAM KRAUT, ESQ.
                                    Prince Law Offices, P.C.
20                                  646 Lenape Road
                                    Bechtelsville, Pennsylvania 19595
21

22    For Plaintiff FPC:           THOMAS GOLDSTEIN, ESQ.
                                   DANIEL WOOFTER, ESQ.
23                                 Goldstein & Russell P.C.
                                   7475 Wisconsin Avenue
24                                 Suite 850
                                   Washington, D.C. 20814
25        -- continued --
```

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendants:          ERIC SOSKIN, ESQ.
                                    U.S. Department of Justice
 3                                  Civil Division, Federal Programs
                                       Branch
 4                                  P.O. Box 883
                                    Washington, D.C. 20044
 5
                                    HASHIM MOOPPAN, ESQ.
 6                                  U.S. Department of Justice
                                    950 Pennsylvania Avenue Northwest
 7                                  Washington, D.C. 20530

 8

 9     Official Court Reporter:     SARA A. WICK, RPR, CRR
                                    U.S. Courthouse, Room 4704-B
10                                  333 Constitution Avenue Northwest
                                    Washington, D.C. 20001
11                                  202-354-3284

12

13     Proceedings recorded by stenotype shorthand.
       Transcript produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           (Call to order of the court.)

3               THE COURTROOM DEPUTY:  Civil Action 18-2988, Damien

4    Guedes, et al., versus Bureau of Alcohol, Tobacco, Firearms &

5    Explosives, et al.

6           Counsel, please come forward and identify yourselves for

7    the Court.

8               MR. KRAUT:  Good afternoon, your Honor.  My name is

9    Adam Kraut, and I represent the plaintiffs in the Guedes matter.

10              THE COURT:  Good afternoon, Mr. Kraut.

11              MR. PRINCE:  Good afternoon, your Honor.  I am

12   attorney Joshua Prince, and I also represent the plaintiffs in

13   the Guedes matter.

14              THE COURT:  Good afternoon, Mr. Prince.

15              MR. GOLDSTEIN:  Good afternoon, Judge.  My name is Tom

16   Goldstein.  I represent the plaintiff in the FPC matter that has

17   been consolidated.  I am joined by Daniel Woofter.

18              THE COURT:  Thank you, Mr. Goldstein.

19              MR. SOSKIN:  Good afternoon, your Honor.  Eric Soskin

20   with the Department of Justice.  I represent the defendants in

21   both matters.  With me at counsel table is John Tyler, Caesar

22   Lopez-Morales, and Mr. Hashim Mooppan, who will be addressing

23   the matters in the Firearms Policy Coalition case.  I will be

24   addressing matters in the Guedes case.

25              THE COURT:  Thank you very much.

1          We are here for argument on the plaintiffs' motions for

2     preliminary injunction to enjoin the final rule on bump-stock

3     devices that the Department of Justice published on December 26

4     of 2018.

5          I previously consolidated these cases involving the Guedes

6     and Firearms Policy Coalition plaintiffs.  As the parties know,

7     the Condrea case, Case Number 18-3086, was recently transferred

8     to me from Judge Contreras.  It includes related claims and a

9     motion for preliminary injunction.  Briefing on the preliminary

10    injunction motion is not yet complete, and I have not yet

11    determined whether or when I will hear argument in that case.

12         But I would like to discuss, after I've heard argument on

13    the motions, whether it makes sense to consolidate all of these

14    cases.  Although I know the Condrea plaintiffs are different

15    than those here, many of the issues raised in the cases are the

16    same or similar to those raised here.  So at the conclusion of

17    today's hearing, I will hear from counsel on both sides on that

18    issue.

19         And as for today's argument, I understand that attorneys

20    for the plaintiffs would like to divide the issues, and it

21    sounds like the defense as well.  I am fine with that.  We have

22    a lot of issues to cover here today.  I am not going to set firm

23    time limits, but do understand that court staff does have

24    obligations.  So we can't be here all night, unfortunately.

25         But here's how I would like to structure the order of

1     arguments.  First, I would like to focus on the alleged APA

2     violations, and I will start with the argument that ATF exceeded

3     its statutory authority by promulgating the new bump-stock rule.

4     After that, I would like to hear argument on the plaintiffs'

5     arbitrary and capricious challenge.  I understand that attorneys

6     may be arguing separately the same issues, and I will just -- I

7     hope you've divided it so you are not covering the same ground,

8     but I will give you the chance, to the extent two attorneys are

9     arguing the same issue, to do so.

10          All right.  After we've done that, I will hear argument on

11    the Whitaker appointment.  And I will also give the parties a

12    few minutes at the end to address any other issues that you

13    would like to raise before me.  There will be a lot to cover.

14    I'm happy to take a break at some point if the parties like.

15          So with that, who will be arguing first for the plaintiffs

16    on the APA challenge to ATF's interpretation of the statutory

17    definition of "machine guns" and Section 5845 of the National

18    Firearms Act?

19               MR. KRAUT:  That would be myself, your Honor.

20               THE COURT:  And you are Mr. Kraut?

21               MR. KRAUT:  Yes, your Honor.

22               THE COURT:  Mr. Kraut, let me just ask you at the

23    outset, do you agree with me that in determining what the

24    meaning of the statutory terms such as "automatically"

25    and "single function" is, that I should look at the ordinary

1    meaning at the time the National Firearms Act was enacted, which

2    is 1934, I believe?

3              MR. KRAUT:  Yes, your Honor, and that was one of the

4    points I was planning on making.

5              THE COURT:  All right.

6              MR. KRAUT:  So as we are aware, we are looking at

7    ATF's interpretation of a statutory term that was adopted by

8    Congress in 1934.  There's a lot of case law that would suggest

9    that ATF is barred from making that kind of interpretation,

10   which they wish to do so.  The Supreme Court said that it's a

11   core administrative law principle that an agency cannot rewrite

12   a clear, statutorily defined term.  So when we have the

13   term "machine gun" the way Congress enacted it and defined it,

14   they said "the term machine gun means."  And the Supreme Court

15   has also said that as a rule, when a definition includes the

16   term "means," it excludes any meaning that's not explicitly

17   stated.

18       So when we are looking at this and we are looking at it

19   under the National Firearms Act, the Gun Control Act that was

20   later passed points back to that same definition found in the

21   NFA.  So we will just talk about the NFA, if that's okay with

22   your Honor.

23              THE COURT:  Sure.  But you are not arguing that ATF

24   doesn't have the authority to define terms within that

25   definition that are not defined by Congress?

1          MR. KRAUT:  I would submit to the Court that they

2     don't have the authority to define clearly -- terms that have

3     clear meaning, such as the term "automatically," such as the

4     term "single function of the trigger."  And we can look at

5     things such as the legislative debate for the National Firearms

6     Act to get an idea as to what Congress was intending, as well as

7     definitions, as you had brought up earlier, in the dictionary at

8     the time in which it was adopted.

9          THE COURT:  But certainly, bump-stock devices did not

10    exist back then; right?

11         MR. KRAUT:  You are correct, your Honor.  No, they did

12    not.

13         THE COURT:  So Congress had no idea when it was using

14    the terms "automatically" and "single function" that it would be

15    applied some day to bump-stock devices of the specific nature at

16    issue here.

17         MR. KRAUT:  I would agree that Congress did not have

18    the foresight to think about what happened in the future as far

19    as new inventions.  Having said that, though, there's a number

20    of instances where that holds true.  And there is actually a

21    quote I have here from a Supreme Court case that was decided

22    last year which says that "Congress alone has the institutional

23    competence, democratic legitimacy, and, most importantly, the

24    constitutional authority to revise statutes in light of new

25    social problems and preferences, and until it exercises that

1      power, the people may rely on the original meaning of the

2      written law."

3              THE COURT:  So was the Eleventh Circuit incorrect in

4      *Akins* when it deferred to ATF's interpretation in that case?

5              MR. KRAUT:  We would argue that we're not happy with

6      that decision.  However, the Eleventh Circuit ruled the way it

7      did, and I would think if we're going to go down that rabbit

8      hole as to the Akins Accelerator versus a bump stock, if we're

9      going to compare the two and accept that for purposes of this

10     discussion the Eleventh Circuit argument -- or decision, rather,

11     is correct, then there is a very clearly delineated difference

12     between the two devices.

13             THE COURT:  I know.  But for the larger point on

14     whether Congress -- whether ATF can define terms in the Act that

15     Congress hasn't specifically, it seems like the Eleventh Circuit

16     deferred to ATF's interpretation.  It seems like other courts

17     have done so in different contexts involving business premises

18     and other terms that are in the Act.

19         So I am just pushing back a little bit on your argument

20     that ATF doesn't have the authority to shed further light on

21     these terms that do have obvious meanings based on dictionary

22     definitions, but yet, the way they're applied in certain

23     contexts like here, there's some ambiguity.  And does ATF not

24     have the ability to further define the words in the definition

25     that Congress enacted?

1          MR. KRAUT:  Sure.  And I would think to that point,

2     there comes a limit.  If we're going to agree that ATF does have

3     the authority to define terms within the meaning of a defined

4     term by Congress, so in the term "machine gun," if we're going

5     to talk about "automatically" and "single function of the

6     trigger," I would think that there comes a limit to the point of

7     where we've gone so far past the intent of "automatically" or

8     "single function of the trigger" that now we are outside the

9     realm of ATF's authority to actually define those terms.

10        And I think that's what's happening in this instance.

11    That's what I would submit to the Court anyway, that they've

12    exceeded that authority that they may have.

13         THE COURT:  All right.  Do you disagree with ATF's

14    definition of "single function" as single pull?  Is that an

15    argument you are making, or are you just disagreeing with

16    whether there's more than a single pull in this case?

17         MR. KRAUT:  Our argument to that point is that there

18    is more than a single function of the trigger involved in the

19    operation of a bump stock.  So it puts it outside of that.

20        The easiest example that I could explain it with would

21    be -- and I believe it's Exhibit 26.  There's a video that was

22    submitted that shows a M16, so an automatic machine -- a machine

23    gun being utilized, and the individual shoots it with one hand.

24    And in that video -- and I have the time stamp here.  It's 19

25    seconds to about 42 seconds in that video.  You will see that

1    the individual pulls the trigger to the rear, and the gun fires

2    until it's exhausted all of its ammunition.

3         Alternatively, if you look at the video that we submitted,

4    which was the video that shows the operation of a bump stock in

5    slow motion from a couple different angles as well as just

6    regular speed, the best I can compare it to in that video would

7    be the second test, if you will, the one in the middle, and you

8    can find that from 1:41 to 3:13 in there.

9         That one was fired with the stock unlocked so that it would

10   slide freely on that buffer tube.  And you will notice in the

11   video, it's fired one-handed, and when the trigger is pulled to

12   the rear once, it fires one round, and that's it.

13        So if we are going to go down that rabbit hole as to

14   "automatically," it doesn't function in the same manner as a

15   machine gun.

16             THE COURT:  Okay.  Let me back up.  On ATF's

17   definition of "single function of the trigger," ATF has defined

18   it to mean a single pull of the trigger.

19             MR. KRAUT:  Correct.

20             THE COURT:  And I think other courts have done so

21   similarly.  Do you disagree with that definition?

22             MR. KRAUT:  No, I would agree with that.  A single

23   function equates to a single pull.

24        Likewise, in their final rule, for that matter, they

25   delineated the use of other devices out there known as binary

1    triggers, that a single function pulling it to the rear fires a
2    round, releasing it fires a separate round, and they have said
3    very clearly in the final rule that each of those is a separate
4    function of the trigger.  So you have two single functions
5    occurring in that instance.
6         THE COURT:  And back just to pure definitions, not the
7    way in which they're applied here --
8         MR. KRAUT:  Yes.
9         THE COURT:  -- but do you disagree with ATF's
10   definition of "automatically," which it defines to mean the
11   result of self-acting or self-regulating mechanism that allows
12   the firing of multiple rounds through a single function of the
13   trigger?
14        MR. KRAUT:  If we are talking about it, just to make
15   sure I understand, not as applied to this?
16        THE COURT:  Not as applied, no.
17        MR. KRAUT:  Then yes, I would give you that.
18        THE COURT:  All right.  Well, in defining "function,"
19   do you think it's reasonable for ATF to look at the actions of
20   the shooter as opposed to the mechanical function of the gun?
21        MR. KRAUT:  I don't.  Again, if we go back to the
22   definition of "machine gun" as adopted by Congress, it's
23   strictly in relation to the firearm or its components.
24        THE COURT:  But once you defined a single function as
25   a single pull, aren't we looking at it from the perspective of a

1    shooter as opposed to the mechanical functioning of the gun?

2          MR. KRAUT:  I suppose you could argue that, your

3    Honor, but at the same token, if we are looking at a single

4    function when we're looking at the mechanics of the operation of

5    how the actual device works, if you remove the shooter from the

6    equation and you just say that when the trigger is, you know,

7    pulled and it starts the initiation of the firing sequence, what

8    happens after that.

9        So I don't know if I would agree with you on that

10   particular point.  I think there is a delineated difference.

11          THE COURT:  Okay.  Go ahead.

12          MR. KRAUT:  Okay.  In that same vein, since we've kind

13   of talked about the definition of a "machine gun" here, there's

14   a couple other points that I would like to make.  I think it

15   makes sense for us to talk about the definition of a

16   "semiautomatic rifle," which is also found in the Gun Control

17   Act.  The way Congress defined that was any repeating rifle

18   which utilizes a portion of the energy of firing a cartridge to

19   extract the fired cartridge case, chamber the next round, and

20   which requires a separate pull of the trigger to fire each

21   cartridge.

22       And again, going back to the operation of a bump stock, the

23   video we did very clearly shows that you pull the trigger, it

24   fires one round.  It ejects the case, chambers another round,

25   and until that trigger is pulled again, nothing happens.

1    So if we accept the ATF's definition as they're proposing

2    it, now we run into the issue, well, are they eviscerating what

3    a semiautomatic firearm is under the Gun Control Act.  And I

4    think that is something that the Court should consider when it

5    looks at this.

6         THE COURT:  All right.  But is the trigger pulled in

7    the sense that the shooter consciously pulls it, or is it simply

8    bumping off the back of the finger that's setting on the ledge

9    of the bump stock?

10        MR. KRAUT:  That's a fair question.  I would think --

11   I guess it would -- if you really had to get into the details,

12   it would define what you mean by "pull" as to how the individual

13   shooter is interacting with the firearm itself.  I'm not sure I

14   have a good answer for you there, your Honor.

15        THE COURT:  Okay.

16        MR. KRAUT:  The other point, then, or a couple other

17   points would be simply that the government, the way they've now

18   rewritten the definition, they've -- obviously, they've talked

19   about "automatically," "single function of the trigger," but

20   they also explicitly put in there that now bump-stock-type

21   devices are covered under this definition of "machine gun."  And

22   I think what that indicates is that the definition of "machine

23   gun" didn't previously encompass bump stocks, because now you

24   have to explicitly say that.

25        Meanwhile, you have other decisions such as the Akins

1  Accelerator, for instance, out there, where the courts and even

2  the agency was able to just take the definition as it existed

3  and say that it applied.

4      So I think by delineating that it wasn't there or by adding

5  it, they're kind of in some way admitting that it wasn't covered

6  under that prior definition.

7          THE COURT:  But do you -- are you arguing that it's

8  inappropriate for ATF to go back to the actual language of the

9  statute and the words in the definition of "machine gun" and

10  actually try to determine what those terms mean as opposed to as

11  they did historically?  They had determinations such as what the

12  Akins Accelerator -- initially, they determined there was a

13  distinction because it had a spring or a mechanism inside.

14          MR. KRAUT:  Yes, your Honor.

15          THE COURT:  So one could argue that the approach that

16  they used this round and actually looking at the words Congress

17  enacted would be the more appropriate role, could you not, for

18  ATF to look at the actual words and try to define those words

19  and then apply it to the mechanism rather than creating --

20          MR. KRAUT:  I would agree with you to a certain

21  extent.  Again, I think it goes back to what we discussed

22  earlier as to where that line gets blurred and it's gone too

23  far.  If we are going back to self-regulating or self-acting

24  mechanism, I think the very clear difference between a bump

25  stock and an Akins Accelerator, for instance, is that the Akins

1    had a spring, and it didn't -- you would pull it to the rear,

2    the trigger to the rear, and it would do its own thing.  Where

3    you could point to, okay, the spring is acting as a

4    self-regulating mechanism or self-acting mechanism, rather, you

5    do the same type of thing with a bump stock, and you get a

6    single round fired.

