UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIREARMS POLICY COALITION, Inc., <br><br> *Plaintiff*, <br><br> v. <br><br> WILLIAM P. BARR, Attorney General, *et al.*, <br><br> *Defendants*. | No. 18-cv-3083 (DLF) |

## MEMORANDUM OPINION

For a second time, Firearms Policy Coalition, Inc. attacks the Bureau of Alcohol, Tobacco, and Firearms rule that essentially banned bump stocks—firearm accessories that allow semiautomatic firearms to fire continuously with a single trigger pull. *See* Bump-Stock-Type Devices (Final Rule), 83 Fed. Reg. 66,514, 66,514–16 (Dec. 26, 2018). Earlier this year, the Coalition sought a preliminary injunction on the ground that then-Acting Attorney General Matthew G. Whitaker lacked authority to promulgate the rule. *See* Guedes's Compl. ¶¶ 1–6, No. 18-cv-2988, Dkt. 1. This Court denied the preliminary injunction, and the Coalition withdrew its appeal of that denial after William P. Barr became Attorney General and ratified the rule.

Through its latest complaint, the Coalition alleges that the government has an unlawful "policy" of using the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3345 *et seq.*, to designate certain non-Senate confirmed federal employees to act as principal officers during a vacancy. Second Am. Compl. ¶¶ 1, 18–19, No. 18-cv-2988, Dkt. 44. It seeks injunctive and declaratory relief against this supposed policy. *Id.* ¶ 1. It also seeks a declaration that the bump stock rule injured the Coalition and its members by depriving them "of their right to alienate

their property" during the period between the rule's issuance on December 18, 2018 and its subsequent ratification by Attorney General Barr on March 14, 2019. *Id.* ¶¶ 2, 20–23.  Before the Court is the government's Motion to Dismiss the Coalition's Second Amended Complaint, Dkt. 46.  Because the Coalition lacks standing, the Court will grant the motion.

## I.   BACKGROUND

Both this Court and the D.C. Circuit have detailed the history of both the bump stock rule and this litigation.  *See Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109, 119–26 (D.D.C. 2019); *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 920 F.3d 1, 6–10 (D.C. Cir. 2019).  The Court will mention only those facts relevant to the government's motion to dismiss.  In considering the motion, the Court accepts as true all material allegations in the complaint.  *See, e.g.*, *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008); *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### A.   Facts

When Attorney General Jefferson Sessions III resigned on November 7, 2018, "Deputy Attorney General Rod Rosenstein automatically became the Acting Attorney General by operation of law" under 28 U.S.C. § 508(a)—a succession statute specific to the Office of the Attorney General.  Second Am. Compl. ¶ 12 (citing 28 U.S.C. § 508(a)).  But a day later, President Trump invoked the FVRA to override this statute and "direct an employee, former Chief of Staff Matthew Whitaker, to perform the functions of the Attorney General."  *Id.*

The FVRA provides that when a Senate-confirmed position becomes vacant, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity."  5 U.S.C. § 3345(a).  But the FVRA authorizes the President to override this default by designating either an officer or employee of the same agency (subject

to a few other requirements) or another Senate-confirmed official to serve temporarily in an acting capacity. *Id.*

The Coalition alleges that President Trump's decision to override the Attorney General-specific succession statute was consistent with "an explicit executive policy of using the FVRA to designate an employee like Mr. Whitaker as any officer, including a principal officer . . . even when": (1) "the principal officer's first assistant is available to serve"; and (2) "an office-specific designation statute automatically designated the first assistant to act during the absence or vacancy." Am. Compl. ¶ 13. The Coalition contends that the Office of Legal Counsel has authorized this policy since 2003, and that "President Trump has also expressed that he 'likes' using 'acting' Cabinet officers because he 'can move so quickly,' and using acting Cabinet officers gives him 'more flexibility.'" *Id.* ¶ 14 (alterations adopted) (quoting *Transcript: President Trump on "Face the Nation," February 3, 2019*, CBS News (Feb. 3, 2019), https://cbsn.ws/2U1LfBA).

In his role as Acting Attorney General, Whitaker issued the bump stock rule that allegedly harmed both the Coalition and its members. *See* Second Am. Compl. ¶ 15; 83 Fed. Reg. at 66,554. William Barr was then confirmed as Attorney General on February 15, 2019. *See* 165 Cong. Rec. S1397 (daily ed. Feb 14, 2019). And on March 14, 2019, Attorney General Barr ratified the rule. *See* Bump-Stock-Type Devices, 84 Fed. Reg. 9,239 (Mar. 14, 2019).

