Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@CivilRightsDefenseFirm.com

Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@CivilRightsDefenseFirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 (t)
(610) 400-8439 (f)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAMIEN GUEDES** | : | |
| Civil Rights Defense Firm, P.C. | : | |
| 646 Lenape Road | : | |
| Bechtelsville, PA 19505 | : | |
| | : | Civil Action No. 1:18-cv-2988 |
| **SHANE RODEN** | : | |
| Civil Rights Defense Firm, P.C. | : | |
| 646 Lenape Road | : | |
| Bechtelsville, PA 19505 | : | |
| | : | |
| **FIREARMS POLICY FOUNDATION** | : | |
| 4212 North Freeway Boulevard | : | |
| Suite 6 | : | |
| Sacramento, CA 95834 | : | |
| | : | Complaint – Violations of the |
| **MADISON SOCIETY FOUNDATION, INC.** | : | Administrative Procedures Act, |
| 210 South Sierra Avenue, Suite 204 | : | U.S. Constitution and Statutory law |
| Oakdale, CA 95361 | : | |
| | : | |
| **and** | : | |
| | : | |
| **FLORIDA CARRY, INC.** | : | |
| P.O. Box 1024 | : | |
| Lehigh Acres, FL 33970-1024 | : | |
| | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |

| | |
|---|---|
| **BUREAU OF ALCOHOL, TOBACCO,** | : |
| **FIREARMS AND EXPLOSIVES,** an agency | : |
| of the Department of Justice | : |
|         99 New York Avenue, N.E., | : |
|         Washington, DC 20226 | : |
| | : |
| **WILLIAM P. BARR,** in his official | : |
|   capacity as Acting Attorney General | : |
|   of the United States | : |
|         United States Department of Justice | : |
|         950 Pennsylvania Avenue, NW | : |
|         Washington, DC 20530 | : |
| | : |
| **THOMAS E. BRANDON,** Acting Director | : |
| Bureau of Alcohol, Tobacco, Firearms, and | : |
| Explosives | : |
|         99 New York Avenue, N.E., | : |
|         Washington, DC 20226 | : |
| | : |
| **UNITED STATES OF AMERICA,** | : |
|         United States Attorney's Office | : |
|         555 4th Street, NW | : |
|         Washington, DC 20530 | : |
| | : |
|                **Defendants** | : |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiffs Damien Guedes, Shane Roden, Firearms Policy Foundation

("FPF"), Madison Society Foundation, Inc. ("MSF"), and Florida Carry, Inc. ("Florida Carry")

by and through their attorneys, Adam Kraut, Esq. and Joshua Prince, Esq., of Firearms Industry

Consulting Group, a division of Civil Rights Defense Firm, P.C., and complain of Defendants as

follows:

## INTRODUCTION

1.     The Executive Branch is not the Congress. And even when he might wish they were so

empowered, a President and his agencies may not enact legislation nor interpret statutes

to mean what they desire rather than what they say.

2.      Under the U.S. Constitution, the Congress has "All legislative Powers," and directs that
the President "shall take Care that the Laws be faithfully executed…" U.S. Const. Art. I,
§ 1 and Art. II, § 3.

3.      This is an action challenging the Bureau of Alcohol, Tobacco, Firearms and Explosives'
("ATF") implementation and enforcement of an agency regulation under Docket No.
ATF-2017R-22 ("Final Rule"), designed to prohibit as criminal the ownership,
possession or transportation of "bump-stock-type" devices by redefining them as
"machineguns" for purposes of the criminal proscriptions under the National Firearms
Act ("NFA") 26 U.S.C. § 5841, *et seq*., and the Gun Control Act ("GCA") 18 U.S.C. §
921, *et seq. See* 83 Fed.Reg. at 13442; https://www.regulations.gov/document?D=ATF-
2018-0002-0001. Indeed, the effect of the Final Rule is that all "current possessors of
these devices would be required to surrender them, destroy them, or otherwise render
them permanently inoperable upon the effective date of the [F]inal [R]ule." 83 Fed. Reg.
at 13442.

4.      ATF's Notice of Proposed Rulemaking comes after years of public pronouncements and
formal rulings in which the agency declared these very same types of devices are *not*
"machineguns" and therefore are *not* subject to the criminal regulation that ATF now
seeks to establish. These were representations of a government agency on which the
public was entitled to do and did reasonably rely in purchasing, possessing, and using
these devices.

5.      ATF's abrupt about-face on this issue in promulgating and implementing the Final Rule
to criminalize that which it had for years expressly deemed legal under the law of
Congress inherently smacks of agency abuse or dereliction of duty in following the law.

3

*See Center for Science in Public Interest v. Department of Treasury*, 573 F. Supp. 1168, 1172 (D.C. 1983) ("sudden and profound alterations in an agency's policy constitute 'danger signals' that the will of Congress is being ignored").

6.  And, in fact, as Plaintiffs' complaint demonstrates, ATF's Final Rule is the product of serious, multi-dimensional legal violations rendering the process and the rule invalid, including, *inter alia*: ATF's procedural process violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq*., in numerous material ways; ATF's Final Rule significantly exceeds its statutory authority to promulgate regulations for purposes of implementing or enforcing the NFA or the GCA; any implementation or enforcement of the Final Rule would violate the fundamental constitutional protections against retroactive imposition of criminal punishment under *ex post facto* principles; and it would constitute an unconstitutional taking without just compensation, destroying the very reasonable investment-backed expectations in private property and running square up against reasonable reliance interests that ATF itself established through its previous contrary determinations that the devices at issue are not "machineguns."

7.  Accordingly, the declaratory, injunctive, and other relief requested herein is necessary to prevent the implementation or enforcement of this illegal regulation or, at a minimum, to fairly compensate for the effective destruction of the property rights that any implementation or enforcement would cause in forcing the dispossession of bump-stock-type devices that ATF itself previously sanctioned as *lawful* firearm devices.

## PARTIES

8.  Plaintiff Damien Guedes is a natural person, a citizen of Whitehall, Pennsylvania and the
    United States, and a member of institutional Plaintiff FPF. Mr. Guedes purchased an
    AR15 BFSystem bump stock on October 30, 2014, from Bump Fire Systems
    ("BFSystem") in reasonable reliance upon one of ATF's previous letter rulings expressly
    determining that "bump-stock" devices of that type do *not* convert semiautomatic
    firearms into "machineguns" under the NFA and GCA. Plaintiff Guedes is entitled to,
    desires, and asserts that he would, but for the governments enforcement of the
    unconstitutional and unlawfully enacted Final Rule, continue to lawfully possess, use,
    and/or transport his lawfully acquired bump-stock device. Plaintiff Guedes is a member
    of Plaintiff FPF.

9.  Plaintiff Representative Shane Roden is a natural person, who is the duly elected state
    representative for District 111 of the Missouri House of Representatives, a citizen of
    Cedar Hill, Missouri and the United States, and a member of institutional Plaintiff FPF.
    Furthermore, Representative Roden in addition to being a fulltime firefighter/paramedic
    since 2003, is a reserve sheriff deputy, and who, since 2004, has worked as a SWAT
    operator/medic, initially for the Franklin County Sheriff's Office and thereafter, since
    2010, for the Camden County Sheriff's Office. In August of 2016, Representative Roden
    purchased a Slide Fire SSAR-15 at a cost of $150.00 in reasonable reliance upon ATF's
    previous determinations expressly determining that "bump-stock" devices of that type do
    *not* convert semiautomatic firearms into "machineguns" under the NFA and GCA.
    Plaintiff Roden is entitled to, desires, and asserts that he would, but for the governments
    enforcement of the unconstitutional and unlawfully enacted Final Rule, continue to

lawfully possess, use, and/or transport his lawfully acquired bump-stock device. Plaintiff Roden is a member of FPF.

10. Plaintiff FPF is a 501(c)(3) non-profit organization incorporated under the laws of Delaware. FPF's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms, and any related charitable and educational activities as permissible under law. On June 19, 2018, by and through counsel, FPF submitted comments in response and opposition to Defendant ATF's NPRM concerning the Final Rule. FPF is also the party who filed the FOIA request regarding the Final Rule, to which ATF never responded.

11. FPF represents its members and supporters, including those who own and possess, or would own and possess, "bump-stock" devices that are or would be subject to the challenged Final Rule, and FPF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public, including Plaintiffs Guedes and Roden.

