# Exhibit A
## (Part 1, Pgs. 1 - 674)

## Bureau of Alcohol, Tobacco, Firearms, and Explosives

| | | |
|---|---|---|
| ——————————— ) | | |
| )| Docket No. ATF 2017R-22 | |
| **Bump-Stock-Type Devices** ) | | |
| ) | RIN 1140-AA52 | |
| ——————————— )| | |

## Firearms Policy Coalition and Firearms Policy Foundation's Comments in Opposition to Proposed Rule ATF 2017R-22

Joshua Prince, Esq.
*Chief Counsel*

Adam Kraut, Esq.
*Attorney*

Firearms Industry Consulting Group
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
www.FirearmsIndustryConsultingGroup.com

June 19, 2018

**Exhibit A, Pg. 1**

# TABLE OF CONTENTS

I. **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING** ................................................................................3

    A. *ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule* ................................................................................3

    B. *ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises*....................7

    C. *ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking* ........................................................12

    D. *ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity* ........................................................................17

        1. ATF's "Institutional Perjury" Before the Courts ........................................18

        2. ATF's Deception in Congressional Oversight ............................................20

        3. ATF's Misleading of the Public ................................................................20

II. **ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES** ................................................................................21

    A. *The Second Amendment*................................................................22

    B. *The Fifth Amendment* ................................................................25

        1. *The Proposed Rulemaking Violates Due Process* ..................................25

            i.  ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties ................................................................25

            ii.  The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior Approvals and Public's Reliance Thereon ........................................26

        2. *The Proposal Constitutes a Taking Without Just Compensation* ..............27

            i.  The Fifth Amendment Precludes a Regulatory Taking........................27

            ii.  Cost-Impact Statement Fails to Address Just Compensation for the Taking................................................................30

    C. *The Ex Post Facto Clause* ................................................................33

        1. *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct* .........33

III. **ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY** ................................34

    A. *Congress Prohibited "Undue or Unnecessary" Restrictions* ..........................35

**Exhibit A, Pg. 2**

B. *Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun*........................................................................36

C. *ATF is Statutorily Prohibited From Retroactively Applying the NPR* ..........................40

IV. **ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS** ............................................41

A. *ATF's Interpretative Jiggery-Pokery is Pure Applesauce* ...............................42

B. *Belt Loops, Rubber Bands and Fingers, OH MY!* ............................................42

C. *The Jerry Miculek Example – He's One Bad Mother... Shut Your Mouth (And: Oh No! They Banned Jerry!)* .............................................................................44

D. *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting* ................................................45

E. *We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices*...............47

F. *The Akins Accelerator Difference* ....................................................................54

V. **ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY**........................55

VI. **ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES**.....................................................................................................57

A. *FPC Supports "Alternative 1"* .........................................................................57

B. *The Amnesty Alternative* ...................................................................................57

C. *ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed* ...............................................................59

D. *ATF's Reclassification of Open Bolt Macs* .....................................................60

E. *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11* .................61

VII. **POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE** ........63

A. *ATF's Assumptions Lack Statistical Validity* ..................................................63

B. *ATF Relies On Multiple False Premises* ..........................................................65

**CONCLUSION**............................................................................................................66

**Exhibit A, Pg. 3**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | Docket No.  ATF 2017R-22 |
| **Bump-Stock-Type Devices** | ) | |
| | ) | RIN 1140-AA52 |
| _____ | ) | |

### Firearms Policy Coalition and Firearms Policy Foundation's Comments in Opposition to Proposed Rule ATF 2017R-22

On March 29, 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or the "Agency") published a Notice of Proposed Rulemaking ("NPR") in the Federal Register at Volume 83, pages 13442 through 13457, to institute this rulemaking proceeding with respect to firearms regulated under the National Firearms Act ("NFA"), 26 U.S.C. §§ 5801-5872. ATF's current regulations under the NFA are codified at 27 C.F.R. Part 479.

Firearms Policy Coalition (FPC) is a grassroots, non-partisan, 501(c)(4) public benefit organization. It is interested in this rulemaking because FPC's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of

1

the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPC offers this public comment for consideration with respect to the proposed rule.

Firearms Policy Foundation (FPF) is a grassroots, non-partisan, 501(c)(3) public benefit organization. It is interested in this rulemaking because FPF's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPF offers this public comment for consideration with respect to the proposed rule.

FPC and FPF oppose the proposed rulemaking for the reasons set forth below and in the Exhibits to this Comment incorporated herein by reference.  For ease of reference and given that FPC's and FPF's interests are aligned, the use of "FPC" throughout this Comment incorporates or otherwise constitutes both FPC and FPF.

**Exhibit A, Pg. 5**

I.   **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING**

ATF has repeatedly violated the basic obligations designed to permit *meaningful* public participation in this rulemaking proceeding.  Despite efforts by FPC and other interested persons to encourage compliance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501-559, other statutory provisions governing rulemaking, and fundamental due process, ATF has persisted on a course that ensures a waste of time and resources by all involved. It should be clear that ATF cannot proceed to promulgate a final rule without publishing a proper NPR and providing the necessary opportunity for *meaningful* public comment.

A.   ***ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule***

On March 30, 2018, the day after ATF published NPR in this matter, Firearms Industry Consulting Group ("FICG"), on behalf of FPC, submitted an expedited FOIA Request "for all ATF determinations relative to devices referred to as 'bump stocks' and 'bump-fire stocks' by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms relative to each determination, and any versions or drafts of the determinations, which were different than the final

3

determination" since ATF failed to include these, or any other "supporting documents," in the docket folder. [1] *See* Exhibit 1.



As of the filing of this Comment, not only has ATF declined to make public any of the requested and necessary supporting documents – *especially its own determinations that bump stocks and bump-fire stocks do not constitute firearms, let alone machineguns* [2] – but has additionally failed to respond to FICG's expedited FOIA or even assign a number to it. [3] Moreover, while acknowledging that it has received "correspondence[s] from members of the United States

---

[1] As reflected in the FOIA Request, "[t]he use of the word 'determinations' shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF."

[2] ATF admits that there are at least "ten letter rulings between 2008 and 2017" (83 Fed. Reg. at 13445); none of which have been made available by ATF. 83 Fed. Reg. at 13445.

[3] FICG submitted its request on March 30, 2018. As is common practice for ATF, it has failed to comply with 5 U.S.C. § 552(a)(6)(A)(i).

4

Senate and the United States House of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition" (83 Fed. Reg. at 13446), ATF has failed to also provide these in the docket.

 As a result, ATF still has not provided any of the documents underlying the NPR either in the docket or in response to the FOIA request.

It has long been understood that "[t]he process of notice and comment rule-making is not to be an empty charade. It is to be a process of reasoned decision-making. One particularly important component of the reasoning process is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 528 (D.C. Cir. 1982). "If the [NPR] fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Id.* at 530. Providing access to materials like FPC requested – in addition to those that ATF has acknowledged in the NPR as the basis for the rulemaking – has long been recognized as essential to a meaningful opportunity to participate in the rulemaking process.

The APA "'requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule.'" *American Medical Ass'n, v. Reno,* 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) (quoting *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C. Cir. 1994)). In order to ensure that rules are not promulgated on the basis of data that to a "critical degree, is known only to the agency," the agency must make available the "methodology" of tests and surveys relied upon in the NPR. *Portland Cement Ass'n v. Ruckelshaus,* 486 F.3d 375, 392-93 (D.C. Cir. 1973).

**Exhibit A, Pg. 8**

An agency commits serious procedural error when it fails to reveal the basis for a proposed rule in time to allow for meaningful commentary. *Connecticut Power & Light,* 673 F.2d at 530-31. The notice and comment requirements

> are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005).

In this rulemaking proceeding, ATF not only refused to make available its own prior determinations that "bump stocks", "bump-fire stocks", and "bump-stock-devices" were not firearms, *let alone*, machineguns, and communications received from Congress and other organizations, but more importantly, as discussed in Sections I., B., and IV., D., *infra*, ATF has failed to provide any evidence that a "bump stock", "bump-fire stock", or a "bump-stock-device" was ever utilized in a single crime. As the putative use of a bump stock in the Las Vegas shooting is the purported underlying basis for this rulemaking (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454) the lack of evidentiary support is mind-boggling – especially in light of legitimate national concerns involving the media and governmental agencies misleading the public on a variety of issues – and constitutes a serious procedural error, as the absence of such evidence supports that there are no verified instances of a bump stock being utilized criminally and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. [4]

---

[4] An expedited Freedom of Information Act request was submitted to both ATF and FBI requesting "Any and all records documenting the use of a bump-fire type stock being used by anyone on or about October 1, 2017 at the Mandalay Bay shooting incident in Las Vegas,

(footnote continued)

**Exhibit A, Pg. 9**

The lack of access to these materials has seriously hindered the ability of interested persons to address everything that underlies the apparent unsupported assertions in the NPR. Bringing forth any such material in support of a final rule will do nothing to remedy the fact that those materials were not available to inform the interested persons preparing public comments. If ATF intends to take any further action relative to this rulemaking, it needs first to lay the foundation for a proposal and then expose that foundation to meaningful critique.

**B.** ***ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises***

In the docket, ATF failed to provide evidence of a single instance where a "bump stock" or "bump-fire stock" was confirmed to be utilized in the commission of a crime. [5] Even more disconcerting, in order to argue a putative benefit of this rulemaking, ATF relies on public comments from an ANPR, stating:

> "As reported by public comments, this proposed rule would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident... Banning bump-stock-type devices *could* reduce casualties in an incident involving a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents, because it prevents shooters from using a device that allows them to shoot a semiautomatic firearm automatically."

---

(footnote continued)

Nevada; and Any and all records documenting the use of a bump-fire type stock used during the commission of any crime to date." To date, neither ATF nor FBI has confirmed the use of a bumpfire stock in the commission of any crime. *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63, *available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18 – Part4" as pdf pages 1 – 2.
[5] *Id*.

83 Fed. Reg. 13454 (emphasis added). These purported benefits are equally illusory and

misleading. First, ATF presents no evidence that bump-stock-type devices have actually

ever been used in any mass shooting incidents.[6] As further discussed *infra* in Section IV.,

D., even in relation to the Las Vegas incident upon which the NPR relies (83 Fed. Reg. at

13443, 13444, 13446, 13447, 13452, 13454), the Las Vegas Metropolitan Police

Department Preliminary Investigative Report *only* indicates that some weapons were

outfitted with bump-stock-type devices but provides no indication that any bump-stock-

device was utilized. *See*, Exhibit 2.[7] Second, ATF contends that casualties *could* be

reduced in such an incident without demonstrating that there have been *any* casualties

attributable to the devices.[8] ATF has also failed to address the fact, as discussed in

Sections IV., B. and C., that not only is a bump-stock unnecessary to bump-fire a firearm

but that practiced shooters can match, *if not exceed*, the speed of a bump fire device, *with*

*far superior accuracy*, unassisted by such a device. *See*, Exhibits 3 and 4.[9] Moreover, as

stated by former ATF Acting Chief of FTB Rick Vasquez, "[a] factory semi-automatic

---

[6] Interestingly, ATF relies solely on prior "public comments" to suggest that a bump stock device
was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock
devices "*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use
of the word "could" reflects that such use is a *possible* future, not past, occurrence. Thus, ATF is
acknowledging that but for public conjecture, it has *no* evidence that a bump stock device has
been utilized in a crime and only hypothesizes that a bump stock device "could be used for
criminal purposes." *See also* Fn. 4, *supr*a.

[7] A copy of the report is also available online at – https://www.lvmpd.com/en-
us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

[8] Relying on nothing more than a "conclusory statement would violate principles of reasoned
decisionmaking." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 154 (D.C. Cir.
1985); *see also Pearson v. Shalala,* 164 F.3d 650, 659 (D.C. Cir. 1999).

[9] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs
Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014),
https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second
with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013)
https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

**Exhibit A, Pg. 11**

and fully-automatic (*i.e.* machinegun) firearm, manufactured by the same manufacturer, will have identical cyclic rates, [10] unless the machinegun version has some form of rate reducing mechanism; whereby, the machinegun version may have a slower cyclic rate than the semi-automatic version." *See* Exhibit 32. [11] Thus, not only can an individual exceed the rate of fire of a bump-stock-device with greater accuracy, but an individual can equal, and sometime exceed, the rate of fire of an actual machinegun.

Third, as also addressed by the Savage Comment [12] and the Expert Declaration of Vasquez (*see* Exhibit 32), the technique of bump firing merely utilizes the recoil impulse that *all* semi-automatic firearms generate, every time the firearm discharges. More importantly, as discussed by the Expert Declaration of Vasquez and the Savage Comment, and reflected *infra* in Sections IV., A. and E., including as depicted in video exhibits related thereto, contrary to ATF's interpretive jiggery-pokery in the NPR that

---

[10] As expert Vasquez explains, "[t]he cyclic rate of a firearm is neither increased nor decreased by the use of a bump-stock-device, as the cyclic rate of a particular firearm is the mechanical rate of fire, which can be explained in laymen's terms as how fast the firearm cycles (*i.e.* loads, locks, fires, unlocks, ejects), which is an objective, not subjective, mechanical standard." *See* Exhibit 32.

[11] This was also addressed by Firearm Engineer Len Savage on page 2 of his Comment, where he declares that all semi-automatic firearms:

> "can fire as fast as a machinegun version. Their cyclic rates are identical to the machinegun version. Their essential operating mechanisms are identical, same ammo, same mag[azines], same reciprocating mass. The only small physical difference is the machineguns described have a mechanical level that 'automatically' starts the new cycle as soon as the previously cycle ends. Some semiautomatic firearms can even fire faster than the full auto version because the machinegun versions having some form of rate reducing mechanism."

*See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available *electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18".

[12] *Id*.

9

bump-stock devices "convert an otherwise semiautomatic firearm into a machinegun by functioning as a *self-acting* or *self-regulating* mechanism" (83 Fed. Reg. 13443), in reality, a bump-stock-device is neither self-acting nor self-regulating and requires the trigger to be fully released, reset and fully pulled, before a subsequent round can be fired.[13] To the extent ATF contends otherwise, then all semi-automatic firearms are "self-acting" or "self-regulating," since, as discussed *infra* in Section IV., B., the technique of bump firing can be easily achieved solely with one's finger while operating a *factory* semi-automatic firearm.

Thus**,** to the extent ATF contends that bump-stock-devices are self-acting, self-regulating or otherwise harness the recoil energy of the firearm, then *all* semi-automatic firearms are self-acting, self-regulating or otherwise harness the recoil energy of the firearm. Under the logic and contentions employed in the NPR, ATF would seemingly be entitled and empowered to regulate *all* semi-automatic firearms in the same manner as they seek to do for bump-stock devices, whereby all semi-automatic firearms could be re-classified by fiat, transmuted into unlawfully-possessed and proscribed contraband items, and, accordingly, force forfeiture (and provide for seizure) and destruction of these items,

---

[13] As also addressed in the Expert Declaration of Vasquez:

> The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.
> …
> A firearm in a bumpstock/slidefire stock cannot be a machinegun because it requires an individual to activate the forward motion of the stock when the firearm is fired. Additionally, it requires a thought process of the individual to continually pull the trigger when the stock is pulled forward bringing the trigger into contact with the finger.

**Exhibit A, Pg. 13**

without any just compensation being paid—never-mind the statutes, let alone the Constitution. [14]

In fact, Eric Larson clairvoyantly published an article in March of 1998 in the Gun Journal, entitled *How Firearm Registration Abuse & the "Essential Operational Mechanism" of Guns May Adversely Affect Gun Collector*s, in which he raised concern over ATF banning all semi-automatic firearms through these types of "interpretations" of law. *See* Exhibit 24.

Fourth, ATF suggests that this rule will assist first responders by preventing shooters from using the devices; however, ATF does not elaborate on how exactly a firearm outfitted with a bump-stock-type device impedes first responders in any way that a differently configured firearm does not.

Finally, ATF laughably suggests that it is addressing a negative externality of the commercial sale of bump-stock-type devices. This negative externality is "that they could be used for criminal purposes." 83 Fed. Reg. at 13449. This suggestion is not supported by any evidence aside from the unproven allegation of their use in the Las Vegas

---

[14] If "the eight-year assault on . . . Second Amendment freedoms [came] to a crashing end" with President Trump's election and inauguration, then a new assault on individual liberties and lawfully acquired and possessed private property apparently came to a crushing beginning in this NPR. *See*, *Trump at NRA convention: 'Eight-year assault' on gun rights is over*, Fox News, April 28, 2018, online at http://www.foxnews.com/politics/2017/04/28/trump-at-nra-convention-eight-year-assault-on-gun-rights-is-over.html. But the "President then directed the Department of Justice . . . to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all" bump-stock devices. Federal Register / Vol. 83, No. 61 at 13446 (NPR Section III). Indeed, it is difficult to reconcile President Trump's statement that "[he] will never, ever infringe on the rights of the people to keep and bear arms," *Trump at NRA convention, supra*, with the NPR. As the NPR admits, it a direct result of his *personal* directive to lawlessly seek an unlawful total, confiscatory ban on bump-stock devices (and criminalize the law-abiding people who possess them) in spite of the Executive Branch's lack of legal and constitutional authority to do so.

**Exhibit A, Pg. 14**

incident. Further, any suggestion that a device responsible for substantial, and lawful,

market activity should be banned because it has a *potential* to be used for criminal

purposes is a mind-blowing and preposterous proposition that supports the banning of

virtually all consumer products, such as vehicles (given the number of individuals who

utilize them while unlawfully under the influence of drugs or alcohol and cause

significant numbers of injuries and deaths [15], and those who use them to carry out

terrorist attacks). [16]

      If the sole example ATF has to offer is the conjectured use of a bump-stock-equipped

firearm during the Law Vegas shooting, there is simply *no evidence of any problem* that existing

criminal law does not address, let alone a statistically-significant one. Murder is already

unlawful, right? And if serious criminal laws have no meaningful *deterrent* effect, what then is

the objective of this NPR, if not to subject law-abiding people who did not commit any crime to

pain of criminal penalty and loss of their property?

      **C.**    ***ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking***

      18 U.S.C. § 926(b) requires that ATF provide "not less than ninety days public notice,

---

[15] "Every day, 29 people in the United States die in motor vehicle crashes that involve an alcohol-impaired driver. This is one death every 50 minutes. The annual cost of alcohol-related crashes totals more than $44 billion." *See, e.g.*, "Impaired Driving: Get the Facts" (citing sources, internal footnotes omitted), Centers for Disease Control and Prevention, online at https://www.cdc.gov/motorvehiclesafety/impaired_driving/impaired-drv_factsheet.html.

[16] *See*, https://www.usatoday.com/story/news/2016/07/14/dozens-dead-nice-france-after-truck-plows-into-crowd-mayor-says/87101850. *See also*, http://abcnews.go.com/International/truck-hits-pedestrians-busy-barcelona-street/story?id=49272618.

and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."

***First and foremost, FPC demands, pursuant to Section 926(b) and ATF's offer in the NPR (83 Fed. Reg. 13456), [17] that they be provided an opportunity to be heard at a hearing before ATF prescribes any rule or regulation in relation to this NPR. [18]***

In this rulemaking proceeding, numerous procedural irregularities and issues have arisen that have precluded the public a meaningful opportunity to respond and have caused some to believe that the comment period was closed, since the very start of the comment period; thus, depriving the public of the ninety day comment period that is required by law.

Immediately, upon the publication of the NPR on March 29, 2018, numerous individuals were advised on FederalRegister.gov [19] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience."

---

[17] Contrary to ATF's assertion in the NPR that the Director of ATF has discretion in whether to grant a public hearing, Section 926(b) requires ATF to hold a public hearing when such is requested, as the statutory language provides that the Attorney General "*shall* afford interested parties opportunity for hearing, before prescribing such rules and regulations." (Emphasis added). If it were discretionary, the Congress would have utilized a permissive word like "may" instead of the command "shall".

[18] Although requesting a hearing in a comment is sufficient, based on the request in the NPR, a separate letter was sent to Acting Director Brandon on behalf of FPC requesting an opportunity to be heard at a hearing. *See* Exhibit 34.

[19] The specific link is https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices

**Exhibit A, Pg. 16**



As is reflected in the above image, taken from the subject Web site, the notice that the comment period was closed was in relation to this proposed rulemaking regarding Bump-Stock-Type devices of "03/29/2018" and also reflects that the comment period was not supposed to end until "06/27/2018"; however, individuals were denied the opportunity to comment.

Even when individuals reached out online to the Federal Register regarding their inability to submit comments, the Federal Register responded by saying that it isn't its problem [20]:

---

[20] It would seem that, at a minimum, the Federal Register's Web site and social media accounts are managed by the same parties responsible for the www.healthcare.gov debacle that precluded individuals from being able to register for Obamacare, which led the Inspector General of the Department of Health and Human Services to issue a scathing report over the incompetence of those responsible. *See* http://www.mcall.com/news/local/watchdog/mc-obamacare-website-failure-watchdog-20160224-column.html.

**Exhibit A, Pg. 17**



But the procedural irregularities and issues didn't end there. On April 2, 2018, Carl Bussjaeger published an article, which was later updated, *[Update] Bumbling Machinations on Bump Stocks? See*, Exhibit 5. [21] In his article, he details the trials and tribulations of trying to find the appropriate docket, based on the NPR in this matter, and the differing number of comments putatively submitted and available for review between three separate dockets. When he submitted an inquiry to ATF regarding these issues, without explaining why there are three separate related dockets, ATF Senior Industry Operations Investigator Katrina Moore responded that he should use https://www.regulations.gov/document?D=ATF-2018-0002-0001; yet, ATF

---

[21] A copy of the article is also available online at – http://zelmanpartisans.com/?p=5071. *See also*, http://zelmanpartisans.com/?p=5055.

failed to relay that information to the public at large or place notices on the other two related dockets informing interested individuals of the location where they can submit their comments.

When other federal administrative agencies have failed to provide a statutorily mandated comment period or issues arose during the comment period, whereby the comment period was thwarted by technological or other delays, those agencies have extended the applicable comment periods. *See, e.g.,* Department of the Interior -- Fish & Wildlife Service, *Endangered and Threatened Wildlife and Plants; Extending the Public Comment Periods and Rescheduling Public Hearings Pertaining to the Gray Wolf (Canis lupus) and the Mexican Wolf (Canis lupus baileyi),* 78 Fed. Reg. 64192 (Oct. 28, 2013); Environmental Protection Agency, *Extension of Review Periods Under the Toxic Substances Control Act; Certain Chemicals and Microorganisms; Premanufacture, Significant New Use, and Exemption Notices, Delay in Processing Due to Lack of Authorized Funding,* 78 Fed. Reg. 64210 (Oct. 28, 2013); Department of the Interior -- Fish & Wildlife Service, *New Deadlines for Public Comment on Draft Environmental Documents,* 78 Fed. Reg. 64970 (Oct. 30, 2013); Department of Labor -- Occupational Safety and Health Administration, *Occupational Exposure to Crystalline Silica; Extension of Comment Period; Extension of Period to Submit Notices of Intention to Appear at Public Hearings; Scheduling of Public Hearings,* 78 Fed. Reg. 35242 (Oct. 31, 2013); Department of Agriculture -- Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations; Extension of Comment Period,* 78 Fed. Reg. 65515 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 65601 (Nov. 1, 2013); Federal Trade Commission, *Ganley Ford West, Inc.; Timonium Chrysler, Inc.; TRENDnet, Inc.; Pinnacle Entertainment, Inc.; Honeywell International, Inc.; Nielsen Holdings, Inc., et al.;*

*Polypore International, Inc.; Mylan, Inc., et al.; Actavis, Inc., et al.; Agency Information Collection Activities (Consumer Product Warranty Rule, Regulation O, Affiliate Marketing Rule),* 78 Fed. Reg. 65649 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 66002 (Nov. 4, 2013). In this rulemaking proceeding, by refusing to extend the comment period and failing to notify interested parties of the correct docket for filing comments, ATF failed to mitigate the harm caused by these procedural irregularities and issues that were resultant from ATF's own conduct and actions. Thus, ATF has failed to provide the statutorily-mandated public comment period and caused public confusion as to whether or not the comment period was open or closed and the appropriate docket for the filing of comments. More disconcerting is that this is not the first time that ATF has acted in this manner during the rulemaking process. [22]

### D.   ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity

The litany of procedural irregularities in this proceeding would undermine the efforts of an agency with a sterling reputation for fairness and candor. ATF has a well-documented record of "spinning" facts and engaging in outright deception of the courts, Congress, and the public. Many of the examples of such conduct arise precisely in the area of regulation of NFA firearms

---

[22] *See*, Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, *available at* https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section I the numerous procedural irregularities and issues that denied interested persons a meaningful opportunity to comment on the proposed rulemaking. For brevity, FPC incorporates into this Comment all exhibits attached to the Comment of Firearms Industry Consulting Group in the response to ATF-41P. All of Firearms Industry Consulting Group's exhibits in response to ATF-41P are available at https://www.regulations.gov/document?D=ATF-2013-0001-8364.

**Exhibit A, Pg. 20**

as detailed in the Motion in Limine filed in *United States v. Friesen,* CR-08-041-L (W.D. Okla. Mar. 19, 2009). *See* Exhibit 6. In light of that record, there is an even greater need for ATF to provide the underlying documents that would permit scrutiny of whether it has fairly characterized issues in the NPR, engaged in a fair consideration of alternatives, only inadvertently provided misleading information about its proposed rule in relation to the Las Vegas incident and operation of bump-stock-devices, omitted pertinent documents – especially its own determinations that bumpstocks were *not even firearms*, let alone, machineguns – from the docket only through an oversight, and only accidentally failed to provide a 90-day comment period.

1.  *ATF's "Institutional Perjury" Before the Courts*

ATF's NFA Branch Chief, Thomas Busey, advised ATF employees in the course of a training program that the National Firearms Registration and Transfer Record ("NFRTR") database had an error rate "between 49 and 50 percent" in 1994. Exhibit 6, p. 14. Yet, despite acknowledging such a high error rate, he observed that "when we testify in court, we testify that the database is 100 percent accurate. That's what we testify to, and we will always testify to that." *Id.* Judges have overturned their own imposition of criminal convictions upon learning of this information, *see, e.g., id.,* pp. 16-17, information that should have routinely been provided to defense counsel in advance of trial as *Brady* material. [23] *See also id.,* p. 6. It is difficult to imagine a more powerful admission that an agency had knowingly, repeatedly misled courts.

This blatant "institutional perjury" took place not only in the context of criminal prosecutions but also in support of numerous probable cause showings for search warrants.

[23] In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court required that government investigators and prosecutors provide criminal defendants with potentially exculpatory information.

18

Indeed, NFA Branch Chief Busey expressly addressed that situation. Despite acknowledging an NFRTR error rate of 49 to 50 percent, he told his ATF audience "we know you're basing your warrants on it, you're basing your entries on it, and you certainly don't want a Form 4 waved in your face when you go in there to show that the guy does have a legally-registered [NFA firearm]. I've heard that happen." *Id.,* p. 15.

Using data obtained from ATF in response to FOIA requests, Eric M. Larson demonstrated that ATF apparently had added registrations to the NFRTR years after the fact, reflecting the correction of errors apparently never counted as errors. *Id.,* pp. 21-28. While reassuring courts as to the accuracy of the NFRTR, at the same time ATF seemed to be adding missing information to the database when confronted with approved forms that had not been recorded in the database. *Id.,* pp. 26-28. As a result of the questions raised by Mr. Larson, both ATF and the Treasury Department Inspector General conducted investigations. *Id.,* pp. 29-31.

In the course of the resulting investigations, ATF's Gary Schaible recanted sworn testimony he had given years earlier in a criminal prosecution. *Id.,* pp. 30-33. The Inspector General's October 1998 report rejected Mr. Schaible's effort to explain away his prior sworn testimony, concluding: "National Firearms Act (NFA) documents had been destroyed about 10 years ago by contract employees. We could not obtain an accurate estimate as to the types and number of records destroyed." *Id.,* pp. 32-33. It is difficult to understand how ATF could routinely provide Certificates of Nonexistence of a Record ("CNRs") to courts without disclosing that an unknown number of records were destroyed rather than processed for the NFRTR. [24]

---

[24]  In *Friesen* itself, the prosecution introduced duplicate ATF records of the approved transfer of a NFA firearm (bearing the identical serial number), but differing in the date of approval.

(footnote continued)

**Exhibit A, Pg. 22**

2.      *ATF's Deception in Congressional Oversight*

In response to a Congressional inquiry, a DOJ Inspector General advised that a request for documents that reflected errors in the NFRTR had been "fully processed" when, in fact, the documents had merely been sent to another component – ATF itself – so as to delay disclosure. *See* Exhibit 6, pp. 12-14. Moreover, ATF changed the meaning of terms like "significant" errors thereby frustrating any attempt to ascertain the true error rate. *See id.,* p. 19. So too, when a congressionally-mandated audit found a "critical error" rate in the NFRTR of 18.4%, the Treasury Department Inspector General seemingly manipulated audit procedures at the instigation of the NFA Branch so as to produce a more acceptable figure. *Id.,* pp. 35-39.

Congress remained sufficiently concerned about inaccuracies in the NFRTR to appropriate $1 million (in Fiscal Years 2002 and 2003) for ATF to address remaining issues. *Id.,* p. 39. In 2007, however, Dr. Fritz Scheuren advised Congress that "serious material errors" continued to plague the NFRTR that ATF "has yet to acknowledge". *Id.,* p. 41.

As recently as June 2012, failure to answer questions about ATF's botched "Fast and Furious" gun-walking operation prompted the House of Representatives to find Attorney General Holder in both civil and criminal contempt. *See* Exhibit 7.

3.      *ATF's Misleading of the Public*

When, after a prolonged period of evasion, ATF finally produced a transcript of NFA Branch Chief Busey's remarks in the training session in response to FOIA requests, the transcript had been "corrected" by ATF's Gary Schaible to minimize damage to ATF. *See* Exhibit 6, p. 17.

---

(footnote continued)

Exhibit 6, pp. 48-49.  ATF could not explain the situation.  *Id.,* p. 49.  Nor could ATF find the original documents underlying the computerized entries.  *Id.,* p. 52.

**Exhibit A, Pg. 23**

Among those corrections, Mr. Schaible asserted that he was unaware that any ATF employee had ever testified that the NFRTR was 100% accurate.

In order to frustrate public inquiries into the Waco Raid, ATF participated in a game of "shifting the paperwork and related responsibilities" among DOJ components and other law enforcement agencies. *Id.,* pp. 13-14.

Former Acting Chief of the NFA Branch, Mr. Schaible, testified that ATF repeatedly – in 2000, 2001, 2002, 2003, 2005, 2008 – approved NFA transfer forms without following procedures to update the information in the NFRTR. *See* Exhibit 8, pp. 398-414. The consequence of those failures was that members of the public received contraband machineguns accompanied by genuine ATF-approved forms indicating that the purchaser had acquired a legally-registered firearm, only to have ATF subsequently seize the machineguns from innocent purchasers.

<p style="text-align:center">*     *     *</p>

ATF's long record of shading the truth to mislead courts, Congress, and the public, underscores the serious nature of the procedural irregularities in this rulemaking. In order to permit meaningful public participation, ATF must provide access to the materials it has placed in issue.

## II.   ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES

Because judicial review of any final rule promulgated by ATF may consider not only compliance with the APA but also all alleged violations of the U.S. Constitution, *see, e.g., Porter v. Califano,* 592 F.2d 770, 780 (5th Cir. 1979), it is incumbent upon ATF to take such

<p style="text-align:center">21</p>

considerations into account in this rulemaking proceeding. [25] Where, as here, agency rulemaking would inherently impact constitutional rights, that impact is among the matters the APA requires the agency to consider in evaluating regulatory alternatives and to address in a reasoned explanation for its decision. *See R.J. Reynolds Tobacco Co. v. FDA,* 696 F.2d 1205 (D.C. Cir. 2012); *Pearson v. Shalala,* 164 F.3d 650 (D.C. Cir. 1999).

### A.   *The Second Amendment*

Nowhere in the NPR did ATF demonstrate the slightest awareness that it is proposing to regulate in an area involving fundamental constitutional rights. Congress has not amended the NFA since the U.S. Supreme Court confirmed that "the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008). Consequently, it would seem exceptionally important for ATF to consider the background constitutional issues in formulating policy, particularly as ATF's proposed rule would *outright ban* bump-stock devices, thereby burdening the exercise of this constitutional right held by law-abiding citizens. Where fundamental, individual constitutional rights are at issue, an agency engaged in rulemaking cannot rely on a conclusory assertion in order to "supplant its burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Ibanez v. Florida Dep't of Business & Professional Regulation,* 512 U.S. 136, 146 (1994). Yet, in direct defiance of this Supreme Court dictate, as discussed *supra* and *infra* in Sections I., B. and IV., D., ATF has failed to provide any evidence

---

[25]   Agency determinations with respect to constitutional issues, however, are not entitled to any deference on judicial review. *See J.J. Cassone Bakery, Inc. v. NLRB,* 554 F.3d 1041, 1044 (D.C. Cir. 2009) (*quoting Lead Indus. Ass'n Inc. v. EPA,* 647 F.2d 1130, 1173-74 (D.C. Cir. 1980)).

that (1) bump-stock devices have actually ever been used in the facilitation of a crime, [26] (2) that

casualties *could* be reduced in an incident involving a bump stock, since there is no evidence

demonstrating that there have been any causalities attributable to bump-stock devices, (3) that

this rule will assist first responders, and (4) that "they could be used for criminal purposes" any

differently than any other item that is currently available throughout the United States. Rather,

ATF relies solely on the conclusory assertions of public comments to an Advanced Notice of

Proposed Rulemaking to determine the benefits of the very rulemaking it is considering. In

soliciting potential benefits from the public and suggesting them without evidence, ATF has run

afoul of the words of wisdom contained in another decision issued by the Supreme Court stating

that "[w]e are in danger of forgetting that a strong public desire to improve the public condition

is not enough to warrant achieving the desire by a shorter cut than the constitutional way of

paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

While ATF claims that this rule is necessary to carry out the will of Congress, as discussed *infra*

in Section III., ATF lacks the authority to alter the definition of a machinegun as it was enacted

by the Congress. Even Senator (and ranking member of the Senate Judiciary Committee) Diane

Feinstein, the lead sponsor of the now-expired federal ban on so-called "assault weapons" and

author or sponsor of voluminous other proposed gun control legislation, declared that "ATF

lacks authority under the law to ban bump-fire stocks. Period." *See*, Exhibit 9.

---

[26] *See* Fns. 4, 6, *supra*.

# Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks

Oct 11 2017

*Washington*—In response to comments by Speaker Paul Ryan (R-Wis.) saying that the Bureau of Alcohol, Tobacco and Firearms should address bump-fire stocks, Ranking Member of the Senate Judiciary Committee Dianne Feinstein (D-Calif.) today released the following statement:

"The ATF lacks authority under the law to ban bump-fire stocks. Period. The agency made this crystal clear in a 2013 letter to Congress, writing that 'stocks of this type are not subject to the provisions of federal firearms statutes.' Legislation is the only answer and Congress shouldn't attempt to pass the buck."

### 

Even a broken clock is right twice a day, and, similarly, Senator Feinstein is correct in her assessment of the ATF's lack of authority for its bump-stock NPR.

Furthermore, as discussed *supra* in Section I., A., ATF only states that it received correspondence from an undisclosed number of members and failed to place that/those correspondence(s) into the docket. The will of Congress cannot simply be derived from the writings of a small number of Senators or Representatives – especially writings outside of the legislative record – nor has it been in the past. [27]

While it is impossible to know for certain, given the NPR's dearth of analysis and discussion of the Second Amendment, it may well be that the ATF, without stating so, believes that the NPR does not violate the fundamental, individual right to keep and bear arms by considering bump-stock devices to be both "dangerous and unusual weapons" *and* "not commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031-1032 (2016). But as the Court recently reminded in

---

[27] *See* Exhibit 10, pp. 4 – 5, *also available at*
https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf

**Exhibit A, Pg. 27**

*Caetano*, the controlling rule set forth in *Heller* "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.*, at 1031 (emphasis in original). However, ATF does not discuss these factors, and instead walks right past the necessary analysis (and the Court's clear direction). The NPR fails to show that a bump-stock device is both "dangerous and unusual," or even that it would materially affect the dangerousness of any firearm so equipped, which are already dangerous *per se*. The ATF's proposed total ban self-evidently lacks necessary tailoring – indeed, its lack of tailoring underscores its overwhelming breadth – and amounts to the total destruction of the right of law-abiding people to keep and bear the affected items for self-defense and other lawful purposes.

**B.    *The Fifth Amendment***

ATF's proposed rule violates the Due Process and Takings clauses of the Fifth Amendment to the U.S. Constitution by failing to provide notice to affected parties of a compelled forfeiture or destruction, entrapping otherwise law-abiding citizens, and failing to provide just compensation for the property in question.

1.    *The Proposed Rulemaking Violates Due Process*

i.    ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties

Although, as discussed *supra* in Section I., A., ATF has failed to place into the docket any of its prior ten determinations between 2008 and 2017 that bump-stock-devices *do not even*

*constitute firearms*, let alone, machineguns (83 Fed. Reg. at 13445),[28] it is admitted by ATF that

it publicly approved of the bump-stock-type devices, which, per ATF (83 Fed. Reg. at 13451), is

believed to have resulted in *over half a million* bump-stock-devices being produced and sold.

Furthermore, to the extent the NPR applies to slamfire shotguns and firearms, Gatling guns, and

triggers, there are tens of millions of such firearms and devices in private ownership. Yet, ATF

has failed to provide individual notice to all those known to own or possess a bump-stock-device,

let alone those owning or possessing slamfire shotguns and firearms, as well as, Gatling guns,

and triggers; thereby, potentially depriving those individuals of an opportunity to respond, in

direct violation of due process. As there can be no dispute, as discussed *infra* Section II., B., 1.,

i., that those owning and possessing bump-stock-devices and other firearms and devices covered

by the NPR, have a vested property interest in their firearms and devices, ATF was required, at a

minimum, to take all possible steps to identify those known to own or possess these firearms and

devices and provide them, each, with notice of this rulemaking proceeding, since it directly

affects their property interests.

> ii.     The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior
>          Approvals and Public's Reliance Thereon

Although ATF publicly approved bump-stock-devices on at least ten occasions between

2008 and 2017 (83 Fed. Reg. at 13445; *see also* Exhibit 10) and issued ATF Ruling 2004-5 [29]

and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns, it now seeks to

severely criminalize the possession of those very same bump-stock-devices – and potentially

---

[28] FPC believes that they have found three of the ten determinations that were issued between 2008 and 2017, which are attached as Exhibit 10. *See also,* https://www.cbsnews.com/news/can-the-atf-regulate-bump-stocks-the-device-used-by-the-las-vegas-shooter/; https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf.
[29] *Available at* https://www.atf.gov/file/83561/download

"slamfire" shotguns and firearms, Gatling guns, and triggers – at the expense of law-abiding

individuals who have relied on those determinations, followed appropriate procedures and

complied with the law. This sudden change in position after eight years of reliance by the public

on determinations to the contrary, clearly constitutes entrapment since the agency invited

reliance on its consistent decisions and now seeks to unfairly impose criminal penalties for the

public's reliance, with potential punishment of 10 years imprisonment, pursuant to 18 U.S.C. §

924(a)(2). As declared by the U.S. Supreme Court, "[e]ntrapment occurs only when criminal

conduct was the 'product of the creative activity of law-enforcement officials.'…. a line must be

drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman*

*v. United States*, 356 U.S. 369, 372 (1958) (internal citation omitted). The Court continued that it

is unconstitutional for the Government to beguile an individual "into committing crimes which

he otherwise would not have attempted." *Id*. at 376. In this matter, by changing the definition of

a machinegun, ATF seeks to entrap citizens who have simply purchased a federally-approved

firearm accessory. Thus, ATF has set a trap with, by their own estimate, the potential to ensnare

520,000 law-abiding citizens; [30] whereby, those law-abiding citizens can be imprisoned for up to

10 years, without even receiving individual notice of ATF's reversal of position. 83 Fed. Reg.

13451.

2.    *The Proposal Constitutes a Taking Without Just Compensation*

i.    The Fifth Amendment Precludes a Regulatory Taking

ATF's proposed rule will force law-abiding citizens to forfeit or destroy their lawfully

---

[30] The actual number may be significantly larger – possibly triple or quadruple the stated number – depending on all the firearms and devices to which the NPR applies, as discussed *supra* and *infra*.

purchased, owned, and possessed property, in violation of the Fifth Amendment. The Takings

Clause of the Fifth Amendment to the U.S. Constitution provides that when private property, real

or personal, is taken or destroyed by the government, the government must pay just

compensation to the person(s) whom the property was taken from. *Horne v. Dep't of Agric.*, 135

S. Ct. 2419, 2425-28 (2015) (applying Takings Clause to personal property); *Pumpelly v. Green*

*Bay & Mississippi Canal Co.*, 80 U.S. 166, 177 (1871) (applying Takings Clause to destroyed

property not used for public purpose). The general rule states that a regulatory action constitutes

a taking under the Fifth Amendment when the action goes *too far* in regulating private property.

*Mahon*, 260 U.S. at 415. Moreover, the Supreme Court has declared that "[a] 'taking' may be

more readily found when the interference with property can be characterized as a physical

invasion by government, than when interference arises from some public program adjusting the

benefits and burdens of economic life." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S.

104, 124 (1978). As this regulation is clearly not meant to adjust the benefits or burdens of

economic life, the compelled forfeiture or destruction of bump-stock-devices and other firearms

and devices covered by the NPR constitutes a physical invasion and taking by government; and

therefore, ATF must address and provide for the payment of just compensation to each

individual who would be deprived of their property under the NPR.

  As reflected in the Verified Declaration of Damien Guedes, he purchased a Bump Fire

Systems' bump-stock-device, only after ensuring the legality of the device and relying on ATF's

determination to Bump Fire System that the device was lawful and did not constitute a

machinegun. *See* Exhibit 15. Matthew Thompson, likewise, issued a Verified Declaration stating

that he purchased a Slide Fire bump-stock-device, only after ensuring the legality of the device

and relying on ATF's determination to Slide Fire that the device was lawful and neither

<div align="center">28</div>

constituted a firearm nor a machinegun. *See* Exhibit 16. Thus, both Mr. Guedes and Mr. Thompson, in reliance on ATF's prior determinations, purchased bump-stock-devices, which ATF now seeks to reclassify [31] as a machinegun – in violation of the *ex post facto* clause of the U.S. Constitution, discussed *infra* – and seeks to force their surrender or destruction of the bump-stock-devices, in the absence of just compensation, [32] all in violation of the takings clause of the U.S. Constitution.

Since ATF failed to address the takings aspects of this proposed rule, including, as discussed *supra* and *infra*, its potential application to shotguns and firearms that are capable of "slamfiring", as well as, Gatling guns, and triggers, interested parties have been denied meaningful review of ATF's position in this regard; however, to the extent ATF contends that an individual would lack a possessory interest in a bump-stock-device and other firearms and devices covered by the NPR as a result of the proposed rule being enacted, the U.S. Supreme Court has already held that while an individual may lose his/her possessory interest in a firearm or other tangible or intangible object, the individual does not lose his/her property or ownership interest in the object. *Henderson v. United States*, 135 S.Ct. 1780, 1785 (2015) (holding that even where an individual is prohibited from purchasing and possessing firearms, he/she still retains a property interest in firearms previously acquired.). Furthermore, as the proposed rule constitutes a *per se* taking, the Government must provide just compensation. *Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). Thus, even if ATF enacted the proposed rule, it would still be responsible for paying just compensation to each person deprived of his/her property.

---

[31] *See* 83 Fed. Reg. 13348, where ATF acknowledges that the proposal is a reclassification.
[32] As reflected in the declarations, Mr. Guedes paid a total of $105.99 for his bump-stock-device and Mr. Thompson paid a total of $134.00 for his bump-stock-device.

ii.    Cost-Impact Statement Fails to Address Just Compensation for the
       Taking

Once again, ATF has denied interested individuals meaningful review and opportunity to

comment by failing to address the economic impact when factoring in the just compensation that

it is constitutionally-obligated to pay law-abiding citizens, who own bump-stock-devices and

other firearms and devices covered by the NPR, if it proceeds with the proposed rule. While ATF

provides detailed tables concerning the anticipated economic loss to producers, retailers, and

consumers, the proposed rule fails to provide information on how the Government will fulfill its

obligation to compensate affected individuals for the taking. As reflected in the proposal, ATF

assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while

acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. 13451. The

proposal then declares the primary estimated cost to be $96,242,750.00 based on ATF's primary

estimate of 520,000 bump-stock-devices having been produced. *Id*. However, multiplying ATF's

stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not

$96,242,750.00 as stated in Table 3. Moreover, by averaging the acknowledged prices for bump-

stock-devices, a proper average sale price should be $302.95, which would result in a primary

estimated cost of $157,534,000.00 in just compensation being due. Additionally, both estimated

costs may be grossly under-estimated given ATF's proposed changes to 27 C.F.R. § 447.11 and

27 C.F.R. 478.11, since they would seemingly include any device – inclusive of rubber bands

and belt loops. More disconcerting, as mentioned on page 6 of the Savage Comment, [33] the

proposed rule would seemingly apply to hundreds of thousands, if not millions, of shotguns and

---

[33] *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-
Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63,
*available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210,
in "Email 013 (Historic Arms) rec 5-29-18 " as pdf pages 1 – 2.

other firearms, which are capable of "slamfiring" [34] which would constitute "firing without additional physical manipulations of the trigger by the shooter." It would also seemingly overrule – without any notice and opportunity to comment – ATF Ruling 2004-5 [35] and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns and result in reclassification of their status – *i.e.* turning the millions of owners into felons overnight and without just compensation being provided. Given that the price, per Gatling gun, can be as high as $124,000.00, if not more, the reclassification of Gatling guns would result in a substantial upward calculation of the cost estimate in this matter.

## How much is a Gatling gun?

### Narrow Your Search

| Item | Title Click Headers to Sort | Price |
|------|------------------------------|-------|
| 771029939 | Colt 1874 Camel Gatling gun (C9743) | **$124,000.00** |
| 770122834 | REAL- WORKING GATLING GUN FULLY- FUNCTIONAL 45 LC | **$6,995.00** |
| 770033106 | Colt 1877 Bulldog 10 Barrel Gatling Gun Carriage NEW Wood Never Touched the Ground! CGG1877HS | $55,000.00 |

35 more rows

Gatling Gun For Sale – Buy a Gatling Gun Online at GunBroker.com
https://www.gunbroker.com/Gatling-Gun/Browse.aspx?Keywords=Gatling+Gun

---

[34] *See* Colton Bailey, *Slam Fire Shotgun? This One Shoots Multiple Rounds Without Releasing The Trigger*, Wide Open Spaces, (Feb. 13, 2017*), available at* http://www.wideopenspaces.com/slam-fire-shotgun-shoots-multiple-rounds-without-releasing-the-trigger.
[35] *Available at* https://www.atf.gov/file/83561/download.

**Exhibit A, Pg. 34**

Even more disconcerting, as discussed *infra* in Section V., given ATF's argle-bargle and interpretive jiggery-pokery, the NPR can be construed as applying also to triggers and fingers, [36] which again, would result in a skyrocketing upward calculation of the cost estimate in this matter.

Regardless of the estimate considered, ATF has failed to address any appropriations available to it or, more generally, the Department of Justice to fund these takings and any such fund, if limited solely to bump-stock-devices, must have a high estimate of $221,494,000.00 ($425.95 x 520,000) available to ensure that all individuals are justly compensated. If, on the other hand, the proposal will apply to shotguns and other firearms capable of "slamfiring", as well as Gatling guns, triggers and fingers, [37] there must be an allocation of no less than $50,000,000,000,000.00.

Thus, before ATF can proceed in this matter, it must provide logistical information as a part of its cost-impact statement detailing how it plans to pay compensation including, but not limited to, the compensation rate, timeline for completing payment, source of the funding, and sequestration of an appropriate amount in an account restricted to paying just compensation in this matter. Thereafter, it must provide interested parties with a meaningful opportunity to respond, which, per 18 U.S.C. § 926(b), cannot be shorter than ninety days.

---

[36] The average value under state and federal workers compensation acts across the U.S. for the loss of an index finger is $24,474.00, with the federal value being $86,788.00. Accordingly, as a federal rate is set, at a minimum, ATF would be required to utilize this value. *See* Exhibit 31, also *available at* - https://projects.propublica.org/graphics/workers-compensation-benefits-by-limb.

[37] With there being between 270,000,000 and 310,000,000 gun owners in the U.S. (*see* http://www.pewresearch.org/fact-tank/2013/06/04/a-minority-of-americans-own-guns-but-just-how-many-is-unclear*), the takings alone in relation to fingers, utilizing the low 270 million gun owner estimate, would be $23,432,760,000,000.00 or 270,000,000 x $86,788.00.

32

C.     *The Ex Post Facto Clause*

Pursuant to Article 1, Section 9, Clause 3 of the U.S Constitution, "No Bill of Attainder

or ex post facto Law shall be passed." The U.S. Supreme Court in *Calder v. Bull*, 3 U.S. 386

(1798) held that an *ex post facto* law includes, *inter alia*, "[e]very law that makes an action done

before the passing of the law, and which was innocent when done, criminal; and punishes such

action." The Court later recognized that the provision reached far enough to prohibit any law

which, "in relation to the offence or its consequences, alters the situation of a party to his

disadvantage." *Collins v. Youngblood*, 497 U.S. 37, 47 (1990).

1.     *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct*

On at least two occasions in the proposed rulemaking, ATF acknowledges that the current

definition of a machinegun does not cover bump-stock-type devices [38] that it now seeks to

regulate. 83 Fed. Reg. 13444, 13448. ATF then explicitly declares that if the final rule is

consistent with the proposal, there will be no mechanism for current holders of bump-stock-type

devices – or any other firearm or device covered by the NPR – to register them and will therefore

be compelled to dispose of them. 83 Fed. Reg. 13448. There is no dispute, and ATF readily

admits, that its proposed rule would change the definition of a machinegun; thereby, affecting

numerous sections of federal law and immediately turning, *at a minimum*, half a million law-

abiding citizens into criminals overnight. ATF's proposal neither includes a grandfather

provision nor a safe harbor, even for a limited period of time. More disconcerting – as if such

---

[38] It likewise does not cover rubber bands, belt loops, slamfire shotguns and firearms, Gatling guns, triggers, or fingers.

were fathomable in anything but an Orwellian nightmare – is the fact that those possessing

bump-stock-devices will have no knowledge of whether any final rule will be implemented, the

text of that rule, and the date, as the final rule would become effective immediately upon the

signature of Attorney General Sessions, without prior publication to the public. But that's no big

deal, right? It's only 10 years in jail and $250,000.00, per violation. Thank God that Article 1,

Section 9, Clause 3 precludes such. [39]

Just as there can be no dispute that the current definition of machinegun does not cover

bump-stock-devices, rubber bands, belt loops, "slamfire" shotguns and firearms, Gatling guns,

triggers, and fingers, as evidenced by the proposed rule seeking to modify the regulatory

definition of machinegun, there can be no dispute that the proposed rule violates the *ex post facto*

Clause, even though it is a regulatory action because the "sanction or disability it imposes is 'so

punitive in fact' that the law 'may not legitimately be viewed as civil in nature." *United States v.*

*O'Neal*, 180 F.3d 115, 122 (4th Cir. 1999) (quoting *U.S. v. Ursery*, 518 U.S. 267, 288 (1996)).


### III.    ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY

From the outset, it is clear that the NFA was designed to provide a basis for prosecution

of "gangsters" with untaxed, unregistered firearms and not as a regulation of law-abiding citizens

who complied with the law. ATF has turned the statutory scheme on its head, imposing ever

more draconian burdens on law-abiding citizens who seek to make and acquire NFA firearms

---

[39] FPC make this statement pursuant to their First Amendment rights under the U.S. Constitution
to the extent that ATF has not seemingly sought to abrogate that inalienable right in the NPR,
although ATF has declared its intent, in violation of the First Amendment, not to consider
comments containing what it deems to be "inappropriate language" for which FPC will
vigorously challenge in court.

while diverting resources to do so from investigating and prosecuting criminals who use illegal means to obtain NFA firearms.

ATF describes the NFA in terms that go beyond the statutory text. According to ATF's Website, the NFA's "underlying purpose was to curtail, *if not prohibit,* transactions in NFA firearms." http://www.atf.gov/content/firearms/firearms-industry/national-firearms-act (emphasis added). It describes the $200 tax imposed by the NFA as having been designed "to discourage *or eliminate* transactions in these firearms." *Id.* (emphasis added). But Congress has never "prohibited" NFA firearms or "eliminated" the ability to transfer them provided the tax is paid and registration procedures are followed.

### A.   *Congress Prohibited "Undue or Unnecessary" Restrictions*

Congress has, in fact, legislated to *limit* the authority of ATF to impose more burdens on law-abiding citizens. Congress was aware of ATF's over-zealous interpretation of the NFA when it enacted the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 110 Stat. 449 (1986). It would be an understatement to say that Congress thought ATF had reached the maximum boundary of its rulemaking and enforcement authority. Well aware of ATF's history, as discussed *supra* in Section I., D., made clear in FOPA that ATF's regulation and enforcement activities of *legal* owners of firearms – like those who seek to register firearms under the NFA – had already gone too far. Congress found that not only were statutory changes needed to protect *lawful* owners of firearms, but that "enforcement policies" needed to be changed as well. FOPA § 1(b). In doing so, Congress reaffirmed that "it is not the purpose of this title to place *any undue or unnecessary* Federal *restrictions or burdens* on law-abiding citizens with respect to the acquisition, possession, or use of firearms," *id*. (emphasis added), signaling in the strongest

35

possible language that ATF should not impose yet additional burdens on law-abiding citizens,

especially in light of the existing criminal laws prohibiting, *inter alia*, murder, manslaughter,

aggravated assault, *etc*. Yet, that is precisely what ATF's proposed rule would do.

### B. *Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun*

Even without consideration of FOPA, there are ample reasons to doubt that Congress

authorized ATF to formulate the proposed regulation, as Congress, itself, defined what

constitutes a machinegun when enacting the NFA in 1934 and the GCA in 1968 and numerous

members of Congress have stated that ATF lacks the authority to redefine what constitutes a

machinegun. As an administrative agency cannot override a congressional enactment, ATF lacks

authority and jurisdiction to amend or otherwise modify the definition of a machinegun as

enacted by the Congress.

In the original NFA as enacted in 1934, and reaffirmed in enacting the GCA in 1968, the

Congress expressly defined what constitutes a machinegun. 18 U.S.C. § 921(a)(23) states "[t]he

term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms

Act (26 U.S.C. 5845(b))." 26 U.S.C. § 5845(b) declares:

> The term "machinegun" *means* any weapon which shoots, is designed to shoot, or
> can be readily restored to shoot, automatically more than one shot, without
> manual reloading, by a single function of the trigger. The term shall also include
> the frame or receiver of any such weapon, any part designed and intended solely
> and exclusively, or combination of parts designed and intended, for use in
> converting a weapon into a machinegun, and any combination of parts from
> which a machinegun can be assembled if such parts are in the possession or under
> the control of a person.

(Emphasis added).

ATF proposes to expand the definition of what a "machinegun" means by adding the following two sentences to the end of the current definition found in 27 C.F.R. §§ 478.11 and 479.11. [40]

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 13457.

And, lest there be no dispute, even Senator Diane Feinstein declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." *See* Exhibit 9. And ATF previously admitted to Congress that it "does not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." See Exhibit 10, p. 5. More importantly, as confirmed by J. Thomas Manger, President of the Major Cities Chiefs Association and Chief of Police of Montgomery County, in his testimony before the Senate Judiciary Committee, ATF Acting Director Thomas Brandon admitted that "ATF does not now have the authority under Federal law to bar [bump-stock-devices] and *new legislation is required to do so*." *See* Exhibit 30, p. 3 (emphasis added).

And the courts have agreed that such an alteration is beyond the power of ATF. "As a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." *Colautti v. Franklin,* 439 U.S. 379, 392–393, n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Congress clearly defined the meaning of the term "machinegun" as evidenced by its use of the

---

[40] The definition of "machinegun" contained in 27 C.F.R. §§ 478.11 and 479.11 mirrors the definition Congress gave the term in 26 U.S.C. § 5845(b).

**Exhibit A, Pg. 40**

phrase "[t]he term 'machinegun' *means*." [41] Even if ATF could define the terms "automatically"

and "single function of the trigger", which is disputed, ATF lacks the authority to unilaterally

declare an item to be a machine gun when it falls outside the statutory parameters, particularly by

incorporating it into the definition itself. [42]

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

"Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms

when it wishes to enlarge, agency discretion." *City of Arlington, Tex. V. F.C.C.*, 569 U.S. 290,

296 (2013).

Here, there can be no question that the intent of Congress was clear. Congress sought to

regulate firearms that: 1) shoot, 2) were designed to shoot, or 3) can be readily restored to shoot,

4) automatically more than one shot, without manual reloading, 5) by a single function of the

trigger. This can be gleaned from an analysis of the debate surrounding the passage of the

legislation. "Mr. Frederick.[] The distinguishing feature of a machine gun is that by a single pull

of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the

magazine. Other guns require a separate pull of the trigger for every shot fired, and *such guns*

*are not properly designated as machineguns*. A gun…which is capable of firing more than one

shot by single pull of the trigger, a single function of the trigger, is properly regarded, in my

---

[41] Even Dictionary.com defines the term "Machine Gun" to mean "a small arm operated by a mechanism, able to deliver rapid and continuous fire as long as the trigger is pressed." *Available at:* http://www.dictionary.com/browse/machine-gun. ATF taking such a nuanced approach to parsing specific terms to shoehorn a particular group of accessories into the definition flies in the face of the statutory text's plain meaning.

[42] *See* 18 U.S.C. 926(a) "The Attorney General may prescribe *only such rules and regulations* as are *necessary* to carry out provisions of this chapter…" (Emphasis added).

opinion, as a machine gun." Exhibit 29, National Firearms Act: Hearings Before the Committee

on Ways and Means, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934) (emphasis added).

For the purposes of this analysis, a machinegun can be distilled down to: a firearm which

shoots automatically more than one shot, without manual reloading, by a single function of the

trigger. Congress also sought to regulate the frames or receivers of such weapons, along with any

parts that could be used to make or convert a firearm into a machinegun. Such an interpretation is

in line with prior court and agency decisions. *See Staples v. United States*, 511 U.S. 600 (1994)

("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. §

5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that

automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also Id*.

at n1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires

repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will

automatically continue to fire until its trigger is released or the ammunition is exhausted. Such

weapons are 'machineguns' within the meaning of the Act."). [43]

Moreover, the Government has previously argued to a Federal Court that a bump-stock-

device was not a machinegun. "While the shooter receives an assist from the natural recoil of the

weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is *contingent*

---

[43] *See also* ATF Rul. 2004-5 quoting George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973) (the term "automatic" is defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device – in other words, a machine gun"); Webster's II New Riverside-University Dictionary (1988) (defining automatically as "acting or operating in a manner essentially independent of external influence or control"); John Quick, Ph.D., Dictionary of Weapons and Military Terms 40 (McGraw-Hill 1973) (defining automatic fire as "continuous fire from an automatic gun, lasting until pressure on the trigger is released").

**Exhibit A, Pg. 42**

*on shooter input* in pushing the weapon forward, rather than mechanical input, and is *thus not an automatic function of the weapon.*" *See* Exhibit 25, page 22.

The statutory language is explicitly clear as to what constitutes a machinegun and is inclusive of parts that can be used to assemble a functioning firearm. ATF acknowledges that bump-stock-devices are not currently able to be regulated as machineguns because it seeks to amend the definition to specifically include them and other firearms and devices covered by the NPR, discussed *supra* and *infra*. Notably absent from the statutory text is language, specifically or implicitly, naming parts that can be used in conjunction with a firearm, which is not a machinegun, to *simulate* automatic fire.

### C.   *ATF is Statutorily Prohibited From Retroactively Applying the NPR*

ATF has acknowledged that it is precluded from taking any action with regard to the reclassification of bump-stock-devices manufactured prior to at least March 29, 2018. As noted in ATF Rul. 82-8, the reclassification of SM10 and SM11A1 pistols and SAC carbines as machineguns, under the National Firearms Act, was not applicable to those firearms manufactured before or assembled before June 21, 1982 pursuant to 26 U.S.C. § 7805(b). 26 U.S.C. § 7805(b) states:

> Retroactivity of regulations.--
> (1) In general.--Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
> (A) The date on which such regulation is filed with the Federal Register.
> (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

**Exhibit A, Pg. 43**

More recently, in enacting ATF-41F (81 Fed. Reg. 2658 through 2723), ATF seemingly invoked Section 7805(b) in declining to retroactively apply the final rule and instead permitting a six month delay in implementation of the final rule and acknowledging that all applications submitted prior to the effective date would be adjudged by the law as it existed prior to the final rule, regardless of whether the application was approved before the effective date of the final rule.

Thus, any final regulation that is promulgated has no effect on bump-stock-devices and other firearms and devices covered by the NPR, which were manufactured, at a minimum, prior to the date of publication of this NPR in the Federal Register.

## IV.    ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS

Contrary to the contention in the proposed rulemaking, bump-firing is neither the result of any particular firearm accessory, device or part nor the modification thereof. Rather, it is a technique that can be utilized with the intrinsic capabilities of most *factory* semi-automatic firearms, including the rifles, such as the AR-15, and pistols, such as the 1911. As reflected *infra* and admitted by ATF (83 Fed. Reg. 13454), bump-firing can be done with a belt loop, a rubber band, or just one's finger. More importantly, no device – whether bump stock, belt loop, rubber band or finger – changes the intrinsic capability of the firearm to be bump-fired. This is made explicitly evident by Jerry Miculek, who can not only shoot faster than an individual employing bump-fire but can shoot far more accurately. [44]

---

[44] *See* Exhibits 3 and 4.

41

Thus, the proposed rule in this matter is so completely arbitrary and capricious that it will not withstand scrutiny. *See*, *Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*, 463 U.S. 29, 42-44 (1983).

### A.      *ATF's Interpretative Jiggery-Pokery is Pure Applesauce*

As reflected in the expert report of former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, bump-stock-devices do not constitute a machinegun, as they are not designed to shoot more than one shot by a single function of the trigger. *See* Exhibit 32. Specifically, he declares that a "Slide Fire [stock] does not fire automatically with a single pull/function of the trigger" and as a result, "ATF could not classify the slide fire as a machinegun or a machinegun conversion device, as it did not fit the definition of a machinegun as stated in the GCA and NFA." *Id*. More importantly, although ATF has failed to disclose it in the NPR or docket, the Slide Fire determination "was sent to Chief Counsel and higher authority for review. After much study on how the device operates, the opinion, based on definitions in the GCA and NFA, was that the Slide Fire was not a machinegun nor a firearm, and, therefore, did not require any regulatory control." *Id*.

Thus, regardless of the interpretative jiggery-pokery employed by ATF in the NPR, at the end of the day, it is pure applesauce.

### B.      *Belt Loops, Rubber Bands and Fingers, OH MY!*

Reflecting the absolutely arbitrary and capricious nature of this rulemaking, ATF admits – albeit at the end of the proposal in the "Alternatives" section – that an individual does not require a bump-stock-device in order to bump-fire a factory semi-automatic firearm. 83 Fed.

Reg. 13454. In fact, ATF readily acknowledges that bump-firing can be lawfully achieved through the "use [of] rubber bands, belt loops, or [to] otherwise train their trigger finger to fire more rapidly," in a clear statement of its intent to unequally apply the law. *Id*.

Numerous videos and articles are available reflecting individuals bump-firing with everything from their finger to belt loops and rubber bands. For example, P.M.M.G. TV posted a video in 2006 of a rubber band being utilized to bump fire a factory semi-automatic firearm. *See* Exhibit 11. [45] In 2011, StiThis1, posted a video of him utilizing his belt loop to bump-fire his AK-47. *See* Exhibit 12. [46]

More importantly, reflecting that no device is necessary to bump-fire a factory semi-automatic firearm, ThatGunGuy45 posted a video of him bump-firing an AK-47 style rifle with his finger. *See* Exhibit 13. [47] Similarly, M45 posted a video of him bump-firing both an AK-47 and AR-15 solely with his finger. *See* Exhibit 14. [48] In no better example, former former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, who previously reviewed bump-stock-devices – specifically the Slide Fire bump-stock – while with ATF, after declaring that a bump-stock-device is not statutorily or regulatorily a machinegun, [49] demonstrates the

---

[45] A copy of the video is also available online – Shooting Videos, *Rapid manual trigger manipulation (Rubber Band Assisted)*, YouTube (Dec. 14, 2006), https://www.youtube.com/watch?v=PVfwFP_RwTQ&t.

[46] A copy of the video is also available online – StiThis1, *AK-47 75 round drum Bumpfire!!!*, YouTube (Sept. 5, 2011), https://www.youtube.com/watch?v=-03y3R9o6hA.

[47] A copy of the video is also available online – ThatGunGuy45, *'Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45*, YouTube (Oct. 13, 2017), https://www.youtube.com/watch?v=-9fD_BX-afo&t.

[48] A copy of the video is also available online – M45, *How to bumpfire without bumpfire stock*, YouTube (Oct. 8, 2017), https://www.youtube.com/watch?v=7RdAhTxyP64&t. *See also*, wrbuford13, How To: Bump fire a semi-automatic rifle from the waist, YouTube (May 25, 2011), https://www.youtube.com/watch?v=wZCO-06qRgY.

[49] During his interview, he declares "[i]f Congress wants to change the law and come up with a new interpretation, then ATF will follow that new interpretation. But until they do that, they have to go by the [law] they have today."

**Exhibit A, Pg. 46**

ability of a factory semi-automatic AR-15 and AK-47 to bump-fire solely with his finger. *See* Exhibit 17. [50] Expert Vasquez then goes on to declare, in response to a question of what if Congress bans bump-fire devices, "[w]hat are they going to ban? If they come out today and say the Slide Fire Stock or the binary trigger by name is made illegal, they're going to have to make illegal the operating principle." *Id.*

Beyond showing that the proposed rulemaking in this matter is completely arbitrary and capricious, as no device is even necessary to bump-fire a factory semi-automatic firearm, these videos and others that are available on YouTube and other social media platforms, reflect that law-abiding citizens have been bump-firing long before Al Gore invented the internet; [51] and yet, ATF cannot produce a single shred of evidence of a bump-stock-device *ever* having been utilized in a crime.

C.     *The Jerry Miculek Example – He's One Bad Mother… Shut Your Mouth (And: Oh No! They Banned Jerry!)*

As mentioned *supra*, Jerry Miculek not only can shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. *See* Exhibit 3 and 4. [52] Even more evident of the completely arbitrary and capricious nature of this proceeding is the video compendium of Mr. Miculek's abilities and achievements, which depicts that "he did it. He did 8

---

[50] A copy of the video is also available online – Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube (Oct. 11, 2017), https://www.youtube.com/watch?v=kryIJIrD5eQ&t.

[51] It has to be true – he said it on live TV… https://www.youtube.com/watch?v=BnFJ8cHAlco.

[52] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

**Exhibit A, Pg. 47**

rounds in one second, on one target. He did 8 rounds on four targets in 1.06 [seconds]. Six shots and reload and six shots in 2.99 seconds." *See* Exhibit 18. [53] Thus, as individuals can achieve, with greater accuracy, faster cyclic rates than those utilizing bump-stock-devices, the underlying premise of this proceeding is completely arbitrary and capricious.

More disconcerting is that to the extent ATF contends in the NPR that it is carrying out some unverified and unsupported contention of Congress to ban anything mimicking the rate of fire of a machinegun [54] (83 Fed. Reg. 13447) – a rate of which varies greatly [55] and neither has a commonly accepted average rate nor a proposed rate by ATF – Mr. Miculek would seemingly be banned by any final promulgated rule, in violation of his Constitutional Rights and reflecting the sheer absurdity of this NPR.

### D.    *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting*

As discussed *supra* in Section I., B., while implying that a bump-stock-device was utilized in the Las Vegas shooting, ATF has failed to provide evidence of a single instance where a bump-stock-device was utilized in the commission of a crime and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. Instead, ATF relies solely on prior

---

[53] A copy of the video is also available online – *Fastest Shooter OF ALL TIME! Jerry Miculek | Incredible Shooting Montage*, DailyMotion (2014), https://www.dailymotion.com/video/x2y1eb8.

[54] In fact, ATF's assertion is contradicted by the testimony in enacting the NFA – previously cited to by ATF in federal court proceedings – which reflects the Congress' intent that guns which "require a separate pull of the trigger for every shot fired, … *are not property designated as machineguns*." Exhibit 29, p. 40.

[55] For example, the Metal Storm gun has a cyclic rate of fire of 1,000,000 rounds (that isn't a typo), per minute (*see*, http://www.businessinsider.com/worlds-fastest-gun-2016-2), a minigun has a rate of fire of 6,000 rounds, per minute (*id.*), and some have as slow of a cyclic rate as 200 rounds, per minute (*see*, https://encyclopedia2.thefreedictionary.com/Cyclic+rate).

"public comments," which are merely conjecture, to suggest that a bump-stock-device was utilized in Las Vegas (83 Fed. Reg. 13454), [56] while thereafter declaring that bump-stock devices "*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use of the word "could" reflects that such use is merely speculative and limited to a *possible* future, not past, occurrence. More importantly, as ATF is involved in the investigation into the Las Vegas shooting, it is in the unique position to have evidence reflecting the use of bump-stock-devices in the shooting, if such devices were utilized; yet, it has not only failed to submit any evidence even suggesting the use of bump-stock-devices in the Las Vegas shooting but has failed to even contend, based on its own knowledge, that such devices were utilized. Additionally, the Las Vegas Metropolitan Police Department Preliminary Investigative Report likewise provides no indication that any bump-stock-devices *were* utilized in the shooting. *See*, Exhibit 2. [57]

Thus, ATF acknowledges that but for public conjecture, it has *no* evidence or knowledge that a bump stock device has been utilized in a crime and only hypothesizes that a bump-stock device "could be used for criminal purposes." Moreover, as discussed *supra* in Section I., D., based on ATF's lack of candor before the courts, Congress, and the public, any contention by ATF that such devices were utilized in the Las Vegas shooting must be dismissed, in the absence of independently-verifiable evidence in support.

Further, ATF's argument as to why they need to be regulated is misleading.

---

[56] Given ATF's prior use of proxies in rulemaking proceedings to support its contentions, these alleged "public comments" cannot be taken at face value, especially in the absence of any evidentiary support. *See* Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, available at https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section G the ATF's use of proxies in rulemaking proceedings to support its own contentions.

[57] A copy of the report is also available online at – https://www.lvmpd.com/en-us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

**Exhibit A, Pg. 49**

Commenters also argued that banning bump-stock-type devices will not significantly impact public safety. Again, the Department disagrees. The shooting in Las Vegas on October 1, 2017, highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict. *The shooting also made many individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious. The proposed regulation aims to ameliorate that threat.*

83 Fed. Reg. 13447. (Emphasis added).

This position is no more valid than asserting that drill presses and the internet need to be regulated because individuals with criminal or terrorist intentions can readily access a drill press to manufacture a machine gun after viewing a video on the internet, or even fabricate a firearm from a chunk of raw aluminum. (Nevermind the fact that a person can purchase ammonium nitrate and nitromethane, or pressure cookers, to build a bomb.) In the land of hypotheticals, anything and everything could be perceived to be and categorized as a potential threat to public safety. But a hypothetical should not and cannot be the premise of a proposed regulation.

E.   ***We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices***

In the Summary for the NPR, ATF claims that bump-stock-devices

allow a shooter of a semiautomatic firearm to initiate a *continuous firing cycle with a single pull of the trigger.* Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun *by functioning as a self-acting or self-regulating mechanism* that harnesses the recoil energy of the semiautomatic firearm in a manner that *allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter.* Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with *a single pull of the trigger.*

83 Fed. Reg. 13442 (emphasis added).

Even setting aside former Acting Chief of the Firearms Technology Branch Richard Vasquez's expert report disputing ATF's current contention (discussed *supra* in Section IV., A.,

47

and Exhibit 28) and before addressing the video evidence of the outright falsity of these

assertions, let us first review the known determinations issued by ATF and the sworn testimony

and pleadings submitted by ATF to the courts regarding bump-stock-devices.

On June 07, 2010, ATF issued a determination letter to Slide Fire, holding that

The stock has *no automatically functioning mechanical parts or springs* and *performs no automatic mechanical function* when installed. In order to use the installed device, *the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand*. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

*See* Exhibit 10 (emphasis added.)

Thus, ATF has already admitted that the Slide Fire stock does not operate automatically

and is neither self-acting nor self-regulating. But what about Bump Fire Systems' bump-stock-

device? Glad you asked.

On April 2, 2012, ATF issued a determination letter to Bump Fire Systems, declaring that

The FTB live-fire testing of the submitted devices indicates that if, as a shot is fired, an *intermediate* amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*.
…
Since your device is *incapable of initiating an automatic firing cycle* that continues until either the finger is released or the ammunition supply is exhausted, FTB find that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

*See* Exhibit 10 (emphasis in original, emphasis added.)

Once again, now in relation to Bump Fire Systems' bump-stock device, ATF found that

bump-stock-devices are incapable of automatic firing and require a mechanical reset of the

**Exhibit A, Pg. 51**

trigger – no different than any other semi-automatic firearm – and thus, are not capable of a continuous firing cycle with a single pull of the trigger.

But, in sworn testimony and pleadings submitted to the courts, ATF contended bump-stock-devices were machineguns, right? Nope.

As reflected on page 20 of the U.S. Government's Brief in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in *Freedom Ordinance Mfg. Inc., v. Thomas E. Brandon*:

> An ATF expert testified that a true trigger activating devices [i.e. bump-stock-devices], although giving the impression of functioning as a machine gun, are not classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*.

*See* Exhibit 25 (emphasis added).

Hence, ATF in sworn testimony and pleadings submitted to the United States District Court, Southern District of Indiana, admitted that the function of bump-stock-devices requires the shooter to separately pull the trigger each time he/she fires the gun, which is two-levels removed from being a machinegun. [58]

So, the question becomes, was ATF lying then, or is it lying now? There can be no dispute, it's lying now.

---

[58] The use of the terminology two-levels removed from being a machinegun is in relation to the explicit definition of machinegun that was enacted by the Congress in 26 U.S.C. § 5845(b), which for a firearm to constitute a machinegun, requires it to shoot "automatically more than one shot … by a single function of the trigger." As acknowledged by ATF, since the trigger is pulled (*i.e.* a single function of the trigger) and then released (*i.e.* a second and separate single function of the trigger), before the subsequent round can be fired, a bump-stock-device is two-levels removed from being a machinegun, as it still would not constitute a machinegun, even if a subsequent round was discharged on the release of the trigger. ATF has determined that this is a proper analysis of Section 5845(b) in approving binary triggers, which permit the discharge of a round on both the pull and release of the trigger.

In response to this NPR, a video was recorded depicting the actual function of a bump-stock-device. *See* Exhibit 28. [59] *See also* Exhibit 33 Declaration of Jonathan Patton. As reflected in the video, a magazine full of ammunition is placed into an AR-15 type firearm that has a Slide Fire bump-stock-device [60] installed onto it. The shooter then proceeds to fire the bump-stock equipped firearm with the stock in the locked position. [61] As depicted, the bump-stock-device neither self-acts nor self-regulates and the shooter proceeds to fire several rounds, without the bump-stock automatically firing more than one round, per function of the trigger. [62] [63] The video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. In fact, for a subsequent round to be fired, two single and separate functions of the trigger are necessary – the release of the trigger and the subsequent pull of the trigger, which is no different than any other factory semi-automatic firearm. The shooter then proceeds to unlock the stock so that it can move freely on the buffer tube and fire the gun one handed. Once again, the video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. At not point does the gun fire more than one round per function of the trigger.

Additionally, the close-ups reveal, contrary to ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the trigger by the shooter" *is necessary* for subsequent

---

[59] A copy of the video is also available online – Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, (June 14, 2018), *available at* https://youtu.be/1OyK2RdO63U.

[60] The actual device is a Slide Fire SSAR-15 SBS.

[61] This position is the same as any other AR-15 type firearm with an adjustable stock.

[62] Thus, contrary to the NPR, bump-stock-devices do not cause a continuous firing cycle with a single pull of the trigger.

[63] If the bump-stock-device actually turned the firearm into a machinegun, the entire magazine of ammunition would have been expended, when the shooter maintained constant pressure on the trigger. *See* Exhibit 26. A copy of the video is also available online – Molon Labe, *hogan 7 m16.wmv*, YouTube (Oct. 25, 2011), is https://www.youtube.com/watch?v=NwQ1aZnVLFA.

rounds to be discharged. Of course, all of this is irrefutably consistent with ATF's prior determinations and sworn testimony and pleadings submitted to the courts.

So what if the shooter shoots the bump-stock equipped AR-15 in the manner depicted by the NPR – *i.e.* while "maintaining constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure?" 83 Fed. Reg. 13443. Clearly, it will shoot automatically, right? It self-acts and self-regulates, right? Nope.

When the shooter maintains constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, while maintaining the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged – again no different than any factory semi-automatic firearm. Moreover, as evidenced by the close-ups, contrary to ATF's assertion (83 Fed. Reg. 13443, 13447), "bump-stock-type devices [*do not*] allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device," as the shooter in the video specifically maintains pressure on the extension ledge of the device the entire time; and yet, only a single round is discharged each time.

Surely, the video must not depict the actual function of a bump-stock-device, right? Wrong.

Former Acting Chief of the FTB and expert Rick Vasquez was responsible for reviewing and making a determination on the Slide Fire stock, when it was submitted to the FTB for evaluation and classification. *See* Exhibit 32. After concluding that the Slide Fire stock was neither a firearm nor a machinegun under the NFA and GCA, the determination was "reviewed

51

by ATF Chief Counsel and higher authorities within ATF and affirmed." *Id*. More recently, he reviewed the *Bump Stock Analytical* video (Exhibit 28) and declared that it "fully, explicitly, and accurately depicts the function of bump-stock-devices, including, but not limited to, the function and operation of the firearm's trigger, which is exactingly consistent with my evaluation and review of the Slide Fire stock during my tenure with ATF and my Slide Fire Analysis." *Id*. He then goes on to explain that as depicted in the video:

a. The bump-stock-device neither self-acts nor self-regulates, as the bump-stock never fires, in any of the three possible ways to fire a bump-fire-device, more than one round, per function of the trigger, even while the shooter maintained constant pressure on the extension ledge. In fact, as explicitly and accurately depicted in the slow motion portions, the bump-stock-device requires two functions of the trigger before a subsequent round can be discharged (*i.e.* after the firearm is discharged for the first time, the trigger must be fully released, reset, and then fully pulled rearward for a subsequent round to be discharged); [64]

b. Bump-stock-devices do not permit a continuous firing cycle with a single pull of the trigger, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired; [65]

c. The bump-stock-device requires additional physical manipulation of the trigger by the shooter, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired;

d. Even when the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintains the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely

---

[64] It must be noted, as made explicitly clear in the slow motion portions of the video, that the bump-stock-device actually requires over-releasing of the trigger, as the shooter's finger travels past the trigger reset by approximately a half-inch, before beginning the sequence to fire a subsequent round (*e.g.* video at 3:46 – 3:51; 3:52 – 3:55; 3:56 – 4:00). Thus, the video makes extremely evident and clear that bump-stock-devices are actually slower than a trained shooter, as a trained shooter, such as Jerry Miculek, would immediately begin the sequence to fire a subsequent round after the trigger resets.

[65] If the device had permitted continuous firing cycle with a single pull of the trigger, the video would depict a scenario identical to Exhibit 26 of Firearm Policy Coalition's Comment (*also available at* https://www.youtube.com/watch?v=NwQ1aZnVLFA), where it clearly and accurately depicts the emptying of the entire magazine, while the shooter maintains constant pressure on the trigger.

**Exhibit A, Pg. 55**

rearward, before the subsequent round is discharged. *See* video at 3:47 – 4:01. This is no different than any factory semi-automatic firearm; and,

e. The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.

So where does this leave us? It leaves us with ATF's prior determinations and sworn testimony and pleadings submitted to the courts as being legally and factually indisputable, with the contrary statements in the NPR being solely designed to carry out a false narrative on the functionality of bump-stock-devices and to appease Attorney General Jeff Sessions and President Donald Trump. [66]

Surely, ATF hasn't sought to *further* mislead the public, right? Wrong.

Once again in the NPR, ATF contends that "[s]hooters use bump-stock-type devices with semiautomatic firearms to *accelerate the firearm's cyclic firing rate* to mimic automatic fire" (83. Fed. Reg. 13444)(emphasis added); yet, as discussed *supra* in Section I., B. and supported by Expert Declaration of Vasquez and the Savage Comment, the mechanical cyclic rate of both the semi-automatic and fully-automatic versions of a firearm are *identical* (and thus cannot be accelerated), except where the manufacturer purposely slows the rate of fire for the machinegun-version; whereby, in such instances, the semi-automatic-version can *exceed* the cyclic rate of the machinegun-version.

---

[66] *See* Memorandum of February 20, 2018 to Attorney General Sessions from President Donald Trump, "directing the Department of Justice to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns," *available at* https://www.whitehouse.gov/presidential-actions/presidential-memorandum-application-definition-machinegun-bump-fire-stocks-similar-devices.

F.      *The Akins Accelerator Difference*

There is a fundamental difference in the manner in which the Akins Accelerator works

versus a bump-fire-device. [67] The Government had previously described the function of the

Akins Accelerator in a brief filed in Federal Court.

> To operate the Akins Accelerator, the shooter pulled the trigger one time,
> initiating an automatic firing sequence, which in turn caused the rifle to recoil
> within the stock, permitting the trigger to lose contact with the finger and
> manually reset (move forward). Springs then forced the rifle forward in the stock,
> forcing the trigger against the finger, which cause the weapon to discharge the
> ammunition until the shooter released the constant pull the ammunition is
> exhausted. *Put another way, the recoil and spring-powered device cause the
> firearm to cycle back and forth, impacting the trigger finger, which remained
> rearward in a constant pull, without further impact by the shooter, thereby
> creating an automatic firing effect.*

*See* Exhibit 25. (Emphasis added).

However, as the video (*see* Exhibit 28) and Expert Vasquez's Declaration (*see* Exhibit

32) reflect, a single pull of the trigger on a firearm equipped with a bump-fire-device does not

cause the firearm to cycle back and forth automatically. In order to have the firearm cycle and

fire another round, mechanical input from the shooter is required. The shooter must both pull the

trigger to the rear and push forward on the fore end of the firearm. Absent any additional input in

a forward direction by the shooter, the firearm fires only a single round, even where the trigger is

continuously held to the rear. Perhaps the description is best stated by the Government's own

brief. "While the shooter receives an assist from the natural backfire of the weapon to accelerate

subsequent discharge, *the rapid fire sequence in bumpfiring is contingent on shooter input,*

---

[67] While FPC do not agree that an Akins Accelerator constitutes a machinegun, they
acknowledge the 11th Circuit's opinion in *Akins v. U.S.*, 312 Fed.Appx. 197 (11th Cir. 2009) and
assume that court's holding for the purposes of this analysis.

*rather than mechanical input, and thus it cannot shoot 'automatically'.*" *See* Exhibit 25. (Emphasis added).

As is clearly demonstrated in the video, Expert Vasquez's Declaration and by the Government's own argument, bump-stock-devices are only capable of being fired in a rapid manner [68] when the shooter him or herself adds mechanical input with a forward push on the fore end of the firearm; however, such affirmative action by the shooter does not result in the bump-stock-device turning the firearm into a machinegun. Otherwise, Jerry Miculek and others will be banned by the implementation of the NPR.

## V.     ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY

ATF's proposed regulation is overly vague and potentially encapsulates a number of firearms and other products [69] that are commercially available.

Notably, ATF's proposed definition includes

> "..devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter."

83 Fed. Reg. 13457. This language could incorporate a variety of triggers that are currently on the market, which are lawfully possessed and utilized. Utilizing the same flawed logic ATF used to turn a bump-stock-devices into a machine gun, ATF would merely need to assert that by

---

[68] As discussed *supra* throughout Section IV. and in the Declaration of Expert Vasquez, this still requires the trigger to be released, reset, and pulled completely rearward, before a subsequent round is discharged; thereby, requiring two separate and distinct functions of the trigger, which precludes any finding that the device is a machinegun or otherwise causes the firearm to which it is attached to fire "automatically".

[69] As discussed *supra*, beyond regulating bump-stock-devices, it would also seemingly include, rubber bands, belt loops, fingers, "slamfire" shotguns and firearms, Gatling guns, triggers, and other devices (*e.g.* Hellfire trigger mechanisms).

placing forward pressure on the gun while holding the trigger to the rear and allowing the recoil

energy of the firearm to move the firearm enough to reset the trigger, that the trigger could

constitute a bump-stock-device, resulting in a variety of products designed for the competition

shooter to be banned overnight. Likewise, as discussed *supra* in Section IV., the technique of

bump firing only requires the use of one's finger – as admitted by ATF in numerous court filings

– thereby resulting in ATF's ability to contend that fingers, *in and of themselves*, are bump-

stock-devices under the NPR. Moreover, the proposal could also apply to everything from rubber

bands and belt loops to slamfire shotguns and firearms.

Such interpretations would leave thousands of gun owners unsure as to the status of their

particular firearm, device, or even finger, creating an influx of requests for determinations [70]

from ATF and making compliance with the proposed regulation the equivalent of navigating a

minefield without proper guidance. Moreover, as discussed *infra* in Section II, it raises a plethora

of constitutional issues in relation to the Second and Fifth Amendment and Article I, Section 9,

Clause 3 of the U.S. Constitution.

Even if one were to set the vagueness issues aside, the NPR is contradictory as it

contends that bump-stock-devices must be outlawed, while permitting rubber bands, belt loops

and fingers, which operate in an identical manner as bump-stock-devices. Specifically, in the

NPR, ATF contends that bump-stock-devices can "mimic automatic fire when added to

semiautomatic rifles" which Congress sought to outlaw (83 Fed. Reg. 13447); yet, thereafter, in

Alternative 2 (83 Fed. Reg. 13454), declares that "individuals wishing to replicate the effects of

bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger

---

[70] Such determinations would be of questionable value given ATF's contention in the NPR that it
can overturn its own determination on a whim or to appease politicians by utilizing interpretive
jiggery-pokery.

finger to fire more rapidly." As discussed *supra* in Section IV. and the video exhibits specified therein, individuals can bump fire factory semi-automatic firearms with rubber bands, belt loops, and their fingers and some shooters, like Jerry Miculek, can not only shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. Thus, this entire NPR is contradictory to its stated purpose and underlying authority.

## VI.   ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES

In the proposal, ATF offers three alternatives. *See* 83 Fed. Reg. 13454. While FPC fully supports ATF moving forward under Alternative 1, [71] to the extent that ATF decides to move forward with some form of rule – despite the major constitutional, statutory, precedential and procedural issues presented by this rulemaking – there are viable alternatives, not previously considered, that would mitigate some of the constitutional and other issues.

### A.   *FPC Supports "Alternative 1"*

FPC fully support ATF not taking any further action in this rulemaking proceeding. Moreover, as discussed throughout this Comment, ATF is foreclosed – constitutionally, statutorily, precedentially and procedurally – from taking any action as described in the NPR. [72]

### B.   *The Amnesty Alternative*

Pursuant to Section 207(d) of 82 Stat. 1235, also known as the Gun Control Act of 1968,

---

[71] "Alternative 1 – No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative."

[72] To the extent ATF ignores the many issues raised in this and other comments, and moves forward with a final rule, FPC will likely seek judicial relief to invalidate and enjoin the enforcement of any final rule.

(*see* Exhibit 19), the Attorney General [73] has the power to establish amnesty periods for up to

ninety days. In fact, an amnesty was previously held between November 2, 1968, to December 1,

1968 and ATF promulgated a regulation – 26 C.F.R. § 179.120, entitled "Registration of

Firearms" (*see* Exhibit 20) – which established the amnesty and procedures relating to the

registration of unregistered NFA firearms. Moreover, as discussed *infra* in Section VI., C., ATF

more recently provided a seven-year registration and amnesty period for Streetsweepers and

USAS-12 firearms, when it reclassified them under the NFA.

Thus, contrary to ATF's assertion that "there is no means by which the possessor may

register a firearm retroactively, including a firearm that has been reclassified" (83 Fed. Reg.

13348), the Attorney General can provide for an amnesty so that the 520,000-some-odd

proscribed bump-stock-devices, and all other firearms and devices covered by the NPR, can be

lawfully registered, thereby saving a minimum of $221,494,000.00 in just compensation being

paid out by ATF while imposing its regulatory scheme under the NFA, which proponents of gun

control, such as Senator Feinstein, desire. *See* Exhibit 21. [74] Given that the primary estimate

suggests that around 520,000 bump-stock-devices are in circulation (not inclusive of other

firearms and devices for which the NPR seemingly applies), the Attorney General should at least

provide for a seven-year amnesty/registration period, as was provided when ATF reclassified the

Streetsweeper and USAS-12 shotguns, which is discussed *infra* in Section VI., C. Alternatively,

the Attorney General should issue an initial amnesty period of ninety days and provided 50 or

---

[73] While the provision refers to the "Secretary of the Treasury," the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, it is now the Attorney General that has the authority to institute an amnesty.

[74] A copy of Senator Feinstein's proposal http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=10993387-5d4d-4680-a872-ac8ca4359119.

more applications are received between the 30th and 60th days, the amnesty period should be extended in increments of ninety days, until such time that less than 50 applications are received during an extension period.

Furthermore, pursuant to the logical outgrowth doctrine [75] and the numerous issues with the National Firearms Registration and Transfer Record ("NFRTR") – especially the deprivation of due process in civil and criminal proceedings (*see* Exhibits 6, 21 [76] and 22 [77]) – the amnesty should permit the registration of *any* unregistered NFA firearm, not just bump-stock-devices and those items subject to the instant NPR, since such is consistent with the Congress' intent that all NFA firearms be registered to the individual possessing them. [78]

**C.     *ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed***

In the alternative, as ATF admits that the NPR is a reclassification of the definition of machinegun to include bump-stock-devices (83 Fed. Reg. 13448), it must treat the reclassification equally to how it treated its prior reclassifications of the Streetsweeper and USAS 12 shotguns, for which it provided a seven-year registration and amnesty period.

---

[75] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).
[76] A copy of the article is available at – Joshua Prince, *Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record When its 'Files are Missing'*, (Sept. 28, 2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2752028.
[77] A copy of Eric Larson's testimony and exhibits of April 3, 1998, before the House Committee on Appropriations is available online at http://www.nfaoa.org/documents/1998testimony.pdf.
[78] *See* U.S. Senate, *Gun Control Act of 1968, Title II-Amendments to the National Firearms Act*, Report No 1501, 90th Cong., 2nd Sess., at 43 (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/SenateReport1501-GCA1968.pdf, declaring that the Congress intends that "every [NFA] firearm in the United States should be registered to the person possessing the firearm."

**Exhibit A, Pg. 62**

In a July 12, 2012, ATF Quarterly Roll Call Lesson Plan, the ATF Firearms Technology Branch admits that based on ATF's March 1, 1994 reclassification of the Striker-12/Streetsweeper and USAS-12 shotguns,[79] individuals were provided from March 1, 1994 through May 1, 2001 – more than seven years – to register these reclassified NFA firearms. *See* Exhibit 23, p. 3.

Accordingly, to the extent ATF moves forward with a final rule, ATF must provide a seven-year amnesty/registration period for individuals to register their bump-stock-devices.

### D.    *ATF's Reclassification of Open Bolt Macs*

As discussed by the Savage Comment on pages 3 – 4 [80], ATF Ruling 82-8 held that ATF was reclassifying semi-automatic SM10 and SM11A1 pistols and SAC carbines as machineguns and as a result of the ruling:

> "With respect to the machinegun classification of the SM10 and SM11A1 pistols and SAC carbines, under the National Firearms Act, pursuant to 26 U.S.C. § 7805(b), this ruling *will not be applied* to SM10 and SM11A1 pistols and SAC carbines manufactured or assembled before June 21, 1982. Accordingly, SM10 and SM11A1 pistols and SAC carbines, manufactured or assembled on or after June 21, 1982, will be subject to all the provisions of the National Firearms Act and 27 C.F.R. Part 179."

Emphasis added.

Thus, as discussed *supra* in Section III., C., 26 U.S.C. § 7805(b) precludes – and ATF has acknowledged – ATF's ability to retroactively reclassify firearms and devices as machineguns and require their registration and compliance with the NFA. Consistent with Section 7805(b), if

---

[79] *See*, ATF Rulings 94-1 and 94-2.

[80] *See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available *electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18".

**Exhibit A, Pg. 63**

ATF reclassifies a firearm or device, it may only require compliance with the NFA in relation to those firearms and devices that were "manufactured or assembled on or after" the date of its reclassification ruling. Moreover, the existence of approximately 50,000 of these reclassified firearms and their lawful possession and transfer absent compliance with the NFA, [81] was testified to by former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez in *U.S. v. One Historic Arms Model54RCCS*, No. 1:09-CV-00192-GET. *See* Exhibit 27.

Accordingly, ATF is statutorily precluded from applying any final rule in this matter to any firearms or devices that were "manufactured or assembled" before at least March 29, 2018 – the date of publication of this NPR in the Federal Register.

Even if, *arguendo*, ATF were not statutorily prohibited, to ensure equal application of the law, its past actions and the public reliance thereon, it must likewise permit all firearms or devices covered by the NPR in this matter to be grandfathered without requisite compliance with the NFA.

### E.   *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11*

Although FPC vigorously disputes ATF's constitutional, statutory, regulatory, procedural and precedential authority to regulate bump-stock-devices and intends to challenge any final rule adopting any proposal other than Alternative 1, FPC contends that ATF must limit its proposed regulatory changes to the definition proposed by Congress in H.R. 4477. [82]

In the NPR (83 Fed. Reg. 13457), ATF proposes amending to 27 C.F.R. §§ 447.11, 478.11, and 479.11 "by adding two sentences at the end of the definition to reads as follows:

---

[81] *Id.*
[82] *See* https://www.congress.gov/bill/115th-congress/house-bill/4477/text.

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger. The term 'machine gun' includes bump-stock-type devices, *i.e.,* devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. * * * "

As such, ATF's proposal, as discussed throughout this Comment, is far more encompassing than the more limited definition proposed by Congress in H.R. 4477. Accordingly, ATF should revise its proposal to be consistent with the Congress' proposal; whereby, the definition of machinegun in 27 C.F.R. §§ 447.11, 478.11, and 479.11 could, *at the absolute most*, be amended by adding one sentence at the end of the definition to read as follows:

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means a device that— (1) attaches to a semiautomatic rifle (as defined in section 921(a)(28) of title 18, United States Code); (2) is designed and intended to repeatedly activate the trigger without the deliberate and volitional act of the user pulling the trigger each time the firearm is fired; and (3) functions by continuous forward pressure applied to the rifle's fore end in conjunction with a linear forward and backward sliding motion of the mechanism utilizing the recoil energy when the rifle is discharged.

62

## VII.   POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE

In arguing that bump-stock devices are or create a machinegun, the proposed rule demonstrates a complete reversal of prior policy – prior policy, as discussed *supra* in Section 1., A., that ATF has failed to provide in the rulemaking docket and for which the absence of, precludes meaningful review and comment by interested persons.

But even if numerous procedural irregularities did not bar ATF from promulgating a final rule in this proceeding, and neither the U.S. Constitution nor the scope of statutory authority served as an obstacle, there are ample reasons ATF should not proceed with its proposed rule. *First,* ATF's assumptions lack statistical validity. *Second,* ATF's reasoning relies on false premises. *Third,* the costs of the proposed rule are much greater than ATF acknowledged.

### A.   *ATF's Assumptions Lack Statistical Validity*

As pertinent to a statistical inquiry, the overarching basis asserted in the NPR – the putative use of a bump-stock-device in the Law Vegas shooting – demands investigation and reflects that at a maximum, [83] only one instance exists [84], where a bump-stock-device was utilized, while acknowledging that there is no quantifiable benefit to the proposal. Thus, to the extent ATF can proceed in this matter, the *first,* and most vital, issue is whether ATF identified a statistically significant basis to conclude that the existing system of regulation should be revised, especially in light of the absence of a quantifiable benefit. As discussed at length *supra* in Sections I., B. and IV., D., ATF relies solely on prior "public comments" – for which, those

---

[83] As discussed *supra* in Section IV., D., FPC dispute that there exists any evidence even suggesting that a bump-stock-device was utilized in the Las Vegas incident and demands, given ATF's lack of candor to the courts, Congress and the public, that any such contention by ATF be dismissed, in the absence of independently, verifiable evidence in support.
[84] Which to date has neither been confirmed by ATF or FBI. *See* Fn. 4, *supra.*

**Exhibit A, Pg. 66**

"public comments" may be proxies of ATF [85] – to suggest that a bump-stock-device was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock devices "*could* be used for criminal purposes." 83 Fed. Reg. 13455 (emphasis added). The second issue*, with* respect to estimating the costs that would be imposed by ATF's proposed rule, ATF fails to address the just compensation that is necessary for the proposed rule, as is discussed *supra* in Section II., B., 2.

Despite the number of bump-stock-devices grossly exceeding 520,000 (when including rubber bands, belt loops, fingers, triggers, Gatling guns, and "slamfire" shotguns and firearms), ATF's entire rulemaking effort is apparently premised on no more than one unverified instance where a bump-stock-device was alleged to have been utilized unlawfully, even though such products have been on the market for over a decade. Even with ATF's too-low estimate of bump-stock-devices in commerce, one alleged instance represents such a minute, statistically-insignificant fraction that no statistically-valid prediction could even be made about this putative problem. ATF has failed to make available in the docket any information regarding the Las Vegas shooting that would permit meaningful inquiry into whether it is at all representative of the problem ATF claims now requires attention, or that the NPR reflects a substantive, tailored, germane, or proportional response to any such problem.

If, nonetheless, ATF were to go forward with its effort to formulate and impose a new rule, whatever benefits ATF claims, would seem to require discount to reflect the sole instance in which there is any reason to believe the new rule would provide additional protection. That is, the *marginal* benefit of added restrictions would be on the order of 1/520,000 or, stated

---

[85] *See* Section IV., D., and Fn. 56, *supra*.

**Exhibit A, Pg. 67**

otherwise, the marginal cost needs to be multiplied by a factor of at least 520,000/1 to be measured against the total benefit.

<p style="text-align:center">*     *     *</p>

There is no statistically-significant (if any at all) evidence of the problem ATF purports to address with the proposed rule, even if one credits the sole anecdote. In weighing costs and benefits of the proposed rule, ATF must discount the benefits (or multiply the costs) to reflect the sole example from the large population of individuals who own or have access to bump-stock-devices and the fact that based on ATF's own proposal, individuals would still be able to bump fire with rubber bands, belt loops and their fingers.

### B.    *ATF Relies On Multiple False Premises*

As discussed at length *supra* in Sections IV., D. and E., ATF's proposed rule is based on multiple false premises. Other than one unsupported allegation, there is no evidence – *let alone substantive statistical evidence* – of misuse of bump-stock-devices. Moreover, as made explicitly clear by the video (Exhibit 28) and Vasquez's Expert Declaration, a bump-stock-device does not self-act, self-regulate, nor harnesses energy and thus cannot meet the statutory definition of a machinegun. Thus, ATF has failed to explain, let alone demonstrate, the need for a change in regulations or shown sufficient authority to implement its desired changes. And perhaps worse, ATF appears to be purposely misleading the public on the *actual* function of bump-stock-devices, which cannot be countenanced.

**CONCLUSION**

ATF has, once again, made a mockery of rulemaking proceedings by engaging in numerous improper and bad-faith tactics that deny meaningful public participation. As shown in these and other comments, the instant NPR is terminally-ridden with procedural defects. As a result, ATF cannot promulgate any final rule that hopes to survive judicial review without starting anew. And ATF's proposed legislation-by-fiat stretches far beyond its statutory authority, ignores important separation of powers principles, and attempts to usurp that which is solely the domain of Congress. But even if ATF were to somehow overcome those fundamental problems, the fact remains that its proposal is built upon a statistically-invalid assumption, a false premise, and flawed policy arguments. To be sure, ATF failed to quantify *any* benefit from the proposed rule, and substantially undercounted the cost it would impose, including a failure to consider (as is its duty) all related costs. The proposed rule is demonstrably un-workable, and many less-burdensome alternatives exist to address any legitimate concerns that might be identified in a proper and procedurally-sound rulemaking.

Finally, even if ATF did initiate a new, proper, and procedurally-sound proposed rulemaking about bump-stock devices, and even if there existed sufficient statutory authority *and* good cause to issue such a rule, there is ample reason to question whether a proposed reclassification of bump-stock-devices as machineguns is consistent with the U.S. Constitution, including but not limited to the Second and Fifth Amendments, as well as Article I, Section 9. ATF fails completely to consider, let alone provide for, the just compensation that would be due to those who would be affected by its proposed rule. Indeed, as discussed above, the proposed rule is unconstitutional, both facially and as applied to law-abiding people who possess and own devices subject to the ATF's proposed rule.

**Exhibit A, Pg. 69**

For all of the reasons set forth above, the NPR should be withdrawn and summarily discarded, or, in the alternative, ATF should elect Alternative 1 and abandon the proposed rulemaking in its entirety.

Respectfully submitted on behalf of
Firearms Policy Coalition and
Firearms Policy Foundation


Joshua Prince, Esq.
*Chief Counsel*


Adam Kraut, Esq.
*Attorney*

Firearms Industry Consulting Group,
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
610-400-8439 (fax)
www.FirearmsIndustryConsultingGroup.com

June 19, 2018

## Exhibit List

Exhibit 1:    FICG Expedited FOIA dated March 30, 2018

Exhibit 2:    LVMPD Preliminary Investigative Report, January 18, 2018

Exhibit 3:    Video: Iraqveteran8888, *Worlds Fastest Shooter vs Bump Fire! – Guns Reviews*, YouTube, October 13, 2014

Exhibit 4:    Video: Miculek.com, *AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!)*, YouTube, June 20, 2013

Exhibit 5:    Carl Bussjaeger, *[Update] Bumbling Machinations on Bump Stocks?*, April 2, 2018 and *[Updated] Bump-fire Rule: "Comments Not Accepted"*, March 30, 2018

Exhibit 6:    Motion in Limine, *United States v. Friesen,* CR-08-041-L (W.D. Okla. Mar. 19, 2009)

Exhibit 7:    John Bresnahan and Seung Min Kim, *Attorney General Eric Holder held in contempt of Congress*, June 28, 2012

Exhibit 8:    Testimony of Gary Schaible, *United States v. Rodman, et al.*, CR-10-01047-PHX-ROS

Exhibit 9:    Senator Diane Feinstein, *Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks*, October 11, 2017

Exhibit 10:   ATF Determinations

Exhibit 11:   Video: Shooting Videos, *Rapid manual trigger manipulation (Rubber Band Assisted)*, YouTube, December 14, 2006

Exhibit 12:   Video: StiThis1, *AK-47 75 round drum Bumpfire!!!*, YouTube, September 5, 2011

Exhibit 13:   Video: ThatGunGuy45, *'Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45*, YouTube, October 13, 2017

Exhibit 14:   Video: M45, *How to bumpfire without bumpfire stock*, YouTube, October 8, 2017

Exhibit 15:   Verified Declaration of Damien Guedes

Exhibit 16:   Verified Declaration of Matthew Thompson

Exhibit 17:    Video: Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube, October 11, 2017

Exhibit 18:    Video: *Fastest Shooter OF ALL TIME! Jerry Miculek | Incredible Shooting Montage*, DailyMotion, 2014

Exhibit 19:    Gun Control Act of 1968, 82 Stat. 1235

Exhibit 20:    26 C.F.R. § 179.120

Exhibit 21:    Joshua Prince, *Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record When its 'Files are Missing'*, September 28, 2008

Exhibit 22:    Eric Larson's testimony and exhibits of April 3, 1998, before the House Committee on Appropriations

Exhibit 23:    ATF Quarterly Roll Call Lesson Plan, July 12, 2012

Exhibit 24:    Eric M. Larson, *How Firearms Registration Abuse & the "Essential Operational Mechanism" of Guns May Adversely Affect Gun Collectors*, Gun Journal, March 1998

Exhibit 25:    U.S. Government's Brief in Support of Cross Motion For Summary Judgment And In Opposition to Plaintiff's Motion For Summary Judgment, *Freedom Ordinance Mfg. Inc., v. Thomas E. Brandon*, Case No. 3:16-cv-243-RLY-MPB

Exhibit 26:    Video: Molon Labe, *hogan 7 m16.wmv*, YouTube, October 25, 2011

Exhibit 27:    Testimony of ATF Senior Analyst Richard Vasquez in *U.S. v. One Historic Arms Model54RCCS*, No. 1:09-CV-00192-GET

Exhibit 28:    Video: Adam Kraut Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, June 14, 2018

Exhibit 29:    National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. April 16, 18, and May 14, 15, and 16 1934

Exhibit 30:    Testimony of Police Chief J. Thomas Manger

Exhibit 31:    ProPublica, *Workers' Comp Benefits: How Much is a Limb Worth?*, March 5, 2015

Exhibit 32:    Verified Declaration of former ATF Acting Chief of FTB Rick Vasquez

Exhibit 33:     Verified Declaration of Jonathan Patton of Patton Media and Consulting

Exhibit 34:     FICG's Letter on Behalf of FPC to Acting Director Brandon

Exhibit 35:     FPC's Letter in Opposition to the ANPR of January 25, 2018

# Exhibit 1

## (FICG Expedited FOIA)

# FIREARMS INDUSTRY CONSULTING GROUP

**A Division of Civil Rights Defense Firm, P.C.**

Joshua Prince
Adam Kraut
Jorge Pereira

Phone: 888-202-9297
Fax: 610-400-8439



March 30, 2018

Stephanie M. Boucher
Disclosure Division
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226

RE:   Firearms Policy Foundation (FPF) and Firearms Industry Consulting Group (FICG) vs. U.S.
        Department of Justice - Bureau of Alcohol, Tobacco, Firearms and Explosives - Bump Stock
        Rulemaking
        Docket Number: ATF-2018-0001
        **EXPEDITED Freedom of Information Act (FOIA) Request**

        **VIA EMAIL: FOIAMail@ATF.gov**

Dear Stephanie Boucher,

    Pursuant to the federal Freedom of Information Act, 5 U.S. Code § 552 (hereinafter "FOIA"), I
submit the following request for documents from the Bureau of Alcohol, Tobacco, Firearms and
Explosives (hereinafter "ATF"). If the requested documents are not available from ATF, I
respectfully request that you forward this request to the appropriate agency that maintains the
requested records or advise me of the identity of any such agency.

<u>Status of Requester</u>: I am attorney and scholar of firearms laws and related issues. I have been
published by the Pennsylvania Bar Institute in a number of publications for attorneys on firearms
law issues and maintain an active blog on firearms law issues at
http://blog.princelaw.com/category/firearms-law/. As a result, I ask that you classify this request as
made by a freelance journalist and I have been previously found, on numerous occasions, to be a
freelance journalist for purposes of FOIA by ATF, FBI and DDTC. In the alternative, I am
requesting a fee waiver. This waiver is applicable under the Freedom of Information Act of 1986.
It specifies, "[a] fee waiver or reduction can only be granted if the information furnished to the
requester is likely to contribute significantly to the public understanding of the operations or

activities of the government and not primarily in the commercial interest of the requester." As this request is in relation to issues of public importance that will significantly assist the public in understanding the ATF's position in relation to its current rulemaking regarding bump stocks (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), a fee waiver is appropriate. Although Firearms Industry Consulting Group ("FICG") has been retained by Firearms Policy Foundation ("FPF"), a 501(c)3 non-profit public benefit organization, in relation to this rulemaking, as both FPF and FICG intend to publicly post all documents received in response to this FOIA, any response will be provided to the public and is for the benefit of the public.

While I believe that my purposes fall directly within the standard set forth for a freelance journalist or, alternatively, for a "Fee Waiver," if you find that my purposes do not, I will agree to pay the appropriate fees up to $100.00. If you estimate that the cost will exceed $100.00, please advise me the estimated costs exceeding $100, and I will make a decision on whether to proceed. Nonetheless, even with my agreement to pay, I retain the right to appeal any decision based on the fee waiver; and if successful, the return of any money, which was inappropriately paid, in relation to this FOIA.

Expedited Request: Pursuant to 5 U.S.C. § 552, I am requesting expedited review of this FOIA, as ATF has entered into rulemaking relative to the requested documents (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), for which individuals, including myself, only have until June 27, 2018 to respond As ATF has failed to include the requested documents in the docket and the absence of the requested documents would deny the public - including FPF, FICG, and myself - due process and the ability to formulate legal arguments and meaningful opportunity to participate in the rulemaking process, this request is proper for expedited review and processing. If the requested documents are not provided promptly, there will be an inadequate opportunity to review them and formulate meaningful comments before the deadline of June 27, 2018. Consistent with 5 U.S.C. § 552(a)(6)(E)(ii), I am requesting, as required, that a determination be made within 10 days.

Subject Matter of Request: This is a request for all ATF determinations relative to devices referred to as "bump stocks" and "bump-fire stocks" by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well as, all ATF Form 9310.3A "Correspondence Approval and Clearance" forms relative to each determination, and any versions or drafts of the determinations, which were different than the final determination. The use of the word "determinations" shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF. A copy of two such known determinations are attached hereto as Exhibit A.

Temporal Scope of Request: Please limit your search for responsive documents to the period January 1, 2000 to the present.

Request for "Vaughn Index": In the event all or any part of an otherwise responsive document is withheld subject to a claim that one or more FOIA exemptions apply, please provide an index identifying the document or part thereof, by author(s), addressee(s), date, subject matter, and the

specific exemption asserted as a basis for failing to produce the complete document. If a document is withheld only in part, please mark the redacted document to indicate the deletion.

<u>Waiver of Inspection</u>: If search and copying costs are not estimated to exceed $100.00, please send a copy of the documents to me at the address referenced below.

<u>Request for Timely Action</u>: As mandated by FOIA, 5 U.S.C. § 552(a)(6)(A)(i), I request your reply within twenty business days. The requested documents relate to a matter of current public concern so that time is of the essence. In the event you have any questions concerning this request, please contact me as soon as possible. I would be pleased to clarify any perceived ambiguity informally or to discuss ways to narrow my request so as to ensure a timely response.

<u>Contact Information</u>: Please direct all communications to me at:

<div align="center">

Joshua Prince
646 Lenape Rd
Bechtelsville, PA 19505
888-202-9297 ext 81114
Joshua@CivilRightsDefenseFirm.com

</div>

<u>Certification</u>: I certify everything in this request, including request for expedited review and processing to true and correct to the best of my knowledge and belief.

Thank you in advance for your attention to this matter.

Yours truly,
Firearms Industry Consulting Group


Joshua G. Prince
joshua@civilrightsdefensefirm.com

jgp/web
Matter no. 10377



**regulations.gov**
*Your Voice in Federal Decision-Making*

Home

📁 **Bump-Stock-Type Devices**

**Docket Folder Summary**   🔖 **View all documents and comments in this Docket**

**Docket ID:** ATF-2018-0002   **Agency:** Alcohol Tobacco Firearms and Explosives Bureau (ATF)   **Parent Agency:** Department of Justice (DOJ)

**RIN:** 1140-AA52   **Impacts and Effects:** None   **CFR Citation:** 27 CFR 478,27 CFR 479   **Priority:** Economically Significant

**+ View More UA and Regulatory Plan Information and Docket Details**

**Primary Documents**   **View All** (1)

| PR | **Bump-Stock Type Device** | **Comment Now!** |
|----|----|----|
| | **Proposed Rule**   **Posted:** 03/29/2018   **ID:** ATF-2018-0002-0001 | Due Jun 27, 2018 11:59 PM ET |

**Supporting Documents**

*No documents available.*

**Exhibit A, Pg. 78**

# Exhibit 2

## (LVMPD Preliminary Investigative Report)



*Joseph Lombardo, Sheriff*

**FORCE INVESTIGATION TEAM**

Lieutenant Dennis O'Brien
Sergeant Jerry MacDonald
Detective Trever Alsup
Detective Marc Colon
Detective Breck Hodson
Detective Craig Jex
Detective Jason Leavitt
Detective Joseph Patton
Detective Blake Penny

**HOMICIDE**

Lieutenant Dan McGrath
Sergeant John Harney
Sergeant Matt Sanford
Sergeant Jon Scott
Detective Maureen Bogatay
Detective Dolphis Boucher
Detective Chris Bunn
Detective Lora Cody
Detective Mitchell Dosch
Detective Jarrod Grimmett
Detective John Hoffman
Detective Ryan Jaeger
Detective Gary King
Detective Kristen Long
Detective Gerald Mauch
Detective Jason McCarthy
Detective Fred Merrick
Detective Terri Miller
Detective Cliff Mogg
Detective Robert Ochsenhirt
Detective Tate Sanborn
Detective Tod Williams

# LVMPD Preliminary Investigative Report
# 1 October / Mass Casualty Shooting

|  |  |
| --- | --- |
| LVMPD Event: | 171001-3519 |
| Division of Occurrence: | Tourist Safety Division |
| Date of Incident: | 10-01-2017 |
| Time of Call: | 2205 hours |
| Incident Locations: | Mandalay Bay Resort and Casino |
|  | 3950 S. Las Vegas Blvd. |
|  | Las Vegas, NV 89119 |
|  |  |
|  | Las Vegas Village |
|  | 3901 S. Las Vegas Blvd. |
|  | Las Vegas, NV 89119 |
|  |  |
| Suspect: | Stephen Paddock |

Date of report: 01-18-18

Submitted by: Detective Trever Alsup, P# 5782

Signature: _____

Approved by: Sergeant Jerry MacDonald, P# 4660

Signature: _____

Approved by: Lieutenant Dennis O'Brien, P# 6192

Signature: _____

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................3

II.    INCIDENT DETAILS ...........................................................................3

III.   VICTIMS ...............................................................................................15

      Deceased .............................................................................................15

      Living Victims ....................................................................................23

IV.   SUSPECT ..............................................................................................23

V.    WITNESS INTERVIEWS ...................................................................24

VI.   SCENE DESCRIPTIONS .....................................................................31

      Route 91 Venue ..................................................................................31

      Mandalay Bay 32nd Floor ..................................................................36

      100-Wing Hallway .............................................................................37

      Room 32-135 ......................................................................................37

      Foyer Inside Room 32-135 .................................................................37

      West Bedroom (Master Bedroom) ......................................................38

      Sitting Area .........................................................................................38

      Decedent Stephen Paddock ................................................................39

      Bar/Kitchenette ..................................................................................39

      Living Room .......................................................................................40

      Room 32-134 ......................................................................................40

VII.  EVIDENCE RECOVERY ....................................................................41

      Physical Evidence ..............................................................................41

      DNA ....................................................................................................45

      Digital .................................................................................................45

VIII. SUSPECT AUTOPSY ..........................................................................48

IX.   INVESTIGATION ................................................................................49

      Mandalay Bay Hotel Room................................................................49

      Paddock's Vehicle ..............................................................................50

      Paddock's Mesquite Residence ..........................................................51

      Paddock's Reno Residence .................................................................51

      Search Warrants and Legal Notices ...................................................51

      Law Enforcement Tips and Leads ......................................................52

X.    PRELIMINARY FINDINGS FROM THE 1 OCTOBER INVESTIGATION......................52

Appendix A .......................................................................................................54

## I.     INTRODUCTION

On October 1, 2017, over 22,000 people came together to enjoy a country music festival in Las Vegas, Nevada. On the third and final night of the festival, a lone gunman opened fire into the crowd from the 32nd floor of the Mandalay Bay Resort and Casino. The gunfire continued for over ten minutes, resulting in the deaths of 58 innocent concert goers and injuring more than 700. With law enforcement closing in, the suspect took his own life.

It is not standard practice for the Las Vegas Metropolitan Police Department (LVMPD) to issue an investigative overview related to an open case. Due to the magnitude of this investigative response and the number of victims associated with this incident, Sheriff Joseph Lombardo felt it was important to author an overview of all investigative work accomplished in the aftermath of 1 October. This report is not intended to be a comprehensive and final account of the facts and evidence gathered but rather an overview of the investigation. The investigation into this incident is on-going and a full comprehensive report will be released upon its completion.

This report will reflect the number and identities of victims known to the Las Vegas Metropolitan Police Department to date. This information is vital in order to grant assistance, properly categorize the level of crime and most importantly, honor those who fell prey to this horrific act of violence.

The Las Vegas Metropolitan Police Department would like to recognize and thank all our local, state and federal law enforcement partners for their assistance with this investigation.

## II.    INCIDENT DETAILS

On October 1, 2017 Stephen Paddock began shooting into the crowd attending the Route 91 Music Festival from his hotel room on the 32nd floor of the Mandalay Bay. As a result, 58 people died and over 700 were injured.  An extensive, joint investigation involving the LVMPD and the Federal Bureau of Investigation (FBI) began immediately after the incident. Every facet of Paddock's life was explored.

At the time of the incident Paddock was 64 years old. He owned residences in Mesquite and Reno, Nevada and lived with his girlfriend, Marilou Danley. Paddock had limited law enforcement contact and no criminal history.

Paddock embarked on numerous international trips beginning in 2012, these included trips to Europe, Asia and South America. Most of Paddock's international travel was unaccompanied. Paddock also took multiple cruises with destinations in the Bahamas, Alaska and Mexico.

Through interviews with Paddock's relatives and acquaintances investigators learned Paddock lived a seemingly normal life. He was married at least once and divorced. He worked as an accountant and in the family real estate business.

**Exhibit A, Pg. 82**

From 1982 through September of 2016, Paddock purchased 29 firearms. These purchases consisted of handguns, shotguns and one rifle. From October 2016 through September 2017, Paddock purchased over 55 firearms. Most of the firearms purchased from 2016 through 2017 were rifles in various calibers along with over 100 firearm related items through numerous retailers. The firearm related items included scopes, cases, bump stocks and ammunition.

**The Ogden**

On September 17, 2017, Paddock checked into The Ogden where he was booked through September 28, 2017 which overlapped his reservation at Mandalay Bay. The Ogden is a condominium complex located in downtown Las Vegas, Nevada. Paddock stayed in three different units during this time.

Paddock's stay at The Ogden coincided with the Life is Beautiful music festival. Similar to the Route 91 Music Festival, the Life is Beautiful event was held in an open air venue from September 22, 2017, through September 24, 2017.

While staying at The Ogden, Paddock exhibited behavior which was similar to his time spent at Mandalay Bay. Paddock left for long periods of time, returning to Mesquite, Nevada, flying to Reno, Nevada and traveling to Arizona. Paddock was observed numerous times gambling at downtown Las Vegas casinos. Paddock was also observed moving numerous suitcases from his vehicle to the various units he rented.

**Mandalay Bay Hotel & Casino**

On Monday, September 25, 2017, Paddock checked into room 32-135 of the Mandalay Bay Hotel and Casino with a scheduled check-out date of October 2, 2017. On Friday September 29, 2017, Paddock checked into room 32-134 which connected with room 32-135 via connecting doors.

From September 25, 2017, through October 1, 2017, Paddock transported multiple suitcases to his room on several occasions. Paddock also left the Mandalay Bay on multiple occasions for long periods of time, often returning to Mesquite, Nevada.



**Route 91 Harvest Festival**



October 1, 2017, was the final day of the Route 91 Harvest Festival held at the Las Vegas Village concert venue located at 3901 S. Las Vegas Boulevard. The site is an open air concert venue approximately 15 acres in size. It is bordered by Las Vegas Boulevard to the west, Reno Avenue to the north, Giles Street to the east and Mandalay Bay Road to the south.

The festival was a three day country music concert with multiple entertainers. On October 1, 2017, the concert began at 1500 hours. Jason Aldean, the last performer, was scheduled to take the main stage at 2140 hours. Over 22,000 people were attending the final day of the festival.

**Incident**

On October 1, 2017, at approximately 2118 hours, Mandalay Bay Security Officer Jesus Campos was assigned to check several Hotel Service Optimization System (HotSOS)[1] alarms from various rooms inside the hotel. Room 32-129 was the last of the rooms Security Officer Campos was assigned to check.

Security Officer Campos was on the 30th floor and responded to the 32nd floor via the stairwell in the north end of the 100 wing. Security Officer Campos attempted to enter the hallway to the 100 wing but the door would not open. He took the stairs to the 33rd floor and used the guest

---

[1] A HotSOS Alarm is triggered by a guest room door that is left ajar for a predetermined amount of time.

elevator to access the 32nd floor. Once on the 32nd floor, Security Officer Campos entered the foyer leading to the stairwell. He discovered an "L" bracket screwed into the door and door frame which prevented it from opening. Security Officer Campos called his dispatch center with the house phone located in the foyer to report the discovery. The security dispatch center then called the engineering section to have the door checked.

Security Officer Campos heard what he described as a rapid drilling sound coming from room 32-135 after he hung up the phone. As he walked down the 100 wing hallway, Campos heard what he described as automatic gunfire coming from the area of room 32-135 and realized he had been shot in the left calf. He took cover in the alcove of rooms 32-122 and 32-124 and utilized both his cellular phone and radio to notify his dispatch he was shot. Security Officer Campos advised he was shot with a BB or pellet gun. While waiting for other security personnel to arrive Security Officer Campos continued to hear gunfire coming from the room.

Engineer Stephen Schuck finished fixing a leak in room 62-207 when he was directed to respond to the 32nd floor reference the bracket preventing the stairwell door from opening. Engineer Schuck used the service elevator in the 200 wing to access the 32nd floor. When he arrived on the 32nd floor, he gathered his tools and equipment and walked from the 200 wing to the 100 wing.

As Engineer Schuck walked up the hallway of the 100 wing, he observed Security Officer Campos poke his head out of an alcove. Engineer Schuck then heard rapid gunfire coming from the end of the 100 hallway which lasted approximately 10 seconds. When the gunfire stopped, he heard Security Officer Campos tell him to take cover. Engineer Schuck stepped into an alcove and gunfire again erupted down the hallway coming from room 32-135. The gunfire lasted a few seconds then stopped. The gunfire started again after a brief pause but Engineer Schuck believed it was directed outside and not down the hallway.

Inside the Las Vegas Village over fifty LVMPD personnel were on overtime assignments for the Route 91 Harvest Festival. The initial gunshots were heard on an officer's Body Worn Camera (BWC). Officers and concertgoers initially believed the gunfire to be fireworks. As Paddock targeted the concertgoers with gunfire, officers quickly determined they were dealing with an active shooter and broadcast the information over the radio.

The crowd inside the Las Vegas Village started reacting to the gunfire and Jason Aldean ran off the stage. Officers and concertgoers began treating victims who were struck by gunfire. They also tried to get concertgoers out of the venue in a safe manner. Officers determined the gunfire was coming from an elevated position, possibly from the Mandalay Bay Hotel. Medical personnel were requested for multiple people struck by gunfire.

As the active shooter incident was occurring, two LVMPD officers were in the security office of the Mandalay Bay handling a call for service reference two females who were in custody for trespassing. The officers heard the radio broadcast of gunfire at the Route 91 Harvest Festival. Both officers, along with security personnel, exited the security office and responded towards the Las Vegas Village. As they were making their way through the casino, security personnel advised the officers of an active shooter on the 32nd floor of the hotel.[2] The officers then directed

---

[2]Information obtained from LVMPD BWC.

security to escort them to that location. The officers and security personnel entered the Center Core guest elevators and were again advised the shooter was on the 32nd floor. The officers made a tactical decision to respond to the 31st floor and take the stairwell to the 32nd floor.

LVMPD officers converged on the Las Vegas Village and Mandalay Bay. Officers formed multiple Strike Teams and entered the Mandalay Bay from various entrance points. A team of officers including a Special Weapons and Tactics (SWAT) Operator reached the 32nd floor via the stairwell in the 100 wing. Officers did not hear gunfire coming from room 32-135. Officers were able to manually breach the "L" bracket on the stairwell door and gain access to the hallway. Officers immediately observed a food service cart which had wires running from it to room 32-134 and prepared themselves for the possibility of an Improvised Explosive Device (IED). The decision was made to use an explosive breach to make entry into room 32-135.

After a successful breach of the doors to room 32-135, officers entered the room and found Paddock deceased on the floor. Paddock appeared to have a self-inflicted gunshot wound to the head. Officers cleared the remainder of the room and observed multiple rifles in various locations throughout the room as well as hundreds of expended casings. A second explosive breach was utilized to gain access to room 32-134 through the connecting doors. Immediately after the breach a SWAT officer negligently discharged his rifle. Officers cleared room 32-134 finding several rifles in the room.

Officers, medical personnel, and concertgoers continued the evacuation of victims in the Las Vegas Village venue. Several triage sites were established in the venue and surrounding area. Injuries ranged from being minor in nature to fatal. Hundreds of wounded were transported to area hospitals by ambulance and privately owned citizen vehicles.

## Sequence of Events

The details listed below were gathered from several different sources[3]. For the purpose of this section, the sequence of events will begin on September 25th when Paddock checked into the Mandalay Bay and end with the LVMPD officers making entry into Paddock's room. *All times in this section are approximates based upon different time sources and different time stamps which were all utilized to document this section of the report. All dates and times listed below occurred in the year 2017.*

On or around September 9th Paddock made his room reservation for a Vista Suite ending in 235 but not a specific floor. On September 20th Paddock was internally[4] assigned to room 33-235. On September 21st Paddock was internally changed to room 32-235. On September 24th Paddock was assigned to room 32-135.

---

[3] LVMPD Officer Body Worn Cameras; UBER Video; Interviews to include officers, civilians & Mandalay Bay Employees; Mandalay Bay Video Surveillance; Lock Interrogation Documents; Cell Phone Videos & Records.
[4] All internal changes to Paddock's rooms were done by a Mandalay Bay computer without Paddock's knowledge.

## September 25th through October 1st

### September 25th

Overview:

At approximately 1533 hours, Paddock checked into room 32-135 of the Mandalay Bay under his name. Paddock booked the connecting room (32-134) for September 29th through October 2nd. When Paddock checked into room 32-134 on September 29th, he did so under his girlfriend, Danley's, name. Paddock was set to check out of both rooms on October 2nd. From approximately 1603 to 1656 hours, Paddock was seen at Mizuya Sushi (inside the Mandalay Bay), he then drove his vehicle from self-park to valet[5], and returned to the front desk with five suitcase bags.

- At approximately 1656 hours, a bellman met Paddock and escorted him to room 32-135. Paddock requested to go through the service elevators and not through the guest elevators. According to interviews, this request is not uncommon for guests of the hotel. Paddock rolled one bag and a bellman used a luggage cart for the other four bags.
- From approximately 2137 to 2140 hours, Paddock had his vehicle removed from valet and Paddock left the Mandalay Bay.
- At approximately 2300 hours, Paddock arrived in Mesquite, Nevada.

### September 26th

Overview:

Paddock spent time at his home in Mesquite, Nevada, Downtown Las Vegas and Mandalay Bay.

- From approximately 1012 to 1455 hours, according to cell phone records, Paddock's cell phone showed in Mesquite, Nevada.
- At approximately 1535 hours, Paddock completed a wire transfer in Mesquite, Nevada of $50,000 from his Wells Fargo account to an account in the Philippines.
- From approximately 2012 to 2100 hours, Paddock drove from Mesquite, Nevada to The Ogden.
- From approximately 2102 to 2216 hours, Paddock walked around and gambled at the El Cortez Hotel.
- At approximately 2223 hours, Paddock returned to The Ogden.
- At approximately 2234 hours, Paddock departed The Ogden and drove to Mandalay Bay.
- From approximately 2245 to 2252 hours, Paddock valeted his vehicle at Mandalay Bay and took six suitcases (located on a luggage cart) and one rolling suitcase (Paddock rolled the suitcase himself) up to room 32-135 by way of the service elevator with help of a bellman. (The bellman who escorted Paddock on the September 25th was different than the bellman who escorted Paddock on the September 26th.)
- At approximately 2308 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

---

[5] Confirmed by valet ticket #275263147

**September 27th**

Overview:
Paddock spent several hours gambling at Mandalay Bay. Paddock spoke with his VIP host reference wanting the "Vista Suite" at the end of the hall with the double doors. Paddock was insistent on the suite and connecting room. Paddock wanted to be in the 200 wing as it had a better view, according to him. Paddock was upset about the room, but was not angry. Paddock never mentioned the reason why he wanted a connecting room.

- At approximately 0713 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- At approximately 1556 hours, Paddock placed a room service order for two entrees totaling $94.33.
- At approximately 1632 hours, room 32-135 was cleaned by hotel staff. Paddock remained in the room as it was cleaned.
- At approximately 2003 hours, Paddock was seen in the valet area of Mandalay Bay with two rolling suitcases. Paddock had his vehicle removed from valet and left the Mandalay Bay at approximately 2015 hours.
- At approximately 2029 hours, Paddock arrived at The Ogden and entered a room at approximately 2031 hours.
- From approximately 2045 to 2200 hours, Paddock left The Ogden and drove to Mesquite, Nevada, where he arrived at approximately 2200 hours.
- At approximately 2300 hours, Paddock arrived at the Walmart in Mesquite, Nevada. He purchased luggage, razor blades, fake flowers, a vase, and a styrofoam ball.

**September 28th**

Overview:
In Mesquite, Nevada, Paddock purchased a .308 bolt action rifle, deposited $14,000 into a Wells Fargo account, and wire transferred $50,000 to an account in the Philippines. Paddock visited a gun range in Mesquite, Nevada, before traveling back to the Mandalay Bay.

- From approximately 0227 to 1420 hours, Paddock's cell phone was located in Mesquite, Nevada according to cell phone records.
- From approximately 1444 to 1501 hours, Paddock made a $14,000 deposit at Wells Fargo and transferred $50,000 to a bank in the Philippines.
- At approximately 1523 hours, Paddock purchased a .308 bolt action rifle from a gun store in Mesquite, Nevada.
- From approximately 1723 to 1803 hours, Paddock was seen driving in the area of the City of Mesquite Landfill / gun range located at 3200 Mesquite Heights Road, in a rural area of Mesquite, Nevada.
- From approximately 2042 to 2146 hours, Paddock traveled from Mesquite, Nevada to the Mandalay Bay and parked in valet. Paddock was seen entering the Mandalay Bay with two rolling suitcases and a laptop bag.
- At approximately 2218 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

**Exhibit A, Pg. 88**

**September 29th**

Overview:
A second refrigerator was delivered to Paddock's room (32-135). Staff was asked to only change linen's and take out the trash in room 32-135. A staff member was told by Paddock not to vacuum 32-135 and not to remove the food service cart from the room. Staff was asked specifically to change sheets and towels in room 32-134 and inform Paddock when room 32-134 was completed. Paddock remained in room 32-135 and used his laptop as the rooms were being cleaned.

- At approximately 0543 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- From approximately 1228 to 1314 hours, Paddock ate at Mizuya Sushi Sake and then returned to room 32-135.
- At approximately 1400 hours, rooms 32-135 and 32-134 were cleaned by hotel staff.
- At approximately 1506 hours, Paddock checked into room 32-134 (under Danley's name) from the VIP check in counter at the Mandalay Bay.
- At approximately 1508 hours, Paddock took the guest elevator to the 32nd floor.
- At approximately 1509 hours, Paddock entered room 32-134.
- From approximately 1509 to 0100 (September 30th) hours, Paddock remained inside rooms 32-134 and 32-135.
- At approximately 2311 hours, a room service ticket totaling $102.99 was charged to room 32-134.

**September 30th**

Overview:
Paddock traveled to Mesquite, Nevada twice from Mandalay Bay. Paddock placed "Do Not Disturb" signs on both 32-135 and 32-134. Paddock gambled for a couple of hours and brought more suitcases up to his room.

- At approximately 0100 hours, Paddock drove to Mesquite, Nevada.
- At approximately 0556 hours, Paddock returned to the Mandalay Bay with four suitcases.
- From approximately 1204 to 1215 hours hotel staff serviced the private mini bar of room 32-134. (Paddock placed the "Do Not Disturb" signs on the room doors sometime after 1215 hours.)
- Between approximately 1300 to 1400 hours, Paddock was asked if he would like rooms 32-135 and 32-134 cleaned. Paddock declined.
- From approximately 1452 hours to 1508 hours, Paddock removed his vehicle from valet and parked in the self-parking garage.
- At approximately 1512 hours, Paddock was observed exiting the parking garage elevator with two suitcase rolling bags.
- At approximately 1520 hours, Paddock was seen in a guest elevator with the two rolling suitcases and took them to his room.
- At approximately 1952 hours, Paddock drove from Mandalay Bay to Mesquite, Nevada and arrived at approximately 2057 hours.

**Exhibit A, Pg. 89**

## October 1st

Overview:

From approximately 0206 to 2040 hours, Paddock departed Mesquite, Nevada and returned to Mandalay Bay. He spent several hours gambling, brought more suitcases to his room, and ordered room service.

- At approximately 0206 hours, Paddock left Mesquite, Nevada.
- At approximately 0305 hours, Paddock arrived at the self-parking garage at the Mandalay Bay.
- From approximately 0324 to 0734 hours, Paddock walked around the casino and gambled. Paddock used both his own and Danley's players cards.
- At approximately 0737 hours, Paddock returned to his room.
- From approximately 1222 to 1226 hours, Paddock moved his vehicle from the self-park garage to valet[6]. This valet transaction was the only parking transaction during his stay at Mandalay Bay that was completed in Danley's name.
- At approximately 1229 hours, Paddock was observed waiting for an elevator with two rolling suitcases. There was also a third bag hanging from one of the rolling suitcases.
- At approximately 1233 hours, a room service ticket was opened for room 32-134.
- At approximately 1317 hours, Mandalay Bay valet parked Paddock's vehicle in "Garage East", space #317.[7]
- At approximately 1337 hours, the room service ticket[8] was closed out for room 32-134 in Danley's name. The check totaled $67.60 and included two entrees.
- From 1423 to 1940 hours, the doors for rooms 32-134 and 32-135 were manipulated multiple times. For example, the doors were opened, closed and the dead bolt locks were engaged and disengaged several times.

From approximately 2040 to 2205 hours, a series of events led up to the mass shooting conducted by Paddock:

- At approximately 2040 hours, a HotSOS alarm was generated for room 32-129.
- At approximately 2118 hours, the HotSOS call was assigned to Security Officer Campos via his cellphone. Security Officer Campos was assigned five HotSOS calls during the 2118 hours cellphone call. According to interviews of hotel staff, it is common practice to assign HotSOS calls to security officers and then immediately close out the HotSOS tickets prior to a security officers actually checking out the room. Security Officer Campos handled the HotSOS call for room 32-129 last.
- At approximately 2136 hours, the dead bolt to room 32-135 was engaged.
- At approximately 2140 hours, Jason Alden started his performance at the Route 91 Festival.
- At approximately 2146 hours, the dead bolt to room 32-134 was engaged.

---

[6] Valet ticket #275274484
[7] This is the same space detectives located the vehicle in after the shooting
[8] Room service ticket #51592684

**Exhibit A, Pg. 90**

**Approximately 2146 to 2204 hours**

- Security Officer Campos entered the service elevator at approximately 2146 hours and got off on the 30th floor at approximately 2147 hours.
- Security Officer Campos walked to the stairwell in the 100 wing of the 30th floor and walked up to the 32nd floor.
- Security Officer Campos could not gain entry to the 32nd floor due to the door being barricaded.[9]
- Security Officer Campos walked up the stairs to the 33rd floor. Security Officer Campos walked down the 100-Wing of the 33rd floor to Center Core. He took a guest elevator to the 32nd floor.
- At approximately 2200 hours, Security Officer Campos exited the guest elevator and walked up the 100 Wing toward room 32-129. Security Officer Campos checked room 32-129 and found it was secure. Security Officer Campos walked into the foyer leading to the stairwell and observed the "L" bracket screwed into the door and frame.
- At approximately 2204 hours, Security Officer Campos picked up a house phone located inside the small foyer leading to the stairwell and called security dispatch to report the "L" bracket on the door to the stairs. Security dispatch transferred the call to maintenance dispatch. The maintenance dispatcher then transferred Security Officer Campos to the maintenance supervisor's cell phone.

From approximately 2205 to 2216 hours, Paddock committed a mass shooting that left 58 people dead and over 700 hundred injured:

**Approximately 2205 hours**

- Engineer Schuck was contacted by the maintenance dispatcher via his radio.
- Paddock fired two single gunshots into the Las Vegas Village area.
- Paddock fired an undetermined amount of gunshots into the Las Vegas Village area.

**Approximately 2206 hours**

- Security Officer Campos ended the phone call and hung up the house phone. After hanging up the phone, Security Officer Campos heard what he described as rapid drilling noises.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Security Officer Campos began walking down the 100-wing toward Center Core.
- Engineer Schuck was told by his supervisor to go to the 32nd floor.
- LVMPD unit 169SE broadcast over the Convention Center Area Command (CCAC) radio channel, "169SE, we got shots fired, 415A at the Route 91. Sounded like an automatic firearm."
- Paddock fired rounds down the hallway at Security Officer Campos. Security Officer Campos was struck in the left calf with a bullet fragment. He took cover in the alcove between rooms 32-124 and 32-122.

---

[9] The investigation would reveal the door leading from the stairwell to the 32nd floor was barricaded by an "L" bracket screwed into the door and the door frame.

**Exhibit A, Pg. 91**

- Security Officer Campos told his dispatcher via his radio, "Hey there's shots fired in, uh, 32-135."
- Engineer Schuck's dispatcher told him specifically where to go on the 32nd floor. Engineer Schuck left room 62-207 and walked to the service elevators with his equipment cart. The service elevators are located in the 200-wing of the hotel.

**Approximately 2207 hours,**

- Paddock fired approximately 95 rounds into the Las Vegas Village area.
- LVMPD Officers Varsin and Hendrex left the Mandalay Bay Security Office with two armed Mandalay Bay Security Officers.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Paddock fired approximately 94 rounds into the Las Vegas Village area.

**Approximately 2208 hours**

- Paddock fired the 1st round at the fuel tank. (Missed tank)
- LVMPD CAD event# 171001-3519 was generated for the shooting incident.

**Approximately 2209 hours**

- Paddock fired the 2nd round at the fuel tank. (Missed tank)
- Paddock fired the 3rd round at the fuel tank. (Missed tank)
- Paddock fired the 4th round at the fuel tank. (Missed tank)
- Paddock fired the 5th round at the fuel tank. 1st strike into the fuel tank. (Top strike)
- Paddock fired the 6th round at the fuel tank. 2nd strike into fuel tank. (Lower strike) The investigation was unable to determine when the 7th and 8th rounds were fired at the fuel tank.[10]
- Paddock fired an undetermined number of rounds into the Las Vegas Village area.

**Approximately 2210 hours**

- Engineer Schuck arrived at the Center Core of the 32nd floor and walked up the 100-wing toward room 32-135. As he walked, Engineer Schuck heard what he believed to be a jack hammer sound in the distance. Engineer Schuck quickly realized it was automatic gunfire.[11] After the gunshots stopped, Security Officer Campos yelled at Engineer Schuck to take cover.
- Engineer Schuck turned and took cover in the alcove between rooms 32-119 and 32-117. Paddock fired rounds down the hallway at Engineer Schuck. He was not struck by gunfire. Engineer Shuck attempted to open room 32-117 with his master key card however the dead bolt lock was engaged and he was unable to gain entry into the room.
- Engineer Schuck stated over his radio, "Shannon, call the police. Someone's firing a rifle on the 32nd floor down the hallway."

---

[10] There were eight .308 casings located inside of room 32-134
[11] The investigation determined at the time Engineer Schuck heard the gunfire, Paddock fired the approximately 21 rounds, referred to above, at the Las Vegas Village area.

**Approximately 2211 hours**

- LVMPD Officers Varsin and Hendrex arrived at the Center Core area of the 31st floor and began walking up the 100-wing along with armed security officers from Mandalay Bay.
- Paddock fired approximately 80-100 rounds into the Las Vegas Village area.
- Paddock fired approximately 95 rounds into the Las Vegas Village area.

**Approximately 2212 hours**

- Two armed Mandalay Bay security officers exited the guest elevator on the 32nd floor and went to the Center Core.
- Paddock fired approximately 80-90 rounds into the Las Vegas Village area.
- Paddock fired an unknown number of rounds into the Las Vegas Village area. LVMPD Officers Clarkson and Cook were struck by gunfire during this volley.
- A Mandalay Bay security officer who was with LVMPD Officers Varsin and Hendrex advised over his radio, "We can hear rapid fire above us. We are on the 31st floor. We can hear it above us."

**Approximately 2213 hours**

- Paddock fired an unknown number of rounds into the Las Vegas Village area.

**Approximately 2215 hours**

- Paddock fired two separate volleys of an unknown number of rounds into the Las Vegas Village area.

**Approximately 2216 hours**

- LVMPD Officers Varsin and Hendrex along with Mandalay Bay security officers made entry into the stairwell on the 31st floor.

**Approximately 2218 hours**

- The heat detection indicator from inside room 32-135 detected no further readings from inside of the room.

**Approximately 2241 hours**

- A Strike Team which included K9 Sergeant Bitsko, K9 Officer Newton, SWAT Officer Hancock and Detective Walford ascended the stairs from the 30th floor. The Strike Team made entry and cleared the 31st floor.

**Approximately 2256 hours**

- The Strike Team reentered the stairwell from the 31st floor and walked up to the 32nd floor.

**Approximately 2257 hours**

- K9 Sergeant Bitsko and SWAT Officer Hancock manually breached the door barricaded with the "L" bracket.

**Approximately 2320 hours**

- The Strike Team conducted an explosive breach into room 32-135 and made entry. The Strike Team reported Paddock was down from an apparent self-inflected gunshot wound to the head.

**Approximately 2326 hours**

- The Strike Team made a second explosive breach from inside of room 32-135 into room 32-134 through the connecting doors. Immediately after the explosive breach an LVMPD SWAT Officer negligently fired a three round burst from his rifle. The rounds fired from the SWAT officer's rifle struck a chair, an entertainment center/cabinet and a wall.

After the Strike Team finished rendering rooms 32-134 and 32-135 safe, the scene was secured until investigative personnel arrived and assumed control of the 32nd floor.

## III.   VICTIMS

**Deceased**

Victims 1-31 were pronounced deceased by the coroner investigator who responded to the Las Vegas Village venue and surrounding areas. The remaining victims were pronounced by the attending physician at the corresponding medical facility they were transported to. After all autopsies were performed, the Clark County Office of the Coroner Medical Examiner (CCOCME) ruled the cause and manner of death for all deceased victims to be gunshot wound(s) and homicide.

1. **Jack Reginald Beaton**
   Age 54
   Clark County Coroner's Office Case Number: 17-10060
   Clark County Coroner's Office Seal Number: 727327
   Time of Death: 10-02-2017 at 0545 hours

2. **Christopher Louis Roybal**
   Age 28
   Clark County Coroner's Office Case Number: 17-10061
   Clark County Coroner's Office Seal Number: 727302
   Time of Death: 10-02-2017 at 0545 hours

3. **Lisa Marie Patterson**
   Age 46
   Clark County Coroner's Office Case Number: 17-10062
   Clark County Coroner's Office Seal Number: 732484
   Time of Death: 10-02-2017 at 0545 hours

4. **Adrian Allan Murfitt**
   Age 35
   Clark County Coroner's Office Case Number: 17-10063
   Clark County Coroner's Office Seal Number: 737364
   Time of Death: 10-02-2017 at 0545 hours

5. **Hannah Lassette Ahlers**
   Age 34
   Clark County Coroner's Office Case Number: 17-10065
   Clark County Coroner's Office Seal Number: 732473
   Time of Death: 10-02-2017 at 0545 hours

6. **Austin William Davis**
   Age 29
   Clark County Coroner's Office Case Number: 17-10066
   Clark County Coroner's Office Seal Number: 727385
   Time of Death: 10-02-2017 at 0545 hours

7. **Stephen Richard Berger**
   Age 44
   Clark County Coroner's Office Case Number: 17-10067
   Clark County Coroner's Office Seal Number: 732488
   Time of Death: 10-02-2017 at 0545 hours

8. **Stacee Ann Etcheber**
   Age 50
   Clark County Coroner's Office Case Number: 17-10068
   Clark County Coroner's Office Seal Number: 727388
   Time of Death: 10-02-2017 at 0545 hours

9. **Christiana Duarte**
   Age 22
   Clark County Coroner's Case Number: 17-10069
   Clark County Coroner's Seal Number: 732404
   Time of Death: 10-02-2017 at 0545 hours

10. **Lisa Romero-Muniz**
    Age 48
    Clark County Coroner's Case Number: 17-10070
    Clark County Coroner's Seal Number: 732458
    Time of Death: 10-02-2017 at 0545 hours

11. **Heather Lorraine Alvarado**
    Age 35
    Clark County Coroner's Office Case Number: 17-10071
    Clark County Coroner's Office Seal Number: 732423
    Time of Death: 10-02-2017 at 0545 hours

**12. Denise Cohen**
    Age 58
    Clark County Coroner's Case Number: 17-10072
    Clark County Coroner's Office Seal Number: 732474
    Time of Death: 10-02-2017 at 0545 hours

**13. Kurt Allen Von Tillow**
    Age 55
    Clark County Coroner's Office Case Number: 17-10073
    Clark County Coroner's Office Seal Number: 732489
    Time of Death: 10-02-2017 at 0545 hours

**14. Brennan Lee Stewart**
    Age 30
    Clark County Coroner's Case Number: 17-10074
    Clark County Coroner's Seal Number: 732414
    Time of Death: 10-02-2017 at 0545 hours

**15. Derrick Dean Taylor**
    Age 56
    Clark County Coroner's Office Case Number: 17-10075
    Clark County Coroner's Office Seal Number: 732445
    Time of Death: 10-02-2017 at 0545 hours

**16. Kelsey Breanne Meadows**
    Age 28
    Clark County Coroner's Office Case Number: 17-10076
    Clark County Coroner's Office Seal Number: 732486
    Time of Death: 10-02-2017 at 0545 hours

**17. Jennifer Topaz Irvine**
    Age 42
    Clark County Coroner's Office Case Number: 17-10077
    Clark County Coroner's Office Seal Number: 727384
    Time of Death: 10-02-2017 at 0545 hours

**18. William W. Wolfe Jr.**
    Age 42
    Clark County Coroner's Office Case Number: 17-10078
    Clark County Coroner's Office Seal Number: 732415
    Time of Death: 10-02-2017 at 0545 hours

**19. Carly Anne Kreibaum**
    Age 33
    Clark County Coroner's Office Case Number: 17-10079
    Clark County Coroner's Office Seal Number: 732478
    Time of Death: 10-02-2017 at 0545 hours

20. **Laura Anne Shipp**
    Age 50
    Clark County Coroner's Office Case Number: 17-10080
    Clark County Coroner's Office Seal Number: 732451
    Time of Death: 10-02-2017 at 0545 hours

21. **Carrie Rae Barnette**
    Age 34
    Clark County Coroner's Office Case Number: 17-10085
    Clark County Coroner's Office Seal Number: 727391
    Time of Death: 10-02-2017 at 0545 hours

22. **Jordyn Nicole Rivera**
    Age 21
    Clark County Coroner's Office Case Number: 17-10101
    Clark County Coroner's Office Seal Number: 732469
    Time of Death: 10-02-2017 at 0545 hours

23. **Victor Loyd Link**
    Age 55
    Clark County Coroner's Office Case Number: 17-10102
    Clark County Coroner's Office Seal Number: 732497
    Time of Death: 10-02-2017 at 0545 hours

24. **Candice Ryan Bowers**
    Age 40
    Clark County Coroner's Office Case Number: 17-10103
    Clark County Coroner's Office Seal Number: 732417
    Time of Death: 10-02-2017 at 0545 hours

25. **Jordon Alan McIldoon**
    Age 23
    Clark County Coroner's Office Case Number: 17-10053
    Clark County Coroner's Office Seal Number: 732487
    Time of Death: 10-02-2017 at 0545 hours

26. **Keri Lynn Galvan**
    Age 31
    Clark County Coroner's Office Case Number: 17-10054
    Clark County Coroner's Office Seal Number: 732499
    Time of Death: 10-02-2017 at 0545 hours

27. **Dorene Anderson**
    Age 49
    Clark County Coroner's Office Case Number: 17-10057
    Clark County Coroner's Office Seal Number: 727313
    Time of Death: 10-02-2017 at 0545 hours

**28. Neysa C. Tonks**
    Age 46
    Clark County Coroner's Office Case Number: 17-10058
    Clark County Coroner's Office Seal Number: 727306
    Time of Death: 10-02-2017 at 0545 hours

**29. Melissa V. Ramirez**
    Age 26
    Clark County Coroner's Office Case Number: 17-10059
    Clark County Coroner's Office Seal Number: 732407
    Time of Death: 10-02-2017 at 0545 hours

**30. Brian Scott Fraser**
    Age 39
    Clark County Coroner's Office Case Number: 17-10056
    Clark County Coroner's Office Seal Number: 732408
    Time of Death: 10-02-2017 at 0545 hours

**31. Tara Ann Roe**
    Age 34
    Clark County Coroner's Office Case Number: 17-10055
    Clark County Coroner's Office Seal Number: 732441
    Time of Death: 10-02-2017 at 0545 hours

**32. Bailey Schweitzer**
    Age 20
    Clark County Coroner's Office Case Number: 17-10051
    Clark County Coroner's Office Seal Number: 732420
    Time of Death:  10-01-2017 at 2307 hours

**33. Patricia Mestas**
    Age 67
    Clark County Coroner's Office Case Number: 17-10049
    Clark County Coroner's Office Seal Number: 727390
    Time of Death: 10-01-2017 at 2250 hours

**34. Jennifer Parks**
    Age 36
    Clark County Coroner's Office Case Number: 17-10052
    Clark County Coroner's Office Seal Number: 727359
    Time of Death: 10-01-2017 at 2300 hours

**35. Angela Gomez**
    Age 20
    Clark County Coroner's Office Case Number: 17-10050
    Clark County Coroner's Office Seal Number: 732413
    Time of Death: 10-01-2017 at 2253 hours

**36. Denise Burditus**
    Age 50
    Clark County Coroner's Office Case Number: 17-10082
    Clark County Coroner's Office Seal Number: 731590
    Time of Death: 10-02-2017 at 0047 hours

**37. Cameron Robinson**
    Age 28
    Clark County Coroner's Office Case Number: 17-10083
    Clark County Coroner's Office Seal Number: 732437
    Time of Death: 10-01-2017 at 2301 hours

**38. James Melton**
    Age 29
    Clark County Coroner's Office Case Number: 17-10084
    Clark County Coroner's Office Seal Number: 727311
    Time of Death: 10-01-2017 at 2320 hours

**39. Quinton Robbins**
    Age 20
    Clark County Coroner's Office Case Number: 17-10046
    Clark County Coroner's Office Seal Number: 731535
    Time of Death: 10-01-2017 at 2315 hours

**40. Charleston Hartfield**
    Age 34
    Clark County Coroner's Office Case Number: 17-10086
    Clark County Coroner's Office Seal Number: 727353
    Time of Death: 10-01-2017 at 2230 hours

**41. Erick Silva**
    Age 21
    Clark County Coroner's Office Case Number: 17-10087
    Clark County Coroner's Office Seal Number: 725563
    Time of Death: 10-01-2017 at 2230 hours

**42. Teresa Nicol Kimura**
    Age 38
    Clark County Coroner's Office Case Number: 17-10088
    Clark County Coroner's Office Seal Number: 725567
    Time of Death: 10-01-2017 at 2230 hours

**43. Susan Smith**
    Age 53
    Clark County Coroner's Office Case Number: 17-10089
    Clark County Coroner's Office Seal Number: 725552
    Time of Death: 10-01-2017 at 2230 hours

**44.** **Dana Leann Gardner**
   Age 52
   Clark County Coroner's Office Case Number: 17-10090
   Clark County Coroner's Office Seal Number: 725569
   Time of Death: 10-01-2017 at 2250 hours

**45.** **Thomas Day Jr.**
   Age 54
   Clark County Coroner's Office Case Number: 17-10091
   Clark County Coroner's Office Seal Number: 725591
   Time of Death: 10-01-2017 at 2341 hours

**46.** **John Joseph Phippen**
   Age 56
   Clark County Coroner's Office Case Number: 17-10092
   Clark County Coroner's Office Seal Number: 725568
   Time of Death: 10-02-2017 at 0244 hours

**47.** **Rachel Kathleen Parker**
   Age 33
   Clark County Coroner's Office Case Number: 17-10093
   Clark County Coroner's Office Seal Number: 725561
   Time of Death: 10-01-2017 at 2230 hours

**48.** **Sandra Casey**
   Age 34
   Clark County Coroner's Office Case Number: 17-10094
   Clark County Coroner's Office Seal Number: 725550
   Time of Death: 10-01-2017 at 2230 hours

**49.** **Jessica Klymchuk**
   Age 34
   Clark County Coroner's Office Case Number: 17-10095
   Clark County Coroner's Office Seal Number: 727322
   Time of Death: 10-01-2017 at 2230

**50.** **Andrea Lee Anna Castilla**
   Age 28
   Clark County Coroner's Office Case Number: 17-10096
   Clark County Coroner's Office Seal Number: 727381
   Time of Death: 10-01-2017 at 2301 hours

**51.** **Carolyn Lee Parsons**
   Age 31
   Clark County Coroner's Office Case Number: 17-10097
   Clark County Coroner's Office Seal Number: 727382
   Time of Death: 10-01-2017 at 2300 hours

**52. Michelle Vo**
    Age 32
    Clark County Coroner's Office Case Number: 17-10098
    Clark County Coroner's Office Seal Number: 727355
    Time of Death: 10-01-2017 at 2244 hours

**53. Rocio Guillen**
    Age 40
    Clark County Coroner's Office Case Number: 17-10099
    Clark County Coroner's Office Seal Number: 732409
    Time of Death: 10-01-2017 at 2318 hours

**54. Christopher Hazencomb**
    Age 44
    Clark County Coroner's Office Case Number: 17-10105
    Clark County Coroner's Office Seal Number: 732444
    Time of Death: 10-02-2017 at 1044 hours

**55. Brett Schwanbeck**
    Age 61
    Clark County Coroner's Office Case Number: 17-10081
    Clark County Coroner's Office Seal Number: 732471
    Time of Death: 10-03-2017 at 1328 hours

**56. Rhonda M. LeRocque**
    Age 42
    Clark County Coroner's Office Case Number: 17-10045
    Clark County Coroner's Office Seal Number: 542385
    Time of Death: 10-02-2017 at 0023 hours

**57. Austin Cooper Meyer**
    Age 24
    Clark County Coroner's Office Case Number: 17-10047
    Clark County Coroner's Office Seal Number: 540045
    Time of Death: 10-01-2017 at 2257 hours

**58. Calla-Marie Medig**
    Age 28
    Clark County Coroner's Office Case Number: 17-10048
    Clark County Coroner's Office Seal Number: 539069
    Time of Death: 10-01-2017 at 2246 hours

**Living Victims**

Documenting the living victims in this case has been a work in progress since October 1st. Source material poured into the LVMPD's Force Investigation Team (FIT) office post October 1st and is still being received.[12]

LVMPD recognizes that the approximate 22,000 people who attended the Route 91 festival are all victims. That number does not take into consideration the hundreds and possibly thousands that were walking along the Las Vegas Strip at the time of the shooting outside the Las Vegas Village venue. The goal of the FIT team was to document those who actually sustained any type of physical injury, no matter the degree. As previously stated in the introduction to this report, this information is vital in order to grant assistance, properly categorize the level of crime and most importantly, honor those who fell prey to this horrific act of violence.

## IV.   SUSPECT

An extensive joint investigation involving the LVMPD and the Federal Bureau of Investigation (FBI) began immediately after the incident into the life of Paddock. Every facet of Paddock's life was explored.

At the time of the incident Paddock was 64 years old. He owned residences in Mesquite and Reno, Nevada and lived with his girlfriend Marilou Danley. Danley was in the Philippines at the time of the incident. She left the country on September 14, 2017, and returned on October 3, 2017. Upon arriving in the United States, Danley was interviewed by investigators several times. Interviews were also conducted with other relatives and acquaintances reference Paddock's background.

Danley stated Paddock's demeanor changed over the course of the last year. According to her, Paddock had become "distant" and their relationship was no longer intimate. Paddock was described as "germaphobic" and had strong reactions to smells. Over the course of the last year Paddock began to buy firearms and Danley believed it was a hobby of his.

During a stay at the Mandalay Bay in the beginning of September 2017, Danley recalled Paddock behaving strangely. The two were staying in room 60-235 and she observed Paddock constantly looking out the windows of the room which overlooked the Las Vegas Village venue. Paddock would move from window to window looking at the site from different angles.

Paddock's ex-wife, Peggy Reiko Paddock, described Paddock as intelligent and great with numbers. She further stated he worked as an Internal Revenue Service Agent. Paddock later worked as an auditor for Lockheed Martin and Boeing. According to her, Paddock began purchasing real estate properties with his mother and renovating them. Paddock bought and sold numerous properties throughout the years and, as far as she knew, sold the last property in 2010.

---

[12] Source material consisted of information from local area hospitals, notes taken by Crime Scene Analysts who responded to local area hospitals to document the injured, voluntary statements from actual victims and witnesses, and lastly, incident crime reports filed by hundreds of victims who sustained injury but waited to travel home to receive medical care. Also included was a separate listing of victims provided by the FBI.

Paddock made numerous claims to friends and family that he consistently felt ill, in pain or fatigued.  An interview was conducted with a physician in Las Vegas who identified himself as Paddock's primary care physician since 2009.  He last saw Paddock as a patient on or around October 2016 for an annual checkup.  He recalled the only major ailment Paddock had was a slip and fall accident at a casino approximately 3 years earlier, which caused a muscle tear.

The physician described Paddock as "odd" in behavior with "little emotion" shown. He believed Paddock may have had bipolar disorder however, Paddock did not want to discuss that topic further with him. Paddock also refused anti-depressant medication but accepted prescriptions for anxiety. He noted Paddock seemed fearful of medications, often refusing to take them. He did not believe Paddock was abusing any medications.

Most of the people interviewed acknowledged Paddock's gambling habits. Paddock was known to gamble tens of thousands of dollars at a time and played at numerous casinos. Paddock was often given complimentary rooms and meals at the casinos he frequented due to the amount of money he gambled.

From 1982 through September of 2016, Paddock purchased approximately 29 firearms. These purchases consisted of handguns, shotguns and one rifle. From October 2016 through September 2017, Paddock purchased over 55 firearms along with firearm related accessories. Most of the firearms were rifles of various calibers. With the exception of the revolver, every firearm recovered in the Mandalay Bay was bought after September 2016.

During the course of the investigation it was learned Paddock had very limited contact with law enforcement. Paddock was stopped by police on occasion for traffic related offenses receiving only traffic citations. No arrest history was found for Paddock.

## V.   WITNESS INTERVIEWS

The following information was taken from witness statements and compiled into a chronological description of the events.

On 10-01-2017, LVMPD had 51 personnel assigned to work special events overtime for the Route 91 Festival. The personnel staffing consisted of one lieutenant, five sergeants, forty-four officers and one civilian. The event had officers staffed from 1300-0100 hours with officers arriving and securing at various times.

The specific assignments for the event were West Traffic (1 sergeant, 10 officers), East Traffic (1 sergeant, 10 officers), Interior Entry / Gates (1 sergeant, 6 officers), Interior Early Squad (1 sergeant, 8 officers), Interior Late Squad (1 sergeant, 8 officers), Event Coordinator (1 officer) and Command Post (1 officer, 1 civilian). The assignments were supervised by Lieutenant Spencer who was designated as the Incident Commander for the festival.[13]

---

[13] Specific officers and assigned locations can be found on the Assignment List, ICS Form 204 for the event.

At approximately 2118 hours, Mandalay Bay Security Officer Campos was working his normal duties when he was notified of several HotSOS calls in the 100 Wing tower that he was assigned to monitor. The standard operating procedure for the Mandalay Bay security staff once an alarm is received is to call the room and attempt to contact the guest. If there is no answer, a security officer will be sent to check the door. These HotSOS calls are common and occur numerous times throughout the day. The security dispatcher will typically close the alarm out once a security officer is assigned. Security Dispatcher Brett Buck notified Security Officer Campos to check several HotSOS calls. Room 32-129 was last on his list to check.

Security Officer Campos was on the 30th floor and en-route to room 32-129 via the stairwell located at the north end of the 100 wing. Security Officer Campos attempted to enter the hallway of the 32nd floor through the small foyer and discovered the door was locked. The doors are always open due the stairwell being a fire escape and county codes require they remain unlocked at all times. The door has a handle but no locking mechanism.

Security Officer Campos stated he walked down the stairwell to the 31st floor, entered the hallway and walked to the Center Core. He used the guest elevator to go to the 32nd floor. Video surveillance showed Security Officer Campos actually went to the 33rd floor, then took a guest elevator down to the 32nd floor.

Security Officer Campos proceeded directly to the end of the 100 wing hallway, opened the inner door of the foyer entrance to the stairwell and observed the "L" bracket screwed into the door frame and door that opens into the stairwell. He realized this is what kept the door secured. Security Officer Campos utilized the house phone mounted inside the foyer to notify the security dispatcher of the bracket. The security dispatcher passed the call to the engineering section.

Security Officer Campos hung up the phone, heard what he described as a loud rapid drilling sound coming from room 32-135. He recalled the drilling sounded like it was coming from deep inside the room.

While walking toward the Center Core, Security Officer Campos heard gunfire coming from room 32-135 and ran down the hallway. Security Officer Campos realized he was shot in his left calf as he took cover in the alcove of rooms 32-122 and 32-124. Using both his radio and cell phone, Security Officer Campos advised the security dispatcher he had been shot in the leg with a BB / Pellet gun and was injured. He stayed in this position on the phone with the dispatcher while waiting for help. Security Officer Campos heard more gunshots coming from inside 32-135, but no rounds were coming down the hallway.

As country music singer Jason Aldean performed on stage, LVMPD officers working the interior of the event heard what they described as fireworks going off. Officer Hutchason and Special Events Coordinator Rodriquez, who were in the Command Post with security personnel, used the video monitors to look for the source of the noise. Upon recognizing the source of the noise to be gunfire, Coordinator Rodriguez directed all officers to change their radios to the CCAC radio channel. Coordinator Rodriguez monitored both the Events radio channel and CCAC radio channel throughout the incident.

LVMPD officers inside the Las Vegas Village recognized the sounds were coming from the southwest. Part of the crowd started to move towards the exits. Shortly after hearing the initial gunfire, LVMPD officers heard the first long burst of what they described as automatic gunfire. Once officers recognized the sound to be gunfire, they immediately searched for the gunman.

Security personnel along with LVMPD officers were in the security office of Mandalay Bay with two females being detained for trespass. They became aware via the radio of an active shooter call. Security Manager Oelke headed towards the Luxor side of the property when another call came over the radio that a security officer[14] had been shot with a pellet gun in the tower of the Mandalay Bay.

Security Manager Oelke ran to the Center Core guest elevators of the Mandalay Bay and met with Security Managers Sottile, Umstott and LVMPD Officers Hendrex and Varsin. As they arrived at the elevators, Engineering Supervisor Shannon Alsbury was holding the elevator door open. Engineer Alsbury was using a key to lock out the elevator and keep it from being stopped by guests trying to get on. There was conflicting information on the exact location of the shooter(s) whether it was on the 31st, 32nd, or the 33rd floors. While on the elevator they decided to check all three floors.

As the door opened on the 31st floor, Security Managers Oelke and Umstott and LVMPD Officers Hendrex and Varsin exited and walked up the 100 wing upon hearing gunshots coming from an unknown direction. Security Manager Sottile and Engineer Alsbury continued to the 32nd floor on the elevator.

At the Las Vegas Village, LMVPD officers observed the crowd move away from the southwest portion of the venue. They believed an active shooter was in that area. As officers moved toward the stage they heard several more bursts of gunfire. Officers directed citizens to get on the ground as they looked for a gunman. As officers moved through the crowd, they observed several citizens wounded and deceased. Officer Polion advised LVMPD Dispatch of shots fired and multiple casualties. The radio traffic was accidently broadcast on SEAC radio channel.

Officers assigned to the venue near Reno Avenue and Las Vegas Boulevard began to move south along the Boulevard. They believed the gunfire was coming from the south end of Las Vegas Village. As they moved southbound, officers directed civilians away from the area. The officers received direct gunfire and took cover behind a wall as bullets impacted around them. Between bursts of gunfire, officers continued to assist evacuating civilians and administering first aid to the wounded.

Officers assigned to the venue near Mandalay Bay Drive and Las Vegas Boulevard heard the initial gunshots followed by a long burst of gunfire. Detective Balonek, who was on Mandalay Bay Drive east of Las Vegas Boulevard, believed the gunfire was coming from inside the Las Vegas Village, or from an elevated position. He retrieved his binoculars from his vehicle and scanned the north facing tower of Mandalay Bay. Approximately three-quarters of the way up the tower on the north end, Detective Balonek observed a silhouette of a male standing in a shooting position several feet back from a window. Detective Balonek could see the smoke from the male shooting, however, no muzzle flashes were observed. Detective Balonek could not get

---

[14] Security Officer Campos

on the radio so he switched to the Northeast Area Command channel and broadcasted the shooters location.

At the same time inside Mandalay Bay, Engineer Schuck was in room 62-207 working on a leak when he was directed by his radio dispatcher and supervisor to respond to the 32nd floor stairwell in the 100 wing to remove the "L" bracket that Security Officer Campos had called and reported. Engineer Schuck utilized the 200 wing service elevator to go down to the 32nd floor. He gathered his drill and other small tools needed to remove the bracket and walked through the Center Core from the 200 wing to the 100 wing. Engineer Schuck walked approximately one third of the way up the hallway when he observed Security Officer Campos poke his head into the hallway from a space between two rooms on Engineer Schuck's right hand side.

Engineer Schuck heard the sound of rapid gunfire coming from the end of the hallway. Security Officer Campos looked out from his position and yelled for Engineer Schuck to take cover. Engineer Schuck immediately took a step to his left into the alcove between two rooms. Gunfire erupted down the hallway towards his direction. Engineer Schuck felt the concussion of the rounds pass by where he was taking cover. An unknown object struck him in his back without causing serious injuries other than a small bruise. Engineer Schuck also stated he could see blood coming from Security Officer Campos' calf area.

Below on the 31st floor, LVMPD Officers Varsin and Hendrex along with Security Managers Oelke and Umstott walked up the 100 wing when they heard gunfire coming from the 32nd floor. They moved to the stairwell at the end of the hall. As they got closer to the stairwell, the gunfire continued and they smelled gunpowder. They entered the 100 wing stairwell and proceeded up to the door of the 32nd floor. They posted up to block any possible escape by the shooter.

Detective Clarkson, assigned to the event in uniform, was on Las Vegas Boulevard north of Mandalay Bay Drive when he heard the initial shots and radio traffic advising of multiple casualties inside of the Las Vegas Village. Detective Clarkson and other officers took cover and began searching for the shooter believing the shots were coming from the west. As patrol cars and a prisoner transport van arrived at the intersection, Detective Clarkson and other officers moved towards the vehicles for cover with the intention to move to Mandalay Bay.

CCAC patrol officers responded to the scene to assist. Officers Cook and Haynes arrived near Las Vegas Boulevard and Mandalay Bay Drive and parked their patrol vehicle. Officers Cook and Haynes moved towards the group that Detective Clarkson was with.

As the officers moved behind the patrol vehicles, they started receiving direct gunfire which impacted the ground and patrol vehicles around them. Detective Clarkson received a gunshot wound to the neck while taking cover behind a patrol vehicle. Officer Cook was struck by a bullet in his right bicep that continued into his chest.

While behind the vehicles, the officers realized the gunfire was coming from an elevated position and was directed at the patrol vehicles. During breaks in the gunfire, officers moved in teams of two from the patrol vehicle to a block wall for better cover. Detective Clarkson and Officer Cook were both transported to the hospitals by separate LVMPD vehicles.

As the gunfire continued, officers inside the event moved through the Las Vegas Village and provided direction for people trying to exit. This included the actions of Officer Hartfield who was attending the concert in an off-duty capacity and was mortally wounded while taking police action. Officers located wounded persons and began first aid measures and coordinated medical efforts with off-duty medical personnel who were attending the concert.

Officers also directed people to the exits and towards positions of cover and concealment. Exterior officers on the east side of the Las Vegas Village were swarmed by people as they fled the gunfire. Officers directed them to continue east and north as they recognized the gunfire was coming from Mandalay Bay. As officers began to encounter wounded civilians, casualty collection points were set up and first aid was rendered. Officers assisted in getting the wounded to hospitals via ambulances, private vehicles and patrol cars.

Exterior officers on the west side of the Las Vegas Village along Las Vegas Boulevard encountered people as they fled the venue. Officers knew the gunfire was coming from Mandalay Bay and directed people to stay behind cover and move to the north, away from gunfire. Officers encountered several wounded people and provided first aid until they could be taken to medical personnel. As officers moved south they formed Strike Teams and moved towards Mandalay Bay.

Sergeants Richmond, Riddle, and Van Nest each formed Strike Teams from overtime officers and patrol officers responding to the venue. The Strike Teams moved west across Las Vegas Boulevard and into the parking lot of the Luxor Hotel, then south onto the Mandalay Bay property. Upon entering Mandalay Bay, Strike Teams coordinated efforts with other LVMPD officers and security personnel already inside the casino.

As Strike Teams entered the hotel through the main valet, they met hotel security and were directed to the Center Core guest elevators. Each group was given information the shooter was possibly on the 29th or 31st floors and taken there by elevator. After each group of officers were taken to the upper floors, they instructed the hotel security guards to lock out the elevators. A Strike Team, which included two SWAT officers, was taken to the Foundation Room located on the top floor. Once inside the bar, officers began to move occupants to a safe location and clear the bar.

On the 32nd floor, Security Officer Campos and Engineer Schuck were still pinned down in the hallway. Engineer Schuck heard another round of rapid gunfire and believed it was being fired towards the outside of the building. During a small break in the gunfire, Engineer Schuck and Security Officer Campos ran from their position back towards the Center Core. Engineer Schuck was checked for injuries by Engineer Alsbury who arrived on the 32nd floor with armed Mandalay Bay Security Officers. Engineer Schuck stated the gunfire continued for several more long rapid fire volleys with short breaks between volleys. He described the breaks in fire lasting only 5-6 seconds before the gunfire would continue.

As LVMPD officers arrived on the 32nd Floor, they proceeded up the 300 wing, officers made entry into rooms and searched for occupants. Engineer Schuck redirected the officers to the 100 wing where the shooting had been coming from. The sound of gunfire had ceased so the officers conducted slow and methodical evacuations as they moved up the hallway.

After hearing the update of the shooters location, SWAT Officer O'Donnell and two patrol officers left the group clearing the Foundation Room and responded to the 32nd floor. Upon exiting the elevator, they encountered several officers already on the floor. The officers were moving up the hallway towards the suspect's room.

Engineer Shuck locked out the elevators to keep guests from ascending the tower.

Police personnel on the 32nd floor included a sergeant, SWAT officer, and patrol officers from the Las Vegas Village and responding officers from various area commands. As occupants were evacuated from their rooms, they were moved to the elevator bank and down the tower. Officers discovered a small infant alone in one of the rooms. As evacuations continued, the nanny for the infant was located in a room across the hall and reunited with the child. The officers stopped evacuations approximately two thirds of the way up the hall.

At the Las Vegas Village, people who were hiding in multiple locations were evacuated. Officers located several people hiding underneath the concert stage and inside tour buses located next to the stage. Additional teams of officers arrived and swept the remaining areas of the Las Vegas Village. Once evacuations were completed, the scene was secured around the Las Vegas Village.

SWAT Officer Hancock, along with K9 Sergeant Bitsko and K9 Officer Newton went to the 31st floor and came up the stairs to the 32nd floor. At the door, they met with LVMPD Officers Hendrex and Varsin and Mandalay Bay security personnel. Officer Hancock attempted to open the first of two doors to enter the hallway but could not due to the "L" bracket described earlier.

After the Strike Team arrived in the stairwell, SWAT Officer Hancock and K9 Sergeant Bitsko manually breached the inner door leading to the foyer of the 32nd floor. From the foyer, the door was cracked open enough to see the doors to rooms 32-135 and 32-134. Both doors were closed and a room service cart was located in front of room 32-134. A white table cloth was draped over the service cart with various items on top of the table cloth. Officers observed wires leading from the service cart to room 32-134 and believed the suspect may have set some type of improvised explosive device.

A decision was made to enter room 32-135 utilizing an explosive breach. Officers in the stairwell notified the officers in the hallway that an explosive breach would be utilized. Over the radio they became aware of the extent of injuries inside the Las Vegas Village. No gunfire had been heard from the suspect's room for approximately 40 minutes. It was decided entry was necessary to the room to determine if the suspect was still inside and to stop any further shooting from the room. SWAT Lieutenant Huddler was advised by SWAT Officer Hancock that the door to room 32-135 was going to be breached using explosives. K9 Officer Newton stepped into the hallway and utilized a ballistic shield to provide cover for SWAT Officer Hancock as he set the breach on the door while K9 Sergeant Bitsko covered the door to 32-134. K9 Sergeant Bitsko observed a camera on the food cart in the hallway. He covered the camera, and turned it away from the doorway while Officer Hancock hung the explosive on the door to room 32-135. Once the charge was hung on the door, the officers returned to the stairwell.

The approval for the breach was given by SWAT Lieutenant Huddler. The officers were notified over the radio, the door to room 32-135 was going to be breached and to take cover. K9 Sergeant Bitsko utilized the ballistic shield to keep the door from the foyer to the hallway open in case the explosion damaged it. SWAT Officer Hancock observed approximately 12 officers now in the stairwell behind him. He designated those that would be making entry into the suspect's room and others would be the downed officer rescue unit if needed.

The entry team consisted of K9 Sergeant Bitsko, K9 Officer Newton, SWAT Officer Hancock, Officers Donaldson, Trzpis and Walford. Officers Burns and Thiele were assigned to post at the door upon the team's entry to guard the hallway. The explosive breach was made into room 32-135 and broadcasted over the radio. The officers opened the stairwell door enough to see the doorway to 32-135 and observed the breach was successful and the door was open into the room. Inside the room, they observed a rifle with a scope and bipod on the floor just inside the door. The officers waited for approximately 30 seconds before leaving the stairwell to see if there was any reaction from Paddock.

Moving slowly and methodically, K9 Officer Newton entered first into the hallway with the shield followed by the officers from stairwell. SWAT Officer O'Donnell and Officer Magsaysay joined the Strike Team as they entered Paddock's room.

From behind the shield, the Strike Team made entry into room 32-135. The team split into 2 teams as they entered. Team 1 went left into a bedroom and cleared it. Team 2 went to the right and yelled Paddock was down. After clearing the bedroom, Team 1 held at the doorway into the main living area of the room.

Team 2 encountered Paddock lying on the floor on his back. A small frame revolver was observed on the ground above Paddock's head. Apparent blood was located on the revolver and a pool of blood had formed around Paddocks head. The officers believed Paddock had a self-inflicted gunshot wound. The large window at Paddock's feet was broken out and the curtain was blowing into the room. On the floor next to the Paddock's feet was a small sledge hammer and Paddock was laying on top of a rifle. The officers also observed several more rifles, spent ammunition throughout the living area, and several loaded magazines.

Team 2 continued through the living area to the right and encountered a closed, locked connecting door leading to the adjoining room 32-134. Team 1 moved through the living space up to Team 2 near the closed connector door. SWAT Officer Hancock and Officer Walford attempted to kick the door open but determined it was a solid wood door inside a metal frame. It was decided a second explosive breach was needed to gain entry into the adjoining room.

SWAT Officer Hancock breached the door. Immediately following the explosive breach, SWAT Officer O'Donnell, had one negligent discharge of a three round burst from his rifle. Officers in the hallway heard the shots fired and broadcasted shots had been fired inside the room. Officers flooded into room 32-134 through the breached adjoining connector door.

As room 32-134 was cleared, several rifles were found inside the room. A small hallway separated the main area of the room from the bathroom and main door. Another food service cart draped in a white table cloth was in this hallway. On the cart was a laptop computer which

was on and the monitor showed a live feed of the hallway where the officers had come from. Inside the room, one of the large windows was also broken out.

A complete recheck of the rooms was made to ensure a person was not hiding under any furniture. Several suitcases were observed throughout the rooms. Many of the suitcases contained several loaded magazines. Officers also observed a camera attached to the peephole on the main door of room 32-135. Once the recheck was completed, the SWAT and K9 officers left the room due to reports of other shootings at other locations.

Sergeant Matchko was in the hallway and entered the rooms once they were cleared. Along with officers still in the room, Sergeant Matchko secured the crime scene. Sergeant Matchko was contacted by the command post and advised to attempt to locate any information reference Paddock. Sergeant Matchko directed officers to look throughout the room in an attempt to locate any cell phones or identification for Paddock. Identification and cellular phones were located, as well as several room keys and player cards with Paddock and Danley's name on it. Pictures of the items were taken and sent to the command post as ordered. The officers also rolled Paddock onto his side to check for identification but found none. After the search for identification was completed, the officers exited and secured the room.

As officers cleared the Las Vegas Village, multiple reports of active shooters along Las Vegas Boulevard at various hotel properties were broadcasted. Several officers from the exterior Las Vegas Village posts joined Strike Teams and left to address those reports. As the active shooter reports were cleared and determined to be unfounded, officers assigned to the Las Vegas Village responded back to the command post for reassignment.

Officers assigned to the Las Vegas Village remained on post until they were relieved the next morning. Officers maintained the security of the Las Vegas Village and the 32nd floor of the Mandalay Bay crime scene as detectives and Crime Scene Analysts responded and began the investigation.

## VI.   SCENE DESCRIPTIONS

### Route 91 Venue

Responsibility for documenting the venue scene was transferred from the LVMPD Homicide Section to the FBI Evidence Recovery Team on October 2, 2017 at approximately 1445 hours. The following scene description of the Las Vegas Village venue was authored by the LVMPD Homicide Section.

The Route 91 Harvest Festival was an open air music event held at the Las Vegas Village. The festival was dimly lit with street lights, variable stage lighting and lights from temporary light stands on the perimeter. There was a chain link fence, with dark netting surrounding the entire venue. On the west perimeter of the venue there was a decorative concrete block wall between Las Vegas Boulevard South and the chain link fencing. This wall ran nearly the entire length of the west side of the venue, from East Mandalay Bay Road to East Reno Avenue.

The surface of the venue consisted of black asphalt, with defined seating areas covered with artificial grass on both the northwest and south ends of the venue and vendors throughout. The northwest artificial grass area was used for lawn chair seating. The large artificial grass areas on the southern end was surrounded by seating, food vendors and portable bathrooms. A large seating area with elevated bleachers and a covered VIP area was oriented near the southwest corner of the venue. Four (4) pedestrian gates ran along the west side of the venue.

The Coca-Cola suites, additional seating areas, vendors, the medical tent and three (3) pedestrian gates were located on the east side of the venue. The event's Command Post (CP), a television broadcast tent and one (1) pedestrian gate were oriented on the north end of the venue.

The main stage was oriented on the south side of the venue. The main stage was covered by green roofing and the sides were covered with black mesh. The main stage viewing area was located in the southern portion of the venue, north of the main stage and was divided into two (2) seating areas by metal pedestrian fencing. The fencing ran from a production tent, located in the center of the viewing area, and eventually encompassed the main stage. In addition to the fencing separating the east and west side grass areas, the production tent and vendors, helped to define the two (2) areas. Production vehicles, concert buses, and trailers were oriented south of the main stage.

**Location and Description of the Bodies**

A total of thirty one (31) bodies were located, documented, and eventually recovered from the inside of the venue and on the exterior perimeter. Clark County Coroner Investigators responded and assisted the LVMPD Homicide Detectives and Crime Scene Analysts conduct the preliminary death investigations.  Each victim was given an individual Clark County Coroner's Case and Seal Number. The time of death was determined to be 0545 hours for those recovered from the venue and exterior perimeter. Davis Funeral Home responded and transported the deceased to the CCOCME for a complete examination.



1.  Jack Reginald Beaton
2.  Christopher Louis Roybal
3.  Lisa Marie Patterson
4.  Adrian Allan Murfitt
5.  Hannah Lassette Ahlers
6.  Austin William Davis
7.  Stephen Richard Berger
8.  Stacee Ann Etcheber
9.  Christiana Duarte
10. Lisa Romero-Muniz
11. Heather Lorraine Alvarado
12. Denise Cohen
13. Kurt Allen Von Tillow
14. Brennan Lee Stewart
15. Derrick Dean Taylor
16. Kelsey Breanne Meadows
17. Jennifer Topaz Irvine
18. William W. Wolfe Jr.
19. Carly Anne Kreibaum
20. Laura Anne Shipp

Four (4) bodies were located and recovered near the medical tent in the northeast portion of the venue.

21. Carrie Rae Barnette
22. Jordyn Nicole Rivera
23. Victor Loyd Link
24. Candice Ryan Bowers

Seven additional victims were located and recovered from the exterior perimeter. Their body positions and locations suggested they had been placed at these locations. The descriptions of their injuries were obtained from the Clark County Coroner Investigator and the photographs taken by an LVMPD Crime Scene Analyst.



25. Jordon Alan McIldoon
26. Keri Lynn Galvan
27. Dorene Anderson
28. Neysa C. Tonks
29. Melissa V. Ramirez
30. Brian Scott Fraser
31. Tara Ann Roe

The remaining victims were transported to various hospitals throughout the greater Las Vegas valley and pronounced deceased at their respective locations. Clark County Coroner Investigators responded and assisted the LVMPD Crime Scene Analyst with documentation of the decedents' injuries.  Each victim was given an individual Clark County Coroner's Case and Seal Number. The time of death was determined by the treating physicians. Davis and Hites Funeral Home Services transported all victims from the hospital to the CCOCME for a complete examination. The descriptions of their injuries were obtained from photographs taken by LVMPD Crime Scene Analyst.

**DESERT SPRINGS HOSPITAL**

32. Bailey Schweitzer
33. Patricia Mestas
34. Jennifer Parks
35. Angela Gomez

**SPRING VALLEY HOSPITAL**

36. Denise Burditus
37. Cameron Robinson
38. James Melton

**VALLEY HOSPITAL**

39. Quinton Robbins

**SUNRISE HOSPITAL**

40. Charleston Hartfield
41. Erick Silva
42. Teresa Nicol Kimura
43. Susan Smith
44. Dana Leann Gardner
45. Thomas Day Jr.
46. John Joseph Phippen
47. Rachel Kathleen Parker
48. Sandra Casey
49. Jessica Klymchuk
50. Andrea Lee Anna Castilla
51. Carolyn Lee Parsons
52. Michelle Vo
53. Rocio Guillen
54. Christopher Hazencomb
55. Brett Schwanbeck

**UMC HOSPITAL**

56. Rhonda M. LeRocque
57. Austin Cooper Meyer
58. Calla-Marie Medig

**Mandalay Bay 32nd Floor**

1. **Master Bedroom**
2. **Sitting Area**
3. **Bar / Kitchenette**
4. **Living Room**
5. **Connecting Doors**
6. **Stairwell Foyer**



**Scene**

The scene was located in the 100-wing of the 32nd floor of the Mandalay Bay. The 100-wing consisted of a north-south oriented hallway with even numbered rooms on the east side and odd numbered rooms on the west side. The rooms ranged in number from 32-101 to 32-135. Room 32-135 was at the far north end of the 100-wing with south facing double entry doors. Room 32-134 was at the north end of the 100-wing and was a connecting room to 32-135. Room 32-134 was east of the entry to 32-135, with a single entry door that faced west. A door leading to a foyer room which led to the stairs was at the north end of the hallway, west of the entry to 32-135, with a single entry door that faced east.

**100-Wing Hallway**

The hallway consisted of alcoves containing access to four rooms, two rooms on the east side of the hallway and two rooms on the west side of the hallway, with a segment of the hallway between each alcove. Each alcove had a ceiling mounted light with two light shades, an exterior blue shade and an interior white shade, as well as a light sconce on the walls between the doors.

Decorative molding was mounted to the walls the entire length of the hallway. There were numerous bullet fragments throughout the hallway floor, from the north side of the alcove of rooms 32-101 through 32-104 to the alcove of 32-133 through 32-135.

A room service cart containing numerous plates, food items, and silverware was on the east side of the hallway, in front of room 32-134. A black "Logitech" camera with connected wires was on top of the cart, at the south end. The camera was positioned in a south direction (down the hallway) and taped to a plate.  A white camera with connected wires was attached to the lower portion of the cart, at the north end.  The camera was positioned in a south direction (down the hallway). Wires from both of the above described cameras went under the door and into room 32-134.

**Room 32-135**

Room 32-135 was a hotel suite located at the far north end of the hallway with south facing double entry doors. The east door had two bullet holes above the door handle. The bullets traveled north to south, entering the interior side of the door and exiting the exterior (hallway). A camera was taped to the interior side of the east door inserted into the peephole. A hole was partially drilled into the bottom of the south wall, east of the entry doors. The west door was damaged (occurred during the explosive breach) and unattached to the door frame. The door was lying on the floor inside of the suite. There were bullet holes in the west door, with the bullets traveling north to south, entering the interior side and exiting the exterior (hallway).

The suite consisted of a south foyer room, a west bedroom (master bedroom) with attached bathroom, and a north sitting area, a central bar/kitchenette, and a second bathroom east of the central bar/kitchenette.  A southeast living room which contained a couch, chairs, an entertainment center/cabinet and a wall mounted TV. A connecting door which led to room 32-134 was located southeast of the living room on the south wall. The entire north end of the suite consisted of floor to ceiling windows.

**Foyer Inside Room 32-135**

The foyer had a table along the west wall. There was a white "Babysense" camera pointed in the direction of the front entry doors at the south end of the table, and a black mini refrigerator at the north end with a white styrofoam cooler on top. There were casings scattered on the floor of the foyer, and on the table along the west wall. A black rifle with the muzzle pointed south, was at the northeast portion of the foyer on the floor.

An east-west hallway extended from the east side of the foyer. A black rifle on a bipod with the muzzle pointed west, and a drill bit partially covered by a white towel were at the west end of the hallway on the floor.

**West Bedroom (Master Bedroom)**

The bedroom was located west of the sitting area. There were east facing double entry doors located northwest of the foyer in the west wall of the sitting area. The room had a desk with a chair along the north wall, just inside the entry doors. There were tools on the desk and the chair. A trashcan was on the floor east of the desk that had numerous empty ammunition boxes inside. There was also a white bag on the floor that had empty ammunition boxes inside as well as a broken Dell laptop computer. Two boxes containing empty ammunition boxes were on the floor behind the entry doors.

A pillar was west of the desk. An empty red gym bag and an "Anran" home security system box were on the floor west of the pillar. A chaise lounge was along the south wall with an open suitcase containing clothing inside and a drill on top. There were chargers plugged into the south wall, west of the chaise lounge.

The bed was along the south wall with nightstands on either side. The following items were located on the bed: a Dell laptop computer, a passport in the name of "Stephen Paddock", four Home Depot gift cards, a checkbook, and a cash out voucher for the Palms Casino dated 8/28/17. There were three suitcases west of the bed: two of which were empty and one had clothing inside. A television was on a dresser to the north of the bed. There were drill bits and tools on the top of the dresser. Eight empty rifle magazines were on the floor below the west end of the dresser. An open suitcase with a tool box inside was east of the dresser. A closet was in the wall east of the bed with a single shirt and a white bathrobe hanging inside.

The attached southeast bathroom had a tub along the north wall with two glass vacuum suction holders on top of the tub ledge, a sink counter along the south wall with toiletries to include a prescription for "Diazepam 10 MG" in the name of "Steve Paddock", and two inhalers.  The toilet room was to the east with a pair of boxers and a pair of shoes on the floor.

**Sitting Area**

The sitting area was north of the foyer. Floor to ceiling windows covered by curtains extended along the length of the north end of the suite. There was a couch along the north side of the room, a coffee table south of the couch, and two chairs pushed together (facing one another) south of the coffee table. Pillars were located along the north wall near the northwest corner and along the north wall near the northeast corner of the sitting area, at the northwest corner of the living room.

A rifle magazine was between the west and central couch cushions of the north couch. The coffee table was covered by white towels. A rifle and an empty rifle magazine were on the coffee table. There were four rifles sitting on the pushed together chairs and a rifle magazine on the north arm of the east chair. One rifle was on the floor east of the chairs. There were two suitcases

on the floor east of the coffee table containing numerous loaded rifle magazines. An empty rifle magazine was on the floor, east of the suitcases.

There was a stack of 14 loaded rifle magazines on the west side of the northeast pillar. A blue plastic tube with a snorkel mouthpiece attached with green tape to the east end and a black funnel with a fan inside at the west end extended from the east side of the suitcases, across the coffee table, to the west side of the room, adjacent to the doors of the west bedroom.

A chair facing south, with a side table to the east, were at the west end along the northeast bank of windows. The window located immediately east of the northwest pillar was shattered with glass on the floor below it. Numerous casings were on the floor at the base of the window, south into the room, and on the seat of the chair. A blue and yellow "Estwing" hammer was on the floor at the east side of the northeast pillar, south of the broken window. The head of the hammer had tape wrapped around it. The curtains in place over the broken window were damaged. Two rifles with bipods were on the floor south of the chair.

A high top table was centrally located along the northeast bank of windows with a loaded rifle magazine on the southeast end of the table. An open suitcase was on the floor south of the table with numerous loaded rifle magazines inside. A rifle with a bipod was on the floor southeast of the table. There were casings on the floor surrounding the table.

## Decedent Stephen Paddock

Paddock was on the floor south of the chair and side table. He was wearing black pants, a long sleeve brown shirt, black gloves, and grey shoes. Paddock was on his back with his head to the south, feet to the north, and arms at his sides.  There was apparent blood surrounding his nose and mouth, and on the floor under his head. There was also apparent blood on the front of his shirt. A rifle was on the floor under his legs. A grey box cutter was on the floor between his feet. There were casings on the floor surrounding him. A silver/black colored "Smith & Wesson" revolver with apparent blood on it was on the floor south of Paddock's head.

## Bar/Kitchenette

The central bar/kitchenette was south of the sitting area east of the foyer and north of the east-west hallway. There was a north bar counter (east-west orientation) with three chairs on the north side of the counter. There were three rifles on the floor north of the west end of the counter with a backpack under them. One rifle was on the seat of the westernmost chair; one rifle was on the seat of the easternmost chair; and one rifle was located on the west end of the bar counter. An empty silver colored rolling case was on the floor north of the counter, at the east end. A Luxor sticker and a "29" sticker were on the back of the case.

At the west end of the bar counter was an "Anran" monitor with a video feed to the previously described camera on the lower portion of the room service cart in the hallway, a laptop computer, which provided a live feed to the camera attached to the peephole of the door, and a Samsung cell phone in a black case.

Centrally located on the bar counter were bank cards and other cards in the name of "Stephen Paddock" and room key card packets.  At the east end of the bar counter was a black holster,  a black glove, binoculars, blue hat, brown wallet, tape roll, credit cards and a Nevada ID in the name of "Stephen Paddock", a Player's card in the name of "Marilou Danley", valet ticket, a notepad with "unplug phones" written on it, and a white handheld monitor, as well as a black ZTE cell phone with the front and back cameras covered with tape and a Samsung Galaxy S6 active in a black case.

At the southwest corner of the bar was a sink. There were two loaded rifle magazines and a "Tundra" fire extinguisher on the sink counter.

**Living Room**

The southeast living room was east of the bar/kitchenette at the east end of the east-west hallway. There was a television mounted on the south wall with an entertainment center/cabinet below, a couch to the north and east, and an orange chair to the west. The couch cushions were off of the east couch and piled on the north couch and on the floor.  A table was along the north side of the north couch with four chairs.

A side table was west of the north couch. A "Meade" spotting scope was on the floor north of the side table. A pink piece of paper with written measurements on one side was on the floor west of the east couch.[15]

An open black suitcase containing soft rifle cases inside was on the floor north of the cabinet. There were three casings on the floor west of the side table and at the east end of the east-west hallway.[16]

There was a bullet hole through the east arm of the orange chair; two bullet holes into the cabinet along the south wall; and one bullet hole into the south wall, between the entertainment center/cabinet and the connecting door to 32-134.[17]

There were two suitcases along the west wall. A blue large bag with numerous towels, soft rifle cases, and scope covers inside were also along the west wall.

**Room 32-134**

Room 32-134 was a single connecting hotel room, south of 32-135. The connecting door was located at the south end of room 32-135 in the southwest corner of the southeast living room. There was damage to the south adjoining door frame[18]and the damaged door was on the floor inside room 32-134. The main entry door to the room was west facing, accessing the hallway. A room service cart with an open laptop computer on the east end was in the entry hallway, east

---

[15] This was the same note originally located on the table near Paddock's body. The wind blew it off of the table to this location.
[16] These casings came from the SWAT Officer's rifle.
[17] These bullet holes came from the SWAT Officer's rifle.

[18] Occurred during the second explosive breach

of the entry door. There were wires connected from the laptop that ran under the entry door. There was a video feed visible on the laptop of the hallway looking south from the previously described black "Logitech" camera attached to the hallway room service cart.

The room was furnished with two beds with a nightstand in between along the south wall, a desk, dresser, and chair along the north wall, a television mounted on the north wall, and floor to ceiling windows on the east. The southernmost window was shattered with glass on the floor below it. There were nine loaded rifle magazines on top of the dresser. The dresser drawers were open and the bottom was broken. There were three rifles with bipods on the east bed and several casings. One cartridge case was on the floor west of the east bed. There were two rifles on the west bed, one of which was a bolt action. A pair of black gloves was on the west side of the west bed. A pair of tan sandals were on the floor north of the west bed. A bullet hole was in the north wall corresponding with a hole in the south wall of the living room, and one bullet hole was in the comforter at the north end of the east bed.

There were two closets along the west wall with the door to the attached southwest bathroom. The bathroom had a sink counter along the south side and tub to the north.  Clothing was on the floor under the sink counter along with a trashcan. There was a snorkel tube located inside the trashcan.

## VII.    EVIDENCE RECOVERY

**Physical Evidence**

During the course of the investigation, several items of evidentiary value were located and impounded by LVMPD Crime Scene Analysts and FBI Evidence Recovery Team. The following is a summary of key pieces of evidence located during searches of multiple locations.

Picture numbers listed below correspond with pictures attached in Appendix A of this report.

**Mandalay Bay Location**

**32nd Floor – 100 Wing – Stairwell Foyer Room (Picture 1)**

| Metal "L" bracket with three screws securing it to the interior door/frame. |
| --- |

**32nd Floor – 100 Wing Hallway (Pictures 2-4)**

| Two surveillance cameras from room service cart outside room 32-134. |
| --- |
| Bullet fragments |

**32nd Floor – Room 32-135 –  Main Room (Pictures 5-17)**

| Make | Model | Serial Number | Description |
| --- | --- | --- | --- |
| Colt | M4 Carbine | LE451984 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. Front sight only. |
| Noveske | N4 | B15993 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 40 round magazine. EOTech optic. |

| LWRC | M61C | 24-18648 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
|------|------|----------|------|
| POF USA | P-308 | UA-1600204 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| Christensen Arms | CA-15 | CA04625 | AR-15 .223 Wylde with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| POF USA | P-15 | PE-1600179 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Colt | Competition | CCR014544 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Smith & Wesson | 342 AirLite Ti | CDZ7618 | .38 caliber revolver with 4 cartridges, 1 expended cartridge case. |
| LWRC | M61C | 5P03902 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| FNH | FM15 | FND000905 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| Daniel Defense | DD5V1 | DD5007426 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| FNH | FN15 | FNB024293 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| POF USA | P15 | 03E-1603178 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| Colt | M4 Carbine | LE564124 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. |
| Daniel Defense | M4A1 | DDM4123629 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| LMT | Def. 2000 | LMT81745 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Daniel Defense | DDM4V11 | DDM4078072 | AR-15 .223/5.56 with a bump stock, vertical fore grip. No magazine. EOTech optic. |
| Sig Sauer | SIG716 | 23D020868 | AR-10 .308/7.62 with a bipod, red dot optic and 25 round magazine. |
| Daniel Defense | DD5V1 | DD5008362 | AR-10 .308/7.62 with a bipod and scope. No magazine. |
| Blue plastic hose with funnel, fan and SCUBA mouthpiece attached. | | | |

| |
|---|
| Surveillance camera mounted to room door peephole. |
| Baby monitor camera (not mounted). |
| Surveillance camera mounted to room door peephole. |
| Small sledge hammer. |
| Laptop computer. |
| Surveillance camera monitor. |
| Spotting scope. |
| Binoculars. |
| Expended .223/5.56 cartridge casings (approximately 1,050). |
| Cellular phones. |
| Nevada Driver's License – Stephen Paddock. |
| Mlife players card – Marilou Danley. |
| Polymer 40 round AR-15 magazines (loaded). |
| Steel 100 round AR-15 magazines (loaded). |
| Polymer 25 round AR-10 magazines (loaded). |
| Live Ammunition (approximately 5,280). |
| Handwritten note with distance/bullet drop calculations. |
| Suitcases, duffel bags, soft rifle cases, towels. |

**32nd Floor – Room 32-135 –  Bedroom Suite (Picture 18)**

| |
|---|
| Laptop computer (on bed). |
| Disassembled laptop computer missing hard drive (on floor). |
| Power hand drills. |
| Empty ammunition boxes and plastic bags. |
| Scuba mask. |
| Loose ammunition. |
| Miscellaneous hand tools and drill bits. |
| Miscellaneous screws and mounting brackets. |
| Suitcases, towels. |
| Empty rifle magazines |

**32nd Floor – Room 32-134 – Hotel Room (Pictures 19-21)**

| Make | Model | Serial Number | Description |
|---|---|---|---|
| FNH | FN15 | FNCR000383 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Ruger | American | 695-93877 | .308 caliber bolt action rifle with scope. |
| LMT | LM308MWS | LMS18321 | AR-10 .308/7.62 with a bipod and red dot scope. No magazine. |
| Ruger | SR0762 | 562-13026 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| LMT | LM308MWS | LMS18300 | AR-10 with a bipod, scope and 25 round magazine. |
| Laptop computer connected to hallway surveillance cameras. | | | |
| Polymer 25 round AR-10 magazines (loaded). | | | |
| Expended .308/7.62 cartridge casings (8). | | | |

**Exhibit A, Pg. 122**

**Mandalay Bay – East Valet – Space 317 (Paddock's Vehicle. Pictures 22-24)**

| |
|---|
| 2017 Chrysler Pacifica, Nevada/74D401 towed to FBI garage. |
| 20x2 pound containers of exploding targets. |
| 10x1 pound containers of exploding targets. |
| 2x20 pound bags of explosive precursors. |
| Polymer 25 round AR-10 .308/7.62 magazines (loaded). |
| Polymer 40 round AR-15 .223/5.56 magazines (loaded). |
| Boxed ammunition. |
| Suitcases, towels. |

**McCarran Airport – Fuel Tanks – East Mandalay Bay Road/Haven Street (Pictures 25-27)**

| |
|---|
| Bullet fragments |

**1372 Babbling Brook Court Mesquite, Nevada (Paddock's House)**

| Make | Model | Serial Number | Description |
|---|---|---|---|
| Smith & Wesson | SW99 | SAB5974 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDU4086 | 9mm semi-automatic pistol. |
| Glock | 17 | BCGM344 | 9mm semi-automatic pistol. |
| Mossberg | 500 | V0397109 | 12 gauge pump action shotgun. |
| Sig Sauer | 516 | 20J036999 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Arma-Lite | SPRM001 | M-10-13530 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0433557 | 12 gauge pump action shotgun. |
| LWRC | M61C-IC-A5 | 24-19038 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0348193 | 12 gauge pump action shotgun. |
| Mossberg | 930 | AF0001141 | 12 semi-automatic gauge shotgun. |
| Arma-Lite | SPRM001 | M-10-12006 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Sig Sauer | 516 | 20K046207 | AR-15 .223/5.56 rifle, with a bipod. No sights or optics. |
| Lantac | LA-R15 Raven | LT-0297 | AR-15 .223 Wylde rifle with a bipod and scope. |
| Mossberg | 590 | P833785 | 12 gauge pump action shotgun. |
| Arsenal | Saiga 12 | H09423015L | AK-47 style semi-automatic 12 gauge shotgun. |
| Arsenal | Saiga 12 | H07420684 | AK-47 style semi-automatic 12 gauge shotgun. |
| Beretta | 92F | C856302 | 9mm semi-automatic pistol. |
| FN | 5.7 | 386215450 | 5.7mm semi-automatic pistol. |
| Handgun, shotgun, rifle ammunition. | | | |
| Exploding targets. | | | |
| Computer related items. | | | |

| Soft body armor. |
|---|

**1735 Del Webb Parkway, Reno, Nevada (Paddock's House)**

| Make | Model | Serial Number | Description |
|---|---|---|---|
| Smith & Wesson | 340 | DCA2099 | .357 caliber revolver. |
| Beretta Pietro | 92A1 | A098515Z | 9mm semi-automatic pistol. |
| Remington Arms | 870 Tactical | RS90036Z | 12 gauge pump action shotgun. |
| Mossberg | 590 | V0187184 | 12 gauge pump action shotgun. |
| Glock | 17 Gen4 | BBVN828 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HHA9534 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDL4053 | 9mm semi-automatic pistol. |
| Firearm ammunition. | | | |
| Rifle magazines. | | | |
| Computer related items. | | | |

**Ammunition**

Several types of ammunition were located within rooms 32-135 and 32-134 loaded into rifle magazines for both the AR-15 and AR-10 style rifles. The AR-15 .223/5.56 rifle magazines were loaded with hollow point and polymer tipped hollow point ammunition. The AR-10 .308/7.62 rifle magazines and the bolt action rifle were loaded with Tracer, Frangible Incendiary, Armor Piercing and Armor Piercing Incendiary ammunition.

A complete breakdown of the ammunition types loaded in the firearms, rifle magazines and expended cartridge casings will be documented in the final report.

**DNA**

Several items of evidentiary value were collected for DNA analysis. At the time of this report the DNA evidence collected has not yielded any significant results or indication that anyone else was in the room.

**Digital**

There were approximately 1,965 leads investigated. There were approximately 21,560 hours of video and 251,099 images obtained by investigators of the LVMPD and the FBI. Analysis found 529 sightings of Paddock.

Four laptop computers and three cellphones were located in 32-135 and 32-134. All laptop computers and cellphones were given the FBI to be forensically analyzed. The forensic analysis on all electronics located in 32-134 and 32-135 has been completed and the results of the analysis is listed below.

**Evidence Item HP Laptop Computer Recovered in Room 32-134**

**Browser Artifacts**

The HP laptop computer contained internet artifacts from the following cloud storage services: Dropbox.com, Box.com, and Microsoft One Drive. Dropbox and Microsoft One Drive were installed on the laptop. Box.com was accessed through a web browser.

**Google Maps**

On 05-18-17 Google Map searches were performed for Venice Beach and Fenway Park.

The following queries were also made with Google Maps:

- Royal Rooters' Club, Boston, MA
- Blandford Street. Station, United States
- Boston University Questrom School of Business
- Boston Hotel Buckminster, Beacon Street, Boston, MA
- Boston Arts Academy
- Official Red Sox Team Store
- Official Red Sox Team Store, 19 Yawkey Way, Boston, MA
- Venice Ale House
- Fairmont Miramar Hotel, Santa Monica, CA
- The Bungalow, 101 Wilshire Boulevard, Santa Monica, CA

**Google Search Queries**

On 05-18-17, searches were performed for "summer concerts 2017," "grant park functions," "biggest bear," "La Jolla Beach," "open air concert venues," "biggest open air concert venues in USA," and "how crowded does Santa Monica Beach get."

On 09-04-17, searches were performed for "Las Vegas rentals," "Las Vegas condo rentals," "Las Vegas high rise condos rent," and "Las Vegas Ogden for rent."

On 09-05-17, searches were performed for "life is beautiful expected attendance," "life is beautiful single day tickets," and "life is beautiful Vegas lineup."

On 09-15-17, searches were performed for "swat weapons," "ballistics chart 308," "SWAT Las Vegas," "ballistic," and "do police use explosives."

**Bing Search Queries**

On 09-05-17, searches were performed for "Mandalay Bay Las Vegas," "Route 91 harvest festival 2017 attendance," and "Route 91 harvest festival 2017."

The following websites were accessed using an IE private browser:

- http://lineup.lifeisbeautiful.com/
- https://www.google.com/maps?hl=en&tab=wl
- https://lifeisbeautiful.com/ticket/
- http://search.topvegascondos.com/i/the-ogden-downtown-las-vegas-condos-forrent
- https://www.google.com/?gws_rd=ssl#q=how+crowded+does+santa+monica+beach+get&spf=1495082236761
- https://www.vividseats.com/blog/category/all-concerts/
- https://www.vividseats.com/blog/fenway-park-concerts-and-seating
- https://www.vividseats.com/blog/the-14-best-outdoor-concert-venues-in-the-us
- http://tsminteractive.com/what-are-the-most-crowded-beaches-in-america/
- https://www.yelp.com/biz/santa-monica-state-beach-santa-monica
- https://www.vividseats.com/blog/memorial-day-weekend-2017.html

The following websites were accessed using Internet Explorer:

- www.grantparkmusicfestival.com/ 05-18-17 0419 hours
- www.ticketmaster.com/ 05-18-17 at 0427 hours
- ticketmaster.com/ 05-18-17 at 0431 hours
- www.sandiego.org/ 05-18-17 at 0505 hours
- sandiego.org/ 05-18-17 at 0505 hours
- www.vividseats.com/ 05-18-17 at 0540 hours
- www.lasvegascondoexperts.com/ 09-04-17 at 2212 hours
- lasvegashighrisetour.com/ 09-04-17 at 2213 hours
- www.thehighrisegroup.com/ 09-04-17 at 2214 hours

**Evidence Item Dell Laptop Computer Recovered in Room 32-135**

Computer forensic analysis of a Dell laptop Model E5570 revealed numerous internet searches for open air venues. Additionally, several hundred images of child pornography were located on the computer's hard drive. The investigation into the source of these images is ongoing. The following internet searches from this laptop are indicated below:

**Google Search Queries**

- How tall is Mandalay Bay/ Unknown date
- NV gun shows/ 09-02-17 & 09-30-17
- Life is Beautiful 2017/ 09-20-2017
- Excalibur Hotel & Casino/ 09-23-17
- Las Vegas Academy of the Arts Performing Arts Center/ 09-23-17
- Fremont Hotel & Casino/ 09-23-17
- El Cortez Hotel & Casino/ 09-23-17
- Family Courts & Services Center/ 09-23-17
- Gary Reese Freedom Park/ 09-23-17

- Cashman Center/ 09-23-17
- Cashman Field/ 09-23-17
- Neon Museum/ 09-23-17
- The Mob Museum/ 09-23-17
- Discovery Children's Museum/ 09-23-17 & 09-26-17
- Arizona Charlie's Decatur/ 09-23-17
- Where is hard drive located on e5570/ 09-28-17
- NHRA schedule 2017/ 09-30-17

## VIII.   SUSPECT AUTOPSY

On 10-06-17, at approximately 1625 hours, under CCOCME case 17-10064 and FBI incident number 4-LV-2215061 an autopsy was performed on the body of Paddock at the CCOCME by Doctor Lisa Gavin.

**Decedent**
Name:              Paddock, Stephen
Date of birth:     04-09-53
Gender:            Male
Ethnicity:         Caucasian
Height:            73 inches
Weight:            224 lbs
Hair:              Gray
Eyes:              Brown

Body bag seal #541486 removed at 1625 hours.

Specific Photography:
- Body bag seal
- Clothed body
- Pre-cleaned unclothed body
- Post-cleaned unclothed body
- Injuries
- X-Rays

The following persons were in attendance:

1)   Clark County Coroner Fudenberg
2)   Forensic Pathologist Doctor Gavin
3)   Detective Alsup
4)   Detective Colon
5)   SCSA Fletcher
6)   FBI ERT Agents (2)
7)   Forensic Technician Rosales

**Exhibit A, Pg. 127**

The following items of evidence were retained by the FBI's Evidence Recovery Team:

1)   One brown long sleeved shirt.
2)   One pair of black pants.
3)   One pair of white socks.
4)   One pair of black slip-on shoes.
5)   One pair of blue underwear.
6)   Paper tissue from the decedent's ears.
7)   Print exemplars.
8)   One projectile recovered from the decedent's head.

## Synopsis

On October 6, 2017, detectives from the LVMPD along with a LVMPD Crime Scene Analyst, attended the autopsy of Stephen Paddock at the CCOCME. Also present were members of the FBI Evidence Recovery Team who retained all collected evidence.

The exam room was secured by Clark County Coroner, John Fudenberg. Forensic Pathologist Doctor Lisa Gavin performed the autopsy with one assistant.

The decedent was x-rayed, photographed and cleaned prior to Doctor Gavin's exam. Preliminarily, the injuries noted were on the posterior of both calves and a gunshot wound to the upper palette inside the decedent's mouth with obvious damage to the upper teeth.

The cause of Paddock's death was an interoral gunshot wound and the manner of death was ruled a suicide.

## IX.   INVESTIGATION

## Mandalay Bay Hotel Room

LVMPD officers located several documents, to include photographs, identifying Paddock as the suspect who was lying on the floor with an apparent gunshot wound to the head. Also located inside the room investigators found documentation related to Danley who was later identified as the longtime girlfriend of Paddock.

Located throughout the 100-wing hallway from the double doors of room 32-135 to the alcove wall of room 32-105 were over 200 bullet strikes. The bullet strikes consisted of actual impacts and holes. These strikes were caused by approximately 35 rounds fired down the 100-wing from inside of room 32-135.

Law Enforcement and the CCOCME took custody of Paddock's body. The body was photographed and transported to the CCOCME where an autopsy was conducted.

The room was secured for evidence recovery. The FBI Evidence Recovery Team responded and took the lead role on documentation and recovery of all evidence inside the hotel rooms and hallway.

Located inside the master bedroom of suite 32-135 were hand drills, drill bits, several miscellaneous tools, and equipment Paddock used to drill holes, run wires, and set up surveillance cameras that showed the 100 wing hallway. Inside the bedroom were several empty ammunition boxes, live rounds, loaded rifle magazines, duffle bags, suitcases, two laptop computers (one of which was broken and missing the hard drive), snorkeling kit bag, diving mask,  circular glass cutter with suction cup and miscellaneous personal items.

Located throughout the main living area of the suite were 18 rifles, one handgun, rifle casings, and loaded magazines. A blue plastic tube, was fashioned with a fan on one end and snorkel mouthpiece on the other end. A spotting scope on a tripod was on the floor near Paddocks body and a slip of paper was on a small table with hand written distances on it. Several suitcases and bags were throughout the main room containing personal items and loaded rifle magazines. A laptop computer was located on the bar and connected to a live feed camera attached to the peephole of the main door to suite 32-135.

Room 32-134 was an adjoining room to suite 32-135 used by Paddock. Located inside the room were five rifles, casings, live ammunition and several loaded magazines. A pair of gloves were located on one of the beds and sandals were located on the floor near the bed. Inside the bathroom, a snorkel tube was located in the trash. A room service receipt and a cardboard box with mailing labels was also located in the bathroom. In the walkway leading to the door to the main hallway was a food service cart. A laptop computer was located on the food service cart. It was connected to two live feed cameras and a battery pack with wires connecting it to the cameras on the food service cart in the 100 wing hallway.

All evidence located and recovered inside suite 32-135 and room 32-134 indicated Paddock was capable of watching people in the hallway. There was no suicide note or manifesto located inside either room.

**Paddock's Vehicle**

Paddock's vehicle was located in Mandalay Bay East Valet, 2nd floor, space 317 by investigators. The vehicle a 2017 Chrysler Pacific bearing Nevada plate 79D401 had been backed into space 317 and was locked. The key for the vehicle was obtained from valet.

A search warrant was obtained and at 0325 hours, detectives with the LVMPD All-Hazard Regional Multi agency Operations and Response Section (ARMOR) broke a window to the vehicle, to allow an explosive detection dog access to the scent from inside the vehicle. A U.S. Marshall explosive detection K9 moved around the vehicle and gave an alert to the presence of explosive precursors.

Detectives secured the area on the belief there were explosive precursors within the vehicle. ARMOR detectives requested LVMPD dispatch notify the Las Vegas Fire and Rescue Chemical, Biological, Radiological, Nuclear and Explosive Task Force (CBRNE) respond. Las Vegas Fire Rescue responded with their CBRNE vehicle along with FBI bomb technicians. Located inside the vehicle were five bags which were x-rayed and removed by the FBI.

Upon rendering the vehicle safe, the vehicle and all items located inside were photographed. All items removed from the vehicle were placed back inside and the vehicle was sealed. The vehicle was subsequently towed from the Mandalay Bay Hotel to a secure FBI facility for a thorough search and evidence collection.

Evidence collected from inside Paddock's vehicle included loaded rifle magazines for both AR-15 and AR-10 style rifles. Also collected were 20 two pound containers of exploding targets, 10 one pound containers of exploding targets and 2 twenty pound bags of explosive precursors.

**Paddock's Mesquite Residence**

LVMPD detectives responded to Paddock's residence in Mesquite, Nevada. The residence was located at 1372 Babbling Brook Court. Detectives obtained and served a search warrant at this location. Inside the residence, seven shotguns, five handguns, six rifles, exploding targets, firearm ammunition, rifle magazines and computer related items were recovered. These items were impounded and turned over to the FBI for processing.

**Paddock's Reno Residence**

FBI Agents responded to Paddock's residence in Reno, Nevada. The residence was located at 1735 Del Webb Parkway, Reno, Nevada. Agents obtained and served a search warrant at this location. Inside of the residence were two shotguns, five handguns, firearm ammunition, rifle magazines and computer related items. The items were recovered by the FBI for processing.

**Search Warrants and Legal Notices**

The investigative process required information to be obtained from numerous sources and venues to include but not limited to:

- Hotels and Casinos
- Firearms related businesses
- Residences of Stephen Paddock
- Vehicles of Stephen Paddock
- Internet providers
- Telephone companies
- Online retail businesses
- Email companies

During the course of the investigation law enforcement authored approximately 1,062 legal notices. These legal notices were to obtain information or items from venues related to the investigation. These legal documents included but are not limited to:

- Administrative Subpoenas
- Court Orders
- Search Warrants
- Grand Jury Subpoenas

**Exhibit A, Pg. 130**

**Law Enforcement Tips and Leads**

All tips or items that needed to be investigated or followed up were coordinated by the FBI and the LVMPD. These leads were tracked using the Operational Response and Investigative Online Network or ORION system through the FBI.

Investigators conducted interviews with 43 people directly associated with Paddock. These included 24 gambling associates, 11 acquaintances and 8 blood relatives.

## X.   PRELIMINARY FINDINGS FROM THE 1 OCTOBER INVESTIGATION

Investigators determined key findings as a result of this investigation:

- Paddock acted alone. Thousands of hours of digital media were reviewed and after all the interviews conducted, no evidence exists to indicate Paddock conspired with or acted in collusion with anybody else. This includes video surveillance, recovered DNA[19]and analysis of cellular phones and computers belonging to Paddock.

- No suicide note or manifesto was found. Of all the evidence collected from rooms 32-135 and 32-134, there was no note or manifesto stating Paddock's intentions. The only handwritten documentation found in either room was the small note indicating measurements and distances related to the use of rifles.

- There was no evidence of radicalization or ideology to support any theory that Paddock supported or followed any hate groups or any domestic or foreign terrorist organizations. Despite numerous interviews with Paddock's family, acquaintances and gambling contacts, investigators could not link Paddock to any specific ideology.

- Paddock committed no crimes leading up to the October 1st mass shooting. All the weapons he purchased to include all the ammunition, were purchased legally. This includes all the purchases Paddock made at gun stores as well as online purchases. Paddock did not commit a crime until he fired the first round into the crowd at the Las Vegas Village.

- Reference the 1,965 investigated leads, 21,560 hours of video, 251,099 images obtained and 746 legal notices filed or sent, nothing was found to indicate motive on the part of Paddock or that he acted with anyone else.

- Security Officer Campos was not shot with a BB gun but rather sustained a gunshot wound from one of the rounds fired by Paddock down the hallway of the 100 wing on the 32nd floor. Security Officer Campos did in fact have a pre-planned vacation to Mexico to go visit his father and Security Officer Campos asked law enforcement for permission to make this trip.

---

[19] Deoxyribonucleic Acid

- One aspect of the investigation focused on Paddock's financials. The investigation proved Paddock was self-funded through his gambling and past real estate transactions. He was indebted to no one and in fact paid all his gambling debts off prior to the shooting.

- The investigation revealed several indicators of intent on the part of Paddock. Those indicators are as follows:

    1. Paddock had a reservation for a hotel during the Lollapalooza music festival held at Grant Park in Chicago, Illinois during the month of August. Like Route 91, the Lollapalooza festival was held in an open air venue.  Paddock specifically requested a room overlooking the venue when he made the reservation. The reservation was cancelled two days prior to the check-in date.

    2. Paddock made lodging reservations during the Life is Beautiful music festival held in Downtown Las Vegas, Nevada. The festival was also an open air music venue attended by thousands of people. Paddock requested units overlooking the venue. Paddock reserved three different units during the period and all faced the venue. Paddock was observed in video surveillance transporting several suitcases from his vehicle to the units he reserved. Paddock was alone for the trip and was never accompanied by anyone for more than a casual conversation. Investigators have been unable to determine if Paddock intended an attack during this festival or if he used it as a means to plan a future attack.

    3. Paddock conducted several internet searches while planning his actions. Search terms included open air concert venues, Las Vegas SWAT tactics, weapons and explosives. Paddock also searched for various gun stores.

    4. The purchasing of over 55 firearms, which were mostly rifles in various calibers, from October 2016 – September 2017. He also bought over 100 firearm related items through various retailers during that period.

    5. During a stay in early September 2017, Paddock requested specific rooms that overlooked the Las Vegas Village. According to Danley, Paddock spent time looking at the Las Vegas Village venue from different angles and windows while inside the room.

**Exhibit A, Pg. 132**

**Appendix A**

Picture 1



(Door leading to the stairwell secured by "L" bracket)

Picture 2



(View from 100 hallway towards room 32-135)

Picture 3



(Food Service Cart in hallway with camera)

Picture 4



(Food Service Cart in hallway with camera)

Picture 5



(View from entry of 32-135 towards the sitting area)

Picture 6



(View from foyer of room 32-135 towards the sitting area)

Picture 7



(View from sitting area towards the living room)

Picture 8



(View from sitting area towards the bar / kitchenette)

Picture 9



(View from sitting area towards the bar / kitchenette)

Picture 10



(View from sitting area towards master bedroom)

Picture 11



(View of connecting doors between room 32-135 and 32-134)

Picture 12



(Blue plastic hose with snorkel mouthpiece attached)

Picture 13



(Surveillance camera mounted to room door peephole)

Picture 14



(Small sledge hammer)

Picture 15



(Handwritten note with distance/bullet drop calculations)

Picture 16



(Damage to entry door of room 32-135)

Picture 17



(Damage to entry door of room 32-135)

Picture 18



(Desk in master bedroom of 32-135 with SCUBA mask and power hand drill)

Picture 19



(Interior of room 32-134 from connecting doors)

Picture 20



(Interior of room 32-134 towards bathroom)

Picture 21



(Hallway of room 32-134 with food service cart and laptop connected to cameras in 100 hallway)

Picture 22



(Paddock's vehicle)

Picture 23

 ()

(Explosive precursors found in Paddock's vehicle)

Picture 24



(Exploding targets found in Paddock's vehicle)

Picture 25



(McCarran International Airport fuel tank with bullet strikes)

Picture 26



(Upper bullet strike)

Picture 27



(Lower bullet strike)

Picture 28



(View of the Las Vegas Village from room 32-135)

# Exhibit 3

## *(Worlds Fastest Shooter vs Bump Fire! –*
## *Guns Reviews)*

# Exhibit 4

*(AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!))*

# Exhibit 5

***( [Update] Bumbling Machinations on Bump Stocks? and [Updated] Bump-fire Rule: "Comments Not Accepted" )***

# The Zelman Partisans

**AUTHORITARIAN SWINE, GUN CONTROL, POLITICS, SO MUCH STUPID!**

# [UPDATE] BUMBLING MACHINATIONS ON BUMP STOCKS?

APRIL 2, 2018 | CARL BUSSJAEGER | 1 COMMENT

*[See ATF update below]*

I've been chasing bump-fire stock commenting on regulations.gov this morning, because it *matters*, trying to sort out the issues with commenting. What I've found so far:

My layman's understanding is that new rules (Notice of Proposed Rulemaking, NPRM) have to be announced in the Federal Register, giving people a chance to voice their views on them, before the rules can be implemented. Sure, they can ignore us, but they have to let us yammer.

The only Federal Register announcement for "Bump-Stock-Type Devices" is "A Proposed Rule by the Alcohol, Tobacco, Firearms, and Explosives Bureau on 03/29/2018." That is **Docket No. 2017R-22**, which on federalregister.gov shows 35,709 public comments. Clicking the link to those comments takes you to the comments for December 2017's proposed rule. (Ditto for the GPO PDF of the Federal Register.)

Regulations.gov is the web site where we — supposedly — get to voice those views.

Regulations.gov shows **two** dockets, neither of which is "Docket No. 2017R-22".

**ATF-2018-0001:**
"Comments Not Accepted"
The comment I made on that, 1k2-92ad-9enm, 3/29/2018, shows *"This comment was received in Regulations.gov but is not yet posted. Please contact the agency directly for more information."*

A search for comments on ATF-2018-0001 shows *"35,709 results"*. But the result displayed are the comments from the December 2017 NPRM, *"Comment Period Closed, Jan 25, 2018 11:59 PM*

**Exhibit A, Pg. 164**
6/10/18, 11:11 AM

*ET"*.

**Docket No. ATF-2018-0002:**
This docket shows different comment counts depending on the page you look at.

- ATF-2018-0002
  Commenting allowed, currently shows "3,673 Comments Received".
- ATF-2018-0002-0001
  Commenting allowed, currently shows "1,864 Comments Received".

But no comments on ATF-2018-002 can be found: *"0 results"*.

My comment on *this docket*, 1k2-92b5-589w, 3/30/2018, also shows "This comment was received in Regulations.gov but is not yet posted. Please contact the agency directly for more information."

Please note: While ATF-2018-0001 was published on 3/29/2018 and could be considered the NPRM referred to in the Federal Register, ATF-2018-002 was not published until 3/30/2018, after comment were closed on the 3/29 docket.

**SUMMARY:** The "Bump-Stock-Type Devices" is being "tracked" under three different docket numbers. The Federal Register — where rules apparently must be legally published — shows *only* Docket No. 2017R-22, which you might recall is also the docket number for the December 2017 NPRM.

But regulations.gov shows *two* dockets, neither published in the Federal Register, with different comment counts. And neither of my comments will display for *any* docket number.

It's hard to tell with the ATF, but this *might* be bureaucratic incompetence rather than deliberate malice. Possibly some idiot did a copy/paste from the 2017 NPRM, and got the old docket number. When they tried to enter a new docket number to keep comments separated, they managed to enter two, screwing up the whole NPRM.

Or it might be deliberate machinations, with bureaucratic bumbling as *plausible deniability*.

**Update,** *4/2/2018, 11:55 AM EDT*: I have received a response from the ATF. As you can see, it fails to explain why commenting closed on one docket, or why there are two *other* separate (and not listed in the Federal Register) dockets. Comments are still separated across dockets in

counts, yet are not visible.

*From: Katrina.A.Moore@usdoj.gov*
*Subject: FW: Comments Closed on Bump-Fire Rule*

*This is in response to your email to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). In your email, which you inquired why the commenting was closed on the Notice of Proposed Rulemaking in "Bump-Stock-Type Devices" after one day.*

*As you may know, ATF is responsible for enforcing the Gun Control Act of 1968 (GCA), as well as other Federal firearms laws. A significant part of the GCA concerns the licensing and recordkeeping requirements pertaining to the manufacture, importation, distribution and sale of firearms.*

*The direct link to comment on the subject notice is https://www.regulations.gov /document?D=ATF-2018-0002-0001*

*If you have any further comments or concerns, they may be directed to the Office of Regulatory Affairs (202) 648-7070.*

*In addition, there may be State laws that pertain to this proposed activity. Contact State Police units or the office of your State Attorney General (www.naag.org) for information on any such requirements. You may also find information in ATF publication 5300.5: State Laws and Published Ordinances – Firearms.*

*We trust the foregoing has been responsive to your inquiry. Should you have additional questions, please contact your local ATF office. A listing of ATF office phone numbers can be found here.*

*Regards,*

*K Moore | Senior Industry Operations Investigator*
*U.S. Department of Justice | Bureau of Alcohol, Tobacco, Firearms and Explosives*
*Firearms Industry Programs Branch*
*99 New York Avenue NE, Mail Stop 6.N-518*
*Washington, DC 20226*

**Update 2, 4/2/2018, 2:55PM EDT:**

The inconsistent comment counts are the same, but 431 comments can now be seen. Visible comments include some submitted today. However, neither of my comments submitted last week can be found anywhere. Since my comments have vanished, I have submitted a third attempt to voice my opinion: 1k2-92d6-aj9o, 4/2/2018:

*Comment Tracking Number Match*
*This comment was received in Regulations.gov but is not yet posted. Please contact the agency directly for more information.*

**Carl is an unpaid TZP volunteer. If you found this post useful, please consider dropping something in his tip jar. He could use the money, what with truck repairs and bills.**





ATF    BANS    BUMP STOCK    BUMP-FIRE    BUMP-STOCK-TYPE DEVICES    COMMENTING    RULES

## ONE THOUGHT ON "[UPDATE] BUMBLING MACHINATIONS ON BUMP STOCKS?"

 **Mutti**

APRIL 2, 2018 AT 12:30 PM

My personal comment has been unable to be submitted via the online form, therefore I suggest individuals FAX: (202) 648-9741 ATTN: Vivian Chu

or Mail:

Vivian Chu, Mailstop 6N-518, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Ave. NE, Washington DC 20226. ATTN: 2017R-22
——
Depending on how much effort one wants to put forward a copy of the FAX receipt and Comment can/should be sent to any of their elected officials who have involvement with the

**Exhibit A, Pg. 167**
6/10/18, 11:11 AM

oversight committee (example: House Judiciary Committee: https://judiciary.house.gov/subcommittee/full-committee/ )

00331751

**Exhibit A, Pg. 168**
6/10/18, 11:11 AM

# The Zelman Partisans

**AUTHORITARIAN SWINE, GUN CONTROL**

# [UPDATED] BUMP-FIRE RULE: "COMMENTS NOT ACCEPTED"

MARCH 30, 2018 | CARL BUSSJAEGER | 9 COMMENTS

**ADDED 2:** jim notes in comments that the proposed rule can *now* be found HERE.

That's nice. Except…

Scroll down. New docket number. Comment count is zero.

Related Dockets: None
Related RINs: None
Related Documents: None

That means this is not tied to the previous notice with existing comments, and those hundreds of comments that were made before are **GONE**.

Inquiries to the ATF, DOJ, Federal Register, and various congresscritters have gone unanswered. An automated response from the ATF reads, *"It is the goal of FIPB to respond to requests from firearms industry members and the general public within 120 days of receipt."*

Nice trick. If comments aren't going your way, kill the proposal, reissue it without telling anyone, and do over until you get the results you want to justify violating human/civil rights.

I have two comment receipts now, so I can check if the first is permanently evaporated, or if they'll… *restore* it.

**Original post (and update) follows:**

**Exhibit A, Pg. 169**

Something is up with the <span style="color:green">Notice of Proposed Rulemaking</span> on "Bump-Stock Type Devices." I was there earlier this morning checking on comment totals: 941.

I thought of something else I wanted to see again a few minutes ago. I found this.



"Comments Not Accepted"

So I cleared cache/cookies/history/*et al* and attempted a new comment.



"Document ATF_FRDOC_0001-0036 is no longer open for comment."

That was supposed to be open for 90 days, until June 29, 2018.

Very odd. Anyone know what's going on?

**Added:** I also did a search on the comments submitted before it was closed (remember: there had been at least 941):





Inquiries have been made to DOJ and the Federal Register. No responses yet.

*Carl is an unpaid TZP volunteer. If you found this post useful, please consider dropping something in his tip jar. He could use the money, what with truck repairs and bills.*





◄ ATF    ◄ BANS    ◄ BUMP STOCK    ◄ BUMP-FIRE    ◄ BUMP-STOCK-TYPE DEVICES    ◄ DOJ

## 9 THOUGHTS ON "[UPDATED] BUMP-FIRE RULE: "COMMENTS NOT ACCEPTED""

**jim**

MARCH 30, 2018 AT 12:15 PM

You may submit comments, identified by docket number ATF 2017R-22, by any of the following methods:

Federal eRulemaking Portal: http://www.regulations.gov. Follow the directions for submitting comments.
Fax: (202) 648-9741.
Mail: Vivian Chu, Mailstop 6N-518, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Ave. NE, Washington DC 20226. ATTN: 2017R-22.

**Exhibit A, Pg. 171**
6/10/18, 11:25 AM

 **jim**

MARCH 30, 2018 AT 12:22 PM

Try this link:

https://www.regulations.gov/document?D=ATF-2018-0002-0001

---

 ★ **Carl Bussjaeger**

MARCH 30, 2018 AT 1:07 PM

That's nice, but according to that page the hundreds of comments already submitted are gone.

---

 **Mike Murray**

APRIL 2, 2018 AT 11:38 AM

Thanks for that, Jim.
The link works, and I shamelessly used part of Carl Bussjaeger's refutation of mechanical concept that "it's a machine gun".
It's not, and if this passes it's one more step toward banning any semi-auto firearm.
Bastards.

---

 ★ **Carl Bussjaeger**

APRIL 2, 2018 AT 11:59 AM

*"It's not, and if this passes it's one more step toward banning any semi-auto firearm."*

Exactly.

*"Bastards."*

Yep.

---

 **Comrade X**

MARCH 30, 2018 AT 4:20 PM

Tyrants don't need no stinkin comments!

**Exhibit A, Pg. 172**
6/10/18, 11:25 AM



**jim**

MARCH 30, 2018 AT 4:57 PM

Roger that, too many games or too many secrets (remember that movie?). I hope people are waking up to the fact dems and repubs are the same animal. Stock up with everything you can get. Never again….



**Comrade X**

MARCH 31, 2018 AT 12:12 PM

I hate to be a broken record but ;Yep, a one party system; the big government party with two branches, a D & a R.



**pigpen51**

MARCH 30, 2018 AT 9:40 PM

I just had flashbacks of Richard Nixon. Yes, I am old enough to remember him talking on the television.

What I remember is him saying " The American people have a right to know if their president is a crook. Well, I am not a crook." Shortly, he resigned his office, because he was found to be a crook. And he knew that if he stayed he would be impeached. Based on his covering up the burglary into Watergate hotel, not for actually doing the burglary or even ordering it, but just trying to hide it.

So I think that I can agree with pretty much all that have spoken here that this is a crooked deal, that once the BATFE's saw the way that the comments were running, they simply did away with them and started over. And that it will happen again, until they get the results that they want. The Dems and the Repubs are one and the same, and that it is prudent to stock up, no matter what the political climate is.

00331764

# Exhibit 6

## (Motion in Limine, *United States v. Friesen*)

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No. CR-08-041-L |
| | ) |
| | ) |
| LARRY DOUGLAS FRIESEN, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## **DEFENDANT'S MOTION IN LIMINE TO PROHIBIT GOVERNMENT'S INTRODUCTION OR REFERENCE TO RECORDS MAINTAINED IN THE NATIONAL FIREARMS REGISTRATION AND TRANSFER RECORD**

COMES NOW the Defendant, Doug Friesen, and moves this Honorable Court to prohibit

the Government from introducing, mentioning, or otherwise allude or refer to any records from

the National Firearms Registration and Transfer Record (NFRTR). In support of said Motion,

Defendant Friesen submits the following, to-wit:

The NFRTR is a data base administered by the Bureau of Alcohol, Tobacco, Firearms

and Explosives[1] (ATF) to track legally owned machine guns and other "firearms"[2] required to be

---

[1] The Bureau of Alcohol, Tobacco and Firearms was renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives under legislation which transferred it from the Department of the Treasury to the Department of Justice, and its law enforcement and administrative functions from the Secretary of the Treasury to the Attorney General, on January 24, 2003. 6 U.S.C. § 531; 116 Stat. 2135 (2003).

[2] Under the NFA a "firearm" is a term of art, and means "(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer . . . and (8) a destructive device. The term 'firearm' shall not include an antique

1

**Exhibit A, Pg. 175**

registered under the National Firearms Act of 1934[3] (NFA). Said database is inaccurate and incomplete; its error rate is currently unknown; and that unless it can be independently and reliably validated, NFRTR data should be excluded as evidence in a criminal trial.

ATF routinely uses NFRTR data to justify seizing and forfeiting firearms it deems to be unregistered or illegally possessed, issuing search and/or arrest warrants, producing Certificates of Nonexistence of a Record (CNR) for NFA firearms at criminal trials which attest that no record of registration for particular firearms can be located in the NFRTR; determining that a specific firearm is not registered to a specific person; and for other law enforcement activities such as approving or disapproving applications to transfer ownership of NFA firearms.

There are no known data that reliably establish the current accuracy and completeness of the NFRTR. The last audit of the NFRTR according to Generally Accepted Government Auditing Standards (GAGAS), by the Treasury Department Inspector General (Treasury IG) in 1998, raises more questions than it answers. The reasons are that the audit (1) disclosed "critical error" rates of 4.3 percent and 18.4 percent for one category of NFRTR transactions, and (2) was limited in scope.[4] The bad news was reliably documented April 23, 1998, when Treasury IG auditor Gary Wilk reported in a Work Paper:

---

firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5845(a).

[3] 26 U.S.C. § 5801 *et seq.*

[4] These errors apply to Form 4467 data, which may be more inaccurate than the 4.3% critical error rate which can be calculated from data the Treasury IG disclosed in its December 1998 audit report. Office of Inspector General, U.S. Department of Treasury, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record*, OIG-99-018, Dec. 18, 1998 at 12, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf. (Hereafter December 1998 Treasury IG Report.) Treasury IG auditor Carol Burgan stated that "error definitions for critical data fields during sampling" include weapon serial number and registrant's last name (each must "be 100% correct"), and "weapon description"). Work Paper F-25, Feb. 29, 1998, *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf. Treasury IG auditor Gary Wilk determined "our Discovery sample indicated a 18.4 percent error rate, one error per error Form

2

Exhibit A, Pg. 176

- Form 4467 was a critical indicator for our audit. We determined, based on our discovery sample, that the combined error rate for original documentation and the computer database was 18.4 percent.

- We were able to determine that the error rate was in excess, with 95 percent confidence, +/ - 7 percent, of the NFA Branch specified error rate limit of (+/-) 5 percent. Based on our Discovery error estimate we did not implement the full statistical sampling plan.

## Conclusion:

The NFA database - National firearms Registration and Firearms Record (NFRTR) does not contain less than the 5 percent error rate limit for Critical data established by the Chief, Firearms and Explosives Division, ATF.

5

During a June 17, 1998, meeting at Treasury Department Office of Inspector General

Headquarters to discuss the foregoing audit findings, an NFA Branch representative

---

4467 in a 'Critical' field." Work Paper H-1 + Attachments H1-H143, April 6, 1998, available at http://www.nfaoa.org/documents/Work_Papers_H.pdf.

Form 4467 ("Registration of Certain Firearms During November 1968") was used to register unregistered NFA firearms during an amnesty period from November 2, 1968, to December 1, 1968, established by the Gun Control Act of 1968 (P.L. 90-618; Stat. 1235, § 207(b)). The 1998 Treasury IG audit was limited to three categories of NFA transactions (approximately 3.3 percent of the total 2,571,766 transactions "for the years 1934 through July 31, 1998" (December 1998 report, id. at 2); none included Form 1, Form 2, Form 3, Form 4 and Form 5 categories, which account for 2,184,454 transactions (85 percent of total transactions). These forms differ according to whether the applicant is a private citizen, government agency, or Special Occupational Taxpayer (SOT) licensed to manufacture and/or deal in or import NFA firearms.

5 Work Paper H-0, April 23, 1998 at 2, reviewed May 7, 1998, by Audit Manager Robert K. Bronstrup. In "Discovery" sampling, the auditor draws a random sample, typically 60 to 70 records or more, to determine the presence or absence of irregularities and the need for a full audit. If no irregularities are found, the data base is presumed to be error-free and a full audit is not conducted. If even 1 irregularity is found, the data base cannot be assumed to be error-free; the audit must be extended; and a larger sample drawn to reliably estimate the error rate for the data base. Herbert Arkin, Handbook of Sampling for Auditing and Accounting. New York: McGraw-Hill Book Company, 1984 at 132-140.

Treasury IG auditor Gary Wilk reported that after reviewing "528 records and documents" in Discovery sampling:
- We discovered a total of 395 errors or omissions of which 176 were Critical to the NFA mission and the remaining 219 were Administrative.

Work Paper H-0, April 23, 1998 at 1.

3

Exhibit A, Pg. 177

███████████asked for an explanation of the analysis results obtained by the OIG audit of the physical and electronic records maintained by ATF and known as the NFRTR. ██further, added that ██reason for asking was that the results obtained by the OIG audit were disappointing at best and could have serious consequences for the ATF firearms registry mission.
[6]

After Treasury IG auditor Gary Wilk "offered that perhaps ATF would prefer to identify a term other than 'critical' as the identifier for the errors identified by this audit report,"[7] one or more NFA Branch representatives asked the Treasury IG auditors to change the definition of "critical error" to obtain a lower rate, and the auditors did so. The Treasury IG did not mention or publish the 18.4 percent rate (or any other error rate) in its December 1998 report or its October 1998 report; whether "critical errors" were present in other major NFRTR categories was not addressed.

The limited audit findings the Treasury IG published regarding errors in the NFRTR as shown in the table below, copied from the December 1998 Treasury IG report, are misleading. In part the reasons are that, as will be documented in this motion, the Treasury IG auditors did violated GAGAS under at least two major standards: (1) failing to extend the audit to determine the impact of the large number of "critical errors" disclosed as the result of Discovery sampling analysis, which required them to report their effects upon the audit results, in view of the auditors' failure to fully disclose the results of their Discovery sampling analyses , and (2) failing to be organizationally independent. This motion will later discuss the implications of violating GAGAS.

---

[6] Work Paper F-37, June 30, 1998 at 1, *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf. In this Work Paper, Treasury IG auditor Gary Wilk "explained that our definition [of "critical error"] had come from our understanding" of definitions provided earlier by NFA Branch representatives, who now "appeared to obtain an improved appreciation of the specific requirements that determined the outcome of the audit."

[7] Id. at 1.

4

Exhibit A, Pg. 178

## SUMMARY OF SAMPLE DISCREPANCIES

| | FORM 4467 | LETTER | OTHER | TOTAL |
|---|---|---|---|---|
| **Discrepancies on Registry Database Reports** | | | | |
| **Name:** | | | | |
| Missing | 2 | 1 | 0 | 3 |
| Incorrect | 0 | 0 | 0 | 0 |
| **Serial Number:** | | | | |
| Missing | 0 | 0 | 0 | 0 |
| Incorrect | 1 | 0 | 0 | 1 |
| **Computer Records Not Found** | 0 | 10 | 0 | 10 |
| | | | | |
| **Original Records Not Found** | 0 | 4 | 16 | 20 |
| **Miscellaneous²** | 3 | 0 | 0 | 3 |
| ***TOTALS*** | 6 | 15 | 16 | 37 |

Source: Database analysis results are dependent on the retrieval methods used. The results shown above are based on a combination of data retrieval methods.

8

Sworn testimony in *Freisen* by NFRTR custodian Denise Brown in this Court on

September 17, 2008, about the current accuracy of the NFRTR was not informative or

encouraging. When asked by defense counsel "how accurate are the NFRTR records?"

Custodian Brown replied: "I don't have a number." When asked to confirm whether "there are

inaccuracies in them [NFRTR data], are there not, ma'am?," she answered "Yes, there are."[9]

ATF officials have willfully failed to disclose that ATF has (1) lost or destroyed firearm

registration documents, (2) added registration documents provided by firearms owners to replace

those which ATF lost, destroyed, or could not locate, (3) knowledge that the NFRTR contains

---

[8] December 1998 Treasury IG Report at 12, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[9] *United States of America vs. Larry Douglas Friesen*, Case No. CR-08-41L, United States District Court for the Western District of Oklahoma, Transcript of Jury Trial, Vols. I-VIII, Sept. 17-Oct. 1, 2008, before the Honorable Tim Leonard, U.S. District Judge at 75-76. (Hereafter *United States of America vs. Larry Douglas Friesen* (2008).)

5

**Exhibit A, Pg. 179**

serious material errors that affect the reliability of its certifications in federal court that a particular firearm is not registered to a defendant, and (4) from time to time, depending on the circumstances, inconsistently applied various definitions of "critical error" in characterizing errors in the NFRTR, as this motion will document. Their actions, reported in documents created and published by the Government since 1979, particularly during the 1990s and continuing to present, violate due process, and obstruct justice.[10] There is evidence, discussed throughout this motion, that ATF has been withholding *Brady* material[11] by failing to disclose potentially exculpatory evidence at criminal trials. Both the Attorney General and his predecessor (Secretary of the Treasury) have failed to establish a new amnesty period to correct errors in the NFRTR because firearm registration documents are missing, as will be shown is required by the Criminal Division of the Department of Justice. Consequently, ATF's use of NFRTR data whose validity and reliability has not been independently established does not represent an acceptable standard for federal law enforcement in criminal prosecutions.

The Congress heard testimony in 1979 that ATF alleged J. Curtis Earl, a federally licensed NFA dealer, illegally possessed 475 unregistered firearms.[12] More than two decades later, the attorney who represented Mr. Earl informed a Subcommittee Chairman during a 2001 Congressional hearing about continuing inaccuracies in NFRTR records, that Mr. Earl

[T]urned to his file cabinet and began to produce the original records of their registration, and one by one the firearms came off the floor and back onto his

---

[10] There are no published law review articles on the NFRTR, and little pertinent case law. The most comprehensive legal review of NFRTR issues to date is in an unpublished article. Joshua Prince, "Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record when its 'Files are Missing'" (2008), *available at* http://www.nfaoa.org/documents/Violating_Due_Process20Aug2008.pdf

[11] *Brady vs. Maryland*, 373 U.S. 83 (1963).

[12] Congressional Hearing, Committee on Appropriations, United States Senate, *Oversight Hearings on Bureau of Alcohol, Tobacco and Firearms*, 96th Cong., 1st Sess. at 39 (1979), *available at* http://www.nfaoa.org/documents/1979_Hearing_Excerpts.pdf.

6

Exhibit A, Pg. 180

racks. At the end, he could show that he had registered every single one of these 475 firearms. ATF's records were grossly incorrect.[13]

In November 1979, in response to a request by then-Senator James A. McClure, the Criminal

Division of the Department of Justice stated if ATF determines that "a particular individual or

weapon is registered" and ATF finds that its "files are missing," then "the only solution would be

to declare another amnesty period."[14] . Sections of this Memorandum that include the preceding

quoted phrases are reproduced below.

No amnesty period was established as the result of Mr. Earl's case.

seventeen problem areas in the record system (see pp 3-4). The most significant of these in terms of its effect on the validity of a certification is where both the index card and the registration record are missing. It must be explained, however, that the only way to determine whether this situation exists is by first knowing that a specific individual or weapon is registered and the finding that both files are missing. Obviously, if the individual has never registered a firearm or if the firearm has never been registered by anyone, no record whatsoever will exist. The report does not suggest that this problem actually existed and it cites no examples where both records were determined to be missing.5/ Indeed, none of the ATF personnel we interviewed were aware of any case where this happened. Most of

5/ If this problem actually existed, the only solution would be to declare another amnesty period. The Secretary is empowered to do this under existing legislation.
15

---

[13] Letter to Ernest S. Istook, Jr., Chairman, Subcommittee on Treasury, Postal Service and General Government dated April 10, 2001, from David T. Hardy, Esq., *available at* http://www.nfaoa.org/documents/BardHard.pdf.

[14] U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, Nov. 29, 1979 at 4, *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

Under § 207(d) of the Gun Control Act of 1968, the Secretary of the Treasury (now the Attorney General) is empowered to administratively establish unlimited numbers of amnesty periods lasting up 90 days per amnesty period, with immunity from prosecution, "as the Secretary determines will contribute" to purposes of the NFA, upon publication in the *Federal Register* of his intention to do.

[15] Id. at 4.

Exhibit A, Pg. 181

In 1997, as the result of allegations by Eric M. Larson, a private citizen,[16] the Chairman, House Committee on Government Reform and Oversight, directed the Treasury IG to audit the NFRTR.[17] One of the audit reports, published in 1998, describes the use and results of Discovery sampling to establish there were "discrepancies" in three categories of NFRTR data, including missing or incorrect name; missing or incorrect serial number; computer records not found; and original records not found.[18] The Treasury IG failed to investigate a credible allegation that "ATF had registered firearms for which the agency had no documentation, but their owners did,"[19] and "did not include a review of the accuracy of ATF's certifications in criminal prosecutions that no record of registration of a particular weapon could be found" in the NFRTR.[20]

Continuing efforts by citizens, federally licensed firearms dealers and gun collectors, and testimonies and statements from 1996 to 2001 at Congressional hearings involving the accuracy

---

[16] Eric M. Larson has been a Senior Analyst, U.S. Government Accountability Office (GAO), since 1987. Mr. Larson's research, Congressional testimonies from 1996 to 2001, and continuing work involving the NFRTR has been and continues to be done in his personal capacity as a private citizen, and does not represent the policy or position of GAO.

[17] Letter from Dan Burton, Chairman, Committee on Government Reform and Oversight, House of Representatives dated June 25, 1997, to the Honorable Valerie Lau, Inspector General, Department of the Treasury. Work Paper D-4, October 14, 1997, by Diane Kentner at 5, *available at* http://www.nfaoa.org/documents/Work_Papers_D.pdf. Chairman Burton's letter states: "From the correspondence and testimony I received . . . it appears that the concerns raised by Mr. Larson may be valid and legitimate. Consequently, I believe an investigation by the OIG into [his] allegations would be appropriate to reveal any possible improprieties or mismanagement at the ATF, and to recommend solutions that would improve and strengthen ATF's registration and record-keeping of firearms."

[18] December 1998 Treasury IG Report at 12, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf. The 1998 Treasury IG reports do not use the term "critical error," and instead refer to them as "discrepancies."

[19] Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Trasfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005 at 12, *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf. The memorandum also states: "While the OIG found discrepancies in the sampled records . . . the critical error rates were not given in the text of the audit report. Nevertheless, based on its own findings and ATF efforts to improve the NFRTR, the Treasury OIG chose not to perform a full sampling and audit of the NFRTR." Id. at 14.

[20] Id. at 12.

8

**Exhibit A, Pg. 182**

and completeness of the NFRTR resulted in another Government examination of the NFRTR. In

the June 2007 report of its "review" of the NFRTR, the Department of Justice Inspector General

(Justice IG) stated:

> We reviewed ATF processes related to requesting records checks from the NFRTR and
> determined that when an error is detected, the NFA Branch staff thoroughly research the
> NFRTR and the imaging database to find out if a weapon is actually registered.
> Additionally, the NFA requires owners to retain the approved NFA weapons application
> as proof of a weapon's registration and make it available to ATF upon request. **If the
> NFA weapons owner can produce the registration paperwork, ATF assumes the
> error is in the NFRTR and fixes it in the database.**[21] [emphasis added]

The Justice IG's finding that "ATF assumes the error is in the NFRTR and fixes it in the

database" when firearms owners produce copies of their registration documents leaves

unanswered questions. Commenting on the foregoing determination, Stephen P. Halbrook, a

nationally and internationally recognized authority on U.S. firearms law, observed:

> . . . if the owner or the executor of a deceased owner cannot find the registration
> paperwork, which may be lost or destroyed, and if the record cannot be found in the
> NFRTR, then a voluntary abandonment of the firearm may be induced or even a criminal
> prosecution initiated. On such issues the report is not sufficiently informative.[22]

The loss or destruction of an NFA firearm registration document by anyone is not a

trivial matter because all violations of the NFA are serious felony offenses, and the penalties are

substantial.[23] Persons who are convicted of illegal possession of a machine gun are singled out

for particularly harsh treatment. The reason is that under Title 18 § 922(o), the Government is

---

[21] U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, June 2007 at 31, *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf. Hereafter June 2007 Justice IG Report.

[22] Stephen P. Halbrook. *Firearms Law Deskbook: Federal and State Criminal Practice.* 2008-2009 Edition. Thomson West Publishing, 2008 at 575.

[23] Violators may be fined not more than $250,000, and imprisoned not more than 10 years, or both. In addition, any vessel, vehicle or aircraft used to transport, conceal or possess an unregistered NFA firearm is subject to seizure and forfeiture, as is the weapon itself. 49 U.S.C § 781-788, 26 U.S.C. § 5861 and § 5872.

**Exhibit A, Pg. 183**

not required to prove that a machine gun is not registered to convict a defendant of Possession of Unregistered Firearm.

The 2007 determination appears to meet the standard the Criminal Division of the Department of Justice established in 1979 for a new amnesty period as "the only solution" when ATF's "files are missing."

When Eric M. Larson filed a FOIA request to the Justice IG to obtain copies of the Work Papers created during its review of the NFRTR, to further clarify its determination, the Justice IG responded by sending them to ATF's Disclosure Division for processing.[24]

It is unusual for an Inspector General to send Work Papers to an agency over which it has oversight responsibility for FOIA processing, because of the potential for conflict of interest it represents for both the agency and the Inspector General. Despite Mr. Larson's repeated efforts to obtain them, ATF has thus far not provided copies of the requested Work Papers. A copy of the July 25, 2008, letter ATF sent to Mr. Larson after receiving the Work Papers from the Justice Department IG, appears on the next page.

---

[24] Letter from Marilyn R. LaBrie, Disclosure Specialist, ATF dated July 25, 2008, to Eric M. Larson, bearing identifier REFER TO: 08-726.

10

Exhibit A, Pg. 184



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

**JUL 2 5** 2008

Washington, DC 20226
www.atf.gov

REFER TO: 08-726

Mr. Eric Larson
P.O. Box 5497
Takoma Park, MD 20913

Re: Work Papers – Report Number 1-2007-006

Dear Mr. Larson:

This is in reference to your Freedom of Information Act request, that you submitted to the
Department of Justice. Your request was forwarded to this Agency together with a large volume
of records.

It is our intent to grant your request in part. We are sorry that our processing has been delayed
but we will endeavor to provide a response as soon as possible.

We are processing your request as an "all others requestor" therefore you are entitled to 100 free
copies and 2 free hours of search. We will inform you if we anticipate any costs for copies that
are not covered by the foregoing.

We regret the delay and will do all we can to provide a response.

Sincerely,

Marilyn R. LaBrie
Team Leader, Disclosure Division

The Government still declines to establish an amnesty period to correct errors in the

NFRTR. For example, in a January 14, 2009, letter, the Department of Justice Deputy Inspector

General Paul K. Martin told Senator Barbara Mikulski, Chairman, Subcommittee on Commerce,

Justice, Science and Related Agencies, Committee on Appropriations, the following:

11

**Exhibit A, Pg. 185**



**U.S. Department of Justice**

Office of the Inspector General

January 14, 2009

The Honorable Barbara A. Mikulski
United States Senate
Hart Senate Office Building
Suite 503
Washington, D.C. 20510-2003

Attention: Benson Erwin

Dear Senator Mikulski:

We received your correspondence of October 28, 2008, forwarding a letter
from Mr. Eric Larson regarding the Office of the Inspector General's (OIG)
review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF)
management of the National Firearms Registration and Transfer Record
(NFRTR) database and Mr. Larson's Freedom of Information Act (FOIA) request
to the OIG. We will first address the concern with the OIG's review of the
NFRTR and, second, with Mr. Larson's FOIA request.

Mr. Larson stated in his letter that he was concerned that the OIG did
not review the "material inaccuracies" in the NFRTR and these errors "expose
innocent firearms owners to legal jeopardy." Mr. Larson also asks the OIG to
issue an opinion on the need for an amnesty period to register National
Firearms Act (NFA) weapons. We are aware of Mr. Larson's concern about
errors in the NFRTR and his desire for a new amnesty period for the
registration of additional NFA weapons. However, our review focused on ATF's
management of the NFRTR and the processing of NFA weapons' forms and did
not address the issue of an amnesty period. The OIG has no opinion on the
establishment of a new amnesty period in which to register NFA weapons.
While our review found that there are some technical and programming issues
that could cause administrative errors in records, we also found that ATF is
taking the appropriate actions to correct these issues and is proactively
correcting any errors found in individual records. Moreover, we found no
instance in which errors in the NFRTR resulted in inappropriate criminal
charges against individuals or federal firearms licensees.

Regarding Mr. Larson's FOIA request, the OIG received a FOIA request
from Mr. Larson on July 26, 2007, seeking information pertaining to our
review, including the work papers associated with the review. We have fully
processed this request.

12

**Exhibit A, Pg. 186**

On August 16, 2007, we provided Mr. Larson with a copy of the report relating to our review. By letter dated September 18, 2007, we informed Mr. Larson that the work papers contained three categories of material: (1) documents that originated with other offices/agencies; (2) public source documents; and (3) documents generated by the OIG that contain information originating from other offices/agencies. We asked Mr. Larson whether he wanted copies of the public source material and whether he wished us to refer the material originating with the other offices/agencies to those entities. We also informed him that we would process the documents generated by the OIG after consultation with the other offices/agencies.

By letter dated September 27, 2007, Mr. Larson responded that he wanted copies of the public source documents and that we should make the referrals to the other entities. We thereafter referred to the Department of the Treasury and the ATF documents that originated with their offices. We informed Mr. Larson of these referrals, telling him that the Department of the Treasury and ATF would respond directly to him regarding the referred documents. We also sent Mr. Larson copies of the public source material.

After consulting with ATF regarding the OIG-generated material, we informed Mr. Larson on December 5, 2008, that these documents were exempt from disclosure pursuant to 5 U.S.C. §552(b)(5). We also informed Mr. Larson regarding his right to appeal our determination.

We are forwarding a copy of this letter to Mr. Larson.

Please feel free to contact us if you have additional questions about the work of the OIG.

Sincerely,

Paul K. Martin
Deputy Inspector General

cc: Mr. Eric Larson

While Deputy Inspector General Martin correctly states "[w]e have fully processed" Mr.

Larson's FOIA request, his statement is misleading because the Justice IG transferred the

documents Mr. Larson requested to ATF for FOIA processing. The Justice IG's action is

reminiscent of how the Government long avoided disclosing documents pertinent to Waco in

13

response to a FOIA request by shifting the paperwork and related responsibilities between the

Department of Justice, ATF, and the Texas Rangers, before a Federal District Judge ordered a

halt to such evasions and ordered that the documents be produced for his Court, and they were.[25]

## "Institutional Perjury": The Busey Videotape and *LeaSure*

The most recent efforts to persuade ATF to render the NFRTR accurate and complete

originated from statements about its inaccuracy during an October 1995 "ROLL CALL

TRAINING" session at ATF headquarters that was also videotaped.[26] During the session, which

was broadcast throughout ATF, then-NFA Branch Chief Thomas Busey stated " . . **. when we**

**testify in court, we testify that the database [NFRTR] is 100 percent accurate. That's what**

**we testify to, and we will always testify to that. As you probably well know, that may not be**

**100 percent true."**[27] (Emphasis added). Asserting the error rate in the NFRTR was recently

reduced as the result of activities of a "quality review team," Mr. Busey stated:

> . . . when I first came in a year ago, our error rate was between 49 and 50 percent, so you
> can imagine what the accuracy of the NFRTR could be, if your error rate's 49 to 50
> percent. The error rate now is down to below 8 percent, and that's total. That's common
> errors and critical errors.[28]

---

[25] David T. Hardy, *This Is Not An Assault: Penetrating the We of Official Lies Regarding the Waco Incident.* Xlibris
Corporation, 2001 at 91-108.

[26] A certified copy of the session is transcribed under the title "ROLL CALL TRAINING, 10-95, TOM BUSEY."
*Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1997.* Hearings Before a
Subcommittee of the Committee on Appropriations, House of Representatives. 104th Cong., 2d Sess., Part 5 at 182-
205, *available at* http://www.nfaoa.org/documents/1996testimony.pdf. (Hereafter Congressional Hearing, House of
Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1997.*)

[27] Id. at 192.

[28] Id. at 202. Mr. Busey was apparently referring to an internal ATF "Quality Review" initiative that "commenced
operations on July 25, 1994," according to a "productivity report" prepared February 9, 1996. *Treasury, Postal
Service, and General Government Appropriations for Fiscal Year 1998.* Hearings Before a Subcommittee of the
Committee on Appropriations, House of Representatives. 105th Cong., 1st Sess., Part 5 at 102, *available at*
http://www.nfaoa.org/documents/1997testimony.pdf. (Hereafter Congressional Hearing, House of Representatives,
*Treasury, Postal Service, and General Government Appropriations far Fiscal Year 1998.*)

In response to Mr. Larson's FOIA request for information about the quality review initiative Mr. Busey described,
ATF sent approximately 100 loose pages consisting of weekly reports and other documents. The result of the

14

Exhibit A, Pg. 188

Mr. Busey's statements that ATF personnel "always testify" in court that the NFRTR "is 100 percent accurate," and "[a]s you probably well know, that may not be 100 percent true," were termed "institutional perjury" by an attorney who learned of the videotape, obtained a transcript of Mr. Busey's statements by filing a FOIA request, and published an article about the incident.[29] During the session Mr. Busey also said the error rate in the NFRTR was between 49 percent and 50 percent in the year before he arrived, and "we know you're basing your warrants on it, you're basing your entries on it, and you certainly don't want a Form $4^{30}$ waved in your face when you go in there to show that the guy does have a legally-registered [NFA firearm]. I've heard that's happened. I'm not sure."[31]

The videotape of Mr. Busey's remarks, now available on the Internet, has more impact than his published words. The reasons are that Mr. Busey's statements were not spontaneous remarks; Mr. Busey prepared his statements in advance, can be seen reading them, and smirks while saying: "I've heard that's happened. I'm not sure." In response to Mr. Larson's FOIA request for a copy of the Busey videotape, ATF responded:

---

initiative is unclear because it is not apparent whether there was a final report, and there are no separate explanations or summaries of the weekly reports.

[29] "Institutional Perjury," by James H. Jeffries III. *Voice for the Defense*, Vol. 25, No. 8, October 1996 at 28-30; *available at* http://www.nfaoa.org/documents/Jeffriesarticle.pdf, reprinted in the *Congressional Record* (Extensions of Remarks), Vol. 142, August 2, 1996 at E1461-E1462, *available at* http://www.nfaoa.org/documents/JeffriesCongRec.pdf.

[30] ATF Form 4, currently titled "Application for Tax Paid Transfer and Registration of Firearm," is prepared in duplicate original and used to transfer the ownership of registered NFA firearms. After ATF approves the Form 4 application, ATF (1) keeps one approved copy for entry into the NFRTR, and (2) sends the other approved copy to the firearm owner (transferor), who must subsequently transfer the firearm (and the other approved copy) to the new owner (transferee) within a reasonable time or cancel the transfer. The NFA prohibits the physical transfer of the firearm by the transferor to the transferee before ATF approves the transfer.

[31] Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1997, available at* http://www.nfaoa.org/documents/1996testimony.pdf.

15

Exhibit A, Pg. 189

> You have requested "a complete and unredacted copy of the videotape created by the Bureau of Alcohol, Tobacco and Firearms which pictures Mr. Thomas Busey, Chief, National Firearms Act Branch, during a "Roll Call Training Session, or about October 18, 1995". Your request is denied pursuant to Title 5, U.S.C. 552 (b)(6) as release of this video tape would constitute an invasion of Mr. Busey's privacy. [32]

The Busey videotape was used, in part, to overturn five convictions of John D. LeaSure for possession of unregistered firearms in a May 1996 bench trial, during which ATF Specialist Gary Schaible testified he was aware of "occasions . . . in the NFA Branch of clerks throwing away transmissions because they don't want to fool with them" rather than process them (Mr. LeaSure testified he FAXed registration documents to ATF in 1994, and ATF claimed it was unable to find a record of them).[33] Under cross-examination, when asked "that's one of the things [NFA Branch clerks throwing away documents] that could happen to you?," Mr. Schaible replied "Certainly."[34]

Citing Mr. Schaible's testimony (in which he also confirmed the Busey video had been broadcast throughout and was common knowledge within ATF Headquarters), the presiding Judge ruled " . . . it throws a disagreeable proposition on my finding somebody guilty on records when their chief man [Mr. Busey] says they were 49 percent wrong," and dismissed five

---

[32] Letter from Marilyn R. LaBrie, Disclosure Specialist, ATF, to Eric M. Larson dated March 18, 1998, bearing symbols L:D:MRL 98-514.  *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1999*. Hearings Before a Subcommittee of the Committee on Appropriations, House of Representatives. 105th Cong., 2d Sess., Part 5 at 170, *available at* http://www.nfaoa.org/documents/1998testimony.pdf. Hereafter Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1999*.

A videotape of the training session was obtained by an attorney who subpoenaed it for trial and made a copy when the U.S. Attorney that prosecuted the case failed to submit a timely order to the court to prohibit its public disclosure, *available at* http://www.nfaoa.org/documents/rollcall_highlights.mp4 .

[33] *United States of America vs. John Daniel LeaSure*, Crim. No. 4:95cr54, E.D. Va.—Newport News Div., *Transcript of Proceedings before the Honorable John A. MacKenzie* (May 21, 1996) at 42-43, *available at* http://www.nfaoa.org/documents/LeaSureTrial.pdf. (Hereafter *United States of America vs. John Daniel LeaSure* (1996).)

[34] Id. at 42-43.

16

Exhibit A, Pg. 190

convictions under the NFA for possession of unregistered firearms.[35]  The *LeaSure* transcript states that Mr. Schiable was a witness "called on behalf of the Government, having been first duly sworn, was examined and testified" to the above facts.[36]  ATF did not appeal the verdict.

ATF acted to contain the damage resulting from Mr. Busey's statements by (1) adding "corrections" by Mr. Schaible to transcribed copies of the videotape of Mr. Busey's remarks disclosed by ATF in response to FOIA requests, and (2) requesting the Audit Services Division of the Department of the Treasury to audit the NFRTR.  On February 13, 1996, Mr. Schaible stated under penalty of perjury that, to the best of his knowledge, no NFA Branch personnel have ever testified that the NFRTR is 100 percent accurate, and "the reference to an error rate of 49-50 percent is based on an informal, undocumented estimate by personnel from the Firearms and Explosives Regulatory Division."[37]

In *Rith*, a 1999 court case that included a challenge to the accuracy and completeness of the NFRTR arising from the Busey videotape, after hearing opposing evidence the Court ruled "[t]he record establishes that the NFRTR database has sufficient guarantees of trustworthiness to satisfy the Sixth Amendment."[38]  The Court based its opinion on (1) statements by Mr. Busey that "a quality review team . . . instituted in 1994" had reduced "the critical-error rate to below three percent," and (2) "a copy of an audit performed February 7, 1996, by the Audit Services Division of the Department of the Treasury" showing a 1.5 percent "critical-error" rate.[39]  The

---

[35] Id. at 45.

[36] Id. at 23.

[37] Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1997, available at* http://www.nfaoa.org/documents/1996testimony.pdf.

[38] *United States of America vs. Rith*, 164 F.3d 1323 at 1336, 51 Fed. R. Evid. Serv. 197 (10th Cir. 1999). Hereafter *United States of America vs. Rith* (1999).

[39] Id. at 1336.

17

Exhibit A, Pg. 191

Court added: "the accuracy of the registration check is buttressed by a second level review by a branch chief."[40] It is unclear whether the Audit Services Division of the Department of the Treasury published a formal report of its 1996 audit of the NFRTR; the audit processes it followed are unknown and may not have been fully disclosed to the Court.

ATF and the Audit Services Division may have perpetrated a fraud upon the Court in *Rith*. The reasons are that (1) Mr. Busey's statements about improvements in the "critical-error" may have been self-serving, (2) there is no evidence that a final report on the "quality review team" accomplishments was rendered, or that the results of the "accomplishments" and reduction of the "critical-error" rate were independently validated, (3) it is unclear whether the 1996 audit was conducted according to GAGAS, and (4) the Audit Services Division auditors may have been improperly influenced by NFA Branch representatives to manipulate the outcome of the audit.

The Audit Services Division is a sister component of ATF; has no oversight authority over ATF; and the purpose of the audit was to establish that the NFRTR was accurate enough to justify criminal prosecutions. It is improbable that one component of a federal law enforcement agency would engage in conduct that would reflect badly upon another component, or the agency itself; and questioning the legal basis for a federal law enforcement activity would be sensitive because of potential legal liabilities, such as overturning convictions and payments to citizens for damages for wrongful convictions.

There are reasons to doubt the independence of Treasury Department and other Government officials regarding their characterization of "errors" in the NFRTR. There are also reasons to question the validity and reliability of Mr. Busey's characterization of what he termed

---

[40] Id. at 1336.

18

Exhibit A, Pg. 192

"common errors" and "critical errors" and "error rate" in the October 1995 "ROLL CALL

TRAINING" session because (1) these terms do not correspond to terms used by the quality

control team, and (2) inspection of "Weekly — Quality Review Report" documents disclose that

the quality review team manipulated the NFRTR error rate by changing the definition of

"Significant Error" by renaming it "Error."[41]  Error and error rate reports created by the quality

review team, obtained via a FOIA request by Mr. Larson, are not straightforward and their

meaning is difficult to interpret; for example, one weekly report states:

    Since 6/30/94 reviewed 25611 Errors 1567 Significant errors 373
    Common Error rate .01%          Significant error rate .01% [42]

No valid and reliable overall error rate of any type could be identified from any of the

documents because numbers of "Errors" and "Significant errors" were different among nearly

100 different weekly reports ATF disclosed in responding Mr. Larson's FOIA request.

---

[41] ATF's "Quality Review" team manipulated the definition of "error" as follows. One document states: "On
approximately October 3, 1994, we began defining and separating the significant errors from the common errors,"
and this document defined "Significant Errors" as shown below:

    Significant Errors:  1.  Mispelled and/or Incomplete names.
                         2.  Voided application--didn't indicate
                             current firearm possessor.
                         3.  $200/$5 remittance not posted.
                         4.  Never mailed approved form to
                             transferor
                         5.  Approved wrong firearm to transferee.
                         6.  Approved form never updated in NFRTR.

Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government
Appropriations for Fiscal Year 1998* at 103, *available at* http://www.nfaoa.org/documents/1997testimony.pdf.

Another weekly report reclassified "Significant Errors" as "Errors" except for slightly changing one type of error,
namely, "2. Voided application - - didn't indicate previous owner," as shown below:

    Errors:  1.  Mispelled and/or Incomplete names.
             2.  Voided application--didn't indicate previous owner.
             3.  $200/$5 remittance not posted.
             4.  Never mailed approved form to transferor
             5.  Approved wrong firearm to transferee.
             6.  Approved form never updated in NFRTR.

Id. at 104.

[42] Id. at 103.

19

Exhibit A, Pg. 193

NFRTR Data Inaccuracies: Early Statistical Evidence, 1992 to 1996

Because of Mr. Busey's statements that records of Forms 4 could not be located in the

NFRTR, Mr. Larson sought to determine if there was any independent statistical evidence that

ATF had lost or destroyed NFA registration documents by analyzing publicly available NFRTR

data on "NFA registration activity" from 1992 to 1996. Mr. Schaible's testimony *LeaSure*

indicated that ATF may have added registration documents obtained from firearms owners to the

NFRTR after discovering that NFA Branch clerks had thrown documents away rather than work

on them.

Under a FOIA request, Mr. Larson obtained copies of reports of annual "NFA

registration activity" from 1992 to 1996 from the NFA Branch, which list 11 categories of

firearms registration activity represented in the NFRTR.[43] Inspection of the data indicates that

some data lack face validity; that is, does not measure what it purports to measure. The reason is

that there are records of NFA registration activity during and prior to the 1920s, a logical

impossibility because the NFA was not enacted until 1934. Just as when a clock incorrectly

strikes 13 on the hour, causing one to question what hour it really is and raising doubts about

---

[43] The NFRTR data Mr. Larson obtained are available in Eric M. Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms.* Prepared for the Honorable Pete Sessions, House of Representatives, Washington, D.C., April 2, 1999 (unpublished), inserted at 5-6, *available at* http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf.

The NFRTR data categories are: Form 1, Form 3, Form 4, Form 5, Form 6, Form 9, Form 10, and Form 4467, and differ according to whether the applicant is a private citizen, government agency, or Special Occupational Taxpayer (SOT) licensed to manufacture, import, and/or deal in NFA firearms, and whether the transfer is tax paid or tax exempt. Form 2, currently titled "Notice of Firearms Manufactured or Imported," is a record of notice to ATF used exclusively by and sent to ATF by SOTs, not an application form. The "Letter" category has been used to register or transfer NFA firearms when ATF forms have not been available, but these transactions are uncommon.

Treasury IG auditors reported that ATF has not formally defined the "Other" category, and stated it included "a procedure where movie industry supply houses and movie industry property masters filed applications by telegraph in lieu of filing a Form 3 in order to expedite processing by ATF." October 1998 Treasury IG Report at 18, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

Exhibit A, Pg. 194

what hour it really was during all the other times the clock was supposed to be striking correctly

on the hour during previous strikes, records of NFA registration activity before 1934 raise doubts

about the accuracy of records of NFA registration activity for other years.

These data tables of NFA registration activity during 1992 to 1996 are reproduced below

in the same form ATF sent them to Mr. Larson.

| DATA THROUGH 12/31/92 | | | | | BUREAU OF ALCOHOL, TOBACCO AND FIREARMS NFA REGISTRATION ACTIVITY - ANNUAL COMPARISON | | | | | | RUN: 2/01/93 13:31 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR | F1 | F2 | F3 | F4 | F5 | F6 | F9 | F10 | LTR | 4467 | OTHER | TOTAL |
| 1992 | 357 | 71296 | 26652 | 6527 | 46462 | 2 | 20385 | 289 | 40 | | 50 | 172040 |
| 1991 | 224 | 78062 | 20914 | 5390 | 42117 | 1 | 36848 | 258 | | | 35 | 183849 |
| 1990 | 692 | 88893 | 22823 | 6807 | 56015 | 4 | 27877 | 289 | 43 | | 134 | 203577 |
| 1989 | 271 | 69932 | 23605 | 8165 | 31190 | 12 | 18133 | 281 | 51 | | 106 | 151754 |
| 1988 | 542 | 24860 | 39747 | 7699 | 8319 | 2 | 1473 | 483 | 66 | | 450 | 83561 |
| 1987 | 409 | 17427 | 34492 | 8311 | 9388 | 2 | 745 | 324 | 144 | 1 | 717 | 71950 |
| 1986 | 935 | 69957 | 22944 | 5158 | 4888 | | 528 | 381 | 181 | 3 | 749 | 195724 |
| 1985 | 645 | 14666 | 15512 | 3524 | 6245 | 1 | 1506 | 334 | 45 | 1 | 726 | 43005 |
| 1984 | 534 | 16846 | 14720 | 3911 | 5437 | 1 | 1506 | 294 | 3 | 3 | 335 | 41590 |
| 1983 | 458 | 11143 | 11132 | 3293 | 3472 | 27 | 248 | 367 | 4 | 1 | 29 | 29686 |
| 1982 | 324 | 7720 | 11417 | 2770 | 2671 | 9 | 1 | 481 | 2 | 3 | 57 | 25435 |
| 1981 | 270 | 7101 | 8148 | 3734 | 2718 | 24 | 1 | 341 | 16 | 1 | 18 | 22366 |
| 1980 | 163 | 5872 | 6850 | 3040 | 1636 | 6 | 1 | 329 | 7 | 4 | 23 | 15109 |
| 1979 | 108 | 3284 | 6988 | 2150 | 1513 | 13 | 6 | 353 | 5 | 1 | 20 | 14441 |
| 1978 | 88 | 1438 | 5498 | 1879 | 1257 | 7 | 1 | 729 | 5 | 4 | 17 | 10989 |
| 1977 | 77 | 1988 | 6846 | 1535 | 1737 | 2 | 1 | 590 | 14 | 1 | 22 | 11973 |
| 1976 | 58 | 878 | 10943 | 979 | 1754 | 20 | 5 | 457 | 3 | 39 | 26 | 15134 |
| 1975 | 78 | 1399 | 3279 | 567 | 1830 | 18 | 3 | 615 | 10 | | 49 | 7846 |
| 1974 | 29 | 1017 | 2961 | 579 | 1688 | 9 | 3 | 597 | 15 | 5 | 8 | 6821 |
| 1973 | 16 | 1351 | 2833 | 353 | 1782 | 5 | 7 | 513 | 8 | 17 | 16 | 6181 |
| 1972 | 50 | 4017 | 1965 | 261 | 1511 | 14 | 9 | 639 | 33 | 84 | 19 | 8580 |
| 1971 | 24 | 2241 | 209 | 36 | 251 | 10 | | 311 | 1959 | 26 | 19 | 5086 |
| 1970 | 38 | 191 | 19 | 10 | 24 | 16 | | 1 | 1563 | 272 | 34 | 2160 |
| 1969 | 36 | 760 | 41 | 13 | 41 | 8 | 1 | | 1148 | 2086 | 19 | 4865 |
| 1968 | 1510 | 1277 | 366 | 192 | 935 | 7 | | 4 | 29 | 54487 | 37 | 58844 |
| 1967 | 909 | 1144 | 306 | 181 | 844 | 2 | | | 5 | 64 | 10 | 3465 |
| 1966 | 908 | 1293 | 435 | 134 | 1062 | 2 | | | | 8 | 20 | 3856 |
| 1965 | 841 | 1246 | 428 | 142 | 1047 | 7 | | 1 | 1 | 2 | 21 | 3736 |
| 1964 | 766 | 937 | 275 | 139 | 699 | 6 | | 1 | | 3 | 4 | 2888 |
| 1963 | 709 | 728 | 291 | 126 | 808 | 3 | 4 | | 1 | 2 | 8 | 2672 |
| 962 | 734 | 1111 | 272 | 264 | 789 | 3 | | | 1 | 14 | 7 | 3135 |
| 1961 | 889 | 1466 | 548 | 152 | 1338 | 5 | | 1 | 4 | 2 | 4 | 4321 |
| 960 | 790 | 657 | 314 | 148 | 654 | 28 | | | 2 | 6 | 1 | 2592 |
| 1950 TO 1959 | 6629 | 5955 | 2165 | 1150 | 2917 | 861 | 16 | 2 | 6 | 23 | 67 | 19771 |
| 1940 TO 1949 | 6574 | 7231 | 4784 | 361 | 4985 | 8455 | 5 | 2 | 4 | 9 | 57 | 32387 |
| 1930 TO 1939 | 11422 | 191 | 548 | 15 | 786 | 22 | 1 | 14 | 26 | 25 | 1280 | 14258 |
| 1920 TO 1929 | 12 | 4 | 12 | 2 | 7 | 1 | | 1 | 1 | 4 | 9 | 53 |
| PRIOR TO 1920 | 1 | 36 | 23 | 2 | 57 | 1 | 2 | 1 | 1 | 4 | 15 | 121 |
| UNKNOWN | 12 | 304 | 32 | 22 | 170 | 6 | 24 | | 6 | 58 | 3513 | 4147 |
| TOTAL | 38766 | 521183 | 349593 | 79573 | 250462 | 9614 | 109140 | 9110 | 5437 | 57187 | 8671 | 1398056 |

| DATA THROUGH 12/31/93 | | | BUREAU OF ALCOHOL, TOBACCO AND FIREARMS NFA REGISTRATION ACTIVITY - ANNUAL COMPARISON | | | | | | | RUN: 1/04/94 | | 7:11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR | F1 | F2 | F3 | F4 | F5 | F6 | F9 | F10 | LTR | 4467 | OTHER | TOTAL |
| 1993 | 299 | 187362 | 27228 | 7749 | 67625 | | 27905 | 405 | 11 | | 25 | 236669 |
| 1992 | 357 | 75756 | 26834 | 6556 | 46561 | 2 | 20391 | 289 | 48 | | 25 | 176889 |
| 1991 | 226 | 78157 | 28983 | 5400 | 42124 | 1 | 36834 | 258 | | | 33 | 184016 |
| 1990 | 692 | 89697 | 22850 | 6821 | 56804 | 4 | 27827 | 289 | 44 | | 132 | 294468 |
| 1989 | 271 | 69927 | 23728 | 8176 | 31210 | 12 | 18133 | 281 | 51 | | 106 | 151893 |
| 1988 | 362 | 26851 | 39767 | 7703 | 8570 | 2 | 1473 | 405 | 66 | | 450 | 83427 |
| 1987 | 489 | 17491 | 34519 | 8318 | 9421 | 2 | 745 | 324 | 143 | 1 | 714 | 72087 |
| 1986 | 936 | 70211 | 22959 | 5162 | 4903 | | 528 | 381 | 181 | 3 | 766 | 106808 |
| 1985 | 645 | 14728 | 15520 | 3526 | 6288 | 1 | 1306 | 334 | 65 | 1 | 725 | 43111 |
| 1984 | 534 | 14849 | 14725 | 3913 | 5437 | 1 | 1586 | 294 | 3 | 3 | 336 | 41681 |
| 1983 | 458 | 11142 | 11144 | 3284 | 3878 | 27 | 248 | 367 | 4 | 1 | 29 | 29782 |
| 1982 | 325 | 7728 | 11420 | 2771 | 2674 | 9 | 1 | 481 | 2 | 3 | 57 | 25451 |
| 1981 | 270 | 7108 | 8148 | 3735 | 2720 | 23 | 1 | 341 | 10 | 1 | 18 | 22375 |
| 1980 | 162 | 3873 | 6838 | 3040 | 1837 | 6 | 1 | 329 | 7 | 4 | 22 | 15111 |
| 1979 | 108 | 3285 | 6998 | 2158 | 1515 | 13 | 6 | 354 | 5 | 1 | 19 | 14444 |
| 1978 | 80 | 1438 | 5497 | 1878 | 1257 | 7 | 1 | 729 | 4 | 6 | 17 | 10906 |
| 1977 | 77 | 1987 | 6009 | 1555 | 1737 | 2 | 1 | 590 | 14 | 1 | 22 | 11975 |
| 1976 | 30 | 879 | 10945 | 979 | 1754 | 19 | 5 | 459 | 3 | 39 | 26 | 15138 |
| 1975 | 78 | 1399 | 5280 | 567 | 1831 | 18 | 3 | 613 | 10 | | 49 | 7848 |
| 1974 | 29 | 1017 | 2961 | 579 | 1689 | 9 | 3 | 587 | 15 | 5 | 8 | 6822 |
| 1973 | 16 | 1351 | 2030 | 355 | 1783 | 5 | 7 | 513 | 8 | 17 | 15 | 6098 |
| 1972 | 30 | 4820 | 1963 | 261 | 1511 | 14 | 11 | 638 | 33 | 84 | 19 | 6584 |
| 1971 | 24 | 2242 | 209 | 36 | 251 | 10 | | 311 | 1959 | 26 | 19 | 5087 |
| 1970 | 38 | 192 | 18 | 10 | 23 | 16 | | 1 | 1566 | 272 | 32 | 2168 |
| 1969 | 36 | 766 | 43 | 15 | 42 | 8 | 1 | | 1140 | 2818 | 18 | 4871 |
| 1968 | 1509 | 1278 | 368 | 193 | 936 | 7 | | 4 | 29 | 54485 | 37 | 58845 |
| 1967 | 909 | 1143 | 306 | 181 | 844 | 2 | | | 5 | 64 | 10 | 3466 |
| 1966 | 908 | 1293 | 435 | 136 | 1062 | 2 | | | | 8 | 20 | 3856 |
| 1965 | 841 | 1246 | 428 | 142 | 1047 | 7 | | 1 | 2 | 2 | 21 | 3757 |
| 1964 | 744 | 937 | 275 | 139 | 699 | 6 | | 1 | | 3 | 4 | 2888 |
| 1963 | 709 | 720 | 291 | 126 | 888 | 3 | 4 | | 1 | 2 | 8 | 2672 |
| 1962 | 734 | 1111 | 272 | 205 | 789 | 3 | | | 1 | 14 | 7 | 3136 |
| 1961 | 810 | 1466 | 548 | 152 | 1330 | 5 | | 1 | 4 | 2 | 4 | 4322 |
| 1960 | 791 | 657 | 314 | 148 | 655 | 20 | | | 2 | 6 | 1 | 2594 |
| 1950 TO 1959 | 6629 | 5956 | 2164 | 1151 | 2915 | 860 | 16 | 2 | 6 | 25 | 47 | 19769 |
| 1940 TO 1949 | 6572 | 7238 | 4703 | 363 | 4908 | 8456 | 5 | 2 | 4 | 9 | 57 | 32309 |
| 1930 TO 1939 | 11422 | 191 | 548 | 15 | 706 | 22 | 1 | 14 | 26 | 25 | 1280 | 14250 |
| 1920 TO 1929 | 12 | 4 | 12 | 2 | 7 | 1 | | | | 6 | 18 | 54 |
| PRIOR TO 1920 | 1 | 36 | 21 | 2 | 37 | 1 | 2 | 1 | 1 | 4 | 15 | 121 |
| UNKNOWN | 12 | 320 | 32 | 23 | 263 | 6 | 24 | | 6 | 58 | 3749 | 4493 |
| TOTAL | 39967 | 634228 | 337325 | 87415 | 518520 | 9612 | 136989 | 9517 | 5451 | 57189 | 8908 | 1644219 |

DATA THROUGH 12/31/94

BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
NFA REGISTRATION ACTIVITY - ANNUAL COMPARISON

RUN: 1/26/95 10:03

| YEAR | F1 | F2 | F3 | F4 | F5 | F6 | F9 | F10 | LTR | 4467 | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1994 | 1278 | 100130 | 22498 | 7838 | 62258 | | 35392 | 2857 | 2 | | 1 | 232246 |
| 1993 | 300 | 108830 | 27638 | 7819 | 67739 | | 28118 | 407 | 11 | | 19 | 240861 |
| 1992 | 356 | 76161 | 26878 | 6568 | 46587 | 2 | 20366 | 290 | 48 | | 21 | 177271 |
| 1991 | 225 | 78280 | 21018 | 5411 | 42243 | 1 | 36814 | 261 | | | 29 | 184282 |
| 1990 | 691 | 89287 | 22888 | 6838 | 56066 | 4 | 27504 | 289 | 44 | | 130 | 203733 |
| 1989 | 271 | 69582 | 23755 | 8176 | 31138 | 12 | 18132 | 281 | 51 | | 96 | 151494 |
| 1988 | 341 | 25164 | 39769 | 7787 | 8586 | 2 | 1473 | 483 | 66 | 1 | 448 | 83760 |
| 1987 | 412 | 17140 | 34536 | 8521 | 9441 | 2 | 745 | 328 | 144 | 1 | 768 | 71730 |
| 1986 | 958 | 78278 | 22978 | 5172 | 6905 | | 527 | 361 | 181 | 3 | 737 | 106092 |
| 1985 | 645 | 14742 | 15534 | 3529 | 6281 | 1 | 1346 | 334 | 45 | 1 | 722 | 45140 |
| 1984 | 535 | 14848 | 14730 | 3915 | 5437 | 1 | 1506 | 274 | 3 | 5 | 536 | 41608 |
| 1983 | 454 | 11137 | 11145 | 3207 | 3878 | 27 | 248 | 367 | 4 | 1 | 26 | 29694 |
| 1982 | 325 | 7724 | 11414 | 2770 | 2674 | 9 | 1 | 481 | 2 | 3 | 57 | 25440 |
| 1981 | 270 | 7127 | 8152 | 3737 | 2720 | 23 | 1 | 342 | 18 | 1 | 18 | 22401 |
| 1980 | 162 | 3873 | 6829 | 3044 | 1637 | 6 | 1 | 329 | 1 | 4 | 22 | 15114 |
| 1979 | 108 | 3285 | 6988 | 2151 | 1515 | 15 | 6 | 354 | 5 | 1 | 18 | 14446 |
| 1978 | 88 | 1450 | 5497 | 1879 | 1257 | 7 | 1 | 730 | 4 | 6 | 16 | 10997 |
| 1977 | 77 | 1907 | 6010 | 1537 | 1737 | 2 | 1 | 598 | 14 | 1 | 22 | 11978 |
| 1976 | 38 | 879 | 10947 | 983 | 1756 | 19 | 5 | 458 | 3 | 39 | 26 | 15145 |
| 1975 | 79 | 1401 | 3289 | 567 | 1831 | 18 | 3 | 614 | 18 | | 48 | 7851 |
| 1974 | 29 | 1818 | 2941 | 579 | 1690 | 9 | 3 | 587 | 15 | 5 | 8 | 6824 |
| 1973 | 16 | 1353 | 2032 | 355 | 1783 | 5 | 7 | 513 | 8 | 18 | 14 | 6102 |
| 1972 | 30 | 4028 | 1963 | 261 | 1511 | 14 | 11 | 638 | 33 | 84 | 19 | 8584 |
| 1971 | 24 | 2241 | 209 | 36 | 250 | 18 | | 311 | 1960 | 26 | 19 | 5086 |
| 1970 | 38 | 192 | 18 | 10 | 23 | 16 | | 1 | 1567 | 271 | 32 | 2168 |
| 1969 | 36 | 768 | 43 | 13 | 42 | 8 | 1 | | 1140 | 2816 | 18 | 4877 |
| 1968 | 1514 | 1277 | 568 | 193 | 935 | 7 | | 4 | 29 | 54485 | 36 | 58844 |
| 1967 | 909 | 1141 | 306 | 181 | 844 | 2 | | | 5 | 64 | 9 | 3461 |
| 1966 | 902 | 1295 | 436 | 136 | 1859 | 2 | | | | 8 | 20 | 3856 |
| 1965 | 841 | 1246 | 429 | 162 | 1047 | 7 | | 1 | 2 | 2 | 20 | 3737 |
| 1964 | 744 | 934 | 276 | 139 | 698 | 6 | | 1 | | 3 | 4 | 2805 |
| 1963 | 789 | 720 | 291 | 126 | 808 | 3 | 4 | | 1 | 2 | 6 | 2672 |
| 1962 | 734 | 1115 | 277 | 205 | 787 | 3 | | | 1 | 14 | 7 | 3143 |
| 1961 | 818 | 1463 | 548 | 155 | 1329 | 5 | | 1 | 4 | 2 | 4 | 4319 |
| 1960 | 792 | 657 | 314 | 148 | 655 | 20 | | | 2 | 6 | 1 | 2595 |
| 1950 TO 1959 | 6631 | 5952 | 2164 | 1152 | 2915 | 859 | 16 | 2 | 6 | 23 | 46 | 19766 |
| 1940 TO 1949 | 6571 | 7230 | 4695 | 363 | 4914 | 8452 | 5 | 2 | 4 | 9 | 56 | 32301 |
| 1930 TO 1939 | 11422 | 196 | 548 | 17 | 708 | 22 | 1 | 14 | 26 | 26 | 1268 | 14248 |
| 1920 TO 1929 | 12 | 4 | 12 | 2 | 8 | 1 | | | | 6 | 9 | 56 |
| PRIOR TO 1920 | 1 | 36 | 22 | 2 | 37 | 1 | 2 | 1 | 1 | 4 | 15 | 122 |
| UNKNOWN | 30 | 329 | 33 | 26 | 273 | 6 | 24 | 1 | 6 | 57 | 3159 | 3944 |
| TOTAL | 40362 | 735422 | 360421 | 95598 | 581002 | 9607 | 172224 | 12379 | 5456 | 57196 | | 8252 1877919 |

BUREAU OF ALCOHOL, TOBACCO AND FIREARMS     RUN: 1/12/96 11:28
AFA REGISTRATION ACTIVITY - ANNUAL COMPARISON

| YEAR | F1 | F2 | F3 | F4 | F5 | F6 | F9 | F18 | LTR | 6667 | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1995 | :124 | 45445 | 17217 | 8059 | 44367 | 2 | 31503 | 1492 | 19 | | | 221488 |
| 1994 | :272 | 104681 | 22794 | 7870 | 62356 | | 35304 | 2045 | 2 | | | 237156 |
| 1993 | 309 | 188282 | 27694 | 7637 | 67761 | | 28117 | 436 | 11 | | 10 | 260604 |
| 1992 | 358 | 76136 | 24083 | 6573 | 46593 | 2 | 20364 | 290 | 48 | | 21 | 177258 |
| 1991 | 228 | 78255 | 21028 | 5428 | 42246 | 1 | 36884 | 262 | | | 25 | 186266 |
| 1990 | 491 | 85266 | 22912 | 4835 | 56670 | 4 | 27497 | 289 | 44 | | 139 | 205728 |
| 1989 | 273 | 69568 | 23761 | 8181 | 31158 | 12 | 16128 | 201 | 51 | | 96 | 151605 |
| 1988 | 341 | 25129 | 39798 | 7712 | 8588 | 2 | 1473 | 483 | 46 | 1 | 445 | 83756 |
| 1987 | 412 | 17141 | 36546 | 6338 | 9461 | 2 | 765 | 320 | 146 | 1 | 787 | 71749 |
| 1986 | 959 | 70531 | 22976 | 5174 | 6939 | | 527 | 301 | 103 | 3 | 735 | 136320 |
| 1985 | 445 | 16750 | 15569 | 5532 | 4293 | 1 | 1306 | 334 | 45 | 1 | 720 | 43167 |
| 1984 | 535 | 16850 | 16737 | 3916 | 5457 | 1 | 1506 | 294 | 3 | 3 | 336 | 41610 |
| 1983 | 455 | 11136 | 11158 | 3297 | 3867 | 27 | 248 | 367 | 4 | 1 | 25 | 29707 |
| 1982 | 325 | 7751 | 11421 | 2773 | 2674 | 9 | 1 | 481 | 2 | 3 | 35 | 25473 |
| 1981 | 270 | 7132 | 8157 | 3741 | 2721 | 25 | 1 | 342 | 18 | 3 | 18 | 22616 |
| 1980 | 162 | 5876 | 6827 | 3846 | 1638 | 6 | 1 | 330 | 7 | 4 | 20 | 15117 |
| 1979 | 130 | 3205 | 6908 | 2151 | 1516 | 13 | 6 | 356 | 5 | 1 | 18 | 14445 |
| 1978 | 62 | 1634 | 5698 | 1878 | 1258 | 7 | 3 | 739 | 4 | 8 | 16 | 10930 |
| 1977 | 77 | 1987 | 6810 | 1537 | 1737 | 2 | 3 | 598 | 16 | 1 | 22 | 11978 |
| 1976 | 39 | 884 | 19940 | 983 | 1757 | 19 | 5 | 458 | 3 | 39 | 26 | 15146 |
| 1975 | 79 | 1602 | 3280 | 568 | 1635 | 18 | 3 | 616 | 18 | | 68 | 7857 |
| 1974 | 29 | 1318 | 2942 | 579 | 1692 | 9 | 3 | 587 | 15 | 5 | 7 | 6824 |
| 1973 | 16 | 1353 | 2033 | 353 | 1781 | 5 | 7 | 513 | 9 | 18 | 13 | 6101 |
| 1972 | 58 | 4021 | 1964 | 262 | 1511 | 14 | 11 | 630 | 53 | 84 | 17 | 8587 |
| 1971 | 26 | 2262 | 209 | 36 | 251 | 18 | | 311 | 1965 | 26 | 18 | 5092 |
| 1970 | 30 | 192 | 18 | 18 | 23 | 16 | | 1 | 1567 | 271 | 32 | 3657 |
| 1969 | 36 | 761 | 43 | 13 | 42 | 6 | 1 | | 1161 | 2017 | 17 | 4379 |
| 1968 | 1518 | 1292 | 368 | 194 | 935 | 7 | | 4 | 29 | \$4583 | 55 | 58877 |
| 1967 | 989 | 1141 | 384 | 181 | 844 | 2 | | 5 | 64 | | 9 | 3461 |
| 1966 | 982 | 1295 | 437 | 134 | 1059 | 2 | | | 8 | | 29 | 3657 |
| 1965 | 863 | 1246 | 629 | 142 | 1047 | 7 | | 1 | 2 | | 20 | 3739 |
| 1964 | 76C | 956 | 276 | 139 | 698 | 6 | | 1 | | 3 | 4 | 2805 |
| 1963 | 709 | 726 | 291 | 126 | 868 | 3 | 4 | | 1 | 2 | 8 | 2672 |
| 1962 | 736 | 1115 | 277 | 205 | 787 | 3 | | | 1 | 16 | 7 | 3143 |
| 1961 | 812 | 1443 | 568 | 153 | 1329 | 3 | | 1 | 4 | 2 | 4 | 4328 |
| 1960 | 792 | 657 | 316 | 168 | 656 | 20 | | | 2 | 6 | 1 | 2596 |
| 1950 TO 1959 | 8433 | 5961 | 2168 | 1152 | 2916 | 859 | 16 | 2 | 6 | 23 | 45 | 19770 |
| 1940 TO 1949 | 6576 | 7231 | 6695 | 363 | 4917 | 8652 | 5 | 2 | 4 | 9 | 55 | 32387 |
| 1930 TO 1939 | 11627 | 198 | 567 | 17 | 710 | 22 | 3 | 16 | 26 | 27 | 1263 | 14252 |
| 1929 TO 1929 | 12 | 4 | 12 | 2 | 8 | 1 | | | | 4 | 9 | 56 |
| PRIOR TO 1926 | 1 | 36 | 21 | 2 | 38 | 1 | 2 | 1 | 3 | 4 | 13 | 120 |
| UNKNOWN | 60 | 349 | 32 | 75 | 334 | 6 | 24 | 1 | 9 | 57 | 3377 | 4274 |
| TOTAL | 41534 | 635586 | 378162 | 103558 | 447580 | 9689 | 203495 | 13888 | 5487 | 57216 | | 8435 2104544 |

| DATA THROUGH 12/31/96 | | | BUREAU OF ALCOHOL, TOBACCO AND FIREARMS |  |  |  |  |  | RUN: 1/06/97 | | 8:32 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | NFA REGISTRATION ACTIVITY - ANNUAL COMPARISON | | | | | | | | |

| YEAR | F1 | F2 | F3 | F4 | F5 | F6 | F9 | F10 | LTR | 4467 | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | 1253 | 96677 | 17197 | 6367 | 67769 | 1 | 60223 | 1202 | 21 | | | 230718 |
| 1995 | 1125 | 99075 | 17329 | 8086 | 66522 | 2 | 37332 | 1487 | 24 | | | 225178 |
| 1994 | 1273 | 104563 | 22796 | 7887 | 62551 | | 35381 | 2048 | 2 | | | 237092 |
| 1993 | 381 | 100226 | 27716 | 7050 | 67752 | | 28116 | 484 | 11 | | 16 | 246312 |
| 1992 | 358 | 76127 | 26096 | 6577 | 46597 | 2 | 20363 | 298 | 48 | | 19 | 177269 |
| 1991 | 226 | 70229 | 21030 | 5423 | 42275 | 1 | 56783 | 262 | | | 22 | 184257 |
| 1990 | 691 | 89257 | 27916 | 6841 | 56881 | 4 | 27696 | 289 | 66 | | 129 | 203748 |
| 1989 | 271 | 69559 | 23769 | 8186 | 31143 | 12 | 18128 | 281 | 49 | | 96 | 151492 |
| 1988 | 361 | 25123 | 39803 | 7716 | 8509 | 2 | 1673 | 403 | 66 | | 665 | 83759 |
| 1987 | 616 | 17183 | 36557 | 8333 | 9445 | 2 | 745 | 320 | 142 | | 706 | 71765 |
| 1986 | 939 | 70656 | 22900 | 5174 | 4946 | | 527 | 301 | 178 | 1 | 731 | 106521 |
| 1985 | 665 | 14032 | 15539 | 5537 | 6375 | 1 | 1588 | 333 | 45 | | 718 | 63331 |
| 1984 | 535 | 16852 | 16739 | 3919 | 5638 | 1 | 1507 | 294 | 3 | | 336 | 41624 |
| 1983 | 655 | 11137 | 12349 | 3208 | 3089 | 27 | 268 | 367 | 6 | | 25 | 29739 |
| 1982 | 326 | 7759 | 11626 | 2771 | 2676 | 9 | 3 | 481 | 2 | | 36 | 25483 |
| 1981 | 271 | 7131 | 8162 | 3741 | 2722 | 25 | 3 | 362 | 10 | | 10 | 22421 |
| 1980 | 162 | 5877 | 6826 | 3046 | 1638 | 6 | 1 | 338 | 7 | | 29 | 15113 |
| 1979 | 138 | 3205 | 6987 | 2151 | 1516 | 15 | 6 | 356 | 5 | | 18 | 14443 |
| 1978 | 88 | 1638 | 5501 | 3078 | 1250 | 7 | 1 | 730 | 6 | | 15 | 10996 |
| 1977 | 77 | 1966 | 6814 | 1538 | 1740 | 2 | 1 | 591 | 14 | 1 | 19 | 11985 |
| 1976 | 38 | 868 | 10944 | 983 | 1758 | 19 | 5 | 658 | 3 | 36 | 26 | 15144 |
| 1975 | 79 | 1682 | 3288 | 569 | 1035 | 18 | 3 | 613 | 10 | | 68 | 7857 |
| 1974 | 29 | 1818 | 2963 | 579 | 1690 | 9 | 3 | 589 | 15 | 5 | 7 | 6027 |
| 1973 | 16 | 1354 | 2853 | 354 | 1700 | 5 | 7 | 513 | 9 | 10 | 12 | 6101 |
| 1972 | 38 | 6021 | 1966 | 262 | 1513 | 16 | 11 | 659 | 33 | 85 | 38 | 8590 |
| 1971 | 26 | 2263 | 209 | 56 | 252 | 10 | | 312 | 1965 | 26 | 18 | 5095 |
| 1970 | 59 | 192 | 18 | 10 | 25 | 16 | | | 1567 | 271 | 31 | 2167 |
| 1969 | 36 | 761 | 63 | 13 | 62 | 8 | 3 | | 1148 | 2053 | 17 | 4116 |
| 1968 | 1511 | 1320 | 368 | 196 | 935 | 7 | | | 29 | 56585 | 35 | 58906 |
| 1967 | 909 | 1161 | 386 | 181 | 864 | 2 | | | 5 | 66 | 9 | 3461 |
| 1966 | 902 | 1293 | 657 | 156 | 1069 | 2 | | | | 8 | 20 | 3858 |
| 1965 | 863 | 1246 | 629 | 142 | 1048 | 7 | | | 2 | 2 | 20 | 3739 |
| 1964 | 766 | 936 | 276 | 139 | 698 | 6 | | | | 3 | 4 | 2844 |
| 1963 | 789 | 728 | 291 | 126 | 838 | 3 | 4 | | 1 | 2 | 8 | 2672 |
| 1962 | 736 | 1115 | 277 | 205 | 787 | 3 | | | 1 | 16 | 7 | 3143 |
| 1961 | 812 | 1464 | 540 | 154 | 1330 | 5 | | | 6 | 2 | 6 | 4323 |
| 1960 | 792 | 657 | 314 | 148 | 656 | 20 | | | 2 | 6 | 1 | 2596 |
| 1950 TO 1959 | 6638 | 5961 | 2165 | 1152 | 2917 | 859 | 16 | 2 | 6 | 23 | 65 | 17988 |
| 1946 TO 1949 | 6575 | 7232 | 6697 | 366 | 4919 | 8456 | 6 | 2 | 6 | 18 | 54 | 32317 |
| 1938 TO 1939 | 11669 | 199 | 566 | 17 | 718 | 22 | 1 | 16 | 27 | 27 | 1247 | 14859 |
| 1928 TO 1929 | | 6 | 6 | | 1 | | | | | 3 | 5 | 19 |
| PRIOR TO 1920 | | 11 | 6 | | 4 | | | | | | 5 | 28 |
| UNKNOWN | 66 | 353 | 32 | 25 | 339 | 6 | 26 | 1 | 10 | 58 | 3872 | 4780 |
| TOTAL | 42810 | 935387 | 395582 | 114814 | 515671 | 9612 | 244717 | 15846 | 5518 | 57223 | | 6076 2341578 |

Mr. Larson arranged the Form 4 data from 1992 to 1996 by and across single years to determine if the number of registrations changed over time. As shown in the following table, the total number of Form 4 registrations increased by 625 during 1992 to 1996, for registrations that occurred since 1934 by single years through 1996 and during unknown years (registrations for

years in and before 1968 have been combined). Mr. Larson reported these results in 1997 in

Congressional testimony, as shown below.

#### Table 4

Form 4 (Tax-Paid) Transfers from 1934 to 1996, and During Unknown Years, as Reported by ATF During 1992 to 1996 in the National Firearms Registration and Transfer Record: Calculations Showing Results of Annual and Overall Changes Have Been Added

| Year | 1992 (1) | 1993 (2) | Change (2)-(1)= (3) | 1994 (4) | Change (4)-(2)= (5) | 1995 (6) | Change (6)-(4)= (7) | 1996 (8) | Change (8)-(6)= (9) | Change 1992-96 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1996 | | | | | | | | 6,367 | 0 | 0 |
| 1995 | | | | | | 8,069 | 0 | 8,086 | +27 | +27 |
| 1994 | | | | 7,838 | 0 | 7,870 | +32 | 7,887 | +17 | +49 |
| 1993 | | 7,749 | 0 | 7,819 | +70 | 7,837 | +18 | 7,850 | +13 | +101 |
| 1992 | 6,527 | 6,556 | +29 | 6,568 | +12 | 6,573 | +5 | 6,577 | +4 | +50 |
| 1991 | 5,390 | 5,400 | +10 | 5,411 | +11 | 5,420 | +9 | 5,423 | +3 | +33 |
| 1990 | 6,807 | 6,821 | +14 | 6,830 | +9 | 6,835 | +5 | 6,841 | +6 | +34 |
| 1989 | 8,165 | 8,176 | +11 | 8,176 | 0 | 8,181 | +5 | 8,186 | +5 | +21 |
| 1988 | 7,699 | 7,703 | +4 | 7,707 | +4 | 7,712 | +5 | 7,714 | +2 | +15 |
| 1987 | 8,311 | 8,318 | +7 | 8,321 | +3 | 8,330 | +9 | 8,331 | +1 | +20 |
| 1986 | 5,158 | 5,162 | +4 | 5,172 | +10 | 5,174 | +2 | 5,174 | 0 | +16 |
| 1985 | 3,524 | 3,526 | +2 | 3,529 | +3 | 3,532 | +3 | 3,537 | +5 | +13 |
| 1984 | 3,911 | 3,913 | +2 | 3,915 | +2 | 3,916 | +1 | 3,919 | +3 | +8 |
| 1983 | 3,203 | 3,204 | +1 | 3,207 | +3 | 3,207 | 0 | 3,208 | +1 | +5 |
| 1982 | 2,770 | 2,771 | +1 | 2,770 | -1 | 2,770 | 0 | 2,771 | +1 | +1 |
| 1981 | 3,734 | 3,735 | +1 | 3,737 | +2 | 3,741 | +4 | 3,741 | 0 | +7 |
| 1980 | 3,040 | 3,040 | 0 | 3,044 | +4 | 3,046 | +2 | 3,046 | 0 | +6 |
| 1979 | 2,150 | 2,150 | 0 | 2,151 | +1 | 2,151 | 0 | 2,151 | 0 | +1 |
| 1978 | 1,879 | 1,878 | -1 | 1,879 | +1 | 1,878 | -1 | 1,878 | 0 | -1 |
| 1977 | 1,535 | 1,535 | 0 | 1,537 | +2 | 1,537 | 0 | 1,538 | +1 | +3 |
| 1976 | 979 | 979 | 0 | 983 | +4 | 983 | 0 | 983 | 0 | +4 |
| 1975 | 567 | 567 | 0 | 567 | 0 | 568 | +1 | 569 | +1 | +2 |
| 1974 | 579 | 579 | 0 | 579 | 0 | 579 | 0 | 579 | 0 | 0 |
| 1973 | 353 | 353 | 0 | 353 | 0 | 353 | 0 | 354 | +1 | +1 |
| 1972 | 261 | 261 | 0 | 261 | 0 | 262 | +1 | 262 | 0 | +1 |
| 1971 | 36 | 36 | 0 | 36 | 0 | 36 | 0 | 36 | 0 | 0 |
| 1970 | 10 | 10 | 0 | 10 | 0 | 10 | 0 | 10 | 0 | 0 |
| 1969 | 13 | 13 | 0 | 13 | 0 | 13 | 0 | 13 | 0 | 0 |
| 1968 | 192 | 193 | +1 | 193 | 0 | 194 | +1 | 194 | 0 | +2 |
| < 1968 | 2,780 | 2,785 | +5 | 2,792 | +7 | 2,791 | -1 | 2,983 | +192 | +203 |
| Unknown | 22 | 23 | +1 | 26 | +3 | 25 | -1 | 25 | 0 | +3 |
| CHANGE | | | +92 | | +150 | | +100 | | +283 | +625 |
| Totals | 79,573 | 87,413 | | 95,338 | | 103,558 | | 110,014 | | |

Data source: Bureau of Alcohol, Tobacco and Firearms. All numbers shown in boldface type were calculated by Eric M. Larson. [44]

Mr. Larson's analysis used arithmetic calculations to determine if there are changes in

NFRTR data, which could mean that registrations were being added after the fact, years after

---

[44] Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1998* at 71, *available at* http://www.nfaoa.org/documents/1997testimony.pdf. Mr. Larson found similar patterns of apparent additions of registrations for Forms 1, 2, 3, 5, 4467, and "Letter" and "Other" categories.

26

Exhibit A, Pg. 200

ATF approved the original registration and concluded NFRTR reporting for a given year. For example, the number of registrations for 1992 changed from 6,527 to 6,556 in 1993, a difference of 29; similarly, the number of registrations for 1992 changed from 6,568 in 1994 to 6,573 in 1995, an increase of 12. Inspection of these Form 4 data disclose that the number of registrations in 1992 (6,527) increased to 6,577 in 1996. Put another way, ATF added 50 registrations during 1992 to 1996, for the year 1992, which gives the appearance that ATF could have added 50 Forms 4 to the NFRTR during that period. Using the same arithmetic calculations to analyze total Form 4 registrations for all years from 1992 to 1996, Mr. Larson determined that total registrations increased by 625; again, the implication is that ATF may have added 625 Forms 4 to the NFRTR after being unable to locate them in the NFRTR, and NFA firearms owners provided ATF with copies of their approved Forms 4. Note that 203 registrations were added for years in or before 1968.

In an effort to determine whether he may have made any errors of fact or omission, Mr. Larson asked NFA Branch officials if the increases in registrations resulted from ATF added copies of lost or destroyed NFA registrations back into the NFRTR, after obtaining them from firearms owners, or if there was another explanation. NFA Specialist Gary N. Schaible told Mr. Larson if an error was detected on a form and the form was misclassified, it would be reclassified as a Form 4, a Form 4467 or whatever form was correct, and that it would be re-entered in the NFRTR in the year that the registration occurred.[45] Mr. Schaible also stated "I assume that's happened," in response to Mr. Larson's question: "Has ATF ever added a firearm to the NFRTR, after a lawful owner produced a valid registration, because ATF had no record of the firearm in

---

[45] Id. at 95.

27

Exhibit A, Pg. 201

the NFRTR?"[46]   In addition to Mr. Schaible's comments, NFA Branch Chief Nereida W. Levine

told Mr. Larson in a January 7, 1997, letter that correcting errors in entering data according to

Form number or year of registration "may result in an adjustment to previously generated

statistics."[47]   NFA Branch Chief Levine concluded:

> Finally, you asked whether a firearm would be 'dded to
> the Registry if a person possessed a valid registration
> that was not in the Registry.  The document if a person
> possesses is his or her evidence of registration.  It
> would be added to the National Firearms Registration
> and Transfer Record if the information was not already
> in the Record.                                              48

If no registrations were added to the NFRTR, explanations by NFA Branch

representatives that changes in annual "NFA registration activity" could result from correcting

errors in Form number and/or year of registration means such changes would be a "zero-sum"

game, and represent classification errors.  In other words, if the annual changes resulted from

reclassified data, total registrations from all categories would not change.

To determine if the number of total registrations did not change, Mr. Larson analyzed

total registrations (for all categories) for each year from 1992 to 1996 using the same arithmetic

calculations he used to analyze Form 4 data.  He found that total registrations increased each

year and totaled 18,869 for the period from 1992 to 1996, and that registrations had been added

to all NFRTR data categories for each year.

Mr. Larson concluded the discrepancies he observed in NFA registration activity, and

statements by ATF representatives, required additional evidence to reliably determine the

reason(s) for the increased number of reported registrations.  While ATF personnel adding

---

[46] Id. at 97. This question was asked and answered twice.

[47] Letter from Nereida W. Levine, Chief, NFA Branch, Bureau of Alcohol, Tobacco and Firearms, dated Jan. 7, 1997, to Eric M. Larson, bearing symbols E:RE:FN:GS.  Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1999* at 110-111, *available at* http://www.nfaoa.org/documents/1998testimony.pdf.

[48] Id. at 41.

28

Exhibit A, Pg. 202

registrations was one possible explanation, there was insufficient statistical and evidence upon which to reliably base such a conclusion. For example, there also could have been flaws in computer software, problems with reporting functions resulting from editing, inadequate internal quality controls or checks, and so forth, so Mr. Larson concluded that a formal investigation was needed, and did not present his findings as definitive. Because he was unable to conduct additional research according to standard social sciences practices, Mr. Larson asked appropriate Government officials to determine if ATF was adding registrations to the NFRTR.[49]

## Coverups in an internal ATF investigation, and audit of the NFRTR by the Treasury IG

ATF and the Treasury IG conducted separate investigations in 1997 and 1998, respectively, of allegations by Mr. Larson that ATF had mismanaged the NFRTR, and there is valid and reliable evidence that each entity avoided determining whether ATF had added registrations. Each covered up facts and failed to diligently investigate Mr. Larson's complaint. All of Mr. Larson's allegations will not be reviewed in this motion, but it is instructive to note that the Treasury IG censored his most serious allegation. Although an audit Work Paper dated October 10, 1997, prepared Treasury IG auditor Diane Kentner, states the following:

---

[49] Because NFRTR data are protected from disclosure under the NFA (26 U.S.C.A. § 5848) and considered "tax return" information prohibited from disclosure under the tax code (26 U.S.C.A. § 6103), it was not legally possible for Mr. Larson to visit the NFA Branch to inspect NFRTR data or observe procedures involving NFA registration activities conducted by NFA Branch personnel.

Because the names and addresses of individual NFA firearms owners and SOTs are also protected from disclosure, it was not possible for Mr. Larson to conduct ordinary social science research, such as drawing representative random samples to try and contact or survey them to investigate what their experiences may have been regarding NFA paperwork for guns in their inventory for which they had valid registration documents, but for which ATF could find no record in the NFRTR. Similarly, Mr. Larson was legally prohibited from accessing the computerized NFRTR data base, and thus was unable to inspect these data, run tabulations and cross-tabulations, or conduct other analyses.

29

Exhibit A, Pg. 203

**(OIG Follow Up)**

➢ **Did ATF add** additional firearms to the NFRTR that were originally registered on **Form 1 or 4467** during 1934 to 1971, for which ATF lost or destroyed original records.

50

there is no evidence in either of its 1998 reports on the NFRTR, or in the 1998 audit Work

Papers, that the Treasury IG fully investigated Mr. Larson's allegation.

Mr. Larson's original allegation, reproduced below, states:

> **L. ATF employees have deliberately destroyed original firearm registration documents that they are required by law to maintain, as noted in sworn testimony in 1996 by ATF Special Agent Gary N. Schaible.** In analyses of data made public by ATF, I found that during 1992 to 1996, ATF may have added 119 or more firearms to the NFRTR which were originally registered on Form 1 or Form 4467 during 1934 to 1971, for which ATF lost or deliberately destroyed the original records.** 51

The Treasury IG censored Mr. Larson's allegation in its October 1998 audit report, and is

reproduced on the following page.

[50] Work Paper D-5, October 10, 1997 at 1, available at http://www.nfaoa.org/documents/Work_Papers_D.pdf.

[51] Letter to Valerie Lau, Inspector General, Office of Inspector General, Department of the Treasury, dated May 10, 1997, from Eric M. Larson. Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 1999* at 99, *available at* http://www.nfaoa.org/documents/1998testimony.pdf.

Form 1 ("Registration of Firearms") was used from 1934 to 1968 to register unregistered NFA firearms; after 1968 it was titled "Application to Make and Register a Firearm" because the Gun Control Act of 1968 prohibited the registration of unregistered NFA firearms after the 1968 amnesty period expired (a citizen can "make" and register an NFA firearm by paying a $200 tax and first obtaining ATF's approval to do so). ATF created Form 4467 "Registration of Certain Firearms in November 1968") under § 207(b) of the 1968 Act to accept registrations of unregistered firearms, with immunity from prosecution, during the amnesty period from November 2, 1968, to December 1, 1968.

The year 1971 specified in Mr. Larson's complaint relates to a different allegation that ATF had improperly registered unregistered NFA firearms after the 1968 amnesty period expired. Such registrations would violate the NFA, because "[n]o firearm may be registered by a person unlawfully in possession of the firearm after December 1, 1968, except that the Director, after publication in the FEDERAL REGISTER of his intention to do so, may establish periods of amnesty, not to exceed ninety (90) days in the case of a single period with such immunity from prosecution as the Director determines will contribute to the purposes of " the NFA, as stated ATF's published regulations in the *Code of Federal Regulations*, 1969 edition at 93. See 26 C.F.R. 179.120(a)(3)(b), *available at* http://blog.princelaw.com/assets/2008/7/7/1969-CFR-ATF-amnesty-regs.pdf.

**Exhibit A, Pg. 204**

## Allegation 1.    Destruction of Documents

> **"ATF employees have deliberately destroyed original firearms registration documents that they are required by law to maintain, as noted in sworn testimony in 1996 by [an ATF Specialist]."**

52

In the internal 1997 ATF investigation, which was completed before the Treasury IG

started audit work to investigate Mr. Larson's allegations, Mr. Schaible contradicted his

testimony in *LeaSure* about NFA Branch employees destroying NFA documents in 1994 by

stating under oath to ATF Special Agent and internal investigator Jeff Groh:

> In response to Larson's first allegation regarding
> testimony in U.S. District Court,
> made reference to certain documents being destroyed at
> the NFA Branch.       . stated he made the comments
> in reference to thousands of Title II firearms
> manufactured by         -          that were being
> exported to                 various manufacturers were
> forwarding the paperwork for these firearms. However,
> not all of the paperwork was entered properly into the
> NFA system. It was suspected that some of the contract
> employees had destroyed some of the documents in an
> effort to reduce case load.   -        admits that
> Larson may have construed from his testimony that ATF
> employees were destroying documents, but this was not
> the case.         suggested that if there was an
> increase in any NFA firearm registrations, it may have
> resulted from the changes made to reflect different
> form numbers being located and entered or from the
> transposition of registration dates on the original
> form.   Such changes would have been added to the NFRTR. 53

The October 1998 Treasury IG report stated that Mr. Schaible

. . . was referring to an incident in 1988 when NFA Branch management suspected that
two contract employees were disposing of documents.  These contract employees were

---

[52] October 1998 Treasury IG Report, at 7, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[53] "[REDACTED], et al." Report of Investigation, by [REDACTED], Bureau of Alcohol, Tobacco and Firearms,
September 8, 1997 at 90.  Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General
Government Appropriations for Fiscal Year 1999* at 102-103, *available at*
http://www.nfaoa.org/documents/1998testimony.pdf.

Mr. Schaible's reference to "Title II firearms" refers to Title II of the Gun Control Act of 1968 (Title II is also, but
less commonly, known as the National Firearms Act of 1968); consequently, NFA firearms are also referred to as
Title II firearms.  Special Agent Groh, representing ATF Internal Investigations, contacted Mr. Larson and advised
that he had been assigned to investigate his allegations, is the author of the foregoing Report of Investigation.

31

**Exhibit A, Pg. 205**

immediately removed from their assignment to the NFA Branch. The employees could not be hired or fired since they were employed by a contractor.[54]

In *LeaSure*, Mr. Schaible testified under oath he was aware of "occasions . . . in the NFA Branch of clerks throwing away transmissions because they don't want to fool with them" rather than process them (Mr. LeaSure testified he FAXed registration documents to ATF in 1994, and ATF claimed it was unable to find a record of them).[55] Under cross-examination, asked "that's one of the things [NFA Branch clerks throwing away documents] that could happen to you?," Mr. Schaible replied "Certainly."[56] In response to a question whether "people have been transferred and fired as a result of that, haven't they," Mr. Schaible answered: "The only situation I can remember is, no, they weren't transferred. No, they weren't fired. They eventually quit, yes, but, no, nothing like transferred or fired." When asked "Did [ATF] ever continue anybody in that particular job after they threw something away, threw an important transmission away or destroyed it or put it in the shredder or whatever they did? [ATF] continued them doing that kind of work?" Mr. Schaible said "With monitoring, yes."[57]

Regarding Mr. Schaible's contradictory statements, made under oath, the October 1998 Treasury IG audit report concluded:

---

[54] *October* 1998 Treasury IG Report at 7, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[55] *United States of America vs. John Daniel LeaSure* (1996) at 42-43, *available at* http://www.nfaoa.org/documents/LeaSureTrial.pdf.

[56] Id. at 42-43.

[57] Id. at 43.

32

Exhibit A, Pg. 206

## Our review of the allegations showed that:

## 1. National Firearms Act (NFA) documents had been destroyed about 10 years ago by contract employees. We could not obtain an accurate estimate as to the types and number of records destroyed.

58

The limited scope of the Treasury IG audit is troubling because Discovery sampling

analysis disclosed a large number (176) of "critical errors"[59] which the Treasury IG failed to

mention or publish in either of its 1998 audit reports, compared with 37 "discrepancies" it

identified in its December 1998 report;[60] and despite finding large numbers of "critical errors,"

there was no effort to reliably estimate the accuracy and completeness of the NFRTR.

The 1998 Treasury IG audit also raises reasonable doubt about the validity of Certificates

of Nonexistence of a Record (CNR) that ATF provides to courts to certify that no record of

registration for particular firearms can be located in the NFRTR. The reason is that the Treasury

IG auditors formally declined to evaluate the accuracy of procedures ATF uses to search the

NFRTR to legally justify issuing CNRs, which are also issued to attest that specific firearms are

not registered to specific persons. NFRTR data are also routinely used for other law enforcement

activities, including legal justifications for issuing search warrants.

---

[58] October 1998 Treasury IG Report at 1, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[59] Work Paper H-0, April 23, 1998, at 1.

[60] December 1998 Treasury IG Report, at 12, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf. The "discrepancies" identified in the December 1998 Treasury IG Report are identified as "critical errors" in audit Work Papers.

33

**Exhibit A, Pg. 207**

The "Objectives, Scope and Methodology" section of the December 1998 Treasury IG

report states:

> Our scope did not include a review of the accuracy of ATF's certifications
> in criminal prosecutions that no record of registration of a particular
> weapon could be found in the registry. We also did not evaluate the
> procedures that ATF personnel use to search the registry to enable them to
> provide an assurance to the court that no such registration exists in specific
> cases. Accordingly, this report does not provide an opinion as to the
> accuracy of the registry searches conducted by ATF.
>
> Audit work was performed from October 1997 through May 1998. Our
> review generally covered ATF's administration of the registry for the
> period October 1, 1996 through March 31, 1998.
>
> Our work was conducted in accordance with Government Auditing
> Standards issued by the Comptroller of the United States, and included
> such audit tests as we determined necessary.[61]

According to the edition of *Government Auditing Standards* the Treasury IG used in its

audit of the NFRTR, the Treasury IG auditors failed to comply with an applicable audit standard,

"abuse," as stated below:

> Abuse is distinct from illegal acts and other noncompliance. When abuse occurs, no law,
> regulation, contract provision, or grant agreement is violated. **Rather, the conduct of a
> government program falls far short of societal expectations for prudent behavior.**
> Auditors should be alert to situations or transactions that could be indicative of abuse.
> **When information comes to the auditors' attention (through audit procedures, tips,
> or other means) indicating that abuse may have occurred, auditors should consider
> whether the possible abuse could significantly affect the audit results. If it could, the
> auditors should extend the audit steps and procedures, as necessary, to determine if
> the abuse occurred and, if so, to determine its effect on the audit results** [emphasis
> added].[62]

---

[61] Id. at 4.

[62] See Chapter 6, "Field Work Standards for Performance Audits." *Government Auditing Standards*, by the
Comptroller General of the United States. 1994 Revision. Washington, D.C.: U.S. Government Printing Office,
1994 at 75.

34

Exhibit A, Pg. 208

There is no statement in the 1998 Treasury IG reports that the auditors (1) considered whether decreasing the "critical error" rate at the request of the audited party at interest (NFA Branch representatives) to achieve a desired result "could significantly affect the audit results," or (2) attempted "to determine its effect on the audit results." In a Work Paper documenting the 1998 audit procedures and activities, the Audit Manager attested that "abuse" was not an issue:

| | Ref. | Initials | N/A | Remarks |
|---|---|---|---|---|
| 2.12 Auditors have been alert to situations or transactions that could be indicative of illegal acts or abuse, and have extended audit steps as necessary (GAS 6.26, 6.32, 6.35). (Support is statement in audit guidelines to be alert to these situations or transactions, and any related work performed.) | A-1 | RKB | | Report deals with allegations of ATF mismanagement of the registry |

63

The conduct of the Treasury IG auditors, who under *Government Auditing Standards* are required to be "independent,"[64] clearly "falls far short of societal expectations for prudent behavior." The reasons are that the Treasury IG auditors (1) manipulated audit procedures at the request of NFA Branch representatives for the purpose of deliberately decreasing the "critical error" rate of the NFRTR because the 18.4 percent "critical error" rate the Treasury IG auditors found was "disappointing at best and could have serious consequences for ATF's firearm

---

[63] Work Paper Bundle A, page 5. The initials RKB are those of Treasury IG auditor Robert K. Bronstrup, identified in Work Paper A-1 as the "Lead Auditor"; and as "Audit Manager" in the October 1998 Treasury IG report at 27, and December 1998 Treasury IG report at 49.

[64] *Government Auditing Standards*, by the Comptroller General of the United States. 1994 Revision. Washington, D.C.: U.S. Government Printing Office, 1994 at 22. See Chapter 3, "General Standards," which states: "In all matters relating to the audit work, the audit organization and the individual auditors, whether government or public, should be free from personal and external impairments to independence, should be organizationally independent, and should maintain an independent attitude and appearance."

35

Exhibit A, Pg. 209

registry mission," (2) left unanswered whether "critical errors" exist in other NFRTR categories, (3) failed to reliably estimate the "critical error" rate of the NFRTR, as required by Discovery sampling rules and procedures, by increasing the size of the sample and conducting additional analysis, (4) chose to avoid resolving reasonable doubts (created by their audit findings) about the accuracy and completeness of the NFRTR, and by extension the validity and reliability of ATF's Certifications of Nonexistence of a Record (CNRs) that "provide an assurance to the court that no such registration [for an NFA firearm] exists in specific instances."

## Congressional Hearings on the NFRTR from 1996 to 2001, and related issues

Each year from 1996 to 2001, Mr. Larson and other concerned citizens provided testimony or statements to the Congress about the accuracy and completeness of the NFRTR.[65] The most important outcomes of these testimonies and statements were (1) the 1998 Treasury Department Inspector General audit of the NFRTR, and (2) appropriations language that allocated $1 million to ATF, with instructions to use it to render the NFRTR accurate and complete. There is no evidence, however, that either of the foregoing outcomes rendered the NFRTR accurate and complete, or resulted in a valid and reliable estimate of the NFRTR error rate. Consequently, the accuracy of the NFRTR is still currently unknown.

The Treasury IG auditors did not follow GAGAS to reliably estimate the "critical error" rate of the NFRTR database, in part, because NFA Branch representatives inappropriately requested them to manipulate the definition of "critical error" to achieve a lower rate, but that is not the whole story. The reason is that the Treasury IG auditors requested an Assistant Director at the U.S. Government Accountability Office to advise them how to conduct Discovery

---

[65] These Congressional testimonies and statements are listed in Mr. Larson's VITA, which has been separately submitted to this Court, and include a variety of issues not relevant to *Friesen*; they are not listed or reviewed in this motion.

36

Exhibit A, Pg. 210

sampling in its 1998 audit,[66] and with knowledge of correct procedures for doing so declined to follow his advice. Consequently, the "critical error" rate for the NFRTR database was not estimated in the 1998 audit.

Mr. Larson's requests to top Government officials with oversight responsibility over ATF to conduct meaningful oversight, particularly over ATF's continuing mismanagement of the NFRTR, failed. For example, when Mr. Larson expressed concerns to Treasury Department Inspector General David C. Williams about the integrity of the 1998 audit based on the Treasury IG censoring his most serious allegation against ATF, and that the audit was conducted during a period that included the regime of the his corrupt predecessor (who resigned in 1998 following Senate hearings documenting her misconduct), Dennis S. Schindel, Assistant Inspector General for Audit, responded in a January 7, 1999, letter:

---

[66] The Treasury IG auditors informally requested Barry Seltser, Assistant Director and Manager, Design, Methodology and Technical Assistance Group, U.S. Government Accountability Office (GAO), for advice in conducting sampling procedures and data analysis in its 1998 audit of the NFRTR. At a January 20, 1998, meeting at GAO Headquarters, which included Sidney Schwartz, Mathematical Statistican, GAO; Carol Burgan, Auditor [DELETED], Robert Bronstrup, Audit Manager, and Gary Wilk, Auditor:

**Mr. Seltser suggested that we use "discovery" sampling for the top three Forms that we were concerned about (Form 4467, Other, and Letter categories). In discovery sampling, about 60-70 items are selected from each category and tested for "critical" and "non-critical" errors. If no errors are found in this discovery sample, then we could make a statement about the category. If errors are found, then we must expand our sample based on a mathematical formula.**

Work Paper F-19, prepared by Carol Burgan, January 24, 1998 at 1.

The Treasury IG auditors did not follow Mr. Seltser's recommendation to "expand our sample based on a mathematical formula" after discovering "critical errors" in the Discovery samples. Mr. Seltser's advice was informal; representative of the kind of informal advice GAO typically and often renders to Executive Branch agencies upon request; and GAO was not involved in the Treasury IG's 1998 audit of the NFRTR.

Exhibit A, Pg. 211

Dear Mr. Larson:

Mr. Williams has asked me to respond to your letter of
November 5, 1998. In that letter you expressed concern that the
previous Inspector General, Valerie Lau and others may have tried
to compromise a congressionally directed audit of the firearm
registration practices of the Bureau of Alcohol, Tobacco and
Firearms (ATF). Since my office oversaw the work, I assured
Mr. Williams and wish to assure you that no effort to influence
the audit occurred.
67

In March 1999, Mr. Schindel told Mr. Larson the 1998 audit "determined there were

errors in the [NFRTR] based on statistically valid sampling methodologies." He added that ATF

"is operationally responsible for correcting the errors in the [NFRTR] data base," and it is

"ATF's management responsibility to identify and correct all of the records that may be in error

in the registry."[68]

Similarly, Mr. Larson expressed concerns to then-ATF Director John W. Magaw, who

answered them in a November 19, 1999, letter:

Your allegations concerning my staff are totally
without foundation. I have been advised of all your
allegations concerning the Bureau of Alcohol, Tobacco
and Firearms' (ATF) administration of the National
Firearms Act (NFA), beginning with your attempts in
1987 to have certain firearms removed from the statute
up through the recent issuance of the Office of the
Inspector General (OIG) reports. I have reviewed the
OIG reports and agree with my staff that most of your
allegations are without merit.

---

[67] Eric M. Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms.* Prepared for the Honorable Pete Sessions, House of Representatives, Washington, D.C., April 2, 1999 (unpublished), inserted at 36-37, *available at* http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf.

[68] Letter from Dennis S. Schindel, Assistant Inspector General for Audit, Office of Inspector General, Office of Inspector General, Department of the Treasury dated March 25, 1999, to Eric M. Larson.

Exhibit A, Pg. 212

We have carefully considered the recommendations made
by the OIG and are working to ensure that the NFRTR
continues to be an accurate and reliable database of
firearms transactions.

69

The foregoing statements by Assistant Inspector General for Audit Schindel and ATF

Director Magaw, each of whom were key Government officials who had major and significant

federal law enforcement responsibilities in 1999, are not worthy of belief.

Congress appropriated $500,000 for fiscal year 2002 for ATF to use "with the aim of

reducing processing times and ensuring the completeness and accuracy of the NFRTR."[70] The

appropriations hearing records included questions by the Subcommittee on Treasury, Postal

Service and General Government about the NFRTR, including the need for "[a]n independent,

annual audit of the [NFRTR] database covering registration to retrieval," and when it would be

"possible to confirm the completeness and accuracy of the NFRTR."[71] Congress again

appropriated $500,000 for fiscal year 2003 for improving ATF's licensing and regulatory

operations, "including making significant progress in correcting remaining inaccuracies within

the NFRTR database."[72]

---

[69] Letter from John W. Magaw, Director, Bureau of Alcohol, Tobacco and Firearms dated November 19, 1999, to Eric M. Larson at 1 and 3, *available at* http://www.nfaoa.org/documents/MagawLetter1999toLarson.pdf.

[70] Report No. 107-152, to accompany H.R. 2590, Treasury, Postal Service, and General Government Appropriations Bill, 2002. 107th Cong., 1st Sess., House of Representatives (2001) at 20. These funds were approved in The Treasury and General Government Appropriations Act, 2002, P.L. 107-67, 115 Stat. 514 (2001).

[71] "Regulatory Processes and Resources," *Treasury, Pastal Service, and General Government Appropriations for Fiscal Year 2002.* Hearings before a Subcommittee of the Committee on Appropriations, House of Representatives, 107th Congress, 1st Sess., Part 1 at 476-479.

[72] Report No. 107-575, to accompany H.R. 5120, Treasury, Postal Service and General Government Appropriations Bill, 2003. 107th Cong., 2d Sess., House of Representatives at 19 (2001). These funds were approved in Report No. 108-10, Conference Report to accompany H.J. Res. 2, 108th Cong., 1st Sess. at 1324-1325 (2003).

Exhibit A, Pg. 213

The Subcommittee was influenced by an independent statistical expert, Dr. Fritz J.

Scheuren, who advised them in response to its request for his review of responses ATF provided

to three questions asked by the Subcommittee.[73] Dr. Scheuren stated, in part:

> Technology question. My reading of the OIG reports suggests that very serious
> problems were uncovered in ATF's recordkeeping systems. In fact, in my long
> experience, I cannot think of any instance where poorer results were obtained. I
> was greatly troubled, therefore, by ATF's comment that it "... found nothing in the
> OIG report to justify a statutory or administrative change...." The automation
> Conclusions. I can only offer a qualified opinion on the ATF's answers but if their
> responses are to be taken at face value, two conclusions arise: (1) ATF has serious
> material weaknesses in its firearm registration system which it has yet to
> acknowledge and (2) the ATF steps taken to improve its recordkeeping clearly lack
> thoroughness and probably lack timeliness as well.
> Recommendations. Let me offer three recommendations to the Committee for its
> consideration: (1) ATF should be asked to engage an outside audit organization to
> give a more complete assessment of the weaknesses in their existing firearms
> system. The scope of the OIG audit was too narrow. These audits should be annual,
> including a full test of the system from registration to retrieval. The Post Office has
> such audit practices and offers a model of the completeness needed. (2) ATF should
> be asked to conduct a thorough benchmarking effort looking at recordkeeping
> practices and how they are changing both within government and in organizations
> like insurance companies that have to keep files for long periods. This
> benchmarking will require another (separate) outside contractor experienced in
> conducting such studies. (3) The use of record linkage technologies to test and
> update the ATF firearms system to reduce its isolation are worth study. A match
> with the SSA decedent file is an example, but there are other government systems
> that might be looked at too. Possibly legislation would be needed but before seeking
> legislation ATF should engage one or more experts in record linkage techniques as
> consultants on the present "matchability" of the system and needs for its future
> "matchability."                                                                                        [74]

Dr. Scheuren's influence is evident in the following exchange between the Subcommittee

and ATF, which subsequently occurred during ATF's appropriations hearing:

**Question:** An independent, annual audit of the database covering registration to
retrieval?

**Answer:** We do not believe an independent audit of the database is needed. The
ongoing efforts we are making to ensure the completeness and accuracy of the NFRTR by
imaging and indexing the documents, performing database verification, and linking the retrieval
system with the imaging system will result in strong internal controls for the NFRTR.            [75]

---

[73] *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 2002.* Hearings Before a
Subcommittee *of the Committee on Appropriations, House of Representa*tives. 107th Cong., 1st Sess., Part 3 at 23-
25, *available at* http://www.nfaoa.org/documents/2001statement.pdf. (Hereafter Congressional Hearings, House of
Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 2002.*) Fritz J.
Scheuren, Ph.D., a past elected President of the American Statistical Association, is currently Vice President,
Statistics, National Opinion Research Center (NORC), University of Chicago.

[74] Letter from Fritz J. Scheuren dated May 23, 2000, to the Honorable Jim Kolbe, Chairman, Subcommittee on
Treasury, Postal Service, and General Government. Id. at 24-25.

40

Exhibit A, Pg. 214

There is currently no evidence that ATF has satisfactorily complied with Congressional instructions to render the NFRTR accurate and complete. The Treasury IG terminated another NFRTR audit in 2002 before it was completed, and a former staff member stated: "We found there were still serious problems with the NFRTR data that, to the best of my knowledge, are still uncorrected."[76]

In 2007, seven years after his Congressional statement, because private citizens expressed concerns to him about the accuracy and completeness of the NFRTR, Dr. Scheuren reanalyzed the NFRTR database situation. In a December 11, 2007, letter, to the Congress, Dr. Scheuren reiterated and expanded his concerns about the consequences of "serious material errors" in the NFRTR that ATF "has yet to acknowledge," and added: "In my considered professional judgment, these errors render the NFRTR questionable as a source of evidence in federal law enforcement."[77]

In or about 2006, possibly in response to the Justice IG's "review" of the NFRTR, ATF created a new form entitled "Firearms Inspection Worknote: NFA Inventory Discrepancies," a

---

[75] Congressional Hearing, House of Representatives, *Treasury, Postal Service, and General Government Appropriations for Fiscal Year 2002*. Hearings Before a Subcommittee of the Committee on Appropriations, House of Representatives. 107th Cong., 1st Sess., Part 1 at 479, *available at* http://www.nfaoa.org/documents/NFRTRdocpack.pdf, at Tab 4.

In October 2008, Mr. Larson filed a FOIA request to ATF for (1) documents pertinent to this "imaging system" and how it may help render the NFRTR accurate and complete by "imaging and indexing the documents," including any evaluation of the accuracy and completeness of the "imaging system"; that is, whether complete documentation is available for firearms for original registration and each subsequent transfer; (2) documents that describe the search procedures ATF uses to provide assurances to the Court that no record of a firearm registration can be located in the NFRTR, and (3) a copy of the current NFRTR procedures manual. ATF has not provided any documents in response to any of the foregoing FOIA requests to date.

[76] For additional information, see Stephen P. Halbrook, *Firearms Law Deskbook: Federal and State Criminal Practice*. 2008-2009 Edition. Thomson West Publishing, 2008 at 572-573.

[77] Letter to the Honorable Alan B. Mollohan, Chairman, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, House of Representatives dated December 11, 2007, by Fritz J. Scheuren, Vice President, Statistics, National Opinion Research Center, University of Chicago, at 1, available at http://www.nfaoa.org/documents/Scheuren_Committee_Chair_Letter.pdf.

41

Exhibit A, Pg. 215

copy of which Mr. Larson obtained by a FOIA request.[78]  A copy of this form is reproduced as

received by Mr. Larson from ATF on the following page.

---

[78] Letter to Averill P. Graham, Chief, Disclosure Division, Bureau of Alcohol, Tobacco, Firearms and Explosives dated January 24, 2007, by Eric M. Larson, *available at* http://www.nfaoa.org/documents/FOIA-FRTRJan2007.pdf.

42

**Exhibit A, Pg. 216**

Case 5:08-cr-00041-L    Document 123    Filed 03/19/2009    Page 43 of 57

**NFA Inventory Discrepancies**



| PURPOSE: To reconcile discrepancies disclosed between the licensee's inventory/records | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SOURCE/SCOPE: | | | | | | | | |
| NOTE: | | | | | | | | |

| Licensee Name: | | | | | | | UI Number: | |
|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | 0 | |

| # | Manufacturer/Importer | Model | Type | Caliber/ Gauge | Serial Number | Date Transferred or Received | Transferred to or Received From: | Nature of the discrepancy | In Inventory Yes/No |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Prepared By: | | | | | | | Date: | |
|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | 01/00/00 | |

*Revised 2/17/06*

NFA Inventory

**Exhibit A, Pg. 217**

In his January 2007 FOIA request, Mr. Larson also requested ATF to provide

**2) Written or audio instructions to ATF personnel which provide guidance and/or definitions of what constitutes an "error" or "discrepancy" in the NFRTR. These would include classroom training materials, flash cards, a manual or similar guide, instructions imparted via DVD, videotape or similar mediums of communication. These instructions would most likely be given to ATF Inspectors, but may also be given to Legal Document Examiners, ATF Special Agents, and others.**

[79]

ATF stated that a search failed to locate such documents responsive to Mr. Larson's

FOIA request, and he appealed. In a letter dated October 2, 2007, Janice Galli McLeod,

Associate Director, Office of Information and Privacy, Department of Justice, stated:

> After carefully considering your appeal, I am affirming ATF's action on your request. ATF conducted a search for records responsive to your request and was unable to locate any records pertaining to the National Firearms Registration and Transfer Record documentation you referred to in your request. I have determined ATF's response was correct.[80]

Associate Director McLeod's statement may be valid and reliable evidence that ATF and

the Department of Justice have improperly denied a FOIA request. It is hard to believe that a

form ATF inspectors are supposed use to record "discrepancies" in the NFRTR database after

encountering them during compliance inspections of SOTs would not have been given

instructions regarding and procedures to follow in to reliably identify and report suspected

"discrepancies," when the stated "purpose" of the form is to "reconcile discrepancies" in the

NFRTR. It is not reasonable to believe ATF has not defined the term "discrepancy," because

otherwise there would be no reason for the new form to exist.

---

[79] Id. at 1.

[80] Letter to Eric M. Larson from Janice Gail McLeod, Associate Director, Office of Information and Policy, U.S. Department of Justice dated October 2, 2007, bearing identifiers RE: Appeal No. 07-1961, Request No. 07-458, BE:REG, *available at* http://www.nfaoa.org/documents/McLeodDOJletter2007.pdf.

44

**Exhibit A, Pg. 218**

According to SOTs who have been inspected in or after 2006, ATF personnel who encounter a discrepancy in NFRTR data are required to assign each discrepancy a "control number" and forward the information to the National Firearms Act Branch for resolution. Are there not tabulations, analyses, and other performance measures used to evaluate the accuracy and completeness of the NFRTR? Are there no records of the type and number of discrepancies? Associate Director McLeod's statement that no documents responsive to Mr. Larson's FOIA request can be found at National Firearms Act Branch is unworthy of belief.

### *Giambro*: A 2007 federal court case involving the NFRTR

In 2008, the United States Court of Appeals for the First Circuit upheld the validity of NFRTR data, including its use in twice creating a Certificate of Nonexistence of a Record, in affirming a conviction for Possession of Unregistered Firearm.[81] The Court of Appeals based its decision mainly on *Rith*, testimony on the NFRTR's reliability by ATF Specialist Gary N. Schaible, and stated "[a]lthough both the *Rith* court and the district court here acknowledged past

---

[81] *United States of America vs. Dario Giambro, United States Court of Appeals for the First Circuit, No.* 08-1044, October 2, 2008, *available at* http://www.ca1.uscourts.gov/cgi-bin/getopn.pl?OPINION=08-1044P.01A. Hereafter Court of Appeals, *United States of America vs. Dario Giambro* (2008).

The Court of Appeals decision was based on *United States vs. Dario Giambro*, United States District Court, District of Maine, Criminal Action, Docket No. 07-14-P-S. Transcript of Proceedings, before the Honorable George Singal, U.S. District Judge, Sept. 25, 2007, *available at* http://www.nfaoa.org/documents/GiambroTrial1.pdf; rest of transcript continued at http://www.nfaoa.org/documents/GiambroTrial2.pdf. Hereafter *United States of America* vs. *Dario Giambra* (2007).

The firearm, a Model 1908 Marble's Game Getter Gun, is a low-powered small-game over-and-under combination gun (has .22 long rifle/.44 Game Getter barrels 12" in length) with a folding shoulder stock, and was designed mainly for trappers, hunters and outdoorsmen. The Model 1908 Game Getter is classified as "Any Other Weapon" under the NFA (26 U.S.C. § 5845(a)(5)), was last manufactured in 1914. In excellent condition, accompanied by the original box, a 12" barrel Model 1908 Game Getter is valued at $2,500 or more. Ned Schwing, "Marble's Game Getter Gun NFA, Curio or Relic," *2005 Standard Catalog of Firearms: The Collector's Price & Reference Guide.* 15th Edition. Iola, Wisconsin: KP Books, 2004 at 728.

Exhibit A, Pg. 219

problems with the NFRTR, both emphasized that the ATF has addressed problems with the database and improved its reliability."

The Court of Appeals did not state that it specifically reviewed either of the 1998 Treasury IG audit reports, or the 2007 Justice IG report (all were introduced in *Giambro*), in its opinion and went on at length to affirm the District Court decision to exclude Mr. Larson as an Expert Witness. In particular, the Court of Appeals cited the District Court finding that Mr. Larson's motion in limine testimony[82] was not "based upon sufficient facts or data," not "the product of reliable principles and methods," and that Mr. Larson had not "applied the principles and methods reliably to the facts of the case."[83] The Court of Appeals stated that "suppositions . . . and conjecture abound[ed]" in Mr. Larson's testimony, and the District Court "was well within its discretion" to "conclude that . . . the data on which Larson based his analysis was 'purely anecdotal.'"[84]

The Court of Appeals decision was criticized the same day it was published.[85]

_____

[82] *United States of America vs. Dario Giambro,* United States District Court, District of Maine, Criminal Action, Docket No. 07-14-P-S. Transcript of Proceedings before the Honorable George Z. Singal, United States District Judge, Sept. 24, 2007, *available at* http://www.nfaoa.org/documents/GiambroMotionInLimine-LarsonTestimony.pdf. Hereafter Larson testimony, *United States of America vs. Dario Giambro* (2007).

An enhanced version of Mr. Larson's testimony, with insertions of the Exhibits to which he referred has been created for ease of reference to said Exhibits, is *available at* http://www.nfaoa.org/documents/GiambroLarsonMotionInLimineTestimonyWithExhibits.pdf.

[83] Court of Appeals, *United States of America* vs. *Dario Giambro* (2008).

[84] Id.

[85] See "CA1: First Bends to Help Government Prove Negative in Antique Gun Registration Case," Oct. 2, 2008. The critique states: "*US v. Giambro*, No. 08-1044 affirms a conviction for possessing an antique gun. (He was acquitted of a number of state charges.) The least interesting issue is under 26 U.S.C. 5861(d), where the court holds that the defendant need not have specific knowledge of the registration requirement, but just knowledge of the statutory elements of the guns subject to the registration requirements. More interesting is the admission of the ATF's 'Certificates of Nonexistence' of a registration record. The maker of the certificate testified. The First's analysis isn't that satisfactory. It basically says 'other circuits have upheld their use' even though there used to be problems. Finally, and without much analysis, the First says that it was fine for the District Court to exclude the testimony of an expert witness that had done some statistical analysis on the reliability of the ATF's system of gun registration. Because the First speaks in broad, general terms (and throws around words like 'Daubert'), it doesn't

46

Exhibit A, Pg. 220

Mr. Larson's motion in limine testimony was based upon, and is not materially different from, most of the evidence presented in this motion. It was not until his motion in limine testimony in *Giambro* that Mr. Larson concluded ATF had been adding firearm registrations to the NFRTR after being confronted with NFA firearms owners with their copies of the registrations, based on the 2007 Justice IG report, and that is what he stated.[86] For more than a decade, Mr. Larson qualified his concerns that, e.g., ATF "may have" added registrations to the NFRTR after losing their copies or records of them, because Mr. Larson did not believe the evidence he cited was <u>sufficiently</u> conclusive.[87] It was only <u>after</u> the Justice IG report reported in 2007 that ATF had added registration documents to the NFRTR that he concluded otherwise (the Treasury IG confirmed his allegation that "National Firearms Act (NFA) documents had been destroyed").[88]

*Giambro* differs from *Friesen* because (1) Mr. Giambro never contended the NFRTR was inaccurate with respect to him, and told one of his attorneys he had not registered the firearm,[89]

---

seem like it was taking this issue seriously." *Available at* http://appellate.typepad.com/appellate/2008/10/ca1-first-bends.html.

[86] Larson testimony, *United States of America vs.Dario Giambro* (2007) at 67-68.

[87] It would have been inappropriate for Mr. Larson to attempt to estimate or publish (such as in a professional, refereed journal) a "critical error" rate of, e.g., ATF adding firearm registrations it had lost or destroyed to the NFRTR, because any such estimate would not have been based on valid and reliable evidence.

Results of Discovery sampling analysis by Treasury IG auditors in 1998 provided valid and reliable evidence of "critical errors" in the NFRTR database, but the auditors failed to extend the audit as GAGAS required and estimate the "critical error" rate, or explain the effect of these "critical errors" upon the audit. Because the NFA (26 U.S.C.A. § 5848) and the tax code (26 U.S.C. § 6103) each prohibit Mr. Larson from accessing these data, he was unable to estimate the "critical error" rate for NFRTR data.

[88] October 1998 Treasury IG Report at 1, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[89] An unexplored aspect of *Giambro* is whether his late father — from whom Mr. Giambro inherited the Game Getter and 203 other firearms, and who instructed him to always keep an accompanying "certificate" in the original wooden box provided by the manufacturer along with the gun — had registered the Game Getter or acquired it through a lawful transfer approved by ATF, and ATF withheld the registration record to enable a prosecution after Mr. Giambro was acquitted in state court of an unrelated firearm wounding charge on grounds of self-defense. This

47

Exhibit A, Pg. 221

(2) that attorney misunderstood the NFA and attempted to register the firearm on Mr. Giambro's

behalf, and (3) both attorneys petitioned the District Judge to exclude Mr. Giambro's statements

and the attempt by one attorney to register the firearm, because the NFA prohibits using

information resulting from an attempt to register an NFA firearm in criminal prosecutions,[90]

which could have predisposed the District Judge to fail to adequately consider evidence at trial

that the NFRTR is inaccurate and incomplete.

## In *Friesen*, this Court questioned the reliability of NFRTR data

On September 17, 2008, this Court expressed concerns about the validity and reliability

of NFRTR data in *Friesen*, in part because the "government has relied almost exclusively" upon

NFRTR data in "many of its exhibits."[91] In further explaining the reasons that "persuade[d] me

to allow the testimony [of Dr. Scheuren] and overrule the motion" by the Government to exclude

him as an Expert Witness, the Court stated:

> One is, of course, the duplicate records of Exhibit 100, and then the government's record
> of the same firearms, which both appear — I've never heard satisfactorily explained why
> there were two of those records. Secondly, the other relationship to the issue over the
> accountability of the other guns that are on the government's chart. And thirdly, the issue,

---

unexplored aspect is significant because (1) there are no independent checks on whether ATF personnel are truthful about their inability to locate a registration document, (2) as the evidence in this motion has reliably documented and contends, there is reasonable doubt regarding ATF's integrity in characterizing the accuracy and completeness of NFRTR data, (3) there has been no publicly known independent evaluation of the adequacy of the search procedures ATF uses to certify to a court that a particular firearm is not registered, and (4) it is not uncommon for persons who inherit registered NFA firearms to be unaware of the need to apply to have ownership of the firearm transferred to them. In such cases, as long as the firearm remains in the chain of inheritance, ATF does not typically initiate criminal action and allows a reasonable time for the firearm to be transferred to the lawful heir. Based on Mr. Giambro's statement, he did not register the Game Getter. It is unclear whether (1) the Game Getter was registered to Mr. Giambro's father (ATF attested that it was not), and (2) Mr. Giambro was aware of the legal requirement for a registered NFA firearm to be transferred to a lawful heir after the death of the registered owner. Because Mr. Giambro may have been suffering from mental illness to some extent, which could have further complicated his legal situation, he did not fully participate in his own defense. Mr. Giambro, whose assets include a $3.5 million passbook savings account, chose to remain in jail for 5 months until trial because he believed the Government would make corrupt use of the bail money he would have had to post to be released.

[90] *United States of America vs. Dario Giambro*, United States District Court, District of Maine, Criminal Action, Docket No. 07-14-P-S. Motion in Limine re: Evidence of Disclosure of Information During Compliance Attempt (26 U.S.C. 5989), July 24, 2007, *available at* http://www.nfaoa.org/documents/GiambroPart6.pdf.

[91] *United States of America vs. Larry Douglas Friesen* (2008), Vol. VI at 1012.

48

Exhibit A, Pg. 222

the fact that the government has relied almost exclusively on many of its exhibits which are records from the [NFRTR].[92]

Regarding this Court's first concern, NFRTR Custodian Denise Brown's failure to satisfactorily explain the existence in NFRTR records why there are two approved Forms 2 bearing different dates and the same serial number (E683) as that of the STEN machine gun that ATF acknowledges it lawfully transferred to Mr. Friesen in 1996, indicates a lack of knowledge of the NFRTR database and, possibly, of procedures NFA Branch personnel use to file or retrieve firearm registration documents (or records of them).[93]

Relevant to this Court's second concern was "the other relationship to the issue over the accountability of the other guns" the Government introduced into evidence to try and explain the characteristics of the STEN machine gun at issue in *Friesen*. ATF's characterization of "weapon description" of the STEN machine gun as a Mark II,[94] a point this motion will further

---

[92] Id., Vol. VI at 1011-1012.

[93] Defense counsel asked NFRTR Custodian Denise Brown to explain the significance of a Form 2 dated April 20, 1986, entered as Defense Exhibit 100, bearing serial number E683, provided to the defense under Discovery. The Government said the NFRTR contains a record that a STEN machine gun bearing serial number E683 is registered to Mr. Friesen (Vol. 1, Id. at 15). Custodian Brown testified that the firearm ATF approved for transfer to Mr. Friesen was "E683, STEN Mark II . . . approved February 22, 1996" (Id. at 48-49), and that the "birthing document" for that E683 STEN Mark II is a certified Form 2 dated May 14, 1986, submitted to ATF by manufacturer Charles Erb (Id. at 68).

[94] At issue in *Friesen* is whether the STEN machine gun bearing serial number E683 manufactured by Mr. Erb is the same one he manufactured, or if another STEN machine gun bearing serial number E683 was substituted in its place. Consequently, also at issue is the accuracy of the STEN "weapon description" based on (1) data from the NFRTR, and documentation in the custody of ATF, and (2) examinations of the STEN seized by ATF, by ATF officials, by Mr. Erb, by transferees who previously owned the STEN, and by a defense Expert Witness. The Government contends the STEN that ATF lawfully transferred to Mr. Friesen is a Mark II, based on the description on the Form 2 submitted by Mr. Erb (Id. at 15) and by previous transferees who were available to testify, all of whom denied that the STEN in *Friesen* was the STEN they had previously owned, and by others as described below. Because one previous transferee is deceased (Vol. IV at 674-675), descriptions by other previous transferees are not described in this motion.

After examining the firearm at trial in *Friesen*, Mr. Erb testified it was not the gun he manufactured "as E683" (Vol. IV at 590); was "made to resemble a STEN Mark III" (Id. at 574); and that the gun "is a MARK III" (Id. at 579). Len Savage, an Expert Witness for the defense who examined the STEN testified: "It appears to be a Sten Mark II-S tube that was completed with Sten Mark III components." Vol. VII at 1349. Mr. Erb testified: "The barrel is the same on a Mark III and a Mark II. They are the same length." Vol. IV at 589.

49

Exhibit A, Pg. 223

develop, is relevant to the Court's second concern. Defense counsel agrees that ATF approved the lawful transfer of a STEN machine gun bearing serial number E683 to Doug Friesen in 1996, and disagrees with the Government's characterization of that STEN as a Mark II. Defense counsel notes that to validate the its description of the STEN machine gun bearing serial number E683 as a Mark II, the Government sought "confirmatory" information that the Mark II description was valid and reliable. The Government sought this "confirmatory" information because Dr. Scheuren testified: "I find the existing [NFRTR] records are quite useful in an exploratory setting, but they are not accurate enough by themselves to be used in a confirmatory way," including "for purposes of prosecution." [95]

The Government asked Dr. Scheuren if NFRTR data could be reliably verified each time the firearm was transferred by independently obtaining such data from each transferee, he would consider the NFRTR data to be accurate for that firearm. Dr. Scheuren replied in the affirmative. On redirect, defense counsel asked " . . . although you didn't come here to testify about this, if there is a break in the link, for example, one of these witnesses didn't testify, would that cause you a concern?" Dr. Scheuren answered: "[I]f there was gap in the evidence, yes. If there was a chain of custody break, yes." The significance of Dr. Scheuren's answer is that "one of these witnesses" is a deceased transferee, [96] which breaks the chain of evidence.

---

Also at issue is whether the STEN machine gun manufactured by Mr. Erb was (1) an unfinished tube, not a finished receiver, (2) finished by Mr. Erb as a STEN Mark II, (3) finished by someone other than Mr. Erb in as a STEN Mark II, Mark II-3, or Mark III, or (4) whether Mr. Erb registered air on one or both of the Forms 2 he submitted to ATF; that is, that Mr. Erb had not physically manufactured a STEN Mark II or a finished or unfinished receiver.

The issue of who manufactured or finished the STEN machine gun in *Friesen* has not been resolved.

[95] Id., Vol. VI at 1024.

[96] Id., Vol. IV at 674-675.

50

Exhibit A, Pg. 224

This Court's third concern about *Friesen* — "the fact that the government has relied almost exclusively on many of its exhibits which are records from the [NFRTR]"[97] — is justified for three major reasons.

First, the "critical error" rate of the NFRTR is currently unknown, and efforts to discern or estimate it even informally are compromised because (1) ATF officials changed the definition of a "Significant Error" in 1995 by renaming it an "Error," and (2) Treasury IG auditors manipulated the definitions of "critical error" in 1998 at the request of NFA Branch representatives, to subjectively lower the "critical error" rate of the NFRTR. Dr. Scheuren testified that "in fact, their reworking of the original 1998 data is data fishing. And you cannot make a statement about the reliability, the probability of your being right with that data fishing, that exercise. So they should have done another audit sample.[98]

Second, relevant to *Friesen*, there is no law or regulation that requires ATF to physically inspect an NFA firearm at the time of its original manufacture (or as a condition of or during any subsequent transfer), and ATF has not presented any evidence that it has done so. Because one transferee who possessed the STEN machine gun bearing serial number E683 is deceased, the chain of evidence has been broken and it is not possible to reliably confirm even by sworn statements of all living previous transferees that ATF's contention that STEN is a Mark II is correct. Even if all living transferees so testified, there is no logical reason for any of them to testify to a "weapon description" with which the Government disagrees, because doing so would put the onus of alleged illegal manufacture of the STEN upon that previous transferee and subject him to the hazards of prosecution.

---

[97] Id., Vol. VI at 1012.

[98] Id., Vol. VI at 1030.

Exhibit A, Pg. 225

Third, although ATF has identified "weapon description" as a "critical" data field,[99] that

is not the most critical problem with the NFRTR data ATF uses and the concern stated by this

Court in *Friesen* about "the issue, the fact that the government has relied almost exclusively on

many of its exhibits which are records from the [NFRTR]."[100] The reason is that based on ATF's

inability to physically locate original documents that literally are NFRTR data, there is

reasonable doubt whether Exhibits based on NFRTR data that the Government entered into

evidence in *Friesen* are based on valid and reliable evidence. During the 1998 audit ATF was

unable to provide original documentation to validate computerized data routinely generated by

the NFRTR. ATF's inability to locate original documents to reliably validate computerized

NFRTR data is an audit finding in the December 1998 Treasury IG report as follows:

> ATF provided copies of other records to clarify the [37] discrepancies [reported in our
> audit results]. These other records, for example, included microfiche records and other
> registry database reports. We examined these records but we could not fully determine if
> the records sufficiently resolved the discrepancies.[101]

ATF's inability to locate original documents, and the Treasury IG auditors' inability to

reliably validate computerized NFRTR data, is further discussed in an audit Work Paper that was

not reviewed and signed by Audit Manager Robert K. Bronstrop until December 18, 1998, the

---

[99] Treasury IG auditor Carol Burgan stated that "error definitions for critical data fields" include "weapon description." Work Paper F-25, Feb. 19, 1998, at 1. During a January 21, 1998, meeting at ATF Headquarters that included ATF participants ("[redacted], Chief, Firearms and Explosives Division," and [redacted]), Carol Burgan, Auditor [redacted], and Gary Wilk, Auditor, agreed that

**Critical errors would include: serial number of the weapon, name of weapon owner, address of owner, date of application (if applicable), date of birth, and weapon description. Address of owner is important however, owners do not have to report intrastate moves (only interstate).**

Work Paper F-22, January 26, 1998, prepared by Carol Burgan, at 1. Both Work Papers in this footnote *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf.

[100] *United States of America vs. Larry Douglas Friesen* (2008), Vol. VI, at 1012.

[101] December 1998 Treasury IG Report, at 12, *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

**Exhibit A, Pg. 226**

same day the December 1998 Treasury IG report was published, suggesting there was the most

extreme of concerns about this audit finding. In fact, less than 3 weeks before the report was

issued, Treasury IG auditor Gary Wilk determined and stated the following conclusion:

**Conclusion:** **Examination of the ATF of the photo copied records did not permit this auditor to fully determine whether the discrepancies continued to exist within the computerized NFRTR database. The materials did not clearly demonstrate that the computer system, typically in use, provides reliable and valid data when a search is performed. ATF did demonstrate that they have the capacity to generate various information from various sources but the original documentation remains missing and the accuracy of the documentation provided cannot be assured.**
102

At the outset of *Friesen* on Sept. 17, 2008, this Court stated: "the evidence that I exclude

. . . is [if] it's not relevant to this case, or secondly, it's not reliable evidence."[103]   The conclusion

of Treasury IG auditor Gary Wilk constitutes reasonable doubt that computerized NFRTR data

are valid and reliable. To the extent any Exhibits introduced by the Government in *Friesen* are

based upon computerized NFRTR data, such exhibits may not be "reliable evidence" and should

be excluded by this Court as evidence in a criminal trial unless the validity and reliability of the

NFRTR data upon which such Exhibits are based can be independently and reliably validated.

In addition to other evidence presented in this motion that NFRTR data are inaccurate,

incomplete and, therefore unreliable, there is also valid and reliable evidence that statements by

ATF inspectors (including statements of ATF inspectors involved in *Friesen*), which are based

on NFRTR data may not be reliable. The reason is that the 2007 "review" of the NFRTR by the

Justice IG concluded:

> . . . continuing management and technical deficiencies contribute to inaccuracies in the
> NFRTR database. For example, NFA Branch staff do not process applications or enter

---

[102] Work Paper F-52, November 30, 1998, prepared by Gary Wilk, at 1, *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf.

[103] *United States of America vs. Douglas Larry Friesen* (2008), Vol. I, at 5.

53

**Exhibit A, Pg. 227**

data into the NFRTR in a consistent manner, which leads to errors in records and inconsistent decisions on NFA weapons applications. In addition, the NFA Branch has a backlog of record discrepancies between the NFRTR and inventories of federal firearms licensees that were identified during ATF compliance inspections. Further, the NFRTR's software programming is flawed and causes technical problems for those working in the database. **The lack of consistency in procedures and the backlog in reconciling discrepancies, combined with the technical issues, result in errors in the records, reports, and queries produced from the NFRTR. These errors affect the NFRTR's reliability as a regulatory tool when it is used during compliance inspections of federal firearms licensees.**[104] [emphasis added]

The Justice IG evaluators did not define the terms "error" or "discrepancy" in the 2007 report, and their "review" did not include determining the extent to which NFRTR data are accurate and complete. The 2007 Justice IG report acknowledges lack of an NFRTR procedures manual and inadequate training of staff.[105] "Supervisors' inadequate training led to variations in their direction and inconsistent decisions about approving or disapproving NFA weapons registration and transfer applications."[106]

### NFRTR data that cannot be independently and reliably validated should be excluded from a criminal trial

The totality of evidence presented and documented in this motion establishes that federal law enforcement officials, and representatives of the Treasury Department, have willfully engaged in systematic efforts to cover up the fact that the NFRTR contains serious material errors, and that its error rate is currently unknown, among other issues relevant to *Friesen*. The Treasury Department's successor, the Department of Justice, has also declined to consider valid and reliable evidence that the NFRTR is inaccurate, incomplete and, therefore, unreliable.

---

[104] June 2007 Justice IG Report at iii, *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

[105] "The NFA Branch does not provide staff with a comprehensive standard operating procedures manual," and NFA Branch staff stated that they did not have adequate written direction on how to enter data such as abbreviations in the NFRTR . . . and who has responsibility for correcting errors in the NFRTR." Id. at v.

[106] Id. at v-vi.

**Exhibit A, Pg. 228**

Attestations or testimonies about NFRTR data by ATF and other Government officials are, as demonstrated in this motion, not worthy of belief.

The totality of the breadth, depth and diversity of reliably documented evidence presented in this motion justifies this Court prohibiting the Government from using any NFRTR data that cannot be independently and reliably validated in prosecuting Doug Friesen in a criminal trial.

Reasonable doubt about the accuracy and completeness of the NFRTR has been reliably established by a variety of documented evidence published by a diverse array of Government entities that include (1) the Executive Branch (Justice IG, Treasury IG, ATF, Audit Services Division of the Treasury Department); (2) the Legislative Branch (Congressional Research Service, the Congress in the *Congressional Record*, Congressional Hearings in 1979 and during 1996 to 2001; and "report language" in reports on appropriations bills; and (3) the Judicial Branch (the sworn testimony of and official documents presented by ATF officials in *Friesen*).

Also regarding the Judicial Branch, in 2007 the Government implied Mr. Larson's research was not customary or diligent when he was asked by an Assistant United States Attorney during a federal court hearing to confirm that he " . . . never had personal or direct access to any ATF documents internally? And you've never had personal or direct access to the NFRTR?"[107] Because NFRTR data are protected from disclosure under the NFA (26 U.S.C.A. § 5848), and are also considered "tax return" information prohibited from disclosure under the tax code (26 U.S.C.A. § 6103), it was not legally possible for Mr. Larson to obtain "personal or direct access" to the NFRTR and related documents under the NFA; moreover, neither could any other person, with the limited exception discussed below.

---

[107] Larson Testimony, *United States of America vs. Dario Giambro* (2007) at 79, *available at* http://www.nfaoa.org/documents/GiambroMotionInLimine-LarsonTestimony.pdf.

Exhibit A, Pg. 229

To any extent ATF may claim that NFRTR documents, data or records of them are

protected "tax return" information that cannot be disclosed and decline to provide that

information to defense counsel under any Discovery motion, ATF cannot decline to disclose that

information to this Court. The reason is that after reviewing pertinent statutes, ATF determined

in 1978:

> the return submitted by the transferor. Except for
> section 6103(o)(1) which authorizes the disclosure of
> subtitle E (i.e., Chapters 51-53) tax information to
> Federal employees whose official duties require such
> information, the only disclosure subsection regarding
> Chapter 53 returns and return information is section
> 6103(d) governing disclosure to State tax officials,
> That section does not include...[108]

Since this Court is constituted by a Federal employee "whose official duties require such

information," there is no legal basis for ATF to refuse to disclose "tax return" information if it is

relevant and required, including potentially exculpatory evidence under *Brady*. Accordingly, to

the extent this Court believes it could be better informed about the accuracy and completeness,

and validity and reliability, of NFRTR data by obtaining documents or information that may

constitute "tax return" information, Doug Friesen respectfully requests this Court to consider

compelling ATF to disclose such information for review by this Court for these proceedings.

## Conclusion

For the reasons set forth above, Defendant requests this Honorable Court grant a

hearing on this motion and, thereafter to exclude, under F.R.E. 803(10), any evidence

---

[108] Memorandum to Director, ATF, from ATF Chief Counsel regarding Freedom of Information Act Appeal of [redacted] dated August 18, 1980, bearing symbols CC-18,778 RMT, at 14, *available at* http://www.nfaoa.org/documents/ATFmemoTaxInfo6103.pdf.

**Exhibit A, Pg. 230**

derived from a search of the NFRTR that has not been independently and reliably

validated.

Respectfully Submitted.
S/ *Kendall A. Sykes*
Mack K. Martin, OB. # 5738
Kendall A. Sykes, OB.#21837
125 Park Avenue,Fifth Floor
Oklahoma City, Oklahoma 73102
Telephone    (405) 236-8888
Facsimile    (405) 236-8844
Email: Mack@Martinlawoffice.net
Kendall@Martinlawoffice.net
Attorneys for Defendant
Larry Douglas Friesen

## CERTIFICATE OF SERVICE

I hereby certify that on Thursday, March 19, 2009, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Mr. Edward J. Kumiega, Assistant United States Attorney.

S/ *Kendall A. Sykes*

Exhibit A, Pg. 231

# Exhibit 7

**( *Attorney General Eric Holder held in contempt of Congress* )**





PROGRESS IS EVERYONE'S BUSINESS
See how Goldman Sachs is helping
Titan International grow.
▶ WATCH THE VIDEO

# POLITICO

## Attorney General Eric Holder held in contempt of Congress

By: **John Bresnahan and Seung Min Kim**
June 28, 2012 04:43 PM EST

The House has voted to hold Attorney General **Eric Holder** in contempt of Congress over his failure to turn over documents related to the **Fast and Furious** scandal, the first time Congress has taken such a dramatic move against a sitting Cabinet official.

The vote was 255-67, with 17 Democrats voting in support of a criminal contempt resolution, which authorizes Republicans leaders to seek criminal charges against Holder. This Democratic support came despite a round of behind-the-scenes lobbying by senior White House and Justice officials - as well as pressure from party leaders - to support Holder.

Two Republicans, Reps. Steve LaTourette (Ohio) Scott Rigell (Va.), voted against the contempt resolution.

Another civil contempt resolution, giving the green light for the House Oversight and Government Reform Committee to sue the Justice Department to get the Fast and Furious documents, passed by a 258-95 margin. Twenty-one Democrats voted for that measure.

But dozens of other Democrats marched off the floor in protest during the vote, adding even more drama to a tumultuous moment in the House chamber.

The heated House floor fight over Holder capped a historic day in Washington, coming just hours after the Supreme Court, just across the street from the Capitol, issued its landmark ruling upholding most of Barack Obama's health care law. The passions of the day were evident inside the Capitol, where Democrats accused Republicans of ginning up the contempt vote for political purposes while Republicans continued to charge the Justice Department with a cover up on the Fast and Furious scandal.

The fight over the Holder contempt resolution also drew intense interest from outside groups ranging from the NAACP to the National Rifle Association.

In a statement released by his office, Holder blasted the contempt votes as "politically motivated" and "misguided," and he singled out Rep. Darrell Issa (Calif.), chairman of the Oversight and Government Reform Committee and lead Republican on the Fast and Furious probe, for special criticism.

"Today's vote is the regrettable culmination of what became a misguided – and politically motivated – investigation during an election year," Holder said in his statement. "By advancing it over the past year and a half, Congressman Issa and others have focused on politics over public safety. Instead of trying to correct the problems that led to a series of flawed law enforcement operations, and instead of helping us find ways to better protect the brave law enforcement officers, like Agent Brian Terry, who keep us safe – they have led us to this unnecessary and unwarranted outcome."

**Exhibit A, Pg. 233**

Holder added: "Today's vote may make for good political theater in the minds of some, but it is – at base – both a crass effort and a grave disservice to the American people. They expect – and deserve – far better."

White House officials also slammed House Republicans for the unprecedented contempt vote. White House Communications Director Dan Pfeiffer said GOP congressional leaders "pushed for political theater rather than legitimate congressional oversight. Over the past fourteen months, the Justice Department accommodated congressional investigators, producing 7,600 pages of documents, and testifying at eleven congressional hearings… But unfortunately, a politically-motivated agenda prevailed and instead of engaging with the President in efforts to create jobs and grow the economy, today we saw the House of Representatives perform a transparently political stunt.

However, Speaker John Boehner (R-Ohio), in a brief interview with POLITICO, blamed Holder for the standoff. Boehner said the Justice Department wanted to turn over some Fast and Furious documents - but not all - if the House agreed to drop the contempt resolution, a deal that neither Boehner nor Issa was prepared to make.

"The idea that we're going to turn over some documents, and whatever we turn over is all you're gonna get and you have to guarantee that you're never going to seek contempt, no deal," Boehner said.

Boehner added that Holder never sought a personal meeting with him to resolve the fight, despite suggestions from some Obama administration officials that Holder asked to do so.

(Also on POLITICO: Report: Holder said no 'BS' on guns)

Issa also said the House had to take such a move in order to get to the bottom of the Fast and Furious scandal.

"Throughout this process, I have reiterated my desire to reach a settlement that would allow us to cancel today's vote," Issa said. "Our purpose has never been to hold the Attorney General in contempt. Our purpose has always been to get the information that the Committee needs to complete its work, and to which it is entitled."

Issa also pointed out that then Speaker Nancy Pelosi (D-Calif.) backed a call for a contempt resolution against the Bush White House over the firing of U.S. attorneys back in 2008, which he raised to counter Democratic charges of partisanship.

The practical, immediate impact of the contempt votes will be minimal. Holder remains as attorney general with strong backing from Obama, and any criminal referral after the contempt vote is unlikely to go far.

In a floor speech before the vote, Boehner stressed that Holder and the Justice Department needed to be held accountable for not providing sufficient answers to Congress about what happened during Fast and Furious.

"Now, I don't take this matter lightly. I frankly hoped it would never come to this," Boehner said. "But no Justice Department is above the law and no Justice Department is above the Constitution, which each of us has sworn to uphold."

(Also on POLITICO: Brown: Eric Holder should resign)

But the GOP-led move infuriated other Democrats, especially minority lawmakers, who see racism and unbridled partisanship in the Republican drive to sanction the first African-American to hold the attorney general post in U.S. history.

**Exhibit A, Pg. 234**

The Democratic walkout was led by the Congressional Black Caucus, many of whom gathered outside the Capitol while their GOP colleagues moved against Holder.

Rep. Elijah Cummings (Md.), the top Democrat on the Oversight and Government Reform, charged that Republicans, led Issa, had been unfairly targeting Holder for months.

"They are finally about to get the prize they have been seeking for more than a year – holding the attorney general of the United States in contempt," Cummings said. "In reality, it is a sad failure. A failure of leadership, a failure of our constitutional obligations and failure of our responsibilities to the American people."

Rep. Gerald Connolly (D-Va.), who serves on the Oversight panel, called the vote "a craven, crass partisan move that brings dishonor to this body."

A procedural motion by Rep. John Dingell (D-Mich.), calling for further investigation before any contempt vote, was defeated by Republicans.

During the floor debate, a group of nine black lawmakers, led by Rep. Sheila Jackson Lee (D-Texas), raised a question of the privileges of the House, accusing Issa of interfering with the investigation and withholding critical information from Democrats. The motion disapproved of Issa for "interfering with ongoing criminal investigations, insisting on a personal attack against the attorney general of the United States and for calling the attorney general of the United States a liar on national television," which "discredit[ed] … the integrity of the House." The motion was not allowed to proceed.

For his part, Issa insisted that the House must act in order to get to the bottom of what happened in the botched Fast and Furious program.

During this under cover operation, federal agents tracked the sale of roughly 2,000 weapons to straw buyers working for Mexican drug cartels. The sting operation failed, and weapons related to the Fast and Furious program were found at the shooting scene when a Border Patrol agent was killed in Dec. 2010.

Relying on what they said was inaccurate information supplied by the Bureau of Alcohol, Tobacco, Firearms and Explosives - which comes under DOJ - senior Justice officials told lawmakers in Feb. 2011 that no guns were allowed to "walk" to Mexico. That letter was later withdrawn by the Justice Department as inaccurate.

Issa has been investigating what happened during Fast and Furious for 16 months, and he subpoenaed the Justice Department last October. Since that time, his panel has been squabbling over what documents will be turned over. Justice officials note that 7,600 pages of Fast and Furious material has already been given to Issa, but the California Republican has demanded more.

Obama asserted executive privilege on some of the documents Issa is seeking shortly before the Oversight and Government voted on party lines to approve a contempt resolution against Holder.

Despite a face-to-face session between Issa and Holder recently, the two men never reached a compromise to end the standoff.

Since the Justice Department would have to seek an indictment of Holder - a department he oversees as attorney general - no criminal charges will be brought against him. Previous administrations, including the Bush administration in 2008, refused to seek criminal charges against White House officials when a Democratic-run House passed a criminal contempt resolution over the firing of U.S. attorneys.

**Exhibit A, Pg. 235**

Case 1:18-cv-02988-DLF   Document 98-1   Filed 03/31/20   Page 237 of 673

Boehner's office, though, is expected to submit a criminal referral to the U.S. attorney for the District of Columbia, Ronald Machen, in the next few days, according to a Republican official.

Issa's aides have already begun discussions with the House General Counsel's office over the anticipated lawsuit against DOJ, but it is not clear when that the legal challenge will be filed.

© 2013 POLITICO LLC

Exhibit A, Pg. 236

# Exhibit 8

## (Testimony of Gary Schaible)

CR-10-01047-PHX-ROS(DKD), November 29, 2012

1           **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3               _____

4

5   United States of America,      )
                            )

6               Plaintiff,  )
   vs.                     )

7                          )  CR-10-01047-PHX-ROS(DKD)
   Randolph Benjamin Rodman and Idan  )
   C. Greenberg,             )

8                          )
              Defendants.  )

9                          )  November 29, 2012
                          )  8:46 a.m.

10  _____)

11

12

13      **BEFORE:**  **THE HONORABLE ROSLYN O. SILVER, CHIEF JUDGE**

14        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15               Jury Trial - Day 3

16           (Pages 364 through 587)

17

18

19

20

21   Official Court Reporter:
   **Elaine Cropper, RDR, CRR, CCP**

22   Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc. 35

23   Phoenix, Arizona  85003-2151
   602.322.7245/(fax) 602.322.7253

24
   Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared by Computer-Aided Transcription

              United States District Court

CR-10-01047-PHX-ROS(DKD), November 29, 2012

1

## I N D E X

2

### TESTIMONY

3

| WITNESS | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| GARY SCHAIBLE | 370 | 388<br>414 | 422 | 443 |
| DANIEL PINCKNEY | 444 | 455<br>477 | 482 | |
| KENDRA TATE | 486 | 493<br>496 | 504 | |
| JASON FRUSHOUR | 511 | 519 | | |
| RALPH FOX | 523 | 532 | 538 | |
| SCOTT H. COLE | 540 | 550 | 552 | |
| JOHN BROWN | 554 | | | |

## E X H I B I T S

| Number | | Ident Rec'd |
|--------|--|-------------|
| 3 | 86-0012729 model 1919 machine gun | 542 |
| 5 | 86-0013454 model 1919 machine gun | 524 |
| 19 | A6042075 model 1919 machine gun-PICTURE ONLY | 558 |
| 23 | 820101086 model 1919 machine gun | 569 |
| 31 | 820101592 model 1919 machine gun | 569 |
| 42 | Blue ribbon certification for 86-0012726 | 385 |
| 48 | Blue ribbon certification for A6041868 | 405 |
| 49 | Blue ribbon certification for A6041869 | 404 |
| 53 | Blue ribbon certification for A6042000 | 406 |
| 54 | Blue ribbon certification for A6042001 | 408 |
| 55 | Blue ribbon certification for A6042026 | 408 |

Exhibit A, Pg. 239

GARY SCHAIBLE - Direct

1          **P R O C E E D I N G S**

2              (Jury enters.)

3              (Court was called to order by the courtroom deputy.)

4              (Proceedings begin at 8:46.)

5              THE COURT:  Please be seated.                              08:46:25

6              Good morning.  We're ready to go.

7              All right.  Counsel, ready?

8              MR. VANN:  Yes, Your Honor.  Gary Schaible.

9                         GARY SCHAIBLE,

10   called as a witness herein by the Government, having been first   08:47:00

11   duly sworn or affirmed to testify to the truth, was examined

12   and testified as follows:

13              COURTROOM DEPUTY:  State your name for the record,

14   spell your last name, please.

15              THE WITNESS:  My name is Gary Schaible.                  08:47:08

16   S-C-H-A-I-B-L-E.

17              COURTROOM DEPUTY:  Great.  Have a seat right up here.

18                         **DIRECT EXAMINATION**

19   BY MR. VANN:

20   Q.   Good morning, Mr. Schaible.                                   08:47:42

21   A.   Good morning.

22   Q.   Can you please tell the jury what it is that you do?

23   A.   I'm well, I'm assigned to the firearms and explosives

24   division in bureau headquarters of Bureau of Alcohol, Tobacco,

25   Firearms & Explosives and most of my time is spent in the NFA     08:47:58

                         United States District Court

1  branch, which is part of this division, and I would write          08:48:02

2  letters, do rule-makings, provide -- well, not technical but

3  interpretations of the statutory requirements of the National

4  Firearms Act, occasionally process forms.  I'm a custodian of

5  the record, make sure it's maintained.                            08:48:19

6  Q.   And how long have you been employed at ATF?

7  A.   40 years.

8  Q.   40 years?

9  A.   Yes.

10 Q.   And in that 40 years, where was the majority of your time   08:48:27

11 spent?

12 A.   In the National Firearms Act branch.

13 Q.   What positions have you held in the National Firearms Act

14 branch?

15 A.   I have been a supervisor coordinator.  I have been the      08:48:36

16 branch chief and a program manager which was retitled to

17 pre-liaison analyst.

18 Q.   All right.  Now, before we get into the details of your

19 job and of some the things related to this case, do you know

20 either of the defendants sitting here today?                      08:48:57

21 A.   I know Mr. Rodman.

22 Q.   You do know Mr. Rodman?

23 A.   Yes.

24 Q.   Please explain your relationship with Mr. Rodman to the

25 jury.                                                             08:49:09

United States District Court

GARY SCHAIBLE - Cross

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:38:48 |

A.    Yes.

Q.    Oh.    Okay.  I am mistaken.  The memo that -- the letter
that you wrote or the referral that you wrote indicated that
one of the guns was in the possession of a licensed SOT in
Virginia, John Brown?                                              09:39:04

A.    That I believe is correct as far as the referral memo we
sent to the field, yes.

Q.    Correct.  And the basis of that referral memo was the
information that you received; right?  And that's what I'm
asking about.                                                      09:39:19

A.    Well, again, it started with what was on the Internet.

Q.    Yes.

A.    But we didn't receive any other information.

Q.    But you wrote a letter with that fact in it when you wrote
the letter to --                                                   09:39:36

A.    Right.  I'm sorry.  I interrupted you there.  I'm sorry.

Q.    Pardon?

A.    I interrupted there.  I'm sorry.

Q.    The memo that you wrote, you personally wrote a memo for
the signature of the Deputy Assistant Director to Phoenix;         09:39:53
correct?

A.    Correct.

Q.    And in that letter, you stated that a licensed SOT in
Virginia was in possession of one of the Clark firearms, did
you not?                                                           09:40:14

United States District Court

Exhibit A, Pg. 242

GARY SCHAIBLE - Cross

1   A.   That was part of the information, correct.                  09:40:15

2   Q.   Okay.  Well, that's what I asked about.

3   A.   Okay.

4   Q.   Now, Virginia is in the jurisdiction of the special agents

5   in the Falls Church office; correct?                            09:40:26

6   A.   Correct.

7   Q.   And did you make a referral to that office?

8   A.   No.

9   Q.   Do you know if anyone did?

10  A.   I would have to guess yes but I don't know.                 09:40:38

11  Q.   Well, you do know that you were involved in the

12  abandonment of one of the firearms in November; correct?

13  A.   Yes.  I'm not sure of the date exactly you're referring

14  to.  You're referring to November 2006.

15  Q.   Correct.  But you have personal recollection of that?      09:40:58

16  A.   Yes.  I was there.

17  Q.   And you were present when a special agent from the Falls

18  Church office accepted abandonment of one machine gun,

19  A6042075; correct?

20  A.   I don't know the number but I was there for the            09:41:16

21  abandonment.

22  Q.   Right.  And who else was there, if you recall?

23  A.   I know the agent was there, Doug Quartetti, someone from

24  Firearms Tech.  I'm not quite sure who.

25  Q.   The agent, Doug Quartetti, where was he assigned?          09:41:33

United States District Court

GARY SCHAIBLE - Cross

1  A.  Falls Church.                                                          09:41:37

2  Q.  All right.  And do you have any knowledge of how he became

3  involved in the investigation?

4  A.  No.

5  Q.  Now, moving on to another subject, I'm going to go through   09:41:51

6  a number of the certificates, Mr. Schaible, and I'll move as

7  fast as I can.  There's a lot of them there.

8       Let's take number 60.  Do you have that?

9  A.  Yes.

10 Q.  Just a cursory review.  You've seen what that is?            09:42:37

11 A.  Yes.

12 Q.  And what do you call that in the jargon of ATF, blue

13 ribbon certificate?

14 A.  A blue ribbon certificate, yes.

15 Q.  That's a common name.                                        09:42:49

16 A.  Yes.

17 Q.  Would you explain to the members of the jury what a blue

18 ribbon certificate is?

19 A.  This is where someone in the NFA branch would do a search

20 of the registry, the National Firearms Registration Transfer    09:43:01

21 Record, and report the results where they would, you know, say

22 that after a diligent search of the record, this is what I

23 found or didn't find, would sign off on it.  It would go, then,

24 to the branch chief who would sign off on the blue cover sheet

25 saying that they basically recognize the specialist's signature  09:43:24

United States District Court

GARY SCHAIBLE - Cross

1  in this case.                                                    09:43:28

2  Q.   In a few sentences, that is a certificate that everything

3  within that packet is what's in the official record, the NFRTR;

4  right?

5  A.   Correct.                                                    09:43:47

6  Q.   Okay now, if you'll go to the first few pages, there is

7  something called a screen shot.

8  A.   Right.

9  Q.   And would you describe what that is?

10 A.   For each firearm in the registry, we maintain basically a   09:44:01

11 transaction history starting with the first registration and

12 basically moving up.  So whoever it's registered to at the

13 current time would appear on the top of the list and we do some

14 color coding in there, that if it's a magenta color, as far as

15 the database goes, that identifies the current registrant.       09:44:23

16 Q.   And you -- in the top there, the serial number of the

17 machine gun is described.

18 A.   Correct.

19 Q.   And the descriptive data, the manufacturer, the type of

20 firearm, the model, the caliber, the barrel length and the       09:44:43

21 overall length are all described on the top line; correct?

22 A.   Correct.

23 Q.   And that is the same information that appears on the Forms

24 3 and Forms 4?

25 A.   Right.                                                       09:45:03

United States District Court

| | | |
|---|---|---|
| 1 | Q. Those are the six items of information; correct? | 09:45:03 |
| 2 | A. Correct. | |
| 3 | Q. So that when -- this is a snapshot of the computer as it | |
| 4 | exists on the date that is in the upper right-hand corner? | |
| 5 | A. I don't have a date in the upper right-hand corner. | 09:45:23 |
| 6 | Q. On the screen shot, you don't have a date and time? | |
| 7 | A. No, not on the screen shot, no. | |
| 8 | Q. All right. But since it's in the blue ribbon certificate, | |
| 9 | that date would be the effective date that this thing was | |
| 10 | prepared. This is a shot of the computer as it appeared on | 09:45:50 |
| 11 | that date? | |
| 12 | A. Correct. | |
| 13 | Q. Now, if you'll look at -- do you have number 60? | |
| 14 | A. Yes. | |
| 15 | Q. The description is manufacturer, MIX; type; model. That's | 09:46:03 |
| 16 | that. And the caliber is 9 millimeter. The barrel length is | |
| 17 | five seven five, 5.75 inches? | |
| 18 | A. M'hum. | |
| 19 | Q. And the overall length of the barrel is 11 inches; | |
| 20 | correct? | 09:46:31 |
| 21 | A. Correct. | |
| 22 | Q. Now, if you would move down the forms to the form that | |
| 23 | went from Clark to my client, Mr. Rodman, for this machine gun. | |
| 24 | A. Okay. | |
| 25 | Q. How is the caliber barrel length and overall length -- | 09:46:58 |

United States District Court

Exhibit A, Pg. 246

GARY SCHAIBLE - Cross

1   what appears on the form?                                    09:47:05
2   A.   On the form it shows .30 caliber.   The barrel length of 24
3   and an overall length of 41.
4   Q.   So each of those in the screen shot, the actual database
5   is inaccurate; correct?                                      09:47:21
6   A.   They differ, correct.
7   Q.   Right.
8        And when the -- the person that approved it at that
9   time, the examiner, the people that work for you are supposed
10  to correct the record in the NFRTR to conform to the form if   09:47:37
11  it's approved; right?
12  A.   If what was shown on the form is correct, then yes.
13  Q.   Well, if it's approved, that's what was approved; right?
14  A.   That's what was approved.   Whether it was picked up as an
15  error is a different matter.                                  09:48:04
16  Q.   Is it signed as approved?
17  A.   Yes.
18  Q.   So that the person who received this form received a form
19  that is different than the description in the database?
20  A.   Correct.                                                 09:48:21
21  Q.   Okay.   And now if you'll move to the number 64.   Do you
22  have 64?
23  A.   Yes.
24  Q.   Would you read the description on the screen shot, just
25  the caliber, barrel length, overall length?                  09:49:02

United States District Court

GARY SCHAIBLE - Cross

1  A.   Caliber, .45; barrel length 6.25; overall length, 11.      `09:49:05`

2  Q.   And now on the Form 3 that came from Clark to Mr. Rodman,

3  for that machine gun.

4  A.   This is from Clark to Mr. Rodman you said?

5  Q.   Yes.  Caliber, barrel length, overall length.             `09:49:35`

6  A.   Okay.  It shows .30 caliber; barrel length of 24; overall

7  length of 41.

8  Q.   The variants in barrel length and overall length of three

9  feet approximately; correct?

10  A.   Yes.  The overall length of 41.                           `09:50:03`

11  Q.   And once again, whoever approved that was supposed to

12  change the description in the database and did not; correct?

13  A.   Correct.  If they subpoenaed that, there was something

14  that we should look into.

15  Q.   It would be something to look into.  What was the date    `09:50:26`

16  that it was approved?

17  A.   September 21, 2000.

18  Q.   And in 12 years nobody looked into it; correct?

19  A.   As far as I know.

20  Q.   Okay.  Number 58.  I think that was the one you had.  57,  `09:50:40`

21  I'm sorry.

22  A.   I have 64.  Number 57.

23  Q.   57, yes.

24  A.   Okay.

25  Q.   And to save a little time, would the same discrepancies   `09:51:03`

United States District Court

GARY SCHAIBLE - Cross

1   appear in that one?  For instance, what is the serial number?    09:51:09
2   A.   A6042028.
3   Q.   And what does the screen shot, the actual computer, say?
4   A.   9 millimeter, 5.75 barrel length, 11-inch overall length.
5   Q.   Okay.  So the same discrepancies appear in that one.    09:51:32
6   A.   I am getting there.  Yes.  The form shows .30 caliber, a
7   barrel length of 22 inches and an overall length of 49.
8   Q.   So that this, the computer, is inaccurate as far as this
9   machine gun is concerned as of today, as of the date of the
10  blue ribbon certificate?    09:52:17
11  A.   Again, they differ.  The descriptions, yes.
12  Q.   And the person that has the -- that it's registered to has
13  a different gun than the one that's described in the database;
14  correct?
15  A.   Different caliber, barrel length, and overall length, yes.    09:52:35
16  Q.   And the next one is 56.  To save a little time, if you
17  could view the same data, compare the screen shot with the
18  transfer itself and tell me if the screen shot is accurate,
19  whether the computer is accurate.
20  A.   And this would be for the transfer from Mr. Clark to    09:53:13
21  Mr. Rodman?
22  Q.   Yes.  This is serial number -- what?
23  A.   A6042027 and, yes, our database shows 9 millimeter with a
24  5.75 barrel length and an 11-inch overall length.  The form
25  shows .30 caliber with a 22-inch barrel length and a 49-inch    09:53:34

United States District Court

GARY SCHAIBLE - Cross

1   overall length.                                                    09:53:39

2   Q.   A different description; correct?

3   A.   Correct.

4   Q.   Inaccurate?

5   A.   I'm sorry?                                                     09:53:43

6   Q.   Inaccurate.  The database is inaccurate?

7   A.   Or the form is inaccurate.

8   Q.   Well, the form is approved.

9   A.   Yes.

10  Q.   So the database shows a different description than what's      09:53:51

11  in the database?

12  A.   And, again, should this have been picked up on?  Maybe so.

13  Q.   When was that approved, that form?

14  A.   June 1, 2002.

15  Q.   Two thousand and . . .?                                        09:54:12

16  A.   Two.

17  Q.   So in 10 years nohody has picked that up?

18  A.   Correct.

19  Q.   Now, the next one is number 49, Mr. Schaible, the number?

20  A.   A6041869.                                                      09:54:42

21  Q.   And the description on the form transferring it to

22  Mr. Rodman?

23  A.   On the form it shows .30 caliber, barrel length of 24,

24  overall length of 41.

25  Q.   So the database is inaccurate on this firearm?                 09:55:16

United States District Court

Exhibit A, Pg. 250

GARY SCHAIBLE - Cross

1 A. Again, they differ.  The database shows .45, 5.75, and 11.  09:55:20

2 Q. And what's the date of the transfer?

3 A. February 21, 2001.

4 Q. So that hadn't been picked up in 11 years?

5 A. Correct.  09:55:36

6 Q. And the next one is number 48.

7 A. Okay.

8 Q. Serial number?

9 A. A6041868.

10 Q. The description in the screen shot, the database?  09:56:12

11 A. Shows .45 caliber, 5.75 barrel and 11 overall.

12 Q. And the form transferring it from Clark to my client?

13 A. .30 caliber, 24-inch barrel length, 41-inch overall.

14 Q. Okay.  The computer, once again, is inaccurate?

15 A. It's different.  09:56:37

16 Q. And the next one is number 69.

17 A. Okay.

18 Q. Serial number?

19 A. 820101457.

20 Q. And description?  09:57:10

21 A. In the database, it's a .45 caliber, the barrel length of

22 6.25 and overall length of 11.

23 Q. And the form transferring it from Clark to Mr. Rodman?

24 A. Shows a caliber of .30, a barrel length of 22, and an

25 overall of 36.  09:57:27

United States District Court

**Exhibit A, Pg. 251**

GARY SCHAIBLE - Cross

1  Q.  Okay.  And the date of the transfer?                           09:57:28

2  A.  February 20, 2008.

3  Q.   Okay.  So the database is inaccurate for that machine

4  gun?

5  A.  Different.                                                      09:57:46

6  Q.  And the final one for Mr. Rodman is number 68.

7  A.  Okay.

8  Q.  The serial number?

9  A.  820101546.

10  Q.  And the description in the database?                           09:58:27

11  A.  .45 caliber, 6.25 barrel length, 11-inch overall.

12  Q.  All right.  And what is the description of that machine

13  gun on the transfer form from Clark to my client?

14  A.  It is .30 caliber, 22-inch barrel length, and 36-inch

15  overall.                                                           09:58:48

16  Q.  Okay.  And the date of that transfer is the same as the

17  other; right?

18  A.  I don't remember what the other one is.  February 20,

19  2008.

20  Q.  February 20, correct.  And the database is inaccurate once     09:58:57

21  more.  That is a different machine gun?

22  A.  Shows a difference in description, yes.

23  Q.  We're nearing the end.  I'm sure you'll be happy to hear

24  that.

25          The next one is number 53.                                 09:59:13

United States District Court

1   A.   Okay.                                                          09:59:37

2   Q.   This is a serial number -- what is the serial number?

3   A.   A6042000.

4   Q.   And the description of the machine gun as it appears in

5   the database?                                                      09:59:55

6   A.   .45 caliber, 5.5 -- I'm sorry, 5.75 barrel length, 11-inch

7   overall.

8   Q.   And the transfer form from Clark to -- who was the

9   transferee on that one?

10  A.   I'm sorry.  Could you ask me that again?                      10:00:15

11  Q.   The Form 3 transferring it from Clark, who is the

12  transferee?

13  A.   From Mr. Clark, I show a transfer to Mr. Clark but

14  nothing --

15  Q.   It was never transferred?                                     10:00:58

16  A.   -- nothing transferred from Mr. Clark.

17  Q.   What is the description of the machine gun that was

18  transferred to Mr. Clark?

19  A.   Okay.  It's not shown as a machine gun.

20  Q.   It's not a --                                                 10:01:10

21  A.   It's shown as an any other weapon.

22  Q.   Oh.  Okay.  And does the description match?

23  A.   No.

24  Q.   Okay.  So that one is inaccurate?

25  A.   Descriptions differ between a form and a database, yes.       10:01:25

United States District Court

GARY SCHAIBLE - Cross

1    Q.   The database does not match the description of the      10:01:30

2    registration form?

3    A.   Right.

4    Q.   Number 54, what's the serial number of that one?

5    A.   I'm sorry, 54 or 64.      10:01:45

6    Q.   54.   Five four.

7    A.   Okay.   That's A6042001.

8    Q.   All right.   And what is the -- how is that described in

9    the computer?

10    A.   .45 caliber, 5.75 barrel length, 11 overall.      10:02:21

11    Q.   And how is that same machine gun described on the form

12    transferring it from Mr. Clark to a Richard Simpson?

13    A.   Okay.   It is shown as a .30 caliber with a barrel length

14    of 24 inches and an overall length of 40.

15    Q.   And what's the date of that transfer?      10:02:50

16    A.   October 2, 2003.

17    Q.   All right.   And so that one is inaccurate.   The computer

18    has an inaccurate description.

19    A.   It has a different description, yes.

20    Q.   Okay.   Number 55.      10:03:05

21    A.   Okay.

22    Q.   What serial number is that?

23    A.   It is A6042026.

24    Q.   And the description in the computer, in the NFRTR?

25    A.   Shows 9 millimeter, 5.75 barrel length, and an 11-inch      10:03:40

United States District Court

1   overall length.                                                 10:03:46

2   Q.   Now, that machine gun or machine gun with that serial

3   number was transferred from Clark to Richard Simpson.  Do you

4   have the Form 3 there -- Form 4, I'm sorry.

5   A.   Yes, sir.                                                   10:04:00

6   Q.   And how is that machine gun described there?

7   A.   .30 caliber, 23-inch barrel, 45-inch overall.

8   Q.   And so the -- once again, the database is inaccurate?

9   A.   It is different, yes.

10  Q.   Is it accurate?                                             10:04:20

11  A.   Well, the 9 millimeter, 5.75, and 11 were what was

12  reported upon manufacture I would believe?

13  Q.   That would be on the Form 2 from the date of birth.

14  Sometime before '86?

15  A.   Right.                                                      10:04:37

16  Q.   Okay.  And it had been transferred a number of times after

17  that?

18  A.   Yes, it has.

19  Q.   And anytime the description changes and is approved, the

20  database must be corrected; correct?                            10:04:50

21  A.   If the examiner picks up on it and sees a difference, yes.

22  Q.   That's what the examiner is supposed to do?

23  A.   Correct.

24  Q.   All right.

25       Now, the next one is number 59.                            10:05:05

United States District Court

Exhibit A, Pg. 255

GARY SCHAIBLE - Cross

| | | |
|---|---|---|
| 1 | A. Okay. | 10:05:27 |
| 2 | Q. What is the serial number of that, Mr. Schaible? | |
| 3 | A. A6042030. | |
| 4 | Q. All right. And what does the computer say is the | |
| 5 | description of that machine gun? | 10:05:40 |
| 6 | A. 9 millimeter, 5.75 inch barrel, 11 overall. | |
| 7 | Q. All right. And that machine gun or machine gun with that | |
| 8 | serial number was transferred from Mr. Clark to Richard | |
| 9 | Simpson, correct, on the Form 4? | |
| 10 | A. Correct. | 10:05:57 |
| 11 | Q. And what is the date of that transfer? | |
| 12 | A. March 24, 2003. | |
| 13 | Q. All right. And how is that machine gun described on the | |
| 14 | form? | |
| 15 | A. .45 caliber, 10-inch barrel, 33-inch overall. | 10:06:07 |
| 16 | Q. Correct. Once again, the database is inaccurate. | |
| 17 | A. It is different, yes, sir. | |
| 18 | Q. The next-to-the-last one is number 63. | |
| 19 | A. Okay. | |
| 20 | Q. Serial number is what? | 10:06:51 |
| 21 | A. A6044921 (sic). | |
| 22 | Q. And what's the description of that machine gun in the | |
| 23 | database? | |
| 24 | A. It's a .45 caliber, 5.75 barrel, and 11-inch overall. | |
| 25 | Q. And that machine gun was transferred on a Form 4 from | 10:07:11 |

United States District Court

Exhibit A, Pg. 256

GARY SCHAIBLE - Cross

1    Clark to Richard Simpson on what date?                              10:07:16

2    A.   October 2, 2003.

3    Q.   And what is the description?

4    A.   On the form that --

5    Q.   On the form.                                                    10:07:33

6    A.   It shows .30 caliber, 19-inch barrel, 41-inch overall.

7    Q.   And so, once again, we have an inaccurate description in

8    the database.

9    A.   A different one, yes, sir.

10   Q.   Okay.  And the final one is serial number -- or number 71,     10:07:50

11   Exhibit 71.

12   A.   Okay.

13   Q.   What's the serial number on that one?

14   A.   It is 820101589.

15   Q.   And the description in the database?                           10:08:29

16   A.   .45 caliber, 11-inch barrel, 6.25 overall.

17   Q.   And that machine gun was transferred from Clark to a

18   Richard Simpson on what date on the Form 3 -- Form 4, I'm

19   sorry.

20   A.   March 22, 2005.                                                10:08:52

21   Q.   And the description?

22   A.   .30 caliber, 21.5-inch barrel, 49.5-inch overall.

23   Q.   So that, once again, the database is inaccurate?

24   A.   Yes, sir, there's a difference between the descriptions.

25   Q.   All right.  And the certificate that we talked about, the      10:09:15

United States District Court

GARY SCHAIBLE - Cross

1  blue ribbon certificate, that form is used in criminal cases     10:09:22
2  all over the country to prove the registration of -- the
3  registration or non-registration of a machine gun; correct?
4  A.   It would be the certified results of a search of the
5  database, yes.                                                    10:09:41
6  Q.   In other words, that's evidence that that -- that unless
7  the machine gun in question matches the description in the
8  database, that firearm would be declared nonregistered; right?
9  A.   Could you ask me that one again?   I'm sorry.
10  Q.   Yes.   The blue ribbon certificate is evidence, provides   10:10:07
11  evidence in criminal cases all over the country all the time of
12  the registration, non-registration of a machine gun; correct?
13  A.   Correct.
14  Q.   And if it does not match the description in the database,
15  it's declared nonregistered; right?                             10:10:28
16  A.   Well, in this case, the certificate says I certified that
17  the following firearm is registered to Richard Alan Simpson and
18  it gives that machine gun.
19  Q.   They certified to the truth of the matter; correct?
20  A.   Certified that it's registered to Mr. Simpson.             10:10:45
21  Q.   Now, in view of this sampling that we've just gone
22  through, would you be surprised to learn that all 34 of the
23  firearms that Mr. Clark transferred, the database is
24  inaccurate?   Would that surprise you?
25  A.   Well, again, I would say there's differences in what the   10:11:08

United States District Court

1   description is.       10:11:12

2   Q.   Well, a difference in a description would be inaccurate,

3   wouldn't it?

4   A.   And the form is part of that process. If the form is

5   inaccurate -- we're relying on what's submitted on the form to   10:11:23

6   transfer these firearms. And the form is being filed by

7   someone who says under the penalties of perjury, I declare that

8   I've examined this application to the best of my knowledge and

9   believe that it is true, correct, and complete. So somewhere

10   along the line if a description changed, someone was saying   10:11:44

11   under penalties of perjury that, you know, this is the

12   description.

13   Q.   Well, do you have any basis to believe that he did not

14   describe the caliber and the barrel length and the overall

15   length accurately on the form?       10:12:03

16   A.   When you say "he," who do you mean?

17   Q.   Oh. The transferor, Clark. Clark was the transferor in

18   each one of those.

19   A.   Well, he's filing it under penalties of perjury.

20   Q.   In fact, you've had them in custody since 2008       10:12:21

21   approximately. Has anyone told you that any of those

22   descriptions were inaccurate?

23   A.   No.

24       MR. SANDERS: I have no further questions, Your

25   Honor.       10:12:36

United States District Court

GARY SCHAIBLE - Cross

1        THE COURT:  Cross?  Mr. Tate.                        10:12:37

2                **CROSS - EXAMINATION**

3   BY MR. TATE:

4   Q.   Good morning, Mr. Schaible.  How are you, sir?

5   A.   My voice is going.                                  10:12:54

6   Q.   I understand.

7            Mr. Schaible, you've been with ATF in various jobs

8   for about 40 years; correct?

9   A.   Correct.

10  Q.   And in that time, let's focus first on a period of time   10:13:10

11  about 2006; okay?  Let's focus on that period of time.  What

12  was your job in 2006?

13  A.   It would have been -- I forget when my title changed but

14  my title was either program manager or industry liaison for the

15  NFA branch.                                              10:13:33

16  Q.   Okay.  And at that time, sometime during that period,

17  let's see if we can put some kind of timeline, although I know

18  that's about six years ago.  You became aware of the Fickaretta

19  memo; correct?  Would that be fair to say?

20  A.   I'm sorry, what memo is that?                        10:13:50

21  Q.   The memo from Theresa Fickaretta?  You're not aware of the

22  Theresa Fickaretta memo?

23  A.   I have no idea which one you're referring to.

24  Q.   Okay.  All right.  That's okay.  You just told me no.

25           And at that time in 2006, you were made aware of by   10:14:02

                    United States District Court

# Exhibit 9

## ( *Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks* )



United States Senator for California

# DIANNE FEINSTEIN

EN ESPAÑOL

### RELATED LINKS

Press Releases

Commentary

Feinstein in the News

Official Photo

Video Library

## PRESS RELEASES
Home / News Room / Press Releases

### Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks

Oct 11 2017

*Washington*—In response to comments by Speaker Paul Ryan (R-Wis.) saying that the Bureau of Alcohol, Tobacco and Firearms should address bump-fire stocks, Ranking Member of the Senate Judiciary Committee Dianne Feinstein (D-Calif.) today released the following statement:

"The ATF lacks authority under the law to ban bump-fire stocks. Period. The agency made this crystal clear in a 2013 letter to Congress, writing that 'stocks of this type are not subject to the provisions of federal firearms statutes.' Legislation is the only answer and Congress shouldn't attempt to pass the buck."

###

# Exhibit 10

# (ATF Determinations)



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, West Virginia  25405

www.atf.gov

JUN 0 7 2010

903050:MMK
3311/2010-434

This is in reference to your submission and accompanying letter to the Firearms Technology
Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), asking for an
evaluation of a replacement shoulder stock for an AR-15 type rifle.  Your letter advises that the
stock (referenced in this reply as a "bump-stock") is intended to assist persons whose hands have
limited mobility to "bump-fire" an AR-15 type rifle.  Your submission includes the following: a
block to replace the pistol grip while providing retention for the selector stop spring; a hollow
shoulder stock intended to be installed over the rear of an AR-15 fitting with a sliding-stock type
buffer-tube assembly; and a set of assembly instructions.

The FTB evaluation confirmed that the submitted stock (see enclosed photos) does attach to the
rear of an AR-15 type rifle which has been fitted with a sliding shoulder-stock type buffer-tube
assembly.  The stock has no automatically functioning mechanical parts or springs and performs
no automatic mechanical function when installed.  In order to use the installed device, the
shooter must apply constant forward pressure with the non-shooting hand and constant rearward
pressure with the shooting hand.  Accordingly, we find that the "bump-stock" is a firearm part
and is not regulated as a firearm under Gun Control Act or the National Firearms Act.

Per your telephoned instructions, we will contact you separately to make return delivery
arrangements.

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

**Exhibit A, Pg. 264**



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg , West Virginia 25405*     903050:MRC
                                        3311/2012-196
www.atf.gov

APR 0 2 2012

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), Firearms Technology Branch (FTB), requesting FTB to evaluate an
accompanying stock and determine if its design would violate any Federal statutes.

As background information, the National Firearms Act (NFA), 26 U.S.C. Section 5845(b),
defines "**machinegun**" as—

"*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot,
automatically more than one shot, without manual reloading, by a single function of the trigger.
The term shall also include the frame or receiver of any such weapon, **any part designed and
intended solely and exclusively, or combination of parts designed and intended, for use in
converting a weapon into a machinegun,** and any combination of parts from which a
machinegun can be assembled if such parts are in the possession or under the control of a
person.*"

The FTB evaluation confirmed that you have submitted a plastic shoulder stock designed to
function on an AR-15 type rifle (see enclosed photos). For your stock to function in the manner
intended, it has to be attached to an AR-15 type platform that is assembled with a collapsible-
stock receiver extension. Along with the shoulder stock, you have submitted what you have
identified as a "receiver module." This module is a plastic block approximately 1-5/16 inches
high, about 1-3/8 inches long, and approximately 7/8-inch wide. Additionally, there are two
extensions, one on each side, that are designed to travel in the two slots configured on the
shoulder stock. The receiver module replaces the AR-15 pistol grip.

Further, the submitted custom shoulder stock incorporates a pistol grip. This grip section has a
cavity for the receiver module to move forward and backward. Additionally, two slots have been
cut for the receiver module extensions to travel in. The upper section of the shoulder stock is
designed to encapsulate the collapsible receiver extension. Further, the custom stock is

**Exhibit A, Pg. 265**

designed with a "lock pin." When the handle on the lock pin is facing in the 3- to 9-o'clock positions, the stock is fixed and will not move; and when the handle on the lock pin is facing in the 12- to 6-o'clock positions, the stock is movable.

The FTB live-fire testing of the submitted device indicates that if, as a shot is fired, an *intermediate* amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow the trigger to mechanically reset. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, the firing of each shot being accomplished by a single trigger function. Further, each subsequent shot depends on the shooter applying the appropriate amount of forward pressure to the fore-end and timing it to contact the trigger finger on the firing hand, while maintaining constant pressure on the trigger itself.

Since your device is incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, FTB finds that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

Please be advised that our findings are based on the item as submitted. Any changes to its design features or characteristics **will void** this classification. Further, we caution that the addition of an accelerator spring or any other non-manual source of energy which allows this device to operate automatically as described will result in the manufacture of a machinegun as defined in the NFA, 5845(b).

To facilitate the return of your sample, to include the module, please provide FTB with the appropriate FedEx or similar account information within 60 days of receipt of this letter. If their return is not necessary, please fax FTB at 304-616-4301 with authorization to destroy them on your behalf.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Assistant Director*

Washington, DC 20226
www.atf.gov

APR 1 6 2013

The Honorable Ed Perlmutter
U.S. House of Representatives
Washington, DC  20515

Dear Congressman Perlmutter:

This is in response to your letter dated March 5, 2013, to the Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF) to rescind a previous evaluation letter and to classify all bump-
fire stocks (to include specifically the Slide Fire Solutions stock) as machineguns.

As you have indicated, machineguns are defined in the National Firearms Title Act, 26 United
States Code Chapter 53 Section 5845(b).  The definition has four distinct parts.  The first, as you
point out, states that a machinegun is "any weapon which shoots, is designed to shoot, or can be
readily restored to shoot, automatically more than one shot, without manual reloading, by a
*single function of the trigger*."  The remaining portions of the definition go on to state that: "[t]he
term shall also include the frame or receiver of any such weapon, any part designed and intended
solely and exclusively, or combination of parts *designed and intended, for use in converting a
weapon into a machinegun*, and any combination of parts from which a machinegun can be
assembled if such parts are in the possession or under the control of a person."

In the course of examining a number of bump-fire stocks, ATF found that none of these devices
could shoot nor did they constitute firearm frames or receivers; therefore, the first portion of the
machinegun definition can not apply.  Those bump-fire stocks which were found to convert a
weapon to shoot automatically were classified as machineguns and regulated accordingly—
most notably, the Akins Accelerator.  Other bump-fire stocks (such as the SlideFire Solutions
stock) that ATF determined to be unable to convert a weapon to shoot automatically were not
classified as machineguns.

Reviewing findings with respect to the Akins and Slide Solutions, ATF, in Ruling 2006-2, found
that the Akins Accelerator incorporated a mechanism to automatically reset and activate the fire-
control components of a firearm following the single input of a user.  Thus, the Akins
Accelerator acted to convert a semiautomatic firearm to shoot automatically.  Conversely, the
Slide Fire Solutions stock requires continuous multiple inputs by the user for each successive

-2-

The Honorable Ed Perlmutter

shot.  Similarly, other devices exist, such as the HellFire Trigger, which attach to and act upon the trigger of a firearm and also work to increase the rate or volume of fire of the firearm.  Like the Slide Fire Solutions stock, the HellFire Trigger does not provide an automatic action—requiring instead continuous multiple inputs by the user for each successive shot.

Public safety is always a primary concern of ATF.  We remain committed to the security of our Nation and the fight against violent crime.  However, bump-fire stocks that do not fall within any of the classifications for firearm contained in Federal law may only be classified as firearms components.  Stocks of this type are not subject to the provisions of Federal firearms statutes.  Therefore, ATF does not have the authority to restrict their lawful possession, use, or transfer.

We hope this information proves helpful in responding to your constituent.  Please let me know if we may be of further assistance.

Sincerely yours,

Richard W. Marianos
Assistant Director
Public and Governmental Affairs

**Exhibit A, Pg. 268**

# Exhibit 11

## ( *Rapid manual trigger manipulation*
## *(Rubber Band Assisted)* )

# Exhibit 12

## ( *AK-47 75 round drum Bumpfire!!!* )

# Exhibit 13

*( Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45 )*

# Exhibit 14

( *How to bumpfire without bumpfire stock* )

# Exhibit 15

## (Declaration of Damien Guedes)

## VERIFIED DECLARATION OF DAMIEN GUEDES

I, Damien Guedes, am competent to state and declare the following based on my personal knowledge:

1. I am a resident of Whitehall Pennsylvania.

2. In 2014, I became interested in a bump stock device.

3. Prior to purchasing a Bump Fire Systems bump stock device, as I wanted to ensure the legality of the device, I went on Bump Fire Systems' website – www.bumpfiresystems.com - to determine if the Bureau of Alcohol, Tobacco, Firearms and Explosives had approved the device.

4. Bump Fire Systems' website stated that it had obtained approval from ATF and provided me with a copy of ATF's April 2, 2012 determination letter. A copy of the letter is attached as Exhibit 1.

5. In reliance on ATF's determination letter of April 2, 2012, I purchased a Bump Fire Systems bump stock device at a cost of $99.99, plus $6.00 shipping, which I still own today. A redacted copy of the receipt is attached as Exhibit 2.

6. It is my understanding, based upon ATF's notice of proposed rulemaking – RIN 1140-AA52, Fed. Reg. No. 2018-06292 – that ATF intends to reclassify bump stock devices as machine guns in violation of Article 1, Section 9 of the United States Constitution (*i.e.* Ex Post Fact clause) and to require me to surrender or otherwise destroy my Bump Fire Systems bump stock device in the absence of any compensation, in violation of the Fifth Amendment to the United States Constitution.

**Exhibit A, Pg. 274**

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.  Executed on April  9, 2018.

Damien Guedes

# Exhibit 1



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg   West Virginia 25405_                    903050:MRC
www.atf.gov                                            3311/2012-196

APR 0 2 2012

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), requesting FTB to evaluate an accompanying stock and determine if its design would violate any Federal statutes.

As background information, the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), defines "**machinegun**" as—

"...*any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, **any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun**, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*"

The FTB evaluation confirmed that you have submitted a plastic shoulder stock designed to function on an AR-15 type rifle (see enclosed photos). For your stock to function in the manner intended, it has to be attached to an AR-15 type platform that is assembled with a collapsible-stock receiver extension. Along with the shoulder stock, you have submitted what you have identified as a "receiver module." This module is a plastic block approximately 1-5/16 inches high, about 1-3/8 inches long, and approximately 7/8-inch wide. Additionally, there are two extensions, one on each side, that are designed to travel in the two slots configured on the shoulder stock. The receiver module replaces the AR-15 pistol grip.

Further, the submitted custom shoulder stock incorporates a pistol grip. This grip section has a cavity for the receiver module to move forward and backward. Additionally, two slots have been cut for the receiver module extensions to travel in. The upper section of the shoulder stock is designed to encapsulate the collapsible receiver extension. Further, the custom stock is

-2-

designed with a "lock pin."  When the handle on the lock pin is facing in the 3- to 9-o'clock positions, the stock is fixed and will not move; and when the handle on the lock pin is facing in the 12- to 6-o'clock positions, the stock is movable.

The FTB live-fire testing of the submitted device indicates that if, as a shot is fired, an *intermediate* amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow the trigger to mechanically reset. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired.  In this manner, the shooter pulls the firearm forward to fire each shot, the firing of each shot being accomplished by a single trigger function.  Further, each subsequent shot depends on the shooter applying the appropriate amount of forward pressure to the fore-end and timing it to contact the trigger finger on the firing hand, while maintaining constant pressure on the trigger itself.

Since your device is incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, FTB finds that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

Please be advised that our findings are based on the item as submitted.  Any changes to its design features or characteristics **will void** this classification.  Further, we caution that the addition of an accelerator spring or any other non-manual source of energy which allows this device to operate automatically as described will result in the manufacture of a machinegun as defined in the NFA, 5845(b).

To facilitate the return of your sample, to include the module, please provide FTB with the appropriate FedEx or similar account information within 60 days of receipt of this letter. If their return is not necessary, please fax FTB at 304-616-4301 with authorization to destroy them on your behalf.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

# Exhibit 2

From: **Bump Fire Systems** orders141@bumpfiresystems.com
Subject: **Your BUMP FIRE SYSTEMS order receipt from October 30, 2014**
Date: October 30, 2014 at 22:27
To:

# Thank you for your order

Your order has been received and is now being processed. Your order details are shown below for your reference:

# Order: #2872

| Product | Quantity | Price |
|---|---|---|
| AR15 BFSystem | 1 | $99.99 |
| **Cart Subtotal:** | | $99.99 |
| **Shipping:** | | $6.00 via Flat Rate |
| **Payment Method:** | | Credit Card |
| **Order Total:** | | $105.99 |

# Customer details

**Email:**

**Tel:**

# Billing address

Damien Guedes

Whitehall, Pennsylvania 18052

**Exhibit A, Pg. 280**

# Exhibit 16

## (Verified Declaration of Matthew Thompson)

## VERIFIED DECLARATION OF MATTHEW THOMPSON

I, Matthew Thompson, am competent to state and declare the following based on my personal knowledge:

1. I am a resident of Hamburg, Pennsylvania.

2. In 2017, I became interested in a bump stock device.

3. Prior to purchasing a Slide Fire bump stock device, as I wanted to ensure the legality of the device, I went on Slide Fire's website - https://slidefire.com - to determine if the Bureau of Alcohol, Tobacco, Firearms and Explosives had approved the device.

4. Slide Fire's website stated that it had obtained approval from ATF and provided me with a copy of ATF's June 7, 2010 determination letter. A copy of the letter is attached as Exhibit 1.

5. In reliance on ATF's determination letter of June 7, 2010, I purchased a Slide Fire bump stock device at a cost of $134.00, which I still own today.

6. It is my understanding, based upon ATF's notice of proposed rulemaking – RIN 1140-AA52, Fed. Reg. No. 2018-06292 – that ATF intends to reclassify bump stock devices as machine guns in violation of Article 1, Section 9 of the United States Constitution (*i.e.* Ex Post Fact clause) and to require me to surrender or otherwise destroy my Slide Fire bump stock device in the absence of any compensation, in violation of the Fifth Amendment to the United States Constitution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.  Executed on April _19_ , 2018.

Matthew Thompson
Matthew Thompson

# Exhibit 1



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, West Virginia 25405

www.atf.gov

JUN 0 7 2010

903050:MMK
3311/2010-434

This is in reference to your submission and accompanying letter to the Firearms Technology Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), asking for an evaluation of a replacement shoulder stock for an AR-15 type rifle. Your letter advises that the stock (referenced in this reply as a "bump-stock") is intended to assist persons whose hands have limited mobility to "bump-fire" an AR-15 type rifle. Your submission includes the following: a block to replace the pistol grip while providing retention for the selector stop spring; a hollow shoulder stock intended to be installed over the rear of an AR-15 fitting with a sliding-stock type buffer-tube assembly; and a set of assembly instructions.

The FTB evaluation confirmed that the submitted stock (see enclosed photos) does attach to the rear of an AR-15 type rifle which has been fitted with a sliding shoulder-stock type buffer-tube assembly. The stock has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed. In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under Gun Control Act or the National Firearms Act.

Per your telephoned instructions, we will contact you separately to make return delivery arrangements.

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

# Exhibit 17

**( *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal* )**

# Exhibit 18

*( Fastest Shooter OF ALL TIME! Jerry Miculek |*
*Incredible Shooting Montage )*

# Exhibit 19

## (Gun Control Act of 1968, 82 Stat. 1235)

Public Law 90-617

### AN ACT

To amend section 2 of the Act of June 30, 1954, as amended, providing for the continuance of civil government for the Trust Territory of the Pacific Islands.

October 21, 1968
[S. 3207]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2 of the Act of June 30, 1954 (68 Stat. 330), as amended, is amended by deleting "and $35,000,000 for each of the fiscal years 1968 and 1969," and inserting in lieu thereof a comma and the following: "for fiscal year 1969, $5,000,000 in addition to the sums heretofore appropriated, for fiscal year 1970, $50,000,000 and for fiscal year 1971, $50,000,000".

Pacific Trust Territory, civil government. Appropriation. 81 Stat. 15. 48 USC 1681 note.

Sec. 2. The Act of June 30, 1954 (68 Stat. 330), as amended, is amended by adding a new section 3 as follows:

"Sec. 3. There are hereby authorized to be appropriated such sums as the Secretary of the Interior may find necessary, but not to exceed $10,000,000 for any one year, to alleviate suffering and damage resulting from major disasters that occur in the Trust Territory of the Pacific Islands. Such sums shall be in addition to those authorized in section 2 of this Act and shall not be subject to the limitations imposed by section 2 of this Act. The Secretary of the Interior shall determine whether or not a major disaster has occurred in accordance with the principles and policies of section 2 of the Act of September 30, 1950 (64 Stat. 1109), as amended (42 U.S.C. 1855a)."

Disaster relief.

76 Stat. 111.

Approved October 21, 1968.

Public Law 90-618

### AN ACT

To amend title 18, United States Code, to provide for better control of the interstate traffic in firearms.

October 22, 1968
[H. R. 17735]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Gun Control Act of 1968".

Gun Contro. Act of 1968.

## TITLE I—STATE FIREARMS CONTROL ASSISTANCE

#### PURPOSE

Sec. 101. The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisi-

tion, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.

*Ante, p. 226.*

SEC. 102. Chapter 44 of title 18, United States Code, is amended to read as follows:

## "Chapter 44.—FIREARMS

"Sec.
"921. Definitions.
"922. Unlawful acts.
"923. Licensing.
"924. Penalties.
"925. Exceptions: Relief from disabilities.
"926. Rules and regulations.
"927. Effect on State law.
"928. Separability clause.

### "§ 921. Definitions

"(a)  As used in this chapter—

"(1)  The term 'person' and the term 'whoever' include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

"(2)  The term 'interstate or foreign commerce' includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

"(3)  The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

"(4)  The term  destructive device  means—

"(A)  any explosive, incendiary, or poison gas—

"(i)  bomb,

"(ii)  grenade,

"(iii)  rocket having a propellant charge of more than four ounces,

"(iv)  missile having an explosive or incendiary charge of more than one-quarter ounce,

"(v)  mine, or

"(vi)  device similar to any of the devices described in the preceding clauses;

**Exhibit A, Pg. 290**

"(B) any type of weapon (other than a shotgun or a shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

"(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Secretary of the Treasury finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting purposes.

70 A Stat. 263.

"(5) The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

"(6) The term 'short-barreled shotgun' means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

"(8) The term 'short-barreled rifle' means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

"(9) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this chapter.

"(10) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or dis-

tribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this chapter.

"(11) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this chapter.

"(12) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(13) The term 'collector' means any person who acquires, holds, or disposes of firearms or ammunition as curios or relics, as the Secretary shall by regulation define, and the term 'licensed collector' means any such person licensed under the provisions of this chapter.

"(14) The term 'indictment' includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(15) The term 'fugitive from justice' means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

"(16) The term 'antique firearm' means—

"(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

"(B) any replica of any firearm described in subparagraph (A) if such replica—

"(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

"(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

"(17) The term 'ammunition' means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

"(18) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(19) The term 'published ordinance' means a published law of any political subdivision of a State which the Secretary determines to be relevant to the enforcement of this chapter and which is contained

Publication in Federal Register

on a list compiled by the Secretary, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

"(20) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate, or (B) any State offense (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

"(b) For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

## "§ 922.  Unlawful acts

"(a) It shall be unlawful—

"(1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing,

**Exhibit A, Pg. 292**

manufacturing, or dealing in firearms or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce;

"(2) for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm or ammunition to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, except that—

"(A) this paragraph and subsection (b)(3) shall not be held to preclude a licensed importer, licensed manufacturer, licensed dealer, or licensed collector from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received; and this paragraph shall not be held to preclude an individual from mailing a firearm owned in compliance with Federal, State, and local law to a licensed importer, licensed manufacturer, or licensed dealer for the sole purpose of repair or customizing;

"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of this title, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty; and

62 Stat. 781;
63 Stat. 95.

"(C) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States;

"(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a rifle or shotgun obtained in conformity with the provisions of subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

"(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Secretary consistent with public safety and necessity;

Post, p. 1231.

"(5) for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe resides in any State other than that in

Exhibit A, Pg. 293

which the transferor resides (or other than that in which its place of business is located if the transferor is a corporation or other business entity); except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes; and

"(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—

"(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

"(2) any firearm or ammunition to any person in any State where the purchase or possession by such person of such firearm or ammunition would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;

"(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of a rifle or shotgun to a resident of a State contiguous to the State in which the licensee's place of business is located if the purchaser's State of residence permits such sale or delivery by law, the sale fully complies with the legal conditions of sale in both such contiguous States, and the purchaser and the licensee have, prior to the sale, or delivery for sale, of the rifle or shotgun, complied with all of the requirements of section 922(c) applicable to intrastate transactions other than at the licensee's business premises, (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes, and (C) shall not preclude any person who is participating in any organized rifle or shotgun match or contest, or is engaged in hunting, in a State other than his State of residence and whose rifle or shotgun has been lost or stolen or has become inoperative in such other State, from purchasing a rifle or shotgun in such other State from a licensed dealer if such person presents to such dealer a sworn statement (i) that his rifle or shotgun was lost or stolen or became inoperative while participating in such a match or contest, or while engaged in hunting, in such other State, and (ii) identifying the chief law enforcement officer of the locality in which such person resides, to whom such licensed dealer shall forward such statement by registered mail;

**Exhibit A, Pg. 294**

"(4) to any person any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1954), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Secretary consistent with public safety and necessity; and

*Post,* p. 1231.

"(5) any firearm or ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

*Recordkeeping.*

Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors. Paragraph (4) of this subsection shall not apply to a sale or delivery to any research organization designated by the Secretary.

"(c) In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if—

"(1) the transferee submits to the transferor a sworn statement in the following form:

> " 'Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are _____
> _____
> Signature _____ Date _____.'

*Ante,* p. 1214.

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

"(2) the transferor has, prior to the shipment or delivery of the firearm, forwarded by registered or certified mail (return receipt requested) a copy of the sworn statement, together with a description of the firearm, in a form prescribed by the Secretary, to the chief law enforcement officer of the transferee's place of residence, and has received a return receipt evidencing delivery of the statement or has had the statement returned due to the refusal of the named addressee to accept such letter in accordance with United States Post Office Department regulations; and

"(3) the transferor has delayed shipment or delivery for a period of at least seven days following receipt of the notification of the acceptance or refusal of delivery of the statement.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer, together with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 923(g).

*Recordkeeping.*

"(d) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—

"(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) is a fugitive from justice;

"(3) is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or

"(4) has been adjudicated as a mental defective or has been committed to any mental institution.

*Post,* p. 1361.
21 USC 321.
74 Stat. 57.
26 USC 4731.

This subsection shall not apply with respect to the sale or disposition of a firearm or ammunition to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms or ammunition, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

"(e) It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter.

"(f) It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

"(g) It shall be unlawful for any person—

"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) who is a fugitive from justice;

"(3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or

"(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

to ship or transport any firearm or ammunition in interstate or foreign commerce.

"(h) It shall be unlawful for any person—

"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) who is a fugitive from justice;

**Exhibit A, Pg. 296**

"(3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or

Post, p. 1361.
21 USC 321.
74 Stat. 57.
26 USC 4731.

"(4) who has been adjudicated as a mental defective or who has been committed to any mental institution;

to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(i) It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

"(j) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, or which constitutes, interstate or foreign commerce, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

"(k) It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.

"(l) Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

"(m) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

Recordkeeping.

## "§ 923.  Licensing

"(a)  No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant shall pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:

Fees.

"(1) If the applicant is a manufacturer—
"(A)  of destructive devices or ammunition for destructive devices, a fee of $1,000 per year;
"(B)  of firearms other than destructive devices, a fee of $50 per year; or
"(C)  of ammunition for firearms other than destructive devices, a fee of $10 per year.
"(2) If the applicant is an importer—
"(A)  of destructive devices or ammunition for destructive devices, a fee of $1,000 per year; or
"(B)  of firearms other than destructive devices or ammunition for firearms other than destructive devices, a fee of $50 per year.
"(3) If the applicant is a dealer—
"(A)  in destructive devices or ammunition for destructive devices, a fee of $1,000 per year;

**Exhibit A, Pg. 297**

"(B) who is a pawnbroker dealing in firearms other than destructive devices or ammunition for firearms other than destructive devices, a fee of $25 per year; or

"(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per year.

"(b) Any person desiring to be licensed as a collector shall file an application for such license with the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulation prescribe. The fee for such license shall be $10 per year. Any license granted under this subsection shall only apply to transactions in curios and relics.

"(c) Upon the filing of a proper application and payment of the prescribed fee, the Secretary shall issue to a qualified applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

Approval.

"(d)(1) Any application submitted under subsection (a) or (b) of this section shall be approved if—

"(A) the applicant is twenty-one years of age or over;

"(B) the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922 (g) and (h) of this chapter;

"(C) the applicant has not willfully violated any of the provisions of this chapter or regulations issued thereunder;

"(D) the applicant has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application; and

"(E) the applicant has in a State (i) premises from which he conducts business subject to license under this chapter or from which he intends to conduct such business within a reasonable period of time, or (ii) in the case of a collector, premises from which he conducts his collecting subject to license under this chapter or from which he intends to conduct such collecting within a reasonable period of time.

76 Stat. 744.

"(2) The Secretary must approve or deny an application for a license within the forty-five-day period beginning on the date it is received. If the Secretary fails to act within such period, the applicant may file an action under section 1361 of title 28 to compel the Secretary to act. If the Secretary approves an applicant's application, such applicant shall be issued a license upon the payment of the prescribed fee.

Revocation.

"(e) The Secretary may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has violated any provision of this chapter or any rule or regulation prescribed by the Secretary under this chapter. The Secretary's action under this subsection may be reviewed only as provided in subsection (f) of this section.

"(f)(1) Any person whose application for a license is denied and any holder of a license which is revoked shall receive a written notice from the Secretary stating specifically the grounds upon which the application was denied or upon which the license was revoked. Any notice of a revocation of a license shall be given to the holder of such license before the effective date of the revocation.

**Exhibit A, Pg. 298**

"(2) If the Secretary denies an application for, or revokes, a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation of a license, the Secretary shall upon the request of the holder of the license stay the effective date of the revocation. A hearing held under this paragraph shall be held at a location convenient to the aggrieved party. <span style="float:right">Hearing.</span>

"(3) If after a hearing held under paragraph (2) the Secretary decides not to reverse his decision to deny an application or revoke a license, the Secretary shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding. If the court decides that the Secretary was not authorized to deny the application or to revoke the license, the court shall order the Secretary to take such action as may be necessary to comply with the judgment of the court. <span style="float:right">Judicial review.</span>

"(g) Each licensed importer, licensed manufacturer, licensed dealer, and licensed collector shall maintain such records of importation, production, shipment, receipt, sale, or other disposition, of firearms and ammunition at such place, for such period, and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, dealers, and collectors shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer, manufacturer, dealer, or collector for the purpose of inspecting or examining (1) any records or documents required to be kept by such importer, manufacturer, dealer, or collector under the provisions of this chapter or regulations issued under this chapter, and (2) any firearms or ammunition kept or stored by such importer, manufacturer, dealer, or collector at such premises. Upon the request of any State or any political subdivision thereof, the Secretary may make available to such State or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of such firearms or ammunition. <span style="float:right">Recordkeeping.</span>

"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the premises covered by the license. <span style="float:right">Posting of license.</span>

"(i) Licensed importers and licensed manufacturers shall identify, by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.

"(j) This section shall not apply to anyone who engages only in hand loading, reloading, or custom loading ammunition for his own firearm, and who does not hand load, reload, or custom load ammunition for others. <span style="float:right">Exemption.</span>

## "§ 924. Penalties

"(a) Whoever violates any provision of this chapter or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any

<span style="float:right">**Exhibit A, Pg. 299**</span>

license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine.

"(b) Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be fined not more than $10,000, or imprisoned not more than ten years, or both.

"(c) Whoever—

"(1) uses a firearm to commit any felony which may be prosecuted in a court of the United States, or

"(2) carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States,

shall be sentenced to a term of imprisonment for not less than one year nor more than 10 years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than five years nor more than 25 years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of such person or give him a probationary sentence.

"(d) Any firearm or ammunition involved in or used or intended to be used in, any violation of the provisions of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

*Post*, p. 1230.

## "§ 925. Exceptions: Relief from disabilities

"(a)(1) The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof.

"(2) The provisions of this chapter shall not apply with respect to (A) the shipment or receipt of firearms or ammunition when sold or issued by the Secretary of the Army pursuant to section 4308 of title 10, and (B) the transportation of any such firearm or ammunition carried out to enable a person, who lawfully received such firearm or ammunition from the Secretary of the Army, to engage in military training or in competitions.

70A Stat. 236.

"(3) Unless otherwise prohibited by this chapter or any other Federal law, a licensed importer, licensed manufacturer, or licensed dealer may ship to a member of the United States Armed Forces on active duty outside the United States or to clubs, recognized by the Department of Defense, whose entire membership is composed of such members, and such members or clubs may receive a firearm or ammunition determined by the Secretary of the Treasury to be generally recognized as particularly suitable for sporting purposes and intended for the personal use of such member or club.

"(4) When established to the satisfaction of the Secretary to be consistent with the provisions of this chapter and other applicable Federal and State laws and published ordinances, the Secretary may

Exhibit A, Pg. 300

authorize the transportation, shipment, receipt, or importation into the United States to the place of residence of any member of the United States Armed Forces who is on active duty outside the United States (or who has been on active duty outside the United States within the sixty day period immediately preceding the transportation, shipment, receipt, or importation), of any firearm or ammunition which is (A) determined by the Secretary to be generally recognized as particularly suitable for sporting purposes, or determined by the Department of Defense to be a type of firearm normally classified as a war souvenir, and (B) intended for the personal use of such member.

"(5) For the purpose of paragraphs (3) and (4) of this subsection, the term 'United States' means each of the several States and the District of Columbia.

"United States."

"(b) A licensed importer, licensed manufacturer, licensed dealer, or licensed collector who is indicted for a crime punishable by imprisonment for a term exceeding one year, may, notwithstanding any other provision of this chapter, continue operation pursuant to his existing license (if prior to the expiration of the term of the existing license timely application is made for a new license) during the term of such indictment and until any conviction pursuant to the indictment becomes final.

"(c) A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Firearms Act) may make application to the Secretary for relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, or possession of firearms and incurred by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector conducting operations under this chapter, who makes application for relief from the disabilities incurred under this chapter by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary grants relief to any person pursuant to this section he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

Post, p. 1227.

Publication in Federal Register.

"(d) The Secretary may authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the person importing or bringing in the firearm or ammunition establishes to the satisfaction of the Secretary that the firearm or ammunition—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10;

"(2) is an unserviceable firearm, other than a machinegun as defined in section 5845(b) of the Internal Revenue Code of 1954 (not readily restorable to firing condition), imported or brought in as a curio or museum piece;

"(3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms; or

70A Stat. 234.
10 USC 4301-4313.
Post, p. 1231.

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm or ammunition.

The Secretary may permit the conditional importation or bringing in of a firearm or ammunition for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm or ammunition will be allowed under this subsection.

### "§ 926. Rules and regulations

"The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter, including—

"(1) regulations providing that a person licensed under this chapter, when dealing with another person so licensed, shall provide such other licensed person a certified copy of this license; and

"(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection.

The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

### "§ 927. Effect on State law

"No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

### "§ 928. Separability

"If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby."

SEC. 103. The administration and enforcement of the amendment made by this title shall be vested in the Secretary of the Treasury.

SEC. 104. Nothing in this title or the amendment made thereby shall be construed as modifying or affecting any provision of—

*Post, p. 1227.*

(a) the National Firearms Act (chapter 53 of the Internal Revenue Code of 1954);

*68 Stat. 848.*

(b) section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; or

*62 Stat. 781;*
*63 Stat. 95.*

(c) section 1715 of title 18, United States Code, relating to nonmailable firearms.

*Effective dates.*

SEC. 105. (a) Except as provided in subsection (b), the provisions of chapter 44 of title 18, United States Code, as amended by section 102 of this title, shall take effect on December 16, 1968.

(b) The following sections of chapter 44 of title 18, United States Code, as amended by section 102 of this title shall take effect on the date of the enactment of this title: Sections 921, 922(l), 925(a)(1), and 925(d).

Exhibit A, Pg. 302

## TITLE II—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

Sec. 201. Chapter 53 of the Internal Revenue Code of 1954 is amended to read as follows:

National Firearms Act Amendments of 1968.
68A Stat. 721.
72 Stat. 1428.
26 USC 5801-5862.

# "CHAPTER 53—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

"Subchapter A. Taxes.
"Subchapter B. General provisions and exemptions.
"Subchapter C. Prohibited acts.
"Subchapter D. Penalties and forfeitures.

## "Subchapter A—Taxes

"Part   I. Special (occupational) taxes.
"Part  II. Tax on transferring firearms.
"Part III. Tax on making firearms.

### "PART I—SPECIAL (OCCUPATIONAL) TAXES

"Sec. 5801. Tax.
"Sec. 5802. Registration of importers, manufacturers, and dealers.

"SEC. 5801. TAX.

"On first engaging in business and thereafter on or before the first day of July of each year, every importer, manufacturer, and dealer in firearms shall pay a special (occupational) tax for each place of business at the following rates:

"(1) IMPORTERS.—$500 a year or fraction thereof;
"(2) MANUFACTURERS.—$500 a year or fraction thereof;
"(3) DEALERS.—$200 a year or fraction thereof.

Except an importer, manufacturer, or dealer who imports, manufactures, or deals in only weapons classified as 'any other weapon' under section 5845(e), shall pay a special (occupational) tax for each place of business at the following rates: Importers, $25 a year or fraction thereof; manufacturers, $25 a year or fraction thereof; dealers, $10 a year or fraction thereof.

"SEC. 5802. REGISTRATION OF IMPORTERS, MANUFACTURERS, AND DEALERS.

"On first engaging in business and thereafter on or before the first day of July of each year, each importer, manufacturer, and dealer in firearms shall register with the Secretary or his delegate in each internal revenue district in which such business is to be carried on, his name, including any trade name, and the address of each location in the district where he will conduct such business. Where there is a change during the taxable year in the location of, or the trade name used in, such business, the importer, manufacturer, or dealer shall file an application with the Secretary or his delegate to amend his registration. Firearms operations of an importer, manufacturer, or dealer may not be commenced at the new location or under a new trade name prior to approval by the Secretary or his delegate of the application.

## "PART II—TAX ON TRANSFERRING FIREARMS

"Sec. 5811. Transfer tax.
"Sec. 5812. Transfers.

**"SEC. 5811. TRANSFER TAX.**

"(a) Rate.—There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845(e) shall be at the rate of $5 for each such firearm transferred.

"(b) By Whom Paid.—The tax imposed by subsection (a) of this section shall be paid by the transferor.

"(c) Payment.—The tax imposed by subsection (a) of this section shall be payable by the appropriate stamps prescribed for payment by the Secretary or his delegate.

**"SEC. 5812. TRANSFERS.**

"(a) Application.—A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary or his delegate a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary or his delegate; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary or his delegate may by regulations prescribe; and (6) the application form shows that the Secretary or his delegate has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

"(b) Transfer of Possession.—The transferee of a firearm shall not take possession of the firearm unless the Secretary or his delegate has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

## "PART III—TAX ON MAKING FIREARMS

"Sec. 5821. Making tax.
"Sec. 5822. Making.

**"SEC. 5821. MAKING TAX.**

"(a) Rate.—There shall be levied, collected, and paid upon the making of a firearm a tax at the rate of $200 for each firearm made.

"(b) By Whom Paid.—The tax imposed by subsection (a) of this section shall be paid by the person making the firearm.

"(c) Payment.—The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the Secretary or his delegate.

**"SEC. 5822. MAKING.**

"No person shall make a firearm unless he has (a) filed with the Secretary or his delegate a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary or his delegate; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form

Exhibit A, Pg. 304

in such manner as the Secretary or his delegate may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary or his delegate may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary or his delegate to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

## "Subchapter B—General Provisions and Exemptions

"Part I. General provisions.
"Part II. Exemptions.

### "PART I—GENERAL PROVISIONS

"Sec. 5841. Registration of firearms.
"Sec. 5842. Identification of firearms.
"Sec. 5843. Records and returns.
"Sec. 5844. Importation.
"Sec. 5845. Definitions.
"Sec. 5846. Other laws applicable.
"Sec. 5847. Effect on other law.
"Sec. 5848. Restrictive use of information.
"Sec. 5849. Citation of chapter.

"SEC. 5841. REGISTRATION OF FIREARMS.

"(a) CENTRAL REGISTRY. The Secretary or his delegate shall maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record. The registry shall include—

 "(1) identification of the firearm;

 "(2) date of registration; and

 "(3) identification and address of person entitled to possession of the firearm.

National Firearms Registration and Transfer Record.

"(b) BY WHOM REGISTERED.—Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor.

"(c) How REGISTERED.—Each manufacturer shall notify the Secretary or his delegate of the manufacture of a firearm in such manner as may by regulations be prescribed and such notification shall effect the registration of the firearm required by this section. Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner as required by this chapter or regulations issued thereunder to import, make, or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section.

"(d) FIREARMS REGISTERED ON EFFECTIVE DATE OF THIS ACT.—A person shown as possessing a firearm by the records maintained by the Secretary or his delegate pursuant to the National Firearms Act in force on the day immediately prior to the effective date of the National Firearms Act of 1968 shall be considered to have registered under this section the firearms in his possession which are disclosed by that record as being in his possession.

68A Stat. 721;
72 Stat. 1428.
26 USC 5801-
5862.
*Post,* p. 1235.

"(e) PROOF OF REGISTRATION.—A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Secretary or his delegate upon request.

**Exhibit A, Pg. 305**

## "SEC. 5842. IDENTIFICATION OF FIREARMS.

"(a) IDENTIFICATION OF FIREARMS OTHER THAN DESTRUCTIVE DEVICES.—Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the Secretary or his delegate may by regulations prescribe.

"(b) FIREARMS WITHOUT SERIAL NUMBER.—Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) of this section shall identify the firearm with a serial number assigned by the Secretary or his delegate and any other information the Secretary or his delegate may by regulations prescribe.

"(c) IDENTIFICATION OF DESTRUCTIVE DEVICE.—Any firearm classified as a destructive device shall be identified in such manner as the Secretary or his delegate may by regulations prescribe.

## "SEC. 5843. RECORDS AND RETURNS.

"Importers, manufacturers, and dealers shall keep such records of, and render such returns in relation to, the importation, manufacture, making, receipt, and sale, or other disposition, of firearms as the Secretary or his delegate may by regulations prescribe.

## "SEC. 5844. IMPORTATION.

"No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction unless the importer establishes, under regulations as may be prescribed by the Secretary or his delegate, that the firearm to be imported or brought in is—

    "(1) being imported or brought in for the use of the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof; or

    "(2) being imported or brought in for scientific or research purposes; or

    "(3) being imported or brought in solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer;

except that, the Secretary or his delegate may permit the conditional importation or bringing in of a firearm for examination and testing in connection with classifying the firearm.

## "SEC. 5845. DEFINITIONS.

"For the purpose of this chapter—

"(a) FIREARM.—The term 'firearm' means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition; and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary or his delegate finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

**Exhibit A, Pg. 306**

"(b) Machinegun.—The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

"(c) Rifle.—The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

"(d) Shotgun.—The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

"(e) Any Other Weapon.—The term 'any other weapon' means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

"(f) Destructive Device.—The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary of the Treasury or his delegate finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

70A Stat. 263.

"(g) Antique Firearm.—The term 'antique firearm' means any firearm not designed or redesigned for using rim fire or conventional

center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

"(h) Unserviceable Firearm.—The term 'unserviceable firearm' means a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition.

"(i) Make.—The term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm.

"(j) Transfer.—The term 'transfer' and the various derivatives of such word, shall include selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of.

"(k) Dealer.—The term 'dealer' means any person, not a manufacturer or importer, engaged in the business of selling, renting, leasing, or loaning firearms and shall include pawnbrokers who accept firearms as collateral for loans.

"(l) Importer.—The term 'importer' means any person who is engaged in the business of importing or bringing firearms into the United States.

"(m) Manufacturer.—The term 'manufacturer' means any person who is engaged in the business of manufacturing firearms.

## "SEC. 5846. OTHER LAWS APPLICABLE.

72 Stat. 1313.
26 USC 5001-
5692.
Post, p. 1235.

"All provisions of law relating to special taxes imposed by chapter 51 and to engraving, issuance, sale, accountability, cancellation, and distribution of stamps for tax payment shall, insofar as not inconsistent with the provisions of this chapter, be applicable with respect to the taxes imposed by sections 5801, 5811, and 5821.

## "SEC. 5847. EFFECT ON OTHER LAWS.

"Nothing in this chapter shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war.

68 Stat. 848.
22 USC 1934.

## "SEC. 5848. RESTRICTIVE USE OF INFORMATION.

"(a) General Rule.—No information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person in order to comply with any provision of this chapter or regulations issued thereunder, shall, except as provided in subsection (b) of this section, be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence.

"(b) Furnishing False Information.—Subsection (a) of this section shall not preclude the use of any such information or evidence in a prosecution or other action under any applicable provision of law with respect to the furnishing of false information.

## "SEC. 5849. CITATION OF CHAPTER.

"This chapter may be cited as the 'National Firearms Act' and any reference in any other provision of law to the 'National Firearms Act' shall be held to refer to the provisions of this chapter.

**Exhibit A, Pg. 308**

## "PART II—EXEMPTIONS

"Sec. 5851. Special (occupational) tax exemption.
"Sec. 5852. General transfer and making exemption.
"Sec. 5853. Exemption from transfer and making tax available to
            certain governmental entities and officials.
"Sec. 5854. Exportation of firearms exempt from transfer tax.

## "SEC. 5851. SPECIAL (OCCUPATIONAL) TAX EXEMPTION.

"(a) Business With United States.—Any person required to pay special (occupational) tax under section 5801 shall be relieved from payment of that tax if he establishes to the satisfaction of the Secretary or his delegate that his business is conducted exclusively with, or on behalf of, the United States or any department, independent establishment, or agency thereof. The Secretary or his delegate may relieve any person manufacturing firearms for, or on behalf of, the United States from compliance with any provision of this chapter in the conduct of such business.

"(b) Application.—The exemption provided for in subsection (a) of this section may be obtained by filing with the Secretary or his delegate an application on such form and containing such information as may by regulations be prescribed. The exemptions must thereafter be renewed on or before July 1 of each year. Approval of the application by the Secretary or his delegate shall entitle the applicant to the exemptions stated on the approved application.

<span style="float:right">Renewal.</span>

## "SEC. 5852. GENERAL TRANSFER AND MAKING TAX EXEMPTION.

"(a) Transfer.—Any firearm may be transferred to the United States or any department, independent establishment, or agency thereof, without payment of the transfer tax imposed by section 5811.

"(b) Making by a Person Other Than a Qualified Manufacturer.—Any firearm may be made by, or on behalf of, the United States, or any department, independent establishment, or agency thereof, without payment of the making tax imposed by section 5821.

"(c) Making by a Qualified Manufacturer.—A manufacturer qualified under this chapter to engage in such business may make the type of firearm which he is qualified to manufacture without payment of the making tax imposed by section 5821.

"(d) Transfers Between Special (Occupational) Taxpayers.— A firearm registered to a person qualified under this chapter to engage in business as an importer, manufacturer, or dealer may be transferred by that person without payment of the transfer tax imposed by section 5811 to any other person qualified under this chapter to manufacture, import, or deal in that type of firearm.

"(e) Unserviceable Firearm.—An unserviceable firearm may be transferred as a curio or ornament without payment of the transfer tax imposed by section 5811, under such requirements as the Secretary or his delegate may by regulations prescribe.

"(f) Right to Exemption.—No firearm may be transferred or made exempt from tax under the provisions of this section unless the transfer or making is performed pursuant to an application in such form and manner as the Secretary or his delegate may by regulations prescribe.

## "SEC. 5853. TRANSFER AND MAKING TAX EXEMPTION AVAILABLE TO CERTAIN GOVERNMENTAL ENTITIES.

"(a) Transfer.—A firearm may be transferred without the payment of the transfer tax imposed by section 5811 to any State, possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

"(b) Making.—A firearm may be made without payment of the making tax imposed by section 5821 by, or on behalf of, any State, or

possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

"(c) Right to Exemption.—No firearm may be transferred or made exempt from tax under this section unless the transfer or making is performed pursuant to an application in such form and manner as the Secretary or his delegate may by regulations prescribe.

## "SEC. 5854. EXPORTATION OF FIREARMS EXEMPT FROM TRANSFER TAX.

"A firearm may be exported without payment of the transfer tax imposed under section 5811 provided that proof of the exportation is furnished in such form and manner as the Secretary or his delegate may by regulations prescribe.

## "Subchapter C—Prohibited Acts

### "SEC. 5861. PROHIBITED ACTS.

"It shall be unlawful for any person—

"(a) to engage in business as a manufacturer or importer of, or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802; or

"(b) to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or

"(c) to receive or possess a firearm made in violation of the provisions of this chapter; or

*Ante, p. 1229.*

"(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

"(e) to transfer a firearm in violation of the provisions of this chapter; or

"(f) to make a firearm in violation of the provisions of this chapter; or

"(g) to obliterate, remove, change, or alter the serial number or other identification of a firearm required by this chapter; or

"(h) to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered; or

"(i) to receive or possess a firearm which is not identified by a serial number as required by this chapter; or

"(j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter; or

"(k) to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844; or

"(l) to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false.

## "Subchapter D—Penalties and Forfeitures

"Sec. 5871. Penalties.
"Sec. 5872. Forfeitures.

### "SEC. 5871. PENALTIES.

"Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine.

## "SEC. 5872. FORFEITURES.

"(a) LAWS APPLICABLE.—Any firearm involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture, and (except as provided in subsection (b)) all the provisions of internal revenue laws relating to searches, seizures, and forfeitures of unstamped articles are extended to and made to apply to the articles taxed under this chapter, and the persons to whom this chapter applies.

"(b) DISPOSAL.—In the case of the forfeiture of any firearm by reason of a violation of this chapter, no notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is forfeited for a violation of this chapter and there is no remission or mitigation of forfeiture thereof, it shall be delivered by the Secretary or his delegate to the Administrator of General Services, General Services Administration, who may order such firearm destroyed or may sell it to any State, or possession, or political subdivision thereof, or at the request of the Secretary or his delegate, may authorize its retention for official use of the Treasury Department, or may transfer it without charge to any executive department or independent establishment of the Government for use by it."

SEC. 202. The amendments made by section 201 of this title shall be cited as the "National Firearms Act Amendments of 1968". *Citation of amendments.*

SEC. 203. (a) Section 6107 of the Internal Revenue Code of 1954 is repealed. *Repeal. 68A Stat. 756. 26 USC 6107.*

(b) The table of sections for subchapter B of chapter 61 of the Internal Revenue Code of 1954 is amended by striking out:

"Sec. 6107. List of special taxpayers for public inspection."

SEC. 204. Section 6806 of the Internal Revenue Code of 1954 is amended to read as follows:

## "SEC. 6806. OCCUPATIONAL TAX STAMPS.

"Every person engaged in any business, avocation, or employment, who is thereby made liable to a special tax (other than a special tax under subchapter B of chapter 35, under subchapter B of chapter 36, or under subtitle E) shall place and keep conspicuously in his establishment or place of business all stamps denoting payment of such special tax." *26 USC 4411- 4414, 4461- 4463, 5001-5862.*

SEC. 205. Section 7273 of the Internal Revenue Code of 1954 is amended to read as follows:

## "SEC. 7273. PENALTIES FOR OFFENSES RELATING TO SPECIAL TAXES.

"Any person who shall fail to place and keep stamps denoting the payment of the special tax as provided in section 6806 shall be liable to a penalty (not less than $10) equal to the special tax for which his business rendered him liable, unless such failure is shown to be due to reasonable cause. If such failure to comply with section 6806 is through willful neglect or refusal, then the penalty shall be double the amount above prescribed."

SEC. 206. (a) Section 5692 of the Internal Revenue Code of 1954 is repealed. *Repeal. 72 Stat. 1413.*

(b) The table of sections for part V of subchapter J of chapter 51 of the Internal Revenue Code of 1954 is amended by striking out:

"Sec. 5692. Penalties relating to posting of special tax stamps."

SEC. 207. (a) Section 201 of this title shall take effect on the first day of the first month following the month in which it is enacted. *Effective dates.*

(b) Notwithstanding the provisions of subsection (a) or any other provision of law, any person possessing a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 (as amended by this title) which is not registered to him in the National Firearms Registra- *Ante, p. 1230.*

**Exhibit A, Pg. 311**

1236                    PUBLIC LAW 90-619—OCT. 22, 1968                    [82 Stat.

tion and Transfer Record shall register each firearm so possessed with
the Secretary of the Treasury or his delegate in such form and manner
as the Secretary or his delegate may require within the thirty days
immediately following the effective date of section 201 of this Act.
Such registrations shall become a part of the National Firearms Regis-
tration and Transfer Record required to be maintained by section
*Ante, p. 1229.*
5841 of the Internal Revenue Code of 1954 (as amended by this title).
No information or evidence required to be submitted or retained by a
natural person to register a firearm under this section shall be used,
directly or indirectly, as evidence against such person in any criminal
proceeding with respect to a prior or concurrent violation of law.
*Effective date.*
        (c) The amendments made by sections 202 through 206 of this title
shall take effect on the date of enactment.
*Publication in Federal Register.*
        (d) The Secretary of the Treasury, after publication in the Federal
Register of his intention to do so, is authorized to establish such periods
of amnesty, not to exceed ninety days in the case of any single period,
and immunity from liability during any such period, as the Secretary
determines will contribute to the purposes of this title.

### TITLE III—AMENDMENTS TO TITLE VII OF THE OMNI-BUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

*Ante, p. 236.*
    Sec. 301. (a) Title VII of the Omnibus Crime Control and Safe
Streets Act of 1968 (Public Law 90–351) is amended—
        (1) by striking out "other than honorably discharged" in sec-
    tion 1201, and substituting therefor "discharged under dishon-
    orable conditions"; and
        (2) by striking out "other than honorable conditions" in sub-
    sections (a) (2) and (h) (2) of section 1202 and substituting there-
    for in each instance "dishonorable conditions".
        (h) Section 1202(c) (2) of such title is amended to read as follows:
*"Felony."*
        "(2) 'felony' means any offense punishable by imprisonment
    for a term exceeding one year, but does not include any offense
    (other than one involving a firearm or explosive) classified as a
    misdemeanor under the laws of a State and punishable by a term
    of imprisonment of two years or less;".
*Effective date.*
    Sec. 302. The amendments made by paragraphs (1) and (2) of
subsection (a) of section 301 shall take effect as of June 19, 1968.
    Approved October 22, 1968.


Public Law 90-619

October 22, 1968
[H. R. 14095]

AN ACT

To amend the Internal Revenue Code of 1954 so as to make certain changes to
facilitate the production of wine, and for other purposes.

*Taxes.*
*Wine spirits.*
*72 Stat. 1382.*
*26 USC 5373.*
        *Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That the first sen-
tence of section 5373(a) of the Internal Revenue Code of 1954 (re-
lating to wine spirits) is amended to read as follows: "The wine
spirits authorized to be used in wine production shall be brandy or
wine spirits produced in a distilled spirits plant (with or without the
use of water to facilitate extraction and distillation) exclusively from—
        "(1) fresh or dried fruit, or their residues,
        "(2) the wine or wine residues therefrom, or
        "(3) special natural wine under such conditions as the Secretary
    or his delegate may by regulations prescribe;
except that where, in the production of natural wine or special natural

Exhibit A, Pg. 312

# Exhibit 20

## (26 C.F.R. § 179.120)

# CODE

# OF FEDERAL

# REGULATIONS



**TITLE 26**

**Parts 170 to 299**

Revised as of January 1, 1969

CONTAINING A CODIFICATION OF DOCUMENTS OF GENERAL APPLICABILITY AND

FUTURE EFFECT AS OF JANUARY 1, 1969

*With Ancillaries*

Published by the Office of the Federal Register, National Archives and Records Service
General Services Administration, as a Special Edition of the Federal Register
Pursuant to Section 11 of the Federal Register Act as Amended

**Exhibit A, Pg. 314**

As of January 1, 1969
Title 26, Parts 170 to 299
Revised as of January 1, 1968
Replaced by This Volume

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1969

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $3.50 (paper cover)

Exhibit A, Pg. 315

179.100 shall be followed in a tax-exempt transfer of a firearm under this section.
[T.D. 6979, 33 F.R. 15907, Oct. 29, 1968]

## Subpart F—Registration and Identification of Firearms

### § 179.120   Registration of firearms.

(a)  The Director shall maintain a central registry of all firearms in the United States which are not in the possession of or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record and shall include:

(1)  Identification of the firearm as required by this part;

(2)  Date of registration; and

(3)  Identification and address of person entitled to possession of the firearm as required by this part.

(b)  Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes in the manner prescribed by this part. Each firearm transferred shall be registered to the transferee by the transferor in the manner prescribed by this part. Any person possessing a firearm which is not registered to him in the National Firearms Registration and Transfer Record shall register such firearm during the period November 2, 1968, through December 1, 1968, in the manner prescribed in Subpart O of this part. No firearm may be registered by a person unlawfully in possession of the firearm after December 1, 1968, except that the Director, after publication in the FEDERAL REGISTER of his intention to do so, may establish periods of amnesty, not to exceed ninety (90) days in the case of any single period with such immunity from liability as the Director determines will contribute to the purposes of this part.

(c)  A person shown as possessing firearms by the records maintained by the Director pursuant to the National Firearms Act (Chapter 53, I.R.C.) in force on October 31, 1968, shall be considered to have registered the firearms in his possession which are disclosed by that record as being in his possession on October 31, 1968.

(d)  A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Director upon request.

(e)  A firearm not identified as required by this part shall not be registered.
[T.D. 6979, 33 F.R. 15907, Oct. 29, 1968]

### § 179.121   Identification of firearms.

Each manufacturer, importer, or maker of a firearm, other than a destructive device, shall identify it by stamping (impressing), or otherwise conspicuously placing or causing to be stamped (impressed) or placed on the frame or receiver thereof, in a manner not susceptible of being readily obliterated or altered, the name and location of the manufacturer and importer, if any, and the serial number, caliber or gauge, and model of the firearm. None of the data indicated may be omitted except with the approval of the Director. A destructive device shall be identified in the manner prescribed by this section, except that if such identification is not practical it may be identified in any manner acceptable to the Assistant Regional Commissioner.
[T.D. 6979, 33 F.R. 15907, Oct. 29, 1968]

### § 179.122   Registration of firearms manufactured.

Each manufacturer qualified under this part shall execute and file with the Director an accurate return on Form 2 (Firearms) setting forth the name, address, class of business (i.e. Class 2 Manufacturer or Class 5 Manufacturer), and special (occupational) tax stamp number of the manufacturer, the date of manufacture, and the type, model, length of barrel, caliber, gauge, or size, the serial numbers of the firearms he manufactures, and the place where the manufactured firearms will be kept. All firearms manufactured by him during a single day shall be included on one return, Form 2 (Firearms), filed by the manufacturer no later than the close of the next business day. The manufacturer shall prepare the return, Form 2 (Firearms), in duplicate, file the original return as prescribed herein and keep the copy with the records required by Subpart H of this part at the premises covered by his special tax stamp. Receipt of the return, Form 2 (Firearms), by the Director shall effectuate the registration to the manufacturer of the firearms listed on that form. The requirements of this part relating to the transfer of a

Exhibit A, Pg. 316

address of the purchaser, and shall be signed in ink by the purchaser.

### § 179.171    Stamps authorized.

Adhesive stamps of the $5 and $200 denomination, bearing the words "National Firearms Act," have been prepared and distributed to District Directors, and only such stamps shall be used for the payment of the transfer tax and for the tax on the making of a firearm.

[20 F.R. 6739, Sept. 14, 1955, as amended by T.D. 6557, 26 F.R. 2410, Mar. 22, 1961]

### § 179.172    Reuse of stamps prohibited.

A stamp once affixed to one instrument cannot lawfully be removed and affixed to another. Any person wilfully reusing such a stamp shall be subject to the penalty prescribed by section 7208 of the Internal Revenue Code of 1954.

### Subpart L—Redemption of or Allowance for Stamps or Refunds

### § 179.180    Redemption of or allowance for stamps.

Where a "National Firearms Act" stamp is destroyed, mutilated or rendered useless after purchase, and before liability has been incurred, such stamp may be redeemed by giving another stamp in lieu thereof or by refunding the amount or value thereof. Claim for redemption of the stamp should be filed on Form 843 with the appropriate District Director of Internal Revenue. Such claim must be accompanied by the stamp or by a satisfactory explanation of the reason why the stamp cannot be returned and must be filed within 3 years after the purchase of the stamp (sec. 6805, I.R.C.).

[T.D. 6979, 33 F.R. 15908, Oct. 29, 1968]

### § 179.181    Refunds.

As indicated in this part, the transfer tax or tax on the making of a firearm is ordinarily paid by the purchase and affixing of stamps, while special (occupational) tax stamps are issued in payment of special taxes. However, in exceptional cases, such taxes may be paid pursuant to assessment. Claims for refund of amounts so paid must be presented to the District Director on Form 843 within three years next after payment of the taxes (sec. 6511, I.R.C. 1954).

[20 F.R. 6739, Sept. 14, 1955, as amended by T.D. 6557, 26 F.R. 2410, Mar. 22, 1961]

### Subpart M—Penalties and Forfeitures

### § 179.190    Penalties.

Any person who violates or fails to comply with the requirements of Chapter 53, Internal Revenue Code of 1954, and the provisions of this part, shall upon conviction, be subject to the penalties imposed under section 5871, Internal Revenue Code of 1954.

[T.D. 6979, 33 F.R. 15908, Oct. 29, 1968]

### § 179.191    Forfeitures.

Any firearms involved in any violation of the provisions of Chapter 53, Internal Revenue Code of 1954, or of the regulations in this part, shall be subject to seizure or forfeiture under the internal revenue laws: *Provided, however,* That the disposition of forfeited firearms shall be in conformance with the requirements of section 5872 of the Internal Revenue Code of 1954. In addition, any vessel, vehicle or aircraft used to transport, carry, convey, or conceal or possess any firearm with respect to which there has been committed any violation of any provision of Chapter 53, Internal Revenue Code of 1954, or the regulations in this part issued pursuant thereto, shall be subjected to seizure and forfeiture under the Customs laws, as provided by the act of August 9, 1939 (U.S.C. Title 49, secs. 781–788).

[T.D. 6979, 33 F.R. 15908, Oct. 29, 1968]

### Subpart N—Other Laws Applicable

### § 179.195    Applicability of other provisions of internal revenue laws.

All of the provisions of the internal revenue laws not inconsistent with the provisions of Chapter 53 of the Internal Revenue Code of 1954 shall be applicable with respect to the taxes imposed by sections 5801, 5811 and 5821 of said Code (see section 5846, I.R.C., 1954).

### Subpart O—Special Registration

Source: The provisions of this Subpart O contained in T.D. 6979, 33 F.R. 15909, Oct. 29, 1968, unless otherwise noted.

### § 179.200    Registration requirement.

Any person possessing a firearm which is not registered to him in the National Firearms Registration and Transfer Record maintained by the Director shall reg-

ister with the Director during the period of November 2, 1968, through December 1, 1968 each firearm so possessed. Such registration of a firearm shall become a part of the National Firearms Registration and Transfer Record maintained by the Director.

§ 179.201   Registration procedure.

A person possessing a firearm not registered to him by the Director shall file a registration return, Form 4467, in duplicate, with the Director within the period of November 2, 1968, through December 1, 1968. The use of information required to register a firearm under this section shall be restricted as provided in section 5848, Internal Revenue Code of 1954. The return, Form 4467, shall show the name, address, place of business or employment, employer identification number or social security number, and date of birth of the registrant, the date the firearm was acquired, the place where the firearm usually is kept, the name, and address of the manufacturer, the type, model, length of barrel, overall length (when applicable), caliber or gauge, serial number, and other identifying marks of the firearms, and if an unserviceable firearm, the manner in which it was rendered unserviceable. Upon registering the firearm, the Director shall retain the original Form 4467 as part of the National Firearms Registration and Transfer Record, and shall return the Form 4467 copy to the registrant with notation that registration of the firearm described on the Form 4467 has been made. In the event the firearm does not bear a serial number, the registrant shall obtain a serial number for the firearm from the Assistant Regional Commissioner and shall stamp (impress) or otherwise conspicuously place such serial number on the firearm in a manner not susceptible of being readily obliterated, altered, or removed.

§ 179.202   Restrictive use of required information.

No information or evidence required to be submitted or retained by a natural person to register a firearm under the provisions of this subpart shall be used, directly or indirectly, as evidence against such person in any criminal proceeding

with respect to a prior or concurrent violation of law: *Provided, however,* That the provisions of this section shall not preclude the use of any such information or evidence in a prosecution or other action under any applicable provision of law with respect to the furnishing of false information.

## PART 186—GAUGING MANUAL

### Subpart A—Scope of Regulations
Sec.
186.1    Gauging of distilled spirits.

### Subpart B—Definitions
186.11   Meaning of terms.

### Subpart C—Gauging Instruments
186.21   General requirements.
186.22   Hydrometers and thermometers.
186.23   Use of precision hydrometers and thermometers.
186.24   Use of U.S. standard hydrometers and thermometers.
186.25   Gauging instruments of unusual or costly design.

### Subpart D—Gauging Procedures
186.31   Determination of proof.
186.32   Determination of proof obscuration.

### DETERMINATION OF QUANTITY
186.36   General requirements.

### DETERMINATION OF QUANTITY BY WEIGHT
186.41   Bulk spirits.
186.42   Denatured spirits.
186.43   Packaged spirits.
186.44   Entry or filling gauge for packages.
186.45   Withdrawal gauge for packages.

### DETERMINATION OF QUANTITY BY VOLUME
186.51   Procedure for measurement.

### Subpart E—Prescribed Tables
186.61   Table 1, showing the true percent of proof spirit for any indication of the hydrometer at temperatures between zero and 100 degrees Fahrenheit.
186.62   Table 2, showing wine gallons and proof gallons by weight.
186.63   Table 3, for determining the number of proof gallons from the weight and proof of spirituous liquor.
186.64   Table 4, showing the fractional part of a gallon per pound at each percent and each tenth percent of proof of spirituous liquor.
186.65   Table 5, showing the weight per wine gallon (at 60 degrees Fahrenheit) and proof gallon at each percent of proof of spirituous liquor.

99

# Exhibit 21

***( Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record When its 'Files are Missing' )***

**Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record when its "Files are Missing"**

**By**
**Joshua Prince**

**Copyright 2009**

**Exhibit A, Pg. 320**

Electronic copy available at: http://ssrn.com/abstract=2752028

# I. INTRODUCTION

Our Supreme Court declared, "A fair trial in a fair tribunal is a basic requirement of due process….[O]ur system of law has always endeavored to prevent even the probability of unfairness."[1] With this in mind, we turn to the current violation of due process: convictions based on the National Firearms Registration and Transfer Record when its "files are missing."

This Article analyzes the issues surrounding the National Firearms Act [NFA], in particular the National Firearms Registration and Transfer Record [NFRTR], and how law-abiding citizens are being deprived of their Due Process rights, because of the inaccuracy of the NFRTR, while the courts believe the NFRTR to be trustworthy. In point of fact, in June 2007, the Bureau of Alcohol, Tobacco, Firearms, and Explosives [BATFE] had lost all record of a registered firearm, which it had approved in April 2007.[2] The NFRTR, established by the NFA and administered by the BATFE, has been in disarray since the late 1970's.[3] In 1996, amid numerous complaints of unjust criminal prosecutions by the BATFE, a citizen supplied reliable evidence, that raised doubts about the accuracy and completeness of the NFRTR, to the House Subcommittee on Treasury,

---

[1]     Gutierrez De Martinez v. Lamagno, 515 U.S. 417, 428 (1995) (citing *In re* Murchison, 349 U.S. 133, 136 (1955); *In re* Murchison, 349 U.S. 133, 136 (1955)).

[2]     Letter to Mr. Kenneth E. Houchens, Chief National Firearms Act Branch, *NFA Letter Control Number [redacted], Title II Firearms Serial Number [redacted ]*, by Saeid Shafizadeh, (July 11, 2007), *available at* http://www.nfaoa.org/documents/ParsLetter2007.pdf.

[3]     U.S. Dep't of Justice, Criminal Div., *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, at 2-3 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf. The Bureau of Alcohol, Tobacco and Firearms was renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives under legislation which transferred it from the Department of the Treasury to the Department of Justice on January 24, 2003. 6 U.S.C. § 531; 116 Stat. 2135 (2003).

**Exhibit A, Pg. 321**

Electronic copy available at: http://ssrn.com/abstract=2752028

Postal Service, and General Government, Committee on Appropriations, and then again in 1997, after inaction by Committee, he complained to the House Committee on Government Reform and Oversight, which ordered the Treasury Department Inspector General to audit the NFRTR; resulting in two reports being rendered in 1998.[4]

While the BATFE continues to prosecute and convict individuals based on its contention that their firearm registration records cannot be found within the NFRTR, the BATFE also declared that errors in the NFRTR could result in the improper arrest, prosecution, and conviction of an innocent person, who had simply lost his paperwork, and for whom the agency had no records.[5] Thus, it is imperative that our Judicial System take action, and find, as a matter of law, that the NFRTR, in its current state, is not sufficient in criminal and civil proceedings. Moreover, the United States Government must take immediate action, in the form of an amnesty, to ensure that law-abiding citizens are not convicted of Possession of Unregistered Firearms because the BATFE lost his/her paperwork, although the individual properly registered the firearm, but through no fault of his/her own, the paperwork was lost or destroyed.

---

[4]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1997, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 104th Cong., 2nd Sess, at 37-274 (Washington, GPO, 1996), *available at* http://www.nfaoa.org/documents/1996testimony.pdf; U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearm's Registration and Recordkeeping of the National Firearms Registration and transfer Records*, OIG-99-009, at 1 (Washington, Oct. 26, 1998), *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf. The second report addressed other weaknesses in the NFRTR; see U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, (Washington, Dec. 18, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[5]     NFA Branch Chief memorandum to ATF Assistant Director for Technical and Scientific Services, *Purification and Verification of the National Firearms Registration and Transfer Record*, Apr. 3, 1975, reproduced in *Oversight Hearings on Bureau of Alcohol, Tobacco, and Firearms*, Senate Committee on Appropriations, 96th Cong., 1st Sess., at 42 (Washington, GPO, 1979), *available at* http://www.nfaoa.org/documents/1979_Hearing_Excerpts.pdf.

**Exhibit A, Pg. 322**

A brief introduction is set forth in Section I. Section II is a background of the firearm laws at issue, broken into the following subsections: A. the 1934 NFA; B. BATFE; C. Gun Control Act [GCA] of 1968; D. 1968 Amnesty; E. the 1986 Firearms Owners' Protection Act [FOPA]; and F. NFA Registration Process and Penalties.

Section III explains the NFRTR. The emergence of the inaccuracy of the NFRTR is discussed in Section IV., proceeded by Section V. depicting the numerous Congressional Hearings and cases related thereto, which is broken down into the following subsections: A. 1934-1980; B. 1980-1995; C. 1995-1998; D. 1998; E. 1999-2002; and F. 2003-2008. The absence of paperwork is not a defense is discussed in Section VI. and is broken down into subsections: A. Error Letters; B. the BATFE's Improper Denial of Exculpatory Evidence; C. the Accuracy and Completeness of the NFRTR; and D. Firearm Law Experts on the absence of paperwork as a defense and the status of the NFRTR generally. The intersection of Procedural Due Process violations is discussed in Section VII. and the Federal Rules of Evidence and the NFRTR follows in Section VIII. The issue of the Confrontation Clause and the admission of the NFRTR as evidence is discussed in Section IX. The solution, a new amnesty, is discussed, in depth, in Section X and broken into the subsections of A. Judicial; B. Legislative; C. BATFE Rationale for Refusing an Amnesty, and Rebuttals Thereof; and D. Amnesty. Lastly, Section XI concludes this article.

## II. Background

The background of the NFA, BATFE, GCA, 1968 Amnesty, and FOPA is a

**Exhibit A, Pg. 323**

complex and interesting situation involving an Administrative Agency, and its power to prosecute violations of the statutes, outlined above, even when that agency acknowledges that innocent individuals may be convicted.[6]

## A. The National Firearms Act [NFA] of 1934

In 1933, after the attempted assassination of President-elect Franklin D. Roosevelt and growing fears of organized crime's increased prominence, the Congress sought federal regulations on firearms.[7] Introduced as H.R. 9066, the bill, which became the NFA, originally sought to require registration of any "firearm, a term defined to mean a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefore, or a machine gun."[8] The term "machine gun" was defined as any weapon capable of firing twelve or more shots without manual reloading.[9]

The Justice Department, aware of the growing concern over H.R. 9066, submitted a substitute bill, H.R. 9741.[10] H.R. 9741 required existing firearm owners to register their arms within sixty days, except for firearm acquired after the effective date of the Act;

---

[6]     *Id.*

[7]     *See* ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 104 (CQ Press 2d ed. 1998); JOSH SUGARMANN, NATIONAL RIFLE ASSOCIATION: MONEY, FIREPOWER, AND FEAR 29 (National Press Books 1992). For an excellent comprehensive history and analysis of the relevant social and legal issues during this period, including an extensive discussion of NFA issues, *see*  Thomas Earl Mahl,  *A History of Individual and Group Action in Promoting National Gun Control Legislation During the Interwar Period, 1919-1941*, unpub. Master of Arts thesis, Kent State University, August 1972,.

[8]     US Congress, House of Representatives, Committee on Ways and Means, *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 1 (Washington, GPO, 1934) (testimony of Attorney General Homer Cummings), *available at* http://www.nfaoa.org/documents/NFA-1934house.pdf.

[9]     *Id.*

[10]    *See* U.S. Congress, House of Representatives, Committee on Ways and Means, *National Firearms Act: Hearings on H.R. 9066 before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 1 (Washington, GPO, 1934) (depicting the Department of Justice's understanding that H.R. 9066 would not be approved), *available at* http://www.nfaoa.org/documents/NFA-1934house.pdf.

whereas, H.R. 9066 would have only applied to firearms sold after its enactment.[11] Worried that the bill would be found unconstitutional, because it violated the Second Amendment, the Congress redrafted it to conform to the regulatory scheme of the Harrison Anti-Narcotic Act of 1914, which was based on the taxing power and held to be Constitutional.[12] The Congress declared, "[I]t is important to be able to identify arms to see which possessors have paid taxes and which firearms have been taxed and which have not."[13]

When H.R. 9741 was complete, the definition of "firearm" had drastically changed. First, pistols and revolvers were omitted, thus limiting the Bill to machineguns, sawed-off shotguns and rifles, silencers, and concealable firearms other than-pistols and revolvers.[14] Second, the definition of "machinegun" was changed to cover firearms that fired more than once for each single function of the trigger, regardless of munitions capacity.[15] Also, of particular interest, the transfer tax was fixed at two-hundred dollars, which in 1934 was the retail price of a Thompson machinegun.[16] The Congress, satisfied with the enumerated changes, enacted the NFA.[17]

Thus, the NFA placed a tax on the manufacture and transfer of all machineguns, short-barreled rifles and shotguns, silencers, and other concealable firearms, excluding

---

[11]    *Id.*; H.R. 9066 at 84. While H.R. 9741 eliminated a double registration requirement for those who registered prior to the expiration of the sixty days, the exemption led to the registration requirement being stricken as a violation of the firth amendment's self incrimination clause some thirty-four years later. *See* Haynes v. United States, 390 U.S. 85, 100.

[12]    H.R. 9066.

[13]    *Id*. at 87 (testimony of Ass't Att'y Gen. Joseph Keenan).

[14]    H.R. Rep. NO. 1780, at 1. "Your committee is of the opinion that limiting the bill to the taxing of sawed-off guns and machineguns is sufficient at this time. It is not thought necessary to go as far as to include pistols and revolvers and sporting arms." *Id.*

[15]    *Id.*

[16]    H.R. 9066 at 12.

[17]    26 U.S.C. §§ 5801-5872, 48 Stat, 1236.

**Exhibit A, Pg. 325**

handguns, identified as "any other weapon."[18] For a more comprehensive understanding of what is being controlled, one must consider the definitions:

(a) Firearm. The term 'firearm' means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length;[19] (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[20]; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer....and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.[21]

(b) Machinegun. The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.[22]

c) Rifle. The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each

---

[18]    § 5811

[19]    It should be noted that under the original NFA of 1934, the barrel length was 18 inches. In 1936, the NFA was amended by changing the 18" barrel standard to 16" for rifles of .22 caliber or less. 49 Stat. 1192. In 1960, the definition was amended to "a rifle having a barrel or barrels of less than 16 inches in length," which was no longer caliber specific. 74 Stat. 149. For the hearings related to this amendment, *see* United States Senate, Committee on Finance, *H.R. 4029,* 86th Cong., 2d Sess., (Washington, GPO, 1960), *available at* http://www.nfaoa.org/documents/NFAamend1960.pdf.

[20]    This was part of the 1960 amendment, 74 Stat. 149, presumably to create an empirical standard for "concealable," a standard absent from the original NFA. For the hearings related to this amendment, *see* United States Senate, Committee on Finance, *H.R. 4029,* 86th Cong., 2d Sess., (Washington, GPO, 1960), *available at* http://www.nfaoa.org/documents/NFAamend1960.pdf.

[21]    26 U.S.C. § 5845(a); It should be noted that Destructive Devices were added by the Gun Control Act of 1968, as was the "collector's item" provision to remove a firearm from the NFA. 82 Stat. 1235, § 921.

[22]    § 5845(b)

Exhibit A, Pg. 326

single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.[23]

(d) Shotgun. The term 'shotgun' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.[24]

(e) Any other weapon. The term 'any other weapon' means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive,[25] a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.[26]

Since the NFA is part of the Internal Revenue Code, it created a regulatory system, which taxed all aspects of the manufacture, importation, and distribution of the above listed firearms, as well as some additional ones that were added during the 1968 Gun Control Act.[27] More importantly, the NFA required the Secretary of the Treasury to create a registry, known as the NFRTR, of all NFA firearms in the United States not under the control of the United States Government.[28] The most interesting aspect to enactment of the NFA, pertinent to the NFRTR, is that during the 1934 Congressional Hearings, Karl T. Frederick, then President of the National Rifle Association, declared,

[A]s a matter of human experience, the owner of a gun is going to lose papers, they are going to get mislaid, they are going to get burned up, if he cannot turn them up when required to do so he is liable to go to jail. I think

---

[23]   § 5845(c)
[24]   § 5845(d)
[25]   § 5845(e)
[26]   *Id.* This provision, which was added by the Gun Control Act of 1968, was largely the result of codifying previous rulings and was intended to bring statutory uniformity to the "any other weapon" definition. 82 Stat. 1235, § 921.
[27]   § 5802
[28]   § 5841

**Exhibit A, Pg. 327**

Case 1:18-cv-02988-DLF   Document 58-1   Filed 03/31/20   Page 329 of 675

there ought to be a simple method of obtaining a copy of that paper from the authorities with whom the original was filed . . . . If not, in the actual operation, you are going to create criminals.[29]

B. Bureau of Alcohol, Tobacco, Firearms, and Explosives [BATFE]

The history of the BATFE is traced back to the first federal tax on distilled spirits in 1791.[30] Since the NFA is ostensibly a tax provision, it was originally administered by Miscellaneous Tax Unit [MTU] of the Department of the Treasury's Bureau of Internal Revenue [BIR].[31] In 1942, the MTU's NFA duties were reassigned to the BIR's Alcohol Tax Unit [ATU].[32]

Effective 1952, all firearm and tobacco programs were transferred to the Alcohol and Tax Division [ATTD], when BIR was reorganized and renamed the Internal Revenue Service [IRS].[33] In the wake of the 1968 Gun Control Act, the ATTD assumed the responsibility for explosives as well, and as a result, was renamed the Alcohol, Tobacco, and Firearms Division [ATFD]; thereafter in 1972, it became a bureau and was designated the Bureau of Alcohol, Tobacco and Firearms (ATF).[34]

With the passage of the Homeland Security Act, the Congress transferred the ATF to the Department of Justice and renamed it the Bureau of Alcohol, Tobacco, Firearms and Explosives [BATFE].[35] The Secretary of the Treasury was replaced by the Attorney

---

[29]     U.S. Congress, House Committee on Ways and Means, *H.R. 9066*, 73rd Cong., 2nd Sess., at 57 (Washington, GPO, 1934), *available at* http://www.nfaoa.org/documents/NFA-1934house.pdf.

[30]     26 U.S.C. § 5001; http://www.atf.gov/about/atfhistory.htm. *See also*, Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Transfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 3, *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf.

[31]     http://www.atf.gov/about/atfhistory.htm.

[32]     *Id.*

[33]     *Id.*

[34]     *Id.*

[35]     6 U.S.C. § 531; 116 Stat. 2135 (2003).

**Exhibit A, Pg. 328**

General as the federal official responsible for administering the NFA and maintaining the NFRTR.[36]

## C. The Gun Control Act [GCA] of 1968

Title II of the GCA, also termed the National Firearms Act of 1968, revised and re-codified the NFA, resulting in: 1.) tightened controls on NFA firearms and devices; particularly in the import restrictions for NFA items; 2.) the inclusion of "destructive devices;" 3.) the codification of various rulings into a statutory definition of "any other weapon;" 4.) the inclusion of "frame or receiver" of a firearm under the definition of a machinegun; and 5.) a provision which authorized the administrative removal of any firearm from the NFA, except a machine gun or destructive device, that was determined by the Secretary of the Treasury to be mainly a "collector's item" and not likely to be used as a weapon.[37] The GCA also increased the penalty for possessing an unregistered NFA firearm to two years and/or ten thousand dollars.[38] Furthermore, the Congress, aware of the Supreme Court's decision in *Haynes v. United States*, as well as other cases, resolved the conflict by: (1) prohibiting any information required to comply with the NFA to be used against a registrant or applicant "in a criminal proceeding with respect to

---

[36]      *Id.*

[37]      26 U.S.C. § 5845.  The GCA, in remaining true to the original intent behind the NFA, limited firearms thought to be used mainly by criminals by requiring registration of the firearms and using prohibitive taxes to discourage their manufacture, distribution, and ownership.  This was a comprehensive strategy then, and remains so today.

[38]      S. Rep. NO. 1097, 90th Cong., 2d Sess. 25 (1967). The 2007 DOJ-OIG report declares, "Possessing an unregistered NFA weapon or one that is registered to someone else is punishable by a $250,000 fine and 10 years imprisonment. The NFA weapon is subject to forfeiture, and if convicted of a criminal violation of the NFA the possessor will be prohibited from receiving or possessing firearms." U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at 3-4 (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

**Exhibit A, Pg. 329**

a prior or concurrent violation of the law;" (2) establishing an amnesty period, to allow persons to register unregistered NFA firearms with full immunity from prosecution, although such immunity did not apply to making false statements;[39] and, (3) prohibiting the release of any information about the registration status or ownership of any NFA firearm.[40]

## D. 1968 NFA Amnesty

The GCA required ATF to establish a 30-day amnesty period beginning on the second day of the first month after its enactment on October 22, 1968; consequently, the amnesty was held from November 2, 1968, to December 1, 1968.[41] In 1992, NFRTR statistics obtained by a Freedom of Information Act (FOIA) request disclosed that 57,187 NFA firearms were registered in 1968; however, this number increased to 57,216, in 1995, and to 57,223 by 1996.[42] This may be due, in part, to the BATFE (1) adding firearms to the NFRTR after being confronted by NFA firearm owners with copies of NFA registration paperwork, (2) adopting a policy to allow some U.S. service personnel to register unregistered NFA firearms from 1969 to 1971, or later, without announcing

---

[39]     82 Stat. 1235, § 207(b), (d); Haynes v. United States, 390 U.S. 85 (1968) (holding that the registration of NFA weapons would likely incriminate those individuals registering unregistered NFA); Grosso v. United States, 390 U.S. 62 (1968); Marchetti v. United States, 390 U.S. 39 (1968).

[40]     The BATFE legal interpretation is that NFA paperwork is "tax return" information. 26 U.S.C. § 6103; Memorandum to ATF Director from Chief Counsel, re: Freedom of Information Act Request, bearing symbols CC-18,778 RMT, (Aug. 18, 1980), *available at* http://www.titleii.com/BardwellOLD/1980_auto_ord_memo.txt

[41]     82 Stat. 1235, § 207(b), (d).

[42]     Eric M. Larson, *Errors in the National Firearms Registration and Transfer Record: A New Amnesty Period May be Required to Correct Them*, prepared for the Subcommittee on Treasury, Postal Services, and General Government of the Committee on Appropriations, Apr. 8, 1997, *available at* http://www.cs.cmu.edu/afs/cs.cmu.edu/user/wbardwel/public/nfalist/rip/larson_study.txt. Mr. Larson is a Senior Analyst with the U.S. Government Accountability Office.

Exhibit A, Pg. 330

such an amnesty period in the Federal Register, as required by law,[43] and/or (3) as stated by a BATFE employee, correctly filing a misfiled form could appear to increase the number of registered firearms in that category, e.g., a Form 4467 registration being misfiled as something else.[44]  An ancillary and troubling issue is the fact that ATF created an unofficial program to allow the registration of thousands of unregistered NFA firearms after the 1968 amnesty expired, in violation of its own published regulations at the time.[45]

There is virtually no legislative history for the amnesty provision under the NFA. With the single exception of a statement that the Congress intended that "every firearm in the United States should be registered to the person possessing the firearm" by December

---

[43]     82 Stat. 1235, § 207(b),(d); U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco and Firearm's Registration and Recordkeeping of the National Firearms Registration and Transfer Records*, Report No. OIG-99-009, at 13 (Washington, Oct. 26, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf; U.S. Department of the Treasury, Bureau of Alcohol Tobacco, and Firearms, *Unpublished Memorandum: Freedom of Information Act regarding United States vs. Eighteen Various Firearms*, by Peter J. Chisholm, Mar. 24, 1998, p. 8, *available at* http://www.nfaoa.org/documents/Fassnacht.pdf. The underlying facts in the court case, United States v. Eighteen Various Firearms, 148 F.R.D. 530 (E.D. Pa. 1993), are set forth in this unpublished ATF Memorandum to the File dated January 15, 1993, obtained by the Freedom of Information Act process. In 1969, CIA employee George Fassnacht sought to register unregistered NFA firearms under the 1968 amnesty provision, ATF agreed, then in 1971 refused to allow the registrations after the firearms were seized in a raid that was later found unconstitutional. *Id.* In 1993, ATF dropped its objections and allowed the firearms to be registered after years of litigation. *Id.* "We reached this conclusion," ATF stated, "only after months of researching every possible lead and finding *only evidence* that Mr. Fassnacht had satisfied the requirements for persons seeking to register NFA firearms after the November 1968 amnesty period [emphasis in original document]." *Id.* It should be noted that BATFE should possibly be applauded for this action, since the 30 day registration period may have been too short. Individuals on vacation or otherwise may not have heard of the Amnesty until it was too late.

[44]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1997, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 104th Cong., 2nd Sess., at 84 (Washington, GPO, 1996),  *available at* http://www.nfaoa.org/documents/1996testimony.pdf.

[45]     26 C.F.R. § 179.120 (1969), *available at* http://blog.princelaw.com/assets/2008/1/9/1969-CFR-ATF-amnesty-regs.pdf; U.S. Senate, Committee on the Judiciary United States Senate, *Hearing on S. 914, A Bill to Protect Owners' Constitutional Rights, Civil Liberties, and Rights to Privacy*, 89th Cong., 1st Sess., at 63 (Washington, GPO, 1984),  *available at* http://www.nfaoa.org/documents/DolaNFAamend.pdf.

**Exhibit A, Pg. 331**

2, 1968, the day after the 30-day amnesty period expired, there is no other mention of the amnesty period provision except in the statute itself.[46]

BATFE published regulations in 26 C.F.R., Section 179.120, entitled "Registration of Firearms", revised as of January 1, 1969, that described procedures for registering unregistered NFA firearms during the 1968 amnesty period.[47]  The regulation states, in part: "No firearm may be registered by a person unlawfully in possession of the firearm after December 1, 1968, except that the Director, after publication in the Federal Register of his intention to do so, may establish periods of amnesty, not to exceed ninety (90) days in the case of any single period with such immunity from liability as the Director determines will contribute to the purposes of this part."[48]  Paragraph (e) further stipulates that "A firearm not identified as registered by this part shall not be registered."[49] Notwithstanding these limitations, in a document entitled "Amnesty

---

[46]    *See* U.S. Senate, *Gun Control Act of 1968, Title II-Amendments to the National Firearms Act*, Report No 1501, 90th Cong., 2nd Sess., at 43 (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/SenateReport1501-GCA1968.pdf.  While not mentioned anywhere in the 1968 Act, of historical interest is a provision discussed during 1965 hearings for a registration period to bring "destructive devices" under the NFA, whereby persons possessing such devices "shall have 30 days from the effective date of this act to register such firearm, and that no liability (criminal or otherwise) shall be incurred in respect to failure to so register under such section prior to the expiration of such 30 days."  *See* U.S. Congress, House of Representatives, Committee on Ways and Means, *Proposed Amendments to the National Firearms Act and the Firearms Act, Part I*, 89th Cong., 1st Sess., at 7 (Washington, GPO, 1965), available at http://www.nfaoa.org/documents/1965_Hearing_Part_I.pdf. The hearing summarizes the need to, "Bring under Federal control interstate shipment and disposition of large caliber weapons such as bazookas and antitank guns, and destructive devices such as grenades, bombs, missiles, and rockets," "curb the flow into the United States of surplus military weapons and other firearms not suitable for sporting purposes," and "increase to twice the present rate of all taxes under the National Firearms Act of 1934," noting that "the principal rates have not been changes since the original enactment of the act in 1934," and that "it is necessary to increase the rates in order to carry out the purposes of the act." (Id. at 3-4).

[47]    26 C.F.R. § 179.120 (1969), *available at* http://blog.princelaw.com/assets/2008/1/9/1969-CFR-ATF-amnesty-regs.pdf.

[48]    *Id.*

[49]    *Id.*

13

Guidelines" and dated April 16, 1969, BATFE established a program which allowed the registration of unregistered NFA firearms.[50]

In 1998, the Treasury Department Inspector General investigated these "post-amnesty" registrations and concluded that ATF may not have followed proper procedures, because ATF failed to publish a notice in the Federal Register as required by law, which casts some legal questions upon the legitimacy of the registrations.[51] Moreover, according to Assistant Attorney General, Criminal Division, Philip B. Heymann, the BATFE's handling of the 1968 Amnesty was a complete disaster:

> The amnesty period spawned a massive volume of registrations, transfers and correspondence which the clerical staff was ill-equipped to handle. As a result, some weapons were mistakenly registered, some were mistakenly registered by part number rather than serial number, and some documents were misfiled. The staff responsible for the system *was aware of these problems*."[52] [emphasis added].

In *United States v. Freed*, apparently without knowledge of the BATFE's mismanagement of the registration process and NFRTR after the 1968 amnesty, the Supreme Court held that the amended NFA no longer violated the Fifth Amendment protection against self-incrimination, or violated an individual's right to due process, as

---

[50]     A copy of the original document is available at http://www.nfaoa.org/documents/Work_Papers_E.pdf, at 4-5; however, the reproduction is of relatively low quality, and a True Copy was submitted in a 2001 Congressional statement, available at http://www.nfaoa.org/documents/2001statement.pdf 19-20, which also includes a True Copy of an ATF memorandum dated March 4, 1975, confirming that the post-amnesty registration program had been implemented but was later discontinued.

[51]     U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearm's Registration and Recordkeeping of the National Firearms Registration and Transfer Records*, OIG-99-009, at 1, 13 (Washington, Oct. 26, 1998), *available at*  http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf. If the legitimacy of these registrations comes into question, it should be held against the BATFE, not the individual, since the individual followed the procedures established by the BATFE. Furthermore, the loss of such a firearm would be a monumental economic loss to the registrant or individual to whom the firearm has been transferred.

[52]     U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, 2-3 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

**Exhibit A, Pg. 333**

Congress had remedied the problem by enacting the 1968 NFA firearms amnesty.[53] If the

Supreme Court was informed of the problems and mishandlings of the 1968 amnesty, the

Court's holding might have been drastically different.

While the 1968 Amnesty was the only amnesty authorized by Congress, the

Congress provided, under § 207(d), for future amnesty periods, up to 90 days per period,

as needed:

> "The Secretary of the Treasury, after publication in the Federal Register of
> his intention to do so, is authorized to establish such periods of amnesty,
> not to exceed ninety days in the case of any single period, and immunity
> from liability during any such period, as the Secretary determines will
> contribute to the purpose of this title."[54]

## E. The Firearms Owners' Protection Act [FOPA] of 1986

The passage of FOPA prohibited the possession of machineguns that were not

legally possessed prior to its enactment on May 19, 1986.[55] The effect was to freeze the

number of machineguns that could be legally owned by private citizens. While previously

contending that FOPA nullified the amnesty provision for machineguns, the BATFE has

recently changed their position.[56]  Moreover, given that the number of NFA registered

---

[53]      United States v. Freed, 401 U.S. 601, 605 (1971). The Court stated, "Under the present Act only possessors who lawfully make, manufacture, or import firearms can and must register them; *the transferee does not and cannot register*. It is, however, unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." [original emphasis]. *Id.* at 604.

[54]      82 Stat. 1235, § 207(d).

[55]      100 Stat. 452, § 102(9); codified at 18 U.S.C. § 922(o)(1) (1986).

[56]      U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 3, Statements of Members of Congress and Other Interest Individuals and Organizations*, 107th Cong., 1st  Sess., at 10 (Washington, GPO, 2002), *available at* http://www.nfaoa.org/documents/2001statement.pdf; The BATFE has now taken the position that they have the power to authorize a new amnesty, but choose not to do so, so as not to "jeopardize pending ATF investigations and prosecutions of NFA violations." BATFE, *ATF National Firearms Act Handbook*, at 23 (June 2007), *available at* http://www.atf.gov/firearms/nfa/nfa_handbook/index.htm.

Exhibit A, Pg. 334

firearms, post-amnesty, has continued to rise, one can only conclude that either the

BATFE has continued to allow a BATFE-discretionary amnesty, which is contrary to

law,[57] or, that which is more likely, the BATFE has been adding lost/destroyed firearm

registrations back into the NFRTR, because it assumes the NFRTR to be in error.[58]

## F. NFA Registration Process and Penalties

The confluence of the NFA, CGA, and FOPA has resulted in a series of

procedures to register a NFA weapon, as well as, penalties for the failure to do so. A

private citizen, who is not otherwise prohibited by law, may acquire an NFA weapon in

several ways: 1.) a registered owner of an NFA firearm may apply for ATF approval to

transfer the firearm to another person residing in the same state or to a FFL in another

state, or an individual may purchase an NFA firearm from a FFL;[59] 2.) an individual may

apply to the BATFE for approval to make and register an NFA firearm (except machine

gun);[60] or 3.) an individual may inherit a lawfully registered NFA firearm.[61]

---

[57]     90 P. L. 618; 82 Stat. 1235, § 207(d); Eric Larson, *Errors in the National Firearms Registration and Transfer Record: A New Amnesty Period May be Required to Correct Them*, prepared for the Subcommittee on Treasury, Postal Services, and General Government of the Committee on Appropriations, at 41-139 (Apr. 8, 1997), *available at* http://www.nfaoa.org/documents/1997testimony.pdf. This is supported by the Treasury Department Inspector General's statement that the BATFE, "may have failed to follow procedures by failing to publish [notice of ATF's years-long extension of the 1968 Amnesty] in the Federal Registrar, as required by the Gun Control Act of 1968." U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 3, Statements of Members of Congress and Other Interest Individuals and Organizations*, 107th Cong., 1st Sess., at 9 (Washington, GPO, 2002), *available at* http://www.nfaoa.org/documents/2001statement.pdf.

[58]     U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at 31 (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf. The lack of an official GAGAS audit precludes a definitive determination on this issue; for example, a "lost" registrations could represent a lost transfer document or documents, or a complete loss of the entire record of a registered NFA firearm or device, as occurred in the Napolilli case, discussed later in this article.

[59]     26 U.S.C. § 5811.

[60]     26 U.S.C. § 5822.

The process for registering a NFA firearm is as follows: 1.) the applicant must file an application, in duplicate, with the BATFE; 2.) if not a Special Occupational Taxpayer licensed to manufacture NFA firearms or devices, pay the two-hundred dollar tax; 3.) if the transferee is an individual, thus exempting corporations and trusts, he/she must submit fingerprints and photographs; and, 4.) the signature of the chief law enforcement officer or other person of prominence, determined by the BATFE.[62]

The penalty for violating the NFA, specifically receiving, possessing, or transferring an unregistered NFA firearm, is a fine of up to two-hundred and fifty thousand dollars, imprisonment for up to ten years, and forfeiture of the firearm and any vessel, vehicle, or aircraft used to conceal or convey the firearm.[63] Firearms, for which there are no or incomplete records in the NFRTR, are considered contraband by the BATFE and are subject to seizure and forfeiture.[64]

### III. The NFRTR

Under the NFA, the Secretary of the Treasury, now the Attorney General, is required to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record."[65]  The NFRTR must include

---

[61]  26 U.S.C. § 5811
[62]  *Id.*; 26 U.S.C. § 5812. The fee for transferring an AOW is $5. § 5811.
[63]  26 U.S.C. §§ 5861(d),(j); 26 U.S.C.S. § 5872; 49 U.S.C. §§ 781-788.
[64]  U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 3, Statements of Members of Congress and Other Interest Individuals and Organizations*, 107th Cong., 1st  Sess., at 9 (Washington, GPO, 2002), *available at* http://www.nfaoa.org/documents/2001statement.pdf.
[65]  26 U.S.C. § 5841(a); 6 U.S.C. § 531; 116 Stat. 2135 (2003).

Exhibit A, Pg. 336

1. "identification of the firearm;" 2. "date of registration;" and 3. "identification and address of person entitled to possession of the firearm."[66] Additionally, "A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Secretary [now Attorney General; effectively, any BATFE Special Agent] upon request."[67]

The NFRTR has been the source of debate in the Congress since the late 1970's, and federally licensed NFA dealers have "suspected" for years that the NFRTR records were incomplete and lacked reliability, because their firearms inventories were not accurately reflected in the NFRTR-generated reports, which came to light when the BATFE performed compliance inspections.[68] These inaccuracies have caused some lawful possessors of NFA weapons to fear, "[S]ome overzealous ATF agent will attempt to make a Registry error into a SWAT visit."[69]

## IV. The Inaccuracy of the NFRTR

Prior to the enactment of the NFA, Karl T. Frederick, then President of the National Rifle Association, voiced concerns over the possibility of citizens who lawfully registered their NFA weapons being turned into criminals for losing their registration papers.[70]  While the issue of accuracy, completeness, and reliability of the NFRTR only

---

[66]        § 5841(a)(1)-(3).
[67]        § 5841(e); 6 U.S.C. § 531; 116 Stat. 2135 (2003).
[68]        Introductory Statement of Dan Shea, editor of Small Arms Review, leading an article by Eric M. Larson, *Voluntary Amnesty Registrations Under the National Firearms Act: Current Prospects and Some History From 1934 to 1968*, SMALL ARMS REVIEW, May 2000, at 41.
[69]        *Id.*
[70]        U.S. Congress, House Committee on Ways and Means, *H.R. 9066*, 73rd Cong., 2nd Sess., at 57 (Washington, GPO, 1934), *available at* http://www.nfaoa.org/documents/NFA-1934house.pdf.

**Exhibit A, Pg. 337**

came to the Congress' attention in 1979, the BATFE was well aware, in December of 1968, that the 1968 Amnesty was a complete disaster.[71]

In 1979, then-Senator Jim McClure, on behalf of the NRA Firearms Museum, contacted the BATFE over its determination to bring a forfeiture action against the Museum, alleging seven weapons were illegally possessed, since they were not found in the registry.[72] While the BATFE had already begun a forfeiture action, *United States v. Seven Miscellaneous Firearms*, the district court, disconcerted by the allegations of the inaccuracy, found none of the weapons to be firearms that required registration.[73]

At the same time, the Congress heard testimony that the BATFE alleged J. Curtis Earl, a federally licensed NFA dealer, illegally possessed 475 unregistered firearms.[74] While ATF had consulted microfiche copies of NFRTR records, the attorney who represented Mr. Earl noted that Mr. Earl,

> [T]urned to his file cabinet and began to produce the original records of their registration, and one by one the firearms came off the floor and back

---

"[A]s a matter of human experience, the owner of a gun is going to lose papers, they are going to get mislaid, they are going to get burned up, if he cannot turn them up when required to do so he is liable to go to jail. I think there ought to be a simple method of obtaining a copy of that paper from the authorities with whom the original was filed. . . . If not, in the actual operation, you are going to create criminals." *Id.*

[71] U.S. Dep't of Justice, Criminal Div., *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, at 2-3 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

[72] *Id.* at 1.

[73] *Id.*; United States v. Seven Miscellaneous Firearms, 503 F. Supp. 565, 579 (D.D.C. 1980). NFA Branch Chief Wayne Miller commented on the decision, bizarrely declaring "Considerable evidence was received that [ATF's] officials have for many years recognized the inadequacy and incompleteness of the Bureau's records. The Court is not required to pass judgment on this, because the Government has failed to show that these seven items are firearms." U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1998, Part 5, Testimony of Members of Congress and Other Interested Individuals and Organizations*, 105th Cong., 1st Sess., at 97 (Washington, GPO, 1997), *available at* http://www.nfaoa.org/documents/1997testimony.pdf.

[74] U.S. Congress, Senate Committee on Appropriations, *Oversight Hearings on Bureau Alcohol, Tobacco & Firearms*, 96th Cong., 1st Sess. at 39 (Washington GPO 1979), *available at* http://www.nfaoa.org/documents/1979_Hearing_Excerpts.pdf.

onto his racks.  At the end, he could show that he had registered every single one of these 475 firearms.  ATF's records were grossly incorrect.[75] In response to a request by Senator McClure, the Criminal Division of the Department of Justice stated that if BATFE determines that "a particular individual or weapon is registered" and BATF finds that its "files are missing," then "the only solution would be to declare another amnesty period."[76] However, no amnesty period was established in response to the Earl case.

In the 1980's, defense attorneys, in several federal court cases, began requesting, during discovery, internal BATFE memoranda and reports that documented problems regarding the accuracy of the NFRTR.[77] One of the procured BATFE memoranda, written by the NFA Branch Chief, declared,

> Our response to inquires on the existence or nonexistence of proper registration of an NFA firearm is the basis for seizure, arrests, prosecution, fines, and imprisonments. Our testimony or certification of the nonexistence of such record is evidence subject to close examination in court. *We continuously discover discrepancies and inaccuracies in the registration file which, if discovered during trial, would destroy the future credibility of such evidence.* One resultant possibility is that a defendant who maintains he had properly registered his firearm but had lost his approved form could, subsequent to his arrest based on non-registration, locate his lost document. *If the court should discover that our negligence caused an unwarranted arrest and trial, the resultant loss of public trust would be irreparable. Just as serious is the possibility that an innocent man might be convicted if he could not find his registrant form and we certified that he had not registered the firearm when, in fact, we had failed to locate his registration in the Record* [NFRTR].[78] [emphasis added]

---

[75]      Letter to Ernest S. Istook, Jr., Chairman, Subcommittee on Treasury, Postal Service and General Government, from David T. Hardy, Esq., dated April 10, 2001, *available at* http://www.nfaoa.org/documents/BardHard.pdf.

[76]      U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, Nov. 29, 1979, at 4, *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

[77]       Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Transfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 6 (citing to United States v. Stout, 667 F.2d 1347 (11th Cir. 1982), *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf; United States v. Seven Miscellaneous Firearms, 503 F. Supp. 565 (D.D.C. 1980)).

[78]      NFA Branch Chief memorandum to ATF Assistant Director for Technical and Scientific Services, *Purification and Verification of the National Firearms Registration and Transfer Record*, Apr. 3,

**Exhibit A, Pg. 339**

However, the then-Assistant Director of the BATFE, continued to assert that the

inaccuracies had been corrected and that the NFRTR was accurate and reliable for

"criminal proceedings."[79]

More disconcerting is the October 1995 "Roll Call" training video of then NFA

Branch Chief, Thomas B. Busey, in which Mr. Busey orders BATFE staff to continue to

commit perjury when testifying about the NFRTR: "Let me say that when we testify in

court, we testify that the database [NFRTR] is 100 percent accurate. That's what we

testify to, and we will always testify to that. As you probably well know, that may not be

100 percent true."[80] Mr. Busey continued, "If our database were absolutely error free, we

could simply run the name of individual and his first name, and if it didn't come up, we

could guarantee everyone that that individual doesn't have a Title II [NFA] weapon

registered to him."[81] Furthermore, Chief Busey stated that the error rate in the NFRTR

was between 49 and 50%, before he became NFA Branch Chief, which means all cases

prosecuted for illegal possession of a firearm, prior to 1994, had a one in two chance of

the legally registered weapon's record not existing or being discoverable in the NFRTR.[82]

Chief Busey then declared that the current, as of 1995, inaccuracy rate was below 8%,

---

1975, reproduced in *Oversight Hearings on Bureau of Alcohol, Tobacco, and Firearms*, Senate Committee on Appropriations, 96th Cong., 1st Sess., at 42 (Washington, GPO, 1979), *available at* http://www.nfaoa.org/documents/1979_Hearing_Excerpts.pdf.

[79]     Bureau of Alcohol, Tobacco, and Firearms, Status Report: National Firearms Registration and Transfer Record (NFRTR), by Deron A. Dobbs, July 1, 1981, at 17, *available at* http://www.nfaoa.org/documents/DeronDobbs.pdf.

[80]     BATFE/NFRTR *Roll Call* Training Video, Oct. 1995, *available at* http://www.nfaoa.org/documents/rollcall_highlights.mp4 or as text http://www.nfaoa.org/documents/BuseyTranscript.pdf at 20.

[81]     *Id.*

[82]     *Id.*

**Exhibit A, Pg. 340**

while at the same time the BATFE was attesting to the court that the NFRTR was 100% accurate.[83]

## V. Congressional Hearings/OIG Audits

The Congress has been aware of the problems of the NFRTR since the 1970's; yet the courts, for the most part, have been relatively uninformed or unaware of such proceedings.[84] The hearings and testimonies on the NFA, and more specifically the inaccuracy in the NFRTR, are massive, some encompassing more than 900 pages; thus, the hearings will be broken down by date, and only the most pertinent information will be discussed, because an article could be written on each hearing. These hearings memorialize the inaccuracy of the NFRTR, misleading statements by the BATFE, official audits that fail to follow Generally Accepted Government Auditing Standards (GAGAS) based on *Government Auditing Standards*,[85] lack of internal controls within the BATFE, and BATFE's failure to follow procedure, as well as, the Congress's and BATFE's failure to rectify the NFRTR. While the Department of the Treasury, Office of Inspector General, purports to have based its 1998 audit reports on GAGAS, inspection of various unpublished Work Papers from these audits disclose that pertinent findings were omitted from the published audit reports, and render a more accurate and complete version of the serious errors in the NFRTR and BATFE mismanagement.

---

[83]     *Id.*
[84]     U.S. Dep't of Justice, Criminal Div., *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, 2-3 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.
[85]     The audits described in this article fell within the scope of COMPTROLLER GENERAL OF THE UNITED STATES, GOVERNMENT AUDITING STANDARDS, (Washington, D.C., U.S. GPO, 1994), which has since been updated.

Exhibit A, Pg. 341

A. 1934-1980


Since the previous section, The Inaccuracies in the NFRTR, dealt mainly with issues that arose from 1933 to the 1980's, I will not reiterate those occurrences. However, in 1968, after *U.S. v. Haynes* invalidated the registration provision of the NFA,[86] the Congress held hearings on new legislation, which would become the GCA.[87] The testimony most pertinent to this article is that of then Internal Revenue Service Commissioner Sheldon S. Cohen on the effect of *U.S. v. Haynes* on enforcement of the NFA. Although his statements do not acknowledge or characterize the inaccuracy of the NFRTR, they illustrate the likely impact on the BATFE's ability to prosecute individuals if a new amnesty period was established.[88] Commissioner Cohen stated, "We had been averaging, under the National Firearms Act, about 60 to 70 prosecutions per month for National Firearms Act violations. Since the first of this year, when the *Haynes* decision was rendered, we are down to about something in the excess of 40 a month."[89] Hence, *U.S. v. Haynes* apparently hampered the BATFE's ability to prosecute individuals in just one out of three cases, presumably limited to cases for Possession of an Unregistered Firearm. Thus, establishing a new amnesty period will not prevent the BATFE from prosecuting violations of the NFA; and as will be shown, BATFE could still successfully prosecute some Possession of Unregistered Firearm cases.

---

[86]     Haynes v. United States, 390 U.S. 85, 100 (1968).

[87]     U.S. Congress, Senate Committee on the Judiciary, Subcommittee to Investigate Juvenile Delinquency, *Pursuant to S. Res. 240*, 90th Cong., 2nd Sess., (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/IRS_Commissioner_GCA_Hearing.pdf.

[88]     *Id.* at 661.

[89]     *Id.*

**Exhibit A, Pg. 342**

B. 1980-1995

In 1983, then Senator Robert Dole, before the Committee on the Judiciary, proposed amending the NFA to establish a "continuing registration period during which possessors of unregistered National Firearms Act (NFA) weapons could register such weapons."[90] In response to Senator Dole's Dole's proposed amendment, then-ATF Deputy Assistant Secretary for Enforcement Robert E. Powis declared "Having provided a 30-day period within which possessors of unregistered weapons could register them with impunity, the 1968 amnesty served its purpose. Therefore, unregistered weapons could no longer be legitimately registered and possessor's retention of them violated the law."[91] However, as will be shown in the 1998 audits of the NFRTR by the Treasury Department Inspector General, and further documented by Eric M. Larson in his 2001 Congressional testimony, Mr. Powis's statement contradicts the fact that BATFE registered thousands of NFA firearms after the 1968 amnesty period expired, and thus knowingly and willfully misled the Congress in an official capacity as the representative of a federal law enforcement agency.[92]

In 1992, the BATFE threatened charging Noel Napolilli, a retired public school teacher, with Possession of an Unregistered Firearm because BATFE said it could find no record of his MP-40 machine gun, serial number 4202, in the NFRTR.[93]  When Mr.

---

[90]     U.S. Congress, Senate Committee on the Judiciary, *S. 914*, 98th Cong., 1st Sess., at 62 (Washington, GPO, 1984), *available at* http://www.nfaoa.org/documents/DolaNFAamend.pdf.

[91]     *Id.* at 63.

[92]     Eric M. Larson,  *Errors in the National Firearms Registration and Transfer Record: A New Amnesty Period May be Required to Correct Them*, prepared for the Subcommittee on Treasury, Postal Services, and General Government of the Committee on Appropriations, at 57-67, Apr. 8, 1997, *available at* http://www.nfaoa.org/documents/1997testimony.pdf.

[93]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government*

Napolilli provided a copy of the Form 3 that the BATFE had approved, later shown to be

a copy that the BATFE made and sent to him, rather than one of the copies prepared in

duplicate that the BATFE approved, the BATFE claimed the document was a forgery.[94]

Even though its own Forensic Document Laboratory examined the Form 3 and

determined the document was genuine, the BATFE nevertheless seized and forfeited the

firearm.[95]

    While BATFE contended the firearm had been illegally registered as

"remanufactured" because BATFE said it bore no evidence of remanufacture, the fact

that BATFE lost all of its computerized and hard copy records of the firearm precluded a

definitive determination.[96] BATFE wrote to James Jefferies, III, Mr. Napolilli's attorney,

that, "We agree with your observation that prior to Mr. Napolilli's production of the

above mentioned Form 3, ATF had no record of registration of the MP40 machinegun to

Mr. Napolilli or any other person."[97] Mr. Napolilli, left with no other option, filed suit.[98]

However, he dropped his suit against the BATFE, "because my wife and I were fearful of

BATF reprisal, the seizure of my sizeable firearms collection, … and being harassed by

constant 'inspections.' There was substantial evidence that these things would likely

*Appropriations for Fiscal Year 1999, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 105th Cong., 2nd Sess., at 33-34 (Washington, GPO, 1998), *available at* http://www.nfaoa.org/documents/NoelNapolilli.pdf.
[94]   *Id.* at 33.
[95]   *Id.*
[96]   *Id.* It should be noted that the gun was not forensically examined by an independent expert.
[97]   Letter from Wayne Miller, Chief, National Firearms Act Branch, Bureau of Alcohol, Tobacco and Firearms to James H. Jeffries III, dated Sept. 18, 1992, *available at* http://www.nfaoa.org/documents/ATF-WayneMillerLetter-1992.pdf.
[98]   U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1999, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 105th Cong., 2nd Sess., at 84-86 (Washington, GPO, 1998) *available at* http://www.nfaoa.org/documents/NoelNapolilli.pdf.

**Exhibit A, Pg. 344**

occur based on other incidents with which I was familiar."[99]  Mr. Napolilli continued, "[I later] learned that a BATF employee destroyed other registration documents to avoid having to work on them and that their database approached a 50% error rate."[100]

Mr. Napolilli's predicament occurred shortly before a new round of hearings and testimonies on the inaccuracy of the NFRTR, as well as two audits of the NFRTR by the Treasury Department Inspector General published in 1998, which would continue for over the next decade. Indeed, in 2006, then Attorney General Gonzales refuted the BATFE's position on refusing to accept previously approved paperwork. When Representative Chris Cannon asked, why do "I have just in my district many, many people who have this problem, and they have paperwork that came from the ATF that is -- it's ignored by ATF," Attorney General Gonzales replied, "That shouldn't be the case."[101]

## C. 1995-1998

As discussed in the section The Inaccuracy in the NFRTR, in the "Roll Call" training video then-BATFE Chief Busey ordered NFA Branch staff to commit perjury when testifying about the accuracy of the NFRTR.[102] The BATFE tried to mitigate Busey's remarks by offering a "correction;" NFA Specialist, Gary N. Schaible, stated

---

[99]        *Id.* at 33.
[100]       *Id.*
[101]       U.S. Congress, House Committee on the Judiciary, Department of Justice, *Serial No. 109-137*, 109th  Cong., 2nd Sess., at 27 (Washington, GPO, 2006), *available at* http://www.nfaoa.org/documents/DOJHearingserialno109-137.pdf.
[102]       BATFE/NFRTR *Roll Call* Training Video, Oct. 1995, *available at* http://www.nfaoa.org/documents/rollcall_highlights.mp4 or as text http://www.nfaoa.org/documents/BuseyTranscript.pdf. This was obtained by a Freedom of Information Act (FOIA) request in 1996 by attorney James H. Jeffries.

**Exhibit A, Pg. 345**

under oath, "I have never testified that the data base [NFRTR] is 100 percent accurate nor, to the best of my knowledge, has any other of the NFA branch personnel, including Mr. Busey."[103] However, Schaible's statement, which carefully avoids characterizing the true error rate of the NFRTR, raises doubts about the legitimacy and trustworthiness of any and all certifications that the BATFE might give in a criminal proceeding, as will be discussed in the section, The Intersection of the Federal Rules of Evidence and the NFRTR. Since the BATFE concedes that the NFRTR is not 100% accurate, how can any court deprive an individual of his/her liberty based on this inaccurate database, in the absence of a valid and reliable estimate such as would be obtained by a GAGAS audit? Surely, this, combined with the Napolilli incident, meets the standard for reasonable doubt, in any proceeding.

Representative David Funderburk was not amused by the Busey comments and Schaible follow up. As a result, he proffered comments made by attorney James Jefferies into the Congressional Record:

> Consider this matter in its starkest terms: a senior BATF official lecturing other senior BATF officials at BATF national headquarters in Washington, DC, declares openly and without apparent embarrassment or hesitation that BATF officers testifying under oath in Federal--and State--courts have routinely perjured themselves about the accuracy of official government records in order to send gun-owning citizens to prison and/or deprive them of their property. Just who is the criminal in these cases?[104]

---

[103]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1997, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 104th Cong., 2nd Sess., at 183 (Washington, GPO, 1996), *available at* http://www.nfaoa.org/documents/Schaiblecorrect.pdf. *See also*, U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1999, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 105th Cong., 2nd Sess., at 146-171 (Washington, GPO, 1998), *available at* http://www.nfaoa.org/documents/LeaSuretest.pdf.

[104]     142 Cong. Rec. E 1461 (1996) (statement of Honorable David Funderburk reiterating James H. Jefferies, *Institutional Perjury*, VOICE FOR THE DEFENSE, Vol. 28, No. 4, Oct. 1996, at 28-30, *available at* http://www.nfaoa.org/documents/1998testimony.pdf.

**Exhibit A, Pg. 346**

The record continues, "After reviewing the incriminating [Busey] tape, BATF officials discussed whether they could get away with destroying it."[105] To push the point home, Representative Funderburk reiterated Jefferies comment that,

> When the fog had cleared Justice learned that the NFR&TR inaccuracy problem had been the subject of internal BATF discussion since at least 1979. BATF's files were replete with minutes of meetings, statistical studies, memoranda, correspondence, et cetera, admiring the problem. The only thing missing was any attempt to correct the problem, or to reveal it to anyone outside the agency.[106]

Most damaging was Jefferies legal opinion of the incident,

> The indirect consequences of BATF's conduct will not be so readily apparent but are potentially devastating. All across the country assistant U.S. attorneys, U.S. district judges, and other Federal and local law enforcement officials are going to learn what most defense lawyers and gun dealers have known for years and what the aftermath of Waco and Ruby Ridge starkly illustrated: *BATF officers and agents lie, dissemble, and cover up on an institutionalized basis. These are not aberrations; they are an institutional ethic, an organizational way of life. Just who is the criminal in these cases?*[107] [emphasis added].

In 1996, the BATFE charged John Daniel LeaSure with illegal possession of firearms, in a case where the testimony of Mr. Schaible would later be impeached by an internal BATFE investigation into the destruction of NFA documents by BATFE employees.[108] Mr. Schaible testified, under oath, when asked if he was aware of BATFE employees throwing away NFA documents so they would not have to process them, he answered, "Yes."[109] When asked if NFA Branch Clerks throwing away such documents could have resulted in the BATFE believing Mr. LeaSure to be in possession of allegedly

---

[105]     *Id.*
[106]     *Id.*
[107]     *Id.* at E 1461-62.
[108]     U.S. v. LeaSure, No 4:95cr54 (E.D. Va. May 21, 1996); Transcript of Record at 217, U.S. v. LeaSure, No 4:95cr54 (E.D. Va. May 21, 1996), *available at* http://www.nfaoa.org/documents/LeaSureTrial.pdf.
[109]     Transcript of Record at 236, U.S. v. LeaSure, No 4:95cr54 (E.D. Va. May 21, 1996), *available at* http://www.nfaoa.org/documents/LeaSureTrial.pdf.

**Exhibit A, Pg. 347**

unregistered firearms, Mr. Schiable responded, "Certainly."[110] More disconcerting is when Mr. Schiable was asked whether these employees were fired, he responded, "No."[111] With this information, the learned and Honorable John A. Mackenzie, United States District Court, Eastern District of Virginia, dismissed the convictions for illegal possession of firearms because, based on the BATFE's own testimony, the BATFE itself may have destroyed Mr. LeaSure's registration documents.[112] As Jefferies' comments, which Representative Funderburk would later read into the Congressional Record, declare, "In essence Schaible was testifying that 'We can't find an official record and therefore the defendant is guilty.' What we now know is that Schaible should have testified that 'We can't find half our records—even when we know they're there—and therefore we're not sure if anyone is guilty.'"[113]

This admonition in the Congressional Record, however, did not stop Mr. Schiable from changing his story during an internal 1997 BATFE investigation into the destruction of NFA documents by BATFE employees. During the investigation, Mr. Schiable told investigators, under oath, that one may have construed from his testimony, "that ATF employees were destroying documents, but this was not the case."[114] Mr. Schiable's sworn testimony in the *LeaSure* case clearly and legally establishes that the BATFE

---

[110]     *Id.* at 237.
[111]     *Id.*
[112]     *Id.* at 239.
[113]     142 Cong. Rec. E 1461 (1996) (statement of Honorable David Funderburk).
[114]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1999, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 105th Cong., 2nd Sess., at 90 (Washington, GPO, 1998), *available at* http://www.nfaoa.org/documents/1998testimony.pdf.  Mr. Schaible's contradictory sworn testimony has been analyzed separately at some length; see "ATF Specialist Gary N. Schaible's Contradictiry Sworn Testimonies Regarding the Destruction of NFA Documents at ATF,"  Eric M. Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms*, at 15-19 (Apr. 2. 1999), *available at*: http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf.

**Exhibit A, Pg. 348**

destroyed NFA documents; otherwise, the United States would have appealed the decision to dismiss the convictions. To appeal and lose would have resulted in the Court of Appeals upholding the verdict and writing case law that would have invalidated the NFRTR.

### D. 1998

In October 1997, the Department of the Treasury, Office of Inspector General, at the request of Representative Dan Burton, then Chairman of the House Committee on Government Reform and Oversight, began investigating allegations that the NFRTR was inaccurate, incomplete and, therefore, unreliable.[115]  Chairman Burton requested the investigation in response to five specific allegations by a private citizen, based on statistical and documentary evidence, which "may be valid and legitimate."[116]  The Treasury Department Inspector General rendered a report on the citizen's allegations in October 1998.[117]

The investigation found, among other things, that "National Firearms Act (NFA) documents had been destroyed about 10 years ago by contract employees. We could not obtain an accurate estimate as to the types and number of records destroyed"[118] and "ATF

---

[115]     U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearm's Registration and Recordkeeping of the National Firearms Registration and Transfer Records*, OIG-99-009, 1 (Washington, Oct. 26, 1998), *available at*  http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[116]     Treasury Department, Inspector General, *Work Paper Bundle A, 1998 audit of NFRTR*; *available at*  http://www.nfaoa.org/documents/Work_Papers_A.pdf at 53-54.

[117]     U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearm's Registration and Recordkeeping of the National Firearms Registration and Transfer Records*, OIG-99-009, at 1 (Washington, Oct. 26, 1998), *available at*  http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[118]     *Id.* at 1. This is in direct contradiction to Mr. Schiable's later testimony.

Exhibit A, Pg. 349

granted amnesty NFA registrations to individuals after December 1, 1968 on a limited basis [almost 2,500 registrations] providing certain conditions were met. ATF did not publish its intent to grant an amnesty period as required by the Gun Control Act."[119]

More importantly, the audit Work Papers memorialize a comment made by an Assistant Special Agent-in-Charge at the Baltimore field office: "When [redacted] first started with the agency in 1971, it was still under IRS. When ATF was made a separate Bureau in 1972, it was not an amicable split from IRS. He believes much of the documentation prior to 1972 *may have been destroyed* or maintained by IRS."[120] [emphasis added].

The Treasury Department Inspector General undertook a separate audit of the NFRTR in addition to the one initiated in response to the citizen complaint, which examined other aspects of the NFRTR.  This additional audit of the NFRTR was published in December of 1998.[121]  The additional audit revealed that the BATFE allowed unauthorized access to the database by individuals no longer employed by the BATFE, remittance checks were left unsecured, transfers were not processed in a timely manner, and NFA weapons are registered to dead people.[122] Furthermore, and more disconcerting, the audit found that when the BATFE combined the existing NFRTR database with its new upgraded NFRTR database, "ATF *did not* have adequate assurance

---

[119]      *Id.* at 1, 13. It should be recognized that BATFE may have sought to provide an opportunity for certain applicants unable to participate in the amnesty because they were outside the continental United States, an opportunity to register unregistered firearms.  Individuals on vacation, or serving overseas in the U.S. armed forces, may have been unaware of and unable to register their firearms due to the relatively short, 30-day amnesty period.

[120]      U.S. Department of the Treasury, Office of Inspector General, *Work Papers C*, A-CH-98-001, at C-18, *available at* http://www.nfaoa.org/documents/Work_Papers_C.pdf at 33-34.

[121]      U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, (Washington, Dec. 18, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[122]      Id. at 1-23.

**Exhibit A, Pg. 350**

that all of the entries had been transferred in order to make *the registry complete for its intended use*."[123] [emphasis added]. The audit found, "An initial review by the OIG showed that the prior registry reflected a total registration of 2,545,425 compared to a total registration of 2,548,918 in the new database."[124] Thus, the registry mysteriously grew by 3,493 entries. However, the Work Papers for this audit tell a much different story: "[redacted] also provided an additional report, Weapon Inventory of Current Owner. The total weapons count for this report is greater than the Annual Registration Activity Report. The variance between the two reports is 212,734."[125]

The audit declared, "ATF officials advised us that in September 1997, they had reconciled the two databases, but *they did not keep any record of it*."[126] [emphasis added]. Thus, the BATFE denied the Treasury Department Inspector General the ability to determine the truth value of their statement. Instead, in June of 1998, the BATFE did its own audit of the reconciliation and, "ATF reported to us that 407 records (entries) from the old database were not found in the new database."[127] Thus, these are just the records to which were known; this audit does not depict all those records which were missing or destroyed, although properly registered. Specifically, consider the statement by a Treasury IG auditor Gary Wilk in an unpublished audit Work Paper that in repeated efforts to reconcile the "discrepancies observed" during the audit, BATFE did not clearly "demonstrate that the computer system, typically in use, provides reliable and valid data

---

[123]     *Id.* at 10.
[124]     *Id.* at 11.
[125]     U.S. Department of the Treasury, Office of Inspector General, *Work Papers C*, A-CH-98-001, at C-37 *available at* http://www.nfaoa.org/documents/Work_Papers_C.pdf at 65.
[126]     U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, at 11 (Washington, Dec. 18, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.
[127]     *Id.*

when a search is performed.  ATF did demonstrate that they have the capacity to generate

various information from various sources but the original documentation remains missing

and the accuracy of the documentation provided cannot be assured."[128]

More troubling is the audit report's statement, "In addition to the discrepancies

between the old and the new databases, we observed discrepancies between the database

and original registration documents."[129] The audit report went on to state concern with a

registration category labeled "Other" where, "If form numbers were incorrectly entered

into the registry, the entry would also be included in this category."[130] Yet another

concern was the use of a Form 4467, which was used by the BATFE to register firearms

during the 1968 Amnesty.[131]  Thus, if the BATFE does a search for a Form 4, which is

the typical form used for transfer to an individual, the search would not yield a result, if

the form had been entered in the "Other" or "4467" categories.

The audit report continued,

ATF has certain formal procedures for entering data into the registry's
database. However, the data entry errors such as those we found in our
sample occurred because employees had not correctly entered some data.
Also, supervisors or other employees did not always verify data entered
into the database because of time limitations and other priorities. In
response to our draft report, ATF officials also believed that discrepancies
summarized in our table may be data entry errors and/or failures to enter
information in accordance with established procedures.[132]

---

[128]     U.S. Department of the Treasury, Office of Inspector General, *Work Papers F*, A-CH-98-001, at
F-52, *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf at 62. These findings, while
limited to Forms 4467, cannot depict the true accuracy and completeness of the NFRTR.  No search,
however diligent, can possibly locate a document that has been lost or destroyed.

[129]     U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations
Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms
Registration and Transfer Record,* OIG-99-018, at 11 (Washington, Dec. 18, 1998) *available at*
http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[130]     *Id.*

[131]     *Id.*

[132]     *Id.* at 12.

Thus, these "errors" may cause a search of the NFRTR to fail to locate numerous legally registered firearms; this audit finding is virtually identical to determinations made by the Department of Justice Inspector General in its June 2007 report on a "review" of the NFRTR.

Incredibly, even in light of this evidence of NFRTR inaccuracies, "ATF officials conclude that none of the identified discrepancies would affect the accuracy of a certificate of non-registration prepared by the NFA Branch for use in support of a criminal prosecution in United States district court."[133] The report continued, "[A]TF stated that it can identify all records that might possibly be the record sought,"[134] which contradicts the BATFE's admittance that it lost all of Mr. Napolilli's records,[135] the destruction of numerous NFA documents 10 years ago,[136] and those 407 missing records.[137] Lastly, it must be noted that the samples drawn by the auditors were smaller than those that would ordinarily be drawn to establish standard estimates of precision and confidence.

As explained in the report, "Because of the error rate we found in our discovery sample and actions that ATF had underway to improve the quality of the registry, we did not implement a full statistical sampling plan."[138] While this was the only information

---

[133]     *Id.* at 13.

[134]     *Id.*

[135]     Letter from Wayne Miller, Chief, National Firearms Act Branch, Bureau of Alcohol, Tobacco and Firearms to James H. Jeffries III, dated Sept. 18, 1992, *available at* http://www.nfaoa.org/documents/ATF-WayneMillerLetter-1992.pdf.

[136]     U.S. Department of the Treasury, Office of Inspector General, *Special Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearm's Registration and Recordkeeping of the National Firearms Registration and Transfer Records,* OIG-99-009, at 1 (Washington, Oct. 26, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-009-1998.pdf.

[137]     U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, at 11 (Washington, Dec. 18, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[138]     *Id.* at 23.

provided to the public, the Work Papers, once again, explain why neither the actual error

rate was listed, nor was the full statistical sampling plan implemented, in a discussion of

audit findings the Treasury Department Inspector General omitted from the final reports.

> Of the 528 records and documents reviewed: We discovered a total of 395
> errors or omissions of which 176 were Critical to the NFA mission and the
> remaining 219 were Administrative…We were unable to adequately
> identify 14,301 Unknown records contained within the category 'Other.'
> These records have subsequently been tentatively identified as 9,621
> miscoded Form 6 and 4,680 unknown (database conversion errors).[139]
> Hence, the overall error rate, without consideration for the "Other" category, was

74.8%, and Critical error rate was 33.3%. To better understand the distinction between

Critical and Administrative errors, "[T]he name of the weapon owner and the weapon

serial number were critical," but "[T]he address, date the document was received, the date

of birth of the applicant, and weapon description were [not] critical;" hence, not critical

has been termed Administrative.[140] More interesting, to this end, is the fact that "Table 3:

Sampling Results: Error Rate Estimates" has been completely redacted.[141]

In a "Discovery" sample of seventy Form 4467s, the Treasury Department

Inspector General determined that "Our discovery sample indicated an 18.4% error rate,

one error per error Form 4467 in a 'critical' field."[142]  Because of concerns that the

"critical error" rate was too high, the BATFE staff told the Treasury Department

Inspector General's auditors to use different definitions of "critical error" to determine

the 4.3% error rate that can be calculated from data that the OIG formally reported;

---

[139]      U.S. Department of the Treasury, Office of Inspector General, *Work Papers H*, A-CH-98-001, at
H-0, *available at* http://www.nfaoa.org/documents/Work_Papers_H.pdf at 28.
[140]      U.S. Department of the Treasury, Office of Inspector General, *Work Papers F*, A-CH-98-001, at
F-37 *available at* http://www.nfaoa.org/documents/Work_Papers_F.pdf at 48.
[141]      U.S. Department of the Treasury, Office of Inspector General, *Work Papers H*, A-CH-98-001,
*available at* http://www.nfaoa.org/documents/Work_Papers_H.pdf at 35.
[142]      *Id.* at H-1, PDF at 32-60.

namely, 6 critical errors out of a "Discovery" sample of 141 cases.[143]  There is evidence

that in other, different, internal BATFE efforts in 1995 to reduce the error rate in the

NFRTR, the BATFE staff manipulated the definition of "Significant Error," including

"Approved wrong firearm to transferee," "Approved form never updated in NFRTR,"

and "Misspelled and/or Incomplete names," by simply redefining these as an "Error"[144]

 The discrepancy between the OIG and BATFE's definition of "critical error"

requires an examination of the Congressional Intent for a definition of "critical error."

The Congress, in 1968, defined "critical" information as: "(1) the identification of the

firearm, (2) date of registration, and (3) identification and address of the person entitled

to possession of the firearm."[145] Therefore, since the Congress felt these factors were

crucial to the database, it was Congress's intent that the absence of, or error in, any of

these data fields correlates to a "critical error." This definition is likely to yield a much

higher error rate; thus, the BATFE is unlikely to support such a determination, even

though the definition represents the original Congressional intent.

 Eric M. Larson, a Senior Analyst at the U.S. Government Accountability Office,

whose complaint in his capacity as a private citizen to the House Committee on

Government Reform and Oversight resulted in the 1998 audits of the NFRTR, agreed that

the above are critical errors, "but they represent only the barest minimum guideline

---

[143]  *Id.*

[144]  Eric Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms*, at 38 (Apr. 2. 1999), *available at* http://www.nfaoa.org/documents/ATF_Significant_Error.pdf. That is just a portion of the entire Work Papers, which can be found here: http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf.

[145]  U.S. Congress, Senate Committee on Judiciary, *Report No. 1501: Gun Control Act of 1968*, 90th Cong., 2nd Sess., at 42 (1968), *available at* http://www.nfaoa.org/documents/SenateReport1501-GCA1968.pdf.

**Exhibit A, Pg. 355**

standards."[146] Mr. Larson continued, "To be accurate and reliable, 'the identification of

the firearm' should include (1) serial number, (2) manufacturer, (3) name or model

number of firearm, and (4) type of firearm (machine gun, short-barreled shotgun, any

other weapon, and so forth)."[147] Furthermore, "The 'identification and address of the

person entitled to possess the firearm' should include correct spelling of at least the last

name, and a current address."[148]

     While Mr. Larson's guideline standards are more encompassing, the BATFE

appears to have determined that even those guideline standards were not sufficient as

critical fields in its interpretation of the Congressional mandate for the 1968 Amnesty and

included the registrant's date of birth, social security number and other information.

Accordingly, in the January 1969 edition of Title 26 C.F.R, Section 179.201, the BATFE

declared,

> The return, Form 4467, shall show the name, address, place of business or
> employment, employer identification number or social security number,
> and date of birth of the registrant, the date the firearm was acquired, the
> place where the firearm usually is kept, the name, and address of the
> manufacturer, the type, model, length of barrel, overall length (when
> applicable), caliber or gauge, serial number, and other identifying marks
> of the firearms, and if an unserviceable firearm, the manner in which it
> was rendered unserviceable. *Upon registering the firearm, the Director
> shall retain the original Form 4467 as part of the National Firearms
> Registration and Transfer Record*.[149] [emphasis added].

It seems a failure of due diligence for BATFE to fail to determine that the information

specified in the 1969 regulations is not "critical" information in audits of the NFRTR,

---

[146]    Letter from Eric M. Larson, Response to Questions asked by Joshua Prince, to Joshua Prince, at
4, dated Jan. 1, 2008, *available at*
http://blog.princelaw.com/assets/2008/1/5/Eric_Larson_letter_to_Joshua_Prince.pdf. Mr. Larson stated that
his comments reflect his personal opinions, and do not represent the policy or position of the U.S.
Government Accountability Office (GAO).

[147]    *Id.*

[148]    *Id.* at 4-5.

[149]    26 C.F.R. 179.201 (1969), *available at* http://blog.princelaw.com/assets/2008/1/9/1969-CFR-
ATF-amnesty-regs.pdf.

when it specifically interpreted its Congressional mandate to require the Director to collect this information on the Form 4467s to implement the 1968 amnesty, which was designed to register unregistered firearms and reliably identify them and their owners.[150]

Nevertheless, given the evidence auditors discovered that the NFRTR was inaccurate and incomplete, it is astonishing that the Treasury Department Inspector General sought to distance himself from the issue of whether the NFRTR was accurate enough to sustain criminal prosecutions:

> Our [audit] scope did not include a review of the accuracy of ATF's certifications in criminal prosecutions that no record of registration of a particular weapon could be found in the registry.  We also did not evaluate the procedures that ATF personnel use to search the registry to enable them to provide an assurance to the court that no such registration exists in specific cases. Accordingly, this report does not provide an opinion as to the accuracy of the registry searches conducted by ATF.[151]

In 1998, the issues surrounding accuracy, or lack thereof, the NFRTR did not end with the 1998 audit. Robert I. Landies, an Ohio firearms dealer, contacted the BATFE in 1998 regarding the fact that they had transferred NFA firearms for which he had not submitted transfer applications, experienced "misplacement of transfer applications by ATF," and "receipt of approved registrations for firearms which do not appear in the NFRTR."[152] The BATFE responded, "The implementation of a new database and the realignment of branch functions and duties have significantly impacted upon the

---

[150]      In the light of trends toward using biometric identifiers, a gradual tightening of standards to acquire state-issued identification and related documents, such as driver's licenses, particularly under provisions of the Real ID Act, it may be advisable for the NFRTR to formally comply with federal provisions for positive identification that are and will be implemented in future, in its standards for positively identifying owners of NFA firearms.  Similarly, BATFE might consider establishing standards for the reliable identification of individual NFA firearms

[151]      U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, at 4 (Washington, Dec. 18, 1998) *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf.

[152]      Letter from Jimmy Wooten, Assistant Director, Firearms, Explosives &Arson, Bureau of Alcohol, Tobacco and Firearms, to Robert I. Landies, Ohio Ordnance Works, dated May 26, 1998, bearing symbols F:SD:NFA:WJO 179.101 98-5593, *available at* http://www.nfaoa.org/documents/LandiesLetterNFRTR1998.pdf.

processing of applications and notices in recent months."[153] The BATFE completely sidestepped the issues of missing records in the NFRTR and transfers of NFA weapons to other individuals, when no application for transfer was submitted. Yet, the BATFE contends that the database is accurate.


## E. 1999-2002


In 1999, the Disclosure Division of BATFE stated, in response to a FOIA request, that the NFRTR data records submitted to the Department of Treasury Inspector General were not accurate: "The report you refer to was submitted to the Inspector General of the Treasury, with the understanding that the report was *not* accurate, because some of the report functions associated with the database [NFRTR] are not working properly."[154] [original emphasis]. The BATFE continued, "Our letter dated April 20, 1999 advised you of the *inaccuracies* we are *still* experiencing."[155] [emphasis added]. Thus, the Disclosure Division, with responsibility to produce NFRTR records, contradicts the BATFE's statement in the 1998 audit that the NFRTR was accurate.[156]

In 2000, concerned about BATFE's answers to three questions it posed about errors in the NFRTR, the House Subcommittee on Treasury, Postal Service, and General

---

153    *Id.*
154    Letter from Averill P. Graham, Disclosure Specialist, Bureau of Alcohol, Tobacco and Firearms, to Eric M. Larson, dated May 18, 1999, bearing symbols 112000 99-1420, *available at* http://www.nfaoa.org/documents/AverillGrahamletter1999.pdf.
155    *Id.*
156    U.S. Department of the Treasury, Office of Inspector General, *Audit Report on Allegations Concerning the Bureau of Alcohol, Tobacco, and Firearms' Administration of the National Firearms Registration and Transfer Record,* OIG-99-018, at 13 (Washington, Dec. 18, 1998), *available at* http://www.nfaoa.org/documents/TreasuryOIG-99-018-1998.pdf. "ATF officials conclude that none of the identified discrepancies would affect the accuracy of a certificate of non-registration prepared by the NFA Branch for use in support of a criminal prosecution in United States district court." *Id.*

Government Appropriations, which requested Dr. Fritz J. Scheuren, an internationally

recognized expert in administrative records and statistics, to evaluate the BATFE's

responses to three questions asked by the Subcommittee.[157] Dr. Scheuren, then affiliated

with The Urban Institute, more recently a past President of the American Statistical

Association and currently Vice President, Statistics, National Opinion Research Center,

University of Chicago, told the Subcommittee, regarding the technology question: ". . .

that very serious problems were uncovered in ATF's recordkeeping systems. In fact, in

my own long experience [after reading the two Treasury Department Inspector General

audit reports on the NFRTR], I cannot think of any instance where poorer results were

obtained."[158] For the remaining questions on searchability of the NFRTR and heirs who

inherit firearms, Dr. Scheuren "found the ATF answer to be unresponsive and too general

to be useful," and that "ATF indicated that it has no system to identify or track the

firearm transfers to heirs," respectively and was thus unable to answer the

Subcommittee's questions.[159]  Dr. Scheuren concluded:

> I can only offer a qualified opinion on the ATF's answers but if their
> responses are to be taken at face value, two conclusions arise: (1) ATF has
> serious material weaknesses in its firearm registration system which it has
> yet to acknowledge, and (2) the ATF steps taken to improve its
> recordkeeping system clearly lack thoroughness and probably lack
> timeliness as well.[160]

Dr. Scheuren offered three recommendations: 1. The BATFE should allow for outside,

independent audit organizations to give a more complete assessment; 2. the audits should

---

[157]      U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 3, Statements of Members of Congress and Other Interested Individuals and Organizations*, 107th Cong., 1st Sess., at 23-26 (Washington, GPO, 2001), *available at* http://www.nfaoa.org/documents/FritzScheuren.pdf. To see Dr. Scheuren's resume, please find it at http://www.nfaoa.org/documents/Scheuren_Resume_July_2007.pdf.
[158]      *Id.* at 24
[159]      *Id.*
[160]      *Id.* at 25.

be annual; and 3. the BATFE needs to implement some form of check to determine if an individual, who owns a registered NFA weapon, died during that year.[161] The BATFE, however, at a separate appropriations hearing on its budget, rejected Dr. Sheuren's suggestions; for example, it stated that "strong internal controls for the NFRTR" would result from improvements it was making, rendering an audit unnecessary, and declined to specifically answer other questions.[162]

Then, in 2001, in responding to a concerned citizen, the BATFE stated, "This is in response to your undated letters to the Bureau of Alcohol, Tobacco, and Firearms (ATF) requesting a guarantee, either by letter or notarized statement, from ATF that your *registered* National Firearms Act (NFA) firearms will never be confiscated as contraband."[163] [emphasis added]. The BATFE continued, "We will *not* provide you with such a guarantee."[164] [emphasis added]. One can only read such a statement in utter confusion and disbelief. The BATFE has approved the transfer of a weapon; yet, it will not guarantee it is lawful? What is the purpose of the BATFE's approval if such is not a guarantee? How can the BATFE approve an application by a law-abiding individual, only to later classify the firearm as contraband and turn the individual into a criminal? While it is conceivable that the statutory law may change prohibiting the ownership of such firearms, a guarantee could be given based on statutory law remaining the same. Nonetheless, it is clear that the BATFE does not wish for the Congress and Judiciary to answer these questions.

---

[161]     *Id.*

[162]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 1*, 107th Cong., 1st  Sess., at 478 (Washington, GPO, 2002), *available at* http://www.nfaoa.org/documents/NFRTRdocpack.pdf.

[163]     Letter from Arthur Resnick, Chief, National Firearms Act Branch, to [redacted] bearing symbols 901040:GS, 5320/2001-0161, *available at* http://www.nfaoa.org/documents/NoGuarantees.pdf.

[164]     *Id.*

Congress' concern over the accuracy and reliability of the NFRTR resulted in the following "report language" in BATFE's Fiscal Year 2001 appropriation:[165] "To address the NFRTR accuracy problem in part, Congress appropriates $500,000 to improve ATF's 'operations, electronic filing systems, and database accuracy for the National Licensing Center, Imports Branch, and the NFA Branch' for each fiscal year, 2001 and 2002."[166] The language of the Fiscal Year 2003 appropriations report indicated the continuation of such funding.[167]

In 2002, the Treasury Department Inspector General initiated a new audit of the NFRTR.[168] The purported purpose of this audit was to determine "Has ATF taken appropriate steps to improve the completeness, accuracy, and processing times of the NFRTR."[169] However,

On December 10, 2004, a former IG staff member who worked on the original 1997-98 audits of the NFRTR, and also been assigned to work on the new 2002 audit, said that the audit team was told to terminate this audit before it was completed; box up the materials and ship them to the IG; and that none of the audit materials were turned over to the Department of Justice Inspector General when ATF was transferred to the Department of Justice on January 24, 2003. Consequently, it appears that the Department of Justice Inspector General may not be aware of the problems with and Congressional concerns about the accuracy and completeness of the NFRTR data base.[170]

F. 2003-2007

---

[165]    Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Trasfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 16 (quoting H.Rept. 106-765 (H.R. 4871), at 23-24), *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf.

[166]    *Id.* (quoting H.Rept. 107-152 (H.R. 2590), at 20).

[167]    *Id.*

[168]    U.S. Department of the Treasury, Office of Inspector General, *Annual Plan Fiscal Year 2003, available at* http://www.nfaoa.org/documents/TreasuryIG2003auditofNFRTR.pdf.

[169]    *Id.* at 74.

[170]    National Firearms Act Owners Association [NFAOA], http://www.nfaoa.org/resources.html, click ATF and Department of Treasury Inspector General investigations and audits of the NFRTR, and related documents, text of: Treasury IG starts new audit of NFRTR in 2002, then terminates it before completion (last visited on Nov. 3, 2007).

Exhibit A, Pg. 361

The Department of Justice Inspector General did not address completeness and accuracy of the NFRTR, until 2007, when it published a report of a limited review of the NFRTR. There was no evidence the IG considered the 2005 testimony of BATFE Inspector George Semonick in *U.S. v. Wrenn*, regarding the condition of the NFRTR.[171] Inspector Semonick testified under oath that "there was a discrepancy" between firearms records maintained by defendant Wrenn and those maintained in the NFRTR.[172] He also confirmed "that the records, the records kept by ATF, were deficient."[173]

In 2005, the Congressional Research Service [CRS], in response to a request by Rep. Jim Gibbons, issued a memorandum on the "accuracy, completeness, and reliability," of the NFRTR, which summarized most Congressional hearing records, OIG reports, other documented concerns of the NFRTR's inaccuracy, and juxtaposes the arguments BATFE offers against a future amnesty with rejoinders, which will be addressed in the section Amnesty: the Nexus between the Congressional Intent and the Inaccuracy of the NFRTR.[174] There is no mention of, or evidence that, the Department of Justice Inspector General considered the CRS memorandum on the NFRTR in its 2007 report.

The 2007 review by the Department of Justice Inspector General found, "[T]hat since 2004, the NFA Branch has improved significantly the timeliness of both processing NFA weapons applications and responding to customer inquiries. However, continuing

---

[171]    U.S. v. Wrenn, No. 1:04-045 (D.S.C. Nov. 8 2005); Transcript of Record, U.S. v. Wrenn, No. 1:04-045 (D.S.C. Nov. 8 2005), *available at*  http://www.nfaoa.org/documents/SemonickTestimony.pdf.
[172]    Transcript of Record at 22, U.S. v. Wrenn, No. 1:04-045 (D.S.C. Nov. 8 2005), *available at* http://www.nfaoa.org/documents/SemonickTestimony.pdf.
[173]    *Id.*
[174]    Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Trasfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 1, *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf.

**Exhibit A, Pg. 362**

management and technical deficiencies contribute to *inaccuracies in the NFRTR database*."[175] [emphasis added]. The report declared,

> Several NFA Branch personnel described the NFRTR programming as obsolete, or becoming obsolete, and identified flaws that make it difficult to work with the database and to ensure that decisions based on NFRTR reports and queries are correct. The flaws include: (1) older NFRTR records with empty data fields can improperly exclude the records from search results, (2) the NFRTR can erroneously generate two separate records for one weapon, (3) the system lacks controls to prevent inconsistent data entry, (4) the system lists incorrect owners of NFA weapons on queries and reports, and (5) when multiple weapons are registered on a single form, a change entered in the NFRTR for one weapon incorrectly applies the change to all the weapons listed on that form.[176]

Furthermore, the report states, "[T]he NFA requires owners to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request. *If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database*."[177] [emphasis added]. Thus, the DOJ Inspector General determined that the NFRTR is inaccurate because firearm registrations are missing; hence, it logically follows that some legally registered firearms would not be identified in a diligent search of the NFRTR. This clearly exposes an individual, who lost his/her paperwork, to the hazards of unwarranted federal prosecution, due to the inaccuracy of the NFRTR.

With regards to the Congressional money earmarked to correct the inaccuracies in the NFRTR,

---

[175]     U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at iii (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

[176]     *Id.* at viii.

[177]     *Id.* at 31. The report fails to define what it terms "the error . . . in the NFRTR;" logically, it could only mean that BATFE (1) failed to update the record of an approved transfer of a registered firearm, having lost its copy of the approved transfer; (2) lost all records of the registered firearm, as occurred in the Napolilli case; and/or (3) some other situation whereby BATFE was unable to locate the record of a registered NFA firearm.  Presumably, a FOIA request for Work Papers from this "review" of the NFRTR could clarify this critical issue, but the DOJ has refused the portion of my FOIA seeking such Work Papers. An appeal is pending.

**Exhibit A, Pg. 363**

> ATF received budget allocations in fiscal year (FY) 2001 and FY 2002 for
> FIT [Firearms Integration Technology]; however, ATF reallocated the
> funding to another priority mission, which exhausted the funding by 2004.
> Any continued work on FIT was dependent on congressionally earmarked
> funds (which were exhausted during 2005) and the acquisition of specific
> funds to perform specific tasks.[178]

The report continued on that a special "Information Technology Specialist" position was

established to "determine the best approach to correcting errors in NFRTR records."[179]

Thus, as of 2007, the DOJ-OIG and BATFE acknowledge that the NFRTR is inaccurate.

Nonetheless, the report concluded,

> Despite the concerns of both the citizens who wrote the letters to Congress
> that prompted our review and federal firearms dealers that errors in the
> NFRTR leave them vulnerable to unwarranted sanctions and criminal
> charges, we concluded, based on ATF documents and interviews with
> ATF personnel and NFA weapons industry representatives, that errors in
> NFRTR records have not resulted in inappropriate criminal charges
> against individuals or licensees.[180]

What is left unsaid in the 2007 report is what occurs when the BATFE decides to

prosecute individuals on a charge of Possession of an Unregistered Firearm; to encourage

the "voluntary abandonment" of firearms to ATF; or to seize and forfeit firearms for

which ATF claims it can find no registration record in the NFRTR.  It would be illogical

for the BATFE to prosecute individuals who were able to procure copies of their NFA

registration paperwork. But, what about those who could not because such paperwork

was lost, due to misplacement, flood, fire, or other acts of God?  What happened in those

cases?  The 2007 report does not say, and the Department of Justice Inspector General

apparently declined to try and find out, demonstrating a failure of due diligence.

The methodology of the 2007 report is also troubling because it appears to rely on

statements by the BATFE staff that uses the NFRTR, to characterize the accuracy and

---

[178]    *Id.* at viii.
[179]    *Id.*
[180]    *Id.* at x.

**Exhibit A, Pg. 364**

completeness of the NFRTR, rather than to conduct an audit according to GAGAS. A more conclusive and reliable way to conduct an audit or review of the accuracy and completeness of the NFRTR would be to (1) obtain a random sample of federally licensed NFA firearms dealers, (2) visit each dealer and conduct an independent inventory of NFA firearms in stock, and (3) compare those lists to records of firearms in the NFRTR.  Such a reverse check on the NFRTR would likely yield a better characterization of the accuracy and completeness of the NFRTR than occurred by using the Department of Justice Inspector General's methodology in its review of the NFRTR.

While the report is appropriately characterized as a "review" rather than an audit, no doubt for that reason, it is still striking how inaccurate the NFRTR data are reported to be, and that the NFRTR data were – as will be discussed shortly – "These errors affect the NFRTR's reliability as a regulatory tool when it is used during compliance inspections of federal firearms licensees."[181]  The DOJ-OIG's failure to investigate the effect of these errors when the NFRTR is used to prosecute citizens for Possession of Unregistered Firearm seems like a failure of due diligence.

Clearly, the Inspector General's report is inappropriately based merely on an assumption of trustworthiness of BATFE statements, rather than independent verification of such statements based on scientific sampling procedures and application of GAGAS, and estimating true "critical error" rates. How can one conclude that errors in the NFRTR records have not resulted in inappropriate criminal charges against individuals or licensees, when 1. the absence of a record could clearly not be known, if it is missing from the NFRTR, as the DOJ-OIG determined; 2. the absence of the record of a registered weapon, caused ATF to suspect Noel Napolilli of counterfeiting the

---

[181]      *Id.* at iii.

**Exhibit A, Pg. 365**

registration document he produced, and later to determine the firearm was contraband in

the absence of documents that could have settled its classification definitively;[182] 3. then

BATFE NFA Branch Chief Busey's statement that the accuracy rate, prior to his

directorship, was at 49-50%;[183] 4. the loss of 475 records of one J. Curtis. Earl;[184] and 5)

at least three OIG reports that reliably document "critical errors" in the NFRTR? Clearly,

as Mark Twain said, "The more you explain it, the more I don't understand it."[185] How

the DOJ-OIG comes to this conclusion, in light of the aforementioned instances, is a

mind boggling wonder of the world. Furthermore, as the DOJ-OIG declares, "[T]he

NFRTR database has technical problems, and its software programming is considered by

the NFA Branch to be flawed. The lack of consistency in processing procedures,

combined with database technical issues, results in errors in records, reports, and queries

produced from the NFRTR that affect its reliability."[186]

   The only conclusion, which makes sense, is that the DOJ-OIG sought to protect

the BATFE; yet, the DOJ-OIG could not perjure itself to completely protect the BATFE.

The fact that the DOJ-OIG declares the NFRTR to be inaccurate; yet, refuses to

acknowledge that law-biding citizens may have had criminal charges brought against

him/her, is a continuing failure of logic and of due diligence by federal law enforcement.

---

[182]    U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1999, Part 5, Testimony of Member of Congress and Other Interested Individuals and Organizations*, 105th Cong., 2nd Sess., at 33-34 (Washington, GPO, 1998), *available at* http://www.nfaoa.org/documents/NoelNapolilli.pdf.

[183]    BATFE/NFRTR *Roll Call* Training Video, Oct. 1995, *available at* http://www.nfaoa.org/documents/rollcall_highlights.mp4 or as text http://www.nfaoa.org/documents/BuseyTranscript.pdf.

[184]    Letter from David T. Hardy, Esq., to Ernest S. Istook, Jr., Chairman, Subcommittee on Treasury, Postal Service and General Government, dated April 10, 2001, *available at* http://www.nfaoa.org/documents/BardHard.pdf.

[185]    Mark Twain

[186]    U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at 11 (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

This report also inquired as to training of new individuals, who would input information into the NFRTR.

> One Examiner described the training as 'sloppy' and further stated: 'Someone [a more experienced staff member] would sit with the new Examiners on occasion to go over how to use the NFRTR, but it was not for a long time and was not consistent . . . . Examiners just started working on the computer.[187]

Yet, these are the employees upon whom law-abiding individuals rely upon to do their job with the utmost accuracy. An erroneous entry can result in an innocent citizen being criminally charged; however, as the report would have one believe, this is a fallacy.  I proffer that the DOG-OIG try to explain this alleged fallacy to Mr. Napolilli, who was unjustly deprived of valuable personal property, and all those others who are in jail because they lost their paperwork. Incredibly, the report states:

> Staff members told us that as a result of inadequate and unstructured training at the beginning of their employment, *they were uncertain how to use the NFRTR*, lacked skill in processing the applications or conducting searches, were not familiar with the NFA, and did not have all the information necessary to accomplish their jobs. Staff stated that it was difficult to become familiar with the NFRTR and navigate through the database, *a vital skill needed to process applications and conduct records checks*. One Examiner told us that because of poor training not all staff members are "on the same page" on how they approach the work and applications may be processed incorrectly. [188] [emphasis added].

The report determined that, "Incomplete and inaccurate training leads to errors in the NFRTR and in decisions based on the NFRTR."[189]

The most important implication for the NFRTR is the report's finding: "If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database," because it fulfills the Department of Justice

---

[187]   *Id.* at 21.
[188]   *Id.* at 21-22.
[189]   *Id.* at 22.

**Exhibit A, Pg. 367**

standard, articulated to the Congress in 1979, for requiring a new amnesty period.[190]
Specifically, if the BATFE determines that "a particular individual or weapon is
registered" and BATFE finds that its "files are missing," then "the only solution would be
to declare another amnesty period."[191] Unfortunately, the Department of Justice Inspector
General fails to address this critical point anywhere in its "review" of the NFRTR,
despite its outrageous finding that "files are missing" from the NFRTR. As Firearms law
expert and attorney Stephen P. Halbrook commented: "[I]f the owner or the executor of a
deceased owner cannot find the registration paperwork, which may be lost or destroyed,
and if the record cannot be found in the NFRTR, then a voluntary abandonment of the
firearm may be inducted or even a criminal prosecution initiated. On such issues the
report is not sufficiently informative."[192]

    In an effort to obtain current expert opinion on the accuracy of the NFRTR, I
contacted Dr. Fritz Scheuren, an internationally recognized expert in administrative
records and statistics and asked if he would be willing to update his 2000 Congressional
Testimony and opine whether the NFRTR is sufficiently accurate to be used as evidence
in a criminal proceeding.[193] He graciously responded to my request by sharing his
thoughts and forwarding his updated findings to House of Representatives, Subcommittee

---

[190]      *Id.* at 31.
[191]      U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, Nov. 29, 1979, at 4, *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.
[192]      STEPHEN HALBROOK, FIREARMS LAW DESKBOOK, 545 (Thomson/West 2008).
[193]      U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2002, Part 3, Statements of Members of Congress and Other Interested Individuals and Organizations*, 107th Cong., 1st Sess., at 23-26 (Washington, GPO, 2001), *available at* http://www.nfaoa.org/documents/FritzScheuren.pdf. To see Dr. Scheuren's resume, please find it at http://www.nfaoa.org/documents/Scheuren_Resume_July_2007.pdf. I also contacted other experts who might have informed the issues addressed in this article, including former IRS Commissioner Sheldon S. Cohen and Philip B. Heymann, co-author of the 1979 Department of Justice determination of standards required to establish a new amnesty period, but they declined comment.

on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, House of Representatives.  Dr. Schueren wrote, "I again reviewed the NFRTR situation and found that ATF still has serious material weaknesses in its firearm registration system that it has failed to recognize. *In my considered professional judgment, these errors render the NFRTR questionable as a source of evidence in federal law enforcement.*"[194] [emphasis added].

## VI. The Absence of Paperwork is not a Defense

The issue of NFA paperwork is particularly critical regarding machineguns.  The reason is that under 18 U.S.C. § 922(o), which bans the making of new machineguns, the Government does not have to prove that a machinegun is not registered to convict the defendant of illegally possessing it.[195] The Government has only to allege that the machinegun is illegally possessed; the defendant may only prove lawful possession through an affirmative defense, by producing his or her approved NFA paperwork.[196] Thus, despite having the means, capabilities, and Congressional mandate to ensure the NFRTR is accurate and complete, the Government is not accountable for losing or deliberately destroying paperwork that would exonerate an innocent defendant.[197]

Where does this leave the individual who lawfully registered his/her weapon, but due to natural disaster, such as hurricanes, wildfires, floods, and earthquakes, loses

---

[194]     Letter to Alan B. Mollohan, Chairman, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, by Fritz J. Scheuren, VP Statistics NORC, 1 (Dec. 11 2007);  *available at* http://www.nfaoa.org/documents/Scheuren_Committee_Chair_Letter.pdf.

[195]     18 U.S.C. § 922(o); United States v. Just, 74 F.3d 902, 904 (8th Cir. 1996); United States v. Gravenmeir, 121 F.3d 526, 528 (9th Cir. 1997); United States v. Franklyn, 157 F.3d 90, 93 (2d Cir. 1998).

[196]     *Id.*

[197]     26 U.S.C. § 5841.

Exhibit A, Pg. 369

his/her paperwork through no fault of his/her own? Do we as a society want these

individuals to risk life and limb to save their paperwork for fear that the Government has

lost its copy of the paperwork? What if the individual is denied access to his paperwork

due to a State of Emergency? To force an individual to risk life and limb or face

conviction and imprisonment, for a lawfully registered firearm, goes against our sense of

justness and fairness. But, how often does this occur?

## A. Error Letters

An "Error Letter" is a letter sent by the BATFE to the applicant seeking to

transfer, register, or determine the status of, a NFA firearm. An Error Letter declares,

"We do not show [serial number] as being registered [in the NFRTR]. Please send proof

of ownership."[198] In my conversations with numerous dealers, they acknowledge that

these Error Letters are extremely common and most, if not all, NFA dealers have a pile of

them in their records; however, most dealers are fearful of retribution by the BATFE if

they disclose these records.[199] Nevertheless, NFA dealer Saeid Shafizadeh, owner of Pars

---

[198]       Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, *Error Letter*,
C:F:N:ERRORLTR, *available at*
http://blog.princelaw.com/assets/2007/12/28/Whited_Out_Error_Letter.pdf. This letter has been redacted
(whited out) because it is personal tax information, since the NFRTR was in error, and the weapon had
been legally registered. Most individuals are fearful of sharing this information for fear of retribution.
Nonetheless, there are/have been several different forms of Error Letters, that this author is aware of, and
can be found at: http://www.nfaoa.org/documents/1999statement.pdf at 15;
http://blog.princelaw.com/assets/2007/12/28/WheatonCase.pdf at 3-4. Both of these Error Letters were in
error, meaning that the individual had legally registered the firearm and luckily had proof of the
registration.
[199]       This information was obtained in private conversation between myself and six dealers. These
dealers asked to remain anonymous, due to fear of retribution. They all informed me that since they deal
with the BATFE on a daily business, their livelihoods would be at stake by disclosing the information. It
must also be noted that all Error Letters would need the approval of the past and current registrant, since it
is tax information, which cannot be disclosed without such approval, unless redacted to veil pertinent tax
information.

International, received an Error Letter in 2007, which has been misplaced, but he retained

a copy of his response to the BATFE and made it publicly available.[200] In his response,

he included a copy of the BATFE approved Form 3 and asserted concerns over the

accuracy and completeness of the NFRTR.[201] Most troubling is the fact that the BATFE

approved his Form 3 on April 12, 2007 and by June 4, 2007, the BATFE had no record of

the approved form.[202]

Since an Error Letter is based on a determination by the BATFE that a firearm is

not in the NFRTR, meaning the BATFE takes the position that the firearm is not

registered and thus, the information about the firearm is not protected tax information,

this author submitted a Freedom of Information Act [FOIA] request for all Error

Letters.[203] The BATFE denied the request, "Because all information on such registration

forms is collected under the tax code, release of this information would be in direct

violation of the Tax Reform Act."[204]

The denial of the FOIA is illogical by the plain meaning of an Error Letter, unless

the BATFE is willing to admit that all Error Letters are in error, meaning that all the

Error Letters sent by the BATFE, based on a search of the NFRTR, were sent to

individuals who possessed legally registered firearms, for which they had approved

---

[200]        Letter to Mr. Kenneth E. Houchens, Chief National Firearms Act Branch, *NFA Letter Control Number [redacted, Title II Firearms Serial Number [redacted ]*, by Saeid Shafizadeh, (July 11, 2007), *available at* http://www.nfaoa.org/documents/ParsLetter2007.pdf. Mr. Warren Kreiser, in a private communication, informed me that he also received two Error Letters about one year ago, to which he submitted BATFE approved Forms.

[201]        *Id.*

[202]        *Id.* It must be noted that Mr. Shafizadeh has documented numerous issue with the BATFE and errors in the NFRTR over the years. See Mr. Shafizadeh declaration, *available at* http://www.gunowners.com/ip10.htm.

[203]        Letter to Ms. Alma McCoy, BATFE Disclosure Specialist, *Freedom of Information Act request for Error Letters*, by Joshua Prince, (Nov. 2 2007), *available at* http://blog.princelaw.com/assets/2007/12/28/Response_to_BATFE_CATEGORY_FOIA_Response.pdf.

[204]        Letter to Joshua Prince, *Freedom of Information Act request for Error Letters*, by Alma McCoy, BATFE Disclosure Specialist, (Dec. 14, 2007), *available at* http://blog.princelaw.com/assets/2007/12/28/BATFE_Error_Letter_Response.pdf.

**Exhibit A, Pg. 371**

paperwork. However, in all likelihood, there are a mix of Error Letters which are Correct and Error Letters which are Incorrect.

An Error Letter which is Correct is one which correctly declares that a specific firearm is not registered, because it never was registered. Per the BATFE's refusal of the FOIA, it is impossible for something that does not exist to be covered as tax information. Pursuant to 26 U.S.C. 6103(b), tax information must fall within the definition of "return information."[205] The absence of a record is not included in the definition of "return information."[206] Hence, the BATFE's response, "Because all information on such registration forms is collected under the tax code" is immaterial, since the request was for "Error Letters" stating that no registration exists. Thus, if no registration exists, it is not and cannot be covered by "tax information" or any other exception to FOIA requests and does not violate the Tax Reform Act.

An Error Letter which is Incorrect is one where, although the NFRTR does not show the weapon to be registered, the individual can provide proof that the weapon was correctly registered and the NFRTR is in error.[207] In essence, the Error Letter is in error, which would connote that some of the information on these Error Letters could be covered by the Tax Reform Act. However, the BATFE releases summary statistics of NFRTR transactions, as well as statistics on machineguns and other NFA firearms, in the

---

[205]     26 U.S.C. §§ 6103(b)(1)-(2).
[206]     § 6103(b)(2).
[207]     Department of Justice Office, Inspector General, Evaluation and Inspections Division, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, *Report Number I-2007-006*, Washington, D.C.: Department of Justice, June 2007, at 31, *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.  "Additionally, the NFA requires owners to retain the approved NFA weapons application form as proof of a weapon's registration and make it available to ATF upon request. If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database." *Id.*

publication *Commerce in Firearms*.[208] The BATFE, by its own actions and publications, acknowledges that summary statistics can be disclosed, including currently registered NFA firearms, if aggregated into large categories where individuals cannot be identified. Thus, the BATFE legally can provide summary statistics on all Error Letters which are Incorrect, as well as Correct, where all identifiable or protected information is redacted or not included.

This author filed an appeal to the BATFE's decision, since these Error Letters would depict the current accuracy, or lack thereof, of the NFRTR, especially since a complete GAGAS audit has not been conducted.[209]  If, as many federally licensed NFA dealers contend, the BATFE has issued hundreds, or even thousands, of these Error Letters, it would depict to a jury the likelihood, or absence thereof, that a criminal defendant may have legally registered his/her firearm, but the BATFE lost his/her registration. More importantly, the fact that the number of NFA firearms registered in the NFRTR continues to rise, may depict that the BATFE has sent out numerous Error Letters which were in error, illustrating the inaccuracy of the NFRTR. [210]

B. The BATFE's Improper Denial of Exculpatory Evidence

---

[208]     ALCOHOL, TOBACCO, AND FIREARMS BUREAU, COMMERCE IN FIREARMS IN THE UNITED STATES (2000), *available at* http://permanent.access.gpo.gov/lps4006/020400report.pdf.

[209]     Letter to Office of Information and Privacy, *Appeal of Decision from Freedom of Information Act request for Error Letters*, by Joshua Prince, (Dec. 19, 2007), *available at* http://blog.princelaw.com/assets/2007/12/28/Error_Letter_Appeal.pdf. Appeal still pending.

[210]     Eric Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms*, inserted between pages 5 and 6 (Apr. 2. 1999), *available at* http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf at 18-26. This depicts that in each year, from 1992 to 1996, the total of machinegun owned in the past year, is drastically different, sometimes a variation of over 5,000 machineguns, than the previous years declared total machinegun owned. *Id.* For instance, in 1995 the total amount of machine guns owned was 21,742; yet in 1996 listing, the total number of machineguns for 1995 is 16,437. *Id.* at 18-20. This is a difference of 5,305.

**Exhibit A, Pg. 373**

The BATFE's efforts to cover up errors in the NFRTR, under conditions applicable to the Tax Code, must be viewed in light of BATFE withholding exculpatory information in a criminal trial under the false premise that such information was protected under the Tax Code.  Suppose BATFE wanted to convict a defendant of Possession of an Unregistered Firearm, in a case where the defendant, through no fault of his or her own, lost the NFA paperwork on his or her firearm, and BATFE had such paperwork and decided not to disclose it, knowing that would ensure the defendant's illegal conviction?  The BATFE's conduct in a recent criminal case illustrates that BATFE is capable of doing just that.

In *U.S. v. Olofson*,[211] "Mr. Olofson, a Drill Instructor in the National Guard, was asked by Robert Kiernicki to teach him how to shoot a firearm."[212] Mr. Olofson did so and after Mr. Kiernicki was proficient with firearms, Mr. Olofson lent Mr. Kiernicki a used AR-15 rifle.[213] On one occasion, the rifle malfunctioned resulting in three rounds being fired.[214] The BATFE's Firearm Technology Branch [FTB] tested the weapon and declared, it "is just a rifle."[215]  However, Special Agent in charge Jody Keeku was not pleased with this outcome and had the firearm sent back to the FTB for a new test to be performed with irregular, but commercially available, ammunition.[216] This time, Special

---

[211]      United States v. Olofson, No. 06-CR-320 (E.D. WI. Jan. 1, 2008). While the documents have not yet been made available, many of the documents have been posted by Mr. Olofson at http://www.ak47.net/forums/topic.html?b=1&f=6&t=507483&page=1.

[212]      Post by Len Savage, Firearms Design Expert, available at http://www.subguns.com/boards/mgmsg.cgi?read=638985.

[213]      *Id.*

[214]      *Id.*

[215]      *Id.* This declaration is an expression declaring that the rifle is not a machinegun but a regular semiautomatic rifle.

[216]      *Id.*

Agent Keeku was pleased with the results. The FTB determined that it was a machinegun when used with the special ammunition.[217]

The case now becomes extremely interesting since Mr. Olofson purchased the semiautomatic rifle from Olympic Arms, which, when manufactured, was legally manufactured with M-16 fire control parts.[218] More importantly, at the time of manufacture, BATFE sent a letter to manufactures declaring that the use of such fire control parts did not constitute a machinegun, because those parts, by themselves, should not, without some major malfunction, cause the rifle to fire fully automatic.[219] Moreover, in 1986, BATFE requested that Olympic complete a "safety recall" due to the possibility of AR-15s, previously built with M-16 fire control parts, "malfunctioning," resulting in the rifle going "full auto."[220]

When the defense sought to acquire the abovementioned letters, in a motion to compel discovery, the BATFE Chief Counsel argued that for the Honorable Charles N. Clevert to decide the relevance of or exculpatory nature of the documents, Judge Clevert would have to see the document; however, the BATFE "claims it is privileged from disclosing correspondence with persons or companies on guns because it is a tax issue" under 26 U.S.C. 6103.[221] More disconcerting, BATFE Chief Counsel declared, through

---

[217]     *Id.*

[218]     *Id.* The general difference between the AR-15 and M-16 is the full auto capability of the M-16; however, it must be noted there are some AR-15s, which are full auto. There are numerous part which make a M-16 full auto, none of which, independently, can transform a semiautomatic AR-15 into a machinegun. When Olympic Arms manufactured the rifle in question, it was built with an M-16 trigger, disconnector, and hammer; the combination of which, still would not transform the rifle into a machinegun.

[219]     Private Correspondence with Len Savage, on file with author.

[220]     Post by Len Savage, Firearms Design Expert, available at http://www.subguns.com/boards/mgmsg.cgi?read=638985.

[221]     Mr. Olofson's recount of the events, available at http://www.ak47.net/forums/topic.html?b=1&f=6&t=507483&page=29.

**Exhibit A, Pg. 375**

AUSA Haanstad, "The Court will have take our word, that the documents in question contain tax information, and contain no exculpatory evidence."[222]

While it is clear that the BATFE letters are not tax information, pursuant to 26 U.S.C. 6103, the BATFE is willing to assert whatever is necessary to obtain the ends to which it seeks. Instead of these letters informing the jurors on the BATFE's prior positions and the alleged failure of Olympic to comply with the BATFE's requested safety recall on Mr. Olofson's rifle, Mr. Olofson was found guilty of transfer of a machinegun.[223] Is this the justice that we seek? Do we honestly want to send Mr. Olofson, a former National Guard, to jail because his weapon malfunctioned, through no fault of his own?

This issue of a firearm malfunctioning, resulting in fully automatic fire, was brought up in *U.S. v. v. Aguilar-Espinosa*.[224] The court declared, "[T]he law is not intended to trap the unwary, innocent, and well intentioned citizen that possess an otherwise semi-automatic weapon that, by repeated use of the weapon, by the inevitable wear and tear of sporting activities, or by means of mere inattention, happenstance, or illfortune, fires more than semi-automatically."[225] If we decide to prosecute individuals whose firearms malfunction, the results could be devastating.[226] As firearms law expert Stephen Halbrook states, "*Staples* illustrates that the malfunction defense is alive and

---

[222]    Post by Len Savage, Firearms Design Expert, available at http://www.subguns.com/boards/mgmsg.cgi?read=638985.

[223]    Mr. Olofson's recount of the events, available at http://www.ak47.net/forums/topic.html?b=1&f=6&t=507483&page=29. *See also*, http://www.wnd.com/news/article.asp?ARTICLE_ID=59650.

[224]    United States v. Aguilar-Espinosa, 57 F. Supp. 2d 1359 (D. Fla. 1999).

[225]    *Id.* at 1362-63; cited to in STEPHEN HALBROOK, FIREARMS LAW DESKBOOK, 453-454 (Thomson/West 2008).

[226]    If such occurs, the law-abiding citizen whose firearm malfunctions will not seek corrective measures, for fear of prosecution. Where will all these "malfunctioning" firearms go? Will they be buried? Will they be thrown into the trash? Will they end up on the Black Market? Surely, none of these are a desired result but we must be cognizant of results of our actions.

**Exhibit A, Pg. 376**

well as a jury issue;"[227] however, the malfunction defense will be moot if the BATFE is allowed to dictate to the court what constitutes tax information, which, in the BATFE's opinion, includes legal interpretations of the law. The result of denying exculpatory evidence will be even more devastating for a system of justice that prides itself on ensuring that the innocent are not found guilty.

## C. Accuracy and Completeness of the NFRTR

How accurate is the NFRTR?  Nobody outside of the BATFE knows, but a summary table of NFRTR errors compiled from public documents is not encouraging.[228] In 1994, documents released by BATFE in response to a FOIA stated an examination of 25,611 NFRTR records disclosed 1,567 "Errors" (6%) and 373 "Significant Errors" (1%) while another 36,903 records had 2,155 "Errors" (6%); however, the BATFE changed the definition of most "Significant Errors" to "Errors," in an obvious effort to manipulate the statistics.[229]  In 1998, the Treasury Department Inspector General used various definitions of "critical" error, which produced different estimates, only some of which are known.[230] The "critical" error rate for a sample of about 140 Forms 4467 was calculated to be 4.3% by one definition (in the published report) and 18.4% by another definition (in

---

[227]   STEPHEN HALBROOK, FIREARMS LAW DESKBOOK, 440 (Thomson/West 2008) (citing to United States v. Staples, 971 F.2d 608 (10th Cir. 1992)).

[228]   Summary of Errors in the National Firearms Registration and Transfer Record Disclosed in Audits or Reviews by ATF or the Treasury Department Inspector General, 1994 to 1998, *available at* http://www.nfaoa.org/documents/SummaryNFRTRerror1.pdf.

[229]   Eric Larson, *Work Papers on Errors in the National Firearms Registration and Transfer Record, and Other Issues Regarding the Bureau of Alcohol, Tobacco, and Firearms*, at 38 (Apr. 2. 1999), *available at* http://www.nfaoa.org/documents/ATF_Significant_Error.pdf. That is just a portion of the entire Work Papers, which can be found here: http://www.nfaoa.org/documents/Critiqueof1998IGreports.pdf.

[230]   See Section V Congressional Hearings/OIG Audits, subsection d. 1998.

unpublished audit Work Papers).[231]  The "critical" error rates for "Letter" and "Other"

categories were 8.4% and 7.9%, respectively, in the published 1998 audit report, and

were redacted completely in the unpublished audit Work Papers.  It is difficult to

conclude that the NFRTR is accurate and complete from these data, but even this limited

audit work proves that the type(s) and extent of "critical" errors in the NFRTR remain

unknown.[232]  Given the repeated and consistent failures of the Treasury Department

Inspector General and the Department of Justice Inspector General to perform due

diligence, the only way to determine the accuracy and completeness of the NFRTR may

be to contract with an outside entity to conduct a GAGAS audit, conforming with the

Congressional intent of what constitutes a "critical" error.

     Since all prosecutions for Possession on an Unregistered Firearm are based on a

search of the NFRTR, its accuracy and completeness are crucial in any proceeding.

Accuracy relates to a determination of how accurate the data in a database must be;[233]

whereas, completeness ensures that "[n]o records are missing and that no records have

missing data elements."[234] Moreover, in many databases, including the NFRTR,

"[m]issing entire records can have disastrous consequences."[235] Since most of the data

errors in the NFRTR are due to data entry failures and deletions, the BATFE needs to

institute a database entry system that edits the entry "to ensure that all data entering the

database/list are of high quality."[236] More importantly, "The role of editing needs to be

---

[231]    *Id.*

[232]    *See,* Summary of Errors in the National Firearms Registration and Transfer Record Disclosed in Results of Audits or Reviews by ATF or the Treasury Department Inspector General, 1994 to 1998, available at http://www.nfaoa.org/documents/SummaryNFRTRerror1.pdf

[233]    THOMAS N. HERZOG, FRITZ J. SCHEUREN & WILLIAM E. WINKLER, DATA QUALITY AND RECORD LINKAGE TECHNIQUES 8 (Springer Science+Business Media 2007).

[234]    *Id.* at 10.

[235]    *Id.*

[236]    *Id.* at 11.

re-examined, and more emphasis placed on using editing to learn about the data

collection process, in order to concentrate on preventing errors rather than fixing

them."[237]

A way to ensure data accuracy is through "record linkage techniques" such as

linking two or more databases. One method for ensuring accuracy is to require that all

applications be entered by at least two different BATFE examiners, into at least two

separate and distinct databases, and if the entries do not match, require the data to be re-

entered until the databases match exactly, a standard practice currently in use by survey

organizations and other entities.[238] Currently, the NFRTR is a single database where

individual examiners input the information into the database. However, this is only part

of the problem with the current NFRTR.

Since a search of the NFRTR database is deterministic, meaning a record can only

be found if it matches exactly to that which is searched, any misspellings, omissions, or

unusual characters, will result in no match.[239] If, however, the database allowed for

probabilistic searches, meaning the search will yield results identical to and similar to the

search, in order from most similar to least similar, there would be a much higher

probability of finding an erroneous entry.[240] Thus, it is crucial that the NFRTR database

software be modified for probabilistic searches to ensure that lawfully registered firearms

can be found, where BATFE examiners omit, or misspell data entries; otherwise, an

innocent defendant may be convicted, if he/she lost his/her paperwork, and the

deterministic search yields no results, due to errors in the original entry.

---

[237]   *Id.*
[238]   *Id.* at 11-12.
[239]   *Id.* at 82-83.
[240]   *Id.* at 83-92.

**Exhibit A, Pg. 379**

### D. Firearm Law Experts on the Absence of Paperwork and Status of the NFRTR

Attorney Stephen Halbrook, author of *Firearms Law Deskbook*, and firearms law expert, declared, "[C]ontroversy over the accuracy of the NFRTR continues unabated. The BATF has not acknowledged the OIG's findings of error and various discrepancies in the NFRTR, taken appropriate corrective actions, or fully answered questions about the NFRTR posed by the Subcommittee on Treasury, Postal Service, and general Government." [241] He continues,

> These errors or discrepancies include the OIG's findings that an unknown number of NFA documents were destroyed by BATF contract employees; that ATF may not have followed correct legal procedures in registering thousands of NFA firearms after the amnesty period …. ; that more than 100,000 NFA firearms are currently registered to persons who may be deceased. [242]

In August 2001, during a compliance inspection of a NFA dealer, "The BATF Examiner determined that 60% of the NFA firearms listed in the BATF's NFRTR computer printout were no longer in the dealer inventory. In fact, the dealer had transferred all of these firearms to various transferees pursuant to authorization by BATF." [243]

Most disconcerting is his determination, "[I]f the owner or the executor of a deceased owner cannot find the registration paperwork, which may be lost or destroyed, and if the record cannot be found in the NFRTR, then a voluntary abandonment of the firearm may be induced or even a criminal prosecution initiated." [244] He further asserts, "It is unclear whether the BATF is capable of correcting the errors identified by the

---

[241]    STEPHEN HALBROOK, FIREARMS LAW DESKBOOK, 535 (Thomson/West 2008).
[242]    *Id.* at 535-36.
[243]    *Id.* at 538.
[244]    *Id.* at 545.

**Exhibit A, Pg. 380**

OIG."[245] In 2004, a former "OIG staff member …. stated 'We found there were still serious problems with the NFRTR data that, to the best of my knowledge, are still uncorrected.'"[246] Mr. Halbrook asserts, "[A]n amnesty period should be declared to allow the registration of firearms with an uncertain registration status."[247] He further advises, "In any prosecution for NFA offenses in which lack of registration is an element of the offense, counsel should carefully consider whether this element can be proven beyond a reasonable doubt in the light of the above considerations."[248]

Lastly, in a 2001 letter to the House Subcommittee on Treasury, Postal Service, and General Government, he declared, "Unless and until the BATF can conform its records to acceptable standards of accuracy, the Subcommittee should consider legislation to prohibit the use of the NFRTR database in civil and criminal proceedings."[249]

> Attorney Richard Gardiner, another expert in firearms law, declared,
> In my opinion, any system of records that is as unreliable as the NFRTR cannot be used to prove, beyond a reasonable doubt, that a particular firearm is not registered.  Once a record is lost, no matter how good the record-keeping after that, the missing record makes the system unreliable from then on.[250]
> James O. Bardwell, a firearms law attorney who for nearly half a dozen years,

ending in 2001, devoted considerable effort to compiling a legal web site devoted to NFA issues, including sections on the NFRTR, told the House Subcommittee on Treasury, Postal Service, and General Government, Committee on Appropriations that, "Several of

---

245     *Id.* at 539. For a full understanding of all the problems, which Attorney Halbrook states, see the entire § 7:3 of his book.
246     *Id.* at 543 (citing a telephone interview by Eric Larson).
247     *Id.* at 539.
248     *Id.* at 545-46.
249     Letter to Ernest J. Istook, Chairman, Subcommittee on Treasury, Postal Service and General Government, (Feb. 14, 2001), *available at* http://www.nfaoa.org/documents/2001statement.pdf at 10.
250     Personal Communication on Dec. 24, 2007, in possession of author.

these errors [in the NFRTR] are potentially very serious, and could cause unwarranted legal difficulties for innocent persons."[251] He continued,

> If a registration record cannot be found because the ATF misspelled the owner's name, then the owner of a lawfully registered firearm …. will become the target of a criminal investigation. And if the owner has the misfortune to have lost his registration paperwork, his troubles will be greatly compounded.[252]

He advises, "An amnesty period which would allow the voluntary re-registration of these firearms by their current owners could solve the problems. While ATF has authority under existing laws to declare an amnesty, they are reluctant to do so without Congressional direction."[253]

Long-time firearms attorney, and NFA expert, David Hardy, wrote to the Subcommittee on Treasury, Postal Service and General Government, stating, "I am writing you now because of my concern that errors in the NFRTR may result in ATF prosecuting innocent persons and convicting them for the illegal possession of unregistered NFA firearms, even though the firearms were in fact [lawfully] registered."[254] Mr. Hardy continues, "I find it personally stunning that no formal investigation has been initiated in [sic] into the accuracy and completeness of the entire NFRTR, in light of the ATF's admission" of losing Mr. Napolilli's paperwork.[255] He questions, "How does the ATF know it has never lost documents before? How does ATF know that it has not caused unlawful prosecution of innocent persons who did lawfully

---

[251]    Letter to Ernest J. Istook, Chairman, Subcommittee on Treasury, Postal Service and General Government, (Apr. 13, 2001), *available at* http://www.nfaoa.org/documents/BardHard.pdf at 2.

[252]    *Id.* at 3. Attorney Bardwell added: "I do not understand how ATF employees can regularly offer sworn statements in court that a given person does not have a firearm registered to him when their records are so poorly kept, and so poorly indexed." *Id.*

[253]    *Id.* at 4.

[254]    Letter to Ernest J. Istook, Chairman, Subcommittee on Treasury, Postal Service and General Government, (Apr. 10, 2001), *available at* http://www.nfaoa.org/documents/BardHard.pdf at 6.

[255]    *Id.* at 8.

**Exhibit A, Pg. 382**

register his firearm, and lost the registration through no fault of his own?"[256] He

concludes by asking the Subcommittee to initiate an investigation into the accuracy and

completeness of the NFRTR, "because ATF has strong institutional, and undoubtedly

political, interests in not being truthful," regarding the current accuracy, or lack thereof,

of the NFRTR.[257]

Even more interesting, the State of New Hampshire, through its House of

Representatives, sent a petition letter to the Subcommittee, stating, "ATF's failure to

correct these errors [in the NFRTR] is an insult to all law-abiding gun owners, because it

undermines the very legal protections ATF is supposed to uphold."[258] It continues,

> What would be fair, is to establish a new amnesty period to provide the
> current lawful owners of NFA firearms an opportunity to re-register those
> firearms. An amnesty seems to be the easiest way to correct many of the
> NFRTR errors. An amnesty period would give reasonable protection to
> law abiding citizens whose NFA paperwork ATF may have lost or
> destroyed.[259]

Dr. Fritz Scheuren, Vice President, Statistics, National Opinion Research Center,

a former elected President of the American Statistical Association, declared that the

NFRTR is "questionable as a source of evidence in federal law enforcement."[260]

Furthermore, Dr. Scheuren asserted that "(1) ATF has serious material weaknesses in its

---

[256]      *Id.*

[257]      *Id.* at 10.

[258]      Letter to Ernest J. Istook, Chairman, Subcommittee on Treasury, Postal Service and General Government, (Apr. 2, 2001), *available at* http://www.nfaoa.org/documents/BardHard.pdf at 12.

[259]      *Id.* at 13. The letter concludes by stating, "We would hope that your Subcommittee will consider strongly encouraging ATF to correct the serious errors in the NFRTR, and provide a written plan, with priorities and timetables, stating exactly how these errors will be corrected. Included in this plan should be an amnesty to allow law-abiding owners of NFA firearms the opportunity to re-register them so as to remove any 'contraband' status that has resulted from ATF employees not following the law or procedures in the conduct of their official duties. If ATF effuses to correct these errors in the NFRTR in a fair and open way, We hope your Subcommittee will consider withholding ATF's operating funds to prevent ATF from prosecuting innocent people, or illegally seizing their valuable firearms." *Id.*

[260]      Letter to Alan B. Mollohan, Chairman, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, by Fritz J. Scheuren, Vice President, Statistics, National Opinion Research Center, at 1 (Dec. 11, 2007); *available at* http://www.nfaoa.org/documents/Scheuren_Committee_Chair_Letter.pdf.

**Exhibit A, Pg. 383**

firearm registration system which it has yet to acknowledge and (2) the ATF steps taken to improve its recordkeeping continue to lack thoroughness" and "[m]y reading of the OIG reports suggests that very serious problems were uncovered in ATF's recordkeeping systems. In fact, in my long experience, I cannot think of any instance where poorer results were obtained."[261]

In testifying at a motion in limine hearing on September 24, 2007, in *U.S. v. Giambro*, Eric M. Larson, Senior Analyst of the U.S. Government Accountability Office, in his capacity as a private citizen and based on his independent research, declared that the NFRTR was not sufficiently accurate to sustain a criminal or civil prosecution and "that there is reasonable doubt to its accuracy."[262]  Mr. Larson stated that his opinion was based on,

> (1) the errors disclosed in the NFRTR as a result of my analyses of NFRTR data released by ATF, which were confirmed by the Treasury Department Inspector General; (2) the likelihood of similar errors throughout the database based on my independent research; (3) the standard articulated by the Criminal Division of the Department of Justice that if a registered person or firearm is encountered, and ATF's 'files are missing' then 'the only solution' is to establish a new amnesty period; and (4) the fact that the Department of Justice Inspector general determined that ATF is adding firearm registration to the NFRTR, and fixes the database and assumes the NFRTR is in error, as stated on page 31 of the June 2007 report.[263]

Mr. Larson also cited a letter dated July 11, 2007, in which Saeid Shafizadeh, a federally licensed firearms dealer, complained to then-NFA Branch Chief Kenneth Houchens

---

[261]       *Id.* at 1-2. It should also be noted that Dr. Scheuren declared that in the second edition of his book, the NFRTR would be included, when he stated, "Even though the first edition of the book has just come out we are already contemplating a second edition and plan to include the ATF issues discussed above in a new chapter. Will the story we tell have a happy ending or continue to be stalemated? We are hoping that changes will be made, so we can report a success and not a failure." *Id.* at 3.

[262]       Letter from Eric M. Larson, Response to Questions asked by Joshua Prince, to Joshua Prince, at 3-4, dated Jan. 1, 2008, *available at* http://blog.princelaw.com/assets/2008/1/5/Eric_Larson_letter_to_Joshua_Prince.pdf. Mr. Larson stated that his comments reflect his personal opinions, and do not represent the policy or position of the U.S. Government Accountability Office (GAO).

[263]       *Id.*

about BATFE's contention that it had no record of a firearm that BATFE had approved

for transfer to his company, Pars International Corporation, on April 12, 2007.[264] Mr.

Shafizadeh noted that he had submitted an application to BATFE on June 4, 2007, to

transfer the firearm; that BATFE responded by stating "the firearm is not shown

registered" to Pars International Corporation, less than two months after ATF registered

the firearm to Pars; provided Mr. Houchens with a copy of the approved April 12, 2007,

BATFE registration document; and expressed concern over the inaccuracy of the

NFRTR.[265] He articulated his frustration to Mr. Larson by stating, "Over the past 25

years I have written many letters of that nature to no avail."[266]

More importantly, Mr. Shafizadeh's error letter and copy of the approved

registration further confirms that the BATFE continues to reject Dr. Scheuren's

recommendation of mandatory annual audits, as it did in 2001, when it stated,

> We do not believe an independent audit of the database is needed.  The
> ongoing efforts we are making to ensure the completeness and accuracy of
> the NFRTR by imaging and indexing the documents, performing database
> verification, and linking the retrieval system with the imaging system will
> result in strong internal controls for the NFRTR.[267]

If the BATFE's "ongoing efforts" to improve the NFRTR were successful, the BATFE

should not lose an approved transfer application in as little as two months, let alone, ever.

There should be sufficient redundancy in the NFRTR system to preclude losing any

approved transfer application.

---

[264]      *Id.* at 4.

[265]      *Id.*

[266]      *Id.* Mr. Shafizadeh has memorialized his concerns over the accuracy and completeness of the
NFRTR in his affidavit, available at http://www.gunowners.com/ip10.htm.

[267]      U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal
Service, and General Government Appropriations, *Treasury Postal Service, and General Government
Appropriations for Fiscal Year 2002, Part 1*, 107th Cong., 1st  Sess., at 478 (Washington, GPO, 2002),
*available at* http://www.nfaoa.org/documents/NFRTRdocpack.pdf.

**Exhibit A, Pg. 385**

With regards to the Treasury Department Inspector General's failure to complete a GAGAS audit, Mr. Larson asserted, "[T]he failure of the Treasury IG to draw the larger samples that would be necessary to establish more precision in its estimates of 'critical errors" seems to me to be a failure of due diligence, as well as GAGAS standards regarding 'abuse' at the time."[268] He continued, "It was particularly troubling that the Treasury IG specifically declined to determine whether ATF's search procedures were adequate to ensure the validity of the certificates that ATF uses in Federal District Court as evidence that particular firearms are not registered in the NFRTR, given these errors."[269]

Furthermore,

Unless and until a GAGAS audit is done, the type and extent of errors in the NFRTR will continue to be unknown. Taking just one NFRTR category—Form 4467—at face value for the published audit results, which include a 4.3% "critical error" rate within the 57,238 Forms 4467 in the NFRTR at that time, that equals 2,461 "critical errors."[270]

It must be noted that this is only the "critical error" rate for Form 4467 and does not include Form 1, Form 2, Form 3, Form 4, and Form 5 categories, each of which, may show the same, if not a higher, error rate, since at the time of the 1998 audit, these other categories represented 85% of the NFRTR transactions.[271] If the error rate is the same, it would equate to over 16,242 "critical errors" in these other categories, for a total of at

---

[268]     *Id.* at 1. "Abuse is distinct from illegal acts and other noncompliance. When abuse occurs, no law, regulation, contract provision, or grant agreement is violated. Rather, the conduct of a government program falls short of societal expectations for prudent behavior. Auditors should be alert to situations or transactions that could be indicative of abuse. When information comes to the auditors attention (through audit procedures, tips, or other means) indicating that abuse may have occurred, auditors should consider whether the possible abuse could significantly affect the audit results. If it could, the auditors should extend the audit steps and procedures, as necessary, to determine if the abuse occurred and, if so, to determine its effect on the audit results." *Id.* at 2 (citing to COMPTROLLER GENERAL OF THE UNITED STATES, GOVERNMENT AUDITING STANDARDS, (Washington, D.C., U.S. GPO, 1994).

[269]     *Id.* at 1-2.

[270]     *Id.* at 2.

[271]     *Id.* Mr. Larson acknowledges that the Form 4 data that he has analyzed shows patterns of error similar to those of the Form 4467 data.

least 18,703 "critical errors." One must also keep in mind that the BATFE altered the definition of what constitutes a "critical error," in direct contradiction to the Congressional intent; thus, the actual "critical error" rate is likely to be much higher than has been publicly and officially reported.[272]

## VII. The Intersection of Procedural Due Process and the NFRTR

"No person shall be …. deprived of life, liberty, or property, without due process of law."[273] Due process of law has a dual aspect, substantive and procedural.[274]

> A procedural due process limitation, unlike its substantive counterpart, does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest. It simply requires that the government provide "due process" before making such a decision. The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process. The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard "in a meaningful manner."[275]

The cornerstone of due process is the prevention of abusive governmental power.[276] As the Supreme Court declared, "[O]ur Constitution imposes …. standards necessary to ensure that judicial proceedings are fundamentally fair. A wise public policy, however,

---

[272]    To see how the definition of "critical error" was changed by the BATFE, see Section V. Congressional Hearings/OIG Reports, subsection d. 1998. Specifically, 26 C.F.R. 179.201 (1969) declares: "The return, Form 4467, shall show the name, address, place of business or employment, employer identification number or social security number, and date of birth of the registrant, the date the firearm was acquired, the place where the firearm usually is kept, the name, and address of the manufacturer, the type, model, length of barrel, overall length (when applicable), caliber or gauge, serial number, and other identifying marks of the firearms, and if an unserviceable firearm, the manner in which it was rendered unserviceable. Upon registering the firearm, the Director shall retain the original Form 4467 as part of the National Firearms Registration and Transfer Record." 26 C.F.R. 179.201 (1969), *available at* http://blog.princelaw.com/assets/2008/1/9/1969-CFR-ATF-amnesty-regs.pdf.
[273]    U.S. CONST. amend. V.
[274]    Howard v. Grinage, 82 F.3d 1343, 1349 (6th Cir. 1996).
[275]    *Id.* (citing to Loudermill v. Cleveland Bd. of Educ., 721 F.2d 550, 563 (6th Cir. 1983)).
[276]    Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989) (citing to Daniels v. Williams, 474 U.S. 327, 330-31 (1986).

**Exhibit A, Pg. 387**

may require that higher standards be adopted than those minimally tolerable under the Constitution."[277]

With regards to the admission of the NFRTR as evidence or a court's refusal to admit evidence of the NFRTR's inaccuracy, the proper focus is on the interplay between due process of the law and criminal procedure. This is illustrated by the holding in *Adamson v. Mazzuca*, "For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial."[278] The court continued,

> The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'"[279]

The Supreme Court similarly held that, "[t]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[280]

In any trial, where the Government seeks to admit a Certificate of Nonexistence of a Record (CNR),[281] based on a search of the NFRTR, as evidence, a court must either deny such admission or allow the defendant to present all evidence of the inaccuracy of the NFRTR, or the likely outcome is that the defendant's due process rights will be violated. Since all cases for illegal possession of NFA firearm are based solely on whether the firearm was registered or not, the accuracy or lack thereof is crucial, critical, and highly significant in the determination of guilt. Since the Government must prove

---

[277]    Lassiter v. Dep't of Social Services, 452 U.S. 18, 33 (U.S. 1981).
[278]    Adamson v. Mazzuca, No. 01-CV-0143, 2003 U.S. Dist. LEXIS 13634, at *17 (D.N.Y. July 23, 2003) (citing to United States v. Agurs, 427 U.S. 97, 108, (1976)).
[279]    *Id.* (citing Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)).
[280]    *In re* Winship, 397 U.S. 358, 364 (1970).
[281]    Fed. R. Evid. 803(10)

**Exhibit A, Pg. 388**

beyond a reasonable doubt that the firearm in question was possessed illegally, it is nearly impossible for any individual to be found guilty, given the DOJ-OIG's report stating, "If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database"[282] and Dr. Scheuren's comments, "[A]TF still has serious material weaknesses in its firearm registration system that it has failed to recognize" and "In my considered professional judgment, these errors render the NFRTR questionable as a source of evidence in federal law enforcement."[283]

 With the consistent Congressional testimony, hearings, and Inspector General reports by the Treasury Department and Department of Justice, if a court denies the admission valid and reliable evidence showing or substantiating the inaccuracies of the NFRTR, the defendant's fundamental right to a fair trial is violated. Our system of Justice, based on justness and fairness, is one where we concern ourselves with ensuring that innocent defendants, as well as those who may or may not be innocent, are protected, and only those who can be found guilty beyond a reasonable doubt are deprived of their liberty.[284] Since the Government holds the power to correct the NFRTR, we cannot hold the absence of a record in the NFRTR against a defendant, who may have lawfully registered the firearm but no longer has proof of registration, which may have been lost because of a fire, tornado, flood, accident of some type, or just plain human error. If the Government, with extensive means and capabilities, cannot ensure that records will not be lost, how can we, as society founded

---

[282] U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at 31 (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

[283] Letter to Alan B. Mollohan, Chairman, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, by Fritz J. Scheuren, VP Statistics NORC, 1 (Dec. 11 2007); *available at* http://www.nfaoa.org/documents/Scheuren_Committee_Chair_Letter.pdf.

[284] "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978).

on justness and fairness, deprive a possibly innocent defendant of his/her liberty, due to a lost

Government record?[285]


VIII. The Intersection of the Federal Rules of Evidence and the NFRTR[286]


The interaction of the inaccuracies of the NFRTR and the Federal Rules of

Evidence is where Due Process issues arise.  By asserting that the NFRTR is inaccurate,

the defendant is declaring that any evidence of the nonexistence of his/her registration is

inadmissible.  Federal Rule of Evidence, Rule 803(10), provides that there exists an

exception to the hearsay rule in situations of accurate records:

> To prove the absence of a record, report, statement, or data compilation, in
> any form, or the nonoccurrence or nonexistence of a matter of which a
> record, report, statement, or data compilation, in any form, was regularly
> made and preserved by a public office or agency, evidence in the form of a
> certification in accordance with rule 902, or testimony, that diligent search
> failed to disclose the record, report, statement, or data compilation, or
> entry.[287]

---

[285]     Is a scenario imaginable under which a citizen would be denied Social Security payments because the Government lost its copies of the citizen's earnings history?  Such records, of course, exist in duplicate at the Internal Revenue Service.  Could not a similar duplicate set of NFRTR data be established to ensure that innocent citizens will not be victimized by NFA Branch Clerks who throw away NFA documents because they don't feel like working on them?

[286]     Over the years, there have been several cases where, as this author will show, appellate courts have erroneously upheld the admission of Certificate of Nonexistence of a Record because these courts were unaware or misled to believe the NFRTR to be accurate.  *See*, United States v. Rith, 164 F.3d 1323 (10th Cir. 1999); United States v. Harrison, No. 95-1678, 1996 U.S. App. LEXIS 13225 (2d Cir. 1996); United States v. Shaffer, 1993 U.S. App. LEXIS 1461 (9th Cir. 1993); United States v. Rigsby, 943 F.2d 631 (6th Cir. 1991); United States v. Sullivan, 919 F.2d 1403 (10th Cir. 1990); United States v. Metzger, 778 F.2d 1195, 1202 (6th Cir. 1985); United States v. Combs, 762 F.2d 1343, 1348 (9th Cir. 1985); United States v. Toner, 728 F.2d 115, 120 (2d Cir. 1984); United States v. Beason, 690 F.2d 439, 445 (5th Cir. 1982); United States v. Moschetta, 673 F.2d 96 (5th Cir. 1982). As firearms law expert Stephen Halbrook states, the use of Certificates of Non-Existence of a Record, in light of the inaccuracy of the NFRTR, "[m]ay well give rise to a meritorious petition for a writ of habeas corpus or, after discharge from probation, a writ of error corum nobis. In fact, large numbers of persons convicted of unregistered firearms may well be entitled to collateral relief." STEPHEN HALBROOK, FIREARMS LAW DESKBOOK, 488 (Thomson/West 2007).

[287]     Fed. R. Evid. 803(10)

While the BATFE is likely to offer two Certificates of Nonexistence of a Record (CNR) to show, under 803(10), that the neither the defendant's name nor the firearm's serial number exist in the NFRTR, such certificates are based on a search of the NFRTR but fail to acknowledge the numerous Treasury Department and Justice Department Inspector General reports and Congressional Hearings, which depict the NFRTR as inaccurate.[288]

The hearsay exception contains the principle that, "Evidence that is otherwise admissible under an exception to the hearsay rule is admissible primarily because evidence of that kind is generally trustworthy, but if, in a particular instance, the circumstances indicate a lack of trustworthiness, the evidence should be excluded."[289] Nonetheless, Chief United States District Judge George Z. Singal, U.S. District Court for the District of Maine, held that defendant Giambro failed to meet this standard because he could not show that the NFRTR was inaccurate as it pertained to him.[290] This holding lacks any form of commonsense, since one cannot show an absence of a record, but for the record not existing. While Judge Singal based his decision on *U.S. v. Rith*, which declared that in relation to a Sixth Amendment challenge, the defendant failed to allege any "defect in the NFRTR as it pertain[ed] to him. General claims of unreliability, particularly those that rely upon outdated information, are not sufficient to raise a constitutional deficiency," he failed to accept the evidence of the inaccuracies in the NFRTR, since the late 1970's and up until the present time, which depict a consistent trend of audits, Congressional Hearings, and Congressional Actions to rectify the

---

[288]     United States v. Giambro, No. 07-41-P-S, 2007 U.S. Dist. LEXIS 61072, at *2 (D. Me. 2007)
[289]     United States v. Robinson, 544 F.2d 110, 115 (2d Cir. 1976)
[290]     United States v. Giambro, No. 07-41-P-S, 2007 U.S. Dist. LEXIS 61072, at *3 (D. Me. 2007)

**Exhibit A, Pg. 391**

NFRTR.[291] Furthermore, Judge Singal's reliance on *U.S. v. Rith* may have been in error

given the Supreme Court's decision in *Crawford v. Washington*, which is discussed in the

section The Intersection of Confrontation Clause and the NFRTR.[292]

Nevertheless, with regards to Judge Singal's decision, a defendant lacks any and

all power to request an audit, since the information is a provision of the tax code and thus

confidential. Hence, the defendant must rely solely on audits by the Treasury Department

Inspector General, a review by the Department of Justice Inspector General, both of

which are seemingly flawed, information divulged in Congressional Hearings and public

documents which become available and accessible.[293] More importantly, any certificates

offered by the BATFE should be viewed with extreme skepticism given the Busey tape,

where BATFE agents were ordered to perjure themselves when speaking about the

accuracy of the NFRTR.[294] Clearly, this tape, as well as the audits and Congressional

Hearings, render the BATFE certifications and sworn testimony untrustworthy and unless

and until the NFRTR is subjected to a complete, independent, GAGAS audit and the

results made public, all evidence related to the NFRTR should be deemed inadmissible.

As the Supreme Court declared, when speaking about the trustworthiness aspect

of Rule 803(10), "[I]t provides [an] ample provision for escape if sufficient negative

factors are present."[295] The Court continued,

> That "provision for escape" is contained in the final clause of the Rule:
> evaluative reports are admissible "unless the sources of information or

---

[291]    United States v. Giambro, No. 07-41-P-S, 2007 U.S. Dist. LEXIS 61072, at *3 (D. Me. 2007)
(citing United States v. Rith, 164 F.3d 1323, 1337 (10th Cir. 1999)).

[292]    Crawford v. Washington, 541 U.S. 36 (2004).

[293]    See, in particular, the "Resources" page of the National Firearms Act Owners Association, at
http://www.nfaoa.org/resources.html (visited July 26, 2008).

[294]    BATFE/NFRTR *Roll Call* Training Video, Oct. 1995, *available at*
http://www.nfaoa.org/documents/rollcall_highlights.mp4 or as text
http://www.nfaoa.org/documents/BuseyTranscript.pdf.

[295]    Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 (1988).

> other circumstances indicate lack of trustworthiness." This trustworthiness
> inquiry -- and not an arbitrary distinction between "fact" and "opinion" --
> was the Committee's primary safeguard against the admission of
> unreliable evidence, and it is important to note that it applies to all
> elements of the report. Thus, a trial judge has the discretion, and indeed
> the obligation, to exclude an entire report or portions thereof -- whether
> narrow "factual" statements or broader "conclusions" -- that she
> determines to be untrust-worthy.[296]

Furthermore, the Court stated, "[T]he admission of a report containing 'conclusions' is

subject to the ultimate safeguard -- the opponent's right to present evidence tending to

contradict or diminish the weight of those conclusions."[297]

In *United States v. Yakobov*, 803(10)'s application to the NFRTR was a central

issue because the ATF provided certificates that Mr. Yakobov's name did not exist in the

registry, but they failed to show a diligent search of the registry for possible

misspellings.[298] The learned Second Circuit declared, "An essential requirement of Rule

803(10) is that evidence of the absence of a record be the result of a "diligent search."[299]

The court continued, "Diligence is the standard set by Rule 803(10), . . . and it is a good

one. It insures that evidence of this kind will be reliable, and reliability is the foundation

upon which all exceptions to the hearsay rule are built."[300] The court concluded that

> "[N]otwithstanding the ATF Certificate's recitation of a diligent search,
> the face of the document itself suggests that the search conducted to
> determine whether Yakobov had applied for or obtained a license to deal
> in firearms was not diligent. The ATF Certificate states that Hall searched
> for a license or application for "Jakubov, Simantov." There is no
> indication that any search was made under the name "Yakobov" or
> "Yakubov." The use instead of misspelled versions of both Yakobov's first
> and last names hardly suggests diligence, and the spelling of Yakobov's
> last name with an initial "J" seems likely to have prevented the discovery
> of any license or application for Yakobov, if one existed."[301]

---

[296]     Beech Aircraft Corp, 488 U.S. at 167 (1988) (citing Advisory Committee's Notes on Fed. R. Evid. 803(8)).

[297]     Beech Aircraft Corp, 488 U.S. at 168 (1988).

[298]     United States v. Yakobov, 712 F.2d 20, 22 (2d Cir. 1983)

[299]     *Id.* at 24 (citing United States v. Robinson, 544 F.2d 110. 115 (2d Cir. 1976)).

[300]     *Id.* (citing United States v. Robinson, 544 F.2d 110, 115 (2d Cir. 1976))

[301]     *Id.*

Furthermore, "It hardly requires extended discussion to demonstrate that a casual or partial search cannot justify the conclusion that there was no record, and we conclude that the ATF Certificate was not admissible under Rule 803(10)."[302]

Thus, the court properly concluded that the BATFE's certification was not valid. One can only assume that if the court were presented with this situation today, in light of the inaccuracy of the NFRTR, it would find any search of the NFRTR to lack diligence, especially considering the BATFE's acceptance, in one instance, that it had lost 475 records of one individual and nearly 30 years later, in 2007, the DOJ Inspector General's report declared, "If the NFA weapons owner can produce the registration paperwork, ATF assumes the error is in the NFRTR and fixes it in the database.[303]

IX. The Intersection of Confrontation Clause and the NFRTR

The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right …. to be confronted with the witnesses against him."[304] In *Crawford v. Washington*, the Supreme Court held that the admission of testimonial hearsay in a criminal proceeding is barred, unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination.[305] Thus, the *Crawford* analysis requires a court

---

[302]     *Id.* (citing United States v. Robinson, 544 F.2d 110, 115 (2d Cir. 1976).

[303]     U.S. Congress, Senate Committee on Appropriations, *Oversight Hearings on Bureau Alcohol, Tobacco & Firearms*, 96th Cong., 1st Sess. at 39 (Washington, GPO, 1979); Letter from David T. Hardy, Esq., to Ernest S. Istook, Jr., Chairman, Subcommittee on Treasury, Postal Service and General Government, dated April 10, 2001, *available at* http://www.nfaoa.org/documents/BardHard.pdf; U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record*, I-2007-006, at 31 (June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

[304]     U.S. CONST. amend. VI.

[305]     Crawford v. Washington, 541 U.S. 36, 68 (2004)

to consider two issues: 1. whether the out-of-court statement was hearsay; and 2. whether the out-of-court statement was testimonial.[306]

The issue becomes whether the admission of a Certificate of Nonexistence of a Record (CNR) is hearsay.  "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[307] Any CNR that the BATFE submits are statements made by a declarant, not present at trial, and those statements are offered into evidence to prove the truth of the matter asserted; specifically that, after a diligent search for the defendant's name and/or firearm's serial number, no evidence was found that the firearm was registered to the defendant. Hence, any CNR is hearsay.

Then the issue becomes whether or not a CNR is testimonial. In *Crawford*, the Supreme Court declined to provide "a comprehensive definition of testimonial."[308] However, the Court listed three formulations of the "core class of testimonial statements:"[309] 1. "*ex parte*  in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pre-trial statements that declarants would reasonably expect to be used prosecutorially,"[310] 2. "extrajudicial statements …. Contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"[311] and 3. "statements that were made under circumstances

---

[306]     Id.; United State v. Maher, 454 F.3d 12, 20 (1st Cir. 2006).
[307]     Fed. R. Evid. 801(c).
[308]     Crawford, 541 U.S. at 68.
[309]     *Id.* at 51.
[310]     *Id.*
[311]     *Id.* at 51-51 (quoting White v. Illinois, 502 U.S. 346, 365 (1992)).

76

**Exhibit A, Pg. 395**

which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[312]

In applying Crawford to a CNR prepared by the BATFE, it is testimonial under all of the formulations. The CNR is a formal document prepared by the custodian of the NFRTR, to be used at trial; thus, it is both an extrajudicial statement and a custodial examination, which the defendant is unable to cross-examine. Furthermore, under the third formulation, "an objectively reasonable person in [the declarant's] shoes would understand that the statement would be used in prosecuting [the defendant] at trial."[313] However, the Government is likely to argue that even if the CNR was only created in anticipation of litigation, "[T]he reasonableness of an expectation of prosecutorial use 'do[es] not transform an otherwise non-testimonial business record, made in the normal course of business, into testimonial evidence."[314]  These courts held that CNRs are not barred by the Confrontation Clause because they closely resemble business records, which, under Crawford, constitute a common law exception to the right of confrontation.[315]

Thus, the Government is likely to argue that "certificates of authenticity were admissible at common law, even when created with an eye toward litigation" and that a "CNR, by analogy to a certificate of authenticity, should be treated like a business

---

[312]    Id. at 52.

[313]    United States v. Maher, 454 F.3d 13, 21 (1st Cir. 2006). See also United States v. Brito, 427 F.3d 53, 60 (1st Cir. 2005). Other courts of appeals have adopted similar tests. See United States v. Gilbertson, 435 F.3d 790, 795-96 (7th Cir. 2006); United States v. Hinton 423 F.3d 355, 359-60 (3d Cir. 2005); United States v. Cromer, 389 F.3d 662, 673-74 (6th Cir. 2004); United States v. Saget, 377 F.3d 223, 228-29 (2d Cir. 2004)  ;

[314]    United States v. Earle, 488 F.3d 537, 544 (1st Cir. 2007). See also, United States v. Urqhart, 469 F.3d 745, 748-49 (8th Cir. 2006); United States v. Cervantes-Flores, 421 F.3d 825, 830-34 (9th Cir. 2005); United States v. Rueda-Rivera, 396 F.3d 678, 680 (5th Cir. 2005).

[315]    Id.; Crawford  541 U.S. at 56. "Most of the hearsay exceptions covered statements that by their nature were not testimonial – for example, business records or statements in furtherance of a conspiracy." Crawford, 541 U.S. at 56.

**Exhibit A, Pg. 396**

record."[316] In essence, the Government is arguing that "[B]oth certificates of authenticity and CNRs …. merely reflect the state of a set of routinely kept business records existing prior to litigation."[317] However, Government's logic is faulty because "a certificate of authenticity merely establishes the validity of a second document that contain probative evidence, whereas a CNR *itself* contain probative evidence."[318] [original emphasis]. As the First Circuit Court of Appeals pointed out in *U.S. v. Earle*, with regards to a certificate of authenticity, there is little to be gained by cross-examining the authenticator; however, "a defendant might benefit from cross-examining the maker of the CNR as to the details of the search, and from exploring the possibility that a record has been overlooked, misfiled, or otherwise lost."[319] In *U.S. v. Nicely*, the learned First Circuit Court of Appeals declared,

> The government argues that negative public records admissible under the hearsay exception in Federal Rule of Evidence 803(10) should be equally immune from constitutional challenge. Even so, we are somewhat troubled by the government's extensive use of affidavits in this case. Unlike routine searches of easily pinpointed data compilations that courts have upheld in the past, this case presents us with a situation where the affidavits were based on a far-ranging review of different Department files for any evidence that the government considered a currency reform proposal along the lines represented to SCT. Under these circumstances, especially absent any explanation from the government as to why it could not have easily called on these Treasury officials to testify in person, use of affidavits in lieu of Department officials who conducted the search may unjustifiably circumscribe defendants' confrontation rights. We think that the district court must carefully scrutinize any similar use of such evidence on retrial.[320]

Furthermore, "even if a certificate of authenticity were admissible at common law, it is clear that CNRs were not so admissible, and this was so perhaps for reasons

---

[316]     Earle, 488 F.3d at 544.
[317]     *Id.*
[318]     *Id.* at 545.
[319]     *Id.*
[320]     United States v. Nicely, 922 F.2d 850, 860 (D.C. Cir. 1991).

**Exhibit A, Pg. 397**

unrelated to the rule of completeness."[321] In *U.S. v. Bass*, the Seventh Circuit Court of Appeals held that "Proof that something is not to be found in the records may not be made by a mere certificate of the custodian, but must be shown by testimony with opportunity to cross-examine."[322] In *U.S. v. Bukis*, the Eastern District Court of Pennsylvania held that "[P]roof that something is not to be found in the records may not be made by mere certificate of the custodian, but is a matter of fact which must be shown by the testimony of a person who has searched the records, with an opportunity to cross-examine."[323] Lastly, the Court in *Crawford* declared, "We cannot agree with THE CHIEF JUSTICE that the fact '[t]hat a statement might be testimonial does nothing to undermine the wisdom of one of these [hearsay] exceptions.'"[324] (alterations in the original).

One must remember that the NFRTR is tax information; thus, the criminal defendant must rely solely on the BATFE's search, which may or may not be adequate. Thus, any CNR prepared by the BATFE for a criminal proceeding should be barred, unless the defendant is at least afforded an opportunity to cross-examine the individual who composed the CNR. Anything less would violate the defendant's Constitutional right to confront the witnesses against him/her. Furthermore, the learned 10th Circuit in *U.S. v. Rose* declared, "There may be circumstances in which one who wishes to impeach the quality of a recordkeeping system must be allowed to examine the system's operation."[325]

---

[321]      *Id.* (citing Fed. R. Evid. 803 notes; 5 Wigmore § 1678(7), at 867). "At common law, the rule of completeness required that the whole of a document be shown forth, in proving any part of it, so that the tribunal may judge better of the significance of the whole and the precise interpretation of any part. At common law, therefore, it was entirely settled that no custodian had authority to certify any less than the entire and literal terms of the original – in short, a copy in the strict sense of the word; and the rule was applied to all varieties of documents." 5 Wigmore § 1678(6), at 863.

[322]      United States v. Bass, 64 F.2d 467, 470 (7th Cir. 1933).

[323]      United States v. Bukis, 17 F. Supp. 77, 78 (E.D. Pa. 1936).

[324]      Crawford, 541 U.S. at 56 n.7 (quoting id. at 74 (Rehnquist, C.J., concurring).

[325]      United States v. Rose, 695 F.2d 1356, 1358 (10th Cir. 1982).

**Exhibit A, Pg. 398**

X. Amnesty: the Nexus between the Congressional Intent and the Inaccuracy of the

NFRTR

The solution to the NFRTR inaccuracy problem is an amnesty period, where an individual can register the NFA firearm(s) in his/her possession, to some extent, regardless of the current status of the weapon, in the registry. Amnesty was designed, in the CGA of 1968, as a safeguard, to ensure that the NFRTR remained accurate.[326] As the evidence, previously provided, shows, the BATFE admitted in numerous declarations and on numerous occasions that the NFRTR is inaccurate; for them to state otherwise, depicts with what ease and what measures, the BATFE is willing to go, including perjury. Furthermore, the Office of Inspector General, of the Department of Justice, declared that "If the NFA weapons owner [sic] can produce the registration paperwork [of a firearm that is not in the registry], ATF assumes the error is in the NFRTR and fixes it in the database."[327] This is a critical point, because in 1979, the Criminal Division of the Department of Justice advised the Congress that if the BATFE determines that "a particular individual or weapon is registered" and the BATFE finds that its "files are missing," then "the only solution would be to declare another amnesty period."[328] Since the Department of Justice Inspector General has published valid and reliable evidence that "ATF assumes the error is in the NFRTR," it is difficult to conclude that the criteria

---

[326]     90 P. L. 618; 82 Stat. 1235, § 207(b),(d); Haynes v. United States, 390 U.S. 85 (1968) (holding that  the registration of NFA weapons would likely incriminate those individuals registering unregistered NFA).

[327]     U.S. Department of the Justice, Office of Inspector General, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer*, I-2007-006, at 31 (Washington, June 2007), *available at* http://www.nfaoa.org/documents/DOJ-OIG2007NFRTRreport.pdf.

[328]     U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, at 4 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

**Exhibit A, Pg. 399**

for establishing a new amnesty period was not met upon publication of the Inspector General's report in June 2007.

While the BATFE, in 1999, contended that FOPA precludes future amnesty periods that would allow the registration of unregistered machineguns,[329] the BATFE's position has since changed, acknowledging that, "The 1968 amendments also provided for the establishment of additional amnesty periods not exceeding 90 days per period. To date, no additional amnesty periods have been declared."[330] The BATFE now contends that the denial of such amnesty periods is, "[P]rincipally because additional periods could jeopardize pending ATF investigations and prosecutions of NFA violations."[331] As will be shown, the BATFE's argument is completely without merit.

Amnesty will require a multi-pronged action, involving both the judiciary and the legislature, to ensure that the inaccuracies of the NFRTR are rectified, hopefully for the last time. Below is my proposition for amnesty, which is divided in four main subsets of Judiciary, Legislature, BATFE's arguments against an amnesty, and Amnesty.

## A. Judiciary

The Judiciary will be the first prong, which will require the Legislature to take action. The Judiciary must declare, that as a matter of law, the NFRTR is not legally sufficient to be used in criminal proceedings. Given that the Legislature has known and been made

---

[329]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1998, Part 5, Statements of Members of Congress and Other Interested Individuals*, 106th Cong., 2nd Sess., at 26 (Washington, GPO, 2000), *available at* http://www.nfaoa.org/documents/2000statement.pdf.

[330]     BATFE, *ATF National Firearms Act Handbook*, at 23 (June 2007), *available at* http://www.atf.gov/firearms/nfa/nfa_handbook/index.htm.

[331]     *Id.*

**Exhibit A, Pg. 400**

repeatedly aware of the inaccuracies, since the late 1970's, and failed to take successful corrective action, the Judiciary must step up, to protect citizens, who lawfully registered their NFA firearms, from being deprived of their Constitutional rights and protections. Such a declaration, by the Judiciary, will force the Legislature either to immediately correct the NFRTR, or to acquiesce that the Legislature no longer feels it necessary, due to the Second Amendment, to prosecute individuals for possession of NFA firearms. Assuming that the Legislature is not willing to nullify the NFA, GCA, and FOPA, in relation to NFA firearms, the following corrective action must be taken by the Legislature.

## B. Legislature

The Legislature may need to begin by considering whether existing law sufficiently provides for an amnesty period that would render the NFRTR accurate and complete, something that may not have been contemplated in drafting the original amnesty provision. First, the GCA may have to be amended by striking "not to exceed ninety days in the case of any single period" in 82 Stat. 1235 § 207(d), if a complete re-registration is not possible in ninety days.[332] Secondly, 18 U.S.C § 922(o)(2)(B) will need to be amended by striking or modifying  "[A]ny lawful transfer or lawful possession of a

---

[332]      Philip Heymann, in explaining the failures of the 1968 Amnesty, declared, "The amnesty period spawned a massive volume of registrations, transfers and correspondence which the clerical staff was ill-equipped to handle. As a result, some weapons were registered, some were mistakenly registered by part number rather than serial number, and some documents were misfiled. The staff responsible for the system was aware of these problems." U.S. Department of Justice, Criminal Division, *Memorandum: Response to letter from Senator McClure*, by Philip B. Heymann and Lawrence Lippe, at 2-3 (Nov. 29, 1979), *available at* http://www.nfaoa.org/documents/DOJamnestyMemo1979.pdf.

**Exhibit A, Pg. 401**

machinegun that was lawfully possessed before the date this subsection takes effect."[333]

This will allow for the new registration of NFA firearms that were registered and the

BATFE lost the registration; thus, in the eyes of the BATFE, making those firearms

unlawfully possessed in 1986. Following these actions, if necessary, the Legislature must

initiate, if the Attorney General refuses to do so, a new amnesty period, with regulations,

to ensure that the NFRTR becomes at least ninety-nine percent accurate, and stays as

such.

Furthermore, the Legislature must pass legislation requiring that the BATFE

implement Electronic Form (E-Forms) for the registration and transfer of NFA firearms.

As will be discussed in the below subsection Amnesty, this will ensure the accuracy and

completeness of the NFRTR by removing the human component of entry of information

into the NFRTR.[334] Lastly, the Legislature must require that the new NFRTR database be

searchable via probabilistic searches and that only probabilistic searches be used in

---

[333]     The BATFE previously contended that FOPA prevents a new amnesty; however, the BATFE has now taken the position that they have the power to authorize a new amnesty, but choose not to do so, so as not to "jeopardize pending ATF investigations and prosecutions of NFA violations." BATFE, *ATF National Firearms Act Handbook*, at 23 (June 2007), *available at* http://www.atf.gov/firearms/nfa/nfa_handbook/index.htm. Also, under current law, an unregistered NFA firearm or device cannot be registered.  This situation evolved from a problem under the original NFA, which required persons to register NFA firearms and the federal government to make these data available to local, state and other federal officials upon request.  But, individuals who possessed NFA firearms in violation of state or local law risked the hazards of prosecution by supplying the registration information required by the federal government, which violated their 5th Amendment rights, guaranteed by the U.S. Constitution, against self-incrimination.  On January 29, 1968, the U.S. Supreme Court ruled that "a proper claim of the privilege is understood to provide a full defense to any prosecution either for failure to register . . . . or . . . . for possession of a [NFA] firearm which has not been registered." Haynes v. United States, 390 U.S. 85, 99 (1968).  The Congress resolved this conflict in amending the NFA under Title II of the Gun Control Act of 1968 by: (1) prohibiting any information required to comply with the NFA to be used against a registrant or applicant to be used against a registrant or applicant in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence; (2) establishing an amnesty period from November 2, 1968, to December 1, 1968, when persons could register unregistered NFA firearms with full immunity from prosecution; and (3) prohibiting the release of any information about the registration status or ownership of any NFA firearm.

[334]     E-Forms have already been made available by Titleii.com. To see the available forms, see http://www.titleii.com/Forms.htm. If you click any of the Forms, you can type in the correct information, which is then entered onto the appropriate BATFE Form. While Titleii.com's E-Forms do not allow for the uploading of pictures, it serves to show how easy and cheap it is to create E-Forms.

**Exhibit A, Pg. 402**

criminal prosecutions; thus, allowing for records which are in error, to possibly be found.[335]

#### C. BATFE Amnesty Refusal Rationale and Rebuttals Thereof

The most comprehensive list of reasons offered by the BATFE to oppose establishing a new amnesty period were given by the BATFE to the Subcommittee on Treasury, Postal Service and General Government, Committee on Appropriations, in November 1999. The only known formal rebuttals were by Eric M. Larson in his 2000 statement[336] and an analysis by William J. Krouse of the Congressional Research Service in 2005, of both the BATFE's reasons and Mr. Larson's rebuttals.[337]

1. "An Amnesty would suspend enforcement of the NFA. Pending investigations and prosecutions for violations of the NFA might have to be terminated."[338] To begin with, the suspension of enforcement of the NFA, for a short period of time, is the primary reason for an amnesty, especially in light of individuals being prosecuted, who lawfully registered their firearms, but through not fault of their own, their paperwork was lost or destroyed, such as Mr. Napolilli.  Moreover, a successful amnesty would enable the

---

[335]        THOMAS N. HERZOG, FRITZ J. SCHEUREN & WILLIAM E. WINKLER, DATA QUALITY AND RECORD LINKAGE TECHNIQUES 82-92 (Springer Science+Business Media 2007).
[336]        U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5*, *Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 26 (Washington, GPO, 2000), *available at*, http://www.nfaoa.org/documents/2000statement.pdf.
[337]        Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Transfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf.
[338]        U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5*, *Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess. (Washington, GPO, 2000), *available at*, http://www.nfaoa.org/documents/2000statement.pdf.

**Exhibit A, Pg. 403**

BATFE to prosecute more individuals, with a greater accuracy, and limit tax payer money being used for mistaken and/or frivolous prosecution. Our system of Justice strives for only the guilty to be convicted; thus, the BATFE should desire to ensure that only the guilty are prosecuted. A successful amnesty would better ensure that only the guilty are likely to be prosecuted, while providing more accurate, and more easily accessible, data records.

That the BATFE would tell the Congress that an amnesty "would suspend enforcement of the NFA" is not borne out by the historical record, and is seriously misleading.  The reason is that in 1968, then-IRS Commissioner Cohen, in his testimony to Congress after the invalidation of the registration provision of the NFA, due to the Supreme Court's decision in *Haynes*, declared that only one-third of the NFA prosecutions were affected.[339]  There is no evidence that invalidating the registration provision of the NFA temporarily to render the NFRTR accurate and complete would "suspend enforcement of the NFA."  Rather, it would strengthen the NFA by strengthening the NFRTR.  Moreover, as Mr. Larson declared, "An amnesty period has the greatest chances of correcting the greatest number of errors in the NFRTR the IG identified, and ATF has not proposed any viable alternative."[340]

---

[339]      US Congress, Senate, Committee on the Judiciary, Subcommittee to Investigate Juvenile Delinquency, *S. Res. 240*, 90th Cong. 2nd Sess., at 661 (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/IRS_Commissioner_GCA_Hearing.pdf. Commissioner Cohen declared, "The National Act prosecutions have fallen as a result of the *Haynes* decision. We had been averaging, under the national act, about 60 to 70 prosecutions per month for national act violations. Since the first of the year, when the *Haynes* decision was rendered, we are down to about something in excess of 40 a month. So we are talking about 35 to 40 percent in the area of prosecutions under *Haynes*." *Id.* at 661-62.

[340]      U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5, Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 23 (Washington, GPO, 2000), *available at,* http://www.nfaoa.org/documents/2000statement.pdf.

2. "Section 922(o), Title 18, U.S.C. prohibits the possession of machine guns not lawfully possessed prior to its effective date, May 19, 1986. The possession of any machine gun registered during a new amnesty period would still violate section 922(o)."[341] The BATFE continues on, "With respect to section 922(o), the law makes no provisions for an amnesty,"[342] but it is also fair to say that there's nothing in 922(o) that would specifically preclude an amnesty, either.  The BATFE now acknowledges that § 207 (d) of the Gun Control Act of 1968 allows for a new amnesty, which could be administratively established by the Attorney General at any time, but they have chosen not to initiate such, so as not to "jeopardize pending ATF investigations and prosecutions of NFA violations."[343] Even if one assumes the BATFE's previous interpretation that section 922(o) precludes an amnesty for machineguns is correct, the Congress retains the power to authorize a new amnesty.

3. "Amnesty would provide the criminally inclines an opportunity to possess unregistered NFA weapons with impunity."[344] As Mr. Larson points out, "The 'criminally inclined' already 'possess unregistered weapons with impunity.' An amnesty would not change that."[345] Furthermore, as Mr. Krouse points out, "As to the 'criminally

---

[341]     *Id.* at 26.

[342]     *Id.*

[343]     The BATFE has now taken the position that they have the power to authorize a new amnesty, but choose not to do so, so as not to "jeopardize pending ATF investigations and prosecutions of NFA violations." BATFE, *ATF National Firearms Act Handbook*, at 23 (June 2007), *available at* http://www.atf.gov/firearms/nfa/nfa_handbook/index.htm; 82 Stat. 1235, § 207(b), (d).

[344]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5, Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 26 (Washington, GPO, 2000), *available at*, http://www.nfaoa.org/documents/2000statement.pdf.

[345]     *Id.* Mr. Larson states: "As noted on page 11 of the January 2000 issues of American Rifleman, Federal law on registration was defined in 1968 by the U.S. Supreme Court in *Haynes v. United States* (390 U.S. 85), 'when it declared that … existing federal case law says with great finality that gun registration only applies to the law-abiding.'" *Id.* The quoted language in Mr. Larson's rebuttal is a recitation of the BATFE's language in opposition to an amnesty period.

**Exhibit A, Pg. 405**

inclined,' there is no way to determine such a condition under current law or otherwise."[346] However, if the BATFE is concerned about individuals registering firearms, which would not have been previously registrable, § 207 (b), (d), does not limit prosecution for making false statements. Irregardless, the accuracy and completeness of the NFRTR is instrumental in ensuring that law-abiding citizens are not prosecuted, which should take precedence over the possibility of additional, not previously registrable, weapons being added to the NFRTR.

    4. "Anyone, including felons, mental incompetents, and persons whose possession of firearms would violate State and local laws, could register NFA weapons."[347] "Excluding them from the amnesty, as well as disallowing any registration that 'would violate State and local laws' would address this concern."[348] In fact, under current law, the NFA represents an odd, continuing law enforcement contradiction because (1) under the 1968 amnesty, a person who possessed an NFA firearm or device in violation of state or local law, could register the firearm or device, and BATFE was legally precluded from disclosing that information; and (2) as state laws change in future, e.g., to prohibit the possession of silencers, machine guns, short-barreled shotguns or other selected NFA firearms or devices, persons who live in those states who possess these items on the basis of an amnesty registration or subsequent legal transfer are transformed into violators of

---

[346]    Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Transfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 17 (citing to United States v. Stout, 667 F.2d 1347 (11th Cir. 1982), *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf. Mr. Krouse gives the example of *Bryan v. United States*, 542 U.S. 184, 191-92, explaining  that " while 'the term knowingly does not necessarily have any reference to a culpable state of mind or to knowledge of the law,' a 'willful' violation is committed when and individual acts with knowledge that his conduct is unlawful." *Id.* at 17 fn. 99.

[347]    U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5*, *Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 26 (Washington, GPO, 2000), *available at*, http://www.nfaoa.org/documents/2000statement.pdf.

[348]    *Id.*

**Exhibit A, Pg. 406**

state or local firearms laws, and there is no legal mechanism under which BATFE could legally notify state or local law enforcement authorities of that fact.  Legislation such as the foregoing could resolve this law enforcement contradiction.[349]

5. "A new amnesty for registering machine gun, bombs, grenades, silencers, etc, will be perceived as a retreat by the Administration from its position of favoring stronger gun controls, e.g., banning the possession of semiautomatic assault weapons."[350] Since the 1994 Assault Weapon Ban was not renewed, the Administration's position is no longer favoring stronger gun controls, but rather reinforcing the Bill of Rights, namely the Second Amendment. Nevertheless, as Mr. Larson points out, "Offering an opportunity to correct defective records would more reasonably be seen as enhancing the Administrations position."[351] Furthermore, individuals can currently register newly manufactured silencers, AOW's, and short-barreled firearms by application to the BATFE.

6. "An upsurge in the making of NFA weapons particularly, short-barrel shotguns, can be expected as individuals seize the opportunity to acquire NFA weapons without incurring the 200 making tax."[352] The BATFE continued, "Also, the $200 transfer tax would be avoided by unlawful transfers to persons who would register the weapon during the amnesty."[353] While these are legitimate concerns, the possibility that law-abiding

---

[349]     Under the original NFA and during the 1968 Amnesty, a Chief Law Enforcement Officer (CLEO) signature, fingerprints of the applicant, and photo of the applicant were not required for an original registration of an unregistered NFA weapon. The registration was on a Form 1 or Form 4467.

[350]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5, Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 27 (Washington, GPO, 2000), *available at,* http://www.nfaoa.org/documents/2000statement.pdf.

[351]     *Id.*

[352]     *Id.*

[353]     *Id.*

**Exhibit A, Pg. 407**

individuals are being prosecuted and convicted, severely outweighs a concern of a possible loss of $200 per application for making a NFA firearm.[354] As Mr. Krouse points out, "The amnesty provision(s) could be crafted to limit its scope to firearms that were commercially manufactured in original configurations that made them subject to the NFA."[355]  Nevertheless, this issue is addressed in the next section Amnesty, subsection Amnesty Process.

7. "Firearm imported with certain restrictions, such as for sales samples or law enforcement use only, would be transferred to persons who would register the weapons during the amnesty and circumvent the restrictions."[356] As Mr. Larson points out, "There are relatively few of these firearms, which can come from only two places: (1) law enforcement agencies; or (2) Class III dealers. There would be no reason for a Class III dealer, much less a law enforcement agency, to knowingly violate existing law."[357] He continues, "Also, ATF could easily disapprove any application to illegally transfer the ownership of such a firearm—which is already legally registered."[358]

8. "It would create ill-will on the part of person who have been prosecuted for possession of unregistered NFA weapons, had their weapons seized, or voluntarily abandoned their weapon to the ATF in the past." The only reason for reasonable ill-will

---

[354]     It must be noted that there has never been a tax for registering a NFA firearm, even under the NFA of 1934 and 1968 Amnesty.  The $200 tax is for making and transferring NFA firearms, other than AOWs, which require a tax of $200 for making and a tax of $5 for transferring.

[355]     Congressional Research Service, *Memorandum: ATF's National Firearms Registration and Transfer Record: Issues Regarding Data Accuracy, Completeness, and Reliability*, by William J. Krouse, Nov. 28, 2005, at 17, *available at* http://www.nfaoa.org/documents/CRSmemoNFRTR0001.pdf.

[356]     U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5, Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 27 (Washington, GPO, 2000), *available at,* http://www.nfaoa.org/documents/2000statement.pdf.

[357]     *Id.*

[358]     *Id.* Congress must be cognizant of the possibility of the BATFE denying applications to register a firearm and the effect of such, if the legal process cannot be completed by the end of the amnesty period.

to be created is if the BATFE has prosecuted individuals for possession of unregistered NFA weapons, when that individual had legally registered his/her weapon, but his/her paperwork was lost or destroyed. Furthermore, as Mr. Larson points out, "[A]n amnesty would likely enhance ATF's public image."[359] More importantly, even if ill-will results, it is crucial that the Government not prosecute innocent individuals, who merely lost their paperwork.

9. "A new amnesty would reward those who have unlawfully stockpiled unregistered contraband in anticipation of registering them during a future amnesty and encourage people to retain or acquire unregistered firearms in the expectation of other such periods."[360] The BATFE has failed to provide any evidence that such would occur or encourage individuals to stockpile unregistered NFA weapons.[361] More importantly, post-successful-amnesty, the use of the NFRTR in criminal prosecutions of these individuals should be flawless. It is also important to realize that the BATFE has administratively removed thousands of NFA firearms from purview of the NFA, as collector's items; to the extent these firearms were unregistered, the BATFE has itself created an expectation of "reward" in the sense it claims. Specifically, "ATF May Have Already Removed 50,000 to 100,000 or More Individual NFA Firearms from the NFA as Collector's Items."[362]

10. "An additional amnesty would only be a temporary solution. It would be only a matter of time before people would claim they did not know about the amnesty or did

---

[359]    *Id.*
[360]    *Id.*
[361]    *Id.*
[362]    U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 1998, Part 5, Testimony of Members of Congress and Other Interested Individuals and Organizations*, 105th Cong., 1st Sess., at 30-32 (Washington, GPO, 1997), *available at* http://www.nfaoa.org/documents/1997testimony.pdf.

**Exhibit A, Pg. 409**

not realize they had an NFA weapon in their possession."[363] To begin with, an additional amnesty should NOT only be a temporary solution. If the BATFE properly conducts the amnesty and, thereafter, continuously and meticulously checks, maintains, and improves the NFRTR, future GAGAS audits by the GAO should depict the NFRTR as sufficient for criminal proceedings. Moreover, while ignorance of the law is not generally recognized as a legitimate defense, a serious effort by BATFE to continuously publicize the amnesty period at the national, state, and local levels at least 90 days before and continuously during the amnesty, as discussed in the next section, would go a long way towards restoring credibility in the Government and in BATFE[364] "In fact an amnesty would strengthen ATF's legal cases by, among other things, enhancing the accuracy and reliability of ATF's records."[365] More importantly, and continually overlooked by the BATFE, the purpose of an amnesty in this instance is to ensure that law-abiding citizens are not prosecuted for possession of an unregistered weapon, which was legally registered, but for which the NFRTR is in error and the paperwork has been lost or destroyed, or unjustly deprived of their valuable personal property—possibly a rare firearm that is a family heirloom.

D. Amnesty[366]

---

[363]    U.S. Congress, House Committee on Appropriations, Subcommittee on the Treasury, Postal Service, and General Government Appropriations, *Treasury Postal Service, and General Government Appropriations for Fiscal Year 2001, Part 5, Statements of Members of Congress and Other Interested Individuals and Organizations,* 106th Cong., 2nd  Sess., at 26 (Washington, GPO, 2000), *available at*, http://www.nfaoa.org/documents/2000statement.pdf.

[364]    *Id.*

[365]    *Id.*

[366]    H.R. 2088, 109th Cong. (2005)(reintroduced as H.R. 1141, 110th Cong. (2007). The Veterans' Heritage Firearms Act should be consulted in the institution of any amnesty. The work, foresight, and understanding of all issues, is clearly depicted in this Act. Some provisions in this section have been taken

**Exhibit A, Pg. 410**

For purposes of this article, the term "individual" connotes an individual person, corporation, or trust, since a NFA firearm may be registered under any of the aforementioned entities.

BATFE Re-Organization: The BATFE shall institute a new division, The NFA-Amnesty and Firearms Classification Division, whose duties shall include (1) processing all Amnesty related registrations, (2) classifying firearms as "collector's items," "curios and relics," or "antique firearms" under provisions of the NFA and/or the GCA, and (3) determining whether unregistered NFA firearms encountered after the amnesty provision expires should be registered, destroyed or removed from the purview of the NFA and/or the GCA.

Time Period: The new amnesty shall last for a period of 90 days, unless changed by Congress. The BATFE shall immediately preceding and during the amnesty, continuously nationally publicize the amnesty. This shall be implemented through posters in U.S. Post Offices, public service announcements, advertisement in major firearm publications, letters to those with currently registered NFA firearms, and distribution of materials through all Federal Firearm Licensees. Furthermore, the BATFE shall be responsible for informing the Congress of the status of the new amnesty period every fifteen days, during the new amnesty and new amnesty extensions, if necessary. If the BATFE fails to accurately inform the Congress of the amount of pending registrations,

---

and/or modified from the Veterans' Heritage Firearms Act of 2007, *available at* http://www.nfaoa.org/documents/H.R.1141VeteransHeritageFirearmsAct.pdf.

**Exhibit A, Pg. 411**

after ninety days, or that set by Congress, and at any, if any, amnesty period extension(s),
a new amnesty shall be immediately instituted.

Furthermore, any registrations filed by an individual and denied by the BATFE,
shall be reviewed by a court of competent jurisdiction. A decision in the favor of the
applicant shall be entered into the NFRTR, even if the amnesty period has ended. At no
time, during judicial process, shall the BATFE have the right to destroy, convert, or
obtain title to the firearm in question.


Forms Amended: All BATFE forms, namely Form 1, Form 2, Form 3, Form 4,
and Form 5 [herein, Form], shall be modified to E-Forms and amended to include an
Estate Verification Portion.

The implementation of E-Forms will ensure the accuracy and completeness of the
NFRTR by removing the human component of inputting data into the database. Jeffery
W. Koch of the Office of E-Government & Information Technology, in response to my
question about implementing E-Forms, declared, "There is merit in the idea. And in
general, the Gov[ernmen]t has a goal of increasing electronic filing, and of citizen self-
service."[367] Since many of the errors in the NFRTR are the result of typographical errors
or omissions, by requiring the use of E-Forms, the data entered by the applicant,
submitted electronically, can be stripped by the database program, entered into the
appropriate data fields, directed to the appropriate examiner, and alert the examiner if
data fields are incomplete or missing.[368]

---

[367] Private Communication from Jeffery W. Koch, on file with the author.
[368] E-Forms have already been made available by Titleii.com. To see the available forms, see
http://www.titleii.com/Forms.htm. If you click any of the Forms, you can type in the correct information,

**Exhibit A, Pg. 412**

This process is depicted by the following: The BATFE implements E-Forms on its website for the registration and transfer of NFA firearms. The applicant logs onto the website, picks the appropriate Form, and enters all the appropriate information. If any data field is omitted, the program will not allow the individual to submit the uncompleted E-Form. If the applicant is an individual, not a Corporation or Trust, the E-Form will allow for the uploading of the applicant's picture, as required by the current Forms. Once completed, the applicant will submit the E-Form.  At that point, the program will acknowledge the submission of the E-Form and produce a Control Number for the applicant to use in any correspondence with the BATFE regarding his/her E-Form submission. The program will also inform the applicant, if the applicant is an individual, not a Corporation or Trust, that he/she must submit the appropriate completed finger print card, to the appropriate address, referencing the Control Number.

The program will then read the data fields, enabling it to determine the appropriate examiner, and forward the E-Form information and the prior registration information to the appropriate examiner for his/her review.[369] The examiner will then review the information ensuring that all fields are complete, correct, and correspond with the prior registration information. If the examiner finds an error, the program will make a backup of the original submission, which will be attached to the electronic record, and allow the examiner to make the appropriate changes.[370] Since the need for examiner intervention should be extremely limited, the possibilities of typographical errors and

which is then entered onto the appropriate BATFE Form. While Titleii.com's E-Forms do not allow for the uploading of pictures, it serves to show how easy and cheap it is to create E-Forms.

[369]    Currently, the BATFE assigns examiners based on the current owner's last name. By implementing E-Form and the programming I have discussed, this could easily be changed in the future if the BATFE decides to change its procedures.

[370]    This will ensure that the examiner does not accidentally delete the appropriate information.  This backup will be searchable, just as the regular NFRTR is, to ensure that the appropriate information can be found.

**Exhibit A, Pg. 413**

omission should be drastically reduced, if not completely eliminated.[371] Once all

information has been submitted and approved by the examiner, the information will be

entered into the NFRTR. The program will then print out a paper copy of the Form to be

signed by the examiner, as well as a digital copy burnt onto a CD, which will be digitally

signed, all of which will be mailed to the applicant. This will allow the applicant to print

out new copies of his/her Form if he/she loses the paper copy, while ensuring to the

BATFE that it is a legitimate copy via the digital signature.[372]

The Estate Verification Portion shall require a registering individual to place the

name and address of an individual to contact [herein Individual Contact], upon his/her

death. Where possible, the Social Security Number of the Individual Contact(s) shall be

listed. There shall be space provided for up to three individuals, but only one individual

need be listed. Furthermore, the BATFE shall institute a check box, next to each

individual's name, which shall allow the registering individual to enable the individual

listed to check the current status of the registration, while the registering individual is still

alive. If a form is processed, absent an Individual Contact, the BATFE shall be held

solely responsible for determination of the executor/administrator/heir of the firearm. In

no instance shall the absence of an Individual Contact, or the inability of the BATFE to

determine the executor/administrator/heir, be a forfeiture of the firearm(s).

If the firearm to be registered during the amnesty is a machinegun, the applicant

shall be required to certify that to his/her knowledge, the machinegun was not

---

[371]     While typographical and omission errors can be reduced, if not eliminated, the database's
accuracy and completeness will rest with the NFA examiners and annual audits.

[372]     In the light of trends toward using biometric identifiers, a gradual tightening of standards to
acquire state-issued identification and related documents, such as driver's licenses, particularly under
provisions of the Real ID Act, it may be advisable for the NFRTR to formally comply with federal
provisions for positive identification that are and will be implemented in future, in its standards for
postively identifying owners of NFA firearms.  Similarly, BATFE might consider establishing standards for
the reliable identification of individual NFA firearms

95

manufactured after May 19, 1986. If the BATFE determines the machinegun was manufactured after May 19, 1986, and it proves that the applicant had knowledge of this, the applicant may be prosecuted for making a false statement.

Amnesty Generally: The Attorney General shall publish in the Federal Register the institution of all amnesties, as well as, nationally publicizing the amnesty 90 days prior to, and during, the 90 day amnesty period. No information or evidence required to be submitted by an individual to register a firearm under an amnesty period shall be used, directly or indirectly, as evidence against the individual, in any criminal proceeding or concurrent violation of the law. The furnishing of false information shall be a prosecutable offense, not protected under the above amnesty provision; thus, allowing the use of information and evidence submitted to the BATFE for the prosecution of false information.

Amnesty Process: Each person in the United States, who is in possession of a firearm defined by the NFA, CGA, and FOPA, shall register his/her NFA firearm with the BATFE NFA-Amnesty Division without payment of any tax or filing fee,[373] on an E-Form to be provided at no cost by the Attorney General.  The amnesty registration form shall include the same data elements appearing on Form 4467, which was used to registered unregistered firearms during the 1968 Amnesty, and an attestation that possession of the firearm by the registrant will not, to the best of the registrant's knowledge, violate any federal, state or local law.  While the applicant must provide

---

[373]    No tax or filing fee was incurred by the applicant under the original NFA or during the 1968 Amnesty.

**Exhibit A, Pg. 415**

sufficient information to reliably identify himself or herself, and the failure of the applicant to do so may constitute grounds for disapproving the registration, in accordance with established procedures for registering unregistered firearms under the original National Firearms Act, and during the 1968 Amnesty, no applicant shall be required to submit fingerprints, photographs, or certification by any law enforcement agency. In the absence of clear and convincing evidence to the contrary, the Attorney General shall accept the information provided as true and accurate, and shall treat any form that is postmarked during the amnesty period as received during the amnesty period.  If the Attorney General determines that an individual may not register a firearm during the amnesty period, the Attorney General shall, under the request of such individual, (1) provide the individual any evidence on which the Attorney General's decision is based, and (2) promptly hold a hearing to review the determination.

The court of law may find the following: 1. Pursuant to § 922(o), the weapon was not legally possessed as of May 19, 1986;[374] thus, requiring the immediate forfeiture of the weapon; 2. Pursuant to § 922(o), the weapon was legally possessed as of May 19, 1986 ;[375] thus, the BATFE must register the firearm. In no instance shall any weapon be destroyed by the BATFE, prior to the exhaustion of all possible court proceedings. Furthermore, if the court finds that the firearm was legally possessed prior to May 19, 1986, the BATFE shall pay all reasonable attorney fees of the applicant.

<u>The BATFE NFA-Amnesty Division and Firearms Classification Division shall be responsible for instituting a new NFRTR:</u> The new database will allow for the

---

[374]     The term "legally possessed" means to have a legal property right to it, even in the absence of registration paperwork from the BATFE.
[375]     *Id.*

stripping of data from the E-Forms and probabilistic searches. The old database will be kept, as a backup, for twenty-five years.  This will ensure that all previously registered firearms are registered in the new NFRTR and that an individual is not prosecuted for a firearm, which was registered in the old NFRTR, but not in the new NFRTR.

Post Amnesty: The BATFE shall be responsible for maintaining the accuracy of the new NFRTR. After the completion of the necessary amnesty period(s), the U.S. Government Accountability Office shall conduct a GAGAS audit of the entire NFRTR. Furthermore, the U.S. Government Accountability Office shall, on a tri-annual basis, audit the NFRTR to determine its accuracy; during other years, the Department of Justice, Inspector General shall be responsible for an annual audit of the NFRTR. In any instance, where the NFRTR is determined to be less than ninety-nine percent accurate, an amnesty period shall be established within 90 days after the audit findings are published.

The BATFE shall inspect the Social Security Master Death File, every year, to ascertain if any registrants have expired.[376] Upon certification of the death of a registrant, the BATFE, if the estate has not previously contacted them, shall use the Individual Contact information to inform the estate of the registration requirements of the particular firearm(s). The BATFE's failure to locate the executor/administrator/heir shall not constitute grounds for seizure and forfeiture of the firearm.

---

[376]     THOMAS N. HERZOG, FRITZ J. SCHEUREN & WILLIAM E. WINKLER, DATA QUALITY AND RECORD LINKAGE TECHNIQUES 174 (Springer Science+Business Media 2007).
.

**Exhibit A, Pg. 417**

NFRTR Defense: In any criminal proceeding, an individual may offer the NFRTR

audit records to the court, for the jury's consideration, unless the new NFRTR is one-

hundred percent accurate and there are no records depicting otherwise.


## XI. Conclusion


As has been depicted, the NFRTR is in a state of disarray, allowing for the

prosecution of individuals who lawfully registered their firearms, but through no fault of

there own, the paperwork was lost or destroyed. This problem has been documented in

Congressional Testimony, since the late 1970's, and continues through today. Mr.

Napolilli would likely have been convicted of a possession of an unregistered firearm, if

he had not found a copy of his paperwork.  Even then, the BATFE believed the

paperwork to be a forgery, and even when the BATFE determined it was not, they

refused to return the firearm. Then, there is current day Error Letter from the BATFE to

Mr. Shafizadeh, owner of Pars International, where the firearm had been transferred in

April 2007, only for the BATFE lose all records of such, by June 2007. Luckily, Mr.

Shafizadeh could provide copies of the approved paperwork, but where would he be, if

such was not the case?  One must remember that neither a citizen nor a criminal

defendant has the authority to review the NFRTR because it is tax information. Thus,

how is a defendant able to confront the database, when he/she cannot even search it, to

ensure that the BATFE's search was not in error?

How is it possible for a Governmental Agency to knowingly consistently lose

and/or destroy paperwork, and yet, rely on the absence of paperwork in criminal

**Exhibit A, Pg. 418**

prosecutions? This violates our sense of justness and fairness, and must be corrected. As has been depicted by firearm law experts, an internationally recognized expert in administrative records and statistics, and a senior analyst at the GAO,[377] the only way to correct the NFRTR is through an amnesty. While Congressional Hearings on how to implement an amnesty will likely take several months, the Congress must act immediately to stop the prosecutions of individuals, who are unable to show approved paperwork, because of the inaccuracy, completeness, and reliability of the NFRTR, until the NFRTR is adequately corrected. If the Congress is unable or unwilling to ensure that justice prevails, the Judiciary must find, as a matter of law, that the NFRTR is insufficient in criminal prosecutions.

As Mr. Scheuren declared in his letter,

> Even though the first edition of the book has just come out we are already contemplating a second edition and plan to include the ATF issues discussed above in a new chapter. Will the story we tell have a happy ending or continue to be stalemated? We are hoping that changes will be made, so we can report a success and not a failure.[378]

I too hope that a success can be reported, and that, without Legislative or Judicial action, the NFRTR will be corrected. However, in looking at the continual trend of inaction, such is not likely to be the case, especially in light of then-NFA Branch Chief's statement,

> If the court should discover that our negligence caused an unwarranted arrest and trial, the resultant loss of public trust would be irreparable. Just as serious is the possibility that an innocent man might be convicted if he could not find his registrant form and we certified that he had not

---

[377]     Eric M. Larson stated that his comments reflect his personal opinions, and do not represent the policy or position of U.S. Government Accountability Office.

[378]     Letter to Alan B. Mollohan, Chairman, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, by Fritz J. Scheuren, VP Statistics NORC, 2 (Dec. 11 2007);  *available at* http://www.nfaoa.org/documents/Scheuren_Committee_Chair_Letter.pdf.

registered the firearm when, in fact, we had failed to locate his registration in the Record [NFRTR].[379]

---

[379]     NFA Branch Chief memorandum to ATF Assistant Director for Technical and Scientific Services, *Purification and Verification of the National Firearms Registration and Transfer Record*, Apr. 3, 1975, reproduced in *Oversight Hearings on Bureau of Alcohol, Tobacco, and Firearms*, Senate Committee on Appropriations, 96th Cong., 1st Sess., at 42 (Washington, GPO, 1979), *available at* http://www.nfaoa.org/documents/1979_Hearing_Excerpts.pdf.

# Exhibit 22

## (Testimony of Eric Larson)

# TREASURY, POSTAL SERVICE, AND GENERAL GOVERNMENT APPROPRIATIONS FOR FISCAL YEAR 1999

## HEARINGS

BEFORE A

SUBCOMMITTEE OF THE

## COMMITTEE ON APPROPRIATIONS

## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

---

COMMITTEE ON THE TREASURY, POSTAL SERVICE, AND GENERAL GOVERNMENT APPROPRIATIONS

**JIM KOLBE**, Arizona, *Chairman*

FRANK R. WOLF, Virginia
ERNEST J. ISTOOK, Jr., Oklahoma
MICHAEL P. FORBES, New York
ANNE M. NORTHUP, Kentucky
ROBERT B. ADERHOLT, Alabama

STENY H. HOYER, Maryland
CARRIE P. MEEK, Florida
DAVID E. PRICE, North Carolina

NOTE: Under Committee Rules, Mr. Livingston, as Chairman of the Full Committee, and Mr. Obey, as Ranking Minority Member of the Full Committee, are authorized to sit as Members of all Subcommittees.

MICHELLE MREDEZA, BOB SCHMIDT, JEFF ASHFORD, and TAMMY HUGHES,
*Staff Assistants*

---

## PART 5

## STATEMENTS OF MEMBERS OF CONGRESS AND OTHER INTERESTED INDIVIDUALS AND ORGANIZATIONS



---

U.S. GOVERNMENT PRINTING OFFICE

47–740 O                     WASHINGTON : 1998

---

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC  20402
ISBN 0-16-056447-6

**Exhibit A, Pg. 422**

25

Statement on

Proposed Removal of the National Firearms Registration and Transfer Record[1]
from the Custody of the Bureau of Alcohol, Tobacco and Firearms
and its Proposed Relocation to the Department of Justice

by

Eric M. Larson[1]

Presented

before the

Subcommittee on Treasury, Postal Service and General Government
of the
Committee on Appropriations
House of Representatives

B-307 Rayburn House Office Building
Washington, D.C.

April 3, 1998

---

[1]Eric M. Larson is a Contributing Editor to the *Official R. L. Wilson Price Guide to Gun Collecting*, the *Blue Book of Gun Values*, the *Standard Catalog of Firearms*, the *Official Price Guide to Antique and Modern Firearms*, and has been a Life Member of the National Rifle Association of America since 1968. His research has been published in *The Gun Report*, *CADA Gun Journal*, *Machine Gun News*, *Guns Illustrated*, *Small Arms Review*, *The Gun Journal*, and he is author of *Variations of the Smooth Bore H&R Handy-Gun: A Pocket Guide to Their Identification*. A journalist and demographer by training, he graduated with honors in 1974 from the University of Texas at Austin, where he also earned a Ph.D. and three master's degrees.

**Exhibit A, Pg. 423**

Mr. Chairman and Members of the Subcommittee:

My name is Eric M. Larson. I testified before this Subcommittee in 1996, and in 1997, and am doing so again this year, regarding serious errors in the National Firearms Registration and Transfer Record (NFRTR). The NFRTR was established under the National Firearms Act (NFA) of 1934. The NFA is designed to control firearms thought to be commonly used by criminals by requiring registration of the firearms, and using prohibitive taxes to reduce their manufacture, distribution, and ownership. It is a harsh federal law to discourage illegally manufacturing, selling, or possessing hand grenades, machine guns, and similar weapons, and the cutting down of conventional shotguns or rifles (regardless of their caliber) to make concealable firearms. Any violation of the NFA is a felony, carrying a penalty of up to a $10,000 fine and 10 years imprisonment upon conviction.

The NFRTR is a permanent record of all transactions involving NFA firearms in the United States. It is currently located within the Bureau of Alcohol, Tobacco and Firearms (BATF), which under current law is responsible for administering the NFA. The NFRTR contains a variety of records, including the original registrations and subsequent transfers of NFA firearms to state and local law enforcement officers, state and local museums, private citizens who are legally qualified to own such firearms and are not prohibited from doing so under state or local law, of transfers to and from federally licensed NFA firearms dealers, and records of NFA firearms manufacture by federally licensed NFA firearms manufacturers. Because of the severe penalties for violations of the NFA, accurate record-keeping is essential to avoid unjust prosecutions, and the unlawful seizure of validly registered NFA firearms.

I am appearing before you today to respectfully ask the Subcommittee to consider removing the NFRTR from custody of the Bureau of Alcohol, Tobacco and Firearms (BATF), and to permanently reassign its functions to the Department of Justice. As you probably know, the Department of Justice is responsible for the "instant background check" of persons who wish to purchase handguns, which is scheduled to go into effect this year. Therefore, it would be relatively easy to incorporate the NFRTR into the existing infrastructure, and modifications to allow for administration of the NFRTR would likely be very minor. Removal of the NFRTR from BATF will also place these records within a professional organization that is capable of maintaining them, and probably will require a badly needed 100% record verification. The BATF (and, possibly, other law enforcement agencies) would continue to have access to the information in the NFRTR, for legitimate law enforcement purposes.

My knowledge about errors in the NFRTR evolved from the study of certain rare firearms that fell under the NFA in 1934 largely for technical reasons, not because they were commonly associated with criminal activities. Today, these firearms are historical artifacts that reflect a bygone era when there were no federal controls, and virtually no state controls, on firearms design. Thus, they represent a unique niche in U.S. firearms genealogy, because there is nothing else like them, and they are highly prized by collectors. As my research on these guns was published in major, reputable firearm reference books, collectors and persons who had inherited these firearms began contacting me. The BATF has represented my sole interest in discussing errors in the NFRTR to seek the

removal of these firearms from the NFA as collector's items, but that is not correct. In fact, my interests and this situation evolved as the result of my discovery of serious errors in the NFRTR, and my 1996 testimony makes that absolutely clear. It is in BATF's interest to try and focus attention away from errors in the NFRTR or impugn my motives, and that is what BATF has been doing.

BATF is correct in portraying me as a collector, but what changed my interest is the fact that some people who inherited some of these firearms told me that BATF alleged the firearms were not registered, then declared the firearms were contraband and must be forfeited to the Government; and apparently, some were. In other instances, people who were enraged by this situation told me they scoured their premises, found a valid registration document—and showed it to BATF. Then, allegedly, BATF said a mistake had been made and the NFRTR was amended to register the firearm to the new, lawful owner. In every instance, the people involved told me they were afraid of BATF, and didn't want to be identified, but wanted me to know this information. While there certainly is a "collector's item" interest in this situation, the loss or destruction of firearm registration records by the BATF clearly places my concerns in another dimension that is removed from gun collecting.

I was aware of these allegations for a number of years, but there seemed no way of proving them one way or the other because of the veil of secrecy that shields NFRTR records from public disclosure. The reason is that the NFA itself prohibits their disclosure as does the Tax Code of 1986, under which the BATF has deemed them to be "tax returns." The BATF also apparently uses the "tax return" angle to cover up wrongdoing by its agents and employees.

From my perspective, the situation regarding the firearms I was researching changed dramatically in March 1996, for two reasons.

First, I was asked by L. Richard Littlefield, then President of the Collectors Arms Dealers Association (CADA) to testify before this Subcommittee about getting a more reasonable treatment, as the law allows, for the smooth bore H&R Handy-Gun, Marble's Game Getter Gun, and similar firearms that came under the NFA in 1934 mainly for technical reasons. I'd known Dick since about 1989, and he was aware of my research, but CADA's testimony was not limited to these firearms. Indeed, one of the reasons CADA testified in 1996 was to ask for a change in the law to allow federally licensed firearms dealers to buy or transfer "curio or relic" firearms among themselves at gun shows. The law itself at that time was silent on the issue (that is, nothing in the legal code prohibited such transactions), but BATF took the position that such transactions were illegal, and nobody wanted to incur the legal expense of fighting the BATF. So, the law was ultimately changed to allow federally licensed firearms dealers to be able to buy and sell guns from each other at gun shows.

The second reason was that for the first time, valid and reliable evidence of the mismanagement and destruction of NFRTR records became available. This is a document that has been called the Busey Transcript, which was released under a Freedom of Information Act Request. This document is the record of a videotaped training session at BATF headquarters which occurred on October 18, 1995. At the session the then-Chief of the National Firearms Act Branch, Mr. Thomas Busey, stated that the error rate in the NFRTR was 50% when he first assumed his duties the year before; and that

1

BATF always testified in court that the NFRTR was 100% accurate, although that was not 100% true. Toward the end of his presentation, Mr. Busey discussed correcting a number of errors that he described, and stated:

> What we're going to do is we're going to go back, starting with the latest entry and working back to the oldest entry and review every hard copy of every document with its entry into the data base to see if it's correct. I think originally we figured this would take 781 man days to do this with five people sitting at a computer eight hours a day.

> But it's the only way that we can feel that we can ever get it completely accurate. *It was fine to begin putting everything in accurate a year ago or at least be guaranteed a year ago it was correct, but what are you going to do with the entries that go back to the early '80s and the '70s and the '60s?* [boldface added for emphasis].

It was an astonishing admission. Based on Mr. Busey's statements, and information about alleged errors in the NFRTR from firearms collectors, I analyzed statistical data that BATF had publicly released each year on NFRTR transaction activities since approximately 1990. In my 1996 testimony, I documented obvious errors in the NFRTR, including the fact that every year since at least 1992, the BATF reported registrations of firearms during years and in categories which they cannot logically or legally exist, and the apparent addition of firearms to the NFRTR for years before 1971. I also included a copy of the Busey Transcript in the Appendix to my 1996 testimony.

On May 21, 1996, less than a month after my testimony, U.S. District Judge John A. MacKenzie dismissed five convictions for nonregistration of NFA firearms on appeal, declaring that the NFRTR records were too unreliable to support a conviction. In fact, a BATF Special Agent, Mr. Gary N Schaible, testified that BATF employees could in fact have destroyed the documents in question. The U.S. Attorney prosecuting the case declined to cross-examine, and the BATF has not appealed the dismissals. The BATF wants this case to go away. As I will show it isn't going to go away, because it is the object of continuing action in Federal Court.

Astonishingly, the BATF made no apparent effort to correct the problems that I identified, because I detected them in the next round of data it released the following year. So, I returned to testify before this Subcommittee nearly a year later using these data, and this time extensively documented credible instances of apparent mismanagement, misconduct and criminal wrongdoing by BATF. On May 10, 1997, I formally complained to the Treasury Department Inspector General (IG) about several specific events, but on June 5, 1997, the IG wrote and told me that it was declining to investigate—and was referring my complaint to BATF. In an effort to try and prevent what surely would have been another coverup, I contacted the House Committee on Government Reform and Oversight. In early October 1997, the Committee ordered the IG to: (1) independently audit the BATF's firearm registration practices; and (2) evaluate the BATF's internal report. The Treasury Department Inspector General has not, to the best of my knowledge, yet reported its findings to the House Committee.

29

Although the BATF internal report was completed in September 1997, I was unable to obtain a copy until late January 1998. The results were no surprise: the BATF completely exonerated itself, and its responses to my allegations seem to raise public scenery chewing to a new level. In response to statistical evidence I presented that BATF was adding firearms to the NFRTR after being confronted by their owners with valid registration documents, BATF stated that such apparent increases "may be" due to reclassifications of forms. Yet, when I asked NFRTR custodian Gary N. Shaible in April 1996 whether BATF had added firearms to the NFRTR because lawful owners presented valid documents of which BATF had no record, he stated: "Yes. I assume that's happened." Thus, it appears likely that at least some people have been unjustly prosecuted for possessing a lawfully registered firearm, for which BATF lost or destroyed the registration documents.

In an internal 1981 BATF report I obtained under a Freedom of Information Act request, but which BATF apparently released to me by mistake (I hadn't known it existed, and had not requested it), a long-time BATF employee stated that some firearms were registered to people who would then have been 112 years old—and that BATF knew they were dead! BATF's data show that of 14,259 NFA firearms registered from 1934 to 1939, 11,175 (78%) are still owned by the same person or organization who registered or obtained them that year. A person who was 21 years old in 1939 would be 80 years old in 1998. Is it safe to conclude that most of them are now dead?

Of the 58,904 firearms registered during the 1968 amnesty, 50,314 (85%) are still owned by the same people. Someone who was 21 years old in 1968 would be aged 51 in 1998, a 65-year-old would today be 95. At least some of these people are dead. Yet, BATF states in its internal report that some firearms may be registered to dead people, but BATF has no knowledge of this.

Mr. Chairman, each of the 58,904 amnesty registration forms has a social security number on it, it was a required data field for the registration to be accepted. It would take no more than a few hours to determine from the Social Security Death Index exactly how many of these 58,904 NFA firearms are registered to people who are dead. What does this say about the ability of the Government to keep track of firearms it believes are dangerous?

And how pervasive is this problem? Well, according to the most recent data BATF has publicly released (as of December 31, 1996), exactly 108,556 persons have never legally transferred the ownership of machineguns, bazookas, sawed-off shotguns, hand grenades, anti-tank rifles, and similar devices that they registered or acquired by transfer in or before 1971. Inasmuch as the NFA was enacted in 1934, this corresponds to ownership periods of from 27 to 64 years. Someone who registered an NFA firearm at age 65 in 1934 (the specific example cited by the BATF employee in the 1981 internal report) would have been 112 years old in 1981; in 1998, such a person would be 129 years old. Is this sound management on the part of the BATF? I think not.

I could go on at some length about these and similar issues, and have reserved them for the attachments to my testimony, but feel that I must discuss two more situations here. One of them potentially affects me personally; the other is valid and reliable evidence of both perjury and an attempt by BATF to continue to try and cover up errors in the NFRTR.

5

**Exhibit A, Pg. 427**

30

After my April 1996 testimony, through a series of Freedom of Information Act requests, I discovered that four firearms in my personal collection were apparently registered or transferred illegally by the BATF years before I lawfully acquired them. All of these firearms are smooth bore H&R Handy-Guns, and bear serial numbers 5592, 29691, 50885, and 53637. Two of them are new-in-box, are quite valuable, and came from the H&R Factory Collection. I documented this in my April 1997 testimony. As the attachments to my testimony today document, on January 31, 1998, I formally requested a statement from Nereida W. Levine, Chief of the National Firearms Act Branch, asking if the BATF plans to seize these firearms as contraband, and undertake a forfeiture action. In a letter dated March 3, 1998, Chief Levine confirmed what I already knew—namely, that the NFRTR shows that the firearms are legally registered to me, a question that I did not ask.

The question Chief Levine left unanswered, and which I re-asked in an immediate followup letter dated March 6, 1998, is whether the BATF considers these specific firearms as subject to seizure and forfeiture. I have received no response to this letter to date, and I don't believe it is because Chief Levine is unable to read. I think I have received no response because I have placed BATF between a rock and a hard place, namely, if BATF declares the firearms are contraband because BATF itself illegally registered or transferred them, that means the BATF has admitted at least some of what I have alleged, which is that the accuracy and integrity of the NFRTR has been compromised.

I frankly do not know if the BATF will move to seize these firearms after all this blows over. If so, I'll have documents to show to the U.S. Attorney who prosecutes that action, demonstrating that I have repeatedly attempted to deal with this matter as a responsible citizen by contacting the BATF, as well as my elected representatives in the Congress. Mr. Chairman, Members of the Subcommittee, if you legally bought something in a transaction that the Government approved years ago, how would you feel about having your Government forcibly invade your home, seize those items, and go to Federal Court to permanently take them away from you without any compensation? That is a tension that I have lived with for more than a year now, and I can tell you that I don't like it. Would you?

The second situation is evidence of both perjury and an attempt to continue to cover up errors in the NFRTR. Specifically, Mr. Shaible told a completely different story in the 1997 BATF internal report than he did under oath in federal court. In the 1997 internal BATF report, Mr. Schalble stated under oath that the registration documents I was referring to in my complaint were thought to have been destroyed some 8 years ago by contract employees, not BATF employees. Yet, my question specifically referred to the May 21, 1996, testimony, which Mr. Schaible gave under oath in Federal Court, and referred specifically to the BATF employees that Mr. Schaible stated could have destroyed the documents in 1994, which is considerably later than the 1986-87 time frame BATF cites. I have repeatedly gone over each word of each document, and I can find no obvious explanation for this blatant discrepancy. I understand that David N. Montague, Esq., a private attorney representing the defendant in this case, filed a Writ of Habeas Corpus on March 25, 1998, in federal court regarding the single outstanding conviction based, in part, on the discrepant testimony of Mr. Schaible. It seems to me as though the BATF is continuing to try and cover all of this up.

31

In an article entitled "Institutional Perjury," published in the October 1996 issue of *Voice for the Defense*, author James H. Jeffries III, Esq., stated that "the Busey tape was clearly exculpatory and clearly implicated every National Firearms Act prosecution and forfeiture in living memory." He concluded:

> All across the country Assistant United States Attorneys, United States District Judges, and other federal and local law enforcement officials are going to learn what most defense lawyers and gun dealers have known for years and what the aftermath of Waco and Ruby Ridge starkly illustrated: BATF officers and agents lie, dissemble and cover up on an institutionalized basis. These are not aberrations; they are an institutional way of life. Just who is the criminal in these cases?

For the above reasons, and the documented evidence I have presented in my 1996 and 1997 testimonies, as well as in the self-explanatory attachments to this testimony, I would like to respectfully ask the Subcommittee to consider removing the NFRTR from custody of the Bureau of Alcohol, Tobacco and Firearms (BATF), and to permanently reassign its functions to the Department of Justice. The Department of Justice is the entity which actually conducts all of the background checks that the BATF, and other law enforcement agencies, use at trial for violations of the law, and has a much better system than does the BATF for assuring the accuracy and integrity of those records. In contrast, the BATF has destroyed NFRTR records, lied about it, and continued to lie about it.

As you know, the "instant background check" for persons who wish to purchase handguns is scheduled to go into effect later this year, and the Department of Justice is responsible for doing these record checks. Moving the NFRTR from BATF to the Department of Justice would mean that BATF (or its successor—I am hopeful of change in this area) would still certainly have access to these records for legitimate law enforcement purposes; however, the BATF could no longer illegally manipulate or destroy these records. The Department of Justice would have no institutional reason to do so and, indeed, would likely be more objective about maintaining their accuracy and integrity. In my judgement, by its past actions and continuing efforts at trying to cover up its wrongdoings, the BATF has forfeited any right to custody of the NFRTR.

When I was a student in the first Intergovernmental Relations class that the late, great, Barbara C. Jordan taught in 1979 at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin, she told us.

# "Government by the people is not a spectator sport."

Enough said, and I thank you all for the opportunity to present this information.

32

Statement on

Proposed Removal of the National Firearms Registration and Transfer Record
from the Custody of the Bureau of Alcohol, Tobacco and Firearms
and its Proposed Relocation to the Department of Justice

## APPENDIX AND TESTIMONIAL EXHIBITS

by

Eric M. Larson[1]

Presented

before the

Subcommittee on Treasury, Postal Service and General Government
of the
Committee on Appropriations
House of Representatives

B-307 Rayburn House Office Building
Washington, D.C.

April 3, 1998

---

[1]Eric M. Larson is a Contributing Editor to the *Official R. L. Wilson Price Guide to Gun Collecting*, the *Blue Book of Gun Values*, the *Standard Catalog of Firearms*, the *Official Price Guide to Antique and Modern Firearms*, and has been a Life Member of the National Rifle Association of America since 1968. His research has been published in *The Gun Report*, *CADA Gun Journal*, *Machine Gun News*, *Guns Illustrated*, *Small Arms Review*, *The Gun Journal*, and he is author of *Variations of the Smooth Bore H&R Handy-Gun: A Pocket Guide to Their Identification*. A journalist and demographer by training, he graduated with honors in 1974 from the University of Texas at Austin, where he also earned a Ph.D. and three master's degrees.

33

251 Napolilli Lane
Fairbanks, Alaska 99712

1/19/98

Dear Chairman Burton,

My name is Noel Napolilli. I am a retired public school teacher of 28 years. I am writing to you regarding the seizure of my German MP-40, by BATF, in 1993.

I recently learned that my case was included in formal testimony last April before the House Subcommittee on Treasury, Postal Service and General Government Appropriations. I also discovered that it was specifically brought to the attention of Ms. Carol Bergen of the Treasury Department Office of Inspector General last October, although she has not contacted me.

Therefore I will not go into the legalities regarding my case here. I believe that the facts will speak for themselves. I simply would ask for your help in encouraging BATF to return my MP-40.

As you know, I sued BATF for the return of my MP-40 (serial 4212) when they refused to return it to me after I had voluntarily sent it to them for review of the firearm and it's registration paperwork (Form 3). I sent these to them because they questioned the fact that the MP-40 was legally registered. Their laboratory analysis determined that my paperwork was not a forgery, yet they still would not return my firearm or acknowledge its registration, because they had no record of it in their data base. In 1994, after many months of litigation, I dropped the suit against the advice of my councils. This was because my wife and I were fearful of BATF reprisals, the seizure of my sizable firearm collection, being "black balled" in future transactions requiring BATF approval and being harassed by constant "inspections". There was substantial evidence that these things would likely occur based on other incidents with which I was familiar. I also had to consider that the cost of continuing litigation against BATF was going to far exceed the value of the firearm involved. I was very upset about having to drop this case at the time. It became worse after I learned that BATF employees had destroyed other registration documents to avoid having to work on them and that their data base approached a 50% error rate. I feel that this entire incident was unnecessary and cavalier on BATF's part.

I would respectfully request your assistance in anyway you would be willing to provide.

Sincerely,

Noel Napolilli

cc
Chairman Orrin G. Hatch Committee on the Judiciary
Chairman Jim Kolbe Subcommittee on Treasury, Postal Service and General Government

**Exhibit A, Pg. 431**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT FAIRBANKS

| | |
|---|---|
| NOEL E. NAPOLILLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. |
| | ) F93-0037 (JKS) |
| UNITED STATES OF AMERICA, | ) |
| | ) COMPLAINT FOR RETURN |
| Defendant. | ) OF PROPERTY |

COMPLAINT

Plaintiff, Noel E. Napolilli, by undersigned counsel, brings the following complaint and for his cause of action alleges and complains as follows:

1. The plaintiff, Noel E. Napolilli, is a natural individual and an adult citizen of the State of Alaska and the United States of America, residing at 251 Napolilli Lane, Fairbanks, Alaska 99712, within the jurisdiction of this Court.

2. The defendant, United States of America, is the national sovereign and may be found within the jurisdiction of this Court.

3. This is an action for the return of personal property of the plaintiff wrongfully and illegally seized from the plaintiff by the United States and wrongfully and illegally withheld by the United States from the plaintiff. The events and acts complained of herein occurred in the State of Alaska and therefore within the jurisdiction of this Court.

4. The Court has jurisdiction over the parties to and the subject matter of this action by virtue of the provisions of Sections 1331, 1346(a)(2), 1356, 2201 and 2463 of Title 28 of the United States Code; Sections 5872(b) and 7323 of the Internal Revenue Code of 1986, Title 26 of the United States Code; Section 924(d)(1) of Title 18 of the United States Code and Federal Rule of Criminal Procedure 41(e); and the Court's equitable and anomalous jurisdiction.

5. Venue is proper in this judicial district by virtue of the provisions of Sections 1391(b) and 1402(a)(1) of Title 28 of the United States Code.

**Exhibit A, Pg. 432**

6. The plaintiff, Noal Z. Napolilli, is, and at all times pertinent to this complaint was, licensed by the Bureau of Alcohol, Tobacco and Firearms of the United States Department of the Treasury (hereafter "BATF"), an agency and instrumentality of the defendant United States of America, as a dealer in firearms, doing business as Nap Armament, a sole proprietorship. He is, and at all times pertinent to this complaint was, a BATF Class 3 Special Occupational Taxpayer, that is, one who may engage in the purchase and sale of machineguns and other firearms as defined by Section 5845 of the National Firearms Act of 1934, as amended, 26 U.S.C. section 5845, Internal Revenue Code of 1986.

7. On or about July 13, 1985, the plaintiff purchased from a federally licensed Fairbanks, Alaska, firearms dealer a federally registered MP-40 machinegun, caliber 9 millimeter, serial number 4212 (hereafter "the firearm"), a World War II era German military machinegun commonly but mistakenly referred to as a "Schmeisser."

8. On or about August 26, 1985, the National Firearms Act Branch of BATF in Washington, D.C., through its authorized representative Gary Schaible, approved the transfer of the firearm from the seller to the plaintiff by execution of the required BATF Form 3, "Application for Tax-Exempt Transfer of Firearm and Registration to Special (Occupational) Taxpayer."

9. Following the official registration and transfer approval described in paragraph 8, above, plaintiff took possession of the firearm and remained in peaceful, uninterrupted and lawful possession of it until on or about February 3, 1992. Plaintiff has remained the sole and lawful owner of the firearm from July 13, 1985, through the date of filing of this complaint.

10. In September of 1991, BATF conducted a firearms dealer compliance inspection of the plaintiff's business. The inspection was satisfactory, with the exception that plaintiff had in his possession four National Firearms Act firearms (including the MP-40 which is the subject of this action) which the BATF inspector's inventory did not show as being registered to the plaintiff.

11. BATF was ultimately able to determine that its records were incorrect as to three of the four questioned firearms, and that those three were in fact lawfully registered to and properly in the possession of the plaintiff. BATF was apparently unable to determine from its own records however that the MP-40 was lawfully registered to the plaintiff (or to anyone).

12. In December 1991, plaintiff was requested by the National Firearms Act Branch of BATF in Washington, D.C., to

**Exhibit A, Pg. 433**

provide it with a copy of his Form 3 transfer and registration of the firearm and the plaintiff did so.

13. BATF Forms 3 are required by Treasury Regulations to be submitted in duplicate original. When the transfer and registration is approved, one original Form 3 remains with BATF as part of the National Firearms Registration and Transfer Record (26 U.S.C. section 5841(a)) and the second original is returned to the transferor for transmission with the firearm to the transferee. The transferee of a National Firearms Act firearm must retain possession of the duplicate original Form 3 so long as the firearm exists and is registered to him/her.

14. Confronted with a copy of an approved transfer and registration form which it apparently could not find in its own records, BATF took the position that the Form 3 must be a forgery. BATF then demanded the original form from the plaintiff with the expressed intention of submitting it to a BATF laboratory analysis. Plaintiff provided BATF with his original Form 3 as well as the firearm itself.

15. BATF's laboratory examination determined that the Form 3 was not altered or fabricated. The necessary implication of BATF's laboratory examination result, and of its course of behavior, is that BATF has lost or destroyed its own records of the firearm's provenance which BATF is mandated by 26 U.S.C. section 5841(a) to maintain.

16. BATF's lost or destroyed records would have consisted under the National Firearms Act of one of the following:

(A) A Form 1, "Application to Make and Register a Firearm" (non-commercial manufacture by an individual); or

(B) A Form 2, "Notice of Firearms Manufactured or Imported" (manufacture by a licensed manufacturer or importation by a licensed importer); or

(C) A Form 6, "Application and Permit for Importation of Firearms, Ammunition and Implements of War (not for use by Members of the United States Armed Forces)" (importation by a commercial importer); or

(D) A Form 6, Part II, "Application and Permit for Importation of Firearms, Ammunition and Implements of War (For use by Members of the United States Armed Forces) (importation by a non-commercial, U.S. service-member importer); or

**Exhibit A, Pg. 434**

(E)   A Form 10, "Application for Registration of Firearms Acquired by Certain Governmental Entities" (by a law enforcement or military organization); or

(F)  An IRS (ATF) Form 4467, "Registration of Certain Firearms during November 1968" (registration of existing but unregistered firearms during a thirty-day amnesty period in 1968); as well as some combination of the following forms for each successive registration and transfer:

(G)  A Form 3, "Application for Tax-Exempt Transfer of Firearm and Registration to Special (Occupational) Taxpayer," (a tax-exempt transfer between special occupational taxpayers, i.e., importers, dealers and manufacturers); and/or

(H)  A Form 4, "Application for Tax Paid Transfer andRegistration of Firearm," (a tax-paid transfer to an individual who is not an importer, manufacturer or dealer); and/or

(I)  A Form 5, "Application for Tax Exempt Transfer and Registration of a Firearm," (a transfer from a decedent's estates or a law enforcement organizations). In summary, the missing BATF records would show the complete history of the firearm since its manufacture or importation into the United States.

17.    Undeterred by its inability to establish a forged registration or to locate its own registration records, BATF submitted the firearm to a technical examination and concluded that the firearm must have, at some undetermined time in the past, by person or persons unknown, been falsely registered by the original registrant as "remanufactured," a category of registration whereby a firearm previously rendered legally inoperable is restored to operating condition and registered or reregistered as an operable National Firearms Act firearm.

18.    BATF has no evidence the firearm in question was originally registered as "remanufactured," or that it was otherwise registered improperly or unlawfully, and its determination to that affect is arbitrary, capricious and without foundation in fact or law.    Moreover, BATF has lost or destroyed the original registration records, which it is mandated by law to retain and preserve, and which would establish beyond any question how the firearm was originally registered.

19.  Purchasers of registered National Firearms Act firearms, such as the plaintiff, have no legal or practical means of determining the pedigree of a registered firearm and are totally at the mercy of BATF's approval of the transfer application and

**Exhibit A, Pg. 435**

registration (BATF Form 3, 4 or 5) by which the purchasers obtain authority to receive and possess the firearm. BATF refuses to disclose to subsequent registrants the prior registration and transfer forms pertaining to any National Firearms Act firearm, citing the taxpayer privacy provisions of the Internal Revenue Code, 26 U.S.C. section 6103. Thus, purchasers/transferees of National Firearms Act firearms are totally at the mercy of BATF's competence and diligence, or lack thereof, in obtaining valid and permanent possession of a validly registered firearm, and in being able to subsequently effect a legal transfer of such firearm. By their very nature, legally restricted and often of historical significance, National Firearms Act firearms ordinarily are valued at thousands of dollars each.

20. BATF is barred by its own violation(s) of law in losing or destroying required records from challenging the original registration of plaintiff's firearm and from drawing a single negative inference of improper registration from several possible types of registration, all others of which would be lawful and proper.

21. BATF is estopped from challenging the original registration of plaintiff's firearm by virtue of the approvals of the firearm's registration and transfer to the plaintiff, and to plaintiff's predecessor owner(s) and registrant(s).

22. In or about March 1992 BATF advised the plaintiff that it was refusing to return the firearm and that BATF intended to administratively forfeit the firearm as "contraband."

23. Despite repeated demands by the plaintiff, by counsel for plaintiff, and by members of Alaska's congressional delegation, BATF has refused to return the firearm. BATF's refusal constitutes an illegal seizure of the firearm and a taking of plaintiff's property without due process of law.

24. The United States is mandated by law to commence any "action or proceeding for the forfeiture of firearms ... within one hundred and twenty days of such seizure." 18 U.S.C. section 924(d)(1). The retention of the firearm by the United States and its failure to commence such a forfeiture action or proceeding is a denial of due process of law and an unconstitutional taking of plaintiff's property. The United States has lost any jurisdiction over the firearm which it might otherwise have had.

39

WHEREFORE, the plaintiff requests the following relief:

1. A declaratory judgment that BATF's seizure of the firearm and its refusal to return it are arbitrary, capricious and unlawful.

2. A determination that the United States is estopped by its conduct from determining that the firearm is not lawfully registered and properly in the possession of the plaintiff.

3. A determination that the United States has violated the provisions of the Firearm Owners' Protection Act of 1986, 18 U.S.C. section 924(d)(1), and is barred from forfeiting the firearm.

4. An order requiring the United States to immediately return the firearm to the plaintiff.

5. An award of the plaintiff's costs, expenses and reasonable attorney fees incurred in prosecuting this action.

6. A judgment for such other and further relief as is just and proper.

JAMES H. JEFFRIES, III
3019 Lake Forest Drive
Greensboro, North Carolina 27408
Telephone: (910) 282-6024


LYNN E. LEVENGOOD
Downes, MacDonald & Levengood
1008 16th Avenue, Suite 200
Fairbanks, Alaska 99701
Telephone: (907) 452-5196
Counsel for Plaintiff

# Institutional Perjury

By James H. Jeffries, III

On October 18, 1995, Thomas A. Busey, then Chief of the National Firearms Act Branch of the Bureau of Alcohol, Tobacco and Firearms (hereafter "BATF") made a videotaped training presentation to BATF Headquarters personnel during a roll call training session. "Roll call training" is weekly or periodic in-house training for BATF officials — a routine show-and-tell whereby bureaucrats learn about each other's duties and functions.

Busey's National Firearms Act Branch administers the National Firearms Act of 1934,[1] the taxation and regulatory scheme governing machineguns, silencers, short-barrelled rifles and shotguns, destructive devices, etc. In his capacity of NFA Branch Chief Busey was the official custodian of the National Firearms Registration and Transfer Record (hereafter "NFR&TR") mandated by 26 U.S.C. 5841.

Busey's presentation was anything but normal, routine or customary. In describing the NFR&TR, Busey made the startling revelation that officials under his supervision routinely perjure themselves when testifying in court about the accuracy of the NFR&TR.

Every prosecution and forfeiture action brought by the United States and involving an allegedly unregistered NFA firearm requires testimony under oath by a duly-authorized custodian of the NFR&TR that after a diligent search of the official records of which he/she is custodian, no record of the registration of the

firearm in question was found (or was found but showed a different registrant than the person being prosecuted).[2] An alternative method of proving the same facts is by admission into evidence of a certified copy under official Treasury Department seal of a similar written declaration by the custodian.[3] This is a critical element of the government's proof and, according to Busey, occurred 880 times in 1995 alone (presumably Fiscal Year 1995).

Busey began his roll call presentation by acknowledging that "Our first and main responsibility is to make accurate entries and to maintain accuracy of the NFRTR...." Moments later Busey makes the astonishing statement that

> ... when we testify in court, we testify that the data base is 100 percent accurate. That's what we testify to, and we will always testify to that. As you probably well know, that may not be 100 percent true.

Busey then goes on for several missteps describing the types of errors which creep into the NFR&TR and then repeats his damning admission:

> So the information on the 728,000 weapons that are in the data base has to be 100 percent accurate. Like I told you before, we testify in court and, of course, our certifications testify to that, too, when we're not physically there to testify, that we are 100 percent accurate.

How bad was the error rate in the NFR&TR? Busey again:

> ... when I first came in a year

Exhibit A, Pg. 438

41



**CLASSIFIED**

FORENSIC DOCUMENT EXAMINER

Board Certified: Certified Fraud Examiner; 25+ years experience. Expert identification of hand-writing, ink, paper, typing, etc. Hair analysis; changes in all courts including Federal and mil-itary. Civil and Criminal. Member: A.C.F.E., A.B.F.D.E. Upon request: R.K. BROWN & ASSOCIATES; Box 37079, El Paso 79937. Call (915) 591-9457. Fax (915) 598-9595.

42

Lawyers and defendants in NFA cases who have not received the "Busey" package from the United States Attorney should be making prompt demands — both for the package and for an explanation of why it was not timely produced. I am acting as an informal clearing house for these matters. Those lawyers or dealers with questions or problems, or with new information, involving the Busey phenomenon, or its continuing aftermath, are invited to contact me at (910) 282-6024.

[The author is a retired U.S. Department of Justice lawyer and a retired colonel in the Marine Corps Reserve practicing firearms law in Greensboro, NC. He is a 1959 graduate of the University of Kentucky and a 1962 graduate of the UK College of Law, where he was Note Editor of the Kentucky Law Journal. He is an associate member of TCDLA and holds BATF in minimum high regard.]

1 Public Law No. 474, ch. 757, 48 Stat. 1236-1240 (Act of June 26, 1934), 26 U.S.C. 1132-1152q, as amended by Act of April 10, 1936, ch. 169, 49 Stat. 1192, as codified by chap. 736, Act of August 16, 1954 (Internal Revenue Code of 1954), 68A Stat. 721-729; as amended by Public Law No. 85-859, Title II, 203, 72 Stat. 1427, 1428 (Act of September 2, 1958); as amended by Public Law No. 85-478, 1-3, 74 Stat. 149 (Act of June 1, 1960); as amended by Public Law No. 90-618, Title II, 201, 82 Stat. 1227-1235 (Act of October 22, 1968); as amended by Public Law No. 94-455, 90 Stat. 1834 (Act of October 4, 1976), as amended by Public Law No. 99-308, 109, 100 Stat. 449, 460 (Act of May 19, 1986); and as amended by



Advanced Criminal Law Seminar A Novel Approach

★★★★★★★★★★★★★★★★

Legal Assistants can become Board Certified in Criminal Law through the Texas Board of Legal Specialization.

In anticipation of the Board Certification exam, an Advanced Criminal Law seminar for Legal Assistants will be held in Austin, October 25-26, 1996.

Topics include Rules of Evidence, Search & Seizure, The Penal Code, Jury Selection, Stress/Case Management, DWI Update, Juvenile Law, Discovery, and Ethics.

Susan Rogers Cooper, a crime novelist will be Friday's featured speaker. Dr. Matthew Ferrara, a clinical and forensic psychologist will be the featured keynote speaker on Saturday.

If you would like registration information please contact:

Elizabeth Elliott, Law Office of David A. Sheppard 2414 Exposition D-210, Austin, Texas 78703  OR ph: 512-476-9488, fax: 512-472-8418 e-mail: mm@swig.com

Public Law No. 100-203, 101 Stat. 1330 (Act of December 22, 1987); Internal Revenue Code of 1986, Title 26 United States Code, ch. 53, 26 U.S.C. 5801-5872 (Title II of the Gun Control Act of 1968).

2 See Federal Rule of Criminal Procedure 27 and Federal Rule of Civil Procedure 44. See also Rules 803(8), 901(b)(7), 902(1), (2), (4), and 1005 of the Federal Rules of Evidence.

3 Ibid.

4 5 U.S.C. 552.

5 The first rule of a bureaucrat is "Never disturb a body at rest." The second, "If I don't do anything, I can't do anything wrong." The third, "When in doubt, mumble."

6 United States v. Lenhoff, Criminal No. 4:95CR54 (E.D. Va., Newport News Div.).

7 "Special Occupational Taxpayers" under 26 U.S.C. 5801 fall into one of three categories: Class III dealers can possess, sell and transfer NFA firearms; Class II manufacturers can, in addition, manufacture and register them; Class I importers can, in addition to all the foregoing, import them. All SOTs are also required to possess Federal Firearms Licenses, which themselves come in six different classifications. Throw in the import and export licenses and permits required, the various taxes imposed, and the state and local licensing and registration schemes involved, the mandatory record-keeping required, and the shipping and transportation limitations concerned, and you have a lawyer's paradise.

8 BATF Forms 3 are used to authorize tax-exempt dealer-to-dealer transfers and to re-register the firearm(s) involved to the transferee. There are numerous other transfer and registration forms used depending upon the nature of the transaction, the status of the parties involved, and the type of firearm and its origin.

9 Violations of the NFA are all 10-year, $10,000 felonies. See 26 U.S.C. 5871. NFA firearms, which carry some impressive sticker prices, are also forfeit if used in any violation of the NFA. See 26 U.S.C. 5872.

10 We are left to conjecture where the NFA Branch shredder is located in relation to its fax machine.

11 In addition to the loss of civil rights imposed on convicted felons by the laws of most states, felons permanently lose the right under federal law to possess firearms, as well as being potentially debarred from service in the armed forces, civil employment in government, receiving security clearances, bidding on federal contracts, etc.

STAFF

Editor-in-Chief William F. Alexander

Managing Editor John Chesen

Attorney/Editor Cby Larsed

Executive Assistant/ Program Coordinator Lilian R. Paglia

Administrative Assistant/ Membership Coordinator Sharon A. Matanich

**Exhibit A, Pg. 440**

43

**CHARLES T. CANADY**
12+ Bandich, Florida

COMMITTEE ON THE JUDICIARY
MARSHAL SUBCOMMITTEE ON
THE CONSTITUTION

COMMITTEE ON AGRICULTURE

## Congress of the United States
### House of Representatives
### Washington, DC 20515—0912

2432 Rayburn Building
Washington, DC 20515-0912
(202) 225-1252

Hansel Arcade Building
109 South Kentucky Avenue
Suite 510
Lakeland, FL 33801
(941) 688-2651

March 11, 1998

Mr. Craig Smith
1519 S Lake Rochelle Dr
Winter Haven, FL 33881-9645

Dear Mr. Smith:

Thank you for contacting me regarding an article alleging
mismanagement, misconduct, and criminal wrongdoing by the Bureau
of Alcohol, Tobacco, and Firearms (BATF). I appreciate hearing
your views on this important issue.

Enclosed is the BATF's response to the article. I hope this
information is helpful to you.

As a member of the House Judiciary Committee (which has BATF
oversight jurisdiction), I will remember your concerns. Again,
thank you for taking the time to contact my office. Please let
me know whenever you have concerns regarding issues before the
Congress.

Sincerely yours,

Chn.

Charles T. Canady
Member of Congress

CTC:jm

Enclosure

PRINTED ON RECYCLED PAPER

**Exhibit A, Pg. 441**

54



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

FEB 13 1998

DIRECTOR



Honorable Charles T. Canady
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Canady:

This is in response to your November 13, 1997, request
concerning allegations made by Mr. Eric M. Larson of
mismanagement, misconduct and criminal wrongdoing by
the Bureau of Alcohol, Tobacco and Firearms (ATF).
Mr. Larson's allegations were contained in the
October 3, 1997 issue of "Gun List." We apologize for
the delay in responding to your request.

By way of background, Mr. Larson has been requesting
information on the H & R Handy Gun and the Marble Game
Getter firearms since approximately 1986 or 1987.
Mr. Larson has requested that these firearms be removed
from the scope of the National Firearms Act (NFA).
Whenever Mr. Larson has contacted ATF with a question
or request, ATF has provided the available information.
In May of 1997, the Assistant Inspector General (IG)
for Investigations, Department of the Treasury,
received a letter from Mr. Larson making allegations
against various ATF employees. The IG's Office
forwarded the letter to the Director of ATF to conduct
an appropriate investigation into these allegations.
The article contained in "Gun List" references these
allegations and suggests that the IG's Office has acted
inappropriately in allowing ATF to investigate
allegations of misconduct made against the agency.

Initially, we would note that it is the function of
ATF's Office of Inspection to investigate allegations
of wrongdoing made against ATF employees and that it
was entirely proper for the IG's Office to forward
Mr. Larson's letter to ATF for investigation.
Furthermore, while ATF did conduct an internal
investigation into the allegations made by Mr. Larson,

45

-2-

Honorable Charles T. Canady

the IG's Office also initiated an independent
investigation into these allegations and that
investigation is still ongoing.  Due to this ongoing
investigation we are unable to comment further on any
action that might be taken with respect to the
allegations made by Mr. Larson.

We hope that this information proves helpful in
responding to your constituent.  Please let me know if
we can be of further assistance.

Sincerely yours,

John W. Magaw
Director

**Exhibit A, Pg. 443**



## GUN TALK

*David Kowalski*

### Establishing Bill Of Rights Day— December 15

### THE STANDARD REPORT

*Ned Schwing*

# What Happens When The BATF Breaks The Law?

> "A federal district court dismissed five convictions for possession of unregistered firearms...a BATF Special Agent testified that BATF employees destroyed registration documents rather than working on them."



**Exhibit A, Pg. 444**

18   March 1998



# How Firearm Registration Abuse & the "ESSENTIAL OPERATIONAL MECHANISM" of Guns May Adversely Affect Gun Collectors



**ban some guns on the basis of "their essential operational mechanism." Both issues may adversely affect gun collectors.**

My concerns about registration evolved from my research on smooth bore pistols, which was published in two series of three-part articles in CADA Gun Journal (August, September and October 1994; and April, May and June 1995).

In 1997, my research triggered a Congressionally-directed audit of the firearms registration practices of the Bureau of Alcohol, Tobacco and Firearms (BATF)—the first ever by an outside entity. This audit is occurring because of my testimony before a Congressional subcommittee regarding the BATF's administration of the National Firearms Act (NFA) of 1934, and involves mismanagement, misconduct and criminal wrongdoing.

The NFA is designed to control firearms thought to be mainly used by criminals by requiring registration of the firearms, and using prohibitive taxes to reduce their manufacture, distribution, and ownership. It is a harsh federal law to discourage illegally manufacturing, selling or possessing hand grenades, machine guns and similar weapons, and the cutting down of conventional shotguns or rifles (regardless of their caliber) to make concealable firearms. Any vio-

lation of the NFA is a felony carrying a 10-year, $10,000 fine penalty upon conviction.

NFA firearms are controlled under Title II of the Gun Control Act of 1968, and are said to have no legitimate sporting purpose. NFA firearms are often referred to as "Title II" firearms. Conventional rifles, shotguns, pistols and revolvers, which are considered to be sporting firearms, have considerably fewer legal restrictions and are controlled under Title I of the 1968 Act.

In 1934, a provision that would have included pistols and revolvers under the NFA failed to pass the Congress by a single vote. For technical reasons (because they were deemed concealable, but not to be pistols or revolvers) the Treasury Department ruled in 1934 that a small group of unusual or specialized firearms fall under the NFA. Most were relatively low-powered small-game guns, such as Marble's Game Getter Gun, the smooth bore .410 H&R Handy-Gun, and various animal trap guns. They were not—even in 1934—normally identified as "gangster weapons." Most others, such as knife-pistols, were obsolete long before 1934 and were designed more as gimmicks or gadgets than as firearms. All are

**Exhibit A, Pg. 445**

Case 1:18-cv-02988-DLF   Document 58-1   Filed 03/31/20   Page 447 of 67

Classified as "Any Other Weapon" (AOW) under the NFA. I estimate that fewer than 17,000 still exist today. AOWs manufactured in the United States in or before 1934 are among the rarest of firearms, and are highly prized by collectors.

What some people have told me regarding their discovery of one of these AOWs (usually a Guns Getter or Handy-Gun) in the estate of a parent or other relative was disturbing. Upon attempting to transfer the ownership, ATF alleged the firearm was not registered—rendering it illegal contraband that nobody can own. But, after searching, some people said they found the registration. ATF then allegedly declared an error had been made, and processed the transfer. It is well-known that ATF will not allow any firearm, even a rare collector's item, to be voluntarily re-registered.

On April 30, 1996, I testified before the House Subcommittee on Treasury, Postal Service and General Government Appropriations, which funds the BATF. This opportunity occurred because the Collectors Arms Dealers Association (CADA) included me as a witness, at the invitation of its then-President, L. Richard Littlefield. I'd known Dick since about 1989.

Dick was aware of my research and thought it was time to make a case for a more reasonable treatment of these guns, as the law provides. Indeed, in 1938, 1945 and 1964, the Congress amended the NFA to provide for a more lenient treatment of many of these firearms, and in 1968 unanimously declared that all AOWs were mainly "gadget-type and unique weapons, which are often sought after by gun collectors," and unlikely to be used by criminals.

Under the Gun Control Act of 1968, the Congress provided that BATF could administratively remove such firearms from the NFA if it determined they are mainly collector's items and are not likely to be used as weapons. Under the 1968 provision, BATF may have administratively re-

moved 50,000 to 100,000 firearms from the NFA. Most are valuable shoulder-stocked Luger and Mauser semi-automatic pistols, or short-barreled Marlin or Winchester "trapper" carbines. After their removal, virtually none have been used by criminals.



My intention in testifying in 1996 was to (1) put a well-researched case on record disclosing the law and legislative history that supports a more reasonable treatment for "Any Other Weapon" firearms which were manufactured in the United States in or before 1934, and (2) provide BATF with an opportunity to do the right thing. Perhaps predictably, BATF did absolutely nothing, although I also presented some evidence that BATF had made errors in its record-keeping on these guns.

So I came back and testified again on April 8, 1997, almost a year later, before the same subcommittee. This time, I provided more details of evidence I mentioned briefly in my 1996 testimony, by documenting credible instances of mismanagement, misconduct and wrongdoing by BATF in administering the NFA. I found evidence that BATF employees have: (1) destroyed firearm registration documents rather than work on them; (2) illegally registered nearly 2,500 NFA firearms after the 1968 amnesty period expired; (3) since 1981, continued to allow thousands of machineguns and other NFA firearms to be registered to people that BATF knows are dead; and (4) added firearms to the NFA database because owners confronted BATF with regis-

tration documents, for which BATF lost or destroyed its records. In 1996, a federal district court dismissed five convictions for possession of unregistered NFA firearms on appeal because of the unreliability of BATF's firearm registration records. Significantly, BATF did not appeal the decision.

In May 1997 I complained to the Treasury Department Inspector General (IG), and requested an investigation. The IG responded by referring my complaint to BATF— which was something like putting my request into a bottle and consigning it to the ocean off Cape Horn. I made a further complaint to the Congress that the IG simply wasn't doing its job, and that BATF would probably simply summarize it. In early October 1997, the House Committee on Government Reform and Oversight directed the IG to independently audit the BATF's firearm registration practices. Further information about my 1997 testimony and the current IG investigation may be found on the Internet at the following address: http://www.co.cass.edu/afs/cs.cmu.edu/user/rhardwel/public/afallaz/index.html

How this case turns out will be critically important for gun collectors and the issue of firearms registration by the federal government. What happens when the government messes up the registration records? And what happens when the BATF breaks the law? At the least, in my judgement, the Congress will unquestionably not allow machineguns and similar firearms to continue to be registered to persons that the BATF has stated are dead.

Just as critical, in my judgement, is the issue of banning firearms on the basis of "their essential operating mechanism." I have quoted this phrase from a White House press

Continued on page 79

Exhibit A, Pg. 446

49

Continued from page 18

release dated November 15, 1987. It contains the context of a Memorandum to the Secretary of the Treasury, directing him to conduct a 120-day review of "whether modified semiautomatic assault-type rifles are properly importable under the statutory sporting purposes test," and to suspend all imports of these guns during the 120-day period.

I am concerned about how the BATF will ultimately interpret political directives such as this one, because of its past activities involving handguns that are designed to fire .410 shotgun ammunition. As I will show, there are important similarities and potentials for abuse of discretion.

During the early 1990s I unsuccessfully petitioned ATF to remove the smooth bore H&R Handy-Gun from the NFA. There is no credible evidence that the Handy-Gun would be likely to be used as a weapon. Indeed, there are more than a dozen handguns designed to fire .410 ammunition on the market today. None are subject to the NFA because their barrels are rifled, however, more importantly, some have been identified as weapons of choice by criminals. A single-shot .410 is a perfect small-game or rodent gun, and not good for much else.

In a letter to me dated July 20, 1994, BATF Director John W. Magaw denied my appeal. The reason, Mr. Magaw stated, is that there is no "practical" difference between an H&R Handy-Gun and a sawed-off shotgun. Interestingly, Mr. Magaw rejected my contention that there was no "practical" difference between an H&R Handy-Gun versus the .410 Thompson Contender pistol, a popular sporting firearm. "We fail to see the basis for this comparison," he wrote, "because the Contender pistol is not a smooth bore shot pistol subject to the NFA."

Mr. Magaw's statement regarding the .410 Contender is "interesting" because for 15 years, BATF held agents took exactly the opposite position—despite the fact that in less a person than then-BATF Director Harold A. Serr had ruled that the .410 Contender was not subject to the NFA. Mr. Serr made this ruling in an official Memorandum dated February 11, 1969, which was distributed throughout BATF, including all ATF agents and other employees with law enforcement or regulatory responsibilities.

Nevertheless, on June 16, 1969, BATF agents Cecil Wolfe and Paul Westenberger (Washington, D.C., national office) and Victor Fenn (Boston Office) threatened Kenneth Thompson and Warren Center, of Thompson/Center Arms, that BATF would

> Here there are hundreds of
> thousands of modern .410
> handguns in circulation to-
> day—the vast majority tucked
> in a fishing tackle box or hunt-
> ing jacket to take on a hunting
> or fishing trip, for use against
> snakes, vermin or small game."

rule the .410 Contender to be an NFA firearm if they didn't stop manufacturing it. "Terminate production," Mr. Wolfe said, and instructed: "Whatever your story will be, please refrain from giving the impression that the 'Contender' is a firearm under the NFA." Mr. Wolfe's threat was flat out illegal, but effective. Mr. Thompson and Mr. Center complied, as do virtually all people who are threatened with either a criminal action or the economic disruption of their livelihood by a federal law enforcement agency with unlimited resources.

Mr. Wolfe's threat worked until 1985, when a Freedom of Information Act request by attorney Stephen P. Halbrook revealed the existence of the February 1969 memorandum.

Production of the .410 Contender soon resumed. Today, the .410 Contender is one of at least a dozen different modern handguns designed to fire .410 shotgun ammunition being currently manufactured and sold in the United States today. None are subject to the NFA because their barrels are rifled. Perhaps most importantly, none have to my knowledge ever been identified as weapons of choice used by criminals. I believe there are hundreds of thousands of modern .410 handguns in circulation today—the vast majority tucked in a fishing tackle box or hunting jacket to take on a hunting or fishing trip, for use against snakes, vermin or small game. I have found no credible evidence that any of these guns are commonly used in street crimes, or that they are weapons of choice by criminals.

In a 1981 prosecution, BATF argued in federal court that it was legally impossible for a firearm such as the smooth bore H&R Handy-Gun and a sawed-off shotgun to be regarded equal under the NFA. The law, BATF argued, requires a firearm like the Handy-Gun to be given "special and more lenient treatment" than a sawed-off shotgun. (In this particular case, a person sawed off the barrel of a 12 gauge shotgun, installed a pistol grip, and claimed it was an AOW.) The BATF presented an ironclad case that a sawed-off shotgun and an AOW are not identical, and cannot be identified according to law and legislative history. Although a sawed-off shotgun, a .410 H&R Handy-Gun, and a .410 Contender are all capable of firing identical ammunition through a barrel of nearly identical length, those shared characteristics are legally meaningless regarding their legal classification as firearms.

A similar example makes the point another way, and also illustrates why BATF's position is legally incorrect. Consider that the NFA prohibits the unauthorized cutting down of a conventional shotgun or rifle (regardless of caliber) to make a concealable firearm. Thus, a person who sawed off the barrel of a Ruger 10-22



51

Source: published in *Official E. L. Wilson Price Guide to Gun Collecting*, by R. L. Wilson. First edition. New York: The Ballantine Publishing Group/Random House, Inc., 1998, pages 56-59.

# Smoothbore Pistols Firing Shotgun Shells

## BY ERIC M. LARSON

As rare American cultural artifacts, certain smoothbore pistols originally manufactured in the United States at or before 1934 occupy a unique niche in U.S. firearms history and genealogy. They are highly prized by collectors, yet still inappropriately regulated strictly as machine guns by the Bureau of Alcohol, Tobacco and Firearms (ATF).

These guns were made when no federal laws (and relatively few state laws) affected firearms design. While it is rare, the most commonly encountered example is the 12½-bored H&R Handy-Gun, designed to fire the 2½" .410 shotgun shell. It is one of several smoothbore pistols that competed with Marble's Game Getter Gun, a .22/.44 or .410 combination firearm with a folding shoulder stock that was first manufactured in 1908. A few smoothbore pistols (such as the 20-gauge Ithaca Auto & Burglar Gun) were marketed as defensive weapons, but most were relatively low-powered small-game guns.

Smoothbore pistols like the H&R Handy-Gun are currently regulated by the National Firearms Act (NFA) of 1934. The NFA is designed to control firearms thought to be mainly used by criminals by requiring registration of the firearms, and using prohibitive taxes to reduce their manufacture, distribution, and ownership. It is a harsh federal law to discourage illegally manufacturing, selling, or possessing hand grenades, machine guns, and similar weapons; and the cutting down of conventional shotguns or rifles (regardless of their caliber) to make concealable firearms.

Curiously, as passed in 1934, the NFA specifically excluded "a pistol or revolver," and still does today. As originally enacted, the NFA defined a "firearm" as:

A shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun; and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

But several original versions of the bill that eventually was enacted as the NFA included "a pistol, revolver ... or any other firearm capable of being concealed on the person" within the definition of an NFA "firearm." Under the NFA as originally proposed, pistols and revolvers would have been regulated as strictly as machine guns.

After debate, the bill was amended to remove pistols and revolvers, but not other concealable firearms. Thus, small firearms not readily classifiable as traditional pistols or revolvers (such as cane-guns, knife-pistols, and so forth) had to be registered. But Congress did not define the terms "pistol," "revolver," "rifle," "shotgun," or "any other weapon" under the original NFA in 1934. Consequently, ATF applied the NFA using administrative regulations.

When the original NFA became effective on July 26, 1934, *all* items defined as "firearms" had to be registered and there was a $200 tax on each transfer of ownership. The $200 rate, set to equal the cost (in 1934) of a new .45 caliber Thompson Submachine gun, was designed to be prohibitive.

Why were smoothbore pistols, which were clearly designed as handguns, deemed not to be pistols? In 1926, the Bureau of Internal Revenue determined that the H&R Handy-Gun was "not a pistol or revolver within the meaning ... and is not, therefore, subject to tax" under the Internal Revenue Act of 1926. The 1926 Act had exempted rifles, shotguns, and ammunition from a 10 percent firearms excise tax enacted in 1918, but, because of anti-handgun politics, retained it for pistols and revolvers, (the .410 Stevens Off-Hand Shot Gun, another smoothbore pistol, also was exempted).

The 1926 ruling resulted from an agitation by the H&R and Stevens manufacturers, who argued that these firearms were useful to trappers, farmers, hunters, lumberjacks, and others who worked outdoors, being relatively compact and less bulky than a firearm intended to be fired from the shoulder.

A circa 1929 H&R advertisement states: "The 'Handy-Gun' is classified by the U.S. Government as a shotgun." Other documentation of the H&R Handy-Gun's classification as a "shotgun" has not been located. Interestingly, H&R catalogues from that era state that under the laws of some states, any firearm with a barrel less than 12 inches in length was defined as a pistol; consequently, the 12½-inch barrel caused the H&R Handy-Gun to avoid being regulated in those states as a pistol.

ATF determined that "since the manufacturer had argued successfully his point in 1926 that the H&R Handy-Gun was not a pistol, it was very easy for the Bureau in 1934 to point out ... that the weapon could not be excepted from the definition of a firearm as defined in ... the National Firearms Act ... as being a pistol." "Therefore," ATF concluded, "it was easy" to place the H&R Handy-Gun within the term "firearm" as being "any other weapon" capable of

52

being concealed on the person. ATF used this interpretation to classify all smoothbore pistols as "any other weapon" under two different rulings, each dated August 6, 1934. Ruling S.T. 772 applies to "a so-called shotgun with a pistol grip, which fires a shot shell," and Ruling S.T. 779 to a firearm that it "a single shot, single trigger, and single hammer gun with a pistol grip, and is chambered for shot loads." The test, S.T. 779 states, "is not the length of the barrel, but whether the weapon is capable of being concealed upon the person."

Because the $200 transfer tax vastly exceeded their value as firearms, no smoothbore pistol that was manufactured in 1934 was ever regularly, commercially manufactured again. Recognizing that some of these firearms have "legitimate uses," Congress reduced the $200 tax to $1 in 1938 for Marble's Game Getter Gun. The Congress declared: "The weapon at which the legislation refers may be utilized either as a shotgun or as a rifle and has legitimate uses." ATF administratively removed the 18-inch barrel variation from the NFA in 1939 because, "after reconsideration," it was not deemed concealable on the person.

In 1945, the Congress extended the $1 tax reduction to a single-shot smoothbore pistol with a barrel at least 12 inches in length. This reduction applied to the .410 and 28 gauge H&R Handy-Gun, .410 Stevens, and .410 Crescent Certified Shotgun, among others. Again Congress spoke definitively, and determined that these firearms "are particu-

larly useful on farms and elsewhere for extermination of vermin and predatory animals, and in hunting and trapping activities where quick firing at close range is essential." The prohibitively high manufacturer, dealer, and transfer taxes Congress found, work "an injustice both against those who need such low-powered, so-called small-game guns, and against those who make and deal in them."

In 1960, Congress changed the transfer tax to $5 for all NFA firearms classified as "any other weapon" (which included all smoothbore pistols), recognizing that they were mainly of interest to collectors and not likely to be used as weapons.

Under the Gun Control Act of 1968, Congress provided that ATF could administratively remove any firearm (except a machine gun or destructive device, such as a land mine or hand grenade) from the NFA if it determined that the firearm is primarily a collector's item and is not likely to be used as a weapon. Since 1968, it appears that ATF may have removed 50,000 to 100,000, or more, firearms from the NFA as collectors' items; and that the vast majority of these firearms were shoulder-stocked pistols of the Mauser and Luger variety. Fewer than 10,000 smoothbore pistols manufactured in or before 1934 are estimated to have survived until 1997, out of an original production of less than 100,000 (see table). While Marble's Game Getter Gun is not a smoothbore pistol, it is included in the table because of its historical relevance.

Modern rifled-barrel pistols that are designed to fire

...eapon shells are not subject to the NFA, that is, no federal registration with ATF or tax payment is required. The reason is that the Congress specifically exempted any pistol with a rifled barrel from the NFA in 1968. The pistols discussed in this research were originally manufactured with smoothbore barrels.

All of the smoothbore pistols and other firearms listed below are Class III firearms unless specifically noted. If they are not currently registered with ATF, their sale, transfer, or possession is illegal. Moreover, it is also illegal for any person to borrow or otherwise possess any NFA firearm that is registered to another person, even if the registered owner is present.

Because smoothbore pistols are not frequently bought or sold, establishing reliable values can be difficult. The values listed here are approximate, and may vary significantly according to local supply and demand. If ATF removed these rare firearms from NFA controls, as it has for 50,000 to 100,000 or more short-barreled Winchester and Marlin "trapper carbines" and various Luger, Mauser, and other shoulder-stocked pistols and other rare firearms, their values would probably increase substantially.

### CALIFORNIA ARMS CO.

San Jose, California, distributed circa 1916 to 1936, but manufactured by The American Machine Company in 1936–37; 2½" shotgun or ten-gauge shells only; total production was probably fewer than 300. Model A has 12½" barrels and a checkered forearm; Model B has 12¼" barrels and a smooth forearm; Model C has 12" barrels and a smooth forearm.

Dekkane Auto-Bandit Gun, 20 gauge, 12½" or 12½" double barrels.
Class III, Curio ................... **RARE**

### CRESCENT FIRE ARMS CO.

Norwich, Connecticut. Knickerbocker Pistol, circa 1900s; total production unknown; nickel-plated barrels, receiver is case-hardened, right side marked AMERICAN GUN CO./NEW YORK U S A, left side marked KNICKERBOCKER, fitted with checkered pistol grip resembling that of the Model 1 and Model 2 smoothbore H&R Handy-Gun. Victor Ejector, circa 1928–30; total production unknown, left side of receiver marked Victor Ejector/ Crescent Fire Arms Co./Norwich, Conn. U.S.A., .410 on top left of receiver near breech, blued barrel marked GENUINE ARMORY STEEL, 2½" shells only; and New Empire, circa 1932, blued barrels, left side of case-colored receiver marked Crescent Fire Arms Co./Norwich, Conn. U.S.A., right side marked New Empire, probably fewer than 30 manufactured, four known specimens bear serial numbers S–1, S–15, S–18 and S–19; referred to as "Crescent Auto & Burglar Gun" in a 1932 advertisement in Hunter Trapper Trader.

Knickerbocker Pistol, 20 gauge, 14" double barrels.
Class III, Curio ................... **RARE**

Victor Ejector Pistol, .410 bore, 12" single barrel.
Class III, Curio ................... **RARE**

New Empire, .410 bore or 20 gauge, 12½" double barrels.
Class III, Curio ................... $700

### CRESCENT-DAVIS ARMS CORP.

Norwich, Connecticut, circa 1930–35; production was probably fewer than 4,000; receiver may be blued, case-colored or color case-hardened, left side marked Crescent Certified Shotgun/Crescent Davis Arms Corp./Norwich, Conn. U.S.A.

Crescent Certified Shotgun, .410 bore, 12½" single barrel.
Class III, Curio ................... 450

Add $200 to $300 for original cardboard box.

### HARRINGTON & RICHARDSON ARMS CO.

Worcester, Massachusetts, 1921–34; total production about 54,000; 8" or 12½" .410 or 28-gauge single barrel; more than 91 variations exist; values below assume choked .410 or unchoked 28-gauge with 12½" barrel, case-hardened receiver marked H&R Handy-Gun, spur grip and plain trigger guard; early models have blued receivers and/or unchoked barrels, late models have choked barrels and/or hook or trigger guard. Other values may be estimated according to scarcity in serial number table, which is a work in progress. Private-branded or trade-branded (e.g. earlier ESSEX GUN WORKS or HUBBARD MODEL W. H.) variations exist; all have nickel-plated receivers and blued barrels.

| Variation | Estimated year(s) of manufacture | Observed serial number ranges | |
|---|---|---|---|
| | | .410 bore | 28 gauge |
| **Series 1** | | | |
| Type 1 | 1921–22 | 607 to 4881 | 5 to 4537 |
| Type II | 1923–23 | 5051 to 6598 | 5554 to 6274 |
| Type III | 1923–24 | unknown to 6817 | 6973 to 7887 |
| **Series 2** | | | |
| Type 1 | 1924–25 | 8276 to 14860 | 10579 to 29731 |
| Type II | 1925–27 | 15159 to 38761 | none observed |
| Type III | 1927–30 | 39060 to 47528 | 44228 to 44747 |
| **Series 3** | | | |
| Type 1 | 1931 | 47642 to 48238 | unknown to 48566 |
| Type II | 1932–53 | 48819 to 51655 | none observed |
| Type III | 1933–34 | 51920 to 53691 | none observed |

H&R Handy-Gun, .410 bore, 12½" choked single barrel.
Class III, Curio ................... [illegible]

H&R Handy-Gun, 28 gauge, 12½" unchoked single barrel.
Class III, Curio ................... [illegible]

Late variations command premiums: 8" barrel, 25% to 50%; 10" barrel, 200% to 400%; unchoked .410, 20% to 50%; 28 gauge or more ... [illegible] ... original [illegible] ...

V.G.    Exc.

area, 1506 or more, Sahue, 375-4200; same matching box, $150-$400; early taxes for extremely rare.

## ITHACA GUN CO.

Ithaca, New York, 1921-39, Model A (two or grip), 295" shells only, about 2,500 manufactured, 1923-29, Model B (no grip), 2" shells, about 2,000 manufactured; variations exist, some below assume 20-gauge, 10" smooth barrels.

Auto & Burglar Gun, Model A.
Class III, Curio .......................... $1,110   $1,500
Auto & Burglar Gun, Model B.
Class III, Curio ..... 800   900

Only 13 special order or unmatched (410 bore, 2B gauge, and 16 gauge, with barrels from 10" to 26" in length) Auto & Burglar Guns have been documented. All are extremely rare, and command premiums of 100% or more; professional subscriptions a highly recommended. Original holsters (marked AUTO AND BURGLAR GUN/MADE BY/ITHACA GUN CO./ITHACA, N.Y.) are rare and worth $300-$500.

## J. STEVENS ARMS CO.

Chicopee Falls, Massachusetts, Off-Hand from 1923-29, exact total production unknown, but probably about 23,000; Auto-Shot from 1929-34, about 2,000 manufactured.

Off-Hand Shot Gun No. 35, .410 bore.
8" or 12¼" single barrel. ...
Class III, Curio ................... 300   500
Auto-Shot No. 39, .410 bore, 8" or 12¼" single barrel.
Class III, Curio ................... 250   350

## MARBLE ARMS & MFG. CO.

Gladstone, Michigan, successor in 1911 to Marble Safety Axe Co. First model from 1908-14, second model from 1921-42, final production was about 10,000 for each model. The 18" barrel variations are exempt from the NFA only if an original shoulder stock is attached. In 1961, ATF ruled that if the shoulder stock is removed from any Game Getter, regardless of its barrel length, it becomes "a firearm made from a shotgun" requiring registration as a short-barreled shotgun with a $200 transfer tax rate.

Marble's Game Getter Gun, Model 1908
12" or 15" barrels, with shoulder stock attached.
Class III, Curio ..... 900   1,500

V.G.   Exc.

18" barrels, with shoulder stock attached.
Curio, Exempt from NFA ............. 31,000   31,800
Marble's Game Getter Gun, Model 1921
12" or 15" barrels, with shoulder stock attached.
Class III, Curio ..................... 600   850
18" barrels, with shoulder stock attached.
Curio, Exempt from NFA ........... 900   1,000

Boxed guns will sometimes command values (.25-.30, .32-.20, .38-.40, etc.) command premiums of 50% to 200% or more; add $75-$150 for original shoulder holster. An extremely small number of Model 1908 Game Getters were originally manufactured as over-and-under double rifles, with rifled barrels. ATF requires these firearms to be registered as short-barreled rifles, with a $200 transfer tax rate, if the barrels are less than 16" in length and originally manufactured with a shoulder stock. If the shoulder stock is removed, ATF has ruled it to be a "firearm made from a rifle," also requiring registration and a $200 transfer tax.

Marble's Game Getter Pistol,
Model 1908 9" barrels, .22/.44 smooth bore.
Class III, Curio ......................... RARE

In approximately 1913, Marble manufactured an extremely small number of pistols with barrels ranging from 9" to 18" as experimental and special-order guns, using the Model 1908 receiver. These firearms are currently defined as "any other weapon" and must be registered; the transfer tax is $5. These firearms may be reliably identified by the lack of an inlet in the receiver to attach a shoulder stock. One known specimen bears serial number 3437.

## REMINGTON ARMS CO.

Ilion, New York, c. 1867-75, 20 gauge, single-shot with rolling block action; may be used as a pistol or shotgun; usually encountered with a detachable shoulder stock and classified as a "short-barreled shotgun" by ATF ($200 transfer tax) in that configuration. Whether it qualifies for the $5 transfer tax if uncompanied by a shoulder stock is unclear. It cannot be classified as a Curio because it is an Antique firearm manufactured before 1899; it is thus a Class III NFA firearm because it fires fixed (cartridge) ammunition that is currently available in ordinary commerce.

Remington Combination Pistol-Shotgun.
11" single barrel.
Class III ............................. RARE

Note: The author wishes to thank Mr. Larson for his contribution of the text in this section. For more information or considerations thereto, Mr. Larson may be contacted at P.O. Box 5457, Tacoma Park MD 20913; telephone (301) 270-3430.

55

FEB 11 1969

Assistant Regional Commissioner
Alcohol, Tobacco and Firearms
North-Atlantic Region

Alcohol, Tobacco and Firearms Division
National Office CP:AF:ED:JBC

Classification of the Thompson/Center "Contender" single shot pistol.

We have received a number of inquiries regarding the classification of the above mentioned pistol which is manufactured by Thompson/Center Arms, Rochester, New Hampshire.

Information available to this office discloses that the Thompson/Center "Contender" is manufactured in various pistol and revolver calibers such as .22LR, .22MR, .22 Hornet, .22 Rem-Jet, .38 Special, .357 Magnum, .256 Winchester Magnum and possibly more. The caliber of the gun can be changed by changing barrels. However, the caliber combination in question, and on which this ruling is based, is the barrel made to accommodate either the .45 Long Colt or .410 shotshell. This barrel measures 6 13/16 inches and contains rifling (spiral lands and grooves). A 1 7/8 inch choke device attached to a 1 5/16 inch unrifled muzzle brake is added to the barrel. The choke device is not smooth bored but contains six straight lands (sometimes called flukes). These straight lands are flush with the rear of the choke tube but taper upward to a height of about 1/32 of an inch at the muzzle like small romps. When a .410 shotshell is fired in this barrel the spiral rifling in the first 6 13/16 inches of the barrel gives the shot pattern a swirling motion. However, as the shot pattern passes through the muzzle brake and enters the choke tube, the straight lands of the choke tube purportedly stop the swirling motion and make the shot pattern more uniform instead of leaving the muzzle like a smoke ring with an empty center. A word of warning from the manufacturer makes it clear that the choke device must be removed before firing the .45 Long Colt cartridge, otherwise severe damage may result to both the shooter and the firearm.

It is the opinion of this office that the Thompson/Center "Contender" was, and is, originally designed as a pistol and its configurations conform to the definition of a pistol as that term is defined in Part 179.35, Title 26, C.F.R. As a pistol the "Contender" is not a firearm subject to the National Firearms Act as amended by Public Law 90-618.

(Signed) Harold A. Serr

Harold A. Serr
Director

CC:   ALL REGIONS
      JBCain/mtc 1/24/69

| | | | CP:AT:E | CP:AT:E | | | GC | |
|---|---|---|---|---|---|---|---|---|

56

REPORT OF TRIP TO THOMPSON/CENTER ARMS, ROCHESTER,

NEW HAMPSHIRE, ON JUNE 18, 1969

CP:AT:ED:PHW

June 18, 1969

At 1:35 p.m. on June 18, 1969, a meeting was held at the
Thompson/Center Arms, Route 11, Rochester, New Hampshire, 03867,
regarding the status of the "Contender" when equipped with the
.45/.410 dual caliber combination barrel and choke tube.

In attendance at this meeting were the following persons:

      Mr. Kenneth Thompson - T/C Arms

      Mr. Warren Center - T/C Arms

      Mr. Robert Gustaffson - T/C Arms

      Mr. Cecil Wolfe - National Office, ATFD

      Mr. Victor Fezio - Boston Office, ATFD

      Mr. Paul Westenberger - National Office, ATFD.

Mr. Wolfe opened the conference by stating the purpose of the visit,
that being to reach a mutual agreement with Thompson/Center Arms
regarding the future of the firearm when equipped with the .45/.410
barrel. Mr. Wolfe then gave a resume of past and current legislation
on similar weapons, using the H&R Handy Gun as an example, and fur-
ther citing the Congressional history surrounding the chain of events
in past years.

The following reflects an accurate summary of the questions
posed by the attendees of the Thompson/Center Arms:

    Q. (Mr. Thompson)  What will be the future action of ATFD?

    A. (Mr. Wolfe)  Two options - (1) Terminate production and
IRS will live with the barrels already in existence or (2) IRS will
issue a Revenue Ruling that the .45/.410 barrel on the "Contender"

Exhibit A, Pg. 454

57

- 2 -

causes it to fall under the purview of the NFA.

Q. (Mr. Gustaffson) What is the IES position on shot shell ammunition and would this be applicable?

A. (Mr. Westenberger) Shot shell ammunition and shotgun ammunition were defined.

Q. (Mr. Thompson) This will put us out of business.

A. (Mr. Wolfe) Not necessarily. Manufacture could continue under the category of an NFA weapon.

Q. (Mr. Gustaffson) Would our distributors require licensing?

A. (Mr. Wolfe) The licensing requirements and transfer requirements were stated.

Q. (Mr. Gustaffson) What would occur if the barrel was only sold as an accessory item?

A. (Mr. Wolfe) Aspects of the individual concerned and the manufacturing tax liability were reviewed.

Q. (Mr. Center) Thompson/Center will load shotshells, brass or otherwise, what then?

A. (Mr. Wolfe) The "Contender" cannot be capable of firing existing shotgun ammunition. Shotshells of pistol calibers, if manufactured by Thompson Center, should use metallic casings rather than cardboard or plastic hulls.

Q. (Mr. Center) What about manufacturing shotshells using metallic rifle cartridge casings?

A. (Mr. Wolfe) We would assume the "Contender" would retains its pistol configuration and that shotshells would be of a cartridge

**Exhibit A, Pg. 455**

58

- 3 -

peculiar to pistols.

Q. (Mr. Thompson) Is there any objection to the "Contender" presently having several barrels chambered for rifle cartridges?

A. (Mr.Wdstenberger) There is no objection on the part of IRS. (The "Contender" presently comes with twelve assorted barrels, excluding special orders. The .22 Hornet, .22 Jet and .256 Winchester Magnum are rifle cartridges adapted to the "Contender."

Q. (Mr. Center and Mr. Thompson) Resume of the "Contender" sales and purpose was offered. Wouldn't the fact that the "Contender" (.410) is used for sporting purposes be justification for its continued manufacture?

A. (Mr. Wolfe) No. The H&R Handy Gun also had a sporting purpose potential but still was an NFA weapon.

At this point in the conference, Mr. Center demonstrated the interchangeable barrel capability of the "Contender." This was followed by a tour of the entire Thompson/Center Arms Manufacturing facility, showing investment casting process, polishing, machining, engraving, blueing, assembly and test firing facility.

The conference was resumed as follows:
Mr. Wolfe repeated the definition of "Any other weapon" from the Gun Control Act of 1968 and the definition of a "Pistol" from Section 179.35 of National Firearms Act Regulations.

Q. (Mr. Center) The shot pattern of the "Contender" with the .45/.410 barrel splatters; it's not effective. The rifling is standard for the .45 caliber cartridge both in depth of the grooves and number of turns per barrel. Would this help? -

Exhibit A, Pg. 456

59

- 4 -

A. (Mr. Westenberger)  The rifling is appropriate but the firearm still chambers a .410 shotgun shell.

Q. (Mr. Thompson)  We then can redesign to shoot shotshells.

A. (Mr. Wolfe)  I'll redefine what we would sanction, shot shells being sanctioned pistol casings that were loaded or reloaded.

Q. (Mr. Wolfe)  Purpose of choke on the "Contender."

A. (Mr. Westenberger)  It straightens the shot on a line-of-barrel axis since the rifling causes it to spiral and become less effective.

Q. (Mr. Gustaffson)  I didn't get what you said you'd sanction. Please repeat it.

A. (Mr. Wolfe)  We would condone a pistol which was designed to fire commercially available ball ammunition.  If the ammunition was metallic and peculiar to a pistol and loaded with shot, the weapon would not come under the NFA as long as the bore was rifled and shotgun shells could not be fired.  This would apply even if the choke attachment was installed.

Q. (Mr. Westenberger)  Could we have accurate production figures to date on the guns sold; .45/.410 barrels sold and the inventory of finished and unfinished .45/.410 barrels?

A. (Mr. Gustaffson)  Yes, I'll mail them to you in a few days. We've sold about 5000 guns, 2000 barrels and probably have 1000 barrels in various stages of completion.  We'll call our barrel maker and tell him to stop manufacture.

**Exhibit A, Pg. 457**

60

- 5 -

Q. (Mr. Gustaffson)  And what will be the status of the weapons that are out with .45/.410 barrels?

A. (Mr. Wolfe)  We'll live with those. I don't feel that the purpose of the law is being subverted.

Q. (Mr. Thompson)  This will cause a stir. Who can be blamed for the sudden stop in production?

A. (Mr. Wolfe)  If you say the Government asked us to quit there would be repercussions and a question about the status of those in existence. We would get heat although we've had heat before. As Harry Truman said, "If you can't stand the heat, get out of the kitchen." I might add that we have had inquiries in the past on the status of the "Contender." We have also had various manufacturing agreements with industry in the past in similar type situations involving potential automatic weapons. Whatever your story will be, please refrain from giving the impression that the "Contender" is a firearm under the NFA. I would recommend that you advise your distributors that in order to avoid any suggestion that the weapon might come under the controls of the Act, you decided to redesign the weapon so it won't chamber commercial shotgun ammunition.

Q. (Mr. Thompson)  Could we fight this?

A. (Mr. Wolfe)  My candid opinion is that it would depend on which court got the case.

Q. (Mr. Thompson)  What would be the steps if we fought it?

A. (Mr. Wolfe)  We would just issue a Revenue Ruling and then serve notice on Thompson/Center Arms, your lawyers would probably get a restraining order. From there we would probably have a hearing

**Exhibit A, Pg. 458**

61

- 6 -

to discuss the characteristics of the firearm, the applicable laws and the regulations. There would be appeals and finally a court determination.

Q. (Mr. Gustaffson)  What would be the next step if it were an NFA weapon.

A. (Mr. Wolfe)  Since the amnesty period is over there could not be registration. They would be contraband and subject to seizure. The owners would be in violation. There could possibly be a registration procedure set up.

Q. (Mr. Thompson)  Would the court set this up?

A. (Mr. Wolfe)  The court would not control this aspect.

Q. (Mr. Center)  What effect would an 18" barrel make on the "Contender?"

A. (Mr. Westenberger)  None. Since the "Contender" is not a shoulder weapon, barrel length would have no bearing.

At this point, Mr. Thompson stated that they would cease production of the .45/.410 barrels and would undertake a redesign. They expressed appreciation for the fact that we would allow them to dispose in commerce of the inventory of finished and unfinished barrels on hand.

All aspects of the meeting were cordial and no belief exists that Thompson/Center Arms will not abide by their agreement.

Cecil M. Wolfe

Paul H. Westenberger

62

- 7 -

### ADDENDUM:   MEMORANDUM OF PHONE CALL

Mr. Thompson phoned at 3:30 p.m. on June 19, 1969, to give a progress report on the status of the "Contender." He advised that letters have been sent to all their representatives and that advertising has been stopped. He further stated that the T/C facility had 2390 barrels in stock in various stages of completion. He further stated that this figure was higher than the previous estimate in that they did not compute the barrels which were in grinding operations. I stated that Mr. Wolfe would be given this information and that he would contact Mr. Thompson upon his return.

P.H. Westenberger

**Exhibit A, Pg. 460**

63



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

JUL 2 0 1994

CC-43.771  FE:TGP

Mr. Eric M. Larson
Post Office Box 5497
Takoma Park, Maryland  20913

Dear Mr. Larson:

This is in response to your letters dated May 31, 1994, to
the Assistant Secretary (Enforcement), June 3, 1994, to the
Director, Bureau of Alcohol, Tobacco and Firearms (ATF);
and June 14, 1994, to Secretary Bentsen, asking for
reconsideration of ATF's decision of March 23, 1992, denying
your request for removal of the Harrington and Richardson
Handygun (H & R Handygun) from the scope of the National
Firearms Act (NFA), 26 U.S.C. Chapter 53.  In support of
your request for reconsideration, you submitted several
articles.  In the paragraphs to follow, we have addressed
those portions of the articles which relate to your request
for removal.

As you observed, one of the reasons for denying your
request was ATF's conclusion that the H & R Handygun is
similar in design and function to the sawed-off shotgun, a
popular crime weapon that has been the subject of numerous
Federal and State prosecutions.  You contend that this
position conflicts with the Government's argument in a
United States district court case.  In that case, the
Government correctly pointed out the legal distinction in
the NFA between a weapon made from a shotgun (e.g., a
sawed-off shotgun) and an "any other weapon" (e.g., an H & R
Handygun).  Specifically, a sawed-off shotgun falls within
the definition of "weapon made from a shotgun" in 26 U.S.C.
§ 5845(a)(2), while weapons such as the H & R Handygun are
within the definition of "any other weapon" in 26 U.S.C.
§ 5845(e).  From a legal standpoint, the difference is
significant since the tax imposed on the transfer of these
weapons is $200 in the case of a weapon made from a shotgun
but only $5 in the case of an "any other weapon."  However,
as we stated in our letter of March 23, 1992, there is no
practical difference between the two types of weapons in
terms of design and function.  Therefore, we see no conflict
between the positions ATF has expressed with regard to these
weapons.

**Exhibit A, Pg. 461**

64

- 2

Mr. Eric R. Larson

You also assert that a sawed-off shotgun has been converted from a shoulder fired weapon for the purpose of transforming it into an offensive weapon, while the Handygun was designed as a sporting pistol which is used as a small game gun. Again, you believe that this difference renders erroneous ATF's conclusion that the design of the two weapons is identical.

From a utilitarian perspective, the fact that the H & R Handygun is capable of being concealed and of firing a fixed shotgun shell makes it comparable in design to the sawed-off shotgun. The Handygun can be used as readily for anti-personnel purposes as for hunting small game or exterminating varmints. Furthermore, the fact that the H & R Handygun utilizes a receiver that is identical in mechanical design and function to various single shot .410 gauge shotguns produced by H & R indicates its similarity to a sawed-off shotgun. Finally, that Congress chose to include both weapons within the NFA definition of "firearm" indicates that both should remain subject to NFA controls unless it is clearly established that they meet the criteria for removal. As we have stated repeatedly, the criteria have not been met in the case of the H & R Handygun since we cannot conclude that it is not likely to be used as a weapon.

In further support of your request, you have again asked us to compare the H & R Handygun with the .45 Colt/410 gauge Thompson Contender pistol, a firearm you believe is similar to the H & R Handygun and which is distributed in commercial channels free of NFA controls. Again, we fail to see the basis for this comparison because the Contender pistol is not a smooth bore shot pistol subject to the NFA.

You also aver that ATF did not give adequate consideration to the statements of certain third parties in support of your request. The statements of third parties were considered but do not persuade us that H & R Handyguns would not likely be used as weapons if removed from NFA controls.

Your most recent correspondence states that ATF has not given fair and adequate consideration to your arguments and has responded cryptically to your requests for reconsideration. Our records indicate that ATF has corresponded with you 17 times concerning the H & R Handygun

**Exhibit A, Pg. 462**

- 3 -

Mr. Eric M. Larson

from 1987-1993. With the exception of the letter dated
July 29, 1993, which briefly restated the basis for denial
articulated in the March 23, 1992 letter, all of our letters
have responded to the issues you raised.

Finally, we request that you delete from your articles the
invitation to your readers to contact ATF for copies of
court documents. Since these documents are public records,
copies should be obtained by contacting the courts.

For the foregoing reasons, our decision must stand.

                    Sincerely yours,

                    *Daniel P. Black*

              for   John W. Magaw
                    Director

66

Table 1

Handguns with Rifled Barrels Designed to Fire .410 Shotgun Shell Ammunition
Currently Being Manufactured and Sold in the United States, by Name,
Caliber(s), Barrel Length(s), and 1996 Retail Price

| Name of handgun price | Caliber(s) | Barrel length(s) | 1996 retail |
|---|---|---|---|
| American Derringer Model 1 (two-shot) | .45 Colt, .410 2½" | 3" | $320.00 |
| American Derringer Model 4 (two-shot) | .45 Colt, .410 3" | 4.1" | $352.00 |
| American Derringer Model 6 (two-shot) | .45 Colt, .410 3" and .45-70 | 4.1 | $387.50 |
| D-MAX Sidewinder Revolver (6-shot) | .45 Colt, .410 3" | 6.5" or 7.5" | $750.00 |
| FMJ Single-Barrel Derringer | .45 Colt, .410 2½" | 4" | $ 70.00 |
| FMJ Double-Barrel Derringer | .45 Colt, .410 3" | 6" | $100.00 |
| Thompson/Center Contender (single-shot) | .45 Colt, .410 3" | 10" | $227.50 |
| Thompson/Center Stainless Contender (single-shot) | .45 Colt, .410 3" | 10" | $485.00 |
| Thompson/Center Stainless Super 14 (single-shot) | .45 Colt, .410 3" | 14" | $520.00 |
| Thompson/Center Stainless Super 16 (single-shot) | .45 Colt, .410 3" | 16½" | $520.00 |
| Thunder-Five (5-shot revolver) | .45 Colt, .410 3" and .45-70 | 2" | $550.00 |

Sources: *Standard Catalog of Firearms*, by Ned Schwing and Herbert Houze.  6th
edition.  Iola, Wisconsin: Krause Publications, 1996, p. 757; and *Guns Illustrated*, 28th
edition, by Harold Murtz (ed.).  Northbrook, Illinois: DBI Books, 1996, pp. 147, 151-152,
154.

**Exhibit A, Pg. 464**



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

JAN 2 8 1998

REFER TO: L:D:AG
98-311

Mr. Eric Larson
P.O. Box 5497
Takoma Park, Maryland  20913

Dear Mr. Larson:

This is in response to your Freedom of Information Act (FOIA) request for access to information maintained by the Bureau of Alcohol, Tobacco and Firearms.

Your request for an administrative appeal dated December 26, 1997, in response to our letter dated December 22, 1997, is being processed as an initial request, because in the interim a final decision was made on the report you requested.  Therefore, your request is granted in part.  We are releasing portions of the record that contains exempt information and are withholding portions for the reasons indicated on the enclosed "Document Cover Sheet."  We were unable to identify responsive records to items numbered two and three of your initial FOIA request dated September 28, 1997.  Item three never materialized.

The fees associated with processing your FOIA request were not waived.  Please submit your check or money order on receipt, in the amount indicated on the enclosed invoice.

Insofar, as your request has been partially denied by deletions, and some records were not located, you submit an administrative appeal by following the procedure outlined in Part III of the enclosed form, and also state your reasons if you believe the search was not adequate.

Sincerely yours,

Averill P. Graham
Senior Disclosure Specialist

Enclosure

**Exhibit A, Pg. 465**

68

<div style="border:1px solid">

DEPARTMENT OF TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## FOIA/PRIVACY ACT INVOICE

| Date: 01/27/98 | Disclosure File Number: 98-311 | INVOICE NUMBER: 98-46 |
|---|---|---|

Instructions to Payer

Send check or money order to "Bureau of Alcohol, Tobacco and Firearms", to the address shown below. Please include a copy of the invoice with your payment.

| To: (Payer)  Mr. Eric Larson<br>P.O. Box 5497<br>Takoma Park, Maryland  20913 | From:<br>Chief, Disclosure Division<br>Bureau of Alcohol, Tobacco and Firearms<br>Room 8430<br>Washington, DC 20026 |
|---|---|

| DESCRIPTION | COST | EACH | QUANTITY OR TIME | AMOUNT |
|---|---|---|---|---|
| Photocopies | $.15 | Page | 51 pages | $ 7.65 |
| Review Time | $28.94 | Per hour | ½ hour | $14.47 |
| Records Search | $34.42 | Per hour | 1 1/4 hour | $43.03 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PLEASE PAY THIS AMOUNT ⇨ | $65.15 |
|---|---|

</div>

---

### DOCUMENT COVER SHEET; EXEMPTIONS LIST AND APPEAL RIGHTS

**PART I—Document Cover Sheet**

| 1. Requesters Name<br><br>Mr. Eric Larson | 2. File Number<br><br>98-311 | 3. Requested documents were referred by the following agency: |
|---|---|---|
| 4. Documents are being released:<br>[ x ] at cost    [ ] without cost | 5. Package ends with document #:<br>-51- | 6. Total # of documents denied:<br>-0- |

7. Exemptions cited for information Blackened-out on pages released: (See Part II for explanation of exemptions)

[  ] (b) (2)        [  ] (b) (3) _____      [  ] (b) (4)       [  ] (b) (5)          [  ] (b) (6)

[  ] (b) (7) (A)      [  ] (b) (6) (B)      [ X ] (b) (7) (C)      [  ] (b) (7) (D)        [  ] (b) (7) (E)      [  ] (b) (7) (F)

8. Documents completely withheld:

Document # — Exemption          Document # — Exemption          Document # — Exemption

_____  _____          _____  _____          _____  _____

_____  _____          _____  _____          _____  _____

_____  _____          _____  _____          _____  _____

9. The records identified above have been determined to be most directly responsive to your request. Other records, described below, are available upon payment of 15 cents per page (or at no cost if a fee waiver has been granted). These records generally consist of duplicated or repetitive information that restates information contained in the package being released. A sample or index of these records is included in this release. The following records are available upon request:

Number of pages:

( a)  Exhibits to Report (See index on page _____ )          _____

(b)  Surveillance Reports (See sample page _____ )          _____

(c)  Interagency Telegrams and Messages (See sample page _____ )          _____

(d)  Property Disposition records (See sample page _____ )          _____

(e)  Newspaper or magazine articles (See sample page _____ )          _____

(f)  Miscellaneous (See sample page _____ )          _____

(g)  _____          _____

Note:  To obtain copies of these records, identify which records you want, count the pages and multiply by 15 cents.  Send check or money order payable to Bureau of Alcohol, Tobacco and Firearms (BATF) and mail to Chief, Disclosure Division;  BATF, 650 Massachusetts Avenue, Room 8430, Washington, D. C. 20226.  Request promptly for best service, as files are returned to field offices 15 days after this notice is mailed to you.

---

(Part II and Part III on reverse side)

Revised 9/95

**Exhibit A, Pg. 467**

70



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

DEC 1 7 1997

F:SD:WAN
7146

MEMORANDUM TO:   ATF Specialist

FROM:   Chief, Firearms, Explosives and Arson
Services Division

SUBJECT:   Memorandum of Clearance

I have reviewed Office of Inspection (OI) Report of Investigation, number 970178-01,
dated October 22, 1997, and determined that disciplinary action is not warranted.

The report documents OI's investigation of allegations made against you and two
other Bureau employees by Mr. Eric M. Larson of Takoma Park, Maryland.
Mr. Larson sent a letter to the Office of the Assistant Inspector General (IG) for
Investigation, dated May 10, 1997. Later forwarded to OI, Mr. Larson's letter alleges
that you and the other Bureau employees committed the following offenses: 1) ATF
employees destroyed firearm registration documents that they were required by law to
maintain; 2) ATF employees registered approximately 2,500 unregistered National
Firearms Act (NFA) firearms without the proper authorization from Congress; 3) you
and another ATF employee perjured yourselves in two letters to Mr. Larson;
4) registration activity that ATF classifies as "other" could include registrations of
firearms that ATF employees registered contrary to the law, and that ATF refused to
disclose the nature of this registration activity; and 5) that a significant number of NFA
firearms were registered to persons who were deceased. However, the investigation
did not substantiate any of the allegations and I have found no evidence of any
wrongdoing on your part.

Therefore, I am issuing this memorandum of clearance concerning the incident covered
in the above-referenced OI report of investigation.

Walt/Ed A  Nelson



**Exhibit A, Pg. 468**

71



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

DEC 1 7 1997                    F-SD WAN
                               2146

MEMORANDUM TO:

      Chief, Firearms Technology Branch

   FROM:  Chief, Firearms, Explosives and Arson
      Services Division

  SUBJECT:  Memorandum of Clearance

The Professional Review Board (PRB) has reviewed Office of Inspection (OI) Report of investigation, number 970178-02, dated October 22, 1997, and has determined that disciplinary action is not warranted.

The report documents OI's investigation of allegations made against you and two other Bureau employees by Mr. Eric M. Larson of Takoma Park, Maryland. Mr. Larson sent a letter to the Office of the Assistant Inspector General (IG) for Investigation, dated May 10, 1997. Later forwarded to OI, Mr. Larson's letter alleges that you and the other Bureau employees committed the following offenses: 1) ATF employees destroyed firearm registration documents that they were required by law to maintain; 2) ATF employees registered approximately 2,500 unregistered National Firearms Act (NFA) firearms without the proper authorization from Congress; 3) you and another ATF employee perjured yourselves in two letters to Mr. Larson; 4) registration activity that ATF classifies as "other" could include registrations of firearms that ATF employees registered contrary to the law, and that ATF refused to disclose the nature of this registration activity; and 5) that a significant number of NFA firearms were registered to persons who were deceased. However, the investigation did not substantiate any of the allegations and I have found no evidence of any wrongdoing on your part.

After a careful review of the report, I concur with the PRB. Therefore, I am issuing this memorandum of clearance concerning the incident covered in the above-referenced OI report of investigation.

Walfred A. Nelson                    

72



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

DEC 1 7 1997

A:AJL
2146

MEMORANDUM TO:

Chief, Revenue Division

FROM: Assistant Director, Alcohol and Tobacco
Programs

SUBJECT: Memorandum of Clearance

The Professional Review Board (PRB) has reviewed Office of Inspection (OI) Report of Investigation, number 970178-03, dated October 22, 1997, and has determined that disciplinary action is not warranted.

The report documents OI's investigation of allegations made against you and two other Bureau employees by Mr. Eric M. Larson of Takoma Park, Maryland. Mr. Larson sent a letter to the Office of the Assistant Inspector General (IG) for Investigation, dated May 10, 1997. Later forwarded to OI, Mr. Larson's letter alleges that you and the other Bureau employees committed the following offenses: 1) ATF employees destroyed firearm registration documents that they were required by law to maintain; 2) ATF employees registered approximately 2,500 unregistered National Firearms Act (NFA) firearms without the proper authorization from Congress; 3) you and another ATF employee perjured yourselves in two letters to Mr. Larson; 4) registration activity that ATF classifies as "other" could include registrations of firearms that ATF employees registered contrary to the law, and that ATF refused to disclose the nature of this registration activity; and 5) that a significant number of NFA firearms were registered to persons who were deceased. However, the investigation did not substantiate any of the allegations and I have found no evidence of any wrongdoing on your part.

After a careful review of the report, I concur with the PRB. Therefore, I am issuing this memorandum of clearance concerning the incident covered in the above-referenced OI report of investigation.



Arthur F. Libertucci



**Exhibit A, Pg. 470**

73

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
ACKNOWLEDGEMENT OF RECEIPT OF DOCUMENTS

| NAME OF EMPLOYER (Last, First, Middle) | DATE RECEIVED | TIME |
|---|---|---|
| | 12/17/97 | 9:50 |

I HEREBY ACKNOWLEDGE THAT ON THE ABOVE DATE I RECEIVED: (Check appropriate box)

| | |
|---|---|
| | NOTICE OF PROPOSED ADVERSE ACTION |
| | NOTICE OF ADVERSE ACTION |
| | NOTICE OF PROPOSED SUSPENSION |
| | NOTICE OF SUSPENSION |
| X | OTHER (Specify)   Memorandum of Clearance |

| SIGNATURE OF EMPLOYEE        12/17/97 | SIGNATURE OF PERSON DELIVERING DOCUMENT |
|---|---|

ATF F 2751.1 (3-75)    REPLACES ATF FORM 80 (7-73) WHICH MAY BE USED

AMM 12/22/97

⑤

**Exhibit A, Pg. 471**

74



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

DEC  9 1997

M:P:B:DEN:bsw
2143

MEMORANDUM TO:
Assistant Director, Alcohol
and Tobacco

FROM:  Chair, Professional Review Board

SUBJECT:  Memorandum of Clearance for

The Professional Review Board (PRB) has reviewed Office
of Inspection Report of Investigation, number 970178-
03, dated October 22, 1997, and has concluded that a
memorandum of clearance is warranted for
Chief, Revenue Division. Accordingly, attached is the
memorandum to the employee for your signature.

NOTE:  If you disagree with this action, or have any
questions about the PRB recommendation, please
feel free to contact me at 202-927-8555 prior to
signing the memorandum.

If you agree, please review, sign and date the memo,
and then issue it to the employee. The employee may
also be allowed to read the OI report should he ask to
do so. Please forward a copy of the signed, dated
memo, to:

            , Chief
Employee and Labor Relations Branch
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, N.W., Room 4300
Washington, D.C.  20226

It is important that you send this memo as soon as
possible so that ELRB can close the case with the
Office of Inspection. You should also complete page 1
of the OI Report of Investigation (ATF Form 8600.36,
Investigation Referral Memorandum), items 12 through
15, and return the OI Report to the Office of
Inspection.

Ⓒ

**Exhibit A, Pg. 472**

75

-2-

Should you have any changes to the memo, please contact
your servicing employee relations specialist,
           at 202-927-8640.


                    Don E. Keith

Attachments

76



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

**ASSISTANT
DIRECTOR**

OCT 2 4 1997

I:RJH
970176

TO:      Assistant Inspector General
         for Investigations

FROM:    Assistant Director
         Inspection

SUBJECT: Mismanagement and misconduct by ¯
         ¯           ¯         s and other unidentified
         employees of the Bureau of Alcohol, Tobacco
         and Firearms.  Case Number: 97-1-075-R

I refer to your memorandum dated June 5, 1997,
referring this matter for investigation.

The investigation has been completed and the report has
been given to ¯            , Auditor, Chicago Office of
Inspector General, who is reviewing this issue for the
Treasury Office of Inspector General.

Richard B. Hankinson

77

| | DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br><br>CROSS REFERENCE INDEX | | OFFICE OF INSPECTION<br>FIELD OFFICE<br>☒ Eastern ☐ Southeast<br>☐ Midwest ☐ Western |
|---|---|---|---|
| TITLE OF INVESTIGATION<br><br>, et a. | | | INVESTIGATION/UI NUMBER<br><br>970178 |

**CROSS REFERENCE INDEX**

| ASSOCIATE NUMBER | NAME OF ASSOCIATE TO BE CROSS-REFERENCED | RELATIONSHIP TO INVESTIGATION | ASSOCIATE IDENTIFICATION CODE |
|---|---|---|---|
| 02 ✓ | | Subject | C |
| 03 ✓ | | Subject | C |
| 04 ✓ | LARSON, Eric | Complainant | A |
| 05 ✓ | | Witness | G |
| 06 ✓ | | Witness | G |
| 07 ✓ | | Witness | G |
| 08 ✓ | | Witness | G |
| 09 ✓ | | Witness | G |
| | | | |
| | Last Investigative<br>Activity:  6/5/97 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | - | |
| | | | ⑨ |
| | | | |
| | | | |
| | | | |

ATF F 8600.37 (11-94) PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 475**

78

### DEPARTMENT OF THE TREASURY
#### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
### INVESTIGATION REFERRAL MEMORANDUM

570178-01

#### INSTRUCTIONS

1. The information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is submitted to enable for review, evaluation and adjudicative disposition. Only the persons officially charged with the aforementioned responsibility should review this report; the information contained therein should be disseminated on a need to know basis only.

2. After action has been taken or a decision has been made that no action will be taken, both copies of this form should be returned in item 12 to

show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in item 11 below if disciplinary action is taken place is also taken if a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, Notice of final decision, Letter of reprimand, or written commendation of said admonishment. 2F 9/... action taken.

---

**1. REPORT FORWARDED TO**

Chair, Professional Review Board

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
| | Chief, Industry Compliance Div. GS-15 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION |
|---|---|
| March 13, 1967 | Integrity |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard J. Hankinson | Assistant Director (Inspection) | 10/22/97 |

**10. REMARKS**

THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc: ATF Form 9600.36, Report of Investigation, with exhibits, to:

    Assistant Director (Firearms, Explosives & Arson);
    Chief, Personnel Division, Bureau Headquarters;
    Chief, Employee and Labor Relations Branch; and to
    Assistant Inspector General for Investigations,
      Office of Inspector General, Department of the Treasury

**11. RETURN TO**

OFFICE OF INSPECTION
BUREAU OF ATF
P.O. BOX 50082
WASHINGTON, DC 20091-0282

MV 12/27/97

**12. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

*Letter of Clearance dated 12/17/97*

(10)

| 13. NAME AND SIGNATURE OF APPROVING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
| ARTHUR J. LIBERTUCCI | ASSISTANT DIRECTOR ALCOHOL AND TOBACCO | 12/17/97 |

ATF F ... AN PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 476**

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**INVESTIGATION REFERRAL MEMORANDUM**          970178-01

INSTRUCTIONS

1  The information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is submitted herewith for review, evaluation and administrative disposition. Only the persons officially charged with the administrative responsibility would review this report; the information contained therein should be disseminated on a need to know basis only.

2  After action has been taken and a decision has been made that no action will be taken, both copies of this form should be endorsed in item 12 to

show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in item 11 below. If disciplinary action is taken please also return a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, Notice of final decision, Letter of reprimand, or written confirmation of oral admonishment, SF 50 covering action taken.

**1. REPORT FORWARDED TO**
Assistant Director (Firearms, Explosives & Arson)          10/24

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
|  | ATF Specialist GS-13 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION |  |
|---|---|---|
| February 23, 1972 | Integrity |  |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard J. Hankinson | Assistant Director (Inspection) | 10/22/97 |

**12. REMARKS**

THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc:  ATF Form 8600.36, Report of Investigation, with exhibits, to:

Chief, Personnel Division, Bureau Headquarters;
Chief, Employee and Labor Relations Branch; and to
Assistant Inspector General for Investigations,
Office of Inspector General, Department of the Treasury

| 11. RETURN TO |
|---|
| OFFICE OF INSPECTION BUREAU OF ATF PO BOX 50291 WASHINGTON, DC 20091-0292 |

**13. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

| 14. NAME AND SIGNATURE OF RETURNING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
|  |  |  |

ATF Form 3120.1 (10/94) PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 477**

80

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**INVESTIGATION REFERRAL MEMORANDUM**

970178-02

### INSTRUCTIONS

1. This information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is submitted herewith for review, evaluation and administrative disposition. Only the persons officially charged with the aforementioned responsibility should review this report. The information contained therein should be disseminated on a need to know basis only.

2. After action has been taken of a decision has been made that no action will be taken, both copies of this form should be endorsed in item 12 to show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in item 11 below. If disciplinary action is taken please also return a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, notices of final decision, Letter of reprimand, or written confirmation of oral admonishment, SF 50 covering action taken.

**1. REPORT FORWARDED TO**

Chair, Professional Review Board

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
|  | Firearms Tech. Manager, GS-15 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION |
|---|---|
| February 8, 1970 | Integrity |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard J. Hankinson | Assistant Director (Inspection) | 10/22/97 |

**10. REMARKS**

THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc:  ATF Form 9600.36, Report of Investigation, with exhibits, to:

Assistant Director (Firearms, Explosives & Arson);
Chief, Personnel Division, Bureau Headquarters;
Chief, Employee and Labor Relations Branch; and to
Assistant Inspector General for Investigations,
    Office of Inspector General, Department of the Treasury

**11. RETURN TO**

OFFICE OF INSPECTION
BUREAU OF ATF
PO BOX 50092
WASHINGTON, DC 20091-0092

**12. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

| 13. NAME AND SIGNATURE OF RETURNING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
|  |  |  |

ATF F 8601.34 (11-94) PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 478**

81

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

970178-01

## INVESTIGATION REFERRAL MEMORANDUM

### INSTRUCTIONS

1. The information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is submitted herewith for review, evaluation and administrative disposition. Only the persons officially charged with the administrative responsibility should review this report; the information contained therein should be disseminated on a need to know basis only.

2. After action has been taken or a decision has been made that no action will be taken, both copies of this form should be enclosed in item 12 to show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in item 11 below. If disciplinary action is taken please also return a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, Notice of final decision, Letter of reprimand, or written confirmation of oral admonishment, SF 50 covering action taken.

---

**1. REPORT FORWARDED TO**

Assistant Director (Firearms, Explosives & Arson)

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
| ‑ | ATF Specialist GS-13 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION |
|---|---|
| February 22, 1972 | Integrity |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard Harrington | Assistant Director (Inspection) | OCT 22 20 |

**10. REMARKS**

THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc: ATF Form 8600.36, Report of Investigation, with exhibits, to:

Chief, Personnel Division, Bureau Headquarters;
Chief, Employee and Labor Relations Branch; and to
Assistant Inspector General for Investigations,
Office of Inspector General, Department of the Treasury

**11. RETURN TO**

OFFICE OF INSPECTION
BUREAU OF ATF
PO BOX 50522
WASHINGTON, DC 20091-0522

**12. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

·

| 13. NAME AND SIGNATURE OF RETURNING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
| | | Ⓐ |

ATF F 8600.36 (11-94) PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 479**

82

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**INVESTIGATION REFERRAL MEMORANDUM**

970178-02

**INSTRUCTIONS**

1. The information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is a detailed account for review, evaluation and administrative disposition. Only the persons officially charged with the above-named responsibility should review this report; the information contained therein should be disseminated on a need to know basis only.

2. After action has been taken and a decision has been made that no action will be taken, both copies of this form should be endorsed in Item 12 to show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in Item 11 below. If disciplinary action is taken please also return a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, Notice of final decision, Letter of reprimand, or written confirmation of oral admonishment, SF 50 covering action taken.

**1. REPORT FORWARDED TO**

Chair, Professional Review Board

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
| | Firearms Tech. Manager, GS-15 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION |
|---|---|
| February 8, 1970 | Integrity |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard W. Hankinson | Assistant Director (Inspection) | OCT 22 |

**10. REMARKS**

THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS
INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc: ATF Form 8600.36, Report of Investigation, with exhibits, to:

Assistant Director (Firearms, Explosives & Arson);
Chief, Personnel Division, Bureau Headquarters;
Chief, Employee and Labor Relations Branch; and to
Assistant Inspector General for Investigations,
Office of Inspector General, Department of the Treasury

**11. RETURN TO**

OFFICE OF INSPECTION
BUREAU OF ATF
PO BOX 50202
WASHINGTON, DC 20091-0202

**12. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

| 13. NAME AND SIGNATURE OF RETURNING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
| | | |

ATF F 8600.36 (11-94) PREVIOUS EDITIONS ARE OBSOLETE

83

## DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
### INVESTIGATION REFERRAL MEMORANDUM

970178-01

#### INSTRUCTIONS

1. The information contained in the attached report represents the results of an investigation conducted by the Office of Inspection. It is submitted herewith for review, evaluation and administrative disposition. Only the person officially charged with the aforementioned responsibility should review this report. The information contained therein should be disseminated on a need to know basis only.

2. After action has been taken or a decision has been made that no action will be taken, both copies of this form should be endorsed in item 12 to

show clearly the nature of action taken and the effective date, or the decision that no action will be taken. Return both copies of this form and all of the investigative material to the address indicated in item 11 below. If disciplinary action is taken please also return a copy of any of the following papers which may be applicable: Notice of proposed adverse action (letter of charges) and any written or oral reply thereto, Notice of final decision, Letter of reprimand, or written confirmation of oral admonishment, SF 50 covering action taken.

**1. REPORT FORWARDED TO**

Chair, Professional Review Board

| 2. NAME OF EMPLOYEE(S) | 3. POSITION AND GRADE | 4. POST OF DUTY |
|---|---|---|
| | Chief, Industry Compliance Div. GS-15 | Bureau Headquarters |

| 5. DATE ENTERED ON DUTY | 6. TYPE OF INVESTIGATION | |
|---|---|---|
| March 13, 1967 | Integrity | |

| 7. NAME AND SIGNATURE OF FORWARDING OFFICIAL | 8. TITLE | 9. DATE |
|---|---|---|
| Richard J. Hankinson | Assistant Director (Inspection) | OCT 22 |

**10. REMARKS**

✔ THIS REPORT IS NOT TO BE DUPLICATED UNLESS THE REPORT OR SECTIONS OF IT IS INTENDED FOR USE AS MATERIAL RELIED UPON IN SUPPORT OF A DISCIPLINARY OR ADVERSE ACTION.

cc: ATF Form 6600.36, Report of Investigation, with exhibits, to:

Assistant Director (Firearms, Explosives & Arson);
Chief, Personnel Division, Bureau Headquarters;
Chief, Employee and Labor Relations Branch; and to
Assistant Inspector General for Investigations,
    Office of Inspector General, Department of the Treasury

**11. RETURN TO**

OFFICE OF INSPECTION
BUREAU OF ATF
PO BOX 50221
WASHINGTON, DC 20091-0221

**12. NATURE OF FINAL ACTION AND EFFECTIVE DATE**

| 13. NAME AND SIGNATURE OF RETURNING OFFICIAL | 14. TITLE | 15. DATE |
|---|---|---|
| | | |

ATF F 8600.36 (11-89) PREVIOUS EDITIONS ARE OBSOLETE

**Exhibit A, Pg. 481**

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

**Report of Investigation**

| TITLE OF INVESTIGATION | | INVESTIGATION NUMBER | |
|---|---|---|---|
| _ at al _ | | 970178-01 | |
| | | TYPE OF INVESTIGATION | TYPE OF REPORT |
| | | ☐ SECURITY ☒ INTEGRITY | ☐ PRELIMINARY |
| | | ☐ SECURITY UPDATE ☐ REVIEW | ☒ FINAL |
| | | ☐ MISCELLANEOUS ☐ ACCIDENT | ☐ SUPPLEMENTAL |

| ☐ EMPLOYEE ☐ APPLICANT ☐ NON-EMPLOYEE | | SOCIAL SECURITY NUMBER | POST OF DUTY ATF Headquarters | |
|---|---|---|---|---|
| POSITION AND GRADE | | ACTIVITY AREA | EOD DATE | DATE OF BIRTH |

SYNOPSIS

In May 1997, Raisa Otero-Cesario, Assistant Inspector General
(IG) for Investigations, received a letter alleging that
employees of the Bureau of Alcohol, Tobacco and Firearms (ATF),
National Firearms Act Branch, had acted erroneously and without
congressional approval on five separate issues. The letter,
which was authored by Eric N. Larson of Takoma Park, Maryland,
requests the Office of Inspector General to investigate the
alleged ATF violations. IG Otero-Cesario forwarded the letter to
the Director, ATF, who requested that the Office of Inspection
(OI) investigate the allegations.

OI determined that the ATF employees referred to in the first
allegation as being suspected of destroying records were, in
fact, contract employees who were hired to assist in the backlog
of paperwork that resulted from an influx of registrations as per
                      Depending on the year in question, if there was
an increase in any National Firearms Act (NFA) firearm
registrations, as alleged, this may have been an adjustment as a
result of a different form number or registration date for the
particular firearm.

To address the second allegation, ATF continued to register
weapons after 1971 because the backlog of paperwork that resulted
from the amnesty period was very large and filing the documents
required extra time. In addition, some individuals were granted
extra filing time if they were out of the country when the time
expired for filing.

Regarding Larson's third allegation, the truthful information
furnished to Larson by                   and                in their
respective letters involves a criminal case in Oregon
investigated by ATF. The suspect, John David Dudley, a multi-
convicted felon, dealt in narcotics and illegally possessed
firearms which included an H & R Handy Gun. Dudley was charged
and subsequently plead guilty in Federal court on Federal
firearms violations.

| ACTION BY OI - ATF (Initials) | REPORT SUBMITTED BY | TITLE | DATE OF REPORT |
|---|---|---|---|
| _____ ACCEPTED | | SA, EOI | 9-8-97 |
| [Date] | | | |
| _____ RETURN | REPORT REVIEWED BY | TITLE | DATE OF REVIEW |
| _____ ACCEPTED | | SAC, EOI | 10-16-97 |

ATF F 3600.9 (10-93) REPLACES ATF FORM 3120 (3-77) WHICH MAY BE USED.

**Exhibit A, Pg. 482**

85

Larson's fourth allegation suggests that ATF is using the 'other
category" to illegally register firearms. However, this category
is used when the computer program cannot recognize a non-standard
document that has been submitted for registration.  For instance,
some registrations were actually filed in correspondence on
letterhead.  If an ATF employee entering the information into the
computer enters a Form 3 as a Form 33, the program will assign
the document to the "other" column.  The fact that the form is
entered in the "other" column does not mean that the firearm is
illegally registered.

In his fifth allegation, Larson states that some of the NFA
weapons registered may be registered to deceased persons.  While
it is possible that, unknown to ATF, some NFA weapons may be
registered to deceased individuals, the integrity of the NFA is
incumbent upon the individuals who possess legally registered
firearms to report deaths and reregister the weapon.

In closing, Larson suggests two solutions to the problems he
cites in his allegations.  His first recommendation is to remove
17,000 "any other weapons" listed under the NFA.  Although
Congress did enable firearms classified as collectors' items to
be removed from the NFA, contrary to Larson's interpretation it
did not mandate their removal.  Therefore, if an individual
weapon is suggested for removal, ATF will consider the particular
firearm on a case-by-case basis and determine if removal is
warranted.

Furthermore, to address Larson's second solution, if the original
registration of a firearm is misplaced, the owner needs only to
contact ATF to obtain another copy.  There is no need to re-
register, and there is no need to establish an amnesty period as
Larson suggests.



**Exhibit A, Pg. 483**

## CHRONOLOGY OF INVESTIGATION

On June 10, 1997, the Office of Inspection (OI) received a memorandum from Reisa Otero-Cesario, Assistant Inspector General for Investigations (IG), that referred a letter alleging misconduct by Bureau of Alcohol, Tobacco and Firearms (ATF) employees. The complaint alleges that various employees of ATF have destroyed (and may have illegally added) National Firearms Registration and Transfer Records (NFRTR), have committed perjury in letters of response to the complainant, and have been negligent in removing firearms registered to deceased individuals.

In his letter dated May 10, 1997, Eric M. Larson sets forth the following allegations:

1. ATF employees have deliberately destroyed firearm registration documents that they are required by law to maintain, as noted in sworn testimony in 1996 by ATF Special Agent _____. In analyses of data made public by ATF, I [Eric M. Larson] found that during 1992 to 1996, ATF may have added 119 or more firearms to the NFRTR which were originally registered on Form 1 or Form 4467 during 1934 to 1971, for which ATF lost or deliberately destroyed the original records.

2. ATF employees registered almost 2,500 unregistered NFA firearms on Form 4467 after December 1, 1968, without proper authorization by the Congress. In addition to not being authorized by the Congress, such registrations were prohibited by the Supreme Court in 1971, yet it appears that ATF registered 172 or more unregistered NFA firearms on Form 4467 after 1971. I have included an example of one apparently illegal post-December 1, 1968, Form 4467 registration in my testimony.

3. ATF employees _____, and _____ committed felony perjury in letters written to me dated March 23, 1992, and July 29, 1993, respectively. _____ and _____ each alleged that "an unlawful trafficker in drugs with an extensive criminal record was in possession of a .410 bore H & R Handy-Gun "while committing drug violations." This alleged instance of criminal conduct was used to deny my petition to remove the H & R Handy-Gun from the NFA as a collector's item. In fact, a Freedom of Information Act request disclosed that the Handy-Gun was recovered from an acquaintance of the trafficker, who said that the trafficker had

- 970178-01
- - 970178-02
- 970178-03        -3-

(18)

**Exhibit A, Pg. 484**

given it to him for safe-keeping (see pages 212-215,
222-230, and 233-236 of my 1996 testimony).  Any person
who petitions for removal of a firearm from the NFA
must state the reasons under penalty of perjury.  The
plain language of the statute at Title 26, U.S.C., §
5861(1) and § 5871 applies to any person who knowingly
makes or causes the making of a false entry on any
document required to be prepared as a result of
administering the NFA, including the legal decision
regarding the classification of an NFA firearm.  Both
     and       deliberately falsified the facts
of the case they cited.

4.  Certain 'registration activity" that ATF classifies
as "OTHER" could include registrations of firearms that
one or more ATF employees registered contrary to law,
because ATF has refused to disclose the nature of this
"registration activity."  To the best of my knowledge,
I've never heard of any forms numbered other than 1, 2,
3, 4, 5, 6, 9, 10 or 4467 being used to register or
transfer NFA firearms.  According to a letter to me
dated January 9, 1997, from NFA Branch Chief
    , the 'OTHER" category is "comprised of
registrations where the form number is different from
the other ones tabulated."     , however, has
declined to provide the names or numbers of these
forms.  Coupled with the other evidence of registration
mismanagement I have documented, it appears that the
'OTHER" category may represent firearms that were
registered illegally, as noted in my 1997 testimony.

5.  It appears that a significant number of NFA
firearms are currently registered to persons who are
deceased, and that ATF has been aware of this fact
since at least 1981 and done nothing about it, as noted
in my 1997 testimony.  Consequently, a significant
number of NFA firearms are now illegally possessed, in
some instances by persons who are unaware they are in
violation of the law.  The reason is that many firearms
classified as "Any Other Weapon" are rare collector's
items that many people do not consider weapons, as
noted in both my 1996 and 1997 testimonies.

(Exhibit 1, Larson letter)

On July 10, 1997, Special Agent (SA)     , Office of
Inspection (OI), interviewed Office of Chief Counsel Attorney
    ATF, who related the following facts:

- 970178-01
- 970178-02
- 970178-03   -6-



88

is currently employed by ATF, as an Associate
Chief Counsel in the Office of Chief Counsel in
Washington D.C.   He is aware of an individual by the
name of Eric Larson, whom he has spoken to and
corresponded with concerning issues related to
particular firearms, specifically, the H & R Handy Gun
shotgun and the Marble Game Getter.

According to                 Larson has been requesting
information on the Handy Gun and the Marble Game Getter
since approximately 1986 or 1987.   Larson has requested
that the H & R Handy Gun be removed from the National
Firearms Act (NFA) arguing that the firearm should only
be classified as a curio or relic subject to the 1968
Gun Control Act.             has debated the issue with
Larson on numerous occasions, both verbally and in
writing.   Furthermore, whenever Larson has contacted
ATF with a question or request, ATF has provided the
information available.

Regarding Larson's first allegation,              stated
that the conclusions Larson draws from
testimony may be incorrect, and recommended that
            be contacted for the correct response.

In response to the third allegation,              stated
that neither ‾         nor            perjured
themselves in their letters to Larson.   The information
referred to in each letter, (         letter dated March
23, 1992, and         letter dated July 29, 1993) is
true and correct based on the facts at the time.
‾            and                 of the Firearms Technology
Branch authored the letter for              response.   Larson
refers to a violation of 26 USC 5861(1) and 5871 by
    and           -            stated that he is unaware of
any violation in these two laws from correspondence
between      or      and Larson.

            responded to Larson's fifth allegation, which
refers to inaccuracies in the NFRTR by explaining that
the NFRTR only reflects changes in the record when an
individual legally transfers and registers a previously
registered weapon.   The NFRTR has no way of detecting
how many times a firearm may have been transferred
between the years 1940 and 1968 unless the transfers
were recorded in the NFRTR.   ‾         - stated that if
ATF were to allow periodic amnesty periods, as Larson
suggests, the NFA may be circumvented any number of
times by individuals in violation of the law.   For
example, a person could obtain a firearm illegally and



**Exhibit A, Pg. 486**

89

wait for the amnesty period to register the illegally
obtained firearm.

explained that when the original paperwork
for a registered firearm is lost, the owner merely has
to contact ATF to obtain copies of the original. If a
firearm is already registered, there is no need to re-
register the firearm.

Regarding Larson's first solution,          explained
that ATF is not required to remove a firearm from the
NFA it determines that the firearm is not likely to be
used as a weapon. ATF did not draw this conclusion
regarding the H & R Handy Gun.          stated that
if Congress wants to remove the weapons from the NFA,
it has the authority to do so. In the late 1950's or
early 1960's, Congress did lower the tax on the "any
other weapon" category from $200 to $5. The category,
however, was not removed from the NFA. The H & R Handy
Gun has the same configuration as a sawed-off shotgun
and is readily concealable. This configuration makes
the firearm an unlikely candidate for removal from the
NFA.

states that Larson's second solution, that
the Secretary of the Treasury grant an amnesty period
as in 1968, is very unlikely to occur because another
amnesty period is not warranted. Moreover, a new
amnesty period could jeopardize pending investigations.
This would also be an opportunity for people to avoid
paying the tax to transfer the weapon. The 1968
amnesty was originally enacted to provide the public a
brief opportunity to comply with the NFA as amended
that year. The 1968 amnesty period served its purpose,
and there is no legitimate reason for another amnesty.

SA        presented            with the above summary of his
statement, and             stated under oath that the facts
contained in the summary are true and correct to the best of his
knowledge and belief.

On July 14, 1997, SA        interviewed                  at his
office in the NFA Branch.                advised SA        of the
following information:

          stated that he has been employed by ATF for
the past 25 years and has been assigned to the NFA
Branch for approximately 16 years.

            - 970178-01
            . - 970178-02
            - 970178-03          -4-



90

He is aware of an individual by the name of Eric Larson
and has spoken with Larson about statistics concerning
NFA weapons.                    states that Larson has been
writing letters to ATF for many years regarding NFA
weapons, in particular the H & R Handy Gun.

In response to Larson's first allegation regarding
                 testimony in U.S. District Court,
made reference to certain documents being destroyed at
the NFA Branch.            stated he made the comments
in reference to thousands of Title II firearms
manufactured by             -            that were being
exported to                    Various manufacturers were
forwarding the paperwork for these firearms.  However,
not all of the paperwork was entered properly into the
NFA system.  It was suspected that some of the contract
employees had destroyed some of the documents in an
effort to reduce case load.   "            admits that
Larson may have construed from his testimony that ATF
employees were destroying documents, but this was not
the case.            suggested that if there was an
increase in any NFA firearm registrations, it may have
resulted from the changes made to reflect different
form numbers being located and entered or from the
transposition of registration dates on the original
form.  Such changes would have been added to the NFRTR.

             then addressed the second allegation in the
letter, which concerns the filing of the proper
paperwork for NFA firearms during the amnesty period
Congress enacted in 1968.  He explained that the
backlog of paperwork received as a result of the
amnesty program back in 1968 was very large, and the
filing of these documents required extra time in order
to get the registrations documented.  In addition,
paperwork was also received late, because certain
groups of individuals were granted an extended period
to file the paperwork.  These individuals would have
been granted extensions if, for example they were
overseas when the amnesty period closed.

Regarding the fourth allegation,            stated that
Larson is referring to the statistics maintained by the
NFA Branch.  The 'other' category Larson refers to in
his letter is a category designated by the computer
program that produces statistics when a standard form
number is not provided.  For instance, an individual
entering the information into the ATF computer may
enter a Form 3 as 33.  This form would then be placed
in the 'other' category.  If an application for

             - 970179-01
             . - 970178-02
             - 970179-03          -3-

(22)

**Exhibit A, Pg. 488**

91

registration were received in correspondence on letterhead, without a form number, this would also be placed in the 'other' category. The fact that the form has been placed in the 'other' category does not mean the form cannot be located. All registration correspondence is numbered and identified for proper filing.

In response to the fifth allegation, _____ stated that if a possessor of a legally registered NFA weapon passes away and the beneficiary of the estate wants to register that firearm in his or her name, ATF will do whatever is necessary to assist that individual in registering the firearm. The individual needs only to contact the NFA Branch, and an ATF employee will assist in any way.

_____ assertd in response to Larson's first solution that ATF will not arbitrarily remove any firearms from the NFA. Congress has the authority to do so and, if Congress deems it necessary to remove some of these firearms, it will do so.

In response to Larson's second solution, he stated that ATF will provide anyone copies of registration forms for documents that may have been misplaced or lost. Another amnesty period has been discussed by Congress, the White House, and ATF; however, the idea was rejected because of pending investigations and other issues related to the registration problems that may arise.

SA ____ provided ____ with the above summary of his statement, and ____ stated under oath that the facts contained in the summary are true and correct to the best of his knowledge and belief.

On July 21, 1997, SA ____ interviewed ____ Chief of the Industry Compliance Branch. ____ advised SA ____ that he has spoken with Larson on the telephone concerning the removal of the H & R Handy Gun. ____ also advised SA ____ of the following facts:

He was the Chief of the NFA Branch in 1986 and 1987 and was unaware of any documents being destroyed by any ATF employee. At that time, some paperwork was missing and some contract employees hired by ATF were suspected of misplacing ATF paperwork.

                    - 970178-01
                      - 970178-02
                 - 970178-01        -8-

stated that the Handy Gun has a configuration
similar to the sawed-off or short-barreled shotgun.   He
likewise statd that it is within the purview of
Congress to remove the firearm from the NFA.

Finally,       also stated that when the paperwork for
a legally registered NFA firearm is lost, the owner
need only contact ATF for copies of the original.   ATF
has the original documents, and a copy can be forwarded
to the legal owner.

Another amnesty period for the registration of NFA
weapons must be authorized by Congress and the
Secretary of the Treasury.

SA       presented     with the above summary, and      stated
under oath that the facts contained in the summary are true and
correct to the best of his knowledge and belief.

(Exhibit 2, Letter from               to Eric Larson dated July 29,
1993)

On July 31, 1997, SA         contacted Eric Larson by telephone to
arrange an interview concerning his correspondence to the IG.
Over the telephone, Larson stated that NFA status of a firearm
known as the Game Getter put him over the edge on this issue, and
he felt that there should be one person in the United States that
stands up for what he believes in.   Larson stated that he works
for the Government Accounting Office (GAO) in the section that
audits ATF.   Larson added that he is not involved in the audit of
ATF.   He stated that he would like to meet with SA       and he
would try to think of anything he may have forgotten to put in
his letter to the IG.

On August 1, 1997, SA         interviewed        , Chief of the
Firearms Technology Branch, ATF.       stated that he has been
employed by ATF since November 1972 and knows of Eric Larson.
      advised SA       of the following:

The letter that Larson refers to was authored by ATF
Counsel           from information obtained by
                    Assistant Chief of the Firearms
Technology Branch.

    stated that if Congress wants to change the law as
it pertains to some NFA weapons, he would have no
problem with it.   Congress has the authority to amend
the law with respect to NFA weapons.   If the law were
changed, ATF would adhere to whatever change was made.

        - 970178-01
         - 970178-02
        - 970178-01        -9-



He added that ATF would help, in any way possible, an individual obtain proper paperwork for NFA registration.

(Exhibit 3, Letter from                         to Eric Larson dated March 23, 1992)

On August 1, 1997, SA          interviewed                  , Chief of the Firearms and Explosives Regulatory Section, ATF. Informed that he has been employed by ATF for the past 25 years and has been in his current position since January 1996. stated that he knows of an individual by the name of Eric Larson and has written a response letter to Larson.          advised SA
*       of the following:

With regard to Larson's fifth allegation, if the relatives of a deceased person notify ATF about the death of a firearm owner and wish to reregister the firearm, ATF will help, in any way it can, to facilitate the registration process. However, the only way ATF would be aware of someone's passing away is if the family of the deceased advised ATF.

In response to Larson's first solution,          is not aware that ATF can legally remove NFA firearms without the approval of the Congress.

In response to Larson's second solution, ATF does not have the authority to establish a 90-day waiting period. If the original copy of the NFA registration is lost, the owner of the firearm need only contact ATF and a copy will be provided.

SA          provided          with the previous summary, and stated under oath that the facts contained in the summary are true and correct to the best of his knowledge and belief.

On August 1, 1997, SA          interviewed                  , Chief of the National Firearms Act Branch, ATF.          stated that she has been employed by ATF for 11 years and has been in her current position since March 1996. She knows of an individual by the name of Eric Larson and has had corresponded with him. advised SA          of the following:

In reference to Larson's first allegation,
stated that she is unaware of any original documents being destroyed by any ATF employees. The testimony given in U.S. District Court by          concerned contract employees hired by ATF who were suspected of destroying or misplacing ATF documents. Such activity

        - 970178-01
         - 970178-02
      - 970178-03          -18-

(25)

94

is by no means recent and occurred well over 8 years
ago.

Regarding Larson's fourth allegation, the "other"
category of registrations is used to capture non-
standard documents. For instance, if a Form 1 is
entered as a Form 33, the computer software would
automatically place the form in the "other" column. If
an individual files a registration on correspondence
with letterhead, the entry is also entered as "other."
Furthermore, if errors are located, they are corrected.

Concerning Larson's fifth allegation, if heirs or
executors of estates of deceased individuals wish to
transfer legally registered firearms to themselves,
they must contact ATF. ATF will conduct a query for
the individual and the particular firearm and advise
the individual of the procedure to register. If an
executor finds a firearm that is not registered, ATF
will advise of abandonment procedures for the weapon.
          stated that family of the deceased go
through enough without having to worry about firearms
they were unaware of.

In response to Larson's first solution, Levine stated
that ATF should not make a blanket removal of some
17,000 firearms classified as "any other weapons." She
suggested that some of these weapons may be looked at
on a case-by-case basis and examined individually for
removal from the NFA.

Regarding Larson's second solution, copies of lost
registrations are requested by registered owners and
the requests are responded to. There would be no
reason for another amnesty period, as it would serve no
purpose.

SA        provided        with the previous summary, and
stated under oath that the facts contained in the summary are
true and correct to the best of her knowledge and belief.

(Exhibit 4, Letter from                    to Eric Larson dated
January 9, 1997)

On August 1, 1997, SAs                    and                    OI, met with
Eric Larson and his attorney,                    .   Larson stated the
following:

He had nothing to add to his allegations, and he felt
he had filed everything that pertained to the issue.

          970178-01
          970178-02
          970178-03        -12-

(2L)

**Exhibit A, Pg. 492**

95

He stated that he received the case information
referred to in his third allegation through the Freedom
of Information Act. This was the only case pertaining
to the issue that he had received, and he felt that ATF
had no other cases pertaining to the misuse of the H &
R Handy Gun.

On August 5, 1997, SA                interviewed
Ansistant Chief of the Firearms Technology Branch, who has been
employed with ATF since 1973.                stated the following:

He knows of Eric Larson and has supplied information
about the H & R Handy Gun to the Office of Chief
Counsel for responses to Larson's inquiries.  The case
cited by Larson refers to a case from the Portland,
Oregon, Post of Duty in which an H & R Handy Gun with a
metal cannabis leaf tacked onto the stock was seized
during an investigation.  The firearm was taken into
custody from an acquaintance of an individual by the
name of John D. Dudley.  The case included a Title 26
charge and a felon-in-possession charge.  Dudley,
however, was not charged with possession of the firearm
in question.

There are numerous cases across the United States
involving the criminal possession of an H & R Handy
Gun.            cited three other investigations that he
is aware of that took place between 1990 and 1992.
This does not preclude the possibility that other
investigations may have been going on that            was
unaware of.  The fact that only one was presented to
Larson under his Freedom of Information request does
not mean that there were no other investigations of
this sort taking place or that no cases had been
adjudicated prior to Larson's request.

SA        presented        with the previous summary, and
        stated under oath that the facts contained in the
summary are true and correct to the best of his knowledge and
belief.

On August 5, 1997, SA        telephoned SA        of the
Portland, Oregon, Field Office about defendant John Dudley.  SA
        stated the following:

He investigated a previously convicted felon by the
name of John David Dudley of Jacksonville, Oregon, in
1990.  Dudley was suspected of methamphetamine
trafficking, possession of stolen property, and being a
felon in possession of firearms.

- 970178-01
- 970178-02
970178-03        -13-



**Exhibit A, Pg. 493**

96

was contacted by a local task force concerning
Dudley after Dudley was stopped on a traffic violation
and found to be in possession of an unregistered pen
gun and a Browning 9mm handgun.  Shortly thereafter, a
State search warrant was executed at the residence of
one of Dudley's associates,                    Recovered
from          were 27 firearms, including an H & R Handy
Gun, which, along with all of the other firearms
located, allegedly belonged to Dudley.          advised
authorities that Dudley requested that      keep the
firearms at his              residence.  Dudley was taken
into custody, and          presented the case to the
U.S. Attorney's Office for prosecution.  The Assistant
United States Attorney (AUSA) handling the case decided
to indict Dudley on possession of the two firearms
found during the traffic stop.  The AUSA decided not to
indict Dudley for the other 27 firearms that were
recovered from          .  Dudley was indicted for
violations of 18 U.S.C. 922(g)(1) and Title 26 5861(d).
Dudley was subsequently sentenced in July 1991 to 60
months imprisonment followed by 36 months supervision.

(Exhibit 5, Copy of ATF Form 3270.1 reference IN #93360-90-4058
S.)

- 970178-01
 . - 970178-02
- 970178-03          -13-

97

## LIST OF EXHIBITS

1. Letter from Eric Larson Takoma Park, Maryland, to Inspector General Valerie Lau, dated May 10, 1997.

2. Letter from            Chief of the Firearms and Explosives Division, to Eric Larson, dated July 29, 1993.

3. Letter from            , Chief of the Firearms Technology Branch, to Eric Larson dated March 23, 1992.

4. Letter from            Chief of the National Firearms Act Branch to Eric Larson, dated January 9, 1997.

5. Copy of ATF Form 3270.1 regarding John David Dudley, investigation #93360-90-4058 S from Portland, Oregon, Field Office.

- 970178-01
  - 970178-02
- 970178-03        -14-

(29)

**Exhibit A, Pg. 495**

98

May 10, 1997

Ms. Valerie Lau, Inspector General
Office of the Inspector General
Department of the Treasury
1500 Pennsylvania Avenue, N.W., Room 2412
Washington, D.C.  20220

Dear General:

I am writing to call your attention to, and provide specific documented valid and reliable
evidence of, what appear to me to be serious instances of mismanagement, misconduct and
illegality by employees of the Bureau of Alcohol, Tobacco and Firearms (ATF) in
administering our Nation's federal gun control laws.  I have presented this evidence in
testimony to the House Appropriations Subcommittee on April 30, 1996,[1] and on April 8,
1997.[2]  I have enclosed a copy of my 1997 testimony for your convenience of reference.

All of these instances of apparent mismanagement, misconduct and illegality involve the
National Firearms Act (NFA) of 1934, as amended, which is a statute that falls under the Tax
Code of 1986, and thus involves taxpayer information.  Taxpayer information is secret under
Internal Revenue Service (IRS) rules and the law, but under court rules and criminal case
law, prosecutors are required to disclose any information that could be used to impeach a
government witness.  Consequently, the instances I have identified here appear to affect
certain types of prosecutions for alleged violations of the NFA, and in particular the alleged
nonregistration of NFA firearms.

Based on my 1996 and 1997 testimonies, it appears that one or more ATF employees have,
in the course of their official duties, committed a number of serious acts which are contrary

---

[1]"Statement of 'Curio or Relic' Firearms Manufactured in or Before 1934 Which Are Also
Classified in the 'Any Other Weapon' Category Under the National Firearms Act (NFA) of
1934, as Amended," by Eric M. Larson, in *Treasury, Postal Service, and General
Government Appropriations for Fiscal Year 1997, Part 6.*  Testimony of Members of
Congress and Other Interested Individuals and Organizations.  Hearings Before a
Subcommittee of the Committee on Appropriations, House of Representatives, 104th
Congress, 2nd Session. Washington, D.C.: U.S. Government Printing Office, 1996, pages 37–
274.

[2]"Statement on Proposed Removal of Certain Firearms Manufactured in the United States in
or Before 1934 from Purview of the National Firearms Act (NFA) of 1934, as Amended, and
Their Reclassification as 'Firearms' as Defined in Title 18, U.S.C., Chapter 44," and "Errors
in the National Firearms Registration and Transfer Record: A New Amnesty Period May be
Required to Correct Them."

(30)

EXHIBIT NO. /

**Exhibit A, Pg. 496**

99

to law. Consequently, I would like to respectfully ask you to consider conducting a criminal investigation of a number of specific instances where it appears that ATF employees have violated the law. From the nature of these possible violations, it appears that it may be desirable for you to consider conducting a forensic audit of the National Firearms Registration and Transfer Record (NFRTR), as these data may have been illegally created or altered. It may also be necessary to have such a forensic audit conducted by an entity which is totally independent from ATF, to avoid any conflict of interest that would obviously result from allowing ATF to investigate itself.

These specific alleged acts are as follows:

1. ATF employees have deliberately destroyed original firearm registration documents that they are required by law to maintain, as noted in sworn testimony in 1996 by ATF Special Agent Gary N. Schaible.[3] In analyses of data made public by ATF, I found that during 1992 to 1996, ATF may have added 119 or more firearms to the NFRTR which were originally registered on Form 1 or Form 4467 during 1934 to 1971, for which ATF lost or deliberately destroyed the original records.

2. ATF employees registered almost 2,500 unregistered NFA firearms on Form 4467 after December 1, 1968, without proper authorization by the Congress. In addition to not being authorized by the Congress, such registrations were prohibited by the Supreme Court in 1971, yet it appears that ATF registered 172 or more unregistered NFA firearms on Form 4467 after 1971. I have included an example of one apparently illegal post-December 1, 1968, Form 4467 registration in my 1997 testimony.

3. ATF employees Edward M. Owen, Jr. and Terry L. Cates committed felony perjury in letters written to me dated March 23, 1902, and July 29, 1993, respectively. Mr. Owen and Mr. Cates each alleged that "an unlawful trafficker in drugs with an extensive criminal record" was in possession of a .410 bore H&R Handy-Gun "while committing drug violations." This alleged instance of criminal conduct was used to deny my petition to remove the H&R Handy-Gun from the NFA as a collector's item. In fact, a Freedom of Information Act request disclosed that the Handy-Gun was recovered from an acquaintance of the trafficker, who said that the trafficker had given it to him for safe-keeping (see pages 212-215, 222-230, and 233-236 of my 1996 testimony). Any person who petitions for removal of a firearm from the NFA must state the reasons under penalty of perjury. The plain language of the statute at Title 26, U.S.C., § 5861(l) and § 5871 applies to any person who knowingly makes or causes the making of a false entry on any document required to be prepared as a result of

---

[3]*United States vs. John Daniel LeaSure*, Criminal No. 4:95CR54, Newport New, Virginia. May 21, 1996. Transcript of Proceedings before the Honorable John A. Mackenzie, United States District Judge. United States Court, Eastern District of Virginia, Newport News Division.

2

Exhibit A, Pg. 497

100

administering the NFA, including a legal decision regarding the classification of an NFA firearm. Both Mr. Owen and Mr. Cates deliberately falsified the facts of the case they cited.

4. Certain "registration activity" that ATF classifies as "OTHER" could include registrations of firearms that one or more ATF employees registered contrary to law, because ATF has refused to disclose the nature of this "registration activity." To the best of my knowledge, I've never heard of any forms numbered other than 1, 2, 3, 4, 5, 6, 9, 10 or 4467 being used to register or transfer NFA firearms. According to a letter to me dated January 9, 1997, from NFA Branch Chief Nereida W. Levine, the "OTHER" category is "comprised of registrations where the form number is different from the other ones tabulated." Ms. Levine, however, has declined to provide the names or numbers of these forms. Coupled with the other evidence of registration mismanagement I have documented, it appears that the "OTHER" category may represent firearms that were registered illegally, as noted in my 1997 testimony.

5. It appears that a significant number of NFA firearms are currently registered to persons who are deceased, and that ATF has been aware of this fact since at least 1981 and done nothing about it, as noted in my 1997 testimony. Consequently, a significant number of NFA firearms are now illegally possessed, in some instances by persons who are unaware they are in violation of the law. The reason is that many firearms classified as "Any Other Weapon" are rare collector's items that many people do not consider weapons, as noted in both my 1996 and 1997 testimonies.

ATF's most recent data (as of December 31, 1996) disclose that of the 14,259 firearms registered during 1934 to 1939, exactly 11,175 (78.4 percent) are still currently owned by the person or government entity that registered or acquired it during that same time period. And of the 68,004 firearms registered in 1968, a stunning 85.4 percent are still owned as of 1996 by the same persons who registered or received them by transfer in 1968. Consider that in 1981, an internal ATF study reported:

> We have the condition where people who registered firearms under the original National Firearms Act at age 65 would now be 112 years old. We know that these people are dead and their heirs have not taken the necessary steps to contact us so that the involuntary transfer created by the registrant's death can be formalized.[4]

One result of ATF's negligence is that some persons who own certain rare, valuable firearms that have special value to collectors have been instantly transformed into criminals. The reason is that through natural disasters (such as the recent floods in North Dakota, house fires, and similar tragic events), the owners of these firearms have lost their copies of the documents which prove their lawful ownership, and the law does not allow these firearms

---

"'Status Report: National Firearms Registration and Transfer Record (NFRTR),' by Deron A. Dobbs. Internal ATF report dated July 1, 1981.

(32)

**Exhibit A, Pg. 498**

101

to be voluntarily re-registered. I believe there are two possible solutions to this problem, and neither requires legislation.  The reason is that each solution may be achieved by administrative action on the part of ATF. These solutions are:

1. Administratively removing approximately 17,000 "curio or relic" firearms classified as "any other weapon" under the NFA, which were originally commercially manufactured in or before 1934 (but not replicas thereof). The Congress determined that these "any other weapon" firearms were mainly collector's items and not likely to be used as weapons in 1960.  It was not until 1968 that the Congress passed legislation enabling these firearms to be removed from the NFA as collector's items.

2. Establishing a 90-day amnesty period to allow persons who may have innocently lost their copies of the registration form to re-register these firearms. The Congress has authorized such amnesty periods to be established by the Secretary of the Treasury under § 207(d) of the Gun Control Act of 1968.

For the past several years, in response to my petitions or requests, ATF has refused to implement either solution that I have proposed.  I believe that removing these firearms from the NFA is an ideal solution, but also believe that an amnesty period may also be an appropriate solution.

I hope that you will take prompt action to resolve the problems that I have documented.  If you have any further questions, please contact me.

Thank you.

Very truly yours,

Eric M. Larson
P.O. Box 5497
Takoma Park, Maryland  20913
(301) 270-3450

cc:  The Honorable Janet Reno
Attorney General
Department of Justice

The Honorable Bill Archer
Chairman
House Committee on Ways and Means

83

**Exhibit A, Pg. 499**

102



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

JUL 29 1993

Mr. Eric M. Larson
Post Office Box 5497
Takoma Park, MD  20913-5497

Dear Mr. Larson:

This is in response to your July 12, 1993, follow-up letter
to Treasury Secretary Bentsen.  In your letter you take
issue with our response, on Secretary's Bentsen's behalf, to
your June 14, 1993, request that the H & R Handygun be
removed from the National Firearms Act (NFA).

H & R Handyguns currently fall within the "any other weapon"
category of NFA weapons.  As defined in 26 U.S.C. 5845(e),
the term "any other weapon" means:

> (A)ny weapon or device capable of being concealed
> on the person from which a shot can be discharged
> through the energy of an explosive, a pistol or
> revolver having a barrel with a smooth bore designed
> or redesigned to fire a fixed shotgun shell. . . .
> Such term shall not include a pistol or a revolver
> having a rifled bore, or rifles bores, or weapons
> designed, made, or intended to be fired from the
> shoulder and not capable of firing fixed ammunition.

The weapons meet this definition because of their
concealability on the person (having an approximate overall
length of 17 inches), and because they are smooth bore
pistols designed to fire a fixed shotgun shell.  They have
been subject to the NFA since the Act was originally enacted
in 1934.

The H & R Handygun was manufactured between 1920 and 1934.
Although the exact number of Handyguns manufactured is
unknown, available information suggests that between 20,000
and 25,000 were made in different gauges and calibers.  The
value of the Handygun is estimated to range from $400 to
$600 for standard variations, with scarcer versions
exceeding that amount.



EXHIBIT NO. 2

**Exhibit A, Pg. 500**

103

-2-

Mr. Eric B. Larson

Pursuant to 26 U.S.C. 5845(a) and the regulations in 27
C.F.R. 179.25, the Bureau of Alcohol, Tobacco and Firearms
(ATF) may remove weapons other than machineguns and
destructive devices from the scope of the NFA which,
although originally designed as weapons, are determined by
reason of their date of manufacture, value, design, and
other characteristics to be primarily collector's items and
not likely to be used as weapons.

The removal of weapons from the scope of the NFA is an
action not taken lightly by ATF, and the requester has a
heavy burden of establishing that an item is not likely to
be used as a weapon.  This is particularly true where, as in
the present case, a substantial number of weapons are sought
to be removed.  In addition, your request requires close
scrutiny in view of prior congressional action with respect
to H & R Handyguns and similar NFA weapons.

In 1945 and 1960, Congress amended the NFA by changing the
rate of tax on the transfer of these smooth bore shot
pistols with the scope of the "any other weapon" category.
Because the weapons were found to be of interest to
collectors and useful for certain legitimate purposes,
Congress in 1945 reduced the original $200 transfer tax to
$1 and in 1960 changed the transfer tax to $5 for all
weapons within the category "any other weapon."  It is
significant that, although the shot pistols were considered
collector's items, Congress did not choose to remove them
from the NFA.  Moreover, the legislative history shows that
Congress deliberately left these weapons within the purview
of the NFA:

> However, this "any other weapon" category will
> continue to be subject to the present control
> provisions applicable to all firearms under present
> law.  As a result, the safeguards of present law are
> maintained, while applicable taxes are lowered to the
> level which makes it possible for gun collectors to
> obtain novel weapons in the category . . .

S. Rep. No. 1303, 86th Cong., 2d Sess. 2, reprinted in 1960
U.S. Code Cong. & Admin. News 2111.

As previously stated, one of the criteria to be considered
in acting upon a removal request is the "design" of the
weapon.  The design and function of the H & R Handygun are
identical to that of the sawed-off shotgun, which is also 

Mr. Eric M. Larson

subject to the NFA.  Both weapons are smooth bore handguns which fire a fixed shotgun shell and are concealable on the person.  The weapons differ in two regards, neither of which relate to their design or function:  (1) the typical sawed-off shotgun is made by converting an existing shotgun into a shot pistol, whereas the H & R Handygun was originally manufactured as a shot pistol; and (2) the sawed-off shotgun is subject to the NFA because it fits within the definition of "weapon made from a shotgun" in 26 U.S.C. 5845(a)(2), whereas the H & R Handygun is within the NFA definition of "any other weapon."  Practically speaking, however, the two weapons are substantially the same.

The sawed-off shotgun is a popular crime weapon and has been the subject of numerous Federal and State prosecutions.  This is attributable in part to the availability of such weapons.  As stated above, sawed-off shotguns are produced by simply altering conventional, sporting shotguns which are readily available in the marketplace and which are not themselves subject to the NFA's registration or other requirements.

Although H & R Handyguns have not frequently been used in crimes, these weapons have been found in the possession of criminals.  The subject of a recent ATF case was an unlawful trafficker in drugs with an extensive criminal record.  While committing drug violations, this person was in possession of two NFA weapons, a sawed-off Savage Arms shotgun and a .410 bore H & R Handygun.  H & R Handyguns may well become a crime problem if they become readily available in commerce.  We believe that their limited availability is affected by the fact that the weapons have not been manufactured since the 1930's, as well as the fact that they have been subject to NFA controls since 1934.  Under the NFA, weapons not registered in the National Firearms Registration and Transfer Record are contraband and cannot be lawfully transferred.  Possessors of registered weapons may only transfer the weapons pursuant to applications approved by ATF.  Transfer applications are denied if the transferees' receipt and possession of the weapons would violate any law.

As stated above, the removal of a weapon from the NFA requires a finding that it would not likely be used as a weapon.  We believe that removal of H & R Handyguns would increase the circulation of these weapons in commerce and their availability to those who would use them for criminal purposes.  Because of the number of weapons originally manufactured, we cannot conclude that they would not find



105

-4-

Mr. Eric W. Larson

their way into criminal hands and be put to unlawful use.
As previously stated, it is believed that 20,000 to 25,000
were manufactured, but the precise figure is unknown.   In
addition, we do not believe that the value of the weapons is
so high as to make the weapons inaccessible to criminals.
Because the weapons are identical in design to the sawed-off
shotgun, we have no doubt that those acquired by criminals
would be used for unlawful purposes.   For the above reasons,
it has not been established that the weapons would not
likely be used as weapons if removed from the NFA.

In support of your request, you have cited examples of ATF's
removal of certain other weapons from the NFA.
Specifically, you refer to Mauser and Luger pistols with
shoulder stocks and trapper carbines.   In our view, these
weapons are distinguishable from the H & R Handygun in that
neither they nor any similar weapons have constituted a
crime problem.   You also suggest that we compare the H & R
Handygun with the .45 Colt/410 bore Thompson Contender
pistol, a firearm which you state is similar to the H & R
Handygun, is distributed in commercial channels today, and
is not considered a crime weapon.   We do not believe this to
be a valid comparison because the Thompson Contender pistol
is not a smooth bore shot pistol and is not a weapon subject
to the NFA.

Accordingly, we must affirm our denial of your request to
remove the H & R Handygun from the scope of the NFA since we
cannot conclude that such weapons, if removed from the Act,
would not likely be used as weapons.

Sincerely yours,


Terry L. Cates
Chief, Firearms and Explosives Division



**Exhibit A, Pg. 503**

106

MAR 23 1992

CC-40,647   EE:CLK

Mr. Eric M. Larson
Post Office Box 5497
Tacoma Park, Maryland   20913-5497

Dear Mr. Larson:

This is in response to your request for removal of the
Harrington and Richardson Handygun (H & R Handygun) from the
scope of the National Firearms Act (NFA), 26 U.S.C.
Chapter 53.

The weapons in question are .410 and 28 gauge H & R Handyguns
which currently fall within the "any other weapon" category
of NFA weapons. As defined in 26 U.S.C. § 5845(e), the term
"any other weapon" means:

> (A)ny weapon or device capable of being concealed
> on the person from which a shot can be discharged
> through the energy of an explosive, a pistol
> or revolver having a barrel with a smooth bore
> designed or redesigned to fire a fixed shotgun
> shell. . . . Such term shall not include a
> pistol or a revolver having a rifled bore, or
> rifles bores, or weapons designed, made, or
> intended to be fired from the shoulder and not
> capable of firing fixed ammunition.

The weapons meet this definition because of their concealability
on the person (having an approximate overall length of
17 inches), and because they are smooth bore pistols designed
to fire a fixed shotgun shell.  They have been subject to the
NFA since the Act was originally enacted in 1934.

The H & R Handygun was manufactured between 1920 and 1934.
Although the exact number of Handyguns manufactured is
unknown, available information suggests that between 20,000
and 25,000 were made in different gauges and calibers.  The
value of the Handygun is estimated to range from $400 to
$600 for standard variations, with scarcer versions exceeding
that amount.



970170

EXHIBIT NO. 5

**Exhibit A, Pg. 504**

- 2 -

Mr. Eric M. Larson

Pursuant to 26 U.S.C. § 5845(a) and the regulations in
27 C.F.R. § 179.25, the Bureau of Alcohol, Tobacco and
Firearms (ATF) may remove weapons other than machineguns and
destructive devices from the scope of the NFA which, although
originally designed as weapons, are determined by reason of
their date of manufacture, value, design, and other
characteristics to be primarily collector's items and not
likely to be used as weapons.

The removal of weapons from the scope of the NFA is an
action not taken lightly by ATF, and the requester has a
heavy burden of establishing that an item is not likely to
be used as a weapon. This is particularly true where, as in
the present case, a substantial number of weapons are sought
to be removed. In addition, your request requires close
scrutiny in view of prior congressional action with respect
to H & R Handyguns and similar NFA weapons.

In 1945 and 1960, Congress amended the NFA by changing the
rate of tax on the transfer of these smooth bore shot
pistols within the scope of the "any other weapon" category.
Because the weapons were found to be of interest to
collectors and useful for certain legitimate purposes,
Congress in 1945 reduced the original $200 transfer tax to
$1 and in 1960 changed the transfer tax to $5 for all
weapons within the category "any other weapon." It is
significant that, although the shot pistols were considered
collector's items, Congress did not choose to remove them
from the NFA. Moreover, the legislative history shows that
Congress deliberately left these weapons within the purview
of the NFA:

    However, this "any other weapon" category will
    continue to be subject to the present control
    provisions applicable to all firearms under
    present law. As a result, the safeguards of
    present law are maintained, while applicable
    taxes are lowered to the level which makes it
    possible for gun collectors to obtain novel
    weapons in this category , . .

S. Rep. No. 1303, 86th Cong., 2d Sess. 2, reprinted in
1960 U.S. Code Cong. & Admin. News 2111.

As previously stated, one of the criteria to be considered
in acting upon a removal request is the "design" of the
weapon. The design and function of the H & R Handygun are
identical to that of the sawed-off shotgun, which is also



108

- 2 -

Mr. Eric M. Larson

subject to the NFA.  Both weapons are smooth bore handguns
which fire a fixed shotgun shell and are concealable on the
person.  The weapons differ in two regards, neither of which
relate to their design or function:  (1) the typical
sawed-off shotgun is made by converting an existing shotgun
into a shot pistol, whereas the H & R Handygun was originally
manufactured as a shot pistol; and (2) the sawed-off shotgun
is subject to the NFA because it fits within the definition
of "weapon made from a shotgun" in 26 U.S.C. § 5845(a)(2),
whereas the H & R Handygun is within the NFA definition of
"any other weapon."  Practically speaking, however, the two
weapons are substantially the same.

The sawed-off shotgun is a popular crime weapon and has been
the subject of numerous Federal and State prosecutions.  This
is attributable in part to the availability of such weapons.
As stated above, sawed-off shotguns are produced by simply
altering conventional, sporting shotguns which are readily
available in the marketplace and which are not themselves
subject to the NFA's registration or other requirements.

Although H & R Handyguns have not frequently been used in
crimes, these weapons have been found in the possession of
criminals.  The subject of a recent ATF case was an unlawful
trafficker in drugs with an extensive criminal record.  While
committing drug violations, this person was in possession of
two NFA weapons, a sawed-off Savage Arms shotgun and a .410
gauge H & R Handygun.  H & R Handyguns may well become a
crime problem if they become readily available in commerce.
We believe that their limited availability is affected by the
fact that the weapons have not been manufactured since the
1930's, as well as the fact that they have been subject to
NFA controls since 1934.  Under the NFA, weapons not
registered in the National Firearms Registration and Transfer
Record are contraband and cannot be lawfully transferred.
Possessors of registered weapons may only transfer the
weapons pursuant to applications approved by ATF.  Transfer
applications are denied if the transferees' receipt and
possession of the weapons would violate any law.

As stated above, the removal of a weapon from the NFA
requires a finding that it would not likely be used as a
weapon.  We believe that removal of H & R Handyguns would
increase the circulation of these weapons in commerce and
their availability to those who would use them for criminal
purposes.  Because of the number of weapons originally
manufactured, we cannot conclude that they would not find



109

- 4 -

Mr. Eric M. Larson

their way into criminal hands and be put to unlawful use.
As previously stated, it is believed that 20,000 to 25,000
were manufactured, but the precise figure is unknown.  In
addition, we do not believe that the value of the weapons is
so high as to make the weapons inaccessible to criminals.
Because the weapons are identical in design to the sawed-off
shotgun, we have no doubt that those acquired by criminals
would be used for unlawful purposes.  For the above reasons,
it has not been established that the weapons would not likely
be used as weapons if removed from the NFA.

In support of your request, you have cited examples of ATF's
removal of certain other weapons from the NFA.  Specifically,
you refer to Mauser and Luger pistols with shoulder stocks
and trapper carbines.  In our view, these weapons are
distinguishable from the M & R Handygun in that neither they
nor any similar weapons have constituted a crime problem.
You also referred to ATF's "removal" of the Marble Game
Getter with an 18-inch barrel from the "any other weapon"
category.  This weapon was not removed from the NFA because
it was not subject to the Act in the first place.  Because
of its overall length, it is not considered concealable on
the person and, therefore, does not fall within the
definition of "any other weapon."  You also suggest that we
compare the H & R Handygun with the .45 Colt/410 gauge
Thompson Contender pistol, a firearm which you state is
similar to the H & R Handygun, is distributed in commercial
channels today, and is not considered a crime weapon.  We do
not believe this to be a valid comparison because the
Thompson Contender pistol is not a smooth bore shot pistol
and is not a weapon subject to the NFA.

Accordingly, we must deny your request to remove the H & R
Handygun from the scope of the NFA since we cannot conclude
that such weapons, if removed from the Act, would not likely
be used as weapons.  Nevertheless, we commend you for your
thorough research and presentation and regret that our
decision could not be more favorable.

Sincerely yours,

SIGNED

Edward M. Owen, Jr.
Chief, Firearms Technology Branch



ATF00024 8/9/10

**Exhibit A, Pg. 507**

110



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON D C 70226

LAR⌀Ø997

JAN - 9 1997

E:RE:FN:GS

Mr. Eric M. Larson
P.O. Box 5497
Takoma Park, MD   20913

Dear Mr. Larson:

This is in response to your letter of November 21, 1996, in which you request confirmation of statements made about data in the "NFA REGISTRATION ACTIVITY - ANNUAL COMPARISON" table. You enclosed a copy of the table with data through December 31, 1995.

The table shows Form 4467 registrations after 1971 and before 1968. We believe that there are errors in the date or form fields which cause the registrations to appear in those years.

The table shows pre-1934 data. This data results from errors, blanks, or misrepresented characters in the date field which cause the registrations to appear prior to 1934. This statistical report was developed several years after the implementation of the automated database and the programmer apparently included a procedure to capture these date ranges because errors in the date field showed dates prior to 1934.

You asked about the "OTHER" column in the table. This category would be comprised of registrations where the form number is different from the other ones tabulated. An incorrect form number would be counted in that column.

In regard to items 5 and 6 of your letter, we are constantly verifying the information in our database. If we do locate a record where the date, form number,

970173



EXHIBIT NO. 4

ATF 3rd Pul
Doc. 96-292

111

- 2 -

Mr. Eric M. Larson

or other information was not entered correctly, we enter the correct information. These actions may then result in an adjustment to previously generated statistics.

We would like to point out that errors in the date or form number fields would not affect the thoroughness of a search of the database by NFA Branch personnel. We use a search methodology that ensures a thorough review of the database for all possible responsive entries and an examination of the original registration document.

Finally, you asked whether a firearm would be added to the Registry if a person possessed a valid registration that was not in the Registry. The document the person possesses is his or her evidence of registration. It would be added to the National Firearms Registration and Transfer Record if the information was not already in the Record.

We trust this has been responsive to your request. Should any additional information be needed, please contact us at (202) 927-8330.

Sincerely yours,

Chief, National Firearms Act Branch

(43)

**Exhibit A, Pg. 509**

| DEPARTMENT OF THE TREASURY BUREAU OF ALC. TOBACCO AND FIREARMS | | | 1. INVESTIGATION IS ☑ NEUTRAL ☐ SENSITIVE ☐ SIGNIFICANT | | Page 1 of |
|---|---|---|---|---|---|
| **REPORT OF INVESTIGATION (Law Enforcement)** | | | | | 1 Pages |
| 1. TITLE Special Agent in Charge Seattle District Office | | (2) CIF Seattle: FY-90-Narcotics | | | |
| TITLE OF INVESTIGATION DUDLEY, John David | | | 3. INVESTIGATION No. 45160-90-40583 | | |
| 5. TYPE OF REPORT (Check appropriate block) | | | 7. BUREAU PROGRAM | | 8. PROJECTED |

| | | | | | TARGETED OFFENDER |
|---|---|---|---|---|---|
| PRELIMINARY | COLLATERAL (Request) | ☑ TITLE I | FIREARMS | | TERRORIST/EXTREMIST |
| | | TITLE II | | | OCD |
| STATUS | COLLATERAL (Reply) | TITLE III | | | TRAF |
| | | TITLE IV | EXPLOSIVES | | SEAR |
| FINAL | INTELLIGENCE | TITLE III | | | DMO |
| | | TOBACCO | | | OTHER (Specify) |
| SUPPLEMENTAL | ADDITIONAL (Attach) | ALCOHOL | | ☒ | Achilles |

**DETAILS:**

This status report relates to alleged violations of federal firearms laws by John David Dudley, a multiple convicted felon, who was unlawfully using and carrying firearms while trafficking in drugs in the Judicial District of Oregon. This investigation is classified as CIF: Narcotics.

John David Dudley has a criminal history dating back to 1977. Dudley's criminal history reflects four felony convictions, one for first degree theft and three for the delivery and possession of controlled substances. Dudley also has four misdemeanor convictions, numerous arrests for both the possession and delivery of controlled substances, ex-con in possession of a firearm, parole violations, burglary, theft and most recently, the manufacture of controlled substances. John Dudley is currently under two separate Oregon state indictments for possession of a controlled substance, methamphetamine and marijuana; manufacturing a controlled substance, methamphetamine; criminal conspiracy; and ex-con in possession of a firearm.

On November 29, 1989, based on information received from a confidential informant about drug activity, the Jackson County Narcotics Enforcement Team (JACNET), served a search warrant at John Dudley's residence, _____ Oregon. During service of this warrant, a small quantity of methamphetamine, photos of a "Streetsweeper" shotgun lying on the car seat of John Dudley's Corvette and the owner's manual for the "Streetsweeper" were seized. On November 30, 1989, John Dudley was subsequently arrested for possession of a controlled substance/ methamphetamine.

On March 30, 1990, a search warrant was served on a shop building located at _____ Oregon. Officers discovered a methamphetamine lab and numerous firearms in a hidden compartment next to the lab. Evidence was found that linked John Dudley and another individual to the lab. JACNET officers found drug records and property in the lab that relate to John Dudley.

On April 12, 1990, a search warrant was served at John Dudley's residence (described as a fifth wheel trailer) _____ Oregon. During this search, an AMT .45 caliber pistol, bearing serial number B23196,

| 12. SUBMITTED BY (Name) | TITLE AND OFFICE S/A, Portland, OR POO | 13. DATE 10/19/90 |
|---|---|---|
| 14. | TITLE AND OFFICE RAC, Portland, OR POD | 15. DATE 10/19/90 |
| 16. APPROVED BY (Name) | 17. TITLE AND OFFICE | 18. DATE |

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

REPORT OF INVESTIGATION—CONTINUATION SHEET
(Criminal Enforcement)

| TITLE OF INVESTIGATION | CASE NUMBER |
|---|---|
| DUDLEY, John David | 93360-90-40588 |

DETAILS (Continued)

was found in a gym bag that also contained several ounces of both methamphetamine and marijuana. Numerous letters, receipts for telephone bills and other correspondence in the name of John Dudley were found in this same residence. Prior to the service of the warrant, John Dudley was stopped while leaving his property and advised of the warrant; he chose not to remain on the premises. In another trailer on this same property,                an associate of John Dudley, was found to be in possession of a small amount of methamphetamine.        was arrested for the possession of a controlled substance/methamphetamine. Sub- sequently, John Dudley was indicted in state court for (1) manufacturing a controlled substance, methamphetamine. (2) possession of a controlled substance, methamphetamine, (3) possession of a controlled substance, marijuana, and (4) ex-con in possession of a firearm.

On April 31, 1990, a weapon made from a shotgun was seized during a consent search of                                Oregon, pursuant to an arrest warrant for John Dudley.             , a resident of
      stated that "Dudley owns all the guns" that were found in the residence, and that Dudley and        had brought the guns over to                house at different times during a two-week period. A total of 27 firearms, including the weapon made from a shotgun, were found and seized from the residence. Three of the above firearms were found to be stolen.

On June 1, 1990, sheriff's deputies went to
Oregon, (John Dudley's residence) to do a follow-up investigation of a burglary, and smelled phenylacetic acid and P2P on the property. Based upon the deputies' experiences with methamphetamine laboratories and the odors associated with the chemicals used in the making of methamphet- amine, a search warrant was issued and executed at the address. In addition to stolen property, an operating methamphetamine lab was discovered in a shed located on the property. Four firearms were seized during execution of the search warrant, including a shotgun which was strategically placed atop the doorway leading into the methamphetamine laboratory. Subsequently, John Dudley and two other suspects were indicted in state court for (1) criminal conspiracy, (2) manufacturing a controlled substance, (3) possession of a controlled substance, and (4) ex-con in possession of a firearm. Arrest warrants were issued for all three; John Dudley turned himself in and was released on bail.

A firearms trace of the Cobray "Streetsweeper", 12 ga., semiauto shot- gun, bearing serial number 6193, found during a search warrant on the residence of                revealed that it was purchased by
      Both individuals are known associates of John Dudley.
      transported several firearms, including the Cobray "Street- sweeper" shotgun, to                residence, allegedly at John Dudley's request.

The Jackson County Narcotics Enforcement Team currently has a total of 55 firearms in custody from various seizures that are linked to John David Dudley.

114

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

**REPORT OF INVESTIGATION—CONTINUATION SHEET**
(Criminal Enforcement)

PAGE 3 OF 3 PAGES

TITLE OF INVESTIGATION
DUDLEY, John David

UNIQUE IDENTIFIER
93160-90-4058S

DETAILS (Continued)

A trace has been initiated on several of the other firearms that were seized by JACNET.

At present, ATF/Portland has no property in custody relating to this case.

AUSA                         has expressed interest in pursuing federal prosecution for violations of federal firearms laws in this case.

Investigation to continue.

| DEPARTMENT OF THE TREASURY - BUREAU OF ALCOHOL, TOBACCO AND FIREARMS | | 1. INVESTIGATION IS | | | Page 1 of |
|---|---|---|---|---|---|
| REPORT OF INVESTIGATION (Law Enforcement) | | ☒ ROUTINE  ☐ SENSITIVE   ☐ SIGNIFICANT | | | — 3. PRINT |
| 1-6 Special Agent in Charge Seattle District Office | | [3] CIP Seattle: FY-90-Narcotics 3. MONITORED INVESTIGATION INFORMATION (Number and Program) | | | |
| TITLE OF INVESTIGATION DUDLEY, John David | | | 1. INVESTIGATION NO. (Include Source FR) 93160-90-4058E | | |

| TYPE OF REPORT (Check appropriate boxes) | | 7. BUREAU PROGRAM | | 8. PROGRAM CTRL |
|---|---|---|---|---|
| PRELIMINARY | COLLATERAL (Request) | X | TITLE I | TARGETED OFFENDER |
| | | | TITLE II  FIREARMS | TERRORISM/EXTREMIST |
| STATUS X | COLLATERAL (Reply) | | TITLE VII | GOD |
| | | | TITLE III  EXPLOSIVES | ITAR |
| FINAL | INTELLIGENCE | | TITLE IV | CLAN |
| | | | TOBACCO | DARS |
| SUPPLEMENTAL | REGIONAL (Transmit) | | ALCOHOL | OTHER (Specify) |
| | | | | v   2-hilles |

**4. DETAILS**

This status report relates to alleged violations of federal firearms laws by John David Dudley, a multiple convicted felon, who was unlawfully using and carrying firearms while trafficking in drugs in the Judicial District of Oregon.  This investigation is classified as CIP: Narcotics.

John David Dudley has a criminal history dating back to 1977.  Dudley's criminal history reflects four felony convictions, one for first degree theft and three for the delivery and possession of controlled substances. Dudley also has four misdemeanor convictions, numerous arrests for both the possession and delivery of controlled substances, ex-con in possession of a firearm, parole violations, burglary, theft and most recently, the manufacture of controlled substances.  John Dudley is currently under two separate Oregon state indictments for possession of a controlled substance, methamphetamine and marijuana; manufacturing a controlled substance, methamphetamine; criminal conspiracy; and ex-con in possession of a firearm.

As described in the previous status report, from November 1989 to June 1990, five search warrants were executed by the Jackson County Narcotics Enforcement Team (JACNET) on John Dudley's residence or his associates' residences that contained Dudley's property.  During these search warrants, numerous firearms, various quantities of both methamphetamine and marijuana, a "boxed" methamphetamine lab and an operating methamphetamine lab were discovered by police officers.  During an April 21, 1990, search warrant on one of John Dudley's associates, two Title II firearms were found that belonged to Dudley.

**THE FOLLOWING EVENTS HAVE OCCURRED SINCE THE LAST STATUS REPORT:**

On December 31, 1990, a Jackson County Sheriff's deputy spotted a stolen vehicle and followed it until the vehicle came to a stop.  Two white males exited the vehicle and the deputy immediately recognized the driver as being John Dudley.  Both John Dudley and his passenger.                    were taken into custody for the unauthorized use of a motor vehicle       . was later released).  Officers discovered a pistol, in plain view. Wedged between the console and passenger side seat.  Officers found that the pistol, an F.N. Browning, 9mm pistol, bearing serial number 295501, was loaded, complete with

| 9. SUBMITTED BY | 10. TITLE AND OFFICE +S/A, Portland, OR POD | 11. DATE 01/10/91 |
|---|---|---|
| | 17. TITLE AND OFFICE RAC, Portland, OR POD | 13. DATE 01/10/91 |
| 14. APPROVED BY | 15. TITLE AND OFFICE SAC   Seattle District Office | 16. DATE |

**Exhibit A, Pg. 513**

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

**REPORT OF INVESTIGATION—CONTINUATION SHEET**
(Criminal Enforcement)

| | |
|---|---|
| TITLE OF INVESTIGATION: DUDLEY, John David | INDEX IDENTIFIER: 93360-90-40589 |

**DETAILS (Continued)**

one round in the chamber and ready to fire. A computer check on the pistol revealed that it had been stolen during a residential burglary in Jackson County two months previously. Officers also discovered a cylindrical metal object in Dudley's left jacket pocket. Upon further examination the object proved to be a .38 caliber pen gun. The .38 caliber pen gun does not have a serial number. John Dudley was arrested for the unauthorized use of a motor vehicle and ex-con in possession of a weapon.

On January 2, 1990, AUSA _____ agreed to indict John Dudley for felon in possession and the unlawful possession of an unregistered Title II firearm, based upon Dudley's December 31, 1990, arrest. Based upon the rationale that Dudley intimidates several of the potential witnesses against him and that once he is in custody, these same witnesses may be willing to testify, AUSA _____ wants to make a supplemental indictment on several of Dudley's previous arrests after he is taken into federal custody.

On January 3, 1990, the F.N. Browning 9mm pistol, described above, was fingerprinted by the Jackson County Sheriff's laboratory with negative results. Both the F.N. Browning, 9mm pistol, bearing serial number 295501, and the suspected .38 caliber pen gun, no serial number, discovered during the December 31, 1990, arrest of John Dudley, were taken into custody by ATF/Portland. Additionally, the two unregistered Title II firearms, allegedly owned by John Dudley and seized in an April 31, 1990, JACKET search warrant, were taken into custody by ATF/Portland:

1. Savage Arms, Stevens Model 94, Series M, .12 gauge shotgun, bearing serial number R000079, barrel length of 13-3/4 inches, and an overall length of 91-11/16 inches.

2. Harrington & Richardson, H & R Handy-Gun, .410-12 m/m choke, bearing serial number 37757, barrel length of 12-1/4 inches.

The .38 caliber pen-gun, taken from John Dudley on December 31, 1990, will be sent to Firearms Technology Branch for a Title II determination.

An NFA search was conducted under the name of John David Dudley, with negative results.

On January 9, 1991, this case was presented before a federal grand jury. It is anticipated that Dudley will be indicted for his 12/31/90 illegal possession of two firearms.

Investigation to continue.

ATTACHMENTS:

ATF # 3100.7 - Case Summary
ATF F 3400.16 - Property Inventory (4)

RCB ATF fi 02N.1

| DEPARTMENT OF THE TREASURY / BUREAU OF ALCOHOL, TOBACCO AND FIREARMS | I. INVESTIGATION IS | | | Page 1 of |
|---|---|---|---|---|
| **REPORT OF INVESTIGATION (Law Enforcement)** | ☒ ROUTINE ☐ SENSITIVE ☐ SIGNIFICANT | | | 2 pages |

| 2. TO: | 3. MONITORED INVESTIGATION OR CRIMINAL ENTERPRISE and Symbol: |
|---|---|
| Special Agent In Charge Seattle District Office | (8) CIP Seattle: FY-90-Narcotics |

| 4. TITLE OF INVESTIGATION | 5. INVESTIGATION No. (Inter Symbol No.) |
|---|---|
| DUDLEY, John David | 93360-90-4058S |

| 6. TYPE OF REPORT (Check appropriate boxes) | | 7. BUREAU PROGRAM | | 8. PROJECTED |
|---|---|---|---|---|
| · | PRELIMINARY | COLLATERAL (Request) | ☒ TITLE I | | TARGETED OFFENDER |
| | | | TITLE II | FIREARMS | TERRORIST/EXTREMIST |
| B | STATUS | · | COLLATERAL (Reply) | TITLE VII | | OCD |
| | | | TITLE II | EXPLOSIVES | LEAA |
| | FINAL | | INTELLIGENCE | TITLE III | | SNAP |
| | | | | TOBACCO | | GUN |
| | SUPPLEMENTAL | | REFERRAL (Interim) | ALCOHOL | x | HGR (Seattle) **Achilles** |

**9. DETAILS**

This report is submitted to update the status and request property disposition regarding the investigation of John David Dudley. Dudley is a multiple convicted felon, who was unlawfully using and carrying firearms while trafficking in drugs in the Judicial District of Oregon. This investigation is classified as CIP: Narcotics.

John David Dudley has a criminal history dating back to 1977. Dudley's criminal history reflects four felony convictions, one for first degree theft and three for the delivery and possession of controlled substances. Dudley also has four misdemeanor convictions, numerous arrests for both the possession and delivery of controlled substances, ex-con in possession of a firearm, parole violations, burglary, theft and most recently the manufacture of controlled substances.

As described in the previous status reports, from November 1989 to June 1990, five search warrants were executed by the Jackson County Narcotics Enforcement Team (JACNET) on John Dudley's residence or his associates' residences that contained Dudley's property. During these search warrants, numerous firearms, various quantities of both methamphetamine and marijuana, a "boxed" methamphetamine lab and an operating methamphetamine lab were discovered by police officers. During an April 21, 1990, search warrant on one of John Dudley's associates, two Title II firearms were found that belonged to Dudley. On December 31, 1990, John Dudley was stopped while driving a stolen vehicle and found to be in possession of a 9mm pistol and a .38 caliber pen-gun, he was arrested for the unauthorized use of a motor vehicle and ex-con in possession of a weapon.

An NFA search was conducted under the name of John David Dudley, with negative results.

On January 9, 1991, this case was presented before a federal grand jury; John Dudley was subsequently indicted for violations of Federal Firearms Laws, Title 18 U.S.C., Section 922(g), and Title 26 U.S.C., Sections 5861(d) & 5871.

| 10. SUBMITTED BY (name) | 11. TITLE AND OFFICE | 12. DATE |
|---|---|---|
| | S/A, Portland, OR POD | 08/12/91 |
| 13. | 14. TITLE AND OFFICE ARAC, Portland, OR POD | 15. DATE 08/13/91 |

118

| DEPARTMENT OF THE TREASURY BUREAU OF ALCOHOL, TOBACCO AND FIREARMS REPORT OF INVESTIGATION—CONTINUATION SHEET (Criminal Enforcement) | PAGE | 2 |
|---|---|---|
| | OF | 2    PAGES |

| TITLE OF INVESTIGATION DUDLEY, John David | INVESTIGATION NUMBER 93360-90-4058S |
|---|---|

DETAILS (Continued)

On January 17, 1991, John Dudley was arrested by ATF/Portland, and he is currently in the custody of the Federal Bureau of Prisons.

On May 9, 1991, John David Dudley pled guilty to the original Indictment.

On July 22, 1991, John David Dudley was sentenced to 60 months imprisonment with three years of supervised release. Permission is requested to destroy the seized property in this investigation and to release the retained property back to the Jackson County Sheriff's Office.

ATTACHMENTS:

ATF F 3270.6  - Progress Record of Defendant
ATF F 3400.16 - Property Inventory - Request for Disposition (3)
ATF F 1850.23 - Release of Property

50

**Exhibit A, Pg. 516**

DEPARTMENT OF THE TREASURY — BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## PROGRESS RECORD OF DEFENDANT

| 1. INVESTIGATION NUMBER (Through suspect) | 2. COURT DOCKET NUMBER | 3. JUDICIAL DISTRICT |
|---|---|---|
| 93360-90-4058S | CR91-60011 | OREGON |

4. COPY TO (Check appropriate box)

☐ ASSOCIATE DIRECTOR (Law Enforcement)   ☑ OTHER (Specify)  S/A Mike Meadows

☑ SPECIAL AGENT IN CHARGE _____

☐ CHIEF, EXPLOSIVES TECHNOLOGY BRANCH

☐ CHEMIST IN CHARGE (Specify location) _____

| 5. RESULT OF GRAND JURY HEARING OR INFORMATION FILED (List each count, including citation and narrative of statute.) | 6. DATE |
|---|---|
| DUDLEY, John David | |
| True Bill Indictment | 01/11/91 |
| Count 1:  Title 18 U.S.C., 922(g)(1) Felon in Possession of Firearm | |
| Count 2:  Title 26 U.S.C., 5861(d) and 5871 Possession of an Unregistered Title II Firearm | |

| 7. RESULTS OF TRIAL OR OTHER FINAL DISPOSITION (including appeals) (List all counts. Use reverse for additional space.) | 8. DATE |
|---|---|
| PLED GUILTY to both counts 1 and 2 of the original indictment. | 05/09/91 |
| Sentenced to 60 months imprisonment followed by three years supervised release. | 07/22/91 |

🖎 51

Responses to the Bureau of Alcohol, Tobacco and Firearms' Internal Investigation of my complaint:

| My five original allegations quoted from my letter dated May 10, 1997, to the Treasury Department Inspector General: | BATF's responses quoted from the "Synopsis" of its internal investigation and final report dated September 8, 1997: | My comments: |
|---|---|---|
| "1.   ATF employees have deliberately destroyed original firearm registration documents that they are required by law to maintain, as noted in sworn testimony in 1996 by ATF Special Agent Gary N. Schaible. | "OI determined that the ATF employees referred to in the first allegation as being suspected of destroying records were, in fact, contract employees who were hired to assist in the backlog of paperwork that resulted from an influx of registrations as per [deleted by ATF]." | Page 23 (references are to the FOIA page numbers) states that contract employees were suspected regarding missing NFA paperwork during 1986-87; on page 22, Mr. Schaible apparently identifies this same incident as the subject of his May 21, 1996, testimony, yet in his 1996 testimony Mr. Schaible states that BATF employees could have thrown away the defendant's registration documents in 1994. It does not appear that these discrepant statements, each made under oath, can be reconciled. |
| In analyses of data made public by ATF, I found that during 1992 to 1996, ATF may have added 119 or more firearms to the NFRTR which were originally registered on Form 1 or Form 4467 during 1934 to 1971, for which ATF lost or deliberately destroyed the original records." | "Depending on the year in question, if there was an increase in any National Firearm Act (NFA) firearm registrations, as alleged, this may have been an adjustment as a result of a different form number or registration data for the particular firearm." | BATF offers no empirical evidence for this hypothetical interpretation, and does not even directly answer the question. Proof of firearms being added may be established by determining if a "docket number" (first created in 1976 for keeping track of incoming paperwork) is found on the records of firearms registered in or before 1971, and by other methods that BATF apparently did not employ. |

120

| | | |
|---|---|---|
| "2. ATF employees registered almost 2,500 unregistered NFA firearms on Form 4467 after December 1, 1968, without proper authorization by the Congress.<br><br>In addition to not being authorized by the Congress, such registrations were prohibited by the Supreme Court in 1971, yet it appears that ATF registered more than 172 unregistered NFA firearms on Form 4467 after 1971.<br><br>I have included an example of one apparently illegal post-December 1, 1968, Form 4467 registration in my 1997 testimony." | "To address the second allegation, ATF continued to register weapons after 1971 because the backlog of paperwork that resulted from the amnesty period was very large and filing the documents required extra time. In addition, some individuals were granted extra filing time if they were out of the country when the time expired for filing. | A statement on Form 4467 states that "This form cannot be accepted for registration of a firearm except when received by Director during the time period November 2, 1968, through December 1, 1968." As my 1997 testimony documents, each Form 4467 had a date/time stamp applied on the rear to indicate receipt, and actual time filed in some cases was in 1969; however, a Freedom of Information Act request disclosed that the date of registration, which BATF reports in its statistics, is the actual date the form was filled out by the person who registered the firearm, and BATF's own data indicate that nearly 2,500 firearms were registered on Form 4467 after 1968.<br><br>BATF has not answered whether it has illegally registered firearms on Form 4467, despite clear evidence that it has done so. Notably, BATF has not disclosed any required notice in the *Federal Register* or other Congressional authorization to accept registrations after December 1, 1968. |

121

"3. ATF employees Edward M. Owen, Jr. and Terry L. Cates committed felony perjury in letters written to me dated March 23, 1992 and July 29, 1993, respectively.

Mr. Owen and Mr. Cates each alleged that "an unlawful trafficker in drugs with an extensive criminal record" was in possession of a .410 bore H&R Handy-Gun "while committing drug violations."

This alleged instance of criminal conduct was used to deny my petition to remove the H&R Handy-Gun from the NFA as a collector's item.

"Regarding Larson's third allegation, the truthful information furnished to Larson by [deleted by ATF] and [deleted by ATF] in their respective letters involves a criminal case in Oregon investigated by ATF. The suspect, John David Dudley, a multi-convicted felon, dealt in narcotics and illegally possessed firearms which included an H&R Handy-Gun. Dudley was charged and subsequently pled guilty in Federal court on Federal firearms violations.

The H&R Handy-Gun in question was, in fact, in the possession of an acquaintance of the drug trafficker at the time of the violations. BATF's manner of stating "possession" implies that the trafficker was carrying the H&R Handy-Gun on his person at the time the drug crimes were committed. BATF has interpreted that the drug trafficker was in "constructive" possession of the H&R Handy-Gun, even though he was not charged with illegally possessing it (see page 27 of the internal BATF report). There is the truth, and then there is the legal truth.

| | | |
|---|---|---|
| [3 continued]   In fact, a Freedom of Information Act Request disclosed that the Handy-Gun was recovered from an acquaintance of the trafficker, who said that the trafficker had given it to him for safe-keeping (see pages 212-215, 222-230, and 233-236 of my 1996 testimony).<br><br>Any person who petitions for removal of a firearm from the NFA must state the reasons under penalty of perjury.<br><br>The plain language of the statue at Title 26, U.S.C., § 5861(l) and § 5871 applies to any person who knowingly makes or causes the making of a false entry on any document required to be prepared as a result of administering the NFA.<br><br>Both Mr. Owen and Mr. Cates deliberately falsified the facts of the case they cited." | | As noted, the characterization may not have been legally false; however, it was definitely misleading. |

123

| | | |
|---|---|---|
| "4. Certain 'registration activity' that ATF classifies as "OTHER" would include registrations of firearms that one or more ATF employees registered contrary to law, because ATF has refused to disclose the nature of this 'registration activity.' | Larson's fourth allegation suggests that ATF is using the "other" category to illegal register firearms. However, this category is used when the computer program cannot recognize a non-standard document that has been submitted for registration. | During each year from 1992 to 1996 (the most recent year for which the BATF has released NFRTR data), there were more than 8,000 entries under the "OTHER" data category.  What are these "non-standard documents?" |
| To the best of my knowledge, I've never heard of any forms numbered other than 1, 2, 3, 4, 5, 6, 9, 10 or 4467 being used to register or transfer NFA firearms. | For instance, some registrations were actually filed in correspondence on letterhead. | There is a separate "LTR" category, which Gary Schaible stated contains firearms that were registered or transferred on letterhead, when standard forms were not available. |
| According to a letter to me dated January 9, 1997, from NFA Branch Chief Nereida W. Levine, the 'OTHER' category is 'comprised of registrations where the form number is different from the other ones tabulated.' | If an ATF employee entering the information into the computer enters a Form 3 as a Form 33, the program will assign the document to the "other" column. | A normal computer program for sensitive documents would not accept the incorrect entry of a form, and data entry could not proceed.  How many other errors were created in the NFRTR because of a failure to properly debug the computer software? |
| Ms. Levine, however, has declined to provide the names or numbers of these forms.<br><br>Coupled with the other evidence of registration mismanagement I have documented, it appears that the "OTHER" category may represent firearms that were registered illegally, as noted in my 1997 testimony." | The fact that the form is entered in the "other" column does not mean that the firearm is illegally registered. | Neither does it mean that an incorrectly registered or transferred firearm can be located in the NFRTR.  Consider the statement of Mr. Thomas Busey in the October 1995 "Roll Call Training" session: "It was fine to begin putting everything in accurate a year ago or at least be guaranteed a year ago it was correct, but what are you going to do with the entries that go back to the early '80s and the '70s and the '60s?" |

124

"5. It appears that a significant number of NFA firearms are registered to persons who are deceased, and that ATF has been aware of this fact since at least 1981 and done nothing about it, as noted in my 1997 testimony.

Consequently, a significant number of NFA firearms are now illegally possessed by persons who are unaware that they are in violation of the law.

The reason is that many firearms classified as 'Any Other Weapon' are rare collector's items that many people do not consider weapons, as noted in both my 1996 and 1997 testimonies.

"In his fifth allegation, Larson states that some of the NFA weapons may be registered to deceased persons. While it is possible that, unknown to ATF, some NFA weapons may be registered to deceased individuals, the integrity of the NFA is incumbent upon the individuals who possess legally registered firearms to report deaths and reregister the weapon.

"Unknown to ATF?" Excuse me.

As my testimony and letter to the IG state, an internal BATF report dated July 1, 1981, by BATF employee Deron Dobbs, states: "We have the condition where people who registered firearms under the original National Firearms Act at age 65 would now be 112 years old. We know that these people are dead and their heirs have not taken the necessary steps to contact us so that the involuntary transfer created by the registrant's death can be formalized."

125

**Exhibit A, Pg. 523**

[5. continued] ATF's most recent data (as of December 31, 1996) disclose that of the 14,259 firearms registered during 1934 to 1939, exactly 11,175 (78.4 percent) are still currently owned by the person or entity that registered or acquired it during that same time period.

And of the 58,904 firearms registered in 1968, a stunning 85.4 percent are still owned as of 1996 by the same persons who registered or received them by transfer in 1968.

Consider that in 1981, an internal ATF study reported: 'We have the condition where people who registered firearms under the original National Firearms Act at age 65 would now be 112 years old.

We know that these people are dead and their heirs have not taken the necessary steps to contact us so that the involuntary transfer created by the registrant's death can be formalized.'"

BATF's most recent (as of December 31, 1996) data disclose that exactly 108, 556 persons have never legally transferred the ownership of machineguns, bazookas, sawed-off shotguns, hand grenades, anti-tank rifles, and similar devices that they registered or acquired by transfer in or before 1971.

Of the 58,904 amnesty registrations, 50,314 (85.4%) are still owned by the same person. Since the social security number was a required data field, it would take no more than a few hours to determine from the Social Security Death Index exactly how many NFA firearms are registered to people who are dead—and when those people died.

126

**Exhibit A, Pg. 524**

| My summary of the problems, issues, and proposed solutions, quoted from my letter dated May 10, 1997, to the Treasury Department Inspector General: | BATF's reponses quoted from the "Synopsis" of its internal investigation and final report dated September 8, 1997: | My comments: |
|---|---|---|
| "One result of ATF's negligence is that some persons who own certain rare, valuable firearms that have special value to collectors have been instantly transformed into criminals.<br><br>The reason is that through natural disasters (such as the recent floods in North Dakota, house fires, and similar tragic events), the owners of these firearms have lost their copies of the documents which prove their lawful ownership, and the law does not allow these firearms to be voluntarily re-registered." | | The 5th Amendment apparently applies to the Bureau of Alcohol, Tobacco and Firearms as an institution. But who answers for the institution? |

47-740   98 - 5

127

**Exhibit A, Pg. 525**

| | | |
|---|---|---|
| SOLUTION #1: "Administratively removing approximately 17,000 'curio or relic' firearms classified as 'any other weapon' under the NFA, which were originally commerically manufactured in or before 1934 (but not replicas thereof). | [Larson's] first recommendation is to remove 17,000 "any other weapons" listed under the NFA. | |
| The Congress determined that these 'any other weapon" firearms were mainly collector's items and not likely to be used as weapons in 1960.<br><br>It was not until 1968 that the Congress passed legislation enabling these firearms to be removed from the NFA as collector's items." | Although Congress did enable firearms classified as collector's items to be removed from the NFA, contrary to Larson's interpretation it did not mandate their removal. Therefore, if an individual weapon is suggested for removal, ATF will consider the particular firearm on a case-by-case basis and determine if removal is warranted. | I never stated anywhere in my letter of complaint, or in either my 1996 or 1997 testimony, that the Congress mandated any firearm to be removed from the NFA as a collector's item. Identify exactly where I stated this. That is not what the law says, and I didn't say that. On page 115 of my 1996 testimony, I did state: "Mr. Chairman, no legal evidence exists to show that the Congress sought to exclude the [Marble's 'Game Getter Gun] from the removal provision under the 1968 Act." I made this statement because of the fact that the BATF formally determined (in writing) that the Game Getter was mainly a collector's item and was unlikely to be used as a weapon; however, the BATF legal counsel later took the position that it nevertheless could not be removed because the Congress excluded it from the removal provision. My 1996 testimony (see pages 107 to 118) cites the law, legislative history, and documents that there is no legally valid and reliable evidence to support BATF's interpretation. |

128

**Exhibit A, Pg. 526**

| | | |
|---|---|---|
| SOLUTION #2: "Establishing a 90-day amnesty period to allow persons who may have innocently lost their copies of the registration forms to re-register these firearms.<br><br>The Congress has authorized such amnesty periods to be established by the Secretary of the Treasury under § 207(d) of the Gun Control Act of 1968." | "Furthermore, to address Larson's second solution, if the original registration of a firearm is misplaced, the owner needs only to contact ATF to obtain another copy;. | BATF presumes a fact not in evidence, and for which reasonable doubt exists: namely, that BATF has not lost or destroyed its copies of original registrations. It appears that for more than 100,000 NFA firearms, there is just a single document (the original registration) in the NFRTR to prove ownership. As noted in my 1996 testimony (see pages 92 to 95) and 1997 testimony (see page 72), I asked Mr. Gary Schaible if BATF had ever added firearms to the NFRTR because BATF had no record of the original registration—but the original owner did. He stated: "Yes. I assume that's happened." BATF's conclusion is premature, since it appears that BATF has lost or destroyed original registrations. |
| | There is no need to re-register, and there is no need to establish an amnesty period as Larson suggests. | In a "Response to letter from Senator [James A.] McClure" dated November 29, 1979, bearing symbols LL:JJD:ajw, Philip B. Heyman, Assistant Attorney General, Criminal Division; and Lawrence Lippe, Chief, General Litigation & Legal Advice Section, Criminal Division, Department of Justice, stated that if an individual had a valid NFA firearm registration document, but that BATF could not find any record of it in the NFRTR, "the only solution would be to declare another amnesty period. The Secretary [of the Treasury] is empowered to do this under existing legislation." |

129

**Exhibit A, Pg. 527**

January 31, 1998

Nereida W. Levine
Chief, National Firearms Act Branch
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, N.W.
Washington, D.C. 20226

Dear Chief Levine:

I am writing this letter to request from you a written statement from the Bureau of Alcohol, Tobacco and Firearms (BATF) regarding the legal status of four National Firearms Act (NFA) firearms that I currently own, which apparently were illegally registered years before I acquired them, as well as the BATF's policy regarding the legal status of other NFA firearms that may have been illegally registered without the knowledge of their current owners.

I discussed these issues at some length in my 1997 testimony before the Subcommittee on Treasury, Postal Service and General Government Appropriations, to the point of specifically identifying each firearm by serial number and citing or providing relevant documentation.

It is perplexing that BATF did not address any of these issues in its recent internal investigation that is based on my testimony. I also find it difficult to imagine that you, as Chief of the National Firearms Act Branch, would not be concerned about the accuracy and integrity of the National Firearms Registration and Transfer Record (NFRTR). After all, the only documentation that any lawful owner of an NFA firearm has to justify the legality of its possession, are documents issued by the NFA branch.

What if NFA firearms were registered illegally? What if BATF's records are inaccurate, or missing? What if BATF chooses to confiscate an affected NFA firearm—even though its current owner acquired the firearm lawfully, BATF approved the transaction, and the current owner had no knowledge of past defects in the history of the firearm which BATF later interprets as transforming the firearm into illegal contraband? Can the lawful owner have faith in the "title" to his or her firearm, and rely totally upon the documentation of an approved transaction by the BATF as evidence that he or she lawfully possesses the firearm? Apparently not.

My concerns are not hypothetical, theoretical, or a "fishing expedition" to try and create problems that do not exist, because BATF has already confiscated at least one NFA firearm after alleging it was illegally registered at some time in the past, though without knowledge by its owner and after BATF had approved the transfer of its ownership.

It is a fact that BATF confiscated an NFA firearm from Noel Napolili of Fairbanks, Alaska, on the grounds that it had been illegally registered sometime in the past by unknown persons, although BATF issued Mr. Napolili a lawful registration document for the firearm when he purchased it for $2,500 in 1985. When BATF moved to seize the firearm in 1993, Mr. Napolili filed a lawsuit to

**Exhibit A, Pg. 528**

demand its return, but dropped the lawsuit before the case could be brought to trial. James H. Jeffries III, Esq., of Greensboro, North Carolina, who acted as Mr. Napollili's attorney, told me that the case was dropped because Mr. Napollili's wife was afraid that BATF agents were going to kill Mr. Napollili in retaliation for the lawsuit. Since this period was during the unpleasantness at Ruby Ridge and Waco, Mr. Napollili's wife's concerns may be understandable, and probably any person who is married can understand the need for domestic tranquility. In any case, Mr. Napollili, as far as he knew, lawfully purchased the firearm and was issued a registration document by BATF in 1985. Suddenly, in 1992, BATF alleged there was absolutely no record that the firearm had ever been registered, even though BATF had issued a registration document entitling Mr. Napollili to lawfully possess the firearm. I included a copy of the Napollili case with my April 8, 1997, testimony, and at that time the Subcommittee placed it into its permanent files.

The Tax Code and the NFA each prohibit disclosure of the past history of NFA firearms because such information or documents are considered to be "tax return" information, so the average person who owns an NFA firearm cannot learn anything about its provenance—legal or otherwise. My case is rather unusual because through the humble virtue of diligence I learned the history of certain firearms that I own. The average person has no means of questioning a forfeiture action by BATF based on the provenance of a firearm, or any protection against BATF flat out lying.

I am the current lawful owner of four smooth bore H&R Handy-Guns bearing serial numbers 5592, 29691, 50885, and 53637, as evidenced by my possession of a BATF issued-and-approved Form 4 for each firearm. These are the only documents which evidence my lawful ownership of these firearms, and BATF is the only entity which can issue them. I obtained some documents, or copies of documents, regarding past transfers of these firearms from the former owners, mainly because they respected my dedication as a firearms researcher and thought the documents would be an interesting addition to my collection.

It was not until 1996, under various Freedom of Information (FOIA) requests, that I was able to learn from BATF the dates of original registration of the firearms that I own. On the basis of this information supplied by BATF, I believe that the four firearms identified above were illegally registered by BATF and that BATF may attempt to confiscate them as contraband at some unknown time in the future for that reason. Since the accuracy and integrity of BATF's firearm registration records is unknown, the situation that I have identified is of potential concern to tens of thousands of people who probably believe they legally own firearms after receiving approved registration and transfer forms from the BATF. The apparently illegal registrations of my firearms on Form 3 or Form 4 considerably widens the potential for other illegal registrations, because these are very commonly used in ordinary transactions to transfer title of ownership.

A group of smooth bore H&R Handy-Guns bearing serial numbers 5592, 43950, 50885, 52551, and 53637 were transferred by and from H&R to Peter Dowd in 1986, using a Form 3 transfer form approved by BATF. Yet, these were not "new" firearms; these guns had existed since at least 1934. As my 1997 testimony documents, H&R advised BATF in writing on November 27, 1953, that "H & R has not manufactured Handy-Guns since the [NFA] law was passed in 1934," and later states that "in the last two (2) years, all our Handy Guns in .410 gauge and 28 gauge were exported to

Canada." Serial numbers 5592 and 50885 are new in their original boxes, and former H&R employees have advised me that H&R had possessed these guns for many years. Yet, under a FOIA request, BATF stated that three of these guns—which I bought during the early 1990s—were originally registered by BATF on April 16, 1986, the date of application for their transfer by H&R; indeed, this is the same date listed on the Form 3 transfer from H&R to Mr. Dowd.

A manufacturer is supposed to register unregistered NFA firearms it has manufactured on Form 2, and Form 3 is supposed to be only used to transfer the ownership of NFA firearms that are already registered. Registering an NFA firearm on Form 3 seems to be a clever way to register an unregisterable NFA firearm, because it places the firearm into the NFRTR, and raises questions about the accuracy and integrity of the NFRTR—and the conduct of whomever approved the transfers (in this particular case, the Form 3 transfers were approved by Gary Schaible via facsimile signature, which may also raise questions about who has access to the signature facsimile machine). As you may know, the U.S. Supreme Court prohibited the registration of such unregistered NFA firearms on April 5, 1971. Consequently, it appears that BATF illegally registered the five firearms described above, three of which I lawfully purchased and was issued lawful registrations by BATF.

The other smooth bore H&R Handy-Gun in question that I own is a rare 28 gauge bearing serial number 29691. I purchased it from the estate of its former owner, whose executrix gave me the old registration (a Form 4 that was approved by BATF on March 23, 1972). According to BATF, this firearm was originally registered on March 2, 1972, more than a year after the U.S. Supreme Court prohibited such a registration. Finally, the old Form 4 that I possess bears the signature of the person who approved its transfer to its now-deceased former owner: the Director of the then-Alcohol, Tobacco and Firearms Division, Rex D. Davis. Based on examples of Mr. Davis' signature on official BATF letters in an unrelated court case during the same time period, it appears that Mr. Davis is not the person who signed this Form 4. Thus, in addition to the firearm being illegally registered by BATF, it appears that someone within BATF forged Mr. Davis' signature. Both of the events that I have documented—an apparently illegal registration, and an apparently forged transfer document—definitely are violations of the NFA.

I respectfully request that you, as Chief of the NFA Branch, state in writing to me what BATF's policy is regarding the legal status of these four smooth bore H&R Handy-Guns and, specifically, whether BATF regards them as lawfully owned by me or as unlawful contraband because they were apparently illegally registered or illegally transferred (or both) without my knowledge by BATF years before I purchased them. This is a law enforcement, compliance, regulatory, and policy issue that potentially affects me as well as thousands of other persons who have lawfully purchased NFA firearms as evidenced by BATF's approvals of these transactions.

I am going to let personal concerns involving selected NFA firearms that I legally purchased speak, in part, as well, for the many people who have contacted me over the years about similar concerns. These people are genuinely terrified of BATF as an arm of the Internal Revenue Service (IRS) and as a law enforcement agency that has in the past over-reacted in situations in which human life was apparently unnecessarily lost. No person should fear being victimized by the unlawful actions of a federal law enforcement agency.

133

4

If you are unable or unwilling to provide me with a written official answer, and policy position, addressing these issues, I am going to take action against you personally regarding your conduct in the performance of your official duties, through appropriate channels.

Very truly yours,

*(signed—Eric M. Larson)*

Eric M. Larson
P.O. Box 5497
Takoma Park, Maryland  20913

cc:     Ms. Carol Bergen, Office of the Inspector General, Department of the Treasury
        The Honorable Jim Kolbe, Chairman
                Subcommittee on Treasury, Postal Service and General Government
        The Honorable Dan Burton, Chairman
                House Committee on Government Reform and Oversight
        The Honorable Orrin G. Hatch, Chairman
                Senate Committee on the Judiciary

**Exhibit A, Pg. 531**

134



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL. TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

**MAR - 3 1998**

F:NFA:GS
179.101/98-4516

Mr. Eric M. Larson
PO Box 5497
Takoma Park, MD  20913

Dear Mr. Larson:

This is in response to your letter of January 31, 1998, in
which you request confirmation of the registration status
of four Harrington and Richardson Handy Guns.

The National Firearms Registration and Transfer Record
reflects that the following four Handy Guns are lawfully
registered to you as follows:

    Serial number 5592, Form 4, approved October 6, 1989
    Serial number 29691, Form 4, approved August 22, 1994
    Serial number 50885, Form 4, approved October 24, 1989
    Serial number 53637, Form 4, approved October 17, 1990

Should any additional information be needed, please contact
us at (202) 927-8330.

Sincerely yours,

Nereida W. Levine
Chief, National Firearms Act Branch

**Exhibit A, Pg. 532**

March 6, 1998

Nereida W. Levine, Chief
National Firearms Act Branch
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, N.W.
Washington, D.C. 20226

Dear Chief Levine:

Thank you for your letter of March 3, 1998, responding to my letter dated January 31, 1998, regarding the legal status of four (4) H&R Handy-Guns that are currently registered to me, given that they were apparently illegally registered by BATF without my knowledge many years before I purchased them, and thus these firearms may be subject to forfeiture. These firearms bear serial numbers 5592, 29691, 50885, and 53637. I raised a number of questions about these specific firearms, as well as about BATF's policies regarding NFA firearms it may have illegally registered or transferred in the past—unknown to their current lawful owners.

Your letter states that "the National Firearms Registration Record reflects that the[se] four Handy Guns are lawfully registered" to me. This response does not fully address the issues that I raised, as explained below.

There are three things at issue. One is whether I could be prosecuted for possessing these guns—was there some crime? I think the answer is clearly no. It is not a crime to possess a firearm that was ever transferred or registered in violation of the National Firearms Act (NFA). Nothing in Title 26, United States Code, § 5861 says so.

Second is whether any of these four firearms are subject to forfeiture under Title 26, United States Code, § 5872. That seems to encompass any firearm ever involved in a violation of the statute. I don't see how a statement that the listed guns are registered to me means BATF is claiming the listed guns were never, to its knowledge, involved in a violation of the NFA.

In short, I believe I am safe from criminal prosecution with regard to these four firearms, and I have always thought that. However, then as now, I don't see any representation from BATF that BATF doesn't think these four firearms are not subject to forfeiture. I don't see how just because BATF states these firearms are registered to me, means they were never registered or transferred in violation of the NFA and, therefore, subject to forfeiture.

Third is what BATF's position is regarding the legal status of NFA firearms that the BATF itself illegally registered or transferred. The law seems to state that such firearms are subject to forfeiture regardless of when the violation of law occurred, and regardless of whether the person who bought the firearms was aware of any such violations. Does BATF take any position that there is a statute of limitations upon such forfeitures?

**Exhibit A, Pg. 533**

136

An important element of my January 31, 1998, letter asked BATF for a statement regarding its viewpoint regarding a forfeiture action or actions against these specific firearms. I would, therefore, very much appreciate it if you would be kind enough to state what BATF's policy is regarding any possible forfeiture action against these four specific firearms. If BATF intends to seize these firearms because BATF without my knowedge illegally registered or transferred any of them in the past before I lawfully purchased them, I would like to be informed immediately. If BATF does not intend to seize these firearms, I would appreciate it if you would be kind enough to state, in writing, that BATF does not regard any of these firearms as subject to forfeiture.

I recognize there is, unfortunately, an adversarial element regarding interpretations of law as it regards gun control. I honestly wish this was not so. I hope that you will accept my good wishes and apologies for continuing to bring matters of concern to your attention. My reason for doing so is that I would like to have these issues publicly and openly resolved.

Thank you.

Sincerely,

*(Signed—Eric M. Larson)*

Eric M. Larson
P.O. Box 5497
Takoma Park, Maryland 20913

cc:   The Honorable Dan Burton, Chairman
      House Committee on Government Reform and Oversight

      The Honorable Jim Kolbe, Chairman
      House Subcommittee on Treasury, Postal Service, and General Government

      The Honorable Orrin G. Hatch, Chairman
      Senate Committee on the Judiciary

**Exhibit A, Pg. 534**

137

February 8, 1998

John W. Magaw
Director
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, N.W.
Washington, D.C. 20226

Dear Director Magaw:

I am writing to alert you to a serious flaw in the Bureau of Alcohol, Tobacco and Firearms' (BATF) recent internal report that was submitted to the Treasury Department Inspector General in response to my May 10, 1997, letter describing apparent mismanagement, misconduct, and criminal wrongdoing by BATF agents or employees. Right now I am preparing a detailed rebuttal of many of the report's findings, but in the meantime would like to respectfully request that you consider addressing one of the most egregious flaws in the internal BATF investigation. I am taking the time to write to you personally, because I plan to ask Chairman Jim Kolbe, Subcommittee on Treasury, Postal Service, and General Government Appropriations, to request you to address these matters in a formal hearing this Spring.

What I'm asking you to consider doing now is pretty simple: namely, doing some straightforward computer runs using existing data to determine if BATF has added firearms to the National Firearms Registration and Transfer Record (NFRTR) because there was no record of the registration of said firearms, after BATF was confronted with a valid registration document by their lawful owners. I will describe how I became aware of this problem, what I did to independently determine that it actually existed, and will identify a method for detecting the extent of this problem.

As my research on the smooth bore H&R Handy-Gun, and other "Any Other Weapon" category NFA firearms has become better known, through publication in the *Standard Catalog of Firearms*, the *Blue Book of Gun Values*, and the *Official Price Guide to Antique and Modern Firearms*, a number of people have contacted me for additional information. What some of these people alleged was very disturbing—that BATF had moved to confiscate a family heirloom firearm because the firearm was allegedly not registered, but BATF added the firearm to the NFRTR data base after the lawful owner produced a valid registration. This has not been a common event, and I don't think more than five people have ever told me this. Because the NFA and the Tax Code each require an NFA document to be regarded as a "tax return," these records aren't open for inspection or research.

Until the Thomas Busey matter came up and a transcript of Mr. Busey's remarks in his capacity as Chief of the National Firearms Act Branch about serious errors in the NFRTR was made public, I believed there was no way to determine the truth or falsity of the allegations of firearms being "added" to the NFRTR. I then re-thought the situation and inspected and analyzed the data on firearm transactions as reported from the NFRTR data base, which BATF has publicly released since approximately 1989. I examined the records of Form 1 registrations from 1934 to 1971, and all Form 4467 (Amnesty Period) registrations, to see if the number of registrations changed over time. In

theory, the original date of a firearm registration should not change, but I found otherwise; specifically, the number of original registrations showed apparent *increases* over time. This was consistent with the allegations I'd heard that BATF had added firearms to the NFRTR data base. It also appeared that BATF had illegally registered NFA firearms on Form 4467 (nearly 2,500) after December 1, 1968, when the Amnesty Period expired.

At the time, in the spring of 1996, I was preparing to testify before the House Subcommittee on Treasury, Postal Service and General Government Appropriations, which as you know funds BATF. I wanted to address this issue of "lost-then-found" registrations, and post-December 1, 1968, Form 4467 registrations, and wondered what I could do to independently confirm whether firearms were, indeed, being added to the NFRTR, so I called Mr. Gary N. Schaible, because I recognized how serious this issue is. For me to testify about matters involving possible misconduct or criminal wrongdoing by a federal law enforcement agency is something I regarded as a grave matter. Specifically, given the nature of my employment, it would be professionally ruinous for me to give such testimony without providing significant and credible, documented evidence.

In an April 1996 telephone interview, I asked Mr. Schaible if, in fact, BATF had ever added firearms to the NFRTR because lawful owners produced valid registrations, yet there was no record of the firearm in the NFRTR. Mr. Schaible answered: "Yes. I assume that's happened." I asked Mr. Schaible this question several times, and each time the answer was the same; I definitely did not misunderstand him. Mr. Schaible also stated that BATF had registered NFA firearms on Form 4467 after December 1, 1968, but could not explain those apparently registered in 1972 and later (such registrations were prohibited by an April 5, 1971, U.S. Supreme Court decision). My account of talking with Mr. Schaible appears on pages 88 to 96 of my 1996 testimony (see official printed hearing record).

In my 1997 testimony, I simply carried my 1996 findings forward one year and dealt with this issue in considerably more detail. Specifically, I determined that BATF may have added 119 or more firearms to the NFRTR during 1992 to 1996 (the most recent year for which data were then available) after being confronted with a valid registration (see pages 51 to 67 of my 1997 testimony, in the official printed hearing record). In a previous letter, NFA Branch Chief Nereida W. Levine stated that adjustments to data to correct errors may cause changes in the statistics, and that if a firearm was lawfully registered but not in the NFRTR data base, it would be added.

In my May 10, 1997, complaint to the Treasury Department Inspector General, I stated, in part:

> In analyses of data made public by ATF, I found that during 1992 to 1996, ATF may have added 119 or more firearms to the NFRTR which were originally registered on Form 1 or Form 4467 during 1934 to 1971, for which ATF lost or deliberately destroyed the original records.

The implication of such registrations "lost or deliberately destroyed" by BATF is that if the lawful owner loses his or her copy as well, the firearm is instantly transformed into unlawful contraband that nobody can own. The proven fact of such loss by BATF would require that another amnesty period

be established to correct the NFRTR, so the stakes in this matter are quite high. In a "Response to letter from Senator [James A.] McClure" by Philip B. Heymann and Lawrence Lippe of the Department of Justice dated November 29, 1979, bearing symbols LL.JJD:aje., stated that if a lawful owner presented a valid registration for which no record in the NFRTR existed, "the only solution would be to declare another amnesty period. The Secretary [of the Treasury] is empowered to do this under existing legislation."

BATF's internal investigation into this matter is unsatisfactory, because it leaves the question of "lost-then-found registrations unanswered. Specifically, the BATF report states:

> Depending on the year in question, if there was an increase in any National Firearms Act (NFA) firearm registrations, as alleged, this may have been an adjustment as a result of a different form number or registration date for the particular firearm.

This response to my allegation is unsatisfactory because the increases I documented certainly "may have been" the result of any number of things, and because the response is not legally definitive, indeed, BATF has cited no empirical, documented evidence backing up its response.

In contrast, I suggested at least one method in my testimony that could establish with definitive legal certainty whether the increases in NFA firearm registrations that I detected are, in fact, the result of BATF adding firearms to the NFRTR after being presented with valid registrations by the firearms' lawful owners. The following method, in fact, is summarized from pages 74 to 77 of my 1997 testimony (again, see the official printed hearing record). In brief, the method involves comparing the "docket number" in the NFRTR for specific firearms with the original registration dates of these firearms. In approximately 1976, BATF began assigning unique "docket numbers" to paperwork (such as NFA firearm registration and transfer forms) that came in for processing. As we have seen, I have alleged that 119 or more firearms may have been added to the NFRTR during 1992 to 1996, for original years of registration from 1934 to 1971; and note that NFA Branch Chief Levine stated to me in a letter dated January 9, 1996, that a firearm "would be added to the National Firearms Registration and Transfer Record if the information was not already in the Record."

Director Magaw, a simple computer run that compared original years of registration of NFA firearms from 1934 to 1971 with "docket numbers" might well conclusively establish whether or not BATF lost or destroyed original registrations and was forced to add them back when confronted with valid registrations by the firearms' owners. If a firearm originally registered in 1936 or 1968 or 1954 or 1962 or 1945 had a "docket number," that would be pretty conclusive evidence that the firearm had been "added" to the NFRTR as the result of a lost registration. Such a computer run could be done in as little as 10 to 20 minutes; it is not complicated.

Of course, independent manual verification and inspection of any paperwork/documents identified in such a search would have to be done. It would also have to be determined if there were any suspicious "breaks" in the "docket number" sequence that would indicate tampering with records, such as to try and cover up whether firearms had been added.

The astonishing thing is that nobody at BATF apparently tried to match "docket number" with year of original firearm registration, but it is not astonishing if you consider that BATF management may have specifically prohibited doing this check of the records. After all, proof that BATF lost or destroyed records, in the opinion of the Department of Justice, requires that another amnesty period be established. In addition to the adverse publicity that would result, such dereliction of duty would seriously call into question the competence of BATF to administer this Nation's firearms control laws.

In the past, BATF has covered up wrongdoing of this type. In the Busey case, I invite your attentions to Mr. Busey's remarks on October 18, 1995. He said, in part:

> Let me say that when we testify in court, we testify that the data base is 100 percent accurate. That's what we testify to, and we will always testify to that. As you probably well know, that may not be 100 percent true . . . we're hoping [that numerous cross-checks using multiple identifiers] eliminates the possibility that anything goes out erroneous because we know you're basing your warrants on it, you're basing your entries on it, and you certainly don't want a Form 4 waved in your face when you go in there to show that the guy does have a legally-registered Title 2 weapon. I've heard that's happened. I'm not sure . . . when I first came in a year ago, our error rate was between 49 and 50 percent, so you can imagine what the accuracy of the [NFRTR] could be, if you're error rate's 49 to 50 percent.

BATF's internal investigation of Mr. Busey's remarks does not inspire confidence. Consider the sole statement of Special Agent Joseph E. Dugan, who was assigned to the case:

> On November 30, 1995, I interviewed BUSEY under oath. The scope of this interview was limited in accordance with the discussion I had with Mr. [Associate Chief Counsel (Firearms and Explosives) Jack B.] Patterson. BUSEY related the following in an affidavit, which is attached hereto:
>
> > When he said that members of his staff testify that the NFRTR database is 100% accurate although they know otherwise, he made a misstatement of the facts. What he meant to convey was the fact that the database contains certain inaccuracies which can be attributed to human error. His personnel testify only to the accuracy and diligence of their search and make no comment, either in court or on any officials document, concerning the accuracy of the database. If he were asked about the accuracy of the database under either direct or cross examination, he would reply that the database contains evidence of human error. He would then explain how a search is performed.

You will note that Mr. Dugan avoided asking Mr. Busey about "a Form 4 waved in your face when you go in there to show that the guy does have a legally-registered Title 2 weapon. I've heard that's happened." Well, I checked the Form 4 data, and found that a BATF agent could have had a legal Form 4 "waved in" his or her face at least 625 times during 1992 to 1996 (see pages 68 to 72 of my 1997 testimony). Moreover, BATF has officially identified "Approved form never updated in NFRTR" as a significant problem (see pages 100 to 106 of my 1997 testimony). Finally, the indented

statement in Mr. Dugan's report, which implies quoted material, isn't actually an "affidavit" from Mr. Busey. The statement is simply what Mr. Dugan says that Mr. Busey would say, and is hardly a direct legal statement. In my judgement, Mr. Dugan didn't ask Mr. Busey about Form 4 and other NFRTR problems because he was specifically directed not to.

The preceding discussion suggests why I had so little faith in BATF's internal review process, that I contacted the House Committee on Government Reform and Oversight to try and prevent what surely would have been just another coverup. As you know, the Committee has requested the Treasury Department Inspector General to: (1) conduct an independent audit of BATF's firearm registration practices; and (2) evaluate the BATF's internal report. The latter has been completed, and the former is apparently still ongoing.

I believe that the Government employs competent criminal investigators, but will their political masters in the Executive Branch allow them to go where the evidence leads? What for me began as a simple concern about lawful heirs who have inherited certain rare, collector's-item firearms being unjustly deprived of these firearms, has evolved into a more lengthy analysis of how BATF has administered the National Firearms Act and obviously serious problems with the NFRTR database.

Director Magaw, you are in a position to require BATF personnel to answer the questions that I have asked truthfully, directly, and completely. So far, BATF has responded with hypothetical or misleading answers that simply are not legally sufficient, and do not cite any definitive, empirical evidence as normally would be required in an audit or investigation. Where are the work papers? BATF's reply to me is that none can be identified. Similarly, a list of witnesses "never materialized."

Today is February 8, 1998. I am sure you will receive this letter within a few days. There is roughly a 2-month period between now and when BATF's Appropriations hearings will be held. I am providing Chairman Kolbe with a copy of this letter at the same time I have sent it to you, and I sincerely hope that he considers asking you to respond to this letter for the record.

Very truly yours,

*(signed—Eric M. Larson)*

Eric M. Larson
P.O. Box 5497
Takoma Park, Maryland  20913

cc:     Ms. Carol Bergen, Office of the Inspector General, Department of the Treasury
        The Honorable Jim Kolbe, Chairman
                Subcommittee on Treasury, Postal Service and General Government
        The Honorable Dan Burton, Chairman
                House Committee on Government Reform and Oversight
        The Honorable Orrin G. Hatch, Chairman
                Senate Committee on the Judiciary

WASHINGTON POST · THURSDAY, JANUARY 22, 1998 · A11

# Federal Workers Must Tell Truth, Court Says

## Separate Charges Can Be Brought for Lying About Misconduct

By Joan Biskupic

The Supreme Court ruled unanimously yesterday that federal workers who deny a job-related misconduct charge can be separately charged and disciplined for lying.

The justices rejected a claim that the practice violates a person's right to due process of law and means that any time a worker must respond to an allegation during an agency investigation, he or she risks a separate false-statement charge if the whole truth is not told. Chief Justice William H. Rehnquist wrote for the court that workers "cannot with impunity knowingly and willfully answer with a falsehood."

Separately, the justices ruled by a 6 to 3 vote in a Virginia capital case that a judge need not instruct a jury about mitigating evidence that might persuade it to give a defendant life in prison rather than death. The justices, also ruling 6 to 3, struck down a New York law that allows in-state residents to deduct alimony payments but denies the deduction to nonresidents filing New York returns.

The federal employees' case was brought by an workers who were disciplined for misconduct and subject to extra sanctions for making false statements, including the lead challenger in the case, Lester E. Erickson, a police officer at the Bureau of Engraving and Printing. During an investigation into "mad laughter" harassing telephone calls at the agency, Erickson said he did not know who was making the calls. Eventually, it was discovered that Erickson had encouraged someone to make a call. The bureau wanted to fire him for his part in the incident and for lying about it, but the federal Merit Systems Protection Board disallowed the double punishment and reduced his sanction of firing to a 15-day suspension.

When the government appealed, the U.S. Court of Appeals for the Federal Circuit said an employee cannot be charged for making a false statement when it involves the denial of another charge. The appeals court reasoned that under the constitutional guarantee of due process, an accused person is entitled to a meaningful opportunity to be heard and that "employees might be reluctant to deny charges for fear that their denials would be 'construed' as additional charges."

But the high court said the opportunity to be heard does not include the opportunity to lie and noted that a criminal defendant's right to testify does not include the right to commit perjury. Lawyers who represent federal workers said yesterday the ruling in Lachance v. Erickson will put new pressure on public employees. They noted that unlike in criminal trials in which defendants need not testify, federal employees have an obligation to answer questions and agencies can draw negative inferences when people refuse to respond.

A related pending case tests whether a denial of wrongdoing during an agency investigation may subject the person to prosecution under a statute making it a felony to lie with respect to any matter within the jurisdiction of a federal agency. A ruling in Brogan v. United States is likely before the justices recess this summer.

In the Virginia case, Douglas M. Buchanan was convicted and sentenced to die for the 1987 murders of his father, stepmother and two young stepbrothers. During his sentencing hearing, testimony over two days detailed Buchanan's troubled family background and mental and emotional problems. Buchanan wanted the judge, who specifically instructed the jury on the aggravating circumstances of the crime, to specifically instruct the jury about mitigating circumstances, including his troubled background. The judge refused and an appeals court upheld the death sentence.

In affirming the sentence in Buchanan v. Angelone, Rehnquist wrote for the majority that although a defendant must be able to present relevant mitigating evidence, the court has never required states to structure in a particular way how juries consider the evidence.

He said it was enough for the judge to tell the jury to base its decision on "all the evidence." Justices Stephen G. Breyer, John Paul Stevens and Ruth Bader Ginsburg dissented. In a statement by Breyer, they said ambiguous instructions "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."

In the New York case, the court said the state lacked sufficient justification for treating residents and nonresidents differently on the alimony tax deduction, violating the Constitution's mandate that states give nonresidents all the "privileges and immunities" given its own people.

FOR MORE INFORMATION

For a list of upcoming cases on the Supreme Court docket, click on the above symbol on the front page of The Post's Web site at www.washingtonpost.com

Exhibit A, Pg. 540

143

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

October 27, 1997

Mr. Eric M. Larson
P.O. Box 5497
Takoma Park, Maryland 20913

Dear Mr. Larson:

Thank you for your letter regarding the Bureau of Alcohol,
Tobacco and Firearms (BATF). I care deeply about the rights
provided and protected under the Constitution of the United
States and appreciate the opportunity to respond to your
concerns.

I am aware of the alleged violations committed by BATF
agents. Trying to balance the public's need for effective law
enforcement and the rights of individual citizens is often
difficult. But it can be done. Unfortunately, the BATF is
plagued by continued allegations of abuse and misconduct.

In the past, the Judiciary Committee has thoroughly
investigated the actions of federal law enforcement agencies in
connection with the tragedies at Waco and Ruby Ridge. I am
committed to pursuing credible allegations through exhaustive and
fair hearings in the Judiciary Committee. You can be sure that I
will do everything in my power as Chairman of the Senate
Judiciary Committee to impress upon federal law enforcement
officials that they must implement policies that prevent abuse
and punish those who overstep their authority.

Meanwhile, the government still has the responsibility to
perform the regulatory functions now executed by the BATF. The
question that remains, then, is how best to perform these
functions while preventing future abuses. I am currently
reviewing the feasibility of three specific suggestions for the
future of the BATF: first, congress could abolish the BATF and
transfer its functions to the FBI; second, congress could
dissolve the BATF while assigning its enforcement functions to
the Secret Service and its regulatory functions to the U.S.
Customs Service; and third, congress could put the BATF under the
authority of the Department of Justice, allowing that Department
to review its policies and procedures.

**Exhibit A, Pg. 541**

144

October 27, 1997
Page 2

Ultimately, I will do everything I can to maintain the balance between effective law enforcement and protected civil rights.

Again, thank you for writing to me on this important issue.

Sincerely,

Orrin G. Hatch
Chairman

OGH:jgg

**Exhibit A, Pg. 542**

ORRIN G. HATCH, UTAH, CHAIRMAN

STROM THURMOND, SOUTH CAROLINA
CHARLES E. GRASSLEY, IOWA
ARLEN SPECTER, PENNSYLVANIA
FRED THOMPSON, TENNESSEE
JON KYL, ARIZONA
MIKE DEWINE, OHIO
JOHN ASHCROFT, MISSOURI
SPENCER ABRAHAM, MICHIGAN
JEFF SESSIONS, ALABAMA

PATRICK J. LEAHY, VERMONT
EDWARD M. KENNEDY, MASSACHUSETTS
JOSEPH R. BIDEN, JR., DELAWARE
HERBERT KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
RUSSELL D. FEINGOLD, WISCONSIN
RICHARD J. DURBIN, ILLINOIS
ROBERT G. TORRICELLI, NEW JERSEY

Manus Cisneros, Chief Counsel and Staff Director
Bruce A. Cohen, Minority Chief Counsel

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510-6275

March 11, 1998

Mr. Eric M. Larson
P.O. Box 5497
Takoma Park, MD 20913

Dear Mr. Larson:

Thank you for your letters regarding the BATF in which you
included testimony given before the House of Representatives'
Appropriations Committee. I appreciate the information you
provided because it is essential to the oversight role of the
Judiciary Committee. Your concerns, combined with the concerns
of others like you, provide insight that would be difficult for
me to obtain in any other way. I will certainly keep your
information in mind when considering future legislation dealing
with the BATF.

Once again, thank you for taking the time to write to me on
this important issue.

Sincerely,

Orrin G. Hatch
Chairman

OGH:jgs

**Exhibit A, Pg. 543**

146

JOHN D. LEASURE
5007C VICTORY BLVD., BOX 360
YORKTOWN, VIRGINIA 23693
TEL: 757-874-7717

MARCH 31, 1998

THE HONORABLE JIM KOLBE, CHAIRMAN
SUBCOMMITTEE ON TREASURY, POSTAL SERVICE AND GENERAL
GOVERNMENT,
HOUSE OF REPRESENTATIVES
B 307 RAYBURN HOUSE OFFICE BLDG.
WASHINGTON, D.C. 20515-6028
TEL: 202-225-5834

DEAR CHAIRMAN KOLBE,

I AM ENCLOSING THE FOLLOWING MATERIAL THAT REFER TO EFFORTS
BY THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS TO COVER UP
ERRORS IN THE NATIONAL FIREARMS REGISTRATION AND TRANSFER
RECORD, AND TO ILLEGALLY WITHHOLD EXCULPATORY EVIDENCE IN
CRIMINAL PROSECUTIONS.

I WOULD RESPECTFULLY ASK THAT MY TESTIMONY BE MADE PART OF
THE WRITTEN RECORD.

CHAIRMAN KOLBE, I WOULD ALSO ASK THAT YOU SUPPORT CHAIRMAN
DAN BURTON IN REQUIRING THE TREASURY DEPARTMENT INSPECTOR
GENERAL TO DO A CREDIBLE INVESTIGATION INTO THE B.A.T.F. AND
THE NATIONAL FIREARM REGISTRATION AND TRANSFER RECORD,
AND TO ALSO SUPPORT REMOVING THE N.F.R.T.R. FROM B.A.T.F. AND
TRANSFERRING IT PERMANENTLY TO THE DEPARTMENT OF JUSTICE.

THANK YOU.

SINCERELY,

JOHN D. LEASURE

**Exhibit A, Pg. 544**

147

Testimony

Statement on

Efforts by the Bureau of Alcohol, Tobacco and Firearms to
Cover Up Errors in the National Firearms Registration and
Transfer Record and to Illegally Withhold Exculpatory Evidence
in Criminal Prosecutions

by

John D. LeaSure
5007C Victory Blvd., Box 360
Yorktown, Virginia 23693

Tel: 757-874-7717

Presented

before the

Subcommittee on Treasury, Postal Service and General Government
of the
Committee on Appropriations
House of Representatives

8307 Rayburn House Office Building
Washington, D.C.

April 3, 1998

**Exhibit A, Pg. 545**

148

Testimony

Mr. Chairman and Members of the Subcommittee:

My name is John D. Leasure. I have prepared this testimony because I have an important story to tell about how part of the legal system in this country is broken. I say "part of the legal system," because certainly all of it is not broken. In addition to having 5 felony convictions reversed because the Bureau of Alcohol, Tobacco and Firearms (BATF) withheld exculpatory evidence, having the opportunity to personally bring this matter to your attention by myself, in my own words, means a great deal to me. There is still a cloud over my name right now, but it is my hope that the Federal Court system will clear me.

I prepared this testimony for three basic reasons.

First, I want to document for the Congress how BATF illegally withheld exculpatory evidence in the course of charging me with and prosecuting me for so-called "crimes" that were artifically created only by flawed firearm registration records.

Second, and perhaps most importantly, I want to place in the formal record of this hearing evidence that the BATF is continuing to try and cover up its misdeeds, and is thus continuing to try to illegally prosecute some people on the basis of firearm registration records that BATF knows good and well are not reliable.

Third, I hope that by bringing this information to your attention, the Subcommittee can help keep what unjustly happened to me from ever happening again to somebody else.

All of the laws that I have been accused of violating are part of the National Firearms Act (NFA) of 1934. The NFA regulates the manufacture, sales or distribution, and possession of machineguns, bazookas, anti-tank rifles, land mines, hand grenades, sawed-off shotguns, firearm silencers, rockets, and similar implements of war. In addition to law enforcement reasons, there are many legitimate activities involved with these items. Museums have them, people study them for research and development purposes, other people collect them as historical artifacts, and they are regularly used in movies. I will not try and address all of these uses here, and instead will begin by explaining how I got where I am today from my perspective.

PERSONAL BACKGROUND

**Exhibit A, Pg. 546**

149

Testimony

I am an inventor of firearm silencers, which are sometimes called
("suppressors," because they reduce or eliminate the sound of a firearm
being discharged.  I hold a patent on my silencer invention, which was
patented in 1992, and which is considered among the best in the industry.
While I have sold perhaps a handful of these items to certain qualified
individuals, virtually all of my clientele has been the U.S. Government,
its foreign-government allies, and law enforcement agencies.  In other
words, my business is not with the civilian market.  As a federally
licensed manufacturer under the NFA, I was legally qualified to
manufacture silencers as well as any other NFA firearm or device.

I also make a good product.  You may not have heard of me before today,
but I'm sure you all have heard of Tom Clancey, the author of Without Remorse.
Well, the technical information in that book regarding firearm silencers
came from me.

My legal problems with BATF forced me to close my first company,
Precision Arms International, which was located in Saluda, Virginia.  As
a convicted felon, I cannot possess any firearm, nor hold a federal
manufacturer's license.  At the moment, I am a consultant to SiOpts.


HOW MY LEGAL PROBLEMS STARTED

In February 1994, I was contacted by BATF for a compliance inspection.
When Inspector Charles Turner arrived at my place of business, we tried
to retrieve my records via the computer.  I had problems with the
computer, so he left and returned two days later with a computer printout
of my supposed inventory provided by the NFA branch in Washington, D.C.
When our records didn't match, Inspector Turner said he would return in a
few days.  Three days later he returned, along with three other BATF
agents, with a search warrant.  I offered the hard copies of my records to
Special Agent Karen Dutton, but she said they were not interested in the
hard copies.  They seized approximately 60 items, saying they would be in
touch with me. (Trial Jan. 18, 1996, Page 96, Line 1-25.


Throughout I called the Norfolk BATF office numerous times inquiring as
to the status of my inventory and trying to find out exactly what was
going on.  I was told, "It is still pending."  In late 1994 I was forced
to close up my company, Precision Arms International, due to poor
business.  I was told by a good customer that word had gotten around that
I was having problems with BATF.

I re-opened my business in Newport News, Virginia under the name of
Silent Options.  In November 1995 I was contacted by Special Agent Karen
Dutton and told the grand jury had returned a true bill on my indictment

Page 3

Exhibit A, Pg. 547

Testimony

and I had better get a lawyer. When my lawyer, David N. Montague of
Hampton, Virginia, called on November 16, 1995 to the U.S. Federal
Eastern District Court, he spoke with Arenda Wright-Allen, Assistant U.S.
Attorney. She told Mr. Montague I had NOT been indicted, but my case was
still under investigation. Three days later, and two days before
Thanksgiving, I received my indictment, delivered by a U.S. Marshal. The
grand jury had met on November 14, 1995 and returned a true bill.

We obtained a copy of Special Agent Karen Dutton's testimony of the grand
jury hearing. In her testimony, she testified I had in my possession
three unregistered functioning machine guns. These "machine guns" were
small replacement parts I was licensed to possess. This tainted the
testimony to the grand jury. As a matter of fact, these were replacement
parts of a United States military project. Even though during my trial
Judge MacKenzie questioned why I was even charged with this count, it
still was an issue we had to spend time and money fighting and proving my
innocence. Furthermore, this prevented the negotiation of reducing my
charge to a misdemeanor, and points were added to my sentencing
guidelines for this count, even though I was found not guilty. (Grand
jury hearing, 11-14-95, Page 10, Line 16.)

In December 1995 David N. Montague, my attorney, asked Arenda
Wright-Allen if there was any way this could be reduced to a misdemeanor
and was told absolutely not. On January 18 and 19, 1996, my trial was
held in the U.S. District Court, Eastern Division, Newport News,
Virginia, before the Honorable John A. MacKenzie. During the trial, Gary
Schaible, who is in charge of record certification for the NFA branch in
Washington, D.C., testified their records were 100 percent accurate, and
that he had made only one mistake in his 20 years of service. Judge
MacKenzie took the case under advisement. (Page 107, Line 23).

In February 1996 I was found guilty on four of the six counts.

In March 1996, through a Freedom of Information Act Request by attorney
James H. Jeffries, III, we obtained a transcript of a roll call training
session conducted by Tom Busey, Chief of the NFA branch of the BATF. Mr.
Busey, in this October 1995 training session, admitted their records were
at best 50% accurate. Mr. Busey also stated when testifying in court
cases, agents testify the records are 100% correct. Gary Schailbe was
present at this meeting. (BATF Roll Call Training Session NFA Branch,
October 1995, Page 9, Line 7)

"Let me say that when we testify in court, we testify that the data base
is 100% accurate. That's what we testify to, and we will always testify
to that. As you probably well know, that may not be 100% true. (BATF
Roll Call Training Session NFA Branch, October 1995, Page 19, Line 4).

"This quality review team, when I first came in a year ago, our error
rate was between 49% and 50%, so you can imagine what the accuracy of the
National Firearms Registration and Transfer Record could be, if your
error rate is 49% to 50%" (Please refer to the enclosed roll call

Exhibit A, Pg. 548

## 151

Testimony

training session tape.)

On March 29, 1996, David Montague wrote a letter to Judge MacKenzie requesting the case be dismissed based on the roll call training session, and regarding Count 1, Mr. Montague wrote, "Count 1 would have been fatally tainted by the multiple acts of misconduct by the Government." (Letter to Judge MacKenzie, 3-29-96).

In April 1996, my attorney filed the roll call training transcript with the court for a motions hearing. It was mailed certified return receipt. The very next day, Mr. Montague received this same transcript from Arenda Wright-Allen, which she filed with the court, only her copy left out seven consecutive pages. It's interesting to note those seven pages contained all the information about the BATF admitting their records were at best 50% accurate.

On May 21, 1996, in a hearing before the Honorable John A. MacKenzie, all counts but one were thrown out due to Gary Schaible's new testimony wherein he perjured himself, and he stated there were examiners at the BATF NFA branch in Washington, D.C. who shredded registration and transfer documents. Furthermore, this was exculpatory material withheld by the prosecution. (Court hearing, 5-21-96, Page 42, Line 19 to Page 44.)

The sentence given was 12 months, but I was let out on bond pending appeal. One interesting point, in my sentencing guidelines prepared by probation officer Sharon Thayer, she included counts of which I was found not guilty. This upped the sentencing range dramatically. (Court hearing 5-21-96, Page 70, Line 5.) U.S. attorney Arenda Wright Allen appealed my sentence.

In June 1996, Stephen Halbrook became attorney of record and noted our appeal based on the ambiguity of the law.

In May 1997, the Court of Appeals, Fourth Circuit, upheld the conviction and refused to hear oral argument on the appeal. The Fourth Circuit remanded my sentence back to Judge MacKenzie to comply with the rules of United States versus Koon. In August 1997, David Montague returned as the attorney of record and noted my appeal to the United States Supreme Court. In October 1997, the Supreme Court refused to hear the case.

David Montague has two motions to file. One is to dismiss stating BATF obtained a search warrant based on the accuracy of their records knowing full well their records were at best 50% accurate. In addition, if this transcript had been turned over before trial, which it should have been, it would have left Count 1, the count on which I was convicted. Even though I was licensed by the BATF to manufacture silencers, I was still convicted for possessing them. However, that count by itself could have been reduced to a misdemeanor under the Tax Code, and as I stated earlier, we tried to get this reduced but were told absolutely not.

**Exhibit A, Pg. 549**

152

Testimony

However, I must state I feel Count 1 should have been thrown out due to the ambiguity of the law. Federal Register, Vol. 53, No. 62, Rules and Regulations, Section 179.102. This is also stated in "Your Guide to Federal Firearms Regulation, 1988-89," Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms. Please see excerpts from Jan. 18 & 19, 1996 trial, Page xx, Line xx, Page xx, Line xx, Page xx, Line xx.

A MISCARRIAGE OF JUSTICE

Why was Gary Schaible able to perjure himself on the stand with no repercussions? If the normal citizen were to perjure himself, they would be tried and most probably convicted. In the roll call training session tape, Tom Busey states there are over 800 cases they are trying based on the accuracy of their records. How many other people are in jail or have felony convictions on their records because of the BATF's lying about the accuracy of their records?

Why weren't Inspector Turner and Special Agent Karen Dutton interested in the hard copies of my records?

Why was Karen Dutton able to testify incorrectly to the grand jury thereby obtaining an erroneous charge against me, and in essence, extra points added to my sentencing guidelines?

Why was Brady material withheld?

Why did Brenda Wright-Allen leave out seven consecutive pages from the roll call training session transcript, which in these seven pages, it's clear Gary Schaible perjured himself? The Department of Justice stated they sent the complete transcript out to all U.S. attorneys.

Why was I "given time" in my sentencing guidelines for charges I was found not guilty? How can a person be given sentencing enhancements/points for counts he was found not guilty? If this is correct law, why have trials?

Why would the Court of Appeals, Fourth Circuit, not even hear oral argument on my case?

Why did the U.S. attorney, Arenda Wright-Allen, tell my attorney, David Montague, that I had not been indicted, yet she was the U.S. attorney who presented my case to the grand jury two days prior? She told Mr. Montague I was under investigation. The grand jury met on November 14, 1995 and Mr. Montague spoke with Ms. Wright-Allen two days later on November 16, 1995.

How can someone who truly believes they are complying with the laws be sent to jail for 12 months? (With the distinct possibility of receiving 51 months.)

Exhibit A, Pg. 550

153

Testimony

Please read David Montague's letter, June 4, 1996, to Michael E. Shaheen, Junior, Director, Office of Professional Responsibility, U.S. Justice Department, regarding the removal of seven pages from the roll call training session transcript; obstruction of justice/tampering with evidence.

I had just re-opened my business in June of 1995 and things were going great. I felt I had recovered my reputation BATF's raid on my prior business. I had pending orders in excess of $500,000. News in the gun/defense industry travels fast, and by the beginning of December 1995, I was being told by customers, "We'll get back to you."

Additionally, I have spent the majority of my life in the defense industry and I was now left with no current job skills to find a new career. Needless to say, this was a severe financial strain on my family.

TESTIMONY AND RESEARCH
OF ERIC M. LARSON

In January 1998--less than 3 months ago--I became aware that Eric M. Larson had testified before this Subcommittee about errors in the National Firearms Registration and Transfer Record, or NFRTR. Mr. Larson became interested in these errors from a completely different perspective, that of hearing about collectors who had firearms confiscated by BATF even though the firearms were legally registered to them. I would like to briefly say that the relatively small number of firearms that Mr. Larson is concerned about (he estimates there are roughly 17,000 of them) are, indeed, in my professional opinion, firearms that are only of interest to collectors. They came under the NFA for mainly technical reasons, and we in the business often encounter them. In a significant number of cases, people simply don't recognize them as NFA firearms--because they look like what they are, obsolete firearms that obviously were manufactured many years ago. I believe that what Mr. Larson has suggested is reasonable, which is to either allow people to voluntarily re-register these guns, or to simply remove them from the NFA as collector's items. I hope you will consider doing this, based on his research and testimony.

Having said that, I am mainly interested in Mr. Larson's work for two very different reasons. First, he independently confirmed what I experienced, and what those of us in the NFA business have recognized for many years. Namely, that the NFRTR records are a mess. They are not totally a mess, of course, but they are enough of a mess to cause unjust prosecutions, for a Federal Judge to deem them unreliable enough to support convictions, and for the BATF not to appeal those dismissals of charges. That's pretty unreliable.

Second, Mr. Larson followed up his testimony with a complaint to the Treasury Department Office of Inspector General, which ultimately turned

Page 7

**Exhibit A, Pg. 551**

154

### Testimony

into written proof of an attempt by the NATF to still try and cover up errors in the NFRTR. Briefly, Inspector General refused to investigate Mr. Larson's complaint, and instead turned it over to the BATF. The BATF then did an internal investigation, completely exonerated itself, and then refused to release the report for a long time. The report was completed in September 1997, but Mr. Larson was unable to obtain a copy until late January 1998. He kindly shared this report with us.

I will not go into Mr. Larson's complaint here, except to say that one specific complaint he made was about the deliberate destruction of registration documents by BATF employees. As we have seen, this is what Mr. Schaible testified to at my trial, and it is one of the reasons that Judge MacKenzie dismissed 5 of my convictions. Yet, the BATF told a completely different story than the one Mr. Schaible related under oath in federal court in response to Mr. Larson's complaint. Specifically, the BATF stated in its internal report that the documents were thought to have been destroyed some eight years ago by contract employees; however, in my trial, Mr. Schaible did not state this. Instead, Mr. Schaible acknowledged, under direct examination, that registration forms belonging to Mr. LeaSure could, in fact, have been destroyed by BATF employees. (May 21, 1996, transcript, Page 42, Line 19 through Page 43.)

Also (incredibly, in my opinion), the BATF is continuing to try and withhold the Busey Tape, which is clearly Brady Material. In a letter dated March 18, 1998, less than 3 weeks ago, the BATF denied a Freedom of Information Act request by Mr. Larson for a copy of the videotape. BATF gave as the reason, and I quote: "Your request is denied pursuant to Title 5, U.S.C. 552(b)(6) as release of this video tape would constitute an invasion of Mr. Busey's privacy."

Mr. Chairman, not only is BATF's refusal to release this information an outrage, what Mr. Busey states on the tape is an outrage: namely, that he knew good and well how messed up the records were. Listen to what Mr. Busey states toward the end of the videotape, and I quote:

"What we're going to do is we're going to go back, starting with the latest entry and working back to the oldest entry and review every hard copy of every document with its entry into the data base to see if it's correct. I think originally we figured this would take 781 man days to do this with five people sitting at a computer eight hours a day."

"But it's the only way that we can feel that we can ever get it completely accurate. It was fine to begin putting everything in accurate a year ago or at least be guaranteed a year ago it was correct, but what are you going to do with the entries that go back to the early '60s and the '70s and the '60s?"

PROPOSED REMOVAL OF THE NFRTR FROM BATF
AND RELOCATING IT TO THE DEPARTMENT OF JUSTICE

**Exhibit A, Pg. 552**

Testimony

I learned about 3 weeks ago that Mr. Larson was planning to recommend that this Subcommittee consider removing the NFRTR from the custody of the BATF, and relocate it within the Department of Justice.

I believe this is a reasonable and necessary action, for several reasons. First, the Department of Justice is the organization that does all of the background checks anyway. Second, the Department of Justice has the capability to professionally manage these records, as it has done do with fingerprint records for many, many years. The BATF has proven, by its actions, that it is incapable of managing these records, but more importantly that it is continuing to try and cover up errors in the NFRTR and thus continue to try and prosecute innocent people. Third, the BATF (or indeed, whatever government agency has the responsibility for enforcing federal gun control laws) would still have access to these records, and have the ability to use them for legitimate law enforcement purposes.

Fourth, and perhaps most importantly, moving the NFRTR to the Department of Justice would provide an objective, legal interface between these records and the BATF. In other words, the BATF could not manipulate these records or misuse them, because they would be in the custody of a disinterested federal agency that has an incentive to maintain their integrity.

Mr. Chairman, I don't know the political and practical details of how you do these things, but I strongly support Mr. Larson's suggestion that the NFRTR be completely removed from the BATF, and turned over to the Department of Justice.

EFFECTS OF BATF'S PROSECUTION
ON MY PERSONAL LIFE

I don't know that I can adequately express how it feels to be wrongly accused of, tried and convicted for crimes that I did not commit. I can tell you that it takes over your life from then on. I think about it every day, and worry about what is going to happen to me and to my family.

In May of 1995 I married the love of my life, and with her I also enjoyed becoming a father to her five year old son. As you know, six months later I was served with the indictment. It is almost impossible, and I have said, to put into words the stress that befell our home life, for the fear of having my son lose his new father would have been devastating to him, not to mention my sorrow as well. My wife and I have both gone through depression, mental anguish, and our son's school performance has suffered.

My wife was a court stenographer who enjoyed going to court for the state felony dockets. After seeing such a gross miscarriage of justice, she was mentally no longer able to perform her duties in court hearings. She

**Exhibit A, Pg. 553**

156

Testimony

lost all faith in the justice system.

We feared for our safety due to retaliation by the BATF, echoes of Waco, Ruby Ridge, and John Lawmaster went through our minds constantly. Even today, we fear that writing to you will prompt retaliation by the BATF.

People who I thought were my friends would no longer talk to me. A close friend finally told me others were afraid if they were associated with me, there would be retaliation by the BATF towards them. This friend also told me that's why no one would testify on my behalf. Furthermore, the night before my trial, a very close friend who wasn't afraid to testify, received an anonymous call stating he better not show up at trial. During this time I received numerous prank calls, some using foul language, and constant hang-ups. I never even bothered asking anybody in the NFA manufacturer or dealer industry to testify on my behalf about the same kinds of errors in the NFRTR they have experienced. The BATF scares them, because the BATF can put you out of business. Knowing what it has done to me, I could never criticize anybody for putting their wife, family and business interests first. I am proof that nobody will step forward and help.

These are just a few examples of the hell we went through and are still continuing to experience, for peace of mind and reputation are not acquired overnight.

In legal fees, our bill with David Montague is $28,300, and the clock is still ticking. We had previously paid him $7,000. (This is not included in the $28,300.) Stephen Halbrook's bill was $24,500. We still owe $18,000. This does not include the countless hours spent worrying about the case; time working on the case; time it has taken away from my family and business life; and time trying to keep it all together financially and emotionally.

CONCLUSION

Mr. Chairman, on March 25, 1997, my attorney filed a writ of Habeas Corpus on my single remaining conviction. As I write these words, I don't know what is going to happen, but I feel like we have a sound case that is based on valid and reliable evidence. It is possible that by the time you read these words, I will be a totally free man, but I don't want this to stop here.

I came forward with this story mainly because I don't want any other person to ever experience what I went through, because of messed-up records and an effort by the BATF to lie about and cover up exculpatory evidence. This is the part of the legal system that is broken, and I sincerely hope that you and other Members of the Subcommittee will use your authority to support reforms that prevent any of this from ever happening again.

Page 10

**Exhibit A, Pg. 554**

157

Testimony

Thank you for the opportunity to have shared this information with you. I will be glad to try and assist you and anybody else in the task of fixing this very serious problem.

Sincerely,

John D. LeaSure

**Exhibit A, Pg. 555**

158

## DAVID N. MONTAGUE
ATTORNEY AND COUNSELOR AT LAW

1 EAST QUEEN'S WAY
SECOND FLOOR
HAMPTON, VIRGINIA 23669

TELEPHONE: (804) 722-7441

FACSIMILE: (804) 722-8180

March 29, 1996

The Honorable John A. MacKenzie
Senior United States District Judge
Eastern District of Virginia
Walter E. Hoffman U. S. Courthouse
600 Granby Street
Norfolk, Virginia  23510

      Re:   United States v. John Daniel LeaSure, Criminal No. 4-95cr54

Dear Judge MacKenzie:

On yesterday, I received a letter with multiple enclosures from Assistant U. S. Attorney Arenda Wright Allen, Esq. It appears that Mrs. Allen also sent a copy of this letter, with the enclosures, to you.

The letter is quite extraordinary for several reasons, and I believe it is appropriate for me to bring these to your attention. I am, of course, sending Mrs. Allen a copy of this letter.

In the first place, this case was tried before you in Newport News more than two months ago, and resulted in the conviction of Mr. LeaSure on 4 of the 6 counts in his indictment. Mrs. Allen's letter of March 26, 1996, states that the accompanying information is sent "to avoid any suggestion that the [Justice] Department has not provided all relevant material in this matter."

My understanding of the Brady rule is that the potentially exculpatory disclosure is to be made to the defense before the trial. It doesn't do much good two months later.

Secondly, on March 25, 1996, we sent to Mrs. Allen by Certified Mail, Return Receipt Requested, a supplement to our motion for new trial with various materials attached, including a copy of the transcript of the departmental briefing given to the Bureau of Alcohol Tobacco and Firearms (BATF) by then NFA Branch Chief Thomas Busey, in October, 1995, and the Return Receipt shows that it was received by Mrs. Allen on March 26—the same day as her letter to me.

Third, she includes as the first item among her enclosures the same transcript of Mr. Busey, except her copy of the transcript omits the last six pages which contained, we thought, the admissions most damaging to the Government's case. Her version of the transcript ends with page 15, but page 16, (we filed the whole thing) has Busey saying: "we maintain these [NFRTR search] files for future reference in case one or the other of us has to CYA for one reason or another."

159

The Honorable John A. MacKenzie
March 29, 1996
Page Two

And on page 19 he says: "when I first came in a year ago, our error rate was between 49 and 50 percent."

Another interesting item is in the portion of the transcript submitted by Mrs. Allen, and appears at page 9:

> "Let me say that when we testify in court, we testify that the data base is 100 percent accurate. That's what we testify to, and we will always testify to that. As you probably know, that may not be 100 percent true."

In Mrs. Allen's next exhibit, a handwritten affidavit by Mr. Busey, he finds it necessary to assert that: "Neither I nor any staff have never [sic] perjured themselves regarding this accuracy . . ."

Assuming this means that they have not committed perjury, it is shocking that he would feel it necessary to issue such a disclaimer.

This casual and flippant attitude on the part of a senior BATF official is unbecoming, unprofessional and inappropriate, but far more importantly, the *sine qua non* of the Government's case on Counts 2, 3 and 6 of the indictment was the testimony and certification of Gary Schaible of the BATF that the weapons in question were not registered to Mr. LeaSure. The fact that this assertion was based on data that at that time (February, 1994) suffered from a "49 or 50 percent" error rate is absolutely appalling. Had we known these facts, I believe the entire case would have been dismissed because: (a) Counts 2-6 would have been subject to reasonable doubt as a matter of law, and (b) Count 1 would have been fatally tainted by the multiple acts of misconduct by the Government.

I would request that you convene a hearing to consider the Defendant's Motion for New Trial and for such other relief as the Court might find appropriate.

With kind regards.

Yours very truly,

David N. Montague

cc:   Arenda Wright Allen, Esquire
      Mr. John D. LeaSure

**Exhibit A, Pg. 557**

## DAVID N. MONTAGUE
### ATTORNEY AND COUNSELOR AT LAW

1 EAST QUEEN'S WAY
SECOND FLOOR
HAMPTON, VIRGINIA 23669

TELEPHONE: (804) 722-7441

FACSIMILE: (804) 722-8189

May 24, 1996

MAILED & FAXED (804) 441-6689

Arenda Wright Allen, Esquire
Assistant U.S. Attorney
World Trade Center, Suite 8000
101 West Main Street
Norfolk, VA 23510

Re: U.S. vs LeaSure
Criminal Number 4-95cr54

Dear Mrs. Allen:

On yesterday I received a call from an out-of-state lawyer who specializes in the defense of NFA cases.

He informed me that he had just received in one of his cases a letter similar to the one you wrote to me in this case on March 26, 1996, with, apparently, most of the same exhibits.

A significant difference, however, was the fact that he received the entire Busey transcript, and not just the first fifteen (15) pages, as I did.

You will recall that I raised that question in my letter to Judge MacKenzie of March 29 and again in remarks to the Court on May 21 in Newport News. On neither occasion did you offer any explanation, nor did your witness, Gary Schaible of the BATF, have any explanation for the missing seven (7) pages, in which most of the damaging admissions occur.

At this point, it is obvious that someone removed those critical pages from your exhibit. While I do not suggest that that person was you, I do need an explanation, and if you cannot provide it, I shall plan to write next week to the Director of the Office of Professional Responsibility at the Justice Department.

Please advise me as to what you know about the following:

(1) Was your letter to me of March 26 unique to the LeaSure case, or was it part of a nationwide notification to defense lawyers involved in similar cases?

(2) Was the substance of the letter your work, or was it suggested by anyone else?

161

(3) From whence did you receive the exhibits which accompanied that letter?

(4) If the answer to question three (3) is: The Justice Department, did you send out the exhibits exactly as received, or did you or anyone you know of make any changes to them?

I realize that next week is a short week, but I shall hope to hear form you by Thursday, May 30.

Yours very truly,

David N. Montague

cc: Mr. John LeaSure
/sfb

**Exhibit A, Pg. 559**

162



U.S. Department of Justice

United States Attorney
Eastern District of Virginia

8000 World Trade Center                 804/441-6331
101 West Main Street
Norfolk, Va. 23510-1624

May 29, 1996

David N. Montague, Esq.
1 East Queens Way, Second Floor
Hampton, Virginia 23669

    Re:  United States v. John Daniel Leasure
         Criminal No. 4:95cr54

Dear Mr. Montague:

     Please be advised that the entire packet which I mailed to you
on March 26, 1996, was xeroxed in total from the original packet
sent to my office from the U.S. Department of Justice, Criminal
Division.

                        Sincerely,

                        HELEN F. FAHEY
                        UNITED STATES ATTORNEY

                   By:  _____
                        Arenda L. Wright Allen
                        Assistant United States Attorney

163

## DAVID N. MONTAGUE
ATTORNEY AND COUNSELOR AT LAW

1 EAST QUEEN'S WAY
SECOND FLOOR
HAMPTON, VIRGINIA 23669

TELEPHONE: (804) 722-7...

FACSIMILE: (804) 722-8...

June 4, 1996

Michael E. Shaheen, Jr., Esquire
Director, Office of Professional Responsibility
U.S. Justice Department
Room 4304
Main Justice Building
10th Street and Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Mr. Shaheen:

I write to bring to your attention a matter which has been of great concern to me in recent weeks.

I have been involved as defense counsel in a case brought under 26 USC Section 5861(d)&(i) in the Eastern District of Virginia, styled U.S.A. v. John Daniel LeaSure, Criminal Number 4:95cr54.

Briefly, the case involved a prosecution of Mr. LeaSure, a federally licensed Class 2 Manufacturer specializing in research and development of firearm suppressors, or "silencers", and the holder of a patent for what is probably the best silencer in the world. The offenses charged in a 6-Count indictment came before the Honorable John A. MacKenzie for a two-day bench trial on January 18 and 19, 1996, for a variety of record-keeping violations, but no substantive violations.

Initially, by Order entered February 1, 1996, Judge MacKenzie found LeaSure guilty of 4 of the 6 counts of the indictment, all of which involved the record-keeping functions of the NFA Branch of the Bureau of Alcohol, Tobacco and Firearms (BATF) except Count 1, which was for possessing unsuccessful experimental silencers without serial numbers.

At the sentencing hearing on May 21, 1996, the Judge was given access to additional information which had become available after the trial, consisting principally of a transcript of a training presentation made to the BATF in October, 1995, by Thomas Busey, then Chief, National Firearms Act Branch, BATF.

**Exhibit A, Pg. 561**

154

This transcript was hushed up by BATF after it was made because extremely damaging admissions about a "49-50 percent" error rate in the NFRTR (National Firearms Registration and Transfer Record). Mr. Busey stated that great strides had been made since he had been on the job (from October, 1994).

This, of course, cast great doubt on all cases antedating Busey's tenure, including this one, which had arisen in February of 1994.

Within a month, Busey had been reassigned to the tobacco section of BATF, and his transcript remained secret until it was produced pursuant to a FOIA request made by James H. Jeffries, III, Esquire, of Greensboro, North Carolina, on November 7, 1995.

Actual production was made to Mr. Jeffries on or about March 1, 1996, about 1 1/2 months after Mr. LesSure's case had been tried, and he sent a copy of the 22-page transcript.

I assembled several exhibits, including the Busey transcript and sent to the Court with a copy to Assistant U.S. District Attorney, Arenda Wright Allen, Esquire, the attorney in charge of the Government's case.

On the same day that the Return Receipt indicates Mrs. Allen got my correspondence (March 26, 1996), a letter was sent to me by Mrs. Allen with the same Busey transcript, except that the last 7 pages had been removed, these being where virtually all of the damaging material appeared.

I have asked Mrs. Allen to explain this, and I finally heard from her on May 29, 1996, stating that she had sent me everything she had gotten from the Justice Department.

As a result of the foregoing disclosures, together with the testimony of Gary Scheible of the BATF that the agency was having a problem with NFRTR clerks destroying registration faxes, Judge MacKenzie threw out all of the convictions except Count 1, and on it he substantially reduced the Guideline indicated penalty. This conviction is being appealed.

At this point, I am seeking as full an explanation as possible of what appears to be government misconduct at fairly high levels involving obvious violations of the Brady rule, coverups by the police (BATF), and tampering with evidence by the Department of Justice.

The situation was brought more forcefully to my attention when I received a phone call from Mr. Jeffries on Friday, May 24, 1996, advising that he had just received a letter from the Assistant U.S. District Attorney on a case he had with a number of attachments. Knowing that I had received a generally similar letter from Mrs. Allen, he wanted to compare them.

165

The letters and the attachments turned out to be identical, suggesting that it was a mass mailing from the Justice Department (through local AUSDAs) to perhaps hundreds of NFA Branch (Section 5861) cases across the country affected by Busey's statements.

Page 3

In addition, Mr. Jeffries' version of the Busey transcript was complete, making it obvious that someone had removed the pages from my version of the transcript.

Please let me know if I may provide you with any further information about this. I shall await your response.

Yours very truly,

David N. Montague

cc:   John LeaSure
      Arenda Wright Allen, Esquire

Attachments:

1. March 26, 1996, letter from Arenda Allen, Esquire, forwarding Busey transcript and other exhibits.

2. My March 29, 1996, letter to Judge MacKenzie.

3. Mrs. Allen's letter to me of May 29, 1996.

166



U. S. Department of Justice

Office of Professional Responsibility

_____

Washington, D.C. 20530

OCT  3 1996

David N. Montague, Esq.
1 East Queen's Way
Second Floor
Hampton, VA  23669

Dear Mr. Montague:

Thank you for your letter and the material you sent to us on
June 4, 1996.  We have opened an investigation into the matter.

If you have any questions about this, please contact me or
Assistant Counsel George Ellard on (202) 514 - 3365.

Sincerely,

Michael E. Shaheen Jr.
Counsel

**Exhibit A, Pg. 564**

167



U. S. Department of Justice

Office of Professional Responsibility

Washington, D.C. 20530

HOV 21 1996

David N. Montague, Esq.
1 East Queen's Way
Second Floor
Hampton, VA  23669

Dear Mr. Montague:

In a letter dated June 4, 1996, you brought to our attention the fact that Assistant U.S. Attorney Arenda Allen had sent you an incomplete transcript of certain remarks made by an agent with the Bureau of Alcohol, Tobacco, and Firearms.

Ms. Allen has affirmed to us that which she told you: she forwarded to you in its entirety the material sent to her by the Criminal Division at Main Justice. We have told that component that some of the material it sent to U.S. Attorneys Offices appears to have been incomplete.

Thank you for bringing this matter to our attention.

Sincerely,

George Ellard
Assistant Counsel

**Exhibit A, Pg. 565**

168

## DAVID N. MONTAGUE
### ATTORNEY AND COUNSELOR AT LAW

1 EAST QUEEN'S WAY
SCOND FLOOR
HAMPTON, VIRGINIA 23669

TELEPHONE: (804) 722-7441

FACSIMILE: (804) 722-8189

November 27, 1996

George Ellard, Esquire
Assistant Counsel
U.S. Justice Department
Room 4304
Main Justice Building
10th Street and Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Mr. Ellard:

I have your letter of November 21, 1996, for reply. You certainly appear to have missed most of the point of my earlier correspondence.

In the first place Thomas Busey should not be referred to as an "agent" of BATF. In fact, he was the Chief of the National Firearms Act Branch for that agency, and his "certain remarks" came from a lengthy training session for all BATF weapons agents.

What Mr. Busey stated was an appalling truth: that when he joined the Bureau the error rate for their records for firearms registrations was 50%, meaning agents' testimony in registration cases was worthless and that perhaps hundreds of gun dealers and manufacturers (including my client, almost) were in prison with felony convictions that should have been acquittals.

To make matters worse, Mr. Busey was summarily fired and the transcript of his remarks hushed up. Busey's career now languishes in the Tobacco Division. His remarks did not become known to the world until obtained on an FOIA request from gun attorney, James H. Jeffries, III, of Greensboro, N.C., who in turn, had heard by the grapevine that such a transcript existed.

After Mr. Jeffries got the transcript, BATF realized the jig was up and immediately sent it to the Justice Department who in turn transmitted it to Assistant U.S. Attorneys handling cases of this type.

My question was, had BATF deleted the crucial last seven (7) pages of the transcript and thereby almost all of the damaging admissions? Apparently you have not even looked into this

**Exhibit A, Pg. 566**

169

The more serious possibility was and is that a very scary conspiracy existed between the Justice Department and BATF to conceal all of these improper convictions even though the price was an unknown number of innocent men and women who had had their lives and reputations ruined.

Your off-handed treatment of the situation suggests an indifference to a matter going to the essence of the administration of justice and due process.

Yours very truly,

David N. Montague

David N. Montague

cc:   Mr. John D. LeaSure
/slb

**Exhibit A, Pg. 567**

170



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

March 18, 1998

REFER TO: L:D:MRL
98-514

Mr. Eric M. Larson
P.O. Box 5497
Takoma Park, MD 20913

Dear Mr. Larson:

This is in response to your Freedom of Information Act request dated January 3, 1998, for information maintained by the Bureau of Alcohol, Tobacco and Firearms.

You have requested "a complete and unredacted copy of the videotape created by the Bureau of Alcohol, Tobacco and Firearms which pictures Mr. Thomas Busey, Chief, National Firearms Act Branch, during a "Roll Call Training Session, or about October 18, 1995". Your request is denied pursuant to Title 5, U.S.C. 552 (b)(6) as release of this video tape would constitute an invasion of Mr. Busey's privacy.

Insofar that your request has been denied, you have the right to request an administrative appeal. Such appeal must be addressed to the Assistant Director, Liaison and Public Information, at the above address and be received within 35 days of the date appearing on this letter. Your letter should state any arguments in support of your request.

Sincerely yours,

Marilyn R. LaBrie
Disclosure Specialist

**Exhibit A, Pg. 568**

171

QUESTIONS AND ANSWERS CONCERNING THE REGULATION
OF MACHINEGUNS AND SILENCERS UNDER THE
NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT,
AS AMENDED BY PUB. L. NO. 99-308

## SILENCERS

QUESTION: What controls are placed on silencer kits,
partial silencer kits and an individual silencer part by
Pub. L. No. 99-308?

ANSWER: The Gun Control Act and the National Firearms Act
regulate firearms, including silencers, as defined by
those Acts. The term silencer is defined in 18 U.S.C.
§ 921(a)(24) and 26 U.S.C. § 5845(a)(7) to mean any device
for silencing, muffling, or diminishing the report of a
portable firearm, including any combination of parts,
designed or redesigned, and intended for use in assembling
or fabricating a firearm silencer or muffler, and any part
intended only for use in such assembly or fabrication.
Thus, a silencer kit, whether partial or complete, and
any individual silencer part is subject to all controls
placed on firearms by the GCA and the NFA. NFA controls
include, e.g., the registration and marking requirements.
A manufacturer and distributor of silencer kits may place
the serial number and other required markings on a single
component of the kit, provided that the markings are
conspicuous and not susceptible of being readily
obliterated as required by regulations. (A manufacturer
distributing a single part which meets the silencer
definition must place all requisite markings on that
part.) Under the GCA, a manufacturer or dealer in
silencers as defined must be licensed.

QUESTION: Can the owner of a registered silencer have
the silencer repaired without the transaction incurring
further registration or payment of additional transfer
taxes?

ANSWER: The registered owner may deliver his registered
silencer to a qualified manufacturer for purposes of
repair, including necessary replacement of component
parts, and receive the repaired silencer without the
transactions necessitating further registration or payment
of transfer taxes. For the protection of the parties
involved, Forms 5 should be filed by the transferors with
ATF prior to the delivery and return. On the other hand,
the transfer of silencer kits or parts by a qualified

Exhibit A, Pg. 569

172

10510 Federal Register / Vol. [illegible], No. [illegible] / Thursday, March [illegible], 1988 / Rules and Regulations

§ 179.9[illegible] Certain government entities.

(a) A firearm may be transferred without payment of the transfer tax to or from any State, possession of the United States, any political subdivision thereof, or any official police organization of such a governmental entity engaged in criminal investigations.

(b) The exemption provided in paragraph (a) of this section shall be obtained by the transferor of the firearm filing with the Director an application, Form 5 (Firearms), Application for Tax-exempt Transfer and Registration of Firearm, in duplicate, executed under the penalties of perjury. The application shall (1) show the name and address of the transferor and of the transferee, (2) identify the Federal firearms license and special (occupational) tax stamp, if any, of the transferor and of the transferee, (3) show the name and address of the manufacturer and the importer of the firearm, if known, (4) show the type, model, overall length (if applicable), length of barrel, caliber, gauge or size, serial number, and other marks of identification of the firearm, and (5) contain a statement by the transferor that the transferor is entitled to the exemption because either the transferor or the transferee is a governmental entity coming within the purview of paragraph (a) of this section. In the case of a transfer of a firearm by a governmental entity to a transferee who is a natural person not qualified as a manufacturer, importer, or dealer under this part, the transferee shall be further identified in the manner prescribed in § 179.85. If the Director approves an application, Form 5 (Firearms), the original Form 5 (Firearms) shall be returned to the transferor with the approval noted thereon. Approval of an application, Form 5 (Firearms), by the Director shall effectuate the registration of that firearm to the transferee. Upon receipt of the approved Form 5 (Firearms), the transferor shall deliver same with the firearm to the transferee. The transferor shall not transfer the firearm to the transferee until the application, Form 5 (Firearms), has been approved by the Director and the original thereof has been returned to the transferor. If the Director disapproves the application, Form 5 (Firearms), the original Form 5 (Firearms) shall be returned to the transferor with the reasons for the disapproval stated thereon. An application by a governmental entity to transfer a firearm shall be denied if the transfer, receipt, or possession of a firearm would place the transferee in violation of law.

Par. 82. Section 179.[illegible] is revised to read as follows:

§ 179.[illegible] Transportation of firearms to effect transfer.

Notwithstanding any provision of § 178.28 of this chapter, it shall not be required that authorization be obtained from the Director for the transportation in interstate or foreign commerce of a firearm in order to effect the transfer of a firearm authorized under the provisions of this subpart.

Par. 83. Section 179.102 is amended by revising the last sentence of the section and adding a new sentence to the end to read as follows:

§ 179.102 Identification of firearms.

* * * A firearm frame or receiver or any other part defined as a machine gun or a muffler or silencer for the purposes of this part which is not a component part of a complete firearm at the time it is sold, shipped, or otherwise disposed of by a manufacturer, importer, or maker shall be identified as required by this section. The Director may authorize other means of identification of parts defined as machine guns other than frames or receivers and parts defined as mufflers or silencers upon receipt of a letter application, in duplicate, showing that such other identification is reasonable and will not hinder the effective administration of this part.

Par. 84. Section 179.104 is amended by revising the last sentence to read as follows:

§ 179.104 Registration of firearms by certain governmental entities.

* * * The registration of any firearm under this section is for official use only and a subsequent transfer will be approved only to other governmental entities for official use.

Par. 85. Section 179.105 and the undesignated center heading preceding it are revised to read as follows:

Machine Guns

§ 179.105 Transfer and possession of machine guns.

(a) *General.* As provided by 26 U.S.C. 5812 and 26 U.S.C. 5822, an application to make or transfer a firearm shall be denied if the making, transfer, receipt, or possession of the firearm would place the maker or transferee in violation of law. Section 922(o), Title 18, U.S.C. makes it unlawful for any person to transfer or possess a machine gun, except a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof, or any lawful transfer or lawful possession of a machine gun that was lawfully possessed before May 19, 1986. Therefore, notwithstanding any other provisions of this part, no application to make, transfer, or import a machine gun will be approved except as provided by this section.

(b) *Machine guns lawfully possessed prior to May 19, 1986.* A machine gun possessed in compliance with the provisions of this part prior to May 19, 1986, may continue to be lawfully possessed by the person to whom the machine gun is registered and may, upon compliance with the provisions of this part, be lawfully transferred to and possessed by the transferee.

(c) *Importation and manufacture.* Subject to compliance with the provisions of this part, importers and manufacturers qualified under this part may import and manufacture machine guns on or after May 19, 1986, for sale or distribution to any department or agency of the United States or any State or political subdivision thereof, or for use by dealers qualified under this part as sales samples as provided in paragraph (d) of this section. The registration of such machine guns under this part and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State or local governmental entities. Subject to compliance with the provisions of this part, manufacturers qualified under this part may manufacture machine guns on or after May 19, 1986, for exportation in compliance with the Arms Export Control Act (22 U.S.C. 2778) and regulations prescribed thereunder by the Department of State.

(d) *Dealer sales samples.* Subject to compliance with the provisions of this part, applications to transfer and register a machine gun manufactured or imported on or after May 19, 1986, to dealers qualified under this part will be approved if it is established by specific information the expected governmental customers who would require a demonstration of the weapon, information as to the availability of the machine gun to fill subsequent orders, and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon. Applications to transfer more than one machine gun of a particular model to a dealer must also establish the dealer's need for the quantity of samples sought to be transferred.

(e) *The making of machine guns on or after May 19, 1986.* Subject to compliance with the provisions of this

Exhibit A, Pg. 570

173

ORIGINAL

ROLL CALL TRAINING

10-95

TOM BUSEY

**Exhibit A, Pg. 571**

174

1           P R O C E E D I N G S

2           MR. BUSEY:  Good morning, my name is

3    Tom Busey.  I'm chief of the NFA branch, National

4    Firearms Act Branch.

5           A lot of the information that Larry gave

6    you relative to chain of command organization, that

7    applies to us too.  What I thought I'd get into this

8    morning is the probably three major things that the

9    branch does.

10          Our first and main responsibility is to

11   make accurate entries and to maintain accuracy of the

12   NFRTR, the National Firearms Registry and Transfer

13   Record.

14          Our second main responsibility is to do

15   look ups for agents in the field who need to find out

16   if an individual has Title 2 weapon.

17          Our third major responsibility, and not

18   quite co-equal, because the sensitivity and

19   criticalness of it is not there, but we also do

20   record inventories for inspectors who are inspecting

21   various firearms dealers.  We verify the inventory

22   that we have  We send it to them. they double check

(9)

**Exhibit A, Pg. 572**

1   it, and we try to get it straight.

2          I thought I'd start off by showing you some

3   figures because, like imports branch, we also process

4   multitudes of paper. My staffing is very similar to

5   Larry's, although you can double the examiners. I

6   have 12 examiners, imports has 6, and that's

7   basically because of the volume.

8          The first chart you see up there is the

9   amount of Title 2 weapons that are registered right

10   now. There's approximately 728,000 Title 2 weapons.

11   This first graph shows it by state. As you can see,

12   the largest state for Title 2 weapons is California,

13   and then you move right on down to, I believe that's

14   Vermont, isn't it? Yes.

15          VOICE: Virgin Islands.

16          MR. BUSEY: Virgin Islands. I'm sorry.

17   Virgin Islands, 25.

18          Of that 728,000, we estimate, because we

19   don't have the time nor the inclination to do it on a

20   monthly basis, anywhere between 150 to 155,000 is the

21   flash grenades. They come in and out of the

22   inventory so quickly, and probably the accuracy is

176

1  those is not very good, basically because when police
2  departments and other law enforcement agencies use
3  these flash grenades, they're supposed to report to
4  us.  We remove them from the inventory.  But it's
5  such a continual turnover.  The Kansas City Police
6  Department may report to us accurately, but the
7  Sheriff's Department up in Utha, we may not hear from
8  them.

9        Some day when we have the manpower and we
10  have the time, we need to go through and separate
11  these out.

12        In fact, we've discussed within the branch
13  setting up possibly two different registries, just so
14  the system doesn't become overburdened to separate
15  these out into an equal category but a separate
16  category.

17        The second graph shows the amount of
18  processing that we do on a fiscal year basis for both
19  '94 and '95.  '95, there was a slight decrease
20  between the Form 1s, Form 2s, all the way up to the
21  Form 10s that we process.  We processed 216,000
22  pieces of paper in fiscal year '95 on the

5

1   registration of manufactured weapons and transferred

2   weapons.

3          The second graph breaks this down into the

4   type of weapon that we have in the registry for both

5   '94 and '95.

6          Destructive devices, the second category,

7   is the largest. Machine guns, silencers, any other

8   weapon, short-barrel shotguns, sawed-off shotguns and

9   short-barrel rifles.

10          I hope that page isn't for a critical

11   lookup.

12          The next graph is the record searches that

13   were completed in 1995. As you can see, our total

14   record searches by our specialists, of which there

15   are six, was 5,368. Of that, 78.5 percent were

16   record searches for special agents in the field who

17   needed either urgent information or routine, and I'll

18   get into that.

19          We did 880 court certifications for trials

20   that came after the work cases, and we did 586

21   inventories for our inspectors in the field and

22   verifying dealers inventories

6

1        The next graph, it probably wouldn't
2   interest you too much.  It gets into the special
3   occupational tax and the population of special
4   occupational taxpayers, the number of manufacturers,
5   importers, and Class III dealers that are out there
6   because we also are, obviously, concerned about this
7   data base also.

8        What I thought I'd move into right away is,
9   like I say, probably either first or second, because
10  they're both probably co-equa, is the search that our
11  specialists do, our look-up specialists do, of the
12  NFRTR for special agents when they're working a case,
13  when they're trying to find out if an individual who
14  they had information on has a Title 2 weapon, do we
15  have that Title 2 weapon registered in our data base.

16       These procedures are in effect right now.
17  There's some changes in here that you probably
18  already have heard about relative to the involvement
19  of management and overseeing the results that
20  specialists come up with when they do a record
21  search.

22       The record search can be made either by a

(3)

**Exhibit A, Pg. 576**

7

1   call in by special agents with a dedicated number.
2   We just recently have constructed in our work area a
3   separate four-walled office that has the two look-up
4   specialists in it.  They're isolated from the other
5   activity of the branch and the division, and their
6   only responsibilities are to take these phone calls
7   from special agents who are doing either weapons
8   searches or individual searches.

9           They can either do that by the telephone
10  number by telephone or by fax machine, which we've
11  recently had installed a separate fax machine,
12  separate from the rest of the division, in that room
13  by itself.  That takes nothing but look ups.  The
14  search can be requested by name, by the firearms
15  serial number, or both.

16          The specialist that's sitting in there that
17  takes the request enters the information on the NFA
18  record search form, and there's a lot of information
19  that we put on there relative to the name of the
20  agent, the badge number, the address/telephone
21  number, and of course all of the information that we
22  can possibly get from the agent.

(7)

**Exhibit A, Pg. 577**

8

1       The more information that we receive,
2   relative to the individual that they're doing the
3   search on, the better.  If we have a birth date,
4   current address, anything.  And of course, a lot of
5   times we don't.  All we get is just a first and last
6   name.  Middle initials even help us.

7       Because as we go through the search, the
8   further we have to go to make sure it's right, all
9   the way back to the actual microfilm records and the
10  actual hard copy of the transfer registration
11  document, even middle initials can help us eliminate
12  erroneous individuals.

13      For a name search, the specialist will
14  search the data base, using the first three letters
15  of the last name.  The example given here is Smith,
16  S-M-I.  What happens is, they run the S-M-I.  They'll
17  get, let's say, 10,000 hits on S-M-I.  Then they'll
18  run the state and the S-M-I, and maybe they'll get
19  400.  In this case, they probably would.  With some
20  more uncommon names, you may only get 3 or 15 or 20
21  names.

22      Then they'll run the fourth letter, to even

9

1   break it down further. It's S-M-I, and then it'll be
2   T.

3       Let me say that when we testify in court,
4   we testify that the data base is 100 percent
5   accurate. That's what we testify to, and we will
6   always testify to that. As you probably well know,
7   that may not be 100 percent true. If our data base
8   was absolutely error free, we could simply run the
9   name of the individual and his first name, and if it
10  didn't come up, we could guarantee everyone that that
11  individual doesn't have a Title 2 weapon registered
12  to him.

13      But since sometimes in the entry part of
14  this game people invert letters and vowels, you could
15  put the name in, it won't come up that way.

16      So we run multiple methods of running it.
17  If the last name and first name, if the guy's first
18  name or the lady's first name, looks like a last
19  name, we'll run that first. We'll invert it, just to
20  see what we come up with.

21      So this way, we try to eliminate the
22  possibility of have somebody in there who has a Title

(//

**Exhibit A, Pg. 579**

182

10

1  2 that we come up with a report that says they do

2  not. We are going to a new data base whose

3  capabilities will allow us to do more varied kind of

4  queries and hopefully better queries, phonetics,

5  Sound, Soundex (ph). Soundex will help us.

6          For a serial number, we'll just search the

7  exact serial number. We have come up with a couple

8  of incidences, and this shows the skill of the

9  specialists that are in there, where a 2 has looked

10  like a 2 and a 2 has looked like a Z. If you run the

11  wrong one, you come up with no registration. If you

12  run them both, you find out that it is registered

13  that way. There was a mistake in the printing on the

14  form, or it was a mistake in the call in.

15          So we do the exact serial numbers, but we

16  do look for idiosyncracies in the seria number that

17  might make it more apt that some kind of inversion

18  could have taken place.

19          The specialists will analyze the results of

20  the search. Like I say, since the serial number is

21  exact, the only records where the serial number is

22  identified, will be provided

11

1        The specialists will eliminate records

2    based on the type and description of the firearm.

3    For the name search, we do the name, we run the FFL,

4    the licensee data base, and the SOT data base with

5    the name to see if there's any trade names.

6        If there's any trade names, then we go back

7    to the registry to run the trade name to see if that

8    trade name has any Title 2 weapons registered to it,

9    because in many cases the agents call in with a name.

10   That individual turns out to be a licensee, turns out

11   to be a special occupational taxpayer.

12       Although there was nothing registered under

13   his name, there were weapons registered under his

14   trade name, his company name. In many cases, they

15   may have two or three different trade names.

16       Again, as I emphasized a minute ago, to

17   ensure the thoroughness of the search, the requesting

18   agent should supply as much information as he

19   possibly can. A lot of times that information is

20   only first name/last name, and that's all he has,

21   based on an informant or tip or whatever, and that's

22   what we run with, is that

12

1          I mentioned before we'll run the SOT data

2     base and we'll run the FFL data base, licensee data

3     base, to see if we come up with anything there, and

4     then we'll go back to the NFRTR to find out if they

5     have any weapons registered to them.

6          Depending on what we come up with, when we

7     come up with similar names, and we don't have a date

8     of birth, if we come up with Allison Stevens or Tom

9     Bussey, and we come up he's in a different state,

10    we'll get the hard copy or the microfilm copy of the

11    actual transfer record to see if the date of birth is

12    the same as the agent has.

13         Depending on the volume that we're dealing

14    with, a lot of times what we're doing now is we are

15    sending -- I have been there a year now, and before I

16    got there, we were sending basically either hit or no

17    hit, and we'd send the hit. We would send possibles

18    if they were real close, but due to some difficulties

19    that we've had and to make sure that we don't -- we

20    try not to send the wrong information, we have been

21    sending probably more information than the agent

22    needs

13

1          If we come up with, if there's 22
2    Tom Smithe in the State of Arkansas that have
3    registered weapons, we send all 22 Tom Smithe, even
4    if the date of birth is different, just to give the
5    agent the opportunity to do the investigative work,
6    rather than just telling, here's the one that we
7    think might be it, the other 19 we don't think are
8    it. We'll let the agent decide whether that other 19
9    might possibly be the individual they're looking for.
10         That's why we can go all the way back to
11   the hard copy. We can go all the way back to the
12   microfilm to really pin down if the individual we
13   have is the one you're looking for.
14         What we've started, since there was a
15   problem in Baltimore with a look up and there was a
16   problem up in Minnesota, I think it was, about six
17   months ago, from now on, before negative information
18   is sent to an agent -- if the agent indicates that
19   it's a routine, he's not in a big rush for it, we
20   used to get it back to him on the same business day.
21   Now if an agent says it's routine, he may not get it
22   back until the next business day. If it's an urgent,

14

1   he will get it back that day.

2           We'll call the information back to him and

3   the hard copy of the information will be mailed to

4   him.  If he needs it real fast, we FedEx it.

5           The reason why the routine may not get back

6   the same day anymore is all the negative

7   information -- by negative, I mean, if the specialist

8   does a look up on a name and comes up with zero,

9   can't find that name anywhere, before that

10  information goes back to the field agent, it comes to

11  the branch chief's office.  The branch chief sits

12  down and basically doesn't do anymore than what the

13  specialist did in the look up, but goes over all the

14  information on the printouts to see if all the

15  procedures have been followed right to the very end.

16          Did they look at the FFL data base.  Did

17  they look at the SOT data base.  Did they have names

18  that were similar to the name that was requested.

19  Did they check out the actual hard copy of the

20  microfilm to see if this was the individual and

21  someone had just misspelled it when it went into the

22  data base



15

1           Once the branch chief reviews this

2    completely, then he'll return the information to the

3    look-up specialist, who will communicate, transmit

4    this information to the field agent.

5           What we're doing is, we're hoping that by

6    this second level of review, and it really doesn't

7    say anything negative about the look-up specialist at

8    all, because the people we have right now have been

9    doing it for a long time and they're excellent in

10   their searches; but you do these searches and you run

11   these printoffs on the screen and you track down

12   these printoffs hour after hour for a full day.

13          I remember during the Oklahoma City bombing

14   we were running it 24 hours a day.  I think we ran it

15   for about two weeks straight.  Sometimes things are

16   missed because there's only so many minutes in an

17   hour and so many hours in a day.  So this gives the

18   branch chief time to just sit there and say, geez, I

19   wonder if this Ivan Smith might be the Evan Smith

20   that the agent wants.  It's the same state.  Then we

21   check to see maybe if it's in the same city that the

22   agent's looking for this guy at.

16

1       So it gives a little more opportunity to
2   scope out different possibilities.  The specialists
3   are, like I say, they're turning these things out all
4   day long for eight hours.

5       So we're hoping that eliminates the
6   possibility that anything goes out erroneous because
7   we know you're basing your warrants on it, you're
8   basing your entries on it, and you certainly don't
9   want a Form 4 waved in your face when you go in there
10  to show that the guy does have a legally-registered
11  Title 2 weapon.  I've heard that's happened.  I'm not
12  sure.

13      Like I say, we'll give the information back
14  by telephone and then we'll send hard copies back to
15  you.

16      At that point, the log entry is closed out,
17  and we maintain these files for future reference in
18  case one or the other of us has to CYA for one reason
19  or another.

20      The important factors, again, are:  If it's
21  communicated to the field agents, and I believe that
22  my boss, Terry Cates, who's down -- well, he's back

17

1  now, but he was down at the conference in South

2  Florida with the district directors and SACs -- one

3  of the topics he was talking about, again, is look

4  up, the look ups that we do for agents.

5          The more information that we can get over

6  the phone on the individual that you're looking for,

7  the better it is for us and the better the

8  information comes back.

9          I mean, if you have a middle initial, give

10 it to us.  If he has a "junior" or a "senior" on the

11 end, give it to us.

12         The second part of the information, the

13 routine and urgent, we've already gone over.

14         So, again, I kind of consider this probably

15 the most important support function that we have.

16 Equal to it, of course, is maintaining the accuracy

17 of the data base to begin with.

18         If the information that's in the data base

19 is not accurate, it doesn't make any difference how

20 good of a search we do, it'll come out wrong.

21         So the information on the 720,000 weapons

22 that are in the data base has to be 100 percent

18

1    accurate.    Like I told you before, we testify in

2    court and, of course, our certifications testify to

3    that, too, when  we're not physically there to

4    testify, that we are 100 percent accurate.

5              But we have found instances in our records

6    where names have been misspelled, they've been

7    inverted; vowels i-e have been changed; and, of

8    course, computer programs only pull up what you put

9    in.

10             We've made monumental strides in correcting

11   this.  A major correction event took place in 1986.

12   About a year ago, we instituted a quality review team

13   in the division.  That's three individuals who review

14   every transfer record that goes through an examiner

15   to register a Title 2 weapon, or to transfer a Title

16   2 weapon.

17             Before it actually gets entered into the

18   data base and stays there permanently, it goes from

19   that examiner to a specialist, who reviews it and the

20   screen to see if the name was spelled correctly when

21   it was put in, because obviously that's the most

22   important thing, is the name and the spelling and the

FRIEDLI  WOLFF L TEMP.

19

1    order that it's put in.  And, of course, the serial

2    number of the weapon, type of weapons and the

3    description of the weapon.

4              This quality review team, when I first came

5    in a year ago, our error rate was between 49 and 50

6    percent, so you can imagine what the accuracy of the

7    NFRTR could be, if your error rate's 49 to 50

8    percent.  The error rate now is down to below 8

9    percent, and that's total.  That's common errors and

10   critical errors.

11             We do a little finagling upstairs on

12   what -- you know, we consider a common error is an

13   error in the data base entry, but it doesn't affect a

14   look up, it wouldn't hurt an agent who doesn't

15   really have any damage.

16             A critical error is one where the

17   gentleman's name is spelled wrong.  Those error rates

18   are probably below 3 percent.  The total error rate's

19   about 8 percent.

20             We hope the QRT team has made sure that,

21   since a year ago, all the entries that go in are

22   absolutely 100 percent accurate.

20

1          The only way we can go back, we have a

2    project -- we established a project, we established a

3    task force.  We haven't begun yet because we haven't

4    converted to the new data base.  As soon as the new

5    data base comes into effect, we'll begin the task

6    force assignment.

7          What we're going to do is we're going to go

8    back, starting with the latest entry and working back

9    to the oldest entry and review every hard copy of

10   every document with its entry into the data base to

11   see if it's correct.  I think originally we figured

12   this would take 751 man days to do this with five

13   people sitting at a computer eight hours a day.

14         But it's the only way that we can feel that

15   we can ever get it completely accurate.  It was fine

16   to begin putting everything in accurate a year ago or

17   at least be guaranteed a year ago it was accurate,

18   but what are you going to do with the entries that go

19   back to the early '80s and the '70s and the '60s?

20         This is the only way we feel we could

21   correct it.  No one in ISD or no one that I've known

22   has come up with a program that we can use.  This new

FRIEDL    191

Exhibit A, Pg. 590

21

1    data base will help us.  And the reason why we're

2    waiting is because the new data base will put fields

3    and menus in there.  I believe it comes from

4    Ed Owens' shop, or maybe it's Jerry out at Tracing

5    Center, has ownership of the data base dealing with

6    the weapons data base.

7              Once that goes in, if we have an MP5 in

8    there that's listed as an MP5, this will correct that

9    to bring it -- to correct it as an MP5.  But you

10   can't do anything -- there's no data base, that I

11   know of, or no program, to correct misspellings of

12   names.

13             We will have an address.  We were supposed

14   to have an address correction, zip code in the data

15   base, but we'll see when it finally gets converted

16   over.  I'm not sure.

17             And the third thing we do is for field

18   inspectors who do regualatory compliance inspections,

19   They call into us to get an inventory from us of

20   Title 2 weapons.  We send the inventory out.  They do

21   the physical inventory, and we make adjustments to

22   settle any problems between the physical inventory

**Exhibit A, Pg. 591**

194

22

1    and the written inventory.

2            That's really the end of my presentation.

3    I wanted to concentrate on those three areas.  I

4    wanted to leave time for Q and As, because I figured

5    there might be some Q and As on the look up.

6            (Pause.)

7            No questions.  Okay.  Thank you very much.

8            (End of requested excerpt.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

(24)

FRIEDLY

195

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        NEWPORT NEWS DIVISION

 3

 4     - - - - - - - - - - - - - -

 5     UNITED STATES OF AMERICA      : Criminal No. 4:95cr54

 6     VS.                           : Newport News, Virginia

 7     JOHN DANIEL LEASURE,          : May 21, 1996

 8     - - - - - - - - - - - - - -

 9                    TRANSCRIPT OF PROCEEDINGS

10          BEFORE THE HONORABLE JOHN A. MACKENZIE

11               UNITED STATES DISTRICT JUDGE

12

13     APPEARANCES:

14     For the United States:   United States Attorney's Office
                                World Trade Center
15                              101 W. Main Street, Suite 8000
                                Norfolk, Virginia  23510
16                              By:  ARENDA WRIGHT ALLEN,
                                     ASSISTANT U.S. ATTORNEY
17
       For the Defendant:       DAVID N. MONTAGUE, ESQUIRE
18                              One East Queen's Way, 2nd Fl.
                                Hampton, Virginia  23669
19
       Court Reporter:          Diane Poulin
20                              550 East Main St., Suite 100
                                Norfolk, Virginia  23510
21

22
       Proceedings recorded by mechanical stenography,
23     transcript produced by computer.

24                           COPY

25
```

**Exhibit A, Pg. 593**

196

2

```
 1                    I N D E X

 2

 3              GOVERNMENT'S EVIDENCE

 4

 5   GARY SCHAIBLE

 6   Direct Examination by Ms. Allen  . . . . . .   23

 7   Cross-Examination by Mr. Montague  . . . . .   32

 8

 9              DEFENDANT'S EVIDENCE

10

11   LEWIS JONES, III

12   Direct Examination by Mr. Montague . . . . .   48

13

14   JOHN D. LEASURE

15   Direct Examination by Mr. Montague . . . . .   53

16

17   CHERYL LEASURE

18   Direct Examination by Mr. Montague . . . . .   59

19

20

21

22

23

24

25
```

**Exhibit A, Pg. 594**

```
 1        THE COURT:  All right.
 2        MADAM CLERK:  Criminal Number 95-54-NN United
 3   States of America versus John Daniel Leasure.
 4        Is the government ready to proceed, Ms. Allen?
 5        MS. ALLEN:  Yes, Your Honor.
 6        MADAM CLERK:  Defense ready, Mr. Montague?
 7        MR. MONTAGUE:  Yes, ma'am.
 8        THE COURT:  Let me make some notes and I'll be
 9   right with you.  Let the record reflect that the
10   defendant, John Daniel Leasure, is present in person and
11   with his attorney, Mr. David Montague.  And the file
12   would reflect that pursuant to an indictment returned in
13   the fall of 1995, this matter came on early in January,
14   as I recall, for trial on the defendant's pleas of not
15   guilty.
16        He was arraigned on January the 18th and, let me
17   get the date straight, he was indicted on November the
18   14th.  It came on for trial on the 18th and 19th of
19   January, and on January the 19th, the Court found --
20   continued the matter to look over the record, and on
21   February the 6th, the Court announced it's verdict that
22   he was guilty of Count 1, Count 2, Count 3, Count 6 and
23   not guilty of Counts 4 and 5.
24        Thereafter, Mr. Leasure through his attorney filed
25   several motions.  The matter was then continued for
```

Exhibit A, Pg. 595

4

1    sentencing and for the receipt of a presentence report.
2    In the meantime the defendant has filed a motion for a
3    new trial and the matter is here on that motion as
4    supplemented and also for a review of the presentence
5    report at the sentencing. I haven't really set motions
6    as to the proceeding but, Mr. Montague, I assume that
7    your motion for a new trial would be foremost, and I'll
8    be glad to hear you with regard to that. Of course, I
9    have your brief and matters filed in connection with
10   that and have reviewed them in detail.

11       MR. MONTAGUE: I'm not going to read them to you,
12   Your Honor. I'm sure that you're well familiar with
13   them. One of the fundamental requirements on the
14   Government in any criminal prosecution is to make known
15   any exculpatory evidence of which the Government
16   reasonably knows.

17       In this case -- let me go back to the beginning.
18   The thing that has troubled me about this case all along
19   is that this is in that set of Federal statutes – and I
20   say Federal because I don't know of any state statutes
21   like this – where there is no requirement of scienter or
22   mens rea or moral turpitude in order to hold a person
23   guilty of a felony even though he be an honorable and
24   law abiding citizen like this defendant simply making
25   good faith mistakes that the law requires or having rule

5

1    changes that he doesn't know about convert him --

2    criminalize what is otherwise innocuous and nondangerous

3    conduct, serious criminal acts.

4        These felonies all carry ten-year sentences

5    potentially and $250,000 fines. The Court relied in its

6    conviction on the case of U.S. v. Freed, which is at 401

7    U.S. 601, a 1971 case but the holding of that case that

8    no specific intent need be proved has been called into

9    very serious question and I think overruled by the case

10    of Staples against U.S. and that was decided by the

11    Supreme Court in 1994 in a decision by Justice Thomas.

12    We've recited that decision to Your Honor in our

13    materials that we filed.

14        Freed involved a gentleman who was in possession of

15    hand grenades, and his defense essentially was that he

16    didn't know that there was anything wrong with that.

17    And the Court believed that inherently there was

18    something wrong with that and that there was no way he

19    would have been surprised if he had learned that, in

20    fact, a private citizen is not supposed to possess hand

21    grenades.

22        The Staples case involved a man who owned an AK-15

23    which is a gun that can be converted. It is normally a

24    semi-automatic weapon that requires the pull of a

25    trigger to fire each round but can be converted into an

6

1   automatic firearm and, hence, be a machine-gun within
2   the meaning of the NFA.  And he contended that he did
3   not know that was a capability of the weapon.

4        The Court refused to so instruct the jury that he
5   didn't -- that they could consider that and so the
6   Supreme Court reversed and did so specifically saying
7   that the reasoning U.S. v. Freed provided little support
8   for dispensing with mens rea in this case, that case
9   involving the gentleman with the AR-15.

10       This case is not like that.  In this case we have a
11  highly sophisticated gun person, a federal licensee
12  licensed as a manufacturer who, as the Court knows from
13  material previously submitted, is highly regarded in his
14  field, holds one of the top patents in the development
15  of silencer or suppressor technology.  Early on at the
16  arraignment, which I think the Court didn't mention the
17  date, I believe it was January the 5th -- I think it was
18  in December actually.  Yes, it was December 5th.

19       THE COURT:  My records indicate it was --

20       MS. ALLEN:  It was December 1st.

21       THE COURT:  December 1st, okay.

22       MR. MONTAGUE:  This defendant was arraigned before
23  Judge Bradberry, and at that time Miss Allen was not
24  available but there was somebody there from the BATF and
25  there was somebody there from the U.S. Attorney's

1  Office.  I turned over to them copies of all of the
2  documents that became the evidence in this case of
3  Mr. Leasure's attempts to reverse certain transfers of
4  the weapons for which he was indicted.

5      And I, frankly, thought that that was going to be
6  the end of the case.  And I think Miss Allen thought it
7  might be as well but she said that -- she said when I
8  talked to her on the phone she said she sent everything
9  up to Washington to be analyzed and she'd let me know.
10  So not too long before Christmas she called me and said
11  that, in fact, the ATF decided they still had a case.  I
12  asked her what it could possibly be but she said, well,
13  she wasn't going to tell me or she said she wasn't going
14  to discuss her case over the phone.  There was no
15  invitation to come and discuss it in person either.

16      What she knew and what the ATF knew was that -- as
17  we did not learn until we heard it on the stand -- was
18  that Mr. Schaible of the ATF would inform us that they
19  had changed their rules on how one went about reversing
20  a transfer or voiding under the commission of the NFA
21  and that the procedure followed by Mr. Leasure was the
22  procedure that had existed as far as he knew forever.
23  And Mr. Schaible said that had they gotten the transfer
24  request or the voiding request from him.  The new
25  procedure involved sending back a form which he had to

**Exhibit A, Pg. 599**

8

1   fill out and it had to go back to Washington to be
2   approved.

3       And Mr. Schaible also said there's no way that
4   Mr. Leasure could have known that because they didn't
5   notify anybody in the field, it was just something to be
6   learned on a case by case basis as you tried the old
7   technique, I suppose, they would tell you what the new
8   procedure was.

9       Well, not knowing that, we were not prepared to
10  prove to the Court that, in fact, all of these transfer
11  voidings had been faxed to the Government in the usual
12  manner. We would have and have subsequently found all
13  of the forgotten phone records that show without a doubt
14  that for 24 minutes on the 16th day of March,
15  Mr. Leasure faxed from his fax machine in Saluda to the
16  fax machine of the ATF at their weapons registry 24
17  minutes worth of documents that were these very
18  transfers submitted in court.

19      It wouldn't show up on the phone bill if they had
20  not actually been received just like an incomplete phone
21  call doesn't show up on a phone bill, so there's no
22  question that he sent them. There's no question that
23  they got them. We don't know what they did with them
24  after they got them if they put them in the shredder or
25  in the trash can or if the building burned down.

Exhibit A, Pg. 600

9

1     We don't know what happened but all we do know is
2     that when Mr. Schaible showed up here to testify, he
3     said we have no record of having received them, which is
4     not the equivalent of not having received them just that
5     he was unable to tell us what had happened.  We
6     certainly did our part or at least what Mr. Leasure
7     thought was his part in following what he then knew to
8     be the procedure.

9     The Court's decision turned not only on the Freed
10    case but also on the exhibits put in evidence by the
11    Government, these things in blue bags with the little
12    ribbons on them that said that the weapons in the
13    various counts of the indictment were not properly
14    registered with the NFA.  The Court treated that as
15    true, as anybody would a government agent's testimony
16    and exhibits, obviously, is going to be taken as true
17    without some kind of very powerful evidence to the
18    contrary.

19    But what the ATF also then knew and didn't tell
20    anybody was that at the time in question of this case,
21    which is February of '94, the Court will recall that
22    this -- the actual bust of Mr. Leasure's place of
23    business and trial were about two years apart and in
24    that two-year period, the firearms registry was taken
25    over by a gentleman by the name of Thomas Busey or Busey

1    - I'm not sure how you pronounce his name - and
2    Mr. Busey held a briefing in October of '95 saying that
3    when he took over a year before, which would have been
4    October of '94 and times prior to that, the agency was
5    suffering from a 50 percent error rate in its
6    determination of what firearms were registered properly.
7        He said on Page 19 of the transcript that we gave
8    the Court, "When I first came in a year ago, our error
9    rate was between 49 and 50 percent." This particular
10   briefing was conducted on a tape and the gentleman who
11   I've become acquainted with since the trial through the
12   Freedom of Information Act has also tried to get the
13   tape, so far has not been able to do that. But in any
14   event, at the very time when these undoubtable documents
15   were being produced in February '94, they were subject
16   to a 50 percent error rate.
17       Now, I don't know when knowledge like that becomes
18   reasonable doubt as a matter of law, but it seems to me
19   that with 50 percent, you've got an equal chance of the
20   Government being wrong. I would think you're there at
21   an error rate of 50 percent.
22       Again, we were not told that. As a matter of fact,
23   I'm informed that the ATF tried to suppress that
24   particular briefing, tried to have the transcript and
25   the tape destroyed. It was not until March that they

Exhibit A, Pg. 602

1   were produced under the Freedom of Information Act.  Of
2   course, our trial was long over by the time that
3   information would have done us any good.

4       It certainly seems to me something for the Court to
5   consider in deciding whether or not this case needs to
6   be retried, that kind of what I would consider dynamite
7   evidence should have been made available to us.
8   Certainly, the ATF knew about it and whether Miss Allen
9   did or not I don't know.

10      But when I filed my letter -- when I supplemented
11  my pleadings in the new trial part of this case on March
12  the 25th, we sent that to Miss Allen by certified mail.
13  She received it on the 26th, and on the 26th she filed
14  part of the same transcript by Mr. Busey but her filing
15  left off the important pages for some reason.  Whether
16  she knew that or whether that's what the ATF gave her, I
17  don't know but I believe her transmission quit on Page
18  15 and all of the important stuff is after that.

19      And her pleadings says that we're not conceding
20  that we had to give that to us but they did anyway.  So
21  I'm not going to say there's anything monstrous or
22  wicked going on here but it certainly appears to me that
23  this defendant was entitled to better treatment by his
24  Government than he has gotten in the prosecution of this
25  case.  Essentially, I believe that covers it, Your

1    Honor.

2         THE COURT:  All right, sir.

3         MS. ALLEN:  Your Honor, if I can I'd like to go in

4    the order that the motions are filed just for the record

5    since I suspect this will go for appeal.  The first

6    motion that the defendant filed was a motion for a new

7    trial, and he filed that motion right after the Court

8    found his client guilty.  I would just like to argue in

9    the first motion, Your Honor, that counsel is correct

10   that on the day of the arraignment, the Jencks material

11   and the discovery materials were provided to the

12   defendant on December 1st of 1995.  The discovery

13   materials included Government Exhibits 7-1 through 7-5.

14        Now, those are all the certified copies of

15   nonregistration.  And the Court will recall 7-1 went to

16   Count 2 of the indictment; 7-2 went to Count 3 of the

17   indictment; 7-3 went to Count 4 of the indictment; 7-4

18   went to Count 5 of the indictment; 7-5 went to Count 6

19   of the indictment.

20        I was not present at that arraignment.  Bob

21   Bradenham was present with ATF Agent Joe Perkins.  The

22   evidence was turned over by the Government.  It is true

23   that I did subsequently receive a packet from

24   Mr. Leasure's attorney regarding documentation.

25        I had previously spoken to Mr. Montague prior to

1    the December 1st arraignment.  Once the indictment had
2    been filed by the Grand Jury, Mr. Montague did tell me
3    that he had paperwork that would cause the Government to
4    dismiss its case.  I told Mr. Montague that I would not
5    be present at the December 1st arraignment but that I
6    would have all of the evidence there for him.  I asked
7    him to bring the documentation to the arraignment, that
8    I was unfamiliar with the documents that he was
9    describing to me over the telephone but that I would
10   take it and send it to my expert in D.C. and get back to
11   him on that.

12        The documentation that I did receive after the
13   December 1st, 1995, arraignment was, in fact, what is
14   now Defense Exhibit 1-8 through Defense Exhibit -- I
15   mean, Defense Exhibit 1-8 through Defense Exhibit 10-18.
16   I received those materials probably in mid December
17   right before Christmas.

18        I forwarded those materials to Mr. Schaible.  I
19   asked him to review those materials in their entirety
20   and compare it with all of the certificates that he had
21   previously provided as listed in 7-1 through 7-5 and to
22   let me know if that changed his opinion.

23        It was in early January right after New Years that
24   I spoke with Mr. Schaible and my question to him was
25   solely, does this change your opinion.  His response to

Exhibit A, Pg. 605

1    me was no. I said thank you very much, called
2    Mr. Montague and told Mr. Montague that it did not
3    change the opinion of our expert and we were not
4    dismissing the indictment, but I did say I was not
5    trying the case on file. I had no further discussions
6    with Mr. Schaible regarding why it did not change his
7    opinion.

8        If we look at -- if the Court looks at the
9    defendant's first motion for a new trial, I think the
10   case law that they've cited and the case law that the
11   Government's filed shows that on the first motion alone,
12   which the defendant has titled motion for a new trial,
13   should be denied.

14       The Court is well aware that the defendant has to
15   show that the evidence that he is seeking is favorable
16   to him, that it's material, and that the prosecution
17   failed to disclose that. Based on the evidence
18   presented before the Court right now, all that the Court
19   has is the fact that documents were exchanged by the
20   parties and the Government decided based upon
21   Mr. Schaible's opinion that the indictment would not be
22   dismissed.

23       The case law that the Government is relying upon,
24   number one, is that the Government feels that the
25   defendant can't meet its burden and is relying on the

Exhibit A, Pg. 606

15.

1    first motion to show that the evidence was favorable.

2    There's been no evidence presented by the defendant that

3    shows there was any discussion by Mr. Schaible or myself

4    regarding any favorable evidence that the defendant had

5    requested.

6        As I'm proffering to the Court as an officer of

7    this Court, my contact with Mr. Schaible was very short.

8    I wanted to know if it changed his opinion.  He's the

9    expert.  He said no.  I didn't need to know at that time

10   why it didn't change his opinion.

11       Additionally, the defendant must show that its

12   material, that being the evidence that he's requested.

13   And the Fourth Circuit has defined material as being a

14   reasonable probability that had the evidence been

15   disclosed to the defense, the result of the proceeding

16   would be different.  That's a Kelly decision, Fourth

17   Circuit 1994 decision, which is at 35 F.3d 929.

18       Additionally, Your Honor, the defendant not only

19   has to show that its material but that it's related to

20   guilt or innocence, and I don't think that the defendant

21   has done that.  There's three cases that the Government

22   cited in its brief all of which deal with exculpatory

23   matters versus inculpatory matters.

24       To be quite candid with you, I thought that the

25   documents were a forgery or false.  Mr. Schaible did not

```
 1    tell me that.  I asked someone who's been with the ATF
 2    for 25 years who's in a high leadership position within
 3    the ATF and very well respected within the bureau, he
 4    told me it didn't change his opinion.  That's all I
 5    needed to know.  I cited the Adverse case --
 6         THE COURT:  Well, tell me -- I don't have the
 7    exhibits right here before me.  What was it that
 8    Mr. Montague produced that you sent to Mr. Schaible,
 9    just so I won't be off on the wrong fork in the road?
10         MS. ALLEN:  It was Defense Exhibit 1 -- Defense
11    Exhibit 1-8 --
12       - THE COURT:  Young lady, do you have the exhibits?
13         MADAM CLERK:  No, sir.  Did they not go with you to
14    the file?  I'll get them.
15         THE COURT:  We didn't have any exhibits, did we?
16         LAW CLERK:  We did at one point.  I don't know.
17         THE COURT:  Well, tell me was it Exhibit 18, is
18    that --
19         MS. ALLEN:  There's a whole bunch of exhibits and
20    they're listed Defense Exhibit 1, Defense Exhibit 2,
21    Defense Exhibit 3, Defense Exhibit 4, Defense Exhibit 5,
22    Defense Exhibit 6, Defense Exhibit 7, Defense Exhibit 8,
23    and then the additional documents were Defense Exhibits
24    10 through 18.
25         MADAM CLERK:  I have the clerk checking on it,
```

Exhibit A, Pg. 608

17

1   Judge.

2       MS. ALLEN:   Some of those documents have void

3   written on them.   Some of them are --

4       THE COURT:   I remember now what you're talking

5   about.

6       MS. ALLEN:   Not all of them had void written on

7   them.   Some of them had void written on them, some of

8   them Agent -- I mean, Mr. Schaible testified that --

9       THE COURT:   These were all of the transfers to

10  Mr. O'Quinn then it became unnecessary for Mr. Leasure's

11  purposes and were marked void across the front and the

12  question is whether these were ever sent, one, whether

13  they were marked void, two, and, three, did they ever

14  arrive at the -- were they ever received by ATF.

15      MS. ALLEN:   That's correct, Your Honor.

16      THE COURT:   What else?

17      MS. ALLEN:   That's all that I forwarded to

18  Mr. Schaible.

19      THE COURT:   All right.   Go ahead.

20      MS. ALLEN:   And what the Court also needs to know

21  is that all of those documents dealt with all of the

22  counts other than Count 1 of the indictment.   Your

23  Honor, the Government's position is still that all of

24  those exhibits, Defense Exhibits 1 through 8 and Defense

25  Exhibits 10 through 18 are not exculpatory matters.   I

1    think it was an attempt to perpetrate a fraud on the
2    Court, to be quite candid with you.

3        And in the three cases that I cited in my brief,
4    the Adverse case, the Jones v. Washington case and the
5    Barker case tells the Court that the Government is under
6    no duty to either disclose all they know about their
7    case or disclose the police investigation that's been
8    done on the case or to disclose anything that's not
9    exculpatory and that's what we did.

10       There was one case of Jones v. Washington case a
11   Seventh Circuit case that dealt with firearms and the
12   cite for that is 15 F.3d, 671.  It was denied at 114
13   Supreme Court 2753 and the Court said that there was no
14   great violation in failing to disclose the firearms work
15   sheet because the evidence wasn't exculpatory.

16       That's one of the only three cases that deal with
17   firearms but, again, we didn't think the evidence that
18   the defense was providing to us was truthful evidence;
19   we thought it was an attempt to perpetrate a fraud on
20   the Court.  For that reason on the first defendant's
21   motion for a new trial, we'd ask the Court to deny that
22   motion.

23       The defendant then filed a second motion to dismiss
24   only Count 6 of the indictment, and in that case, Your
25   Honor, the defendant's alleging basically that since the

**Exhibit A, Pg. 610**

1   word "firearm" was not used in the count as opposed to

2   "weapon" that that count should be dismissed.   The

3   Government's relying on Federal Rule of Criminal

4   Procedure 7-C-1 that tells us what the indictment shall

5   state.

6         The Fourth Circuit law tells us that you're to look

7   at the elements of the offense as it's listed in the

8   statute.   The Court is to look to see whether or not the

9   defendant can prepare a defense to the charge and

10  whether or not that defendant is protected against

11  double jeopardy if, in fact, that same defendant is

12  subsequently charged and that's the Daniels case, Fourth

13  Circuit 1992 case.

14        If you look at Count 6 of the indictment, it

15  charges that the defendant knowingly and unlawfully

16  possessed a weapon, number one, and, number two, that it

17  was not registered.   Title 26 United States Code Section

18  5845-B defines weapon and Title 18 USC Code Section

19  92183 defines firearms.   And if you look at both of

20  those definitions, definition number one is listed in

21  Count 6 and number two very similar.   In Title 26 United

22  States Code 5861-D makes it unlawful to possess a

23  firearm which is not registered.

24        If you pulled the elements out of Count 6 and if

25  you look at the statute, the penal statute not the

**Exhibit A, Pg. 611**

20

1    definitional statute but the penal statute for which

2    he's charged, you will see that Count 6 is in compliance

3    with the penal statute in the Freed case, which lists

4    the three elements that the Government has to prove

5    beyond a reasonable doubt and, that is, possession, that

6    they are firearms, and that they were not registered.

7        The defendant also says that Count 6 does not use

8    the word "firearm" but instead uses the word "weapon."

9    The Government's position would be weapon and firearm

10   are words of similar import. Weapon is specific enough

11   in the count to allow the defendant to know what

12   specific firearm he was charged with possessing and not

13   having properly registered to him, that Count 6 allows

14   him to contest that charge properly, and that Count 6

15   will prevent him from being charged with possessing and

16   not having registered that same weapon that's charged in

17   Count 6 thereby protecting him from double jeopardy.

18       In Count 6 the Government refers to the definition

19   of both "weapon" and "firearm." Again, I said the

20   definitions are basically the same and then the

21   Government found some case law -- Supreme Court case law

22   and Fourth Circuit case law that says, plus, if the

23   defendant raises the issue to dismiss the count at the

24   return of the verdict that this Court as well as the

25   Fourth Circuit will look at the challenge to the count

Exhibit A, Pg. 612

1    under a more liberal standard, and that's the Fogle

2    decision which is at 901, F.2d 23, 1990 decision where a

3    cert was denied and the Court found the objection was

4    made at the return of the verdict.  Any review for

5    alleged defect was to be reviewed if at all under a

6    liberal standard and there's the Sutton case and the

7    Hooker case here.

8        In conclusion, Your Honor, it's very clear that

9    Count 6 described a very specific weapon whether it's a

10    weapon or a firearm, I think that's immaterial.  They're

11    words that are very similar as to import as the Court

12    said.  The weapon in Count 6 was seized pursuant to a

13    lawful search warrant and that was Government Exhibit

14    6-1 during the trial, the actual weapon.  Government

15    Exhibit 9-1 was the actual search warrant.

16        And Mr. Schaible testified that the weapon was not

17    properly registered to the defendant on February 8th,

18    1995, which was done by the certificate 7-4 and then in

19    Government Exhibit 8-1 which was the ATF report that we

20    introduced saying that the weapon functioned as

21    designed, and it's a firearm and a weapon, so we would

22    ask the Court to deny the defendant's motion to dismiss

23    Count 6 of the indictment for the reasons I've just

24    stated and the law.

25        THE COURT:  Thank you, Miss Allen.

**Exhibit A, Pg. 613**

| | |
|---|---|
| 1 | Mr. Montague, do you want to -- |
| 2 | MS. ALLEN: And then, Your Honor, I'd like to |
| 3 | address the Brady issue based on -- |
| 4 | THE COURT: What? |
| 5 | MS. ALLEN: I have one more issue I'd like to |
| 6 | address. |
| 7 | THE COURT: Now? |
| 8 | MS. ALLEN: Yes, sir. The last motion that |
| 9 | Mr. Montague filed was his supplemental motion for a new |
| 10 | trial. What I'd like to do for that, Your Honor, is to |
| 11 | put on evidence regarding that for the record to protect |
| 12 | the record and for that I'll be relying on Special Agent |
| 13 | Schaible. And the issue will be whether or not the |
| 14 | packet of material which I sent to the Court and sent to |
| 15 | Mr. Montague as soon as our office received it is, in |
| 16 | fact, Brady material and whether or not -- |
| 17 | THE COURT: Well, that's a choice for me to make. |
| 18 | MS. ALLEN: That's a choice for you to make, Your |
| 19 | Honor, but I would like -- I know the Court's gone |
| 20 | through it but I don't think the record is clear as to |
| 21 | what the documents are and what impact, if any, it would |
| 22 | have had on Mr. Schaible's testimony regarding the |
| 23 | weapons that were before the Court. |
| 24 | THE COURT: Well, bring him on. |
| 25 | MS. ALLEN: Okay. Thank you, Your Honor. |

**Exhibit A, Pg. 614**

23

```
1        GARY SCHAIBLE, a Witness, called on behalf of the
2   Government, having been first duly sworn, was examined
3   and testified as follows:
4                   DIRECT EXAMINATION
5   BY MS. ALLEN:
6        Q.  Please state your full name for the record.
7        A.  Gary Schaible.
8        Q.  And are you the same Gary Schaible that
9   testified before Judge MacKenzie during Mr. Leasure's
10  trial?
11       A.  Yes, I am.
12       THE COURT:  How do you spell Schaible, I don't have
13  it right here in front of me?
14       THE WITNESS:  S-c-h-a-i-b-l-e.
15       THE COURT:  Go ahead.
16  BY MS. ALLEN:
17       Q.  And, Mr. Schaible, I'm going to ask the court
18  security officer to give you what I've marked as
19  Government Exhibit 10-1 through 10-8 and also a copy for
20  the Court and a copy of these documents have already
21  been provided to Mr. Montague for Mr. Leasure's benefit.
22       Mr. Schaible, if you would, I'd ask you to first
23  look at Government Exhibit 10-1 and I believe that's
24  entitled The Role Call Training.  Do you have that
25  document there?
```

**Exhibit A, Pg. 615**

24

```
1        A.  Yes, I do.
2        Q.  Okay.  And are you familiar with that document?
3        A.  Yes, I am.
4        Q.  And have you seen it before?
5        A.  Yes, I have.
6        Q.  And have you read it from top to bottom?
7        A.  Yes, I have.
8        Q.  And if you could now look at Government Exhibit
9    10-2 and I believe that's entitled --
10        THE COURT:  Well, let's label that.  Is 10-1 the
11   Busey --
12        MS. ALLEN:  That's correct, the Role Call Training
13   of Mr. Busey.
14        THE COURT:  Busey's statement.  All right.  Go
15   ahead.  10 dash what?
16        MS. ALLEN:  That was 10-1, Your Honor, the next one
17   is Government Exhibit --
18        THE COURT:  All right.  We've got that.  Next.
19   BY MS. ALLEN:
20        Q.  10-2.  And, Mr. Schaible, I believe that is
21   entitled Memorandum, dated December 1st, 1995.
22        A.  10-2 is the statement.
23        Q.  Oh, I'm sorry.  10-2 -- you're right.  10-2 is
24   the handwritten sworn statement of Tom Busey dated
25   November 30th, 1995; is that correct?
```

25

```
 1        A.  Yes, it is.

 2        Q.  Okay.  And if you could look at Government

 3   Exhibit 10-3.

 4        A.  I have it.

 5        Q.  And I believe that you have there a memorandum

 6   dated December 1st, 1995, and a memorandum dated

 7   December 11th, 1995, and an incident report concerning

 8   the ATF internal investigation of Mr. Busey's statement;

 9   is that correct?

10        A.  Yes, it is.

11        Q.  And if you can look at Government Exhibit 10-4,

12   I believe that those are minutes of a meeting held on

13   November 9 through 10, 1994, to address firearms and

14   explosives date of integration; is that correct?

15        A.  Yes.

16        Q.  And if you could look at Government Exhibit

17   10-5, I believe that's a memo dated February 9th, 1996,

18   and supporting material constituting the report of the

19   recent audit of the NFA data base; is that correct?

20        A.  Yes, it is.

21        Q.  And if you can look at Government Exhibit 10-6,

22   I believe that's a memo dated April 30th, 1991,

23   concerning the accuracy of the NFRTR; is that correct?

24        A.  Yes, it is.

25        Q.  And Government Exhibit 10-7 is a memo -- a
```

**Exhibit A, Pg. 617**

1   correspondence, excuse me, between Senators McClure,

2   M-c-C-l-u-r-e, and Senator Bayh, B-a-y-h dated from

3   December 1979 through January 1980 relative to the

4   accuracy of the NFRTR, correct?

5       A.  Okay.  The first letter is October 15th, 1979,

6   actually.

7       Q.  Okay.

8       A.  And there's -- I can't read the date on the

9   last one, it says January 1980 but I can't read the

10  actual date.

11      Q.  Okay.  And then Government Exhibit 10-8, the

12  last exhibit that's there, it's a two-page affidavit of

13  Gary Schaible dated February 13th, 1996.

14      A.  Correct, yes.

15      Q.  And, Mr. Schaible, is it fair that you have

16  familiarized yourself with the total contents of

17  Government Exhibits 10-1 through 10-8?

18      A.  Yes.

19      Q.  The first question I have for you, sir, is this

20  the first time in preparation for this hearing today

21  that you have reviewed those materials that are before

22  you?

23      A.  No.

24      Q.  When did you first review that packet that's in

25  total there before you, what month and year?

27

```
 1          A.   It was in late February 1996 for the total
 2    packet.
 3          Q.   And do you know the facts and circumstances as
 4    to how you got possession of that packet generally?
 5          A.   Yes, I received a copy of what the U.S.
 6    Attorneys's Office sent out, I mean, Justice sent out to
 7    the U.S. Attorney's Office.
 8          Q.   Okay.  And is it fair to say that that packet
 9    of information specifically Government Exhibit 10-2
10    through 10-8, was the result of an internal audit that
11    was done after Mr. Busey made his statements which are
12    in Government Exhibit 10-1?
13          A.   Yes.
14          Q.   Is it also fair to say, sir, based upon your
15    knowledge of the exhibits here that Government Exhibit
16    10-1 through 10-8 once they were compiled by the
17    internal audit were subsequently sent by DOJ to the
18    respective U.S. Attorney's Offices across the country?
19          A.   Yes.
20          Q.   And is it also fair to say, sir, that in late
21    February or early March once I received this packet, I
22    called you and asked you if you knew about the packet?
23          A.   Yes, you did.
24          THE COURT:  Well, whether you knew about it or not,
25    obviously, the Department of Justice knew about all of
```

28

1   this material, Mr. Schaible.

2          THE WITNESS: At what time, sir?

3          THE COURT: Well, from -- the letter of the Role

4   Call Training Statement was 10-2 was a statement gotten

5   from Mr. Busey on December the 1st, 1995, so they knew

6   about it at that time, the problem had arisen by virtue

7   of his statement.

8          THE WITNESS: Yes.

9          THE COURT: All right.

10  BY MS. ALLEN:

11         Q.  Agent Schaible, you are a part of this packet

12  that's been sent out across the country in Government

13  Exhibit 10-8.  Why were you asked to submit that

14  affidavit and what, in essence, was the gist of your

15  affidavit?

16         A.  I was asked to submit it because I was

17  basically the senior person in the NFA Branch, had been

18  around the longest, and was more familiar with the

19  procedures and operations of the branch.  The gist of it

20  was that what Mr. Busey had said was, you know,

21  exaggerating the situation, you know, that the problems

22  that he said were there weren't there.

23         Q.  And who was it that asked you to review these

24  materials and submit your affidavit?

25         A.  Our office of chief counsel.

**Exhibit A, Pg. 620**

29

```
 1        Q.  So would it be your testimony that that packet
 2   as has been provided to the Court and to Mr. Montague
 3   was not in existence when you testified during
 4   Mr. Leasure's trial?
 5        A.  No, it wasn't.
 6        THE COURT:  Say that again.  Did you say that this
 7   material wasn't available before Mr. Leasure's trial
 8   which was in --
 9        MS. ALLEN:  January.
10        THE COURT:  January 18th and 19th but the
11   Department of Justice had it, Mr. Schaible?
12        THE WITNESS:  Well, yeah.  The packet -- the total
13   packet wasn't in existence.  There were bits and pieces,
14   yes, but it hadn't been put together.  They were still
15   looking at -- seeing what exactly the import of this
16   was.
17   BY MS. ALLEN:
18        Q.  Now, when you testified during the trial, your
19   testimony dealt with Counts 2 through 6 of the
20   indictment, is that true?
21        A.  Yes.
22        Q.  And when you testified regarding Count 2 of the
23   indictment, you also testified regarding Government
24   Exhibit 7-1 which is the certificate of nonregistration
25   regarding the weapons, is that true?
```

47-740 98 - 8

**Exhibit A, Pg. 621**

224

30

1      A.  Yes.

2      Q.  Is there anything based on your review of the

3  evidence that's in Government Exhibit 10-1 through 10-8

4  that would cause you to change your testimony regarding

5  the fact that the silencers listed in Count 2 were not

6  properly registered to Mr. Leasure?

7      A.  No, it wouldn't change my opinion.

8      Q.  Is there any -- I believe during the trial you

9  also testified regarding Count 3 of the indictment in

10  Government Exhibit 7-2 the certificate that goes with

11  that; is that correct?

12      A.  Yes.

13      Q.  Is there anything in your review of Government

14  Exhibit 10-1 through 10-8 that would cause you to change

15  anything that you testified to during Mr. Leasure's

16  trial regarding Count 3 in Government Exhibit 7-2?

17      A.  No.

18      Q.  And, lastly, Count 6 of the indictment and the

19  corresponding Government Exhibit 7-5, is there anything

20  in your review of the exhibits in the 10 series that

21  would change your testimony regarding Count 6 of

22  Government Exhibit 7-5?

23      A.  No.

24      Q.  Is there anything that you have seen either in

25  Mr. Busey's statements or in Government Exhibit 10-1 --

**Exhibit A, Pg. 622**

31

```
 1        MR. MONTAGUE:   That's leading, Your Honor, I
 2   object.
 3        THE COURT:   Go on and ask the questions proper.
 4   BY MS. ALLEN:
 5        Q.  Mr. Schaible, is there anything in the
 6   Government's 10-1 through 10-8 series that you would
 7   consider material, important information that you needed
 8   in order to do your certificates that were in the
 9   Government 7 series?
10        A.  No.
11        Q.  All right.  Mr. Schaible, I'm now going to ask
12   you to look at Government Exhibit 11-1 which I'm handing
13   to the court security officer.
14        THE COURT:   What is 11-1 in view of the fact that I
15   must have left that packet on my desk?
16   BY MS. ALLEN:
17        Q.  Is that entitled telephone records of
18   Mr. Leasure, Sprint Services Account regarding activity
19   taking place on March 16, 1993?
20        A.  Yes, well, it says DIW Advantage Quality
21   Account, which I guess is what I think you're saying
22   there.
23        Q.  Okay.  And have you seen that document before?
24        A.  Yes, I have.
25        Q.  And I believe that counsel referred to the fact
```

```
1    that that document shows that on March 16, 1993,

2    there are two faxed times totaling 24 minutes where

3    documents were sent to the BATF; is that correct?

4         A.  Yes, it is.

5         Q.  Okay.  And based on that document there, is

6    there anything that that document tells you that would

7    cause you to change any of your testimony regarding

8    Counts 2, 3, or 6 of the indictment?

9         A.  No.

10        Q.  Does that document there tell you what

11   documents were faxed if at all to the BATF?

12        A.  No, it doesn't.

13        MS. ALLEN:  Your Honor, I'd move for the admission

14   of Government Exhibits 10-1 through 10-8 and Government

15   Exhibit 11-1.

16        THE COURT:  To be received.

17        MS. ALLEN:  Your Honor, that's all the questions I

18   have regarding this issue.

19        THE COURT:  Cross-examine.

20                    CROSS-EXAMINATION

21   BY MR. MONTAGUE:

22        Q.  I said Busey, how does the man pronounce his

23   name?  I hate people who mispronounce names.  I've had

24   mine mispronounced all my life, you probably have too.

25        A.  Yes.  It's Busey.
```

1          Q.  Busey with a long U, all right, thank you.

2    Now, at the time of this extraordinary Role Call

3    Statement by Mr. Busey, he was then the chief of the NFA

4    Branch?

5          A.  Yes, he was.

6          Q.  He was the top man in that part of your

7    organization?

8          A.  Yes.

9          THE COURT:  Chief of what, you say?

10         THE WITNESS:  The NFA Branch, National Firearms

11   Branch.

12         THE COURT:  The National -- NAF --

13         THE WITNESS:  NFA.

14         THE COURT:  Excuse me, National Firearms Branch,

15   what is that?

16         THE WITNESS:  We're the ones who maintain the

17   registration records and transfers.

18         THE COURT:  He was the chief of the National

19   Firearms --

20         THE WITNESS:  Branch, yes, sir.

21         THE COURT:  Registration branch.

22         THE WITNESS:  Yes.

23         THE COURT:  Go ahead.

24   BY MR. MONTAGUE:

25         Q.  And after he made that statement, what happened

Exhibit A, Pg. 625

34

```
1    to Mr. Busey?  Did he get fired or transferred?

2         A.  He requested reassignment to another position

3    in January.

4         Q.  Was that a coerced request as far as you know,

5    Mr. Schaible?

6         A.  No, he went down and asked for it or I should

7    say up.

8         Q.  Well, there was considerable hullabaloo around

9    the agency, was there not --

10        A.  Yes.

11        Q.  -- having the chief in charge of the

12   registration of firearms saying there was a 50 percent

13   error?

14        A.  Yes.

15        Q.  You say that that testimony is not correct?

16        A.  Well, the 50 percent error rate I said that we

17   have no idea how it was determined.

18        Q.  Weren't you working on it?

19        A.  No.

20        Q.  You were the senior man in the branch and you

21   weren't working on it?

22        A.  No, I didn't.

23        Q.  Did you check on how it was arrived at?  Did

24   you talk to the people who were involved?

25        A.  It was done at the request of our former
```

**Exhibit A, Pg. 626**

35

```
 1  | division chief.  He said that he did not know exactly
 2  | what was done to come up with this although he had the
 3  | figures himself.
 4  |      Q.  But whether it was right or wrong, you
 5  | instituted a number of changes in the way you did that
 6  | part of your business, didn't you?
 7  |      A.  Yes.
 8  |      Q.  That also appears in your affidavit.
 9  |      A.  Yes.
10  |      Q.  Now, when Ms. Allen sent me her copy of
11  | Mr. Busey's statement, the Role Call transcript, do you
12  | have any idea why she only sent the first 15 pages
13  | instead of the whole 22 pages?
14  |      A.  No, I don't.
15  |      Q.  Did you have anything to do with furnishing her
16  | with that transcript?
17  |      A.  No, sir, I didn't.
18  |      Q.  Do you know who did?
19  |      A.  Came out of main Justice, that's my
20  | understanding.
21  |      Q.  Came out of the justice department?
22  |      A.  Yes.
23  |      Q.  I'm not sure about the organic structure; do
24  | you have people in the Justice Department assigned to
25  | the ATF as your lawyers or do you have your own lawyers?
```

**Exhibit A, Pg. 627**

```
1        A.  We have our own lawyers.

2        Q.  But they interact with the Justice Department?

3        A.  Yes, sir.

4        Q.  Now, all of these -- when was Mr. Busey's

5   transfer?

6        A.  January of '96.

7        Q.  And he had made this statement somewhere around

8   the end of October of '95, something like that, middle

9   of October?

10       A.  I believe it was -- I think, October 18th, I'm

11  not quite sure of the exact date, certainly would have

12  been October.

13       Q.  Where did he go?

14       A.  He is a specialist in the Wine and Beer Branch

15  of ATF.

16       THE COURT:  It says that the Role Call Training

17  Sessions were conducted by Busey, Chief of the National

18  Firearms Act Branch in the period between October 3, '95

19  to October 10, '95 at BATF headquarters and recorded and

20  transmitted through headquarters on closed circuit

21  television.  That letter is correct, isn't it,

22  Mr. Schaible?

23       THE WITNESS:  That's correct.  There was only one

24  session.

25       THE COURT:  Well, sometime between October 3 and
```

**Exhibit A, Pg. 628**

```
1    October 10 there was one session.  It doesn't -- well,
2    go ahead.
3    BY MR. MONTAGUE:
4         Q.  Was any intermediate administrative action
5    taken with regard to was Mr. Busey put on administrative
6    leave or anything like that?
7         A.  No, sir, not that I know of.
8         Q.  And the closed circuit television the Judge
9    referred to, did that result in a VCR tape of the
10   affair, Mr. Busey's statement?
11        A.  The tape was being done irregardless of its
12   transmission throughout the building.
13        Q.  That there was a tape?
14        A.  Yes.
15        Q.  But also a closed circuit transmission within
16   your offices?
17        A.  Yes.
18        Q.  Okay.  And then were you aware of -- well,
19   excuse me.  Let me ask a different question.  After
20   Mr. Busey left, was he replaced?  Is there now a new
21   chief of the NFA Division?
22        A.  Yes, there is.
23        Q.  NFA Branch.
24        THE COURT:  That's you, isn't it?
25        THE WITNESS:  No.
```

**Exhibit A, Pg. 629**

```
1   BY MR. MONTAGUE:
2        Q.  Who is it?
3        A.  A lady named Nerida Levine.
4        Q.  Is she someone who has been with the ATF for a
5   long time?
6        A.  I believe she started in '85 -- '86 somewhere
7   around there.
8        Q.  Okay.  Now, your testimony in response to Miss
9   Allen just now was that these exhibits 10-1 through 10-8
10  didn't exist at the time of this trial?
11       A.  No, it was that the packet -- the entire packet
12  --
13       Q.  What entire packet?
14  MS. ALLEN:  Your Honor, I think counsel is
15  misstating the evidence.  I asked him whether or not the
16  packet of material existed at the time of trial since
17  there's been an allegation that the Government and
18  Mr. Schaible knew about all of this during the trial.
19       THE COURT:  The statement Mr. Busey made on
20  December 1st, 1995, that was certainly in existence.
21  MS. ALLEN:  In existence, Your Honor, but I think
22  the allegation was that we knew that it was there during
23  the trial and we withheld favorable evidence and that
24  was not done.
25  MR. MONTAGUE:  I didn't make that allegation
```

```
1    because I have no way of knowing.

2        THE COURT:  You would want me to assume that,

3    wouldn't you, Mr. Montague?

4        MR. MONTAGUE:  Well, I certainly believe it's

5    within the breast of the Government and I realize that's

6    a very large breast but it's the Justice Department and

7    the --

8        THE COURT:  Well, let's move on.

9    BY MR. MONTAGUE:

10       Q.  Now in fact, Mr. Schaible, there was a strong

11   effort within the ATF to cover up this whole affair, was

12   there not?

13       A.  No.

14       Q.  There was no effort to cover up this affair?

15       A.  No.

16       Q.  When was the statement by Mr. Busey made

17   public?

18       A.  I believe in February.

19       Q.  End of February or early March, right?

20       A.  Not quite sure on that.

21       Q.  But five months after the event?

22       A.  Uh-huh.

23       Q.  If that was not the result of a cover up, what

24   was it a result of?

25       A.  Freedom of Information Act request.
```

```
 1        Q.  Okay.  So the agency did nothing to put this
 2    thing out voluntarily; it had to be taken away from you
 3    by an FOI request?
 4        A.  Yes.
 5        Q.  And then all of this other stuff, your
 6    affidavit, and all of these things about the changes
 7    that have been made since then were done after that,
 8    were they not?
 9        A.  Yes.
10        Q.  So in answer to the Judge's question, did this
11    stuff exist at the time of trial, obviously it
12    potentially all existed?
13        A.  Some of it.
14        Q.  But simply was not being put together because
15    you, for whatever reason, had not put Mr. Busey's words
16    out publicly.
17        A.  Certainly, some of it existed.
18        Q.  What is the policy of the ATF regarding
19    statements by the top officials?
20        MS. ALLEN:  Your Honor, I'm going to object based
21    on relevance.  I think the focus of this hearing should
22    be whether or not there's any Brady material that if
23    released during the trial would tend to establish that
24    Mr. Leasure is guilty or innocent and now we're putting
25    BATF on trial.
```

**Exhibit A, Pg. 632**

41

| | |
|---|---|
| 1 | THE COURT:  I think it goes further than that, not |
| 2 | whether be would be found guilty or innocent but whether |
| 3 | there's an obligation for that material to have been |
| 4 | available to defense counsel to try to convince me that |
| 5 | BATF were rotten recordkeepers; I think that's the issue |
| 6 | not his guilt.  Anyway, your objection is overruled. |
| 7 | Your exception is in the record.  Let's move on. |
| 8 | BY MR. MONTAGUE: |
| 9 | Q.  Let's drop down to the Exhibit that I |
| 10 | submitted.  I think it's Government 11-1 which is the |
| 11 | telephone record of Mr. Leasure's Saluda office.  The |
| 12 | record itself shows that the phone number used for his |
| 13 | fax machine obviously is the phone number of his fax |
| 14 | machine.  Is the phone number for your fax machine |
| 15 | correct? |
| 16 | A.  Yes. |
| 17 | Q.  202 number? |
| 18 | A.  (Witness nods head.) |
| 19 | Q.  Okay.  So would you agree with me that when a |
| 20 | phone bill is produced that shows a completed fax |
| 21 | transmission, that faxes actually have arrived at their |
| 22 | destination? |
| 23 | A.  I would certainly agree, yes. |
| 24 | Q.  So the faxes got to your office and no one |
| 25 | knows what happened after that? |

**Exhibit A, Pg. 633**

42

1      A.  I wouldn't say that.  Certainly faxes were

2  sent, what they were I can't know.

3      Q.  Well, we can't prove what they were either but

4  it stands to reason they're what we said they were.  But

5  whether they were or not, they disappeared into the 50

6  percent error plague of BATF's recordkeeping at that

7  time.  And the 50 percent Mr. Busey was talking about

8  would have been in existence in February of 1994, would

9  it not?

10     A.  I don't know what he based the 50 percent on.

11     Q.  Mr. Schaible, there was a serious problem,

12 wasn't there, whether it was 50 percent or 35 percent or

13 80 percent, you-all took substantial action to correct

14 the serious defect in your recordkeeping system, didn't

15 you?

16     A.  I believe that any problem is serious, yes.

17     Q.  Yes, sir, particularly in a field like this.

18     A.  Yes.

19     Q.  Do you have -- have you had occasions that

20 you're aware of in the NFA branch of clerks throwing

21 away transmissions because they don't want to fool with

22 them?

23     A.  Yes.

24     Q.  And so that's one of the things that could

25 happen to you?

**Exhibit A, Pg. 634**

43

```
 1        A.  Certainly.
 2        Q.  A bunch of transmissions come through from
 3   Saluda, Virginia, and the clerk says, this is going in
 4   File 13?
 5        A.  Yes.
 6        Q.  And that has happened?
 7        A.  Yes.
 8        Q.  And people have been transferred and fired as a
 9   result of that, haven't they?
10        A.  No.
11        Q.  No, which?  I asked two questions.  Have they
12   been transferred out of that work?
13        A.  The only situation I can remember is, no, that
14   they weren't transferred.  No, they weren't fired.  They
15   eventually quit, yes, but, no, nothing like transferred
16   or fired.
17        Q.  Did you ever continue anybody in that
18   particular job after you knew they threw something away,
19   threw an important transmission away or destroyed it or
20   put it in the shredder or whatever they did?
21        A.  And when you say "you," you mean, the branch?
22        Q.  I mean you the agency, I'm sorry.
23        A.  Yes.
24        Q.  You continued them doing that kind of work?
25        A.  With monitoring, yes.
```

**Exhibit A, Pg. 635**

1      Q.  Okay.

2      MR. MONTAGUE:  I believe that's all I have, Your

3  Honor.

4      THE COURT:  Anything further, Ms. Allen?

5      MS. ALLEN:  No thank you, Your Honor.

6      THE COURT:  All right.  Step down, Mr. Schaible.

7      MS. ALLEN:  Your Honor, that's all the evidence I

8  have to that last motion.

9      THE COURT:  All right.  All right.  The evidence --

10  that record has been made.  Anything you want to --

11      MR. MONTAGUE:  I just have a couple of comments

12  with regard to the first part of Ms. Allen's comments.

13  In the first place, I don't know what the implication

14  was about fraud on the Court and fraudulent material but

15  I don't practice that kind of law and the documents were

16  genuine as far as I know and I have every reason to

17  think they were.  I also think we have every reason to

18  think they were received by the ATF based on the

19  testimony we've just had.

20      THE COURT:  I don't think there's any evidence of

21  that, Mr. Montague, that these particular things marked

22  void or received are because you point out Carl O'Quinn

23  or Mr. Leasure called this telephone number on a certain

24  date.  But I don't think it's going to make any

25  difference in this case.

```
 1        I'm going to throw out the convictions that have to
 2   do with registrations. I'm going to throw out Count 2,
 3   3, and 6 so that the only count left is Count 1, that's
 4   the one I want to hear addressed at this time. That's
 5   got nothing to do with registrations, we're talking
 6   about silencers.
 7        MR. MONTAGUE: Yes, sir. All right, thank you for
 8   that.
 9        THE COURT: The motion for a new trial is denied
10   because it was addressed only to Counts 2, 3, and 6.
11   I have thrown out Count 2, 3, and 6, so the motion for a
12   new trial is denied. We're here for sentencing as to
13   Count 1. And now, if you want to sit down and talk to
14   your client about how you want to proceed on Count 1 and
15   I'll take a five-minute recess.
16        MR. MONTAGUE: Thank you, Your Honor.
17        THE COURT: Ms. Allen, this isn't to impune
18   anything dishonest from you. I think you sent to them
19   whatever you've received, but Mr. Schaible has testified
20   that they knew all about Mr. Busey's statement in the
21   National Firearms people. It's on television all over
22   the building, it was in the files of the Department of
23   Justice, and it throws a disagreeable proposition on my
24   finding somebody guilty on records when their chief man
25   says they were 49 percent wrong. That's not your fault.
```

**Exhibit A, Pg. 637**

```
 1        Five minutes and we'll take up sentencing on Count
 2   1.  And I'll have something more to say for the record
 3   so you-all can have it for appellate purposes but right
 4   now that's where we are.
 5                      (Recess.)
 6        THE COURT:  Hold up a minute.  Let me make some
 7   notes.  It seems to me that the Court having thrown out
 8   Counts 2, 3, 4, 5 and 6 the only thing left is Count 1
 9   of which I found that's the silencers count which has
10   nothing to do with registration.  In fact, it's
11   nonregistration that's the essence of the case.  There
12   was no motion, I don't believe, made with reference to
13   Count 1, Mr. Montague, but in the wealth of paper
14   you-all have provided me with I may have overlooked
15   something.  We're here only on sentencing of Count 1 at
16   this point; is that correct?
17        MR. MONTAGUE:  Well, I intended to include -- it's
18   certainly an entirely different animal.
19        THE COURT:  All right.  We're here for sentencing
20   now.  Bring Mr. Leasure up to the lectern with you.
21        MR. MONTAGUE:  All right, sir.
22        THE COURT:  Mr. Leasure, the matter ended in a
23   conviction of you on Count 1 on, I think it was January
24   the 19th, but so that the record won't have any errors
25   in it, let me be sure.  On January the 19th the matter
```

Biggs & Fleet Court Reporters
Norfolk - (804) 625-6695

**Exhibit A, Pg. 638**

1    was taken under advisement.

2        On February 6th an order was entered in which I

3    brought all parties back to court and filed a written

4    order of the Court finding you guilty as to Count 1 and

5    as to some other counts which are now made moot by

6    virtue of the rulings of the Court. I at that time

7    ordered a presentence report and ordered you to return

8    here for sentencing for 9:30 on May 21, which is today.

9        I have a presentence report prepared by my

10    probation officer Miss Thayer over here and I ask you

11    first, Mr. Montague, have you been over this report in

12    detail with your client, Mr. John Leasure?

13        MR. MONTAGUE: Yes, sir, I have.

14        THE COURT: And, Mr. Leasure, have you been over

15    this report in detail with your attorney, Mr. Montague?

16        THE DEFENDANT: Yes, sir, I have.

17        THE COURT: And we're here only on Count 1.

18    Mr. Montague, is there any evidence you want to present

19    with reference to this count?

20        MR. MONTAGUE: Not with reference to the count as

21    such but I'd like to put on some character evidence, if

22    I may.

23        THE COURT: All right, sir. Have a seat.

24        I'll be glad to hear the first witness, if you'll

25    call your first witness.

**Exhibit A, Pg. 639**

242

48

```
 1        MR. MONTAGUE:  I'm going to call Sheriff Lewis
 2   Jones.
 3        THE COURT:  Have a seat.  All right, sir, go right
 4   ahead.
 5        LEWIS JONES, III, a Witness, called on behalf of
 6   the Defendant, having been first duly sworn, was
 7   examined and testified as follows:
 8                     DIRECT EXAMINATION
 9   BY MR. MONTAGUE:
10        Q.  Would you state your -- let me let you get
11   seated.  Will you state your full name, please.
12        A.  Lewis Jones, III.
13        THE COURT:  Lewis spelled L-e- or L-o-?
14        THE WITNESS:  L-e-.
15        THE COURT:  L-e-w-i-s Jones, III.  Go ahead,
16   Mr. Montague.
17   BY MR. MONTAGUE:
18        Q.  How are you currently employed, Mr. Jones?
19        A.  I'm the sheriff of Middlesex County, Virginia.
20        Q.  How long have you held that office?
21        A.  I'm in my ninth year.
22        Q.  And prior to being -- that's an elective
23   office, is it not?
24        A.  Yes, sir, it is.
25        Q.  Prior to being elected sheriff of Middlesex,
```

**Exhibit A, Pg. 640**

49

| | |
|---|---|
| 1 | did you have any other background in law enforcement? |
| 2 | A. Yes, sir. I was a Virginia state trooper for |
| 3 | six and a half years and also with the City of |
| 4 | Charlottesville, Virginia Police Department |
| 5 | three-and-a-half years. |
| 6 | Q. During your time as a state trooper, were you |
| 7 | stationed in the Middlesex County area? |
| 8 | A. Yes, sir, I was stationed there in December of |
| 9 | 1980. |
| 10 | Q. All right, sir. Now, would it be fair to |
| 11 | describe your position of sheriff of Middlesex as the |
| 12 | chief local law enforcement officer in that area? |
| 13 | A. Yes, sir, that's correct, I am. |
| 14 | Q. Would it be fair to say that as sheriff -- as |
| 15 | the chief local law enforcement officer, it's important |
| 16 | for you to know - to be blunt - who the good guys and |
| 17 | the bad guys are that frequent your county? |
| 18 | THE COURT: Mr. Montague, you've practiced law as |
| 19 | long as I have and we're talking about character |
| 20 | evidence; we're not talking about anything else. So |
| 21 | let's get into it; let's don't get into anything else. |
| 22 | MR. MONTAGUE: All right, sir. |
| 23 | BY MR. MONTAGUE: |
| 24 | Q. But it is necessary for you to evaluate people |
| 25 | that may run afoul of the law? |

**Exhibit A, Pg. 641**

244

50

```
 1        A.  Yes, sir.

 2        Q.  And in your office as sheriff, did you become

 3   acquainted with a gentleman named, John Leasure?

 4        A.  Yes, sir, I did.

 5        Q.  And is he in the courtroom today?

 6        A.  Yes, sir, he is.

 7        Q.  Would you point him out?

 8        A.  (Indicating.)

 9        Q.  You're indicating Mr. Leasure at the Defense

10   table.  And what was Mr. Leasure's business in Middlesex

11   County?

12        A.  My first encounter with him in a business was

13   with a parts store with his brother and then later as a

14   retail gun dealer and then with his current business

15   status.

16        Q.  Did he operate a business called John's Gun

17   Shop in Saluda?

18        A.  Yes, sir, he did.

19        Q.  All right.  Did you come to develop a

20   relationship or friendship with Mr. Leasure?

21        A.  Yes, sir, I did.

22        THE COURT:  What we're interested in, Mr. Jones, is

23   do you know his reputation for truth and voracity in the

24   community?

25        THE WITNESS:  Yes, sir, I do.
```

**Exhibit A, Pg. 642**

51

```
1        THE COURT:  And what is it?

2        THE WITNESS:  John enjoys a very good character and

3    standing in the community.

4        THE COURT:  All right.  That's about as far as you

5    can go, Mr. Montague.

6        MR. MONTAGUE:  Well, let me try one other step,

7    Your Honor.

8        THE COURT:  I'll be glad to stop you if you're

9    wrong.  Let's go.

10        MR. MONTAGUE:  I know that.

11    BY MR. MONTAGUE:

12        Q.  In connection with that reputation, did you

13    have occasion to appoint him as anything in your

14    department?

15        A.  Yes, sir.  February of 1988 I appointed

16    Mr. Leasure a deputy sheriff of Middlesex County

17    Sheriff's Office.

18        Q.  And what were his duties, if any, with your

19    department?

20        THE COURT:  That's of no importance to me.  He said

21    he has a good reputation for truth and voracity and I

22    let you show that he appointed him as deputy sheriff in

23    1988.  How long did he act?

24        THE WITNESS:  Through March of 1990.

25        THE COURT:  For a couple of years?
```

```
 1        THE WITNESS:  Yes, sir.

 2        THE COURT:  A year and a half?

 3        THE WITNESS:  Yes, sir.

 4        THE COURT:  All right now.

 5   BY MR. MONTAGUE:

 6        Q.  Sheriff Jones, you're here by your own

 7   volition, you're not here by reason of a subpoena; is

 8   that correct?

 9        A.  That is correct.

10        MR. MONTAGUE:  Answer Miss Allen.

11        THE COURT:  Any questions, Ms. Allen?

12        MS. ALLEN:  No questions, Your Honor.

13        THE COURT:  Thank you, Sheriff, step down.  Any

14   reason why Sheriff Jones can't be excused?

15        MR. MONTAGUE:  He can return to his duties as far

16   as we're concerned with our thanks.

17        THE COURT:  Call your next witness.

18        MR. MONTAGUE:  I'm going to call Mr. Leasure.

19        THE COURT:  Mr. Leasure.

20        MR. MONTAGUE:  He's not been sworn yet.

21        THE COURT:  Go ahead, sir

22        JOHN D. LEASURE, the Defendant, called on behalf of

23   the Defense, having been first duly sworn, was examined

24   and testified as follows:

25                  DIRECT EXAMINATION
```

53

```
 1   BY MR. MONTAGUE:
 2        Q.   State your name please, sir.
 3        A.   John Daniel Leasure.
 4        Q.   And you are the defendant in this case?
 5        A.   Yes.
 6        Q.   Mr. Leasure, during your trial in this case, I
 7   showed one of the Government witnesses, I think it was
 8   Mr. Schaible, a copy of this book. It's a red cover
 9   entitled Federal Firearms Regulation 1988-89. My
10   question, sir, is, was this book provided to you by the
11   ATF as your guide to the law affecting your work as a
12   firearms manufacturer?
13        A.   Yes, it was.
14        Q.   And the answer given to me by whoever it was
15   that testified from the ATF was that you were told that
16   by following this book you would stay out of trouble,
17   this was your bible, what you had to do as a firearms --
18   in relation to federal firearms purchases?
19        A.   (Witness nods head.)
20        Q.   Now, in connection with that, did you have an
21   understanding as to what your obligation based on the
22   material appearing in this manual -- what your
23   obligation was with regard to placing serial numbers and
24   manufacturer's names on silencers?
25        A.   Yes, I did.
```

54

```
 1        MS. ALLEN:  Your Honor, I'm going to object.  We
 2   went through --
 3        THE COURT:  It's already in the record one time and
 4   that's all.
 5        MR. MONTAGUE:  Count 1 involves 19 unserialized
 6   silencers.
 7        THE COURT:  Was one withdrawn?  Are there 18 or 19?
 8        MS. ALLEN:  There are 19, Your Honor, one was
 9   withdrawn from Count 2.
10        THE COURT:  19, all right.
11        MR. MONTAGUE:  I think 19 is correct.
12   BY MR. MONTAGUE:
13        Q.  Of the 19 none had a serial number on it nor
14   the identification of your manufacturing name which was
15   Precision Arms International or PAI?
16        A.  That's correct.
17        Q.  And each of those being unmarked, did that
18   result from the same misconception of the law by you?
19        MS. ALLEN:  Your Honor, I have a continuing
20   objection to this whole --
21        THE COURT:  All right.  I'll let him testify one
22   time.  He's already testified to this.
23        THE WITNESS:  Yes, it did.
24   BY MR. MONTAGUE:
25        Q.  Not only based upon the regulations but was
```

1 | that misconception also based upon industry practices as
2 | you understood them?
3 |     A. Yes, it is.
4 |     Q. And is it fair to say, sir, that your intention
5 | at all times with regard to these silencers as well as
6 | all other armaments and weapons within your shop and
7 | within your control was to attempt to obey the law?
8 |     A. Yes, it is.
9 |     Q. Mr. Leasure, as based upon the Court's action
10 | this morning, you stand convicted of one felony count.
11 | And what do you understand will be the impact, leaving
12 | aside the question of whether you go to jail or not --
13 | what do you understand the impact of that conviction to
14 | be upon your life as it's been lived up to now?
15 |     A. Well, it -- from then on I'll be treated as a
16 | second class citizen I feel like. It is what I feel
17 | like about the worst thing that could happen to me.
18 |     But I will state and I don't know whether I can do
19 | this now or not but I will say sitting here today right
20 | here and right now, if I still had -- if I was still
21 | asked whether or not I would plead guilty or not to
22 | Count 1, I would still plead not guilty. I read and
23 | understood the law. I tried to interpret from the law
24 | what I understood to be the law, and I've given you the
25 | code section and I still feel it's very vague. I still

56

1   feel it's very vague.  In one sentence it says by the
2   ATF's own admission that any firearm silencer part is a
3   silencer, even a rubber disk that goes in the end of it.
4        Q.  Even a Coke bottle?
5        A.  Yeah, absolutely.  So I don't understand how I
6   can manufacture, own, and I'm the one who assigns the
7   serial number but under the Code Section 179.102 that I
8   provided you out of that book that you have, not out of
9   the new book that was published in October of 1995 it's
10  much more explicit, it's very clear, out of the old book
11  it's not.
12       Q.  Let me ask you one question about that if we
13  may, Your Honor.  The new book, which I think has a
14  yellow cover, came out in, what, November of '95?
15       A.  Yes.
16       Q.  And what is different bearing on this
17  particular point between that book and the one that you
18  had to go by?
19       A.  It says in the yellow book under that code
20  section that the form has to be done by closing the next
21  business day, the Form 2.
22       Q.  That does not appear in the red book?
23       A.  Not under that code section marked 179.102
24  Identification of Firearms.
25       Q.  So it is your testimony that nowhere in the red

1   book are you told when you're supposed to mark these

2   silencers?

3        A.  Not that I could find, no.  Under 179.102 it

4   states that it is to be marked when it is sold,

5   transferred, or otherwise disposed of and that's what I

6   got from it.

7        Q.  These particular silencers were never going to

8   be sold or transferred, were they?

9        A.  They were totally separate, separate from

10  everything else in a locked cabinet, and at various

11  times I would cannibalize them and get parts off of

12  them.  I had enough parts in my shop to assemble five

13  hundred silencers.

14       Q.  And, as a matter of fact, you had hundreds of

15  parts, tubes, and the like that were intended to be used

16  as parts of silencers?

17       A.  Hundred and hundreds and hundreds.

18       Q.  And the way the law is written you could have

19  been charged on all of them, you could have a thousand

20  counts or a thousand items under the count?

21       A.  I guess so.

22       Q.  And I guess they'd want to electrocute you at

23  that point, I don't know.

24       THE COURT:  I'm the only one entitled to humor in

25  this courtroom.

**Exhibit A, Pg. 649**

1       MR. MONTAGUE:  I withdraw the attempt at humor,
2   Your Honor.  There isn't anything funny about this
3   situation.

4   BY MR. MONTAGUE:

5       Q.  Is there anything else you'd like to tell us,
6   Mr. Leasure?

7       A.  Just that I feel like I have tried to -- it has
8   been my intention to abide by the law.  I had no
9   intention of breaking the law.  I -- certainly from the
10  time the ATF came into the raid, I had three days.  They
11  left their own printout there.  They'd never even been
12  in the back and seen my inventory.  I could have taken
13  that inventory and made sure everything matched and then
14  I probably wouldn't be sitting here, but I wanted -- I
15  wanted to get it straight.  If there was a problem, I
16  wanted it to be straight.  And, I'm sorry, I still
17  wouldn't do it any differently.

18      Q.  And you didn't attempt to hide anything, you
19  cooperated fully in that investigation?

20      A.  Absolutely.

21      Q.  Because you didn't think you'd done anything
22  wrong; is that correct?

23      A.  No, I did not.

24      MR. MONTAGUE:  Answer Miss Allen.

25      THE COURT:  Cross, Ms. Allen?

Exhibit A, Pg. 650

59

1      MS. ALLEN:  No questions, Your Honor.

2      THE COURT:  Step down.  Thank you, Mr. Leasure.

3      Any other witness, Mr. Montague?

4      MR. MONTAGUE.  Yes, sir.  I'd like to call

5   Mrs. Leasure.

6      THE COURT:  All right.

7      CHERYL LEASURE, a Witness, called on behalf of the

8   Defendant, having been first duly sworn, was examined

9   and testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. MONTAGUE:

12      Q.  Would state your name, please, ma'am.

13      A.  Cheryl Leasure.

14      Q.  Would you spell Cheryl for the Court.

15      A.  C-h-e-r-y-l.

16      THE COURT:  C-h-e-r-y-l, go ahead.

17   BY MR. MONTAGUE:

18      Q.  And you're married to Mr. Leasure?

19      A.  That's correct.

20      Q.  How long have you-all been married?

21      A.  We have been married almost a year.

22      Q.  And you're -- actually, your first anniversary

23   is going to be next week; isn't it?

24      A.  That's right, Monday.

25      Q.  Okay.  And do you have any children by a prior

Case 1:18-cv-02988-DLF   Document 58-1   Filed 03/31/20   Page 653 of 67...

254

60

1    marriage?

2          A.   Yes, I do.

3          Q.   And describe the child.

4          A.   He's six years old.  His name is Drew.

5          Q.   And has Drew in your observation as his mother

6    formed a relationship with Mr. Leasure?

7          A.   Yes, sir, a very close one.

8          Q.   Would it be fair to say that you think

9    Mr. Leasure has become a father figure to your son?

10         A.   Very much so, more than his own father; I

11   should say biological father.

12         Q.   And how do you regard your husband in terms of

13   hard workingness, good citizenship, and that sort of

14   thing?

15         A.   He's very hardworking, he's very honest.  I've

16   never seen anything where he's tried to hide or do

17   anything wrong.

18         Q.   And you're involved -- have been involved in

19   the business at the gun shop, have you not?

20         A.   Right, I've come up there and helped out a

21   little bit there.

22         Q.   Have you helped improve the recordkeeping?

23         A.   Yes.

24         MR. MONTAGUE:   I think that's all.

25         THE COURT:   Any questions?

**Exhibit A, Pg. 652**

61

```
 1        MS. ALLEN:  No, thank you, Your Honor.
 2        THE COURT:  Thank you, Ms. Leasure.  Step down.
 3        Call your next witness.
 4        MR. MONTAGUE:  That's all, Your Honor.
 5        THE COURT:  All right.  I'll be glad to hear from
 6   you, Mr. Montague, and at the proper time I'll ask
 7   Mr. Leasure if there's anything further he wants to say.
 8        MR. MONTAGUE:  All right.  Excuse me one second,
 9   Your Honor.
10        THE COURT:  Surely.
11                     (Pause.)
12        THE COURT:  Hold up for just a minute.
13        MR. MONTAGUE:  Yes, sir.
14        THE COURT:  Mr. Montague, there were objections and
15   I overlooked these beginning on Page 16, 17, and 18 and
16   they looked like you objected to paragraph 16.  You
17   object to the finding made by Miss Thayer that
18   Mr. Leasure was not entitled to any acceptance of
19   responsibility under the law.  Because of his pleas of
20   not guilty in the defense of the case, he isn't entitled
21   to any so if you have any objection to his not getting
22   the three points, that objection is overruled.
23        MR. MONTAGUE:  Well --
24        THE COURT:  Now, to Paragraph 19 an objection is
25   raised.  The probation officer's report that defendant
```

**Exhibit A, Pg. 653**

62

1   failed to pay fines and court costs for a reckless
2   driving conviction and that would have no effect on any
3   penalty that I would be involved with to start with, so
4   that objection is irrelevant so far as I'm concerned.

5           MS. ALLEN:  And, Your Honor, just for the record,
6   the probation officer informed me this morning that upon
7   further investigation she found out on February 10th,
8   1987, that Mr. Leasure had, in fact, paid those court
9   costs, and we would withdraw that and note that for the
10  record.

11          THE COURT:  The fine has been paid?
12          MS. ALLEN:  February 10th, 1987, that's correct,
13  Your Honor.

14          MR. MONTAGUE:  The only reason I made that
15  objection, Your Honor, is because it created a sort of
16  scuff or a different type of appearance and I didn't
17  think that was deserving.

18          THE COURT:  Paragraph 20 reflects the date of the
19  arrest.  The probation officer relies on a copy of the
20  warrant executed June 1, 1993.  I find that to be of no
21  consequence to this.

22          MS. ALLEN:  Just for the record, Your Honor, we
23  have a certified copy of the paperwork the probation
24  officer was relying upon which is marked as Government's
25  Exhibit 12-1 which we'd offer to the Court.

**Exhibit A, Pg. 654**

257

63

1      THE COURT: All right. Show it to Mr. Montague.

2   Put it with the papers in the suit.

3      Paragraph 47 an objection is raised that the

4   probation officer reported the defendant didn't file

5   Federal taxes for the years '90, '91, '92, and '93

6   according to the Internal Revenue Service's Taxpayer

7   Services Division; they have no record of a return being

8   filed for those four years and, therefore, no change was

9   made to that. Do you have any response to that?

10     MS. ALLEN: Your Honor, we have a certified copy of

11   the probation officer's request for the information as

12   well as the IRS's response that reflects that Government

13   Exhibit 12-2 has also been shown to Mr. Montague.

14     THE COURT: Mr. Montague, apparently he hadn't

15   filed a return at least according to the evidence

16   available to me. I don't know that it's going to make a

17   lot of difference but do you have anything to the

18   contrary?

19     MR. MONTAGUE: The only thing I have is that

20   Mr. Leasure has assured me that he has filed all the

21   returns and has paid all of the taxes. He is constantly

22   in this case a victim of Government records that don't

23   exist.

24     THE COURT: Well, wait a minute. We're not going

25   to start with that. Are you going to indict the

**Exhibit A, Pg. 655**

64

```
 1    Internal Revenue Service for reporting that he didn't
 2    file any taxes for those years?
 3         MR. MONTAGUE:  No, sir.  I'm sure they --
 4         THE COURT:  Turn to your client, I'm not going to
 5    take that as a charge against the Government.  Talk to
 6    your client.  Ask him has he got any evidence that he
 7    paid taxes, filed returns for those years when they say
 8    he did not.
 9         MR. MONTAGUE:  I don't need to ask him that, Your
10    Honor, he would have given it to me if he had.  No, he
11    does not, and I'm sure the IRS is acting in good faith.
12    I don't question that.
13         The only thing I do know and will add this to the
14    Court if I may is that after the demise of his company,
15    Precision Arms International, there were some unpaid
16    payroll taxes and the IRS procedure in that case is to
17    impose a hundred percent penalty on the person in charge
18    of the company that's gone belly up.  In the case of
19    Mr. Leasure, they imposed that penalty and then after
20    meeting with him, they waived it because of his
21    financial condition and the only thing that happened was
22    they did take an assignment on all of the guns that the
23    government now holds.  They're supposed to get those
24    when they're turned loose.
25         THE COURT:  The last objection is the computations
```

**Exhibit A, Pg. 656**

65

1    based on the number of weapons and that's an amount that
2    we'll have to discuss after your argument, so now go on
3    with the argument.
4        MR. MONTAGUE: All right, sir. I'm getting a
5    little discombobulated here, Your Honor. I think that
6    -- let me see if I can find the language. This language
7    came up, the language of the regulations under 179 of
8    the regs. affecting firearm manufacturers, registration,
9    identification of firearms.
10       Mr. Leasure has testified that the regulation has
11   been amended at a time after this case was already in
12   process to require anyone manufacturing silencers as he
13   did to mark them with a serial number which he makes up
14   and puts on himself and the name showing the
15   manufacturer's identification. It says that that must
16   be done in accordance with these regulations and the
17   only positive time that it gives him to do it is where
18   the silencer is not an integral part of a complete
19   firearm. It must be done at the time of sale or of
20   transfer.
21       THE COURT: I've ruled on that and ruled against
22   you. You take that up with the Fourth Circuit.
23       MR. MONTAGUE: Well, the issue today I think is of
24   the element of time. I think that is important and
25   should be important to the Court. I understand what the

Exhibit A, Pg. 657

1   Court's ruling was and I think the interpretation
2   probably is wrong but on the other hand nowhere in the
3   regulation does it tell him when he is to do it other
4   than when he sells it.

5       THE COURT: I've already ruled on that,
6   Mr. Montague. I've found him guilty. I don't have any
7   problem with that. If you've got anything to add to
8   that, you'll get your opportunity in Richmond.

9       MR. MONTAGUE: I have already flagged for the Court
10  the case of Staples against the United States. It's
11  important in this case because it does involve a mental
12  element in what appeared in the way Congress drew these
13  laws to be an absolute offense, a strict liability type
14  of offense. These are what have been called public
15  welfare crimes. They're instrumentalities that are so
16  inherently dangerous such as drugs, high explosives,
17  things of that nature that a person would be deemed to
18  know that there must be some regulation whether he says
19  with all the innocence of a lamb that he did not know,
20  there's many reasons he should know whatever it may be,
21  a nuclear device or hand grenade or something of that
22  kind.

23      The Staples opinion was passed after -- long after
24  the Freed opinion on which this court relied and decided
25  in 1994. Justice Thomas wrote the opinion for the

**Exhibit A, Pg. 658**

1    majority and he discussed it at great length.  The
2    tradition of Anglo-Saxon courtroom jurisprudence
3    requires that there be some knowledge of evil in conduct
4    that a person elects to pursue.  He says it is as
5    universal and persistent in mature systems of law as
6    belief in the freedom of the human will and,
7    consequently, the ability and duty of a normal
8    individual to choose between good and evil.

9        This case at least the last time I looked had not
10   come out of the U.S. Reports but it's in the 128
11   Lawyer's Edition, 2nd, beginning at Page 608.  In that
12   edition he says on Page 616 that the Government seeks
13   support for its position which was basically a no-intent
14   position from our decision in U.S. v. Freed, 401, U.S.
15   and so forth, 1971, A case involving unregistered hand
16   grenades.  That's the case the Court relied on in making
17   it's ruling in this case.

18        That reasoning provides little support for
19   dispensing with mens rea in this case.  In this case
20   what I think has happened is the defendant has made a
21   conclusive showing of a lack of anything other than a
22   law abiding spirit.  He's an honorable man; his record
23   supports that.  He didn't mean to break the law, and I
24   do not think that the instrumentalities, these locked up
25   silencers that didn't work properly --

Exhibit A, Pg. 659

262

68

```
 1        THE COURT:  There was no showing that these
 2   silencers didn't work properly.  He fired every one,
 3   kept a minute record of the decibels.  They were
 4   completely done, Mr. Montague, so don't put anything
 5   false in the record.
 6        MR. MONTAGUE:  I'm not putting anything false in
 7   the record, Your Honor.  That was a mistake in
 8   recollection that the Court drew from the testimony of
 9   one of the BATF agents.
10        THE COURT:  I'll live with it.
11        MR. MONTAGUE:  Well, it was the BATF agent that
12   fired the silencers.  I'm sure Mr. Leasure had fired
13   them at some time too but he didn't -- the record of
14   decibel reduction was done by --
15        THE COURT:  He testified, Mr. Montague, that many
16   of these silencers the reason they were in the cabinet
17   was because they didn't meet -- when he tested them,
18   they didn't meet the reduction in decibels that he would
19   require of an instrument.  You can argue with me but
20   that as a fine workman he found something wrong with
21   them, but he tested them and found that they didn't suit
22   what he wanted.  He knew that they would work.  Don't
23   tell me otherwise.
24        MR. MONTAGUE:  I'm not telling you otherwise.  I'm
25   saying your finding in your order in this case that
```

**Exhibit A, Pg. 660**

1    somebody fired them and kept a record was the Government
2    agent not Mr. Leasure.

3        THE COURT:  We can check the record but I'm going
4    on what he testified.

5        MR. MONTAGUE:  Yes, there's no question that he
6    knew that they did not meet his standards, and he was
7    not going to sell them for that reason, and he kept them
8    for parts.

9        THE COURT:  That's your argument and that's the one
10   you ought to make but don't tell me that they were not
11   fireable or couldn't be used, that's not in the record.

12       MR. MONTAGUE:  I didn't tell you that, and I'm not
13   trying to mislead the Court in any way.  I think I've
14   been very open in all aspects of this thing.

15       Certainly, he isn't going to throw away the
16   silencer but he wasn't going to market it because it
17   didn't work right, didn't meet his higher standards and
18   he saw nothing wrong in the way he understood the
19   regulation and the industry practices to keep them
20   simply as a source of spare parts.  The metals involved
21   in those devices are very expensive and why throw them
22   away.

23       Based upon everything that's before the Court, I
24   would ask the Court to take into account this man's
25   lifelong good record and the fact that this particular

Exhibit A, Pg. 661

70

1    case, the incidents that arose to bring this case into
2    this court were the product of a completely innocent
3    mind, a man who is a lifelong law abiding citizen.
4         THE COURT: Thank you. Miss Allen.
5         MS. ALLEN: Your Honor, I believe that the
6    presentence report shows the base offense level to be 18
7    plus a 6 for 60 weapons, which the probation officer
8    relies upon Paragraph 11 of the presentence report. The
9    probation officer's calculations are in accordance with
10   the Fourth Circuit law, particularly, the Bowman case
11   which was 926 F.2d, 380, 1991 Fourth Circuit decision
12   approving the Court's sentence based upon the convicted
13   counts and uncharged counts.
14        I think the probation officer has figured 60
15   firearms based on the guns that were in the indictment
16   as well as other guns that were seized with the search
17   warrant. If her calculations are right, the guidelines
18   would be 51 to 63 months. If the Court decides not to
19   consider 60 --
20        THE COURT: I'm not going to count any of the guns
21   that have been thrown out because of the registration
22   period, so it will reach nowhere near 20. It will be 19
23   at the most.
24        MS. ALLEN: Based on the Court's statement there,
25   the Government sees the base level of 18 plus 4 since

**Exhibit A, Pg. 662**

1   the guns in Count 1 are 19 and the 4 point enhancement
2   is for 13 to 24 firearms and if that's true, the total
3   for that level will be 22 giving the Court a guideline
4   range of 41 to 51 months.  If that's what the Court
5   finds, the Government has no further argument other than
6   that.

7       THE COURT:  All right.  Mr. Montague, you have a
8   right to answer that.  She says that the unlawful
9   possession of firearms in Level 18 -- this doesn't state
10  what I'm going to do but that number of firearms are
11  more than 12 and less than 25, add 4 and you come up
12  with 22 and the incarceration period is 31 to some other
13  months so you better answer that, and I'll make my
14  findings in the matter.

15      MR. MONTAGUE:  My answer to it would be this, Your
16  Honor, would be the retention of the unmarked silencers
17  - the 19 unmarked silencers - resulted from a single
18  misinterpretation of law and should be treated as one.
19  Mr. Leasure testified it could have been 500 or 1,000
20  devices under the same category entirely innocently
21  retained as were the hundreds that he was not charged
22  under.  Why he wasn't I don't know but the retention of
23  the firearms, of these silencers, these non-properly
24  working silencers should be treated as one weapon and
25  there be no enhancement.

**Exhibit A, Pg. 663**

266

72

1        And, of course, I think beyond that, the Court
2   should exercise its discretion.  I suggested in one of
3   my pleadings that the Court consider a lesser included
4   offense which is failure to properly record firearms,
5   which is under 18 USC 912M, which is a misdemeanor at
6   offense Level 6 which is much more appropriate to this
7   case.  I'm not going to say there was nothing wrong
8   here.  I do think the Government has a right to regulate
9   these things; they are dangerous.
10       Certainly, we associate silencers with many
11  criminal activities, assassinations and things of that
12  kind that this Government certainly has a right to
13  control but here the appearance of heavy evil is just
14  not there.
15       THE COURT:  I'm not going to file a written order
16  in the matter, so I will record for the record my
17  findings as they apply to this case.  Upon the
18  conclusion of the evidence and the information set forth
19  in the trial order the Court dated something like
20  February 6th, the Court found the defendant guilty then
21  as to Count 1 which was the silencer count, 19 silencers
22  that were not registered at all and not in compliance
23  with the statute which requires them to be registered
24  with the firearms people by the close of business of the
25  second day after their manufacture.  That's perfectly

**Exhibit A, Pg. 664**

267

73

1    clear to me. And while I understand Mr. Leasure may

2    have some trouble with that, I don't. He's found guilty

3    of a violation of Count 1.

4        I also had some -- as to Counts 2 and 3, the deal

5    with registration and the debate that surfaced between

6    Mr. Leasure and the firearms people as to whether or not

7    he was using a method of cancelling certain transfers

8    that he made to his accountant apparently over some

9    bankruptcy difficulty that he -- but that's -- they were

10   transferred to somebody named O'Quinn and when the --

11   whatever the problem -- the matter that had prompted

12   that transfer seemed not to have transpired, then the

13   effort was made to cancel those transfers by writing

14   void across the front of the transfer agreement that had

15   been acceded to by the firearms people.

16       And then the same thing would apply to Count 3 and

17   to the registration of a 22 pen pistol gun which is set

18   forth in Count 6. The argument made in Count 6 that the

19   pistol was not called a firearm it was called a weapon

20   is of no importance to me and I think that's a facetious

21   argument and I would overrule it on that basis.

22       But having heard the indictment of the

23   recordkeeping of the National Firearm Services that was

24   expressed in February of 1993 and having heard something

25   that was not brought up at trial that the head of the

**Exhibit A, Pg. 665**

74

1    registration division made a speech to all of his people
2    and said that the recordkeeping was 49 to 50 percent in
3    error and feeling as I do that from the testimony of
4    Mr. Schaible today that that information was fully
5    knowledgeable within the National Firearms Bureau at the
6    time it was made - it seems it was on closed circuit
7    television and then a transcription was made - and
8    hearing from him that at the time, whether it was in
9    October or November 1994, that this raised such a furor
10   within the bureau that Mr. Busey if was not fired but
11   that he "voluntarily" retired from his position so that
12   statement -- which nobody seems to know where he got his
13   figures from -- but that was not furnished to the
14   defendants in this case.  And they would have had a
15   right to have brought that up to me as showing the
16   correctness of the firearms registration for their being
17   questioned by the top man in the registration bureau.

18        I don't say this to Miss Allen.  I've known her for
19   a long time and she's said in court and it's in the
20   record that she knew nothing about this until she
21   received a packet from some place from the Department of
22   Justice, I believe, which indicated Busey's statement,
23   then an investigation was immediately ordered, and the
24   consequences of it.  That statement and the question of
25   whether or not Mr. Busey's information was correct or

**Exhibit A, Pg. 666**

1    not should have been furnished to the defendant's

2    counsel, and its not being furnished seems to me to have

3    violated a precept under which we proceed.

4        For that reason I've thrown out all of those counts

5    of the indictment which deal in any manner upon the

6    active and registered numbers assigned to weapons and

7    that leaves us with the silencers.  I have absolutely no

8    problem with the law in the case that when you make a

9    silencer, you've got to register it by five o'clock on

10   the end of the day following its manufacture.  And so

11   the matter is before me for sentencing now on only Count

12   1 of the indictment that affects Mr. Leasure.

13   Mr. Montague, have Mr. Leasure step with you to the

14   lectern.

15       Mr. Leasure, the law requires that a judge of this

16   court give you an opportunity to make any statements

17   you'd like to make before I proceed to sentencing.  It

18   does not require that you say anything.  You have, in

19   fact, already testified both at the trial in chief and

20   at this sentencing hearing, but if there's anything

21   further you want to say, I'll be glad to hear from you.

22   Anything further?

23       THE DEFENDANT:  I would like to say something, Your

24   Honor, and not take up too much of the Court's time.  I

25   have it over here.

| | |
|---|---|
| 1 | THE COURT: Go ahead. I'm not tired, Mr. Leasure. |
| 2 | To give you full benefit of the law, you have a right to |
| 3 | make any statement you'd like to make. |
| 4 | THE DEFENDANT: Thank you, sir. |
| 5 | MR. LEASURE: Your Honor, I had no criminal intent. |
| 6 | If I had, when the ATF came to my shop three days prior |
| 7 | to the raid and left the National Firearms printout of |
| 8 | the weapons that were supposed to be in my inventory, I |
| 9 | would have made up paperwork or whatever to get my |
| 10 | inventory to match theirs. But I knew that I had |
| 11 | completed my paperwork properly, and I knew in my heart |
| 12 | I had committed no crime. I felt any discrepancies with |
| 13 | BATF could be worked out. |
| 14 | I cooperated fully. I left everything just the way |
| 15 | it was even though they had never stepped foot in the |
| 16 | manufacturing portion of my shop at that point in time. |
| 17 | I contacted them on two separate occasions to find out |
| 18 | what the status was on the case and on the things that |
| 19 | they seized from me. I was told they were waiting on |
| 20 | word from Washington, and during that time frame, I |
| 21 | basically went out of business. |
| 22 | As to Count 1, I truly interpreted the ATF |
| 23 | regulations book — the only book that I had in my |
| 24 | possession of 1980 and 1989 — to mean a serial number |
| 25 | was not required until it was sold, shipped, or |

77

1   otherwise disposed of.  This was the only regulation
2   book in print and the only one that I had in my
3   possession.

4       I, of course, now know it crystal clear that that's
5   not the way that it is and that I'm supposed to do it by
6   closing of the next business day.  The next update that
7   was printed by ATF was in October of 1995.  I was never
8   furnished with one of these updates.  I had to receive
9   one from someone else; a friend of mine gave me one.

10      The Code Section 179.102 is what is practiced in
11  the industry, although no one was willing to testify to
12  that fact for fear of retaliation and prosecution.  In
13  regard to the -- briefly, just the transfers to Carl
14  O'Quinn.  There were transfers that were done to Carl
15  O'Quinn, who was my accountant at that time and the
16  person that I transferred these things to that were
17  voided and approved, that I was not indicted on that
18  were done in exactly the same way the others that I
19  furnished to the Court were done.

20      In closing, Your Honor, whenever I thought of
21  someone who was a convicted felon, I thought of a person
22  who committed a terrible crime, certainly not one that I
23  considered to be paperwork and a misinterpretation of
24  the law.  I did not and have not knowingly committed a
25  crime and I did not have any criminal intent, and that's

**Exhibit A, Pg. 669**

78

1     all I have to say.

2          THE COURT: All right.  Thank you, Mr. Leasure.

3     Normally, going strictly by the guidelines in the case

4     we would come up with the possession of silencers and it

5     being a violation of the statute would come into the

6     guidelines with a basic 78 points under 2K2.1(a)(5).

7     The unlawful possession of a firearm has a entry level

8     of 18.

9          And if I took into account the whole 19 of the

10    silencers, there would be added at least -- we would be

11    between 13 and 24 and you would add 4 points and that

12    would come up with a total of 22 for which the guideline

13    sentencing table would reach 41 to 51 months.  But I'm

14    satisfied in the case not that there hasn't been a

15    violation, there has been so far as I'm concerned

16    clearly shown, but that the impact of the bundle of

17    silencers which were introduced as evidence in this

18    court range from little small implements to something of

19    considerable size and the finding of those in a cabinet,

20    as Mr. Leasure suggests, in a locked cabinet, and, of

21    course, at that point the violation had already

22    occurred.

23         But it seems to me that this matter falls under 5K2

24    of the guidelines and I quote it.  It says that the

25    judge may depart from the guidelines and impose a

Exhibit A, Pg. 670

19

1    sentence outside of the guidelines, "if there exists an
2    aggravating or mitigating circumstance of a kind or to a
3    degree not adequately taken into consideration by the
4    sentencing commission in formulating the guidelines,
5    that should result in a sentence different from that
6    described." I think that's the case here.

7        I'd add one thing further in Mr. Leasure's favor,
8    the record wasn't written up totally in the case but as
9    I recall it, the sales that had been made by him had
10   been made to other Governments under prohibitions
11   granted by the United States or to the agencies of the
12   United States so that generally speaking there was a
13   great deal of scrutiny being applied to silencers and
14   their manufacture as indeed there should be because it's
15   certainly an implement that is used in covertness of the
16   most advanced sort. I, therefore, will depart down by 5
17   points and come to -- well, depart by 9 points, that
18   comes to 13 which carries under the Sentencing Tables of
19   Criminal History Category 1, 12 to 18 months and
20   sentence him at the bottom of that to 12 months, $50 for
21   the conviction of a felony, waive fine, three years
22   supervised release.

23       So to review that that would be that pursuant to
24   this order of the Court, John Daniel Leasure is hereby
25   committed to the custody of the United States Bureau of

**Exhibit A, Pg. 671**

274

60

```
 1    Prison to be by them incarcerated for a period of 12
 2    months.  That he shall serve a term of supervised
 3    release of three years upon his release from
 4    incarceration.  That if requested by the probation
 5    people upon his release on supervised release, he would
 6    take such tests for the use of any controlled substance
 7    within a reasonable time period thereafter that should
 8    be required of him.
 9        You have a right of appeal, Mr. Leasure.  If you
10    wish to appeal, you must notify the clerk of this court
11    in writing within ten days.  If you do not have the
12    money to hire an attorney to prosecute an appeal and if
13    you fall within the statutes being provided, an attorney
14    would be appointed by the United States and paid by the
15    United States.
16        If you don't have the money to pay the cost of such
17    an appeal and if you fall within the statute they've
18    provided, that cost will be paid by the United States.
19    Where you would be incarcerated for this period of 12
20    months would be a matter that would have to be
21    determined by the Marshall's office, and I'll leave you
22    free on bond under the present orders of the Court to
23    report before 2 p.m. on June the 21st.  I don't have a
24    calendar.  Is that not on a Friday, Saturday, or Sunday?
25        MS. ALLEN:  That's on a Friday, Your Honor.
```

**Exhibit A, Pg. 672**

| | |
|---|---|
| 1 | MADAM CLERK: It is a Friday, Judge. |
| 2 | THE COURT: All right. The 20th, Thursday, to the |
| 3 | U.S. Marshall at Norfolk by two o'clock, June 20, 1996. |
| 4 | If a point of designation has been indicated by the |
| 5 | Department of Prisons and Bureau of Prisons at that |
| 6 | time, you would report to the warden of the prison so |
| 7 | designated before two o'clock of June 20th, 1996. |
| 8 | Now, I assume if he appeals -- I assume he's going |
| 9 | to appeal. What sort of bond is he presently on, |
| 10 | Mr. Montague? |
| 11 | MR. MONTAGUE: It is a monetary amount, Your Honor. |
| 12 | I don't recall. |
| 13 | THE COURT: Well, let me look. I'll find it. |
| 14 | MR. MONTAGUE: It's not a surety bond. |
| 15 | THE COURT: He's on an unsecured appearance bond in |
| 16 | the amount of $10,000. If he appeals, I would require |
| 17 | that he have a secured bond for the $10,000, but I would |
| 18 | leave him on bond pending that appeal, but I won't leave |
| 19 | him on a $10,000 personal recognizance bond. He'll have |
| 20 | to come up with security if he wants to take advantage |
| 21 | of that. |
| 22 | MR. MONTAGUE: Understood. |
| 23 | THE COURT: All right. Have a seat. Hand this to |
| 24 | the probation officer. Miss Clerk, let me give you |
| 25 | these papers. |

276

82

```
 1        MS. ALLEN:  Your Honor, just for the record, the
 2   Government needs to object to the Court's ruling
 3   regarding the downward departure.
 4        THE COURT:  I couldn't hear you.
 5        MS. ALLEN:  Just for the record, we're going to
 6   object to your downward departure with respect to the --
 7        THE COURT:  Be my guest.
 8        MS. ALLEN:  Thank you.
 9        THE COURT:  This goes back.  All right.  Miss
10   Clerk, recess the court.
11
12                    CERTIFICATION
13        I certify that the foregoing is a correct
14   transcript from the record of proceedings in the above-
15   entitled matter.
16
17   Diane Poulin, Court Reporter              6-29-96
                                                 Date
18
19
20
21
22
23
24
25
```

**Exhibit A, Pg. 674**