**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAMIEN GUEDES,
            *et al.*


                        Plaintiffs,

            v.

BUREAU OF ALCOHOL, TOBACCO
FIREARMS, AND EXPLOSIVES,
            *et al.*


                        Defendants.

Case No.  1:18-cv-02988-DLF
The Hon. Judge Friedrich

DAVID CODREA,
            *et al.*


                        Plaintiffs,

            v.

BUREAU OF ALCOHOL, TOBACCO
FIREARMS, AND EXPLOSIVES,
            *et al.*


                        Defendants.

Case No.  1:18-cv-03086-DLF
The Hon. Judge Friedrich

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ...........................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ...............................................2

    I.     Statutory Framework for Regulation of Firearms ..............................................2

    II.    Past Regulation of Bump Stocks ........................................................................4

    III.   Development and Issuance of the Rule ...............................................................5

    IV.   The Instant Actions. ............................................................................................7

    V.    Other Litigation Over the Rule ..........................................................................8

STANDARD OF REVIEW .............................................................................................9

ARGUMENT ................................................................................................................10

    I.     The Rule Is Not Arbitrary or Capricious in Its Definitions or Treatment of
          Bump Stocks. ....................................................................................................10

          A.    The Rule Gives the Terms "Single Function of the Trigger" and
                "Automatically" Their Ordinary, Accepted Meaning. ........................11

          B.    The Rule Correctly Applies Its Interpretations of "Single Function of
                the Trigger" and "Automatically" To Classify Bump Stocks As
                Machine Guns. ....................................................................................14

          C.    The Rule Reasonably Distinguishes Between Bump Stocks, Other
                Weapons, and Other Methods of Bump Firing a Weapon. ..................17

          D.    The Rule Reasonably Required That Bump Stocks Be Destroyed, Not
                Disabled. .............................................................................................18

          E.    The Rule Properly Reflects Input From Elected Officials. .................19

          F.    The Rule Properly Explains the Department's Change in Course. ..................20

          G.    The Rule of Lenity Does Not Prohibit the Department's
                Interpretation. .....................................................................................21

          H.    The Rulemaking Is Procedurally Valid. .............................................22

II.    The Rule Is Promulgated Pursuant to Valid Authority..................................................24

       A.    Congress Has Provided Defendants With the Authority to Issue the
             Rule.......................................................................................................................24

       B.    The Rule Does Not Reflect an Improper Delegation of Legislative
             Authority or Violate the Separation of Powers.....................................................26

III.   The Rule Satisfies the Due Process Clause and Is Not Impermissibly Vague..............28

IV.    Defendants are Entitled to Judgment on Plaintiffs' Takings Claims. ...........................32

       A.    The Court Lacks Jurisdiction over Plaintiffs' Takings Claims. ......................32

       B.    Plaintiffs Are Not Entitled to Relief on Their Takings Claims.......................33

V.     Defendants Are Entitled to Judgment on Plaintiffs' Other Claims. ..............................35

       A.    The Rule Is Not Retroactive. .................................................................................35

       B.    The Rule Properly Concluded That the Department Lacks Authority
             to  Grant an Amnesty.............................................................................................37

CONCLUSION .................................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. U.S.*,
    573 U.S. 169 (2014) ........................................................................................................21

*Acadia Tech., Inc. v. United States*,
    458 F.3d 1327 (Fed. Cir. 2006) .....................................................................................33

*Agape Church v. FCC*,
    738 F.3d 397 (D.C. Cir. 2013) .......................................................................................10

*\*Akins v. U.S.*,
    312 F. App'x 197 (11th Cir. 2009) ............................................................................ 4, 31

*\*Akins v. United States*,
    82 Fed. Cl. 619 (2008) ................................................................................................ 4, 34

*Am. Public Gas Ass'n v. Federal Power Comm'n*,
    498 F.2d 718 (D.C. Cir. 1974) .......................................................................................30

*\*AmeriSource Corp. v. United States*,
    525 F.3d 1149 (Fed. Cir. 2008) .....................................................................................33

*Andrus v. Allard*,
    444 U.S. 51 (1979) .........................................................................................................35

*\*Aposhian v. Barr*,
    374 F. Supp. 3d 1145 (D. Utah 2019), *aff'd* --- F.3d ---, 2020 WL 2204198
    (10th Cir. May 7, 2020) ...................................................................................8, 10, 11, 13

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) .......................................................................................................41

*ATX, Inc. v. U.S. Department of Transportation*,
    41 F.3d 1522 (D.C. Cir. 1994) .......................................................................................20

*Baldwin v. United States*,
    921 F.3d 836 (9th Cir. 2019) .........................................................................................36

*Barnes v. U.S.*,
    122 Fed. Cl. 581 (Fed. Cl. 2015) ..................................................................................34

*Bell Atlantic Telephone Cos. v. FCC*,
    79 F.3d 1195 (D.C. Cir. 1996) .......................................................................................10

*Bldg. Owners & Managers Ass'n v. FCC,*
  254 F.3d 89 (D.C. Cir. 2001) .................................................................................35

*Brewer v. HUD,*
  508 F. Supp. 72 (S.D. Ohio 1980)..........................................................................32

*Brooks v. United States,*
  267 U.S. 432 (1925) ................................................................................................34

*Calder v. Bull,*
  3 U.S. 386 (1798) ....................................................................................................36

*Calif. ex. rel. Lockyer v. FERC,*
  329 F.3d 700 (9th Cir. 2003) ..................................................................................30

*Chevron v. NRDC,*
  467 U.S. 837 (1983) ..................................................................................................7

*City of Portland v. EPA,*
  507 F.3d 706 (D.C. Cir. 2007) ...............................................................................18

*Connally v. Gen. Const. Co.,*
  269 U.S. 385 (1926) ................................................................................................30

*Cranford Fitting Co. v. J.T. Gibbons, Inc.,*
  482 U.S. 437 (1987) ................................................................................................40

*Edelman v. Lynchburg Coll.,*
  535 U.S. 106 (2002) ................................................................................................10

*English v. Trump,*
  279 F. Supp. 3d 307 (D.D.C. 2018) ........................................................................39

*FBME Bank v. Lew,*
  209 F. Supp. 3d 299 (D.D.C. 2019) ........................................................................29

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ...........................................................................................19, 21

*F.J. Vollmer v. Higgins,*
  23 F.3d 448 (D.C. Cir. 1994) ..................................................................................25

*Fed./Postal/Retiree Coalit., AFGE v. Devine,*
  751 F.2d 1424 (D.C. Cir. 1985) ..............................................................................24

*Firearms Policy Coal. v. Barr,*
  419 F. Supp. 3d 118 (D.D.C. 2019) ..........................................................................8

*First English Evangelical Lutheran Church of Glendale v. County of L.A.*,
    482 U.S. 304 (1987) ..................................................................................35

*Fla. Rock Indus., Inc. v. United States*,
    18 F.3d 1560 (Fed. Cir. 1994) ...............................................................34

*Ford Motor Co. v. Texas Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ..................................................................31

*Fox v. Clinton*,
    684 F.3d 67 (D.C. Cir. 2012) ...................................................................9

*Friends of Animals v. Ross*,
    396 F. Supp. 3d 1 (D.C. Cir. 2019) .........................................................9

*Fulbright v. McHugh*,
    67 F. Supp. 3d 81 (D.D.C. 2014) ...........................................................32

*Gambrell v. Fulwood*,
    950 F. Supp. 2d 109 (D.D.C. 2013) .......................................................37

*German Alliance Ins. Co. v. Barnes*,
    189 F. 769 (C.C.D. Kan. 1911) ..............................................................33

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................31

*Guedes v. ATF*,
    356 F. Supp. 3d 109 (D.D.C. 2019) ..................................................*passim*

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019) ..............................................................*passim*

*Guedes v. ATF*, No. 19-296,
    140 S. Ct. 789 (Mar. 2, 2020) ............................................................ 8, 10

*Gun Owners of Am. ("GOA") v. Barr*,
    363 F. Supp. 3d 823 (W.D. Mich. 2019) ..........................................8, 9, 21

*Gun South Inc. v. Brady*,
    877 F.2d 858 (11th Cir. 1989) ...............................................................31

*Hills v. Scottsdale Unified School Dist. No. 48*,
    329 F.3d 1044 (9th Cir. 2003) ...............................................................31

*Holliday Amusement Co. of Charleston v. South Carolina*,
    493 F.3d 404 (4th Cir. 2007) .............................................................34, 35

*Jackson v. U.S.*,
   143 Fed. Cl. 242 (Fed. Cl. 2019)................................................................32

*Kandi v. United States*,
   97 A.F.T.R.2d 2006-721, 2006 WL 83463 (W.D. Wash. 2006)............................36

*Lane v. United States*,
   No. 3:19-cv-1492-X, 2020 WL 1513470 (N.D. Tex. Mar. 30, 2020)......................34

*Lockhart v. United States*,
   136 S. Ct. 958 (2016)...........................................................................22

*Loving v. United States*,
   517 U.S. 748 (1996)............................................................................27

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992)..........................................................................33

*Maracich v. Spears*,
   570 U.S. 48 (2013).............................................................................21

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...........................................................................29

*Maynard v. Cartwright*,
   486 U.S. 356 (1988)...........................................................................31

*McCutchen v. United States*,
   145 Fed. Cl. 42 (Fed. Cl. 2019).......................................................... 9, 34

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016)........................................................................37

*Minn. State Bd. for Comm'ty Colls. v. Knight*,
   465 U.S. 271 (1984)...........................................................................28

*Modern Sportsman, LLC v. United States*,
   145 Fed. Cl. 575 (Fed. Cl. 2019)........................................................ 9, 34

*Morton v. Mancari*,
   417 U.S. 535 (1974)...........................................................................40

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983).............................................................................10

*Mugler v. Kansas*,
   123 U.S. 623 (1887)...........................................................................33

*National Mining Ass'n v. U.S. Dep't of Interior,*
    251 F.3d 1007 (D.C. Cir. 2001) ........................................................................29

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ........................................................................................39

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ................................................................. 19, 20

*Nat'l Coal. Against the Misuse of Pesticides v. Thomas,*
    809 F.2d 875 (D.C. Cir. 1987) ........................................................................28

*Nat'l College Preparatory v. D.C. Charter School Bd.,*
    2019 WL 7344826 (D.D.C. Dec. 11, 2019) ....................................................30

*Nat'l Lifeline Ass'n v. FCC,*
    915 F.3d 19 (D.C. Cir. 2019) ..........................................................................21

*Nat'l Rifle Ass'n v. Brady,*
    914 F.2d 475 (4th Cir. 1990) ..........................................................................23

*Nevada v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) ..........................................................................23

*Norwest Bank Minnesota Nat. Ass'n v. F.D.I.C.,*
    312 F.3d 447 (D.C. Cir. 2002) ........................................................................38

*Olim v. Wakinekona,*
    461 U.S. 238 (1983) ........................................................................................29

*Ozark Auto. Distrib., Inc. v. NLRB,*
    779 F.3d 576 (D.C. Cir. 2015) ........................................................................22

*PDK Labs. v. DEA,*
    362 F.3d 786 (D.C. Cir. 2004) ................................................................... 23, 24

*Perez v. Mortgage Bankers Ass'n,*
    135 S. Ct. 1199 (2015) ............................................................................... 25, 26

*Perry v. U.S.,*
    28 Fed. Cl. 82 (Fed. Cl. 1993) ........................................................................32

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ........................................................................................41

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ........................................................................................40

*Rivers v. Roadway Express,*
   511 U.S. 298 (1994) ................................................................................................36

*Roberts v. Bondi,*
   2018 WL 3997979 (M.D. Fla. Aug. 21, 2018) ...............................................30

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) ................................................................................................35

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,*
   789 F.2d 26 (D.C. Cir. 1986) ..............................................................................10

*Seal v. Morgan,*
   229 F.3d 567 (6th Cir. 2000) ..............................................................................29

*Shalala v. Guernsey Mem'l Hosp.,*
   514 U.S. 87 (1995) ..................................................................................................25

*Sierra Club v. Mainella,*
   459 F. Supp. 2d 76 (D.D.C. 2006) .......................................................................9

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ..................................................................................4

*Springfield, Inc. v. Buckles,*
   292 F.3d 813 (D.C. Cir. 2002) .....................................................................20, 21

*\*Staples v. U.S.,*
   511 U.S. 600 (1994) ................................................................................................11

*Tabb Lakes v. U.S.,*
   10 F.3d 796 (Fed. Cir. 1993) ...............................................................................32

*Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency,*
   535 U.S. 302 (2002) ................................................................................................33

*Tate v. Dist. of Columbia,*
   601 F. Supp. 2d 132 (D.D.C. 2009) ..................................................................33

*Touby v. United States,*
   500 U.S. 160 (1991) ................................................................................................27

*Traynor v. Turnage,*
   485 U.S. 535 (1988) ................................................................................................39

*Trudeau v. FTC,*
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................24

*U.S. v. Hunter,*
   843 F. Supp. 235 (E.D. Mich. 1994) .................................................................... 39, 40

*U.S. v. Williams,*
   216 F.3d 1099 (D.C. Cir. 2000) ............................................................................... 39

*United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus., AFL-CIO v. Reno,*
   73 F.3d 1134 (D.C. Cir. 1996) ................................................................................. 40

*United States v. Anderson,*
   59 F.3d 1323 (D.C. Cir. 1995) ................................................................................. 22

*United States v. Awan,*
   966 F.2d 1415 (11th Cir. 1992) ............................................................................... 31

*United States v. Carter,*
   465 F.3d 658 (6th Cir. 2006) ................................................................................... 13

*United States v. Dodson,*
   519 F. App'x 344 (6th Cir. 2013) ............................................................................ 25

*United States v. Droganes,*
   728 F.3d 580 (6th Cir. 2013) ................................................................................... 33

*United States v. Evans,*
   978 F.2d 1112 (9th Cir. 1992) ................................................................................. 13

