**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAMIEN GUEDES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO FIREARMS, AND EXPLOSIVES, *et al.* <br><br> Defendants. | Case No.  1:18-cv-02988-DLF <br> The Hon. Judge Friedrich |
| DAVID CODREA, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO FIREARMS, AND EXPLOSIVES, *et al.* <br><br> Defendants. | Case No.  1:18-cv-03086-DLF <br> The Hon. Judge Friedrich |

# EXHIBIT 1

# Selected Comments

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

### Comment

See Attached

### Attachments (4)

#### Email 013 (Historic Arms) rec 5-29-18

View Attachment:    + View more information

**Abstract:**
Email 013 (Historic Arms) rec 5-29-18
4 Parts to Document~ total 66 pages

#### Email 013 (Historic Arms) rec 5-29-18 - Part2

View Attachment: 

#### Email 013 (Historic Arms) rec 5-29-18 - Part3

View Attachment: 

#### Email 013 (Historic Arms) rec 5-29-18 - Part4

View Attachment: 

---

**ID:** ATF-2018-0002-31210

**Tracking Number:** 1k2-93f3-s09b

### Document Information

**Date Posted:**
May 29, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Len Savage III

**Organization Name:**
Historic Arms LLC



LEN SAVAGE, PRESIDENT

# Historic Arms L.L.C.

706-675-0287 Home
706-675-0818 Shop

Analysis and commentary regarding: **DOCKET NUMBER: ATF 2017R-22**
&

# BUMP-STOCK-TYPE-DEVICES

ORIGIN

***Why was the bump stock invented in the first place?***   The answer is that they would not exist if the government had not effectively "banned" machineguns on May 19, 1986 with implementation of the Hughes amendment of the Firearms Owners Protection Act.

A "bump-stock-type-device" is a direct result of the government banning something. With the supply of citizen legal machineguns fixed, demand grew with the population and that has caused prices of these "transferable" machineguns to skyrocket in price.

Prices drove the market into looking for an alternative.  Simulating "full auto fire" with a multitude of products that claim to increase the rate of fire had a ready made market created by the government.

In most cases the product is more of a parlor trick than anything else.  You do not hear of any law enforcement agency or foreign military fielding them.

OPERATION

***How does a bump stock work?***  A bump stock can do NOTHING without the skill and coordination of the shooter.   A specific skill based shooting technique called "bump firing" must be utilized.

The United States Department of Justice on July 27, 2017 explained the operation of bump-stock-type-devices to US district courts as:

> **"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter.  Bump**

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 0002

**firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21) complete document attached.*

All firearms have a recoil impulse because in order to propel a projectile out the barrel, an equal force in the opposite direction is also generated.   A semiautomatic firearm, due to its mechanical nature, has the ability to generate this recoil impulse every time the trigger is activated.

This cycle of mechanical events that start with the trigger activation and end with a new round in the chamber ready to begin again is the cycle rate or how fast the firearm can physically complete cycles (or rounds fired).

The fact is any semiautomatic AR-15 (or AK-47 for that matter) can fire as fast as a machinegun version.  Their cyclic rates are identical to the machinegun version.  Their essential operating mechanisms are identical, same ammo, same mags, same reciprocating mass.  The only small physical difference is the machineguns described have a mechanical lever that "automatically" starts the new cycle as soon as the previous cycle ends.

Some semiautomatic firearms can even fire faster than the full auto version because the machinegun version having some form of a rate reducing mechanism.

ALL semiautomatic firearms can be "bump fired" regardless of any "bump-type-stock-device" installed or not.  It is a matter of skill and coordination to find the "rhythm", or cyclic rate of the firearm at hand and the correct amount of counterforce to be applied and when to apply them.

The only "self acting and self regulating" force of a bump-type-stock-device is provided by the shooter and the firearm, none is provided by the stock.   Basketballs don't dribble automatically even if the skills of most the NBA players make it appear so.

A bump-type-stock-device allows a small amount of linear motion of the firearm frame, allowing for safe control of the firearm while utilizing the bump fire shooting technique.  There is less risk of loss of control of the firearm when using bump-type-stock-device vs. using the shooting technique without one.

**Put bluntly, bump-stock-type-devices make using the bump fire shooting technique safer for the shooter and those around the shooter.**

ADMINISTRATIVE RECORD

Bill Akin seeking to fill a market need invented, patented, and then produced the Akin's Accelerator.  In his quest to simplify or make the bump fire shooting technique easier, though similar to a bump-stock-type-device it was different in two ways.

Page | 2

1.)  No required bump fire skills or technique to function.
2.)  Reduced shooter input required to function (no coordination required).

The ATF initially agreed with Mr. Akin that indeed the trigger of the firearm was being activated with each shot.   Mr Akin after securing his patent went into business making the "Akins Accelerator" stock for the Ruger 10/22 rifle.

The .22 rim fire cartridge made the real skill in the Akins Accelerator the tuning process involved in adjusting the operating spring that regulated his device.   They were tricky to set up to work, (lots of trial and error), but once set up ran like a sewing machine.

When the ATF reclassified his product Mr. Akins sought judicial relief and took the ATF and DOJ to court over the issue.   The case went to the 11th circuit court of appeals.   The Department of Justice documented through court proceedings just how much "extensive legal analysis" was conducted by them on the subject of machineguns and bump-stock-type-devices.

Mr. Akin researched ways to salvage his patent and hopefully come up with a lawful replacement product that would pass ATF examination and classification.

I was a member of Mr. Akins legal team and my company later helped him research and develop his compliant replacement product.  20% of the DOJ cited ATF classification letters on "Bump-Stock-Type-Devices" are addressed to me.  I have no commercial interest in bump-stock-type devices other than the research and development completed.

The administrative record, such that it is, is VERY clear.

The basic premise of all current  ATF classification letters as well as court pleadings by ATF and DOJ to date are that a device not omit the required skill or the shooters required input in order to achieve "bump fire".

The Department of Justice on September 13, 2017 on why a bump-stock-type-device is NOT a machinegun:

> **"Because of the manual, skill based methods required to operate a bump fire device"**  *(case3:16-cv-00243-RLY-MPB, Document 33, page 8) complete document attached.*

The above policy is based on logic and science and is therefore demonstrable with a simple scientific test.

ATF RULING 82-8 proves that DOJ knows that "grandfathering" a device when they had; 1.) Previously declared the device to be lawful, 2.) Then later declared the device to be a machinegun, as being perfectly lawful to possess if made before the ruling date. *Complete document attached.*

Page | 3

*Complete document attached.*

Furthermore on September 10, 2009, ATF experts were asked about the firearms "grandfathered" in ATF Ruling 82-8 under oath.  The ATF's official position is that the firearms are machineguns, do not require registration, nor do they require a tax be paid on them, and the ATF is aware they are in circulation *(approximately 50,000)*, but are no longer manufactured.  (US vs. One Historic Arms Model 54RCCS Case 1:09-CV-00192-GET).  *Relevant document page attached.*

The Department of Justice currently claims that an ordinary shoe string can be a machinegun if installed on a semiautomatic firearm.  There are documents dating from 1996, 2004, and 2007 from ATF on this issue.  ATF letter to Brian Blakely June 25, 2007:

> **"When the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun"**
> *Complete document attached.*

It is significant that the DOJ claims that both shoe strings and bump-stock-type-devices convert semiautomatic firearms into machineguns, yet has chosen NOT to regulate them in any way, let alone ban all shoe strings and demand their forfeiture, destruction, or ban further manufacture.

The documents prove that DOJ can indeed grandfather items that purportedly convert a semiautomatic firearm into a machinegun as they have with the shoe string issue.

BUMP-STOCK-TYPE-DEVICE CRIME

***Just how many crimes are committed using "Bump-Stock-Type-Devices" anyway?***
The only alleged use of a "bump-type-stock-device" during a crime was the Las Vegas shooting incident on October 1, 2017.

Both ATF and FBI were specifically asked if they had ANY records of a "bump-type-stock-device" being used in a crime on April 9, 2018 via a Freedom Of Information Act (FOIA) request.  *Complete document attached.*

To date neither ATF nor FBI will confirm ANY crime being committed (including the Oct 1, 2017 Las Vegas incident).  In fact ATF Firearms Technology did not even receive the firearms from the Oct. 1, 2017 shooting incident until April of this year.

No ATF "Report of Technical Examination" (ATF form 3311.2) has been released for any of the firearms used in the incident.   For all we know the firearms could have been a machinegun with a "bump-stock-type-device" installed to throw off unwanted attention from law enforcement as a ruse or decoy for reports of automatic gun fire.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 0005

There simply are no other known crimes committed with "bump-stock-type-devices". No known military uses "bump-stock-type-devices, nor does any known law enforcement agency.

## THE NPRM ENFORCEMENT SCHEME FATALLY FLAWED

The NPRM does not address several serious issues.

1.  The change in policy asks for a willing suspension of disbelief of basic science and physics.

2.  The change in policy will put ATF experts at risk of being impeached as expert witnesses.

3.  The summary of the NPRM is filled with demonstrably false or misleading statements that are disputed by DOJ's own experts at ATF.

ATF expert testimony in trials and in classification letters conflict factually with the NPRM when it states on page 19:

**"Because these bump stock type devices allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device, they are a machinegun".**

The problem with that statement is that it is patently false.

Furthermore, it easily demonstrated as a false statement.

If that where all it took to make a bump-stock-type-device to function as the DOJ claims a simple scientific test could be given to determine if the device is really self activating and self regulating or whether there is coordinated skilled input from the shooter:

**....please demonstrate firing a bump type stock device equipped firearm using only your trigger hand as described, using no skilled coordinated input from your other hand.** *(It can't be done as it takes two hands, skill, and coordination in order to function.)*

No doubt such a requested demonstration would be part of any court proceedings should this proposed rule be implemented and ultimately prosecuted.

One could point out the United States Department of Justice knows of this test, as they certainly are familiar with the results of such a test:

**"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter. Bump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21)Complete document attached.*

If such a device were truly self acting and self regulating as the Department of Justice now claims, then a bump-stock-type-device equipped firearm should fire as a machinegun with no coordinated skilled effort from any other body part (which is impossible).

**This same "coordinated input test" applied to an Akins Accelerator equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

**This same "coordinated input test" applied to the "shoe string" equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

The document control number of every ATF classification letter contains the identity of person drafting the communication. Furthermore, a simple search for the "Correspondence Approval and Clearance" (ATF form 9310.3A) associated with any bump stock letter assuring the item in question is not a firearm under the NFA and GCA will indentify every person involved in the classification process. Under US v. Brady the Department of Justice is mandated to providing this information to any future defendant when they attempt to prosecute anyone on this policy.

The cost of this proposed rule will be the credibility of the ATF firearms expert trying to explain or defend its preposterous claims under cross examination during some current or future court case.

**The definition of the word arbitrary:** *"Based on some random choice or personal whim, rather than any reason or system".*

THE SCOPE OF THE NPRM IS OVERLY BROAD DUE TO VAGUE LANGUAGE

The NPRM has descriptive language that is so vague it could be describing hundreds of thousands of pump shotgun in the US, making each a potential machinegun. As there are several models of shotguns that operate precisely as stated on page (1) of the NPRM **"firing without additional physical manipulation of the trigger by the shooter"** (There were approximately 500,000 Model 37 pump shotguns made by Ithaca alone).

The vague language of the NPRM also describes every semiautomatic firearm made to date. Because;

Page | 6

1.)  All semiautomatic firearms have the intrinsic ability to "bump fire" and are a type of device.

2.)  All semiautomatic firearms are by their very definition both a "self regulating", and a "self acting" mechanism.

Rate of fire is not regulated by the NFA or the GCA in any way.  DOJ knows that ALL semiautomatic firearms CAN fire as fast as a machinegun.  This is because a semiautomatic and a machinegun version of the same firearm have the same essential operating mechanism (other than a few small parts in the trigger assembly).

Bump-stock-type-devices were created as a direct result of government regulation.  They simply would not exist if the purchase price of so called "transferable" machineguns were not so expensive due to supply being fixed on May 19, 1986.

If the government really wanted bump-stock-type-devices to go away, and they claim they have the right to reconsider its previous interpretations, then the government would open the NFRTR to new transferable machineguns.

Nobody would bother with a bump-stock-type-devices and the government would know precisely where each new machinegun was.  922(o) " ….Or under the authority of". The government could choose to simply "authorize" the new registrations.

OR: The Attorney General could simply declare a general amnesty under the NFA any time he wishes to as long as they are not concurrent (must be separated by one calendar day).

DOJ has had the power to do both and neither would have required any proposed rule making.

Claims made by DOJ in the NPRM can only be described as deceptive; they are not supported by scientific facts or DOJ's own documents.

Len Savage
Historic Arms LLC
May 25, 2018

The documents are attached in the order they are referred to in the text.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case No. 3:16-cv-243-RLY-MPB | |
| | ) | |
| THOMAS E. BRANDON, Director, | ) | |
| Bureau of Alcohol Tobacco Firearms | ) | |
| and Explosives, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a firearms manufacturer

headquartered in Chandler, Indiana.   In this case, Freedom challenges a decision by the Bureau

of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that a device Freedom seeks to

manufacture and market is a "machinegun" as defined under the National Firearms Act, 26

U.S.C. § 5845(b).   ATF's decision is not arbitrary and capricious, but is supported by the

administrative record.   Based on the foregoing, ATF is entitled to summary judgment.

1

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a federally-licensed firearms manufacturer with its principle place of business in Chandler, Indiana.   (Docket No. 1 ¶ 2.) Freedom designed an Electronic Reset Assist Device ("ERAD") for commercial sale to the general public.   (Docket No. 1 ¶ 9.)   The purpose of the ERAD, as described by Freedom, is to "improve firearm design" to assist the firearm user's "ability to continually pull the trigger in a rapid manner when a high rate of fire is desired."   (Administrative Record ("AR") 0025; Patent documents.)

The Firearms and Ammunition Technology Division ("FATD") of ATF, through its Firearms Technology Industry Services Branch ("FTISB"), provides expert technical support to ATF, other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general public.   ATF, Firearms Ammunition and Technology (2017), available at https://www.atf.gov/firearms/firearms-and-ammunition-technology.   FTISB is responsible for technical determinations concerning types of firearms approved for importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.   *Id.*

There is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture.   *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook 7.2.4 (2017), available at

---

[1] As discussed in Legal Background, Section D, the typical Fed. R. Civ. P. 56 standard and procedural structure does not apply in an APA review case.   Accordingly, the Defendant is not required to marshal evidence showing material issues of fact in dispute and the typical "Statement of Material Facts Not In Dispute" does not apply, but is offered for factual context. Specific sections of the Record are cited in the relevant portions of the Argument section.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00010

https://www.atf.gov/firearms/national-firearms-act-handbook.   ATF, however, encourages firearms manufacturers to submit devices for classification before they are offered for sale to ensure that the sale of such devices would not violate the Federal firearms laws and regulations. *Id.*   ATF responds to classification requests with letter rulings that represent "the agency's official position concerning the status of the firearms under Federal firearms laws."   *Id.* at 7.2.4.1.

### A.   The November 2015 Submission

In November 2015, Freedom submitted a request to FTISB to examine a "trigger reset device."   (AR 0002; 0005 – 17 (photos of submission).)   Freedom submitted a prototype of the device, along with correspondence, and a Bushmaster Model XM15-E2S AR-type firearm to be used in testing the prototype.   (*Id.*)

FTISB closely examined and tested the prototype.   (AR 0003.)   As part of the examination, FTISB staff fired an AR-type rifle[2] with the prototype attached.   (*Id.*)   FTISB staff noted two instances of machinegun function with the prototype device attached.   (*Id.*) Specifically, FTISB found that trigger reset device, when attached to the test weapon, converted it into a weapon that fired automatically – "firing more than one shot without manual reloading by a single function of the trigger."   (*Id.*)   Based on the examination and testing conducted, FTISB determined that the trigger reset device was a "machinegun" as defined in 26 U.S.C. § 5845(b), and notified Freedom in a letter dated March 23, 2016.   (AR 0002 – 4.)

### B.   The April 2016 Submission and October 27, 2016 Classification Decision

---

[2] FTISB ended up using an ATF AR-type firearm to field test the prototype device because it noted a deformity in the Bushmaster Model XM15-E2S AR-type firearm submitted by Freedom. (AR 0003.)

3

In April 2016, Freedom submitted a new sample prototype of its trigger reset assist device (referred to as the "ERAD").  (AR 0001.)   According to Freedom, the new sample prototype "is a total redesign" of the initial prototype.  (AR 0001.)   In the submission, Freedom included two sample prototypes of the device, along with 9-volt lithium batteries, and DVDs showing demonstrations of live firing and disassembly of the device.  (*Id.*)   Although Freedom did not explicitly request a classification from FTISB on its prototype, FTISB treated the submission as such because the letter referred back to the Agency's March 23, 2016, classification and stated that Freedom "worked very hard to correct" the issues identified in the March 23, 2016, letter.  (*Id.*)

On or about September 7, 2016, Freedom submitted a supplemental letter to FTISB in support of its April 2016 request for classification of the ERAD.  (AR 0018 – 24.)   The supplemental materials included a letter from Freedom's counsel setting forth Freedom's position that the ERAD should not be classified as a machinegun.  (AR 0018 – 24.)   The supplemental materials also included a sixteen minute demonstration video of the ERAD, and written materials, including Freedom's purported patent application for the ERAD.  (AR 0018; AR0025 – 46.)   In the video, Freedom states that the ERAD permits the shooter to discharge 450 to 500 rounds per minute.  (AR 0047.)

FTISB examined that submission and supplemental materials, including the demonstration video.  (AR 0070 – 71.)   Specifically, FTISB disassembled and examined the two sample ERAD prototypes.  (*Id.*)   FTISB examined each component part of the ERAD and its design features and characteristics.  (AR 0071 – 72.)   FTISB staff also conducted field testing of the ERAD by attaching it to and firing from commercially-available Remington and

4

PMC rifles and a Bushmaster Model XM15-E2S AR-type firearm.  (AR 0072.)  During the

test-fire portion of the examination, staff observed machinegun function six times.  (*Id.*)

Specifically, FTISB personnel observed that a single pull of the ERAD trigger - designated as the

"primary trigger" - initiated the firing sequence, which caused firing until the trigger finger was

removed.  (AR 0073.)

By letter dated October 27, 2016, FTISB issued a classification on Freedom's ERAD

trigger system.  (AR 0070 - 82.)  In the eleven-page letter, FTISB described (1) the

composition of the trigger and grip assembly, including its several constituent parts; (2) FTISB's

process for examining and testing the ERAD trigger system; (3) its observations of the ERAD

trigger system functionality and the firing effect that was produced when the ERAD was applied

to a firearm (*i.e.*, the prototype sent by Freedom) and test-fired; and (4) a breakdown of the firing

sequence with and without the ERAD, including several accompanying illustrations.  (*Id.*)

FTISB concluded that the ERAD is properly classified as a machinegun.  Significantly,

FTISB found that "the firing sequence is initiated by a pull of the primary trigger and

perpetuated *automatically* by shooter's constant pull and the reciprocating, battery-powered

metal lobe repeatedly forcing the primary trigger forward."  (AR 0073.)  Thus, "[a] single pull

of the trigger by the shooter therefore starts a firing sequence in which *semiautomatic* operation

is made *automatic* by an electric motor."  (*Id.*)  FTISB found that because the shooter does not

have to release the trigger for subsequent shots to be fired, the firing sequence is continually

engaged as long as the shooter maintains constant rearward pressure (a pull) on the trigger and

the motor continues to push the shooter's finger forward.  (*Id.*)  In other words, as long as the

trigger is depressed, the firearm continues to fire until either the trigger finger is removed, the

5

firearm malfunctions, or it runs out of ammunition.   (*Id.*)

FTISB therefore concluded that the installation of an ERAD on a semiautomatic firearm causes that firearm to shoot automatically (through the automatic functioning made possible by the electric motor), more than one shot, by a single function (a single constant pull) of the trigger.   FTISB therefore properly concluded that the ERAD is classified as a combination of parts designed and intended for use in converting a semiautomatic rifle into a machinegun under 26 U.S.C. § 5845(b).   (AR at 79-80; 80-82.)

## THE COURT MUST STRIKE AND DISREGARD FREEDOM'S EXTRA-RECORD EVIDENCE

Freedom brings its claim under the Administrative Procedure Act, 5 U.S.C. § 704, challenging ATF's decision that Freedom's ERAD device be classified as a machinegun. (Docket No. 1; Docket No. 24.)   As discussed further below, review of the agency's decision under the APA is conducted using an arbitrary and capricious standard, and the Court's review is limited to the administrative record lodged by the agency.   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court].").

In support of its motion for summary judgment, Freedom submitted the declarations of

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00014

Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No. 24-5).   Mr. Winge is one of the owners of Freedom Manufacturing.   (Pl.'s Ex. D, Docket No. 24-4.)   Several paragraphs of his declaration recount correspondence between FTISB and Freedom, which is already contained in the Administrative Record and which is the best evidence of its contents.   (See Pl.'s Ex. D, Docket No. 24-4, ¶¶ 18 – 20.)   The remaining paragraphs contain Mr. Winge's opinions about the ERAD and his arguments regarding why the ERAD should not be classified as a machinegun.   Mr. Winge's opinions are merely that – his opinions – and are not part of the official record containing the information upon which ATF relied in issuing its decision.   The Court should strike and disregard these opinions because the Court's review is limited to the administrative record lodged by ATF.   Freedom did not challenge or move to supplement that administrative record; therefore, it is complete.   *Highway J Citizens Grp.,* 349 F.3d at 952; *see also United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to [g]overnment agencies' actions."); *Spiller v. Walker*, No. A-98-CA-255-SS, 2002 U.S. Dist. Lexis 13194, *26-27 (W.D. Tex. July 19, 2002) ("any legal conclusions and post-[decision] evidence within the declarations and argumentation offered simply to contest the agencies' experts are not admissible.").

Richard Vasquez appears to be a witness who was retained by Freedom to provide his expert opinion regarding the ERAD's classification.   (Pl.'s Ex. E, Docket No. 24-5.)   Expert reports are generally not permitted in an APA review case.   *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555 (1978) ("the role of a court in reviewing the sufficiency of an agency's consideration . . . is a limited one, limited both by the time at which the decision was made and by the statute mandating review.").   Both the Supreme Court and the Seventh Circuit

7

have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Cronin v. USDA*, 919 F.2d 439, 443 (7th Cir. 1990) ("it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency."); *see also Airport Cmtys Coal. v. Graves*, 280 F. Supp.2d 1207, 1213 (W.D. Wash. 2003) (holding that APA was intended to preclude "Monday morning quarterbacking").

The Vasquez Declaration simply criticizes the agency's analysis, but under the APA the Court must allow the agency to rely on its own experts' opinions even if a plaintiff has other expert opinions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive."). Therefore, even if a so-called "expert" conclusion would contradict the agency's expert's conclusions, this Court can give it no force. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992).

Based on the foregoing, the Court must strike and disregard the Winge and Vasquez Declarations.

## LEGAL BACKGROUND

### A. The National Firearms Act and Gun Control Act

The National Firearms Act of 1934, 26 U.S.C. Chapter 53, and the Gun Control Act of 1968, 18 U.S.C. Chapter 44, comprise the relevant federal framework governing the firearm

market.   The Gun Control Act generally makes it unlawful for a person to transfer or possess a

machinegun manufactured on or after May 19, 1986.   18 U.S.C. § 922(o).   ATF is charged

with administering and enforcing both the National Firearms Act and the Gun Control Act.   28

C.F.R. § 0.130(a)(1)–(2).

> 18 U.S.C. § 922(a)(4) states that it shall be unlawful –
>
> (4) for any person, other than a licensed importer, licensed manufacturer, licensed
> dealer, or licensed collector, to transport in interstate or foreign commerce any
> destructive device, machinegun (as defined in section 5845 of the Internal
> Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as
> specifically authorized by the Attorney General consistent with public safety and
> necessity;

Accordingly, with the limited exception of State, Federal and local law enforcement

agencies, it is unlawful for any person to transfer or possess a machinegun manufactured on or

after May 19, 1986.   Moreover, machineguns must be registered in the National Firearms

Registration and Transfer Record and may only be transferred upon the approval of an

application.   26 U.S.C. § 5812.   The National Firearms Act makes it unlawful to manufacture

a machine gun in violation of its provisions.   26 U.S.C. § 5861(f).   Specifically, the National

Firearms Act requires that a person shall obtain approval from ATF to make a National Firearms

Act firearm, which includes a machinegun. 26 U.S.C. §§ 5922, 5845(a).   Similarly, licensed

manufacturers are required to notify ATF by the end of the business day following manufacture

of a NFA firearm.   26 U.S.C. § 5841(c), 27 CFR 479.103.

### B.  The Definition of a Machinegun

The National Firearms Act, 26 U.S.C. § 5845(b), defines a machinegun[3] as

---

[3] Although more commonly spelled "machine gun," the applicable statutes use the spelling
"machinegun."

9

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00017

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

*See also* 27 C.F.R. § 478.11 (stating same).

The Gun Control Act incorporates the National Firearms Act's definition of machinegun and defines machinegun identically to the National Forearms Act.   18 U.S.C. § 922(a)(4). Both statutory definitions of a machinegun therefore include a combination of parts designed and intended for use in converting a weapon into a machinegun.   *Id.*   This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.   *See* ATF Rule 2006-2 (AR at 630-32.)

### C.  The Administrative Procedure Act

The Administrative Procedure Act (APA) requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).   The agency's decisions

10

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00018

are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one," *id*. at 416.

Federal courts are particularly deferential towards the "'scientific determinations'" of the

agency, which are "presumed to be the product of agency expertise." *Franks v. Salazar*, 816

F.Supp.2d 49, 55 (D. D.C. 2011) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,

Inc.*, 462 U.S. 87, 103 (1983)).   The Court's review is confined to the administrative record,

subject to limited exceptions not at issue here.   *See Camp v. Pitts*, 411 U.S. 138, 142 (1973)

("[T]he focal point for judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court.").   *See also Sig Sauer, Inc. v. Jones*,

133 F. Supp. 3d 364, 371 (D.N.H. 2015), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d

598 (1st Cir. 2016) (recognizing that classification determinations "require expertise that is well

within the ATF's grasp" and that "its conclusions are entitled to substantial deference from a

reviewing court.") (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

### D. Summary Judgment in APA Cases

Under the APA, "courts are to decide, on the basis of the record the agency provides,

whether the action passes muster under the appropriate APA standard of review." *Fla. Power &

Light Co.*, 470 U.S. at 743-44.   Because extra-record evidence and trials are inappropriate in

APA cases, courts decide APA claims via summary judgment based on the administrative record

the agency compiles.   *Cronin*, 919 F.2d at 445 ("Because the plaintiffs are not entitled to present

evidence in court to challenge the [decision-maker's] decision . . . , there will never be an

evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir.

11

1994).

Although summary judgment is the procedural mechanism by which the Government is

presenting its case, the limited role federal courts play in reviewing such administrative decisions

means that the typical Federal Rule 56 summary judgment standard does not apply. *See*

*Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1228 (S.D. Ind. March

31, 2014) (Barker, J.) (citing *Cronin*, 919 F.2d at 445); *see also Sierra Club v. Mainella*, 459

F.Supp.2d 76, 89–90 (D. D.C. 2006).   Instead, in APA cases, "[t]he factfinding capacity of the

district court is thus typically unnecessary to judicial review of agency factfinding . . . .   [C]ourts

are to decide, on the basis of the record the agency provides, whether the action passes muster

under the appropriate APA standard of review." *Florida Power & Light Co.*, 470 U.S. at 744–

74.

## ARGUMENT

Plaintiff raises several challenges to FTISB's classification decision.   As discussed

below, FTISB conducted a thorough examination of the ERAD, and fully disclosed the findings

supporting its decision.   FTISB's decision was not arbitrary and capricious, but is supported by

the facts as presented in the administrative record, and is a reasonable interpretation of the

statute.   Defendant is entitled to judgment in its favor on all of the Plaintiff's claims.

### A. ATF's Decision Is Not Arbitrary and Capricious.

A machinegun is defined in part as any weapon that shoots "automatically more than one

shot, without manual reloading, by a single function of the trigger."   26 U.S.C. § 5845(b).   The

term also includes any "combination of parts designed and intended, for use in converting a

weapon into a machinegun." *Id.*   In the definition of machinegun, neither the National

12

Firearms Act nor the Gun Control Act further define the phrase "single function of the trigger." The test firing of Plaintiff's prototype—an AR-15 semi-automatic rifle (Bushmaster Model XMI150E2S) with an integrated ERAD grip—demonstrated that, once the grip button was pulled (activating the motor) concurrent with constant rearward pressure being applied to the trigger extension (which Plaintiffs refer to as the "reset bar"), the weapon fired more than one shot without manual reloading and without any additional action on the shooter's part.   Indeed, the weapon fired continuously until the shooter stopped applying rearward pressure to the trigger extension, or the ERAD's ammunition supply was exhausted.   (AR at 79, 47 (demonstration video).)   Additionally, when equipped with the ERAD, the weapon fired at a very high rate of speed, discharging up to 500 rounds per minute.   (AR 0047.)   Thus, the nature and mechanics of the ERAD support FTISB's finding that it converted the semiautomatic firearm to a machinegun.

FTISB's conclusion is consistent with the National Firearm's Act's legislative history, in which the drafters equated "single function of the trigger" with "single pull of the trigger."   *See* National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong., 2nd Sess., at 40 (1934) ("Mr. Frederick.[ ] The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine.   Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns.   A gun, however, which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun."); *see also* George C. Nonte, Jr., Firearms Encyclopedia 13 (1973) (the term "automatic" is defined to include "any firearm in

13

which a single pull and continuous pressure upon the trigger (or other firing device) will produce

rapid discharge of successive shots so long as ammunition remains in the magazine or feed

device – in other words, a machinegun").

FTISB's decision is also consistent with the ordinary meaning of the term "function,"

which includes "any of a group of related actions contributing to a larger action." Webster's

Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College

Edition, 297 (1984) (a synonym of function is "act"). Here, the action, or act, is pulling the

trigger, which leads to the automatic firing.

Courts have also interpreted "function" as the action of pulling the trigger. *See Staples*

*v. United States*, 511 U.S. 600, 600 (1994) ("The National Firearms Act criminalizes possession

of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which

is defined as a weapon that automatically fires more than one shot with a single pull of the

trigger, § 5845(b)."); *see also id.* at 602 n.1 ("As used here, the terms 'automatic' and 'fully

automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once

its trigger is depressed, the weapon will automatically continue to fire until its trigger is released

or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the

Act.").

In *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit

held that a "minigun" was a machinegun even though it was "activated by means of an electronic

on-off switch rather than a more traditional mechanical trigger." Despite Fleischli's arguments

that the minigun was not a machinegun because it was not fired by pulling a traditional trigger,

but rather was fired using an electronic switch, the court found to the contrary: "Fleischli's

14

electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted.   The minigun was therefore a machine gun as defined in the National Firearms Act."   *Id.* (superseded by statute on other grounds); *see also United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (rejecting defendant's argument that because he had constructed a weapon with two triggers, it would not fire by a single function of the trigger, finding "it is undisputed that the shooter could, by fully pulling the trigger, and it only, at the point of maximum leverage, obtain automation with a single trigger function.   We are satisfied the gun was a machine gun within the statutory definition both in law and fact.")

Similarly here, the ERAD is a component that, when attached to a rifle, causes the rifle to function automatically.   The ERAD allows the firing sequence to be initiated by a single pull of the primary trigger, which is continually engaged as long as the shooter maintains rearward pressure on the trigger and the motor continues to push the shooter's finger forward.   (AR 0073; 79-80.)   Because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.   ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

### B. ATF's Classification is Consistent with Public Policy.

Because of their rapid rate of fire, machineguns have long been considered inherently dangerous and are therefore strictly regulated and generally unlawful to possess.   *See* 18 U.S.C. § 922(o); *United States v. Brock*, 724 F.3d 817, 824 (7th Cir. 2013) ("Congress has grouped together sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for

15

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed
Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-15059

**Tracking Number:** 1k2-92s1-vjeq

### Document Information

**Date Posted:**
Apr 25, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Thomas Oas

### Comment

I oppose this proposed ban on so-called "bump stocks" in the strongest terms.

They have been around for almost 10 years. The ATF said that they were legal to purchase and use. They came with a letter saying so. Bump firing, without the stock, using belt loops or rubber bands, has around much longer than that.

Shooting a machine gun is fun. Many ranges rent machine guns for that very reason. But the cost to purchase a civilian legal fully automatic AR-15/M-16/M4 machine gun is as much as my first house cost. Bump stocks simulate that experience for a few hundred dollars.

And depending on the wording of the final rule, a future leftist president could interpret it to ban everything from ammunition magazines and target triggers to all semi automatic weapons.

So one, and only one, demented lunatic uses these stocks in a horrific crime. So now, tens of thousands, maybe hundreds of thousands, maybe millions of Americans who have committed no crime, are in a position to have their private, legally purchased, property seized with no due process.

Does not the prohibition on Ex Post Facto laws apply here?

This is a travesty of justice, grossly unfair and unreasonable, and simply wrong.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-1050

**Tracking Number:** 1k1-90kr-x5jm

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Mason Hicks

### Comment

Hello dear Sir/Ma'am, my name is Mason Hicks and I am commenting as a consumer.

To answer the questions on Docket No. 2017R-22 Pg. 8 for Consumers:

"21. In your experience, where have you seen these devices for sale and which of these
has been the most common outlet from which consumers have purchased these
devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar
events; or private sales between individuals)?"
ANSWER: They were commonly sold in nearly all outdoor sporting goods (Brownell's, Cabelas, Academy Sports, Gander Mountain, Dick's, Field&Stream, et cetera), local gun stores, and countless online retailors (Amazon.com, Ebay.com cheaperthandirt.net, Impact guns, Bud's Gun Shop, et cetera) prior to the Las Vegas massacre.

"22. Based on your experience or observations, what is (or has been) the price range
for these devices?"
ANSWER: They're retailing for around $200-ish right now, during the panick they could be bought new at retailers for as little as $300 to as much as $1500 used at online auction (Gunbroker, prior to delisting). Before the Las Vegas attack, they could be had for a little less than $100, for example, off of Amazon.com and other online retailers. Brick and morter stores sold them for more then the online retailers did, usually for around $150-$250 depending on retailer and brand of manufacturer.

"23. For what purposes are the bump stock devices used or advertised?"

ANSWER: Amusement. They serve no real practical purpose, nor do I believe they can be made to. It's an attempt to simulate full auto fire, but it's too awkward a device to do so. It requires a skilled hand in order to work correctly, and even then there's no practical way to use it with the entire weapon shaking and and out of the operator's shoulder pocket while they have to concentrate on keeping forward momentum on the front handguard of the weapon. It's simply a mag dump device for backyard and range use. The device itself isn't even a necessary assist in that it's simply taking advantage of the inherent nature of self-loading rifles. Using the recoil of the rifle to reset the trigger, the only real thing needed to bump fire a rifle is the operator's index finger and practice. The bump stock itself is essentially like the training wheels on a bicycle.

Now, with the docket questions answered, I feel it's important to recognize that the main reason that bump fire devices became popular on the market was mostly due to the Hughes' amendment to the Firearm Owners Protection Act of 1986. Before the bill's passing, a law abiding citizen could pay a $200 tax in addition to the cost of the weapon and fill out the necessary ATF paperwork (4467) to register and own their own genuine machine gun under the National Firearms Act of 1934. Consequently, hobbyists and sportsmen had no affordable legal outlet to own weapons such as these given supply and demand driving up the cost of pre-'86 weapons.

As a direct result of the 1986 new machine gun sales ban (the Hughes' amendment), bump fire devices like Hell fire, Akins Accelerator (which was later decided illegal due to its spring mechanism), Slide Fire, and others became popular. Under the Hughes' amendment, if these devices are to be reclassified as machine guns, they will be unregistrable and henceforth banned. There are also unknown thousands out there, including those which were cobbled together using brackets, pistol grips, and buttstock parts and those manufactured using home 3D printers ; the bump fire stock is only a cheap piece of plastic. Rather than criminalizing thousands of people with unregistrable accessories, It would be more constructive to either grandfather them or have them registered under something like the 1968 Machine Gun Amnesty and to plead with/lobby Congress on behalf of a hired registered lobbyist or Congressional liaison to repeal the Hughes amendment which would allow for this. With a Hughes' Amendment repeal, machine guns and bump fire devices would be treated just as any other NFA item. Legally owned machine guns have only been used in 3 crimes prior to Las Vegas since 1934; over a period of 83 years, that isn't many.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-1259

**Tracking Number:** 1k1-90ki-8eo2

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Ronald Devito

### Comment

Alcohol, Tobacco, Firearms and Explosives Bureau
Docket Number: 2017R-22

Answers to Consumer Questions

Q 21:

New Bump Fire Stocks are sold via online vendors and at brick-and-mortar retail establishments. Private sales, gun shows, are a secondary market for used items.

Q 22:

Bump fire stocks range in price from $180 - $500.

Q 23:

Bump Fire Stocks are advertised and marketed as "novelties" or "range toys," allowing the recreational shooter to simulate machine gun fire.

***My perspective as a shooter***

Military and law enforcement agencies have machine guns. They don't need bump fire stocks, which are not suitable for combat or law enforcement. The bump fire stock consists of two pieces, wherein one piece slides in a track built into the other. This track could get clogged with grit and the stock would fail to function. The typical plastic bump stock would break when subjected to physical stress such as butt-stroking, or accidental drops. Finally, bump fire - with or without a bump fire stock - requires the shooter to change

the way he or she handles the weapon. With bump fire stocks, you're still shouldering, but you're pulling the weapon forward, while your trigger finger is on a finger rest and using the recoil to cycle the gun. It takes skill to do this without stalling the gun and inducing misfeeds.

26 U.S.C. 5845(b) defines a machine gun. The Obama-era approval of bump fire stocks very clearly states these devices are not machine guns and do not convert their host gun into a machine gun. The simple reason: the trigger must pulled one time for each round fired. To fire 30 rounds with a bump fire stock requires 30 trigger pulls. To fire 30 rounds with a machine gun requires only one trigger pull and holding the trigger down.

The Obama era approval of these stocks also stipulates that no mechanical assistance be provided to the shooter via springs, etc. Approved bump fire stocks meet this requirement.

Bump fire has been around as long as semi-auto firearms have been. Bump fire is using the gun's own recoil to assist the shooter in pulling the trigger much faster than the shooter can move the trigger finger. From your proposed rulemaking document:

"'Bump fire' stocks (bump stocks) are devices used with a semiautomatic firearm to increase the firearm's cyclic firing rate to mimic nearly continuous automatic fire. Since 2008, ATF has issued a total of 10 private letters in which it classified various bump stock devices to be unregulated parts or accessories, and not machineguns or machinegun conversion devices as defined in section 5845(b) of the NFA or section 921(a)(23) of the GCA."

Bump fire can be achieved without any device at all - purely by skill. It has a significant learning curve. The bump fire stock is much safer than the typical method of holding the weapon at the hip, and hooking the trigger finger through a belt loop and pulling forward - which is what beginner bump fire shooters do. It is possible to bump fire from the shoulder or a bipod without any devices, but again, there is a long learning curve.

The cone of fire generated by bump fire is much larger than that generated by a machine gun. With a machine gun, the shooter is holding the weapon steady and releasing a stream of rounds with a single trigger pull. In bump fire, the entire gun is moving as the shooter uses its recoil to generate the rapid fire.

***Bump Fire vs. Directed, Aimed Fire***

I performed this experiment: the goal was to hit 10 2-liter bottles at 10 yards. Using bump fire and a 30-round magazine, I was able to hit TWO out of 10 bottles. I replaced the two bottles hit with fresh ones and used directed, aimed,

fire, but went fast. I hit all 10 bottles with 12 rounds, since there were two misses. Directed, aimed fire is always more effective in getting hits - by a factor of at least five times!

****Las Vegas Attack****

The Las Vegas attack was the first nefarious use of a bump fire stock. One shooter was perched 32 stories up and bump fired into a crowd 300 - 400 yards away resulting in 58 deaths, and hundreds wounded. Ironically, if the shooter used directed, aimed, fire - if we were to extrapolate my own numbers with the bottles - the death toll would have been 250 to 300 or even more! The shooter actually *mimimized* casualties by bump firing, because he created a huge, inaccurate cone of fire from a great distance. He was relying on "shock and awe" and random hits.

The calls to re-classify bump fire stocks are rooted in emotion. Per the ATF's 10 approval letters, these stocks require a single trigger pull per round fired. It is my opinion that the 10 approval letters - ironically issued during the most anti-gun administration in our history - should stand as is. Bump fire stocks should not be re-classified as machine guns to appease emotions, and further infringe on our Second Amendment rights.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**

For related information, **Open Docket Folder** 🔗

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-24397

**Tracking Number:** 1k2-9134-hs15

### Document Information

**Date Posted:**
Jan 26, 2018

**RIN:**
1140-AA52

**Show More Details** 🔗

### Submitter Information

**Submitter Name:**
Dave Matheny

**Organization Name:**
Hill Country Class III, LLC d/b/a Silencer Shop

## Comment

See attached file(s)

## Attachments (1)

### Silencer Shop - Comment Bump fire

**View Attachment:** 

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-3251

**Tracking Number:** 1k2-92c0-gshi

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Robert Hahn

### Comment

I oppose the proposed change in regulations which would redefine "bump stock" devices as machineguns under the National Firearms Act.

There are a number of technical flaws with the proposed ruling:

1. Machineguns are defined by the NFA as "Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger." The proposed ruling claims that bump stocks "initiate a continuous firing cycle with a single pull of the trigger." This is factually incorrect, since use of a bump stock requires the shooter to maintain continuous forward pressure on the firearm to actuate the trigger, firing one shot per function.

2. The proposal states that devices currently owned would be contraband. Bump stocks in existence were manufactured, purchased, and used with the approval of the BATFE. Redefining them to be considered machineguns would be the equivalent of a ex post facto law, criminalizing behavior legal before passage of the ruling change.

3. Repeated references are made to how a bump stock "harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger." This is again incorrect, since the recoil energy is irrelevant to the function of the firearm..

4. The "need for regulatory action" section states "this rulemaking aims to apply Congress's policy decision to

prohibit machineguns." No such law has been passed by Congress to prohibit machineguns on the Federal level. The proposed regulatory action thus goes beyond administering law and crosses the line into creating law, which power is reserved to Congress.

Again, I do not support the proposed ruling and urge that it not be considered.

Thank you.



---

**COMMENT OF HILL COUNTRY CLASS III, LLC D/B/A SILENCER SHOP TO
NOTICE OF APPLICATION OF THE DEFINITION OF MACHINEGUN TO BUMP
FIRE STOCKS AND OTHER SIMILAR DEVICES**

---

Respectfully submitted on behalf of Hill Country Class III, LLC d/b/a Silencer Shop.

 

Hill Country Class III, LLC
d/b/a Silencer Shop
13729 Research Blvd #630
Austin, TX 78750
(512) 931-4556

Hill Country Class 3, LLC d/b/a/ Silencer Shop ("Silencer Shop") files this comment related to ATF-2018-0001-0001, docket number 2017R-22, RIN 1140-AA52, entitled Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices.  Silencer Shop is the largest dealer of firearm silencers in the country.   Silencer Shop has a public showroom in Austin, Texas and a large online store available at www.silencershop.com.   Silencer Shop sells silencers and other firearms to law enforcement agencies, individual law enforcement officers, as well as individuals.  Silencer Shop customers use their silencers for a broad array of applications, including use in their official duties as law enforcement officers, home and self-defense, hunting, teaching, recreational shooting, varmint eradication, and collecting.  Although Silencer Shop is a licensed firearms dealer, Silencer Shop is not, nor has it ever been, in the business of selling bump-fire stocks.

## I.     "BUMP FIRE" STOCKS ARE SIMPLY NOT MACHINE GUNS.

The National Firearms Act defines "machinegun" as any weapon which: "shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." The term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. 5845(b).  Since 2008, ATF has issued a total of ten letters in which it classified various bump stock devices to be unregulated parts or accessories, and not machineguns or machinegun conversion devices as defined in section 5845(b) of the NFA or section 921(a)(23) of the GCA. In its January 7, 2010, John Spencer the Chief of the Firearms Technology Branch of the ATF correctly concluded that "[t]he stock has no automatically

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**                **Page 1**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00034

functioning mechanical parts or springs and performs no automatic function when installed. In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

The bump-fire stock simply assists in rapid semi-automatic fire, not automatic. Each individual shot comes from independent function of the trigger. With each shot, the trigger is fully reset and must be pulled again. Simply because a firearm part allows this independent trigger function to be accomplished in a more economic manner, does not make it "more than one shot" coming with a "single function of the trigger." As such, this device is simply not a machine gun.

The ATF lacks to authority to classify a device as a machine gun simply because the device received "a significant amount of public attention" and the "general public and from members of both houses of Congress request[ed] that ATF re-examine its past classification." In order to be classified as a machine gun it must meet the statutory definition of a machine gun. Should those members of Congress who requested the "reexamination" want the statutory definition of machine gun changed it would be up to them to do so by legislation.

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**                                    **Page 2**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00035

## II.   DEFINING "BUMP FIRE" STOCKS AS MACHINE GUNS WOULD CREATE FEAR OF PROSOCUTION FOR THOUNSANDS OF AMERICANS WHO RELIED ON THE ATF'S PRIOR RULING

As the ATF notes in its request for comment it has at least 10 letters concluding that bump-fire stocks are not machine guns.  Since that time, thousands (perhaps even tens or hundreds of thousands) of Americans have relied on these letters to purchase bump-fire stocks.  The retroactive classification of these devices as machine guns would have the enormous impact of making most of these Americans illegally in possession of an unregistered machine gun.   Additionally, because of 922(o), there is no legal way for these Americans to register these firearms as machine guns. Americans would be uncertain on how to handle the new contraband and could lead to countless criminal felony prosecutions of unknowing citizens, who believed they were buying an "ATF Approved" product.

*A retroactive ban without a grandfather clause would be an unconstitutional taking unless compensation was paid.*

The "Takings Clause" of the Fifth Amendment to the federal constitution prohibits taking private property "for public use, without just compensation." While the Takings Clause is often discussed in the context of land and real estate, it also applies to personal property.  The clause applies to actual confiscations of property as well as to regulatory takings.

In the context of firearms, several courts have ruled that bans are only not an unconstitutional taking if they contain a grandfather clause.   See, e.g. *Silveira v. Lockyer*, 312 F.3d at 1092 (city's assault weapon ban upheld only because it contained a grandfather clause).

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**      **Page 3**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00036

*If the ATF moves forward with this rule it should allow amnesty registration.*

When the National Firearms Act was amended in 1968, a 30-day amnesty period immediately following the law's effective date was established during which persons possessing unregistered firearms could register them. The 1968 amendments also provided for the establishment of additional amnesty periods at the discretion of the director. Such a period would be appropriate here given the volume of contraband in the hands of the general public and the serious penalties that could be imposed on buyers who relied on the ATF's prior rulings.

Such amnesty registrations are not unheard of when the ATF reclassifies a previously unregulated item. For instance, on March 1, 1994, the Secretary of the Treasury announced that the USAS 12, Streetsweeper, and Striker-12 shotguns had been classified as Destructive Devices subject to registration and tax controls under the NFA. The ATF rulings was retroactive for registration purposes as many had previously been imported as traditional shotguns. However, the ATF allowed for retroactive registration, and waived the $200 tax. The ATF held the registration period open from 1994 to 2001 and some 8,200 firearms were registered. See ATF Ruling 2001-1.

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**                    **Page 4**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00037

### III.   ANSWERS TO CERTAIN QUESTIONS POSED BY THE ATF.

**Question 20: If ATF classified bump stock devices as "machineguns" under the Gun Control Act of 1968, as amended, and the National Firearms Act of 1934, as amended, do you believe that there would be a viable (profitable) law-enforcement and/or military market for these devices?**

*Answer:* No.

**Question 21: In your experience, where have you seen these devices for sale and which of these has been the most common outlet from which consumers have purchased these devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar events; or private sales between individuals)?**

*Answer:* These devices are commonly sold online, at gun shows, in traditional brick and mortar stores (both firearm and non-firearm dealers), and in fact-to-face sales.  Common retainers include Walmart, Cabela's, Slide Fire and Bump Fire Systems.

**Question 22: Based on your experience or observations, what is (or has been) the price range for these devices?**

*Answer:* Prices typically range from $99 for the most basic model to $329.95 for high-end models with added features.  Firearms equipped with bump-fire stocks range in price from $300 to $5000 and up, depending on the firearm used as the platform.

**Question 23: For what purposes are the bump stock devices used or advertised?**

Answer: These have been marketed as a product that would allow users to "bump-fire" firearms.  Bump-fire is commonly understood to be a method of rapid semi-automatic fire by allowing the recoil of the firearm to cause a quick, but independent, pull of the trigger.  Some companies advertise these devices specifically to users with limited mobility or handicaps.  They are also marketed as "ATF Approved" items.  Many retailers either include a copy of an ATF letter with the stock or actively tout that it was been ATF approved.

We have seen these devices used for several lawful and legitimate purposes.  Most importantly, licensed firearm manufacturers and retailers have used these devices to conduct reach and development and to test and evaluate firearms and parts.  For instance, many silencer makers, retailers, and evaluators use these devices to "torture" test silencers for evaluation under extreme rapid semi-automatic shooting conditions.  Bump-fire is an extremely valuable tool for this type of testing.

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**                    **Page 5**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00038

Some customers use these devices for hunting and other sporting purposes.  This device is an important tool in varmint control and eradication.  According to Smithsonian Magazine, "[w]ild hogs are among the most destructive invasive species in the United States today." Wild hogs often herd together, so having the ability to use rapid semi-automatic fire can often result in the eradication of more hogs. For similar reason, these devices are also used in the control of other varmints including coyotes, foxes, gophers and prairie dogs. Some consumers use these devices for shooting competitions.

Some consumers use these devices to conduct training and to practice for "real world" shooting scenarios.  Many customers are military or law enforcement and often train off-duty with personal guns.  Having a device that allows for rapid semi-automatic fire is essential for their training.

Lastly, many customers simply use these devices in recreational shooting and "plinking". Although often overlooked, recreational shooting is an important part of American's connection with nature and is an important bonding time for many American families.

**COMMENT OF HILL COUNTRY CLASS III, LLC d/b/a SILENCER SHOP**                    **Page 6**
Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00039

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-0013

**Tracking Number:** 1k2-92aj-z95i

## Comment

I will not disarm.

### Document Information

**Date Posted:**
Apr 2, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
David Codrea

**Organization Name:**
Unorganized Militia

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Bump-Stock Type Device**</u>

For related information, <u>**Open Docket Folder**</u>

### Comment

I oppose this overreach of authority.

**ID:** ATF-2018-0002-49591

**Tracking Number:** 1k2-93jz-dons

### Document Information

**Date Posted:**
Jun 15, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Owen Monroe

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 🔗

## Comment

In reference to ATF 2017R-22:

Do not reclassify the bump fire stock accessory as a machine gun. It does not meet the definition as such per the National Firearms Act.

Thank you

---

**ID:** ATF-2018-0002-34581

**Tracking Number:** 1k2-939x-erz7

### Document Information

**Date Posted:**
May 31, 2018

**RIN:**
1140-AA52

**Show More Details** 🔗

### Submitter Information

**Submitter Name:**
Scott Heuman

## VERIFIED DECLARATION OF DAMIEN GUEDES

I, Damien Guedes, am competent to state and declare the following based on my personal knowledge:

1. I am a resident of Whitehall Pennsylvania.

2. In 2014, I became interested in a bump stock device.

3. Prior to purchasing a Bump Fire Systems bump stock device, as I wanted to ensure the legality of the device, I went on Bump Fire Systems' website – www.bumpfiresystems.com - to determine if the Bureau of Alcohol, Tobacco, Firearms and Explosives had approved the device.

4. Bump Fire Systems' website stated that it had obtained approval from ATF and provided me with a copy of ATF's April 2, 2012 determination letter. A copy of the letter is attached as Exhibit 1.

5. In reliance on ATF's determination letter of April 2, 2012, I purchased a Bump Fire Systems bump stock device at a cost of $99.99, plus $6.00 shipping, which I still own today. A redacted copy of the receipt is attached as Exhibit 2.

6. It is my understanding, based upon ATF's notice of proposed rulemaking – RIN 1140-AA52, Fed. Reg. No. 2018-06292 – that ATF intends to reclassify bump stock devices as machine guns in violation of Article 1, Section 9 of the United States Constitution (*i.e.* Ex Post Fact clause) and to require me to surrender or otherwise destroy my Bump Fire Systems bump stock device in the absence of any compensation, in violation of the Fifth Amendment to the United States Constitution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.  Executed on April 9, 2018.

Damien Guedes

# Exhibit 1



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, West Virginia 25405_
www.atf.gov

903050:MRC
3311/2012-196

APR 0 2 2012

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), requesting FTB to evaluate an accompanying stock and determine if its design would violate any Federal statutes.

As background information, the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), defines "**machinegun**" as—

"..._any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, **any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun**, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person._"

The FTB evaluation confirmed that you have submitted a plastic shoulder stock designed to function on an AR-15 type rifle (see enclosed photos). For your stock to function in the manner intended, it has to be attached to an AR-15 type platform that is assembled with a collapsible-stock receiver extension. Along with the shoulder stock, you have submitted what you have identified as a "receiver module." This module is a plastic block approximately 1-5/16 inches high, about 1-3/8 inches long, and approximately 7/8-inch wide. Additionally, there are two extensions, one on each side, that are designed to travel in the two slots configured on the shoulder stock. The receiver module replaces the AR-15 pistol grip.

Further, the submitted custom shoulder stock incorporates a pistol grip. This grip section has a cavity for the receiver module to move forward and backward. Additionally, two slots have been cut for the receiver module extensions to travel in. The upper section of the shoulder stock is designed to encapsulate the collapsible receiver extension. Further, the custom stock is

-2-

designed with a "lock pin."  When the handle on the lock pin is facing in the 3- to 9-o'clock positions, the stock is fixed and will not move; and when the handle on the lock pin is facing in the 12- to 6-o'clock positions, the stock is movable.

The FTB live-fire testing of the submitted device indicates that if, as a shot is fired, an *intermediate* amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow the trigger to mechanically reset. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired.  In this manner, the shooter pulls the firearm forward to fire each shot, the firing of each shot being accomplished by a single trigger function.  Further, each subsequent shot depends on the shooter applying the appropriate amount of forward pressure to the fore-end and timing it to contact the trigger finger on the firing hand, while maintaining constant pressure on the trigger itself.

Since your device is incapable of initiating an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, FTB finds that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

Please be advised that our findings are based on the item as submitted.  Any changes to its design features or characteristics **will void** this classification.  Further, we caution that the addition of an accelerator spring or any other non-manual source of energy which allows this device to operate automatically as described will result in the manufacture of a machinegun as defined in the NFA, 5845(b).

To facilitate the return of your sample, to include the module, please provide FTB with the appropriate FedEx or similar account information within 60 days of receipt of this letter. If their return is not necessary, please fax FTB at 304-616-4301 with authorization to destroy them on your behalf.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

# Exhibit 2

From: **Bump Fire Systems** orders141@bumpfiresystems.com
Subject: Your BUMP FIRE SYSTEMS order receipt from October 30, 2014
Date: October 30, 2014 at 22:27
To: 

# Thank you for your order

Your order has been received and is now being processed. Your order details are shown below for your reference:

# Order: #2872

| Product | Quantity | Price |
|---|---|---|
| AR15 BFSystem | 1 | $99.99 |
| **Cart Subtotal:** | | $99.99 |
| **Shipping:** | | $6.00 via Flat Rate |
| **Payment Method:** | | Credit Card |
| **Order Total:** | | $105.99 |

# Customer details

**Email:**

**Tel:**

# Billing address

Damien Guedes

Whitehall, Pennsylvania 18052

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

### Comment

See attached file(s)

### Attachments (19)

**Comment to ATF re Bumpstocks**

View Attachment: 📄

**Form 1 Approval 9.5.1986_redacted**

View Attachment: 📄

**17-530_6537**

View Attachment: 📄

**HistoricArmsLLC bump stock analysis (1)_3**

View Attachment: 📄

**MSI Comment**

View Attachment: 📄

**HistoricArmsLLC bump stock analysis (1)_1**

---

**ID:** ATF-2018-0002-75886

**Tracking Number:** 1k2-93y1-pyr1

### Document Information

**Date Posted:**
Jul 3, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Stephen Stamboulieh

**Organization Name:**
Stamboulieh Law, PLLC

**View Attachment:** 

## HistoricArmsLLC bump stock analysis (1)_2

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_7

**View Attachment:** 

## March 15 Production 1-5

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_6

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_10

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_9

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_8

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_11

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_12

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_13

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_14

**View Attachment:** 

---

## March 15 production - full size version - reduced_Redacted_16

**View Attachment:** 

---

## March 15 production - full size version - reduced_Redacted_15

**View Attachment:** 

---

# Ⓢ Stamboulieh Law, PLLC

P.O. Box 4008, Madison, MS  39130 | (601) 852-3440 | stephen@sdslaw.us

June 26, 2018

Attn: Vivian Chu, Mailstop 6N-518                    ***Via Regulations.gov Portal***
Office of Regulatory Affairs
Enforcement Programs and Services
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Ave. NE
Washington, DC  20226
ATTN: 2017R-22
Facsimile: (202) 648-9741

    **Re:   ATF 2017R-22**

Dear Ms. Chu:

I write this comment on behalf of Scott Heuman and other interested parties regarding the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Notice of Proposed Rulemaking (ID ATF-2018-0002-0001, Federal Register No. 2018-06292) which attempts to regulate bumpstock type devices as machineguns.

Specifically, the Notice states the following:

On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada. By using several AR-type rifles with attached bump-stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and injuring over 800. The bump-stock-type devices recovered from the hotel room from which the shooter conducted the attack included two distinct, but functionally equivalent, model variations from the same manufacturer.

Despite requests for documentation and information under the Freedom of Information Act ("FOIA") which would allow the public to verify that bumpstock type devices were actually used during the shooting in Las Vegas, Nevada, no such document has been produced. In fact, the Federal Bureau of Investigation ("FBI") has refused to

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

release information related to the shooting, claiming that the information was "compiled for a law enforcement purpose."[1]

The ATF produced several hundred documents to undersigned[2], but none of the documents demonstrate that the firearms with bumpstock type devices attached were utilized during the shooting.  It is also understood that ATF was precluded from examining the firearms found in Las Vegas by the FBI and only recently received the firearms for testing.  In any event and with that backdrop, the ATF has moved to regulate these devices as machineguns.

Len Savage of Historic Arms L.L.C. was retained as an expert to provide an analysis and commentary regarding Docket Number ATF 2017R-22 and bumpstock type devices.  Mr. Savage's expert report, comment, and supporting documentation were submitted to the ATF and are currently available to view on https://www.regulations.gov/document?D=ATF-2018-0002-31210. For convenience, Mr. Savage's report, comment and supporting documentation are attached hereto and fully incorporated herein.  Additionally, this comment fully supports and incorporates Maryland Shall Issue's comment dated April 9, 2018.  It is also attached to this comment.

The ATF's proposal does nothing to address criminal misuse of either machineguns or bumpstocks.  Much like 18 USC § 922(o), it criminalizes mere possession.  This is why whether the Las Vegas shooter utilized bumpstocks is critically important to this proposed regulation, since such alleged use provides the impetus for this attempt at regulation.  If the Las Vegas shooter did not utilize a bumpstock equipped rifle, then the entire premise of this regulation is at best suspect and at worst fraudulent.

If, as the ATF alludes in its proposed rule, the shooter did in fact utilize a bumpstock equipped rifle, then it would be the first (and since then, only) shooting which utilized a bumpstock device.  The ATF did not provide any documents demonstrating prior crimes committed with bumpstocks and the FBI wholesale refused to provide any documentation.  So, how is it that this proposed rule "would affect the criminal use of bump-stock-style-devices in mass shooting, such as the Las Vegas shooting incident[]"?  If the new regulation goes into effect and magically 519,927

---

[1] This denial has been appealed and we are presently waiting for the FBI to deny the appeal before commencing litigation for the release of these records.
[2] For purposes of a complete record, all documents received in that FOIA are attached hereto.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00054

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

bumpstock devices[3] are declared machineguns overnight, it still does not stop someone
from committing mass murder with a now illegal machinegun.

It is a documented fact that legally owned machineguns are almost never utilized
in crimes. How does the public know that the rifle(s) utilized by the Las Vegas shooter
were not illegally modified machineguns? Unless either the ATF, the Las Vegas Metro
Police Department or the FBI provides actual documentary proof that the rifles were
not illegally modified machineguns, but were instead "regular" semi-automatic firearms
with bumpstock type devices attached, we will never know.

The National Firearms Act ("NFA") regulates the manufacture and transfer of
certain firearms by, in sum, requiring a person proposing to make or transfer an NFA
firearm to: (1) file an application with the BATFE; (2) obtain BATFE approval; (3) have
the firearm registered in the National Firearms Registration and Transfer Record
(completed by BATFE upon approval); and (4) pay a $200.00 tax which is evidenced
by the BATFE's attachment of a tax stamp on the application, which is then returned
to the maker or transferor. 26 U.S.C. §§ 5812 and 5822. Possession of an NFA firearm
not registered to the possessor is a felony punishable by ten years imprisonment and a
fine of $250,000.00. 26 U.S.C. § 5861(d), 18 U.S.C. § 3571(b). Machineguns, defined
under federal law as any firearm capable of firing more than one round automatically
by a single function of the trigger, fall under the NFA's purview. 26 U.S.C. § 5845(b).

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun
manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any
> person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
> (A) a transfer to or by, or possession by or under the authority of,
> the United States or any department or agency thereof or a State,
> or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machinegun that
> was lawfully possessed before the date this subsection takes effect.

This provision was enacted in 1986 as §102(9) of the Firearm Owners' Protection
Act, which amended the GCA of 1968. The legislative history of this amendment is,
for the most part, nonexistent, except for the mention on the floor by its sponsor,

---

[3] This number is the estimate provided in the proposed rule.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00055

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

Representative Hughes, when he stated, "I do not know why anyone would object to the banning of machine guns." 132 Cong. Rec. H1750 (1986) (statement of Rep. Hughes). While the House vote on the amendment failed, the amendment still made it into the final bill.

The prohibition on machineguns does not apply to all machineguns. Any machinegun lawfully owned before May 19, 1986 may still be transferred or possessed. Accordingly, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals, and but for §922(o), there would likely be hundreds of thousands more lawfully possessed by private individuals. If bumpstocks are now machineguns, then there are an additional 519,927 machineguns that are typically owned by law abiding citizens for lawful purposes. This surpasses the threshold of approximately 200,000 stun guns found to trigger a common use analysis because a firearm cannot be banned unless it is both dangerous and unusual. *See District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Caetano v. Massachusetts*, 577 U.S. 1027 (2016). The proposed regulation attempts to downplay the significance of the numbers of machineguns that would be in circulation that would be otherwise lawfully owned. This is important because these cases referenced in the proposed regulation did not surpass the threshold established by *Caetano* for common use protection.

**Argument**

First, "[i]t is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623, 327 U.S. App. D.C. 126 (D.C. Cir. 1997). This review generally must be based on the "whole record"—no more or no less. See *Overton Park*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." (emphasis added)); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792, 242 U.S. App. D.C. 110 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 84 (D.D.C. 2013).

As such, this proposed regulation should be able to easily demonstrate whether bumpstocks were utilized in the Las Vegas shooting and that the shooter did not have illegally modified machineguns in his possession. If not, then the stated reasons of the ATF in attempting to regulate these as machineguns is arbitrary and capricious. This comment does not take a position on whether bumpstocks were used or not, only that if they were utilized, then evidence of that utilization should be produced.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00056

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

Secondly, the proposed rule is vague as it redefines statutory law from "single function of the trigger" to "single pull of the trigger." The plain language of this new proposed rule would appear to turn binary triggers into machineguns. If that is the case, then this is further evidence that the ATF has not fully taken into consideration the pitfalls of legislating by regulation as there are no numbers of binary triggers sold, the costs associated with disposal of same, and in fact, the proposed rule is completely silent with regard to binary triggers.

Thirdly, this proposed regulation would turn, overnight, hundreds of thousands of individuals who legally possess(ed) bumpstock devices into unwitting felons. A firearm accessory heretofore specifically allowed by the ATF would be magically declared a machinegun by administratively legislating through regulation. Further, this proposed rule does not provide any relief to the owners of said bumpstocks and the investment in those bumpstocks. Instead, once this regulation is final-ruled, the instruction to the owners will be, "Mr. and Mrs. America, turn them all in." This is a governmental taking without compensation and is itself unconstitutional.

Fourth, this regulation can be read, and indeed given the ATF's previous expansions of meanings of regulations and legislation, to prohibit belt loop bump firing (perhaps even belt loops?) and bump firing in general if you gain the skill and ability to do so. So, in essence, what the proposed rule could do is to affect a rate-of-fire limitation in a few more iterations, revisions and expansive readings. If the ATF can redefine statutory language in excess of the ATF's authority, why not just propose a one round per minute rule?

Congress legislated the current statutes for what defines a machinegun. The ATF simply has no authority to expand Congress' definition when Congress specifically set forth the rule. The statute is not vague. It is not ambiguous. And given the previous ten or so years of ATF guidance, was not up for interpretation as the ATF has *consistently* taken the position that a bumpstock was not a machinegun. But now, the ATF wants to change its position based on the current political climate. In a recent United States Supreme Court case, *Wis. Cent., Ltd. v. United States*, No. 17-530, 2018 U.S. LEXIS 3837 (June 21, 2018), the Supreme Court interpreted a taxing statute that differentiated between "money" and "stock." For years, the statute was treated the same way and the statute at issue unambiguously excluded "stock" from "money". The corollary here is that the NFA, as passed in 1934, used a definition of machinegun that

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00057

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

has been consistent since its enactment using the standard of a "single function of the trigger." If Congress understood, in 1934, that a machinegun operated automatically on the basis of a "single function of the trigger", then it follows that under *Wisconsin Central*, the ATF cannot expand the definition as it attempts to do so here because the definition of machinegun (and how it has always been) is unambiguous.

Take this quote from the recent case: "If Congress really thought everything is money, why did it take such pains to differentiate between money and stock in the Internal Revenue Code of 1939?" *Wis. Cent., Ltd. v. United States*, No. 17-530, 2018 U.S. LEXIS 3837, at *12 (June 21, 2018) (attached). The same would hold true for bumpstocks. If Congress wanted to expand the definition of machinegun, it would have simply done so. However, in 1934 it was understood that machineguns could not be banned and, instead, Congress infringed on the rights of Americans via the taxing power. Further, and as just recently stated so eloquently by the Supreme Court, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Id.* at *17.

Finally, should the ATF desire to classify these firearm accessories as machineguns, it would have no choice but to declare an amnesty and allow for the registration of these devices, as machineguns. The ATF could take the position that 922(o) prohibits this, but it is incorrect. §922(o) provides that the ATF could allow the possession and/or transfer of any machinegun, even ones made after May 19, 1986 utilizing the "under the authority of" clause. In fact, this would evade the constitutional takings clause issue and allow lawful possessors of said bumpstocks to continue to enjoy and possess in compliance with federal law. In fact, the ATF is well aware of its authority as it has previously allowed a Form 1 machinegun to be lawfully manufactured and possessed after the May 19, 1986 cutoff. See Attachment.

Ultimately, the ATF should choose to do nothing because it is beyond the scope of your enabling statutes to redefine what Congress has already defined. Doing nothing would allow Congress, if it chose, to revise its statutes and not rely on an unelected agency to further erode citizens' rights under the Second Amendment. Truthfully, that courts have ignored and eviscerated the Second Amendment is a travesty. Machineguns would no doubt have been protected when the Founders drafted the Second Amendment as machineguns are the quintessential military weapon of today. In fact,

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00058

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

most agencies also have a nice collection of machineguns, but apparently the citizens that fund these agencies just cannot be trusted to own these types of weapons.

This comment incorporates the expert report of Mr. Len Savage from Historic Arms, LLC as he sets forth in specific detail the problems with this proposed rule. Additionally, this comment incorporates Maryland Shall Issue's comment as a further basis for why the proposed rule should not be implemented. In any event, should this rule be finalized and implemented, we are prepared to litigate the matter immediately.

Yours very truly,

STEPHEN D. STAMBOULIEH

1512-0024 (9/30/86)

**DEPARTMENT OF THE TREASURY—BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**

# APPLICATION TO MAKE AND REGISTER A FIREARM
*(Submit in duplicate.  See Instructions attached.)*

1. TYPE OF APPLICATION *(Check one)*

☒ TAX PAID. Attach this application with a check or money order for $200 made payable to the Upon approval this office will accept and a "Na..." you.

**P.B. 667 73**

034314

☐ b. TAX EX made on be department agency the

☐ c. TAX EX made by of session of t subdivision organizatio... engaged in criminal investigations.

**TWO HUNDRED DOLLARS**

TO: National Firearms Act Branch, Bureau of Alcohol, Tobacco and Firearms, Washington, DC 20226

The undersigned hereby makes application, as required by Sections 5821 and 5822 of the National Firearms Act, Title 26 U.S.C., Chapter 53, to make and register the firearm described below.

2. APPLICATION IS MADE BY:  ☒ INDIVIDUAL     ☐ BUSINESS FIRM  ☐ GOVERNMENT ENTITY

TRADE NAME *(If any)*

3a. APPLICANT'S NAME AND MAILING ADDRESS *(Type or print below and between the dots)*

COPY

b. IF P.O. BOX IS SHOWN ABOVE, STREET ADDRESS MUST BE GIVEN HERE

c. COUNTY

IMPORTANT: COMPLETE THE REVERSE SIDE. INDIVIDUALS (INCLUDING LICENSED COLLECTORS) MUST ALSO SUBMIT, IN DUPLICATE, FBI FORM FD-258, FINGERPRINT CARD.

d. TELEPHONE AREA CODE AND NUMBER

4. DESCRIPTION OF FIREARM *(Complete items a through i)*

| a. NAME AND LOCATION OF ORIGINAL MANUFACTURE OF FIREARM (RECEIVER) *(If prototype, furnish plans and specifications) (See Instruction 2f.)* | b. TYPE OF FIREARM TO BE MADE *(Shortbarreled rifle, machine gun, destructive device, etc.)* | c. CALIBER, GAUGE OR SIZE *(Specify)* | d. MODEL |
|---|---|---|---|

d. MODEL  *BAR 1918 A-2*

a. Browning Auto  Mfd by N E Small Arms

b. Machine Gun

c. 30

LENGTH e. OF BARREL: *24"*  *(inches)* f. OVERALL: *47"*

g. SERIAL NUMBER *(See Instruction 2g.)*  *# 574936*

| h. ADDITIONAL DESCRIPTION *(Include all numbers and other identifying data which will appear on the firearm)* | i. STATE WHY YOU INTEND TO MAKE FIREARM *(Use additional sheet if necessary)*  *Private Collection* |
|---|---|

5. APPLICANT'S FEDERAL FIREARMS LICENSE *(If any)*
*(Give complete 15-digit number)*

| First 6 digits | 2 digits | 2 digits | 5 digits |
|---|---|---|---|

6. SPECIAL (OCCUPATIONAL) TAX STATUS—

| a. ATF IDENTIFICATION NO. | b. CLASS |
|---|---|

7. EMPLOYER'S IDENTIFICATION NUMBER *(If applicable)*

IMPORTANT: GIVE FULL DETAILS ON SEPARATE SHEET FOR ALL "YES" ANSWERS IN ITEMS 8 AND 9

| 8. IS APPLICANT | YES | NO | 9. HAS APPLICANT | YES | NO |
|---|---|---|---|---|---|
| a. Charged by information or under indictment in any court for a crime punishable by imprisonment for a term exceeding one year? | | X | a. Been convicted in any court of a crime punishable by imprisonment for a term exceeding one year? | | X |
| b. A fugitive from justice? | | X | b. Been discharged from the armed forces under dishonorable conditions? | | X |
| c. An alien who is illegally or unlawfully in the United States? | | X | c. Been adjudicated as a mental defective or been committed to any mental institution? | | X |
| d. Under 21 years of age? | | X | | | |
| e. An unlawful user of or addicted to marihuana or any depressant, stimulant or narcotic drug? | | X | d. Renounced his or her citizenship, having been a citizen of the United States? | | X |
| 10. A citizen of the United States | X | | | | |

...amined this application, including accompanying documents, and to the best of my knowledge and belief it is true, accurate and complete and the makin... and possession of the firearm described above would not constitute a violation of Chapter 44, Title 18, U.S.C., Chapter 53, Title 26, U.S.C., Title VII of th... Omnibus Crime Control and Safe Streets Act, as amended, or any provisions of State or local law.

UNDER PENALTIES OF PERJURY, I DECLARE that I have ex...

11. SIGNATURE OF APPLICANT

12. NAME AND TITLE OF AUTHORIZED OFFICIAL OF FIRM OR CORPORATION *(If applicable)*

13. DATE  *4-21-86*

COPY

THE SPACE BELOW IS FOR THE USE OF THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

By authority of the Director, Bureau of Alcohol, Tobacco and Firearms, this applicant's making and registration of the firearm described above is:

STAMP NUMBER  *034314*

☒ APPROVED *(With the following conditions, if any)*
*NAME CITY AND STATE MUST BE STAMPED ON RECEIVER*

☐ DISAPPROVED *(For the following reasons)*

EXAMINER

DATE

AUTHORIZED ATF OFFICIAL

DATE

1086

ATF FORM...

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-1557

**Tracking Number:** 1k2-92ai-gtxq

### Document Information

**Date Posted:**
Apr 3, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Michael Taylor

**Organization Name:**
Michael E. Taylor, Attorney at Law

### Comment

Because these bump-stock-type devices allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device, ATF has determined that bump-stock-type devices are machinegun conversion devices, and therefore qualify as machineguns under the GCA and the NFA.

In other words, removing the extension ledge means that there is no longer an extension ledge or similar item upon which the shooters finger can maintain rearward pressure, therefore the free moving finger would then have only the trigger itself upon which to apply rearward pressure and, in resetting the trigger, release pressure off of. Such a device could therefore not be a machinegun under this interpretation rubric. This is likewise consistent with your proposed Alternative 3Opportunity alternatives wherein all of the techniques and devices employed do not have shelves on which to rest the shooters finger and in which the entire firearm is likewise allowed to reciprocate to facilitate rapid firing, and only the trigger, and not some other surface, is contacted, pulled or released by the shooters finger.

Many times throughout this proposal we see variations on this statement, ATF Ruling 20062 determined that the phrase single function of the trigger in the statutory definition of machinegun was best interpreted to mean a single pull of the trigger. Also phrased as the language of the statute and the legislative history supported ATFs interpretation of the statutory phrase single function of the trigger as synonymous with a single pull of the trigger . Unfortunately, this interpretation and insistence that function is synonymous with pull must therefore result in the proliferation of new civilian owned M2 .50 Cal machineguns

(now non-machineguns) due to the fact that fire is most assuredly initiated by a forward press, and 100% certainly not by any manner of pull against a trigger. Furthermore, fire initiated by voice command, electronic switch, swipe on a touchscreen or pad, or any conceivable number of interfaces not requiring a pull will open up a whole new fully automatic non-machinegun market. The authors of the original legislation were, in fact, intimately familiar with spade grip, press activated machineguns, as they were common to all Maxim, Browning 1917, M2 and other heavy machineguns dating back to before World War One, and still in common use today. The term function was chosen intentionally. A pull, a push, a release, a voice command, a swipe on a touch screen are all examples of functions, and if fire continues automatically and constantly after that pull, push, release, command, or swipe, then that single function is what triggers automatic fire.

For this reason your interpretation that the term automatically in your proposed changes to 478.11 Meaning of terms - Machine Gun, as means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and single function of the trigger means a single pull of the trigger, is not a functional substitute or clarification of the term single function. Saying that a function can include, but is not limited to a pull will work in context with bump stocks, and not open up a whole new can of worms by limiting your interpretation of function exclusively to pulls. No jury is going to interpret push as pull, or swipe as pull, or release as pull, or say the magic word as pull. Certainly a single function includes a single pull, but cannot be limited to exclusively, or worse, as the ATF has argued synonymously with only pull. Trying to limit function regarding triggers will backfire. Any child who has seen a door labeled push on one side, and pull on the other, knows the difference; and likewise any jury given this example will see it that way as well.

Thanks for taking the time to review this response.

Sincerely,
Michael E. Taylor, Attorney at Law

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

---

### Comment

After reading the ATF proposed regulation changes, below are my options on this matter & alternatives to BANNING an item "Bump-Stocks", plus the alternatives I offer don't BAN or make law abiding citizens in to criminals overnight. I will also go over the states that have already banned "Bump-Stocks" below.

1. Removal of device's extension ledge. (Sample images will be provided)
* The bump-stock-type device functions as a self-acting & self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed).
- I have tested with my friend a police officer an unmodified & altered bump-stock with ledge removed. The removed ledge reduces the devices effectiveness & wears out the shooter faster, only after about 3 mags, were the original with the ledge intact starts to wear out around 20-24 mags. This simple change can be done very easy to any bump-stock, & makes the device on function by shooters own trigger finger with no help from a ledge.
- This does not BAN the item & would prevent it from be misused, because 3 mags is about the same you can bump fire a unmodified weapon before the shooter is wore out.
- This mod to the bump-stock also takes longer to get use to in order to use the item, me & my cop friend it took almost 20-30 mins to get it work without the device's extension ledge, where only 2-3 mins with the original.

- People who have made homemade bump-stocks can easy remove the extension ledge from their version.

Comment Period Closed
Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-2593
**Tracking Number:** 1k2-92b8-8hv6

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Ryan Mulder

2. Add the following to all current option letters on bump-stocks.
- Any felon or prohibited person bared for possession a firearm, if found in possession of this accessory will be subject to & not including imprisonment of up to 10 years, a fine of up to $250,000.
- This simple change to the option letters is a good deterrent, a felon would no want to go to jail for 10 years over an accessory, but this won't affect law abiding citizen.
- In states that have already BANNED bump-stocks & owners of them before the BAN should have them "Grandfathered" because they were legal for over 8 years when they purchased the item before the actions of 1 evil man changes all that, they should not be punished or have their property taken, & in the case of Massachusetts up to LIFE in PRISON just for having an accessory, instead only going after criminals.

3. In states that have BANNED bump-stocks as stated in alternative #2, GRANDFATHERED any bump-stock before ban, & only punish criminal found in possession of that type of accessory. This leave the people that legally purchased them before the ban alone & would only affect criminal found with them & it can be left up to the states to decide if the would like bump-stocks to be sold in their states, but don't punish those that purchased them be for that decision.
- This prevents law abiding citizen's from becoming criminal & felons overnight with the stroke of a pen, & the loss of their legal purchased property with out compensation.

4. Change the way bump-stocks are sold in order to help prevent evil people from getting their hands on them, & as in alternative #2 change option letter so that if a felon or prohibited person bared for possession a firearm is cot with one is punished, but leave legal owners alone.
- Require all bump-stock sold to be shipped to a FFL & the purchaser must provide the weapon it is to be installed on, & once installed the must pass a background check to get the provided weapon back.
- This can help find & imprison felons & prohibited person's attempting to purchase a bump-stock, & because they are bared for possession a firearm, if they come into to the FFL with one to get a bump-stock they are incriminating them-self.
- This will how get criminals & their weapons off the street, but only causing a delay for law abiding citizens buy the same item.

5. BANNING will not stop an evil person form getting their hands an a item, look at drugs make them banned & highly illegal has not stopped people from getting them.
- Bump fire is a just a way of shooting a weapon & can be done with or without a bump-stock, again as stated in alternative #2 make is so a felon "evil person" doesn't want to be found in possession of the item without punishing law abiding citizens.

- Below is in uploads files are example of how easy bump-
stocks are to make at home, they can be done for as little as
$20 a simple 2 x 4 piece of wood & 4 nails or screws. They
have had the 3d blueprint available for over 6 years for free
download ^ can be printed up on most 3d printers in less
then 2 hours, I checked on known download link it had been
download 12.6 million times.

All the alternatives to the proposed rule changes don't
punish law abiding citizens & only affects criminals.

Thank You ATF for allowing me to give me option & input on
the issue.


## Attachments (10)

### Homemade Bump-Stock 02

**View Attachment:**  

### Homemade Bump-Stock 03

**View Attachment:**  

### SSAR-15® MOD Side View

**View Attachment:**  

### Homemade Bump-Stock 01

**View Attachment:**  

### 3D Printed Bum Stock 01

**View Attachment:**  

### SSAR-15® OGR 01

**View Attachment:**  

### SSAR-15® OGR 02

**View Attachment:** 

### SSAR-15® OGR Side View

**View Attachment:**

### SSAR-15® OGR 04

**View Attachment:**

 

## SSAR-15® OGR 03

**View Attachment:** 





Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00067



Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00068



Guedes v. ATF / Cohen v. ATF
Ex. 1 Page 00069





Exhibit 1 A/P/I - Version 1.0.0.1
Ex. 1 Page 0073





Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00073





Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00075

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-1123

**Tracking Number:** 1k2-92ag-x22p

### Document Information

**Date Posted:**
Apr 3, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Thomas Currie

### Comment

The first comment that comes to mind on this proposal is: Ri - Dic - U - Lous! It is totally ridiculous that the BATFE is suddenly making a purely political move to reverse long-standing determinations.

My background consists of over forty years government service with the US Army, both active duty military and as a civilian employee, including service as a Master Gunner (19Z50C5) while in the military, and as both a Weapons Training Specialist (GS-1712-11) and an Administrative Officer (GS-341-11).

While the BATFE has been known to flip-flop on some issues when faced with political pressure (most recently their double flip-flop on pistol braces) this proposed new regulation is the most egregious example of the BATFE attempting to completely bypass the legislative process.

The definition of a machine gun is well established in federal law and the BATFE has repeatedly CORRECTLY determined that "bump stocks" and "binary triggers" do not fall within that definition.

Recently we have a media-fueled public outcry "How can this be legal?" -- in response, the BATFE again correctly determined that such devices are completely legal under federal law and clearly stated that outlawing such devices would require a change to existing federal laws.

Whether bump stocks and other devices should be outlawed is an issue for the US Congress -- not a regulatory agency whose charter is to interpret and enforce existing laws -- the BATFE has no authority to create new laws.

Further, the proposed regulations are technically flawed in many ways. Nearly any semi-automatic rifle can be bump fired without any special stock or other accessory. Bump firing was being done long before the first "bump stock" was created. While a so-called "bump stock" might make bump firing a little easier, the simple fact is that anyone who can learn to operate a bump stock can also learn to bump fire the same gun without any accessory -- are we going to also outlaw fingers and belt loops? Should we also outlaw simply pressing a trigger very quickly?

The BATFE description stating "The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire." is plainly false from a purely mechanical and technical standpoint. The "device" (a so-called "bump stock") does not harness anything. The recoil energy is being "harnessed" by the shooter's support arm. Would the BATFE propose to outlaw using both hands to operate a rifle (which, by the way, is part of the definition of a rifle)?

If these devices are going to be outlawed, the first step MUST be for Congress to pass appropriate legislation. Once there is a legal basis, THEN AND ONLY THEN will to be the role of BATFE to develop regulations to apply that legislation -- and whatever regulations the BATFE then adopts will need to be technically correct. The present proposal lacks any legal basis and includes numerous technical inaccuracies that would need to be corrected.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-12748

**Tracking Number:** 1k2-92g3-qb1v

### Document Information

**Date Posted:**
Apr 18, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Isaac Arritt

### Comment

Regarding docket ATF 2017R-22.
To: Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATFE)

I do not support this proposed rule. This rule would misinterpret the definitions used to determine if a firearm with a bump-stock is a machinegun.

Cited from this docket:
"V. Proposed Rule
        Finally, it is reasonable to conclude, based on these interpretations, that the term "machinegun" includes a device that allows a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. When a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger, that movement initiates a firing sequence that produces more than one shot. And that firing sequence is "automatic" because the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as the trigger finger remains stationary on the device's ledge (as designed). Accordingly, these devices are included under the definition of machinegun and, therefore, come within the purview of the NFA."

This information above is inaccurate. A bump-stock does not "harness the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger, so long as

the trigger finger remains stationary on the device's ledge (as designed)." A bump-stock allows the trigger-finger to remain in a position and requires the manual force of the person's other hand to push the firearm forward. The bump-stock does not have any automatic function to it. Without a person manually pushing the firearm against the recoil it would stay rearward and not fire a second time.

Bump-firing is an intrinsic capability of most semi-automatic firearms. Bump-firing is a technique that uses the recoil of a firearm to reset the trigger while using forward pressure with another hand to push the firearm into the trigger-finger thereby pulling the trigger and firing another shot. A bump-stock is only assists in the technique of a person bump-firing.

The 2nd Amendment of the United States clearly states that "the right of the people to keep and bear Arms, shall not be infringed." The National Firearms Act is a clear infringement on the natural human rights of the people. This proposed rule only further infringes on those fundamental rights. I, in good conscious, oppose this rule been proposed.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-14969

**Tracking Number:** 1k2-92qs-z5k6

### Document Information

**Date Posted:**
Apr 23, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Mason Hicks

### Comment

After having read the proposed rule document, I felt it would be appropriate to comment on it piece-by piece as I was reading therefore, given it's length and quotation I had to make, it will have to be broken into pieces and submitted as individual comments. ">" proceeds quotes, ">>" proceeds comments. My personal recommendations are as follows:

1. Call for a congressional hearing and send a representative and let them know in no uncertain terms that this was the fault of the 99th US congress for having tacked on the Hughes' Amendment to the Firearm Owners Protection Act of 1986.

2. Propose the authoring of a bill that would repeal 18 U.S.C.922(o) as it is currently written, opening the registry to post-'86 machine guns, and amend GCA/NFA listing bump-fire assist devices as NFA items.

3. Have an NFA amnesty similar to the Machine Gun Amnesty of 1968, have it open for a year, do not charge them their NFA tax (or at the very least allow for a considerable discount in order to negate the cost of this service), serialize all bump stocks and other bump-fire-assist devices which are brought in for registration, and have it open for all NFA items (which could include, but not limited to: destructive devices like the Striker 12/Street Sweeper, USAS-12's, Homemade and commercial machine guns/war trophies, SBS/SBR, et cetera)

SUMMARY
>"...such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger."

>>Incorrect, the weapon still only fires a single shot with a single pull (function) of the trigger. The addition of the bump stock does not change this fact.

>"Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. "
>>The weapon is still only semi automatic. The cyclic rate is a function of the operator pulling the trigger into his/her finger to fire one shot for every trigger pull. The recoil of the weapon assists in reset, yes; however, the entir weapon has to be continuously physically manipulated by the operator of the weapon.

>"Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. "
>>Again, the weapon only fires once for each trigger pull. The operator is only assisted in trigger reset by the recoil energy of said weapon. This is not what makes a machine gun as defined by the National Firearms Act of 1934 nor the Gun Control Act of 1968.

>"The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented. Consequently, current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the final rule."
>>Firstly, the device does not operate at all, it simply rests with the operator's high pocket shoulder. The weapon itself operates as it normally does as is the nature of any other self-loading/semi-automatic firearm. Secondly, these devices were legally purchased and owned, as ATF had already given their approval of legality (and rightfully so given what they are under the the laws upon which firearms are defined and regulated) . Such a surrender/destruction demand without financial compensation could also be construed as unconstitutional under the 2nd, 4th, 5th, and 10th Amendments to the US constitution as well; although the constitution never seems to matter unless a court says so. Given the Circuit and Supreme courts' history of going through outrageous mental gymnastics for the sake of protecting the blatantly unconstitutional NFA and GCA, it seems unlikely they'd ever defend a firearm accessory.

SUPPLEMENTARY INFORMATION

>"The device itself then harnesses the recoil energy of the firearm, providing the primary impetus for automatic fire."
>>The device does not harness anything, the operator does.

It simply helps restrict the operator's placement of their finger while reciprocating recoil motion of the rifle moves independently of the stationary stock/pistol grip so that the operator can work against recoil energy while pulling the trigger into their finger. It essentially does the same work that training wheels on a bicycle do: train the operator to perform his/her intended operation.

>continued in next comment..<

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov

 Regulations.gov -
Your Voice in Federal

# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

In the rule proposed in Docket ATF 2017R-22, the ATF states that the "relevant statutory question is whether a particular device causes a firearm to shoot * * * automatically more than one shot, without manual reloading, by a single function of the trigger" and goes on to propose that "the definition of a machinegun includes a device that allows semiautomatic firearms to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter (commonly known as bump-stock-type devices)"

In point of fact the firearm components commonly known as bump-stock-type devices do not shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. For this reason the proposed ruling does not apply to commonly available bump-stock-type devices.

In the case of the devices commonly marketed as bump stock devices, the trigger is reset by the recoil of the weapon, but is not fired again by any action of the stock device. The stock device harnesses no energy, and provides no forward motion to initiate another shot. Because the stock provides no forward motion of the rifle, and does not cause the trigger to come into contact with the shooter's finger, the device does not fall within the purview of the proposed rule as written since the stock device does not "harness the recoil energy of the

**ID:** ATF-2018-0002-91757

**Tracking Number:** 1k2-93yo-td7z

## Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Jason Cuny

semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter".

A bump stock does not harness recoil energy. The recoil energy is merely spent in collision with the back of the stock device. Without the shooter physically manipulating the trigger by pulling the entire rifle forward to contact the grip finger, the trigger is not pulled, and no continuance of fire occurs. For this reason the devices commonly known as bump-stock-type devices do not fall within the purview of this new rule.

An animated gif file has been included in this attachment which shows a shooter pulling the trigger of a regular semi-automatic rifle equipped with a Fostech DefendAR sliding stock. The shooter's finger comes to a stop on the stock's finger rest. The rifle comes to a stop at the back of the stock's slot. The stock harnesses no energy, and the trigger is not pressed again. No continuance of fire occurs. Under the proposed rule this devices is not a "bump-stock-type device", since it does continue firing without additional physical manipulation of the trigger by the shooter. It is not subject to 18 USC 922(o) under the proposed rule. In order for this firearm to continue firing, the shooter must physically manipulate the trigger by pulling the entire rifle forward until the trigger that moves with this firearm is depressed by the shooter's stationary grip finger.

Given that the proposed rule demonstrably does not apply to the firearms components commonly marketed as "bump stocks", it should be clear that to move forward with this ruling would be at the very least wasteful, and potentially disastrous as mistaken enforcement actions may be taken against owners of devices demonstrably not affected by this rule, and will resort in law suits and potential damages.

The ATF should consider and publicly recognize the fact that these stocks do nothing but provide additional support and stability to the bump fire capability that virtually all semi-automatic firearms are capable of, and discontinue further action on the current rule proposal.

## Attachments (1)

### FostechDefendAROneHandTest-sm

**View Attachment:** 

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**

For related information, **Open Docket Folder** 🗗

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

| | |
|---|---|
| **ID:** ATF-2018-0001-1385 | |
| **Tracking Number:** 1k1-90mr-pzuz | |

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details** 🗗

### Submitter Information

**Submitter Name:**
Bernard Owens

### Comment

Agencies:
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Agency/Docket Number:
Docket No. 2017R-22

Commenter standing: Consumer

Credentials: Certified Pistol Instructor and Certified Range Safety Officer

Questions directed to consumer commenters are:

"21. In your experience, where have you seen these devices for sale and which of these has been the most common outlet from which consumers have purchased these devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar events; or private sales between individuals)?

22. Based on your experience or observations, what is (or has been) the price range for these devices?

23. For what purposes are the bump stock devices used or advertised?"

Answers:

21. In my experience, I have seen these devices for sale in brick and mortar retail stores, from online vendors, and at gun shows. I have most commonly seen them stocked in the largest numbers in brick and mortar stores. I have seen the

most sales at gun shows. I have no experience with any private sale.

22. Based on my experience, the price range for these devices has generally been USD$139.00 to USD$149.00.

23. The purposes for which bump stock devices have, in my experience, been used or advertised is multi-faceted. Each of the following paragraphs is based directly on my personal experience.

First, given that bump-firing techniques that do not use bump fire stocks are ubiquitously understood amongst serious firearms enthusiasts, the stocks help reduce the learning curve for shooters who wish to discharge a firearm rapidly. While bump-firing is easily done by a number of other methods, those methods require excessive and potentially dangerous practice to become proficient. Bump-fire stocks also require practice to use effectively but the amount of effort expended in that practice is substantially reduced compared to the older bump-fire techniques such as two-handed free recoil against the shoulder, hooking the trigger finger into a belt loop, using a bump stick, etc. in order to obtain a similar level of skill.

Second, bump-fire stocks are used to better control aim while bump firing. In other words, using one of the stocks generally, for a given level of practice and/or instruction, results in more accurate fire. This is a major advantage to this technology; better accuracy during rapid fire means fewer chances for errant shots to strike unintended targets.

Third, bump-fire stocks are used to better control the number of shots fired when bump-firing. Older bump-firing techniques and devices tend to result in less control over the number of shots fired and it is often true that excessive rounds are fired. With a bump stock, it is easy to limit firing strings to two or three rounds.

Fourth, bump-fire stocks are advertised for the purpose in the previous paragraph. A review of point-of-sale video advertising used by Slide-Fire, for example, makes it very clear that one of the primary purposes of the stock is to enable firing 2 or 3 shots very quickly with good accuracy. In situations where a rifle is used for lawful defensive purposes, the ability to limit the number of rounds fired yet also fire them very quickly is extremely important, even life-saving.

Fifth, bump-fire stocks are advertised and used for lawful recreational purposes. Many informal shooting endeavors benefit from rapid fire, increasing the enjoyment of participants. While similar results can be obtained by other bump-firing methods, bump-fire stocks allow for easier, more accurate rapid fire by shooters without the time, facilities, money, and large quantities of ammunition normally needed to obtain a given level of skill.

In sum and in my experience, bump-fire stocks enable an increased rapidity of fire in the many sporting and defensive situations where such an increased rate of fire is appropriate while also ensuring better control, greater accuracy, and, for those reasons, substantially enhanced safety for all lawful participants.

As an addendum, I would like to add a personal observation. Bump-firing is now a known commodity well beyond the firearms enthusiasts who have previously practiced it. A rule defining bump stocks as machine guns will reduce the numbers of them in circulation. It will not, however, discourage a now much-larger audience of gun owners from seeking ways to bump-fire. They will find ways; such techniques have existed for at least a century. However, the loss of the stocks as an easily-legal and simple way to bump-fire will inevitably result in people trying to bump-fire without instruction with unsafe results. The "bump-fire genie" is out of the bottle. The availability of the stocks ensures that even shooters of a low skill level can bump-fire safely, with reasonable accuracy and control, even without formal training. Their removal from society will substantially increase the dangers that accompany people trying to learn to bump-fire without such a useful shooting aid.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**

For related information, **Open Docket Folder**

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-20294
**Tracking Number:** 1k2-9119-zmoz

### Document Information

**Date Posted:**
Jan 25, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Nathan Johnson

### Comment

Comments Attached.

### Attachments (5)

Attachment_1_Bumpfire_Stock_Comments

**View Attachment:**  

Attachment_2_Bumpfire-Beltloop

**View Attachment:**  

Attachment_3_Bumpfire_Board-Stick

**View Attachment:** 

Attachment_4_Bumpfire_Shoestring

**View Attachment:**  

Attachment_5_Bumpfire_Scratch-Built_Stock

**View Attachment:** 

I am commenting as an individual citizen, one who has not purchased a bump-stock, nor have I any intention to do so, for reasons which will be included below.

Regarding your specific questions,

21) In my experience, where I have seen these devices for sale has been exclusively on the internet, as no local gun store has had such devices in stock when I have visited.  I have not, to my recollection, seen them at a gun show, but I usually go on the second day, so I may have missed them.

22. The prices I have seen have ranged from $129.95 for a Bump Fire Systems brand stock, or $179.95-$329.95 for Slide Fire brand stocks.

23. I'll let their marketing statements speak for themselves:

Slide Fire: "Bump-fire is a well-established technique utilizing the recoil of a semi-automatic firearm to fire multiple shots in rapid succession. The patented Slide Fire® stock allows shooters to bump-fire their rifles without compromising safety and accuracy."

Bump Fire Systems: "Did you know that you can do simulated full-auto firing and it is absolutely legal? Bump Fire Systems is here to introduce you to Bump Fire Stock, that allows you to recreate the feeling of automatic firing. You can use it with your semiautomatic weapon by gripping the fore-end of the barrel and pulling it forward. Bump Fire uses a gun's recoil to shoot multiple rounds."

Now here is my case as to why these answers are irrelevant.  The "bump-fire stock" devices are an aesthetically and ergonomically pleasing replacement for numerous methods of accelerating the ability to pull the trigger on a semi-automatic firearm.  The methods they replace are nearly-to-absolutely impossible to regulate:

The first, and least safe for anyone to use, is to extend a thumb through the trigger guard of the firearm and hook it through a belt loop on one's pants (or shorts), then use the other hand to pull the firearm

forward, drawing the trigger into the thumb, depressing it.  The recoil forces the firearm back, allowing the trigger to reset.  As the recoil dissipates, the gripping hand draws the firearm forward again, repeating the process.

The second, which closely resembles the functionality of a "bump-fire stock" is to use a dowel rod, braced against the shoulder, with the firing hand's index finger held across the forward end, and extended through the trigger guard to rest upon the trigger, and the rest of the hand palming the front and sides of the pistol grip of the firearm.  The other hand is used to pull the firearm forward, drawing the trigger into the firing hand's index finger, depressing it.  The recoil forces the firearm back, allowing the trigger to reset.  As the recoil dissipates, the other hand draws the firearm forward again, repeating the process.

The third is a variant of the second.  A board braced against the shoulder, with a stick or bar affixed across the front end.  A pistol can then be held with the fingers outside of the trigger guard, and placed so that the stick fits through the trigger guard and across the trigger.  The other hand supports the board/stick combination.  Pressing the firing hand forward will cause the stick to depress the trigger, discharging the firearm.  The pistol pivots back and down with the recoil, releasing pressure on the trigger, and allowing it to reset.  When the slide returns to the battery position, tension in the wrist pivots the firearm back into position, putting pressure upon the trigger and restarting the process.

The fourth, which is surprisingly functional, but only works with firearms with a reciprocating charging handle, is to use a piece of string (such as paracord, nylon cord, kite string, a shoe string, or high-strength fishing line) affixed to the charging handle, wrapped back behind the pistol grip or the back of the trigger guard (on the same side as the charging handle), then through the trigger guard so that it creates tension across the trigger, and then to a ring (an empty key-ring will do), which fits on the trigger finger.  The firearm is then held in its normal firing position.  The trigger finger is tensed, drawing the ring back, and creating sufficient tension to depress the trigger, discharging the firearm.  When the firearm discharges, the charging handle moves back with the bolt carrier, creating slack in the string, which allows the trigger to reset.  When the bolt carrier returns forward, the charging handle pulls the string taught, creating tension upon the trigger sufficient to depress it, beginning the process anew.  This will continue until the operator of the firearm reduces the tension they are applying with the ring and string.

The fifth option is the "zero equipment" option.  A semi-automatic firearm can be held half an inch to an inch from the shoulder, held firmly by the support hand and cradled with the firing hand.  The trigger finger is held at a firm approximation of a ninety(90)-degree angle, and placed in the trigger guard

against the trigger, while the arm is locked in place. The support hand pulls the firearm forward, drawing the trigger against the locked trigger finger until it is depressed, discharging the firearm. The recoil forces the firearm back into the shoulder, and away from the trigger finger, allowing the trigger to reset. Once the recoil has dissipated, the supporting hand continues to draw the firearm forward, pressing the trigger against the trigger finger, and beginning the process anew. For a pistol too small to grip with a second hand, the wielding hand can grasp the grip below the trigger guard, while one finger of the off-hand is extended through the trigger guard and placed against the trigger. The wielding hand presses the pistol forward, pressing the trigger against the off-hand trigger finger until the trigger depresses and the pistol discharges. The pistol rocks back with the recoil, relieving pressure on the trigger and allowing it to reset. When the slide returns to battery, tension in the wrist of the wielding hand then returns the pistol to its firing position, pressing the trigger against the off-hand trigger finger until it depresses and begins the process anew.

That list comprises one evening of research, and does not include the numerous scratch-built bump-stocks also discovered, which have been constructed by individuals for around twenty (20) dollars. The simple fact is that the only thing commercially available bump-fire stocks achieve is to part firearms enthusiasts from their money. They replicate, in some cases, something that can be done with less than a dollar's worth of investment, and do not reduce the mechanical trigger-pull-to-discharge ratio. Atop that, bump-fire stock equipped firearms do not have the reliability to serve in the capacity of a machinegun, with many online available videos depicting the finicky nature of firearms equipped with these devices, the result being intermittent bursts of fire good for little more than short recreational thrills.

There is also information that the ATF has that citizens do not. It is a pertinent question you could ask of your own records, regarding the incident which spurred this discussion in the first place: "How many of the bump-stock equipped firearms out of the substantial arsenal reportedly used in the Las Vegas Incident were jammed or otherwise rendered useless due to malfunctions caused by the use of bump-stocks on weapons not designed to fire at those rates?" Also available to you should be the statistics of how many times a bump-fire stock has been used in a crime, nationally. The answer should provide some answer as to the feasibility of these devices as machine guns.

Finally, there is the economic argument. In order to classify these devices as machineguns, the ATF would have to create a comprehensive database of all devices sold, then try to either confirm registration of all devices, in contradiction to the Hughes Amendment, or require their confiscation and destruction, in contradiction to the post-facto clause in the Constitution of the United States as well as the Second Amendment. As far as I can tell, there would need to be some kind of legislation in place to allow for the processing of these devices. Atop of this, there will most likely be a series of lawsuits challenging the ruling, resulting in substantial expenditures of taxpayer funds, and requests for stays of

enforcement for the duration of the lawsuits, which could put enforcement efforts on hold.  Honestly, as a taxpayer, I do not want my money wasted on such fruitless endeavors - not to ban a thing which serves the same function as a belt-loop, a dowel rod, or a key-ring and string.

Thank you for your time and consideration.  I hope this document has been of assistance.



Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00095





Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00097



Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00098

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-3344

**Tracking Number:** 1k2-92dc-uxi2

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Ronald Devito

### Comment

The ATF in this proposed re-classification says, bump stocks "allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter."

This definition is mechanically incorrect. The notion that a bump stock functions as a "self-acting and self-regulating force" is patently false. The same forces provided by the bump stock are provided by skill alone. The action and regulation is provided by the shooter's support hand. A machine gun also does not short-stroke and mis-feed as a result of automatic fire, like a bump-fired gun does. A machine gun is much easier to control than bump fire with or without a bump stock.

The ATF is committing a linguistic sleight of hand by classifying bump stocks as machine guns to satisfy a politically motivated narrative.

Though not mentioned specifically in the proposed rule, the ATF speaks about changing the standard as is applies to machine guns from a single \*function\* of the trigger to a single \*pull.\* The ATF defines a single pull as consisting of the entire cycle of the trigger to release a single round. A single pull consists of two functions: pull and release. Under the single function standard, binary triggers are perfectly legal. They release one round on the pull and another round

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 00099

on the release, that is one round per function of the trigger. Under the proposed single pull standard, binary triggers would be classified as machine guns, because they release more than one round per pull. The proposed rule-making includes the catch-all phrase "and other such devices," which binary triggers arguably could fall under.

The ATF fluffs off the Second Amendment issue - albeit citing case law, because machine guns are "dangerous and unusual." Machine guns are only "unusual," because they are scarce in the civilian market thanks to the NFA of 1934 and the Hughes Amendment of 1986. Otherwise, machine guns are quite common. Prior to 1934, you could buy a Thompson submachine gun in a local hardware store. All guns are dangerous - that is the point of them. The Second Amendment was not written for "sporting purposes." The right to keep and bear arms for personal defense against all enemies foreign and domestic is a natural right that is not granted by the Amendment but acknowledged.

Per the ATF's proposed rule change, at least 400,000 bump stocks have been manufactured and sold. Twelve bump stocks were used in one crime by a man who had a dishonorable discharge the Air Force failed to report to NICS. Mr. Paddock, the Vegas shooter should not have been able to legally buy any guns. Due to the government's failure to follow its own procedures, this man was able to buy many guns over the course of nearly 20 years. So, 399,999 law abiding citizens have to pay the price for his criminal act and the government's failure to keep guns out of his hands? Who is being punished for failing to inform NICS about Paddock's dishonorable discharge?

The Parkland shooting was a massive fail at all levels of government. Police were called 39 times over terroristic threats being made by this student. The FBI failed to act when informed about him. The school was involved in a federal grant program that encouraged quashing crime reports on students to keep them out of the justice system! Armed sheriff's deputies were derelict in their duties that day. The student in Parkland did not use a bump stock. Bump stocks have been legal for nearly 10 years. As previously noted, at least 400,000 of these devices have been manufactured and sold to law-abiding citizens. Each unit sold when sold new included an approval letter from the ATF. Citizens spent their hard-earned money on these legal devices in good faith. The ATF seeks to declare - ex post facto - legal property - to now be illegal. The federal government is demanding that this legally purchased and owned property be turned in, without any compensation to the owner, else destroyed by the owner. Law-abiding citizens are expected to take further infringement on their rights in the name of "public safety," "for the children."

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

---

### Comment

I am opposed to any regulation on bump stocks.

These proposed regulations would declare a bump stock to be a machinegun because it allows the gun to fire more than one shot by a single PULL of the trigger -- that is, by a single volitional function of the finger. I can accomplish the same end with a hundred-year old Model 1897 Winchester pump shotgun! Hold the trigger back and it slam-fires every time it's pumped - so one pull of the trigger empties the (tubular) magazine.

Federal law 26 U.S.C. 5845(b), defines a "part" as a machinegun ONLY if it is designed solely and exclusively to allow the gun to fire more than one shot ... by a single FUNCTION of the trigger.

To state the obvious, a finger is not the same thing as a trigger. And, while a bump stock is in operation, the trigger functions separately every time a round is discharged.

So these regulations are proposing a radical change -- as they effectively define a gun as a machinegun even if the trigger resets for every round that is fired, so long as the finger only pulls the trigger once. In my example of century old technology in the 1897 shotgun, only one pull of the trigger is required.

While bump stock devices will now be treated as machineguns under these regulations, they also raise serious questions in regard to AR-15s and other semi-automatic rifles -- as they are now on the brink of being designated as machineguns by the next anti-gun administration.

### Document Information

**ID:** ATF-2018-0002-59112

**Tracking Number:** 1k2-93ol-sq1r

**Date Posted:**
Jun 22, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Jay Callaham

In the past, one had to fundamentally change the firing mechanism of a semi-automatic firearm to convert it into a fully automatic firearm.

But now according to these regulations, a bump stock is a machinegun -- and it can "readily restore" a semi-auto into a machinegun, simply because the gun owner can effectively fire the weapon continuously with a single pull of the trigger. This would invoke the statutory definition for a rifle, which is classified as a machinegun (26 USC 5845(b)). I'm also at a loss as to how one can "restore" a semi-auto, that was NEVER a "machine gun" in the first place, into something that it was not and is not.

It wont matter that a gun which is being bump fired has not been fundamentally altered. AR-15s, and ultimately ANY other semi-auto firearm, will be on the brink of extinction should these regulations go into force. For what it's worth, I do not personally own any AR-15 platform firearms, though I used the Stoner system weapons when I was in the Army. I see a threat to all semi-autos if this over-reach is allowed to occur.

These regulations dismiss Second Amendment protections, by appealing to the Heller court decision. But the Constitution trumps the Supreme Court -- so when the Second Amendment says that the right to keep and bear arms shall not be infringed, any limitation of the right for law-abiding citizens should be treated as unconstitutional.

Thank you for your consideration.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov


Your Voice in Federal Decision-Making

## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-2679

**Tracking Number:** 1k2-92b8-1hz0

### Comment

In regards to ATF-2018-0002-0001

"Bump stock" technology requires a "pull" of the trigger for each shot. The operator must use their support arm to apply forward pressure to the rifle, until the trigger is activated by the index finger. The recoil forces the rifle to slide back, but unless the support arm is still applying forward pressure, the process is interrupted and stops. It is still one trigger pull per shot. The speed at which the process occurs does not change this fact.

The correct term is called "bumpfire" or "bump fire". This can be achieved with a belt loop, string, rubber band, or can be made from home. Bump firing with simply a finger is possible, as is demonstrated in this video: https://youtu.be/7RdAhTxyP64. Whoever wrote this proposal clearly does not understand the concept at all, much less the correct terminology.

As anyone who has actually fired automatic weapons can attest, rapid fire is incredibly inaccurate. It is typically only used in short bursts or for suppressive fire. There would have been countless more dead in the Las Vegas shooting if the shooter had used a bolt-action or semi-automatic rifle, with a suppressor and high power scope.

Jerry Miculek is a professional shooter, who can accurately fire nearly as fast as a bumpfire stock with just his finger. https://youtu.be/JTb6hsSkV1w. Are you going to ban/regulate his fingers?

Lastly, proposing to regulate bumpfire stocks because of what they accomplish sets a dangerous precedent. A fast

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Tyler Capobres

finger and light trigger will be able to accomplish the same thing. Are firearms parts next. Let me remind you that firearms parts and accessories are protected by the Second Amendment.

Trying to ban an accessory because one person misused it is immoral and unjust. It also will not prevent another incident like this from happening, since those determined to commit a crime will choose not to follow the law. This proposal only harms the law-abiding citizen. This is the epitome of feel-good legislation, which accomplishes nothing other than appeasing the guilty conscience of ignorant people.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-2922

**Tracking Number:** 1k2-92ba-xyve

## Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Andrew Pynckel

## Comment

I am commenting on behalf of the proposed rule change for "bump-stocks". Docket number ATF 2017R-22.

First and foremost, as a concerned citizen, Title II weapons owner (legally transferred, thank you), and staunch 2nd amendment advocate, I wish to express my disdain in yet another attempt by the ATF to change the rules by executive fiat, instead of through legislation, as would be the LEGAL pathway.

First and foremost, the Hughes Amendment was illegally ratified. Secondly, the NFA is an unconstitutional infringement on our 2nd amendment. Thirdly BATFE doesn't have the constitutional authority to even have this power (SHALL NOT BE INFRINGED).

I wish to point out that between the Heller v DC decision, as well as Caetano v Mass, the NFA of 1934 is invalidated, as all arms covered underneath it can be considered "bearable arms". I will even quote the opinion for you....

"the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding"

But I digress. Back to the topic at hand.

"For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the

trigger."

So I have a couple major concerns with your change in the definition of a machinegun. Firstly, a machinegun is a weapon that with one pull of a trigger will fire until a magazine depletes, requiring no additional reset. A bump fire stock REQUIRES a second pull of the trigger to fire a second round, contrary to what you have attempted to change the definition to. Secondly, a bump-fire stock is not a self acting or self regulating device. It still requires a human to make sequential trigger pulls.

"The term "machine gun" includes bum-stock-type devices, I.E., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger..."

That right there is false, because the trigger is being pulled each time, as stated above

"...by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter."

Again, this is a false statement. The shooter has to continue to manipulate the trigger of the firearm. Each shot still requires a pull of the trigger to disengage the reset, disengage the seer/hammer interface, and allow the hammer to fall.

What happens if someone decides to "bump fire" a semi automatic weapon with a belt loop? Are they now a felon? Do they have to register their belt loops? Fingers? Why do you, BATFE, think you have the authority to turn law abiding citizens into felons overnight? How exactly does this help the American People?

ATF already ruled that a bump-fire stock DOES NOT modify a semi-automatic weapon into a machinegun. You cannot change that ruling, and you DEFINITELY cannot change the definition of a machinegun without CONGRESSIONAL LEGISLATION, as the NFA was drafted. You do not have the authority.

Sincerely,
A deeply concerned LAW ABIDING citizen,
Andrew

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-3452

**Tracking Number:** 1k2-92dk-p3i4

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Nathan Thurman

### Comment

I have read the proposed ban on bump fire stocks and have heard and discussed the device after the tragedy in Las Vegas. Thank you for taking the time to read my comments and concerns in advance.

I do not think a ban is the answer. Bump fire stocks were allowed for sale, plus with a letter from the ATF, showing it is not an automatic weapon or under any kind of NFA regulation, under the Obama Administration for many years. The weapon it is mounted on is still a semi-automatic rifle. The rate of fire from the bump fire isn't even guaranteed. It depends on the users experience or the firearms quality/how it's been maintained if it will even cycle. Let it be shown that before Vegas, your branch showed it as not making the weapon an automatic weapon or even acting like one.

I see from tests that you have seen that bump firing can be done by other methods. From a block of wood, belt loop, rubber band, or even a human finger. Banning this device would not stop the act of bump firing as a whole. I'm sure it was also shown that bump firing was intermittent and inaccurate.

I think I speak for the firearms community that this device is a gimmick. Even with that said, I'm against any regulation of it. It's just not for me, but I believe others should be able to own the device and use it for all legal purposes. I have rented fully automatic weapons before. The bump fire is nothing like a true automatic weapon, or select fire. The rate of fire isn't constant on a bump fire, it varies widely from what I've seen. There's no guarantee it would even be a rate increasing device compared to an experienced shooter firing

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000107

as fast as possible.

Why would owners have to give them up also? They are their property already and this proposal is well after they were already purchased. At the least, buy back or forfeit should be voluntary. If it must, register the devices through NFA for further purchases.

I believe banning this device is a slippery slope. The ATF should not be allowed to mandate a regulation that can act as law. With second amendment protection, infringement means no regulation. Banning the bump fire stocks could lead to any number of parts or devices being regulated also deemed evil by whoever is in charge. We in the firearm community will not stand for anymore regulation of any kind. I would like to see the NFA repealed also to show where I stand.

Please feel free to contact me if any questions or concerns or additional feedback.

Thank you
Nathan Thurman

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-4641

**Tracking Number:** 1k2-92f9-rlcm

### Document Information

**Date Posted:**
Apr 6, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Steve Pegram

### Comment

I take exception to this wording: "The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented." Rubber recoil pads (to absorb recoil-but that unintendedly create a bumpfire condition) did indeed exist and were on the open market long before FOPA 1986 or even before NFA-'34.. They have been marketed since before the year 1900. Here is just one example, patented in 1998: https://patents.google.com/patent/US6305115

23.) The proposed rulemaking constitutes an ex post facto law. Any ex post facto Federal laws are expressly forbidden by the United States Constitution in Article 1, Section 9, Clause 3.

24.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 2nd Amendment.

25.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 4th Amendment.

26.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 5th Amendment. It is an illegal "taking" without "just compensation."

27.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 6th Amendment because it gives no opportunity for trial by jury in

determining the applicability of the law to any particular device.

28.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 8th Amendment because it mandates an excessive fine or prison sentence in relation to a newly-imagined "offense".

29.) Overall, the proposed rulemaking is null and void per Marbury v. Madison because it violates The 10th Amendment because it violates the unqualified "right to keep and bear arms" provisions of 44 sovereign State Constitutions.

30.) The the proposed rulemaking has no provision exempting bumpfire stocks that are owned by U.S. Citizens who are living abroad (such as missionaries or military servicemembers deployed abroad) who have their stocks (or firearms equipped with such stocks) in storage with relatives, with friends, or in commercial storage facilities. Hence they will not have the opportunity to "surrender them, destroy them, or otherwise render them permanently inoperable" before the changed law goes into force. This will make these citizens unprosecuted felons.

31.) The the proposed rulemaking has no provision exempting bumpfire stocks that are owned by U.S. Citizens who have large gun collections who have an indefinite number of stocks (or firearms equipped with such stocks) in their possession. By simply being disorganized, they will not realize the exact number that they own and hence not have the opportunity to "surrender them, destroy them, or otherwise render them permanently inoperable" before the changed law goes into force. This will make these citizens unprosecuted felons.

32.) The the proposed rulemaking has no provision exempting bumpfire stocks that are owned by U.S. Citizens who are ignorant of the fact that they have become contraband and that they must "surrender them, destroy them, or otherwise render them permanently inoperable" before the changed law goes into force. This will make these citizens unprosecuted felons.

33.) To restrict particular brands of stocks (per your mechanical definition) while not at the same time restricting ALL brands of stocks (per your mechanical definition) is an unconstitutional Bill of Attainder.

34.) I take exception to this wording: "...these devices convert an otherwise semiautomatic firearm into a machinegun." By your new definition, then so does loosening the buttstock attachment screw, with some stocks designs. (This allows the stock to slide forward and backward enough to allow the trigger to reset.)

35.) I take exception to this wording: "...these devices

convert an otherwise semiautomatic firearm into a
machinegun." By your new definition, then so do the
prosthetics worn by some arm or hand amputees.

37.) I take exception to this wording: "...these devices
convert an otherwise semiautomatic firearm into a
machinegun." By your new definition, then so does
loosening the pistol grip attachment screw, with some
stocks designs. (This allows the grip to slide forward and
backward enough to allow the trigger to reset.)

40.) I take exception to this wording: "...these devices
convert an otherwise semiautomatic firearm into a
machinegun." By your new definition, then so does changing
the weight of a trigger spring.

42.) I take exception to this wording: "...these devices
convert an otherwise semiautomatic firearm into a
machinegun." By your new definition, then so does wrapping
a soft rubber band around the shooter's trigger finger, or
around the trigger itself.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

---

**ID:** ATF-2018-0002-2492

**Tracking Number:** 1k2-92bw-g4ox

### Comment

I have a question, and potentially request for clarification. The definition of a bump-fire device, as opposed to a bump-fire technique, seems to hinge on the "extension ledge" portion of the stock. Would a bump-fire stock without this ledge be a legal accessory (i.e not creating a machinegun)? If so, would modification of an existing device, by the manufacturer or by the device owner or by a third party, be an alternative to destruction/turn-in? If necessary, would there be any way to reflect this in the resulting decision?

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Brian G

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

---

## Comment

Docket Number ATF 2017R-22

In this comment, I would like to address a number of assertions by the Alcohol Tobacco Firearms and Explosives Bureau (ATF) from the Proposed Rule document "Bump-Stock Type Device". Based on analysis of the assertions, I would also like to recommend proposed actions regarding the affected devices. Please see my attached document for analysis and recommended proposals; thank you for your time and consideration.

## Attachments (1)

### ATF_2017R-22_comment_1

**View Attachment:** 

---

**ID:** ATF-2018-0002-91805

**Tracking Number:** 1k2-93yo-cj6q

## Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Walter Barnes

Docket Number ATF 2017R-22

In this comment, I would like to address a number of assertions by the Alcohol Tobacco Firearms and Explosives Bureau (ATF) from the Proposed Rule document **Bump-Stock Type Device**.  Based on analysis of the assertions, I would also like to recommend proposed actions regarding the affected devices.

---

The first assertion I would like to address is:

> Specifically, ATF has determined that these devices initiate an "automatic[]" firing cycle sequence "by a single function of the trigger" because the device is the primary impetus for a firing sequence that fires more than one shot with a single pull of the trigger. 26 U.S.C. 5845(b).

The assertion that "the [bump-stock-type] device is the primary impetus for a firing sequence" as described can be shown to be incorrect by examples where the same operating principles allow the same effect, but without such a device being used.  That is, recoil from a semi-automatic firearm can be used to allow resetting of a trigger, which can then be activated again by forward force/motion of the firearm, but without a bump-stock type device.

In one such example, an operator can use a variety of holds to allow recoil from a semi-automatic firearm to move enough to allow the trigger to reset, then apply force/motion to activate the trigger again.  With long arms, this can be accomplished with a somewhat loose hold of the firearm instead of a tight hold with the buttstock firmly against the shoulder.  When held at the hip from a standing position, the operator can also simulate the trigger-finger rest of a bump-stock-type device by using a belt loop to hold the trigger finger in place while using the support hand to move the firearm forward[1], but the same effect can be accomplished with a long arm using a traditional upright (standing) position[2].  Note that the ATF would appear to be not only aware of these techniques, but can be understood to endorse at least one of them by the following statement in Proposed Rule section (VI)(A), "ALTERNATIVES":

> Based on public comments, individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, **belt loops**, or otherwise train their trigger finger to fire more rapidly.  [*Emphasis mine.*]

However, this technique of utilizing recoil and forward force/motion for rapid-fire of a semi-automatic firearm is not limited to long arms.  Semi-automatic handguns can use the same operating principle[3][4][5], and by definition, handguns *cannot* have a buttstock, so bump-stock-type devices are not the "primary impetus" of the operating principle.

While these techniques vary in difficulty and are arguably more difficult to master than the use of a bump-stock-type device, the fact is that they use exactly the same principle as a bump-stock-type device *without* the use of such a device, and thus the device itself cannot be the "primary impetus for a firing sequence" as described.

In another such example, an operator can harness simple physics to show that it is possible, with effectively no technique involved, to utilize recoil of a semi-automatic firearm to facilitate resetting the trigger and forward force/motion to activate the trigger.  Consider the following figures:



Figure 1



Figure 2

Given a semi-automatic long arm supported by a support *S* at the buttstock and a support *A* at the trigger, consider it supported horizontally with regards to the ground, such that the ground can be considered *x* in the *x-y* plane of Figure 1.  In this case, there is no force applied to the firearm other than the force of gravity, $F_{gravity}$.  Now consider rotating the firearm about axis *A* with respect to the *x-y* plane creating angle *a* as seen in Figure 2.  As the firearm rotates and angle *a* increases, the force $F_{forward}$ increases with respect to angle *a* due to the force of $F_{gravity}$, which results in an equal

and opposite force against the trigger at axis $A$.  Once $F_{forward}$ exceeds the force necessary to activate the trigger, the firearm discharges, producing recoil (momentum) with force $F_{momentum}$.  If $F_{momentum}$ results in enough force to move the firearm rearward on support $S$ such that the trigger resets, the firearm is then capable of firing again.  As $F_{gravity}$ slows the rearward motion, the firearm will eventually stop, then $F_{gravity}$ will again result in forward motion due to $F_{forward}$.  Since we have already established that $F_{forward}$ exceeds the force necessary to activate the trigger, the firearm will then fire again.  This is exactly the same principle as used by bump-stock-type devices, but given that $A$ can be an operator's finger and $S$ can be the operator's support hand (and the firearm effectively allowed to reciprocate about $S$), this type of rapid fire is possible with no modifications to the firearm and *no manual force* applied once the firearm is rotated.

In short, this should be possible with any semi-automatic firearm whose weight exceeds the weight of the trigger pull which can be rotated and held stationary about an axis such that an object at the axis (like a finger) activates the trigger, and which fires a cartridge producing sufficient force to move the firearm enough to reset the trigger.  Not only does this imply that a bump-stock-type device is not the  "primary impetus" for such a firing sequence, but it also implies that a bump-stock-type device actually requires *more manual input* to function that many semi-automatic firearms actually need to discharge the same way without such a device.  In this sense, a bump-stock-type device arguably makes the process easier and more controllable (and thus, safer), but it does not, in any way, change the nature of how the firearm works.

---

The next assertion I would like to address is:

> Such [bump-stock-type] devices are designed principally to increase the rate of fire of semiautomatic firearms.

This is demonstrably false based on my understanding of semi-automatic firearms in general, including a more detailed understanding of the AR-15 operating system.  This is because the rate of fire is effectively limited by the way the underlying mechanics of a particular firearm work.  For example, the AR-15 generally has a rate of fire between 600 and 900 rounds per minute, whether or not an operator can utilize the rate of fire.  The actual rate of fire for any given AR-15 is determined by a number of things, including, but not limited to, the weight of the buffer, the strength of the buffer spring, the weight of the bolt and carrier, cartridge pressure, and the speed at which the trigger/sear resets.  In this example, a heaver buffer or bolt/carrier will generally reduce the rate of fire, while a lighter buffer or bolt/carrier will increase the rate of fire, but the rate is fixed for a given set of internal parts and cartridge.

A bump-stock-type device does not *increase* the rate of fire any more than a lighter trigger does.  Continuing the AR-15 example, in the case of a lighter trigger with the same reset speed as a heaver trigger, an operator may be able to discharge the firearm faster with a lighter trigger because activating the trigger takes less effort.  However, in the case of both the lighter trigger and the heavier trigger, an operator with the ability to operate both triggers *faster* than the firearm's rate of fire will either have no effect during certain trigger activations, or induce a malfunction.  In the former case, if the operator activates the trigger to discharge the firearm, then quickly does so again before the sear engages, the activation effectively does nothing; after the sear engages, the operator may activate the trigger again to discharge the firearm.  In the latter case, if the operator activates the trigger to discharge the firearm, then quickly does so again *after* the sear engages but *before* the self-loading cycle completes, the hammer will follow the bolt and carrier as they go into battery, causing a malfunction such that a cartridge is in the chamber, but the hammer is not cocked; thus, subsequent trigger activation does nothing without manual intervention.  A bump-stock device works similarly in that it allows an operator to more easily use a semi-automatic firearm in a way it

already works, and attempting to fire faster than the firearms rate of fire will produce no result or a malfunction.  In short, it more easily allows an operator to fire faster for more sustained periods (much like a lighter trigger), but it does not actually change the firearms rate of fire (like a lighter trigger).

---

The next set of assertions I would like to address are:

> Specifically, these [bump-stock-type] devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter.

This actually implies several assertions:

- A bump-stock-type device works as a self-acting or self-regulating mechanism.
- A bump-stock-type device harnesses recoil energy.
- A bump-stock-type device allows continuous firing without physical manipulation of the trigger by the shooter.

First, a bump-stock-type device is neither self-acting nor self-regulating.  The Proposed Rule document repeatedly references the "Akins Accelerator" from ATF Ruling 2006-2.  One might argue that, in an unmodified state (with the internal spring in place), an Akins-style device is "self-acting" (due to the spring providing recoil-driven force without user interaction) and "self-regulating" (due to the fact that the internal spring would regulate recoil-driven force without user interaction).  However, neither an Akins-style device with the internal spring removed, nor a manually-operated bump-stock-device as described in the Proposed Rule self-acts or self-regulates; all "action" and "regulation" is on the part of the operator.  This can be demonstrated in the following scenarios, given, for example, an AR-15 with a bump-stock-device as described in the Proposed Rule and an operator using the integral rest to prop the trigger finger while sliding the firearm forward to discharge it:

- If the operator discharges the firearm by sliding it forward and applies even more forward force to the firearm, the firearm discharges only once.  The device does not regulate the force needed to fire again; it is up to the operator to regulate the forward force applied.
- If an operator discharges the firearm by sliding it forward and loosens the grip on the firearm with the support hand allowing the firearm to slide rearward in the support hand, the firearm will discharge only once and recoil into the stock.  It is up to the operator to act to fire again; the device does not self-act in any way.

Second, a bump-stock-type device does not harnesses recoil energy.  To harness implies to capture or store; in this context, the Proposed Rule implies the device stores recoil energy for later use.  An Akins-style device with internal spring *does* harness recoil energy as the energy is stored in (and released from) the internal spring.  A bump-stock-type device has no means by which to "harness" (store) energy due to recoil.  It allows the firearm to slide back and forth, but any force producing forward motion (necessary for the finger to activate the trigger again) is produced *solely* by some external force.  Generally, this force is applied by the operator with the support hand, but the prior example in Figure 2 shows how gravity itself can be the force producing forward motion.  In any case, force producing forward motion is *not* supplied by the device because the device *cannot* store energy produced by recoil.

Third, a bump-stock-type device does not allow continuous firing without physical manipulation of the trigger by the shooter.  The Proposed Rule document seems to imply that the initial activation of the trigger to discharge a firearm with a bump-stock-type device is somehow a special case, and is an example of "physical manipulation", even though subsequent discharges of the firearm when using a bump-stock-type device are produced exactly the same way.  For example, the Proposed Rule document in the "Supplementary Information" section states the device effectively produces:

> ...a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge…

This implies that the "single pull" (that is, the *first* trigger pull in a firing sequence) somehow produces "continuous firing", but seems to ignore the fact that all subsequent discharges are produced in the *exact same way* as the initial activation.  That is, all subsequent discharges are each "single pulls", by the Proposed Rule's own implied definition of the initial "single pull".  Each discharge is a discrete activation (or "pull") of the trigger in the same way that the first is, and none are self-acting or self-regulating any more than the first is.  The Proposed Rule document goes on to say:

> ...bump firing without an assistive device requires the shooter to exert pressure with the trigger finger to re-engage the trigger for each round fired.

However, the document goes on to then explicitly name "rubber bands" and "belt loops", both of which would be considered "assistive devices".  In the case of using the "assistive device" of a belt loop, the entire premise of using the belt loop as part of the firing sequence is to give the trigger finger a rest or prop which functions effectively identically to the "finger shelf" on a bump-stock-type device.  This seems to imply that "bump firing" when using a belt loop as an "assistive device", which is functionally identical to the technique used with bump-stock-type devices, is permissible, but using the same technique resulting in the same effect is somehow not permissible when using a different device.

---

In conclusion, I would like to address potential alternatives in a similar way as the Proposed Rule document.

Alternative 1: No change alternative.  This seems to make the most sense based on analysis of the assertions by the Proposed Rule document.  Given that analysis shows premises asserted regarding additional regulation of the devices are, at a minimum, logically unsound, the most sensible and consistent action with regards to current law is to take no action and leave regulations as they are.

Alternative 2: Device modification.  Given that the *only* objective difference between "bump firing" from the shoulder both with and without a bump-stock-type device is that the device has an extension ledge ("finger rest") for resting the trigger finger, the ATF could find that bump-stock-type devices with the ledge/rest removed are *not* affected by any additional regulation.  This would allow companies selling the devices to continue doing so with minimal modifications, it would allow existing owners to keep their devices with minimal modifications, and it would make the law (and this proposed rule) logically consistent with the notion that operators may "bump fire" with or without a bump-stock-type device, as long as they do not utilize a device allowing a fixed trigger finger.

Alternative 3: Should the ATF conclude that bump-stock-type devices are still in need of additional regulation even with the ledge/rest removed, when calling for destruction of said devices, the U.S.

government should provide just compensation for owners and businesses for the destruction of said devices, given that both consumers and businesses operated in commerce of said devices for approximately nine years under various ATF opinions and rulings.  This promotes confidence in the public that if government agencies reconsider and change interpretations of what is allowed by law, after years of allowed practice by consumers and businesses under previous interpretations, that businesses and consumers will at least be compensated for the government's error when businesses and consumers make every effort to abide by all laws and regulations.

---

References:

[1] https://www.youtube.com/watch?v=wZCO-06qRgY
[2] https://www.youtube.com/watch?v=7RdAhTxyP64
[3] https://www.youtube.com/watch?v=-6NrDMec168
[4] https://www.youtube.com/watch?v=Um60zNjw6r0
[5] https://www.youtube.com/watch?v=CEx3rykkY5Y

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder** 

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-15158

**Tracking Number:** 1k2-92rw-h6mh

### Comment

See attached file(s)

### Document Information

**Date Posted:**
Apr 25, 2018

**RIN:**
1140-AA52

**Show More Details**

### Attachments (1)

#### Comments of MSI on AFT Proposed Rule

**View Attachment:** [PDF]

### Submitter Information

**Submitter Name:**
Mark Pennak



**President**
Mark W. Pennak

April 24, 2018

# WRITTEN COMMENTS OF MARK W. PENNAK, PRESIDENT, MARYLAND SHALL ISSUE, INC., REGARDING DOCKET NUMBER ATF 2017R-22

The undersigned is the President of Maryland Shall Issue, Inc. ("MSI"). Maryland Shall Issue is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The undersigned is also an attorney and an active member of the Bar of the District of Columbia, having recently retired from the Department of Justice after more than 33 years of service in the Civil Division, Appellate Staff. These comments are submitted on behalf of MSI, its Board and Officers and members in response to the Notice of Proposed Rulemaking issued by the Alcohol, Tobacco, Firearms, and Explosives Bureau ("ATF") on March 29, 2018, at https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices in docket number ATF 2017R-22. For the reasons set forth below, the ATF should abandon its attempt to reverse its prior rulings in which it expressly declined to regulate bump-stocks as a machinegun part. Alternatively, at a minimum, the ATF should expressly provide that its regulation does not apply to ban the continued possession of bump stocks already possessed and lawfully acquired by existing owners.

## A. THE REGULATION IS IMPERMISSIBLY RETROACTIVE WITHOUT CONGRESSIONAL AUTHORIZATION.

The proposed rule makes clear that it would require a current lawful owner of a bump stock to either destroy the bump stock or turn it into law enforcement. See Preamble at 30. There is no grandfather clause in the proposed regulation that allows an existing owner to retain possession. As statutory authorization, the proposed rule cites 18 U.S.C. § 926(a); 26 U.S.C. § 7801(a)(2)(ii), § 7805(a) as the authority to issue rules and regulations. None of these statutory provisions authorize retroactive rules or regulations with respect to the subject matter addressed in this docket number, *viz.*, the definition of machinegun and machine parts as otherwise regulated by 18 U.S.C. § 922(o), and as defined by 26 U.S.C. § 5845(b). Indeed, Section 7805(b) generally bans retroactive rulemaking with respect to the internal revenue laws at issue here. As detailed below, the proposed rule is retroactive in requiring the destruction or dispossession of any existing bump stocks currently lawfully possessed by existing owners. Such retroactive rules exceed the authority of the ATF under the law for multiple reasons.

## 1.  The ATF statutory justification for retroactive application fails.

The proposed rule explicitly purports to require the destruction of all existing bump stocks on the theory that registration of existing bump stocks is impossible because the NFA "provides that only the manufacturer, importer or maker of a firearm my register it."  Proposed Rule at 25, citing 26 U.S.C. § 5841(b).  That is incorrect as a matter of law.  While Section 5841(b) provides that manufacturers, importers or makers shall register covered firearms, nothing in Section 5841(b) states that "only" such entities may register.

Indeed, the ATF has permitted existing owners to register firearms lawfully owned where the ATF has issued interpretations that have brought existing firearms under the ambit of the National Firearms Act ("NFA") that were previously not registered by a manufacturer, importer or maker. See Expiration of the Registration Period for Possession of the USAS–12, Striker–12, and Streetsweeper Shotguns (ATF Ruling 2001–1), 66 Fed. Reg. 9748 (Feb. 9, 2001).  In that ruling, the ATF reclassified certain firearms as "destructive devices" under the National Firearms Act retroactively, but applied the rule prospectively under 26 U.S.C. § 7805(b) to allow "the prospective application of the tax provisions" and to allow "registration without payment of tax."  See 66 Fed. Reg. at 9749.   Section 7805(b) provides that

> no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
> (A) The date on which such regulation is filed with the Federal Register.
> (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

Section 7805(b) plainly allows only a "prospective" application of the tax and registration provisions of the National Firearms Act.  That requirement provision fully applies to machineguns.  Both machine guns and destructive devices are encompassed by 26 U.S.C. § 5845 and 26 U.S.C. § 7805(b), so there is no principled basis for applying one approach to "destructive devices" and a different approach to machineguns.  Yet, the agency's approach in ATF Ruling 2001–1 is ignored in this proposed rule.  The proposed rule never addresses the prospective-only requirements of Section 7805(b) that it expressly applied in ATF Ruling 2001–1.

The ATF should follow the same approach here that it followed in ATF Ruling 2001-1, by making the rule prospective only. A failure to do so would be "contrary to law" and arbitrary and capricious, an abuse of discretion and not in accordance with law and in excess of statutory jurisdiction, authority and limitations and short of statutory right under the APA, 5 U.S.C. § 706(2).  At a minimum, the ATF is

required to acknowledge its prior approach and explain why it is not following that approach here. It is well established that a failure to explain a regulatory departure from prior statutory interpretation is a violation of Section 706. See, e.g., *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

## 2. The ATF's reliance on 18 U.S.C. § 922(o) creates an impermissible Ex Post Facto law and is otherwise misplaced.

The proposed rule also relies on 18 U.S.C. § 922(o)(1), noting that under that provision it is unlawful for any person to possess a machinegun, except for those machineguns that were "lawfully possessed before the date" that the provision took effect (in 1986). (Id. at 25). First, this reliance on Section 922(o)(1) is circular, as it begs the question of whether existing bump stocks should be made illegal as "machineguns." As prior ATF rulings attest, this result can be easily avoided by interpreting the NFA as not to include bump stocks.

Second, in any event, the agency's reliance on Section 922(o)(1) would mean that, by virtue of an agency *ipse dixit*, all current bump stocks owners become instant felons on the effective date of the regulation **and** became felons in the past as of the date and time they took possession of a bump stock, even though such possession was then expressly permitted by prior ATF interpretations. That reality is inescapable if, as the agency states, Section 922(o)(1) flatly illegalizes all such possessions or transfers taking place after 1986. Such a retroactive application of an ATF rule would violate the *ex post facto* clause of the Constitution. See Article 1, Section 9, Clause 3 ("No Bill of Attainder or ex post facto Law shall be passed."). As the Supreme Court stated long ago, an *ex post facto* law is "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Calder v. Bull*, 3 U.S. 386, 390 (1798). See also *Peugh v. United States*, 569 U.S. 530 (2013) ("the Clause also safeguards 'a fundamental fairness interest ... in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'"), quoting *Carmell v. Texas*, 529 U.S. 513, 533 (2000). The doctrine of constitutional avoidance counsels giving Section 922(o) and 26 U.S.C. 5845, a limited interpretation in these unique circumstances. See, e.g, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575-77 (1988) (where agency interpretation raises serious constitutional questions, an agency and reviewing court are required to inquire as to whether there existed another permissible interpretation that did not raise substantial constitutional doubts). The rule would be unconstitutional if issued as proposed.

This *ex post facto* result can be avoided by a proper application of Section 922(o). Specifically, Section 922(o)(2)(A) expressly provides that the ban imposed on possession under Section 922(o)(1) does not apply with respect to any possession "under the authority of the United States or any department or agency thereof."

While this provision has been interpreted to permit possession of machineguns by federal or state agents acting in an official capacity, *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir.1993) (§ 922(o)(2)(A), *cert. denied*, 510 U.S. 1126 (1994), that limited meaning is not compelled by the statutory language and should not be applied here where bump stocks are possessed under "the authority" of prior ATF rulings. Simple fairness requires a broad interpretation of Section 922(o)(2)(A) in such circumstances. Cf. *Staples v. United States*, 511 U.S. 600 (1994) (holding that government must prove beyond a reasonable doubt that the defendant knew that his rifle had the characteristics that brought it within the statutory definition of a machinegun). In any event, the ATF may not retroactively change its interpretation and then invoke the provisions of Section 922(o)(1) to illegalize (as a felony) a possession that it previously allowed without running afoul of the ban on *ex post facto* laws. In short, ATF's decision to change its interpretation cannot be sustained.

### 3. Retroactive application greatly impairs legitimate reliance interests without justification.

The rule against retroactive rulemaking was stated by the Supreme Court in in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988), where the Court held that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." As the Court explained, "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress" and "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." Id. Thus, "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." Id. at 208-09.

As explained in *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 36 (2006), in assessing whether a rule has retroactive effect "we ask whether applying the statute to the person objecting would have a retroactive effect in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.'" Id. quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 278 (1994). Such retroactivity is highly disfavored in the law in accordance with "fundamental notions of justice" that have been recognized throughout history, *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring); *Horne v. Department of Agriculture*, 135 S.Ct. 2419, 2427 (2015) ("people still do not expect their property, real or personal, to be actually occupied or taken away").

Here, as the ATF's reliance on Section 922(o)(1) demonstrates, there is no question that the proposed rule would retroactively illegalize existing possession of bump stocks that were lawfully possessed before the proposed rule was announced. As the proposed rule fully recognizes, prior ATF classification letters had expressly ruled that bump stocks did not convert a semi-auto firearm into a machinegun. https://www.federalregister.gov/d/2018-06292/p-38 In reliance on these prior rulings, existing owners purchased, possessed and owned bump stocks that were, at that time, fully compliant with these ATF rulings.  That reality is undisputed. These prior purchases were completed prior to this proposed new rule and thus the

proposed rule would attach new legal consequences to those completed purchases. See *Landgraf*, 511 U.S. at 269-70.

The proposed rule reverses these prior rulings to illegalize these devices and requires destruction or dispossession of any bump stocks that were purchased and possessed prior to the effective date of the new, proposed rule. It converts an existing, lawful owner into a felon under Section 922(o). It is thus incontestable that the proposed rule would "affect" existing rights and impose new liabilities on the past and continued possession of these items of personal property. Indeed, under the ATF's reasoning and interpretation of Section 922(o), bump stocks were *always* a machinegun part and thus *always* illegal under Section 922(o). It is thus only a matter of prosecutorial discretion whether to arrest and prosecute existing owners. Yet, any interpretation that allows that result is impermissible. See, e.g., *Marinello v. United States,* 138 S.Ct. 1101, 1108 (2018) ("we have said that we 'cannot construe a criminal statute on the assumption that the Government will use it responsibly'"), quoting *McDonnell v. United States*, 136 S.Ct. 2355, 2372-73 (2016) (internal quotation omitted). The proposed rule violates these principles. ATF's reliance on and construction of Section 922(o) thus fails for this reason alone.

These principles have an especially powerful application to bump stocks because of the reliance that existing owners placed on the ATF's prior rulings applying an interpretation of the term "machinegun" it now reverses in the proposed rule. The Supreme Court has stated that "an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Heckler v. Community Health Services*, 467 U.S. 51, 60 n.12 (1984). The D.C. Circuit held in *Georgetown Hospital* that there is no exception to this rule against retroactive rulemaking for "curative rules." *Bowen v. Georgetown University Hospital*, 821 F.2d 750, 758 (D.C. Cir. 1987) ("both the express terms of the APA and the integrity of the rulemaking process demand that the corrected rule, like all other legislative rules, be prospective in effect only"). The D.C. Circuit has continued to adhere to that position. See, e.g.*, ICORE, Inc. v. FCC*, 985 F.2d 1075, 1080-81 (D.C. Cir. 1993) ("It seems apparent that the Court does not view "curative" rules as permissible under a statutory scheme that generally withholds authority for retroactive rulemaking."). We know of no contrary precedent. Retroactive application of the proposed rule to ban existing, lawfully owned property fails under these principles. The ATF simply may not engage in this retroactive rulemaking.

At a minimum, the reliance interests at issue here place a heavy burden on the ATF to explain fully and justify its change of its prior interpretation of the National Firearms Act. See *Fox Television*, 556 U.S. at 515 ("This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. *Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.*") (emphasis added). The agency has failed to do so here, stating merely the new rule adopts "a better legal and practical interpretation of 'function'" of the trigger. (Proposed Rule at 19). That failure to address fully its prior interpretations makes clear that the ATF's proposed rule is not entitled to

*Chevron* deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The Supreme Court's recent decision in *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016), is on point. There, the Court held that an agency's change in interpretation of statutory authority was not entitled to *Chevron* deference because the agency had failed to adequately explain its departure from its prior interpretation. As the Court stated, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars,* 136 S.Ct. at 2125. Yet, the Court stressed that "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." Id. at 2126, quoting *Fox Television Stations,* 556 U.S. at 515. "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." (Id.).

The proposed rule completely fails address the heavy reliance interests that came about as a direct result of the ATF's prior interpretations. The ATF estimates that there are as many as 520,000 bump stocks devices currently in possession (Proposed Rule at 33), with a value of up to $96,242,750. (Id. at 34). Yet, the ATF accords absolutely no recognition of or weight to the enormity of this reliance interest in deciding whether to change its interpretation. Rather, it merely cites these burdens in conducting a *cost-benefit* analysis under Executive Orders 12866, 13563, and 13771. Yet, that cost-benefit analysis is obviously not the same as assessing **reliance** interests. A cost-benefit mandate is intended to require the agency "to select regulatory approaches that maximize net benefits." (Preamble at 25). "Net benefits" are not the same thing as "reliance interests," particularly where, as here, a criminal statute (section 922(o)) is involved. As *Encino Motorcars* holds, that failure to address reliance interests indicates that the agency's action is "arbitrary and capricious" under 5 U.S.C. § 706, "[a]nd arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Encino Motorcars*, 136 S.Ct. at 2126. The reliance interests alone suggest that the ATF should not require the destruction of $96.2 million of lawfully acquired and legally owned private property. For all the foregoing reasons, the proposed rule will not survive judicial review. At a minimum, the ATF should modify the proposed rule to make clear that the rule will not apply to the possession of existing bump stocks already lawfully owned.

## B. THE PROPOSED RULE VIOLATES THE TAKINGS CLAUSE OF THE CONSTITUTION.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amendment 5. As explained in *Horne v. Dept. of Agriculture*, 135 S.Ct. 2419, 2426 (2015), the Clause "protects 'private property' without any distinction between different types," and thus includes personal property as well as real property. Under the Takings Clause, the government simply does not have the right to take property by declaring, in an *ipse dixit*, the property to be noxious or in the interest of public safety. In *Horne* the

Supreme Court held that there is a fundamental difference between a regulation that restricts only the use of private property and one that requires "physical surrender … and transfer of title." *Horne*, 135 S. Ct. at 2429. *Horne* squarely holds that the latter situation is a Takings that must be compensated. See also *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."). As detailed below, the ban on possession of existing property in the proposed rule is a total regulatory taking that must be compensated.

This duty to compensate may not be evaded by invoking the general police power to provide for the common good. In *Mugler v. Kansas*, 123 U.S. 623 (1887), the Supreme Court held that the State may ban the sale and manufacture of beer from a brewery. However, the case did not involve a seizure of the brewery itself. The Court made that clear in stating "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation *does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it*, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests." 123 U.S. at 668-69 (emphasis added).

These limits of *Mugler* were stressed in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), where the Supreme Court reversed a lower court's reading of *Mugler* as allowing a State to ban harmful or noxious private property without paying compensation. The Court stated:

> [T]he legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed." 505 U.S. at 1026 (emphasis added).

The proper test, the Court held, is:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. (Id. at 1027) (emphasis added).

See also *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 425 (1982) (accepting the lower court's holding that the regulation at issue was "within the State's police power," but holding that "[i]t is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid"); *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979) (holding there was no Taking because the Government did not "compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them").

The Proposed Rule does not even mention the Takings issue, much less this body of controlling Supreme Court precedent.  Here, an owner's possession of bump stocks and magazines were indisputably "interests" that were "part of his title to begin with." *Lucas*, 505 U.S. at 1027. Illegalizing such interests constitutes a "total regulatory taking" which must be compensated under the Court's "categorical rule."

Specifically, banning possession by lawful owner of his own property is "tantamount to a direction appropriation or ouster" under *Loretto v. Teleprompter Manhattan CATV Corp.* 458 U.S. 419, 426 (1982), because possession is an essential property interest.  The word "property" in the Takings Clause means "the group of rights inhering in [a] citizen's relation to [a] … thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945).  As one court of appeals has held, "it is sufficient" that the law "involves a direct interference with or disturbance of property rights," even if the government itself does not "directly appropriate the title, possession or use of the propert[y]." *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977).

The Taking at issue here is not supported by *Akins v. United States*, 892 Fed. Cl. 619 (2008).  In that case, the AFT ruled that a particular new invention, (the Akins accelerator) violated previously existing law on the manufacture of machineguns. In holding that this AFT ruling did not effect a Taking, the Court of Federal Claims ruled that the government may invoke its police power to enforce existing criminal law by banning the sale or possession of property that is in violation of that previously existing law. *Akins* did not involve a retroactive ban on a person's existing lawful possession of a machinegun.  Rather, *Akins* is in accord with the rule that "the Takings Clause does not prohibit the uncompensated seizure of evidence in a criminal investigation, or the uncompensated seizure and forfeiture of criminal contraband." *Spann v. Carter*, 648 Fed. Appx. 586 (6th Cir. 2016), citing *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006).  Existing bump stocks are lawful property under prior ATF rulings, not contraband. As stated in *Lucas* "the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed." 505 U.S. at 1026.

In summary, the ATF may not retroactively ban such existing bump stocks without express Congressional authorization (which it lacks) and it certainly may not impose such a ban without paying just compensation.

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
1332 Cape St. Claire Rd #342
Annapolis, MD 21409
mpennak@marylandshallissue.org

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Bump-Stock Type Device**</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-13313

**Tracking Number:** 1k2-92nd-nchj

### Document Information

**Date Posted:**
Apr 19, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Michael Hendricks

### Comment

One significant concern of this proposed rule is how the ATF is, in effect, creating an ex-post facto prohibition.

As stated in the summary, "The GCA makes it unlawful for any person to transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented. Consequently, current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the final rule."

Properly stated, bump stocks did not exist prior to the GCA's effective date. This nation's long-standing history asserts that activities or possessions are legal unless a law prohibits it, specifically BEFORE the possession is acquired or the activity is performed. The term "machine gun" was clearly defined in the GCA, and did not address how a bump stock functions. The summary asserts that the only way a bump stock could fall within the definition of machineguns is to change the definition AFTER the fact that they are possessed by many Americans, and are being legally manufactured today.

The ATF had to review the designs of bump stocks before they could be manufactured and sold. The ATF unequivocally ruled that they did not meet the criteria for prohibition under any existing rules or laws. We are now considering whether the ATF is going to "change it's mind," making the possession of goods which the ATF previously

(properly) deemed to be legal, now illegal. Law-abiding Americans purchase items for their firearms based upon the laws of this nation, and properly expect that the bureaucracies of this nation shall live by their word. This proposed rule will mandate that law-abiding citizens surrender or destroy legally acquired possessions (at the cost of hundreds of dollars each) without any recompense. This will result in the loss of millions of dollars of personal property, business inventory and manufacturing tools and training. Had the ATF not made what may now be considered a politically inconvenient determination, this loss would not be a topic of debate. Many who purchase a firearm determine what firearm and accessories to purchase as a whole package. Not only are Americans at risk of having to discard their currently legal bump stocks, but may have to purchase additional items to replace the bump stock, which would not have been the case had the ATF not previously determined that bump stocks were legal.

Four of my family members were in the crowd at the concert in Las Vegas. My cousin, her husband and her two adult children all witnessed people being shot during the incident, and were at risk of injury during the panic as people tried to escape the scene. Our entire extended family has discussed this incident, which has not changed how strongly we support the right to keep and bear arms. It is absolutely inappropriate to punish or restrict the rights of more than 300 million Americans based on the actions of a madman. We are considering restricting the rights of all Americans not on the basis of the acts of a couple hundred people. We are considering restricting the rights of all Americans on the basis of the actions of ONE person.

The right to keep and bear arms pre-existed this nation. We are constantly debating what the founding fathers meant by the 2nd Amendment, but too often ignore what THEY wrote about it and its implications. One has to simply read the Federalist Papers, the militia act of 1792, and contemporary State Constitutions to attain a clear understanding of their intentions. Their intention was to clarify that our government had the obligation to protect the right of each and every American to keep and bear arms equivalent to any criminal or invading force, be that force a tool of our own government, another government or individual or organized criminal element. 10 USC s 246 still defines the unorganized militia as all able-bodied males between the age of 17 and 45 who are not part of the National Guard or Naval Militia. On a daily basis, we are debating how much infringement upon this right we're willing to accept. Today, we are adding the idea of accepting an ex-post facto infringement.

Too many politicians state that the worst thing we can do is nothing. This is patently wrong. The worst thing we can do is the wrong thing, and restricting the rights of an entire nation based on the actions of a tiny number of lunatics is the wrong thing. It is even more wrong to declare a possession illegal after the ATF determined they were legal, and

permitted the manufacture, sale and possession of these items for years. If the ATF starts down this road, where does it stop? If we permit ex-post facto rules and laws for one item or activity, what item or activity is next?

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed
Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-14117

**Tracking Number:** 1k2-92fz-alcz

### Comment

I oppose this proposed rule wholeheartedly. It would be UNCONSTITUTIONAL under Article 1 Section 9 to pass this ex post facto legislation. "Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." Over the past several years, these devices and those similar to them have been examined by regulatory bodies including the ATF and found to not constitute the creation of a "machine gun." Overnight you would criminalize prior legal possession of these devices by thousands of law-abiding citizens.

This unconstitutional act has profound implications on future items beyond imagination that are currently utilized in our daily lives. I understand attempts to change future regulations, but stripping a previously law-abiding American citizen of an item which was previously purchased and held legally without any attempt at compensation fails even the most basic sniff test for fair treatment or reasonable law-making. I ask you to please find another avenue of action on this issue, if you are to decide they should no longer be produced and sold, so be it. While I and others will disagree with you, it does not criminalize prior law-abiding citizens or strip those citizens of items which have been legally acquired and responsibly used.

Apart from my objections above, a "bump-stock type device" does not constitute an automatic rifle when attached. It relies on a single pull of the trigger mechanism to initiate a firing cycle. They have no active moving parts, nor do they include any internal mechanisms that would allow a single trigger pull to sustain fire, nor do they fire at the rate of machine guns as defined in current legislation.

### Document Information

**Date Posted:**
Apr 19, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Gilbert Brown

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed
Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-3455

**Tracking Number:** 1k2-92c2-meoe

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Gordon Davis

### Comment

Article 1, Section 9, Clause 3 of the United States Constitution states:

"No Bill of Attainder or ex post facto Law shall be passed."

Fifth Amendment to the United States Constitution states:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

This proposal is a clear violation of Article 1, Section 9, Clause 3 of the United States Constitution as it qualifies as ex post facto and is a clear violation of the Fifth Amendment to the United States Constitution by depriving people of property without due process of law and without compensation.

Furthermore, the following statement is false:

"The Department has determined that there would not be a registration period for any device that would be classified as "machinegun" as a result of this rulemaking. The NFA provides that only the manufacturer, importer, or maker of a firearm may register it. (9) Accordingly, there is no means by which the possessor may register a firearm retroactively,

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000134

including a firearm that has been reclassified. Further, 18 U.S.C. 922(o) prohibits the possession of machineguns that were not lawfully possessed before the effective date of the statute. Accordingly, if the final rule is consistent with this NPRM, current possessors of bump-stock-type devices will be obligated to dispose of those devices. A final rule will provide specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o)."

The Treasury Secretary is within his power to open a 90 day amnesty period to allow for the registration of machineguns in accordance with the Hughes Amendment to the Firearm Owners Protection Act of 1986. As such, the Department of Justice could coordinate with the Department of the Treasury to allow for registration of "new" machineguns during said 90 day amnesty.

Allowing for grandfathering of existing bump stocks or opening a 90 day amnesty for machinegun registrations would allow this proposal to past Constitutional muster.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov


Your Voice in Federal Decision-Making

# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

See attached file(s)

## Attachments (19)

### Comment to ATF re Bumpstocks

**View Attachment:** PDF

### Form 1 Approval 9.5.1986_redacted

**View Attachment:** PDF

### 17-530_6537

**View Attachment:** PDF

### HistoricArmsLLC bump stock analysis (1)_3

**View Attachment:** PDF

### MSI Comment

**View Attachment:** PDF

### HistoricArmsLLC bump stock analysis (1)_1

**ID:** ATF-2018-0002-75886

**Tracking Number:** 1k2-93y1-pyr1

### Document Information

**Date Posted:**
Jul 3, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Stephen Stamboulieh

**Organization Name:**
Stamboulieh Law, PLLC

**View Attachment:** 

## HistoricArmsLLC bump stock analysis (1)_2

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_7

**View Attachment:** 

## March 15 Production 1-5

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_6

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_10

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_9

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_8

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_11

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_12

**View Attachment:** 

## March 15 production - full size version - reduced_Redacted_13

**View Attachment:** 

### March 15 production - full size version - reduced_Redacted_14

**View Attachment:** 

---

### March 15 production - full size version - reduced_Redacted_16

**View Attachment:** 

---

### March 15 production - full size version - reduced_Redacted_15

**View Attachment:** 

---



LEN SAVAGE, PRESIDENT

# Historic Arms L.L.C.

706-675-0287 Home
706-675-0818 Shop

Analysis and commentary regarding:  **DOCKET NUMBER: ATF 2017R-22**
&

# **BUMP-STOCK-TYPE-DEVICES**

ORIGIN

***Why was the bump stock invented in the first place?***   The answer is that they would not exist if the government had not effectively "banned" machineguns on May 19, 1986 with implementation of the Hughes amendment of the Firearms Owners Protection Act.

A "bump-stock-type-device" is a direct result of the government banning something. With the supply of citizen legal machineguns fixed, demand grew with the population and that has caused prices of these "transferable" machineguns to skyrocket in price.

Prices drove the market into looking for an alternative.  Simulating "full auto fire" with a multitude of products that claim to increase the rate of fire had a ready made market created by the government.

In most cases the product is more of a parlor trick than anything else.  You do not hear of any law enforcement agency or foreign military fielding them.

OPERATION

***How does a bump stock work?***  A bump stock can do NOTHING without the skill and coordination of the shooter.   A specific skill based shooting technique called "bump firing" must be utilized.

The United States Department of Justice on July 27, 2017 explained the operation of bump-stock-type-devices to US district courts as:

> **"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter.  Bump**

Page | 1

**firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21) complete document attached.*

All firearms have a recoil impulse because in order to propel a projectile out the barrel, an equal force in the opposite direction is also generated.   A semiautomatic firearm, due to its mechanical nature, has the ability to generate this recoil impulse every time the trigger is activated.

This cycle of mechanical events that start with the trigger activation and end with a new round in the chamber ready to begin again is the cycle rate or how fast the firearm can physically complete cycles (or rounds fired).

The fact is any semiautomatic AR-15 (or AK-47 for that matter) can fire as fast as a machinegun version.  Their cyclic rates are identical to the machinegun version.  Their essential operating mechanisms are identical, same ammo, same mags, same reciprocating mass.  The only small physical difference is the machineguns described have a mechanical lever that "automatically" starts the new cycle as soon as the previous cycle ends.

Some semiautomatic firearms can even fire faster than the full auto version because the machinegun version having some form of a rate reducing mechanism.

ALL semiautomatic firearms can be "bump fired" regardless of any "bump-type-stock-device" installed or not.  It is a matter of skill and coordination to find the "rhythm", or cyclic rate of the firearm at hand and the correct amount of counterforce to be applied and when to apply them.

The only "self acting and self regulating" force of a bump-type-stock-device is provided by the shooter and the firearm, none is provided by the stock.   Basketballs don't dribble automatically even if the skills of most the NBA players make it appear so.

A bump-type-stock-device allows a small amount of linear motion of the firearm frame, allowing for safe control of the firearm while utilizing the bump fire shooting technique. There is less risk of loss of control of the firearm when using bump-type-stock-device vs. using the shooting technique without one.

**Put bluntly, bump-stock-type-devices make using the bump fire shooting technique safer for the shooter and those around the shooter.**

ADMINISTRATIVE RECORD

Bill Akin seeking to fill a market need invented, patented, and then produced the Akin's Accelerator.  In his quest to simplify or make the bump fire shooting technique easier, though similar to a bump-stock-type-device it was different in two ways.

Page | 2

1.)  No required bump fire skills or technique to function.
2.) Reduced shooter input required to function (no coordination required).

The ATF initially agreed with Mr. Akin that indeed the trigger of the firearm was being activated with each shot.   Mr Akin after securing his patent went into business making the "Akins Accelerator" stock for the Ruger 10/22 rifle.

The .22 rim fire cartridge made the real skill in the Akins Accelerator the tuning process involved in adjusting the operating spring that regulated his device.   They were tricky to set up to work, (lots of trial and error), but once set up ran like a sewing machine.

When the ATF reclassified his product Mr. Akins sought judicial relief and took the ATF and DOJ to court over the issue.   The case went to the 11th circuit court of appeals.   The Department of Justice documented through court proceedings just how much "extensive legal analysis" was conducted by them on the subject of machineguns and bump-stock-type-devices.

Mr. Akin researched ways to salvage his patent and hopefully come up with a lawful replacement product that would pass ATF examination and classification.

I was a member of Mr. Akins legal team and my company later helped him research and develop his compliant replacement product.  20% of the DOJ cited ATF classification letters on "Bump-Stock-Type-Devices" are addressed to me.  I have no commercial interest in bump-stock-type devices other than the research and development completed.

The administrative record, such that it is, is VERY clear.

The basic premise of all current  ATF classification letters as well as court pleadings by ATF and DOJ to date are that a device not omit the required skill or the shooters required input in order to achieve "bump fire".

The Department of Justice on September 13, 2017 on why a bump-stock-type-device is NOT a machinegun:

> **"Because of the manual, skill based methods required to operate a bump fire device"** *(case3:16-cv-00243-RLY-MPB, Document 33, page 8) complete document attached.*

The above policy is based on logic and science and is therefore demonstrable with a simple scientific test.

ATF RULING 82-8 proves that DOJ knows that "grandfathering" a device when they had; 1.) Previously declared the device to be lawful, 2.) Then later declared the device to be a machinegun, as being perfectly lawful to possess if made before the ruling date. *Complete document attached.*

Page | 3

*Complete document attached.*

Furthermore on September 10, 2009, ATF experts were asked about the firearms "grandfathered" in ATF Ruling 82-8 under oath.  The ATF's official position is that the firearms are machineguns, do not require registration, nor do they require a tax be paid on them, and the ATF is aware they are in circulation *(approximately 50,000)*, but are no longer manufactured.  (US vs. One Historic Arms Model 54RCCS Case 1:09-CV-00192-GET).  *Relevant document page attached.*

The Department of Justice currently claims that an ordinary shoe string can be a machinegun if installed on a semiautomatic firearm.  There are documents dating from 1996, 2004, and 2007 from ATF on this issue.  ATF letter to Brian Blakely June 25, 2007:

> **"When the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun"**
> *Complete document attached.*

It is significant that the DOJ claims that both shoe strings and bump-stock-type-devices convert semiautomatic firearms into machineguns, yet has chosen NOT to regulate them in any way, let alone ban all shoe strings and demand their forfeiture, destruction, or ban further manufacture.

The documents prove that DOJ can indeed grandfather items that purportedly convert a semiautomatic firearm into a machinegun as they have with the shoe string issue.

BUMP-STOCK-TYPE-DEVICE CRIME

***Just how many crimes are committed using "Bump-Stock-Type-Devices" anyway?***
The only alleged use of a "bump-type-stock-device" during a crime was the Las Vegas shooting incident on October 1, 2017.

Both ATF and FBI were specifically asked if they had ANY records of a "bump-type-stock-device" being used in a crime on April 9, 2018 via a Freedom Of Information Act (FOIA) request.  *Complete document attached.*

To date neither ATF nor FBI will confirm ANY crime being committed (including the Oct 1, 2017 Las Vegas incident).  In fact ATF Firearms Technology did not even receive the firearms from the Oct. 1, 2017 shooting incident until April of this year.

No ATF "Report of Technical Examination" (ATF form 3311.2) has been released for any of the firearms used in the incident.   For all we know the firearms could have been a machinegun with a "bump-stock-type-device" installed to throw off unwanted attention from law enforcement as a ruse or decoy for reports of automatic gun fire.

Page | 4

There simply are no other known crimes committed with "bump-stock-type-devices".
No known military uses "bump-stock-type-devices, nor does any known law enforcement
agency.

THE NPRM ENFORCEMENT SCHEME FATALLY FLAWED

The NPRM does not address several serious issues.

1. The change in policy asks for a willing suspension of disbelief of basic science
   and physics.

2. The change in policy will put ATF experts at risk of being impeached as expert
   witnesses.

3. The summary of the NPRM is filled with demonstrably false or misleading
   statements that are disputed by DOJ's own experts at ATF.

ATF expert testimony in trials and in classification letters conflict factually with the
NPRM when it states on page 19:

**"Because these bump stock type devices allow multiple rounds to be fired when the
shooter maintains pressure on the extension ledge of the device, they are a
machinegun".**

The problem with that statement is that it is patently false.

Furthermore, it easily demonstrated as a false statement.

If that where all it took to make a bump-stock-type-device to function as the DOJ claims
a simple scientific test could be given to determine if the device is really self activating
and self regulating or whether there is coordinated skilled input from the shooter:

**….please demonstrate firing a bump type stock device equipped firearm using only
your trigger hand as described, using no skilled coordinated input from your other
hand.** *(It can't be done as it takes two hands, skill, and coordination in order to
function.)*

 No doubt such a requested demonstration would be part of any court proceedings should
this proposed rule be implemented and ultimately prosecuted.

One could point out the United States Department of Justice knows of this test, as they
certainly are familiar with the results of such a test:

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000140

**"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter.  Bump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21)Complete document attached.*

If such a device were truly self acting and self regulating as the Department of Justice now claims, then a bump-stock-type-device equipped firearm should fire as a machinegun with no coordinated skilled effort from any other body part (which is impossible).

**This same "coordinated input test" applied to an Akins Accelerator equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

**This same "coordinated input test" applied to the "shoe string" equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

The document control number of every ATF classification letter contains the identity of person drafting the communication.  Furthermore, a simple search for the "Correspondence  Approval and Clearance" (ATF form 9310.3A) associated with any bump stock letter assuring the item in question is not a firearm under the NFA and GCA will indentify every person involved in the classification process.  Under US v. Brady the Department of Justice is mandated to providing this information to any future defendant when they attempt to prosecute anyone on this policy.

The cost of this proposed rule will be the credibility of the ATF firearms expert trying to explain or defend its preposterous claims under cross examination during some current or future court case.

**The definition of the word arbitrary:**  *"Based on some random choice or personal whim, rather than any reason or system".*

THE SCOPE OF THE NPRM IS OVERLY BROAD DUE TO VAGUE LANGUAGE

The NPRM has descriptive language that is so vague it could be describing hundreds of thousands of pump shotgun in the US, making each a potential machinegun.  As there are several models of shotguns that operate precisely as stated on page (1) of the NPRM **"firing without additional physical manipulation of the trigger by the shooter"** (There were approximately 500,000 Model 37 pump shotguns made by Ithaca alone).

The vague language of the NPRM also describes every semiautomatic firearm made to date.  Because;

Page | 6

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000141

1.)  All semiautomatic firearms have the intrinsic ability to "bump fire" and are a type of device.

2.)  All semiautomatic firearms are by their very definition both a "self regulating", and a "self acting" mechanism.

Rate of fire is not regulated by the NFA or the GCA in any way.  DOJ knows that ALL semiautomatic firearms CAN fire as fast as a machinegun.  This is because a semiautomatic and a machinegun version of the same firearm have the same essential operating mechanism (other than a few small parts in the trigger assembly).

Bump-stock-type-devices were created as a direct result of government regulation.  They simply would not exist if the purchase price of so called "transferable" machineguns were not so expensive due to supply being fixed on May 19, 1986.

If the government really wanted bump-stock-type-devices to go away, and they claim they have the right to reconsider its previous interpretations, then the government would open the NFRTR to new transferable machineguns.

Nobody would bother with a bump-stock-type-devices and the government would know precisely where each new machinegun was.   922(o) " ….Or under the authority of". The government could choose to simply "authorize" the new registrations.

OR: The Attorney General could simply declare a general amnesty under the NFA any time he wishes to as long as they are not concurrent (must be separated by one calendar day).

DOJ has had the power to do both and neither would have required any proposed rule making.

Claims made by DOJ in the NPRM can only be described as deceptive; they are not supported by scientific facts or DOJ's own documents.

Len Savage
Historic Arms LLC
May 25, 2018

The documents are attached in the order they are referred to in the text.

Page | 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:16-cv-243-RLY-MPB |
| | ) |
| THOMAS E. BRANDON, Director, | ) |
| Bureau of Alcohol Tobacco Firearms | ) |
| and Explosives, | ) |
| | ) |
| Defendant. | ) |

**BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a firearms manufacturer

headquartered in Chandler, Indiana.    In this case, Freedom challenges a decision by the Bureau

of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that a device Freedom seeks to

manufacture and market is a "machinegun" as defined under the National Firearms Act, 26

U.S.C. § 5845(b).    ATF's decision is not arbitrary and capricious, but is supported by the

administrative record.    Based on the foregoing, ATF is entitled to summary judgment.

1

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a federally-licensed firearms manufacturer with its principle place of business in Chandler, Indiana.   (Docket No. 1 ¶ 2.)   Freedom designed an Electronic Reset Assist Device ("ERAD") for commercial sale to the general public.   (Docket No. 1 ¶ 9.)   The purpose of the ERAD, as described by Freedom, is to "improve firearm design" to assist the firearm user's "ability to continually pull the trigger in a rapid manner when a high rate of fire is desired."   (Administrative Record ("AR") 0025; Patent documents.)

The Firearms and Ammunition Technology Division ("FATD") of ATF, through its Firearms Technology Industry Services Branch ("FTISB"), provides expert technical support to ATF, other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general public.   ATF, Firearms Ammunition and Technology (2017), available at https://www.atf.gov/firearms/firearms-and-ammunition-technology.   FTISB is responsible for technical determinations concerning types of firearms approved for importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.   *Id.*

There is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture.   *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook 7.2.4 (2017), available at

---

[1] As discussed in Legal Background, Section D, the typical Fed. R. Civ. P. 56 standard and procedural structure does not apply in an APA review case.   Accordingly, the Defendant is not required to marshal evidence showing material issues of fact in dispute and the typical "Statement of Material Facts Not In Dispute" does not apply, but is offered for factual context. Specific sections of the Record are cited in the relevant portions of the Argument section.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000144

https://www.atf.gov/firearms/national-firearms-act-handbook.   ATF, however, encourages

firearms manufacturers to submit devices for classification before they are offered for sale to

ensure that the sale of such devices would not violate the Federal firearms laws and regulations.

*Id.*   ATF responds to classification requests with letter rulings that represent "the agency's

official position concerning the status of the firearms under Federal firearms laws."   *Id.* at

7.2.4.1.

>    A.    **The November 2015 Submission**

In November 2015, Freedom submitted a request to FTISB to examine a "trigger reset

device."   (AR 0002; 0005 – 17 (photos of submission).)   Freedom submitted a prototype of the

device, along with correspondence, and a Bushmaster Model XM15-E2S AR-type firearm to be

used in testing the prototype.   (*Id.*)

FTISB closely examined and tested the prototype.   (AR 0003.)   As part of the

examination, FTISB staff fired an AR-type rifle[2] with the prototype attached.   (*Id.*)   FTISB

staff noted two instances of machinegun function with the prototype device attached.   (*Id.*)

Specifically, FTISB found that trigger reset device, when attached to the test weapon, converted

it into a weapon that fired automatically – "firing more than one shot without manual reloading

by a single function of the trigger."   (*Id.*)   Based on the examination and testing conducted,

FTISB determined that the trigger reset device was a "machinegun" as defined in 26 U.S.C. §

5845(b), and notified Freedom in a letter dated March 23, 2016.   (AR 0002 – 4.)

>    B.    **The April 2016 Submission and October 27, 2016 Classification Decision**

---

[2] FTISB ended up using an ATF AR-type firearm to field test the prototype device because it
noted a deformity in the Bushmaster Model XM15-E2S AR-type firearm submitted by Freedom.
(AR 0003.)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000145

In April 2016, Freedom submitted a new sample prototype of its trigger reset assist device (referred to as the "ERAD").   (AR 0001.)   According to Freedom, the new sample prototype "is a total redesign" of the initial prototype.   (AR 0001.)   In the submission, Freedom included two sample prototypes of the device, along with 9-volt lithium batteries, and DVDs showing demonstrations of live firing and disassembly of the device.   (*Id.*)   Although Freedom did not explicitly request a classification from FTISB on its prototype, FTISB treated the submission as such because the letter referred back to the Agency's March 23, 2016, classification and stated that Freedom "worked very hard to correct" the issues identified in the March 23, 2016, letter.   (*Id.*)

On or about September 7, 2016, Freedom submitted a supplemental letter to FTISB in support of its April 2016 request for classification of the ERAD.   (AR 0018 – 24.)   The supplemental materials included a letter from Freedom's counsel setting forth Freedom's position that the ERAD should not be classified as a machinegun.   (AR 0018 – 24.)   The supplemental materials also included a sixteen minute demonstration video of the ERAD, and written materials, including Freedom's purported patent application for the ERAD.   (AR 0018; AR0025 – 46.)   In the video, Freedom states that the ERAD permits the shooter to discharge 450 to 500 rounds per minute.   (AR 0047.)

FTISB examined that submission and supplemental materials, including the demonstration video.   (AR 0070 – 71.)   Specifically, FTISB disassembled and examined the two sample ERAD prototypes.   (*Id.*)   FTISB examined each component part of the ERAD and its design features and characteristics.   (AR 0071 – 72.)   FTISB staff also conducted field testing of the ERAD by attaching it to and firing from commercially-available Remington and

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000146

PMC rifles and a Bushmaster Model XM15-E2S AR-type firearm. (AR 0072.) During the test-fire portion of the examination, staff observed machinegun function six times. (*Id.*) Specifically, FTISB personnel observed that a single pull of the ERAD trigger - designated as the "primary trigger" - initiated the firing sequence, which caused firing until the trigger finger was removed. (AR 0073.)

By letter dated October 27, 2016, FTISB issued a classification on Freedom's ERAD trigger system. (AR 0070 - 82.) In the eleven-page letter, FTISB described (1) the composition of the trigger and grip assembly, including its several constituent parts; (2) FTISB's process for examining and testing the ERAD trigger system; (3) its observations of the ERAD trigger system functionality and the firing effect that was produced when the ERAD was applied to a firearm (*i.e.*, the prototype sent by Freedom) and test-fired; and (4) a breakdown of the firing sequence with and without the ERAD, including several accompanying illustrations. (*Id.*)

FTISB concluded that the ERAD is properly classified as a machinegun. Significantly, FTISB found that "the firing sequence is initiated by a pull of the primary trigger and perpetuated *automatically* by shooter's constant pull and the reciprocating, battery-powered metal lobe repeatedly forcing the primary trigger forward." (AR 0073.) Thus, "[a] single pull of the trigger by the shooter therefore starts a firing sequence in which *semiautomatic* operation is made *automatic* by an electric motor." (*Id.*) FTISB found that because the shooter does not have to release the trigger for subsequent shots to be fired, the firing sequence is continually engaged as long as the shooter maintains constant rearward pressure (a pull) on the trigger and the motor continues to push the shooter's finger forward. (*Id.*) In other words, as long as the trigger is depressed, the firearm continues to fire until either the trigger finger is removed, the

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000147

firearm malfunctions, or it runs out of ammunition.   (*Id.*)

FTISB therefore concluded that the installation of an ERAD on a semiautomatic firearm causes that firearm to shoot automatically (through the automatic functioning made possible by the electric motor), more than one shot, by a single function (a single constant pull) of the trigger.  FTISB therefore properly concluded that the ERAD is classified as a combination of parts designed and intended for use in converting a semiautomatic rifle into a machinegun under 26 U.S.C. § 5845(b).   (AR at 79-80; 80-82.)

## THE COURT MUST STRIKE AND DISREGARD FREEDOM'S EXTRA-RECORD EVIDENCE

Freedom brings its claim under the Administrative Procedure Act, 5 U.S.C. § 704, challenging ATF's decision that Freedom's ERAD device be classified as a machinegun. (Docket No. 1; Docket No. 24.)   As discussed further below, review of the agency's decision under the APA is conducted using an arbitrary and capricious standard, and the Court's review is limited to the administrative record lodged by the agency.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court].").

In support of its motion for summary judgment, Freedom submitted the declarations of

6

Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No.

24-5).   Mr. Winge is one of the owners of Freedom Manufacturing.   (Pl.'s Ex. D, Docket No.

24-4.)   Several paragraphs of his declaration recount correspondence between FTISB and

Freedom, which is already contained in the Administrative Record and which is the best

evidence of its contents.   (See Pl.'s Ex. D, Docket No. 24-4, ¶¶ 18 – 20.)   The remaining

paragraphs contain Mr. Winge's opinions about the ERAD and his arguments regarding why the

ERAD should not be classified as a machinegun.   Mr. Winge's opinions are merely that – his

opinions – and are not part of the official record containing the information upon which ATF

relied in issuing its decision.   The Court should strike and disregard these opinions because the

Court's review is limited to the administrative record lodged by ATF.   Freedom did not

challenge or move to supplement that administrative record; therefore, it is complete.   *Highway

J Citizens Grp.,* 349 F.3d at 952; *see also United States Postal Serv. v. Gregory*, 534 U.S. 1, 10

(2001) ("a presumption of regularity attaches to [g]overnment agencies' actions."); *Spiller v.

Walker*, No. A-98-CA-255-SS, 2002 U.S. Dist. Lexis 13194, *26-27 (W.D. Tex. July 19, 2002)

("any legal conclusions and post-[decision] evidence within the declarations and argumentation

offered simply to contest the agencies' experts are not admissible.").

Richard Vasquez appears to be a witness who was retained by Freedom to provide his

expert opinion regarding the ERAD's classification.   (Pl.'s Ex. E, Docket No. 24-5.)   Expert

reports are generally not permitted in an APA review case.   *Vt. Yankee Nuclear Power Corp. v.

NRDC*, 435 U.S. 519, 555 (1978) ("the role of a court in reviewing the sufficiency of an

agency's consideration . . . is a limited one, limited both by the time at which the decision was

made and by the statute mandating review.").   Both the Supreme Court and the Seventh Circuit

7

have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Cronin v. USDA*, 919 F.2d 439, 443 (7th Cir. 1990) ("it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency."); *see also Airport Cmtys Coal. v. Graves*, 280 F. Supp.2d 1207, 1213 (W.D. Wash. 2003) (holding that APA was intended to preclude "Monday morning quarterbacking").

The Vasquez Declaration simply criticizes the agency's analysis, but under the APA the Court must allow the agency to rely on its own experts' opinions even if a plaintiff has other expert opinions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive."). Therefore, even if a so-called "expert" conclusion would contradict the agency's expert's conclusions, this Court can give it no force. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992).

Based on the foregoing, the Court must strike and disregard the Winge and Vasquez Declarations.

## LEGAL BACKGROUND

### A. The National Firearms Act and Gun Control Act

The National Firearms Act of 1934, 26 U.S.C. Chapter 53, and the Gun Control Act of 1968, 18 U.S.C. Chapter 44, comprise the relevant federal framework governing the firearm

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000150

market.   The Gun Control Act generally makes it unlawful for a person to transfer or possess a machinegun manufactured on or after May 19, 1986.   18 U.S.C. § 922(o).   ATF is charged with administering and enforcing both the National Firearms Act and the Gun Control Act.   28 C.F.R. § 0.130(a)(1)–(2).

18 U.S.C. § 922(a)(4) states that it shall be unlawful –

(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

Accordingly, with the limited exception of State, Federal and local law enforcement agencies, it is unlawful for any person to transfer or possess a machinegun manufactured on or after May 19, 1986.   Moreover, machineguns must be registered in the National Firearms Registration and Transfer Record and may only be transferred upon the approval of an application.   26 U.S.C. § 5812.   The National Firearms Act makes it unlawful to manufacture a machine gun in violation of its provisions.   26 U.S.C. § 5861(f).   Specifically, the National Firearms Act requires that a person shall obtain approval from ATF to make a National Firearms Act firearm, which includes a machinegun. 26 U.S.C. §§ 5922, 5845(a).   Similarly, licensed manufacturers are required to notify ATF by the end of the business day following manufacture of a NFA firearm.   26 U.S.C. § 5841(c), 27 CFR 479.103.

## B. The Definition of a Machinegun

The National Firearms Act, 26 U.S.C. § 5845(b), defines a machinegun[3] as

---

[3] Although more commonly spelled "machine gun," the applicable statutes use the spelling "machinegun."

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000151

any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

*See also* 27 C.F.R. § 478.11 (stating same).

The Gun Control Act incorporates the National Firearms Act's definition of machinegun and defines machinegun identically to the National Forearms Act.   18 U.S.C. § 922(a)(4). Both statutory definitions of a machinegun therefore include a combination of parts designed and intended for use in converting a weapon into a machinegun.   *Id.*   This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.   *See* ATF Rule 2006-2 (AR at 630-32.)

### C. The Administrative Procedure Act

The Administrative Procedure Act (APA) requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).   The agency's decisions

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000152

are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one," *id*. at 416.

Federal courts are particularly deferential towards the "'scientific determinations'" of the

agency, which are "presumed to be the product of agency expertise." *Franks v. Salazar*, 816

F.Supp.2d 49, 55 (D. D.C. 2011) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,

Inc.*, 462 U.S. 87, 103 (1983)).   The Court's review is confined to the administrative record,

subject to limited exceptions not at issue here.   *See Camp v. Pitts*, 411 U.S. 138, 142 (1973)

("[T]he focal point for judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court.").   *See also Sig Sauer, Inc. v. Jones*,

133 F. Supp. 3d 364, 371 (D.N.H. 2015), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d

598 (1st Cir. 2016) (recognizing that classification determinations "require expertise that is well

within the ATF's grasp" and that "its conclusions are entitled to substantial deference from a

reviewing court.") (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

### D. Summary Judgment in APA Cases

Under the APA, "courts are to decide, on the basis of the record the agency provides,

whether the action passes muster under the appropriate APA standard of review." *Fla. Power &

Light Co.*, 470 U.S. at 743-44.   Because extra-record evidence and trials are inappropriate in

APA cases, courts decide APA claims via summary judgment based on the administrative record

the agency compiles.   *Cronin*, 919 F.2d at 445 ("Because the plaintiffs are not entitled to present

evidence in court to challenge the [decision-maker's] decision . . . , there will never be an

evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000153

1994).

Although summary judgment is the procedural mechanism by which the Government is presenting its case, the limited role federal courts play in reviewing such administrative decisions means that the typical Federal Rule 56 summary judgment standard does not apply.  *See Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1228 (S.D. Ind. March 31, 2014) (Barker, J.) (citing *Cronin*, 919 F.2d at 445); *see also Sierra Club v. Mainella*, 459 F.Supp.2d 76, 89–90 (D. D.C. 2006).  Instead, in APA cases, "[t]he factfinding capacity of the district court is thus typically unnecessary to judicial review of agency factfinding . . . . [C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review."  *Florida Power & Light Co.*, 470 U.S. at 744–74.

## ARGUMENT

Plaintiff raises several challenges to FTISB's classification decision.  As discussed below, FTISB conducted a thorough examination of the ERAD, and fully disclosed the findings supporting its decision.  FTISB's decision was not arbitrary and capricious, but is supported by the facts as presented in the administrative record, and is a reasonable interpretation of the statute.  Defendant is entitled to judgment in its favor on all of the Plaintiff's claims.

### A. ATF's Decision Is Not Arbitrary and Capricious.

A machinegun is defined in part as any weapon that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  The term also includes any "combination of parts designed and intended, for use in converting a weapon into a machinegun."  *Id.*  In the definition of machinegun, neither the National

12

Firearms Act nor the Gun Control Act further define the phrase "single function of the trigger."

The test firing of Plaintiff's prototype—an AR-15 semi-automatic rifle (Bushmaster Model

XMI150E2S) with an integrated ERAD grip—demonstrated that, once the grip button was pulled

(activating the motor) concurrent with constant rearward pressure being applied to the trigger

extension (which Plaintiffs refer to as the "reset bar"), the weapon fired more than one shot

without manual reloading and without any additional action on the shooter's part.   Indeed, the

weapon fired continuously until the shooter stopped applying rearward pressure to the trigger

extension, or the ERAD's ammunition supply was exhausted.   (AR at 79, 47 (demonstration

video).)   Additionally, when equipped with the ERAD, the weapon fired at a very high rate of

speed, discharging up to 500 rounds per minute.   (AR 0047.)   Thus, the nature and mechanics

of the ERAD support FTISB's finding that it converted the semiautomatic firearm to a

machinegun.

FTISB's conclusion is consistent with the National Firearm's Act's legislative history, in

which the drafters equated "single function of the trigger" with "single pull of the trigger."   *See*

National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No.

9066, 73rd Cong., 2nd Sess., at 40 (1934) ("Mr. Frederick.[ ] The distinguishing feature of a

machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any

ammunition in the belt or in the magazine.   Other guns require a separate pull of the trigger for

every shot fired, and such guns are not properly designated as machine guns.   A gun, however,

which is capable of firing more than one shot by a single pull of the trigger, a single function of

the trigger, is properly regarded, in my opinion, as a machine gun."); *see also* George C. Nonte,

Jr., Firearms Encyclopedia 13 (1973) (the term "automatic" is defined to include "any firearm in

13

which a single pull and continuous pressure upon the trigger (or other firing device) will produce

rapid discharge of successive shots so long as ammunition remains in the magazine or feed

device – in other words, a machinegun").

FTISB's decision is also consistent with the ordinary meaning of the term "function,"

which includes "any of a group of related actions contributing to a larger action."   Webster's

Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College

Edition, 297 (1984) (a synonym of function is "act").   Here, the action, or act, is pulling the

trigger, which leads to the automatic firing.

Courts have also interpreted "function" as the action of pulling the trigger.   *See Staples

v. United States*, 511 U.S. 600, 600 (1994) ("The National Firearms Act criminalizes possession

of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which

is defined as a weapon that automatically fires more than one shot with a single pull of the

trigger, § 5845(b)."); *see also id*. at 602 n.1 ("As used here, the terms 'automatic' and 'fully

automatic' refer to a weapon that fires repeatedly with a single pull of the trigger.   That is, once

its trigger is depressed, the weapon will automatically continue to fire until its trigger is released

or the ammunition is exhausted.   Such weapons are 'machineguns' within the meaning of the

Act.").

In *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit

held that a "minigun" was a machinegun even though it was "activated by means of an electronic

on-off switch rather than a more traditional mechanical trigger."   Despite Fleischli's arguments

that the minigun was not a machinegun because it was not fired by pulling a traditional trigger,

but rather was fired using an electronic switch, the court found to the contrary:   "Fleischli's

14

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000156

electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun as defined in the National Firearms Act." *Id.* (superseded by statute on other grounds); *see also United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (rejecting defendant's argument that because he had constructed a weapon with two triggers, it would not fire by a single function of the trigger, finding "it is undisputed that the shooter could, by fully pulling the trigger, and it only, at the point of maximum leverage, obtain automation with a single trigger function. We are satisfied the gun was a machine gun within the statutory definition both in law and fact.")

Similarly here, the ERAD is a component that, when attached to a rifle, causes the rifle to function automatically. The ERAD allows the firing sequence to be initiated by a single pull of the primary trigger, which is continually engaged as long as the shooter maintains rearward pressure on the trigger and the motor continues to push the shooter's finger forward. (AR 0073; 79-80.) Because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun. ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

### B. ATF's Classification is Consistent with Public Policy.

Because of their rapid rate of fire, machineguns have long been considered inherently dangerous and are therefore strictly regulated and generally unlawful to possess. *See* 18 U.S.C. § 922(o); *United States v. Brock*, 724 F.3d 817, 824 (7th Cir. 2013) ("Congress has grouped together sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for

15

stringent restrictions on possession and strict registration requirements for those that can be possessed lawfully."); *United States v. Brazeau*, 237 F.3d 842, 845 (7th Cir. 2001) ("The point is that most firearms do not have to be registered-only those that Congress found to be inherently dangerous."); *United States v. Kruszewski*, No. 91-0031P, 1991 WL 268684, at *1 (N.D. Ind. Dec. 10, 1991) ("The categories of firearms covered by U.S.C. Title 26 include only particularly dangerous weapons such as machineguns . . . . In *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), the Supreme Court discussed a machinegun (M-16), and recognized a "limitation on the right to keep and carry arms" that includes "dangerous and unusual weapons." *See also United States v. Spires*, 755 F.Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons, as opposed to firearms in general, are extremely dangerous and serve virtually no purpose other than furtherance of illegal activity.").

The device at issue in this case – the ERAD grip – enables a firearm to produce automatic fire with a single pull of the trigger, and therefore makes an otherwise semiautomatic firearm into one of the "dangerous and unusual weapons" recognized by the *Heller* court.. A rifle with the ERAD will continue to fire automatically once the trigger is pulled and remains depressed, with no further action by the shooter required.   The widely-available Bushmaster Model XMI150E2S fires at a rate of one shot per trigger pull and up to 120 rounds per minute.[4]   When

---

[4] Although there are no official documents establishing a maximum firing rate, it is thought that 120 rounds per minute would be a ceiling. Obviously, the rate of fire depends on how fast the shooter can pull and release the trigger. The Department of the Army has published 45 rounds per minute as the maximum effective rate of fire for AR-type weapons, meaning the number of shots that allow the shooter to effectively engage the intended target. *See* Department of the Army, Field Manual (FM) 3-22.9, Rifle Marksmanship M16-/M4-Series Weapons, Ch. 2-1 (Characteristics of M16-/M4-Series Weapons), Aug. 2008, available at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0ahUKEwixkfTIrPzTAhUKwiYKHf9iA30QFggnMAA&url=http%3A%2F%2Fusacac.army.m

16

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000158

the ERAD device is attached to it, however, the same rifle is capable of firing at a rate of up to

500 rounds per minute.   (AR 0047.)   This unhindered automatic firing capability is the very

danger that the National Firearms Act was intended to protect against.   *See* 149 Cong. Rec.

H2944-02, H2950 (Apr. 9, 2003) ("these weapons … are inherently dangerous"); *United States

v. Newman*, 134 F.3d 373 (6th Cir. Jan. 21, 1998) (unpublished) ("Although the National

Firearms Act is ostensibly a revenue-generating statute enacted under Congress's taxation power,

it is clearly designed to regulate the manufacture, transfer, and possession of dangerous weapons.

Although the means by which Congress advanced its objectives are somewhat roundabout, close

analysis of the relevant provisions reveals an unmistakable intent to prohibit possession of any

machine gun the manufacture or importation of which was not explicitly authorized by the

Bureau of Alcohol, Tobacco, and Firearms.").   Nor is such easy transformation to an automatic

firearm consistent with the prohibition imposed by section 922(o) of the Gun Control Act.   *See

United States v. Haney*, 264 F.3d 1161, 1168 (10th Cir. 2001) ("banning possession of post 1986

machine guns is an essential part of the federal scheme to regulate interstate commerce in

dangerous weapons.").   Accordingly, ATF's assessment of the functionality of the ERAD grip,

including its ability to convert a firearm into an automatic weapon, support ATF's finding that

the ERAD is properly classified as a machinegun.

### C. Freedom's "Reset Bar" Terminology Does Not Alter the Outcome

Freedom argues that FTISB's analysis is flawed because the ERAD's "reset bar" is not a

"trigger."   Freedom specifically claims that, "the trigger finger reset bar is not the trigger, nor

---

il%2Fsites%2Fdefault%2Ffiles%2Fmisc%2Fdoctrine%2FCDG%2Fcdg_resources%2Fmanuals
%2Ffm%2Ffm3_22x9.pdf&usg=AFQjCNEzIuwG-XuAHAhI5HSuun3SGVrZxg&sig2=5AF-
YguyuZCKe4rELoibbQ.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000159

can it activate the firing sequence.   Only the shooter's conscious and deliberate pull of the reset

bar that subsequently engages the trigger that causes the weapon to fire and the ERAD cannot be

made to function any other way."   (Docket No. 24 at 8.)   To this end, Freedom admits it has

created a device that incorporates the traditional firearm trigger as another intermediate

component in the firing mechanism.

Nevertheless, Freedom's position has been rejected by ATF before, and this rejection has

been upheld in court.   As discussed above, in *United States v. Fleischli*, 305 F.3d 643 (7th Cir.

2002), the Seventh Circuit rejected the appellant's argument that an electronic switch did not

meet the traditional definition of a trigger, holding as follows:

> This is a puerile argument, based on hyper-technical adherence to literalism.   We
> are not surprised to learn that Fleischli is not the first defendant to make such a
> brazen argument, although he appears to be the first to do so in this circuit.   We
> join our sister circuits in holding that a trigger is a mechanism used to initiate a
> firing sequence.   *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992)
> (commonsense understanding of trigger is mechanism used to initiate firing
> sequence); *United States v. Evans*, 978 F.2d 1112, 1113–14 n. 2 (9th Cir.1992),
> *cert. denied*, 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (trigger is
> anything that releases the bolt to cause the weapon to fire).   Fleischli's definition
> "would lead to the absurd result of enabling persons to avoid the NFA simply by
> using weapons that employ a button or switch mechanism for firing."   *Evans*, 978
> F.2d at 1113–14 n. 2.   The dictionary definition of "trigger" includes both the
> traditional ("a small projecting tongue in a firearm that, when pressed by the
> finger, actuates the mechanism that discharges the weapon") and the more general
> ("anything, as an act or event, that serves as a stimulus and initiates or precipitates
> a reaction or series of reactions.").   *See* Webster's Unabridged Dictionary Of The
> English Language (2001).   Fleischli's electronic switch served to initiate the
> firing sequence and the minigun continued to fire until the switch was turned off
> or the ammunition was exhausted.   The minigun was therefore a machine gun as
> defined in the National Firearms Act.

*Id.* at 655–56.

Similarly, in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006), the Sixth Circuit

opined on the definition of a "trigger" under the National Firearms Act.   There, Carter appealed

18

a conviction for illegal possession of a machine gun and other parts designed or intended for use in converting a weapon into a machinegun. *Id.* at 660. Carter argued that the jury instruction on the definition of "trigger" was faulty because the indictment "did not mention a trigger mechanism among the parts he was alleged to have possessed" and thus the indictment failed to state a charge pursuant to the Federal Rule of Criminal Procedure 7(c)(1) because "the definition of 'machinegun' given at 26 U.S.C. § 5845 specifically includes a trigger." *Id.* at 661. According to the testifying expert, the weapon was complete except for a trigger mechanism. Thus "[a]fter inserting a magazine with three rounds of ammunition, he said, he was able to make the gun fire all three rounds consecutively by pulling the bolt back and releasing it by hand." *Id.* at 661-62. The court held that, even in the absence of a traditional trigger, the weapon fell within the definition of a "machinegun."

> The reasoning adopted by other circuits, as well as simple logic, compels the conclusion that the district court's instruction was proper and not an abuse of discretion. A trigger is generally "anything, as an act or event, that serves as a stimulus and initiates or precipitates a reaction." Webster's Unabridged Dictionary 2021 (2nd ed.1997). Within the realm of firearms, it is commonly understood as "a small projecting tongue in a firearm that, when pressed by the finger, actuates the mechanism that discharges the weapon." *Id.* However, the latter definition is obviously a context-specific articulation of the former. According to the testimony of the government's expert, the manipulation of his hands on the assembled weapon initiated a reaction, namely the firing of the gun and two automatic successive firings. This manual manipulation constituted a trigger for purposes of the weapon's operation. The district court's "trigger" instruction to the jury was not an abuse of discretion.

*Id.* at 665.

Finally, in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), the defendant modified a semiautomatic rifle by adding an electrically operated trigger mechanism, which operated as follows:

19

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000161

> When an added switch behind the original trigger was pulled, it supplied electrical
> power to a motor connected to the bottom of a fishing reel that had been placed
> inside the weapon's trigger guard; the motor caused the reel to rotate; and that
> rotation caused the original trigger to function in rapid succession. The weapon
> would fire until either the shooter released the switch or the loaded ammunition
> was expended.

*Id.* at 744.

An ATF expert testified that a true trigger activating devices, although giving the
impression of functioning as a machinegun, are not classified as machineguns because the
shooter still has to separately pull the trigger each time he/she fires the gun by manually
operating a lever, crank, or the like.   To this end, the court stated:

> We reject Camp's contention that the switch on . . . his firearm was a legal
> "trigger activator".   As discussed, those activators described by the ATF Agent
> require a user to separately pull the activator each time the weapon is fired.
> Camp's weapon, however, required only one action – pulling the switch he
> installed – to fire multiple shots.

*Camp*, 343 F.3d at 745.

Similarly here, even though Freedom refers to its ERAD as a "trigger reset assistance
device," a firearm fitted with the ERAD does not require separate, mechanical pulls of the trigger
(*i.e.*, pull and release) to discharge more than a single round.   The trigger is moving at such a
rapid rate that the shooter's finger does not pull the trigger each time to fire each shot, but
instead pulls the trigger once and then remains stationary, resisting forward pressure, as the
motor causes the weapon to function automatically, and continue to fire rounds.   It is undisputed
that when the shooter's finger remains connected to the "reset bar," and an electric motor is
activated, the "reset bar" functions as a trigger in and of itself, and controls the pace of the firing
sequence.   The only action required by the shooter is that of continued rearward pressure.   To
this end, the ERAD is capable of firing at a rate of 500 rounds per minute and does not require

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000162

any additional act by the shooter after the motor is turned on and the shooter pulls the "reset bar"

(or what FTISB describes as the "primary trigger") once without releasing pressure.   (AR 0047.)

Accordingly, in spite of its branding and terminology, the ERAD meets the

definition of a machinegun.

### D. The ERAD Is Not The Same As "Bump Fire" or "Slide Fire" Stock.

Freedom also argues that its ERAD is similar to "bump fire" or "slide fire" stock, which

has been found not to be machinegun technology.   (Pl.'s Br. at 24 (citing AR at 231 and Pl.'s

Exhibits A, B, and C, Docket Nos. 24-1, 24-2, 24-3).)   "Bump firing" is the process of using the

recoil of a semi-automatic firearm to fire in rapid succession, simulating the effect of an

automatic firearm when performed with a high level of skill and precision by the shooter.   Bump

firing requires the shooter to manually and simultaneously pull and push the firearm in order for

it to continue firing.   (See Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket No. 24-3 at

4-5.)   The shooter must use both hands to pull the trigger rearward - and the other to push the

firearm forward to counteract the recoil - to fire in rapid succession.   While the shooter receives

an assist from the natural backfire of the weapon to accelerate subsequent discharge, the rapid

fire sequence in bump firing is contingent on shooter input, rather than mechanical input, and

thus cannot shoot "automatically."   (Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket

No. 24-3 at 4-5.)

Conversely, the ERAD does not require any such skill or input from the shooter.   A rifle

equipped with the ERAD will utilize a battery-powered motor to continue to fire automatically

once the trigger is pulled and remains depressed, with no other action by the shooter required.

Indeed, in its classification letter, FTISB noted that the AR-type trigger functions as a

21

"secondary trigger" in that "it merely becomes a part of the firing sequence."   (AR at 0071.)

Freedom argues that the ERAD allows the shooter to make a "conscious decision to apply or not

apply rearward pressure to fire the weapon by initiating a trigger function," (AR at 47

(demonstration video)).   This argument is technically correct to the extent the shooter may make

a purposeful choice to cease applying rearward pressure to the reset bar/primary trigger.   In fact,

this is true of any machinegun—a shooter makes a conscious decision to pull and release the

trigger.   What is misleading, however, is any assertion that the shooter may make a conscious

choice to pull and release the trigger for *each individual, subsequent shot*.   In accepting this

argument, the shooter would presumably be able to control the precise number of shots he

intends to fire.   For example, he could intend to fire a precise number of rounds of ammunition,

such as 263 rounds, and actually expel that exact number of rounds.   With the ERAD engaged,

however, the number of rounds fired is the result of automatic functioning so long as the shooter

is applying pressure on the "reset bar," and therefore the number of rounds expelled cannot

accurately be characterized as conscious or deliberate.   (AR 0047; 0073.)

In contrast, bump firing requires the shooter to manually pull and push the firearm in

order for it to continue firing.   Generally, the shooter must use both hands—one to push forward

and the other to pull rearward—to fire in rapid succession.   While the shooter receives an assist

from the natural recoil of the weapon to accelerate subsequent discharge, the rapid fire sequence

in bump firing is contingent on shooter input in pushing the weapon forward, rather than

mechanical input, and is thus not an automatic function of the weapon.

Freedom also argues that FTISB's decision regarding the ERAD is inconsistent with its

decision regarding the Akins Accelerator, which was an accessory attached to firearm that

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000164

accelerated rate of fire.  *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009).   On the

contrary, ATF's decision is entirely consistent with its decision regarding the Akins Accelerator

and ATF Ruling 2006-2.[5]

      To operate the Akins Accelerator, the shooter pulled the trigger one time, initiating an

automatic firing sequence, which in turn caused the rifle to recoil within the stock, permitting the

trigger to lose contact with the finger and manually reset (move forward).  *Akins*, 312 F. App'x

at 199.   Springs then forced the rifle forward in the stock, forcing the trigger against the finger,

which caused the weapon to discharge the ammunition until the shooter released the constant

pull or the ammunition is exhausted.   Put another way, the recoil and the spring-powered device

caused the firearm to cycle back and forth, impacting the trigger finger, which remained

rearward in a constant pull, without further input by the shooter, thereby creating an automatic

firing effect.  *Id.*   The advertised rate of fire for a weapon with the Akins Accelerator was 650

rounds per minute.  *Id.*

      The Eleventh Circuit found that ATF properly classified the Akins Accelerator as a

machinegun because:

> [a] machinegun is a weapon that fires "automatically more than one shot, without
> manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).
> The interpretation by the Bureau that the phrase "single function of the trigger"
> means a "single pull of the trigger" is consonant with the statute and its legislative
> history.  After a single application of the trigger by a gunman, the Accelerator
> uses its internal spring and the force of recoil to fire continuously the rifle cradled
> inside until the gunman releases the trigger or the ammunition is exhausted.
> Based on the operation of the Accelerator, the Bureau had authority to "reconsider
> and rectify" what it considered to be a classification error.   That decision was not

---

[5] Initially ATF classified the Akins Accelerator as a non-machinegun, but after a subsequent test
fire, it was determined the Akins Accelerator converts a semiautomatic rifle into a weapon
capable of firing automatically by a single function of the trigger and was therefore in fact a
machinegun.  Thus, ATF overruled its earlier classification.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000165

arbitrary and capricious.

*Id.* at 200.

Pursuant to ATF Ruling 2006-2, any device that is truly analogous to the Akins Accelerator - *i.e.*, a device that allows a weapon to fire automatically when the shooter pulls the trigger - is properly classified as a machinegun.   (AR at 630-32.)   Specifically, the Rule provides that a firearm with the following functionality constitutes a machinegun:

> A shooter pulls the trigger which causes the firearm to discharge.   As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.   The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed.   Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger.   Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.   The assembled device is advertised to fire approximately 650 rounds per minute. Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

(AR at 631.)

Like the Akins Accelerator, the ERAD requires a single pull of the trigger to activate the firing sequence, which continues until the shooter's finger is released, or the firearm depletes its ammunition supply.   (AR at 354-68, 395-97.)   Because the ERAD is a part designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.   Thus, ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

With regard to Plaintiff's Exhibit B (Docket No. 24-3), the 3MR reset trigger device submitted to ATF was an internal mechanism, which operated to push the shooter's finger

24

forward.   It does not run on a motor, and although the mechanism assists in manually resetting

the trigger, the shooter is still required to release the trigger to fully reset the trigger.   Thus,

during inspection, ATF determined that the weapon could not be fired automatically.   The item

was tested by seven individuals at ATF prior to the classification, and no individual was able to

generate automatic fire.   Because the reset trigger required a release of the trigger and

subsequent pull before another round was expelled, the 3MR was not classified as a machinegun.

Based on the foregoing, FTISB has not rendered inconsistent decisions, but has inspected

and analyzed each prototype or device presented to it by Freedom for classification, and has

issued its decisions based on the unique characteristics of each.   Accordingly, ATF's

classification of the ERAD device as a machinegun is not arbitrary, capricious, an abuse of

discretion, or otherwise inconsistent with the applicable law.

## CONCLUSION

Based on the foregoing, the Court must enter judgment in favor of the Bureau of Alcohol,

Tobacco, Firearms, and Explosives as to all of Plaintiff's claims against it.

Respectfully submitted,


JOSH J. MINKLER
United States Attorney

By:   *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney


25

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000167

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing upon the Plaintiff herein by electronically filing a copy thereof through the Court's CM/ECF system, which will transmit a copy electronically to the following on the 27th day of July, 2017:

> Brent R. Weil
> KIGHTLINGER & GRAY, LLP
> bweil@k-glaw.com
>
> Timothy R. Rudd
> Scott Braum
> SCOTT L. BRAUM & ASSOCIATES, LTD.
> trr@braumlaw.com

> _s/ Shelese Woods_
> Shelese Woods
> Assistant United States Attorney
> 10 West Market Street
> Suite 2100
> Indianapolis, Indiana 46204

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000168



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg , West Virginia 25405*          903050:MSK
*www.atf.gov*                                3311/2011-502

MAY 2 5 2011

Mr. Len Savage
Historic Arms, LLC
1486 Cherry Road
Franklin, Georgia  30217

Dear Mr. Savage:

This is in reference to your sample, as well as accompanying correspondence, which was submitted to the Firearms Technology Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  You have submitted this item, consisting of a Chinese, Type 56 (SKS) rifle and a stock of your own manufacture, with a request for classification under the National Firearms Act (NFA).

As you know, the NFA, **26 U.S.C. § 5845(b)**, defines the term **"machinegun"** as follows:

*…any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*

Further, **ATF Ruling 2006-2** describes a device that is designed and intended to accelerate the rate of fire of a semiautomatic weapon and classifies it as follows:

*Held, a device (consisting of a block replacing the original manufacturer's V-Block of a Ruger 10/22 rifle with two attached rods approximately ¼ inch in diameter and approximately 6 inches in length; a second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, machined to allow the two guide rods of the first block to pass through; the second block supporting the guide rods and attached to the stock; using ¼ inch rods; metal washers; rubber and metal bushings; two collars with set screws; one coiled spring; C-clamps; a split ring; the*

Mr. Len Savage

*two blocks assembled together with the composite stock) that is designed to attach to a firearm
and, when activated by a single pull of the trigger, initiates an automatic firing cycle that
continues until either the finger is released or the ammunition supply is exhausted, is a
machinegun under the NFA, 26 U.S.C. 5845(b), and the ...[Gun Control Act: GCA]... 18 U.S.C.
921(a)(23).*

The submitted device (also see enclosed photos) incorporates the following features or
characteristics:

- A metal block which secures the SKS trigger mechanism to the remainder of the weapon
  (a function formerly accomplished by the weapons factory stock). A metal rod is attached
  and protrudes from the rear section of this metal block. This rod rides within a bushing
  inletted into the rear portion of your "ALM" stock.
- A second metal block which has been machined to allow the three guide rods located in
  the front portion of your stock to pass through it. This component serves as a support for
  the front portion of the SKS rifle and as an attachment to the modified stock.
- A forward hand guard/gripping surface which is attached to the bottom portion of the
  second metal block noted above.
- Lack of any operating springs, bands, or other devices which would permit automatic
  firing.

Your ALM stock is designed to allow the SKS rifle mounted within it to reciprocate back and
forth in a linear motion. The absence of an accelerator spring or similar component in the
submitted device prevents the device from operating automatically as described in ATF Ruling
2006-2.  When operated, forward pressure must be applied to the above noted forward hand-
guard/gripping surface with the support hand, bringing the receiver assembly forward to a point
where the trigger can be pulled by the firing hand.  If sufficient forward pressure is not applied to
the hand guard with the support hand, the rifle can be fired in a conventional semiautomatic
manner since the reciprocation of the receiver assembly is eliminated.

The FTB live-fire testing of the submitted device indicates that if, as a shot is fired and a
*sufficient* amount of pressure is applied to the hand guard/gripping surface with the shooter's
support hand, the SKS rifle assembly will come forward until the trigger re-contacts the
shooter's stationary firing-hand trigger finger, allowing a subsequent shot to be fired.  In this
manner, the shooter pulls the receiver assembly forward to fire each shot, each shot being fired
by a single function of the trigger.

Since your device does not initiate an automatic firing cycle by a single function of the trigger,
FTB finds that it is NOT a machinegun under the NFA, 26 U.S.C. 5845(b), or the GCA, 18
U.S.C. 921(a)(23).

-3-

Mr. Len Savage

Please note that this classification is based on the item as submitted. Any changes to its design features or characteristics will void this classification. Moreover, we caution that the addition of an accelerator spring or any other non-manual source of energy which allows this device to operate automatically as described in Ruling 2006-2 will result in the manufacture of a machinegun as defined in the NFA, 26 U.S.C. 5845(b).

Please provide our Branch with a FedEx account number so that we may return this item to you.

We thank you for your inquiry and trust that the foregoing has been responsive to your evaluation request.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure

-4-

Mr. Len Savage

Submitted device assembled:



-5-

Mr. Len Savage

View of the three forward guide rods:



-6-

Mr. Len Savage

Metal block which secures SKS rifle and rides over the guide rails pictured above:



-7-

Mr. Len Savage

Metal block which secures trigger mechanism and metal rod which rides in bushing located in rear portion of the ALM stock:



Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000175

-8-

Mr. Len Savage



Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000176



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

Washington, DC 20226
www.atf.gov

903050:MMK
3311/2011-624

Mr. Len Savage
Historic Arms, LLC
1486 Cherry Road
Franklin, Georgia  30217

NOV 2 3 2011

Dear Mr. Savage:

This refers to your correspondence to the Firearms Technology Branch (FTB), Bureau of
Alcohol, Tobacco and Firearms (ATF), with an accompanying sample "ASFS Stock" and
magazine, requesting an evaluation in accordance 18 U.S.C. 921(a)(3) and 26 U.S.C. 5845(a).
As explained below, the evaluation of your submitted ASFS Stock (photo enclosed) finds that it
is a combination of parts designed and intended to convert a firearm into a machinegun.

The examination conducted by FTB noted that the stock consisted of a large main outer shell, a
rear shoulder pad, a right-side dust cover, two vertical grip assemblies, guide-rail mounting
blocks, guide rails, and a retractable trigger cross-pin.  The main shell and dust cover encase the
firearm (a semiautomatic WASR-10 type) and guide-rail mounting blocks.  The shell also
incorporates an extension which covers the encased firearm's trigger and provides attachment for
the retractable trigger cross-pin.  The mounting blocks are attached to the interior of the main
shell, and the guide rails are attached, connecting the encased firearm to the outer shell at both
the rear and near the firearm's midpoint.  One vertical grip is attached to the bottom of the main
shell at the shell's forward end, and the other vertical grip is attached to the bottom of the
forward end of the firearm's barrel.  When assembled onto the firearm, the cross pin engages the
enclosed WASR-10 trigger, and the forward vertical grip becomes the **trigger** used to initiate the
firing sequence.

The firing sequence is initiated by the shooter pushing forward on the forward-most vertical grip
while the shooter's other hand maintains control of the device by holding the rearmost vertical
grip.  The application of forward pressure forced the encased firearm to move forward against
the cross pin; the weapon fired, the recoiling energy pushed the encased firearm rearward inside
the stock, the trigger reset and the continuous forward pressure of the shooter drove the encased
firearm back onto the cross pin so that the weapon again fired.  The firing sequence continued
until pressure was removed or the ammunition source was exhausted.

During the test firing, when a magazine of five rounds was inserted, the device fired all five
rounds automatically without manual reloading by a single function of the trigger.  Additionally,
after loading a second magazine with two rounds, the device fired automatically when the device
was simply tilted forward at an angle.

-2-

Mr. Len Savage

The weight of the encased firearm drove its trigger against the cross pin and initiated the firing sequence, causing both rounds to be fired without manual reloading by a single function of the triggering mechanism.

A noted difference between this submission and your previously submitted ALM Stock, which was not classified as a "firearm," is the length of the area shrouding the trigger and the addition of a cross pin designed to engage an encased firearm's trigger. Thus configured, the ASFS Stock is designed to convert the recoiling forces generated from the action of an explosive to maintain a sequence of events which will continue automatically until the trigger is no longer activated or the ammunition is depleted.

As you know the National Firearms Act (NFA), 26 U.S.C. § 5845(a)(6), defines the term "firearm" to include ...*a machinegun...* . Further, § 5845(b) defines a "machinegun" in part as: ...*any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun....* Since the Historic Arms, ASFS stock was found to convert a semiautomatic firearm to fire automatically, more than one shot without manual reloading by the single function of the trigger, we determined the ASFS stock to be a "machinegun" as defined.

Because your sample is a "machinegun" as defined in the NFA and you are a licensed special occupational tax-payer, you have by close of business the next business day following receipt of this letter to register your device. As soon as FTB has received verification that the submitted ASFS stock is registered, we will return it to you. Since the device is not yet serialized, you must immediately upon its return apply the assigned serial number clearly and conspicuously and in accordance with the size and depth requirements found in 27 CFR 479.102. To preclude the susceptibility to obliteration, alteration, or removal, we recommend you apply the serial number markings to an externally visible portion of the largest single component of the device.

To facilitate return of your submission after registration is complete, please provide FTB with a prepaid shipping label from FedEx, UPS, or other such appropriate carrier.

As always, we remain available for future written inquiries concerning this or other matters.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure





Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000179





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

FREEDOM ORDNANCE MFG., INC.,          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )   Case No. 3:16-cv-243-RLY-MPB
                                      )
THOMAS E. BRANDON, Director,          )
Bureau of Alcohol Tobacco Firearms    )
and Explosives,                       )
                                      )
          Defendant.                  )

**REPLY BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") has not provided a legal or factual

basis establishing that the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF")

decision is arbitrary and capricious.   Freedom admits that this case may be decided as a matter

of law on the administrative record,[1]  but simply disagrees with ATF's conclusion that

---

[1] Freedom states that it has submitted the extra-record declarations of Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No. 24-5) to "inform the Court's analysis as to the persuasiveness of ATF's informal classification system."   (Pl.'s Resp. Br., Docket No. 32 at 14.)   As discussed in ATF's opening brief, the task of the reviewing court is to apply the appropriate Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court]."). The post-record Winge and Vasquez reports were not before the agency when it made its decision.   Freedom appears to concede this point, stating that the record is sufficient to decide the issues before the Court.   (Pl.'s Resp. Br., Docket No. 32 at 14-15.)

1

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000181

Freedom's Electronic Reset Assist Device ("ERAD") be classified as a machinegun.    Based on

the foregoing, ATF is entitled to summary judgment.

## ARGUMENT

### A.  The Proper Standard of Review of ATF's Classification.

Freedom argues that ATF's decision is entitled only to limited deference - not *Chevron*

(referring to *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984)) deference -

because the decision is an "informal" classification letter.    In its opening brief, ATF set out the

well-established standard of review applicable in cases brought under the APA, 5 U.S.C. §

706(2)(A), which is whether the agency's decision is arbitrary and capricious.    As the Supreme

Court has held, the agency's decision is entitled to a presumption of regularity, and the Court

may not substitute its judgment for that of the agency.    *Marsh v. Or. Nat. Res. Council*, 490

U.S. 360, 378 (1989).    As it pertains to this case, it is important to note that traditional

deference to the agency is at its highest where a court is reviewing an agency action that required

a high level of technical expertise.    *Id.* at 377.

With regard to an agency's "scientific and technical determination," the Seventh Circuit has

also instructed that, "a reviewing court must generally be at its most deferential."    *Indiana v.

E.P.A.*, 796 F.3d 803, 811 (7th Cir. 2015) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87,

103 (1983)) (internal citation omitted).    This is especially so "when a regulation concerns a

complex and highly technical regulatory program in which the identification and classification of

relevant criteria necessarily require significant expertise and entail the exercise of judgment

grounded in policy concerns."    *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015).    ).

In this regard, other federal courts have applied *Chevron* deference to ATF classifications and

2

Case 2:16-cv-00243-RLY-MPB   Document 33   Filed 09/13/17   Page 3 of 11 PageID #: 209

other agency determinations that require substantial technical analysis.   *See, e.g., Firearms Imp./Exp. Roundtable Trade Grp. v. Jones*, 854 F. Supp. 2d 1, 15 (D.D.C. 2012) *aff'd sub nom, Firearms Imp./Exp. Roundtable Trade Grp. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 498 F. App'x 50 (D.C. Cir. 2013) (applying the *Chevron* standard to ATF's denial of its application to import firearm barrels pursuant to the GCA); *see also Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29, 35-36 (D.D.C. 1998) (applying the Chevron standard to ATF's classification of a rifle under the GCA).

The classification of the ERAD as a machinegun reflects ATF's technical expertise and discretion and is therefore entitled to deference.

Freedom relies almost exclusively on a district court opinion from the District of Columbia, *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 21 (D.D.C. 2014), where the court held that ATF's classification letter classifying a developer's device as a firearm silencer within the meaning of 18 U.S.C. § 921(a)(24) was entitled to *Skidmore*, rather than *Chevron*, deference. The *Innovator* decision was a departure from other federal decisions, which have applied *Chevron* deference to the fruits of an agency's informal adjudication.   The court in *Innovator* held that *Skidmore* deference was warranted because the Agency's classification letter, which was "just over a page long, and contain[ed] only a few short paragraphs of reasoning," constituted a "short, informal document that contains little more than uncited, conclusory assertions of law, and no relevant agency regulations." *Id.* at 23-24 (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161 (1944), holding that an administrative agency's interpretative rules deserve deference according to their persuasiveness).

Here, ATF's October 27, 2016, classification letter stands in stark contrast to the one-page

3

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000183

letter issued to *Innovator*, and provides a substantive and in-depth analysis of the ERAD's

functionality, including diagrams and drawings, applying the relevant statutory provisions to the

ERAD, explaining in great length the steps Firearms Technology Industry Services Branch

("FTISB") took to assess whether the ERAD constitutes a machinegun, and detailing the reasons

why it classified the ERAD as a machinegun within the meaning of 26 U.S.C. § 5845(b).

Finally, unlike in *Innovator*—where the district court held that the Agency had not given

careful consideration to the question because of the brevity of the Agency's classification letter

and because "the [A]gency has no formal guidance or written procedure for classifying

silencers"—here the Agency has a long history of addressing industry requests for firearm

classifications that implicate the definition of a "machinegun" under 26 U.S.C. § 5845(b).   As

the federal entity charged with interpreting and enforcing the nation's firearms laws and

regulations governing the firearms industry, ATF takes seriously its classifications of weapons as

machineguns and has consistently promulgated rules regarding the application of its

classification standards.   *See* ATF Rule 81-4 (classification of AR14 auto sear as machinegun),

Administrative Record ("AR") at 635; ATF Rule 2004-5 (classification of Aircraft Machine Gun

known as Minigun), AR at 633-34; ATF Rule 2006-2 (definition of machinegun as applied to

devices designed to increase rate of fire of a semiautomatic firearm), AR at 630-32.   Thus ATF

has given careful consideration to the application of the Gun Control Act's definition of a

"machinegun," and its application to industry devices implicating the statutory framework for a

long period of time.[2]

---

[2] Freedom also cites *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F. Supp. 2d
896 (E.D. Ky. 2003), for support.   However, the *One TRW* court did not conclusively hold that
*Chevron* was inapplicable to the agency's decision.   Rather, the court stated that "[t]he authority

4

### B. ATF's Classification Is Not Arbitrary or Capricious and is Supported by the Record

In its Response Brief, Freedom argues that "the determinative issue of whether the ERAD

constitutes a machinegun is whether it enables a firearm to fire more than one round with a

single function of the trigger."   (Pl.'s Resp. Br. at 4.)   This, however, is not supported by the

plain language of the statute, which says that the determinative issue is not simply whether a

weapon fires "more than one shot…by a single function of the trigger," but that it does so

*automatically*.   26 U.S.C. § 5845(b).[3]   Thus, the "single function of the trigger" constitutes

only half of the analysis.

By focusing only on a portion of the statutory language, Freedom also argues that ATF has

changed its position and interpretation of "single function of the trigger," and that the ERAD is

similar to "bump-fire" devices that ATF has not classified as machineguns.   In actuality, ATF

classifies weapons as machineguns only when a single function of the trigger results in the firing

of more than one shot through automatic functioning.   For example, in ATF Ruling 2004-5,

ATF explained that a hand cranked Gatlin gun is not a "machinegun" "because it is not a weapon

---

is inconsistent on the question of whether ATF firearm classifications enjoy full *Chevron*
deference" and "the courts . . . consistently recognize that when such decisions are shown to be
the product of substantial agency expertise, experience and thought, they are entitled to at least
the highest level of *Skidmore* respect."   *Id.* at 900.   Therefore, the court concluded that "ATF
firearm classifications are usually reviewed under an 'arbitrary and capricious' or similar
standard."   *Id.*

[3] 26 U.S.C. § 5845(b), defines a machinegun as

> any weapon which shoots, is designed to shoot, or can be readily restored to
> shoot, automatically more than one shot, without manual reloading, by a single
> function of the trigger. The term shall also include the frame or receiver of any
> such weapon, any part designed and intended solely and exclusively, or
> combination of parts designed and intended, for use in converting a weapon into a
> machinegun, and any combination of parts from which a machinegun can be
> assembled if such parts are in the possession or under the control of a person.

5

Case 1:16-cv-00243-RLY-MPB   Document 73   Filed 09/13/17   Page 6 of 11 PageID = 212

that fires automatically."   (AR at 633.)

Contrary to Freedom's assertion, ATF "has consistently taken the position that manually operated 'two-stage' triggers result in a firearm which fires one shot for each function of the trigger.   Thus, the phrase 'single function of the trigger' [means] a single <u>movement</u> of the trigger, whether that movement is the pull of the trigger or the release of the trigger."   (AR at 636-37, ATF Memo on "Definition of 'Single Function of Trigger' under 26 U.S.C. § 5845(b)," Sept. 28 1989 (emphasis in original).)

Moreover, ATF's classifications of two-stage triggers have no meaningful application in this case because the ERAD is not a two-stage trigger allowing one shot to be fired when the trigger is pulled and another when the trigger is released.   Rather, to create "movement," the ERAD uses an electric motor.   Thus, while there is no doubt that the trigger moves, the electric motor moves the trigger, not the shooter.   The shooter takes absolutely no action to release the trigger. Indeed, the shooter does just the opposite by continuing to apply rearward pressure.   Further, the shooter makes no decision to pull again, but merely maintains a constant pull as the motor automatically causes movement of the trigger and the weapon continually fires.

ATF's classification of the operation of the ERAD device as a single function of the trigger is also consistent with a previous classification of the "AR 16" device.   (AR at 369-73.)   In this device, continued pressure applied to the trigger allowed the rifle to be fired until the release of the trigger.   (*Id.*)   The manufacturer of the "AR 16" argued that a device (cam) installed in the firearm removed the impediment to the trigger and allowed the operator to once again pull the trigger.   (*Id.*)   However, ATF found that pressure was applied to the trigger and the rifle fired, and unless the pressure from the trigger finger was removed, the rifle continued to fire.   (*Id.*)

6

Therefore, a single pull of the trigger by the user of the firearm resulted in the firing of more than

one shot.   (*Id.*)   The classification concluded that "the fact that operation of the firearm causes

movement of the trigger is not relevant to this determination."   (*Id.*)   Similarly, the fact that the

ERAD device moves the trigger forward by a motor is irrelevant to determine whether the device

causes a firearm to fire automatically by a single function of the trigger.

Freedom also claims that ATF erroneously referred to the rapid, maximum firing rate made

possible by using the ERAD.   (Pl.'s Resp. Br. at 5.)   ATF is not arguing that rate of discharge

is the dispositive factor in its classification.   But the fact that a firearm shoots hundreds of

rounds per minute is a relevant.   The rate of fire is a significant factor taken into consideration

in determining whether a weapon functions, or is converted to function, automatically by a single

function of the trigger.   The term "automatic" is defined to include "any firearm in which a

single pull and continuous pressure upon the trigger (or other firing device) will produce rapid

discharge of successive shots so long as ammunition remains in the magazine or feed device in

other words, a machinegun."   (AR at 634 (ATF Rule 2004-5 citing to the dictionary definition

of "automatic").)   Automatic functioning is the functioning of the firearm such that it is "acting

or operating in a manner essentially independent of external influence or control."   *Id.*   The

rate of fire is therefore evidence of the necessity of automatic functioning.   Indeed, the

Administrative Record contains other examples of reference to the high rates of fire of

machineguns. *See, e.g.,* AR at 599-607.   These firearms have high rates of fire because the

independent mechanical operation of the firearm allows a large number of rounds to be expelled

in a short amount of time.   While not solely determinative, high rate of fire is a relevant factor

in determining whether a firearm may be operating automatically, for that is the entire point of

7

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000187

Case 3:18-cv-00243-DLF-MPB   Document 33   Filed 00/13/17   Page 3 of 11 PageID # 214

automatic fire, to shoot faster than a human being may possibly accomplish unaided.

In summary, because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single function of the trigger—the pull of the trigger—it is a machinegun.   ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

### C. Freedom's Comparison Classifications Are Not Applicable

Freedom also argues that its ERAD should be classified the same as a bump fire devices because they use "gas/recoil energy to facilitate the trigger reset while the ERAD uses electrical energy to facilitate the trigger reset," which Freedom asserts is "a distinction without a difference."   (Pl.'s Resp. Br. at 6.)   For the reasons discussed in ATF's opening brief, there is in fact a significant difference between the devices, particularly because of the manual, skill-based methods required to operate a bump fire device.   In contrast, the ERAD operates mechanically, requiring only that the shooter maintain rearward pressure on the primary trigger to produce automatic fire.

Freedom argues that that the only difference between the ERAD and a non-machinegun bump fire device "is that continuous pressure is applied to the forend of the gun with the non-trigger hand and the power employed to assist in trigger reset is recoil.   Legally that is no difference at all."   (Pl.'s Resp. Br. at 6.)   In arguing that the "continuous pressure" is the same in the ERAD and in bump fire devices, Freedom conflates the continuous pressure on the forend of a firearm necessary for bump fire devices to operate (the necessity of which means there is no automatic functioning), with the continuous pressure on the trigger of the ERAD that constitutes

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000188

a single "function" of the trigger.    This difference is key because the constant pressure of the

non-trigger hand is manual, not automatic.    Far from "novel," ATF has provided this analysis to

the industry in the past, and it is included in the Administrative Record.    (AR at 350.)

Freedom also argues that the Tac-Con 3MR trigger is indistinguishable from the ERAD.

Freedom's argument, however, is based upon a misunderstanding of the 3MR's operation.

Although the 3MR is a trigger mechanism that pushes a shooter's finger forward in a way that is

similar to the ERAD, there is a vital difference.    The 3MR pushes the finger very close to the

point at which the trigger resets, but actually requires that a shooter *release* the original pull

before the trigger resets and another shot may be fired.    (AR at 259-331.)[4]    Therefore, any

comparison between the ERAD and the 3MR is inapposite because the 3MR requires exactly

what the ERAD does not—a release to end the first "pull" and a separate "pull" or function for

the firing of each subsequent round.

Freedom also attempts to distinguish the ERAD from the Akins Accelerator, which ATF

classified as a machinegun, arguing that "the Akins Accelerator further used nonhuman energy

(springs) to force the trigger against the user's finger causing the weapon to discharge at a rate of

650 rounds per minute."    (Pl.'s Resp. Br. at 13.)    The ERAD, however, operates on the same

principle—a single rearward pull without a release, and non-human input for automatic

functioning.    (AR at 377-87 (patent documents Akins Accelerator, specifically paras. 70 and 78,

_____

[4] Freedom claims that there is no evidence in the Administrative Record for this proposition.
However, the 3MR patent documents in the Administrative Record explicitly explain how the
device operates.    (AR at 259-331.)    Specifically, the documents explain that when the trigger
is pulled and held, the hammer is retained by the device, such that it cannot move forward and
fire another round.    (AR at 277-78.)    Then, when the trigger is "released," the hammer "is thus
retained in the cocked position…preparatory to firing by another trigger pull."    (AR at 278-79.)

9

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000189

describing the Akins Accelerator functionality).)    Whether automatic fire is generated by spring

recoil or motor is irrelevant because the result is the same:    a single pull of the trigger by the

shooter causes the firearm to shoot automatically and continuously.

In sum, ATF's classification of the ERAD is consistent with its other determinations.

## CONCLUSION

Based on the foregoing, the Court must enter judgment in favor of the Bureau of Alcohol,

Tobacco, Firearms, and Explosives as to all of Plaintiff's claims against it.


Respectfully submitted,


JOSH J. MINKLER
United States Attorney

By:    *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney

10

**CERTIFICATE OF SERVICE**

This is to certify that I have served a copy of the foregoing upon the Plaintiff herein by

electronically filing a copy thereof through the Court's CM/ECF system, which will transmit a

copy electronically to the following on the 13th day of September, 2017:

> Brent R. Weil
> KIGHTLINGER & GRAY, LLP
> bweil@k-glaw.com
>
> Timothy R. Rudd
> Scott Braum
> SCOTT L. BRAUM & ASSOCIATES, LTD.
> trr@braumlaw.com

> *s/ Shelese Woods*
> Shelese Woods
> Assistant United States Attorney
> 10 West Market Street
> Suite 2100
> Indianapolis, Indiana 46204

11

**27 C.F.R. 179.11:  MEANING OF TERMS**

*The SM10 and SM11A1 pistols and SAC carbines are machineguns as defined in the National Firearms Act.*

**ATF Rul. 82-8**

**[Status of ruling:  Active]**

The Bureau of Alcohol, Tobacco and Firearms has reexamined firearms identified as SM10 pistols, SM11A1 pistols, and SAC carbines.  The SM10 is a 9 millimeter or .45ACP caliber, semiautomatic firearm; the SM11A1 is a .380ACP caliber, semiautomatic firearm; and the SAC carbine is a 9 millimeter or .45ACP caliber, semiautomatic firearm.  The weapons are blowback operated, fire from the open bolt position with the bolt incorporating a fixed firing pin, and the barrels of the pistols are threaded to accept a silencer.  In addition, component parts of the weapons are a disconnector and a trip which prevent more than one shot being fired with a single function of the trigger.

The disconnector and trip are designed in the SM10 and SM11A1 pistols and in the SAC carbine (firearms) in such a way that a simple modification to them, such as cutting, filing, or grinding, allows the firearms to operate automatically.  Thus, this simple modification to the disconnector or trip, together with the configuration of the above design features (blowback operating, firing from the open bolt position, and fixed firing pin) in the SM10 and SM11A1 pistols and in the SAC carbine, permits the firearms to shoot automatically, more than one shot, without manual reloading, by a single function of the trigger.  The above combination of design features as employed in the SM10 and SM11A1 pistols and SAC carbine are normally not found in typical sporting firearms.

The National Firearms Act, 26 U.S.C. § 5845(b), defines a machinegun to include any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

The "shoots automatically" definition covers weapons that will function automatically.  The "readily restorable" definition defines weapons which previously could shoot automatically but will not in their present condition.  The "designed" definition includes those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by a simple modification or elimination of existing component parts.

*Held:*  The SM10 and SM11A1 pistols and the SAC carbine are designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.  Consequently, the SM10 and SM11A1 pistols and SAC carbines are machineguns as defined in Section 5845(b) of the Act.

With respect to the machinegun classification of the SM10 and SM11A1 pistols and SAC carbines, under the National Firearms Act, pursuant to 26 U.S.C. § 7805(b), this ruling will not be applied to SM10 and SM11A1 pistols and SAC carbines manufactured or assembled before

June 21, 1982.  Accordingly, SM10 and SM11A1 pistols and SAC carbines, manufactured or assembled on or after June 21, 1982, will be subject to all the provisions of the National Firearms Act and 27 C.F.R. Part 179.

United States of America v.                                                    Richard Vasquez
One History Arms Model 54RCCS, etc.                                    September 10, 2009

Page 73

1    Q   Martin.  So is it fair to say Mr. Martin's
2  and Mr. Spencer's participation are at a fairly high
3  level more or less reviewing and approving and not
4  actively participating in the decision?
5    A   Are you meaning high level like their
6  superior ranking or --
7    Q   Well, I was more getting at they reviewed
8  the final product, maybe made changes, maybe didn't
9  and approved it without getting into the substantive
10  details of the decision.
11    A   That would be correct.
12    Q   Okay.
13       MR. MONROE: Let's take one more break.
14       (Thereupon, a brief recess ensued at
15       approximately 11:43 a.m. and the proceedings
16       subsequently resumed at approximately 11:50
17       a.m. with all parties present).
18  BY MR. MONROE:
19    Q   In Exhibit 1 which are the operating
20  procedures that you wrote, there's a reference to
21  two rulings, 82-8 and 83-5, do you recall that?
22    A   Do I recall the rulings or the reference?
23    Q   Well, first of all the reference.
24    A   Yes.
25    Q   Do you recall the ruling?

Page 74

1    A   Yes.
2    Q   82-8 if I remember had to do with some
3  devices that were determined to be machine guns but
4  that the ones manufactured before a particular date
5  were not I guess treated as machine guns for
6  purposes of transfer and possession; is that right?
7    A   Let me find it.  (Reviews document).
8  Correct.
9    Q   What is the proper treatment of one of
10  those firearms under that ruling if it's ... I mean,
11  I guess ATF considers it to be a machine gun but
12  it's freely transferable without even a Form 4 if I
13  understand it; is that right?
14    A   If it was manufactured before that date as
15  an open bolt pistol, then ATF said we're not going to
16  apply the machine gun classification to it.
17    Q   So I guess the conclusion is that means
18  there's a, I don't know about the sizes, but there's
19  some bucket of firearms that are machine guns that
20  aren't registered, don't have to be registered and
21  are freely transferable without a Form 4; is that
22  right?
23    A   Well, that is correct but they are no longer
24  allowed to be manufactured.
25    Q   I understand.  So we're only talking about

Page 75

1  ones that were manufactured before a particular
2  date?
3    A   That's correct.
4    Q   But whatever number of those there are,
5  they're out there?
6    A   Yes.
7    Q   Now, based on your inspection and
8  observations of the defendant, did you conclude
9  whether it was intended to be installed on a
10  particular firearm blower?
11    A   Can you say that again?
12    Q   I mean, did you come to any conclusion of
13  what the purpose of the defendant was?
14    A   What the intention of the manufacturer was?
15    Q   Yes.
16    A   Or what our interpretation of what the
17  defendant weapon was?
18    Q   What the intention of the manufacturer
19  was.
20    A   Yes.  And it's indicated that there's a
21  portion of a MAC upper welded inside the receiver.
22    Q   And so what did you conclude the purpose
23  of the manufacturer was in manufacturing the device?
24    A   The purpose of the manufacturer in
25  manufacturing the device is that he wanted to install

Page 76

1  it on to a MAC receiver.
2    Q   And then what would that accomplish?
3    A   Well, with our classification, that would be
4  the classification of two machine guns, the registered
5  MAC or -- would be a machine gun, or if it was a
6  semiautomatic MAC, that would be converting the
7  semiautomatic MAC into a machine gun.  And since we
8  classified the upper as a machine gun, that would also
9  be a machine gun in and of itself.
10    Q   And the caliber of the defendant is what,
11  do you know?
12    A   Of the defendant weapon?
13    Q   Yes.
14    A   7.62X54.
15    Q   And that's not the caliber of a MAC; is
16  that right?
17    A   Correct.
18    Q   So the result would be a MAC that shoots
19  7.62X54; is that right?
20    A   Yes.
21    Q   There was some discussion in the responses
22  to our third discovery request about the possibility
23  of returning the defendant to the claimant for
24  modification, do you recall that?
25    A   Yes.



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives



SEP 8 0 2004

www.atf.gov

903050:RDC
3311/2004-379

Mr. Brian A. Blakely

Dear Mr. Blakely:

This refers to your letter of February 6, 2004, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), in which you inquired about the legality of a small section of string intended for use as a means for increasing the cycling rate of a semiautomatic rifle.

As you may be aware, the National Firearms Act, 26 U.S.C. § 5845(b), defines "machinegun" to include the following:

...any weapon that shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. This term shall also include the frame or receiver of any such weapon, **any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and** any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person [bolding added].

In 1996, FTB examined and classified a 14-inch long shoestring with a loop at each end. The string was attached to the cocking handle of a semiautomatic rifle and was looped around the trigger and attached to the shooter's finger. The device caused the weapon to fire repeatedly until finger pressure was released from the string. Because this item was designed and intended to convert a semiautomatic rifle into a machinegun, FTB determined that it was a **machinegun** as defined in 26 U.S.C. 5845(b).

We thank you for your inquiry, regret the delay in response, and trust the foregoing has been responsive.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000195



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV   25401   903050:JPV
www.atf.gov                        3311/2007-615

**JUN 2 5 2007**

Mr. Brian A. Blakely

Dear Mr. Blakely:

On February 6, 2004 you wrote to the Firearms Technology Branch (FTB) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) inquiring about the legality of a small section of string intended for use as a means for increasing the cycling rate of a semiautomatic rifle.  We responded on September 30, 2004.  In that letter we stated:

> In 1996, FTB examined and classified a 14-inch long shoestring with a loop at each end.  The string was attached to the cocking handle of a semiautomatic rifle and was looped around the trigger and attached to the shooter's finger.  The device caused the weapon to fire repeatedly until finger pressure was released from the string.  Because this item was designed and intended to convert a semiautomatic rifle into a machinegun, FTB determined that it was a **machinegun** as defined in 26 U.S.C. 5845(b).  (Emphasis in original).

Upon further review, we have determined that the string by itself is not a machinegun, whether or not there are loops tied on the ends.  However, when the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun.  To the extent that prior ATF classification letters are inconsistent with this letter, they are hereby overruled.

We hope that this clarifies our position.  Should you have any questions, please do not hesitate to contact us.

Sincerely,

Richard Vasquez
Acting Chief, Firearms Technology Branch

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000196

# (S) Stamboulieh Law, PLLC

P.O. Box 4008, Madison, MS 39130 | (601) 852-3440 | stephen@sdslaw.us

April 9, 2018

ATTN: FOIPA Request
Record/Information Dissemination Section                    *Via Electronic Mail*
170 Marcel Drive
Winchester, Virginia 22602-4842
Email: foiparequest@ic.fbi.gov

RE: Freedom of Information Act Request

Dear FOIA Officer:

This is a request under the Freedom of Information Act. I represent Len Savage in this request. As a result of Notice of Proposed Rulemaking found at 83 FR 13442 and located online at https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices, we are hereby requesting an expedited response to the following request in order to allow proper comments on the proposed rule. The comment period ends in seventy-nine (79) days from today or on 6/27/2018.

Because the information sought is believed to be with your agency, Mr. Savage hereby requests the following information:

•    Any and all records documenting the use of a bump-fire type stock being used by anyone on or about Oct 1, 2017 at the Mandalay Bay shooting incident in Las Vegas, Nevada; and
•    Any and all records documenting the use of a bump-fire type stock used during the commission of any crime to date.

I am willing to pay up to $200 for the processing of this request. I also request a fee waiver as these materials are greatly in the public interest and because the requested records will be distributed free of charge on the internet. Additionally, this information should be released immediately due to the impending regulations promulgated by the ATF regarding bump-stock devices referenced earlier to allow the public to fully be availed of all necessary information.

If for whatever reason, any part of this request is unavailable or not able to be produced at this time due to claims of "ongoing investigation," I request that any segregable documents that can be produced, be produced within twenty days. In the alternative, if the documents will not be released without resorting to litigation, please advise as soon as possible so that litigation may begin. Thank you for your attention to this matter.

Best regards,

STEPHEN D. STAMBOULIEH

# Ⓢ Stamboulieh Law, PLLC

P.O. Box 4008, Madison, MS  39130 | (601) 852-3440 | stephen@sdslaw.us

April 9, 2018

ATTN: Disclosure Division, Room 4E.301                    *Via Electronic Mail and Facsimile*
99 New York Avenue, NE
Washington, DC 20226
Email: foiamail@atf.gov
Fax: (202) 648-9619

RE: Freedom of Information Act Request

Dear FOIA Officer:

This is a request under the Freedom of Information Act.  I represent Len Savage in this request.
As a result of Notice of Proposed Rulemaking found at 83 FR 13442 and located online at
https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices, we are
hereby requesting an expedited response to the following request in order to allow proper comments on
the proposed rule.  The comment period ends in seventy-nine (79) days from today or on 6/27/2018.

Because the information sought may reside with your agency, Mr. Savage hereby requests the
following information:

•       Any and all records documenting the use of a bump-fire type stock being used by anyone
on or about Oct 1, 2017 at the Mandalay Bay shooting incident in Las Vegas, Nevada; and
•       Any and all records documenting the use of a bump-fire type stock used during the
commission of any crime to date.

I am willing to pay up to $200 for the processing of this request.  I also request a fee waiver as
these materials are greatly in the public interest and because the requested records will be distributed
free of charge on the internet.  Additionally, this information should be released immediately due to the
impending regulations promulgated by the ATF regarding bump-stock devices referenced earlier to allow
the public to fully be availed of all necessary information.

If for whatever reason, any part of this request is unavailable or not able to be produced at this
time due to claims of "ongoing investigation," I request that any segregable documents that can be
produced, be produced within twenty days.  In the alternative, if the documents will not be released
without resorting to litigation, please advise as soon as possible so that litigation may begin. Thank you
for your attention to this matter.

Best regards,

STEPHEN D. STAMBOULIEH

**Lennis F. Savage III**
**President,**
**Historic Arms LLC**
**1486 Cherry Rd.**
**Franklin, GA 30217**
**(706) 675-0818**
**lensavag@bellsouth.net**

**Concentration**:

Research, Design, Manufacture, Repair, Restoration, and transfer of NFA and semiautomatic firearms.

**Licensure:**

- Federal Firearms Manufacturing License (FFL type 07)
- Special Occupational Taxpayers Stamp or [NFA Firearms Manufacturer type (72)] *referred to in the firearms industry as an 07/SOT.*

**Experience:**

Owned by Len and Sherrey Savage, Historic Arms LLC is known for:
- Designing and building semiautomatic versions of historic machineguns that are classified by BATFE Firearms Technology Branch as "firearms" [A/K/A ATF "approved" designs].
- Conducting research in areas of component failure and firearms malfunctions, and developing solutions based on the research conducted.
- Conducting transfers of NFA firearms.
- In 2012 consulted with ATF on identifying recurring issues occurring in the firearms industry and solutions for those issues.
- Entertainment industry firearms technical advisor and consultant.

**Performed research and development for the following other licensed firearms manufacturers:**

- RPB of Atlanta
- Masterpiece Arms
- Century International Arms
- Ohio Ordnance Works
- Calico Light Weapons Systems
- Ohio Rapid Fire
- Signature Weapons

**Designed the following firearms or firearms systems:**

- BREN MKIIsa

- BREN Belt-Fed
- RPDsa
- SGMBsa
- 971 Sport Rifle
- Gunzilla Project
- MAG 58sa
- BM-3000 Caliber Conversion Unit
- Calico/MAC Conversion System
- Ballou Belt-Fed Caliber Conversion Unit
- ZB-37sa
- 54R/ MAC type Caliber Conversion System
- Glock feed MAC conversion
- The title I "short barreled NON-shotgun" or pistol gripped shotgun-like firearm
- MPK or Modular PK or *Pulemyot Kalashnikova*
- UK-59 semiautomatic rifle
- "Open Bolt" Saiga 12 and AK format machineguns fire control system.
- Hyper burst pistol system (rate of fire @ 45 rounds per second).

**Firearms technical advisor or expert witness in the following Federal Court cases:**

- United States v. Glover [Charlotte, NC]
- United States v. Wrenn [Columbia, SC]
- United States v. Kwan [Seattle, WA]
- United States v. Olofson [Milwaukee, WI]
- United States v. Friesen [Oklahoma City, OK]

**Firearms consultant in the following Federal Court cases:**

- United States v. Harris [Atlanta, GA]
- United States v. Celeta KTOrdnance [Dilon, MT]
- United States v, Standbury [Missoula, MT]
- United States v. Gardner [Eugene, OR]
- United States v Offerman [Salt Lake City, UT]
- United States v. Keener [Eugene, OR]
- United States v. Clark et al [Phoenix, AZ]

**Press Coverage:**

- TAPCO Issue #9 [front cover]
- Small Arms Review [Jan. 2004 pg. 66]
- Small Arms Review [July 2004 pg. 22]
- Small Arms Review [Nov. 2004 pg. 30]
- Small Arms Review [Jan. 2005 pg. 90]
- Small Arms Review [April 2005 pg. 56]

- Guns Magazine [July 2005 pg. 64]
- The Congressional Research Service Memorandum [Sept. 2005]
- SWAT Magazine [May 2006 pg. 32]
- Small Arms Review [May 2006 pg. 62]
- Small Arms Review [Nov. 2006 pg. 89]
- SWAT Magazine [Jan. 2007 pg. 32]
- Soldier of Fortune [July 2008, pg.6]
- Shot Gun News, The Knox Report [September 2008, Vol. 62, Issue 25, pg 9]
- CNN **Lou Dobbs Tonight**
- Historic Arms LLC firearms have been featured on the History Channel "**Mail Call**" twice.
- Documentary Film- **BATFE Fails the Test**
- Documentary Film- **The Gang**
- Guest appearance on Discovery Channel's "**SONS OF GUNS**" as a firearms expert for an episode featuring the semiautomatic BREN. Season 3, episode "Red Jacket Snow Cannon".
- Technical advisor to Discovery Channel's "**SONS OF GUNS**" for season 4 episode "Will's Monster".
- Technical advisor and guest appearance as a firearms expert to Discovery Channel's "**SONS OF GUNS**" for season 4, episode "One Man Army".
- Technical and creative advisor for Discovery Channel's "**SONS OF GUNS**" season 5, episode 2 "Mobile MAG 58's".
- Technical and creative advisor for Discovery Channel's "**SONS OF GUNS**" season 5, episode 3 "Steel Tornado".
- Technical and creative advisor for Discovery Channel's "**SONS OF GUNS**" season 5, episode 5 "Master Blaster".

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

### Comment

The comments of the National Rifle Association on ATF2017R-22 are attached.

### Attachments (1)

#### NRA Comments on ATF2017R-22

**View Attachment:** 

---

**ID:** ATF-2018-0002-87401

**Tracking Number:** 1k2-93yk-qbbs

### Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Josh Savani

**Organization Name:**
National Rifle Association

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 

### Comment

The comments of the National Rifle Association on ATF2017R-22 are attached.

### Attachments (1)

#### NRA Comments on ATF2017R-22

**View Attachment:** 📄

---

**ID:** ATF-2018-0002-87401

**Tracking Number:** 1k2-93yk-qbbs

### Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details** ⊡

### Submitter Information

**Submitter Name:**
Josh Savani

**Organization Name:**
National Rifle Association

NATIONAL RIFLE ASSOCIATION OF AMERICA
**INSTITUTE FOR LEGISLATIVE ACTION**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



# NRA-ILA

## COMMENTS OF THE NATIONAL RIFLE ASSOCIATION ON ATF'S PROPOSED RULE TO AMEND THE DEFINITION OF "MACHINEGUN"

June 27, 2018

Vivian Chu
Office of Regulatory Affairs,
Enforcement Programs Services,
Bureau of Alcohol, Tobacco, Firearms, and Explosives,
U.S. Department of Justice,
99 New York Ave. NE,
Washington DC 20226

Via electronic submission to regulations.gov

**Re: ATF's Notice of Proposed Rulemaking Docket Number ATF2017R-22**

On March 29, 2018, ATF posted a notice of proposed rulemaking to the federal register that would amend the existing definition of "machinegun" used in the enforcement of domestic federal gun laws.[1] The National Rifle Association of America submits the following comments in response to the proposed rulemaking.

### I. Congress's Definition of "Machinegun" Creates a Mechanical Test, Not a Performance-Based Standard

When assessing whether bump fire stocks meet the legal definition of a "machinegun," it's important to keep in mind the statutory limitations of that term. Congress defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."[2] More relevant to bump fire stocks,

---

[1] 83 Fed. Reg. 13442 (March 29, 2018). https://www.gpo.gov/fdsys/pkg/FR-2018-03-29/pdf/2018-06292.pdf
[2] 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(23) (adopting the same definition for purposes of the Gun Control Act).

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000204

the term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."[3] Thus, the law sets forth a mechanical test, not a performance-based standard focusing on rate of fire.

Because Congress created a mechanical test, ATF has consistently applied the definition to devices or firearms depending on their function, not on the rate of fire achievable with the device or firearm.[4] Indeed, ATF has noted that "bump fire" can also be induced in unmodified semiautomatic firearms. Yet unmodified semiautomatic firearms are clearly not "machinegun[s]" under federal law and do not become one simply because a particular user induces bump fire with them.[5]

Semiautomatic firearms were in common use when Congress created the first definition of "machinegun" in 1934,[6] and the current definition of "machinegun" in 1968.[7] Yet unmodified semiautomatic firearms have never been considered "machinegun[s]" for purposes of federal law.[8] Indeed, Congress enacted an entirely separate law to regulate AR-15s and various other semiautomatic firearms between 1994 and 2004,[9] with no suggestion that these firearms could simply have been administratively reclassified as "machinegun[s]."

While the new proposed definitions of "automatically" and "single function of the trigger" continue to focus on mechanical function, rather than capability or performance, there are numerous phrases throughout the proposed rule that could be used to imply capability or performance is relevant to a firearm's classification as a "machinegun." For example, Section II of the proposed rule begins: "[s]hooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire. Such devices are designed principally to increase the rate of fire of semiautomatic firearms."

This focus on performance by claiming that a bump fire stock either "increase[s] the rate of fire of semiautomatic firearms" or "mimic[s] automatic fire" is irrelevant to whether or not a bump fire stock is a machine gun. Either it is a "part designed and intended solely and exclusively, or combination of parts

---

[3] *Id.*

[4] *See, e.g.*, ATF's discussion of prior determinations regarding "bump-stock-type devices" in the proposed rule. 83 Fed. Reg. at 13444-45.

[5] *See* letter from Sterling Nixon, Chief, ATF Firearms Technology Branch, to Jason A. Lee (Oct. 13, 2006) ("As long as you must consciously pull the trigger for each shot of the 'bump fire' operation, you are simply firing a semiautomatic weapon in a rapid manner and are not violating any Federal firearms laws or regulations.").

[6] *See* National Firearms Act of 1934, 48 STAT. 1236, Sec. 1 (June 26, 1934) (defining "machine gun").

[7] *See* Gun Control Act of 1968, Pub. L. 90-618, Sec. 201 (Oct. 22, 1968) (defining "machinegun" for purposes of the re-enacted and amended National Firearms Act) This definition was amended slightly by the Firearm Owners Protection Act of 1986. Pub. L. 99-308, Sec. 109 (May 19, 1986).

[8] This was so, even though the 1934 definition encompassed "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." The term "semiautomatically" was omitted from the 1968 definition.

[9] *See* Public Safety and Recreational Firearms Use Protection Act, Title XI of P.L. 103-322 (Sept. 13, 1994).

designed and intended, for use in converting a weapon . . . to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger,"[10] or it is not.

Beyond being irrelevant, ATF's claim that "bump-stock-type devices . . . accelerate the firearm's cyclic firing rate . . ." is simply incorrect. These devices do not affect the rate of fire of the host firearm, which is determined by the firearm's operating system and, to a limited extent, certain environmental factors such as the level of lubrication and cleanliness of the host firearm.

The rate of fire achievable with a particular firearm or device is irrelevant to whether or not a particular firearm is a "machinegun." Some "machinegun[s]" fire as slowly as 200-400 rounds per minute, while many common "machinegun[s]" fire 1000 rounds per minute or more. [11] With such a broad range of firing rates, it's apparent why Congress did not use rate of fire as a determinant factor in the definition of "machinegun."

However ATF proceeds with this rulemaking, it is important that the distinction between semiautomatic firearms and machineguns remains clear. There are tens of millions of semiautomatic firearms currently possessed by law-abiding Americans. Suddenly and retroactively banning them as "machinegun[s]" under federal law would create a number of very serious constitutional, legal, and practical problems. More to the point, the statutory definition is simply not intended to stretch this far.

## II. Application of the Regulation to Existing Bump Fire Stocks

The proposed rule does not provide for a registration period for "any device that would be classified as 'machinegun' as a result of this rulemaking." Without the ability to register, owners of existing devices will be required to destroy their heretofore-lawful property. ATF claims that "[a] final rule will provide specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o)."

As support for requiring such disposal, ATF claims that, "[t]he NFA provides that only the manufacturer, importer, or maker of a firearm may register it." This statement ignores the three methods that ATF has used in the past when reversing prior classifications under the NFA: amnesty, non-retroactivity, and modification of the device.

In this case, equitable principles strongly favor protecting those who in good faith acquired devices that ATF now seeks to reclassify as "machinegun[s]." Owners of these products have relied on over a decade of ATF's own rulings and guidance when lawfully acquiring bump fire stocks, and the proposed rule would now turn these gun owners into felons or require destruction of their property.

Beyond problems of fundamental fairness, the lack of a way for gun owners to retain some value in their property likely makes the proposed rule a taking in violation of the Fifth Amendment. While some courts have refused to recognize taking challenges that result from the exercise of the government's regulatory

---

[10] 26 U.S.C. § 5845(b) (The definition of machinegun has been reorganized in this case so that it is more readable as applied to a "part" or "combination of parts."

[11] The Chauchat light machine gun has a rate of fire of only 250 rounds per minute. Ivan V. Hogg & John Weeks, Military Small Arms of the 20th Century 269 (DBI Books, 6th ed. 1991).

authority,[12] recent Supreme Court case law makes these cases of questionable merit. In *Murr v. Wisconsin*, a regulatory land-use decision, the Court held that:

> The Takings Clause of the Fifth Amendment provides that private property shall not be taken for public use, without just compensation. The Clause is made applicable to the States through the Fourteenth Amendment. As this Court has recognized, the plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose, but it does not address in specific terms the imposition of regulatory burdens on private property.[13]

In response to this new guidance from the Supreme Court, the United States District Court for the Southern District of California issued an injunction blocking enforcement of a law that would have required gun owners to surrender their lawful magazines, remove them from the state, or sell them to a licensed firearm dealer.[14] That court relied, in part, on the fact that the plaintiffs were likely to succeed on the merits of their Takings Clause claim based on the forced loss of their magazines without compensation.[15]

The case for a Takings Clause violation is even stronger with devices that would be reclassified as "machineguns" by the proposed rule because, unlike the California magazine owners who could move their property out of the state or transfer it to a firearm dealer, owners of bump fire stocks are given only the option of destroying their property.

To comply with principles of equity and ensure that the proposed rule is not a violation of the Takings Clause, ATF must address the problem the proposed rule creates for existing bump fire stock owners -- through an amnesty, by limiting retroactivity of any final rule, or by providing for modification of the devices.

### a. Amnesty

When passing the Gun Control Act in 1968, Congress included a 30-day amnesty period for individuals to register NFA firearms.[16] In addition to that amnesty period, Congress gave the Secretary of the Treasury the authority to conduct additional amnesty periods of up to 90 days for any single period.[17] This provision gave broad authority to the Secretary by allowing amnesty "as the Secretary determines will contribute to the purposes of this title."[18]

---

[12] *See* e.g., *Akins v. United States,* 82 Fed.Cl. 619, 622 (2008).
[13] 137 S. Ct. 1933 (2017).
[14] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1139-40 (S.D. Cal. 2017).
[15] *Id*. at 1139.
[16] Pub.L. 90-618, Title II, § 207(b), Oct. 22, 1968, 82 Stat. 1230.
[17] Pub.L. 90-618, Title II, § 207(d), Oct. 22, 1968, 82 Stat. 1230.
[18] *Id.*

When ATF reclassified certain shotguns as destructive devices in 1994,[19] the agency also provided for a period of amnesty, which finally closed May 1, 2001 after about 8,200 of the shotguns were registered with ATF.[20]

ATF could provide one or more 90-day periods of amnesty for the registration of bump fire stocks. While there are some additional complications due to the lack of markings on bump fire stocks, Congress has delegated broad discretion to determine the scope and requirements of any amnesty. ATF already has experience with firearms marking issues for individuals who are not federal firearm licensees. (Every time a non-licensee makes an NFA "firearm," the maker must mark the firearm in compliance with federal law.[21])

In addition to providing amnesty for bump fire stocks, ATF should consider a broader amnesty for "machinegun[s]." When Congress delegated the authority to provide for additional periods of amnesty, there was a clear legislative understanding that amnesty generally serves the purposes of federal firearms laws by bringing "machinegun[s]" and other NFA "firearms" that are currently contraband, and therefore likely to eventually end up in the wrong hands, into the legal market where they have value and are extremely unlikely to be used in crime.[22]

While there has always been some concern about an amnesty affecting ongoing investigations or allowing possession by otherwise prohibited persons[23], ATF, as previously stated, could place substantial limitations on the scope of any amnesty, and would be free to set the requirements for registration to prevent the problems associated with the 1968 amnesty.

> ### b. No Retroactive Effect

ATF has broad authority to limit the retroactive effect of administrative actions affecting the internal revenue laws.[24] In the case of regulations, there is a general rule against retroactive effect.[25]

In past rulings, ATF has attempted to completely limit any retroactive effect. For example, in the case of AR-15 "Auto Sears," ATF stated that "[w]ith respect to the machine gun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981. Accordingly, auto sears manufactured on or after

---

[19] ATF Rul. 94-1, 94-2.

[20] ATF Rul. 2001-1 (repealed by ATF Rul. 2017-1 because ruling was "unnecessary and obsolete" due to long past deadline for registration).

[21] 26 U.S.C. § 5842.

[22] *See* Testimony of ATF Director Stephen E. Higgins, before the Subcommittee on Crime of the House Committee on the Judiciary on H.R. 641 and Related Bills (May 17, 24, and June 27, 1984) (testifying that "[r]egistered machineguns which are used in crimes are so minimal as to not be considered a law enforcement problem."

[23] These two examples could be determined to not "contribute to the purposes" of the NFA, so ATF could exclude them, and other similarly problematic registrations, from the proposed amnesty.

[24] 26 U.S.C. § 7805(b)(8).

[25] 26 U.S.C. § 7805(b)(1) It's unclear how this section would apply to the reclassification of certain devices as "machinegun[s]" by regulation.

November 1, 1981, will be subject to all of the provisions of the National Firearms Act and 27 C.F.R. Part 479."[26]

The Seventh Circuit rejected this broad reading of section 7805(b) in *United States v. Cash*.[27] While ATF's "Auto Sear" ruling seemed to imply that mere possession of a pre-1981 sear alone remained lawful, the *Cash* court limited 7805(b)'s retroactivity limitations to only excusing the payment of taxes:

> Defendants believe that it places auto sears manufactured before November 1, 1981, outside all obligations laid by statute on the ownership and transfer of firearms. But nothing in the firearms statutes gives the Secretary of the Treasury (or the Bureau of Alcohol, Tobacco and Firearms) the power to make exemptions to § 5845(b) and associated legal obligations. The statute to which ATF Ruling 81-4 refers, 26 U.S.C. § 7805(b), provides that the Secretary cannot give retroactive application to tax regulations and adds in § 7805(b)(8) that the "Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." Read in conjunction with § 7805(b)(8), the proviso in the fourth paragraph of ATF Ruling 81-4 means only that the Secretary will not collect any tax under 26 U.S.C. §§ 5801, 5811, or 5821 on account of auto sears manufactured or transferred before November 1, 1981. The ruling does not-and cannot-excuse compliance with criminal laws applicable at the time of post-1981 transfers.[28]

In *United States v. Dodson*, the Sixth Circuit agreed with this reading of section 7805(b), concluding that the statute's purpose was to excuse prior tax and regulatory violations, and not continuing non-compliance with criminal laws.[29]

While NRA does not agree with this narrow reading of section 7805(b), reliance on this restrictive interpretation would complicate any attempt to generally limit the retroactivity of the proposed rule. However, this provision still serves an important purpose when used in conjunction with an amnesty. Section 7805(b) can excuse tax payments that might otherwise be required when a firearm is registered under an amnesty.

ATF used the provision in this manner during the registration period for the shotguns that were reclassified as NFA "firearms," discussed *supra*.[30] Registrants were not required to pay the $200 transfer tax that would have been associated with the acquisition of a "destructive device." This same approach

---

[26] ATF Rul. 81-4 (The ruling does note that "[r]egardless of the date of manufacture of a drop in auto sear, possession of such a sear and certain M16 fire control parts is possession of a machine gun as defined by the NFA. Specifically, these parts are a combination of parts designed and intended for use in converting a weapon into a machine gun as defined in the NFA.")
[27] 149 F.3d 706, 707 (7th Cir. 1998).
[28] *Id.*
[29] 519 F. App'x 344, 349 (6th Cir. 2013).
[30] ATF Rul. 94-1, 94-2.

could be applied to excuse tax payments for the registration of bump fire stocks or other "firearms" during the recommended amnesty period.

### c. Modification

As discussed in the proposed rule, when ATF reclassified the "Akins Accelerator" as a "machinegun," existing owners of the device were allowed to remove and dispose of a spring rather than destroying the entire device.[31] Similar modifications could be done in the case of bump fire stocks. While it would be up to ATF to determine the exact extent of modification necessary, removal of the finger rest, permanently affixing the stock, or removal of the stock pin assembly would seem to limit the use of a bump fire stock to semiautomatic fire only.

While modification in these ways would limit the financial harm to gun owners over complete destruction, these types of modifications may so diminish the utility of a bump fire stock that a violation of the Takings Clause still occurs.[32] For this reason, NRA recommends an amnesty as a less onerous solution for dealing with the existing supply of bump fire stocks.

## III. Conclusion

However ATF continues with this proposed rule, it must keep in mind the limitations placed on the definition of "machinegun" by Congress. If ATF decides to reverse prior determinations regarding the classification of specific devices, then it should provide for an amnesty period for these devices and other unregistered "machinegun[s]."

Signed,

Josh Savani
Director
Research & Information Division
NRA-ILA

---

[31] 83 Fed. Reg. at 13445.

[32] A "regulatory taking" occurs when the government regulates the use of property in a manner that "is tantamount to a direct appropriation or ouster." *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005).

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov

 **regulations.gov**
*Your Voice in Federal Decision-Making*

## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 

---

### Comment

See attached file(s)

Docket number ATF 2017R-22

---

### Attachments (1)

---

#### Docket number ATF 2017R

**View Attachment:** [PDF]

---

**ID:** ATF-2018-0002-91367

**Tracking Number:** 1k2-93yr-h7vm

### Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Joshua Fitch

Docket number ATF 2017R-22

### (I)   Issues of statute as passed by Congress:

26 U.S. Code § 5845 (b) defines a machine gun as the following:

*"(b) Machinegun  The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*

On April 16, 1934, Congress took under consideration H.R. 9066, a bill "to provide for the taxation of manufacturers importers and dealers in small arms and machine guns and other weapons."[1] The administration, under the direction of then Attorney General Homer Cummings, implored congress to pass legislation that would define a machine gun as the following:

*"The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."[2]*

On April 16, 18, and May 14, 15, and 16, 1934, the Committee on Ways and Means held hearings H.R. 9066.  Numerous witnesses were called and Congress discussed many aspects of the proposed legislation.

The following is an excerpt from the testimony, questions and answers between Congressmen Hill, Congressmen Frear and Karl T. Frederick; the President of the National Rifle Association:

*"**Mr. HILL:** Suppose your definition were adopted. Would it be practicable to manufacture a gun that would be classed either as an automatic or semiautomatically operated gun even with more than one function of the trigger and still answer the purpose in a large way of a machine gun which requires only one function of the trigger.*

***Mr. FREDERICK:** I do not think so. For purposes of example you may look at the automatic pistol which is the standard weapon of the United States Army. That has an automatic discharge of the empty cartridge and a reloading principle which is operated by the force of the gas from the exploded cartridge. But with a single pull of the trigger only one shot is fired. You must release the trigger and pull it again for the second shot to be fired. You can keep firing that as fast as you can pull your trigger. But that is not properly a machine gun and in point of effectiveness any gun so operated will be very much less effective than one which pours out a stream of bullets with a single pull and as a perfect stream.*

***Mr. HILL:** In one sense you are limiting the scope of this definition and in another you are broadening it When you say that any weapon or any gun that will shoot more than once is a machine gun you are broadening the definition But when you say one operation of the trigger you may be limiting the definition as it is in this bill as I see it because this says nothing about what operation of the trigger is necessary to constitute the machine gun*

***Mr. FREDERICK:**  If I understand your remark.*

***Mr. Hill:** I think that is quite true I am including within the definition however everything that I think is a machine gun instead of including only those machine guns which fire 12 or more shots without reloading.*

---

1 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
2 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
3 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066
4 The National Firearms Act (NFA), 73rd Congress, Sess. 2, ch. 757, 48 Stat. 1236, (1934)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000212

Docket number ATF 2017R-22

**Mr. HILL:** *The point I am making is why include in your definition the phrase with one function of the trigger.*

**Mr. FREDERICK:** *Because that is the essence of a machine gun.  Otherwise you have the ordinary repeating rifle.  You have the ordinary shotgun which is in no sense and never has been thought of as a machine gun.*

**Mr. FREAR:**  *You are attempting to cover more than is embodied in this bill.*

**Mr. FREDERICK: I** *am trying to bring within this everything that in my opinion should be included under the term machine gun.*

**Mr. FREAR:**  *That would be desirable.*

**Mr. FREDERICK:** *I should not like if there is to be legislation with respect to machine guns to have machine guns capable of firing up to 12 shots exempted from the operations of this bill.*

**Mr. COCHRAN:** *Mr. Frederick under your proposed definition would the Colt automatic pistol be a machine gun?*

**Mr. FREDERICK:**  *No sir I do not think that in the eyes of any ballistic engineer it would be so regarded I do not think it should be so regarded.*

**Mr. COCHRAN:** *Does not the Colt automatic pistol continue to shoot as long as you exert pressure upon the trigger Mr. FREDERICK No sir It requires a separate pull of the trigger for every shot fired.*

**Mr. HILL:** *If the Colt automatic pistol could fire 12 times would it be a machine gun under this definition in the bill.*

**Mr. FREDERICK:** *Under the definition as printed in the bill.*

**Mr. HILL**: *Yes.*

**Mr. FREDERICK**: *I do not know what the language means, "automatically or semiautomatically." The language is not, as I read it, and from my limited knowledge of firearms and ballistics - which has some scope, but I do not pretend to be a finished master in that; I am a lawyer, I am not a firearms manufacturer. I do not know what "automatically or semiautomatically" means. There are automatic features about the Colt pistol in the sense that when a shot is fired the action of the gas not only expels the bullet from one end of the barrel but it expels the empty shell from the other end and if is so devised that upon the return of the carriage through a spring it puts another shell in place of the old one. That is in a sense automatic and that principle is found in machine guns. But that is not the distinguishing features of a machine gun.*

**Mr FREAR:** *The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as Dillinger and others. Do you think that by your proposed amendment you have aided in that result?*

**Mr FREDERICK: I** *believe so.*

**Mr FREAR:** *Then what is the purpose of any longer discussing that? Why not go on to something else?*

**Mr FREDERICK:** *If none of you gentlemen desires to discuss that particular feature.*

**Mr. FREAR:** *You are a lawyer you are not a firearms manufacturer as you have said. Let us assume that we accept your proposed suggestion I suggest that we pass it and get to the other serious questions that are involved in the bill.*"[3]

1 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
2 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
3 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066
4 The National Firearms Act (NFA), 73rd Congress, Sess. 2, ch. 757, 48 Stat. 1236, (1934)

**2**

Docket number ATF 2017R-22

Congress ultimately agreed with Mr. Frederick's suggestions and passed the National Firearms Act which defined a machine gun as the following:

""*Machine gun." (b) The term "machine gun " means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.*

Congress specifically and deliberately chose to rely upon "single function of the trigger" as one of the defining characteristics of what defines a machine gun.  This definition was expanded with the Gun Control Act in 1968 and again with the Firearms Owners' Protection Act of 1986 but the core definition of what constitutes a machine gun still revolves around firearms that shoot "automatically more than one shot, without manual reloading, by a single function of the trigger."

Congress specifically entertained the idea of defining a machine gun as firearms that can be fired very quickly with multiple trigger functions in 1934 and decided, instead, to focus on a single function of the trigger.  This has not changed in the approximately 84 years since the NFA was considered and passed into law by Congress.  This proposed rule change goes beyond the documented intent of congress to interpret into statute an issue that was explicitly considered and rejected by Congress.

### (II)    Devices known as Bump Stocks comply with existing statute:

These devices known as "bump stocks" are intended to aid in the ability but are not required nor essential to allow of a shooter to utilize the recoil of a weapon to pull the shooter's finger into the trigger, allow the trigger to reset, and then pull the shooter's finger into the trigger again, and so on and so forth, in order to reach or approach the cyclic rate of the firearm in a process known as bump firing. These devices do not modify the mechanical function of the weapon as this process of using the recoil to allow the shooter to fire the weapon quickly can be replicated on any semi-automatic firearm that generates sufficient recoil with or WITHOUT a bump stock or similarly designed attachment.

Furthermore, these stocks DO NOT FUNCTION unless the trigger is allowed to reset.   A person can "bump fire" many common firearms without the use of a bump stock however a person with a bump stock CANNOT "bump fire" the same weapon unless the trigger is allowed to reset and then pulled again.  If the trigger is NOT allowed to reset, a subsequent round will not be discharged and the weapon will cease firing.  In other words, these stocks are in compliance with statutory definitions Congress created.

---

1 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
2 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
3 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066
4 The National Firearms Act (NFA), 73rd Congress, Sess. 2, ch. 757, 48 Stat. 1236, (1934)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000214

Docket number ATF 2017R-22

**(III)    Impact this proposed rule would have up crime:**

As of 2018, many tens of thousands of machine guns are legal to own for American citizens who are not otherwise prohibited persons (18 USC 922 (o)(2)(A) and (B) ).

This proposed rule change cannot and will not stop a person who is not otherwise a prohibited person who possesses the financial means to acquire machine guns in full compliance with the law nor would this change have hand any meaningful impact on people who seek to use other means of "bump firing" their semi-automatic weapons that DO NOT involve a stock or other mechanical modification to the firearm.

**(IV)    Proposed alternative:**

If ATF and DOJ feel so strongly about firearms that can be "bump fired" I suggest ATF/DOJ consider offering an amnesty or a series of amnesties as authorized under the GCA '68 (Section 207(d) of 82 Stat. 1235) to allow registration of all firearms that fall under the preview of the National Firearms Act (26 U.S. Code § 5845) thus mooting many potential issues that will almost certainly follow the implementation of this proposed rule change.

**(V)    Conclusion:**

I strongly urge the ATF to follow their previous conclusions as demonstrated in public media and in courts of law where ATF has stated these bump stocks comply with the existing statute and that ATF lacks the authority to ban them without further action from Congress.

Thank you for your time and your consideration.

Joshua Fitch

Docket number ATF 2017R-22

---

1 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
2 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066 Page 1.
3 Hearings on April 16, 18, and May 14, 15 and 16, 1934, before the Committee on Ways and Means, House of Representatives, Seventy-third Congress, Second Session, on H.R. 9066
4 The National Firearms Act (NFA), 73rd Congress, Sess. 2, ch. 757, 48 Stat. 1236, (1934)

4

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder** 🔃

### Comment

To whom it may concern:

I am Adam Roberts, I am currently suing the state of Florida over their bumpstock prohibition. What theyre doing is unconstitutional and illegal, and I see at the Federal level, ATFs proposed regulation on bumpstocks is doing exactly the same for similar and also new reasons by overreaching your regulatory authority.

As you should know the NFAs definition of machinegun is any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

A machinegun is also:
* The frame or receiver of any such weapon
* any part, or combination of parts, designed and intended for use in converting a weapon into a machinegun,
* any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

a bumpstock:

*Is not a weapon.
*It is not designed to shoot, nor can it be readily restored to shoot
(because it is not a weapon and is not capable of firing a shot)
* it cannot automatically more than one shot without manual reloading by a single function of a trigger, (since it has no trigger)
* Nor can it be a combination of parts where a machinegun

**ID:** ATF-2018-0002-78013

**Tracking Number:** 1k2-93yb-bfjs

### Document Information

**Date Posted:**
Jul 3, 2018

**RIN:**
1140-AA52

**Show More Details** 🗗

### Submitter Information

**Submitter Name:**
Adam Roberts

can be assembled. Because a semiauto firearm with a bump stock does not fire more than one shot with a single pull of the trigger. Any other interpretation is demonstrably false.

You reference the Akins accelerators reclassification as a machinegun. The problem here is that the Akins accelerator had a spring, current bumpstocks do not.

In the Akins accelerator, a spring was referenced to in classifying it a machinegun. In the bumpstocks case, the moving force is the shooters hand and fingers. There are no springs here to lean on as a crutch to use to say the bumpstock fires more than one shot per each pull of the trigger.

Actually, its quite the opposite. As your Firearms Technology Branch at ATF should know, bumpfire does not require a bump fire stock. One can bumpfire with just their body. Exactly the same way that is done with the bumpstock. 1 shot fired per function of the trigger. It is not Automatic.

Therefore a bump stock does not fit the definition of any of those definitions of a machinegun. Specifically more than 1 round is NOT fired, without manual reloading, from a single function of the trigger. The trigger has to function for each round fired. Slow-motion footage of this is readily available on the internet. Any other interpretation is demonstrably false.

Therefore, as regulators you should know, does not fit the definition of machinegun and does not fall within the scope of the NFA.

Your FTB branch should know. Theyre the ones who themselves said that bumpstocks do not qualify as machineguns because they did not automatically shoot more than one shot with a single pull of the trigger.

Its not up to ATF to reinterpret words. ATF does not have power to make law. Only Congress can do that. Furthermore, this is a foolish and slippery slope to be on. Once you can reinterpret any law to fit your needs, theres no stopping where this will end up.

It leads to eroding the freedoms in a civil society. Do NOT take part in it.

Also, as in the state of Florida, ATF attempting to regulate bump stocks places constitutional violations as well as regulatory overreach.

Namely, but not limited to:

The Fifth Amendment guarantees no one shall be "deprived of life, liberty, or property, without due process of 1aw; nor shall private property be taken for public use, without just compensation."

A prohibition without just compensation would violate the 5th amendments Takings Clause

Unconstitutional vagueness is derived from the Fifth and Fourteenth Amendments to the United States Constitution. It is based upon the premise that no one must be subjected to criminal prosecution if he or she cannot reasonably understand what conduct is prohibited under the law. This in turn deprives citizens of their rights therefore violating due process.

Having a bumpstock prohibition can be unconstitutionally vague. Which firearms will be prohibited by which person if they can bump fire that weapon without a bump stock. For some, a firearm will fit the definition of bump stock and for some it will not. This is a violation of the Fourteenth Amendment, and is an issue the State of Florida is having to deal with as we speak.

This also violates equal protection.

As a consequence of this, I have already filed a lawsuit in Federal Court Against the state of Florida (Roberts v. Bondi 8:18-cv-01062) on their unconstitutional bumpstock prohibition and I will not hesitate to file another with ATF over their regulatory overreach in this matter.

This means if you attempt to regulate bump stocks, I will likely sue you, and I will likely win, since I will use your own determinations against you in court.

Have a nice day,

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder** 

### Comment

The ATF is holding that they can interpret congressional acts as they deem fit based on an erroneous interpretation of Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 57 (1983). The error lies in that this rule would be outside the scope of the congressional act on which it relies, "As long as the agency remains within the bounds established by Congress".

The proposed rule also does not take into account that the Congressional act that the rule relies is one of taxation. Even if the Government cannot accept the tax by law that does not change the basis of the law. The ATF is proposing that the tax law is one in which they can, as directed, be used as a "Police Power".

Arguing that the NFA Act is not based on the collecting of taxes law but a Commerce Clause based law still does not give the Federal Government the non-enumerated right of "Police Power". This was held in United States v. Alfonso D. Lopez, Jr., 514 U.S. 549 (1995).
"To uphold the Government's contentions here, we have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to

**ID:** ATF-2018-0002-86008

**Tracking Number:** 1k2-93yj-ze9p

### Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Toby Patten

do."

The ATF is proposing that they cannot take a tax for an item so that item must be forfeited to the Government. The argument that the ATF is making is that the NFA Act, that the proposed regulation is based on, is in fact a Taxation act that they are reinterpreting to a police power.

The ATF argues for this proposed rule that Staples v. U.S. provides support to this rule. The ATF is disregarding the actual court ruling which stated that the Government must prove that a defendant must know that the gun, as determined by the ATF, is the sort to be regulated. With that ruling in mind one must consider the function of a bump stock. A bump stock "harnesses" energy only if a person is entered into the equation. If that individual person cannot get it to function as the ATF rule proposes then how can they know it is the type of gun that is regulated?

The ATF should articulate if this rule is based on the Commerce Clause/Taxation or if in fact they are making this rule because

"The negative externality of the commercial sale of bump-stock-type devices is that they could be used for criminal purposes.".
"Unquantified Benefits        Prevents criminal usage of bump-stock-type devices."
"BENEFITS - As reported by public comments, this proposed rule would affect the criminal use of bump-stock-type devices in mass shootings".

These quotes are from the actual rule making text which would lead one to believe that this rule is based on a Police Power that the Federal Government does not have and not regulating commerce or enforcing tax statutes.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

See Attached

## Attachments (20)

### FPC Comment ATF 2017R-22

View Attachment:     **+ View more information**

### Exhibit 1

**Abstract:**
FPC/FICG Comment with Exhibit List and Exhibits 1, 2, 5, 6, 7, 8, 9, 10, 13, 16, 19, 20, 21, 22 (4 parts), and 23. Exhibits 24 (3 parts) and 27, 29 ( 2 parts), 30, 31, 32, 33, 34, and 35 are in a separate comment submission (comment ID 61778) due to limitations on attachment size. Exhibits 3, 4, 11, 12, 14, 15, 17, 18, 25, 26, 28 are video files that cannot be uploaded as attachments to regulations.gov

### Exhibit 2

View Attachment: 

### Exhibit 5 [UPDATE] Bumbling Machinations on Bump Stocks The Zelman Partisans

View Attachment: 

### Exhibit 6 - Friesen

View Attachment:

### Exhibit 7 Holder contempt

---

**ID:** ATF-2018-0002-61777

**Tracking Number:** 1k2-93xx-l8o0

## Document Information

**Date Posted:**
Jun 26, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Joshua Prince

**Organization Name:**
Firearms Industry Consulting Group (FICG)

View Attachment: 📄

---

## Exhibit 8

View Attachment: 📄

---

## Exhibit 9 Feinstein Screenshot

View Attachment: 🖼️

---

## Exhibit 10 ATF Determinations

View Attachment: 📄

---

## Exhibit 15 Guedes Declaration

View Attachment: 📄

---

## Exhibit 16 Thompson Declaration

View Attachment: 📄

---

## Exhibit 19 - 82 Stat. 1235

View Attachment: 📄

---

## Exhibit 20 1969-CFR-ATF-amnesty-regs 26 CFR 179-120

View Attachment: 📄

---

## Exhibit 21 Violating Due Process

View Attachment: 📄

---

## Exhibit 22 1998testimony_Part1

View Attachment: 📄

---

## Exhibit 22 1998testimony_Part2

View Attachment: 📄

---

## Exhibit 22 1998testimony_Part3

View Attachment: 📄

---

## Exhibit 22 1998testimony_Part4

View Attachment: 📄

---

## Exhibit 23 ATF Quarterly Roll Call

**View Attachment:**

## Exhibit List

**View Attachment:**

# FIREARMS INDUSTRY CONSULTING GROUP

### A Division of Civil Rights Defense Firm, P.C.

Joshua Prince
Adam Kraut
Jorge Pereira



Phone: 888-202-9297
Fax: 610-400-8439

March 30, 2018

Stephanie M. Boucher
Disclosure Division
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, NE
Washington, DC 20226

RE:    Firearms Policy Foundation (FPF) and Firearms Industry Consulting Group (FICG) vs. U.S.
       Department of Justice - Bureau of Alcohol, Tobacco, Firearms and Explosives - Bump Stock
       Rulemaking
       Docket Number: ATF-2018-0001
       **EXPEDITED Freedom of Information Act (FOIA) Request**

       **VIA EMAIL: FOIAMail@ATF.gov**

Dear Stephanie Boucher,

     Pursuant to the federal Freedom of Information Act, 5 U.S. Code § 552 (hereinafter "FOIA"), I
submit the following request for documents from the Bureau of Alcohol, Tobacco, Firearms and
Explosives (hereinafter "ATF"). If the requested documents are not available from ATF, I
respectfully request that you forward this request to the appropriate agency that maintains the
requested records or advise me of the identity of any such agency.

<u>Status of Requester</u>: I am attorney and scholar of firearms laws and related issues. I have been
published by the Pennsylvania Bar Institute in a number of publications for attorneys on firearms
law issues and maintain an active blog on firearms law issues at
http://blog.princelaw.com/category/firearms-law/. As a result, I ask that you classify this request as
made by a freelance journalist and I have been previously found, on numerous occasions, to be a
freelance journalist for purposes of FOIA by ATF, FBI and DDTC. In the alternative, I am
requesting a fee waiver. This waiver is applicable under the Freedom of Information Act of 1986.
It specifies, "[a] fee waiver or reduction can only be granted if the information furnished to the
requester is likely to contribute significantly to the public understanding of the operations or

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000224

activities of the government and not primarily in the commercial interest of the requester." As this request is in relation to issues of public importance that will significantly assist the public in understanding the ATF's position in relation to its current rulemaking regarding bump stocks (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), a fee waiver is appropriate. Although Firearms Industry Consulting Group ("FICG") has been retained by Firearms Policy Foundation ("FPF"), a 501(c)3 non-profit public benefit organization, in relation to this rulemaking, as both FPF and FICG intend to publicly post all documents received in response to this FOIA, any response will be provided to the public and is for the benefit of the public.

While I believe that my purposes fall directly within the standard set forth for a freelance journalist or, alternatively, for a "Fee Waiver," if you find that my purposes do not, I will agree to pay the appropriate fees up to $100.00. If you estimate that the cost will exceed $100.00, please advise me the estimated costs exceeding $100, and I will make a decision on whether to proceed. Nonetheless, even with my agreement to pay, I retain the right to appeal any decision based on the fee waiver; and if successful, the return of any money, which was inappropriately paid, in relation to this FOIA.

Expedited Request: Pursuant to 5 U.S.C. § 552, I am requesting expedited review of this FOIA, as ATF has entered into rulemaking relative to the requested documents (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), for which individuals, including myself, only have until June 27, 2018 to respond As ATF has failed to include the requested documents in the docket and the absence of the requested documents would deny the public - including FPF, FICG, and myself - due process and the ability to formulate legal arguments and meaningful opportunity to participate in the rulemaking process, this request is proper for expedited review and processing. If the requested documents are not provided promptly, there will be an inadequate opportunity to review them and formulate meaningful comments before the deadline of June 27, 2018. Consistent with 5 U.S.C. § 552(a)(6)(E)(ii), I am requesting, as required, that a determination be made within 10 days.

Subject Matter of Request: This is a request for all ATF determinations relative to devices referred to as "bump stocks" and "bump-fire stocks" by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well as, all ATF Form 9310.3A "Correspondence Approval and Clearance" forms relative to each determination, and any versions or drafts of the determinations, which were different than the final determination. The use of the word "determinations" shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF. A copy of two such known determinations are attached hereto as Exhibit A.

Temporal Scope of Request: Please limit your search for responsive documents to the period January 1, 2000 to the present.

Request for "Vaughn Index": In the event all or any part of an otherwise responsive document is withheld subject to a claim that one or more FOIA exemptions apply, please provide an index identifying the document or part thereof, by author(s), addressee(s), date, subject matter, and the

specific exemption asserted as a basis for failing to produce the complete document. If a document is withheld only in part, please mark the redacted document to indicate the deletion.

Waiver of Inspection: If search and copying costs are not estimated to exceed $100.00, please send a copy of the documents to me at the address referenced below.

Request for Timely Action: As mandated by FOIA, 5 U.S.C. § 552(a)(6)(A)(i), I request your reply within twenty business days. The requested documents relate to a matter of current public concern so that time is of the essence. In the event you have any questions concerning this request, please contact me as soon as possible. I would be pleased to clarify any perceived ambiguity informally or to discuss ways to narrow my request so as to ensure a timely response.

Contact Information: Please direct all communications to me at:

Joshua Prince
646 Lenape Rd
Bechtelsville, PA 19505
888-202-9297 ext 81114
Joshua@CivilRightsDefenseFirm.com

Certification: I certify everything in this request, including request for expedited review and processing to true and correct to the best of my knowledge and belief.

Thank you in advance for your attention to this matter.

Yours truly,
Firearms Industry Consulting Group


Joshua G. Prince
joshua@civilrightsdefensefirm.com

jgp/web
Matter no. 10377

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000226



# regulations.gov
**Your Voice in Federal Decision-Making**

📁 **Bump-Stock-Type Devices**

**Docket Folder Summary**    ⊕ **View all documents and comments in this Docket**

**Docket ID:** ATF-2018-0002    **Agency:** Alcohol Tobacco Firearms and Explosives Bureau (ATF)    **Parent Agency:** Department of Justice (DOJ)

**RIN:** 1140-AA52    **Impacts and Effects:** None    **CFR Citation:** 27 CFR 478,27 CFR 479    **Priority:** Economically Significant

**+ View More UA and Regulatory Plan Information and Docket Details**

## Primary Documents    View All (1)

**PR**    **Bump-Stock Type Device**

**Proposed Rule**    **Posted:** 03/29/2018    **ID:** ATF-2018-0002-0001

**Comment Now!**
Due Jun 27, 2018 11:59 PM ET

## Supporting Documents

*No documents available.*

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

| | | |
|---|---|---|
| _____ ) | | |
| ) | Docket No. ATF 2017R-22 | |
| **Bump-Stock-Type Devices** ) | | |
| ) | RIN 1140-AA52 | |
| _____ ) | | |

**Firearms Policy Coalition and Firearms Policy Foundation's
Comments in Opposition to Proposed Rule ATF 2017R-22**

Joshua Prince, Esq.
*Chief Counsel*

Adam Kraut, Esq.
*Attorney*

Firearms Industry Consulting Group
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
www.FirearmsIndustryConsultingGroup.com

June 19, 2018

# TABLE OF CONTENTS

I. **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING** ............................................................................3

   A. *ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule* ..................................................................................3

   B. *ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises* ....................7

   C. *ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking* .................................................12

   D. *ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity* ....................................................................................17

      1. ATF's "Institutional Perjury" Before the Courts ......................................18

      2. ATF's Deception in Congressional Oversight ..........................................20

      3. ATF's Misleading of the Public .................................................................20

II. **ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES** ....................................................................................................21

   A. *The Second Amendment* ..................................................................22

   B. *The Fifth Amendment* ......................................................................25

      1. *The Proposed Rulemaking Violates Due Process* ..................................25

         i. ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties ...........................................................25

         ii. The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior Approvals and Public's Reliance Thereon .....................................26

      2. *The Proposal Constitutes a Taking Without Just Compensation* ..............27

         i. The Fifth Amendment Precludes a Regulatory Taking ........................27

         ii. Cost-Impact Statement Fails to Address Just Compensation for the Taking ...................................................................................30

   C. *The Ex Post Facto Clause* ...............................................................33

      1. *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct* .........33

III. **ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY** ...............................34

   A. *Congress Prohibited "Undue or Unnecessary" Restrictions* ...........................35

ii

B. *Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun*.................................................................36

C. *ATF is Statutorily Prohibited From Retroactively Applying the NPR* .........................40

**IV. ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS** ..............................................41

A. *ATF's Interpretative Jiggery-Pokery is Pure Applesauce* ...............................42

B. *Belt Loops, Rubber Bands and Fingers, OH MY!* .........................................42

C. *The Jerry Miculek Example – He's One Bad Mother… Shut Your Mouth (And: Oh No! They Banned Jerry!)* ...............................................................44

D. *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting* .................................................45

E. *We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices* ..............47

F. *The Akins Accelerator Difference* .......................................................54

**V.   ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY** ..........................55

**VI. ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES**............................................................................57

A. *FPC Supports "Alternative 1"* ...........................................................57

B. *The Amnesty Alternative* ...............................................................57

C. *ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed* .....................................................59

D. *ATF's Reclassification of Open Bolt Macs* ............................................60

E. *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11* .................61

**VII. POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE** ........63

A. *ATF's Assumptions Lack Statistical Validity* ........................................63

B. *ATF Relies On Multiple False Premises* ..............................................65

**CONCLUSION**.......................................................................................66

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

| | | |
|---|---|---|
| ———————————————— ) | | |
| ) | Docket No.  ATF 2017R-22 | |
| **Bump-Stock-Type Devices** ) | | |
| ) | RIN 1140-AA52 | |
| ———————————————— ) | | |

**Firearms Policy Coalition and Firearms Policy Foundation's
Comments in Opposition to Proposed Rule ATF 2017R-22**

On March 29, 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or the "Agency") published a Notice of Proposed Rulemaking ("NPR") in the Federal Register at Volume 83, pages 13442 through 13457, to institute this rulemaking proceeding with respect to firearms regulated under the National Firearms Act ("NFA"), 26 U.S.C. §§ 5801-5872. ATF's current regulations under the NFA are codified at 27 C.F.R. Part 479.

Firearms Policy Coalition (FPC) is a grassroots, non-partisan, 501(c)(4) public benefit organization. It is interested in this rulemaking because FPC's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of

1

the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPC offers this public comment for consideration with respect to the proposed rule.

Firearms Policy Foundation (FPF) is a grassroots, non-partisan, 501(c)(3) public benefit organization. It is interested in this rulemaking because FPF's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPF offers this public comment for consideration with respect to the proposed rule.

FPC and FPF oppose the proposed rulemaking for the reasons set forth below and in the Exhibits to this Comment incorporated herein by reference.  For ease of reference and given that FPC's and FPF's interests are aligned, the use of "FPC" throughout this Comment incorporates or otherwise constitutes both FPC and FPF.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000232

I.   **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING**

ATF has repeatedly violated the basic obligations designed to permit *meaningful* public participation in this rulemaking proceeding.  Despite efforts by FPC and other interested persons to encourage compliance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501-559, other statutory provisions governing rulemaking, and fundamental due process, ATF has persisted on a course that ensures a waste of time and resources by all involved. It should be clear that ATF cannot proceed to promulgate a final rule without publishing a proper NPR and providing the necessary opportunity for *meaningful* public comment.

A.   ***ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule***

On March 30, 2018, the day after ATF published NPR in this matter, Firearms Industry Consulting Group ("FICG"), on behalf of FPC, submitted an expedited FOIA Request "for all ATF determinations relative to devices referred to as 'bump stocks' and 'bump-fire stocks' by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms relative to each determination, and any versions or drafts of the determinations, which were different than the final

determination" since ATF failed to include these, or any other "supporting documents," in the

docket folder. [1] *See* Exhibit 1.



As of the filing of this Comment, not only has ATF declined to make public any of the requested

and necessary supporting documents – *especially its own determinations that bump stocks and*

*bump-fire stocks <u>do not</u> constitute firearms, let alone machineguns* [2] – but has additionally failed

to respond to FICG's expedited FOIA or even assign a number to it. [3] Moreover, while

acknowledging that it has received "correspondence[s] from members of the United States

---

[1] As reflected in the FOIA Request, "[t]he use of the word 'determinations' shall be understood to mean any correspondence, whether in electronic or paper form, by ATF to any person, which shall include any individual, Member of Congress, corporation, limited liability company, and partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock device, whether a sample device was submitted or not to ATF."

[2] ATF admits that there are at least "ten letter rulings between 2008 and 2017" (83 Fed. Reg. at 13445); none of which have been made available by ATF. 83 Fed. Reg. at 13445.

[3] FICG submitted its request on March 30, 2018. As is common practice for ATF, it has failed to comply with 5 U.S.C. § 552(a)(6)(A)(i).

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000234

Senate and the United States House of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition" (83 Fed. Reg. at 13446), ATF has failed to also provide these in the docket.

 As a result, ATF still has not provided any of the documents underlying the NPR either in the docket or in response to the FOIA request.

It has long been understood that "[t]he process of notice and comment rule-making is not to be an empty charade. It is to be a process of reasoned decision-making. One particularly important component of the reasoning process is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 528 (D.C. Cir. 1982). "If the [NPR] fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Id.* at 530. Providing access to materials like FPC requested – in addition to those that ATF has acknowledged in the NPR as the basis for the rulemaking – has long been recognized as essential to a meaningful opportunity to participate in the rulemaking process.

The APA "'requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule.'" *American Medical Ass'n, v. Reno,* 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) (quoting *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C. Cir. 1994)). In order to ensure that rules are not promulgated on the basis of data that to a "critical degree, is known only to the agency," the agency must make available the "methodology" of tests and surveys relied upon in the NPR. *Portland Cement Ass'n v. Ruckelshaus,* 486 F.3d 375, 392-93 (D.C. Cir. 1973).

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000235

An agency commits serious procedural error when it fails to reveal the basis for a proposed rule in time to allow for meaningful commentary. *Connecticut Power & Light,* 673 F.2d at 530-31. The notice and comment requirements

> are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005).

In this rulemaking proceeding, ATF not only refused to make available its own prior determinations that "bump stocks", "bump-fire stocks", and "bump-stock-devices" were not firearms, *let alone*, machineguns, and communications received from Congress and other organizations, but more importantly, as discussed in Sections I., B., and IV., D., *infra*, ATF has failed to provide any evidence that a "bump stock", "bump-fire stock", or a "bump-stock-device" was ever utilized in a single crime. As the putative use of a bump stock in the Las Vegas shooting is the purported underlying basis for this rulemaking (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454) the lack of evidentiary support is mind-boggling – especially in light of legitimate national concerns involving the media and governmental agencies misleading the public on a variety of issues – and constitutes a serious procedural error, as the absence of such evidence supports that there are no verified instances of a bump stock being utilized criminally and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. [4]

---

[4] An expedited Freedom of Information Act request was submitted to both ATF and FBI requesting "Any and all records documenting the use of a bump-fire type stock being used by anyone on or about October 1, 2017 at the Mandalay Bay shooting incident in Las Vegas,

(footnote continued)

The lack of access to these materials has seriously hindered the ability of interested persons to address everything that underlies the apparent unsupported assertions in the NPR. Bringing forth any such material in support of a final rule will do nothing to remedy the fact that those materials were not available to inform the interested persons preparing public comments. If ATF intends to take any further action relative to this rulemaking, it needs first to lay the foundation for a proposal and then expose that foundation to meaningful critique.

> **B.**     ***ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises***

In the docket, ATF failed to provide evidence of a single instance where a "bump stock" or "bump-fire stock" was confirmed to be utilized in the commission of a crime. [5] Even more disconcerting, in order to argue a putative benefit of this rulemaking, ATF relies on public comments from an ANPR, stating:

> "As reported by public comments, this proposed rule would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident… Banning bump-stock-type devices *could* reduce casualties in an incident involving a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents, because it prevents shooters from using a device that allows them to shoot a semiautomatic firearm automatically."

---

(footnote continued)

Nevada; and Any and all records documenting the use of a bump-fire type stock used during the commission of any crime to date." To date, neither ATF nor FBI has confirmed the use of a bumpfire stock in the commission of any crime. *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63, *available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18 – Part4" as pdf pages 1 – 2.

[5] *Id*.

83 Fed. Reg. 13454 (emphasis added). These purported benefits are equally illusory and misleading. First, ATF presents no evidence that bump-stock-type devices have actually ever been used in any mass shooting incidents. [6] As further discussed *infra* in Section IV., D., even in relation to the Las Vegas incident upon which the NPR relies (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454), the Las Vegas Metropolitan Police Department Preliminary Investigative Report *only* indicates that some weapons were outfitted with bump-stock-type devices but provides no indication that any bump-stock-device was utilized. *See*, Exhibit 2. [7] Second, ATF contends that casualties *could* be reduced in such an incident without demonstrating that there have been *any* casualties attributable to the devices. [8] ATF has also failed to address the fact, as discussed in Sections IV., B. and C., that not only is a bump-stock unnecessary to bump-fire a firearm but that practiced shooters can match, *if not exceed*, the speed of a bump fire device, *with far superior accuracy*, unassisted by such a device. *See*, Exhibits 3 and 4. [9] Moreover, as stated by former ATF Acting Chief of FTB Rick Vasquez, "[a] factory semi-automatic

---

[6] Interestingly, ATF relies solely on prior "public comments" to suggest that a bump stock device was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock devices "*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use of the word "could" reflects that such use is a *possible* future, not past, occurrence. Thus, ATF is acknowledging that but for public conjecture, it has *no* evidence that a bump stock device has been utilized in a crime and only hypothesizes that a bump stock device "could be used for criminal purposes." *See also* Fn. 4, *supr*a.

[7] A copy of the report is also available online at – https://www.lvmpd.com/en-us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

[8] Relying on nothing more than a "conclusory statement would violate principles of reasoned decisionmaking." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 154 (D.C. Cir. 1985); *see also Pearson v. Shalala,* 164 F.3d 650, 659 (D.C. Cir. 1999).

[9] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

8

and fully-automatic (*i.e.* machinegun) firearm, manufactured by the same manufacturer, will have identical cyclic rates, [10] unless the machinegun version has some form of rate reducing mechanism; whereby, the machinegun version may have a slower cyclic rate than the semi-automatic version." *See* Exhibit 32. [11] Thus, not only can an individual exceed the rate of fire of a bump-stock-device with greater accuracy, but an individual can equal, and sometime exceed, the rate of fire of an actual machinegun.

Third, as also addressed by the Savage Comment [12] and the Expert Declaration of Vasquez (*see* Exhibit 32), the technique of bump firing merely utilizes the recoil impulse that *all* semi-automatic firearms generate, every time the firearm discharges. More importantly, as discussed by the Expert Declaration of Vasquez and the Savage Comment, and reflected *infra* in Sections IV., A. and E., including as depicted in video exhibits related thereto, contrary to ATF's interpretive jiggery-pokery in the NPR that

---

[10] As expert Vasquez explains, "[t]he cyclic rate of a firearm is neither increased nor decreased by the use of a bump-stock-device, as the cyclic rate of a particular firearm is the mechanical rate of fire, which can be explained in laymen's terms as how fast the firearm cycles (*i.e.* loads, locks, fires, unlocks, ejects), which is an objective, not subjective, mechanical standard." *See* Exhibit 32.

[11] This was also addressed by Firearm Engineer Len Savage on page 2 of his Comment, where he declares that all semi-automatic firearms:

> "can fire as fast as a machinegun version. Their cyclic rates are identical to the machinegun version. Their essential operating mechanisms are identical, same ammo, same mag[azines], same reciprocating mass. The only small physical difference is the machineguns described have a mechanical level that 'automatically' starts the new cycle as soon as the previously cycle ends. Some semiautomatic firearms can even fire faster than the full auto version because the machinegun versions having some form of rate reducing mechanism."

*See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available *electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18".

[12] *Id.*

bump-stock devices "convert an otherwise semiautomatic firearm into a machinegun by functioning as a *self-acting* or *self-regulating* mechanism" (83 Fed. Reg. 13443), in reality, a bump-stock-device is neither self-acting nor self-regulating and requires the trigger to be fully released, reset and fully pulled, before a subsequent round can be fired. [13] To the extent ATF contends otherwise, then all semi-automatic firearms are "self-acting" or "self-regulating," since, as discussed *infra* in Section IV., B., the technique of bump firing can be easily achieved solely with one's finger while operating a *factory* semi-automatic firearm.

Thus**,** to the extent ATF contends that bump-stock-devices are self-acting, self-regulating or otherwise harness the recoil energy of the firearm, then *all* semi-automatic firearms are self-acting, self-regulating or otherwise harness the recoil energy of the firearm. Under the logic and contentions employed in the NPR, ATF would seemingly be entitled and empowered to regulate *all* semi-automatic firearms in the same manner as they seek to do for bump-stock devices, whereby all semi-automatic firearms could be re-classified by fiat, transmuted into unlawfully-possessed and proscribed contraband items, and, accordingly, force forfeiture (and provide for seizure) and destruction of these items,

---

[13] As also addressed in the Expert Declaration of Vasquez:

> The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.
> …
> A firearm in a bumpstock/slidefire stock cannot be a machinegun because it requires an individual to activate the forward motion of the stock when the firearm is fired. Additionally, it requires a thought process of the individual to continually pull the trigger when the stock is pulled forward bringing the trigger into contact with the finger.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000240

without any just compensation being paid—never-mind the statutes, let alone the Constitution. [14]

In fact, Eric Larson clairvoyantly published an article in March of 1998 in the Gun Journal, entitled *How Firearm Registration Abuse & the "Essential Operational Mechanism" of Guns May Adversely Affect Gun Collector*s, in which he raised concern over ATF banning all semi-automatic firearms through these types of "interpretations" of law. *See* Exhibit 24.

Fourth, ATF suggests that this rule will assist first responders by preventing shooters from using the devices; however, ATF does not elaborate on how exactly a firearm outfitted with a bump-stock-type device impedes first responders in any way that a differently configured firearm does not.

Finally, ATF laughably suggests that it is addressing a negative externality of the commercial sale of bump-stock-type devices. This negative externality is "that they could be used for criminal purposes." 83 Fed. Reg. at 13449. This suggestion is not supported by any evidence aside from the unproven allegation of their use in the Las Vegas

---

[14] If "the eight-year assault on . . . Second Amendment freedoms [came] to a crashing end" with President Trump's election and inauguration, then a new assault on individual liberties and lawfully acquired and possessed private property apparently came to a crushing beginning in this NPR. *See*, *Trump at NRA convention: 'Eight-year assault' on gun rights is over*, Fox News, April 28, 2018, online at http://www.foxnews.com/politics/2017/04/28/trump-at-nra-convention-eight-year-assault-on-gun-rights-is-over.html. But the "President then directed the Department of Justice . . . to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all" bump-stock devices. Federal Register / Vol. 83, No. 61 at 13446 (NPR Section III). Indeed, it is difficult to reconcile President Trump's statement that "[he] will never, ever infringe on the rights of the people to keep and bear arms," *Trump at NRA convention, supra*, with the NPR. As the NPR admits, it a direct result of his *personal* directive to lawlessly seek an unlawful total, confiscatory ban on bump-stock devices (and criminalize the law-abiding people who possess them) in spite of the Executive Branch's lack of legal and constitutional authority to do so.

11

incident. Further, any suggestion that a device responsible for substantial, and lawful,

market activity should be banned because it has a *potential* to be used for criminal

purposes is a mind-blowing and preposterous proposition that supports the banning of

virtually all consumer products, such as vehicles (given the number of individuals who

utilize them while unlawfully under the influence of drugs or alcohol and cause

significant numbers of injuries and deaths [15], and those who use them to carry out

terrorist attacks). [16]

     If the sole example ATF has to offer is the conjectured use of a bump-stock-equipped

firearm during the Law Vegas shooting, there is simply *no evidence of any problem* that existing

criminal law does not address, let alone a statistically-significant one. Murder is already

unlawful, right? And if serious criminal laws have no meaningful *deterrent* effect, what then is

the objective of this NPR, if not to subject law-abiding people who did not commit any crime to

pain of criminal penalty and loss of their property?

     **C.**    *ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking*

     18 U.S.C. § 926(b) requires that ATF provide "not less than ninety days public notice,

---

[15] "Every day, 29 people in the United States die in motor vehicle crashes that involve an alcohol-impaired driver. This is one death every 50 minutes. The annual cost of alcohol-related crashes totals more than $44 billion." *See, e.g.*, "Impaired Driving: Get the Facts" (citing sources, internal footnotes omitted), Centers for Disease Control and Prevention, online at https://www.cdc.gov/motorvehiclesafety/impaired_driving/impaired-drv_factsheet.html.

[16] *See*, https://www.usatoday.com/story/news/2016/07/14/dozens-dead-nice-france-after-truck-plows-into-crowd-mayor-says/87101850. *See also*, http://abcnews.go.com/International/truck-hits-pedestrians-busy-barcelona-street/story?id=49272618.

12

and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."

**First and foremost, FPC demands, pursuant to Section 926(b) and ATF's offer in the NPR (83 Fed. Reg. 13456), [17] that they be provided an opportunity to be heard at a hearing before ATF prescribes any rule or regulation in relation to this NPR. [18]**

In this rulemaking proceeding, numerous procedural irregularities and issues have arisen that have precluded the public a meaningful opportunity to respond and have caused some to believe that the comment period was closed, since the very start of the comment period; thus, depriving the public of the ninety day comment period that is required by law.

Immediately, upon the publication of the NPR on March 29, 2018, numerous individuals were advised on FederalRegister.gov [19] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience."

---

[17] Contrary to ATF's assertion in the NPR that the Director of ATF has discretion in whether to grant a public hearing, Section 926(b) requires ATF to hold a public hearing when such is requested, as the statutory language provides that the Attorney General "*shall* afford interested parties opportunity for hearing, before prescribing such rules and regulations." (Emphasis added). If it were discretionary, the Congress would have utilized a permissive word like "may" instead of the command "shall".

[18] Although requesting a hearing in a comment is sufficient, based on the request in the NPR, a separate letter was sent to Acting Director Brandon on behalf of FPC requesting an opportunity to be heard at a hearing. *See* Exhibit 34.

[19] The specific link is https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000243



As is reflected in the above image, taken from the subject Web site, the notice that the comment period was closed was in relation to this proposed rulemaking regarding Bump-Stock-Type devices of "03/29/2018" and also reflects that the comment period was not supposed to end until "06/27/2018"; however, individuals were denied the opportunity to comment.

Even when individuals reached out online to the Federal Register regarding their inability to submit comments, the Federal Register responded by saying that it isn't its problem [20]:

---

[20] It would seem that, at a minimum, the Federal Register's Web site and social media accounts are managed by the same parties responsible for the www.healthcare.gov debacle that precluded individuals from being able to register for Obamacare, which led the Inspector General of the Department of Health and Human Services to issue a scathing report over the incompetence of those responsible. *See* http://www.mcall.com/news/local/watchdog/mc-obamacare-website-failure-watchdog-20160224-column.html.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000244



But the procedural irregularities and issues didn't end there. On April 2, 2018, Carl Bussjaeger published an article, which was later updated, *[Update] Bumbling Machinations on Bump Stocks? See*, Exhibit 5. [21] In his article, he details the trials and tribulations of trying to find the appropriate docket, based on the NPR in this matter, and the differing number of comments putatively submitted and available for review between three separate dockets. When he submitted an inquiry to ATF regarding these issues, without explaining why there are three separate related dockets, ATF Senior Industry Operations Investigator Katrina Moore responded that he should use https://www.regulations.gov/document?D=ATF-2018-0002-0001; yet, ATF

---

[21] A copy of the article is also available online at – http://zelmanpartisans.com/?p=5071. *See also*, http://zelmanpartisans.com/?p=5055.

15

failed to relay that information to the public at large or place notices on the other two related dockets informing interested individuals of the location where they can submit their comments.

When other federal administrative agencies have failed to provide a statutorily mandated comment period or issues arose during the comment period, whereby the comment period was thwarted by technological or other delays, those agencies have extended the applicable comment periods. *See, e.g.,* Department of the Interior -- Fish & Wildlife Service, *Endangered and Threatened Wildlife and Plants; Extending the Public Comment Periods and Rescheduling Public Hearings Pertaining to the Gray Wolf (Canis lupus) and the Mexican Wolf (Canis lupus baileyi),* 78 Fed. Reg. 64192 (Oct. 28, 2013); Environmental Protection Agency, *Extension of Review Periods Under the Toxic Substances Control Act; Certain Chemicals and Microorganisms; Premanufacture, Significant New Use, and Exemption Notices, Delay in Processing Due to Lack of Authorized Funding,* 78 Fed. Reg. 64210 (Oct. 28, 2013); Department of the Interior -- Fish & Wildlife Service, *New Deadlines for Public Comment on Draft Environmental Documents,* 78 Fed. Reg. 64970 (Oct. 30, 2013); Department of Labor -- Occupational Safety and Health Administration, *Occupational Exposure to Crystalline Silica; Extension of Comment Period; Extension of Period to Submit Notices of Intention to Appear at Public Hearings; Scheduling of Public Hearings,* 78 Fed. Reg. 35242 (Oct. 31, 2013); Department of Agriculture -- Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations; Extension of Comment Period,* 78 Fed. Reg. 65515 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 65601 (Nov. 1, 2013); Federal Trade Commission, *Ganley Ford West, Inc.; Timonium Chrysler, Inc.; TRENDnet, Inc.; Pinnacle Entertainment, Inc.; Honeywell International, Inc.; Nielsen Holdings, Inc., et al.;*

16

*Polypore International, Inc.; Mylan, Inc., et al.; Actavis, Inc., et al.; Agency Information Collection Activities (Consumer Product Warranty Rule, Regulation O, Affiliate Marketing Rule),* 78 Fed. Reg. 65649 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 66002 (Nov. 4, 2013). In this rulemaking proceeding, by refusing to extend the comment period and failing to notify interested parties of the correct docket for filing comments, ATF failed to mitigate the harm caused by these procedural irregularities and issues that were resultant from ATF's own conduct and actions. Thus, ATF has failed to provide the statutorily-mandated public comment period and caused public confusion as to whether or not the comment period was open or closed and the appropriate docket for the filing of comments. More disconcerting is that this is not the first time that ATF has acted in this manner during the rulemaking process. [22]

### D.   ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity

The litany of procedural irregularities in this proceeding would undermine the efforts of an agency with a sterling reputation for fairness and candor. ATF has a well-documented record of "spinning" facts and engaging in outright deception of the courts, Congress, and the public. Many of the examples of such conduct arise precisely in the area of regulation of NFA firearms

---

[22] *See*, Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, *available at* https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section I the numerous procedural irregularities and issues that denied interested persons a meaningful opportunity to comment on the proposed rulemaking. For brevity, FPC incorporates into this Comment all exhibits attached to the Comment of Firearms Industry Consulting Group in the response to ATF-41P. All of Firearms Industry Consulting Group's exhibits in response to ATF-41P are available at https://www.regulations.gov/document?D=ATF-2013-0001-8364.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000247

as detailed in the Motion in Limine filed in *United States v. Friesen,* CR-08-041-L (W.D. Okla. Mar. 19, 2009). *See* Exhibit 6. In light of that record, there is an even greater need for ATF to provide the underlying documents that would permit scrutiny of whether it has fairly characterized issues in the NPR, engaged in a fair consideration of alternatives, only inadvertently provided misleading information about its proposed rule in relation to the Las Vegas incident and operation of bump-stock-devices, omitted pertinent documents – especially its own determinations that bumpstocks were *not even firearms*, let alone, machineguns – from the docket only through an oversight, and only accidentally failed to provide a 90-day comment period.

1.      *ATF's "Institutional Perjury" Before the Courts*

ATF's NFA Branch Chief, Thomas Busey, advised ATF employees in the course of a training program that the National Firearms Registration and Transfer Record ("NFRTR") database had an error rate "between 49 and 50 percent" in 1994. Exhibit 6, p. 14. Yet, despite acknowledging such a high error rate, he observed that "when we testify in court, we testify that the database is 100 percent accurate. That's what we testify to, and we will always testify to that." *Id.* Judges have overturned their own imposition of criminal convictions upon learning of this information, *see, e.g., id.,* pp. 16-17, information that should have routinely been provided to defense counsel in advance of trial as *Brady* material. [23] *See also id.,* p. 6. It is difficult to imagine a more powerful admission that an agency had knowingly, repeatedly misled courts.

This blatant "institutional perjury" took place not only in the context of criminal prosecutions but also in support of numerous probable cause showings for search warrants.

---

[23]  In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court required that government investigators and prosecutors provide criminal defendants with potentially exculpatory information.

Indeed, NFA Branch Chief Busey expressly addressed that situation. Despite acknowledging an NFRTR error rate of 49 to 50 percent, he told his ATF audience "we know you're basing your warrants on it, you're basing your entries on it, and you certainly don't want a Form 4 waved in your face when you go in there to show that the guy does have a legally-registered [NFA firearm]. I've heard that happen." *Id.,* p. 15.

Using data obtained from ATF in response to FOIA requests, Eric M. Larson demonstrated that ATF apparently had added registrations to the NFRTR years after the fact, reflecting the correction of errors apparently never counted as errors. *Id.,* pp. 21-28. While reassuring courts as to the accuracy of the NFRTR, at the same time ATF seemed to be adding missing information to the database when confronted with approved forms that had not been recorded in the database. *Id.,* pp. 26-28. As a result of the questions raised by Mr. Larson, both ATF and the Treasury Department Inspector General conducted investigations. *Id.,* pp. 29-31.

In the course of the resulting investigations, ATF's Gary Schaible recanted sworn testimony he had given years earlier in a criminal prosecution. *Id.,* pp. 30-33. The Inspector General's October 1998 report rejected Mr. Schaible's effort to explain away his prior sworn testimony, concluding: "National Firearms Act (NFA) documents had been destroyed about 10 years ago by contract employees. We could not obtain an accurate estimate as to the types and number of records destroyed." *Id.,* pp. 32-33. It is difficult to understand how ATF could routinely provide Certificates of Nonexistence of a Record ("CNRs") to courts without disclosing that an unknown number of records were destroyed rather than processed for the NFRTR. [24]

---

[24]  In *Friesen* itself, the prosecution introduced duplicate ATF records of the approved transfer of a NFA firearm (bearing the identical serial number), but differing in the date of approval.

(footnote continued)

2.  *ATF's Deception in Congressional Oversight*

In response to a Congressional inquiry, a DOJ Inspector General advised that a request for documents that reflected errors in the NFRTR had been "fully processed" when, in fact, the documents had merely been sent to another component – ATF itself – so as to delay disclosure. *See* Exhibit 6, pp. 12-14. Moreover, ATF changed the meaning of terms like "significant" errors thereby frustrating any attempt to ascertain the true error rate. *See id.,* p. 19. So too, when a congressionally-mandated audit found a "critical error" rate in the NFRTR of 18.4%, the Treasury Department Inspector General seemingly manipulated audit procedures at the instigation of the NFA Branch so as to produce a more acceptable figure. *Id.,* pp. 35-39.

Congress remained sufficiently concerned about inaccuracies in the NFRTR to appropriate $1 million (in Fiscal Years 2002 and 2003) for ATF to address remaining issues. *Id.,* p. 39. In 2007, however, Dr. Fritz Scheuren advised Congress that "serious material errors" continued to plague the NFRTR that ATF "has yet to acknowledge". *Id.,* p. 41.

As recently as June 2012, failure to answer questions about ATF's botched "Fast and Furious" gun-walking operation prompted the House of Representatives to find Attorney General Holder in both civil and criminal contempt. *See* Exhibit 7.

3.  *ATF's Misleading of the Public*

When, after a prolonged period of evasion, ATF finally produced a transcript of NFA Branch Chief Busey's remarks in the training session in response to FOIA requests, the transcript had been "corrected" by ATF's Gary Schaible to minimize damage to ATF. *See* Exhibit 6, p. 17.

---

(footnote continued)

Exhibit 6, pp. 48-49.  ATF could not explain the situation.  *Id.,* p. 49.  Nor could ATF find the original documents underlying the computerized entries.  *Id.,* p. 52.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000250

Among those corrections, Mr. Schaible asserted that he was unaware that any ATF employee had ever testified that the NFRTR was 100% accurate.

In order to frustrate public inquiries into the Waco Raid, ATF participated in a game of "shifting the paperwork and related responsibilities" among DOJ components and other law enforcement agencies. *Id.*, pp. 13-14.

Former Acting Chief of the NFA Branch, Mr. Schaible, testified that ATF repeatedly – in 2000, 2001, 2002, 2003, 2005, 2008 – approved NFA transfer forms without following procedures to update the information in the NFRTR. *See* Exhibit 8, pp. 398-414. The consequence of those failures was that members of the public received contraband machineguns accompanied by genuine ATF-approved forms indicating that the purchaser had acquired a legally-registered firearm, only to have ATF subsequently seize the machineguns from innocent purchasers.

*     *     *

ATF's long record of shading the truth to mislead courts, Congress, and the public, underscores the serious nature of the procedural irregularities in this rulemaking. In order to permit meaningful public participation, ATF must provide access to the materials it has placed in issue.

## II.     ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES

Because judicial review of any final rule promulgated by ATF may consider not only compliance with the APA but also all alleged violations of the U.S. Constitution, *see, e.g., Porter v. Califano,* 592 F.2d 770, 780 (5th Cir. 1979), it is incumbent upon ATF to take such

21

considerations into account in this rulemaking proceeding. [25] Where, as here, agency rulemaking would inherently impact constitutional rights, that impact is among the matters the APA requires the agency to consider in evaluating regulatory alternatives and to address in a reasoned explanation for its decision. *See R.J. Reynolds Tobacco Co. v. FDA,* 696 F.2d 1205 (D.C. Cir. 2012); *Pearson v. Shalala,* 164 F.3d 650 (D.C. Cir. 1999).

### A.    *The Second Amendment*

Nowhere in the NPR did ATF demonstrate the slightest awareness that it is proposing to regulate in an area involving fundamental constitutional rights. Congress has not amended the NFA since the U.S. Supreme Court confirmed that "the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008). Consequently, it would seem exceptionally important for ATF to consider the background constitutional issues in formulating policy, particularly as ATF's proposed rule would *outright ban* bump-stock devices, thereby burdening the exercise of this constitutional right held by law-abiding citizens. Where fundamental, individual constitutional rights are at issue, an agency engaged in rulemaking cannot rely on a conclusory assertion in order to "supplant its burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Ibanez v. Florida Dep't of Business & Professional Regulation,* 512 U.S. 136, 146 (1994). Yet, in direct defiance of this Supreme Court dictate, as discussed *supra* and *infra* in Sections I., B. and IV., D., ATF has failed to provide any evidence

---

[25]  Agency determinations with respect to constitutional issues, however, are not entitled to any deference on judicial review. *See J.J. Cassone Bakery, Inc. v. NLRB,* 554 F.3d 1041, 1044 (D.C. Cir. 2009) (*quoting Lead Indus. Ass'n Inc. v. EPA,* 647 F.2d 1130, 1173-74 (D.C. Cir. 1980)).

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000252

that (1) bump-stock devices have actually ever been used in the facilitation of a crime, [26] (2) that

casualties *could* be reduced in an incident involving a bump stock, since there is no evidence

demonstrating that there have been any causalities attributable to bump-stock devices, (3) that

this rule will assist first responders, and (4) that "they could be used for criminal purposes" any

differently than any other item that is currently available throughout the United States. Rather,

ATF relies solely on the conclusory assertions of public comments to an Advanced Notice of

Proposed Rulemaking to determine the benefits of the very rulemaking it is considering. In

soliciting potential benefits from the public and suggesting them without evidence, ATF has run

afoul of the words of wisdom contained in another decision issued by the Supreme Court stating

that "[w]e are in danger of forgetting that a strong public desire to improve the public condition

is not enough to warrant achieving the desire by a shorter cut than the constitutional way of

paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

While ATF claims that this rule is necessary to carry out the will of Congress, as discussed *infra*

in Section III., ATF lacks the authority to alter the definition of a machinegun as it was enacted

by the Congress. Even Senator (and ranking member of the Senate Judiciary Committee) Diane

Feinstein, the lead sponsor of the now-expired federal ban on so-called "assault weapons" and

author or sponsor of voluminous other proposed gun control legislation, declared that "ATF

lacks authority under the law to ban bump-fire stocks. Period." *See*, Exhibit 9.

---

[26] *See* Fns. 4, 6, *supra*.

23

## Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks

Oct 11 2017

*Washington*— In response to comments by Speaker Paul Ryan (R-Wis.) saying that the Bureau of Alcohol, Tobacco and Firearms should address bump-fire stocks, Ranking Member of the Senate Judiciary Committee Dianne Feinstein (D-Calif.) today released the following statement:

"The ATF lacks authority under the law to ban bump-fire stocks. Period. The agency made this crystal clear in a 2013 letter to Congress, writing that 'stocks of this type are not subject to the provisions of federal firearms statutes.' Legislation is the only answer and Congress shouldn't attempt to pass the buck."

### ###

Even a broken clock is right twice a day, and, similarly, Senator Feinstein is correct in her assessment of the ATF's lack of authority for its bump-stock NPR.

Furthermore, as discussed *supra* in Section I., A., ATF only states that it received correspondence from an undisclosed number of members and failed to place that/those correspondence(s) into the docket. The will of Congress cannot simply be derived from the writings of a small number of Senators or Representatives – especially writings outside of the legislative record – nor has it been in the past. [27]

While it is impossible to know for certain, given the NPR's dearth of analysis and discussion of the Second Amendment, it may well be that the ATF, without stating so, believes that the NPR does not violate the fundamental, individual right to keep and bear arms by considering bump-stock devices to be both "dangerous and unusual weapons" *and* "not commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031-1032 (2016). But as the Court recently reminded in

---

[27] *See* Exhibit 10, pp. 4 – 5, *also available at* https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf

24

*Caetano*, the controlling rule set forth in *Heller* "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.*, at 1031 (emphasis in original). However, ATF does not discuss these factors, and instead walks right past the necessary analysis (and the Court's clear direction). The NPR fails to show that a bump-stock device is both "dangerous and unusual," or even that it would materially affect the dangerousness of any firearm so equipped, which are already dangerous *per se*. The ATF's proposed total ban self-evidently lacks necessary tailoring – indeed, its lack of tailoring underscores its overwhelming breadth – and amounts to the total destruction of the right of law-abiding people to keep and bear the affected items for self-defense and other lawful purposes.

### B.    *The Fifth Amendment*

ATF's proposed rule violates the Due Process and Takings clauses of the Fifth Amendment to the U.S. Constitution by failing to provide notice to affected parties of a compelled forfeiture or destruction, entrapping otherwise law-abiding citizens, and failing to provide just compensation for the property in question.

1.    *The Proposed Rulemaking Violates Due Process*

i.    <u>ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties</u>

Although, as discussed *supra* in Section I., A., ATF has failed to place into the docket any of its prior ten determinations between 2008 and 2017 that bump-stock-devices *do not even*

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000255

*constitute firearms*, let alone, machineguns (83 Fed. Reg. at 13445), [28] it is admitted by ATF that it publicly approved of the bump-stock-type devices, which, per ATF (83 Fed. Reg. at 13451), is believed to have resulted in *over half a million* bump-stock-devices being produced and sold. Furthermore, to the extent the NPR applies to slamfire shotguns and firearms, Gatling guns, and triggers, there are tens of millions of such firearms and devices in private ownership. Yet, ATF has failed to provide individual notice to all those known to own or possess a bump-stock-device, let alone those owning or possessing slamfire shotguns and firearms, as well as, Gatling guns, and triggers; thereby, potentially depriving those individuals of an opportunity to respond, in direct violation of due process. As there can be no dispute, as discussed *infra* Section II., B., 1., i., that those owning and possessing bump-stock-devices and other firearms and devices covered by the NPR, have a vested property interest in their firearms and devices, ATF was required, at a minimum, to take all possible steps to identify those known to own or possess these firearms and devices and provide them, each, with notice of this rulemaking proceeding, since it directly affects their property interests.

        ii.      <u>The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior Approvals and Public's Reliance Thereon</u>

Although ATF publicly approved bump-stock-devices on at least ten occasions between 2008 and 2017 (83 Fed. Reg. at 13445; *see also* Exhibit 10) and issued ATF Ruling 2004-5 [29] and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns, it now seeks to severely criminalize the possession of those very same bump-stock-devices – and potentially

---

[28] FPC believes that they have found three of the ten determinations that were issued between 2008 and 2017, which are attached as Exhibit 10. *See also,* https://www.cbsnews.com/news/can-the-atf-regulate-bump-stocks-the-device-used-by-the-las-vegas-shooter/; https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf.

[29] *Available at* https://www.atf.gov/file/83561/download

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000256

"slamfire" shotguns and firearms, Gatling guns, and triggers – at the expense of law-abiding individuals who have relied on those determinations, followed appropriate procedures and complied with the law. This sudden change in position after eight years of reliance by the public on determinations to the contrary, clearly constitutes entrapment since the agency invited reliance on its consistent decisions and now seeks to unfairly impose criminal penalties for the public's reliance, with potential punishment of 10 years imprisonment, pursuant to 18 U.S.C. § 924(a)(2). As declared by the U.S. Supreme Court, "[e]ntrapment occurs only when criminal conduct was the 'product of the creative activity of law-enforcement officials.'…. a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 372 (1958) (internal citation omitted). The Court continued that it is unconstitutional for the Government to beguile an individual "into committing crimes which he otherwise would not have attempted." *Id*. at 376. In this matter, by changing the definition of a machinegun, ATF seeks to entrap citizens who have simply purchased a federally-approved firearm accessory. Thus, ATF has set a trap with, by their own estimate, the potential to ensnare 520,000 law-abiding citizens;[30] whereby, those law-abiding citizens can be imprisoned for up to 10 years, without even receiving individual notice of ATF's reversal of position. 83 Fed. Reg. 13451.

    2.    *The Proposal Constitutes a Taking Without Just Compensation*

    i.    <u>The Fifth Amendment Precludes a Regulatory Taking</u>

ATF's proposed rule will force law-abiding citizens to forfeit or destroy their lawfully

---

[30] The actual number may be significantly larger – possibly triple or quadruple the stated number – depending on all the firearms and devices to which the NPR applies, as discussed *supra* and *infra*.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000257

purchased, owned, and possessed property, in violation of the Fifth Amendment. The Takings

Clause of the Fifth Amendment to the U.S. Constitution provides that when private property, real

or personal, is taken or destroyed by the government, the government must pay just

compensation to the person(s) whom the property was taken from. *Horne v. Dep't of Agric.*, 135

S. Ct. 2419, 2425-28 (2015) (applying Takings Clause to personal property); *Pumpelly v. Green*

*Bay & Mississippi Canal Co.*, 80 U.S. 166, 177 (1871) (applying Takings Clause to destroyed

property not used for public purpose). The general rule states that a regulatory action constitutes

a taking under the Fifth Amendment when the action goes *too far* in regulating private property.

*Mahon*, 260 U.S. at 415. Moreover, the Supreme Court has declared that "[a] 'taking' may be

more readily found when the interference with property can be characterized as a physical

invasion by government, than when interference arises from some public program adjusting the

benefits and burdens of economic life." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S.

104, 124 (1978). As this regulation is clearly not meant to adjust the benefits or burdens of

economic life, the compelled forfeiture or destruction of bump-stock-devices and other firearms

and devices covered by the NPR constitutes a physical invasion and taking by government; and

therefore, ATF must address and provide for the payment of just compensation to each

individual who would be deprived of their property under the NPR.

As reflected in the Verified Declaration of Damien Guedes, he purchased a Bump Fire

Systems' bump-stock-device, only after ensuring the legality of the device and relying on ATF's

determination to Bump Fire System that the device was lawful and did not constitute a

machinegun. *See* Exhibit 15. Matthew Thompson, likewise, issued a Verified Declaration stating

that he purchased a Slide Fire bump-stock-device, only after ensuring the legality of the device

and relying on ATF's determination to Slide Fire that the device was lawful and neither

28

constituted a firearm nor a machinegun. *See* Exhibit 16. Thus, both Mr. Guedes and Mr.

Thompson, in reliance on ATF's prior determinations, purchased bump-stock-devices, which

ATF now seeks to reclassify [31] as a machinegun – in violation of the *ex post facto* clause of the

U.S. Constitution, discussed *infra* – and seeks to force their surrender or destruction of the bump-

stock-devices, in the absence of just compensation, [32] all in violation of the takings clause of the

U.S. Constitution.

Since ATF failed to address the takings aspects of this proposed rule, including, as

discussed *supra* and *infra*, its potential application to shotguns and firearms that are capable of

"slamfiring", as well as, Gatling guns, and triggers, interested parties have been denied

meaningful review of ATF's position in this regard; however, to the extent ATF contends that an

individual would lack a possessory interest in a bump-stock-device and other firearms and

devices covered by the NPR as a result of the proposed rule being enacted, the U.S. Supreme

Court has already held that while an individual may lose his/her possessory interest in a firearm

or other tangible or intangible object, the individual does not lose his/her property or ownership

interest in the object. *Henderson v. United States*, 135 S.Ct. 1780, 1785 (2015) (holding that

even where an individual is prohibited from purchasing and possessing firearms, he/she still

retains a property interest in firearms previously acquired.). Furthermore, as the proposed rule

constitutes a *per se* taking, the Government must provide just compensation. *Nixon v. United*

*States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). Thus, even if ATF enacted the proposed rule, it

would still be responsible for paying just compensation to each person deprived of his/her

property.

---

[31] *See* 83 Fed. Reg. 13348, where ATF acknowledges that the proposal is a reclassification.
[32] As reflected in the declarations, Mr. Guedes paid a total of $105.99 for his bump-stock-device
and Mr. Thompson paid a total of $134.00 for his bump-stock-device.

ii.     Cost-Impact Statement Fails to Address Just Compensation for the
Taking

Once again, ATF has denied interested individuals meaningful review and opportunity to

comment by failing to address the economic impact when factoring in the just compensation that

it is constitutionally-obligated to pay law-abiding citizens, who own bump-stock-devices and

other firearms and devices covered by the NPR, if it proceeds with the proposed rule. While ATF

provides detailed tables concerning the anticipated economic loss to producers, retailers, and

consumers, the proposed rule fails to provide information on how the Government will fulfill its

obligation to compensate affected individuals for the taking. As reflected in the proposal, ATF

assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while

acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. 13451. The

proposal then declares the primary estimated cost to be $96,242,750.00 based on ATF's primary

estimate of 520,000 bump-stock-devices having been produced. *Id*. However, multiplying ATF's

stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not

$96,242,750.00 as stated in Table 3. Moreover, by averaging the acknowledged prices for bump-

stock-devices, a proper average sale price should be $302.95, which would result in a primary

estimated cost of $157,534,000.00 in just compensation being due. Additionally, both estimated

costs may be grossly under-estimated given ATF's proposed changes to 27 C.F.R. § 447.11 and

27 C.F.R. 478.11, since they would seemingly include any device – inclusive of rubber bands

and belt loops. More disconcerting, as mentioned on page 6 of the Savage Comment, [33] the

proposed rule would seemingly apply to hundreds of thousands, if not millions, of shotguns and

---

[33] *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-
Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63,
*available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210,
in "Email 013 (Historic Arms) rec 5-29-18 " as pdf pages 1 – 2.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000260

other firearms, which are capable of "slamfiring" [34] which would constitute "firing without additional physical manipulations of the trigger by the shooter." It would also seemingly overrule – without any notice and opportunity to comment – ATF Ruling 2004-5 [35] and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns and result in reclassification of their status – *i.e.* turning the millions of owners into felons overnight and without just compensation being provided. Given that the price, per Gatling gun, can be as high as $124,000.00, if not more, the reclassification of Gatling guns would result in a substantial upward calculation of the cost estimate in this matter.

## How much is a Gatling gun?

### Narrow Your Search

| Item | Title Click Headers to Sort | Price |
|------|------------------------------|-------|
| 771029939 | Colt 1874 Camel Gatling gun (C9743) | **$124,000.00** |
| 770122834 | REAL- WORKING GATLING GUN FULLY- FUNCTIONAL 45 LC | **$6,995.00** |
| 770033106 | Colt 1877 Bulldog 10 Barrel Gatling Gun Carriage NEW Wood Never Touched the Ground! CGG1877HS | $55,000.00 |

35 more rows

**Gatling Gun For Sale – Buy a Gatling Gun Online at GunBroker.com**
https://www.gunbroker.com/Gatling-Gun/Browse.aspx?Keywords=Gatling+Gun

---

[34] *See* Colton Bailey, *Slam Fire Shotgun? This One Shoots Multiple Rounds Without Releasing The Trigger*, Wide Open Spaces, (Feb. 13, 2017)*, available at* http://www.wideopenspaces.com/slam-fire-shotgun-shoots-multiple-rounds-without-releasing-the-trigger.
[35] *Available at* https://www.atf.gov/file/83561/download.

31

Even more disconcerting, as discussed *infra* in Section V., given ATF's argle-bargle and interpretive jiggery-pokery, the NPR can be construed as applying also to triggers and fingers, [36] which again, would result in a skyrocketing upward calculation of the cost estimate in this matter.

Regardless of the estimate considered, ATF has failed to address any appropriations available to it or, more generally, the Department of Justice to fund these takings and any such fund, if limited solely to bump-stock-devices, must have a high estimate of $221,494,000.00 ($425.95 x 520,000) available to ensure that all individuals are justly compensated. If, on the other hand, the proposal will apply to shotguns and other firearms capable of "slamfiring", as well as Gatling guns, triggers and fingers, [37] there must be an allocation of no less than $50,000,000,000,000.00.

Thus, before ATF can proceed in this matter, it must provide logistical information as a part of its cost-impact statement detailing how it plans to pay compensation including, but not limited to, the compensation rate, timeline for completing payment, source of the funding, and sequestration of an appropriate amount in an account restricted to paying just compensation in this matter. Thereafter, it must provide interested parties with a meaningful opportunity to respond, which, per 18 U.S.C. § 926(b), cannot be shorter than ninety days.

---

[36] The average value under state and federal workers compensation acts across the U.S. for the loss of an index finger is $24,474.00, with the federal value being $86,788.00. Accordingly, as a federal rate is set, at a minimum, ATF would be required to utilize this value. *See* Exhibit 31, also *available at* - https://projects.propublica.org/graphics/workers-compensation-benefits-by-limb.

[37] With there being between 270,000,000 and 310,000,000 gun owners in the U.S. (*see* http://www.pewresearch.org/fact-tank/2013/06/04/a-minority-of-americans-own-guns-but-just-how-many-is-unclear*), the takings alone in relation to fingers, utilizing the low 270 million gun owner estimate, would be $23,432,760,000,000.00 or 270,000,000 x $86,788.00.

32

C.     *The Ex Post Facto Clause*

Pursuant to Article 1, Section 9, Clause 3 of the U.S Constitution, "No Bill of Attainder or ex post facto Law shall be passed." The U.S. Supreme Court in *Calder v. Bull*, 3 U.S. 386 (1798) held that an *ex post facto* law includes, *inter alia*, "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." The Court later recognized that the provision reached far enough to prohibit any law which, "in relation to the offence or its consequences, alters the situation of a party to his disadvantage." *Collins v. Youngblood*, 497 U.S. 37, 47 (1990).

1.     *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct*

On at least two occasions in the proposed rulemaking, ATF acknowledges that the current definition of a machinegun does not cover bump-stock-type devices [38] that it now seeks to regulate. 83 Fed. Reg. 13444, 13448. ATF then explicitly declares that if the final rule is consistent with the proposal, there will be no mechanism for current holders of bump-stock-type devices – or any other firearm or device covered by the NPR – to register them and will therefore be compelled to dispose of them. 83 Fed. Reg. 13448. There is no dispute, and ATF readily admits, that its proposed rule would change the definition of a machinegun; thereby, affecting numerous sections of federal law and immediately turning, *at a minimum*, half a million law-abiding citizens into criminals overnight. ATF's proposal neither includes a grandfather provision nor a safe harbor, even for a limited period of time. More disconcerting – as if such

_____

[38] It likewise does not cover rubber bands, belt loops, slamfire shotguns and firearms, Gatling guns, triggers, or fingers.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000263

were fathomable in anything but an Orwellian nightmare – is the fact that those possessing

bump-stock-devices will have no knowledge of whether any final rule will be implemented, the

text of that rule, and the date, as the final rule would become effective immediately upon the

signature of Attorney General Sessions, without prior publication to the public. But that's no big

deal, right? It's only 10 years in jail and $250,000.00, per violation. Thank God that Article 1,

Section 9, Clause 3 precludes such. [39]

     Just as there can be no dispute that the current definition of machinegun does not cover

bump-stock-devices, rubber bands, belt loops, "slamfire" shotguns and firearms, Gatling guns,

triggers, and fingers, as evidenced by the proposed rule seeking to modify the regulatory

definition of machinegun, there can be no dispute that the proposed rule violates the *ex post facto*

Clause, even though it is a regulatory action because the "sanction or disability it imposes is 'so

punitive in fact' that the law 'may not legitimately be viewed as civil in nature." *United States v.*

*O'Neal*, 180 F.3d 115, 122 (4th Cir. 1999) (quoting *U.S. v. Ursery*, 518 U.S. 267, 288 (1996)).

## III.    ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY

     From the outset, it is clear that the NFA was designed to provide a basis for prosecution

of "gangsters" with untaxed, unregistered firearms and not as a regulation of law-abiding citizens

who complied with the law. ATF has turned the statutory scheme on its head, imposing ever

more draconian burdens on law-abiding citizens who seek to make and acquire NFA firearms

---

[39] FPC make this statement pursuant to their First Amendment rights under the U.S. Constitution
to the extent that ATF has not seemingly sought to abrogate that inalienable right in the NPR,
although ATF has declared its intent, in violation of the First Amendment, not to consider
comments containing what it deems to be "inappropriate language" for which FPC will
vigorously challenge in court.

while diverting resources to do so from investigating and prosecuting criminals who use illegal means to obtain NFA firearms.

ATF describes the NFA in terms that go beyond the statutory text. According to ATF's Website, the NFA's "underlying purpose was to curtail, *if not prohibit,* transactions in NFA firearms." http://www.atf.gov/content/firearms/firearms-industry/national-firearms-act (emphasis added). It describes the $200 tax imposed by the NFA as having been designed "to discourage *or eliminate* transactions in these firearms." *Id.* (emphasis added). But Congress has never "prohibited" NFA firearms or "eliminated" the ability to transfer them provided the tax is paid and registration procedures are followed.

### A.   *Congress Prohibited "Undue or Unnecessary" Restrictions*

Congress has, in fact, legislated to *limit* the authority of ATF to impose more burdens on law-abiding citizens. Congress was aware of ATF's over-zealous interpretation of the NFA when it enacted the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 110 Stat. 449 (1986). It would be an understatement to say that Congress thought ATF had reached the maximum boundary of its rulemaking and enforcement authority. Well aware of ATF's history, as discussed *supra* in Section I., D., made clear in FOPA that ATF's regulation and enforcement activities of *legal* owners of firearms – like those who seek to register firearms under the NFA – had already gone too far. Congress found that not only were statutory changes needed to protect *lawful* owners of firearms, but that "enforcement policies" needed to be changed as well. FOPA § 1(b). In doing so, Congress reaffirmed that "it is not the purpose of this title to place *any undue or unnecessary* Federal *restrictions or burdens* on law-abiding citizens with respect to the acquisition, possession, or use of firearms," *id*. (emphasis added), signaling in the strongest

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000265

possible language that ATF should not impose yet additional burdens on law-abiding citizens, especially in light of the existing criminal laws prohibiting, *inter alia*, murder, manslaughter, aggravated assault, *etc*. Yet, that is precisely what ATF's proposed rule would do.

### B.     Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun

Even without consideration of FOPA, there are ample reasons to doubt that Congress authorized ATF to formulate the proposed regulation, as Congress, itself, defined what constitutes a machinegun when enacting the NFA in 1934 and the GCA in 1968 and numerous members of Congress have stated that ATF lacks the authority to redefine what constitutes a machinegun. As an administrative agency cannot override a congressional enactment, ATF lacks authority and jurisdiction to amend or otherwise modify the definition of a machinegun as enacted by the Congress.

In the original NFA as enacted in 1934, and reaffirmed in enacting the GCA in 1968, the Congress expressly defined what constitutes a machinegun. 18 U.S.C. § 921(a)(23) states "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." 26 U.S.C. § 5845(b) declares:

> The term "machinegun" *means* any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

(Emphasis added).

ATF proposes to expand the definition of what a "machinegun" means by adding the following two sentences to the end of the current definition found in 27 C.F.R. §§ 478.11 and 479.11. [40]

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 13457.

And, lest there be no dispute, even Senator Diane Feinstein declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." *See* Exhibit 9. And ATF previously admitted to Congress that it "does not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." See Exhibit 10, p. 5. More importantly, as confirmed by J. Thomas Manger, President of the Major Cities Chiefs Association and Chief of Police of Montgomery County, in his testimony before the Senate Judiciary Committee, ATF Acting Director Thomas Brandon admitted that "ATF does not now have the authority under Federal law to bar [bump-stock-devices] and *new legislation is required to do so*." *See* Exhibit 30, p. 3 (emphasis added).

And the courts have agreed that such an alteration is beyond the power of ATF. "As a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." *Colautti v. Franklin,* 439 U.S. 379, 392–393, n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Congress clearly defined the meaning of the term "machinegun" as evidenced by its use of the

---

[40] The definition of "machinegun" contained in 27 C.F.R. §§ 478.11 and 479.11 mirrors the definition Congress gave the term in 26 U.S.C. § 5845(b).

phrase "[t]he term 'machinegun' *means*." [41] Even if ATF could define the terms "automatically"

and "single function of the trigger", which is disputed, ATF lacks the authority to unilaterally

declare an item to be a machine gun when it falls outside the statutory parameters, particularly by

incorporating it into the definition itself. [42]

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

"Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms

when it wishes to enlarge, agency discretion." *City of Arlington, Tex. V. F.C.C.*, 569 U.S. 290,

296 (2013).

Here, there can be no question that the intent of Congress was clear. Congress sought to

regulate firearms that: 1) shoot, 2) were designed to shoot, or 3) can be readily restored to shoot,

4) automatically more than one shot, without manual reloading, 5) by a single function of the

trigger. This can be gleaned from an analysis of the debate surrounding the passage of the

legislation. "Mr. Frederick.[] The distinguishing feature of a machine gun is that by a single pull

of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the

magazine. Other guns require a separate pull of the trigger for every shot fired, and *such guns*

*are not properly designated as machineguns*. A gun…which is capable of firing more than one

shot by single pull of the trigger, a single function of the trigger, is properly regarded, in my

---

[41] Even Dictionary.com defines the term "Machine Gun" to mean "a small arm operated by a mechanism, able to deliver rapid and continuous fire as long as the trigger is pressed." *Available at:* http://www.dictionary.com/browse/machine-gun. ATF taking such a nuanced approach to parsing specific terms to shoehorn a particular group of accessories into the definition flies in the face of the statutory text's plain meaning.

[42] *See* 18 U.S.C. 926(a) "The Attorney General may prescribe *only such rules and regulations* as are *necessary* to carry out provisions of this chapter…" (Emphasis added).

opinion, as a machine gun." Exhibit 29, National Firearms Act: Hearings Before the Committee

on Ways and Means, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934) (emphasis added).

For the purposes of this analysis, a machinegun can be distilled down to: a firearm which

shoots automatically more than one shot, without manual reloading, by a single function of the

trigger. Congress also sought to regulate the frames or receivers of such weapons, along with any

parts that could be used to make or convert a firearm into a machinegun. Such an interpretation is

in line with prior court and agency decisions. *See Staples v. United States*, 511 U.S. 600 (1994)

("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. §

5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that

automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also Id*.

at n1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires

repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will

automatically continue to fire until its trigger is released or the ammunition is exhausted. Such

weapons are 'machineguns' within the meaning of the Act."). [43]

Moreover, the Government has previously argued to a Federal Court that a bump-stock-

device was not a machinegun. "While the shooter receives an assist from the natural recoil of the

weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is *contingent*

---

[43] *See also* ATF Rul. 2004-5 quoting George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper &
Rowe 1973) (the term "automatic" is defined to include "any firearm in which a single pull and
continuous pressure upon the trigger (or other firing device) will produce rapid discharge of
successive shots so long as ammunition remains in the magazine or feed device – in other words,
a machine gun"); Webster's II New Riverside-University Dictionary (1988) (defining
automatically as "acting or operating in a manner essentially independent of external influence or
control"); John Quick, Ph.D., Dictionary of Weapons and Military Terms 40 (McGraw-Hill
1973) (defining automatic fire as "continuous fire from an automatic gun, lasting until pressure
on the trigger is released").

*on shooter input* in pushing the weapon forward, rather than mechanical input, and is *thus not an automatic function of the weapon.*" *See* Exhibit 25, page 22.

The statutory language is explicitly clear as to what constitutes a machinegun and is inclusive of parts that can be used to assemble a functioning firearm. ATF acknowledges that bump-stock-devices are not currently able to be regulated as machineguns because it seeks to amend the definition to specifically include them and other firearms and devices covered by the NPR, discussed *supra* and *infra*. Notably absent from the statutory text is language, specifically or implicitly, naming parts that can be used in conjunction with a firearm, which is not a machinegun, to *simulate* automatic fire.

### C.      *ATF is Statutorily Prohibited From Retroactively Applying the NPR*

ATF has acknowledged that it is precluded from taking any action with regard to the reclassification of bump-stock-devices manufactured prior to at least March 29, 2018. As noted in ATF Rul. 82-8, the reclassification of SM10 and SM11A1 pistols and SAC carbines as machineguns, under the National Firearms Act, was not applicable to those firearms manufactured before or assembled before June 21, 1982 pursuant to 26 U.S.C. § 7805(b). 26 U.S.C. § 7805(b) states:

> Retroactivity of regulations.--
> (1) In general.--Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
> (A) The date on which such regulation is filed with the Federal Register.
> (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

40

More recently, in enacting ATF-41F (81 Fed. Reg. 2658 through 2723), ATF seemingly invoked Section 7805(b) in declining to retroactively apply the final rule and instead permitting a six month delay in implementation of the final rule and acknowledging that all applications submitted prior to the effective date would be adjudged by the law as it existed prior to the final rule, regardless of whether the application was approved before the effective date of the final rule.

Thus, any final regulation that is promulgated has no effect on bump-stock-devices and other firearms and devices covered by the NPR, which were manufactured, at a minimum, prior to the date of publication of this NPR in the Federal Register.

## IV.    ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS

Contrary to the contention in the proposed rulemaking, bump-firing is neither the result of any particular firearm accessory, device or part nor the modification thereof. Rather, it is a technique that can be utilized with the intrinsic capabilities of most *factory* semi-automatic firearms, including the rifles, such as the AR-15, and pistols, such as the 1911. As reflected *infra* and admitted by ATF (83 Fed. Reg. 13454), bump-firing can be done with a belt loop, a rubber band, or just one's finger. More importantly, no device – whether bump stock, belt loop, rubber band or finger – changes the intrinsic capability of the firearm to be bump-fired. This is made explicitly evident by Jerry Miculek, who can not only shoot faster than an individual employing bump-fire but can shoot far more accurately. [44]

---

[44] *See* Exhibits 3 and 4.

41

Thus, the proposed rule in this matter is so completely arbitrary and capricious that it will not withstand scrutiny. *See*, *Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*, 463 U.S. 29, 42-44 (1983).

### A.      *ATF's Interpretative Jiggery-Pokery is Pure Applesauce*

As reflected in the expert report of former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, bump-stock-devices do not constitute a machinegun, as they are not designed to shoot more than one shot by a single function of the trigger. *See* Exhibit 32. Specifically, he declares that a "Slide Fire [stock] does not fire automatically with a single pull/function of the trigger" and as a result, "ATF could not classify the slide fire as a machinegun or a machinegun conversion device, as it did not fit the definition of a machinegun as stated in the GCA and NFA." *Id*. More importantly, although ATF has failed to disclose it in the NPR or docket, the Slide Fire determination "was sent to Chief Counsel and higher authority for review. After much study on how the device operates, the opinion, based on definitions in the GCA and NFA, was that the Slide Fire was not a machinegun nor a firearm, and, therefore, did not require any regulatory control." *Id*.

Thus, regardless of the interpretative jiggery-pokery employed by ATF in the NPR, at the end of the day, it is pure applesauce.

### B.      *Belt Loops, Rubber Bands and Fingers, OH MY!*

Reflecting the absolutely arbitrary and capricious nature of this rulemaking, ATF admits – albeit at the end of the proposal in the "Alternatives" section – that an individual does not require a bump-stock-device in order to bump-fire a factory semi-automatic firearm. 83 Fed.

42

Reg. 13454. In fact, ATF readily acknowledges that bump-firing can be lawfully achieved through the "use [of] rubber bands, belt loops, or [to] otherwise train their trigger finger to fire more rapidly," in a clear statement of its intent to unequally apply the law. *Id*.

Numerous videos and articles are available reflecting individuals bump-firing with everything from their finger to belt loops and rubber bands. For example, P.M.M.G. TV posted a video in 2006 of a rubber band being utilized to bump fire a factory semi-automatic firearm. *See* Exhibit 11. [45] In 2011, StiThis1, posted a video of him utilizing his belt loop to bump-fire his AK-47. *See* Exhibit 12. [46]

More importantly, reflecting that no device is necessary to bump-fire a factory semi-automatic firearm, ThatGunGuy45 posted a video of him bump-firing an AK-47 style rifle with his finger. *See* Exhibit 13. [47] Similarly, M45 posted a video of him bump-firing both an AK-47 and AR-15 solely with his finger. *See* Exhibit 14. [48] In no better example, former former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, who previously reviewed bump-stock-devices – specifically the Slide Fire bump-stock – while with ATF, after declaring that a bump-stock-device is not statutorily or regulatorily a machinegun, [49] demonstrates the

---

[45] A copy of the video is also available online – Shooting Videos, *Rapid manual trigger manipulation (Rubber Band Assisted)*, YouTube (Dec. 14, 2006), https://www.youtube.com/watch?v=PVfwFP_RwTQ&t.

[46] A copy of the video is also available online – StiThis1, *AK-47 75 round drum Bumpfire!!!*, YouTube (Sept. 5, 2011), https://www.youtube.com/watch?v=-03y3R9o6hA.

[47] A copy of the video is also available online – ThatGunGuy45, *'Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45*, YouTube (Oct. 13, 2017), https://www.youtube.com/watch?v=-9fD_BX-afo&t.

[48] A copy of the video is also available online – M45, *How to bumpfire without bumpfire stock*, YouTube (Oct. 8, 2017), https://www.youtube.com/watch?v=7RdAhTxyP64&t. *See also*, wrbuford13, How To: Bump fire a semi-automatic rifle from the waist, YouTube (May 25, 2011), https://www.youtube.com/watch?v=wZCO-06qRgY.

[49] During his interview, he declares "[i]f Congress wants to change the law and come up with a new interpretation, then ATF will follow that new interpretation. But until they do that, they have to go by the [law] they have today."

43

ability of a factory semi-automatic AR-15 and AK-47 to bump-fire solely with his finger. *See* Exhibit 17. [50] Expert Vasquez then goes on to declare, in response to a question of what if Congress bans bump-fire devices, "[w]hat are they going to ban? If they come out today and say the Slide Fire Stock or the binary trigger by name is made illegal, they're going to have to make illegal the operating principle." *Id.*

Beyond showing that the proposed rulemaking in this matter is completely arbitrary and capricious, as no device is even necessary to bump-fire a factory semi-automatic firearm, these videos and others that are available on YouTube and other social media platforms, reflect that law-abiding citizens have been bump-firing long before Al Gore invented the internet; [51] and yet, ATF cannot produce a single shred of evidence of a bump-stock-device *ever* having been utilized in a crime.

C.     *The Jerry Miculek Example – He's One Bad Mother… Shut Your Mouth (And: Oh No! They Banned Jerry!)*

As mentioned *supra*, Jerry Miculek not only can shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. *See* Exhibit 3 and 4. [52] Even more evident of the completely arbitrary and capricious nature of this proceeding is the video compendium of Mr. Miculek's abilities and achievements, which depicts that "he did it. He did 8

---

[50] A copy of the video is also available online – Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube (Oct. 11, 2017), https://www.youtube.com/watch?v=kryIJIrD5eQ&t.

[51] It has to be true – he said it on live TV… https://www.youtube.com/watch?v=BnFJ8cHAlco.

[52] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

rounds in one second, on one target. He did 8 rounds on four targets in 1.06 [seconds]. Six shots and reload and six shots in 2.99 seconds." *See* Exhibit 18. [53] Thus, as individuals can achieve, with greater accuracy, faster cyclic rates than those utilizing bump-stock-devices, the underlying premise of this proceeding is completely arbitrary and capricious.

More disconcerting is that to the extent ATF contends in the NPR that it is carrying out some unverified and unsupported contention of Congress to ban anything mimicking the rate of fire of a machinegun [54] (83 Fed. Reg. 13447) – a rate of which varies greatly [55] and neither has a commonly accepted average rate nor a proposed rate by ATF – Mr. Miculek would seemingly be banned by any final promulgated rule, in violation of his Constitutional Rights and reflecting the sheer absurdity of this NPR.

D.      *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting*

As discussed *supra* in Section I., B., while implying that a bump-stock-device was utilized in the Las Vegas shooting, ATF has failed to provide evidence of a single instance where a bump-stock-device was utilized in the commission of a crime and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. Instead, ATF relies solely on prior

---

[53] A copy of the video is also available online – *Fastest Shooter OF ALL TIME! Jerry Miculek | Incredible Shooting Montage*, DailyMotion (2014), https://www.dailymotion.com/video/x2y1eb8.

[54] In fact, ATF's assertion is contradicted by the testimony in enacting the NFA – previously cited to by ATF in federal court proceedings – which reflects the Congress' intent that guns which "require a separate pull of the trigger for every shot fired, … *are not property designated as machineguns*." Exhibit 29, p. 40.

[55] For example, the Metal Storm gun has a cyclic rate of fire of 1,000,000 rounds (that isn't a typo), per minute (*see*, http://www.businessinsider.com/worlds-fastest-gun-2016-2), a minigun has a rate of fire of 6,000 rounds, per minute (*id.*), and some have as slow of a cyclic rate as 200 rounds, per minute (*see*, https://encyclopedia2.thefreedictionary.com/Cyclic+rate).

"public comments," which are merely conjecture, to suggest that a bump-stock-device was utilized in Las Vegas (83 Fed. Reg. 13454), [56] while thereafter declaring that bump-stock devices "*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use of the word "could" reflects that such use is merely speculative and limited to a *possible* future, not past, occurrence. More importantly, as ATF is involved in the investigation into the Las Vegas shooting, it is in the unique position to have evidence reflecting the use of bump-stock-devices in the shooting, if such devices were utilized; yet, it has not only failed to submit any evidence even suggesting the use of bump-stock-devices in the Las Vegas shooting but has failed to even contend, based on its own knowledge, that such devices were utilized. Additionally, the Las Vegas Metropolitan Police Department Preliminary Investigative Report likewise provides no indication that any bump-stock-devices *were* utilized in the shooting. *See*, Exhibit 2. [57]

Thus, ATF acknowledges that but for public conjecture, it has *no* evidence or knowledge that a bump stock device has been utilized in a crime and only hypothesizes that a bump-stock device "could be used for criminal purposes." Moreover, as discussed *supra* in Section I., D., based on ATF's lack of candor before the courts, Congress, and the public, any contention by ATF that such devices were utilized in the Las Vegas shooting must be dismissed, in the absence of independently-verifiable evidence in support.

Further, ATF's argument as to why they need to be regulated is misleading.

---

[56] Given ATF's prior use of proxies in rulemaking proceedings to support its contentions, these alleged "public comments" cannot be taken at face value, especially in the absence of any evidentiary support. *See* Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, available at https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section G the ATF's use of proxies in rulemaking proceedings to support its own contentions.

[57] A copy of the report is also available online at – https://www.lvmpd.com/en-us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000276

Commenters also argued that banning bump-stock-type devices will not significantly impact public safety. Again, the Department disagrees. The shooting in Las Vegas on October 1, 2017, highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict. *The shooting also made many individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious. The proposed regulation aims to ameliorate that threat.*

83 Fed. Reg. 13447. (Emphasis added).

This position is no more valid than asserting that drill presses and the internet need to be regulated because individuals with criminal or terrorist intentions can readily access a drill press to manufacture a machine gun after viewing a video on the internet, or even fabricate a firearm from a chunk of raw aluminum. (Nevermind the fact that a person can purchase ammonium nitrate and nitromethane, or pressure cookers, to build a bomb.) In the land of hypotheticals, anything and everything could be perceived to be and categorized as a potential threat to public safety. But a hypothetical should not and cannot be the premise of a proposed regulation.

E.    ***We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices***

In the Summary for the NPR, ATF claims that bump-stock-devices

allow a shooter of a semiautomatic firearm to initiate a *continuous firing cycle with a single pull of the trigger*. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun *by functioning as a self-acting or self-regulating mechanism* that harnesses the recoil energy of the semiautomatic firearm in a manner that *allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter*. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with *a single pull of the trigger*.

83 Fed. Reg. 13442 (emphasis added).

Even setting aside former Acting Chief of the Firearms Technology Branch Richard Vasquez's expert report disputing ATF's current contention (discussed *supra* in Section IV., A.,

47

and Exhibit 28) and before addressing the video evidence of the outright falsity of these

assertions, let us first review the known determinations issued by ATF and the sworn testimony

and pleadings submitted by ATF to the courts regarding bump-stock-devices.

On June 07, 2010, ATF issued a determination letter to Slide Fire, holding that

The stock has *no automatically functioning mechanical parts or springs* and *performs no automatic mechanical function* when installed. In order to use the installed device, *the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand*. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

*See* Exhibit 10 (emphasis added.)

Thus, ATF has already admitted that the Slide Fire stock does not operate automatically

and is neither self-acting nor self-regulating. But what about Bump Fire Systems' bump-stock-

device? Glad you asked.

On April 2, 2012, ATF issued a determination letter to Bump Fire Systems, declaring that

The FTB live-fire testing of the submitted devices indicates that if, as a shot is fired, an <u>*intermediate*</u> amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*.
…
Since your device is *incapable of initiating an automatic firing cycle* that continues until either the finger is released or the ammunition supply is exhausted, FTB find that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

*See* Exhibit 10 (emphasis in original, emphasis added.)

Once again, now in relation to Bump Fire Systems' bump-stock device, ATF found that

bump-stock-devices are incapable of automatic firing and require a mechanical reset of the

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000278

trigger – no different than any other semi-automatic firearm – and thus, are not capable of a continuous firing cycle with a single pull of the trigger.

But, in sworn testimony and pleadings submitted to the courts, ATF contended bump-stock-devices were machineguns, right? Nope.

As reflected on page 20 of the U.S. Government's Brief in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in *Freedom Ordinance Mfg. Inc., v. Thomas E. Brandon*:

> An ATF expert testified that a true trigger activating devices [i.e. bump-stock-devices], although giving the impression of functioning as a machine gun, are not classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*.

*See* Exhibit 25 (emphasis added).

Hence, ATF in sworn testimony and pleadings submitted to the United States District Court, Southern District of Indiana, admitted that the function of bump-stock-devices requires the shooter to separately pull the trigger each time he/she fires the gun, which is two-levels removed from being a machinegun. [58]

So, the question becomes, was ATF lying then, or is it lying now? There can be no dispute, it's lying now.

---

[58] The use of the terminology two-levels removed from being a machinegun is in relation to the explicit definition of machinegun that was enacted by the Congress in 26 U.S.C. § 5845(b), which for a firearm to constitute a machinegun, requires it to shoot "automatically more than one shot … by a single function of the trigger." As acknowledged by ATF, since the trigger is pulled (*i.e.* a single function of the trigger) and then released (*i.e.* a second and separate single function of the trigger), before the subsequent round can be fired, a bump-stock-device is two-levels removed from being a machinegun, as it still would not constitute a machinegun, even if a subsequent round was discharged on the release of the trigger. ATF has determined that this is a proper analysis of Section 5845(b) in approving binary triggers, which permit the discharge of a round on both the pull and release of the trigger.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000279

In response to this NPR, a video was recorded depicting the actual function of a bump-stock-device. *See* Exhibit 28. [59] *See also* Exhibit 33 Declaration of Jonathan Patton. As reflected in the video, a magazine full of ammunition is placed into an AR-15 type firearm that has a Slide Fire bump-stock-device [60] installed onto it. The shooter then proceeds to fire the bump-stock equipped firearm with the stock in the locked position. [61] As depicted, the bump-stock-device neither self-acts nor self-regulates and the shooter proceeds to fire several rounds, without the bump-stock automatically firing more than one round, per function of the trigger. [62] [63] The video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. In fact, for a subsequent round to be fired, two single and separate functions of the trigger are necessary – the release of the trigger and the subsequent pull of the trigger, which is no different than any other factory semi-automatic firearm. The shooter then proceeds to unlock the stock so that it can move freely on the buffer tube and fire the gun one handed. Once again, the video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. At not point does the gun fire more than one round per function of the trigger.

Additionally, the close-ups reveal, contrary to ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the trigger by the shooter" *is necessary* for subsequent

---

[59] A copy of the video is also available online – Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, (June 14, 2018), *available at* https://youtu.be/1OyK2RdO63U.

[60] The actual device is a Slide Fire SSAR-15 SBS.

[61] This position is the same as any other AR-15 type firearm with an adjustable stock.

[62] Thus, contrary to the NPR, bump-stock-devices do not cause a continuous firing cycle with a single pull of the trigger.

[63] If the bump-stock-device actually turned the firearm into a machinegun, the entire magazine of ammunition would have been expended, when the shooter maintained constant pressure on the trigger. *See* Exhibit 26. A copy of the video is also available online – Molon Labe, *hogan 7 m16.wmv*, YouTube (Oct. 25, 2011), is https://www.youtube.com/watch?v=NwQ1aZnVLFA.

rounds to be discharged. Of course, all of this is irrefutably consistent with ATF's prior determinations and sworn testimony and pleadings submitted to the courts.

So what if the shooter shoots the bump-stock equipped AR-15 in the manner depicted by the NPR – *i.e.* while "maintaining constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure?" 83 Fed. Reg. 13443. Clearly, it will shoot automatically, right? It self-acts and self-regulates, right? Nope.

When the shooter maintains constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, while maintaining the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged – again no different than any factory semi-automatic firearm. Moreover, as evidenced by the close-ups, contrary to ATF's assertion (83 Fed. Reg. 13443, 13447), "bump-stock-type devices [*do not*] allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device," as the shooter in the video specifically maintains pressure on the extension ledge of the device the entire time; and yet, only a single round is discharged each time.

Surely, the video must not depict the actual function of a bump-stock-device, right? Wrong.

Former Acting Chief of the FTB and expert Rick Vasquez was responsible for reviewing and making a determination on the Slide Fire stock, when it was submitted to the FTB for evaluation and classification. *See* Exhibit 32. After concluding that the Slide Fire stock was neither a firearm nor a machinegun under the NFA and GCA, the determination was "reviewed

51

by ATF Chief Counsel and higher authorities within ATF and affirmed." *Id*. More recently, he reviewed the *Bump Stock Analytical* video (Exhibit 28) and declared that it "fully, explicitly, and accurately depicts the function of bump-stock-devices, including, but not limited to, the function and operation of the firearm's trigger, which is exactingly consistent with my evaluation and review of the Slide Fire stock during my tenure with ATF and my Slide Fire Analysis." *Id*. He then goes on to explain that as depicted in the video:

    a.  The bump-stock-device neither self-acts nor self-regulates, as the bump-stock never fires, in any of the three possible ways to fire a bump-fire-device, more than one round, per function of the trigger, even while the shooter maintained constant pressure on the extension ledge. In fact, as explicitly and accurately depicted in the slow motion portions, the bump-stock-device requires two functions of the trigger before a subsequent round can be discharged (*i.e.* after the firearm is discharged for the first time, the trigger must be fully released, reset, and then fully pulled rearward for a subsequent round to be discharged); [64]

    b.  Bump-stock-devices do not permit a continuous firing cycle with a single pull of the trigger, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired; [65]

    c.  The bump-stock-device requires additional physical manipulation of the trigger by the shooter, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired;

    d.  Even when the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintains the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely

---

[64] It must be noted, as made explicitly clear in the slow motion portions of the video, that the bump-stock-device actually requires over-releasing of the trigger, as the shooter's finger travels past the trigger reset by approximately a half-inch, before beginning the sequence to fire a subsequent round (*e.g.* video at 3:46 – 3:51; 3:52 – 3:55; 3:56 – 4:00). Thus, the video makes extremely evident and clear that bump-stock-devices are actually slower than a trained shooter, as a trained shooter, such as Jerry Miculek, would immediately begin the sequence to fire a subsequent round after the trigger resets.

[65] If the device had permitted continuous firing cycle with a single pull of the trigger, the video would depict a scenario identical to Exhibit 26 of Firearm Policy Coalition's Comment (*also available at* https://www.youtube.com/watch?v=NwQ1aZnVLFA), where it clearly and accurately depicts the emptying of the entire magazine, while the shooter maintains constant pressure on the trigger.

rearward, before the subsequent round is discharged. *See* video at 3:47 – 4:01. This is no different than any factory semi-automatic firearm; and,

e. The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.

So where does this leave us? It leaves us with ATF's prior determinations and sworn testimony and pleadings submitted to the courts as being legally and factually indisputable, with the contrary statements in the NPR being solely designed to carry out a false narrative on the functionality of bump-stock-devices and to appease Attorney General Jeff Sessions and President Donald Trump. [66]

Surely, ATF hasn't sought to *further* mislead the public, right? Wrong.

Once again in the NPR, ATF contends that "[s]hooters use bump-stock-type devices with semiautomatic firearms to *accelerate the firearm's cyclic firing rate* to mimic automatic fire" (83. Fed. Reg. 13444)(emphasis added); yet, as discussed *supra* in Section I., B. and supported by Expert Declaration of Vasquez and the Savage Comment, the mechanical cyclic rate of both the semi-automatic and fully-automatic versions of a firearm are *identical* (and thus cannot be accelerated), except where the manufacturer purposely slows the rate of fire for the machinegun-version; whereby, in such instances, the semi-automatic-version can *exceed* the cyclic rate of the machinegun-version.

---

[66] *See* Memorandum of February 20, 2018 to Attorney General Sessions from President Donald Trump, "directing the Department of Justice to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns," *available at* https://www.whitehouse.gov/presidential-actions/presidential-memorandum-application-definition-machinegun-bump-fire-stocks-similar-devices.

F.    *The Akins Accelerator Difference*

There is a fundamental difference in the manner in which the Akins Accelerator works versus a bump-fire-device. [67] The Government had previously described the function of the Akins Accelerator in a brief filed in Federal Court.

> To operate the Akins Accelerator, the shooter pulled the trigger one time, initiating an automatic firing sequence, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset (move forward). Springs then forced the rifle forward in the stock, forcing the trigger against the finger, which cause the weapon to discharge the ammunition until the shooter released the constant pull the ammunition is exhausted. *Put another way, the recoil and spring-powered device cause the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull, without further impact by the shooter, thereby creating an automatic firing effect.*

*See* Exhibit 25. (Emphasis added).

However, as the video (*see* Exhibit 28) and Expert Vasquez's Declaration (*see* Exhibit 32) reflect, a single pull of the trigger on a firearm equipped with a bump-fire-device does not cause the firearm to cycle back and forth automatically. In order to have the firearm cycle and fire another round, mechanical input from the shooter is required. The shooter must both pull the trigger to the rear and push forward on the fore end of the firearm. Absent any additional input in a forward direction by the shooter, the firearm fires only a single round, even where the trigger is continuously held to the rear. Perhaps the description is best stated by the Government's own brief. "While the shooter receives an assist from the natural backfire of the weapon to accelerate subsequent discharge, *the rapid fire sequence in bumpfiring is contingent on shooter input,*

---

[67] While FPC do not agree that an Akins Accelerator constitutes a machinegun, they acknowledge the 11th Circuit's opinion in *Akins v. U.S.*, 312 Fed.Appx. 197 (11th Cir. 2009) and assume that court's holding for the purposes of this analysis.

*rather than mechanical input, and thus it cannot shoot 'automatically'*." *See* Exhibit 25.
(Emphasis added).

As is clearly demonstrated in the video, Expert Vasquez's Declaration and by the Government's own argument, bump-stock-devices are only capable of being fired in a rapid manner [68] when the shooter him or herself adds mechanical input with a forward push on the fore end of the firearm; however, such affirmative action by the shooter does not result in the bump-stock-device turning the firearm into a machinegun. Otherwise, Jerry Miculek and others will be banned by the implementation of the NPR.

## V.    ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY

ATF's proposed regulation is overly vague and potentially encapsulates a number of firearms and other products [69] that are commercially available.

Notably, ATF's proposed definition includes

> "..devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter."

83 Fed. Reg. 13457. This language could incorporate a variety of triggers that are currently on the market, which are lawfully possessed and utilized. Utilizing the same flawed logic ATF used to turn a bump-stock-devices into a machine gun, ATF would merely need to assert that by

---

[68] As discussed *supra* throughout Section IV. and in the Declaration of Expert Vasquez, this still requires the trigger to be released, reset, and pulled completely rearward, before a subsequent round is discharged; thereby, requiring two separate and distinct functions of the trigger, which precludes any finding that the device is a machinegun or otherwise causes the firearm to which it is attached to fire "automatically".

[69] As discussed *supra*, beyond regulating bump-stock-devices, it would also seemingly include, rubber bands, belt loops, fingers, "slamfire" shotguns and firearms, Gatling guns, triggers, and other devices (*e.g.* Hellfire trigger mechanisms).

placing forward pressure on the gun while holding the trigger to the rear and allowing the recoil

energy of the firearm to move the firearm enough to reset the trigger, that the trigger could

constitute a bump-stock-device, resulting in a variety of products designed for the competition

shooter to be banned overnight. Likewise, as discussed *supra* in Section IV., the technique of

bump firing only requires the use of one's finger – as admitted by ATF in numerous court filings

– thereby resulting in ATF's ability to contend that fingers, *in and of themselves*, are bump-

stock-devices under the NPR. Moreover, the proposal could also apply to everything from rubber

bands and belt loops to slamfire shotguns and firearms.

Such interpretations would leave thousands of gun owners unsure as to the status of their

particular firearm, device, or even finger, creating an influx of requests for determinations [70]

from ATF and making compliance with the proposed regulation the equivalent of navigating a

minefield without proper guidance. Moreover, as discussed *infra* in Section II, it raises a plethora

of constitutional issues in relation to the Second and Fifth Amendment and Article I, Section 9,

Clause 3 of the U.S. Constitution.

Even if one were to set the vagueness issues aside, the NPR is contradictory as it

contends that bump-stock-devices must be outlawed, while permitting rubber bands, belt loops

and fingers, which operate in an identical manner as bump-stock-devices. Specifically, in the

NPR, ATF contends that bump-stock-devices can "mimic automatic fire when added to

semiautomatic rifles" which Congress sought to outlaw (83 Fed. Reg. 13447); yet, thereafter, in

Alternative 2 (83 Fed. Reg. 13454), declares that "individuals wishing to replicate the effects of

bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger

---

[70] Such determinations would be of questionable value given ATF's contention in the NPR that it
can overturn its own determination on a whim or to appease politicians by utilizing interpretive
jiggery-pokery.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000286

finger to fire more rapidly." As discussed *supra* in Section IV. and the video exhibits specified therein, individuals can bump fire factory semi-automatic firearms with rubber bands, belt loops, and their fingers and some shooters, like Jerry Miculek, can not only shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. Thus, this entire NPR is contradictory to its stated purpose and underlying authority.

## VI.     ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES

In the proposal, ATF offers three alternatives. *See* 83 Fed. Reg. 13454. While FPC fully supports ATF moving forward under Alternative 1, [71] to the extent that ATF decides to move forward with some form of rule – despite the major constitutional, statutory, precedential and procedural issues presented by this rulemaking – there are viable alternatives, not previously considered, that would mitigate some of the constitutional and other issues.

### A.     *FPC Supports "Alternative 1"*

FPC fully support ATF not taking any further action in this rulemaking proceeding. Moreover, as discussed throughout this Comment, ATF is foreclosed – constitutionally, statutorily, precedentially and procedurally – from taking any action as described in the NPR. [72]

### B.     *The Amnesty Alternative*

Pursuant to Section 207(d) of 82 Stat. 1235, also known as the Gun Control Act of 1968,

---

[71] "Alternative 1 – No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative."

[72] To the extent ATF ignores the many issues raised in this and other comments, and moves forward with a final rule, FPC will likely seek judicial relief to invalidate and enjoin the enforcement of any final rule.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000287

(*see* Exhibit 19), the Attorney General [73] has the power to establish amnesty periods for up to ninety days. In fact, an amnesty was previously held between November 2, 1968, to December 1, 1968 and ATF promulgated a regulation – 26 C.F.R. § 179.120, entitled "Registration of Firearms" (*see* Exhibit 20) – which established the amnesty and procedures relating to the registration of unregistered NFA firearms. Moreover, as discussed *infra* in Section VI., C., ATF more recently provided a seven-year registration and amnesty period for Streetsweepers and USAS-12 firearms, when it reclassified them under the NFA.

Thus, contrary to ATF's assertion that "there is no means by which the possessor may register a firearm retroactively, including a firearm that has been reclassified" (83 Fed. Reg. 13348), the Attorney General can provide for an amnesty so that the 520,000-some-odd proscribed bump-stock-devices, and all other firearms and devices covered by the NPR, can be lawfully registered, thereby saving a minimum of $221,494,000.00 in just compensation being paid out by ATF while imposing its regulatory scheme under the NFA, which proponents of gun control, such as Senator Feinstein, desire. *See* Exhibit 21. [74] Given that the primary estimate suggests that around 520,000 bump-stock-devices are in circulation (not inclusive of other firearms and devices for which the NPR seemingly applies), the Attorney General should at least provide for a seven-year amnesty/registration period, as was provided when ATF reclassified the Streetsweeper and USAS-12 shotguns, which is discussed *infra* in Section VI., C. Alternatively, the Attorney General should issue an initial amnesty period of ninety days and provided 50 or

---

[73] While the provision refers to the "Secretary of the Treasury," the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, it is now the Attorney General that has the authority to institute an amnesty.

[74] A copy of Senator Feinstein's proposal
http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=10993387-5d4d-4680-a872-ac8ca4359119.

more applications are received between the 30th and 60th days, the amnesty period should be extended in increments of ninety days, until such time that less than 50 applications are received during an extension period.

Furthermore, pursuant to the logical outgrowth doctrine [75] and the numerous issues with the National Firearms Registration and Transfer Record ("NFRTR") – especially the deprivation of due process in civil and criminal proceedings (*see* Exhibits 6, 21 [76] and 22 [77]) – the amnesty should permit the registration of *any* unregistered NFA firearm, not just bump-stock-devices and those items subject to the instant NPR, since such is consistent with the Congress' intent that all NFA firearms be registered to the individual possessing them. [78]

**C.**    ***ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed***

In the alternative, as ATF admits that the NPR is a reclassification of the definition of machinegun to include bump-stock-devices (83 Fed. Reg. 13448), it must treat the reclassification equally to how it treated its prior reclassifications of the Streetsweeper and USAS 12 shotguns, for which it provided a seven-year registration and amnesty period.

---

[75] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).

[76] A copy of the article is available at – Joshua Prince, *Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record When its 'Files are Missing'*, (Sept. 28, 2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2752028.

[77] A copy of Eric Larson's testimony and exhibits of April 3, 1998, before the House Committee on Appropriations is available online at http://www.nfaoa.org/documents/1998testimony.pdf.

[78] *See* U.S. Senate, *Gun Control Act of 1968, Title II-Amendments to the National Firearms Act*, Report No 1501, 90th Cong., 2nd Sess., at 43 (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/SenateReport1501-GCA1968.pdf, declaring that the Congress intends that "every [NFA] firearm in the United States should be registered to the person possessing the firearm."

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000289

In a July 12, 2012, ATF Quarterly Roll Call Lesson Plan, the ATF Firearms Technology Branch admits that based on ATF's March 1, 1994 reclassification of the Striker-12/Streetsweeper and USAS-12 shotguns,[79] individuals were provided from March 1, 1994 through May 1, 2001 – more than seven years – to register these reclassified NFA firearms. *See* Exhibit 23, p. 3.

Accordingly, to the extent ATF moves forward with a final rule, ATF must provide a seven-year amnesty/registration period for individuals to register their bump-stock-devices.


### D.     *ATF's Reclassification of Open Bolt Macs*

 As discussed by the Savage Comment on pages 3 – 4[80], ATF Ruling 82-8 held that ATF was reclassifying semi-automatic SM10 and SM11A1 pistols and SAC carbines as machineguns and as a result of the ruling:

> "With respect to the machinegun classification of the SM10 and SM11A1 pistols and SAC carbines, under the National Firearms Act, pursuant to 26 U.S.C. § 7805(b), this ruling *will not be applied* to SM10 and SM11A1 pistols and SAC carbines manufactured or assembled before June 21, 1982. Accordingly, SM10 and SM11A1 pistols and SAC carbines, manufactured or assembled on or after June 21, 1982, will be subject to all the provisions of the National Firearms Act and 27 C.F.R. Part 179."

Emphasis added.

Thus, as discussed *supra* in Section III., C., 26 U.S.C. § 7805(b) precludes – and ATF has acknowledged – ATF's ability to retroactively reclassify firearms and devices as machineguns and require their registration and compliance with the NFA. Consistent with Section 7805(b), if

---

[79] *See*, ATF Rulings 94-1 and 94-2.

[80] *See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available *electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18".

ATF reclassifies a firearm or device, it may only require compliance with the NFA in relation to those firearms and devices that were "manufactured or assembled on or after" the date of its reclassification ruling. Moreover, the existence of approximately 50,000 of these reclassified firearms and their lawful possession and transfer absent compliance with the NFA, [81] was testified to by former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez in *U.S. v. One Historic Arms Model54RCCS*, No. 1:09-CV-00192-GET. *See* Exhibit 27.

Accordingly, ATF is statutorily precluded from applying any final rule in this matter to any firearms or devices that were "manufactured or assembled" before at least March 29, 2018 – the date of publication of this NPR in the Federal Register.

Even if, *arguendo*, ATF were not statutorily prohibited, to ensure equal application of the law, its past actions and the public reliance thereon, it must likewise permit all firearms or devices covered by the NPR in this matter to be grandfathered without requisite compliance with the NFA.

### E.      *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11*

Although FPC vigorously disputes ATF's constitutional, statutory, regulatory, procedural and precedential authority to regulate bump-stock-devices and intends to challenge any final rule adopting any proposal other than Alternative 1, FPC contends that ATF must limit its proposed regulatory changes to the definition proposed by Congress in H.R. 4477. [82]

In the NPR (83 Fed. Reg. 13457), ATF proposes amending to 27 C.F.R. §§ 447.11, 478.11, and 479.11 "by adding two sentences at the end of the definition to reads as follows:

---

[81] *Id.*
[82] *See* https://www.congress.gov/bill/115th-congress/house-bill/4477/text.

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger. The term 'machine gun' includes bump-stock-type devices, *i.e.,* devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. * * * "

As such, ATF's proposal, as discussed throughout this Comment, is far more encompassing than the more limited definition proposed by Congress in H.R. 4477. Accordingly, ATF should revise its proposal to be consistent with the Congress' proposal; whereby, the definition of machinegun in 27 C.F.R. §§ 447.11, 478.11, and 479.11 could, *at the absolute most*, be amended by adding one sentence at the end of the definition to read as follows:

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means a device that—(1) attaches to a semiautomatic rifle (as defined in section 921(a)(28) of title 18, United States Code); (2) is designed and intended to repeatedly activate the trigger without the deliberate and volitional act of the user pulling the trigger each time the firearm is fired; and (3) functions by continuous forward pressure applied to the rifle's fore end in conjunction with a linear forward and backward sliding motion of the mechanism utilizing the recoil energy when the rifle is discharged.

62

## VII.    POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE

In arguing that bump-stock devices are or create a machinegun, the proposed rule demonstrates a complete reversal of prior policy – prior policy, as discussed *supra* in Section 1., A., that ATF has failed to provide in the rulemaking docket and for which the absence of, precludes meaningful review and comment by interested persons.

But even if numerous procedural irregularities did not bar ATF from promulgating a final rule in this proceeding, and neither the U.S. Constitution nor the scope of statutory authority served as an obstacle, there are ample reasons ATF should not proceed with its proposed rule. *First,* ATF's assumptions lack statistical validity. *Second,* ATF's reasoning relies on false premises. *Third,* the costs of the proposed rule are much greater than ATF acknowledged.

### A.    *ATF's Assumptions Lack Statistical Validity*

As pertinent to a statistical inquiry, the overarching basis asserted in the NPR – the putative use of a bump-stock-device in the Law Vegas shooting – demands investigation and reflects that at a maximum, [83] only one instance exists [84], where a bump-stock-device was utilized, while acknowledging that there is no quantifiable benefit to the proposal. Thus, to the extent ATF can proceed in this matter, the *first,* and most vital, issue is whether ATF identified a statistically significant basis to conclude that the existing system of regulation should be revised, especially in light of the absence of a quantifiable benefit. As discussed at length *supra* in Sections I., B. and IV., D., ATF relies solely on prior "public comments" – for which, those

---

[83] As discussed *supra* in Section IV., D., FPC dispute that there exists any evidence even suggesting that a bump-stock-device was utilized in the Las Vegas incident and demands, given ATF's lack of candor to the courts, Congress and the public, that any such contention by ATF be dismissed, in the absence of independently, verifiable evidence in support.

[84] Which to date has neither been confirmed by ATF or FBI. *See* Fn. 4, *supra*.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000293

"public comments" may be proxies of ATF [85] – to suggest that a bump-stock-device was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock devices "*could* be used for criminal purposes." 83 Fed. Reg. 13455 (emphasis added). The second issue*, with respect to estimating the costs that would be imposed by ATF's proposed rule, ATF fails to address the just compensation that is necessary for the proposed rule, as is discussed *supra* in Section II., B., 2.

Despite the number of bump-stock-devices grossly exceeding 520,000 (when including rubber bands, belt loops, fingers, triggers, Gatling guns, and "slamfire" shotguns and firearms), ATF's entire rulemaking effort is apparently premised on no more than one unverified instance where a bump-stock-device was alleged to have been utilized unlawfully, even though such products have been on the market for over a decade. Even with ATF's too-low estimate of bump-stock-devices in commerce, one alleged instance represents such a minute, statistically-insignificant fraction that no statistically-valid prediction could even be made about this putative problem. ATF has failed to make available in the docket any information regarding the Las Vegas shooting that would permit meaningful inquiry into whether it is at all representative of the problem ATF claims now requires attention, or that the NPR reflects a substantive, tailored, germane, or proportional response to any such problem.

If, nonetheless, ATF were to go forward with its effort to formulate and impose a new rule, whatever benefits ATF claims, would seem to require discount to reflect the sole instance in which there is any reason to believe the new rule would provide additional protection. That is, the *marginal* benefit of added restrictions would be on the order of 1/520,000 or, stated

---

[85] *See* Section IV., D., and Fn. 56, *supra*.

otherwise, the marginal cost needs to be multiplied by a factor of at least 520,000/1 to be measured against the total benefit.

*       *       *

There is no statistically-significant (if any at all) evidence of the problem ATF purports to address with the proposed rule, even if one credits the sole anecdote. In weighing costs and benefits of the proposed rule, ATF must discount the benefits (or multiply the costs) to reflect the sole example from the large population of individuals who own or have access to bump-stock-devices and the fact that based on ATF's own proposal, individuals would still be able to bump fire with rubber bands, belt loops and their fingers.

**B.**     ***ATF Relies On Multiple False Premises***

As discussed at length *supra* in Sections IV., D. and E., ATF's proposed rule is based on multiple false premises. Other than one unsupported allegation, there is no evidence – *let alone substantive statistical evidence* – of misuse of bump-stock-devices. Moreover, as made explicitly clear by the video (Exhibit 28) and Vasquez's Expert Declaration, a bump-stock-device does not self-act, self-regulate, nor harnesses energy and thus cannot meet the statutory definition of a machinegun. Thus, ATF has failed to explain, let alone demonstrate, the need for a change in regulations or shown sufficient authority to implement its desired changes. And perhaps worse, ATF appears to be purposely misleading the public on the *actual* function of bump-stock-devices, which cannot be countenanced.

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000295

## CONCLUSION

ATF has, once again, made a mockery of rulemaking proceedings by engaging in numerous improper and bad-faith tactics that deny meaningful public participation. As shown in these and other comments, the instant NPR is terminally-ridden with procedural defects. As a result, ATF cannot promulgate any final rule that hopes to survive judicial review without starting anew. And ATF's proposed legislation-by-fiat stretches far beyond its statutory authority, ignores important separation of powers principles, and attempts to usurp that which is solely the domain of Congress. But even if ATF were to somehow overcome those fundamental problems, the fact remains that its proposal is built upon a statistically-invalid assumption, a false premise, and flawed policy arguments. To be sure, ATF failed to quantify *any* benefit from the proposed rule, and substantially undercounted the cost it would impose, including a failure to consider (as is its duty) all related costs. The proposed rule is demonstrably un-workable, and many less-burdensome alternatives exist to address any legitimate concerns that might be identified in a proper and procedurally-sound rulemaking.

Finally, even if ATF did initiate a new, proper, and procedurally-sound proposed rulemaking about bump-stock devices, and even if there existed sufficient statutory authority *and* good cause to issue such a rule, there is ample reason to question whether a proposed reclassification of bump-stock-devices as machineguns is consistent with the U.S. Constitution, including but not limited to the Second and Fifth Amendments, as well as Article I, Section 9. ATF fails completely to consider, let alone provide for, the just compensation that would be due to those who would be affected by its proposed rule. Indeed, as discussed above, the proposed rule is unconstitutional, both facially and as applied to law-abiding people who possess and own devices subject to the ATF's proposed rule.

66

For all of the reasons set forth above, the NPR should be withdrawn and summarily discarded, or, in the alternative, ATF should elect Alternative 1 and abandon the proposed rulemaking in its entirety.

Respectfully submitted on behalf of
Firearms Policy Coalition and
Firearms Policy Foundation


Joshua Prince, Esq.
*Chief Counsel*


Adam Kraut, Esq.
*Attorney*


Firearms Industry Consulting Group,
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
610-400-8439 (fax)
www.FirearmsIndustryConsultingGroup.com

June 19, 2018



*Joseph Lombardo, Sheriff*

**FORCE INVESTIGATION TEAM**

Lieutenant Dennis O'Brien
Sergeant Jerry MacDonald
Detective Trever Alsup
Detective Marc Colon
Detective Breck Hodson
Detective Craig Jex
Detective Jason Leavitt
Detective Joseph Patton
Detective Blake Penny

**HOMICIDE**

Lieutenant Dan McGrath
Sergeant John Harney
Sergeant Matt Sanford
Sergeant Jon Scott
Detective Maureen Bogatay
Detective Dolphis Boucher
Detective Chris Bunn
Detective Lora Cody
Detective Mitchell Dosch
Detective Jarrod Grimmett
Detective John Hoffman
Detective Ryan Jaeger
Detective Gary King
Detective Kristen Long
Detective Gerald Mauch
Detective Jason McCarthy
Detective Fred Merrick
Detective Terri Miller
Detective Cliff Mogg
Detective Robert Ochsenhirt
Detective Tate Sanborn
Detective Tod Williams

# LVMPD Preliminary Investigative Report
# 1 October / Mass Casualty Shooting

LVMPD Event: 171001-3519
Division of Occurrence: Tourist Safety Division
Date of Incident: 10-01-2017
Time of Call: 2205 hours
Incident Locations: Mandalay Bay Resort and Casino
3950 S. Las Vegas Blvd.
Las Vegas, NV 89119

Las Vegas Village
3901 S. Las Vegas Blvd.
Las Vegas, NV 89119

Suspect: Stephen Paddock

Date of report: 01-18-18

Submitted by: Detective Trever Alsup, P# 5782

Signature:

Approved by: Sergeant Jerry MacDonald, P# 4660

Signature:

Approved by: Lieutenant Dennis O'Brien, P# 6192

Signature:

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................3

II.     INCIDENT DETAILS ............................................................................................3

III.    VICTIMS .............................................................................................................15

       Deceased .......................................................................................................15

       Living Victims ...............................................................................................23

IV.     SUSPECT ..........................................................................................................23

V.      WITNESS INTERVIEWS ....................................................................................24

VI.     SCENE DESCRIPTIONS ....................................................................................31

       Route 91 Venue ...........................................................................................31

       Mandalay Bay 32nd Floor ..............................................................................36

       100-Wing Hallway ........................................................................................37

       Room 32-135 ................................................................................................37

       Foyer Inside Room 32-135 ...........................................................................37

       West Bedroom (Master Bedroom) ................................................................38

       Sitting Area ...................................................................................................38

       Decedent Stephen Paddock ........................................................................39

       Bar/Kitchenette ............................................................................................39

       Living Room ..................................................................................................40

       Room 32-134 ................................................................................................40

VII.    EVIDENCE RECOVERY .....................................................................................41

       Physical Evidence ........................................................................................41

       DNA ..............................................................................................................45

       Digital ...........................................................................................................45

VIII.   SUSPECT AUTOPSY .........................................................................................48

IX.     INVESTIGATION ................................................................................................49

       Mandalay Bay Hotel Room ..........................................................................49

       Paddock's Vehicle ........................................................................................50

       Paddock's Mesquite Residence ...................................................................51

       Paddock's Reno Residence .........................................................................51

       Search Warrants and Legal Notices ............................................................51

       Law Enforcement Tips and Leads ................................................................52

X.      PRELIMINARY FINDINGS FROM THE 1 OCTOBER INVESTIGATION ...................52

Appendix A ..................................................................................................................54

**FORCE INVESTIGATION TEAM REPORT**

**Event: 171001-3519**

## I.    INTRODUCTION

On October 1, 2017, over 22,000 people came together to enjoy a country music festival in Las Vegas, Nevada. On the third and final night of the festival, a lone gunman opened fire into the crowd from the 32nd floor of the Mandalay Bay Resort and Casino. The gunfire continued for over ten minutes, resulting in the deaths of 58 innocent concert goers and injuring more than 700. With law enforcement closing in, the suspect took his own life.

It is not standard practice for the Las Vegas Metropolitan Police Department (LVMPD) to issue an investigative overview related to an open case. Due to the magnitude of this investigative response and the number of victims associated with this incident, Sheriff Joseph Lombardo felt it was important to author an overview of all investigative work accomplished in the aftermath of 1 October. This report is not intended to be a comprehensive and final account of the facts and evidence gathered but rather an overview of the investigation. The investigation into this incident is on-going and a full comprehensive report will be released upon its completion.

This report will reflect the number and identities of victims known to the Las Vegas Metropolitan Police Department to date. This information is vital in order to grant assistance, properly categorize the level of crime and most importantly, honor those who fell prey to this horrific act of violence.

The Las Vegas Metropolitan Police Department would like to recognize and thank all our local, state and federal law enforcement partners for their assistance with this investigation.

## II.    INCIDENT DETAILS

On October 1, 2017 Stephen Paddock began shooting into the crowd attending the Route 91 Music Festival from his hotel room on the 32nd floor of the Mandalay Bay. As a result, 58 people died and over 700 were injured.  An extensive, joint investigation involving the LVMPD and the Federal Bureau of Investigation (FBI) began immediately after the incident. Every facet of Paddock's life was explored.

At the time of the incident Paddock was 64 years old. He owned residences in Mesquite and Reno, Nevada and lived with his girlfriend, Marilou Danley. Paddock had limited law enforcement contact and no criminal history.

Paddock embarked on numerous international trips beginning in 2012, these included trips to Europe, Asia and South America. Most of Paddock's international travel was unaccompanied. Paddock also took multiple cruises with destinations in the Bahamas, Alaska and Mexico.

Through interviews with Paddock's relatives and acquaintances investigators learned Paddock lived a seemingly normal life. He was married at least once and divorced. He worked as an accountant and in the family real estate business.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

From 1982 through September of 2016, Paddock purchased 29 firearms. These purchases consisted of handguns, shotguns and one rifle. From October 2016 through September 2017, Paddock purchased over 55 firearms. Most of the firearms purchased from 2016 through 2017 were rifles in various calibers along with over 100 firearm related items through numerous retailers. The firearm related items included scopes, cases, bump stocks and ammunition.

**The Ogden**

On September 17, 2017, Paddock checked into The Ogden where he was booked through September 28, 2017 which overlapped his reservation at Mandalay Bay. The Ogden is a condominium complex located in downtown Las Vegas, Nevada. Paddock stayed in three different units during this time.

Paddock's stay at The Ogden coincided with the Life is Beautiful music festival. Similar to the Route 91 Music Festival, the Life is Beautiful event was held in an open air venue from September 22, 2017, through September 24, 2017.

While staying at The Ogden, Paddock exhibited behavior which was similar to his time spent at Mandalay Bay. Paddock left for long periods of time, returning to Mesquite, Nevada, flying to Reno, Nevada and traveling to Arizona. Paddock was observed numerous times gambling at downtown Las Vegas casinos. Paddock was also observed moving numerous suitcases from his vehicle to the various units he rented.

**Mandalay Bay Hotel & Casino**

On Monday, September 25, 2017, Paddock checked into room 32-135 of the Mandalay Bay Hotel and Casino with a scheduled check-out date of October 2, 2017. On Friday September 29, 2017, Paddock checked into room 32-134 which connected with room 32-135 via connecting doors.

From September 25, 2017, through October 1, 2017, Paddock transported multiple suitcases to his room on several occasions. Paddock also left the Mandalay Bay on multiple occasions for long periods of time, often returning to Mesquite, Nevada.



LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

**Route 91 Harvest Festival**



October 1, 2017, was the final day of the Route 91 Harvest Festival held at the Las Vegas Village concert venue located at 3901 S. Las Vegas Boulevard. The site is an open air concert venue approximately 15 acres in size. It is bordered by Las Vegas Boulevard to the west, Reno Avenue to the north, Giles Street to the east and Mandalay Bay Road to the south.

The festival was a three day country music concert with multiple entertainers. On October 1, 2017, the concert began at 1500 hours. Jason Aldean, the last performer, was scheduled to take the main stage at 2140 hours. Over 22,000 people were attending the final day of the festival.

**Incident**

On October 1, 2017, at approximately 2118 hours, Mandalay Bay Security Officer Jesus Campos was assigned to check several Hotel Service Optimization System (HotSOS)[1] alarms from various rooms inside the hotel. Room 32-129 was the last of the rooms Security Officer Campos was assigned to check.

Security Officer Campos was on the 30th floor and responded to the 32nd floor via the stairwell in the north end of the 100 wing. Security Officer Campos attempted to enter the hallway to the 100 wing but the door would not open. He took the stairs to the 33rd floor and used the guest

---

[1] A HotSOS Alarm is triggered by a guest room door that is left ajar for a predetermined amount of time.

elevator to access the 32nd floor. Once on the 32nd floor, Security Officer Campos entered the foyer leading to the stairwell. He discovered an "L" bracket screwed into the door and door frame which prevented it from opening. Security Officer Campos called his dispatch center with the house phone located in the foyer to report the discovery. The security dispatch center then called the engineering section to have the door checked.

Security Officer Campos heard what he described as a rapid drilling sound coming from room 32-135 after he hung up the phone. As he walked down the 100 wing hallway, Campos heard what he described as automatic gunfire coming from the area of room 32-135 and realized he had been shot in the left calf. He took cover in the alcove of rooms 32-122 and 32-124 and utilized both his cellular phone and radio to notify his dispatch he was shot. Security Officer Campos advised he was shot with a BB or pellet gun. While waiting for other security personnel to arrive Security Officer Campos continued to hear gunfire coming from the room.

Engineer Stephen Schuck finished fixing a leak in room 62-207 when he was directed to respond to the 32nd floor reference the bracket preventing the stairwell door from opening. Engineer Schuck used the service elevator in the 200 wing to access the 32nd floor. When he arrived on the 32nd floor, he gathered his tools and equipment and walked from the 200 wing to the 100 wing.

As Engineer Schuck walked up the hallway of the 100 wing, he observed Security Officer Campos poke his head out of an alcove. Engineer Schuck then heard rapid gunfire coming from the end of the 100 hallway which lasted approximately 10 seconds. When the gunfire stopped, he heard Security Officer Campos tell him to take cover. Engineer Schuck stepped into an alcove and gunfire again erupted down the hallway coming from room 32-135. The gunfire lasted a few seconds then stopped. The gunfire started again after a brief pause but Engineer Schuck believed it was directed outside and not down the hallway.

Inside the Las Vegas Village over fifty LVMPD personnel were on overtime assignments for the Route 91 Harvest Festival. The initial gunshots were heard on an officer's Body Worn Camera (BWC). Officers and concertgoers initially believed the gunfire to be fireworks. As Paddock targeted the concertgoers with gunfire, officers quickly determined they were dealing with an active shooter and broadcast the information over the radio.

The crowd inside the Las Vegas Village started reacting to the gunfire and Jason Aldean ran off the stage. Officers and concertgoers began treating victims who were struck by gunfire. They also tried to get concertgoers out of the venue in a safe manner. Officers determined the gunfire was coming from an elevated position, possibly from the Mandalay Bay Hotel. Medical personnel were requested for multiple people struck by gunfire.

As the active shooter incident was occurring, two LVMPD officers were in the security office of the Mandalay Bay handling a call for service reference two females who were in custody for trespassing. The officers heard the radio broadcast of gunfire at the Route 91 Harvest Festival. Both officers, along with security personnel, exited the security office and responded towards the Las Vegas Village. As they were making their way through the casino, security personnel advised the officers of an active shooter on the 32nd floor of the hotel.[2] The officers then directed

---

[2]Information obtained from LVMPD BWC.

security to escort them to that location. The officers and security personnel entered the Center Core guest elevators and were again advised the shooter was on the 32nd floor. The officers made a tactical decision to respond to the 31st floor and take the stairwell to the 32nd floor.

LVMPD officers converged on the Las Vegas Village and Mandalay Bay. Officers formed multiple Strike Teams and entered the Mandalay Bay from various entrance points. A team of officers including a Special Weapons and Tactics (SWAT) Operator reached the 32nd floor via the stairwell in the 100 wing. Officers did not hear gunfire coming from room 32-135. Officers were able to manually breach the "L" bracket on the stairwell door and gain access to the hallway. Officers immediately observed a food service cart which had wires running from it to room 32-134 and prepared themselves for the possibility of an Improvised Explosive Device (IED). The decision was made to use an explosive breach to make entry into room 32-135.

After a successful breach of the doors to room 32-135, officers entered the room and found Paddock deceased on the floor. Paddock appeared to have a self-inflicted gunshot wound to the head. Officers cleared the remainder of the room and observed multiple rifles in various locations throughout the room as well as hundreds of expended casings. A second explosive breach was utilized to gain access to room 32-134 through the connecting doors. Immediately after the breach a SWAT officer negligently discharged his rifle. Officers cleared room 32-134 finding several rifles in the room.

Officers, medical personnel, and concertgoers continued the evacuation of victims in the Las Vegas Village venue. Several triage sites were established in the venue and surrounding area. Injuries ranged from being minor in nature to fatal. Hundreds of wounded were transported to area hospitals by ambulance and privately owned citizen vehicles.

## Sequence of Events

The details listed below were gathered from several different sources[3]. For the purpose of this section, the sequence of events will begin on September 25th when Paddock checked into the Mandalay Bay and end with the LVMPD officers making entry into Paddock's room. ***All times in this section are approximates based upon different time sources and different time stamps which were all utilized to document this section of the report. All dates and times listed below occurred in the year 2017.***

On or around September 9th Paddock made his room reservation for a Vista Suite ending in 235 but not a specific floor. On September 20th Paddock was internally[4] assigned to room 33-235. On September 21st Paddock was internally changed to room 32-235. On September 24th Paddock was assigned to room 32-135.

---

[3] LVMPD Officer Body Worn Cameras; UBER Video; Interviews to include officers, civilians & Mandalay Bay Employees; Mandalay Bay Video Surveillance; Lock Interrogation Documents; Cell Phone Videos & Records.
[4] All internal changes to Paddock's rooms were done by a Mandalay Bay computer without Paddock's knowledge.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

## September 25th through October 1st

### September 25th

Overview:
At approximately 1533 hours, Paddock checked into room 32-135 of the Mandalay Bay under his name. Paddock booked the connecting room (32-134) for September 29th through October 2nd. When Paddock checked into room 32-134 on September 29th, he did so under his girlfriend, Danley's, name. Paddock was set to check out of both rooms on October 2nd. From approximately 1603 to 1656 hours, Paddock was seen at Mizuya Sushi (inside the Mandalay Bay), he then drove his vehicle from self-park to valet[5], and returned to the front desk with five suitcase bags.

- At approximately 1656 hours, a bellman met Paddock and escorted him to room 32-135. Paddock requested to go through the service elevators and not through the guest elevators. According to interviews, this request is not uncommon for guests of the hotel. Paddock rolled one bag and a bellman used a luggage cart for the other four bags.
- From approximately 2137 to 2140 hours, Paddock had his vehicle removed from valet and Paddock left the Mandalay Bay.
- At approximately 2300 hours, Paddock arrived in Mesquite, Nevada.

### September 26th

Overview:
Paddock spent time at his home in Mesquite, Nevada, Downtown Las Vegas and Mandalay Bay.

- From approximately 1012 to 1455 hours, according to cell phone records, Paddock's cell phone showed in Mesquite, Nevada.
- At approximately 1535 hours, Paddock completed a wire transfer in Mesquite, Nevada of $50,000 from his Wells Fargo account to an account in the Philippines.
- From approximately 2012 to 2100 hours, Paddock drove from Mesquite, Nevada to The Ogden.
- From approximately 2102 to 2216 hours, Paddock walked around and gambled at the El Cortez Hotel.
- At approximately 2223 hours, Paddock returned to The Ogden.
- At approximately 2234 hours, Paddock departed The Ogden and drove to Mandalay Bay.
- From approximately 2245 to 2252 hours, Paddock valeted his vehicle at Mandalay Bay and took six suitcases (located on a luggage cart) and one rolling suitcase (Paddock rolled the suitcase himself) up to room 32-135 by way of the service elevator with help of a bellman. (The bellman who escorted Paddock on the September 25th was different than the bellman who escorted Paddock on the September 26th.)
- At approximately 2308 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

---

[5] Confirmed by valet ticket #275263147

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

## September 27th

Overview:

Paddock spent several hours gambling at Mandalay Bay. Paddock spoke with his VIP host reference wanting the "Vista Suite" at the end of the hall with the double doors. Paddock was insistent on the suite and connecting room. Paddock wanted to be in the 200 wing as it had a better view, according to him. Paddock was upset about the room, but was not angry. Paddock never mentioned the reason why he wanted a connecting room.

- At approximately 0713 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- At approximately 1556 hours, Paddock placed a room service order for two entrees totaling $94.33.
- At approximately 1632 hours, room 32-135 was cleaned by hotel staff. Paddock remained in the room as it was cleaned.
- At approximately 2003 hours, Paddock was seen in the valet area of Mandalay Bay with two rolling suitcases. Paddock had his vehicle removed from valet and left the Mandalay Bay at approximately 2015 hours.
- At approximately 2029 hours, Paddock arrived at The Ogden and entered a room at approximately 2031 hours.
- From approximately 2045 to 2200 hours, Paddock left The Ogden and drove to Mesquite, Nevada, where he arrived at approximately 2200 hours.
- At approximately 2300 hours, Paddock arrived at the Walmart in Mesquite, Nevada. He purchased luggage, razor blades, fake flowers, a vase, and a styrofoam ball.

## September 28th

Overview:

In Mesquite, Nevada, Paddock purchased a .308 bolt action rifle, deposited $14,000 into a Wells Fargo account, and wire transferred $50,000 to an account in the Philippines. Paddock visited a gun range in Mesquite, Nevada, before traveling back to the Mandalay Bay.

- From approximately 0227 to 1420 hours, Paddock's cell phone was located in Mesquite, Nevada according to cell phone records.
- From approximately 1444 to 1501 hours, Paddock made a $14,000 deposit at Wells Fargo and transferred $50,000 to a bank in the Philippines.
- At approximately 1523 hours, Paddock purchased a .308 bolt action rifle from a gun store in Mesquite, Nevada.
- From approximately 1723 to 1803 hours, Paddock was seen driving in the area of the City of Mesquite Landfill / gun range located at 3200 Mesquite Heights Road, in a rural area of Mesquite, Nevada.
- From approximately 2042 to 2146 hours, Paddock traveled from Mesquite, Nevada to the Mandalay Bay and parked in valet. Paddock was seen entering the Mandalay Bay with two rolling suitcases and a laptop bag.
- At approximately 2218 hours, Paddock began gambling at Mandalay Bay and continued gambling into the next morning.

**Event: 171001-3519**

**September 29th**

Overview:

A second refrigerator was delivered to Paddock's room (32-135). Staff was asked to only change linen's and take out the trash in room 32-135. A staff member was told by Paddock not to vacuum 32-135 and not to remove the food service cart from the room. Staff was asked specifically to change sheets and towels in room 32-134 and inform Paddock when room 32-134 was completed. Paddock remained in room 32-135 and used his laptop as the rooms were being cleaned.

- At approximately 0543 hours, Paddock stopped gambling, which he was doing continuously since the previous night.
- From approximately 1228 to 1314 hours, Paddock ate at Mizuya Sushi Sake and then returned to room 32-135.
- At approximately 1400 hours, rooms 32-135 and 32-134 were cleaned by hotel staff.
- At approximately 1506 hours, Paddock checked into room 32-134 (under Danley's name) from the VIP check in counter at the Mandalay Bay.
- At approximately 1508 hours, Paddock took the guest elevator to the 32nd floor.
- At approximately 1509 hours, Paddock entered room 32-134.
- From approximately 1509 to 0100 (September 30th) hours, Paddock remained inside rooms 32-134 and 32-135.
- At approximately 2311 hours, a room service ticket totaling $102.99 was charged to room 32-134.

**September 30th**

Overview:

Paddock traveled to Mesquite, Nevada twice from Mandalay Bay. Paddock placed "Do Not Disturb" signs on both 32-135 and 32-134. Paddock gambled for a couple of hours and brought more suitcases up to his room.

- At approximately 0100 hours, Paddock drove to Mesquite, Nevada.
- At approximately 0556 hours, Paddock returned to the Mandalay Bay with four suitcases.
- From approximately 1204 to 1215 hours hotel staff serviced the private mini bar of room 32-134. (Paddock placed the "Do Not Disturb" signs on the room doors sometime after 1215 hours.)
- Between approximately 1300 to 1400 hours, Paddock was asked if he would like rooms 32-135 and 32-134 cleaned. Paddock declined.
- From approximately 1452 hours to 1508 hours, Paddock removed his vehicle from valet and parked in the self-parking garage.
- At approximately 1512 hours, Paddock was observed exiting the parking garage elevator with two suitcase rolling bags.
- At approximately 1520 hours, Paddock was seen in a guest elevator with the two rolling suitcases and took them to his room.
- At approximately 1952 hours, Paddock drove from Mandalay Bay to Mesquite, Nevada and arrived at approximately 2057 hours.

**Event: 171001-3519**

## October 1st

Overview:
From approximately 0206 to 2040 hours, Paddock departed Mesquite, Nevada and returned to Mandalay Bay. He spent several hours gambling, brought more suitcases to his room, and ordered room service.

- At approximately 0206 hours, Paddock left Mesquite, Nevada.
- At approximately 0305 hours, Paddock arrived at the self-parking garage at the Mandalay Bay.
- From approximately 0324 to 0734 hours, Paddock walked around the casino and gambled. Paddock used both his own and Danley's players cards.
- At approximately 0737 hours, Paddock returned to his room.
- From approximately 1222 to 1226 hours, Paddock moved his vehicle from the self-park garage to valet[6]. This valet transaction was the only parking transaction during his stay at Mandalay Bay that was completed in Danley's name.
- At approximately 1229 hours, Paddock was observed waiting for an elevator with two rolling suitcases. There was also a third bag hanging from one of the rolling suitcases.
- At approximately 1233 hours, a room service ticket was opened for room 32-134.
- At approximately 1317 hours, Mandalay Bay valet parked Paddock's vehicle in "Garage East", space #317.[7]
- At approximately 1337 hours, the room service ticket[8] was closed out for room 32-134 in Danley's name. The check totaled $67.60 and included two entrees.
- From 1423 to 1940 hours, the doors for rooms 32-134 and 32-135 were manipulated multiple times. For example, the doors were opened, closed and the dead bolt locks were engaged and disengaged several times.

From approximately 2040 to 2205 hours, a series of events led up to the mass shooting conducted by Paddock:

- At approximately 2040 hours, a HotSOS alarm was generated for room 32-129.
- At approximately 2118 hours, the HotSOS call was assigned to Security Officer Campos via his cellphone. Security Officer Campos was assigned five HotSOS calls during the 2118 hours cellphone call. According to interviews of hotel staff, it is common practice to assign HotSOS calls to security officers and then immediately close out the HotSOS tickets prior to a security officers actually checking out the room. Security Officer Campos handled the HotSOS call for room 32-129 last.
- At approximately 2136 hours, the dead bolt to room 32-135 was engaged.
- At approximately 2140 hours, Jason Alden started his performance at the Route 91 Festival.
- At approximately 2146 hours, the dead bolt to room 32-134 was engaged.

---

[6] Valet ticket #275274484
[7] This is the same space detectives located the vehicle in after the shooting
[8] Room service ticket #51592684

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

**Approximately 2146 to 2204 hours**

- Security Officer Campos entered the service elevator at approximately 2146 hours and got off on the 30th floor at approximately 2147 hours.
- Security Officer Campos walked to the stairwell in the 100 wing of the 30th floor and walked up to the 32nd floor.
- Security Officer Campos could not gain entry to the 32nd floor due to the door being barricaded.[9]
- Security Officer Campos walked up the stairs to the 33rd floor. Security Officer Campos walked down the 100-Wing of the 33rd floor to Center Core. He took a guest elevator to the 32nd floor.
- At approximately 2200 hours, Security Officer Campos exited the guest elevator and walked up the 100 Wing toward room 32-129. Security Officer Campos checked room 32-129 and found it was secure. Security Officer Campos walked into the foyer leading to the stairwell and observed the "L" bracket screwed into the door and frame.
- At approximately 2204 hours, Security Officer Campos picked up a house phone located inside the small foyer leading to the stairwell and called security dispatch to report the "L" bracket on the door to the stairs. Security dispatch transferred the call to maintenance dispatch. The maintenance dispatcher then transferred Security Officer Campos to the maintenance supervisor's cell phone.

From approximately 2205 to 2216 hours, Paddock committed a mass shooting that left 58 people dead and over 700 hundred injured:

**Approximately 2205 hours**

- Engineer Schuck was contacted by the maintenance dispatcher via his radio.
- Paddock fired two single gunshots into the Las Vegas Village area.
- Paddock fired an undetermined amount of gunshots into the Las Vegas Village area.

**Approximately 2206 hours**

- Security Officer Campos ended the phone call and hung up the house phone. After hanging up the phone, Security Officer Campos heard what he described as rapid drilling noises.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Security Officer Campos began walking down the 100-wing toward Center Core.
- Engineer Schuck was told by his supervisor to go to the 32nd floor.
- LVMPD unit 169SE broadcast over the Convention Center Area Command (CCAC) radio channel, "169SE, we got shots fired, 415A at the Route 91. Sounded like an automatic firearm."
- Paddock fired rounds down the hallway at Security Officer Campos. Security Officer Campos was struck in the left calf with a bullet fragment. He took cover in the alcove between rooms 32-124 and 32-122.

---

[9] The investigation would reveal the door leading from the stairwell to the 32nd floor was barricaded by an "L" bracket screwed into the door and the door frame.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

- Security Officer Campos told his dispatcher via his radio, "Hey there's shots fired in, uh, 32-135."
- Engineer Schuck's dispatcher told him specifically where to go on the 32nd floor. Engineer Schuck left room 62-207 and walked to the service elevators with his equipment cart. The service elevators are located in the 200-wing of the hotel.

## Approximately 2207 hours,

- Paddock fired approximately 95 rounds into the Las Vegas Village area.
- LVMPD Officers Varsin and Hendrex left the Mandalay Bay Security Office with two armed Mandalay Bay Security Officers.
- Paddock fired approximately 100 rounds into the Las Vegas Village area.
- Paddock fired approximately 94 rounds into the Las Vegas Village area.

## Approximately 2208 hours

- Paddock fired the 1st round at the fuel tank. (Missed tank)
- LVMPD CAD event# 171001-3519 was generated for the shooting incident.

## Approximately 2209 hours

- Paddock fired the 2nd round at the fuel tank. (Missed tank)
- Paddock fired the 3rd round at the fuel tank. (Missed tank)
- Paddock fired the 4th round at the fuel tank. (Missed tank)
- Paddock fired the 5th round at the fuel tank. 1st strike into the fuel tank. (Top strike)
- Paddock fired the 6th round at the fuel tank. 2nd strike into fuel tank. (Lower strike) The investigation was unable to determine when the 7th and 8th rounds were fired at the fuel tank.[10]
- Paddock fired an undetermined number of rounds into the Las Vegas Village area.

## Approximately 2210 hours

- Engineer Schuck arrived at the Center Core of the 32nd floor and walked up the 100-wing toward room 32-135. As he walked, Engineer Schuck heard what he believed to be a jack hammer sound in the distance. Engineer Schuck quickly realized it was automatic gunfire.[11] After the gunshots stopped, Security Officer Campos yelled at Engineer Schuck to take cover.
- Engineer Schuck turned and took cover in the alcove between rooms 32-119 and 32-117. Paddock fired rounds down the hallway at Engineer Schuck. He was not struck by gunfire. Engineer Shuck attempted to open room 32-117 with his master key card however the dead bolt lock was engaged and he was unable to gain entry into the room.
- Engineer Schuck stated over his radio, "Shannon, call the police. Someone's firing a rifle on the 32nd floor down the hallway."

---

[10] There were eight .308 casings located inside of room 32-134
[11] The investigation determined at the time Engineer Schuck heard the gunfire, Paddock fired the approximately 21 rounds, referred to above, at the Las Vegas Village area.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

## Approximately 2211 hours

- LVMPD Officers Varsin and Hendrex arrived at the Center Core area of the 31st floor and began walking up the 100-wing along with armed security officers from Mandalay Bay.
- Paddock fired approximately 80-100 rounds into the Las Vegas Village area.
- Paddock fired approximately 95 rounds into the Las Vegas Village area.

## Approximately 2212 hours

- Two armed Mandalay Bay security officers exited the guest elevator on the 32nd floor and went to the Center Core.
- Paddock fired approximately 80-90 rounds into the Las Vegas Village area.
- Paddock fired an unknown number of rounds into the Las Vegas Village area. LVMPD Officers Clarkson and Cook were struck by gunfire during this volley.
- A Mandalay Bay security officer who was with LVMPD Officers Varsin and Hendrex advised over his radio, "We can hear rapid fire above us. We are on the 31st floor. We can hear it above us."

## Approximately 2213 hours

- Paddock fired an unknown number of rounds into the Las Vegas Village area.

## Approximately 2215 hours

- Paddock fired two separate volleys of an unknown number of rounds into the Las Vegas Village area.

## Approximately 2216 hours

- LVMPD Officers Varsin and Hendrex along with Mandalay Bay security officers made entry into the stairwell on the 31st floor.

## Approximately 2218 hours

- The heat detection indicator from inside room 32-135 detected no further readings from inside of the room.

## Approximately 2241 hours

- A Strike Team which included K9 Sergeant Bitsko, K9 Officer Newton, SWAT Officer Hancock and Detective Walford ascended the stairs from the 30th floor. The Strike Team made entry and cleared the 31st floor.

## Approximately 2256 hours

- The Strike Team reentered the stairwell from the 31st floor and walked up to the 32nd floor.

## Approximately 2257 hours

- K9 Sergeant Bitsko and SWAT Officer Hancock manually breached the door barricaded with the "L" bracket.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

Event: 171001-3519

### Approximately 2320 hours

- The Strike Team conducted an explosive breach into room 32-135 and made entry. The Strike Team reported Paddock was down from an apparent self-inflected gunshot wound to the head.

### Approximately 2326 hours

- The Strike Team made a second explosive breach from inside of room 32-135 into room 32-134 through the connecting doors. Immediately after the explosive breach an LVMPD SWAT Officer negligently fired a three round burst from his rifle. The rounds fired from the SWAT officer's rifle struck a chair, an entertainment center/cabinet and a wall.

After the Strike Team finished rendering rooms 32-134 and 32-135 safe, the scene was secured until investigative personnel arrived and assumed control of the 32nd floor.

## III.   VICTIMS

### Deceased

Victims 1-31 were pronounced deceased by the coroner investigator who responded to the Las Vegas Village venue and surrounding areas. The remaining victims were pronounced by the attending physician at the corresponding medical facility they were transported to. After all autopsies were performed, the Clark County Office of the Coroner Medical Examiner (CCOCME) ruled the cause and manner of death for all deceased victims to be gunshot wound(s) and homicide.

### 1.  Jack Reginald Beaton
Age 54
Clark County Coroner's Office Case Number: 17-10060
Clark County Coroner's Office Seal Number: 727327
Time of Death: 10-02-2017 at 0545 hours

### 2.  Christopher Louis Roybal
Age 28
Clark County Coroner's Office Case Number: 17-10061
Clark County Coroner's Office Seal Number: 727302
Time of Death: 10-02-2017 at 0545 hours

### 3.  Lisa Marie Patterson
Age 46
Clark County Coroner's Office Case Number: 17-10062
Clark County Coroner's Office Seal Number: 732484
Time of Death: 10-02-2017 at 0545 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

4. **Adrian Allan Murfitt**
   Age 35
   Clark County Coroner's Office Case Number: 17-10063
   Clark County Coroner's Office Seal Number: 737364
   Time of Death: 10-02-2017 at 0545 hours

5. **Hannah Lassette Ahlers**
   Age 34
   Clark County Coroner's Office Case Number: 17-10065
   Clark County Coroner's Office Seal Number: 732473
   Time of Death: 10-02-2017 at 0545 hours

6. **Austin William Davis**
   Age 29
   Clark County Coroner's Office Case Number: 17-10066
   Clark County Coroner's Office Seal Number: 727385
   Time of Death: 10-02-2017 at 0545 hours

7. **Stephen Richard Berger**
   Age 44
   Clark County Coroner's Office Case Number: 17-10067
   Clark County Coroner's Office Seal Number: 732488
   Time of Death: 10-02-2017 at 0545 hours

8. **Stacee Ann Etcheber**
   Age 50
   Clark County Coroner's Office Case Number: 17-10068
   Clark County Coroner's Office Seal Number: 727388
   Time of Death: 10-02-2017 at 0545 hours

9. **Christiana Duarte**
   Age 22
   Clark County Coroner's Case Number: 17-10069
   Clark County Coroner's Seal Number: 732404
   Time of Death: 10-02-2017 at 0545 hours

10. **Lisa Romero-Muniz**
    Age 48
    Clark County Coroner's Case Number: 17-10070
    Clark County Coroner's Seal Number: 732458
    Time of Death: 10-02-2017 at 0545 hours

11. **Heather Lorraine Alvarado**
    Age 35
    Clark County Coroner's Office Case Number: 17-10071
    Clark County Coroner's Office Seal Number: 732423
    Time of Death: 10-02-2017 at 0545 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

**12.** **Denise Cohen**
Age 58
Clark County Coroner's Case Number: 17-10072
Clark County Coroner's Office Seal Number: 732474
Time of Death: 10-02-2017 at 0545 hours

**13.** **Kurt Allen Von Tillow**
Age 55
Clark County Coroner's Office Case Number: 17-10073
Clark County Coroner's Office Seal Number: 732489
Time of Death: 10-02-2017 at 0545 hours

**14.** **Brennan Lee Stewart**
Age 30
Clark County Coroner's Case Number: 17-10074
Clark County Coroner's Seal Number: 732414
Time of Death: 10-02-2017 at 0545 hours

**15.** **Derrick Dean Taylor**
Age 56
Clark County Coroner's Office Case Number: 17-10075
Clark County Coroner's Office Seal Number: 732445
Time of Death: 10-02-2017 at 0545 hours

**16.** **Kelsey Breanne Meadows**
Age 28
Clark County Coroner's Office Case Number: 17-10076
Clark County Coroner's Office Seal Number: 732486
Time of Death: 10-02-2017 at 0545 hours

**17.** **Jennifer Topaz Irvine**
Age 42
Clark County Coroner's Office Case Number: 17-10077
Clark County Coroner's Office Seal Number: 727384
Time of Death: 10-02-2017 at 0545 hours

**18.** **William W. Wolfe Jr.**
Age 42
Clark County Coroner's Office Case Number: 17-10078
Clark County Coroner's Office Seal Number: 732415
Time of Death: 10-02-2017 at 0545 hours

**19.** **Carly Anne Kreibaum**
Age 33
Clark County Coroner's Office Case Number: 17-10079
Clark County Coroner's Office Seal Number: 732478
Time of Death: 10-02-2017 at 0545 hours

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

**FORCE INVESTIGATION TEAM REPORT**

CONTINUATION

**Event: 171001-3519**

20. **Laura Anne Shipp**
    Age 50
    Clark County Coroner's Office Case Number: 17-10080
    Clark County Coroner's Office Seal Number: 732451
    Time of Death: 10-02-2017 at 0545 hours

21. **Carrie Rae Barnette**
    Age 34
    Clark County Coroner's Office Case Number: 17-10085
    Clark County Coroner's Office Seal Number: 727391
    Time of Death: 10-02-2017 at 0545 hours

22. **Jordyn Nicole Rivera**
    Age 21
    Clark County Coroner's Office Case Number: 17-10101
    Clark County Coroner's Office Seal Number: 732469
    Time of Death: 10-02-2017 at 0545 hours

23. **Victor Loyd Link**
    Age 55
    Clark County Coroner's Office Case Number: 17-10102
    Clark County Coroner's Office Seal Number: 732497
    Time of Death: 10-02-2017 at 0545 hours

24. **Candice Ryan Bowers**
    Age 40
    Clark County Coroner's Office Case Number: 17-10103
    Clark County Coroner's Office Seal Number: 732417
    Time of Death: 10-02-2017 at 0545 hours

25. **Jordon Alan McIldoon**
    Age 23
    Clark County Coroner's Office Case Number: 17-10053
    Clark County Coroner's Office Seal Number: 732487
    Time of Death: 10-02-2017 at 0545 hours

26. **Keri Lynn Galvan**
    Age 31
    Clark County Coroner's Office Case Number: 17-10054
    Clark County Coroner's Office Seal Number: 732499
    Time of Death: 10-02-2017 at 0545 hours

27. **Dorene Anderson**
    Age 49
    Clark County Coroner's Office Case Number: 17-10057
    Clark County Coroner's Office Seal Number: 727313
    Time of Death: 10-02-2017 at 0545 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

28. **Neysa C. Tonks**
   Age 46
   Clark County Coroner's Office Case Number: 17-10058
   Clark County Coroner's Office Seal Number: 727306
   Time of Death: 10-02-2017 at 0545 hours

29. **Melissa V. Ramirez**
   Age 26
   Clark County Coroner's Office Case Number: 17-10059
   Clark County Coroner's Office Seal Number: 732407
   Time of Death: 10-02-2017 at 0545 hours

30. **Brian Scott Fraser**
   Age 39
   Clark County Coroner's Office Case Number: 17-10056
   Clark County Coroner's Office Seal Number: 732408
   Time of Death: 10-02-2017 at 0545 hours

31. **Tara Ann Roe**
   Age 34
   Clark County Coroner's Office Case Number: 17-10055
   Clark County Coroner's Office Seal Number: 732441
   Time of Death: 10-02-2017 at 0545 hours

32. **Bailey Schweitzer**
   Age 20
   Clark County Coroner's Office Case Number: 17-10051
   Clark County Coroner's Office Seal Number: 732420
   Time of Death:  10-01-2017 at 2307 hours

33. **Patricia Mestas**
   Age 67
   Clark County Coroner's Office Case Number: 17-10049
   Clark County Coroner's Office Seal Number: 727390
   Time of Death: 10-01-2017 at 2250 hours

34. **Jennifer Parks**
   Age 36
   Clark County Coroner's Office Case Number: 17-10052
   Clark County Coroner's Office Seal Number: 727359
   Time of Death: 10-01-2017 at 2300 hours

35. **Angela Gomez**
   Age 20
   Clark County Coroner's Office Case Number: 17-10050
   Clark County Coroner's Office Seal Number: 732413
   Time of Death: 10-01-2017 at 2253 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

**36. Denise Burditus**
Age 50
Clark County Coroner's Office Case Number: 17-10082
Clark County Coroner's Office Seal Number: 731590
Time of Death: 10-02-2017 at 0047 hours

**37. Cameron Robinson**
Age 28
Clark County Coroner's Office Case Number: 17-10083
Clark County Coroner's Office Seal Number: 732437
Time of Death: 10-01-2017 at 2301 hours

**38. James Melton**
Age 29
Clark County Coroner's Office Case Number: 17-10084
Clark County Coroner's Office Seal Number: 727311
Time of Death: 10-01-2017 at 2320 hours

**39. Quinton Robbins**
Age 20
Clark County Coroner's Office Case Number: 17-10046
Clark County Coroner's Office Seal Number: 731535
Time of Death: 10-01-2017 at 2315 hours

**40. Charleston Hartfield**
Age 34
Clark County Coroner's Office Case Number: 17-10086
Clark County Coroner's Office Seal Number: 727353
Time of Death: 10-01-2017 at 2230 hours

**41. Erick Silva**
Age 21
Clark County Coroner's Office Case Number: 17-10087
Clark County Coroner's Office Seal Number: 725563
Time of Death: 10-01-2017 at 2230 hours

**42. Teresa Nicol Kimura**
Age 38
Clark County Coroner's Office Case Number: 17-10088
Clark County Coroner's Office Seal Number: 725567
Time of Death: 10-01-2017 at 2230 hours

**43. Susan Smith**
Age 53
Clark County Coroner's Office Case Number: 17-10089
Clark County Coroner's Office Seal Number: 725552
Time of Death: 10-01-2017 at 2230 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

**44. Dana Leann Gardner**
    Age 52
    Clark County Coroner's Office Case Number: 17-10090
    Clark County Coroner's Office Seal Number: 725569
    Time of Death: 10-01-2017 at 2250 hours

**45. Thomas Day Jr.**
    Age 54
    Clark County Coroner's Office Case Number: 17-10091
    Clark County Coroner's Office Seal Number: 725591
    Time of Death: 10-01-2017 at 2341 hours

**46. John Joseph Phippen**
    Age 56
    Clark County Coroner's Office Case Number: 17-10092
    Clark County Coroner's Office Seal Number: 725568
    Time of Death: 10-02-2017 at 0244 hours

**47. Rachel Kathleen Parker**
    Age 33
    Clark County Coroner's Office Case Number: 17-10093
    Clark County Coroner's Office Seal Number: 725561
    Time of Death: 10-01-2017 at 2230 hours

**48. Sandra Casey**
    Age 34
    Clark County Coroner's Office Case Number: 17-10094
    Clark County Coroner's Office Seal Number: 725550
    Time of Death: 10-01-2017 at 2230 hours

**49. Jessica Klymchuk**
    Age 34
    Clark County Coroner's Office Case Number: 17-10095
    Clark County Coroner's Office Seal Number: 727322
    Time of Death: 10-01-2017 at 2230

**50. Andrea Lee Anna Castilla**
    Age 28
    Clark County Coroner's Office Case Number: 17-10096
    Clark County Coroner's Office Seal Number: 727381
    Time of Death: 10-01-2017 at 2301 hours

**51. Carolyn Lee Parsons**
    Age 31
    Clark County Coroner's Office Case Number: 17-10097
    Clark County Coroner's Office Seal Number: 727382
    Time of Death: 10-01-2017 at 2300 hours

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

52. **Michelle Vo**
Age 32
Clark County Coroner's Office Case Number: 17-10098
Clark County Coroner's Office Seal Number: 727355
Time of Death: 10-01-2017 at 2244 hours

53. **Rocio Guillen**
Age 40
Clark County Coroner's Office Case Number: 17-10099
Clark County Coroner's Office Seal Number: 732409
Time of Death: 10-01-2017 at 2318 hours

54. **Christopher Hazencomb**
Age 44
Clark County Coroner's Office Case Number: 17-10105
Clark County Coroner's Office Seal Number: 732444
Time of Death: 10-02-2017 at 1044 hours

55. **Brett Schwanbeck**
Age 61
Clark County Coroner's Office Case Number: 17-10081
Clark County Coroner's Office Seal Number: 732471
Time of Death: 10-03-2017 at 1328 hours

56. **Rhonda M. LeRocque**
Age 42
Clark County Coroner's Office Case Number: 17-10045
Clark County Coroner's Office Seal Number: 542385
Time of Death: 10-02-2017 at 0023 hours

57. **Austin Cooper Meyer**
Age 24
Clark County Coroner's Office Case Number: 17-10047
Clark County Coroner's Office Seal Number: 540045
Time of Death: 10-01-2017 at 2257 hours

58. **Calla-Marie Medig**
Age 28
Clark County Coroner's Office Case Number: 17-10048
Clark County Coroner's Office Seal Number: 539069
Time of Death: 10-01-2017 at 2246 hours

**Living Victims**

Documenting the living victims in this case has been a work in progress since October 1st. Source material poured into the LVMPD's Force Investigation Team (FIT) office post October 1st and is still being received.[12]

LVMPD recognizes that the approximate 22,000 people who attended the Route 91 festival are all victims. That number does not take into consideration the hundreds and possibly thousands that were walking along the Las Vegas Strip at the time of the shooting outside the Las Vegas Village venue. The goal of the FIT team was to document those who actually sustained any type of physical injury, no matter the degree. As previously stated in the introduction to this report, this information is vital in order to grant assistance, properly categorize the level of crime and most importantly, honor those who fell prey to this horrific act of violence.

## IV.   SUSPECT

An extensive joint investigation involving the LVMPD and the Federal Bureau of Investigation (FBI) began immediately after the incident into the life of Paddock. Every facet of Paddock's life was explored.

At the time of the incident Paddock was 64 years old. He owned residences in Mesquite and Reno, Nevada and lived with his girlfriend Marilou Danley. Danley was in the Philippines at the time of the incident. She left the country on September 14, 2017, and returned on October 3, 2017. Upon arriving in the United States, Danley was interviewed by investigators several times. Interviews were also conducted with other relatives and acquaintances reference Paddock's background.

Danley stated Paddock's demeanor changed over the course of the last year. According to her, Paddock had become "distant" and their relationship was no longer intimate. Paddock was described as "germaphobic" and had strong reactions to smells. Over the course of the last year Paddock began to buy firearms and Danley believed it was a hobby of his.

During a stay at the Mandalay Bay in the beginning of September 2017, Danley recalled Paddock behaving strangely. The two were staying in room 60-235 and she observed Paddock constantly looking out the windows of the room which overlooked the Las Vegas Village venue. Paddock would move from window to window looking at the site from different angles.

Paddock's ex-wife, Peggy Reiko Paddock, described Paddock as intelligent and great with numbers. She further stated he worked as an Internal Revenue Service Agent. Paddock later worked as an auditor for Lockheed Martin and Boeing. According to her, Paddock began purchasing real estate properties with his mother and renovating them. Paddock bought and sold numerous properties throughout the years and, as far as she knew, sold the last property in 2010.

---

[12] Source material consisted of information from local area hospitals, notes taken by Crime Scene Analysts who responded to local area hospitals to document the injured, voluntary statements from actual victims and witnesses, and lastly, incident crime reports filed by hundreds of victims who sustained injury but waited to travel home to receive medical care. Also included was a separate listing of victims provided by the FBI.

Paddock made numerous claims to friends and family that he consistently felt ill, in pain or fatigued.  An interview was conducted with a physician in Las Vegas who identified himself as Paddock's primary care physician since 2009.  He last saw Paddock as a patient on or around October 2016 for an annual checkup.  He recalled the only major ailment Paddock had was a slip and fall accident at a casino approximately 3 years earlier, which caused a muscle tear.

The physician described Paddock as "odd" in behavior with "little emotion" shown. He believed Paddock may have had bipolar disorder however, Paddock did not want to discuss that topic further with him. Paddock also refused anti-depressant medication but accepted prescriptions for anxiety. He noted Paddock seemed fearful of medications, often refusing to take them. He did not believe Paddock was abusing any medications.

Most of the people interviewed acknowledged Paddock's gambling habits. Paddock was known to gamble tens of thousands of dollars at a time and played at numerous casinos. Paddock was often given complimentary rooms and meals at the casinos he frequented due to the amount of money he gambled.

From 1982 through September of 2016, Paddock purchased approximately 29 firearms. These purchases consisted of handguns, shotguns and one rifle. From October 2016 through September 2017, Paddock purchased over 55 firearms along with firearm related accessories. Most of the firearms were rifles of various calibers. With the exception of the revolver, every firearm recovered in the Mandalay Bay was bought after September 2016.

During the course of the investigation it was learned Paddock had very limited contact with law enforcement. Paddock was stopped by police on occasion for traffic related offenses receiving only traffic citations. No arrest history was found for Paddock.

## V.    WITNESS INTERVIEWS

The following information was taken from witness statements and compiled into a chronological description of the events.

On 10-01-2017, LVMPD had 51 personnel assigned to work special events overtime for the Route 91 Festival. The personnel staffing consisted of one lieutenant, five sergeants, forty-four officers and one civilian. The event had officers staffed from 1300-0100 hours with officers arriving and securing at various times.

The specific assignments for the event were West Traffic (1 sergeant, 10 officers), East Traffic (1 sergeant, 10 officers), Interior Entry / Gates (1 sergeant, 6 officers), Interior Early Squad (1 sergeant, 8 officers), Interior Late Squad (1 sergeant, 8 officers), Event Coordinator (1 officer) and Command Post (1 officer, 1 civilian). The assignments were supervised by Lieutenant Spencer who was designated as the Incident Commander for the festival.[13]

---

[13] Specific officers and assigned locations can be found on the Assignment List, ICS Form 204 for the event.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

At approximately 2118 hours, Mandalay Bay Security Officer Campos was working his normal duties when he was notified of several HotSOS calls in the 100 Wing tower that he was assigned to monitor. The standard operating procedure for the Mandalay Bay security staff once an alarm is received is to call the room and attempt to contact the guest. If there is no answer, a security officer will be sent to check the door. These HotSOS calls are common and occur numerous times throughout the day. The security dispatcher will typically close the alarm out once a security officer is assigned. Security Dispatcher Brett Buck notified Security Officer Campos to check several HotSOS calls. Room 32-129 was last on his list to check.

Security Officer Campos was on the 30th floor and en-route to room 32-129 via the stairwell located at the north end of the 100 wing. Security Officer Campos attempted to enter the hallway of the 32nd floor through the small foyer and discovered the door was locked. The doors are always open due the stairwell being a fire escape and county codes require they remain unlocked at all times. The door has a handle but no locking mechanism.

Security Officer Campos stated he walked down the stairwell to the 31st floor, entered the hallway and walked to the Center Core. He used the guest elevator to go to the 32nd floor. Video surveillance showed Security Officer Campos actually went to the 33rd floor, then took a guest elevator down to the 32nd floor.

Security Officer Campos proceeded directly to the end of the 100 wing hallway, opened the inner door of the foyer entrance to the stairwell and observed the "L" bracket screwed into the door frame and door that opens into the stairwell. He realized this is what kept the door secured. Security Officer Campos utilized the house phone mounted inside the foyer to notify the security dispatcher of the bracket. The security dispatcher passed the call to the engineering section.

Security Officer Campos hung up the phone, heard what he described as a loud rapid drilling sound coming from room 32-135. He recalled the drilling sounded like it was coming from deep inside the room.

While walking toward the Center Core, Security Officer Campos heard gunfire coming from room 32-135 and ran down the hallway. Security Officer Campos realized he was shot in his left calf as he took cover in the alcove of rooms 32-122 and 32-124. Using both his radio and cell phone, Security Officer Campos advised the security dispatcher he had been shot in the leg with a BB / Pellet gun and was injured. He stayed in this position on the phone with the dispatcher while waiting for help. Security Officer Campos heard more gunshots coming from inside 32-135, but no rounds were coming down the hallway.

As country music singer Jason Aldean performed on stage, LVMPD officers working the interior of the event heard what they described as fireworks going off. Officer Hutchason and Special Events Coordinator Rodriquez, who were in the Command Post with security personnel, used the video monitors to look for the source of the noise. Upon recognizing the source of the noise to be gunfire, Coordinator Rodriguez directed all officers to change their radios to the CCAC radio channel. Coordinator Rodriguez monitored both the Events radio channel and CCAC radio channel throughout the incident.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

LVMPD officers inside the Las Vegas Village recognized the sounds were coming from the southwest. Part of the crowd started to move towards the exits. Shortly after hearing the initial gunfire, LVMPD officers heard the first long burst of what they described as automatic gunfire. Once officers recognized the sound to be gunfire, they immediately searched for the gunman.

Security personnel along with LVMPD officers were in the security office of Mandalay Bay with two females being detained for trespass. They became aware via the radio of an active shooter call. Security Manager Oelke headed towards the Luxor side of the property when another call came over the radio that a security officer[14] had been shot with a pellet gun in the tower of the Mandalay Bay.

Security Manager Oelke ran to the Center Core guest elevators of the Mandalay Bay and met with Security Managers Sottile, Umstott and LVMPD Officers Hendrex and Varsin. As they arrived at the elevators, Engineering Supervisor Shannon Alsbury was holding the elevator door open. Engineer Alsbury was using a key to lock out the elevator and keep it from being stopped by guests trying to get on. There was conflicting information on the exact location of the shooter(s) whether it was on the 31st, 32nd, or the 33rd floors. While on the elevator they decided to check all three floors.

As the door opened on the 31st floor, Security Managers Oelke and Umstott and LVMPD Officers Hendrex and Varsin exited and walked up the 100 wing upon hearing gunshots coming from an unknown direction. Security Manager Sottile and Engineer Alsbury continued to the 32nd floor on the elevator.

At the Las Vegas Village, LMVPD officers observed the crowd move away from the southwest portion of the venue. They believed an active shooter was in that area. As officers moved toward the stage they heard several more bursts of gunfire. Officers directed citizens to get on the ground as they looked for a gunman. As officers moved through the crowd, they observed several citizens wounded and deceased. Officer Polion advised LVMPD Dispatch of shots fired and multiple casualties. The radio traffic was accidently broadcast on SEAC radio channel.

Officers assigned to the venue near Reno Avenue and Las Vegas Boulevard began to move south along the Boulevard. They believed the gunfire was coming from the south end of Las Vegas Village. As they moved southbound, officers directed civilians away from the area. The officers received direct gunfire and took cover behind a wall as bullets impacted around them. Between bursts of gunfire, officers continued to assist evacuating civilians and administering first aid to the wounded.

Officers assigned to the venue near Mandalay Bay Drive and Las Vegas Boulevard heard the initial gunshots followed by a long burst of gunfire. Detective Balonek, who was on Mandalay Bay Drive east of Las Vegas Boulevard, believed the gunfire was coming from inside the Las Vegas Village, or from an elevated position. He retrieved his binoculars from his vehicle and scanned the north facing tower of Mandalay Bay. Approximately three-quarters of the way up the tower on the north end, Detective Balonek observed a silhouette of a male standing in a shooting position several feet back from a window. Detective Balonek could see the smoke from the male shooting, however, no muzzle flashes were observed. Detective Balonek could not get

---

[14] Security Officer Campos

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
### CONTINUATION

**Event: 171001-3519**

on the radio so he switched to the Northeast Area Command channel and broadcasted the shooters location.

At the same time inside Mandalay Bay, Engineer Schuck was in room 62-207 working on a leak when he was directed by his radio dispatcher and supervisor to respond to the 32nd floor stairwell in the 100 wing to remove the "L" bracket that Security Officer Campos had called and reported. Engineer Schuck utilized the 200 wing service elevator to go down to the 32nd floor. He gathered his drill and other small tools needed to remove the bracket and walked through the Center Core from the 200 wing to the 100 wing. Engineer Schuck walked approximately one third of the way up the hallway when he observed Security Officer Campos poke his head into the hallway from a space between two rooms on Engineer Schuck's right hand side.

Engineer Schuck heard the sound of rapid gunfire coming from the end of the hallway. Security Officer Campos looked out from his position and yelled for Engineer Schuck to take cover. Engineer Schuck immediately took a step to his left into the alcove between two rooms. Gunfire erupted down the hallway towards his direction. Engineer Schuck felt the concussion of the rounds pass by where he was taking cover. An unknown object struck him in his back without causing serious injuries other than a small bruise. Engineer Schuck also stated he could see blood coming from Security Officer Campos' calf area.

Below on the 31st floor, LVMPD Officers Varsin and Hendrex along with Security Managers Oelke and Umstott walked up the 100 wing when they heard gunfire coming from the 32nd floor. They moved to the stairwell at the end of the hall. As they got closer to the stairwell, the gunfire continued and they smelled gunpowder. They entered the 100 wing stairwell and proceeded up to the door of the 32nd floor. They posted up to block any possible escape by the shooter.

Detective Clarkson, assigned to the event in uniform, was on Las Vegas Boulevard north of Mandalay Bay Drive when he heard the initial shots and radio traffic advising of multiple casualties inside of the Las Vegas Village. Detective Clarkson and other officers took cover and began searching for the shooter believing the shots were coming from the west. As patrol cars and a prisoner transport van arrived at the intersection, Detective Clarkson and other officers moved towards the vehicles for cover with the intention to move to Mandalay Bay.

CCAC patrol officers responded to the scene to assist. Officers Cook and Haynes arrived near Las Vegas Boulevard and Mandalay Bay Drive and parked their patrol vehicle. Officers Cook and Haynes moved towards the group that Detective Clarkson was with.

As the officers moved behind the patrol vehicles, they started receiving direct gunfire which impacted the ground and patrol vehicles around them. Detective Clarkson received a gunshot wound to the neck while taking cover behind a patrol vehicle. Officer Cook was struck by a bullet in his right bicep that continued into his chest.

While behind the vehicles, the officers realized the gunfire was coming from an elevated position and was directed at the patrol vehicles. During breaks in the gunfire, officers moved in teams of two from the patrol vehicle to a block wall for better cover. Detective Clarkson and Officer Cook were both transported to the hospitals by separate LVMPD vehicles.

As the gunfire continued, officers inside the event moved through the Las Vegas Village and provided direction for people trying to exit. This included the actions of Officer Hartfield who was attending the concert in an off-duty capacity and was mortally wounded while taking police action. Officers located wounded persons and began first aid measures and coordinated medical efforts with off-duty medical personnel who were attending the concert.

Officers also directed people to the exits and towards positions of cover and concealment. Exterior officers on the east side of the Las Vegas Village were swarmed by people as they fled the gunfire. Officers directed them to continue east and north as they recognized the gunfire was coming from Mandalay Bay. As officers began to encounter wounded civilians, casualty collection points were set up and first aid was rendered. Officers assisted in getting the wounded to hospitals via ambulances, private vehicles and patrol cars.

Exterior officers on the west side of the Las Vegas Village along Las Vegas Boulevard encountered people as they fled the venue. Officers knew the gunfire was coming from Mandalay Bay and directed people to stay behind cover and move to the north, away from gunfire. Officers encountered several wounded people and provided first aid until they could be taken to medical personnel. As officers moved south they formed Strike Teams and moved towards Mandalay Bay.

Sergeants Richmond, Riddle, and Van Nest each formed Strike Teams from overtime officers and patrol officers responding to the venue. The Strike Teams moved west across Las Vegas Boulevard and into the parking lot of the Luxor Hotel, then south onto the Mandalay Bay property. Upon entering Mandalay Bay, Strike Teams coordinated efforts with other LVMPD officers and security personnel already inside the casino.

As Strike Teams entered the hotel through the main valet, they met hotel security and were directed to the Center Core guest elevators. Each group was given information the shooter was possibly on the 29th or 31st floors and taken there by elevator. After each group of officers were taken to the upper floors, they instructed the hotel security guards to lock out the elevators. A Strike Team, which included two SWAT officers, was taken to the Foundation Room located on the top floor. Once inside the bar, officers began to move occupants to a safe location and clear the bar.

On the 32nd floor, Security Officer Campos and Engineer Schuck were still pinned down in the hallway. Engineer Schuck heard another round of rapid gunfire and believed it was being fired towards the outside of the building. During a small break in the gunfire, Engineer Schuck and Security Officer Campos ran from their position back towards the Center Core. Engineer Schuck was checked for injuries by Engineer Alsbury who arrived on the 32nd floor with armed Mandalay Bay Security Officers. Engineer Schuck stated the gunfire continued for several more long rapid fire volleys with short breaks between volleys. He described the breaks in fire lasting only 5-6 seconds before the gunfire would continue.

As LVMPD officers arrived on the 32nd Floor, they proceeded up the 300 wing, officers made entry into rooms and searched for occupants. Engineer Schuck redirected the officers to the 100 wing where the shooting had been coming from. The sound of gunfire had ceased so the officers conducted slow and methodical evacuations as they moved up the hallway.

**FORCE INVESTIGATION TEAM REPORT**

**Event: 171001-3519**

After hearing the update of the shooters location, SWAT Officer O'Donnell and two patrol officers left the group clearing the Foundation Room and responded to the 32nd floor. Upon exiting the elevator, they encountered several officers already on the floor. The officers were moving up the hallway towards the suspect's room.

Engineer Shuck locked out the elevators to keep guests from ascending the tower.

Police personnel on the 32nd floor included a sergeant, SWAT officer, and patrol officers from the Las Vegas Village and responding officers from various area commands. As occupants were evacuated from their rooms, they were moved to the elevator bank and down the tower. Officers discovered a small infant alone in one of the rooms. As evacuations continued, the nanny for the infant was located in a room across the hall and reunited with the child. The officers stopped evacuations approximately two thirds of the way up the hall.

At the Las Vegas Village, people who were hiding in multiple locations were evacuated. Officers located several people hiding underneath the concert stage and inside tour buses located next to the stage. Additional teams of officers arrived and swept the remaining areas of the Las Vegas Village. Once evacuations were completed, the scene was secured around the Las Vegas Village.

SWAT Officer Hancock, along with K9 Sergeant Bitsko and K9 Officer Newton went to the 31st floor and came up the stairs to the 32nd floor. At the door, they met with LVMPD Officers Hendrex and Varsin and Mandalay Bay security personnel. Officer Hancock attempted to open the first of two doors to enter the hallway but could not due to the "L" bracket described earlier.

After the Strike Team arrived in the stairwell, SWAT Officer Hancock and K9 Sergeant Bitsko manually breached the inner door leading to the foyer of the 32nd floor. From the foyer, the door was cracked open enough to see the doors to rooms 32-135 and 32-134. Both doors were closed and a room service cart was located in front of room 32-134. A white table cloth was draped over the service cart with various items on top of the table cloth. Officers observed wires leading from the service cart to room 32-134 and believed the suspect may have set some type of improvised explosive device.

A decision was made to enter room 32-135 utilizing an explosive breach. Officers in the stairwell notified the officers in the hallway that an explosive breach would be utilized. Over the radio they became aware of the extent of injuries inside the Las Vegas Village. No gunfire had been heard from the suspect's room for approximately 40 minutes. It was decided entry was necessary to the room to determine if the suspect was still inside and to stop any further shooting from the room. SWAT Lieutenant Huddler was advised by SWAT Officer Hancock that the door to room 32-135 was going to be breached using explosives. K9 Officer Newton stepped into the hallway and utilized a ballistic shield to provide cover for SWAT Officer Hancock as he set the breach on the door while K9 Sergeant Bitsko covered the door to 32-134. K9 Sergeant Bitsko observed a camera on the food cart in the hallway. He covered the camera, and turned it away from the doorway while Officer Hancock hung the explosive on the door to room 32-135. Once the charge was hung on the door, the officers returned to the stairwell.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

The approval for the breach was given by SWAT Lieutenant Huddler. The officers were notified over the radio, the door to room 32-135 was going to be breached and to take cover. K9 Sergeant Bitsko utilized the ballistic shield to keep the door from the foyer to the hallway open in case the explosion damaged it. SWAT Officer Hancock observed approximately 12 officers now in the stairwell behind him. He designated those that would be making entry into the suspect's room and others would be the downed officer rescue unit if needed.

The entry team consisted of K9 Sergeant Bitsko, K9 Officer Newton, SWAT Officer Hancock, Officers Donaldson, Trzpis and Walford. Officers Burns and Thiele were assigned to post at the door upon the team's entry to guard the hallway. The explosive breach was made into room 32-135 and broadcasted over the radio. The officers opened the stairwell door enough to see the doorway to 32-135 and observed the breach was successful and the door was open into the room. Inside the room, they observed a rifle with a scope and bipod on the floor just inside the door. The officers waited for approximately 30 seconds before leaving the stairwell to see if there was any reaction from Paddock.

Moving slowly and methodically, K9 Officer Newton entered first into the hallway with the shield followed by the officers from stairwell. SWAT Officer O'Donnell and Officer Magsaysay joined the Strike Team as they entered Paddock's room.

From behind the shield, the Strike Team made entry into room 32-135. The team split into 2 teams as they entered. Team 1 went left into a bedroom and cleared it. Team 2 went to the right and yelled Paddock was down. After clearing the bedroom, Team 1 held at the doorway into the main living area of the room.

Team 2 encountered Paddock lying on the floor on his back. A small frame revolver was observed on the ground above Paddock's head. Apparent blood was located on the revolver and a pool of blood had formed around Paddocks head. The officers believed Paddock had a self-inflicted gunshot wound. The large window at Paddock's feet was broken out and the curtain was blowing into the room. On the floor next to the Paddock's feet was a small sledge hammer and Paddock was laying on top of a rifle. The officers also observed several more rifles, spent ammunition throughout the living area, and several loaded magazines.

Team 2 continued through the living area to the right and encountered a closed, locked connecting door leading to the adjoining room 32-134. Team 1 moved through the living space up to Team 2 near the closed connector door. SWAT Officer Hancock and Officer Walford attempted to kick the door open but determined it was a solid wood door inside a metal frame. It was decided a second explosive breach was needed to gain entry into the adjoining room.

SWAT Officer Hancock breached the door. Immediately following the explosive breach, SWAT Officer O'Donnell, had one negligent discharge of a three round burst from his rifle. Officers in the hallway heard the shots fired and broadcasted shots had been fired inside the room. Officers flooded into room 32-134 through the breached adjoining connector door.

As room 32-134 was cleared, several rifles were found inside the room. A small hallway separated the main area of the room from the bathroom and main door. Another food service cart draped in a white table cloth was in this hallway. On the cart was a laptop computer which

---

Case 1:18-cv-02988-DLF   Document 61-2   Filed 05/28/20   Page 332 of 382
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

Event: 171001-3519

was on and the monitor showed a live feed of the hallway where the officers had come from. Inside the room, one of the large windows was also broken out.

A complete recheck of the rooms was made to ensure a person was not hiding under any furniture. Several suitcases were observed throughout the rooms. Many of the suitcases contained several loaded magazines. Officers also observed a camera attached to the peephole on the main door of room 32-135. Once the recheck was completed, the SWAT and K9 officers left the room due to reports of other shootings at other locations.

Sergeant Matchko was in the hallway and entered the rooms once they were cleared. Along with officers still in the room, Sergeant Matchko secured the crime scene. Sergeant Matchko was contacted by the command post and advised to attempt to locate any information reference Paddock. Sergeant Matchko directed officers to look throughout the room in an attempt to locate any cell phones or identification for Paddock. Identification and cellular phones were located, as well as several room keys and player cards with Paddock and Danley's name on it. Pictures of the items were taken and sent to the command post as ordered. The officers also rolled Paddock onto his side to check for identification but found none. After the search for identification was completed, the officers exited and secured the room.

As officers cleared the Las Vegas Village, multiple reports of active shooters along Las Vegas Boulevard at various hotel properties were broadcasted. Several officers from the exterior Las Vegas Village posts joined Strike Teams and left to address those reports. As the active shooter reports were cleared and determined to be unfounded, officers assigned to the Las Vegas Village responded back to the command post for reassignment.

Officers assigned to the Las Vegas Village remained on post until they were relieved the next morning. Officers maintained the security of the Las Vegas Village and the 32nd floor of the Mandalay Bay crime scene as detectives and Crime Scene Analysts responded and began the investigation.

## VI.    SCENE DESCRIPTIONS

**Route 91 Venue**

Responsibility for documenting the venue scene was transferred from the LVMPD Homicide Section to the FBI Evidence Recovery Team on October 2, 2017 at approximately 1445 hours. The following scene description of the Las Vegas Village venue was authored by the LVMPD Homicide Section.

The Route 91 Harvest Festival was an open air music event held at the Las Vegas Village. The festival was dimly lit with street lights, variable stage lighting and lights from temporary light stands on the perimeter. There was a chain link fence, with dark netting surrounding the entire venue. On the west perimeter of the venue there was a decorative concrete block wall between Las Vegas Boulevard South and the chain link fencing. This wall ran nearly the entire length of the west side of the venue, from East Mandalay Bay Road to East Reno Avenue.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

The surface of the venue consisted of black asphalt, with defined seating areas covered with artificial grass on both the northwest and south ends of the venue and vendors throughout. The northwest artificial grass area was used for lawn chair seating. The large artificial grass areas on the southern end was surrounded by seating, food vendors and portable bathrooms. A large seating area with elevated bleachers and a covered VIP area was oriented near the southwest corner of the venue. Four (4) pedestrian gates ran along the west side of the venue.

The Coca-Cola suites, additional seating areas, vendors, the medical tent and three (3) pedestrian gates were located on the east side of the venue. The event's Command Post (CP), a television broadcast tent and one (1) pedestrian gate were oriented on the north end of the venue.

The main stage was oriented on the south side of the venue. The main stage was covered by green roofing and the sides were covered with black mesh. The main stage viewing area was located in the southern portion of the venue, north of the main stage and was divided into two (2) seating areas by metal pedestrian fencing. The fencing ran from a production tent, located in the center of the viewing area, and eventually encompassed the main stage. In addition to the fencing separating the east and west side grass areas, the production tent and vendors, helped to define the two (2) areas. Production vehicles, concert buses, and trailers were oriented south of the main stage.

**Location and Description of the Bodies**

A total of thirty one (31) bodies were located, documented, and eventually recovered from the inside of the venue and on the exterior perimeter. Clark County Coroner Investigators responded and assisted the LVMPD Homicide Detectives and Crime Scene Analysts conduct the preliminary death investigations.  Each victim was given an individual Clark County Coroner's Case and Seal Number. The time of death was determined to be 0545 hours for those recovered from the venue and exterior perimeter. Davis Funeral Home responded and transported the deceased to the CCOCME for a complete examination.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**

# FORCE INVESTIGATION TEAM REPORT

**CONTINUATION**

**Event: 171001-3519**



1.  Jack Reginald Beaton
2.  Christopher Louis Roybal
3.  Lisa Marie Patterson
4.  Adrian Allan Murfitt
5.  Hannah Lassette Ahlers
6.  Austin William Davis
7.  Stephen Richard Berger
8.  Stacee Ann Etcheber
9.  Christiana Duarte
10. Lisa Romero-Muniz
11. Heather Lorraine Alvarado
12. Denise Cohen
13. Kurt Allen Von Tillow
14. Brennan Lee Stewart
15. Derrick Dean Taylor
16. Kelsey Breanne Meadows
17. Jennifer Topaz Irvine
18. William W. Wolfe Jr.
19. Carly Anne Kreibaum
20. Laura Anne Shipp

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**FORCE INVESTIGATION TEAM REPORT**
**CONTINUATION**

**Event: 171001-3519**

Four (4) bodies were located and recovered near the medical tent in the northeast portion of the venue.

21. Carrie Rae Barnette
22. Jordyn Nicole Rivera
23. Victor Loyd Link
24. Candice Ryan Bowers

Seven additional victims were located and recovered from the exterior perimeter. Their body positions and locations suggested they had been placed at these locations. The descriptions of their injuries were obtained from the Clark County Coroner Investigator and the photographs taken by an LVMPD Crime Scene Analyst.



25. Jordon Alan McIldoon
26. Keri Lynn Galvan
27. Dorene Anderson
28. Neysa C. Tonks
29. Melissa V. Ramirez
30. Brian Scott Fraser
31. Tara Ann Roe

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

The remaining victims were transported to various hospitals throughout the greater Las Vegas valley and pronounced deceased at their respective locations. Clark County Coroner Investigators responded and assisted the LVMPD Crime Scene Analyst with documentation of the decedents' injuries. Each victim was given an individual Clark County Coroner's Case and Seal Number. The time of death was determined by the treating physicians. Davis and Hites Funeral Home Services transported all victims from the hospital to the CCOCME for a complete examination. The descriptions of their injuries were obtained from photographs taken by LVMPD Crime Scene Analyst.

## DESERT SPRINGS HOSPITAL

32. Bailey Schweitzer
33. Patricia Mestas
34. Jennifer Parks
35. Angela Gomez

## SPRING VALLEY HOSPITAL

36. Denise Burditus
37. Cameron Robinson
38. James Melton

## VALLEY HOSPITAL

39. Quinton Robbins

## SUNRISE HOSPITAL

40. Charleston Hartfield
41. Erick Silva
42. Teresa Nicol Kimura
43. Susan Smith
44. Dana Leann Gardner
45. Thomas Day Jr.
46. John Joseph Phippen
47. Rachel Kathleen Parker
48. Sandra Casey
49. Jessica Klymchuk
50. Andrea Lee Anna Castilla
51. Carolyn Lee Parsons
52. Michelle Vo
53. Rocio Guillen
54. Christopher Hazencomb
55. Brett Schwanbeck

---

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**FORCE INVESTIGATION TEAM REPORT**
**CONTINUATION**

**Event: 171001-3519**

**UMC HOSPITAL**

56. Rhonda M. LeRocque
57. Austin Cooper Meyer
58. Calla-Marie Medig


**Mandalay Bay 32nd Floor**

1. **Master Bedroom**
2. **Sitting Area**
3. **Bar / Kitchenette**
4. **Living Room**
5. **Connecting Doors**
6. **Stairwell Foyer**



**Scene**

The scene was located in the 100-wing of the 32nd floor of the Mandalay Bay. The 100-wing consisted of a north-south oriented hallway with even numbered rooms on the east side and odd numbered rooms on the west side. The rooms ranged in number from 32-101 to 32-135. Room 32-135 was at the far north end of the 100-wing with south facing double entry doors. Room 32-134 was at the north end of the 100-wing and was a connecting room to 32-135. Room 32-134 was east of the entry to 32-135, with a single entry door that faced west. A door leading to a foyer room which led to the stairs was at the north end of the hallway, west of the entry to 32-135, with a single entry door that faced east.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

## 100-Wing Hallway

The hallway consisted of alcoves containing access to four rooms, two rooms on the east side of the hallway and two rooms on the west side of the hallway, with a segment of the hallway between each alcove. Each alcove had a ceiling mounted light with two light shades, an exterior blue shade and an interior white shade, as well as a light sconce on the walls between the doors.

Decorative molding was mounted to the walls the entire length of the hallway. There were numerous bullet fragments throughout the hallway floor, from the north side of the alcove of rooms 32-101 through 32-104 to the alcove of 32-133 through 32-135.

A room service cart containing numerous plates, food items, and silverware was on the east side of the hallway, in front of room 32-134. A black "Logitech" camera with connected wires was on top of the cart, at the south end. The camera was positioned in a south direction (down the hallway) and taped to a plate.  A white camera with connected wires was attached to the lower portion of the cart, at the north end.  The camera was positioned in a south direction (down the hallway). Wires from both of the above described cameras went under the door and into room 32-134.

## Room 32-135

Room 32-135 was a hotel suite located at the far north end of the hallway with south facing double entry doors. The east door had two bullet holes above the door handle. The bullets traveled north to south, entering the interior side of the door and exiting the exterior (hallway). A camera was taped to the interior side of the east door inserted into the peephole. A hole was partially drilled into the bottom of the south wall, east of the entry doors. The west door was damaged (occurred during the explosive breach) and unattached to the door frame. The door was lying on the floor inside of the suite. There were bullet holes in the west door, with the bullets traveling north to south, entering the interior side and exiting the exterior (hallway).

The suite consisted of a south foyer room, a west bedroom (master bedroom) with attached bathroom, and a north sitting area, a central bar/kitchenette, and a second bathroom east of the central bar/kitchenette.  A southeast living room which contained a couch, chairs, an entertainment center/cabinet and a wall mounted TV. A connecting door which led to room 32-134 was located southeast of the living room on the south wall. The entire north end of the suite consisted of floor to ceiling windows.

## Foyer Inside Room 32-135

The foyer had a table along the west wall. There was a white "Babysense" camera pointed in the direction of the front entry doors at the south end of the table, and a black mini refrigerator at the north end with a white styrofoam cooler on top. There were casings scattered on the floor of the foyer, and on the table along the west wall. A black rifle with the muzzle pointed south, was at the northeast portion of the foyer on the floor.

Case 1:18-cv-02988-DLF   Document 61-2   Filed 05/28/20   Page 339 of 382
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

Event: 171001-3519

An east-west hallway extended from the east side of the foyer. A black rifle on a bipod with the muzzle pointed west, and a drill bit partially covered by a white towel were at the west end of the hallway on the floor.

**West Bedroom (Master Bedroom)**

The bedroom was located west of the sitting area. There were east facing double entry doors located northwest of the foyer in the west wall of the sitting area. The room had a desk with a chair along the north wall, just inside the entry doors. There were tools on the desk and the chair. A trashcan was on the floor east of the desk that had numerous empty ammunition boxes inside. There was also a white bag on the floor that had empty ammunition boxes inside as well as a broken Dell laptop computer. Two boxes containing empty ammunition boxes were on the floor behind the entry doors.

A pillar was west of the desk. An empty red gym bag and an "Anran" home security system box were on the floor west of the pillar. A chaise lounge was along the south wall with an open suitcase containing clothing inside and a drill on top. There were chargers plugged into the south wall, west of the chaise lounge.

The bed was along the south wall with nightstands on either side. The following items were located on the bed: a Dell laptop computer, a passport in the name of "Stephen Paddock", four Home Depot gift cards, a checkbook, and a cash out voucher for the Palms Casino dated 8/28/17. There were three suitcases west of the bed: two of which were empty and one had clothing inside. A television was on a dresser to the north of the bed. There were drill bits and tools on the top of the dresser. Eight empty rifle magazines were on the floor below the west end of the dresser. An open suitcase with a tool box inside was east of the dresser. A closet was in the wall east of the bed with a single shirt and a white bathrobe hanging inside.

The attached southeast bathroom had a tub along the north wall with two glass vacuum suction holders on top of the tub ledge, a sink counter along the south wall with toiletries to include a prescription for "Diazepam 10 MG" in the name of "Steve Paddock", and two inhalers.  The toilet room was to the east with a pair of boxers and a pair of shoes on the floor.

**Sitting Area**

The sitting area was north of the foyer. Floor to ceiling windows covered by curtains extended along the length of the north end of the suite. There was a couch along the north side of the room, a coffee table south of the couch, and two chairs pushed together (facing one another) south of the coffee table. Pillars were located along the north wall near the northwest corner and along the north wall near the northeast corner of the sitting area, at the northwest corner of the living room.

A rifle magazine was between the west and central couch cushions of the north couch. The coffee table was covered by white towels. A rifle and an empty rifle magazine were on the coffee table. There were four rifles sitting on the pushed together chairs and a rifle magazine on the north arm of the east chair. One rifle was on the floor east of the chairs. There were two suitcases

on the floor east of the coffee table containing numerous loaded rifle magazines. An empty rifle magazine was on the floor, east of the suitcases.

There was a stack of 14 loaded rifle magazines on the west side of the northeast pillar. A blue plastic tube with a snorkel mouthpiece attached with green tape to the east end and a black funnel with a fan inside at the west end extended from the east side of the suitcases, across the coffee table, to the west side of the room, adjacent to the doors of the west bedroom.

A chair facing south, with a side table to the east, were at the west end along the northeast bank of windows. The window located immediately east of the northwest pillar was shattered with glass on the floor below it. Numerous casings were on the floor at the base of the window, south into the room, and on the seat of the chair. A blue and yellow "Estwing" hammer was on the floor at the east side of the northeast pillar, south of the broken window. The head of the hammer had tape wrapped around it. The curtains in place over the broken window were damaged. Two rifles with bipods were on the floor south of the chair.

A high top table was centrally located along the northeast bank of windows with a loaded rifle magazine on the southeast end of the table. An open suitcase was on the floor south of the table with numerous loaded rifle magazines inside. A rifle with a bipod was on the floor southeast of the table. There were casings on the floor surrounding the table.

## Decedent Stephen Paddock

Paddock was on the floor south of the chair and side table. He was wearing black pants, a long sleeve brown shirt, black gloves, and grey shoes. Paddock was on his back with his head to the south, feet to the north, and arms at his sides. There was apparent blood surrounding his nose and mouth, and on the floor under his head. There was also apparent blood on the front of his shirt. A rifle was on the floor under his legs. A grey box cutter was on the floor between his feet. There were casings on the floor surrounding him. A silver/black colored "Smith & Wesson" revolver with apparent blood on it was on the floor south of Paddock's head.

## Bar/Kitchenette

The central bar/kitchenette was south of the sitting area east of the foyer and north of the east-west hallway. There was a north bar counter (east-west orientation) with three chairs on the north side of the counter. There were three rifles on the floor north of the west end of the counter with a backpack under them. One rifle was on the seat of the westernmost chair; one rifle was on the seat of the easternmost chair; and one rifle was located on the west end of the bar counter. An empty silver colored rolling case was on the floor north of the counter, at the east end. A Luxor sticker and a "29" sticker were on the back of the case.

At the west end of the bar counter was an "Anran" monitor with a video feed to the previously described camera on the lower portion of the room service cart in the hallway, a laptop computer, which provided a live feed to the camera attached to the peephole of the door, and a Samsung cell phone in a black case.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**FORCE INVESTIGATION TEAM REPORT**
**CONTINUATION**

**Event: 171001-3519**

Centrally located on the bar counter were bank cards and other cards in the name of "Stephen Paddock" and room key card packets.  At the east end of the bar counter was a black holster,  a black glove, binoculars, blue hat, brown wallet, tape roll, credit cards and a Nevada ID in the name of "Stephen Paddock", a Player's card in the name of "Marilou Danley", valet ticket, a notepad with "unplug phones" written on it, and a white handheld monitor, as well as a black ZTE cell phone with the front and back cameras covered with tape and a Samsung Galaxy S6 active in a black case.

At the southwest corner of the bar was a sink. There were two loaded rifle magazines and a "Tundra" fire extinguisher on the sink counter.

**Living Room**

The southeast living room was east of the bar/kitchenette at the east end of the east-west hallway. There was a television mounted on the south wall with an entertainment center/cabinet below, a couch to the north and east, and an orange chair to the west. The couch cushions were off of the east couch and piled on the north couch and on the floor.  A table was along the north side of the north couch with four chairs.

A side table was west of the north couch. A "Meade" spotting scope was on the floor north of the side table. A pink piece of paper with written measurements on one side was on the floor west of the east couch.[15]

An open black suitcase containing soft rifle cases inside was on the floor north of the cabinet. There were three casings on the floor west of the side table and at the east end of the east-west hallway.[16]

There was a bullet hole through the east arm of the orange chair; two bullet holes into the cabinet along the south wall; and one bullet hole into the south wall, between the entertainment center/cabinet and the connecting door to 32-134.[17]

There were two suitcases along the west wall. A blue large bag with numerous towels, soft rifle cases, and scope covers inside were also along the west wall.

**Room 32-134**

Room 32-134 was a single connecting hotel room, south of 32-135. The connecting door was located at the south end of room 32-135 in the southwest corner of the southeast living room. There was damage to the south adjoining door frame[18]and the damaged door was on the floor inside room 32-134. The main entry door to the room was west facing, accessing the hallway. A room service cart with an open laptop computer on the east end was in the entry hallway, east

---

[15] This was the same note originally located on the table near Paddock's body. The wind blew it off of the table to this location.
[16] These casings came from the SWAT Officer's rifle.
[17] These bullet holes came from the SWAT Officer's rifle.

[18] Occurred during the second explosive breach

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000337

Case 1:18-cv-02988-DLF   Document 61-2   Filed 05/28/20   Page 342 of 382
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

Event: 171001-3519

of the entry door. There were wires connected from the laptop that ran under the entry door. There was a video feed visible on the laptop of the hallway looking south from the previously described black "Logitech" camera attached to the hallway room service cart.

The room was furnished with two beds with a nightstand in between along the south wall, a desk, dresser, and chair along the north wall, a television mounted on the north wall, and floor to ceiling windows on the east. The southernmost window was shattered with glass on the floor below it. There were nine loaded rifle magazines on top of the dresser. The dresser drawers were open and the bottom was broken. There were three rifles with bipods on the east bed and several casings. One cartridge case was on the floor west of the east bed. There were two rifles on the west bed, one of which was a bolt action. A pair of black gloves was on the west side of the west bed. A pair of tan sandals were on the floor north of the west bed. A bullet hole was in the north wall corresponding with a hole in the south wall of the living room, and one bullet hole was in the comforter at the north end of the east bed.

There were two closets along the west wall with the door to the attached southwest bathroom. The bathroom had a sink counter along the south side and tub to the north. Clothing was on the floor under the sink counter along with a trashcan. There was a snorkel tube located inside the trashcan.

## VII.    EVIDENCE RECOVERY

**Physical Evidence**

During the course of the investigation, several items of evidentiary value were located and impounded by LVMPD Crime Scene Analysts and FBI Evidence Recovery Team. The following is a summary of key pieces of evidence located during searches of multiple locations.

Picture numbers listed below correspond with pictures attached in Appendix A of this report.

**Mandalay Bay Location**

**32nd Floor – 100 Wing – Stairwell Foyer Room (Picture 1)**

| Metal "L" bracket with three screws securing it to the interior door/frame. |
| --- |

**32nd Floor – 100 Wing Hallway (Pictures 2-4)**

| Two surveillance cameras from room service cart outside room 32-134. |
| --- |
| Bullet fragments |

**32nd Floor – Room 32-135 –  Main Room (Pictures 5-17)**

| Make | Model | Serial Number | Description |
| --- | --- | --- | --- |
| Colt | M4 Carbine | LE451984 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. Front sight only. |
| Noveske | N4 | B15993 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 40 round magazine. EOTech optic. |

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

| | | | |
|---|---|---|---|
| LWRC | M61C | 24-18648 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| POF USA | P-308 | UA-1600204 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| Christensen Arms | CA-15 | CA04625 | AR-15 .223 Wylde with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| POF USA | P-15 | PE-1600179 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Colt | Competition | CCR014544 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Smith & Wesson | 342 AirLite Ti | CDZ7618 | .38 caliber revolver with 4 cartridges, 1 expended cartridge case. |
| LWRC | M61C | 5P03902 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| FNH | FM15 | FND000905 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| Daniel Defense | DD5V1 | DD5007426 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| FNH | FN15 | FNB024293 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| POF USA | P15 | 03E-1603178 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| Colt | M4 Carbine | LE564124 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. |
| Daniel Defense | M4A1 | DDM4123629 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. EOTech optic. |
| LMT | Def. 2000 | LMT81745 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Daniel Defense | DDM4V11 | DDM4078072 | AR-15 .223/5.56 with a bump stock, vertical fore grip. No magazine. EOTech optic. |
| Sig Sauer | SIG716 | 23D020868 | AR-10 .308/7.62 with a bipod, red dot optic and 25 round magazine. |
| Daniel Defense | DD5V1 | DD5008362 | AR-10 .308/7.62 with a bipod and scope. No magazine. |
| Blue plastic hose with funnel, fan and SCUBA mouthpiece attached. | | | |

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

| |
|---|
| Surveillance camera mounted to room door peephole. |
| Baby monitor camera (not mounted). |
| Surveillance camera mounted to room door peephole. |
| Small sledge hammer. |
| Laptop computer. |
| Surveillance camera monitor. |
| Spotting scope. |
| Binoculars. |
| Expended .223/5.56 cartridge casings (approximately 1,050). |
| Cellular phones. |
| Nevada Driver's License – Stephen Paddock. |
| Mlife players card – Marilou Danley. |
| Polymer 40 round AR-15 magazines (loaded). |
| Steel 100 round AR-15 magazines (loaded). |
| Polymer 25 round AR-10 magazines (loaded). |
| Live Ammunition (approximately 5,280). |
| Handwritten note with distance/bullet drop calculations. |
| Suitcases, duffel bags, soft rifle cases, towels. |

### 32nd Floor – Room 32-135 –  Bedroom Suite (Picture 18)

| |
|---|
| Laptop computer (on bed). |
| Disassembled laptop computer missing hard drive (on floor). |
| Power hand drills. |
| Empty ammunition boxes and plastic bags. |
| Scuba mask. |
| Loose ammunition. |
| Miscellaneous hand tools and drill bits. |
| Miscellaneous screws and mounting brackets. |
| Suitcases, towels. |
| Empty rifle magazines |

### 32nd Floor – Room 32-134 – Hotel Room (Pictures 19-21)

| Make | Model | Serial Number | Description |
|---|---|---|---|
| FNH | FN15 | FNCR000383 | AR-15 .223/5.56 with a bump stock, vertical fore grip and 100 round magazine. No sights or optics. |
| Ruger | American | 695-93877 | .308 caliber bolt action rifle with scope. |
| LMT | LM308MWS | LMS18321 | AR-10 .308/7.62 with a bipod and red dot scope. No magazine. |
| Ruger | SR0762 | 562-13026 | AR-10 .308/7.62 with a bipod, scope and 25 round magazine. |
| LMT | LM308MWS | LMS18300 | AR-10 with a bipod, scope and 25 round magazine. |
| Laptop computer connected to hallway surveillance cameras. | | | |
| Polymer 25 round AR-10 magazines (loaded). | | | |
| Expended .308/7.62 cartridge casings (8). | | | |

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

### Mandalay Bay – East Valet – Space 317 (Paddock's Vehicle. Pictures 22-24)

| |
|---|
| 2017 Chrysler Pacifica, Nevada/74D401 towed to FBI garage. |
| 20x2 pound containers of exploding targets. |
| 10x1 pound containers of exploding targets. |
| 2x20 pound bags of explosive precursors. |
| Polymer 25 round AR-10 .308/7.62 magazines (loaded). |
| Polymer 40 round AR-15 .223/5.56 magazines (loaded). |
| Boxed ammunition. |
| Suitcases, towels. |

### McCarran Airport – Fuel Tanks – East Mandalay Bay Road/Haven Street (Pictures 25-27)

| |
|---|
| Bullet fragments |

### 1372 Babbling Brook Court Mesquite, Nevada (Paddock's House)

| Make | Model | Serial Number | Description |
|---|---|---|---|
| Smith & Wesson | SW99 | SAB5974 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDU4086 | 9mm semi-automatic pistol. |
| Glock | 17 | BCGM344 | 9mm semi-automatic pistol. |
| Mossberg | 500 | V0397109 | 12 gauge pump action shotgun. |
| Sig Sauer | 516 | 20J036999 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Arma-Lite | SPRM001 | M-10-13530 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0433557 | 12 gauge pump action shotgun. |
| LWRC | M61C-IC-A5 | 24-19038 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Mossberg | 590 | V0348193 | 12 gauge pump action shotgun. |
| Mossberg | 930 | AF0001141 | 12 semi-automatic gauge shotgun. |
| Arma-Lite | SPRM001 | M-10-12006 | AR-15 .223/5.56 rifle with a bipod and scope. |
| Sig Sauer | 516 | 20K046207 | AR-15 .223/5.56 rifle, with a bipod. No sights or optics. |
| Lantac | LA-R15 Raven | LT-0297 | AR-15 .223 Wylde rifle with a bipod and scope. |
| Mossberg | 590 | P833785 | 12 gauge pump action shotgun. |
| Arsenal | Saiga 12 | H09423015L | AK-47 style semi-automatic 12 gauge shotgun. |
| Arsenal | Saiga 12 | H07420684 | AK-47 style semi-automatic 12 gauge shotgun. |
| Beretta | 92F | C856302 | 9mm semi-automatic pistol. |
| FN | 5.7 | 386215450 | 5.7mm semi-automatic pistol. |
| Handgun, shotgun, rifle ammunition. | | | |
| Exploding targets. | | | |
| Computer related items. | | | |

**Event: 171001-3519**

| Soft body armor. |
| --- |

## 1735 Del Webb Parkway, Reno, Nevada (Paddock's House)

| Make | Model | Serial Number | Description |
| --- | --- | --- | --- |
| Smith & Wesson | 340 | DCA2099 | .357 caliber revolver. |
| Beretta Pietro | 92A1 | A098515Z | 9mm semi-automatic pistol. |
| Remington Arms | 870 Tactical | RS90036Z | 12 gauge pump action shotgun. |
| Mossberg | 590 | V0187184 | 12 gauge pump action shotgun. |
| Glock | 17 Gen4 | BBVN828 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HHA9534 | 9mm semi-automatic pistol. |
| Smith & Wesson | M&P9 | HDL4053 | 9mm semi-automatic pistol. |
| Firearm ammunition. | | | |
| Rifle magazines. | | | |
| Computer related items. | | | |

## Ammunition

Several types of ammunition were located within rooms 32-135 and 32-134 loaded into rifle magazines for both the AR-15 and AR-10 style rifles. The AR-15 .223/5.56 rifle magazines were loaded with hollow point and polymer tipped hollow point ammunition. The AR-10 .308/7.62 rifle magazines and the bolt action rifle were loaded with Tracer, Frangible Incendiary, Armor Piercing and Armor Piercing Incendiary ammunition.

A complete breakdown of the ammunition types loaded in the firearms, rifle magazines and expended cartridge casings will be documented in the final report.

## DNA

Several items of evidentiary value were collected for DNA analysis. At the time of this report the DNA evidence collected has not yielded any significant results or indication that anyone else was in the room.

## Digital

There were approximately 1,965 leads investigated. There were approximately 21,560 hours of video and 251,099 images obtained by investigators of the LVMPD and the FBI. Analysis found 529 sightings of Paddock.

Four laptop computers and three cellphones were located in 32-135 and 32-134. All laptop computers and cellphones were given the FBI to be forensically analyzed. The forensic analysis on all electronics located in 32-134 and 32-135 has been completed and the results of the analysis is listed below.

**Event: 171001-3519**

## Evidence Item HP Laptop Computer Recovered in Room 32-134

### Browser Artifacts

The HP laptop computer contained internet artifacts from the following cloud storage services: Dropbox.com, Box.com, and Microsoft One Drive. Dropbox and Microsoft One Drive were installed on the laptop. Box.com was accessed through a web browser.

### Google Maps

On 05-18-17 Google Map searches were performed for Venice Beach and Fenway Park.

The following queries were also made with Google Maps:

- Royal Rooters' Club, Boston, MA
- Blandford Street. Station, United States
- Boston University Questrom School of Business
- Boston Hotel Buckminster, Beacon Street, Boston, MA
- Boston Arts Academy
- Official Red Sox Team Store
- Official Red Sox Team Store, 19 Yawkey Way, Boston, MA
- Venice Ale House
- Fairmont Miramar Hotel, Santa Monica, CA
- The Bungalow, 101 Wilshire Boulevard, Santa Monica, CA

### Google Search Queries

On 05-18-17, searches were performed for "summer concerts 2017," "grant park functions," "biggest bear," "La Jolla Beach," "open air concert venues," "biggest open air concert venues in USA," and "how crowded does Santa Monica Beach get."

On 09-04-17, searches were performed for "Las Vegas rentals," "Las Vegas condo rentals," "Las Vegas high rise condos rent," and "Las Vegas Ogden for rent."

On 09-05-17, searches were performed for "life is beautiful expected attendance," "life is beautiful single day tickets," and "life is beautiful Vegas lineup."

On 09-15-17, searches were performed for "swat weapons," "ballistics chart 308," "SWAT Las Vegas," "ballistic," and "do police use explosives."

### Bing Search Queries

On 09-05-17, searches were performed for "Mandalay Bay Las Vegas," "Route 91 harvest festival 2017 attendance," and "Route 91 harvest festival 2017."

**Event: 171001-3519**

The following websites were accessed using an IE private browser:

- http://lineup.lifeisbeautiful.com/
- https://www.google.com/maps?hl=en&tab=wl
- https://lifeisbeautiful.com/ticket/
- http://search.topvegascondos.com/i/the-ogden-downtown-las-vegas-condos-forrent
- https://www.google.com/?
  gws_rd=ssl#q=how+crowded+does+santa+monica+beach+get&spf=149508223676
  1
- https://www.vividseats.com/blog/category/all-concerts/
- https://www.vividseats.com/blog/fenway-park-concerts-and-seating
- https://www.vividseats.com/blog/the-14-best-outdoor-concert-venues-in-the-us
- http://tsminteractive.com/what-are-the-most-crowded-beaches-in-america/
- https://www.yelp.com/biz/santa-monica-state-beach-santa-monica
- https://www.vividseats.com/blog/memorial-day-weekend-2017.html

The following websites were accessed using Internet Explorer:

- www.grantparkmusicfestival.com/ 05-18-17 0419 hours
- www.ticketmaster.com/ 05-18-17 at 0427 hours
- ticketmaster.com/ 05-18-17 at 0431 hours
- www.sandiego.org/ 05-18-17 at 0505 hours
- sandiego.org/ 05-18-17 at 0505 hours
- www.vividseats.com/ 05-18-17 at 0540 hours
- www.lasvegascondoexperts.com/ 09-04-17 at 2212 hours
- lasvegashighrisetour.com/ 09-04-17 at 2213 hours
- www.thehighrisegroup.com/ 09-04-17 at 2214 hours

**Evidence Item Dell Laptop Computer Recovered in Room 32-135**

Computer forensic analysis of a Dell laptop Model E5570 revealed numerous internet searches for open air venues. Additionally, several hundred images of child pornography were located on the computer's hard drive. The investigation into the source of these images is ongoing. The following internet searches from this laptop are indicated below:

**Google Search Queries**

- How tall is Mandalay Bay/ Unknown date
- NV gun shows/ 09-02-17 & 09-30-17
- Life is Beautiful 2017/ 09-20-2017
- Excalibur Hotel & Casino/ 09-23-17
- Las Vegas Academy of the Arts Performing Arts Center/ 09-23-17
- Fremont Hotel & Casino/ 09-23-17
- El Cortez Hotel & Casino/ 09-23-17
- Family Courts & Services Center/ 09-23-17
- Gary Reese Freedom Park/ 09-23-17

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

- Cashman Center/ 09-23-17
- Cashman Field/ 09-23-17
- Neon Museum/ 09-23-17
- The Mob Museum/ 09-23-17
- Discovery Children's Museum/ 09-23-17 & 09-26-17
- Arizona Charlie's Decatur/ 09-23-17
- Where is hard drive located on e5570/ 09-28-17
- NHRA schedule 2017/ 09-30-17

## VIII.   SUSPECT AUTOPSY

On 10-06-17, at approximately 1625 hours, under CCOCME case 17-10064 and FBI incident number 4-LV-2215061 an autopsy was performed on the body of Paddock at the CCOCME by Doctor Lisa Gavin.

**Decedent**
Name:              Paddock, Stephen
Date of birth:     04-09-53
Gender:            Male
Ethnicity:         Caucasian
Height:            73 inches
Weight:            224 lbs
Hair:              Gray
Eyes:              Brown

Body bag seal #541486 removed at 1625 hours.

Specific Photography:
- Body bag seal
- Clothed body
- Pre-cleaned unclothed body
- Post-cleaned unclothed body
- Injuries
- X-Rays

The following persons were in attendance:

1)   Clark County Coroner Fudenberg
2)   Forensic Pathologist Doctor Gavin
3)   Detective Alsup
4)   Detective Colon
5)   SCSA Fletcher
6)   FBI ERT Agents (2)
7)   Forensic Technician Rosales

---

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

The following items of evidence were retained by the FBI's Evidence Recovery Team:

1) One brown long sleeved shirt.
2) One pair of black pants.
3) One pair of white socks.
4) One pair of black slip-on shoes.
5) One pair of blue underwear.
6) Paper tissue from the decedent's ears.
7) Print exemplars.
8) One projectile recovered from the decedent's head.

## Synopsis

On October 6, 2017, detectives from the LVMPD along with a LVMPD Crime Scene Analyst, attended the autopsy of Stephen Paddock at the CCOCME. Also present were members of the FBI Evidence Recovery Team who retained all collected evidence.

The exam room was secured by Clark County Coroner, John Fudenberg. Forensic Pathologist Doctor Lisa Gavin performed the autopsy with one assistant.

The decedent was x-rayed, photographed and cleaned prior to Doctor Gavin's exam. Preliminarily, the injuries noted were on the posterior of both calves and a gunshot wound to the upper palette inside the decedent's mouth with obvious damage to the upper teeth.

The cause of Paddock's death was an interoral gunshot wound and the manner of death was ruled a suicide.

## IX.   INVESTIGATION

**Mandalay Bay Hotel Room**

LVMPD officers located several documents, to include photographs, identifying Paddock as the suspect who was lying on the floor with an apparent gunshot wound to the head. Also located inside the room investigators found documentation related to Danley who was later identified as the longtime girlfriend of Paddock.

Located throughout the 100-wing hallway from the double doors of room 32-135 to the alcove wall of room 32-105 were over 200 bullet strikes. The bullet strikes consisted of actual impacts and holes. These strikes were caused by approximately 35 rounds fired down the 100-wing from inside of room 32-135.

Law Enforcement and the CCOCME took custody of Paddock's body. The body was photographed and transported to the CCOCME where an autopsy was conducted.

The room was secured for evidence recovery. The FBI Evidence Recovery Team responded and took the lead role on documentation and recovery of all evidence inside the hotel rooms and hallway.

**Event: 171001-3519**

Located inside the master bedroom of suite 32-135 were hand drills, drill bits, several miscellaneous tools, and equipment Paddock used to drill holes, run wires, and set up surveillance cameras that showed the 100 wing hallway. Inside the bedroom were several empty ammunition boxes, live rounds, loaded rifle magazines, duffle bags, suitcases, two laptop computers (one of which was broken and missing the hard drive), snorkeling kit bag, diving mask,  circular glass cutter with suction cup and miscellaneous personal items.

Located throughout the main living area of the suite were 18 rifles, one handgun, rifle casings, and loaded magazines. A blue plastic tube, was fashioned with a fan on one end and snorkel mouthpiece on the other end. A spotting scope on a tripod was on the floor near Paddocks body and a slip of paper was on a small table with hand written distances on it. Several suitcases and bags were throughout the main room containing personal items and loaded rifle magazines. A laptop computer was located on the bar and connected to a live feed camera attached to the peephole of the main door to suite 32-135.

Room 32-134 was an adjoining room to suite 32-135 used by Paddock. Located inside the room were five rifles, casings, live ammunition and several loaded magazines. A pair of gloves were located on one of the beds and sandals were located on the floor near the bed. Inside the bathroom, a snorkel tube was located in the trash. A room service receipt and a cardboard box with mailing labels was also located in the bathroom. In the walkway leading to the door to the main hallway was a food service cart. A laptop computer was located on the food service cart. It was connected to two live feed cameras and a battery pack with wires connecting it to the cameras on the food service cart in the 100 wing hallway.

All evidence located and recovered inside suite 32-135 and room 32-134 indicated Paddock was capable of watching people in the hallway. There was no suicide note or manifesto located inside either room.

**Paddock's Vehicle**

Paddock's vehicle was located in Mandalay Bay East Valet, 2nd floor, space 317 by investigators. The vehicle a 2017 Chrysler Pacific bearing Nevada plate 79D401 had been backed into space 317 and was locked. The key for the vehicle was obtained from valet.

A search warrant was obtained and at 0325 hours, detectives with the LVMPD All-Hazard Regional Multi agency Operations and Response Section (ARMOR) broke a window to the vehicle, to allow an explosive detection dog access to the scent from inside the vehicle. A U.S. Marshall explosive detection K9 moved around the vehicle and gave an alert to the presence of explosive precursors.

Detectives secured the area on the belief there were explosive precursors within the vehicle. ARMOR detectives requested LVMPD dispatch notify the Las Vegas Fire and Rescue Chemical, Biological, Radiological, Nuclear and Explosive Task Force (CBRNE) respond. Las Vegas Fire Rescue responded with their CBRNE vehicle along with FBI bomb technicians. Located inside the vehicle were five bags which were x-rayed and removed by the FBI.

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Upon rendering the vehicle safe, the vehicle and all items located inside were photographed. All items removed from the vehicle were placed back inside and the vehicle was sealed. The vehicle was subsequently towed from the Mandalay Bay Hotel to a secure FBI facility for a thorough search and evidence collection.

Evidence collected from inside Paddock's vehicle included loaded rifle magazines for both AR-15 and AR-10 style rifles. Also collected were 20 two pound containers of exploding targets, 10 one pound containers of exploding targets and 2 twenty pound bags of explosive precursors.

**Paddock's Mesquite Residence**

LVMPD detectives responded to Paddock's residence in Mesquite, Nevada. The residence was located at 1372 Babbling Brook Court. Detectives obtained and served a search warrant at this location. Inside the residence, seven shotguns, five handguns, six rifles, exploding targets, firearm ammunition, rifle magazines and computer related items were recovered. These items were impounded and turned over to the FBI for processing.

**Paddock's Reno Residence**

FBI Agents responded to Paddock's residence in Reno, Nevada. The residence was located at 1735 Del Webb Parkway, Reno, Nevada. Agents obtained and served a search warrant at this location. Inside of the residence were two shotguns, five handguns, firearm ammunition, rifle magazines and computer related items. The items were recovered by the FBI for processing.

**Search Warrants and Legal Notices**

The investigative process required information to be obtained from numerous sources and venues to include but not limited to:

- Hotels and Casinos
- Firearms related businesses
- Residences of Stephen Paddock
- Vehicles of Stephen Paddock
- Internet providers
- Telephone companies
- Online retail businesses
- Email companies

During the course of the investigation law enforcement authored approximately 1,062 legal notices. These legal notices were to obtain information or items from venues related to the investigation. These legal documents included but are not limited to:

- Administrative Subpoenas
- Court Orders
- Search Warrants
- Grand Jury Subpoenas

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

**Law Enforcement Tips and Leads**

All tips or items that needed to be investigated or followed up were coordinated by the FBI and the LVMPD. These leads were tracked using the Operational Response and Investigative Online Network or ORION system through the FBI.

Investigators conducted interviews with 43 people directly associated with Paddock. These included 24 gambling associates, 11 acquaintances and 8 blood relatives.

## X.   PRELIMINARY FINDINGS FROM THE 1 OCTOBER INVESTIGATION

Investigators determined key findings as a result of this investigation:

- Paddock acted alone. Thousands of hours of digital media were reviewed and after all the interviews conducted, no evidence exists to indicate Paddock conspired with or acted in collusion with anybody else. This includes video surveillance, recovered DNA[19] and analysis of cellular phones and computers belonging to Paddock.

- No suicide note or manifesto was found. Of all the evidence collected from rooms 32-135 and 32-134, there was no note or manifesto stating Paddock's intentions. The only handwritten documentation found in either room was the small note indicating measurements and distances related to the use of rifles.

- There was no evidence of radicalization or ideology to support any theory that Paddock supported or followed any hate groups or any domestic or foreign terrorist organizations. Despite numerous interviews with Paddock's family, acquaintances and gambling contacts, investigators could not link Paddock to any specific ideology.

- Paddock committed no crimes leading up to the October 1st mass shooting. All the weapons he purchased to include all the ammunition, were purchased legally. This includes all the purchases Paddock made at gun stores as well as online purchases. Paddock did not commit a crime until he fired the first round into the crowd at the Las Vegas Village.

- Reference the 1,965 investigated leads, 21,560 hours of video, 251,099 images obtained and 746 legal notices filed or sent, nothing was found to indicate motive on the part of Paddock or that he acted with anyone else.

- Security Officer Campos was not shot with a BB gun but rather sustained a gunshot wound from one of the rounds fired by Paddock down the hallway of the 100 wing on the 32nd floor. Security Officer Campos did in fact have a pre-planned vacation to Mexico to go visit his father and Security Officer Campos asked law enforcement for permission to make this trip.

---

[19] Deoxyribonucleic Acid

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
## FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

- One aspect of the investigation focused on Paddock's financials. The investigation proved Paddock was self-funded through his gambling and past real estate transactions. He was indebted to no one and in fact paid all his gambling debts off prior to the shooting.

- The investigation revealed several indicators of intent on the part of Paddock. Those indicators are as follows:

    1. Paddock had a reservation for a hotel during the Lollapalooza music festival held at Grant Park in Chicago, Illinois during the month of August. Like Route 91, the Lollapalooza festival was held in an open air venue.  Paddock specifically requested a room overlooking the venue when he made the reservation. The reservation was cancelled two days prior to the check-in date.

    2. Paddock made lodging reservations during the Life is Beautiful music festival held in Downtown Las Vegas, Nevada. The festival was also an open air music venue attended by thousands of people. Paddock requested units overlooking the venue. Paddock reserved three different units during the period and all faced the venue. Paddock was observed in video surveillance transporting several suitcases from his vehicle to the units he reserved. Paddock was alone for the trip and was never accompanied by anyone for more than a casual conversation. Investigators have been unable to determine if Paddock intended an attack during this festival or if he used it as a means to plan a future attack.

    3. Paddock conducted several internet searches while planning his actions. Search terms included open air concert venues, Las Vegas SWAT tactics, weapons and explosives. Paddock also searched for various gun stores.

    4. The purchasing of over 55 firearms, which were mostly rifles in various calibers, from October 2016 – September 2017. He also bought over 100 firearm related items through various retailers during that period.

    5. During a stay in early September 2017, Paddock requested specific rooms that overlooked the Las Vegas Village. According to Danley, Paddock spent time looking at the Las Vegas Village venue from different angles and windows while inside the room.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**FORCE INVESTIGATION TEAM REPORT**
CONTINUATION

**Event: 171001-3519**

**Appendix A**

Picture 1



(Door leading to the stairwell secured by "L" bracket)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 2



(View from 100 hallway towards room 32-135)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000352

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 3



(Food Service Cart in hallway with camera)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000353

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 4



(Food Service Cart in hallway with camera)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**FORCE INVESTIGATION TEAM REPORT**
**CONTINUATION**

**Event: 171001-3519**

Picture 5



(View from entry of 32-135 towards the sitting area)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 6



(View from foyer of room 32-135 towards the sitting area)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000356

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 7



(View from sitting area towards the living room)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 8



(View from sitting area towards the bar / kitchenette)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000358

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 9



(View from sitting area towards the bar / kitchenette)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 10



(View from sitting area towards master bedroom)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 11



(View of connecting doors between room 32-135 and 32-134)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000361

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 12



(Blue plastic hose with snorkel mouthpiece attached)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 13



(Surveillance camera mounted to room door peephole)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 14



(Small sledge hammer)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 15



(Handwritten note with distance/bullet drop calculations)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000365

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 16



(Damage to entry door of room 32-135)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000366

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 17



(Damage to entry door of room 32-135)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 18



(Desk in master bedroom of 32-135 with SCUBA mask and power hand drill)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 19



(Interior of room 32-134 from connecting doors)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

# FORCE INVESTIGATION TEAM REPORT

CONTINUATION

**Event: 171001-3519**

Picture 20



(Interior of room 32-134 towards bathroom)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000370

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 21



(Hallway of room 32-134 with food service cart and laptop connected to cameras in 100 hallway)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000371

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 22



(Paddock's vehicle)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
CONTINUATION

**Event: 171001-3519**

Picture 23



(Explosive precursors found in Paddock's vehicle)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
### CONTINUATION

**Event: 171001-3519**

Picture 24



(Exploding targets found in Paddock's vehicle)

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 25



(McCarran International Airport fuel tank with bullet strikes)

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**

Picture 26



(Upper bullet strike)

Picture 27

---

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000376

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**FORCE INVESTIGATION TEAM REPORT**
**CONTINUATION**

**Event: 171001-3519**



(Lower bullet strike)

Picture 28

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# FORCE INVESTIGATION TEAM REPORT
**CONTINUATION**

**Event: 171001-3519**



(View of the Las Vegas Village from room 32-135)

Guedes v. ATF / Codrea v. ATF
Ex. 1 Page 000378