## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAMIEN GUEDES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-02988-DLF |
| | ) | The Hon. Judge Friedrich |
| BUREAU OF ALCOHOL, | ) | |
| TOBACCO, FIREARMS AND | ) | |
| EXPLOSIVES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| DAVID CODREA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. 1:18-cv-03086-DLF |
| v. | ) | The Hon. Judge Friedrich |
| | ) | |
| BUREAU OF ALCOHOL, | ) | |
| TOBACCO, FIREARMS AND | ) | |
| EXPLOSIVES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ............................................................................................................... 8

I.   THE FINAL RULE CONTRADICTS THE PLAIN STATUTORY DEFINITION OF A
MACHINEGUN ....................................................................................................... 8

   A.  The Final Rule's Definitions Are Inconsistent with the Common Public
Meanings of the Statutory Terms .............................................................. 8

   B.  The Final Rule's Definitions Make No Sense as Applied to Bump Stocks ........ 17

   C.  The Final Rule's Definitions Are Overbroad ..................................................... 21

   D.  Congress in 1968 Ratified a Narrow Reading of the Definition of Machinegun 24

II.  IF THE STATUTE IS AMBIGUOUS, THE FINAL RULE IS INVALID ............................ 27

   A.  The Rule of Lenity Forecloses Executive Expansion of Ambiguous Criminal
Statutes .................................................................................................... 28

   B.  *Chevron* Deference Does Not Apply or Was Waived by the Government. ........ 33

   C.  *Chevron* Deference Violates the Constitution ...................................... 34

   D.  The Final Rule Is Unreasonable, Arbitrary, and Capricious ................................ 34

III. APPLICATION OF DEFINITIONAL ISSUES TO SPECIFIC COUNTS ............................ 38

   A.  Guedes Count I – Lack of Statutory Authority to Alter Definition Established by
Congress (APA and Article I); Codrea Counts I, II, III, V & VII – Ultra Vires,
APA Violation and Amnesty. .................................................................... 39

   B.  Guedes Count II – Separation of Powers and Non-Delegation ......................... 39

   C.  Guedes Count III – Due Process and Takings; Codrea Counts IV & VI –
Procedural Due Process and Takings .................................................... 40

D.  Guedes Count IV – Ex Post Facto Clause; Codrea Count VI – Retroactive
Rulemaking and Ex Post Facto Clause .................................................................. 43

CONCLUSION ................................................................................................................ 44

# TABLE OF AUTHORITIES

## Cases

A & D *Auto Sales, Inc. v. United States*, 748 F.3d 1142
(Fed. Cir. 2014)..................................................................................43

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir.
2017). .................................................................................................8

*Boeing Co. v. United States*, 537 U.S. 437 (2003) ........................27

*Bowles v. United States*, 31 Fed. Cl. 37 (1994) ............................43

*Butte Cty v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010) ......................38

*Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722 (6th Cir. 2013) ...................29, 30, 31

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) ..................9

*Crandon v. United States*, 494 U.S. 152 (1990).............................30

*Duncan v. Becerra*, 366 F.Supp.3d 1131 (S.D. Cal. 2019)............42

*Guedes v. ATF*, 140 S. Ct. 789 (2020) (Gorsuch, J., statement
regarding denial of certiorari) ................................1, 4, 28, 35

*Guedes v. ATF*, 356 F. Supp.3d 109 (D.D.C. 2019)......................4, 15

*Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019)........................9, 20, 36

*Gundy* v. *United States*, 139 S. Ct. 2116 (2019) ...........................31

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)...............................17

*INS* v. *St. Cyr*, 533 U.S. 289 (2001) ..............................................30

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)...............................17

*Lewis v. United States*, 445 U.S. 55 (1980)...................................32

*Liparota v. United States*, 471 U.S. 419 (1985) ............................31

*Lorillard v. Pons*, 434 U.S. 575 (1978).........................................27

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ..................43

*Maracich v. Spears*, 570 U.S. 48 (2013) ....................................................33

*McNally* v. *United States*, 483 U.S. 350 (1987) ........................................32

*Moskal v. United States*, 498 U.S. 103 (1990) ..........................................33

*Pitt News v. Pappert,* 379 F.3d 96 (3d Cir. 2004).....................................27

*Scheidler* v. *NOW*, 537 U.S. 393 (2003) ....................................................32

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640
   (D.C. Cir. 1998) .....................................................................................8

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)...................................................8

*Skilling* v. *United States*, 561 U.S. 358 (2010)..........................................32

*United States v. Gradwell*, 243 U.S. 476 (1917) .......................................32

*United States v. Olofson*, 563 F.3d 652 (7th Cir.), *cert. denied*, 558
   U.S. 948 (2009)....................................................................................15

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) ........................28

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992)..............30

*United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218 (1952)...........32

*United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76 (1820) ......................29

*United States v. Wishnefsky*, 7 F.3d 254 (D.C. Cir. 1993) ..........................8

*Whitman v. United States*, 135 S. Ct. 352 (2014) (statement of Scalia
   & Thomas, JJ., respecting the denial of certiorari).................................31

*Yates* v. *United States*, 135 S. Ct. 1074 (2015) .........................................32

**Statutes**

18 U.S.C. § 921(a)(23) ....................................................................................2

18 U.S.C. § 921(a)(28) ..................................................................................22

26 U.S.C. § 5845(b)...................................................................................2, 24

## Other Authorities

ATF Rul. 2004-5.................................................................................................17

Brief for the Respondents in Opposition, *Guedes v. ATF*, No. 19-296
(U.S. Supreme Court, 2019) ........................................................................34

Brief of the Cato Institute as *Amicus Curiae* in Support of Petitioners,
*Guedes v. ATF*, No. 19-239 (U.S., Oct. 3, 2019)........................................37

Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315
(2000).....................................................................................................29, 30

*DHS v. Regents of the Univ. of Cal.*, No. 18-587 (June 18, 2020), Slip.
Op..................................................................................................................37

Final Rule 83 Fed. Reg. 66,54 (Dec. 26, 2018)........................................passim

George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973 .......17

John Quick, DICTIONARY OF WEAPONS AND MILITARY TERMS
(McGraw-Hill 1973) .....................................................................................16

Petition, *Guedes v. ATF*, No. 19-296 (U.S., Aug. 29, 2019)...........................35

Rev. Rul. 55-528, 1955-2 C.B. 482, 1955 WL 9410........................................25

THE OXFORD ENGLISH DICTIONARY, Volume I (1970 printing, 1933
publication date).........................................................................................16

THE SHORTER OXFORD ENGLISH DICTIONARY, THIRD EDITION  (1973
printing, original Third Edition copyright 1944)....................................16, 19

WEBSTER'S II NEW RIVERSIDE-UNIVERSITY DICTIONARY (1988) ...................16

WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION
(1941 Printing) ..............................................................................................15

WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, SECOND
EDITION (1965 printing, 1964 copyright) ....................................................16

## Regulations

27 C.F.R. § 478.11...............................................................................................2

27 C.F.R. § 479.11...............................................................................................2

## INTRODUCTION

The crux of this case for purposes of summary judgment is the proper interpretation of the statutory definition of "machinegun."  In their rulemaking and throughout this litigation, Defendants have maintained that Final Rule merely articulates the plain meaning of the statutory definition.  In their current Memorandum, they continue to claim that the final rule constitutes the "plain," or at least the "best," meaning of the statutory definition of "machinegun."  As before, that argument borders on the absurd given the decades of contrary and incompatible construction by Treasury and the ATF, Congressional action in the face of prior agency interpretations, and the absurd overbreadth of the definitions proposed by the Final Rule.

Even assuming, *arguendo*, that the Final Rule's definitions were barely plausible, Defendants have long conceded that *Chevron* deference does not apply and, in any event, to the extent there was ambiguity sufficient to allow Defendants to enact a "legislative" rule under *Chevron*, such ambiguity would be sufficient to trigger the rule of lenity and all of the separation of powers and anti-delegation concerns that argue against deference to the government in the context of criminal statutes.  *See generally*, *Guedes v. ATF*, 140 S. Ct. 789 (2020) (Gorsuch, J., statement regarding denial of certiorari) (discussing the many errors of applying *Chevron* deference in this case but finding a grant of cert. premature).

## BACKGROUND

The term "machinegun" means **any weapon *which shoots*,** is designed to shoot, or can be readily restored to shoot, ***automatically more than one shot, without***

> **manual reloading, by a single function of the trigger**. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and **any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person**.