7        So again, I think you get to a threshold as to it's a step

8    too far.

9            THE COURT:  Okay.  So you would agree that some degree

10   of manual input does not negate the automatic nature of an item

11   like a firearm; right?  Obviously, you have to pull the trigger;

12   right?  There's always some degree of manual input, and it

13   doesn't happen by itself.  And the question is, how much manual

14   input is too much manual input?

15       Here, you have to pull the trigger.  You have the trigger

16   finger sitting on a ledge on the bump stock.  That, to me, seems

17   akin to what happened with the Akins Accelerator.  You've got

18   that manual input that seems pretty close.

19       The real distinction here, of course, is that the

20   non-trigger arm is putting outward pressure on the barrel, and

21   that's the real distinction here; correct?

22           MR. KRAUT:  I would submit to you that if we are

23   talking about a person's input, it's pulling the trigger one

24   time, and that's the extent of it, especially when we are

25   looking at machine guns as they were -- especially in 1934 as

they were commonly understood to operate.  Machine guns, you
would pull the trigger to the rear.  Ammunition would be
exhausted in the magazine, belt, whatever it was, and that would
be the end of it.

I think when you start getting into distinguishing it as
to, okay, well, now there's additional input from the individual
utilizing it, we're kind of getting away from what, by
definition, was a machine gun.

THE COURT:  Let's focus on the trigger finger.

MR. KRAUT:  Sure.

THE COURT:  The difference here is it sits on a ledge;
right?  But there's no conscious effort on the shooter's part to
pull it multiple times.  It's sitting on a ledge, and it's --
correct me if I'm wrong.  I'm trying to understand.

MR. KRAUT:  I'm trying to follow along with you, your
Honor.

THE COURT:  But there's no conscious additional pull
of the trigger.  It's a single motion by the shooter, constant
pressure on the trigger that then produces the repeated resets;
correct?

MR. KRAUT:  There is the issue with constant pressure
on the trigger, because unlike a machine gun -- again, it's
depicted on the video as to the operation of a bump stock.
Every time that that was fired in the capacity where it operated
is what's really at issue here.  Trigger finger was removed from

1    the trigger by up to, I would say, a half inch.  I don't want to

2    give you an exact measurement, but every time that that

3    happened, the trigger finger left contact with the trigger

4    itself.

5              THE COURT:  And again, that's not because of the

6    shooter's conscious effort to do that; it's because of the what?

7    Answer it for me.  I'm looking for guidance here.

8              MR. KRAUT:  Sure.  I would say that because the buffer

9    tube slides freely within the stock itself.  Now, that same

10   exact effect can be done without the use of a bump stock.  We've

11   submitted many videos as well as to individuals being able to do

12   it not only through the use of belt loops or what have you, but

13   also just with their own two hands.

14        So I don't think in that regard that's anything unique to

15   the device at issue itself.  It just might happen to make it a

16   little easier, if you will.

17             THE COURT:  Okay.  So you have a problem with both the

18   pull of the trigger and the outward pressure; correct?

19             MR. KRAUT:  Yes, your Honor, yeah.

20             THE COURT:  What about, as just one analogy -- I know

21   the government has thrown out the car, which I will talk to them

22   about, but let's say like a sewing machine, operates in an

23   automatic way, but the sewer has to put the foot on the pedal

24   and then also has to manipulate the fabric to use it a certain

25   way.

1          You would not say that's an automatic --

2               MR. KRAUT:  I would -- I didn't mean to cut you off,

3     your Honor.  I would think that if we are talking about the

4     sewing machine as far as the operation of the machine itself

5     without utilizing the motion as to direct the fabric through it,

6     putting your foot on the pedal, pressing down, and the machine

7     doing its own thing, I would agree with you that that's

8     automatic.

9          I think --

10              THE COURT:  So how is this different?

11              MR. KRAUT:  I think that you're kind of comparing

12    apples and oranges with that, because if we're talking about,

13    again, the machine's operation, I would point to it being like

14    the machine gun in Exhibit 26, where foot is on the pedal,

15    machine goes.  Finger's on the trigger, pulled to the rear;

16    machine gun goes until it's out of ammunition.  The sewing

17    machine, I guess the comparable analogy would be until you're

18    out of thread, until you're running out of the direction it's

19    going in automatically.

20         If you're getting into returning the fabric on the machine,

21    again, I think that it's -- I'm not sure that they're directly

22    comparable in that vein.

23              THE COURT:  Okay.

24              MR. KRAUT:  The other point that I would bring up

25    here, the other one anyway, and then I will let Mr. Prince

address the other issues in front of you, the Supreme Court in *Staples v. United States* said that the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger.  That is, once the trigger is depressed, the weapon automatically continues to fire until the trigger is released or the ammunition is exhausted.  They're saying that such of those are machine guns under the Act.

And then we had also in our brief submitted *Olofson*, *U.S. v. Olofson*, where they're talking about -- again, going to your point as to the definitions that were in existence at the time.

With that, unless you have any other questions, your Honor, I will defer my time to Mr. Prince.

THE COURT:  Nothing more.  Thank you.

MR. KRAUT:  Thank you, your Honor.

MR. PRINCE:  Good afternoon again, your Honor.

THE COURT:  Good afternoon.

MR. PRINCE:  May it please the Court.  I am going to real briefly discuss several of the procedural issues, because I believe they quasi relate to the arbitrary and capricious aspect of some of the final rule.

THE COURT:  Can we get into that after I have heard from the government on the definitions?  I want to hear all that, but I think it would be helpful, while my mind is fresh, to hear the government's response on the definitions.

1           MR. PRINCE:  That's perfectly fine, your Honor,

2    because we believe our briefs have really already addressed

3    those issues.  I don't want to take up more of the Court's time

4    than is necessary, because we do believe that, especially in the

5    reply brief in relation to the arbitrary and capricious nature

6    of the final rule, the analytical video is the key evidence that

7    demonstrates that it is not what the government contends, that a

8    bump stock does not all of a sudden cause a semiautomatic rifle

9    to become a machine gun.  Because if we do allow that premise to

10   stand, we have now not only eviscerated the definition

11   of "machine gun" that the Congress enacted, but now we're going

12   to eviscerate the definition of "semiautomatic rifle" that the

13   Congress enacted.

14          So in looking at the analytical video, we actually put the

15   second markers for the Court in reference to that video so that

16   the Court can see how the trigger is depressed, the action

17   cycles.  You see the ejection of the empty casing eject out.

18   You see then in the one picture the bolt moving forward.  We did

19   it from both sides so the Court could see what's happening on

20   both sides of the firearm.  And you see the finger lose contact,

21   as the Court's already aware, with the trigger, move about a

22   half inch in front of it, and then come back in contact.

23          Also, as Attorney Kraut had mentioned, we have shown prior

24   to that that shooting it one-handed in the identical fashion

25   with the stock unlocked does not cause it to fire more than one

1    round.

2        So even if the Court were to say that it's in some sense

3    user input, that isn't true either, because when we look at the

4    mechanics of it, the user input, pulling the trigger in that

5    scenario shows that only one round does fire and that the

6    mechanism does not self-actuate or in any way, shape, or form

7    automatically operate.

8        And so I truly believe that that Exhibit 28 to the

9    complaint, which is actually within Exhibit A to the complaint

10   because Exhibit A was the entire comment that was submitted

11   during the rulemaking process, really depicts that.

12       It also depicts the fact that there is no self-acting or

13   self-regulating mechanism.  In fact, there's no mechanism

14   whatsoever, and the government admits that in their brief.

15   There is no mechanism in the stock.  Now what they want the

16   Court to believe is nothingness, absolutely nothing, the air

17   space is a mechanism, and that is a step way too far.

18           THE COURT:  But isn't it more than space?  Doesn't the

19   bump stock help channel the recoil energy along a straight line

20   and a certain distance, and isn't that important in assessing

21   whether it's automatic or not?

22           MR. PRINCE:  But that's not what the government's

23   argued.  They've argued specifically that in relation to the

24   self-acting and self-regulating mechanism, that it's now the

25   space that is, in essence, the mechanism.  And we had cited to

1    that in our reply brief.  So we don't believe that now the

2    government can try and contend something else.

3            THE COURT:  But implicit in that -- I mean, it's not

4    just space.  It's space that's defined by this apparatus that

5    keeps it moving through the space in a certain way.

6            MR. PRINCE:  Once again, when we look at the video

7    doing it one-handed, it doesn't operate that way.

8            THE COURT:  Clearly, you need the other arm doing --

9            MR. PRINCE:  Well, then --

10           THE COURT:  Which makes it, I agree, much, you know,

11   more manual input.  And my question is, at what point is too

12   much manual input too much to be automatic?  And that's the real

13   crux of this case.

14           MR. PRINCE:  I think then it becomes the question of

15   whether the person is actually the machine gun, and how are we

16   going to contend with that.  Because now if we're saying for it

17   to operate automatically it has to be the person who actuates

18   it, we're talking about every single person in the United States

19   and throughout the -- through the world as being a machine gun,

20   if that's the rabbit hole we're going to go down.  And that's

21   why this is so arbitrary and capricious.

22       This needs Congress to act.  As Attorney Kraut had

23   previously relayed to the Court, in a case that was not in our

24   initial briefs, the U.S. Supreme Court has already acknowledged

25   that and acknowledged, as he correctly stated, that when these

1    issues arise, it is for the Congress -- and that case was

2    *Wisconsin Central Limited v. United States*, 138 Supreme Court

3    2067, and it comes at page 2074.

4         And I will just real quickly recite what the Court said.

5    "Congress alone has the institutional competence, democratic

6    legitimacy, and, most importantly, constitutional authority to

7    revise statutes in light of new social problems and preferences.

8    Until it exercises that power, the people may rely on the

9    original meaning of the written law."

10        In our brief, we've documented the government in this case

11   concedes that when the Congress enacted the National Firearms

12   Act, it was intended to be a narrow area of law and of firearms

13   that were covered by it.  They admit that absent the expansion

14   that they are proposing in the final rule, they cannot regulate

15   bump stock in any regard.  They admit in their brief that they

16   lack the authority to expand the definition.  Yet, in that same

17   brief, they admit they're expanding the definition.

18             THE COURT:  To be fair, they say they're clarifying.

19             MR. PRINCE:  We cite where they say they're expanding

20   it.  It's an expansion.

21             THE COURT:  It's an expansion from where they were in

22   their earlier interpretation; right?  They narrowly interpreted

23   it to only apply to Akins Accelerator, and now they've expanded

24   their interpretation more broadly.

25             MR. PRINCE:  But if we allow administrative agencies

in general now to redefine every term within a definition that
Congress enacts, there is no meaning to anything Congress
enacts, because an administrative agency can come in and say,
well, "the" doesn't really mean "the" anymore, "shall" doesn't
mean "shall."

     And we see that with the procedural issue.  They're
contending "shall" now means "may."  And I know we will touch on
those later.

     But I think it's important, when we look at the totality of
the circumstances before the Court, that this is an
administrative agency that found through multiple letters, of
which they won't even produce to us -- we submitted an expedited
FOIA March 30th, 2018, for all of the information.  Under FOIA,
within 10 days they had to respond.  Today, we are 313 days
since the submission of that, and guess what?  Government hasn't
responded at all.

     We believe the Court should take an adverse inference to
that, because it seems clear that they're trying to hide
something, not only from us but from the public.  What are these
other determinations that exist out there, and do they conflict
with what the government's contending here?  We believe so,
because why else is there this secrecy surrounding it?  What's
the big issue?

     They admit in the final rule that they rely on these
rulings.  Yet they won't publish them, they won't make them

1    available.  What else do those rulings say?  What about the

2    rulings that they don't rely on in the final rule but which have

3    an interplay or relationship to the issues that now this Court

4    has to address.

5              THE COURT:  Did they concede that any of those earlier

6    rulings actually defined "single function" and "automatically"?

7              MR. PRINCE:  They have not conceded that, your Honor.

8    However, we do not know what all determinations exist.  That's

9    why we filed the Freedom of Information Act during the pendency

10   of the rulemaking.  Two days into the rulemaking, we filed the

11   Freedom of Information Act saying, look, government, you failed

12   in producing these in the docket like you have to; we're trying

13   to mitigate that harm, fix that harm for you; we're submitting a

14   FOIA; we want this information.

15        And how does the government respond?  They ignore us.  313

16   days, 31 times the amount that Congress dictated that the agency

17   has.  They haven't even assigned a control number to it that

18   they've relayed to us.

19        What is in those documents?

20        Your Honor, I believe the only other aspects that have

21   already really been touched on by my counsel, co-counsel, are

22   the issues of "automatically," and we've already touched on

23   them.  We've already touched on the fact that there is no real

24   mechanism here.  The government concedes that.

25        We have also pointed out in our reply brief that the

1  government states that it requires additional manipulation of

2  the trigger.  They admit that our bump stock video shows that.

3  But in the final rule, it's premised on the fact that there is

4  no additional physical manipulation of the trigger.

5  Manipulation of the trigger is a very broad explanation for

6  what's occurring there.  And they say that that is required for

7  a bump stock to meet this new definition.  Yet it doesn't.  We

8  can see that all very clearly in the video.

9       The other aspect that the Court already addressed with

10  co-counsel Kraut was that there isn't -- in the government's

11  argument, there has to be constant rearward pressure on the

12  trigger.  And again, the analytical video shows that that is not

13  the case, that there is a loss of contact with the trigger, and

14  therefore, it is not like the machine gun in Exhibit 26 where

15  you pull the trigger, it's pulled to the rear, and it continues

16  to operate until either the user releases the trigger or all the

17  ammunition is depleted.

18       So with that, I believe those are really the issues

19  regarding arbitrary and capriciousness, other than the

20  procedural issues that we will address when the Court is ready.

21       Thank you, your Honor.

22            THE COURT:  All right.  Thank you, Mr. Prince.

23       Mr. Soskin, are you arguing initially?

24            MR. SOSKIN:  Yes, your Honor.  As long as we're

25  hearing from the Guedes plaintiffs and their counsel, I will be

1    representing the United States.

2              THE COURT:  All right.

3              MR. SOSKIN:  Having heard the exchange between the

4    Court and plaintiffs' counsel, I think it would behoove us to

5    just take a step back here and think about the operation of a

6    bump stock in the big picture.

7         What does a bump-stock-type device do?  It permits -- as

8    you saw in plaintiffs' videos, it permits a shooter of ordinary

9    skill to operate a -- to operate a firearm in a race with the

10   self-proclaimed world's fastest shooter and accomplish the same

11   results.  How does it do that?  By supplying the mechanism that

12   lets that shooter operate what was previously a semiautomatic

13   rifle automatically, by taking manual components of that process

14   out, by taking the individual initiative and thought going into

15   a single pull of the trigger out, and it thus allows the

16   ordinary -- of the ordinary skill, the ordinary shooter to shoot

17   must faster.

18        That's the type of "automatically" that Congress relied on

19   in the text at the time and in its purpose in adopting the

20   definition it did in 1934.  And that's why the government has

21   operated within its statutory authority in promulgating the

22   rule.

23             THE COURT:  All right.  Let me stop you there.  You

24   talk about the manual inputs that the bump stock takes out.  One

25   is the multiple conscious pulls of the trigger by the shooter.

1  What else?

2        MR. SOSKIN:  When an individual attempts to bump fire

3  on his or her own, he or she faces the challenge of ensuring

4  that the recoil doesn't take the shooter's finger or the firearm

5  so far away or in such a direction as to make it more difficult

6  or difficult to engage in a subsequent pull of the trigger.