### B. Procedural History

In December 2018, the Coalition, along with several other plaintiffs in related actions, sued to enjoin the bump stock rule. *See* Guedes's Compl.; Codrea's Compl., No. 18-cv-3086, Dkt. 1. In the three actions that were later consolidated, the plaintiffs moved for preliminary injunctive relief on the grounds that: (1) the rule violated the Administrative Procedure Act

(APA) and 18 U.S.C. § 926(b); (2) ATF violated the Takings Clause; and (3) Whitaker lacked authority to promulgate the bump stock rule.  *See Guedes*, 356 F. Supp. 3d at 120–21.  This Court denied the motions.  *See id.* at 155.  It concluded that the plaintiffs were "unlikely to succeed on the merits of their administrate law challenges; preliminary injunctive relief [was] not available for [the] Takings Clause challenge; and the plaintiffs [were] unlikely to succeed on the merits of their statutory and constitutional challenges to the authority of then-Acting Attorney General Whitaker."  *Id.* at 128.

The plaintiffs appealed to the D.C. Circuit.  *See Guedes*, 920 F.3d at 10.  But "[w]hile the appeal was pending, Attorney General Barr ratified and individually endorsed the final Bump-Stock Rule."  *Id.*  The D.C. Circuit granted the Coalition's post-argument request to dismiss its appeal voluntarily.  *Id.*  But another group of plaintiffs pursued the same substantive challenges to Whitaker's authority that the Coalition had alleged in its first complaint.  *Id.* at 10–11.  As to those plaintiffs, the D.C. Circuit affirmed this Court's denial of a preliminary injunction.  *Id.* at 35.  On the challenge to Whitaker's authority, it held that Barr's ratification of the rule had cured any alleged defects from Whitaker's designation as Acting Attorney General.  *See id.* at 12–13.

A month or so later, the Coalition returned to this Court and filed a Second Amended Complaint, alleging two variations on its prior challenge.  First, it seeks declaratory and injunctive relief against an alleged "explicit executive policy of using the FVRA to designate an employee like Mr. Whitaker as any officer, including a principal officer, and even when the principal officer's first assistant is available to serve and an office-specific designation statute automatically designated the first assistant to act during the absence or vacancy."  Second Am. Compl. ¶ 13; *see also id.* ¶¶ 18–19, 24–27.  Second, the Coalition asks for a declaration that the Final Rule "caused [the Coalition] and its members harm from [its] inception, because it

4

deprived [the Coalition] and its members of their property right to alienate their bump stocks from the day it was signed, and . . . Whitaker was not constitutionally or statutorily authorized to issue the Final Rule on December 18, 2018." *Id.* ¶ 21. According to the Coalition, Barr's ratification of the rule did not "cure th[is] harm that [the Coalition] and its members already suffered during the period between . . . Whitaker's unconstitutional and unlawful issuance of the Final Rule on December 18, 2018, and . . . Barr's ratification on March 14, 2019." *Id.* ¶ 23. In other words, the Coalition seeks a pronouncement that the rule was unlawful for a time, between its promulgation and ratification.

## II.     LEGAL STANDARD

A federal court must dismiss a complaint whenever it lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1), (h)(3). The party invoking federal jurisdiction—here, the Coalition—bears the burden of establishing subject matter jurisdiction, including its standing to sue. *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the pleading stage, a court must "accept all of the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alteration adopted and internal quotation marks omitted), and construe the complaint "with sufficient liberality to afford all possible inferences favorable to the pleader on the allegations of fact," *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). But "in resolving a 12(b)(1) motion" as opposed to a "12(b)(6) motion for failure to state a claim," factual allegations "will bear closer scrutiny." *Wright v. Foreign Serv. Griev. Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal quotation marks and citation omitted).

## III.    ANALYSIS

The federal judicial power extends only to "Cases" and "Controversies." U.S. Const. art.

III, § 2; *see, e.g.*, *Spokeo*, 136 S. Ct. at 1547.  The familiar doctrine of standing "gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  It "serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role."  *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and citations omitted).

As the party seeking to invoke federal jurisdiction, the Coalition "bears the burden" of establishing this "irreducible constitutional minimum" of standing.  *Id.*  In particular, it must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  To survive a motion to dismiss, "the plaintiff must clearly allege facts demonstrating each element."  *Id.* (alteration adopted and internal quotation marks omitted).  And because "standing is not dispensed in gross," the plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks omitted).