12. Plaintiff MSF is a (501)(c)(3) non-profit organization incorporated under the laws of Nevada. MSF's mission is to promote and preserve the purposes of the Constitution of the United States, in particular the right to keep and bear arms, for its members and all citizens. MSF believes that individual constitutional rights should not be infringed to deny citizens their life, liberty, and pursuit of happiness. MSF is headquartered in Stanislaus County, California. The focus of MSF's litigation efforts is challenging violations of the right to keep and bear arms. Defendants' actions and failures alleged herein have caused MSF to divert and dedicate resources that would otherwise be

available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action.

13.    Plaintiff Florida Carry is a Florida not-for-profit corporation existing under the laws of Florida with its principal office in Lehigh Acres, Florida.  Florida Carry has over 30,000 registered members and supporters, including members residing in all counties through the state of Florida and in other states. Florida Carry's purpose is to defend and advance the fundamental civil right to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution and the Constitution of Florida, Declaration of Rights. Florida Carry owns a Slide Fire bump stock device. Florida Carry brings this action on behalf of itself and its members, including itself and those who own and possess "bump stock" devices that are or would be subject to the challenged Final Rule, and Florida Carry brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public.

14.    Defendant ATF is the federal government agency responsible for promulgating and enforcing regulations under the statutory provisions of the GCA and the NFA on which ATF has relied as the ostensible basis for its authority to issue the Final Rule.

15.    Defendant William P. Barr ("Attorney General" or "Barr"), the Acting Attorney General of the United States, is sued in that official capacity. The Attorney General is responsible for executing and administering the laws, regulations, customs, practices, and policies of the United States including the implementation and enforcement of the Final Rule. The Attorney General is ultimately responsible for supervising the functions and actions of the United States Department of Justice, including the ATF, which is an arm of the Department of Justice.

16.    Defendant Thomas E. Brandon ("ATF Director" or "Brandon") is the Acting Director of the Bureau of ATF, and he is sued in the that official capacity. ATF is responsible for, *inter alia*, regulating and licensing the sale, possession, transfer, and transportation of firearms and ammunition in interstate commerce, including "machineguns" as that term is defined under the NFA, GCA, and any purported agency regulations of ATF. As Acting Director of ATF, Defendant Brandon is responsible for the creation, implementation, execution, and administration of the laws, regulations, customs, practices, and policies of the United States, including implementation and enforcement of the Final Rule.

17.    Defendant United States of America ("United States") is a proper party in this action pursuant to 5 U.S.C. §§ 702, 703.

## JURISDICTION AND VENUE

18.    This case concerns certain subject matter under the original and exclusive jurisdiction of the federal courts of the United States of America.

19.    This action seeks relief pursuant to 5 U.S.C. §§ 552, 702, 703, 704; 26 U.S.C. § 7805; and 28 U.S.C. §§ 1331, 1343, 1346, 2201, 2202, and 2412. Therefore, jurisdiction is founded on 5 U.S.C. §§ 702 and 704 and 28 U.S.C. § 1331, as this action arises under the Administrative Procedure Act, as well as the Constitution and laws of the United States.

20.    This Court has authority to award costs and attorney fees pursuant to 18 U.S.C. § 924, 5 U.S.C. § 552(a)(4)(E)(i), and 28 U.S.C. §§ 1920, 2412.

21.    Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1)(B), as a substantial part of the events and omissions giving rise to the claims occurred in the District of Columbia.

**STATEMENT OF FACTS COMMON TO ALL DEFENDANTS**

*Publication of the ANPRM*

22.   On December 26, 2017, ATF published the ANPRM in the Federal Register and on

federalregister.gov, seeking public input concerning its proposed new treatment of

"bump-stock-type" devices under the Final Rule. 82 Fed. Reg. at 60929;

https://www.federalregister.gov/documents/2017/12/26/2017-27898/application-of-the-

definition-of-machinegun-to-bump-fire-stocks-and-other-similar-devices.

23.   In the ANPRM, ATF sought certain information pertaining to bump stocks including, but

not limited to: calendar years produced; economic impact of ATF classifying bump

stocks as machine guns; use(s) for which the device was marketed; number of bump

stocks sold; and purposes bump stocks are used for.

24.   On March 29, 2018, ATF published its NPRM concerning the Final Rule in the Federal

Register and on federalregister.gov. 83 Fed. Reg. at 13442;

https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-

devices.

25.   In the NPRM, ATF stated, *inter alia*, that

> When a bump-stock-type device is affixed to a semiautomatic
> firearm, however, the device harnesses the recoil energy to slide
> the firearm back and forth so that the trigger automatically re-
> engages by "bumping" the shooter's stationary trigger finger
> without additional physical manipulation of the trigger by the
> shooter. The bump-stock-type device functions as a self-acting and
> self-regulating force that channels the firearm's recoil energy in a
> continuous back-and-forth cycle that allows the shooter to attain
> continuous firing after a single pull of the trigger so long as the
> trigger finger remains stationary on the device's extension ledge (as
> designed). No further physical manipulation of the trigger by the
> shooter is required.
>
> …

These bump-stock-type devices are generally designed to operate with the shooter shouldering the stock of the device (in essentially the same manner a shooter would use an unmodified semiautomatic shoulder stock), maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire.

83 Fed. Reg. at 13443, 13446.

26.     ATF announced that its intention behind the new rule was "to clarify that 'bump fire' stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are 'machineguns' as defined by the [NFA] and the [GCA], because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of a trigger." 83 Fed. Reg. at 13442. Both the NFA and GCA define "machinegun" to include any "weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," as well as the frame or receiver of such a weapon or any parts or combination of parts that could be converted or assembled into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. At the time of the NPRM, the regulations under 27 C.F.R. §§ 478.11 and 479.11 contained the same general definition of "machinegun." ATF's new rule would amend these to specifically define "single function of the trigger" to mean "single pull of the trigger," and to define "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 Fed. Reg. at 13442.

27.     ATF acknowledged it had made a series of previous determinations over the last decade that declared the same kind of "bump-stock-type" devices – operating with the same sort

of functionality that the new rule seeks to prohibit – did *not* constitute "machineguns" within the meaning of the governing law. Specifically, ATF admitted that between 2008 and 2017, it issued classification decisions and letter rulings concluding that "'bump-stock-type' devices that enable a semiautomatic firearm to shoot more than one shot with a single function of the trigger by harnessing a combination of the recoil and the maintenance of pressure by the shooter, do not fire 'automatically'" within the meaning of a "machinegun" as that term is defined under the law. 83 Fed. Reg. at 13443, 13445.

28.   Further, although now seeking to prohibit "all bump-stock-type devices" through the Final Rule on the basis that additional "legal analysis" supports the opposite conclusion that they convert the firearm into a prohibited "machinegun," 83 Fed. Reg. at 13443, ATF's NPRM at the same time conceded that such devices are neither essential nor necessary to this functionality of a firearm because individuals can "replicate the effects of bump-stock-type devices" through myriad other means, such as by "us[ing] rubber bands, belt loops, or otherwise train[ing] their trigger finger to fire more rapidly," *id.* at 13454.

29.   Comments were required to be submitted on or before June 27, 2018. Fed. Reg. at 13446. Plaintiff FPF submitted its comment on June 19, 2018.[1] In its Comment, FPF documented numerous deficiencies regarding ATF's NPRM, including, but not limited

---

[1] This comment was posted publicly on Regulations.gov on June 26, 2018. *See* https://www.regulations.gov/document?D=ATF-2018-0002-61777 and https://www.regulations.gov/document?D=ATF-2018-0002-61778. The comment was broken into two separate sections due to the size. Certain media submitted as part of the comment are unavailable for public viewing because the website is incapable of hosting or displaying the content. A copy of the comment and its supporting exhibits are attached hereto and incorporated herein as Exhibit A. Any exhibits that cannot be filed via the Court's ECF system due to their electronic nature will be included on a notice as required by Local Rule 49(e)(1) and are referred to herein by the exhibit number it was assigned in the comment. In any instance where it is possible to link to another source where the material may be found, the undersigned has done so.

to, several of the procedural and substantive violations giving rise to the causes of action in this case: 1) ATF's exceeding its statutory authority in the promulgation of the Final Rule; 2) the arbitrary and capricious nature of the Final Rule; and 3) ATF's failure to provide the necessary supporting documents in the rulemaking process, thereby denying interested all parties an opportunity to fully consider and respond to the claims made by ATF in support of the Final Rule.[2]

30.    On December 18, 2018, Acting Attorney General Matthew Whitaker executed the Final Rule; thereby, purportedly making effective the Final Rule, RIN 1140-AA52, Docket No 2018R-22F.