*United States v. Fisher,*
   145 Fed. Appx. 379 (6th Cir. 2005) ........................................................................ 41

*United States v. Fla. E. Coast Ry. Co.,*
   410 U.S. 224 (1973) ........................................................................... 22, 23, 28, 29

*United States v. Fleischli,*
   305 F.3d 643 (7th Cir. 2002) ................................................................................... 13

*United States v. Jokel,*
   969 F.2d 132 (5th Cir. 1992) ................................................................................... 13

*United States v. McDonald,*
   991 F.2d 855 (D.C. Cir. 1993) ................................................................................. 21

*United States v. Oakes,*
   564 F.2d 384 (10th Cir. 1977) ................................................................................. 11

*United States v. Olofson,*
   563 F.3d 652 (7th Cir. 2009) ................................................................................... 14

*United States v. Sun–Diamond Growers of Cal.,*
   526 U.S. 398 (1999) ..................................................................................................37

*United States v. Vector Arms Inc.,*
   Case No. 14-cv-00046, 2017 WL 2838210 (W.D. Va. June 30, 2017) ...................................41

*Via Christi Regional Med. Ctr. v. Leavitt,*
   2006 WL 2773006 (D. Kan. Sept. 25, 2006) ............................................................16

*Weaver v. Graham,*
   450 U.S. 24 (1981) ..................................................................................................37

*Whitman v. Am. Trucking Ass'n,*
   531 U.S. 457 (2001) ..................................................................................................27

*Wisc. Cent. Ltd. v. United States,*
   --- U.S. ---, 138 S. Ct. 2067 (2018) ............................................................................11

**Statutes**

5 U.S.C. § 706 .......................................................................................................1, 9, 22

15 U.S.C. § 78n .........................................................................................................27

18 U.S.C. § 921 ...........................................................................................................3, 7

18 U.S.C. § 922 ....................................................................................................*passim*

18 U.S.C. § 926 ...............................................................................................22, 24, 25

26 U.S.C. ch. 53 ...........................................................................................................2

26 U.S.C. § 5822 ...........................................................................................................3

26 U.S.C. § 5841 .........................................................................................................41

26 U.S.C. § 5842 .........................................................................................................41

26 U.S.C. § 5845 ....................................................................................................*passim*

26 U.S.C. § 7801 ...............................................................................................2, 24, 25

26 U.S.C. § 7805 ...............................................................................................24, 25, 35

28 U.S.C. § 599A ...........................................................................................................2

28 U.S.C. § 1346 .........................................................................................................32

28 U.S.C. § 1491 ..................................................................................................................32

82 Stat. 197.........................................................................................................................3
100 Stat. 453.......................................................................................................................39

Ohio Rev. Code Ann. § 2923.11 (West 2017) .......................................................................7

Pub. L. 73-474, 26 U.S.C. ch. 53 ........................................................................................2

Pub. L. 90-351, 18 U.S.C. ch. 44 ........................................................................................2

Pub. L. 90-619, 82 Stat. 1236 ......................................................................................38, 42

Pub. L. 99-308 ....................................................................................................................2
v
Pub. L. 107-296, 116 Stat. 2135 (2002) ...............................................................................2

Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968) ........................................................3

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................9

Local Civil Rule 7(n) ..........................................................................................................1

**Regulations**

27 C.F.R. Part 479 ............................................................................................................41

27 C.F.R. § 479.105...........................................................................................................41

27 C.F.R. § 447.11 .............................................................................................................6

27 C.F.R. § 448.11 .............................................................................................................6

8 C.F.R. § 0.130 .................................................................................................................2

82 FR 60929.......................................................................................................................5

83 FR 7949 ...................................................................................................................5, 20

83 FR 13442.......................................................................................................................6

83 FR 66516.................................................................................................................passim

**Other Authorities**

132 Cong. Rec. S5360........................................................................................................40

132 Cong. Rec. S5361 .................................................................................................40

ATF, NFA Handbook (2009), *available at*: https://go.usa.gov/xpwp5 .....................4

ATF Ruling 82-8, https://www.atf.gov/firearms/docs/ruling/1982-8-sm10-sm11a-pistols
    -and-sac-carbines-nfa-weapons/download.........................................................39

ATF Ruling 94-1, https://www.atf.gov/file/55416/download ....................................39

ATF Ruling 94-2, https://www.atf.gov/file/55426/download ....................................39

Dwight D. Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958) ...................12

Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*,
    4 J. Legal Studies 133 (1975)..............................................................................3

H.R. Rep. No. 73-1780 (1934) .................................................................................12

H.R. Rep. No. 99-495 (1986), 1986 U.S.C.C.A.N. 1327 ...........................................3

H.R. 9066, 73rd Cong., (1934)..................................................................................12

Josh Blackman, *Presidential Mal-administration*, 2018 Ill. L. Rev. 397, 405 (2018) ...................20

*Nightline: Biting the Bullet at the NRA [National Rifle Association]*,
    (ABC television broadcast, June 8, 1990) ...................................................11, 12

Oliver Wendell Holmes, Jr., <u>The Common Law: Lecture IV</u> (1881) .........................12

S. Rep. 73-1444 (1934) ............................................................................................12

S. Rep. No. 89-1866 (1966) .......................................................................................3

Stephen P. Halbrook, Firearms Law Deskbook (2019) ............................................40

Webster's New World Dictionary (3d ed. 1988)....................................................11, 13

**INTRODUCTION**

Plaintiffs wish to continue to possess "bump stocks," devices that transform ordinary semi-automatic weapons into extremely dangerous machine guns, which the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Department of Justice (collectively, "the Department" or "DOJ") properly determined are prohibited by statute.   After a deadly massacre in Las Vegas underscored the dangers of bump stocks, which the Department previously and erroneously classified as unregulated firearms parts, the Department reviewed its prior determinations and engaged in rulemaking to revise its treatment of these weapons.  The resulting final rule, *Bump-Stock-Type Devices*, *see* 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Rule"), corrected the erroneous prior classifications and amended the Department's regulations to clarify that a bump stock is a machine gun. *See id.*  As this Court and others correctly concluded in rejecting requests for preliminary relief against the Rule, the Rule is substantively correct because, when a bump stock is installed and used as designed, a shooter fires the weapon automatically with a single pull of the trigger, which is the hallmark of a machine gun under federal law.  *See* 26 U.S.C. § 5845(b).  Following the denial of preliminary relief, the Rule went into effect on March 26, 2019, and this litigation is now ripe for final disposition.

The two pending cases set forth a variety of overlapping challenges to the Rule under the Administrative Procedure Act ("APA") and various constitutional provisions.  *See* Second Amended Complaint, Case No. 18-cv-3086, ECF No. 35 ("Codrea SAC"); Second Amended Complaint, Case No. 18-cv-2988, ECF No. 58 ("Guedes SAC").  The parties have agreed that these cases should be resolved on the basis of applicable law and the administrative record produced for the Rule, *see* 5 U.S.C. § 706(2),[1] and that, although Plaintiffs' claims are not identical, judicial economy would best be served by having the briefing in the two cases consolidated before the Court.  Plaintiffs allege that the bump stock rule is arbitrary and capricious, not in accordance with law, and in excess of statutory authority under the APA

---

[1] The Administrative Record ("AR") has been produced to Plaintiffs and an index filed on the docket in each case. *See* 18-cv-3086, ECF No. 36 (Apr. 7, 2020); 18-cv-2988, ECF No. 59 (Apr. 7, 2020).  In accordance with Local Civil Rule 7(n), Defendants will consult with Plaintiffs and prepare a joint appendix containing the material cited within 14 days following the completion of briefing on this motion and Plaintiffs' cross-motion.  In addition, for the Court's convenience, the rulemaking comments cited in this brief have been reproduced in Exhibit 1, and are cited both to that Exhibit and to the AR page on which the comment is listed.

because, in their view, their bump stocks are not machine guns within the statutory definition. As to the Constitution, Plaintiffs contend, *inter alia*, that, in promulgating the Rule, the Department has exercised authority that the Constitution places in Congress and that has not properly been delegated to the Executive Branch; that statutory law and the Due Process Clause required additional procedures; that the Rule retroactively changes the classification of their bump stocks from lawful to unlawful in violation of the Ex Post Facto Clause and that Defendants were therefore required to provide an "amnesty" for existing bump stocks; or, in the alternative, that the Fifth Amendment requires compensation for the destruction of their bump stocks. Defendants are entitled to judgment on all of these claims.

### STATUTORY AND REGULATORY BACKGROUND

### A. Statutory Framework for Regulation of Firearms

Machine guns are strictly regulated through an interconnected array of federal laws dating back to the 1930s: the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. ch. 53; the Gun Control Act of 1968 ("GCA"), Pub. L. 90-351, 18 U.S.C. ch. 44; and the Firearm Owners Protection Act of 1986, ("FOPA"), Pub. L. 99-308. Together, these statutes generally prohibit the possession by members of the public of newly-manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA. *See* 18 U.S.C. § 922(o). These statutes share a common statutory and regulatory definition of machine guns, and the Rule revised the regulatory definition to clarify that bump stocks are properly classified as machine guns.[2]

> The definition of machine gun used by all of these statutes is set forth in the NFA as follows:
>
> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed

---

[2] The Final Rule amends the regulations of ATF, which is charged with the administration and enforcement of the GCA and the NFA. The Final Rule was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF. *See* 28 C.F.R. § 0.130(a)(1). NFA provisions still refer to the "Secretary of the Treasury." *See* 26 U.S.C. Ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

> and intended, for use in converting a weapon into a machinegun, and any combination
> of parts from which a machinegun can be assembled if such parts are in the possession
> or under the control of a person.

26 U.S.C. § 5845(b).  At the time of its enactment, the NFA was "popularly known as an 'anti-machine gun' law."  Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Studies 133, 138 n.29 (1975).  The NFA regulated machine guns (and other "firearms")[3] as an exercise of Congress's taxing authority, and the NFA continues to be codified in the Internal Revenue Code and imposes taxes on the lawful manufacturers of firearms.  *See* 26 U.S.C. § 5822.

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime."  *See* 18 U.S.C. § 921 *et seq.*; S. Rep. No. 89-1866, at 1 (1966).  The GCA supplanted some prior firearms regulations, but exists alongside the NFA.  *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968). The GCA generally established the current framework under which gun dealers and purchases are regulated, and limited the sale of machine guns to those who could obtain a supportive, sworn statement from local law enforcement.  *See* GCA, 82 Stat. 197, 230.

In 1986, Congress again turned its attention to firearms, directly addressing the hazards of machine guns.  *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun limits as "benefit[ing] law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns"). Congress therefore enacted the FOPA "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime."  H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327.  Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA.  Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or
> any department or agency thereof or a State . . .; or

_____

[3] The term "firearms" in 26 U.S.C. § 5845 includes machine guns, short-barreled shotguns, short-barreled rifles, and several disparate items such as silencers, rockets, and grenades, but not standard-length shotguns, semi-automatic rifles, or non-automatic handguns.

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2).

### B. Past Regulation of Bump Stocks

After the FOPA barred the manufacture and sale to the public of new machine guns, the price of machine guns lawfully possessed pursuant to subsection (B) "steadily increased over time" due to continuing interest by firearms owners in the automatic-fire capability of such weapons and a static supply of earlier-manufactured machine guns.  83 FR 66515-16.  This rising price spurred innovation as manufacturers sought to devise ways to simulate automatic weapons fire while remaining compliant with 18 U.S.C. § 922(o).  *See, e.g.*, Ex. 1 at 2 (AR002664); Ex. 1 at 24 (AR00232).  In 2002 and 2004, one weapons developer asked ATF whether the Akins Accelerator, the early model of a bump stock owned by Mr. Codrea, would be classified as a machine gun under the NFA.[4]  *Akins v. U.S.*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam); AR 000007-AR000021.  ATF tested a prototype of the device and, after initially concluding it did not constitute a machine gun, reversed its view and classified the weapon as a machine gun.  *Id.* at 198-99; *see* AR000075-AR000077.  To implement its revised view of the Akins Accelerator, ATF issued a policy statement explaining that the Akins device and similar attachments that use an internal spring to harness the force of recoil so that a weapon shoots more than one shot with a single pull of the trigger are machine guns.  AR005600; *see also* 83 FR 66516.  ATF also determined that the phrase "single function of the trigger" should be interpreted as a "single pull of the trigger" by the shooter, not a single trigger motion. AR005599. ATF then ordered the manufacturer "to register the devices he possessed or to surrender them," *Akins*, 312 F. App'x 199, and instructed existing owners of bump stocks to disable their devices by removing and disposing of the internal spring.  *See* AR000090-AR000092.  The inventor brought suit to challenge the reclassification of the device, as well as a takings claim seeking compensation, and courts rejected both claims.  *See Akins*, 312 F. App'x at 198; *Akins v. United States*, 82 Fed. Cl. 619 (2008).

---

[4] ATF permits manufacturers and owners to seek ATF's view regarding the correct classification of a firearm, accessory, or other item, and in response, the agency may provide a classification letter indicating its current position on a particular device. *See* ATF, NFA Handbook § 7.2.4 (2009), *available at*: https://go.usa.gov/xpwp5; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).

The Department soon received classification requests for other bump stocks that, unlike the Akins Accelerator, did not include internal springs. In a series of classification decisions between 2008 and 2017, the Department concluded that some such devices were not machine guns. *See* AR000103-AR000278; Codrea SAC at ¶¶ 41-42 (describing these as "written determination letter[s]"). Under the analysis used, although the bump stocks acted with a "single pull of the trigger," the bump stocks did not fire "automatically" because they lacked internal springs or other mechanical parts that channeled recoil energy. 83 FR 66517. The conclusion that some bump stocks were not machine guns placed those devices outside the scope of federal firearms regulations altogether, *see id*, and these weapons became popular for recreation among those seeking inexpensive substitutes for machine guns grandfathered by the FOPA. *See, e,g.*, Ex. 1 at 25 (AR001455), Ex. 1 at 27 (AR001500) Ex. 1 at 30 (AR001752).