26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(23)  (emphasis added).  Prior to the current rulemaking, the regulatory definition of a machine gun simply mirrored the statutory definition.  27 C.F.R. § 478.11; 27 C.F.R. § 479.11.  The Final Rule alters the regulatory definition by retaining the prior language but adding:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

27 C.F.R. § 478.11;

Defendants' new definition proposes that "function of the trigger" be defined as the action of the *shooter* in "pull[ing]" or otherwise moving the trigger, rather than as the mechanical operation of the trigger mechanism itself, as the statutory text more naturally reads.  While that difference is meaningful in a variety of contexts, as will be discussed *infra*, recognizing that each time the trigger *moves* in a way that causes a shot to be fired is a separate function of the trigger is more important to this case than how that trigger is made to move.

Defendants' definitions also propose that the adverb "automatically" be defined as referring not merely to performing the specified action via a "self-acting" mechanism, but also through the far more vague and malleable notion of a "self-regulating" mechanism that need not actually perform the action of "shoot[ing]" more than one shot, but instead merely makes it easier in some ill-defined way to perform such action notwithstanding the need for continuous manual input beyond the initial "single function of the trigger." That definition is not even remotely plausible, much less the "plain" or "best" definition of what it means to "shoot … automatically more than one shot … by a single function of the trigger."  While it may in some sense be a plausible definition of "semi-automatically" – a term previously included in, but eventually removed from, the definition of machinegun – firearms that fired "automatically" were, are, and always have been understood as a far narrower class of firearms that continued to expend available ammunition so long as the trigger remained depressed.  A firearm that only shot another round if the trigger was released or reset and then depressed again for each subsequent shot would never have been understood by Congress, the agency, or the public as an automatic weapon when Congress enacted the definition in 1934 or when it later amended and narrowed that definition in 1968.

This Court previously held that the statutory words "single function of the trigger" and "shoot ... automatically" in the above definition were ambiguous, but approved Defendants' expansive redefinition of those words by applying *Chevron* deference. *Guedes v. ATF*, 356 F. Supp.3d 109, 119, 126-27, 129-31 (D.D.C. 2019).  Plaintiffs maintain that such predicate determination of ambiguity was erroneously generous to

Defendants and that the statutory language is meaningfully narrower than, and precludes, the redefinitions proposed by Defendants.  Additionally, *Chevron* deference has no proper role in this case.  *Guedes*, 140 S. Ct. at 789-90 (Gorsuch, J., statement regarding denial of certiorari).

The phrase "single function of the trigger," as it relates to a typical trigger mechanism, involves the mechanical movement of the lever that constitutes the trigger. It is complete when the trigger traverses its range of motion and initiates the internal sequence of mechanical actions resulting in one or more shots being fired.  That function ends when the trigger is released and returns to its starting point or is otherwise reset to await further action to cause a subsequent function of the trigger. Any other interpretation of that phrase is contrary to the public understanding of those words and yields absurd results.

The word "automatically" likewise means by a "self-acting" mechanical process without further human intervention and to "shoot … automatically more than one shot" means to continue to fire a second or subsequent shot without further human action until the trigger is released, thus terminating that single function of the trigger.  *See infra* at 14-17 (citing numerous definitions).  A bump stock does not cause a semi-automatic firearm to fire more than one shot by a single function of the trigger, but rather, by multiple functions of the trigger, with the trigger having to traverse its range of motion each time a shot is fired.   *See* Pl. Statement of Facts ("SOF") ¶ 1 (discussing video of bump stock operation and affidavits describing same).  Similarly, the bump stocks at issue in this case do not "shoot … automatically," but instead require ongoing human intervention beyond

merely keeping the trigger continuously depressed.  For each and every shot, the shooter must repeatedly force the gun body and trigger forward to reengage the trigger with the trigger finger once the trigger has been disengaged from the trigger finger and reset after each shot. Whether an individual pulls their finger against a trigger or pushes the trigger assembly forward to meet their finger, human intervention occurs for each of the consecutive functions of the trigger, and nothing is accomplished "automatically." *See* Pl. SOF ¶ 1 (referencing video and affidavit demonstrating same).

To better understand these simple mechanical realities, it is useful to review how a typical semi-automatic trigger assembly operates.  For example, the fire control group of a semi-automatic AR-15 has three main components: the trigger, disconnector, and hammer. Image 1.



When the firearm is set to fire, the hammer rests on the internal edge of the trigger. Image 2.  Causing the trigger to move rearward releases the hammer, which strikes the firing pin and results in a single round being discharged. Images 3-4.



While the empty casing is being ejected from the firearm, the bolt carrier slides rearwards and the hammer is pushed back towards the disconnector. The disconnector grabs and holds the hammer, preventing it from firing another round without the trigger being "reset." Images 5-6. Indeed, unlike with a machinegun, keeping the trigger depressed actually prevents gun from firing again because the disconnector keeps hold of the hammer.



A second function of the trigger occurs when the trigger is released and allowed to move forward, causing the disconnector to let go of the hammer, which then again rests on the

"reset" edge of the trigger, awaiting the next function of the trigger to initiate the next firing sequence. Image 7.



*See* animation at http://publicfiles.firearmspolicy.org/ar15.gif.

A bump-stock-type device does not change these functions. Regardless whether the shooter "pulls" their finger against the trigger or pushes the trigger assembly forward against a stationary finger, neither the operation or "function" of the trigger's connected parts, nor the operation of the firearm, vary. Each round discharged is the result of a single function of the trigger initiated by the manual act of putting sufficient pressure on the reset trigger.

## STANDARD OF REVIEW

Because the primary issues in this case involve the legal meaning of the statutory definition of "machinegun," the standard of review for those issues is *de novo*. *United States v. Wishnefsky*, 7 F.3d 254, 256 (D.C. Cir. 1993) (questions of statutory interpretation are reviewed *de novo*). Other issues, insofar as necessary, are evaluated under the familiar arbitrary, capricious, or contrary to law standard. *Animal Legal Def.*

*Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017).  In this case, the Department purported to be bound by what it claimed was the plain meaning of the law, claimed to lack discretion in deviating from that plain meaning, and hence its decisions would not receive deference but must be evaluated solely based on whether the Department correctly understood the law's commands or restraints.  Regardless whether an agency action might be justified on some other basis, if it "is based upon a determination of law," then it "may not stand if the agency has misconceived the law."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law.") (cleaned up); *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990) ("'[I]f a district court's findings rest on an erroneous view of the law, they may be set aside on that basis.'") (citation omitted).

## ARGUMENT

I. **THE FINAL RULE CONTRADICTS THE PLAIN STATUTORY DEFINITION OF A MACHINEGUN**

### A. The Final Rule's Definitions Are Inconsistent with the Common Public Meanings of the Statutory Terms

In the statutory definition of a machinegun, the phrase "by a single function of the trigger" is best understood as referring to a single instance of the trigger performing its intrinsic function as part of the firearm.  Who or what *causes* the trigger to perform that function is not the point.  The object of the word "function" is the trigger itself, not the

operator of the firearm.  *See Guedes v. ATF*, 920 F.3d 1, 44 n. 13 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part).

Defendants argue, Def. SJ Mem. at 11-14, that the plain meaning of "single function of the trigger" is "a single pull of the trigger and analogous motions."  They assert that focusing on the action of the "shooter" rather than the action of the "trigger" itself is the best interpretation, though they further claim that dictionary definitions are of little help in reaching such a conclusion.  While this Court has already found the language ambiguous, the structure of the sentence, and relevant past interpretations support Plaintiffs' trigger-centric view.  Ultimately, however, the debate over the word "function" is less relevant than its interaction with the word "single."

Whether defined as a single movement or operation of the trigger, or a single manual input upon the trigger – a "pull" or analogous motion – causing such movement, what matters is understanding where one "function" of the trigger ends and the next begins.[1]  Typically, the primary function or "pull" of the trigger is complete when the hammer is released, and a shot is fired.  For the trigger to perform its primary firing function again it must be released, and the hammer must be reset to await a subsequent

---

[1] The prior debate between trigger- or shooter-focused definitions tended to obscure the more meaningful question discussed in the text of whether bump stocks involve a single function or multiple functions of the trigger.  The trigger- versus shooter-focused disagreement remains relevant, however, because the trigger-focused definition helps explain various past decisions by ATF, better comports with the language and structure of the statute, and avoids redundancy with the phrase "shoots … automatically more than one shot."  Defendant's emphasis on the shooter's manual operation of the trigger goes more to the issue of whether subsequent shots are occurring automatically, not *how many* functions of the trigger are involved.  Indeed, Defendant's definitions make the phrase "single function of the trigger" superfluous in that the word automatically already implies the absence of further volitional action by the shooter.

function of the trigger.  It is the release of the trigger that terminates the single function of

an ordinary trigger and initiates a second or subsequent function.  The same analysis

would apply even if viewing "function" as a "pull," push, or bump of the trigger.  A

single "pull" of the trigger is complete when the shooter pulls the trigger through its

range of motion.  It ends when the trigger is released and the trigger returns to its starting

position and is reset awaiting a subsequent "pull" or analogous motion by the shooter.