7        And what the bump-stock device allows is by limiting the

8  space that the firearm can move, that it can reciprocate on, in

9  some models, the tube that plaintiffs' counsel was describing

10  and other models what I understand to be essentially a

11  constrained space, as your Honor and Mr. Kraut discussed, it

12  allows the shooter not to have to determine, delineate that

13  space of recoil, to find the appropriate amounts of pressure, or

14  it simplifies the process of applying the appropriate amounts of

15  pressure to attain that reciprocating fire that you see

16  illustrated in the video, that fast rate of automatic fire.

17        THE COURT:  And the fact that the shooter has to keep

18  this outward pressure on the barrel, is that not a manual input

19  that just takes it a step too far from being automatic?

20        MR. SOSKIN:  It does not, your Honor.  The statutory

21  text talks about a single function of the trigger.  The

22  interpretation that ATF has put on it for the last more than 10

23  years now, the interpretation that was affirmed by the Court in

24  the *Akins* case of single pull of the trigger, likewise is

25  focused on the shooter's trigger hand, not on what's going on

1    with other parts of the firearm.

2            THE COURT:  Let's talk about Mr. Prince's point on the

3    trigger finger, that it actually doesn't keep continuous

4    contact, that there's actually space between the trigger and the

5    finger and, thus, there are multiple pulls.

6            MR. SOSKIN:  That's right, your Honor.  Obviously, we

7    cannot dispute what you see in the videos of its operation.  And

8    in fact, my understanding is that for it to mechanically

9    function, the trigger finger is going to have to cycle a little

10   further than the trigger would -- the trigger has to move beyond

11   the reset point in order for it to reset and initiate the next

12   fire.

13       But their view is an objection that's based on their

14   interpretation of function of the trigger, a very

15   trigger-focused, function-focused interpretation.  If the focus

16   is, as we have for more than 10 years held and as Courts have

17   affirmed, on the pull of the trigger, then the fact that that

18   pull continues both on and off of the trigger, that that single

19   volitional act doesn't end when the separation occurs between

20   the finger and the trigger is of no relevance.

21       Turning back to the question of the other hand, however,

22   plaintiffs make much out of this -- the portion of the video

23   that shows an attempt to fire a bump-stock-equipped machine gun

24   with one hand.  And they say, look, it doesn't fire with one

25   hand; therefore, it's not a machine gun.

1      But nowhere in the statutory definition of "machine gun" is

2   there a requirement that a machine gun be fired only with one

3   hand.  And in fact, many machine guns cannot even realistically

4   be fired with two hands.  One needs some kind of a fixed mount

5   in order to keep it steady.

6      If Congress wanted to limit the definition of "machine gun"

7   to a weapon that could only be fired with one hand, it could

8   have said so, but it did not.  And that doesn't interact with

9   our interpretation here.

10      As Mr. Kraut noted, they don't actually disagree with the

11   agency's definition of "single function of the trigger."  They

12   don't actually disagree with the agency's definition of

13   "automatically."  So the question here only becomes whether, in

14   applying "single function" and "single pull of the trigger" and

15   "automatically" here as the final rule defines them, a bump

16   stock falls within that definition or not.

17          THE COURT:  Okay.  What about the second hand, not

18   just the fact that it requires two arms, two hands, but also

19   requires the added pressure?

20          MR. SOSKIN:  The added pressure likewise is not

21   directed to the trigger.  It's added pressure that is directed

22   to the firearm as a whole.

23          THE COURT:  But without it, it won't work

24   automatically.

25          MR. SOSKIN:  That is true.  It is an element of manual

1    input.  But "automatically" and the definition of "automatic"

2    does not require that the machine gun become a Roomba and

3    operate by itself.

4         In fact, no machine gun operates that way.  Every machine

5    gun requires some amount of manual input.  The shooter has to

6    pull and keep pulling on the trigger.  The shooter has to direct

7    where the weapon is going.  These are highly manual firearms,

8    your Honor.  And the presence of the second arm, and even the

9    application of pressure by the second arm, whether you're using

10   that to engage in bump firing or whether you're -- with a bump

11   stock, or whether you're using that to direct and aim the

12   firearm or to make sure that, as a lot of people discover their

13   first time with an automatic weapon, the muzzle doesn't just

14   rise and start dinging rounds into the ceiling, that doesn't

15   make it -- that doesn't defeat the automatic nature of the

16   weapon.

17        THE COURT:  So why doesn't the rubber band example,

18   why isn't that equally automatic?

19        MR. SOSKIN:  Your Honor, we addressed the rubber band

20   and belt loop examples in our brief.  The difference is simple.

21   Those are not items that are designed to turn a semiautomatic

22   rifle into a machine gun.

23        THE COURT:  But the statute doesn't have any sort of

24   everyday exception in it for machine gun.

25        MR. SOSKIN:  The statute includes in its definition

1    the combination of parts to make a machine gun.  So it's

2    possible that if you were to permanently attach a rubber band to

3    a machine gun in some sort of way, you might actually be making

4    a machine gun out of the combination of the semiautomatic rifle

5    and the rubber band.  But simply rubber bands that are designed

6    for some other purpose independent of a machine gun, you know,

7    certainly do not make one.

8            THE COURT:  So I misunderstood ATF's position on this.

9    ATF's position would be that if there's a rubber band attached

10   to the semiautomatic weapon, that it is automatic?  I thought

11   ATF was drawing a distinction between the automaticity of the

12   rubber band and the bump stock here.

13           MR. SOSKIN:  Our position, I believe, is that the

14   rubber band on its own is not a machine gun.

15           THE COURT:  Well, clearly.

16           MR. SOSKIN:  The fact that you are selling rubber

17   bands.  If you were to go out and sell a semiautomatic -- what

18   was a semiautomatic rifle with a rubber band affixed to it in a

19   way that turned it into a mechanism that qualified it under this

20   final rule, the semiautomatic plus rubber band might well be.

21           THE COURT:  Might?  What is ATF's position on this?

22   What if you have a closet full of semiautomatic rifles and your

23   box of rubber bands there that can be assembled to create this

24   automatic -- would ATF agree that would be an automatic machine

25   gun?

1       It's unclear from your position here.  I thought ATF's

2   position was no, that's different because there are more manual

3   inputs that are required with respect to a rubber band than

4   there is with respect to the bump stock here.

5       Have I misunderstood your position?

6       MR. SOSKIN:  Our position, your Honor -- and we,

7   obviously, don't have this exact situation confronting us and

8   haven't made a classification determination on it under the new

9   rule, but I don't think a box of rubber bands and a closet full

10  of semiautomatic rifles would get you there.

11      If you had, though, some arrangement by which, you know,

12  there may be a snap piece or a set of buttons and a clip that

13  permitted you to directly mount your rubber band in a manner

14  akin to how a bump stock, you know, can be directly mounted as a

15  replacement stock or a supplemental stock, that might require a

16  different outcome.

17      I don't think we can prejudge how those classification

18  decisions would be reached until we see --

19      THE COURT:  Okay.  But just to be clear, in terms of

20  function of the two, putting aside whether there's enough

21  evidence that that's what the purpose of the rubber band is

22  being used for, putting that aside, the way in which the rubber

23  band operates and the way in which the bump stock operates, if

24  it's all attached to the machine gun in the proper way, is it

25  equally automatic?  Is that what you're saying?

1          MR. SOSKIN:  Your Honor, I'm not familiar enough with

2     how the rubber band is used to facilitate bump firing and how it

3     gets, you know, attached in that circumstance.  I've seen the

4     belt loop model, and that, I think, doesn't get you there.

5          THE COURT:  No, I agree with you, but the rubber band

6     is harder.

7          MR. SOSKIN:  You know, I think until we -- I don't

8     think we are in a position to come out and give an advisory

9     opinion on what the agency might decide to do with a particular

10    rubber band.

11       One of the problems --

12          THE COURT:  Wait.  Just to be clear, I'm not asking

13    for that.  I just understood -- and I need to review the record,

14    but I just understood that ATF's position with regard to rubber

15    bands was not simply that they're used in these other ways, but

16    rather that there's a distinction to draw and that that's in the

17    record.  But if you're telling me that it's not, it's not.

18    Maybe I'm incorrect.

19       Can you check on that when you sit back down?

20          MR. SOSKIN:  Sure.  I think I understand your question

21    a little bit better.  Our understanding is, we were responding

22    to an argument by plaintiffs that the final rule would require

23    us to classify rubber bands in general as machine guns and that

24    if we failed to say the rubber bands being sold at your local

25    CVS are -- if we failed to say that those are machine guns, that

would be arbitrary and capricious because we're drawing a distinction between a rubber band in isolation and a bump stock in isolation.

And to the extent that our brief wasn't clear that we were arguing only about the question of whether we could distinguish rubber bands in isolation, I think that's as far as our argument was intended to go.

THE COURT:  All right.  Do you have any additional arguments on the definitions?

MR. SOSKIN:  Yes, your Honor.  I would also like to address the question regarding the movement of the shooter's finger, because I think this came up in your dialogue with Mr. Kraut, that when the -- you know, when the trigger is being bumped into the shooter's finger, there may be some amount of motion in that finger, not just a separation, and whether that comprises a separate pull.

And, you know, in preparing for this argument, you know, I do have an analogy for this one that doesn't quite make its way into our brief.

THE COURT:  Did you go fire a bump stock?

MR. SOSKIN:  I have in the past, your Honor, but not since these cases were filed.

THE COURT:  I'm ready for a field trip, by the way.

MR. SOSKIN:  That's interesting, your Honor.  In one of the other cases, there has been a motion for a field trip.

1        THE COURT:  Oh, okay.  I'm kind of joking.

2        MR. SOSKIN:  I think when you review in slow motion

3   the operation of the movement of the finger that you're looking

4   at, it's much more akin to a reflexive movement like shivering

5   as opposed to a conscious voluntary act.

6        And that's really why those minuscule movements of the

7   finger that result -- that come about as a result of the trigger

8   being bumped into the shooter's finger do not comprise separate

9   pulls and are not evidence of separate pulls.  The shooter is

10  still not thinking, okay, we're going to initiate another firing

11  cycle with a separate pull.

12       THE COURT:  So again, you're looking at this solely

13  from the shooter's perspective?  There's no conscious effort on

14  the shooter's part?  This is just happening as the trigger bumps

15  against the finger; it's pushing it away?

16       MR. SOSKIN:  Right.  If we look at the 1934, you know,

17  meaning of "pull" and "function" and "automatically," as we

18  describe in our brief, it's fully consistent with those

19  meanings, as well as, you know, the apparent and quite obvious

20  automatic functioning of this device when installed as a part of

21  a semiautomatic firearm.

22       So I believe I've addressed all of the issues that

23  plaintiffs discussed here regarding why the department would not

24  have authority to engage in -- to engage in the rulemaking.

25  There are some other issues that they raised in their brief,

1    but, you know, our briefs, you know, address those directly as

2    well.

3        I did want to highlight Mr. Kraut's answer with regard to

4    the Akins device and the *Akins* cases, because I think he was

5    asked directly whether the *Akins* decision was wrongly decided.

6        Of course, the Akins Accelerator involved a spring that

7    really is indistinguishable in terms of its mechanical

8    operation.  It's a different kind of device.  But in terms of

9    the way that it channels energy, it's really indistinguishable

10   from an ordinary machine gun that we all agree is encompassed

11   within the definition.

12       Mr. Kraut said that he's not really happy with that

13   decision, but stood short of saying that we should walk that

14   back.  Well, if he is committed to the positions that plaintiffs

15   have taken here, that the agency doesn't have authority to

16   interpret the undefined terms in the statute, then there would

17   be a different outcome in the *Akins* case, and the agency would

18   not have the authority even to take plainly energy-storing

19   devices like the Akins Accelerator and say you can't use that

20   storage of energy to operate the trigger of a firearm, and so we

21   have no choice but to permit even these much more obviously

22   machine guns out in unlimited numbers.  That's the meaning of

23   what would be required before Congress acts.

24       Turning finally to the *Wisconsin Central* case that

25   plaintiffs have cited -- have cited twice here, I think there

are two key words in that quotation that they keep reading, and that explain why it is that the exercise of authority by the department here is proper.

What *Wisconsin Central* is talking about is the agency's ability to, quote, revise statutes.  Here, the Department of Justice has not revised the statute.  It has provided interpretations of two terms Congress left undefined.  That's a noncontroversial administrative law position, that the agency has the authority to define those undefined terms.

And then it has added only to its regulatory definition, not to the statutory definition, a sentence that clarifies how the statutory language, as interpreted by the definition of those two undefined terms, applies to some very common, very widely or widely purchased devices, the bump stocks that people naturally in the wake of the final rule will be asking questions about how it applies to.

And that's why the clarification in the ATF's regulation, the regulatory definition is also appropriate and within the agency's authority.

THE COURT:  Okay.  Thank you.  Is Mr. Mooppan also arguing this point?  No?  All right.  Thank you, Mr. Soskin.

Mr. Kraut or Mr. Prince, do one of you want to respond and then also address any other arguments you want to make with respect to whether ATF's actions were arbitrary and capricious?

MR. KRAUT:  If I may have just a moment of the Court's

1    time, I will be brief, and then if Mr. Prince has anything, but

2    I will try to keep it short for your Honor, because I know

3    there's other arguments to get to.

4         One of the things that Mr. Soskin had talked about here was

5    the finger coming off the trigger in order to get it to

6    function -- when we are talking about the operation of a bump

7    stock and that it was his understanding that the finger has to

8    come further off.

9         Just for the Court's clarity real quick, the way a trigger

10   works, particularly in an AR-15, there's three components to the

11   trigger, not including the pins or the springs.  You have the

12   trigger itself, which is the part that you pull on.  You have

13   the hammer, which is inside, which is what goes forward and hits

14   the firing pin in order to shoot the gun, and then you have

15   what's called a disconnector.

16        So the way these all work together is when the trigger is

17   pulled, hammer strikes the firing pin, comes back.  Disconnector

18   grabs onto the hammer.  As long as that trigger is pulled to the

19   rear, disconnector keeps the hammer in place so that it doesn't

20   go forward and start another round going down the barrel.  When

21   the trigger is released, the hammer then is cocked in the locked

22   position and is actually at the bottom of the front of the

23   trigger on the inside of the firearm, caught there until it's

24   pulled and released again.

25        So I am just trying to paint a mental picture here as to

the operation inside the firearm as to how all that works.

So if we are going to go down that road, I would submit that, again, a single function of the trigger, well, it releases the hammer and then it gets caught again, and that's where that kind of goes there.

The government brought up the firing of the bump stock one-handed in the video that we had submitted as Exhibit, I believe, 28. And the purpose of that was to show that single function of the trigger equates to one round there. That goes back to just how I explained the operation of the trigger, to show that single pull equals single round there.

The last point I'd bring up real quick for you, your Honor, is that the Akins Accelerator, as far as it being indistinguishable from the operation of the machine gun, what ATF did in relation to that specific device was they said as long as you remove the spring, you can keep the stock that it's in.

So it would seem that the stored energy of the spring really gets to that automatic nature of what they're describing. That's kind of what I had tried to allude to earlier, if I didn't outright say it.

With that, I will -- I believe I will allot any extra time to Mr. Prince here.

THE COURT: All right. Thank you.

MR. PRINCE: Your Honor, just a point of

1    clarification.  I'm not sure if the Court wants to yet go into

2    the procedural issues at this point.

3              THE COURT:  Yes, I am ready.

4         MR. PRINCE:  You are?  Very well, your Honor.

5         Again, I will be brief, as we've detailed these especially

6    in our reply brief based on admissions even that the government

7    has made.

8         The first one is the failure to provide the underlying

9    documents.  I've already touched on that.  So I'm not going to

10   waste the Court's time.  I will just quickly cite to the D.C.

11   Circuit's decision in *American Medical Association vs. Reno*

12   where it says the APA, quote, requires the agency to make

13   available to the public in a form that allows for meaningful

14   comment the data the agency used to develop the proposed rule.

15        Here again, we even went so far as to ask ATF -- we put

16   them on notice, you didn't put any of the underlying documents

17   in the docket during the rulemaking --

18             THE COURT:  But by "underlying documents," are you

19   talking about more than just their prior rulings?