Because the Coalition has not met its burden, the Court will dismiss its Second Amended Complaint.  *See* Fed. R. Civ. P. 12(b)(1), (h)(3).  First, the Court rejects the Coalition's invitation to "forgo addressing standing and to enter judgment against [the Coalition] on the merits."  Pl.'s Opp'n at 5, No. 18-cv-2988, Dkt. 47.  Second, it concludes that the Coalition lacks standing to challenge the alleged FVRA policy because its theory of injury rests on a tenuous chain of impermissible speculation and assumption.  Third, it determines that the Coalition fails to show that a declaratory judgment in its favor would redress its restriction-on-alienation claim.

## A. The Need to Determine Standing

In all but the rarest of cases, "[f]ederal courts must determine that they have jurisdiction before proceeding to the merits." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam). That is because "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (internal quotation marks omitted). As the Supreme Court has explained, "[f]or a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* at 101–02; *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (a court must establish rather than assume it has jurisdiction before addressing the merits); *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016) (same).

The one narrow, discretionary exception to this rule does not apply. This *Steel Co.* exception permits courts to bypass a jurisdictional question only in "peculiar circumstances" not present here. *Steel Co.*, 523 U.S. at 99. *First*, a court may bypass a jurisdictional question only when "the merits decision [is] 'foreordained' by precedent." *Sherrod v. Breitbart*, 720 F.3d 932, 937 (D.C. Cir. 2013) (internal quotation marks omitted). This Court's prior decision denying a preliminary injunction does not constitute binding precedent because it was an interlocutory ruling, not a final judgment. And even if it was a final judgment, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (internal quotation marks omitted). *Second*, the Coalition's challenge does not present any "difficult and perhaps close" jurisdictional questions. *Sherrod*, 720 F.3d at 937

(internal quotation marks omitted); *cf. Lemma v. Hispanic Nat'l Bar Ass'n*, 318 F. Supp. 3d 21, 24 (D.D.C. 2018). As will be discussed, both of the Coalition's standing theories are plainly foreclosed by Supreme Court precedent.

Even if the exception could apply here, neither the Supreme Court nor the D.C. Circuit has suggested that a Court must apply it. To the contrary, the *Steel Co.* exception appears to be discretionary. The D.C. Circuit has explained that courts are "free" to invoke the exception where appropriate. *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 920 (D.C. Cir. 2013) (alterations adopted and internal quotation marks omitted). This "narrow set of circumstances" is merely one "in which a court *could* decide the cause of action before resolving Article III jurisdiction." *Id.* (alteration adopted, emphasis added, and internal quotation marks omitted). The Second Circuit has likewise said that a court "*may* dispose of the case on the merits without addressing a novel question of jurisdiction." *Ctr. for Reprod. Law and Policy v. Bush*, 304 F.3d 183, 195 (2d Cir. 2002) (emphasis added). It makes little sense to apply the exception here because doing so would not serve "judicial economy by achieving greater finality in the disposition of the case." *Lemma*, 318 F. Supp. 3d at 24–25 (declining to apply the exception).

**B.      The Coalition's Standing to Challenge the Alleged FVRA Policy**

The Coalition lacks standing to challenge the alleged FVRA policy because they fail to identify an actual or sufficiently imminent injury resulting from the policy. Injury in fact is the "'first and foremost' of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co.*, 523 U.S. at 103) (alteration adopted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). And when a plaintiff rests its "claims for declaratory and injunctive relief on predicted future

8

injury, [it] bears a more rigorous burden to establish standing." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (internal quotation marks and citations omitted). "'Allegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Instead, the "threatened injury must be *certainly impending* to constitute injury in fact." *Id.* (internal quotation marks omitted).