31.    The Final Rule, executed by Whitaker, was published and otherwise made available online at https://www.justice.gov/opa/pr/department-justice-announces-bump-stock-type-devices-final-rule [3] and www.atf.gov/rules-and-regulations/bump-stocks [4] [5] on December 18, 2018 and all Plaintiffs obtained and reviewed the Final Rule on December 18, 2018.

---

[2] According to Regulations.gov, ATF received a total of 193,297 comments about the NPR. It is unclear whether this number reflects the number of comments actually received and published by ATF or whether it excludes any comments that ATF may have refused to accept for some reason (e.g., profane content). *See* https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices (where ATF declared that it would "not consider, or respond to, comments that do not meet these requirements or comments containing profanity," even though such speech is protected by the First Amendment to the U.S. Constitution).

[3] On DOJ's website, it declares: "Today, Acting Attorney General Matthew Whitaker announced that the Department of Justice has amended the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), clarifying that bump stocks fall within the definition of "machinegun" under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."

[4] On ATF's website, it specifies: "On December 18, 2018, Acting Attorney General Matthew Whitaker announced that the Department of Justice has amended the regulations of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), clarifying that bump stocks fall within the definition of "machinegun" under federal law, as such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."

32.    On December 21, 2018, a link was published on the Federal Register website –

https://www.federalregister.gov/documents/2018/12/26/2018-27763/bump-stock-type-

devices – to download a copy of the Final Rule.

33.    On December 26, 2018, the Final Rule was published in the Federal Register.

https://www.govinfo.gov/content/pkg/FR-2018-12-26/pdf/2018-27763.pdf

34.    The Final Rule, spanning 157 pages, implements changes to 27 C.F.R. ¶¶ 447.11, 478.11,

479.11, almost identical to the proposed changes in the NPRM.

35.    Specifically, modifies the definition of "Machinegun" in Section 447.11 such that,

pursuant to the Final Rule, it will provide:

> A "machinegun", "machine pistol", "submachinegun", or
> "automatic rifle" is a firearm which shoots, is designed to shoot, or
> can be readily restored to shoot, automatically more than one shot,
> without manual reloading, by a single function of the trigger. The
> term shall also include the frame or receiver of any such weapon,
> any part designed and intended solely and exclusively, or
> combination of parts designed and intended, for use in converting a
> weapon into a machinegun, and any combination of parts from
> which a machinegun can be assembled if such parts are in the
> possession or under the control of a person. For purposes of this
> definition, the term "automatically" as it modifies "shoots, is
> designed to shoot, or can be readily restored to shoot," means
> functioning as the result of a self-acting or self-regulating
> mechanism that allows the firing of multiple rounds through a
> single function of the trigger; and "single function of the trigger"
> means a single pull of the trigger and analogous motions. The term
> "machinegun" includes a bump-stock-type device, i.e., a device
> that allows a semiautomatic firearm to shoot more than one shot
> with a single pull of the trigger by harnessing the recoil energy of
> the semi-automatic firearm to which it is affixed so that the trigger
> resets and continues firing without additional physical
> manipulation of the trigger by the shooter.

83 Fed. Reg. at 66553-66554.

---

[5] The link to download the Final Rule on both DOJ's and ATF's websites is
www.justice.gov/opa/press-release/file/1120876/download.

36.     Specifically, modifies the definition of "Machine gun" in Section 478.11 such that,

pursuant to the Final Rule, it will provide:

> For purposes of this definition, the term "automatically" as it
> modifies "shoots, is designed to shoot, or can be readily restored to
> shoot," means functioning as the result of a self-acting or self-
> regulating mechanism that allows the firing of multiple rounds
> through a single function of the trigger; and "single function of the
> trigger" means a single pull of the trigger and analogous motions.
> The term "machine gun" includes a bump-stock-type device, i.e., a
> device that allows a semi-automatic firearm to shoot more than one
> shot with a single pull of the trigger by harnessing the recoil
> energy of the semiautomatic firearm to which it is affixed so that
> the trigger resets and continues firing without additional physical
> manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

37.     Specifically, modifies the definition of "Machine gun" in Section 479.11 such that,

pursuant to the Final Rule, it will provide:

> For purposes of this definition, the term "automatically" as it
> modifies "shoots, is designed to shoot, or can be readily restored to
> shoot," means functioning as the result of a self-acting or self-
> regulating mechanism that allows the firing of multiple rounds
> through a single function of the trigger; and "single function of the
> trigger" means a single pull of the trigger and analogous motions.
> The term "machine gun" includes a bump-stock-type device, i.e., a
> device that allows a semi-automatic firearm to shoot more than one
> shot with a single pull of the trigger by harnessing the recoil
> energy of the semiautomatic firearm to which it is affixed so that
> the trigger resets and continues firing without additional physical
> manipulation of the trigger by the shooter.

83 Fed. Reg. at 66554.

38.     In connection with its NPRM, ATF failed to include in the agency docket folder any

supporting documentation for its newly formed determination that its previous, directly

opposite conclusion about bump-stock-type devices "does not reflect the best

interpretation of 'machinegun'" under the NFA and GCA. 83 Fed. Reg. at 13443. [6]

39.    As a result, on March 30, 2018, the day after ATF published the NPRM, Plaintiff FPF

submitted an expedited FOIA Request seeking the following documentation: "all ATF

determinations relative to devices referred to as 'bump stocks' and 'bump-fire stocks' by

ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No.

2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well

as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms relative to

each determination, and any versions or drafts of the determinations, which were

different than the final determination."[7] ATF also received "correspondence[s] from

members of the United States Senate and the United States House of Representatives, as

well as nongovernmental organizations, requesting that ATF examine its past

classifications and determine whether bump-stock-type devices currently on the market

constitute machineguns under the statutory definition." 83 Fed. Reg. at 13446.

---

[6] Interestingly, in support of the Final Rule, ATF referred to a number of documents, which were never provided to the public. *See* 83 Fed. Reg. at 66518 FN 4 "Examples of recent ATF classification letters relying on the 'single pull of the trigger' interpretation to classify submitted devices as machineguns include the following…" (citing to April 13, 2015 ATF determination letter and an October 7, 2016 ATF determination letter). *See also* 83 Fed. Reg. at 66519 (referencing rulings from 2008-2017 which were never provided to the public in relation to the NPRM). By ATF's failure to even mention these documents in the ANPRM and NPRM, let alone provide them in the docket, Defendants precluded the public, including Plaintiffs, from reviewing these determinations and commenting on their applicability; thereby, denying the public, including Plaintiffs, an opportunity for meaningful review.

[7] For purposes of the FOIA Request, "[t]he use of the word 'determinations' shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF." *See* Exhibit A at 75-78.

40.     These requests were made several months ago now and yet, to date, ATF has not

        responded at all to the FOIA request, and it has not otherwise made available to the

        public in the docket folder or elsewhere any of the requested documents or any other

        documentation in support of its Final Rule. Most notably, ATF has not disclosed any of

        the prior classification decision or letter rulings that concluded bump-stock-type devices

        <u>do not</u> constitute firearms, let alone "machineguns" under the law.

25.     In their comment, FPF also requested an opportunity to be heard at a hearing

        before ATF implemented any rule or regulation in relation to this NPRM, pursuant to

        U.S.C. section 926(b). [8] 83 Fed. Reg. at 13456. The NPRM stated that "[a]ny interested

        person who desires an opportunity to comment orally at a public hearing should submit

        his or her request, in writing, to the Director of ATF within the 90-day comment period."

        83 Fed. Reg. at 13456. However, ATF also declared, in violation of Section 926(b), that

        the matter of granting such a hearing was left to the discretion of the ATF Director as to

        whether it was "necessary." *Id.*

26.     Out of an abundance of caution, FPF also sent a separate letter on June 15, 2018 to

        Acting Director Brandon, which requested a hearing, and included a copy of the letter as

        Exhibit 34 to its Comment. *See* Exhibit A at 913.

27.     Nevertheless, ATF never granted FPF any such process, and never even responded to the

        request for such a hearing, other than to simply refuse to provide FPF with a hearing in

        the Final Rule, without even addressing 18 U.S.C. § 926(b)'s mandate that ATF "*shall*

---

[8] This statute provides: "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."

afford interested parties opportunity for hearing, *before* prescribing…rules and
regulations." 83 Fed. Reg. at 66542.

41.    Not only did ATF fail to provide the material supporting documentation despite the
formal requests for it, the comment period was littered with additional procedural
irregularities and errors.