## C. Development and Issuance of the Rule

The Las Vegas massacre brought into sharp relief the shortcomings of the previous treatment of bump stocks. Fifty-eight concertgoers were killed, hundreds more wounded, and when investigators entered the shooter's hotel room, they discovered that the majority of the shooter's rifles were equipped with bump stocks. AR000325-AR000328; *see also* AR3314. The Las Vegas attack, and the public attention given to bump stocks in the wake of that crime, led the Department to revisit its prior treatment of bump stocks, as well as its interpretations of the terms used to define machinegun in 26 U.S.C. § 5845(b). *See* 83 FR 66516-17. As an initial step, the Department published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register. *See* AR000773 (*Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017)). The ANPRM solicited comments concerning the market for bump stocks. *See id.* Specifically, the ANPRM asked a set of questions of manufacturers, consumers, and retailers regarding the cost of bump stocks, the number of sales, the cost of manufacturing, and input on the potential effect of a rulemaking prohibiting bump stocks. *See* 83 FR 60930-31. Public comment on the ANPRM concluded on January 25, 2018, yielding 115,916 comments. *Id.* at 60929; *see* AR00198.

On February 20, 2018, the President issued a memorandum to the Attorney General

concerning bump stocks.  *See* AR000790 (*Definition of Machinegun*, 83 FR 7949).  The memorandum instructed the Department, working "within established legal protocols," "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id.*  Carrying out that directive, DOJ published a notice of proposed rulemaking ("NPRM"), setting forth changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 that clarify the meaning of the terms "single function of the trigger" and "automatically."  *See* AR001239 (*Bump-Stock-Type Devices*, 83 FR 13442 (Mar. 29, 2018)).  DOJ received "over 186,000 comments" on the NPRM, 83 FR 66519; *see* AR002121, reviewed those comments, and drafted the Rule, addressing the comments raised.  *See generally* 83 FR 66519-43.  Plaintiffs Codrea, Monroe, Heuman, Guedes, and Firearms Policy Foundation ("FPF") participated in the comment process.  *See* Ex. 1 at 40 (AR002195); Ex. 1 at 41 (AR003054); Ex. 1 at 42 (AR002736); Ex. 1 at 221 (AR003314); Ex. 1 at 50, 135A (AR003614).

DOJ published the Rule in its final form in the Federal Register on December 26, 2018.  *See* 83 FR 66514.  The Rule sets forth DOJ's interpretations of the terms "automatically" and "single function of the trigger."  Consistent with ATF's position since 2006, the Rule explains that the Department is interpreting the phrase "single function of the trigger" to mean a "single pull of the trigger" as well as "analogous motions."  *Id.* at 66515.  As to "automatically," the Rule states that, in the context of the statutory definition of machine gun, the term means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66554.  The Rule explains that these definitions are being adopted because they "represent the best interpretation of the statute."  *Id.* at 66521.

Relying on these definitions, the Rule clarifies for members of the public that "[t]he term 'machine gun' includes a [bump stock]."  *Id.* at 66554.  As the Rule describes, by pulling the trigger once, resting the trigger finger on the device's finger ledge, and maintaining pressure on the barrel-shroud or fore-grip of the rifle with the other hand, a shooter is able to harness the firearm's recoil energy in a continuous back-and-forth cycle that continues until the shooter releases his pull, the

weapon malfunctions, or the ammunition is exhausted.  *Id.* at 66532.  This "self-regulating" or "self-acting" mechanism that allows continuous firing after a single pull of the trigger thus functions "automatically" after a "single function of the trigger."  *Id.*  Because bump stocks convert otherwise semiautomatic firearms into machine guns, the devices are prohibited under 18 U.S.C. § 922(o).[5]  The Department instructed "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office."  *Id.* at 66549.  The Rule explained that DOJ would not take enforcement action for 90 days to give possessors of bump stocks time to destroy the devices or to abandon them at the nearest ATF office.  *Id.* at 66530, 66549.

   **D.  The Instant Actions**.

   Plaintiffs in the *Guedes* action, No. 1:18-cv-02988-DLF, filed the first of these cases on December 18, 2018.  The *Guedes* plaintiffs moved for a preliminary injunction the same day, requesting that the Court prevent the Rule from going into effect.  *See* No. 18-2988, ECF Nos. 1, 2.  Plaintiffs in the *Codrea* case, No. 1:18-cv-3086, filed their action on December 27, 2018, *see* No. 18-3086, ECF No. 1, moving for a preliminary injunction on January 18, 2019.  *See* No. 18-3086, ECF No. 5.  After seeking the views of the parties, the Court entered an order relating these two cases and re-assigning them to the judge presiding over the earlier-filed case, in accordance with Local Civil Rule 40.5.  *See* No. 18-3086, ECF Nos. 14, 15.  After full briefing and a February 19, 2019 motions hearing, *see* No. 18-3086, ECF No. 25, the Court denied the preliminary injunction motions, finding that Plaintiffs in both cases lacked a reasonable likelihood of success on the subset of claims relied on in their respective motions.  *See Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) ("*Guedes I*").  As relevant here, the Court determined that: (1) under the standard set forth by *Chevron v. NRDC*, 467 U.S. 837 (1983), Defendants "reasonably interpreted and applied" the definition of "machinegun" to conclude

---

[5] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."  18 U.S.C. § 921(a)(28).  The term "semi-automatic firearm" is not specifically defined in federal law, but generally refers to any weapon that after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger.  *See, e.g.*, Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger").

that bump stocks are machine guns; (2) Defendants have the "authority to interpret and apply" the definition of "machinegun"; and (3) preliminary relief could not be obtained for Plaintiffs' Takings Clause challenge. *Guedes I* at 128-29, 137.[6]

Plaintiffs in both cases appealed the denial of the preliminary injunction motion, and the D.C. Circuit affirmed. *See Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) ("*Guedes II*"). Although rejecting Defendants' understanding of the Rule as the "agency's interpretation of the best reading of the statutory definition" and concluding that the Rule is instead legislative in character, *id.* at 19-20, the Court of Appeals agreed with Defendants and this Court that the Rule reasonably interprets the statutory definition and applies that definition to bump stocks. *Id.* at 29-34.[7]  The Court of Appeals also rejected any suggestion that Defendants lacked authority to promulgate the Rule. *Id.* at 18, 27. Noting that Plaintiffs' retroactivity claim had "been forfeited because the plaintiff failed to raise it in the district court" preliminary injunction proceedings, the Court of Appeals explained it would reject an Ex Post Facto Clause challenge, finding that the Rule is not retroactive in light of the opinion's earlier conclusion that the Rule is legislative in character. *Id.* at 35.  Plaintiffs sought a writ of certiorari, which was denied, with a brief explanatory statement by Justice Gorsuch concurring in the denial. *See Guedes v. ATF*, No. 19-296, 140 S. Ct. 789 (Mar. 2, 2020) ("*Guedes III*").

### E.  Other Litigation Over the Rule

In addition to the cases in this Court, the Rule has been subject to several other challenges across the country.  Like this court, a district court in Utah denied a preliminary injunction, finding that plaintiffs lacked a likelihood of success on challenges similar to the ones raised in this case, and the Tenth Circuit affirmed. *See Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019); *aff'd* --- F.3d ---, 2020 WL 2204198 (10th Cir. May 7, 2020).  A district court in Michigan also denied a preliminary

---

[6] This case no longer presents a challenge to the validity of the designation of former Acting Attorney General Matthew Whitaker, a question which has already been litigated to dismissal in a separate case before this Court. *See Firearms Policy Coal. v. Barr*, 419 F. Supp. 3d 118 (D.D.C. 2019) (Case No. 18-cv-3083).

[7] A dissent concluded that the Final Rule erred as to its interpretation of one of the statutory terms and in its application of the Department's interpretation of the term "automatically" to bump stocks. *Guedes II*, 920 F.3d at 42 (Henderson, J., dissenting).

injunction against the Rule, and an appeal of that decision remains pending. *See Gun Owners of Am.* ("*GOA*") *v. Barr*, 363 F. Supp. 3d 823 (W.D. Mich. 2019), appeal docketed, No. 19-1298 (6th Cir. Mar. 25, 2019). The Court of Federal Claims has dismissed two takings cases seeking compensation for bump stocks abandoned or destroyed pursuant to the Rule; a third such challenge remains pending in that court while the two dismissals are on appeal to the Federal Circuit. *See McCutchen v. United States*, 145 Fed. Cl. 42 (Fed. Cl. 2019), appeal docketed Nov. 27, 2019, No. 20-1188 (Fed. Cir.); *Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575 (Fed. Cl. 2019), appeal docketed Nov. 1, 2019, No. 20-1107 (Fed. Cir.); *Rouse v. U.S.*, 18-cv-1980 (Fed. Cl.). Several other challenges to the Rule remain pending in district courts. *See Hardin v. ATF*, Case No. 19-cv-56 (W.D. Ky.); *Cargill v. Barr*, Case No. 19-cv-349 (W.D. Tex.); *Lane v. USA*, 3:19-cv-01492-S (N.D. Tex.); *Doe v. Trump*, Case No. 3:19-cv-00006-SMY-RJD (S.D. Ill.).

## STANDARD OF REVIEW

Under Rule 56, summary judgment is to be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In an APA case like this one, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 7 (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "The function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Mainella*, 459 F. Supp. 2d 90 (internal quotations omitted).

The Court's function in reviewing final agency action, as prescribed by the APA, is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Friends of Animals*, 396 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)). The Court is to determine whether the challenged agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and the plaintiff bears the burden of proof in establishing that the legal standard is met.

*See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc). The Court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Rather, review is limited to whether the agency "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, . . . offered an explanation . . . [that] runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Agape Church v. FCC*, 738 F.3d 397, 412 (D.C. Cir. 2013) (*quoting State Farm*, 463 U.S. at 43); *see also Bell Atlantic Telephone Cos. v. FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996).

## ARGUMENT

### I.    The Rule Is Not Arbitrary or Capricious in Its Definitions or Treatment of Bump Stocks.

This Court and the Court of Appeals have already rejected many of plaintiffs' challenges to the Rule in ruling on Plaintiffs' motions for a preliminary injunction. The same result should obtain here. Although both this Court and the Court of Appeals applied *Chevron* deference to the Rule in those earlier opinions, *see Guedes II*, 920 F.3d at 29; *Guedes I*, 356 F. Supp. 3d at 129, this Court need not apply *Chevron* deference to grant summary judgment to the government. As the Supreme Court has explained, resort to deference is unnecessary where an agency has adopted "the position [the court] would adopt" when "interpreting the statute from scratch." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see also Guedes III*, 140 S. Ct. 789-90 (statement of Gorsuch, J.). Because the Rule adopts the correct interpretations of the terms "single function of the trigger" and "automatically" as used in the definition of a machine gun and correctly applies those terms to bump stocks, this Court can and should grant summary judgment to the government on that basis. *See Aposhian*, 374 F. Supp. 3d at 1151 & n.8. If, however, the Court concludes that application of deference is appropriate, then both this Court and the Court of Appeals have already held that Plaintiffs could not establish a substantial likelihood of success on many of their claims, rejecting many of plaintiffs' specific substantive and procedural challenges in the process. *See generally Guedes II*, 920 F.3d at 29-35. Those conclusions would be equally applicable here, and Defendants are

therefore entitled to summary judgment on Plaintiffs' challenges to the Rule.

**A.      The Rule Gives the Terms "Single Function of the Trigger" and "Automatically" Their Ordinary, Accepted Meaning.**

The Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger," along with "analogous motions," an interpretation that "reflect[s] ATF's position since 2006." 83 FR 66518.  As this Court explained in *Guedes I*, this interprets the statute "from the perspective of the shooter." 356 F. Supp. 3d 130.  The Rule and the district court in *Aposhian* both recognized that this "shooter-focused interpretation" is not only reasonable, but is "the best interpretation" of the phrase.  *Aposhian*, 374 F. Supp. 3d 1151; *see* 83 FR 66518.

Courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute," *Guedes I*, 356 F. Supp. 3d 130 (quoting *Wisc. Cent. Ltd. v. United States*, --- U.S. ---, 138 S. Ct. 2067, 2070 (2018)), and "[g]enerally, courts rely on dictionaries from the time statutes became law" to undertake this task.  *Id.*  When, as here, those dictionaries "are of little help" in interpreting the term "single function of the trigger," *id.*, the Court may appropriately turn to the long-time, common-sense understanding that a single pull of the trigger is the manner in which most personal guns are fired (by the shooter's pull on a curved trigger).  For this reason, courts have "instinctively reached for the word 'pull'" when discussing the statutory definition of 'machinegun.'" *Guedes I*, 356 F. Supp. 3d 130 (citing *Staples v. U.S.* 511 U.S. 600, 602 n.1 (1994) and *U.S. v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977)).

In *Staples*, the Supreme Court described a machine gun within the NFA's definition as "a weapon that fires repeatedly with a single pull of the trigger." 511 U.S. 600, 602 n.1.  In *Oakes*, the court explained that automatic fire was achieved "with a single trigger function" by means of "the shooter . . . fully pulling the trigger."  564 F.2d 388.  This accords with common usage in dictionaries and other sources both before and since the enactment of the NFA, including the time in which Congress incorporated the NFA's definition of machine gun into the GCA and the FOPA. *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); *Nightline: Biting the Bullet at the NRA [National Rifle*

*Association]*, (ABC television broadcast, June 8, 1990) (NRA President Joe Foss: "[semi-automatic] guns are like any other gun . . . they're a single-shot, every time you pull the trigger it shoots"); Dwight D. Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger"); *see also* Oliver Wendell Holmes, Jr., <u>The Common Law: Lecture IV</u> (1881) (an ordinary person "would foresee the possibility of danger from pointing a gun which he had not inspected into a crowd, and pulling the trigger, although it was said to be unloaded").