Indeed, the Final Rule itself admits that releasing a trigger constitutes a separate and

second "function" of the trigger when it discusses binary triggers.  83 Fed. Reg. at

66,534; *see infra* at 22-23.

Much of Defendants' arguments, therefore, miss the point.  There is no credible

dispute that bump-firing in general, and using bump-stocks in particular, the "bump" of

the shooter's finger against the trigger, causing it to traverse its range of motion and

release the hammer to fire a shot would constitute a "pull" of the trigger or analogous

motion.  The shooter in such a scenario engages with the trigger mechanism, manually

pressing the fore-end of the firearm forward causing the trigger to move into contact with

the trigger finger, be pushed backwards by such contact, and thereby perform its firing

function.  That "pull" or analogous motion typically ends when the pressure from the

shooter's finger on the trigger is reduced or eliminated, allowing the trigger to return to

its starting position and reset.[2]  Any subsequent interaction between the shooter's finger

and the trigger, causing it once again to traverse its range of motion, is a second or

---

[2] For a binary trigger, the trigger resets on its own after the initial shot is fired.  Releasing the trigger – a separate function – causes a further shot to be fired.

subsequent "pull" of the trigger, not a continuation of the initial completed pull.  Indeed,

even ATF previously conceded in the rulemaking the mechanical reality that "additional

physical manipulation of the trigger" results in an additional "function of the trigger."  83

Fed. Reg. 66519.

Defendants' reliance, at 12, on its 2006 reversal of position regarding the Akins

Accelerator is a good example of the mischief of their revised approach.  When initially

reviewed, ATF determined that the Akins Accelerator did not convert a semi-automatic

weapon into a machine gun because it involved multiple functions of the trigger.  83 Fed.

Reg. 66,517.  In changing its determination, it focused not on the number of functions or

pulls of the trigger, but on whether subsequent operation of the trigger was "automatic."

While it may be the case that the spring-loaded Akins Accelerator harnessed the recoil

energy of an initial shot and used that energy to cause an "automatic" subsequent

function, "pull," or bump of the trigger, that renders the word "single" superfluous.

Indeed, the revised determination slyly altered and manipulated the language of the

statute by saying that the device was "*activated* by a single pull of the trigger, initiat[ing]

an automatic firing cycle which continues until either the *finger is released* or the

ammunition supply is exhausted." AR005599 (emphasis added); *see also* 83 Fed. Reg.

66517 (same).

The first meaningful alteration was that the device does not "shoot" multiple shots

"by" a single function of the trigger, but rather is merely "activated" by a single function

of the trigger.  Of course, while every journey is initiated or "activated" by a single step,

that hardly denies the existence of the many subsequent steps that follow.  The second

sleight of hand is the reference to the firing cycle continuing until the finger is released. But that begs the question "released" from what?  Certainly not from the trigger, since the finger and the trigger separate after each shot and recoil when using a bump stock.

Ultimately, however, even allowing the conflation of whether the Akins Accelerator operated automatically with the number of functions of the trigger involved, the same decision recognized that without the spring the process did not work "automatically," but required manual input to cause each subsequent pull or bump or movement of the trigger.

Turning, then, to Defendants' revised notion of what it means to "shoot[] … automatically more than one shot," they conflate the separate statutory concepts of "by a single function of the trigger" and "shoots automatically more than one shot" by arguing, at 12-13, that that "the 'single function of the trigger' is the action that initiates a firing sequence that continues automatically."  As for whether the "firing sequence … continues automatically," that once again substitutes imprecise language for the statutory phrase "shoots ... automatically."  It is anybody's guess what a firing sequence is in this context.  It certainly does not comport with the technical or mechanical understanding of the firing sequence as involving the operation of the trigger releasing the hammer causing the shot to be fired.  Rather, it seems to involve the entire process, broadly conceived, of firing multiple rounds, regardless of its technical or mechanical meaning or how many pulls of the trigger are involved.[3]  Thus, the serial actions of pull, release, pull, release,

---

[3] Defendants, at 13, raise a bit of a red herring in arguing that there may be many different types of triggers and it should not matter how the trigger is caused to operate.  While it is true that once

etc. would be a "firing sequence" under this altered phraseology regardless how many trigger functions are involved.  The only issue under Defendant's revised definitions thus would be whether such sequence is "automatic," a concept also stripped of meaning under the Final Rule.

Regarding the Final Rule's definition of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger," Defendants claim it is take directly from contemporaneous dictionaries, but that is misleading and largely inaccurate.

As an initial matter, Defendants use the definition of "automatic" standing alone, rather than the relevant phrase of "shoots … automatically more than one shot."  The difference is important, because the statutory phrase explains *what* needs to occur "automatically" – "shooting" – and sets the sole non-automatic activity allowed as part of the process – "by a single function of the trigger."  The importance of precision in identifying the verb to which the adverb "automatically" applies can be seen by a simple example:  Automobiles are colloquially referred to as "automatic" or "manual," yet such labels obscure the fact that automatic cars generally do not drive themselves (though that

---

one moves beyond the traditional "trigger" of a physical lever as seen on most firearms, there may be ambiguities and uncertainty as to what counts as the "trigger" where firing is initiated by electronic or other means, those issues are not meaningful to bump-stocks that are used with more traditional firearms.  Defendants further point that it should not matter "how the trigger is caused to operate," however, is entirely correct.  That the traditional trigger of a rifle equipped with a bump-stock is caused to operate by bumping it forward against a stationary finger rather than by a moving finger pulling backward against a stationary trigger mechanism does not change the fact that each interaction between finger and trigger is a separate function of the trigger and each and every shot fired on a bump-stock equipped semi-automatic rifle requires a separate such function of the trigger.

may soon change).  Rather, an automatic car *shifts gears* automatically, but still requires considerable driver input into the driving overall.  Likewise with firearms, there may be many things a firearm does automatically – it can eject a spent cartridge, load the next round, reset the trigger, or adjust for recoil, etc. – but none of those means that it "shoots … more than one shot" automatically, much less does so "by" a single function or even "pull" of the trigger.

The definition proposed by the Final Rule also erroneously expands the notion of "automatic" performance of an identified task by including not merely the operation of a "self-acting" mechanism, which is quite sensible, but also the operation of a "self-regulating" mechanism, which is incoherent as applied by Defendants.  Indeed, this Court's prior reliance on *United States v. Olofson*, 563 F.3d 652 (7th Cir.), *cert. denied*, 558 U.S. 948 (2009), supported only the concept of a "self-acting" mechanism, and this Court recognized that including a "self-regulating" mechanism in the revised definition created added ambiguities and impossible-to-predict judgments about how much manual input was allowed in a self-regulating mechanism. 563 F.3d at 658-60; *Guedes*, 356 F. Supp.3d at 131.

Furthermore, even the dictionary cited by Defendants as the source of its definition – WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION – does not support the use of the broader phraseology in the context of firearms.  Indeed, the same edition contains a separate definition of an "automatic gun" as "[a] firearm which, after the first round is exploded, by gas pressure or force of recoil automatically extracts and ejects the empty case, loads another round into the chamber, fires, and repeats the above

cycle, *until* the ammunition in the feeding mechanism is exhausted, or *pressure on the trigger is released*." *Id.* at 187 (emphasis added).[4]

Other definitions from the 1930s and, more importantly, from the 1960s when the statutory definition of "machinegun" was amended and narrowed, confirm that the language is best understood as referring to the operation of a "self-acting" mechanism, not a merely a "self-regulating" one, and that the concept of an automatic firearm had a more specific and discrete meaning as one that fired continuously until the trigger is released or the ammunition exhausted. *See, e.g.*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, SECOND EDITION 127 (1965 printing, 1964 copyright) (defining "automatic" and "automatical" as "1. conducted or carried on by self-acting machinery; as, *automatic* operations."; defining "automatic pistol, automatic rifle, etc." as "a pistol, rifle, etc. that uses the force of the explosion of a shell to eject the empty cartridge case and place the next cartridge into the breech so that shots are fired in rapid succession until the trigger is released."); THE SHORTER OXFORD ENGLISH DICTIONARY, THIRD EDITION 135 (1973 printing, original Third Edition copyright 1944) (defining "Automatic," in relevant part, as "1. *lit.* Self-acting, having the power of motion or action within itself 1812. 2. Going by itself; *esp.* of machinery and its movements, which produce results otherwise done by hand, or which simulate human or animal action 1802."); THE

---

[4] There are several printings of the Second Edition, all of which appear the same other than regarding the addition of a separately copyrighted New Words Section.  The above quote is from the 1941 printing, which lists 1934 as the copyright for the main body of the work and 1939 as the copyright for the New Words Section.  The 1937 printing of the Second Edition contains the identical definitions on the identical page of the edition.