20             MR. PRINCE:  We're talking about whatever prior

21   rulings they issued regarding even single function of the

22   trigger, anything that relates to what the agency was seeking to

23   do and define had to be placed in the docket so that the public

24   could see everything and actually have a meaningful opportunity

25   to comment.

1          Again, I go back to, what's the secrecy here?  Why are we,

2     you know, not disclosing these things?  And we even gave ATF a

3     heads-up about their failure to do it, and they still didn't

4     want to mitigate the harm.

5               THE COURT:  It sounds like previously the government

6     really didn't do any legal analysis, and the legal analysis is

7     what's driving this do-over.

8          But are you arguing in addition to wanting that, those

9     prior -- I don't know what you would call them -- opinions, but

10    there's actual data that you think informs this decision that

11    they did not provide as a part of their record here?

12    Specifically, what is that?

13              MR. PRINCE:  In the final rule -- and we do cite to

14    this in our reply brief -- they specify a whole host of

15    decisions where allegedly they talked about single pull of the

16    trigger that were again never put forth, and we don't know to

17    the extent that decisions by the agency exist contrary.

18         Also, I would argue to the Court that realistically, this

19    was not an unbiased review of what the Congress initially

20    enacted in the National Firearms Act.  In the government's

21    brief, they admit they were directed by President Trump to ban

22    bump stocks.  We have the evidence showing that President Trump

23    stated he would ban bump stocks.  And in their brief, they admit

24    they carried out the directive.

25         That is not the informed, reasoned decision of an

1    administrative agency that looks at all the evidence impartially

2    and makes a determination.  They did that before.  There's over

3    10 determinations where apparently the agency is incompetent to

4    properly make determinations.  That's what they want us to

5    believe.  And now all of a sudden, they had an epiphany.  All of

6    a sudden now, oh, wow, there's all these other terms there that

7    we haven't yet had opportunity to define, and now based on a

8    presidential directive, well, we're going to take those terms

9    and define them as whatever we want to carry that out.

10             THE COURT:  Didn't they start looking at this well

11    before the presidential directive?

12             MR. PRINCE:  No.  In fact, we have that in our brief.

13    President Trump directed before the directive was issued that he

14    would ban bump stocks.  It was thereafter -- on Twitter.  And we

15    have the links in our reply brief and were submitted during the

16    comment period.  That was before the comment period even

17    started.

18        So we know that this was a directive from the president,

19    not the unbiased decisionmaking that an administrative agency is

20    supposed to perform.  And if we are going to give ATF some form

21    of deference based on their prior determinations or this

22    determination, we know of at least 10 or 11 prior determinations

23    that are opposite to it.

24        We also know and discuss in our reply brief that agency

25    leadership -- the government admits agency leadership within ATF

1    found the opposite.  Agency leadership hasn't changed.  The only

2    thing that's changed is a directive from the president.

3        THE COURT:  I think what they've argued is that they

4    started looking at the undefined terms in the definition, and

5    that's why the result is different.

6        MR. PRINCE:  But that's where we go down the rabbit

7    hole.  If now an administrative agency can redefine every single

8    term that the Congress defines --

9        THE COURT:  Congress did not define the

10   term "automatically" and did not define the term "single

11   function."

12       MR. PRINCE:  Because it was understood.  In fact, in

13   the Congressional debates that we do cite to again in our brief

14   and our exhibits to the comment, we do know what the Congress

15   believed, and the Congress said it's where you pull the trigger

16   all the way to the rear and it depletes the ammunition.  Any

17   time the trigger is released, reset, and repulled, that is a

18   semiautomatic firearm.  That is not intended to be included.

19   And that's from 1934.

20       So we know that -- ATF has even admitted that it's intended

21   to be a narrow area of law affecting certain firearms, and yet,

22   they're broadening it.

23       The same is true with "single function of the trigger," and

24   again, we cite to this in our reply brief.  They say, yeah, we

25   could have "single function of the trigger" that is a narrow

definition, but instead, we're deciding to interpret it broadly
as single pull so that it encompasses a whole bunch of other
ways in which one could operate a firearm.

Again, it runs directly contrary to what they've admitted
was the intent of the Congress.  This rests solely with the
Congress to change if the Congress sees fit.  Again, in our
brief, we document even Senator Feinstein said ATF does not have
this power; this rests solely with the Congress; we need to take
action if there's going to be any action.  And yet, that's not
what occurred.

Now, moving on to the failure to provide a 90-day comment
period.  Once again, we have an admission from the government
that yeah, there were technical difficulties; it was 85 days
long that people could electronically submit comments.  85 isn't
90.  They had an opportunity to mitigate this harm immediately.
They could have immediately filed a notice in the Federal
Register extending it for the time that there were technical
difficulties, and this issue wouldn't even be before the Court.
They could have notified the individuals who were precluded from
being able to file comments during that period.  They didn't.

THE COURT:  Can you explain how that failure
prejudices you, the five missing days?

MR. PRINCE:  Because the Congress enacted a statute
that says in 926(b) that the comment period shall be 90 days.

THE COURT:  I know.  But are you conceding there was

1    no prejudice to you?

2              MR. PRINCE:  No, we do believe --

3              THE COURT:  I think Courts do look at that in

4    determining --

5              MR. PRINCE:  Again, and we did document this in our

6    brief, we believe there were individuals who were precluded from

7    being able to submit comments and were led to believe that the

8    comment period was closed, because that is the statement that

9    was on the government website.

10             THE COURT:  And they otherwise would have submitted

11   something that never was a part of the record that's different

12   than what's already in the record?

13             MR. PRINCE:  Correct.  And none of us have --

14             THE COURT:  Specifically, what?  Can you give me an

15   example of what's --

16             MR. PRINCE:  I don't know what another person would

17   have submitted, your Honor.

18             THE COURT:  Well, then how can you say it would not be

19   harmless, given that there were tens of thousands of comments

20   that were received here?  Is there something unique that didn't

21   get into this record as a result of that five-day lapse?

22             MR. PRINCE:  That, I don't know, your Honor.  Off the

23   top of my head, I don't know of a specific issue, but that

24   doesn't mean that there weren't individuals that did have issues

25   that I haven't thought of that were important to them.  And even

1    if it was a duplicative argument, they still had a right to be

2    heard.  That's why we have a requirement to have a 90-day

3    comment period.

4        And this could have easily been addressed by ATF mitigating

5    the harm by simply extending it by five days back then.  They

6    knew it happened.  It's their own fault.  And it's no different

7    for any other administrative agency that they could have

8    corrected it.  But they chose not to, and instead, now it

9    becomes an issue for the Court.

10       The other issue that ties hand in hand with this and is

11   found in the same section, 926(b), is the failure to provide a

12   hearing.

13            THE COURT:  Hasn't the Fourth Circuit addressed this

14   issue?  I know it's not binding on me, but hasn't the Fourth

15   Circuit looked at 926 and said it does not require an oral

16   hearing?

17            MR. PRINCE:  That is what the Fourth Circuit said.  We

18   don't believe that's a correct interpretation, because now it

19   eviscerates what the Congress's intent was in saying that there

20   shall afford interested parties opportunity for hearing before

21   prescribing such rules and regulations.  So basically, we're

22   going to wipe that whole Congressional statement out.  We're

23   just going to put blinders on and not care.

24       The government concedes that not only did our clients

25   request a hearing, but there were others as well.  And we have a

plethora of issues that the agency never addressed in the final rule.  They admit that.  They acknowledge in relation to the statement on the Federal Register that the comment period was closed, but yeah, the final rule doesn't address that.  They put that in their brief.

We also have the fact that they never once in the final rule address our analytical video, nor any of the other videos. We were prepared to have our expert, Richard Vasquez, down there for the hearing so that we could go over all of this.  We could address issues like single function of the trigger, automatic, how, if there is, any differences between rubber bands, belt loops, and people's fingers and bump stocks.

You also heard, as Attorney Kraut raised, the fact that ATF has allowed all users of Akins Accelerators to continue to possess the stock, which is now functionally no different than a bump stock.  All they required was for the individual to either turn in the spring to an ATF field office or to cut it in half. What about all those Akins Accelerators now?

This is the rabbit hole that we find ourselves going down because the agency is trying to carry out a directive from the president that does not belong with the agency.  This is solely within the purview of the Congress.  And if the Congress wants to act, it is within the Congress's authority to act.

Yet, what have we seen?  We've seen Congress not take action, after we've even had the current acting -- Thomas

1    Brandon for ATF, the acting director, state to Congress, yeah,

2    look, my agency does not have the power to regulate bump stocks.

3    It was only after that directive that all of a sudden an

4    epiphany occurred, whereby they now all of a sudden had

5    authority to regulate bump stocks.

6              THE COURT:  So back to the Akins Accelerator, you said

7    that ATF requires the springs to be destroyed or removed.  What

8    remains?  The stock?

9              MR. PRINCE:  The entire stock.

10             THE COURT:  Which -- does it function like the bump

11   stock here?

12             MR. PRINCE:  That is my understanding, your Honor.

13             THE COURT:  It creates a space just like this?

14             MR. PRINCE:  The spring sat in the space.  But those

15   are okay.  Even when -- before this occurred, ATF reviewed the

16   situation, and there are the letter determinations stating --

17   not determinations, but actually statements by ATF telling Akins

18   Accelerator owners you just have to destroy the spring or turn

19   it in to the local field office.

20             THE COURT:  So is it essentially like a

21   semiautomatic --

22             MR. PRINCE:  So are bump stocks, your Honor.  No

23   different.

24             THE COURT:  If you do the two things that you have to

25   do here, can you do that with the remaining Akins Accelerator

1    and create the same effect?

2          MR. PRINCE:  That is my understanding, that you can.

3       With that, those are really the procedural issues that I

4    wanted to address.  Again, I don't want to take up a plethora of

5    the Court's time.  We've already addressed these ad nauseam in

6    all of the briefs.  So I thank the Court.

7          THE COURT:  Okay.  Thank you.

8       Mr. Soskin?  Before I get distracted, is he correct about

9    the Akins Accelerator?  Does it function identically to these

10   bump stocks without the spring?

11         MR. SOSKIN:  Your Honor, the letters that Akins

12   Accelerator owners received were not sent with the benefit of

13   the agency's definition of "automatically" made under the

14   current examination.  So to the extent that an Akins Accelerator

15   functions in the same way as the bump stocks like a Slide Fire

16   that were subsequently sold, the Akins Accelerator would be

17   covered under the final rule and would be subject to the statute

18   in the same manner as any other bump stock.

19      I believe one of the plaintiffs in the Condrea case is

20   actually -- alleges he is an owner of an Akins Accelerator that

21   has been deactivated, and they may have more insight into that

22   issue.

23      Your Honor appears very familiar with the procedural

24   arguments that the parties have made.  Are there particular

25   areas on those issues you would like to direct my attention to?

1          THE COURT:  If you can just respond to his argument

2     that ATF did not provide not just opinions but, it sounds like,

3     some other data, some other information on which it relied.  Is

4     that true?

5          MR. SOSKIN:  Your Honor, the final rule addressed

6     these questions itself and explained that the agency is relying

7     on legal analysis that has determined what the best

8     interpretation of the statutory definition is.  That legal

9     analysis is not affected by underlying data like the notes of

10    examinations of the devices that were submitted in the past.

11        And the agency -- I think the legal standard here is for

12    the agency to set forth the basis on which it's making the

13    decision in a way that all of those who would be expected to

14    comment can understand what the basis for that decision is.

15        The basis for the agency's decision is not its past

16    classification decisions.  The basis for the department's

17    rulemaking here is its legal analysis of what the terms -- what

18    the undefined terms in the statute are and how that applies to a

19    bump-stock device that operates in the manner described in the

20    final rule.

21        So the documents that were requested in plaintiffs' FOIA

22    request are not relevant to that determination.  They did not

23    prevent commenters from having the information they needed to

24    comment.

25          THE COURT:  So there's no underlying data that

1    reflects or could affect in any way ATF's determination that the

2    way in which, for example, the single pull operates, would shed

3    any kind of light on that?

4         Is it simply because -- is ATF's position simply that

5    because you're now looking at the intent of the shooter, that

6    any data ATF has about how far away from the trigger the finger

7    goes or anything like that is just irrelevant here because you

8    are shifting the way in which you're looking at this?  Is that

9    essentially your position?

10        MR. SOSKIN:  Yes, your Honor.  The application of the

11   now-defined term "automatically" and the now, you know,

12   published definition of "single function of the trigger"

13   or "single pull of the trigger" are what do the work here in

14   achieving the element of the final rule, the clarification that

15   bump stocks are machine guns.

16        THE COURT:  But there's a real debate between you and

17   the plaintiffs over whether there's a single pull.  And as I

18   understand it, it all boils down to whether you look at this

19   from the perspective of the shooter who is, in ATF's view, doing

20   a single pull, a single movement and keeping that pressure and

21   that direction, and the plaintiffs', which is the ricocheting or

22   shivering or whatever you want to say, is not relevant here

23   because it's not the shooter's conscious effort.  Is that --

24        MR. SOSKIN:  That seems to -- and our position is that

25   that's a question of legal interpretation of the interpretation

of language and text, and it's not something on which light is
going to be shed by, you know, anything that's not in the
record.

THE COURT:  Although has ATF's position on "single
pull of the trigger" been the same for the last 10 years, in
that it's always looked at the intent of the shooter?  Has that
always been ATF's interpretation of single function of the
trigger?  You've suggested that's not new.

MR. SOSKIN:  It's correct that it's not new, your
Honor.  The single function/single pull interpretation --

THE COURT:  Has been around by ATF, and yet
historically, did ATF not issue determinations in which it said
there's not a single pull in the past?  And if so, why would
that not be relevant here if ATF's always looked at it from the
perspective of the shooter?

MR. SOSKIN:  If a particular classification decision
was made in 2009 or 2010, some particular year -- and I don't
know if there was one, your Honor.  I have not reviewed all
those classification decisions.  I understand that ATF is
working on a response to plaintiffs' FOIA request, but those
decisions were not and those materials were not relied on in the
final rule.  The history certainly reflects -- it reflects the
publication of Ruling 2006-2 in 2006.  It reflects the judicial
affirmances of that interpretation.

And so even if the agency had made some error in one of

1   those classification decisions and failed to apply the

2   definition that it had made publicly available, that would not

3   change that the best interpretation of the statute is the

4   definition and the clarification being promulgated here.

5           THE COURT:  But when an agency reverses its position,

6   it can do that, but doesn't it have to explain, you know, why

7   the position was reversed?  And you've done that in the sense

8   that you've talked about now.  We're looking at legal

9   definitions.  You've done that to some degree.

10          But my point is, if ATF's interpretation of "single

11  function of the trigger" has always been "single pull of the

12  trigger" and always been from the perspective of the shooter and

13  if there are, in fact, earlier determinations that reach the

14  opposite conclusion -- I don't know that there are, but let's

15  assume for a moment that there are -- why does ATF not have to

16  provide that and explain away how they now think this is not a

17  single pull of the trigger from the shooter's perspective?  Why

18  is that not something you have to do here, you have to explain

19  your reasoning and why it shifted?

20          Because we're not just now saying you've got a definition

21  that was never there before that you're applying.  You're

22  saying, this was the definition we always had internally; even

23  though we hadn't stated it explicitly, this is what we were

24  doing.  And if you were reaching different results with that

25  same definition, why is that not something, if it does, in fact,

1   exist, that you should turn over and explain away?

2   MR. SOSKIN:  I think there are a couple of answers to

3   that, your Honor.  First, if what we are looking at is the

4   interpretation of "single function of the trigger" as "single

5   pull of the trigger," that was a change in course that the

6   agency acknowledged it was making in 2006.  And at that time it

7   did provide the reasoned basis required by the law and the

8   recognition that it was changing course and the explanation of

9   why it was doing so.  It did that at the time of the Akins

10  Accelerator.  The Eleventh Circuit confirmed that in the *Akins*

11  case.  So that change in course is by the wayside.