Far from certainly impending, the Coalition's supposed future injury from the alleged FVRA policy—that some future invalidly designated officer will promulgate other gun-control measures that affect the Coalition or its members—is fraught with "quixotic speculation." *Guedes*, 920 F.3d at 15 (finding the case moot in part because of the "quixotic speculation" necessary for this "legal injury to recur"); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). The Court rejects the notion that the Coalition (or its members) "face a realistic *probability* of injury from [purportedly] invalid officers like Mr. Whitaker promulgating *further* gun-control measures." Coalition's Opp'n at 7 (emphases added). That hypothetical injury depends on a tenuous chain of uncertain events, including that: (1) there would be an "absence or vacancy" in an undetermined office requiring Presidential appointment and Senate confirmation, Second Am. Compl. ¶ 13; (2) the vacant office would be subject to "an office-specific designation statute" that "automatically designate[s]" an individual "to act during the absence or vacancy," *id.*; (3) the "first assistant" designated by the office-specific statute would be "available to serve," *id.*; (4) the President would replace the designated individual and invoke his discretionary authority under the FVRA to temporarily appoint another unspecified acting officer; (5) the acting officer would possess the statutory authority to promulgate gun-control regulations; (6) the unknown acting officer would in fact exercise his or her discretion to issue a regulation affecting guns; and (7) "by sheer coincidence, that rule would . . . adversely affect [the

Coalition's or its members'] legal rights," *Guedes*, 920 F.3d at 15.  This is precisely the type of "reli[ance] on a highly attenuated chain of possibilities" that the standing inquiry proscribes. *Clapper*, 568 U.S. at 410; *see also Arpaio*, 797 F.3d at 21 (holding that "[w]hen considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)"). "While it is certainly possible" that all of these events occur as the Coalition envisions, "that speculation does not suffice." *Summers*, 555 U.S. at 499.

The Coalition responds that in the current administration, there is a "high rate of turnover" in "high-level positions," Coalition's Opp'n at 9, and that President Trump has a "proclivity for using 'acting' officers because he 'can move so quickly.'" *Id.* at 10 (quoting *Transcript: President Trump on "Face the Nation," February 3, 2019*, CBS News (Feb. 3, 2019), https://cbsn.ws/2U1LfBA).  Thus, in the Coalition's view, "it is highly likely that another invalidly acting official will soon be in a position to issue regulations that affect [it] or its members." *Id.* at 10.  But again, it is uncertain when or in what circumstances any particular vacancy may occur—if at all.  And "in the absence of clear markers—such as proposed rules or agency pronouncements—the Court should avoid speculating about how governmental entities 'will exercise their discretion.'" *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 22–23 (D.D.C. 2018) (quoting *Clapper*, 568 U.S. at 412).

Moreover, the Coalition has not identified any specific member that would suffer from some "imminent and concrete harm." *Summers*, 555 U.S. at 495.  The Coalition instead highlights that it "has hundreds of thousands of members and supporters across the United States." Second Am. Compl. ¶ 6.  From this, it contends that "'[g]iven the organization's large membership' it is 'reasonable to infer that at least one member will suffer injury-in-fact.'" Pl's

10

Opp'n at 8 (quoting *Util. Air Regulatory Grp. v. EPA*, 471 F.3d 1333, 1339 (D.C. Cir. 2006)). But the Supreme Court has already rejected such reliance on "a statistical probability that some of [an organization's] members would be threatened with concrete injury" at some unknown point in the future. *Summers*, 555 U.S. at 497. "This novel approach to the law of organizational standing would make a mockery of [the Court's] prior cases, which have required plaintiff-organizations to make *specific* allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498 (emphasis added); *see also Lujan*, 504 U.S. at 566.

Nor has the Coalition established actual or imminent injury in its own right. The Coalition says that it has standing because it will be forced to expend resources to respond to the alleged executive policy. Coalition's Opp'n at 8–9. This argument too is unavailing. For one, the Coalition still must "show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Elec. Privacy Info. Ctr. v. United States DOC*, 928 F.3d 95, 100–01 (D.C. Cir. 2019) (internal quotation marks omitted). Yet as already described, the injury that the Coalition alleges is not concrete—it is abstract speculation. Any purported injury is based on a hypothetical vacancy in a hypothetical office wherein a hypothetical acting officer promulgates some hypothetical future regulation.

And even if the Coalition will divert some unidentified resources to counteract these future regulations arising from the alleged policy, such diversion does not give rise to a cognizable injury because "this particular harm is self-inflicted." *Fair Emp't Council of Greater Wash. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). That is, "it results not from any actions taken by [the defendants], but rather from the [Coalition]'s own budgetary choices." *Id.*; *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25

(D.C. Cir. 2011) ("[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing."). The Coalition "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402.