42.    Immediately upon the publication of the NPR on March 29, 2018, the following advisory
appeared on federalregister.gov:[9] "COMMENT PERIOD CLOSED – The comment
period on this document is closed and comments are no longer being accepted on
Regulations.gov. We apologize for any inconvenience." Exhibit A at 17.

43.    And, in fact, the website was not accepting comments. When people complained to the
Federal Register that they could not submit their comments online, the Federal Register
responded that they could not be of any help. *See* Exhibit A at 17.

44.    Upon information and belief, it was not until April 2, 2018 (*i.e.* five days into the
comment period) that the declaration that "COMMENT PERIOD CLOSED" was
removed from federalregister.gov by ATF and that interested individuals were able to
submit comments. Unfortunately, upon information and belief, numerous individuals, due
to the declaration on federalregister.gov "COMMENT PERIOD CLOSED," were led to
believe that they were unable to submit comments in relation to this rulemaking and were
therefore deprived of an opportunity to be heard, since they were never informed, after
ATF removed the declaration and permitted comments to be filed, that they could then
submit comments.

---

[9] The website address where this advisory appeared was
https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices.

45.   Further, while the public was directed to federalregister.gov as a resource for all relevant information and as a vehicle through which to submit comments regarding the Final Rule, the website's content was confusing and convoluted. The NPRM identified the rulemaking procedures under "Docket No. 2017R-22," but the information on the website related to these proceedings made no mention of this docket number. Instead, it referred to two *different* docket numbers (ATF-2018-0002 and ATF-2018-0002-0001), and these dockets concerned the ANPRM, for which the comment period had closed in January.

46.   The confusing and convoluted display of the information on federalregister.gov was documented in an article Carl Bussjaeger on April 2, 2018, titled *[Update] Bumbling Machinations on Bump Stocks?* Exhibit A at 164-173; *see* http://zelmanpartisans.com/?p=5071 and http://zelmanpartisans.com/?p=5055 for copies of this publication.

47.   When Mr. Bussjaeger inquired of ATF about the issues, an ATF Senior Industry Operations Investigator responded that he should refer to https://www.regulations.gov/document?D=ATF-2018-0002-0001, which contains the ANPRM and the NPRM, including information on the submission of comments. However, ATF failed to supply this or any other clarifying information to the public at large concerning where to locate the relevant material and how to submit their comments.

48.   In the Final Rule, the Government admits to there being procedural issues with the comment period and declares that (1) "[t]he Department acknowledges that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal," (2) "that on March 29, 2018, when the comment period opened for the NPRM, the link for

submitting comments to the NPRM had been inadvertently connected to the

Regulations.gov Docket ID number 2018–0001–0001, which had been used by the

Regulations.gov website for the ANPRM comment period, December 26, 2017, through

January 25, 2018," and (3) that ATF "acknowledges that there was some confusion

because there was a brief period on March 29, 2018, during which the ANPRM link

(2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov

website even though that link was no longer able to accept comments for the NPRM." 83

Fed. Reg. at 66541-42.

49.    On information and belief, Plaintiffs allege that, as a result of these technical

irregularities and errors in ATF's rulemaking process, numerous people were precluded

from being able to timely submit their comments and ATF ultimately never received or

actually considered all the comments submitted under the different docket numbers.

50.    As statutory authorization, the Final Rule cites 18 U.S.C. § 926(a); 26 U.S.C. §

7801(a)(2)(ii), § 7805(a).  83 Fed. Reg. at 66515.  None of these statutory provisions

authorize retroactive rules or regulations with respect to the subject matter addressed in

this docket number, viz., the definition of machinegun and machine parts as otherwise

regulated by 18 U.S.C. § 922(o), and as defined by 26 U.S.C. § 5845(b).

51.    Indeed, with few exceptions not applicable here, Section 7805(b) flatly bans retroactive

rulemaking.  Retroactive application of criminal statutes is also expressly barred by the

Ex Post Facto Clause of the Constitution. Article 1, Section 9, Clause 3; *Calder v. Bull*, 3

U.S. 386, 390 (1798); *Peugh v. United States*, 569 U.S. 530 (2013).

52.    The federal government has no police powers. U.S. Const., Art. I § 8. Such powers are

reserved to the States. U.S. Const., Amend. X.

53.  The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

54.  In *United States v. Darby*, 312 U.S. 100 (1941) at 124, the Supreme Court held:

> The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers.

55.  That only the States have police powers was reaffirmed in United States v. Lopez, 514 U.S. 549 (1995), and again in United States v. Morrison, 529 U.S. 598 (2000).

56.  The ATF has no retroactive rulemaking authority. And the ATF had no authority to ban "bump-stock" devices, period.

## STATEMENT OF FACTS CONCERNING PLAINTIFF GUEDES

57.  In 2014, Mr. Guedes became interested in a bump stock device. Exhibit A at 274-75. Before purchasing such a device, Mr. Guedes accessed BFSystems's website to determine whether ATF had approved the particular device he sought to purchase. BFSystems's website stated that ATF had approved the device in a written determination letter dated April 2, 2012. *Id.* at 277-78.

58.  Relying upon this determination from ATF, Mr. Guedes purchased an AR15 BFSystem for $99.99, which he possessed, until such time as the Court denied the preliminary injunction request in this matter and was forced to turn it in to ATF under protest. *Id.* at 280.

59.     A copy of the ATF property receipt is attached as Exhibit B.

## STATEMENT OF FACTS CONCERNING PLAINTIFF RODEN

60.     Representative Roden is the duly elected state representative for District 111 of the
Missouri House of Representatives, having been initially elected, by the citizens of
District 111, in 2014, and since, reelected every two years; whereby, he is currently
serving his third term as state representative.

61.     Since 2003, Representative has worked fulltime as a firefighter/paramedic, in addition to
being a reserve deputy Sheriff.

62.     In 2004, Representative Roden attended the Missouri Sheriffs' Association
Training Academy, where he graduated with a POST class A license, which he has
maintained since issuance; thereby resulting in him being a reserve sheriff deputy.

63.     From 2004 through 2009, Representative Roden worked at the Franklin County Sheriff's
Office and from 2010 through the present, he works at the Camden County Sheriff's
Office as a reserve assigned to road patrol and a SWAT operator/medic.

64.     In August of 2016, he purchased a Slide Fire SSAR-15 at a cost of $150.00, only after
becoming aware that ATF issued several determinations that bump-stock-devices do not
constitute machine guns nor firearms, under the GCA or NFA.

## STATEMENT OF FACTS CONCERNING PLAINTIFF FPF

65.     On April 10, 2019, Plaintiff FPF, in order to comply with the Final Rule and avoid
criminal liability and fines, as well as instructions given to it by ATF and counsel for the
Department of Justice, surrendered under protest its lawfully acquired "bump-stock"
device that was purchased on reasonable reliance upon ATF's previous determinations
expressly determining that "bump-stock" devices of that type do *not* convert

semiautomatic firearms into "machineguns" under the NFA and GCA, and placed it into

the custody of ATF and ATF Special Agent Chris Loudermilk at the local ATF office in

Las Vegas, Nevada through its local counsel. FPF was not provided any compensation

for the taking of its property. A copy of the protest letter and ATF property receipt are

attached as Exhibit C.

### COUNT I: VIOLATIONS OF U.S. CONSTITUTION, ARTICLE 1, SECTION 1 AND ADMINISTRATIVE PROCEDURE ACT – DEFENDANTS LACKED CONSTITUTIONAL AND STATUTORY AUTHORITY TO ACT

(*All Plaintiffs vs. All Defendants*)

66.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

67.    Defendants stated to the D.C. Circuit of Appeals, that, if the validity of its rule

(re)interpreting the definition of machinegun "turns on the applicability of *Chevron*, it

would prefer that the [r]ule be set aside rather than up held." 920 F. 3d 1, 21 (CADC

2019) (Henderson, J., concurring in part and dissenting in part) (noting concession).

68.    Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be

vested in a Congress of the United States."

69.    No agency has any inherent power to make law, and "an agency literally has no power to

act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*,

476 U.S. 355, 374 (1986).

70.    The "core administrative-law principle" is that "an agency may not rewrite clear statutory

terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Group

v. EPA*, 134 S. Ct. 2427, 2446 (2014); *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984) ("If the intent of Congress is clear,

that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress.").

71.   5 U.S.C. § 706 provides, in pertinent part,

The reviewing court shall …

(2) hold unlawful and set aside agency action, findings, and conclusions found to be –

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law;

…

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557

of this title or otherwise reviewed on the record of an agency hearing provided by

statute;

72.   Congress did not prohibit the purchase, possession or utilization of bump-stock devices

by statute.