The Rule's interpretation of "single function of the trigger" also reflects longstanding interpretations by ATF, dating to the 2006 ruling that corrected the misclassification of the Akins Accelerator.  *See* AR005599.  There, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted," should be classified as a machine gun.  The ruling noted, as the Rule does, that this "determination is consistent with the legislative history of the NFA."  AR005600.  In particular, Congress received testimony in 1934 that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns."  AR004230 (reproducing *Nat'l Firearms Act: Hrg's Before the Comm. on Ways and Means*, House of Rep's, Second Session H.R. 9066, 73rd Cong., at 40 (1934)).  And in explaining the definition of "machinegun" in the bill that ultimately became the National Firearms Act, *see* H.R. 9741, 73d Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  H.R. Rep. No. 73-1780, at 2 (1934); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions).

The Rule explains that the "single function of the trigger" is the action that initiates a firing sequence that continues automatically, and is therefore consistent with numerous cases recognizing that the definition of this term is not limited either to a specific method of making that trigger

function or to a specific kind of "trigger" mechanism.  As the Ninth Circuit explained in *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992), "'by a single function of the trigger' describes the action that enables the weapon to 'shoot ... automatically ... without manual reloading,' not the 'trigger' mechanism" itself.  This is necessary to ensure that the statutory definition applies to weapons that have "no mechanical trigger" at all.  *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam).  In *Carter*, the Sixth Circuit applied the statutory definition to a modified weapon that, although lacking a traditional "trigger," fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it." *Id.*  Other courts have similarly recognized that a trigger is whatever mechanism serves "to initiate the firing sequence" of a weapon, thereby ensuring that creative or innovative designs cannot be used to circumvent the definition of machinegun. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam); *accord United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (holding that a minigun fired by "an electronic switch" was a machinegun).  And the Rule reflects this longstanding interpretive approach by stating that a "single function of the trigger" encompasses "a single pull of the trigger and analogous motions" like pressing a button, flipping a switch, or otherwise initiating the firing sequence without pulling a traditional trigger. 83 FR 66553.  *See also* id. 66515 ("there are other methods of initiating an automatic firing sequence that do not require a pull"); *id.* (observing that many machineguns "operate through a trigger activated by a push"); *accord* AR000660 (documenting ATF's classification as a machine gun the "AutoGlove," designed to be a glove worn by a shooter, in which pushing a button inside the glove led to an electromechanical "finger" pulling repeatedly the trigger of an ordinary firearm); *accord* Ex. 1 at 61 (AR002333).

The Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" is likewise "the best interpretation of the statute." *Aposhian*, 374 F. Supp. 3d 1153.  "This interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment, *id.* (citing 83 FR 66519), as this Court recognized in *Guedes I.  See* 356 F. Supp. 3d 131 (quoting "automatic," *Webster's New International Dictionary* 157 (1933); "automatic," 1 Oxford

English Dictionary 574 (1933)).  As this Court also highlighted, the Rule's interpretation of "automatically" is "[c]onsistent with . . . the Seventh Circuit's decision in [*U.S. v.* ]*Olofson*, concluding that "'automatically . . . delineates how the discharge of multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading."  356 F. Supp. 3d 131 (quoting *Olofson*, 563 F.3d 652, 658 (7th Cir. 2009)).

### B. The Rule Correctly Applies Its Interpretations of "Single Function of the Trigger" and "Automatically" To Classify Bump Stocks As Machine Guns.

As set forth in the Rule, applying the correct definitions of the statutory terms "single function of the trigger" and "automatically" to bump stocks demonstrates that they are machineguns under federal law.  A bump stock produces automatic fire by a single function of the trigger "because a bump stock permits the shooter to discharge multiple rounds by, among other things, 'maintaining the trigger finger on the device's extension ledge with constant rearward pressure.'"  *Guedes I*, 356 F. Supp. 3d 132 (quoting 83 FR 66532).  This Court explained the application of the statutory terms cogently in *Guedes I*:

> [A] bump stock permits a firearm to function automatically by directing the recoil energy of the discharged rounds into the space created by the sliding stock in constrained linear rearward and forward paths so that the shooter can maintain a continuous firing sequence. . . .  [W]ithout such a device, the shooter would have to manually capture, harness, or otherwise utilize the recoil energy to fire additional rounds and bump fire a gun.  In other words, the bump stock makes it easier to bump fire because it controls the distance the firearm recoils and ensures that the firearm moves linearly—two tasks the shooter would ordinarily have to perform manually. In this way, a bump stock creates a self-acting mechanism that permits the discharge of multiple rounds with a single function of the trigger without manual reloading.

*Id.* at 132-33 (cleaned up).  To be sure, this cycle requires certain "conditions [to be] fixed" to ensure that "a firing sequence that produces more than one shot" occurs, 83 FR 66519, but the Court correctly recognized that "the definition of 'automatically' does not mean that an automatic device must operate spontaneously without any manual input," *Guedes I*, 356 F. Supp. 3d at 132.  The Court analogized this usage of "automatic" to "[a]n automatic sewing machine . . . [which] still requires the user to press a pedal and direct the fabric."  *Id* at 131.  This analogy illustrates the error in the *Codrea*

Plaintiffs' contention that a bump stock is not a machine gun because it requires "coordinated skilled effort" on the part of the shooter.  Codrea SAC ¶ 50.

Citing to the views of Mr. Len Savage, who provided materials submitted as part of Plaintiff Heuman's comment on the NPRM and submitted his own comment, *see* Ex. 1 at 50, 135A (AR003614); *see also* AR002664, the *Codrea* Plaintiffs assert that the "only self acting and self regulating force of a bump-type-stock-device is provided by the shooter and the firearm [and] none is provided by the stock."  Codrea SAC ¶ 45; *see* Ex. 1 at 2 *et seq.* (AR002664).  But that mistakenly assumes that a bump stock must provide a "force" to provide the self-acting mechanism necessary to satisfy the definition of "automatically."  To the contrary, because the bump stock's function is to assist the shooter in harnessing the force of recoil, it need do no more than create limits on that force, thereby providing constraints to the rifle's motion that "the shooter would ordinarily have to [provide] manually."  *Guedes I*, 356 F. Supp. 3d at 132.  DOJ engaged with this and similar comments in the Rule itself, explaining that the "constrained linear rearward and forward paths" provided by a bump stock are what make such stocks "different from a traditional shoulder stock," allowing "shooters to fire . . . without repeated manual manipulation of the trigger by the shooter."  83 FR 66532; *see* Ex. 1 at 77 (AR002240); Ex. 1 at 79 (AR002273); Ex. 1 at 81 (AR002320); Ex. 1 at 84 (AR003951).  The Rule's response explained that many other commenters had provided descriptions that confirm that bump stocks provide a self-regulating mechanism that assists in bump-firing, *see, e.g.*, Ex. 1 at 87 (AR001526); Ex. 1 at 90 (AR001664).  Indeed, the *Codrea* Plaintiffs themselves acknowledge in the portion of Mr. Savage's analysis excerpted in the Complaint that the "small amount of linear motion of the firearm frame" permitted by a bump stock "allow[s]s for safe control of the firearm . . . [with] less risk of loss of control of the firearm."  Codrea SAC ¶ 45

The *Guedes* Plaintiffs rely on a different report by a different individual, former ATF official Rick Vasquez, *see* Guedes SAC ¶ 98, but that report is equally flawed.  In opining that "the shooter must still separately pull the trigger to fire each successive shot," *id.* & Guedes SAC Ex. A at 901, Mr. Vasquez erroneously conflates the mechanical operation of the trigger with the legal definition of the

term "single function of the trigger" adopted by the Rule.[8]  Because a "single function of the trigger" is the action that initiates a firing sequence that continues automatically, *see supra*, the fact that the trigger may release and rest between rounds is irrelevant to whether there is a "single pull" of the trigger. *See Guedes I*, 356 F. Supp. 3d at 132.  The video submitted by Plaintiff FPF alongside its comment is no more compelling.  *See* AR 3314; https://youtu.be/1OyK2RdO63U.  While Plaintiffs contend that "the video shows that each shot requires a *separate* pull of the trigger," Guedes SAC at ¶ 99, the focus in the slow-motion portion of the video on whether separation occurs ignores that a continuing pull of the trigger may continue as long as there is a single volitional act to "hold[] the trigger finger stationary." *Guedes II*, 920 F.3d at 33.  Nor do the slight motions by the trigger finger between the firing of each round demonstrate a volitional impulse on the part of the shooter, let alone the conscious, "additional physical manipulation" of the trigger that Plaintiffs assert is "necessary."  Guedes SAC at ¶ 99 (emphasis omitted).

The administrative record provides additional evidence which the Department reasonably credited over Plaintiffs' videos and reports in concluding bump stocks should be classified as machine guns.  For example, the record highlights the statements of a major bump stock manufacturer, Bump Fire Systems, that its device "uses a gun's recoil to shoot multiple rounds."  AR000837; AR000840. The record also identifies a mechanical explanation described by ATF as a "great animation for understanding bump stocks," which illustrates the manner in which the trigger finger remains fixed and the other hand provides constant pressure, permitting the "harnessing [of] energy" from the recoil into an automatic process.  AR000716, *see* https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited May 15, 2020).  In addition, the patent application for the Slide Fire bump stock, one of the Las Vegas shooter's weapons, explains that the core of the innovation in a bump stock is that "[t]he shoulder stock and pistol grip and finger rest are fixed together as a monolithic handle unit that, in use, is held tight to the user's body," AR 000382, and thus,

---

[8] As this Court recognized in *Guedes I*, Mr. Vasquez's views as a former agency official are entitled to no special weight.  *See* 356 F. Supp. 3d at 132 n.4 (citing *Via Christi Regional Med. Ctr. v. Leavitt*, 2006 WL 2773006, at *13 n.3 (D. Kan. Sept. 25, 2006) ("the personal opinion of [former agency] officials as to what [] regulations were intended to mean . . . does not bind the agency").

this unit (including the user's trigger finger) "remain[s] relatively stationary as they are pulled" in the bump-firing mode.[9]  AR 000385.

**C.**   **The Rule Reasonably Distinguishes Between Bump Stocks, Other Weapons, and Other Methods of Bump Firing a Weapon.**

Plaintiffs in each of the cases take issue with the Rule's conclusions that bump stocks are machine guns and certain other weapons and methods of bump firing are not machine guns.  The *Codrea* Plaintiffs focus on firearms components called binary triggers and on "Model 37 pump shotguns" and other similar shotguns.  Codrea SAC ¶ 51.  However, the administrative record demonstrates that the Department considered and reasonably rejected these arguments, because commenters made the Department aware of these concerns during the rulemaking process, and the Department responded. *See, e.g.* Ex. 1 at 91 (AR002712); Ex. 1 at 101 (AR003257).  In the text of the Rule, ATF logically explained that Model 37 pump shotguns do not shoot a second shot "automatically" or "without manual reloading" because the shooter must "pump the fore-end" to load a new shell after the first discharge.  83 FR 66534.  That the newly-loaded shell then fires without a separate function of the trigger does not mean that the pump shotgun is automatic.  *See id.*  The Rule likewise explains the distinction between a bump stock and a binary trigger: when the trigger "release results in a second shot being fired," the trigger release is the analogous motion to the pull of the trigger that constitutes a *second* function of the trigger.  *Id.*  Thus, although a binary trigger does permit two rounds to be fired with a single *pull* of the trigger, only one round is being fired for each single function of the trigger.  *See Guedes II,* 920 F.3d at 33 ("the Rule reasonably distinguishes binary-trigger guns on the ground that they require a second act of volition with the trigger finger") (emphasis omitted); *Guedes I,* 356 F. Supp. 3d at 136 (""ATF adequately and reasonably responded to comments arguing that the 'proposed regulatory text encompasses ... binary triggers'").

The *Guedes* Plaintiffs challenge a different set of distinctions, alleging that the Rule is

---

[9] The portions of the administrative record cited in this paragraph and elsewhere, like the capacious review contained in the Rule itself, demonstrate the error of the *Guedes* Plaintiffs' thesis that there is "no evidence in support of [Defendants'] 'legal analysis' . . . that bump-stock-type devices are 'machineguns.'"  Guedes SAC ¶ 97.

arbitrary and capricious because it does not treat rubber bands, belt loops, or "training one's trigger finger to fire more rapidly" as machine guns.  Guedes SAC at ¶ 103.  Commenters raised the same objection numerous times following publication of the NPRM, *see, e.g.*, Ex. 1 at 103 (AR002571), Ex. 1 at 105 (AR002622), Ex. 1 at 107 (AR002735); Ex. 1 at 109 (AR002987), and the Rule addressed these comments, stating that, unlike a belt loop or a rubber band, bump stocks are "designed to be affixed" to a semiautomatic firearm. 83 FR 66515; 83 FR 66533; *see also* 83 FR 66531-32 (describing how the linear space in a bump stock functions as a self-regulating mechanism to assist in resetting the trigger). As this Court previously explained and the Court of Appeals confirmed, Defendants "'clearly thought about [their] objections and provided reasoned replies,' which is 'all the APA requires.'" *Guedes I*, 356 F. Supp. 3d at 135 (quoting *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007)); *see Guedes II*, 920 F.3d at 32 ("belt loops, unlike bump stocks, do not transform semiautomatic weapons into statutory 'machineguns[,]' [o]r so [Defendants] reasonably concluded in the Rule").