OXFORD ENGLISH DICTIONARY, Volume I at 574 (1970 printing, 1933 publication date) (defining "Automatic," in relevant part, as "1. *lit.* Self-acting, having the power of motion or action within itself. … 2. Self-acting under the conditions fixed for it, going of itself. Applied *esp.* to machinery and its movements, which produce results otherwise done by hand ….").[5]

Various court cases, including many cited by the government, confirm this understanding of what constitutes an automatic firearm and hence what it means to shoot more than one shot "automatically" "by a single function of the trigger." *See Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994) ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. *That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted*." (emphasis added)); *Kolbe v. Hogan*, 849 F.3d 114, 158 (4th Cir. 2017)  (Traxler, J., dissenting) ("[S]emiautomatic firearms require that the shooter pull the trigger for each shot fired, while … 'machine guns' do not require a pull of the trigger for each shot and will [shoot] as long as the trigger is depressed.") (citation omitted); *Hollis v. Lynch*, 827 F.3d 436, 440 n. 2 (5th Cir. 2016) (a machinegun "fir[es] more than one round per trigger-action" and a semiautomatic firearm "fires only one round per trigger-action.").

---

[5] *See also* WEBSTER'S II NEW RIVERSIDE-UNIVERSITY DICTIONARY (1988) (automatically: "acting or operating in a manner essentially independent of external influence or control"); John Quick, DICTIONARY OF WEAPONS AND MILITARY TERMS 40 (McGraw-Hill 1973) (automatic fire: "continuous fire from an automatic gun, lasting until pressure on the trigger is released").

Even ATF used to understand this plain and firearm-specific meaning of the words "automatic" or "automatically" in the statute, prior to its being instructed to pretend otherwise. *See, e.g.*, ATF Rul. 2004-5 (" '[A]utomatic' is defined to include 'any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots[.]' ") (quoting George C. Nonte, Jr., FIREARMS ENCYCLOPEDIA 13 (Harper & Rowe 1973)).  The suggestion that the actual firearms experts at ATF, and numerous general and specialized dictionaries, for years misunderstood the "plain" and public understanding of what it means to shoot "automatically," as distinguished from "semi-automatically," is frivolous and asks this Court to suspend disbelief to a fantastical degree.

### B.  The Final Rule's Definitions Make No Sense as Applied to Bump Stocks

Even under the Defendants' wrongly expanded definitions, bump stocks still are not properly categorized as machineguns.  And if the Final Rule's definitions *could* be contorted to cover them, the effort required to get there illustrates the ambiguity and error of such definitions.

Defendants argue, for example, that a bump-stock allows a firearm to "function automatically" by making it "easier to bump fire" because it controls recoil and ensures more linear motion of the firearm.  Def. SJ Mem. at 14.  Making it *easier* to bump fire a firearm, however, is hardly the test in the statute or even in the Final Rule.  It does not speak to whether each subsequent round fired requires a further function of the trigger, and it does not explain why making operation of a weapon "easier" constitutes shooting

via a self-acting or self-regulating mechanism.  At best, Defendants' discussion perhaps describes the mechanical *stabilization* of a firearm, but hardly the automatic *shooting* of such firearm.  Indeed, any stock stabilizes a rifle in much the same way – it controls the distance and linearity of recoil – particularly as compared to a handgun.  Pl. SOF ¶ 2 (citing Hlebinsky Declaration discussing how fixed stock and other innovations stabilize a firearm to allow more rapid or accurate successive shots).  Given that ATF argues that all other means of facilitating bump firing of a semi-automatic firearm do not convert that firearm into an illegal machinegun, it is impossible to find a statutory basis for concluding that this one means of making such action easier has crossed some now utterly unknowable line from semi-automatic to automatic.

The Final Rule's new definition of "automatically" ultimately makes the concept of a "semi-automatic" weapon meaningless – such a weapon is plainly self-regulating at any number of levels in the sense that they reduce or replace the manual effort needed to manage the "firing sequence," the stabilization of the barrel, and the control of recoil.

Defendants' citation, at 14, to this Court's prior determination that "automatically" does not require the device to act spontaneously without any manual input actually proves the point.  And it begs the questions of what manual input is allowed and what must be accomplished "automatically."  As to the first question, the statute provides the definitive answer – the only manual input allowed is that required to cause "a single function of the trigger," which is, of course, the part of the gun designed to accept manual input in order to fire.  If there were any doubt, the word "single" would confirm that such input is strictly limited and that all remaining steps required to fire more than one shot

must be accomplished without further manual input beyond maintaining that completed single function by keeping the trigger depressed.

Defendants' analogy, at 14, to an automatic sewing machine is particularly inapt given that it uses the wrong form of speech – an adjective rather than an adverb – and nobody would say that such a machine "automatically sews clothes" any more than an automatic car "automatically drives."  Indeed, had Defendants looked to the extended definitions of "automatic" in, for example, THE SHORTER OXFORD ENGLISH DICTIONARY, THIRD EDITION 135, they would have seen reference to "[a] sewing machine with a[utomatic] tension (*mod*.)," making clear that the label "automatic" refers only to a limited particular function of the machine – maintaining tension – not to the act of "sewing" in general.  Popular nomenclature for different devices that do *some* things automatically is useless in this case given that there is no dispute that semi-automatic firearms – which likewise do *some* things automatically – are perfectly legal.  The question is not whether the firearm does anything automatically, but whether it "shoots" more than one shot automatically "by" a single function of the trigger.  The better comparison would be a sewing machine that sews automatically by a single push of a button.  While some industrial or robotic machines may indeed do that, the typical "automatic" sewing machine does not.

Finally, Defendant's attempts, at 16, to distinguish the video evidence illustrating a separate manual interaction with the trigger for each shot fired is pure sophistry.   That video, referenced and discussed in Plaintiffs' SOF ¶ 1, demonstrates and explains the mechanics of bump-stock-equipped semi-automatic rifles.  Defendants do not dispute that

the trigger is released and reset between each shot, or that it requires the manual volitional act of pushing the fore-body of the rifle forward to reengage the trigger with the trigger finger for the next shot.  *See also*, *Guedes*, 920 F.3d at 36-37 (Henderson, J., concurring in part and dissenting in part) (discussing the clarity of video evidence and related Vasquez declaration)

Instead, Defendants claim that "a continuing pull of the trigger may continue as long as there is a single volitional act to 'hold the trigger finger stationary.'"  Def. SJ Mem. at 16 (citation omitted).  That sentence could not be more preposterous.  An unmoving trigger finger that is not in contact with the trigger is not in any conceivable sense still "pulling" the trigger.  If *that* is what constitutes a single pull of the trigger, then *every* firearm is capable of multiple shots by a single pull.  Just hold one finger steady and repeatedly shove the firearm's trigger into the immobile finger, even without a bump stock, and even as slowly as you like.  By Defendants' reasoning, that sequence of events remains a *single* continuous pull of the trigger as long as the trigger *finger* remains steady in space, regardless how much the trigger itself moves, separates, takes a smoke break, etc.  The only question then would be whether any aid to such bump firing provided sufficient assistance to render the exercise automatic.  Of course, a rubber band, a belt loop, a tennis ball, or a padded vest provides comparable assistance in helping a shooter control the path and distance of recoil, and hence would render the process automatic under ATF's distorted view.[6]

---

[6] Defendants' reliance, at 16-17, on irrelevant descriptions of bump-stocks to claim their application of the definitions was reasonable does not actually go to the coherence of the

In reality, while a bump-stock may facilitate the *termination* of a "pull" or "function" of the trigger, it is the manual effort and decision to push the fore-body containing the trigger assembly forward that initiates the next pull or analogous "bump" of the trigger.  That is not what is meant by "automatic," and is not a "self-acting" process that continues until pressure on the trigger is released.

### C. The Final Rule's Definitions Are Overbroad

The flaw in defendant's definitions can be seen by the gross overbreadth of those definitions.  If a "single" pull of the trigger only means the *first* pull of a trigger in a sequence made easier by some component that relieves the shooter of some unspecified degree of manual input relating to any aspect of controlling the weapon for multiple shots, then every modern semi-automatic firearm is a machinegun, and the definitions in the Final Rule are in conflict with the statutory scheme permitting such firearms.  *Cf.* 18 U.S.C. § 921(a)(28) (defining "semiautomatic rifle").