12  As to the interpretation of "automatically" --

13  THE COURT:  No, that's new.  That's new.  I'm hung up

14  on the "single pull of the trigger" and whether you look at it

15  from the shooter's perspective or from the mechanical function

16  of the trigger.  And I understood you to say, we've always --

17  that from at least 2006, we've always said single function means

18  single pull; we explained that then.

19  Am I also correct that way back then you also looked at it

20  from the perspective of the shooter?

21  MR. SOSKIN:  Yes.  The *Akins* ruling in 2006-2 are the

22  embrace of that looking at it from the perspective of the

23  shooter that is embodied in the single-pull approach.

24  THE COURT:  Okay.  So to the extent that you

25  historically took a different position with respect to the bump

1    stocks at issue here, did it ever rely on ATF's determination

2    that the shooter's single pull of the trigger, the shooter's

3    intent was more than one pull?

4         Do you understand what I'm saying?  Did you historically

5    say, we're looking at this from the shooter's perspective, and

6    there are multiple pulls here?

7              MR. SOSKIN:  I understand the question.  It might

8    be -- suppose there were 10 determinations made.  What if eight

9    of them used one definition, used the Ruling 2006-2 definition

10   of single pull and two of them did not, and even if that were

11   the case -- and I don't believe it is, your Honor, but even if

12   that were the case, the agency would have the authority here to

13   promulgate this final rule based on the best interpretation of

14   the statute, both to formalize its previous determination so

15   that people inside the agency and submitters of devices for

16   classification decisions don't make mistakes or don't

17   misunderstand what that --

18             THE COURT:  No, I understand, but I'm hung up on the

19   fact that -- let's assume your hypothetical is correct and that

20   there were eight prior determinations where you were applying

21   the same definition and looking at it in the same way here.  And

22   in all eight of those, you applied that, and yet you came out

23   differently, not because of the automatic nature, but you came

24   out differently on the issue of a single pull from the shooter's

25   perspective.

1          That, to me, seems like something you should have to share

2     and explain.  Do you disagree with me under the law?

3          I'm not asking you to tell me right now whether that's, in

4     fact, the case, but if it is, is that not something that the

5     agency should have to explain away now in a rational way?

6          MR. SOSKIN:  I do not believe that the law governing

7     changes in an agency's views would require that or would make

8     that relevant where the agency is not relying on its -- you

9     know, for its change in position on the analysis that's

10    contained in those previous decisions.

11         But I would say, your Honor, that this is a factual matter

12    that I believe ATF could answer.  And so just because I haven't

13    read all of those decisions, you know, doesn't mean we can't do

14    that in short order and, you know, submit something to that

15    effect if that's necessary.

16         But because the final rule is not built on these are what

17    the -- these are what the classification decisions were before,

18    in fact, it's built on the premise that these classification

19    decisions were wrong.  And so now, as we -- as we promulgate the

20    new interpretation of "automatically" and as we put into this

21    more formal form the definition of "single function of the

22    trigger" and we apply those to bump stocks, we're reversing all

23    of those previous classification decisions.  We are explicitly

24    not relying on those previous classification decisions.  And I

25    don't think that the particular analysis in those decisions goes

1    to the question of whether the final rule is arbitrary or

2    capricious.

3                THE COURT:  All right.  Anything else?

4                MR. SOSKIN:  If your Honor has no other questions on

5    the procedure, that's all I have.  Thank you.

6                THE COURT:  I don't have any more.  Mr. Kraut,

7    Mr. Prince, anything you want to briefly respond on?

8                MR. PRINCE:  No, your Honor.

9                MR. KRAUT:  No, your Honor.

10               THE COURT:  So that leaves the challenges to the

11   Whitaker appointment.  If it's all right, I would like to take

12   just a five-, 10-minute break, and we will come back for that.

13   Thank you.

14          (Recess taken from 3:26 p.m. to 3:41 p.m.)

15               THE COURT:  All right.  Are we ready for argument on

16   the Whitaker appointment?  Mr. Goldstein?

17               MR. GOLDSTEIN:  Yes, your Honor.

18               THE COURT:  Mr. Goldstein, I would like to start with

19   the constitutional questions.  And you've raised a number of

20   compelling and novel arguments in your briefs.  Yet, my first

21   question for you is, given that I'm just a lowly district court

22   judge here, why doesn't *Eaton* and subsequent cases, which seem

23   to suggest that an individual can perform the duties of a

24   principal office at least for a limited period of time without

25   being confirmed by the Senate, why are those not controlling

1    here?

2            MR. GOLDSTEIN:   Okay.   So two things.   The first is,

3    of course, we have two lines of constitutional argument.   One is

4    about an employee serving as an officer.   And that doesn't arise

5    in *Eaton* because *Eaton* is unquestionably an officer.   So that

6    entire line of argument is separate.

7            So the question is whether Mr. Whitaker is equivalent to

8    what the Supreme Court approved in *Eaton*.   I think *Eaton* is the

9    right focus.   The post-*Eaton* cases just say that *Eaton* held that

10   a vice consul could perform the functions of a consul and remain

11   an officer, not a principal officer.

12           So I think the question is, what were the features of a

13   vice consul in *Eaton* that are or are not analogous to

14   Mr. Whitaker.   And the defining feature of *Eaton*, I think, is

15   the fact that that is a person who was the second in charge and

16   also the person who automatically stepped in for the consul.

17           THE COURT:   Right.   Those are the facts.   But the

18   Supreme Court didn't seem to limit its opinion on that basis.

19   And it refers to a subordinate officer, as do other cases, a

20   subordinate officer generally rather than the first assistant.

21           So why do I read *Eaton* that narrowly?

22           MR. GOLDSTEIN:   Actually, I guess we would have to

23   disagree.   The government itself, in reading its brief, you will

24   see that they say the critical feature of *Eaton* was the

25   regulatory scheme.   And the Supreme Court says that.

What gives -- you have to separate out, I think, two
different issues.  One is the Supreme Court, when it says
"subordinate" there, which it says one time, is saying that this
person is an inferior officer under the Constitution.  That is,
when the vice consul is originally -- there was a question in
*Eaton*, hey, this person, the vice consul, what is their kind of
original function?  And they were an inferior officer approved
by the Secretary of State.

Then the Supreme Court says it's the regulatory scheme that
puts the limits and makes them stay a subordinate.

The difference here is that the government's position is
that the president can take anyone and put them in and say that
they will serve the functions of a principal officer.  There's
no limit whatsoever.

THE COURT:  Though there's the limit set forth in the
FVRA.

MR. GOLDSTEIN:  Well, I guess we were -- I'm trying to
talk about the Constitution --

THE COURT:  I know.  But it's just not under that.
The government's position is not any person.

MR. GOLDSTEIN:  Your Honor, it is any person under the
Appointments Clause.  Of course, when the Supreme Court decided
*Eaton* in the late 1800s, it didn't have these limits of the
FVRA.  The only limit there, it did say that you could put in a
Senate-confirmed officer.

1          But I suppose the other thing that you would look at along

2     with *Eaton* is what was the practice at the time.  It would give

3     you a better sense of what it was that the Supreme Court was

4     looking at.

5          And as the government explains, as OLC explained, the

6     practice was chief clerks.  And so I think it's the case that if

7     you were to look from the beginning of the country all the way

8     through the point Congress limited temporary appointments in

9     1863, if you looked at all of what are called the acting and ad

10    interim service -- so acting is someone who steps in when a

11    principal is sick or away; ad interim is the office is vacant --

12    there are only two instances in that entire period of 70 or 80

13    years that anybody has been able to identify that it was someone

14    other than the second in charge.

15         That's a hugely important factor.  And that is, it's what

16    stops the president from evading the Appointments Clause.  That

17    person remains a subordinate, the second in charge, because it's

18    a part of their job function.

19         Everybody understood that the chief clerk would step in.

20    The chief clerk, except for those two instances, did step in.

21    The vice consul's job was by statute defined to step in.  And

22    when that person steps in, they are subordinate because they're

23    going to go back to that position.  I think it's quite clear

24    that Mr. Whitaker isn't even going to resume his position as the

25    chief of staff.

1        And if the government is going to win on the employee

2   argument, that's going to be because there's been an appointment

3   of him from being an employee to an officer.  And I think

4   everybody has to agree, in the period of that appointment when

5   he is an officer, the standard is *Edmond*.  And that is, does he

6   generally speaking have some superior below the president, and

7   he absolutely does not.

8        Generally speaking, *Eaton* had a superior because in the job

9   of vice consul the vice consul reported to the consul.  But

10  here, you have a situation in which this appointment, which is

11  from employee to officer, he has no superior --

12       THE COURT:  But here, the DAG himself would not have a

13  superior.

14       MR. GOLDSTEIN:  And that's the *Eaton* problem.  The

15  Supreme Court says we have to deal with this practically.  That

16  is, generally speaking, the DAG has a superior.  That's the

17  standard.

18       THE COURT:  But not when the office is vacant; right?

19       MR. GOLDSTEIN:  Exactly.  But the Supreme Court says

20  you look at the character of the office as a whole, and the

21  character of that office, the DAG steps in.

22       So take when this kind of situation first arose, that is,

23  when Attorney General Sessions stepped out and recused from the

24  Russia investigation.  It's true that the DAG had no superior

25  with respect to the Russia investigation, but he generally had a

superior.

And what the Supreme Court says in *Eaton* is that when the principal is sick or away, the fact that that person generally has a superior and will revert to their secondary position means that they aren't -- they aren't transformed into a principal officer.

And I think that the most that the government could say is that *Eaton* doesn't resolve the question, because even the government agrees it was the framework of the regulatory scheme that was critical.  But the most you would say is that *Eaton* doesn't resolve this question, and you have to ask yourself what are the implications of the government's position.

The implications of the government's position with respect to the Appointments Clause is that any person can be named.  It doesn't even have to be someone from the government.  And they've been quite explicit about that.  And when *Edmond* is saying that, you know, the structure of the Appointments Clause is critical to the separation of powers and a principal officer is someone -- an inferior officer is someone who generally has a superior, that seems an enormous tension, that there would be no limitations whatsoever.

So I do think that *Eaton* fairly read is understood to be talking about the second in command.

And the only other thing I would say is, we could debate who has the better reading of it, but then think about, okay,

the period before *Eaton* and the period after *Eaton*.  Are there
instances that the government can point to in which it was
understood that their interpretation was right.  And I don't
think that there are.  As I mentioned, before *Eaton*, there were
these two isolated examples.  Every other time, it was the
second in charge.

And subsequently, the Congress understood that to be the
rule when it enacted the first assistant rule.  And that is, it
took the chief clerks who had been stepping in or had been
assigned by the president when there was an actual vacancy and
created this first assistant standard, which appeared starting
in the 1863 statute.

So there's this uniform practice in the United States under
the Appointments Clause of not allowing just anybody to be put
in there and not allowing the president to evade the
Appointments Clause in that way, which I think is the inevitable
consequence of their position.

THE COURT:  All right.  Let's talk about the other
constitutional argument.

MR. GOLDSTEIN:  Sure, employee.  So it's a little hard
for me to understand and predict what my friends are going to
say on this question.  Previously, they have conceded that
Mr. Whitaker was an employee.  That seems absolutely right,
because he had no authority to enforce or apply the laws of the
United States.  He was a chief of staff.  He was an important

manager, but he was a manager.  So I'm going to take as that

premise.

    There is a suggestion in the Whitaker OLC opinion that the

fact that he was hired by the attorney general is enough to make

him an officer.  That seems plainly wrong.  The fact that the

attorney general, as we say, hires a secretary or personal

assistant doesn't make them an officer.  The standard for being

an officer is quite clear.

    In addition, you don't have -- so then the question is, all

right, if he was an employee to begin with, what is it that made

him an officer?  Was there an appointment?  So I've made the

point that, well, if there was an appointment, then he was

appointed a principal officer, because for the entire period of

the appointment he wouldn't have a superior.

    But we don't think there was an appointment to begin with.

And that's the Supreme Court's decision in *Weiss*.  The Supreme

Court said we look at the statutory scheme, and when you have a

statutory scheme that says "appoint" and distinguishes it from

things like designations, the Supreme Court says Congress hasn't

called for an appointment there.

        THE COURT:  But isn't the whole point of the FVRA to

appoint individuals when there's a vacancy?  Granted, it does

use the word "designate," but --

        MR. GOLDSTEIN:  It does use the word "direct."

        THE COURT:  Or "direct."

1        MR. GOLDSTEIN:  That's our point.  Up until 1998, it

2   was not necessary for the Vacancies Act to appoint anyone

3   because it was either the first assistant, who was an officer to

4   begin with, unlike Mr. Whitaker, or the president could

5   substitute for the first assistant a PAS, Senate-confirmed

6   person.

7        In 1998, this issue arose, and Congress just said -- just

8   inserted the employees without considering the fact that the

9   Vacancies Act never called for appointments.

10        So as we point out, all of the presidential designation

11   letters, including the one for Mr. Whitaker, distinguished the

12   fact that you are being directed to do something from the fact

13   that there would be an appointment of somebody else later.

14        That's exactly parallel to *Weiss*.  It also comes up in

15   *Edmond*, applying the same rules.  The Supreme Court has twice

16   said this, that you look at the statutory scheme.  The answer

17   back is kind of the practical one.  Well, wouldn't Congress want

18   this thing to operate constitutionally?  Shouldn't we just

19   understand that if Congress wrote this, that it would

20   understandably write a thing that would function

21   constitutionally?

22        And the Supreme Court has said absolutely not.  It is

23   absolutely possible for Congress to violate the Appointments

24   Clause, and when it provides for appointment versus

25   designation -- and this is just one of those cases.  You have a

situation in which Congress only provided for a temporary designation.  That's a separate part of the rule, of course. The Supreme Court has said over and over that you can't temporarily appoint someone as an officer.  That doesn't exist. That phenomenon doesn't.

This started with a case involving the medical examinations, and the Supreme Court reaffirmed it in *Lucia*.  It has said that an officer is a permanent position.

So even if one were to say that the Supreme Court -- that the Congress intended, even though it didn't actually say so, for 3345(a) to produce an appointment, the fact that it's temporary means that it can't constitutionally provide for an appointment.  And that's, of course, totally consistent with the constitutional history.  It was only officers.

Again, if we look through the span of the nation's history from its founding until President Trump became president and you ask how many times is it that an employee stepped in for an officer, much less a principal officer, so far as we can tell, it's twice.  It's the two isolated examples.

And the government itself is the one who is telling you that historical practice has enormous value in informing the meaning of the Appointments Clause.  And if no other presidents except one in two very isolated instances thought this was how the Appointments Clause worked from the nation's founding, that's really strong evidence that it doesn't work this way.

1    You layer on top of it just the implications.  Again, their

2    position is the President, under the Constitution, can put in

3    any of those people and make them the attorney general of the

4    United States.  And it seems extremely unlikely that the --

5    these are fine people, but they may not have been vetted in the

6    sense that one ordinarily thinks.  Even if they're qualified to

7    be the attorney general, they could also be made the secretary

8    of defense, then the secretary of war.

9    And it seems extremely unlikely that a provision of the

10   Constitution that is intended to require that that person go

11   through Senate confirmation, they were satisfied that the

12   qualification be that the person be breathing.  That seems quite

13   a discordant set of standards.

14   We do layer on top of that, there is some intersection

15   between the statutory and constitutional points.  The government

16   has set up a strawman and said that our constitutional argument

17   is that the person has to have been Senate-confirmed.  That is

18   not our argument.  We've said that over and over.

19   We do think as a statutory matter, when we turn to this in

20   a minute, the fact that the Congress required that the DAG and

21   the associate and the other people on 508 be Senate-confirmed is

22   strong evidence that it didn't intend just to allow the

23   president to put in any of the 7,000 GS-15s under the Vacancies

24   Act.  But that's to come in a second.

25   THE COURT:  Okay.  I would like you to address how

1   these two statutes can be read together.