The Coalition's theory of "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lance*, 549 U.S. at 442. By the Coalition's logic, the alleged FVRA policy could apply to any hypothetical office subject to presidential appointment and Senate confirmation, which might be filled by any number of hypothetical acting officers, who might promulgate any hypothetical regulation, that might adversely impact any hypothetical citizen in the United States. Such a theory is "inconsistent with the 'framework of Article III' because 'the impact on [the Coalition] is plainly undifferentiated and 'common to all members of the public.'" *Lujan*, 504 U.S. at 575 (alteration adopted) (quoting *United States v. Richardson*, 418 U.S. 166, 171, 176–77 (1974)). In other words, the Coalition does not allege anything uniquely pervasive or injurious about future gun-control regulations issued within this purported policy. Nor does it suggest that this nebulous policy is confined in such a way that the Coalition's asserted harm is no longer "shared in substantially equal measure by all or a large class of citizens." *Warth*, 422 U.S. at 499. The Court will therefore dismiss the Coalition's FVRA-policy claim for lack of standing.

> C. **The Coalition's Standing to Challenge the Past Validity of the Bump Stock Rule**

The Coalition's restriction-on-alienation claim fares no better. "In a case of this sort, where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to

establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Rather, a plaintiff must adequately plead that it "is suffering an ongoing injury or faces an immediate threat of injury." *Dearth*, 641 F.3d at 501.  This requirement "ensures that the lawsuit does not entail the issuance of an advisory opinion without the possibility of any judicial relief." *Lyons*, 461 U.S. at 129.

The Coalition asks this Court for a pronouncement that for a time in the past the bump stock rule was briefly unlawful and that Barr's ratification did not cure any harm to those members who were unable to alienate their bump stocks during that period.  *See* Second Am. Compl. ¶¶ 20–23.  The Court need not address the merits of this claim.  A case must "be presented in the context of a specific live grievance." *Golden v. Zwickler*, 394 U.S. 103, 110 (1969).  "This is as true of declaratory judgments as any other field." *Id.* at 108 (internal quotation marks and citation omitted).  And so even if the Coalition were correct on the merits, the past injury it alleges is insufficient to confer standing.  *See, e.g.*, *Dearth*, 641 F.3d at 501; *Lujan*, 504 U.S. at 561; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976).  That is because the requested declaratory judgment would not enable the Coalition to obtain redress for its inability to sell bump stocks during the period between the Rule's issuance and its ratification.  The Coalition seeks an abstract and advisory judicial pronouncement that some unlawful action occurred in the past.  The standing inquiry demands more.

The Court therefore agrees with the government that the Coalition "lacks standing to seek declaratory relief because it would do nothing to redress the purported injury it suffered prior to the Rule's ratification." Defs.' Mot. to Dismiss at 15.  Indeed, the Coalition does not even appear to contest this point in its response.  It merely cites to *Petworth Holdings, LLC v. Bowser*, 308 F. Supp. 3d 347 (D.D.C. 2018), for the unremarkable proposition that a restriction on

alienation can be "'sufficient for the purposes of alleging' an Article III injury." Coalition's Opp'n at 18 (quoting *Petworth*, 308 F. Supp. 3d at 356). Such a bare assertion of harm fails to show how a declaratory judgment by this Court could redress the past alleged injury. *See Lujan*, 504 U.S. at 561; *see also Vietnam Veterans of Am. & Veterans of Modern Warfare v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010) (noting that injury in fact and redressability are "separate element[s]" of the standing inquiry).

The Coalition also fails to allege specific facts that any of its members ever attempted or even considered alienating a bump stock. *Cf. Petworth*, 308 F. Supp. 3d at 351 ("Plaintiffs made a decision to sell the Property and solicited bids from potential purchasers and developers."). Instead, it once more speculates that due to the organization's large membership, "it is a fair inference . . . that at least one of its members would have sold a bump stock during the relevant period but for the Rule." Coalition's Opp'n at 18–19. But "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). *See also Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, 313 F. Supp. 3d 285, 298–99 (D.D.C. 2018). Unless "*all* the members of the organization are affected by the challenged activity," a court cannot dispense with the "requirement of naming the affected members . . . in light of statistical probabilities." *Summers*, 555 U.S. at 498–99. The Coalition's conjecture is thus insufficient to support associational standing. It does not allege that all of its members are affected by the bump stock rule. Nor does it specifically identify any member who suffered from the alleged harm. As with the FVRA-policy claim, the Court will dismiss the Coalition's restriction-on-alienation claim for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' Motion to Dismiss the Second Amended Complaint for lack of subject matter jurisdiction. A separate order accompanies this memorandum opinion.

October 31, 2019

_____
DABNEY L. FRIEDRICH
United States District Judge