*Violation of Article 1, Section 1*

73.   Congress has clearly defined "machinegun" to include only a firearm "which shoots, is

designed to shoot, or can readily be restored to shoot, automatically more than one shot,

without manual reloading, by a single function of the trigger," and the frame or receiver

of such a weapon, or parts or combination of parts that could be converted or assembled

into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921.

74.     As the Final Rule was issued in direct contravention to the congressionally enacted

        definition of "machinegun" and without any statutory authority to eviscerate a

        congressionally enacted definition, it violates Article 1, Section 1 of the U.S.

        Constitution.

*The Final Rule is Beyond ATF's Statutory Authority*
*and Lacks Substantial Evidence*

75.     5 U.S.C. § 706(2)(c) requires that a court "hold unlawful and set aside agency action,

        findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or

        limitations, or short of statutory right."

76.     5 U.S.C. § 706(2)(e) requires that a court "hold unlawful and set aside agency action,

        findings, and conclusions found to be … unsupported by substantial evidence in a case

        subject to sections 556 and 557 of this title or otherwise reviewed on the record of an

        agency hearing provided by statute."

77.     Congress has clearly defined "machinegun" to include only a firearm "which shoots, is

        designed to shoot, or can readily be restored to shoot, automatically more than one shot,

        without manual reloading, by a single function of the trigger," and the frame or receiver

        of such a weapon, or parts or combination of parts that could be converted or assembled

        into such a weapon. 26 U.S.C. § 5845(b); 18 U.S.C. § 921. The express purpose behind

        the Final Rule's alteration and expansion of this definition is to capture "*all* bump-stock-

        type devices" with the law's prohibitive sweep based upon ATF's conclusion – directly

        countered by all the available evidence and logic – that such devices enable shooters to

        shoot *automatically* through a "self-acting or self-regulating" firing mechanism.

78.     Because there is no support for ATF's conclusion about the functionality of these

        devices, it has necessarily exceeded its statutory authority by purporting to expand the

24

law of Congress for the specific purpose of regulating firearms such devices as prohibited "machineguns." Indeed, through its previous formal determinations that bump stock devices are *not* "machineguns," ATF itself has conceded that it lacks the authority to regulate these devices at all. In fact, in a 2013 letter to Congressman Ed Perlmutter, ATF stated it "does not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." *Id.* at 268. And members of Congress have said the same: ranking Judiciary Committee Member, Senator Diane Feinstein, has declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." Exhibit A at 267.

79.    Moreover, in its Final Rule, ATF admits that it has exceeded the authority granted to it.

80.    "The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes." 83 Fed. Reg. at 66527.

81.    "The NFA is a statute, which only Congress may repeal or alter." 83 Fed. Reg. at 66540.

82.    Perhaps most importantly, "the statutory definition *alone* determines whether a firearm is a machinegun." 83 Fed. Reg. at 66533-34 (emphasis added).

83.    The Final Rule then goes on to declare that the "Department believes that this rule's interpretations of 'automatically' and 'single function of the trigger' in the statutory definition of 'machinegun' accord with the plain meaning of those terms. Moreover, even if those terms are ambiguous, this rule rests on a reasonable construction of them…*Congress thus implicitly left it to the Department to define "automatically' and 'single function of the trigger' in the event those terms are ambiguous.*" *Id*. (emphasis added).

84.    Here, even setting aside ATF's admission that that "the statutory definition alone determines whether a firearm is a machinegun," it takes the untenable position that the

statutory language is so clear that the agency is merely "defining those terms in

accordance with the plain meaning;" yet, it concedes that it only has the authority to do

such when terms are ambiguous and admits that the terms are not ambiguous; thereby,

precluding it from implementing the Final Rule, since it admits that it lacks the legal

authority to define terms that are not ambiguous.

85.     Furthermore, even if this Court were to hold that the definition of machinegun was

ambiguous, the rule of lenity would apply, resulting in the definition being construed in

the light most favorable to Plaintiffs. *See*, *United States* v. *Thompson/Center Arms Co.*,

504 U.S. 505, 517-18 (1992) (refusing to apply deference to an ambiguous definition and

instead applying the rule of lenity to two other terms in the National Firearms Act with

both civil and criminal applications, despite civil nature of suit and Justice Stevens'

dissent to the contrary); *see also*, *Burrage v. United States*, 571 U.S. 204, 216 (2014)), [10]

(declaring that where a criminal statute is ambiguous, the rule of lenity precludes any

deference being afforded to an administrative agency and requires the narrowest

interpretation.)

---

[10]     The Supreme Court in holding that rule of lenity applies to criminal statutes, declared
"we cannot give the text a meaning that is different from its ordinary, accepted meaning." The
D.C. Circuit in *United States v. McGoff*, 831 F.2d 1071, 1077 (D.C. Cir. 1987) has likewise held
that the rule of lenity displaces *Chevron* deference when it declared:

> In the criminal context, courts have traditionally required greater clarity in draftsmanship
> than in civil contexts, commensurate with the bedrock principle that in a free country
> citizens who are potentially subject to criminal sanctions should have clear notice of the
> behavior that may cause sanctions to be visited upon them.

> That is to say, the law of crimes must be clear. There is less room in a statute's regime for
> flexibility, a characteristic so familiar to us on this court in the interpretation of statutes
> entrusted to agencies for administration. We are, in short, far outside *Chevron* territory
> here.

86.   The government has previously conceded that Chevron does not and should not apply in this case, and that deference does not apply to criminal and dual-use statutes.

87.   Non-deference and lenity apply to criminal or dual-use statutes, regardless of how the government seeks a broader interpretation of ambiguous language.

88.   Whether the test is gross ambiguity, or the more straight-forward test of whether "there are two rational readings of a criminal statute, one harsher than the other," the statutes underlying the Final Rule trigger the rule of lenity. See *McNally v. United States*, 483 U.S. 350, 359-60 (1987) ("when there are two rational readings of a criminal statute, one harsher than the other, [the Court is] to choose the harsher only when Congress has spoken in clear and definite language").

89.   ATF's final rule constitutes an agency action that is Ultra Vires and should be set aside by this Court.

*The Final Rule is Arbitrary and Capricious*
*and Lacks Substantial Evidence*

90.   5 U.S.C. § 706(2)(a) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

91.   5 U.S.C. § 706(2)(e) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute."

92.   "On February 20, 2018, the President issued a memorandum to the Attorney General concerning 'bump fire' stocks and similar devices...The President then directed the Department of Justice, working within established legal protocols, 'to dedicate all

27

available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.'"   83 Fed. Reg. at 66516-66517.

93.    Let there be no mistake, President Trump directed the ATF, through the Attorney General, to ban bump-stock devices, before the notice and comment period was even initiated and without consideration for the legal authority of ATF to regulate bump-stock devices or the public, including Plaintiffs, being afforded an unbiased review of their comments. *See*, https://www.cnn.com/2018/02/20/politics/donald-trump-bump-stocks/index.html.

94.    As noted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the Cato Institute in their comment, Comments to the Bureau of Alcohol, Tobacco, Firearms and Explosives, *In the Matter of* The Language of the National Firearms Act and Definition of "Machinegun" submitted by Josh Blackman, Ilya Shapiro, and Matthew Larosiere of the Cato Institute, *available at* https://www.regulations.gov/document?D=ATF-2018-0002-65898, the rulemaking process, before its inception, "was a fait accompli" and that President Trump admitted that he would write out bump-stock devices through executive action and even stated, "I'll do that myself because I'm able to."  Directly on point, the Cato Comment recounts that moments before the rulemaking was announced, "President Trump tweeted: … As I promised, today the Department of Justice will issue the rule banning BUMP STOCKS with a mandated comment period. We will BAN all devices that turn legal weapons into illegal machine guns."

95.     The Cato Comment then continues on, citing to Josh Blackman, *Presidential Maladministration*, 2018 Il. L. Rev. 397 at 405, [11] that:

> To be clear, there is no problem when the president exercises his constitutional authority to direct the actions of his principal officers. There can be a problem, however, when those actions *reverse* past executive actions by *discovering* new authority in old statutes. One of us has referred to the former phenomenon as *presidential reversals* and the latter as *presidential discovery*. When interpreting an unambiguous statute, courts should hesitate before deferring to exercises of reversal coupled with discovery.

96.     As previously noted, a reviewing court may "hold unlawful and set aside agency action … found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (2017 D.C. Cir.) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43).