### D.     The Rule Reasonably Required That Bump Stocks Be Destroyed, Not Disabled.

As a separate question from whether the Rule properly classifies bump stocks as machine guns, the *Codrea* Plaintiffs also contend that the Rule is arbitrary and capricious because it does not permit bump stock owners to continue to possess a bump stock that has been "rendered inoperable." Codrea SAC ¶ 55.  In particular, the *Codrea* Plaintiffs highlight the fact that a bump stock owner could "permanently disabl[e] the sliding feature of the stock," *id.*, rather than carrying out the procedures for "destroy[ing] a bump stock by cutting," "crushing, melting, or shredding" the device, as required by the Rule and ATF instructions for destruction.  *Id.*  ¶¶ 57-58.  However, Defendants reasonably concluded in the Rule that lesser methods of destruction would leave bump stocks capable of "operat[ing] as designed" and firing more than one shot automatically with a single function of the trigger.  *See* 83 FR 66537.

Commenters to the NPRM raised the possibility that "modification of an existing [bump stock] device" would suffice to take it outside the Rule's clarified definition of "machinegun."  Ex. 1 at

112 (AR002531); Ex. 1 at 61-61a (AR002333) ("removing the extension ledge means that there is no longer an extension ledge or similar item upon which the shooter's finger can maintain rearward pressure, . . . [s]uch a device could therefore not be a machinegun under [ATF's definition]"); Ex. 1 at 62 (AR002629); *see generally* 83 FR 66536-66537;   The Rule specifically quoted the analysis of a specific commenter who observed that "the only objective difference between 'bump firing' . . .  without a bump-stock-type device" and bump-firing with a bump stock "is that the device has an extension ledge ("finger rest") for resting the trigger finger." Ex. 1 at 118 (AR003952).  However, Defendants considered that commenter's analysis and explained that "even without the trigger ledge, the bump-stock-type device will operate as designed if the shooter simply holds his or her finger in place."  83 FR 66537.  Because a bump stock would continue to facilitate bump-firing even if the sliding feature of the stock was disabled through removal of the extension ledge, the Rule reasonably mandated the complete destruction of bump stocks, and the decision to do so was not arbitrary or capricious.[10]

E.     **The Rule Properly Reflects Input From Elected Officials.**

Plaintiffs are also in error in their contention that the agency's consideration of the views of the President renders the Rule arbitrary and capricious.  *See* Codrea SAC at ¶ 70; Guedes SAC at ¶ 93. But as the Court of Appeals explained in rejecting this argument at the preliminary injunction stage, "[p]residential administrations are elected to make policy," *Guedes II*, 920 F.3d at 34, and so, as the Supreme Court has recognized, it is entirely proper for an agency to consider "Presidential oversight" in adopting policy changes.  *See FCC v. Fox Television Stations*, 556 U.S. 502, 523 (2009) (rejecting dissenting view that independent agencies should be "sheltered" from political influence).  For this reason, "[a]s long as [an] agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Guedes II*, 920 F.3d at 34 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir.

---

[10] The *Codrea* Plaintiffs also err when they assert that bump stock owners face legal jeopardy from the possibility that Defendants could "chang[e] the website" on which ATF posted the instructions for destroying a bump stock.  Codrea SAC ¶ 61; *see id.* ¶¶ 58-60.  As the *Codrea* Plaintiffs recognize, however, the Rule required that possessors "throw the pieces away" after destroying the bump stock, *see id.* ¶ 61 n.10 (quoting 83 FR 66530), and compliance with this requirement would protect a former bump stock owner from the *Codrea* Plaintiffs' unlikely hypothetical.

2012)).  And as the court of appeals observed, "the agency *has* articulated a satisfactory explanation for the Bump-Stock Rule."  *Id.*  Moreover, the President's direction to the Attorney General regarding the Rule explicitly instructed that the agency follow "the rule of law and . . . the procedures the law prescribes," recognizing the "established legal protocols" required by the APA.  AR000790, *Definition of Machinegun*, 83 FR 7949.

In any event, Plaintiffs provide no reason to depart from these conclusions.  They do not explain how input from an elected official would alter the correct reading of the statutory terms in the definition of machine gun, which is what the Rule sets forth.  Nor do Plaintiffs offer any case law to support their remarkable suggestion that presidential input into the policymaking process renders an otherwise-reasonable outcome arbitrary and capricious.  Instead Plaintiffs quote a law review article cited in a comment to the NPRM, but that article itself concedes that "[t]here is *nothing nefarious* when a new administration disagrees" with the interpretations of a prior administration and changes those interpretations.  Josh Blackman, *Presidential Maladministration*, 2018 Ill. L. Rev. 397, 405 (2018) (emphasis added); *see* Guedes SAC ¶ 95.

Finally, the President's direction to the Attorney General regarding the Rule explicitly instructed that the agency follow "the rule of law and . . . the procedures the law prescribes," recognizing the "established legal protocols" required by the APA.  AR000790, *Definition of Machinegun*, 83 FR 7949.  As the Court of Appeals explained, "[a]ll would agree" that Defendants adopted the Rule because of "the urging of the President, Members of Congress, and others, as part of an immediate and widespread [public] outcry."  *Guedes II*, 920 F.3d at 34.  Because the Rule is open in its acknowledgment that public attention, congressional interest, and Presidential input played a role in prompting the reconsideration of DOJ's past analyses and definitions, the standards of the APA are satisfied.  *See id.*; *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1528 (D.C. Cir. 1994).

### F.    The Rule Properly Explains the Department's Change in Course.

Plaintiffs also suggest that the Rule violates the APA because it represents a "departure from prior practice."  Codrea SAC at ¶ 69; *see* Guedes SAC at ¶¶ 5, 95.  But, as the D.C. Circuit has recognized, "agency views may change," *Springfield, Inc. v. Buckles*, 292 F.3d 813, 819 (D.C. Cir. 2002),

and "[t]he standard for reviewing an agency's rule or interpretation of a statute does not change just because the agency reversed course and altered its prior interpretation." *GOA*, 363 F. Supp. 3d at 833 (citing *Fox Television*, 556 U.S. at 515). As this Court explained in *Guedes I*, when changing position, an agency must demonstrate that "the new policy is permissible under the statute, . . . acknowledge it is changing its policy . . . and that the agency believes it to be better, which the conscious change of course adequately indicates." 356 F. Supp. 3d at 133 (alterations omitted) (quoting *Nat'l Lifeline Ass'n*, 915 F.3d at 28); *see also Springfield*, 292 F.3d at 819 ("The courts may require only 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not causally ignored."). In its opinion, the Court explained at length Defendants' conscious treatment of the differing, past classifications of bump stocks, the agency's explicit acknowledgment of the change in course, and its explanation that the Rule now adopts "the best interpretation of [the statute]." *Guedes I*, 356 F. Supp. 3d at 133-34; *see* 83 FR 66514, 66516-517, 66520, 66527. Indeed, the Department described specifically the error it had identified in its past interpretation: that, "[w]hile the Department accepted the previous classification of some [bump stocks] as non-machineguns, it relied on the mistaken premise that the need for 'shooter input' . . . for firing with [bump stocks] means that such devices do not enable 'automatic' firing." 83 FR 66531. For these reasons, the Department's adoption of the correct reading of the statutory text by definition satisfies the standards of the APA. *Cf. Abramski v. U.S.*, 573 U.S. 169, 191 (2014) (observing that "[w]hether the Government interprets a criminal statute too broadly . . . or too narrowly" does not change the meaning of the statute).

## G.     The Rule of Lenity Does Not Prohibit the Department's Interpretation.

The *Guedes* Plaintiffs assert that the "rule of lenity" requires rejecting the Department's conclusion that bump stocks are machine guns in favor of their own view that bump stocks fall outside the statutory definition. However, that doctrine applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013); *see also United States v. McDonald*, 991 F.2d 866, 870 (D.C. Cir. 1993) ("grievous" uncertainty is "an essential condition for applying" the rule of lenity). As the D.C. Circuit recognized in *Guedes II*,

the Supreme Court has "characteriz[ed] the rule of lenity as a canon of last resort . . . [that] 'applies only 'when the ordinary canons of statutory construction have revealed no satisfactory construction.'" 920 F.3d at 27 (quoting *Lockhart v. United States*, 136 S. Ct. 958, 968 (2016)); *see also United States v. Anderson*, 59 F.3d 1323, 1334 (D.C. Cir. 1995) (en banc) (Buckley, J., concurring); *id.* at 1335 (Randolph, J., concurring).  The Rule's application of the terms used to define "machinegun" in the NFA is correct, and so there is no ambiguity, let alone "grievous ambiguity," in the statute such that the rule of lenity would apply.  *See* 83 FR 66517, 66518 (explaining that the Rule sets forth the "best interpretation" of the statute.

**H.      The Rulemaking Is Procedurally Valid.**

The *Guedes* Plaintiffs contend that Defendants erred by failing to provide an oral hearing to Plaintiff FPF and by purportedly "depriv[ing] . . . [the] ability to submit comments" to certain commenters for the first "five days" after "the publication of the NPR[M]."  Guedes SAC ¶¶ 117-18; *see generally id.* ¶¶ 114-125.  Plaintiffs' claims arise from their interpretation of 18 U.S.C. § 926(b), which requires that "[t]he Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing [] rules and regulations" interpreting the GCA and NFA.  As this Court correctly concluded in *Guedes I*, Plaintiffs' procedural arguments cannot succeed because Defendants complied with Section 926(b) and, in any event, no "prejudicial error" under the APA could have arisen from the alleged procedural defects.  *See* 356 F. Supp. 3d 136; *Ozark Auto. Distrib., Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) ("In administrative law . . . there is a harmless error rule: § 706 of the APA, 5 U.S.C. § 706, instructs reviewing courts to take 'due account . . . of the rule of prejudicial error'").

"'[T]he term 'hearing' in its legal context . . . has a host of meanings,' including the opportunity to submit written comments without oral presentation.  And it is well established that the requirement for a 'hearing,' as opposed to a 'hearing on the record,' generally does not require a formal, oral hearing."  *Guedes I*, 356 F. Supp. 3d at 136 (quoting *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 239, 241-42 (1973)).  "Indeed, the Fourth Circuit has held that the hearing requirement in § 926(b) requires only that the Secretary 'provide interested parties with the opportunity to submit written

comments.'" *Id.* (quoting *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 485 (4th Cir. 1990)).  And, as explained in the text of the Rule itself, the comprehensive public record from comments suggests that "a public hearing would [not] meaningfully add data or information germane to the examination of the merits of the proposal or . . . provide substantive factual information that would assist the Department in improving the rule in material ways." 83 FR 66542.

As to the length of the comment period, members of the public *were* provided 90 days to comment, notwithstanding Plaintiffs' allegations otherwise and the modest technical difficulties that occurred on a government website.  The Rule "acknowledge[d] that upon publication of the NPRM on March 29, 2018, there was some confusion within the first 24 to 48 hours about submitting comments through the Federal eRulemaking Portal." 83 FR 66541. One source of confusion arose through an error made by the third-party managers of the *Regulations.gov* website, who placed the link for providing comments under the "Docket ID" for a different, already-closed rulemaking. *See* 83 FR 66542 (explaining that "the ANPRM link . . . was prominently situated on the homepage of the *Regulations.gov* website even though that link was no longer able to accept comments"). But these technical problems did not preclude comments: as the Rule made clear, "a simple search for 'bump stock' in the main search bar on *Regulations.gov* during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments." [11] *Id.*  Further, Plaintiffs have not identified any way in which extending the comment period an additional five days or otherwise responding to the brief technical difficulties would have been anything other than a "meaningless gesture." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).  For these reasons, this Court correctly recognized that any "mistake did not affect the outcome . . . [or] prejudice the [Plaintiffs], [so] it would be senseless to vacate and remand" the Rule on this basis. *Guedes I* at 136 (quoting *PDK Labs.*

---

[11] Although some commenters apparently also encountered an error in which "the website specifically declared that the comment period was 'closed,'" Guedes SAC at ¶ 117, Defendants "received numerous comments from the very beginning of the comment period." 83 FR 66542; see AR002195-AR002211 (documenting hundreds of comments received on the first two days of the comment period, Mar. 29-30, 2018). Further, those commenters "were able to submit comments during the remaining 85 days of the comment period . . . [and] to submit comments by mail and facsimile throughout the comment period." *Guedes I*, 356 F. Supp. 3d at 137.

*v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)).

## II.    **The Rule Is Promulgated Pursuant to Valid Authority**.

### A.    **Congress Has Provided Defendants With the Authority to Issue the Rule.**

Both sets of Plaintiffs allege that the Department lacked the authority to promulgate the Rule, *see* Codrea SAC ¶¶ 30-31, Guedes SAC ¶¶ 72, 74, 77-89, and assert that the Department's actions are therefore invalid and *ultra vires*.   Codrea SAC ¶¶ 63-66, Guedes SAC ¶ 89.   At the outset, Plaintiffs' allegations regarding Departmental authority largely overlap with their claim that the interpretations in the Rule are arbitrary and capricious or contrary to law.   *See* Codrea SAC ¶ 66 (Rule is *ultra vires* because it is "in open defiance of statutory text"); Guedes SAC ¶¶ 72-74, 77-80.   To the extent that Plaintiffs' *ultra vires* claim is a rephrased objection to the Rule's substance, it fails for the same reasons as Plaintiffs' arbitrary and capricious claims: the Department has correctly interpreted "automatically" and "single function of the trigger" and correctly applied those interpretations to bump stocks.   *See supra* Part I.A & I.B; *Guedes I*, 356 F. Supp. 3d 130-33 *see generally Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (noting that *ultra vires* review is "a more difficult course" than general APA review). Further, the *Codrea* Plaintiffs' *ultra vires* claim mischaracterizes the Rule's own statement of its effect: far from "purport[ing] to redefine statutory law," Codrea SAC ¶ 22, the Rule makes clear that it "clarifies" the pre-existing, statutory definition of machine gun to include bump stocks, 83 FR 66520, including by elaborating on the plain meanings of the terms "automatically" and "single function of the trigger."[12]   83 FR 66528.