Since the 1930s there have been all sorts of innovations that make it easier to shoot multiple rounds in a row, including improved stocks, pistol grips, recoil compensators, adjustable tension for triggers, binary triggers, and improved bipods or tripods, just to name a few. Pl. SOF ¶ 2 (describing Hlebinsky affidavit discussing evolution of firearms technology).  Every one of those technologies relieves a shooter of a task that would require greater manual activity and attention in order to control the

---

definitions.  There is no debate about the mechanical operation of bump stocks, only about the legal applicability of the statutory terms to those mechanics.  That random comments submitted in the rulemaking may intentionally or mistakenly mischaracterize the operation of a bump-stock is of no moment.

firearm or release and reengage the trigger, and hence would make firing subsequent shots "automatic" under the Final Rule definitions. That the Final Rule sought to limit the applications of its overbroad definitions by inconsistently ignoring them when inconvenient only shows the vagueness and ambiguity of the supposed definitions and the Department's results-driven application of those definitions.

Regarding binary triggers, for example, Defendants claim, at 17, that releasing the trigger is analogous to pulling the trigger and hence constitutes a *second* "function" of the trigger.[7] But the fact that the binary trigger "automatically" resets surely makes it *easier* to fire the second shot and removes one step of manual input – releasing the trigger – than otherwise would be required to fire a second shot using a traditional trigger. Under the Final Rule it thus initiates an "automatic" firing sequence with the initial pull regardless whether there is a subsequent analogous motion. The Department's rationale for distinguishing binary triggers thus is identical to the rationale it rejected regarding bump stocks: that the repeated release and subsequent *bumps* of the trigger are properly considered second and subsequent functions. Furthermore, the greater irony is that binary triggers actually facilitate bump-firing more than one shot far more efficiently than bump-stocks do. A single pull of a binary trigger would fire the first shot and, if a shooter held the firearm with a light to moderate grip, the recoil alone would cause the

---

[7] *See also* 83 Fed. Reg. 66,534 (In denying that binary-trigger-equipped guns are machineguns, ATF noted that while "semiautomatic firearms may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired. Even if this release results in a second shot being fired, it is as the result of a separate function of the trigger. This is also the reason that binary triggers cannot be classified as 'machineguns' under the rule—one function of the trigger results in the firing of only one round.")

release of the trigger and fire the second shot without further manual input.  With a bump

stock and an ordinary trigger the recoil merely causes the trigger to reset, not to fire

again, and it is only the manual and volitional act of forcing the trigger mechanism

forward that results in a second function of the trigger and a second shot.[8]

Other simple physical aids, like a belt-loop, a rubber band, any fixed stock itself,

or a padded shooting jacket, likewise facilitate bump firing by constraining movement of

the firearm, maintaining linearity during recoil, controlling the distance of recoil, and

myriad other things a shooter otherwise would have do through greater manual effort.

Every one of those aids thus would convert a semi-automatic firearm into a machine gun

under the Final Rule's own definitions and logic.

As for Defendants' claim, at 18, that such aids are not "designed" to be affixed to

a semi-automatic firearm, that is factually false for fixed stocks, and is not material to the

statutory test in any event.  Under the statute, a "machinegun" includes "any *combination*

of parts from which a machinegun can be assembled if such parts are in the possession or

under the control of a person."  26 U.S.C. § 5845(b).  While parts that are "designed and

intended" for use in converting a firearm into a machine gun are alone regulated as

---

[8] Similarly, Defendant's attempt, at 17, to distinguish a pump action shotgun capable of being "slam-fired" when the trigger is kept depressed ignores their own expansive definition of "automatically."  Pumping the fore-end does not "reload" the firearm, it simply ejects the old shell and chambers the next round from a pre-loaded cache of shells in the firearm itself.  And it does so via a mechanism that significantly reduces the manual inputs as compared to having to open the breech, remove the spent shell, and add the new one.  The linear back-and-forth motion of the pump mechanism likewise allows greater control and continued aim by requiring and regulating the path of the recoil and the pumping of the forward hand, again eliminating or making easier considerable manual effort.  Defendants' claim that this is not automatic under their broad definitions is disingenuous and illustrates the manipulability of their definitions.

machine guns even without the rest of the firearm, the last "combination" portion of the definition cited above does not have such a design and intent requirement, simply a functional test of parts that, when possessed in a combination, "can" be assembled into a machine gun, *i.e.*, a semiautomatic rifle and pants with belt loops.  Under the misguided and overbroad definitions of the Final Rule, actually using such components in combination to bump fire a firearm would convert the firearm into a machinegun even if the Department claims otherwise and such a result would contradict other parts of the statute.  The point is *not* that such actions are covered by the statutory definition of "machinegun," but rather that they are not materially distinguishable from the operation of a bump stock under the revised regulatory definitions and hence those definitions are necessarily wrong.  The very ambiguity and overbreadth of the definitions the Department adopts demonstrate they are neither the best nor the plain meaning of the terms.  If Congress in fact had used terms with such malleable application, then such a criminal law would be invalid or would have to be narrowly construed by a court, as discussed *infra*.

### D. Congress in 1968 Ratified a Narrow Reading of the Definition of Machinegun

One especially glaring weakness of Defendants' revisionist claim to have suddenly discovered the plain or best meaning of the statutory definition is that for over eight decades Treasury and ATF thought otherwise.  The clearest instance if this is in the 1955 ruling that certain Gatling guns were not machineguns.  Rev. Rul. 55-528, 1955-2 C.B. 482, 1955 WL 9410.  Such firearms used a hand crank or an *electric motor* to drive a

"cam action to perform the functions of repeatedly cocking and firing the weapon." *Id*. But while recognizing that they were the "forerunner[s] of fully automatic machine guns," and obviously could fire at a high rate of speed, the agency concluded they did not meet the statutory definition of automatically or even semi-automatically shooting "more than one shot with a single function of the trigger." *Id*.

Those determinations are necessarily inconsistent with ATF's current definitions. A crank-driven Gatling gun, for example, while not automatic in the proper sense of the word, surely satisfies the Final Rule's overbroad definitions of a "self-regulating" mechanism that relieves some, though not all, of the required manual input.  Just substituting a crank-driven cam for any manual back and forth pulling and releasing of a trigger serves to direct and control the application of linear force into a circular motion that then drives rapid firing of multiple rounds.  That alone meets the Final Rule's now-revised definition of automatic, yet the agency at the time had a narrower and correct understanding of the statute.

The issue is even more stark regarding motor-driven Gatling guns, also included in that ruling and held *not* to be machineguns.  While such firearms might indeed have been automatic, they functioned via a rotating cam that repeatedly pressed upon and released the trigger of the firearm.  The only way that could have been excluded is because it involved more than "a single function of the trigger."  While ATF many years later repudiated that portion of the earlier ruling and held that so-called mini-guns (partly comparable to motor-driven Gatling guns) were indeed machine guns, Ruling 2004-5 (holding that electric-motor-operated firearms, including Gatling guns, are machineguns

but that crank-driven cam-operated Gatling guns still are not), it is the earlier ruling that actually has interpretive significance given its timing.

The 1955 ruling on both crank- and motor-driven Gatling guns was the extant view when Congress next returned to the statutory definition of machineguns in 1968. Congress addressed numerous aspects of the NFA and actually *narrowed* the definition of machinegun.  As originally adopted, the NFA definition read: "any weapon which shoots, or is designed to shoot, automatically *or semiautomatically*, more than one shot, without manual reloading, by a single function of the trigger." 48 Stat. 1236 (emphasis added). Congress amended that definition of machinegun by removing the words "or semiautomatically," but leaving the current language of the first sentence of the definition. Despite having responded to numerous concerns from court cases and filling various other perceived gaps in the statute, Congress did not question the narrow prior construction of the first sentence, did not object to the Gatling gun ruling, and hence effectively incorporated that narrow interpretation into the meaning of the statute – or at least confirmed and narrowed the existing "public meaning" of the statute at the time.

It is well settled that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]"  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also Boeing Co. v. United States*, 537 U.S. 437, 456 (2003) ("The fact that Congress did not legislatively override 26 CFR § 1.861–8(e)(3) (1979) in enacting the FSC provisions in 1984 serves as persuasive evidence that Congress regarded that regulation as a correct implementation of its intent").  That presumption is even stronger where Congress

amends the precise definition at issue in a way that strengthens, rather than weakens, the earlier interpretation.