2          MR. GOLDSTEIN:  Terrific.  And I think that is the

3   right answer.  We, of course, have a constitutional avoidance

4   argument.  And that is, there's the layer on top that at the

5   very least the tie goes to the runner here.  And that is that

6   one would avoid the novelty at the very least of the

7   government's interpretation.  If one were to take -- I think you

8   have all the authority and wisdom that's required under

9   Article III to make the constitutional decision.  But if you

10  were to say these constitutional questions -- you describe them

11  as novel.  We think we have the better of the argument, that you

12  would read the statutes in a way to avoid that problem.

13         But then the question is, all right, the job is to

14  reconcile the statutes.  What's the best way to make them work

15  together?  Now, we both think, we and the government, that the

16  Office of the Attorney General is subject to both 508 and the

17  Vacancies Act.

18         The question is, when?  The government's position is that

19  all the time.  And that is, though 508 has the DAG and then the

20  associate and the attorney general can name other people, that

21  the president can nullify that at any time by putting in

22  somebody else, an employee, at any time.

23         We think that instead it's the mandatory designations that

24  come first, and then once those are exhausted, then the

25  president can use the Vacancies Act.  So the statute applies at

1    a different time.

2        The question is, which one of those two interpretations

3    makes better sense of the statutory scheme?  The answer is ours,

4    I think, both as a textual matter and as a functional matter.

5        So to start with the text, we are talking about 3347(a)(1),

6    and the structure of that statute, it says that the Vacancies

7    Act is the exclusive, which is the government's big word, means

8    to assign someone to a PAS position unless.  So it's exclusive,

9    assign, unless, and then it's a statute, designate.

10       Now, the government talks about the word "exclusive" a lot,

11   but I've never seen them talk about the phrase.  And we, of

12   course, read statutes as a whole.  And I can just give you

13   several examples that I think make quite clear that when the

14   statute has the structure, something is an exclusive way of

15   picking something, unless something else designates that thing,

16   doesn't give a choice to the president.

17       So here are three quick examples.  They all involve civil

18   litigation.  One is -- we'll just take the course of a

19   litigation.  First is where you're going to file suit.  If we

20   had a statute that said that the general venue statute is the

21   exclusive means of determining where a lawsuit may be filed

22   unless the statute creating the cause of action designates a

23   venue, you wouldn't say that the plaintiff could choose between

24   the two.  You would say that the designation in the specific

25   statute is controlling.

1        Then when we got to this court -- remember, we have the

2    Codrea case, of course.  We would have the rule that says the

3    wheel is the exclusive means of determining what judge will

4    decide a case unless it is designated as a related case.  You

5    wouldn't say that once it's a related case, you could then --

6    the court would then either use the wheel or the related case

7    designation.

8        And then with respect to how it is that we were to serve

9    papers in the case, if we had a rule that said the Federal Rules

10   of Civil Procedure is the exclusive means of determining the

11   deadlines for serving papers unless the judge specifies a

12   deadline, you wouldn't say that the plaintiff can then choose

13   between those two things.

14       When you have the structure, it's exclusive unless

15   something is designated, that structure recognizes that the

16   designation controls.

17       And I can give you an example inside 3347 itself.

18   3347(a)(2), so if I were just to take you to it, the structure

19   of this provision is, the Federal Vacancies Reform Act is

20   exclusive unless the president has put somebody in in a recess

21   appointment.  Right?  So it's the exact "exclusive unless"

22   structure.

23       No one would possibly say that this was intended to mean

24   that if the position is filled through a recess appointment, the

25   president can also decide to put in somebody under the Federal

Vacancies Reform Act.  There's actually an appointee under the
Constitution there.

And it's quite clear that the "exclusive unless" structure
there has our meaning, which is that if something is already
determined in another provision of the statute, then that is
controlling, whether it's a recess appointment or a designation.

So that's, I think, the textual point, and the second is
the structural one.  The government says, quite rightly, that it
leads a technical role for these other office-specific
designation statutes, the one for the attorney general, the
secretary of defense, the chairman of the joint chiefs, all of
those statutes, there are about three dozen of them, but its
role for them is extremely minor.  It's so minor so as to be
bizarre.

So they say that what Congress did is it enacted this
general statute and it turned the specific ones into a choice.
That is, Congress said to the president, okay, you can choose to
subject yourself to a limitation where the first assistant can
serve for 210 days or not.  I've never seen a statute that
operates like that.  Why would the Congress give that choice to
the president?

And the second is, what is the consequence of the choice?
So the choice -- if the president makes the choice to adhere to
the 210-day deadline, then he can appoint an employee.  But if
he decides not to follow the 210-day deadline, he can't

appoint -- designate an employee.  Why in the world would
Congress make the president's power to designate an employee
turn on whether the first person is subject to 210 days?

Our reading, on the other hand, makes perfect sense of the
statutes, because we know why the statutes exist.  What happened
was, starting in 1868, Congress started passing a general
vacancies statute.  Starting in 1870, it started creating these
office-specific statutes that were an exception to this.  So
1868, the president can put in any PAS person.  1870, no, he
cannot for the attorney general; it will be the solicitor
general.  The Vacancies Act is amended and changed, and over
time, Congress adopts three dozen of these statutes.  These are
all exceptions to the statute.  That's their entire reason to
exist.  It is to say that the president's general power to put
in somebody when this very important office is vacant doesn't
exist here.  Congress wants a very specific person to be in that
job, very frequently someone that they have confirmed.

And so what the government is saying is that while it does
have a technical role for those statutes, it is a nonsensical
technical role that guts the statutes.

THE COURT:  But can't Congress state that much more
clearly than it did so here?  And do you think that the Court
got it wrong here in *English* and also the *Hooks* Court?  Are
those decisions incorrect?

MR. GOLDSTEIN:  So I'm going to answer that, but let

me just very quickly focus on the fact that Congress could have done this more clearly.  Congress did do what they said quite clearly.  There are multiple of these office designation statutes, for example the ones for the Army, the Air Force, and the Navy, that operate exactly as they say this scheme does, because the office-specific statutes say the deputy will serve unless the president designates someone under the Federal Vacancies Reform Act.  The exact structure that they ascribe to the Federal Vacancies Reform Act Congress did in terms in the office-specific statutes but didn't do with respect to the attorney general.

So now let me address both of those decisions.  I will do *English* and then --

THE COURT:  But back to finish your point there, so why isn't that determinative here?  Why --

MR. GOLDSTEIN:  It would be our point, and that is, Congress knows how to do what they claim happened here.  And that is, if Congress did want to make the choice to say the president can override an office-specific designation statute with the Federal Vacancies Reform Act, it has done that three different times.  The Attorney General Succession Act stands in very stark contrast to that.  It has never been the case that the president could override them.

And can I give you one other reason?  And that is, when will you know the statute doesn't operate the way the government

1    suggests is that there is no default provision.

2              THE COURT:  What do you mean?

3              MR. GOLDSTEIN:  That is, what happens on day 1 when

4    the attorney general resigned?  Which statute controlled?  Was

5    it the Federal Vacancies Reform Act or Section 508?

6         There is nothing in the text --

7              THE COURT:  Succession, isn't it?

8              MR. GOLDSTEIN:  Pardon?

9              THE COURT:  Isn't it the 50 --

10             MR. GOLDSTEIN:  But why?  I mean, I agree that that's

11   what the government believes.  It's been very coy about it, but

12   I think that's their position.

13        But my point is, if you look at the text of the two

14   statutes, the one that says "shall" is the Vacancies Reform Act;

15   the one that says "may" is 508.  But the government, for no

16   apparent textual reason, says that 508 controls.

17        Even when Mr. Sessions recused in the Russia investigation,

18   that gave rise to the exact same issue.  And that is, it could

19   have been -- according to the government, the president had a

20   choice under the Vacancies Reform Act or 508.  But there is

21   nothing there that tells anyone what happens if the president

22   does nothing.  And he did do nothing.  Remember, Mr. Rosenstein

23   stepped in for the attorney general in the Russia investigation.

24   There is today no textual -- according to the government, no

25   textual way of knowing whether he can only serve for 210 days.

1    Because when Congress wants the statute to operate as the

2    government suggests, it adopts a default rule -- take the Air

3    Force, Army, and Navy statutes, a default rule.  And that is,

4    the deputy will serve.  And then it says, or the president can

5    displace that person under the Vacancies Reform Act.

6         It never has had a situation so far as we are aware in

7    which it's just a jump ball.  And the government's position that

8    the president can choose would gut, as we explained in our

9    brief, an array of statutory construction principles, which is

10   just the more specific provision controls.

11        THE COURT:  But Congress did consider excluding

12   Department of Justice from the FVRA, and it didn't.

13        MR. GOLDSTEIN:  And we completely agree.  Remember, I

14   started with the fact -- because this is again a strawman of the

15   government.  The government says it used to be that the attorney

16   general was not subject to the Vacancies Reform Act ever, and it

17   now is.  That's right.  The question is when.  Is it when the

18   designations are done, because 3743(a)(1) says while it's

19   designated that statute controls, or is it from day 1?

20        And before one says that seems an odd structure, remember

21   that the government adopted our reading of the statute

22   initially.  The White House counsel adopted our reading when the

23   statute was enacted and said it was the Vacancies Act applies

24   once the designated officials are exhausted.  And then every

25   president from that point on has issued an order of succession,

1    an executive order.  Every one of them adopts our

2    interpretation.  The president has never issued an order of

3    succession that deviates from 508 controls and then the

4    Vacancies Act.  Never has it happened.  It is always in the

5    structure of 508.

6        Not only that, every one of those designation orders, the

7    executive orders, every one of those for every other agency does

8    the same thing.  So as I mentioned, there are some three dozen

9    of these statutes.  The president has issued executive orders

10   with respect to probably half of them over time.  Every single

11   time the president does that, he has respected the

12   office-specific statute and then applied the Vacancies Reform

13   Act.  We have not been able to and the government has not

14   identified any time where this supposed power to displace the

15   designations statute was ever asserted by the president.

16       I don't want to lose sight of *English*.  I'm just trying to

17   answer your question.  *English* and *Hooks*.

18       What happened was, starting in 2003, the government with

19   respect to the Office of Management and Budget -- this will

20   inform the discussion of *Hooks,* with respect to the Office of

21   Management and Budget all the way through 2017 dealt with

22   statutes that aren't designated statutes.  The designation

23   statutes are in 3347(a)(1)(B).  Those are statutes under

24   3347(a)(1)(A).  They have a different structure.  (a)(1)(A)

25   refers to statutes where the president or the department head or

1    a court of law can pick the person.  And there it's, I think,

2    fair to say, those don't have the structure I gave you of the

3    venue statute or the wheel or the deadlines, because they don't

4    pick something.  They provide another process.  And there, the

5    government has said, well, the processes are not exclusive.

6    That is a different question from the statute that designates.

7         Even when -- the government relies, for example, on Peter

8    Keisler being made the acting attorney general over Paul Clement

9    when he was the SG.  That's dealing with 508(b).  That's a

10   situation where the attorney general provided a succession list.

11   The statute itself did not designate anyone in that situation,

12   and the president chose his own designation list over the

13   attorney general's one.  It doesn't give rise to the designation

14   issue.

15        So let me deal with *English* and *Hooks*, if I can.  So *Hooks*

16   has that structure.  So I will just start with it.  And that is,

17   the NLRB statute in *Hooks* -- let me just be quite clear.  Both

18   *Hooks* and *English* do say in the context of those cases it's

19   nonexclusive.  So I don't want to run away from that.  I do want

20   to say that our result would be consistent with those decisions,

21   but I'm not running away from the fact that in one paragraph

22   each of those decisions, *Hooks* completely in dictum, says when

23   one of the exceptions applies the statute is nonexclusive.  I

24   understand that.

25        The reason the cases are actually distinguishable is the

1    following:  *Hooks* does not involve (a)(1)(B).  It is not a

2    designation statute.  It is instead a statute where the

3    president would have been able to pick the general counsel of

4    the NLRB, but from a different list.  It wasn't that the statute

5    itself designated who would be the NLRB general counsel.  And

6    that case was a very strange situation.  It was only a question

7    of how long the person could serve, not who the person was.

8    Both statutes authorized the same person.

9        *English* is a different matter.  So here are really

10   important distinctions in *English*.  In addition to the fact that

11   neither of those cases involved the constitutional issue,

12   number 1, *English* itself in term says if Congress wanted to

13   displace the FVRA, it would have done something like 508.  I

14   mean, it says those words.  The Court quite clearly points to

15   our statute as an example of something that Congress would write

16   to displace the FVRA.

17       Second, it was very important in *English* that Dodd-Frank

18   was adopted second after the FVRA and has a provision that says

19   this statute shall be --

20           THE COURT:  Shall.

21           MR. GOLDSTEIN:  -- construed as consistent with prior

22   law.  And the court refers to that many times, and the

23   government relied on it quite heavily.  That is, Congress was

24   understood to adopt Dodd-Frank on the basis of the provisions of

25   Title 5 that included the Vacancies Reform Act.  In fact, the

1   Court found that it was obliged to make the FVRA the controlling

2   statute and not displace the FVRA in light of that special

3   provision --

4        THE COURT:  But in this case the statute comes after

5   the succession statute; right?

6        MR. GOLDSTEIN:  That's right, exactly, but there isn't

7   the provision here that you have in *English*.  And that is, there

8   is nothing in the Attorney General Succession Act that says you

9   shall conform it to the later-enacted Vacancies Act.  There is a

10  principal of law, however, and that is, of course, that Congress

11  adopt statutes against the backdrop of the understanding of

12  existing law.

13       So you ask yourself, in 1998 when Congress enacted the

14  Vacancies Reform Act, how was 508 understood?  What was the

15  backdrop of it?  The understanding was that 508 controlled over

16  the Vacancies Act.  Even before 1998, the position of the

17  Executive Branch is that the Vacancies Act was not exclusive.

18       THE COURT:  But that's the practice.  Did they think

19  that that was required?

20       MR. GOLDSTEIN:  Oh, I think - well, everyone -- I

21  think you do ask yourself, what was the practice?  How was the

22  statute being applied?

23       And so the relevant point, I think, is that presidents

24  100 percent of the time before the adoption of the Vacancies

25  Reform Act in 1998 treated 508 as controlling over the Vacancies

Act.  And it was very analogous.

Starting in 1973, the Department of Justice took the position that the pre-FVRA Vacancies Act was nonexclusive.  The presidents could use other statutes, not just the Vacancies Act. This was described in *Southwest General* by the Supreme Court. It's what spurred the adoption of the FVRA in 1998.

So the Department of Justice said no, the president can pick from the Vacancies Act or other statutes.  Under that interpretation of the Vacancies Act, presidents never did this, never went so far as to say that we see there's an office-specific designation statute, whether 508 or any of the three dozen others, and I'm going to use my Vacancies Act power to trump that.  That was the backdrop under which Congress adopted the Vacancies Reform Act in 1998.

So you say, what tells me in 1998 that Congress wanted to take these three dozen statutes and have them work in a totally different way ever since they were adopted, since the Attorney General Succession Act was adopted in 1870?  From 1870 to 1998, 128 years, it had been understood that you could not displace the DAG with the Vacancies Act.  What is it that tells me that Congress decided to change its mind?  And what would make sense for Congress to change its mind with respect to that and the other statutes in a way that operates as I described, which is, their only job is to circumvent the Vacancies Act, to avoid the date, and when the only consequence of avoiding the date is that

1    the president can't appoint an employee?  There's just no

2    rational reason why Congress would do that sort of thing.

3         And so if we just come back to kind of what the governing

4    principle of statutory construction is, we have to put these two

5    things together.  You have two choices.  Our reading is

6    perfectly reasonable, and that is, they work together in the

7    designation sense.  And that is, the office-specific statute is

8    controlling while there's a designation; then the Vacancies Act

9    applies.  So it does apply to the Office of the Attorney General

10   in that way.

11        Or you can say that the Vacancies Act applies from day 1

12   and just blows up in every functional way the Attorney General

13   Succession Act.  To do that, to so radically undermine the

14   purpose of a statute that existed for 128 years, that's whole

15   purpose is to be an exception to the Vacancies Act, that is

16   mirrored in three dozen other statutes, you would really think

17   Congress would say it was going to do that, and it just did not.

18        The only thing the government points to is one half of one

19   sentence in a Senate report on a bill that was not enacted that

20   didn't even include the word "exclusive."  When -- that report

21   expressly says these office-specific statutes are an exception

22   to the Vacancies Act.