97.     Here, given its failure or refusal to produce any records in support of the Final Rule, ATF has presented *no* evidence in support of its "legal analysis" leading to the unprecedented conclusion that bump-stock-type devices are "machineguns" because "they convert a semiautomatic firearm into a firearm that shoots automatically more than one shot, without manual reloading, by a single function of the trigger." 83 Fed. Reg. at 13443. And all the *known* evidence runs directly counter to this conclusion.

---

[11] "The first species of presidential maladministration is by far the most commonplace: when the incumbent administration abandons a previous administration's interpretation of a statute. Every four to eight years, to comply with the new President's regulatory philosophy, political appointees in agencies alter certain interpretations of the law."

98. Experts opining *on behalf of* ATF have consistently concluded that commonly used bump-stock-type devices manufactured by Slide Fire and Bump Fire Systems do *not* function so as to convert the associated firearm into a "machinegun" because, in fact, the shooter must still separately pull the trigger to fire each successive shot. *See* Exhibit A at 901 and 908 (expert report of Rick Vasquez, former Acting Chief of Firearms Technology Branch); *id.* at 708 (expert testimony of Thomas E. Brandon, ATF Deputy Director, in *Freedom Ordnance Mfg. v. Thomas E. Brandon*).

99. Additionally, FPF placed before the agency, as part of its comment, compelling video evidence in which an AR-15 type of firearm fitted with a Slide Fire bump stock device was fired in multiple ways,[12] Exhibit 28 to Exhibit A,[13] including in precisely the same manner that the NPRM emphasizes as creating "machinegun" functionality – *i.e.*, where the shooter maintains "constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and constant rearward pressure on the device's extension ledge with the shooter's trigger finger," 83 Fed. Reg. at 13444. As this evidence clearly demonstrates, in all methods of firing, the bump stock device does not, as ATF claims in the NPRM, function as "a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." 83 Fed.Reg. at 1344. Rather, the video shows that each shot requires a *separate* pull of the trigger. Exhibit 28 to Exhibit A.

---

[12] The video depicts the firearm being shot in three different manners: first with the stock in a "locked" position (meaning that the stock does not move); second with the stock unlocked (so that the stock may move freely); and finally, again with the stock unlocked but in the manner described in the NPR itself (maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure").

[13] This video can also be viewed online at the following link: https://youtu.be/1OyK2RdO63U (Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*).

This most notably includes the form of firing on which ATF relies to make its claim, as

the video plainly and indisputably illustrates that, even when fired in this manner, the

trigger must be released, reset, and pulled completely rearward before the next shot can

be fired. *Id.* [14] Thus, at no point does the firearm fire more than one round, by a single

function of the trigger. *Id*. Moreover and consistently, the close-ups reveal, contrary to

ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the

trigger by the shooter" *is necessary* for subsequent rounds to be discharged. *Id*.

100.   Indeed, Mr. Vasquez, the former Acting Chief of FTB, viewed the *Bump Stock Analytical*

video and attested it "fully, explicitly, and accurately depicts the function of bump-stock-

devices, including, but not limited to, the function and operation of the firearm's trigger,

which is exactingly consistent with my evaluation and review of the Slide Fire stock

during my tenure with ATF and my Slide Fire Analysis." Exhibit A at 901.

101.   As Mr. Vasquez further explained (Exhibit A at 903):

> The bump-stock-device does not permit automatic fire by
> harnessing the recoil energy of the firearm. Harnessing the energy
> would require the addition of a device such as a spring or
> hydraulics that could automatically absorb the recoil and use this
> energy to activate itself. If it did harness the recoil energy, the
> bump-stock equipped firearm in the video would have continued to
> fire, while the shooter's finger remained on the trigger, after
> pulling it rearwards without requiring the shooter to release and
> reset the trigger and then pull the trigger completely reward for a
> subsequent round to be fired.

102.   Moreover, *even assuming* bump-stock-type devices do or could produce such

machinegun-like effects (something Plaintiffs do not concede given the evidence clearly

---

[14] *See* 83 Fed. Reg. at 66534 declaring that "[w]hile semiautomatic firearms may shoot one
round when the trigger is pulled, the shooter must release the trigger before another round is
fired." The operation of a bump-stock-type device is no different than another other
semiautomatic firearm as depicted in the video exhibit, Exhibit 28 to Exhibit A.

demonstrating otherwise), ATF's own analysis in the NPRM tellingly undermines the validity of the conclusion on which its new rule is based, because it reveals the underlying rationale is capricious, absurd, and invites total arbitrariness.

103.     As noted, because bump-firing is produced by a *technique* and not a particular device, ATF admits that this method of firing can be produced by myriad means totally unrelated to any bump-stock-style device, such as through certain fashioning of rubber bands or belt loops, or by simply training one's trigger finger to fire more rapidly. 83 Fed. Reg. at 13454. This acknowledgement can lead to one of only two untenable conclusions: First, ATF is *explicitly approving* the use of such techniques to produce machinegun-like effects, which cannot reasonably be squared with its claim that regulation of bump-stock-type devices is urgently necessary prevent mass-shooting mayhem.[15] Second, ATF is declaring that *any* such manipulations of a semiautomatic firearm to produce this shooting capability is subject to regulation under the Final Rule just the same as if the firearm were a "machinegun." This *does* square logically with the thesis of ATF's NPRM that this *functionality* of firearms, in general, must be stamped out to prevent mass shootings, *but* such a rationale leads to the absurd result that people could be arrested, prosecuted, and convicted of illegal "machinegun" possession, and additionally lose not only their firearms but their Second Amendment rights pursuant to 18 U.S.C. § 922(g)(1), simply because they employed a *technique* on some occasion that happened to produce a "bump-fire" effect.

---

[15] One could draw this inference from ATF's statement that, for those individuals who seek to do so, these manual manipulations of semiautomatic firearms "would be their alternatives to using bump-stock-type devices," 83 Fed. Reg. at 13454, which arguably implies that while attempting to use *bump-stock* devices to produce such effects is *not* acceptable, these "alternatives" *are* acceptable.

104.   Either way, all the known evidence (as well as logic and common sense) before ATF and elsewhere concerning the *actual* functionality and utility of bump-stock-type devices, runs diametrically counter to the conclusion on which ATF's Final Rule rests. Therefore, the Final Rule cannot be sustained and instead must be stricken as invalid. *Stand Up for California! v. United States DOI*, 204 F. Supp. 3d 212, 245 (D.C. 2016) (quoting *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1021, 338 U.S. App. D.C. 168 (D.C. Cir. 1999) (When an agency '"fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."').

105.   More importantly if this Court were to hold that the definition of machinegun was ambiguous, the rule of lenity would apply, resulting in the definition being construed in the light most favorable to Plaintiffs. *See*, *United States* v. *Thompson/Center Arms Co.*, 504 U.S. 505, 517-18 (1992) (refusing to apply deference to an ambiguous definition and instead applying the rule of lenity to two other terms in the National Firearms Act with both civil and criminal applications, despite civil nature of suit and Justice Stevens' dissent to the contrary).

### *Failure to Provide an Amnesty*

106.   While the Final Rule is unconstitutional and unlawful, both on its face and *as-applied*, even if *arguendo* that were not so, the ATF failed to provide an amnesty period.

107.   5 U.S.C. § 706(2)(b) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity."

108.    5 U.S.C. § 706(2)(d) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."

109.    Pursuant to Section 207(d) of 82 Stat. 1235, also known as the Gun Control Act of 1968, the Attorney General [16] has the power to establish amnesty periods for up to ninety days.

110.    27 C.F.R. § 479.101(b) provides, in pertinent part, that "No firearm may be registered by a person unlawfully in possession of the firearm except during an amnesty period established under section 207 of the Gun Control Act of 1968 (82 Stat. 1235)."

111.    An amnesty was previously held between November 2, 1968, to December 1, 1968 and ATF promulgated a regulation – 26 C.F.R. § 179.120, entitled "Registration of Firearms," – which established the amnesty and procedures relating to the registration of unregistered NFA firearms.

112.    More recently, ATF provided a seven-year registration and amnesty period – from March 1, 1994 through May 1, 2001 – for Streetsweepers and USAS-12 firearms, when it reclassified them under the NFA.

113.    As Defendants have the authority to declare an amnesty and register all bump stock devices, Plaintiffs' constitutional rights and justice requires that instead of requiring surrender or destruction of bump stock devices, all bump stock devices should instead be registered through an amnesty.