To the extent Plaintiffs challenge the Department's authority to define "machinegun" and its component terms as a claim independent of their merits challenges, the Rule sets forth the specific authorities under which the Department acted.   *See* 83 FR 66515 (citing 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); and 28 CFR 0.130(a)(1)-(2)).   The Department has exercised these authorities here in explaining that bump stocks are machineguns and notifying the public of that

---

[12] Plaintiffs' reliance on a present-day statement by Senator Feinstein about the scope of Defendants' authority to interpret the NFA, *see* Guedes SAC ¶ 78, is of no moment: "subsequent statements by members of Congress do not constitute reliable evidence as to what Congress intended in the past." *Fed./Postal/Retiree Coalit., AFGE v. Devine*, 751 F.2d 1424, 1429 n.9 (D.C. Cir. 1985).

classification.  *See Guedes I*, 356 F. Supp. 3d 128 (recognizing that the Rule relies on the Department's "general rulemaking authority under 18 U.S.C. § 926(a)").  And courts have recognized that ATF is empowered to issue rulings interpreting the statutory definition of "machinegun" and its component terms.  For example, in *F.J. Vollmer Co. v. Higgins*, the D.C. Circuit recognized the authority of ATF to determine whether particular receivers had been modified to fall within the statutory definition of machine gun, and thus, whether conversion kits paired with those receivers fell within ATF's policy of "good faith" and "innocent buyer" exceptions to 18 U.S.C. § 922(o).  23 F.3d 448, 451 (D.C. Cir. 1994).  Similarly, in *United States v. Dodson*, the Sixth Circuit recognized the authority of ATF to issue a ruling "clarifying that . . . auto-sears"—a category of firearms parts —"were considered machineguns, subject to all the provisions" of the NFA, based on the fact that "[h]istorically, it was not clear whether [such] auto-sears were 'machineguns.'"  519 Fed. App'x 344, 348 (6th Cir. 2013).  DOJ has exercised the same authority here to remove "historical[]" confusion by clarifying that bump stocks are machine guns.  These examples bely Plaintiffs' assertion that Congress defined the term "machinegun" so clearly "in 1934 when it drafted the NFA" that  DOJ is entirely precluded from exercising interpretive authority over 26 U.S.C. § 5845(b).  Codrea SAC ¶ 41.  To the contrary, because the Rule falls well within the long-recognized authority of the Department to clarify the meaning and application of the machine gun definition, Plaintiffs' *ultra vires* challenge is meritless.

Nor is it the case that the Department's reliance on the "plain meaning" of "automatically" and "single function of the trigger" in the Rule undercut its authority to define those terms, as the *Guedes* Plaintiffs contend.  Guedes SAC at ¶¶ 79-84.  The starting point in any statutory interpretation, whether by a court or an agency, is the meaning of the statutory text, and as explained above, the plain meaning of the text demonstrates that bump stocks are machineguns.  In any event, the rulemaking authorities in 18 U.S.C. § 926(a) and 26 U.S.C. §§ 7801(a)(2)(A), 7805(a) authorize the issuance of both interpretive and legislative rules.  DOJ has consistently maintained that the Rule is an interpretive rule, and the "critical feature" of such rules "is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)); *see also*

*Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) ("To fall within the category of interpretive, the rule must derive a proposition from an existing document whose meaning compels or logically justifies the proposition") (cleaned up).   It is thus unsurprising that DOJ relied on the plain meaning of the statutory terms given that the agency is correcting past, erroneous applications of those terms.   DOJ respectfully disagrees with the Court of Appeals' conclusion that the Rule is a legislative rule.   *See Guedes II*, 920 F.3d at 18-20.[13] But to the extent this Court adopts that analysis, the Court of Appeals has already held that DOJ had authority to issue such a rule.   There is thus no viability to Plaintiffs' claim that the Rule "admits that it has exceeded the authority granted by Congress."  Guedes SAC ¶ 79.

### B.   The Rule Does Not Reflect an Improper Delegation of Legislative Authority or Violate the Separation of Powers.

As an alternative to their *ultra vires* argument, the *Guedes* Plaintiffs contend that Defendants

---

[13] DOJ has consistently maintained that the Rule is an interpretive rule like other past weapons classifications.  The Rule is clear that the only source of legal force for the prohibition on bump stocks is Congress's statutory ban on new machineguns, not the Rule itself.  *See, e.g.*, 83 FR 66529 ("[T]he impetus for this rule is the Department's belief, after a detailed review, that bump-stock-type devices satisfy the statutory definition of 'machinegun.'"); *id.* ("ATF must . . . classify devices that satisfy the statutory definition of 'machinegun' as machineguns."); *id.* at 66535 ("[T]he Department has concluded that the [National Firearms Act] and [Gun Control Act] require regulation of bump-stock-type devices as machineguns.").  Thus, the agency concluded that bump stocks are machineguns under the statute, not that the agency had (and was exercising) discretion to classify them as such.  The Rule also explains that notice-and-comment procedures were used because they were "specifically designed to notify the public about changes in ATF's interpretation of the [National Firearms Act] and [Gun Control Act] and to help the public avoid the unlawful possession of a machinegun."  83 FR at 66523; *see id.* (stressing the need to "ensur[e] that the public is aware of the correct classification of bump-stock-type devices"); *id.* at 66529 ("The proposed rule is . . . necessary to provide public guidance on the law").  Providing the public with notice of an agency's understanding of the statutes that it administers is the purpose of interpretive rules.  *See Mortgage Bankers*, 135 S. Ct. at 1204.  The Rule repeatedly explains that past classification decisions involving bump stocks were erroneous, not superseded by a prospective change in the law.  83 FR at 66523 (explaining that ATF had "misclassified some bump-stock-type devices and therefore initiated this rulemaking"); *id.* at 66531 (observing that the agency has "authority to 'reconsider and rectify' its classification errors") (citation omitted); *id.* at 66516 (same).  And the Rule explains that the "definitions for the terms 'single function of the trigger' and 'automatically'" contained in the Rule "represent the best interpretation of the statute," *i.e.*, what the statute has always meant.  83 FR 66521.  These indicia that the Rule is a clarifying interpretation rather than a legislative action underscore that the Rule is interpretive, not legislative in nature, *contra Guedes II*.  *See Central Tex. Tel. Coop. v. FCC*, 402 F.3d 205, 212-14 (D.C. Cir. 2005).

may not rely on the authority delegated by Congress because, in their view, "Congress may not divest itself of the authority to define the term 'machinegun' under the NFA and GCA" without unconstitutionally "allow[ing] the Executive Branch . . . to define what circumstances will be made criminal." Guedes SAC at ¶ 142.  Not so.  To begin, Congress has provided a detailed definition of the term "machinegun," attached criminal consequences to the unlawful possession of such a weapon, *see* 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b), and Defendants have explained "the best interpretation of the statute" that Congress itself enacted. 83 FR 66521.  Applying the text as written in no sense "divests" Congress of its authority, and there is thus no need to consider plaintiffs' broad constitutional challenge.

In any event, Congress *can* delegate authority to Executive Branch agencies to engage in rulemaking without transgressing constitutional limits, even if that rulemaking may lead to criminal consequences. For example, Congress has delegated to the Securities and Exchange Commission the authority to "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent" in connection with tender offers, notwithstanding the criminal penalties associated with a violation. 15 U.S.C. § 78n(e); *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (noting that the Supreme Court has regularly "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").

The Court of Appeals previously rejected the validity of a similar argument floated by Plaintiffs in the preliminary injunction proceedings. "At oral argument, the plaintiffs suggested that permitting an agency's interpretation to carry the force of law in the criminal context would infringe the separation of powers." *Guedes II*, 920 F.3d at 26. The D.C. Circuit described Plaintiffs' argument as "difficult to square with the Supreme Court's decision in *Touby v. United States*, 500 U.S. 160 (1991)[, w]here the Court upheld a delegation of legislative authority to the Attorney General to schedule substances under the Controlled Substances Act against a challenge under the nondelegation doctrine." *Guedes II*, 920 F.3d at 26.  As explained therein, "the separation of powers 'does not prevent Congress from seeking assistance" of the sort involved in the Rule and in Defendants' classification of bump stocks as machine guns pursuant to the Rule.  *Id.* at 26-27

(quoting *Touby*, 500 U.S. at 165).  Plaintiffs offer nothing that would alter that conclusion here, where Congress and the Department have acted within the constraints of constitutional limits on delegation, *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001), and Plaintiffs' non-delegation challenge therefore fails.

Raising another structural constitutional challenge, the *Guedes* Plaintiffs also allege that the Rule violates the separation of powers, but this claim is simply a restatement of their statutory claims under the APA.  *See* Guedes SAC at ¶¶ 126-33.  Plaintiffs' supposed "constitutional" argument is that the Rule "intrude[s] upon the central prerogatives of" Congress because the legislature "has not prohibited the purchase, possession or utilization of bump stock devices."  *Id.* at ¶¶ 130-31.  As explained above in Part I, those challenges fail because the Rule validly exercises the Department's authority under the NFA and GCA by setting forth the "best interpretation of the statute" actually promulgated by Congress.  83 FR 66521.  The recycling of this claim under the separation-of-powers rubric likewise fails.

## III.   The Rule Satisfies the Due Process Clause and Is Not Impermissibly Vague.

Plaintiffs allege that the Due Process Clause of the Fifth Amendment entitled them to "a pre-deprivation or other hearing" before being dispossessed of their bump stocks pursuant to the Rule.  Codrea SAC at ¶ 78; *see* Guedes SAC at ¶¶ 150-51.  However, it is well-established that the Due Process Clause does not require a hearing, individual or otherwise, for "proceedings for the purpose of promulgating policy-type rules or standards" such as rulemakings.  *Fla. E. Coast Ry. Co.*, 410 U.S. at 245; *Nat'l Coal. Against the Misuse of Pesticides v. Thomas*, 809 F.2d 875, 880 n.4 (D.C. Cir. 1987) ("due process imposes no constraints on informal rulemaking beyond those imposed by statute"); *see also Minn. State Bd. for Cmty Colls. v. Knight*, 465 U.S. 271, 284 (1984) ("Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted").  The procedures followed by Defendants went beyond what due process requires.  As the complaint acknowledges, the Department conducted a public comment process that was announced in the

Federal Register and responded to the comments received.  All of the *Codrea* Plaintiffs submitted comments: Mr. Codrea and Mr. Monroe submitted brief ones (totaling ten words between them), and Mr. Heuman submitted both a personal, short comment, and a lengthy comment containing detailed analysis through his counsel.  *See* Ex. 1 at 40 (AR002195); Ex. 1 at 41 (AR003054); Ex. 1 at 42 (AR002736); Ex. 1 at 50 (AR003614).  One of the *Guedes* Plaintiffs submitted a comment, while Mr. Guedes provided a declaration to be included as part of another's comments, *see* Ex. 1 at 221 (AR003314), and none of the other Plaintiffs contend that they were unaware of the rulemaking or deprived of the opportunity to submit comments and thereby be heard.  This is all that the Due Process Clause required.  *Fla. E. Coast Ry.*, 410 U.S. at 245.

Further, "[p]rocess is not an end in itself."  *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983); *see Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000) ("There is no abstract federal constitutional right to process for process's sake.").  Instead, "[c]laims of denials of due process are evaluated under the familiar framework set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)."  *FBME Bank v. Lew*, 209 F. Supp. 3d 299, 329 (D.D.C. 2016).  This framework involves a "balance [of] three factors: 'first, the private interest . . . .; second, the risk of an erroneous deprivation of such interest . . . and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'"  *Id.* (quoting *Mathews*, 424 U.S. at 335); *see also Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1010 (D.C. Cir. 2001).  Here, Plaintiffs do not identify any way in which an individualized hearing would provide a benefit.  First, as the Rule explains, DOJ is required to treat bump stocks as machine guns by the terms of the statutory text.  *See* 83 FR 66529.  The Rule therefore rejects the alternative of taking no action because "the NFA and GCA require regulation of bump-stock-type devices as machineguns."  *Id.* at 66535.

Moreover, under the Rule, all bump stocks are machine guns, and Plaintiffs do not allege that their individual bump stocks should be treated differently than other bump stocks in a manner where the fact-finding of an individual hearing would provide a benefit.  Nor do Plaintiffs identify any evidence or arguments that require a *hearing* to present, and a review of the comments they submitted does not reveal any materials that appear inadequate in writing.  *See* Ex. 1 at 40 (AR002195); Ex. 1 at

41 (AR003054); Ex. 1 at 42 (AR002736); Ex. 1 at 50 (AR003614); Ex. 1 at 221 (AR003314).  Plaintiffs can identify no "probable value" of a hearing or other additional procedure to weigh in the *Mathews v. Eldridge* balancing, and therefore cannot prevail on a due process claim.

Plaintiffs also reallege their APA claims as part of their alleged violations of due process, and such claims should be rejected on the same grounds as the underlying claims.  In the *Codrea* SAC, these duplicative arguments are styled as procedural due process claims: "the Final Rule . . . ignores the definition of machinegun Congress adopted in the [NFA]." Codrea SAC ¶ 80. However, such purported "due process" claims for "improper rulemaking" are not separately cognizable, "do not amount to a . . . *constitutional* violation," and belong in Plaintiffs' APA counts. *Nat'l College Preparatory v. D.C. Charter School Bd.*, 2019 WL 7344826 at *3 (D.D.C. Dec. 11, 2019) (emphasis added); *see Am. Public Gas Ass'n v. Federal Power Comm'n*, 498 F.2d 718, 723 (D.C. Cir. 1974) (procedures that satisfy the APA also satisfy due process, except to the extent that plaintiffs can identify specific benefits from additional process); *cf. Calif. ex. rel. Lockyer v. FERC*, 329 F.3d 700, 706-07 (9th Cir. 2003) (publication in the Federal Register with opportunity to comment is "legally sufficient" to satisfy due process). Likewise, the *Guedes* Plaintiffs' "substantive due process" claim is entirely derivative of their *ultra vires* claim, which fails for the reasons described above.  *See supra* Part II.A. Plaintiffs cannot succeed in their respective, substantive challenges to the Rule by recasting those claims under the "due process" rubric.