## II.   IF THE STATUTE IS AMBIGUOUS, THE FINAL RULE IS INVALID

This Court and the D.C. Circuit both preliminarily found that the statute was ambiguous but gave Defendants *Chevron* deference and upheld the Final Rule on those grounds.  That preliminary decision should not preclude revisitng those issues on summary judgment.  *See Pitt News v. Pappert,* 379 F.3d 96, 105 (3d Cir. 2004) (Alito, J.) ("In the typical situation—where the prior panel stopped at the question of likelihood of success—the prior panel's legal analysis must be carefully considered, but it is not binding on the later panel").   Defendants never sought, and expressly eschewed, *Chevron* deference, so the issue has never been properly litigated in this case.  Justice Gorsuch has correctly pointed out the substantial error of the applying *Chevron* deference in this case, and that alone should be sufficient grounds for this Court to reconsider its earlier decision.   *Guedes*, 140 S. Ct. at 789-90 (Gorsuch, J., statement regarding denial of certiorari).  Furthermore, the Supreme Court's recent decision in *United States v. Sineneng-Smith* also provides strong grounds for questioning a decision based on arguments not raised, and in fact repudiated, by Defendants.  140 S. Ct. 1575, 1579 (2020) ("But as a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'") (citation omitted; alteration in original); *id*. at 1578 ("[T]he appeals panel departed so drastically from the principle of party presentation as to constitute an abuse of discretion.").

## A. The Rule of Lenity Forecloses Executive Expansion of Ambiguous Criminal Statutes

While Plaintiffs maintain that the plain and best meaning of the statutory definition of machinegun affirmatively *excludes* the definitions proffered in the Final Rule, at a minimum Plaintiffs have demonstrated serious ambiguity.  Indeed, the fact that the Final Rule contradicts eight decades of supposedly erroneous interpretations by Treasury and ATF is more than sufficient to illustrate that, at best, the statute's meaning is not apparent or discernable by reasonable persons.

If it took government experts 80-plus years to "discover" the supposed plain meaning of the statute, surely the average citizen could not have been expected to do better, and there is no evidence that the public has ever shared the Defendants' expansive understanding of the statutory terms.  Any alternative conclusion implies that the many lawyers and firearms experts making the decisions all those years were not reasonable people and were somehow incapable of reading a plain and reputedly common definition that they applied repeatedly in numerous cases and rulings.  Under such circumstances, the rule of lenity requires a narrower reading of the statute, not a broader one.

The rule of lenity is one of "the most venerable and venerated of interpretive principles," *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 731 (6th Cir. 2013) (Sutton, J., concurring), and is deeply "rooted in a constitutional principle," Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315, 332 (2000).  As Chief Justice Marshall observed, the rule of lenity "is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the

plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820).

Narrow construction of ambiguous criminal laws is especially important in the administrative context. Because agencies have a natural tendency to broadly interpret the statutes they administer, deference in the criminal context "would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring).

One central purpose of lenity is to *avoid* improper delegation of lawmaking authority in the criminal realm.  Sunstein, 67 U. CHI. L. REV. at 332 ("One function of the lenity principle is to ensure against delegations."). The rule of lenity "is *not* a rule of administration," but "a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language."  *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n. 10 (1992).

Lenity is an interpretive rule that resolves ambiguity in favor of potential defendants and is part of the traditional toolkit for determining the meaning of statutory language. "Rules of interpretation bind all interpreters, administrative agencies included. That means an agency, no less than a court, must interpret a doubtful criminal statute in favor of the defendant." *Carter*, 736 F.3d at 731 (Sutton, J., concurring). Lenity thus comes *before* applying any questionable inference that Congress intentionally delegated legislative authority to executive agencies through ambiguous drafting. "If you believe

that *Chevron* has two steps, you would say that the relevant interpretive rule—the rule of

lenity—operates during step one. Once the rule resolves an uncertainty at this step, 'there

[remains], for *Chevron* purposes, no ambiguity * * * for an agency to resolve.' " *Id.* at

731 (Sutton, J., concurring) (alteration in original) (quoting *INS* v. *St. Cyr,* 533 U.S. 289,

320 n. 45 (2001)). That *Chevron* deference depends on such inferred delegation is all the

more reason to apply other rules of construction first. "Only after a court has determined

a challenged statute's meaning can it decide whether the law sufficiently guides executive

discretion to accord with Article I." *Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019)

(plurality opinion).

Furthermore, if trumped by *Chevron* deference, the separation-of-powers function

of the rule of lenity would be severely compromised.

> Making something a crime is serious business. It visits the moral
> condemnation of the community upon the citizen who engages in the
> forbidden conduct, and it allows the government to take away his liberty and
> property. The rule of lenity carries into effect the principle that only the
> legislature, the most democratic and accountable branch of government,
> should decide what conduct triggers these consequences. By giving unelected
> commissioners and directors and administrators carte blanche to decide when
> an ambiguous statute justifies sending people to prison, [*Chevron* deference]
> diminishes this ideal.

*Carter*, 736 F.3d at 731 (Sutton, J., concurring); see also *Whitman v. United States*, 135

S. Ct. 352, 354 (2014) (statement of Scalia & Thomas, JJ., respecting the denial of

certiorari) ("[E]qually important, [the rule of lenity] vindicates the principle that only the

*legislature* may define crimes and fix punishments. Congress cannot, through ambiguity,

effectively leave that function to the courts—much less to the administrative

bureaucracy.") (emphasis in original).[9]

As the Supreme Court recognizes, "when choice has to be made between two

readings of what conduct Congress has made a crime, it is appropriate, before we choose

the harsher alternative, to require that Congress should have spoken in language that is

clear and definite." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22

(1952); *see also Lewis v. United States*, 445 U.S. 55, 65 (1980) ("[T]he touchstone" of

the lenity principle "is statutory ambiguity."), *United States v. Gradwell*, 243 U.S. 476,

485 (1917) ("[B]efore a man can be punished as a criminal under the Federal law his case

must be 'plainly and unmistakably' within the provisions of some statute.") (citations

omitted).[10]  The burden thus properly rests upon the government to show that the statute

"plainly" covers the conduct supposedly criminalized, not on potential defendants to

show overly sever ambiguity.

Defendants' only other argument is that lenity requires grievous ambiguity in

order to apply.  Plaintiffs would note that any level of ambiguity in a criminal statute

sufficient to allow *Chevron* deference and the "legislative" enactment of crimes by the

---

[9] The "first principle" of criminal law requires that crimes be explicitly and unambiguously specified in advance by statute. *Liparota v. United States*, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." (citation omitted)).

[10] The Supreme Court has long held that "when there are two rational readings of a criminal statute, one harsher than the other, [the Court is] to choose the harsher only when Congress has spoken in clear and definite language." *McNally* v. *United States*, 483 U.S. 350, 359-60 (1987); see *Yates* v. *United States*, 135 S. Ct. 1074, 1087-88 (2015) (plurality opinion); *Skilling* v. *United States*, 561 U.S. 358, 410-11 (2010); *Scheidler* v. *NOW*, 537 U.S. 393, 409 (2003).

Executive Branch is sufficiently "grievous" to trigger the rule of lenity.  While courts themselves should strive to resolve minor ambiguities when reading a statute, at the point a court is willing to throw up its hands and pass the ball to the Executive Branch to legislatively *define* crimes, it should be willing to look first to the rule of lenity.  At a minimum, it should do so as a matter of constitutional avoidance given the serious separation of powers concerns raised by allowing the Executive Branch to define crimes.

Cases such a *Maracich v. Spears*, 570 U.S. 48, 75-76 (2013), are not to the contrary.  The Court in *Maracich*, for example, considered a civil liability provision "written in different terms" than a separate criminal provision and concluded that the statute's "surrounding text and structure … resolve any ambiguity in" the disputed phrases.  *Id*.  While it indeed cited some cases mentioning "grievous ambiguity," it also cited cases applying lenity "'where the language or history of the statute is uncertain'" after ordinary principles of construction are applied.  *Id*. (cleaned up); *see Moskal v. United States*, 498 U.S. 103, 107–08 (1990) ("We have repeatedly emphasized that the touchstone of the rule of lenity is statutory ambiguity. …  [That] leaves open the crucial question – almost invariably present – of *how much* ambiguousness constitutes ... ambiguity. … [W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute.") (cleaned up).  While various cases use stronger or weaker language regarding whether uncertainty can be resolved by traditional tools before the rule of lenity, those cases do not address the *relative* amounts of uncertainty needed for lenity as opposed to *Chevron* deference for a

criminal statute.  Plaintiffs' position is that if the uncertainty is enough for the court to take the extreme act of abdicating its interpretive role for a criminal statute, it is more than enough for lenity.