23        It is implausible, we submit, that Congress would have made

24   such a radical change on such a radically important question.

25   Who is the attorney general is a big deal.  Who is the secretary

1    of defense is a big deal.  It matters who is the chairman of the
2    Joint Chiefs of Staff.  If the Congress were about to say that's
3    a jump ball, I see you have 7,000 employees who are GS-15s, pick
4    anyone you like, we can't be bothered, someone would make a
5    point of it.  We do not find elephants in mouse holes.
6        Anything else?
7                THE COURT:  No.  Thank you.
8                MR. GOLDSTEIN:  Thank you.
9                THE COURT:  All right.  Mr. Mooppan?
10               MR. MOOPPAN:  May it please the Court.  I would be
11   happy to start with constitutional questions.
12               THE COURT:  Sure.
13               MR. MOOPPAN:  So on the constitutional questions, the
14   unbroken history of practice and precedent demonstrates that the
15   president is entitled to select on a temporary basis a
16   non-Senate-confirmed official to perform the functions of a
17   principal office.  Plaintiffs actually concede that, and they
18   make a big deal of conceding it and saying that it's a strawman.
19   And what they want to say is the fight here is over who can
20   serve in that capacity.  Their argument, as best I can
21   understand it, is that the person who can do it is only the
22   so-called first assistant.
23       As a threshold matter, they don't really explain where they
24   get that from the text of the Appointments Clause.  But I think
25   what the basic argument they're making is that that is a part of

the first assistant's job responsibilities as an inferior

officer.  In other words, he's an inferior officer, and one of

his jobs is to perform the functions of the principal officer

when the principal officer is gone.

If that's their theory, it's flatly belied by the same

history of both the Legislative Branch and the Executive Branch

and the Judicial Branch.  So let me just go through those in

turn.

The first is the acts of Congress that were passed in 1792

and 1795.  Those statutes quite clearly do not restrict the

acting secretary of state and treasury and the war department to

the first assistant.  They say any person could serve as the

acting secretary.  They could have.  It would not have been very

hard to write a statute along the lines that plaintiffs suggest

that says the acting secretary of state, treasury, or war shall

be the chief clerk and, if the chief clerk's not available, any

other Senate-confirmed person, and if all that's not available,

then any person.  They didn't write that.  They just said "any

person."

And this wasn't some accidental choice either, because

there were two of these statutes.  It started in 1792, and it

said any person for those three departments.  But it was only

for a limited set of vacancies.  It was either for a death or

sickness or absence.

And then in 1795, Congress both simultaneously broadened

1    and narrowed the statute.  It broadened it by making it for any

2    vacancy; it narrowed it by limiting it to six months.  That

3    makes crystal clear that Congress, these early Congresses, which

4    the Supreme Court has repeatedly emphasized are strong evidence

5    of proper interpretation of the Constitution because they

6    included many of the people who ratified the Constitution, it

7    makes perfectly clear that those individuals thought that the

8    critical function was not who the person is, not what their

9    extant office was.  It was instead that they were serving on a

10   temporary basis.

11         And that legislative judgment, of course, carries through

12   to this day because the FVRA, as plaintiffs also concede,

13   clearly and unambiguously -- and I will get into this more when

14   we get to the statutory side -- clearly and unambiguously allows

15   non-Senate-confirmed officials who are not the first assistant

16   to serve as acting principal officers, because for among other

17   reasons there are cabinets and departments that don't have

18   office-specific vacancy statutes, like the State Department.

19         So when he stands up and says you would have thought

20   Congress would have said something, Congress made crystal clear

21   that for the State Department, which is one of the very first

22   cabinet departments in this country, it is permissible to

23   appoint an acting secretary of state who is not Senate-confirmed

24   and who is not the first assistant.  So that's the Legislative

25   Branch.

1          Now let's turn to the Executive Branch, which I think is
2     probably the most showing of why he is incorrect.  He is right.
3     He points out that most of the early history involved so-called
4     chief clerks.  What he is wrong about is what those chief
5     clerks' job responsibilities are.  He asserts just boldly that
6     their job was, among other things, to step into the shoes of
7     their bosses when the principal officer was gone.  He doesn't
8     cite anything to support that.
9          If you look at the statutes that created the chief clerks,
10    the statutes that created the Treasury Department, the State
11    Department, and the War Department, what you will see is it says
12    nothing of the sort.  What it says is that the chief clerks are
13    there to do whatever the principal officer says.  And when the
14    principal officer is vacant, what was their job responsibility?
15    To hold onto the papers.  That was their job responsibility.  It
16    doesn't say a word about their job being to take over the
17    department and run it.
18         And you don't have to take my word for that, because it's
19    what the Court of Claims held in *Boyle*.  In *Boyle*, a chief clerk
20    sued to recover compensation for when he served as acting
21    secretary.  And the Court of Claims said exactly what I just
22    said, which is, he did not serve as acting secretary ex officio.
23    It wasn't a part of his job responsibilities.  The reason he
24    served is because the president picked him, and because the
25    president picked him to do something that was not a part of his

job responsibilities, that's why the Court of Claims held he would get extra compensation.

So I agree with plaintiffs, the fact that he got compensation or not is not a part of the constitutional rule. The reason why he got the compensation is quite relevant.  The reason -- I urge the Court to read *Boyle*.  We only quoted part of it, but it's a very short opinion.  It makes very clear that it was not ex officio.  It was not a part of their job responsibilities.  If you look at the statutes that created the chief clerks, that's abundantly clear that it was not a part of their job responsibilities.

There too, that historical period -- sorry.  One other thing I should say about the history.  The other thing that he skipped over, because he kept saying there were only two, that's not true, because there is a clear history of picking other Senate-confirmed officials, including in other departments.  For example, when the secretary of treasury was absent or vacant, they would let the secretary of war, for example, be the ad interim service.

And why that's important, it's true they are Senate-confirmed, but they sure weren't Senate-confirmed for the other department.  No one, when they confirmed, for example, a general to be the secretary of war, necessarily made the determination that you know what, he can also be the secretary of state and go negotiate peace agreements or he could be the

attorney general and take care of legal matters.  No one
confirmed them to that job.  And unlike today, where the FVRA
makes totally clear that when you are Senate-confirmed, under
3345(a)(2), that means that the president can also designate you
to serve as another acting principal, so that you could say that
the confirmation for one job is essentially confirmation for all
the other jobs.

That was not true at the founding.  The statutes did not
say that when you're confirmed for one job, because of the fact
of confirmation you can be confirmed for any other job.  As we
talked about earlier, what the statute said was any person could
be picked for those other jobs when there was a vacancy.

So he doesn't have any explanation for why those are
permissible either, and he also doesn't have any explanation for
why, when there was no first assistant, they were allowed to
pick someone who was not either the first assistant or
Senate-confirmed.  He seems to suggest there's just some
floating emergency exception to the Constitution, but there's,
obviously, no such exception in the text of the Constitution,
and I don't know where the basis for creating an emergency
exception would be.

The way it does reconcile this is in *Eaton*.  The point is
that, when you are serving temporarily, you are not actually the
principal officer.  You are at most an inferior officer.  And
once you think about it that way, it makes perfect sense that

1    you could pick either the first assistant or a Senate-confirmed

2    person or someone else.  The fact of the matter is, they are not

3    the principal officer.  They are only acting as the principal

4    officer and at most are an inferior officer.

5            THE COURT:  Do you think *Eaton* alone controls here, or

6    do I have to rely on the historical practice of the political

7    branches?

8            MR. MOOPPAN:  I think *Eaton*'s reasoning does control

9    here.  But I agree with him that factually *Eaton* is not the same

10   as this case, because the statute in *Eaton* did contemplate

11   expressly that the vice consul would serve as acting.

12       I would point out one thing about that, though, which is,

13   he says that the vice consul in *Eaton* was sort of the functional

14   equivalent of the DAG; he was the first assistant.  That's not

15   right either.  If you look at the statutes that are cited in

16   *Eaton*, you will see that the vice consul -- the vice consul had

17   one and only one job.  It was to step into the shoes of the

18   principal when the principal was gone.  There was such a thing

19   as a deputy consul.  If you look at the statute that's cited in

20   *Eaton* and you pull up the original -- it's a revised statute, I

21   believe 1674.  You will see that there's a consul, a deputy

22   consul, and then there's a vice consul.  The only thing a vice

23   consul did was step into the shoes of the principal officer, the

24   consul there, when the consul was gone.

25       I think what that shows is that his position is largely one

of labels.  If it's permissible, as *Eaton* squarely holds it is,
to have sitting on the books an office where the only job of the
office is you will serve as the acting principal when the
principal is gone, and that choice can be made by the president
without Senate confirmation, and you could pick literally any
person off the street, as happened in *Eaton* where they picked a
missionary who had no prior government role, the secretary of
state appointed him to be the vice consul solely for the purpose
of serving as the consul because the consul was sick, going home
to die, which is what he did, there is no difference between
that and under the FVRA the president designating someone to be
exactly the same thing, someone who serves as the acting
principal for a temporary period when the Senate-confirmed
principal is not present.

    And I think that largely answers his point about the
employees as well.  He could be making one of two different
arguments.  If he's arguing that you can't pick someone who was
an employee before, I think all of the sort of legislative,
executive, and judicial practice that I just talked about shows
that that is wrong.

    He is, I think, making a second argument, which we should
have addressed a little bit more squarely in the brief, which is
this.  I think what he's saying is that you have to become an
officer before you could serve as an acting principal.  And I
will say two things about that.  One is, it's not entirely clear

that it's right, because as he pointed out the Supreme Court has repeatedly held that for there to be an office one of the requirements of an office is it has to be continuing and permanent.  And if you're only serving temporarily, arguably, you don't need to have an office.

But let's grant him the premise that -- and this is what OLC said and this is what is in our brief -- that you do need to have a, quote unquote, appointment as an inferior officer, why would the FVRA not satisfy it?  The FVRA is the president designating a certain person to serve exactly in the role that the vice consul in *Eaton* served.  His only point is that it uses the D word rather than the A word.  It says "designate" rather than "appoint."  There is no reason that should be given constitutional significance, especially given the canon of constitutional avoidance.

The only argument to the contrary is he relies on *Weiss*. *Weiss* is a very different case because it's basically the converse.  In *Weiss*, it was undoubted that it wasn't an appointment.  We know this because the person who was making the choice was not the president or secretary of war or defense at the time, who are the only people who can actually make an appointment.

It was, I believe, the JAG who was the person who designated someone to be a military judge.  So there was no question that that statute did not purport to be authorizing an

appointment.  The only question is whether the statute required an appointment.  And in the context of saying it didn't require an appointment, the Court made the point that it doesn't use the word "appoint," it uses the word "designate."

Fair enough, but that's not enough to say you should strike down the FVRA as unconstitutional as applied, even though it's unquestionable that Congress could have written it to make even clearer that it is an appointment if that were necessary.

So with that, unless you have any other questions on constitutional, let me turn to the statutory.

THE COURT:  Go ahead.

MR. MOOPPAN:  On the statutory, again, there are a lot of points that we both agree on, though he tries to make it like we are suggesting that it's all a red herring.  It is undisputed that the plain text of 3345 allows the president to designate a chief of staff to serve as the acting principal.  It's clearly covered by the text of 3345.  There is no question that agency heads are covered by the FVRA.  And there's no question that that's true equally for the attorney general, because the Congress and the FVRA expressly removed an exclusion that would have meant that the FVRA didn't apply to the Office of Attorney General.  So there's really no doubt that the statute applies to the Office of Attorney General, and he agrees.

What the fight is about at this point is, does Section 508 displace the FVRA?  And on that, we know what the answer is,

because Congress has already told us how the FVRA interacts with office-specific statutes.  And what Congress said in 3347 is that the FVRA is generally exclusive unless there is an office-specific statute.

THE COURT:  Which there is here.

MR. MOOPPAN:  Which there is here.  But what that means is, it is not exclusive, but that does not mean it is not applicable.  There's a difference between the statute being not exclusive and the statute being not applicable.

THE COURT:  Why doesn't the plain language of that provision suggest that you go to a specific statute and stay there?

MR. MOOPPAN:  I would say two things.  One is, if the point was to say it has rendered the FVRA inapplicable because you go to the other statute and stay there, you wouldn't have phrased it as an exception to exclusivity.  You would have phrased it as an exception to applicability.  And the FVRA has a whole separate section about when the FVRA is not applicable.  It's 3349(c).  It lists a whole bunch of offices where the FVRA is not applicable.  It would have been perfectly sensible and more sensible to put in that section of the code office-specific statutes.  So you would have said the FVRA does not apply to all those things and also when there's an office-specific statute.

He's got a response to that, too, which is, he recognizes that he can't say the entire FVRA is inapplicable just because

there's an office-specific statute.  So what he tries to do is
he tries to generate a rigid order of operations.  You first
have to do the office-specific statute, and if and only if
that's exhausted, then the FVRA kicks back in.  And on that, the
text of the statute just doesn't say that.

As your Honor pointed out, if they wanted to say that, they
could have said it.  They could have said it in many different
ways.  That would have been much clearer.  They could have said,
for example, that the FVRA does not apply unless an
office-specific statute has been exhausted.  They could have
said that the office-specific statute is exclusive unless it's
been exhausted.  What you would not say is that the FVRA is not
exclusive unless.

He tries to say otherwise because he emphasizes the fact
that it uses the word "designates," as if "designates" somehow
by its plain text requires you to go in the one bucket and take
the other bucket off.  And I think there's a couple reasons why
that's wrong.

First, he used a lot of hypotheticals, but what he did in
every one of those hypotheticals is the first part, the part
that was exclusive, he had it be something that it was
automatic, like venue shall be under such statute or the wheel
shall work.  The reason this is different is because this
statute, the thing that's exclusive, is something that says the
president may do something.  So if you had a statute that said,

1    for example, venue may lie in districts A, B, and C, and that

2    shall be exclusive unless another statute designates D and E,

3    there, I think it quite plausibly could be read and properly

4    would be read to say that those coexist, that it's not that A,

5    B, and C get displaced if D and E exist.  At that point it's

6    plaintiffs' option where to go with A, B, and C or invoke the

7    automatic rules of D and E.

8         The other problem with his impasse on the word

9    "designates," if that were true, then it shouldn't matter

10   whether there was someone in the office.  So let's say there was

11   no deputy attorney general, say there was no associate attorney

12   general, and let's say the whole 508 all the way down was not

13   filled.  It still designates someone.  The person is just not

14   there.

15        So there's no textual basis to say that because it

16   says "designates," you have to go to that statute, but only if

17   there's someone there, and if someone's not there, you can kick

18   back into the FVRA.

19        And that's particularly true, because as he pointed out

20   when he was trying to distinguish *Hooks*, if you look at 3347, it

21   deals with two types of designation statutes:  Statutes that

22   authorize the president to designate and statutes that directly

23   designate.  He recognizes that for the first of those two

24   prongs, there, his designate argument doesn't work, that because

25   it says the president "may" and then because it says the

1    president "may" the president has a choice.

2         The problem for him is, he's having 3347(a)(1)(A) function

3    fundamentally differently than 3347(a)(1)(B).  (a)(1)(B) somehow

4    displaces the FVRA; (a)(1)(A) does not.  That's an odd way to

5    write the statute, especially given the legislative history

6    where the legislative history listed all 41 of the statutes that

7    fall within either (a)(1)(A) or (a)(1)(B) and then said of all

8    of them in a clear sentence -- and I would urge the Court to

9    read the sentence because he suggests we've clipped it, but we

10   haven't.  It says that "if those statutes were to remain in

11   force, the FVRA would nevertheless provide an alternative

12   procedure."  It didn't say an alternative procedure if those

13   people were exhausted.  It just said an alternative procedure.

14        The last thing I would say on this is, he's tried to

15   suggest this is an unprecedented application of the statute, and

16   it's not, because of the -- primarily because of the example

17   where George W. Bush designated Peter Keisler to serve as the

18   acting attorney general, even though Solicitor General Clement

19   was available.

20        He is right that the solicitor general under 508, it's now

21   one of the two people automatically designated.  But the way 508

22   is written, it says if those two people aren't there, if the DAG

23   and the associate are not present, then the attorney general may

24   specify other officers, solicitor general and other assistant

25   attorney generals in order.