---

[16] While the provision refers to the "Secretary of the Treasury," the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, it is now the Attorney General that has the authority to institute an amnesty.

*Failure to Provide 90-Day Comment Period*

114.    5 U.S.C. § 706(2)(d) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."

115.    Under 18 U.S.C. § 926(b), ATF was statutorily obligated to provide at least a 90-day public comment period to facilitate the public discourse intended under the APA.

116.    Nevertheless, in addition to failing to provide any supporting documents to the public at large – or even to FPF in response to its properly presented formal record requests – ATF failed or refused to provide for this crucial public comment process.

117.    As described above, immediately upon the publication of the NPR, the portal through which concerned citizens were directed to submit online comments, was shut down and the website specifically declared that the comment period was "closed."

118.    As a result, for a minimum of five days of the statutorily required ninety-day comment period, interested individuals were deprived of their ability to submit comments.

119.    Even ATF admits "that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal," and that "there was some confusion because there was a brief period on March 29, 2018, during which the ANPRM link (2018–0001– 0001) was prominently situated on the homepage of the Regulations.gov website even though that link was no longer able to accept comments for the NPRM." 83 Fed. Reg. at 66541-42.

120.    Furthermore, numerous individuals, due to the declaration on federalregister.gov, were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard, since they were never

informed, after ATF removed the declaration and permitted comments to be filed, that they could now submit comments.

*Failure to Provide Plaintiff FPF a Hearing*

121.  5 U.S.C. § 706(2)(d) requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."

122.  Under 18 U.S.C. § 926(b), ATF was also expressly required to "afford interested parties opportunity for hearing, before prescribing such rules and regulations."

123.  In contravention of the clear mandate that the agency "*shall* afford" such hearings, ATF purported to transform this mandatory obligation into a discretionary option for itself, by declaring in the NPRM that such hearings ultimately would be granted only if the Director found it "necessary" to do so. 83 Fed. Reg. at 13456. The NPRM included no objective standards or criteria controlling or limiting the Director's determination here and therefore essentially vested the Director with unbridled discretion to deny hearings.

124.  Moreover, in an apparent exercise of this unchecked discretion that the agency purportedly created for itself in violation of section 926(b), ATF failed and refused to provide FPF any opportunity for a hearing before implementing the Final Rule despite the organizations' formal requests for such a hearing.

125.  Accordingly, ATF's attempt to redefine the term "machinegun" in the Final Rule is in violation of Article 1, Section 1 of the U.S. Constitution and the Administrative Procedures Act and therefore, Plaintiffs are entitled to the relief prayed for herein.

**COUNT II: VIOLATIONS OF U.S. CONSTITUTION, ARTICLES 1, SECTIONS 1 and 7 AND ARTICLE 2, SECTION 3 – DEFENDANTS HAVE VIOLATED THE SEPARATION OF POWERS AND NON-DIVESTMENT / NON-DELAGATION PROVISIONS**

(*All Plaintiffs vs. All Defendants*)

126.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

*Violations of Separations of Powers*

127.    Article I, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

128.    Article I, Section 7, Clauses 2 and 3 of the Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

129.    Article II, Section 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed … ."

130.    "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 756-57 (1996).

131.    Congress has not prohibited the purchase, possession or utilization of bump stock devices.

132.    Rather, as set forth *supra*, in defiance of the statutorily enacted definition of machinegun by the Congress, former-Acting Attorney General Whittaker, at the President's direction, promulgated the Final Rule to criminalize conduct not covered by the statute.

133.    As a result, the Final Rule violates the separation of powers established by Article 1, Section 1 and Article 2, Section 3 of the U.S. Constitution.

*Violations of Non-Divestment / Non-Delegation*

134.   Article I, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

135.   Article I, Section 3 of the Constitution directs that the President "shall take Care that the Law be faithfully executed…"

136.   A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." Loving v. United States, 517 U.S. 748, 758 (1996).

137.   Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 529 (1935).

138.   Neither the President no his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances … should be forbidden" by law. Panama Refining Co. v. Ryan, 293 U.S. 388, 418-19 (1935).

139.   Congress has not prohibited the purchase, possession or utilization of bump stock devices.

140.   The Congress did not divest itself of the authority to define the term "machinegun" under the National Firearms Act and Gun Control Act.

141.   Even if Congress wanted to divest itself of that authority, it could not do so because defining crimes is an essential legislative function reserved exclusively for Congress.

142.     Congress may not divest itself of the authority to define the term "machinegun" under the
NFA and GCA, because doing so would allow the Executive Branch, not Congress, to
define what circumstances will be made criminal.

143.     The Final Rule violates Article I, Section 1 and Article 2, Section 3 of the U.S.
Constitution because it improperly defined a crime even though Congress did not
delegate the authority to define the term "machinegun."

144.     The Final Rule violates Article I, Section 7 because the House of Representatives and
Senate did not pass a bill banning bump stock devices, nor did the President sign such a
bill.

145.     The Final Rule also violates Article I, Section 1 and Article 2, Section 3 of the U.S.
Constitution because, even if Congress attempted to divest itself of its legislative power,
the Executive Branch may not rewrite criminal prohibitions in this fashion.

146.     Accordingly, the Final Rule is in violation of Articles 1, Sections 1 and 7 and Article 2,
Section 3 of the U.S. Constitution and therefore, Plaintiffs are entitled to the relief prayed
for herein.

## COUNT III: VIOLATIONS OF THE FIFTH AMENDMENT TO THE U.S. CONSTIUTION – DEFENDANTS HAVE VIOLATED PROCEDURAL AND SUBSTANTIVE DUE PROCESS AND THE FINAL RULE IS VAGUE CONSTITUTES A TAKINGS WITHOUT JUST COMPENSATION

*(All Plaintiffs vs. All Defendants)*

147.     The foregoing paragraphs are hereby incorporated herein as if set forth in full.

148.     The Fifth Amendment to the U.S. Constitution provides, in pertinent part, that "No
person shall … be deprived of life, liberty, or property, without due process of law; nor
shall private property be taken for public use, without just compensation."

*Violation of Procedural Due Process*

149.  The fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 US 319 (1976).

150.  Plaintiffs' procedural due process rights were violated when Defendants caused the Final Rule to be published without affording a pre-deprivation or other hearing.

151.  Plaintiffs' procedural due process rights were violated when Defendants criminalized their possession of bump stock devices and forced their divestiture of their bump stock devices in the absence of affording a pre-deprivation or other hearing.

*Violation of Substantive Due Process*

152.  *Ultra vires* conduct violates Due Process. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 779 (2d Cir. 2007).

153.  If a government agency does "not have authority for the actions it took" then those actions are "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *Id*.

154.  Plaintiffs' substantive due process rights were violated when Defendants exceeded the scope of their statutory authority.

*The Final Rule is Void for Vagueness*

155.  "[T]he terms of a penal statute ... must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties… and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).

156.   "[W]hen choice has to be made between two readings of what conduct Congress has

made a crime, it is appropriate, before we choose the harsher alternative, to require that

Congress should have spoken in language that is clear and definite." *United States v.*

*Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221–22 (1952).

157.   Similarly, the Court has declared that "before a man can be punished as a criminal under

the federal law his case must be 'plainly and unmistakably' within the provisions of some

statute." *United States v. Gradwell*, 243 U.S. 476, 485 (1917). [17]

158.   The Final Rule is void for vagueness as bump stock devices do not come "plainly and

unmistakably within the definition of machinegun, which is emphasized by the numerous

determinations, issued by ATF, declaring that bump stock devices do not even constitute

firearms, let alone, machineguns.

### *Violation of the Takings Clause*

159.   Generally, under the Takings Clause of the Fifth Amendment to the U.S. Constitution,

when government laws or regulations result in the taking or destruction of private

property, the government must provide just compensation for the value of that property.

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425-28 (2015); *Pumpelly v. Green Bay &*

*Mississippi Canal Co.*, 80 U.S. 166, 177 (1871). More specifically, an agency regulation

amounts to such a taking when "denies all economically beneficial or productive use" of

the property or when it "impedes the use of property without depriving the owner of all

---

[17] *See also*, *United States v. Bass*, 404 U.S. 336, 348 (1971) (declaring "First, a fair warning
should be given to the world in language that the common world will understand, of what the law
intends to do if a certain line is passed. To make the warning fair, so fair as possible the line
should be clear. Second, because of the seriousness of criminal penalties, and because criminal
punishment usually represents the moral condemnation of the community, legislatures and not
courts should define criminal activity … Thus, where there is ambiguity in a criminal statute,
doubts are resolved in favor of the defendant.)(internal citations omitted).

economically beneficial use," based upon "a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

160. ATF has made no bones about the property-destroying effect of its Final Rule. It has boldly declared that, upon implementation of the rule, all "manufacturers, current owners, and persons wishing to purchase [bump-stock-type] devices would be subject to the restrictions imposed by the GCA and NFA." Reg. Red. At 13448. Thus, all "bump-stock-type devices currently possessed by individuals would have to be destroyed or turned in upon implementation of the regulation." *Id.* at 13450." Indeed, given the teeth built into the criminal statutes that ATF seeks to invoke through this application of the Final Rule, the forced dispossession comes on pain of criminal prosecution for failure to comply.