The *Guedes* Plaintiffs raise yet another variation of a due process challenge in a claim that the "Rule is void for vagueness," Guedes SAC at ¶ 158, arguing that the Rule falls within the prohibition on penal statutes that are not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable." *Id.* ¶ 155 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  Yet bump stocks do come "plainly and unmistakably" within the terms of the Rule, which straightforwardly defines bump stocks—including those previously possessed by the *Guedes* Plaintiffs—as machine guns.[14]  *See* 83 FR 66553-54.  There is thus no danger that the Rule

---

[14] Although the Rule addresses comments asserting that the classification of bump stocks as machine guns is vague in other respects, *see* 83 FR 66533-534, it does not address the contention that the Rule is not sufficiently explicit to inform bump stock owners that their devices are prohibited, an issue that was raised only by a single commenter and only in connection with a separate lawsuit against a

fails "to inform" Plaintiffs that their bump stocks are prohibited by the terms of 18 U.S.C. § 922(o). To the extent the *Guedes* Plaintiffs direct their vagueness challenge to the statute itself, rather than the Rule, such a claim would fare no better.[15]  As the Eleventh Circuit explained in turning away a similar challenge in *Akins*, a statute is only "unconstitutionally vague when it fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited,'" and here, "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly."  *Akins*, 312 F. App'x at 200-01 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Nor does the fact that ATF's initial classifications of bump stocks were later deemed in error render the statute invalid for vagueness. Lawful statutes may be susceptible of multiple interpretations, and the mere fact that "there may be some 'close cases' or difficult decisions does not render a policy unconstitutionally vague." *Hills v. Scottsdale Unified School Dist. No. 48*, 329 F.3d 1044, 1056 (9th Cir. 2003); *see also Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001) ("A statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case").  Indeed, the individual *Guedes* Plaintiffs' own allegations confirm that they recognized the uncertainty about the application of 18 U.S.C. § 922(o) to their bump stocks: each asserts that they acquired their bump stocks only in "reliance upon . . . ATF's previous letter rulings" regarding bump stocks.  Guedes SAC ¶ 8 (Plaintiff Guedes); *see id.* at ¶ 9 (Plaintiff Roden "purchased . . . in reasonable reliance upon ATF's previous determinations").  To require perpetual adherence to the erroneous classification letters under the guise of a protection against vagueness would negate the well-established authority of Executive Branch agencies "to reconsider and rectify errors" such as these, *Gun South, Inc. v. Brady*, 877 F.2d

---

state bump stock ban, in which the court has since squarely rejected the commenter's claim that a ban on bump stocks is unconstitutionally vague.  *Compare* Ex. 1 at 216 (AR003659) *with Roberts v. Bondi*, 2018 WL 3997979 (M.D. Fla. Aug. 21, 2018).

[15] Plaintiffs do not articulate a facial vagueness challenge to the statute, and this Court need only review the statute as-applied, because "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand." *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)).

858, 862 (11th Cir. 1989), notwithstanding Congress' determination that machine guns should be banned.

## IV. Defendants are Entitled to Judgment on Plaintiffs' Takings Claims.

Plaintiffs also claim that the Rule should be enjoined as a violation of the Takings Clause, or that, in the alternative, Defendants should be required to provide compensation for their bump stocks. *See* Codrea SAC at ¶¶ 26-27, 29, 86-88; *id.* at p.23 (relief subparagraph 9); Guedes SAC at ¶¶ 159-63 & pp. 45-46 (prayer for relief). However, the Court has jurisdiction over a takings claim only when the validity of the government action is conceded, which precludes Plaintiffs' effort to plead a takings claim given that the gravamen of their Complaints is that the Rule is invalid and they have not conceded the validity of the Rule in the context of their takings claims. Further, the Takings Clause provides only for compensatory relief, not injunctive relief, and does not require compensation at all where, as here, the federal government is exercising one of its enumerated powers in a manner analogous to a state's exercise of plenary police powers.

### A. The Court Lacks Jurisdiction over Plaintiffs' Takings Claims.

Federal courts lack jurisdiction under the statutes providing damages for compensatory takings unless a plaintiff acknowledges that he is challenging a *lawful* action by the government, which is not the case here. The Little Tucker Act, 28 U.S.C. § 1346(a), provides district courts with jurisdiction over takings claims against the United States that parallels the "concurrent [jurisdiction] with the United States Court of Federal Claims," *id.*, provided in the Tucker Act, 28 U.S.C. § 1491. The grant of jurisdiction is on nearly-identical terms to the Tucker Act for monetary "claim[s] against the United States . . . founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," except that Little Tucker Act claims are limited to $10,000. *Compare* 28 U.S.C. § 1346(a)(2) *with id.* § 1491; *accord Fulbright v. McHugh*, 67 F. Supp. 3d 81, 92 n.4 (D.D.C. 2014) (concluding jurisdictional limits imposed by statute of limitations applied to the same extent in district court and claims court); *Brewer v. HUD*, 508 F. Supp. 72, 76 (S.D. Ohio 1980) (recognizing "identical" jurisdictional scope of two provisions). And it is well-established under the Tucker Act that "for the Court to possess jurisdiction over a takings claim, the 'claimant must

concede the validity of the government action which is the basis of the taking claim.'" *Jackson v. U.S.*, 143 Fed. Cl. 242, 247 (Fed. Cl. 2019) (quoting *Tabb Lakes v. U.S.*, 10 F.3d 796, 802-03 (Fed. Cir. 1993)), *appeal docketed* No. 19-2213 (Fed. Cir. July 3, 2019).  This limitation flows logically from the principle that a "takings claim may only be based on the Government's rightful exercise of its property, contract, or regulatory powers," *Perry v. U.S.*, 28 Fed. Cl. 82, 85 (Fed. Cl. 1993).

## B.       Plaintiffs Are Not Entitled to Relief on Their Takings Claims.

Even if there were jurisdiction over Plaintiffs' taking claims, Plaintiffs would not be entitled to relief.  The prohibition on bump stock possession is an exercise of the police power that does not give rise to a "taking" that requires compensation.  Although the plain language of the Clause "requires the payment of compensation whenever the government acquires private property for a public purpose," *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321 (2002), "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause."  *Tate v. Dist. of Columbia*, 601 F. Supp. 2d 132, 136 (D.D.C. 2009) (quoting *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008)); *see United States v. Droganes*, 728 F.3d 580, 591 (6th Cir. 2013) ("[T]he [g]overnment's seizure and retention of property under its police power does not constitute a 'public use,'" and therefore "the Fifth Amendment is not implicated.")  These cases recognize long-established precedent holding that the scope of the Takings Clause excludes "[a] prohibition simply upon the use of property for purposes that are declared . . . to be injurious to the health, morals, or safety of the community[.  Such] cannot, in any just sense, be deemed a taking."  *Mugler v. Kansas*, 123 U.S. 623, 668 (1887); *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) (A "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers.").  This is particularly true as to "personal property, by reason of the State's traditionally high degree of control over commercial dealings," including where a "new regulation might even render . . . property economically worthless."  *Lucas*, 505 U.S. at 1027-28.

Here, the promulgation of the Rule to clarify that bump stocks are contraband machine guns is precisely such an exercise of the police power, "the lawful exercise of [which]" includes

prohibitions on "private property . . . as contraband goods, a power, the exercise of which is essential to the preservation of order and the enforcement of the laws."  *German Alliance Ins. Co. v. Barnes*, 189 F. 769, 775 (C.C.D. Kan. 1911); *see Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006) ("[T]he . . . exercise of the police power to condemn contraband or noxious goods . . . has not been regarded as a taking for public use."); *Barnes v. U.S.*, 122 Fed. Cl. 581, 583 (Fed. Cl. 2015) (DEA seizure in connection with illegal possession of marijuana is "pursuant to the police power" and not within the scope of the Takings Clause).[16]  Applying the same principle, the Court of Federal Claims held in *Akins* that ATF may revise its interpretation of Section 922(o) to encompass bump stocks without giving rise to a compensable taking.  *See Akins*, 82 Fed. Cl. at 622-23 (analogizing ATF's 2006 reversal of a classification decision to the "condemn[ation of] contraband" in *Acadia* and explaining that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause").

Indeed, in two cases seeking takings compensation for bump stocks abandoned or destroyed pursuant to the Rule, the Court of Federal Claims has, following *Akins*, held that the police power exception required dismissal of such claims.  In *McCutchen*, the court explained that requiring "owners to divest themselves of such tools of war is the paradigmatic example of the exercise of the government's police power, which defeats any entitlement to compensation under the Takings Clause."  145 Fed. Cl. at 52.  Similarly, in *Modern Sportsman*, the court reasoned that "the Takings Clause is not implicated" because the Government "acted within the narrow confines of the police

---

[16] In response to commenters objecting to the Government's invocation of the police power exception to compensable takings, *see, e.g.*, Ex. 1 at 219 (AR003829), the Rule explained that it "does not posit the existence of a 'plenary police power' at the Federal level." 83 FR 66524 n.7; *compare Lane v. United States*, No. 3:19-cv-1492-X, 2020 WL 1513470 at *5 (N.D. Tex. Mar. 30, 2020) (observing that "the police power is a power reserved for the states" and concluding that the Rule must rely on one of the federal government's enumerated powers).  Rather, when "the federal government . . . engage[s], pursuant to one or more of its enumerated powers, in activities not unlike those engaged in by the states under their inherent sovereign powers to protect the public welfare," such activities are the exercise of a narrower "police power" that is a necessary and proper component of the enumerated power.  83 FR 66524 n.7 (cleaned up) (quoting *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 n.17 (Fed. Cir. 1994)); *see also Brooks v. United States*, 267 U.S. 432, 436 (1925) (When Congress "regulate[s] interstate commerce" by "punishing the use of such commerce . . . [to] harm [] the people of other states . . . it is merely exercising the police power").

power when it required the surrender or destruction of all bump stocks."  145 Fed. Cl. at 582-83.

This Court should reach the same result here, because the classification and seizure of contraband is

one of "the most basic exercises of the police power," and the Takings Clause does not "compel the

government to regulate by purchase" when it prohibits items as contraband.  *Holliday Amusement Co.*

*of Charleston v. South Carolina*, 493 F.3d 404, 410 (4th Cir. 2007) (quoting *Andrus v. Allard*, 444 U.S. 51,

65 (1979)).

Nor is injunctive or declaratory relief available for Plaintiffs' takings claims.  The Fifth

Amendment does not "prohibit the taking of private property, but instead places a condition on the

exercise of that power.  This basic understanding of the Amendment makes clear that it is designed

not to limit the government[] . . . but rather to secure *compensation*."  *First English Evangelical Lutheran*

*Church of Glendale v. County of L.A.*, 482 U.S. 304, 314 (1987) (emphasis in original) (citations omitted).

Such compensation may be unavailable, but nevertheless, the Fifth Amendment does not "prohibit

[a] taking," and accordingly, Plaintiffs may not enjoin or invalidate the Rule based on an unlawful

takings theory.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984); *Bldg. Owners & Managers*

*Ass'n v. FCC*, 254 F.3d 89, 101 (D.C. Cir. 2001) (Randolph, J., concurring).

## V.     Defendants Are Entitled to Judgment on Plaintiffs' Other Claims.

### A.     The Rule Is Not Retroactive.

Contrary to Plaintiffs' assertions, the Rule is not impermissibly retroactive and therefore is not

barred by either Article I, Section 9, Clause 3 of the Constitution, which provides that "No . . . ex post

facto Law shall be passed," or by 26 U.S.C. § 7805, which bars the application of a tax regulation "to

any taxable period ending before" the proposal of such regulation.  26 U.S.C. § 7805(b); *see* Codrea

SAC ¶ 34; Guedes SAC ¶¶ 164-70.  In *Guedes II*, the Court of Appeals held that the *Codrea* Plaintiffs

could not establish a likelihood of success to support a preliminary injunction on these claims, but did

so on the basis that they had been "forfeited" in district court in the preliminary injunction context.

920 F.3d at 35.  Nevertheless, in dicta, the Court of Appeals explained that, under its analysis of

Plaintiffs' APA claims, even a proper claim under Section 7805(b) or the Ex Post Facto Clause would

necessarily fail because "the Rule is legislative in character and therefore purely prospective."  *Id.*  As

the Court of Appeals noted, if "the possession of bump stocks would become unlawful only after the effective date," there is nothing retroactive about the Rule.[17]  *Id.*

To be sure, as the Court of Appeals acknowledged, the Government did not—and does not—agree with that Court's determination that the Rule is legislative, rather than interpretive, in nature. However, the nature of the Rule is irrelevant to Plaintiffs' retroactivity claims because, even under the Government's analysis of the Rule as interpretive, the Rule is not impermissibly retroactive.  As an interpretive rule, the Rule merely explains that possession of a bump stock violates 18 U.S.C. § 922(o), the criminal prohibition on machine gun ownership, a statute enacted in 1986.  Because the statute banned machineguns and "ATF must . . . classify devices that satisfy the statutory definition of 'machinegun' as machineguns," 83 FR 66529, the Rule explains that "the restrictions imposed by the NFA and GCA" apply to bump stocks, as they have since 1986.  83 FR 66420.  Thus, the interpretation set forth in the Rule does not represent a change in the law, but is instead "an authoritative statement of what the statute meant before as well as after the decision" to issue the Rule. *Rivers v. Roadway Express*, 511 U.S. 298, 312-13 (1994).  Because the bar on retroactive rulemaking applies only when doing so "makes an action, done before [the Rule], and which was innocent when done, criminal," Codrea SAC ¶ 38 (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)), if the Rule is interpretive in nature, no retroactive action has occurred.  As the Court of Appeals explained, if the Rule is legislative, retroactive action has similarly not occurred.