At the end of the day, *Chevron* deference is not a means for a court to interpret a statute, not a cannon of construction, and not even part of *Chevron* step one.  Rather, it is an allocation of *authority* to interpret or construe a statute once the words have been found sufficiently uncertain after the application of tradition interpretive principles to suggest an implied delegation of legislative authority to fill any such gaps.  Lenity, by contrast, is a traditional interpretive principle, and would apply before deferring to an agency to "legislatively" define terms in a criminal statute.

### B. *Chevron* Deference Does Not Apply or Was Waived by the Government.

As the government has repeatedly stated, it does not invoke deference for its interpretive rule, it did not do so in the rulemaking, and on numerous occasions it affirmatively denied having the sort of discretion that leads to deference for an agency's legislative choices.  *See, e.g.*, Brief for the Respondents in Opposition, *Guedes v. ATF*, No. 19-296 (U.S. Supreme Court, 2019) at 14, 20-27.  Before the Supreme Court, it repeated and expanded on its arguments that the rule was not legislative, it did not understand itself to be engaging in legislative rulemaking, and that the definitions should rise or fall of a court's independent construction of the statute.  And it likewise denied having any delegated "legislative" gap-filling authority regarding the definition of "machinegun."  *Id*. at 25.

That Attorney General Barr is the Head of the Department responsible for ratifying the Final Rule itself, and for defending that rule in court and in the Supreme Court, makes this case different than if litigation counsel makes assertions that may or may not reflect the views of the agency *qua* agency.  Here, the Department and its counsel are one and the same and there is no basis for ignoring the Department's explanation of what it was doing in the rulemaking.[11]

### C. *Chevron* Deference Violates the Constitution

Plaintiffs recognize that this Court lacks authority to overrule *Chevron* or to disregard D.C. Circuit precedent on such deference generally.  They note, merely to preserve the argument for later review, that such deference, particularly in the context of a  statute defining crimes, violates the separation of powers, the anti-delegation doctrine, and is otherwise improper for the reasons discussed in Justice Gorsuch's opinion respecting the denial of cert. and in the Plaintiffs' interlocutory petition for certiorari in this case.  *See Guedes*, 140 S. Ct. at 789-92 (Gosruch, J., statement respecting the denial of cert.); Petition, *Guedes v. ATF*, No. 19-296 (U.S., Aug. 29, 2019).

### D.  The Final Rule Is Unreasonable, Arbitrary, and Capricious

---

[11] It is, of course, true that small portions of the rulemaking were indeed legislative in nature: How much time to give as a transition period, how innocently acquired supposed contraband could be surrendered or destroyed, etc.  Those indeed required judgment, are not predetermined by the statute, and at some level represent formal guidance on prosecutorial discretion instructing Department lawyers not to prosecute in circumstances that surely would raise due process and retroactivity concerns.  But those "legislative" components of the rulemaking did not extend to the Department's interpretation of the operative words of the definition of "machinegun," regarding which the department claimed it had no discretion at all.

Even assuming ambiguity and that lenity did not apply, *Chevron* deference cannot save the Final Rule because it was not based on unbiased and reasoned consideration and is unreasonable, arbitrary, and capricious. "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, … [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (citation omitted).

First, because the government repeatedly claimed that it was bound by the plain meaning of the statute, even if deference to a "legislative" definition of machinegun were appropriate, not legislative discretion was in fact exercised.  Indeed, Defendants have repeatedly claimed in numerous briefs in this case that it did not exercise any discretion. *See, e.g.*, *Guedes*, 920 F.3d at 39 n. 6 (Henderson, J., concurring in part and dissenting in part) ("I would note that the ATF in fact declared that the Rule's interpretations of 'single function of the trigger' and 'automatically' 'accord with the *plain meaning* of those terms.' *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,527 (emphasis added).").[12]

---

[12] *See also* 83 Fed. Reg. at 66,529-36 ("The bump-stock-type device rule is not a discretionary policy decision based upon a myriad of factors that the agency must weigh, but is instead based only upon the functioning of the device and the application of the relevant statutory definition."; "the materials and evidence of public safety implications that commenters seek have no bearing on whether these devices are appropriately considered machineguns based on the statutory definition."; rejecting various alternatives to the reclassification, stating that "the Department has concluded that the NFA and GCA require regulation of bump-stock-type devices as machineguns, and that taking no regulatory action is therefore not a viable alternative to this rule."; "This is because the statutory definition alone determines whether a firearm is a machinegun. The Department believes that the final rule makes clear that a bump-stock-device will be classified as a machinegun based only upon whether the device satisfies the statutory definition."; "Because bump-stock-type devices are properly classified as "machineguns" under

It is a fundamental truism that an agency that does not believe it has discretion cannot be deemed to have exercised such discretion.  *See supra*, at 8-9 (standard of review and agency misconception of the governing law).  If the Court again determines that the statutory definition is ambiguous and that the Department was perhaps *permitted* to define machinegun as it did in a legislative rule, but not *required* to do so, then all of the Final Rule's responses rejecting proposed alternatives due to a lack of discretion rest on a false assumption.  A legislative choice to expand to the outer reaches of the potential definitions of machinegun is not required and hence the Department would have to consider and articulate "legislative" reasons for rejecting the comments, not simply erroneously perceived legal constraint. *See DHS v. Regents of the Univ. of Cal.*, No. 18-587 (June 18, 2020), Slip. Op. at 19 (rejecting repeal of DACA because Acting Secretary of DHS "did not appear to appreciate the full scope of her discretion").

 If the statutory definition of a machinegun is ambiguous and the Department thus has an implied delegation of legislative discretion, then its rejections of numerous comments and objections due to a supposed lack of discretion are based on a false legal premise and the Rule is arbitrary and capricious.  As with the recent DACA decision, a remand would be required.

Second, as noted by the Cato Institute, the rulemaking here "was a fait accompli" from inception. Cato Institute Comments on Definition of "Machinegun," at 2, *available at* https://www.regulations.gov/document?D=ATF-2018-0002-65898. President Trump

---

the NFA and GCA, the Department believes that ATF must regulate them as such, and that the recommended alternatives are not possible unless Congress amends the NFA and GCA.").

declared he would "write out" bump-stock devices "myself because I'm able to." *Id*.; *see also* Brief of the Cato Institute as *Amicus Curiae* in Support of Petitioners, *Guedes v. ATF*, No. 19-239 (U.S., Oct. 3, 2019), at 6-8 (discussing fait accompli that was the bump stock review).  Pre-ordained rulemaking outcomes reversing past reasoned determinations are arbitrary and capricious and not entitled to deference. "The agency's statement must be one of 'reasoning'; it must not be just a [foregone] 'conclusion[.]' " *Butte Cty v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citation omitted). The Final Rule appears to stem from political compulsion, not agency expertise. Political determinations in criminal statutes must be made by Congress, not the President. While Defendants now dubiously claim, at 20, that they were merely told to apply the statute, not that they were instructed to reach a particular outcome, there is at least a genuine dispute whether the President directed the Department to reach a pre-ordained result.  His public statements certainly say the decision was predetermined, notwithstanding that some Department lawyer ghost-wrote a memo providing false cover for what the President claimed he was doing.  At a minimum, these disputes would preclude summary judgment for Defendants so it could be determined through discovery whether the actual instructions given the agency were improperly excluded from the administrative record.

Third, the new definition on its own terms is arbitrary and capricious in its treatment of the phrase "shoot … automatically." This Court previously endorsed ATF's expansion of the word automatically to mean "'functioning as the result of a self-acting or self-regulating mechanism,'" but then found that expansion itself to be ambiguous because "[a]utomatic devices regularly require *some* degree of manual input" and

"[b]ecause [neither] the statute [nor the regulation] … specify how much manual input is too much." Opinion 21-22. Of course, the statute does indeed state the maximum level of manual input allowed – a *single* function of the trigger – but regardless, defining a supposedly ambiguous term with an even more ambiguous concept conflating automatic and manual is arbitrary and capricious.

Fourth, the numerous absurdities and inconsistencies discussed previously in this brief, even if thought insufficient to remove any and all ambiguity in the statute, would at least be sufficient to demonstrate why the Defendants' chosen alternative definition is arbitrary and capricious.

## III.   APPLICATION OF DEFINITIONAL ISSUES TO SPECIFIC COUNTS

Most of the specific counts in the two Second Amended Complaints turn in large part on the resolution of the definitional issues.  If Defendants are correct that the plain language or best independent reading of the statute requires the definitions in the Final Rule, then many of the counts would fall with that determination.  If Plaintiffs are correct that the plain language of the statute precludes the definitions in the Final Rule, then many of the specific counts are either redundant or moot.  Indeed, several of them were included in a belt-and-suspenders approach simply to ensure the proper procedural and legal basis for challenging the incorrect legal determinations in the Final Rule.  Finally, if the language is ambiguous many of the counts turn on the specifics of the Final Rule and the discussions above whether the rule is arbitrary and capricious.