1        And the critical point is, the attorney general had done

2   that.  At the time there was an AG order in place, and Solicitor

3   General Clement was the next person in line.  And nevertheless,

4   President Bush invoked the FVRA and leapfrogged and picked

5   Assistant Attorney General Keisler.

6        They have no textual basis for how that could have been

7   lawful under their argument, because there is no question that

8   that was a -- 508 was there.  The 508 person was available and

9   could have served.  They had been designated.  They'd been

10  designated pursuant to the attorney general's existing order

11  that was in place and couldn't be revoked because, of course,

12  the attorney general wasn't there to revoke it.

13       I don't think there's any possible way to say that they are

14  right without saying that that designation was unlawful, that

15  Acting Attorney General Keisler illegally served and, therefore,

16  that every action he took while acting attorney general would

17  all be ultra vires and not subject to ratification.

18       Unless your Honor has further questions.

19          THE COURT:  No, thank you.

20       Mr. Goldstein?

21          MR. GOLDSTEIN:  Thank you, your Honor.  I will take it

22  in the same order, if that's okay.

23       So, the government's position is that the Appointments

24  Clause says "any person."  So let's just be on the record that

25  the government's position is that the president under the

Appointments Clause, which has no time limit for temporary

appointments, says pick any human being that's breathing and put

them in until you decide to send someone to the Senate.

That is not a plausible reading of the provision of the

Constitution that is intended as fundamental to the separation

of powers.  There has to be some limiting principle.  The

government has none, because they have to fall back on the fact

that the 1792 and 1795 statutes didn't say it has to be the

second in charge.  And that's because those statutes at the

beginning of the nation didn't set boundaries.  You didn't know

who was going to be available at any particular time.

I have one really good piece of evidence that says that it

was not understood, as Mr. Mooppan says, that it wasn't intended

to authorize the President to put in any person.  That is, for

70 years, until Congress wrote a statute, the president didn't

do it.  It did not happen.  Only one of two people was put in.

If the person, if the secretary was out of town or sick,

with the exception of those two very limited examples -- in

fact, 100 percent of the time, because the two examples are

where the office is vacant, 100 percent of the time, according

to the Office of Legal Counsel, the chief clerk, who is the

second in command in the department, stepped in.  The chief

clerk stepped in without an order from the president.  It is

true that if the office was vacant, then the president would

write an order.

1    But if you look at the trial, the impeachment trial record,

2    if you look at the OLC opinion, you will see well over, I think,

3    a hundred instances where the secretary is sick or away and then

4    the chief clerk takes responsibility and takes charge of the

5    office.  That is the best evidence of how those statutes were

6    understood to operate.

7    If it were like Mr. Mooppan says, that the president could

8    pick anyone he wanted in those circumstances, he would have done

9    that.  But he never did.  It was either a Senate-confirmed

10   person, almost always a department head, except for the

11   military.  They might put in a general.  Or it was the chief

12   clerk.  That is how it actually operated.

13   And that's quite, quite important in understanding

14   historical practice.  It is quite, quite important in

15   understanding the context of *Eaton*.  And it is quite, quite

16   important, because it is a really important limiting principle.

17   If that person is in place ahead of time, is the second in

18   command ahead of time, if it is understood that they will fill

19   in in times of sickness or vacancy, that really limits the

20   president manipulating the appointment power to fire the

21   principal officer and put in somebody who is convenient and

22   avoid Senate confirmation.  The idea is because the person

23   preexists -- it is subject to manipulation conceivably, but it

24   is harder to manipulate.  That person exists.  And because they

25   do have that predefined job, the chief clerk in particular, then

they do ordinarily have someone who is in charge of them.

And I'd just invite the Court to ask, in writing an opinion, does there have to be some limiting principle here, or is the government right that the president was empowered to fire every single member of the cabinet, put in any breathing human being of any age or nationality for any period of time until the president decided to nominate someone, or was there some constraint?

And on the view that there is no constraint, it is not fundamental to the separation of powers.  It is a typo in the Constitution.

On the textual arguments, first of all, if we are right that there is at least a constitutional question, one could look at this as saying, look, what the government is saying the rule is was never actually operationalized as the rule.  They have no doubt that it happened only twice in history that you had an employee do this or you had someone other than the first assistant who wasn't Senate-confirmed going for a principal officer.  So the country has been around for a long time.  What they were saying before this president happened twice.  That is, I think, fairly described as a significant constitutional question, at the very least.

Then you ask, hey, how could this statute be interpreted?  And I will concede, my friend says -- he used the verbiage it's plausible in his venue example that you would get to choose the

two.  "Plausible" is not a very high standard.  But take his

example.  If the venue statute said venue will exist in the

District of Maryland or the District of Columbia or the Eastern

District of Virginia, unless the statute specifies the Eastern

District of Pennsylvania, is it conceivable that that's a

choice?  It's conceivable, but it is not likely.

The government never, in all of its briefing in the OLC

opinion never takes the clause as a whole.  Mr. Mooppan didn't

say a single word about the purpose of the statutes that he's

negating here.  He didn't say a single word about how it is that

Congress could have intended to adopt this crazy framework,

where the only purpose of these statutes is to negate the amount

of time and then the effect is that you can appoint an employee.

If one were to say I'm trying to put these statutes

together, I'm trying to make the text work together, I'm trying

to make Congress's intent work, then you would say that at the

very least ours is the more sensible one of those.

He has a couple of technical arguments I should mention.

Number 1, he says it doesn't make sense that the Congress did

what we ascribe to it in 3347 because it wouldn't exclude an

office in 3347.  We know that's not true, because 3347 excludes

an office.  If you were to look at it, it says it is exclusive

with respect to every executive office except the General

Accounting Office, or now the Government Accountability Office,

whatever.  Its name changed.  But that office has to be -- using

our interpretation, that office is excluded in terms under 3347.
And it has to be understood that it doesn't become optional for
the GAO.  You can't use the Vacancies Act or some other
provision.

And the reason the Congress didn't refer to the Attorney
General Act any more is because it wasn't excluding it
altogether.  And the reason why it wasn't referring to the
attorney general is that there are three dozen statutes that are
office-specific statutes.  So it dealt with them en masse.  It
wasn't necessary or even sensible to have a provision specific
to the Office of the Attorney General.  But we know it's not the
case that Congress only dealt with, you know, excluding offices
in 3349(c), because 3347 has an office-based exclusion.

Remember as well that he didn't discuss at all the recess
appointment provision, which is 3347(a)(2) and under the same
structure.  It cannot be the case that it is exclusive unless
the president makes a recess appointment, and that means that
the president can make a -- can make a temporary designation
while the office is full.  It has to be in that instance that
the "exclusive unless" clause means that the Vacancies Act
doesn't apply at all, which is our position.

And that is, when the statute designates -- so there is a
person who is designated.  It is the DAG.  Rod Rosenstein is in
the building probably right now.  He is available.  While he is
designated, then that controls.

1    It is important, we think, that this is not some

2    fly-by-night drive-by interpretation of the statute.  It is the

3    interpretation of the Executive Branch during the statute's

4    enactment and until 2017.  Remember, the White House Counsel

5    issued a regulation adopting our interpretation, rejecting

6    theirs.  And then all of the executive orders under the Attorney

7    General Succession Act and all the designation statutes use our

8    formulation.  Again, it we're trying to make them work together,

9    not negate them both, make sense of them both and avoid the

10   constitutional question, then you would adopt our

11   interpretation.

12   As to the Paul Clement example, he misunderstands the

13   difference between 3437(a) and (b).  So, Paul Clement and Rod

14   Rosenstein become the acting attorney general under two

15   different provisions.  Rod Rosenstein is under -- it would be a

16   statute that is governed by 3347(a)(1)(B), because there the

17   statute designates the DAG.

18   When Paul Clement was designated, he was designated by the

19   attorney general, not by the statute.  508(b) says look, once

20   you get past the associate, the attorney general gets to pick.

21   And so that's another set of options.  That's much more like a

22   venue statute that says venues A, B, and C are exclusive unless

23   Congress provides for venues D, E, and F.  In those situations

24   where you have two different lists, it is much more plausible to

25   believe that both choices are available.

1    But when you have quite clearly -- when the Congress

2    designates the Eastern District of Pennsylvania, when Congress

3    designates the DAG or the deputy secretary of defense, it wants

4    that person or that place.  It is making a very concrete choice.

5    You would need a good reason to believe that Congress negated

6    that choice.

7        And with all respect, half of a sentence in a Senate report

8    on a version of the statute that was not -- a statute that

9    wasn't adopted that doesn't even include the word "exclusive"

10   when the report says in terms that those statutes operate as an

11   exception to the Vacancies Act, is not anywhere within the field

12   of reason of the reaction you would expect in Congress on a

13   question like this.  To say any of 7,000 people, any of these

14   five lawyers can be the attorney general because they're all

15   GS-15, I hope -- they deserve it.  But anybody who is senior in

16   the Department of Defense can now be the secretary of defense.

17   Anybody can be the joint chief of staff who is senior there.

18   Any of these offices.  Is it conceivable that Congress would

19   make that choice?  Okay.  That would be an interesting choice.

20   It would surprise me.

21       I feel comfortable saying that somebody would mention it.

22   Heads-up, everyone, this statute has been around for 128 years,

23   it exists for a very good reason.  The attorney general can

24   investigate the president, we prefer that the president not be

25   able to put in somebody that will have control over the

1    investigation without that person being Senate-confirmed,

2    something like that.  Somebody would make a point of it.

3        And when nobody says anything and it's possible to

4    reconcile the statutes as we do in a very sensible way, as the

5    government did originally, that's the better interpretation.

6            THE COURT:  All right.  Thank you.

7            MR. GOLDSTEIN:  Did you want us to talk about

8    consolidation, your Honor?

9            THE COURT:  I do.  Before we do that, I want to ask

10   the other attorneys if there are any other issues that I have

11   not asked you specifically about that you would like to raise,

12   if there are any other points that we haven't covered here

13   today.

14           MR. PRINCE:  I don't believe so, your Honor.  We would

15   just rely on our briefs.  Thank you.

16           THE COURT:  All right.

17           MR. MOOPPAN:  There is one thing I do want to raise,

18   which is a scope of relief issue, which I probably should have

19   mentioned at the tail end.  This is limited to the Whitaker

20   piece.

21       I just wanted to emphasize two things about the scope of

22   relief.  If you look at their complaint and their motion, they

23   actually ask for an injunction that says that -- to enjoin

24   Acting Attorney General Whitaker from performing the functions

25   of the office.

1          Two things about that.  One, even if they're right on the

2     merits, the most that they could get is an injunction enjoining

3     the enforcement of the bump-stock rule, because they don't have

4     standing to complain about Acting Attorney General Whitaker's

5     actions beyond the bump-stock rule.  So that's the first thing.

6          And the second thing about the scope of relief I want to

7     mention is, the most they would be able to get is an injunction

8     against the bump-stock rule.  But of course, depending on what

9     this Court rules on the non-Appointments Clause challenges to

10    the bump-stock rule, it's possible, depending on how broad the

11    relief this Court grants, that there would be no reason to reach

12    the Appointments Clause issue.

13         Now, that will turn on whether this Court grants relief

14    limited to the plaintiffs, as we think would be proper, or

15    whether it granted broader relief, which I think is an issue

16    that really, frankly, hasn't been briefed about scope of relief.

17              THE COURT:  All right.  Thank you.

18         This reminds me, Firearms Policy Coalition does have a

19    motion to file an amended complaint.

20              MR. GOLDSTEIN:  The question of whether we can do this

21    as a matter of right is perhaps a little complicated.  It's our

22    first amended complaint, although we were a part of an earlier

23    complaint.  I don't know exactly what the rules do in that kind

24    of odd situation.  There's been no answer filed.  So we could

25    debate that question, but it may be objectionable.

1        THE COURT:  Does the government object to this motion?

2        MR. MOOPPAN:  No, your Honor.

3        THE COURT:  Okay.  The motion is granted.

4        MR. GOLDSTEIN:  That, I think, speaks to the scope of

5   relief question, because we do have declaratory judgment claims

6   and we do have standing to get those, unquestionably.  So

7   putting aside the question -- we're not trying to unduly

8   interfere with operations.  We're not asking for an order that

9   he get out of the office.  We are very conscious of the

10  sensitivities there.

11       But we do have the declaratory judgment claims.  We

12  represented to the Court when we filed that that after the

13  Court's ruling we would promptly confer with the government.  We

14  don't want to defer appellate review.  We're not trying to play

15  games.

16       We were a little concerned about what Mr. Mooppan is

17  suggesting is going to happen, and that is, that they might try

18  and moot out our Whitaker arguments so that the Court of Appeals

19  couldn't get to them just by having the rule reissued.  That's a

20  possibility.  So that makes our declaratory judgment claims

21  potentially significant.  We will talk to them after whatever

22  the Court does.

23       THE COURT:  And what's your position on consolidation?

24       MR. GOLDSTEIN:  Your Honor, we oppose consolidation.

25  Of course, it doesn't require our consent.  I can speak for all

of the plaintiffs in this case.  I will tell you the reasons.

        And that is, it is my honest assessment that the different sets of plaintiffs challenging bump stocks don't necessarily coordinate that well.  We think it would be a favor to the Court of Appeals when this case goes up to not have it go in a single matter.

        We think the Court can accomplish everything it needs to without a formal consolidation order, and that is, the Court could dispose of both cases in a single opinion, in a single order.  The Court can say that its opinion in this case is controlling in that one.

        We want it to be smooth.  We want it to be smooth for both you and the Court of Appeals.  And if you consolidate them together, because of the D.C. Circuit's rules on, for example, one brief, it can take out of the Court of Appeals' hands the question of whether it wants them briefed together or separately.  It would require everyone to be working together.

        THE COURT:  Don't we already have that issue to a degree, given that I've consolidated these two?

        MR. GOLDSTEIN:  Yes, but this consolidation --

        THE COURT:  You all work together well, but the others, you won't?

        MR. GOLDSTEIN:  I'm not blaming them.  If anyone doesn't get along, I'm sure it's my fault.

        It's just a genuine point.  And that is, we are totally

1    sympathetic to the Court's presumed desire and the rules' desire

2    for things to be disposed of efficiently.

3        I will say that there is a slight difference between the

4    cases.  That is, the substantive claims are the same, but they,

5    in passing, have an injunctive claim for takings.  I'm not sure

6    how serious they are about it, but it's there.  So I don't mean

7    to prejudge it.

8            THE COURT:  Mr. Goldstein, look at this handy-dandy

9    chart that my law clerks made for me.  You can see, these are

10   your two cases, and this is this one.  And with the exception of

11   two areas, they overlap.

12           MR. GOLDSTEIN:  Bingo.

13           THE COURT:  Yes.  So I am trying to be efficient here

14   and conserve judicial resources.  I am sensitive to the issues

15   you raised about briefing.  I will consider it and hear from the

16   government, if the government has any position on this.

17           MR. SOSKIN:  We don't see any need for consolidation,

18   your Honor, and we echo Mr. Goldstein's views.

19           THE COURT:  Okay.  So both sides would prefer that I

20   issue the same opinion, perhaps, or refer to the other case but

21   not consolidate the matters?

22           MR. GOLDSTEIN:  Yes, your Honor.

23           THE COURT:  I will be checking with the plaintiffs in

24   the other case as well.

25       Are there any other issues we need to address here?

1    As I said, I haven't decided whether I will hear additional

2  argument in that case, given that the claims overlap so much

3  that are raised in their motion for preliminary injunction.

4    In terms of when I hope to issue a ruling, it will, I hope,

5  be some time the week of February 18th, but may be late in that

6  week.  That would be a goal.  I'm not -- don't hold me to it.

7  But I am sympathetic to the notion that whoever does not prevail

8  here may want to seek emergency relief in the Court of Appeals,

9  and I would like to give you adequate time to do that.

10    With that, any other matters?  No?  All right.  Thank you.

11    (Proceedings adjourned at 4:51 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     /s/ Sara A. Wick                February 18, 2019

10    SIGNATURE OF COURT REPORTER     DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```