161. Unquestionably, the effect of this regulation is to destroy "*all* economically beneficial or productive use" and to destroy *all* the "investment-backed expectations" that ATF itself set up through its previous public pronouncements consistently declaring these very same types of devices *lawful* as *not* constituting "machineguns." And the loss of private interests here is substantial. ATF itself assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. at 13451. It then declares that the primary estimated cost to be $96,242,750.00 based on an estimate of 520,000 affected bump-stock-devices. However, multiplying ATF's stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not $96,242,750.00 as stated in Table 3 of the NPRM. Moreover, by averaging the acknowledged prices for bump-stock-devices, a proper

average sale price should be $302.95, which would result in a primary estimated cost of $157,534,000.00 in just compensation being due.

162.   Moreover, the requirement of just compensation for this destruction of valuable private interests cannot be set aside as a valid exercise of police power.

163.   The Final Rule is violative of the Takings Clause of the Fifth Amendment as it seeks to divest Plaintiffs and those similarly situated of their personal property in the absence of just compensation, and therefor Plaintiffs are entitled to the relief prayed for herein.

## COUNT IV: VIOLATION OF THE INTERNAL REVENUE CODE

*(All Plaintiffs vs. All Defendants)*

164.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

165.   ATF's Final Rule is not only procedurally and substantively invalid as set forth above, but any implementation or enforcement of the rule against such devices manufactured or assembled before the date of the NPRM publication would violate 26 U.S.C. § 7805(b). 26 U.S.C. § 7805(b) provides that "no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before … [¶ … ¶] [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public." ATF has previously acknowledged the limiting effect of this law on the retroactivity of its firearms regulations, in that it cannot properly apply a legal reclassification of items produced before this date. *See e.g.*, ATF Rule 82-8 (in reclassifying SM10 and SM11A1 pistols and SAC carbines as "machineguns" under the National Firearms Act, ATF acknowledged that the reclassification was not applicable to those firearms manufactured or assembled before June 21, 1982, pursuant to 26 U.S.C. § 7805(b)); ATF-41F (81 Fed. Reg. 2658 through

43

2723) (where ATF cited Section 7805(b) in declining to retroactively apply the final rule

related to the transfer of regulated firearms and acknowledging that the old law would

apply to all transfer applications submitted prior to the effective date of the new rule).

166.    Accordingly, to whatever extent the Final Rule may otherwise legitimately be

implemented or enforced, it cannot be properly be applied to bump stock devices

manufactured before March 29, 2018 – the date of publication of this NPR in the Federal

Register – if not, the date of issuance of the Final Rule.

## COUNT V: EX POST FACTO VIOLATION

*(All Plaintiffs vs. All Defendants)*

167.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

168.    Article I, Section 9, Clause 3 of the U.S Constitution declares that "No Bill of Attainder

or ex post facto Law shall be passed." It is well established that this prohibition includes

"[e]very law that makes an action done before the passing of the law, and which was

innocent when done, criminal; and punishes such action," *Calder v. Bull*, 3 U.S. 386

(1798), and any law that, "in relation to the offence or its consequences, alters the

situation of a party to his disadvantage," *Collins v. Youngblood*, 497 U.S. 37, 47 (1990).

The specific focus of this proscription is to prevent the retroactive application of laws and

regulations whose primary purpose is to impose punishment on the affected citizens or

whose impact would be so punitive either in purpose or effect as to negate any claim of a

mere intent to effect a civil and nonpunitive regulatory purpose. *See Smith v. Doe*, 538

U.S. 84, 92 (2003); *Johnson v. Quander*, 440 F.3d 489, 500-501 (D.C. Cir. 2006).

169.    Much like the unabashed manner in which ATF attempts to destroy all value and

beneficial use of bump-stock-type devices without providing any just compensation, ATF

openly admits the harsh criminal consequences flowing from its unsupported about-face

on the classification of bump-stock-type devices. As the NPRM states (italics added):

> The proposed rule would *replace prior classifications* of bump-stock-type devices, *including* those that ATF previously determined *were* not machineguns. This rule would thus *supplant any prior letter rulings* with which it is inconsistent so that *any* bump-stock device described above qualifies as a machinegun.

83 Fed. Reg. at 13448.

170.   And, as already seen, because all "manufacturers, current owners, and persons wishing to

purchase such devices would be subject to the restrictions imposed by the GCA and

NFA," 83 Fed. Reg. at 13448, everyone is subject *criminally punitive* sanctions for

failing to comply with this rouge ATF – without exception (except for the small class of

individuals exempted from the rule). Indeed, ATF has expressly declared that "there is *no*

means by which a possessor may register a firearm retroactively, including a firearm that

has been *reclassified*." *Id.* (italics added). So ATF has effectively shackled everyone

affected by this new rule, transforming them into criminals based upon their mere

possession of any bump-stock-type device *regardless* of whether that device had

theretofore been *lawfully* possessed and *regardless of* whether *ATF itself* previously

determined the device does *not* to have the capability of converting a firearm into a

prohibited "machinegun." This is a prohibited *ex post facto* in the purest sense.

171.   Accordingly, Plaintiffs are entitled to the relief prayed for herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Damien Guedes, Representative Shane Roden, Firearms

Policy Foundation, Madison Society Foundation, and Florida Carry, Inc. respectfully requests

that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a)      Declare that the Final Rule and/or enforcement of the Final Rule is Ultra Vires;

b)      Declare that the Final Rule violates Article I, Section 1 of the United States Constitution;

c)      Declare that the Final Rule violates the Administrative Procedures Act (APA) and is unlawful;

d)      Declare that the Final Rule violates Article I, Sections 1 and 7, and Article II, Section 3 of the United States Constitution;

e)      Declare that the statutes underlying the Final Rule, including 26 U.S.C. § 5841, et seq., and 18 U.S.C. § 921, et seq, and/or the Final Rule are unconstitutionally vague and violate the rule of lenity;

f)      Declare that the Final Rule and/or enforcement of the Final Rule violates the Plaintiffs' rights under the Fifth Amendment to the United States Constitution;

g)      Declare pursuant to 26 U.S.C. § 7805, Internal Revenue Code, Defendants are unable to enforce a ban on the possession or use of "bump-stock" devices;

h)      Declare that the Final Rule's enforcement constitutes a violation of Article I, Section 9, Clause 3 of the U.S Constitution (Ex Post Facto Clause);

i)      Permanently enjoin Defendants, their officers, agents, servants, employees and all persons in active concert or participation with them from enforcing the Final Rule and all related laws, policies, and procedures that would impede or criminalize a person's exercise of their use, possession, sale, transfer, transport, or other disposition of a bump-stock device, as the result of the Final Rule;

j)      Issue an injunction prohibiting Defendants and anyone acting in concert with them from taking any action inconsistent with any invalidation or rescission of, or injunction against, the Final Rule; and,

k)   Order the government to return to the owner of the property all taken and/or collected property caused by the Final Rule; or,

l)   Alternatively, Declare that the Final Rule violates the Administrative Procedures Act as it is arbitrary and capricious and is of no force and effect, enjoin the enforcement of the Rule against the Plaintiffs and others who owned a device before the effective date of the Rule, and mandate that the Defendants declare and institute an amnesty and allow for the registration of affected devices in the National Firearms Registration and Transfer Record (NFRTR).

In addition to the above, Plaintiffs further respectfully request that the Court:

m)   Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action under 5 U.S.C. § 552(a)(4)(E)(i), 18 U.S.C. § 924, and 28 U.S.C. §§ 1920, 2412 and any other applicable law; and,

n)   Grant Plaintiffs such other equitable and/or legal relief as the Court deems just and proper and as justice so requires.

Respectfully Submitted,

Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@CivilRightsDefenseFirm.com

Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@CivilRightsDefenseFirm.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-92973 (t)

(610) 400-8439 (f)

Attorneys for Plaintiffs