Further, in response to commenters raising concerns about the ex post facto implications of banning bump stocks, *see, e.g.*, Ex. 1 at 120-25 (AR002324); Ex. 1 at 130 (AR002694), the Rule included protections for those who may have unknowingly purchased prohibited machine guns in light of the agency's previous misclassifications.  Specifically, the Rule explained that, in order to inform the public

---

[17] The *Codrea* Plaintiffs plead their retroactivity claims in the same count and without distinguishing between them, *see* Codrea SAC at ¶¶ 79-80, confirming the view of the Court of Appeals that the *Codrea* Plaintiffs' claims under Section 7805(b) and the Ex Post Facto Clause can be analyzed together.  *See Guedes II*, 920 F.3d at 35 (treating these claims as subject to the same analysis).  This Court should do the same.  *See generally Baldwin v. United States*, 921 F.3d 836, 844 (9th Cir. 2019) (explaining limits of authority to issue retroactive regulations under Section 7805(b); *Kandi v. United States*, 97 A.F.T.R.2d 2006-721, 2006 WL 83463 (W.D. Wash. 2006) (comparing presumption against retroactivity under current version of Section 7805(b) with prior version of statute).

of the revised classifications, possessors of bump stocks would have ninety days to destroy or relinquish their devices and avoid prosecution. *See* 83 FR 66530, 66549. This ensured that no consequences would arise for "past possession of bump-stock-type devices that cease[d] by the effective date of [the] rule." 83 FR 66525. Those statements reflected the government's decisions (1) not to prosecute individuals who possessed bump stocks during the period in which the Department had erroneously classified them, and (2) to provide a reasonable grace period for individuals who already possessed bump stocks to come into compliance with the law. This satisfied the "purpose of the *Ex Post Facto* Clause": to ensure that the public has "fair warning of [the] effect" of laws and to "permit individuals to rely on their meaning until explicitly changed." *Gambrell v. Fulwood*, 950 F. Supp. 2d 109, 123 (D.D.C. 2013) (quoting *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981)). The *Guedes* Plaintiffs concede this point, acknowledging that the Rule subjects individuals to "punitive sanctions [only] for failing to comply" with the Rule's instruction to abandon or destroy existing bump stocks. Guedes SAC at ¶ 170.[18] Individuals who comply with the Rule thus do not face criminal liability for their past possession of a bump stock.

### B. The Rule Properly Concluded That the Department Lacks Authority to Grant an Amnesty.

Plaintiffs also contend that, if the Rule is valid, equitable considerations require "that the Attorney General allow for an amnesty so as to register these devices as machineguns under the National Firearms Act," Codrea SAC ¶ 43, and that continued possession of bump stocks following such an amnesty would be lawful "under the authority" of the Attorney General within the meaning of 18 U.S.C. § 922(o)(2)(A). *See* 18 U.S.C. § 922(o)(2)(A) (creating an exception from the general prohibition on machine guns for weapons "possess[ed] by or under the authority of, the United States

---

[18] Relying on *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the *Codrea* Plaintiffs assert that the "agency['s] promise to forego enforcement in the exercise of prosecutorial discretion" cannot cure a retroactivity violation. Codrea SAC ¶ 39. But the exercise of discretion on which the Court in *McDonnell* declined to rely was a substantive interpretation of a vague statutory term that could "be interpreted to be either a meat axe or a scalpel," *id.* at 2373 (quoting *United States v. Sun–Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999). Such concerns have no application here, where the exercise of prosecutorial discretion concerns a specified time period in which enforcement would not be undertaken.

or any department or agency thereof"). As the Rule concluded, however, federal law does not authorize an "amnesty period" in which bump stock owners could register their bump stocks as machine guns such that they could continue to possess them.  *See* AR004120-AR004122; 83 FR 66536. And even if the Attorney General *could* choose to issue an amnesty, that choice would be within the discretion of the Attorney General.[19]

Relying again on Mr. Savage's report, the *Codrea* Plaintiffs assert that the "Attorney General could simply declare a general amnesty under the NFA any time he wishes to," during which time "the government would open the NFRTR [National Firearms Registration and Transfer Record] to new transferable machineguns."  Codrea SAC ¶ 52.  As the Rule properly concluded, however, Congress eliminated amnesty authority with regard to machine guns in 1986 by enacting 18 U.S.C. § 922(o), *see* 83 FR 66536.  As a later in time enactment, the outright prohibition on machine guns in Section 922(o) impliedly repeals the Attorney General's amnesty authority, and also controls over the general amnesty provision in the NFA as the more specific statute. *See Norwest Bank Minn. Nat'l Ass'n v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002).

Section 207(d) of the 1968 Amendments to the NFA, enacted alongside the GCA, *generally* grants the Attorney General and ATF authority to provide an amnesty for certain firearms that are not otherwise prohibited by law.  That provision reads:

> The Secretary of the Treasury, after publication in the Federal Register of his intention to do so, is authorized to establish such periods of amnesty, not to exceed ninety days in the case of any single period, and immunity from liability during any such period, as the Secretary determines will contribute to the purposes of this title.

Pub. L. 90-619, 82 Stat. 1236.  As the Rule explains, however, whereas "in 1968 Congress left open the possibility of future amnesty registration" of machine guns and other weapons subject to the NFA, no "amnesty period is possible" for the bump stocks covered by the Rule because the 1986 enactment of the FOPA impliedly repealed the Secretary's amnesty authority with respect to machine guns.

---

[19] The *Guedes* Plaintiffs challenge the Rule's conclusion that an amnesty is unavailable as arbitrary and capricious, rather than as a standalone claim.  Regardless of how the claim is styled, this argument fails for the same reasons.

AR004120-21; 83 FR 66536.[20]

FOPA added to the GCA an absolute ban on the possession of machine guns, codified at 18 U.S.C. § 922(o) and subject only to the two limited exceptions spelled out in its text.  *See* 100 Stat. 449, 453. When read alongside the NFA's amnesty language, "the earlier and later statutes are irreconcilable," and such a conflict is the "permissible justification for a repeal by implication." *U.S. v. Williams*, 216 F.3d 1099, 1102 (D.C. Cir. 2000); *see also English v. Trump*, 279 F. Supp. 3d 307, 324 (D.D.C. 2018) (implied repeal occurs where "the later-enacted statute 'expressly contradict[s] the original act'" as well as when inferring repeal "is absolutely necessary" to ensure "the words of the later statute . . . have any meaning at all") (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (alterations omitted)).  The conflict here is truly irreconcilable: As commenters to the Rule pointed out, Section 207(d) facially authorizes an amnesty as to the registration provisions of the NFA, thereby permitting the belated registration of bump stocks as machine guns. *See* Ex. 1 at 203 (AR003859); Ex. 1 at 211 (AR003943).  However, the exercise of such authority would create a category of lawful machine guns beyond those in the two exceptions enumerated within 18 U.S.C. § 922(o) and thereby contradicting that provision's facial ban on all machine guns not covered by those exceptions and stripping "any meaning at all" from the machine gun ban.  *English*, 279 F. Supp. 3d at 324.  Because "the later statute expressly contradicts the original act," it is correct to "infer a statutory repeal." *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 662-63 (2007).[21]

---

[20] The *Codrea* Plaintiffs suggest that their comments to the Rule contain "proof" that "at least one machinegun was allowed to be registered" after the May 19, 1986 repeal of Defendants' amnesty authority and that "discovery on this topic" is warranted to learn whether there are other, similar registrations. Codrea SAC ¶ 43 & n.6.  But the approved application to which Plaintiffs refer, *see* Ex. 1 at 60, shows that it was submitted to ATF on April 21, 1986—*before* enactment of the FOPA.

[21] ATF Ruling 82-8, cited by the *Codrea* Plaintiffs as a supposed example demonstrating that "grandfathering of machineguns can occur," Codrea SAC ¶ 48, is inapposite.  The grandfathering of machine guns under that ATF Ruling applies to machine guns "manufactured or assembled before June 21, 1982."  ATF Ruling 82-8, *available at*: https://www.atf.gov/firearms/docs/ruling/1982-8-sm10-sm11a-pistols-and-sac-carbines-nfa-weapons/download (last visited May 19, 2020).  This ruling was issued before the implied repeal of authority by the FOPA in 1986 and applies to machine guns that, if lawfully registered, were exempted by Section 922(o)(2)(A), so no similar authority exists here.  ATF Rulings 94-1 and 94-2, the "Streetsweeper" and "USAS-12" amnesties cited by the *Guedes* Plaintiffs, are even further afield: these amnesties applied to "destructive

The implied repeal of the 1968 amnesty authority is also supported by the "clear and manifest" intention of Congress in 1986, as reflected in both the statutory text and the history of its adoption. The purpose of the FOPA was to "effectively ban[] private ownership of machine guns." *Guedes II*, 920 F.3d at 36 (Henderson, J., concurring in part and dissenting in part); *see U.S. v. Hunter*, 843 F. Supp. 235, 247-48 (E.D. Mich. 1994) ("[T]he language of the statute . . . demonstrate[s] that Congress wanted to regulate possession and transfer of machineguns as a means of stemming interstate gun trafficking . . . The means Congress chose to accomplish its goal was to ban the transfer and possession of such weapons outright"). As explained in the Rule, during legislative debates on the FOPA, "[w]hen asked whether an amnesty period could 'be administratively declared by the Secretary of the Treasury by the enactment of this bill,' Senator Kennedy responded that '[t]here is nothing in the bill that gives such an authority.'" 83 FR 66536 (quoting 132 Cong. Rec. S5358); *but see* 132 Cong. Rec. S5361 (1986) (colloquy of other senators, asking "[c]an an amnesty period be declared administratively . . . ?" and yielding the response "[a]bsolutely").[22]

Traditional canons of statutory construction bolster Defendants' conclusion that there is no authority to provide an amnesty for machine guns. "The Supreme Court has instructed that if 'there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus., AFL-CIO v. Reno*, 73 F.3d 1134, 1140 (D.C. Cir. 1996) (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987)). Indeed, the "general/specific canon is perhaps most frequently applied" to situations like this when "a general permission or prohibition is contradicted by a specific prohibition or permission," and to "eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

---

devices," which are not subject to the implied repeal of amnesty authority by the FOPA's ban on machine guns. *Compare* Guedes SAC at ¶ 112 *with* 83 FR 66535-36.

[22] The Rule's conclusion that no amnesty is possible is also consistent with longstanding Executive Branch practice. ATF has held the view that the FOPA impliedly repealed the amnesty provision as to machine guns since at least 1997, *see* AR001394, and "[s]ince the initial registration period in 1968, neither the Secretary nor the Attorney General (after assuming the Secretary's functions in 2002) have declared an amnesty to allow further registrations." Stephen P. Halbrook, Firearms Law Deskbook § 7:10 (2019); *see also* 83 FR 66536.

566 U.S. 639, 645 (2012) (citing *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)).  Here, section 207(d) applies to the entirety of the NFA, while section 922(o) addresses machineguns with specificity, providing that no new machine guns may be lawfully possessed in, or transferred to, private hands. This further demonstrates that Defendants lack authority to grant an amnesty.

The *Codrea* Plaintiffs also appear to suggest that the Department could "choose to simply 'authorize' the new registrations," and that such an action would permit the possession of bump stocks "under the authority" of the United States and/or the Department of Justice, within the meaning of Section 922(o)(2)(A).  As the Rule explained, however, Section 922(o)(2)(A) is "an exception for governmental entities," not for any member of the public, and it exists only to serve "the necessity for the military and law enforcement to continue to use and possess [machine guns]." 83 FR 66520; *see id.* at 66526 ("section 922(o)(2)(A) does not empower ATF to freely grant exemptions from section 922's general prohibition of machine guns"); *United States v. Fisher*, 145 F. App'x 379, 383 n.2, 2005 WL 2033329 (6th Cir. 2005) (recognizing that purpose of Section 922(o)(2)(A) relates to "the National Guard or . . . militia service"); *United States v. Vector Arms Inc.*, 2017 WL 2838210 at *2 (W.D. Va. June 30, 2017) (authorization letter from Department of Justice does not provide continuing "authority" within the meaning of Section 922(o)(2)(A)).  Contrary to Plaintiffs' argument, Congress has never provided the Government with "the authority" to broadly exempt owners of an entire category of machine guns, such as bump stocks, from the prohibition in Section 922(o).

Nor can Plaintiffs circumvent the statutory restrictions on the Government's authority to permit continued possession of bump stocks by appealing to this Court's equitable authority. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."  *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015); *see Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (judicial authority to grant equitable remedies is limited by "a clear and valid legislative command" or "by a necessary and inescapable inference"). In addition to the explicit command by Congress that private possession of machine guns be limited by Section 922(o), the comprehensive regulatory system for NFA firearms cannot be reconciled with

41

the exercise of equitable authority to mandate registration of bump stocks in the NFRTR. This is because the NFA includes other provisions with which compliance is now impossible, such as the requirement that NFA firearms be registered and authorized *prior* to their manufacture, *see* 26 U.S.C. § 5841; the requirement that every maker of an NFA firearm identify that firearm with a serial number, *see* 26 U.S.C. § 5842; and the numerous regulations set forth in 27 C.F.R. Part 479, including those specifically applicable to machine guns. *See, e.g.*, 27 C.F.R. § 479.105.  The Rule correctly determined that registration and continued lawful possession of bump stocks cannot be reconciled with the terms of the NFA, and so the Department is entitled to judgment on this claim. Finally, even if the Attorney General retained authority to issue an amnesty for machine guns, plaintiffs articulate no basis by which such an amnesty would "contribute to the purposes of this title," Pub. L. 90-619, 82 Stat. 1236, a manner by which such a discretionary judgment would be reviewable by this Court, or a principle under which the Court could require the Attorney General to exercise his discretion in that fashion.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.


DATED this 28th day of May, 2020.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MATTHEW J. GLOVER
Counsel

LESLEY FARBY
Assistant Branch Director

*/s/ Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division

42

1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*