### A. Guedes Count I – Lack of Statutory Authority to Alter Definition Established by Congress (APA and Article I); Codrea Counts I, II, III, V & VII – Ultra Vires, APA Violation and Amnesty.

These counts turn on whether the statutory definition of a machinegun is plain and unambiguous and whether Defendants otherwise satisfied the requirements for rulemaking under the APA.  If Plaintiffs are correct in their narrower reading, or in their contention that the Rule was otherwise arbitrary and capricious, the Final Rule would be unlawful, either as contrary to law under the APA or directly as a violation of the relevant constitutional provisions.

If Defendants are correct that the statute plainly requires the definitions in the Final Rule, then each of these counts would fail.

If the statute is ambiguous, these counts would turn on the interplay between *Chevron* deference and lenity, discussed above.  This Court's resolution of those issues thus would similarly resolve these counts for better or worse.

### B. Guedes Count II – Separation of Powers and Non-Delegation

These counts need only be resolved if the court finds the statue ambiguous but nonetheless applies *Chevron* deference to uphold the Final Rule.  Insofar as these same constitutional concerns inform the application of deference or lenity, the Court's reasoning as to those questions in the interpretive context likely would resolve these counts as well.  They exist, however, to ensure that an actual ruling on the constitutional questions is made and thus to facilitate further review.  If Plaintiffs' prevail on interpretive or other APA grounds, the cannon of constitutional avoidance would suggest that these counts need not be decided.  If defendants prevail on the various other APA

grounds, it would be necessary to resolve the constitutional counts as they relate to separation of powers and delegated authority regarding criminal or mixed-use law.

### C. Guedes Count III – Due Process and Takings; Codrea Counts IV & VI – Procedural Due Process and Takings

The procedural counts regarding the comment period and the nature of the hearing afforded by the rulemaking process would be moot if the Final Rule is rejected for other reasons or sent back as arbitrary and capricious. If Defendants prevail on the interpretive and separation of power issues, Plaintiffs propose that this Court enter judgment for Defendants on the procedural or substantive Due Process issues, other than as they may be deemed necessary to reach and resolve those other issues, in order to facilitate timely appellate review of the interpretive and separation of powers/delegation related issues.

The vagueness component of the Due Process counts, however, largely overlaps with the lenity and deference issues. If the language is sufficiently vague to warrant lenity instead of deference, it might be unnecessary to reach vagueness if a suitably clear interpretation applied as a matter of lenity would render the Final Rule invalid. In the unlikely event that a sufficiently clear and narrowed construction is not possible, the Court should invalidate the definition of machinegun.

If Defendants prevail regarding then plain or best reading of the statute, then the Court's resolution of that issue would necessarily find that the statute is not vague. If Defendants' prevail based on *Chevron* deference, the court would have to decide whether the ambiguity permitting Deference was insufficient to make the statute vague or whether agency clarification cured any such vagueness. For the same reasons, lenity should

trump deference in the face of ambiguity, the void-for vagueness doctrine likewise should take priority in such circumstances.  If the court nonetheless rejects the arguments against *Chevron* deference it would implicitly have resolved the vagueness issues for the same reasons. If the statute is vague enough for *Chevron*, then it is vague enough to require lenity or simply to be void, particularly because the test for a criminal statute should be stricter given the rule of lenity.  Due to anti-delegation concerns, the two issues should be considered *in pari materia*.

As for the Takings claim, part of the claims are not to recover compensation, but rather that, because the Final Rule claims compensation is not authorized at all, 83 Fed. Reg. 66,536,  if the Final Rule constitutes a Taking it would be an uncompensated taking and hence invalid.  *See Duncan v. Becerra*, 366 F.Supp.3d 1131, 1185 (S.D. Cal. 2019) ("[T]he Takings Clause prevents [the State] from compelling the physical dispossession of such lawfully-acquired private property without just compensation.").  Questions regarding jurisdiction to award compensation thus are not relevant if compensation is not available. Furthermore, if compensation is available, the amounts at issue are less than $10,000, so such claims would be cognizable under the Little Tucker Act.

As for the Defendants' argument that there is no Taking when contraband is seized or destroyed, that simply begs the interpretive question.  If the government prevails on plain meaning, then it *might* be correct, though, to this day, *actual* machineguns manufactured before 1986 may be possessed and transferred by persons in compliance with the National Firearms Act of 1934, by paying the tax, registering the machinegun and submitting to a background investigation prior to acquisition.  According to the ATF,

as of 2017, there were 630,019 machineguns lawfully registered in this country. *See* https://www.atf.gov/resource-center/docs/undefined/firearmscommerce-united-states-annual-statistical-update-2017/download. Not even Defendants contend that bump stocks are more dangerous than these lawfully owned machineguns.  Nothing in the Final Rule even attempts to apply any "principles of nuisance and property law." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1031 (1992); *see also Bowles v. United States*, 31 Fed. Cl. 37, 45 (1994) ("[T]he government has the burden of proof to demonstrate that the prohibited use of the property constitutes a nuisance under state common-law doctrine. It cannot hide behind conclusory legislative findings that simply characterize land use restrictions as harm-preventing.").

If the Defendants lose on the interpretive issues, then the Takings question as framed here is moot, though there might be separate claims elsewhere for compensation for bump stocks destroyed as a result of the Final Rule's unlawful adoption.

But if the government only prevails based on *Chevron* deference or the Court's view that the rule is "legislative," then the new rule would still constitute a Taking. Under such reasoning, bump stocks are not intrinsically contraband or otherwise contrary to traditional nuisance, property, or pre-existing statutory law.  Rather, they would have been *completely lawful* prior to the Final Rule and are now merely *malum prohibitum* on a prospective basis. A holding based on ambiguity and deference thus would confirm that that bump stocks were not previously illegal under the statute and thus cannot be characterized as contraband or nuisance under "background principles of nuisance and property law." *Lucas*, 505 U.S. at 1031. These devices are thus "property" protected by

the Takings Clause of the Fifth Amendment because the right of possession abolished by the Final Rule "inhered" in Plaintiffs' (and institutional Plaintiffs' affected members') title prior to the adoption of the Final Rule.  A & D *Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014) ("If a challenged restriction as enacted after the plaintiff's property interest was acquired, it cannot be said to 'inhere' in the plaintiff's title").

### D. Guedes Count IV – Ex Post Facto Clause; Codrea Count VI – Retroactive Rulemaking and Ex Post Facto Clause

The Ex Post Facto Clause count likewise turns on the definitional question.  If the statute plainly requires the definitions in the Final Rule, there is no violation.  If the Final Rule is contrary to the Statute, the claim is moot as the Rule is invalid for non-constitutional reasons and hence can have no retroactive effect in any event.  If the statute is ambiguous and the Final Rule is an exercise of legislative discretion, the fact that DOJ declared it would only prospectively enforce the statute against bump stocks perhaps saves such enforcement actions, but might well result in other consequences imposed for past possession of bump stocks.  Such consequences, however, are likely best addressed in any as applied challenges that might later arise, and the Court should simply make clear that it is only the Department's formal disavowal of any ability to enforce the revised interpretation against conduct preceding the Rule's effective date that saves it from constitutional infirmity.

## CONCLUSION

The Final Rule conflicts with the proper construction of the statutory definition of "machinegun" and is unlawful.  This Court should deny Defendant's Motion for Summary Judgement, grant Plaintiff's Cross-Motion for Summary Judgment, and resolve the individual counts accordingly, as described above.

Respectfully Submitted,

/s/ Joshua Prince
Joshua Prince
D.D.C. Bar No. PA0081
Joshua@princelaw.com

/s/ Adam Kraut
Adam Kraut
D.D.C. Bar No. PA0080
AKraut@princelaw.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
*Counsel for Guedes Plaintiffs*

Stephen D. Stamboulieh
D.D.C. Bar No. MS0009
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS 39130
(601) 852-3440
stephen@sdslaw.us

Alan Alexander Beck
D.D.C. Bar No. HI001
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(615) 905-9105
alan.alexander.beck@gmail.com

*Counsel for Codrea Plaintiffs*

Erik S. Jaffe
D.C. Bar No. 440112
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com

*Of Counsel*

**CERTIFICATE OF SERVICE**

I, Adam Kraut, hereby certify that I have filed with the Clerk of this Court, a true and correct copy of the foregoing document or pleading, utilizing this Court's CM/ECF system, which generated a Notice and delivered a copy of this document or pleading to all counsel of record.

Dated: June 26th, 2020.

*/s/ Adam Kraut*
Adam Kraut