# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAMIEN GUEDES,<br>     *et al.*<br><br>     Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO<br>FIREARMS, AND EXPLOSIVES,<br>     *et al.*<br><br>     Defendants. | Case No.  1:18-cv-02988-DLF<br>The Hon. Judge Friedrich |
| DAVID CODREA,<br>     *et al.*<br><br>     Plaintiffs,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO<br>FIREARMS, AND EXPLOSIVES,<br>     *et al.*<br><br>     Defendants. | Case No.  1:18-cv-03086-DLF<br>The Hon. Judge Friedrich |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

     A.    Defendants Have Established That the Rule Reasonably Clarifies the
          Statutory Definition of Machinegun And Logically Applies The Definition
          to Bump Stocks ...................................................................................................... 2

     B.    The Rule Properly Interprets the Statute From the Perspective of the Shooter ........ 5

     C.    Plaintiffs' Objections to the Application of the Rule's Definitions to Bump
          Stocks Are Unavailing ............................................................................................ 8

     D.    The Rule's Definitions Are Not Overbroad. .......................................................... 11

     E.    Congress's 1968 Amendment Did Not "Ratify" Plaintiffs' Incorrect
          Interpretation of the Statute .................................................................................. 13

     F.    Plaintiffs' Discussion of Interpretive Canons Does Not Advance Their
          Argument ............................................................................................................... 14

          1. The Rule of Lenity ............................................................................................ 15

          2. *Chevron* Deference ......................................................................................... 16

     G.    Contrary to Plaintiffs' Other Theories, the Rule Is Not Arbitrary and
          Capricious ............................................................................................................. 19

     H.    Plaintiffs Cannot Establish That the Rule Effects a Taking and Are Not
          Entitled to Injunctive Relief or an Amnesty Based on a Takings Claim ............... 22

     I.    Judgment Should Be Granted on Plaintiffs' Ex Post Facto and Retroactivity
          Claims Because Those Claims Have Been Conceded or Waived .......................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A & D Auto Sales, Inc. v. U.S.*,
  748 F.3d 1142 (Fed. Cir. 2014) ................................................................................. 24

*Abramski v. U.S.*,
  573 U.S. 169 (2014) ................................................................................................... 16

*Acadia Tech., Inc. v. United States*,
  458 F.3d 1327 (Fed. Cir. 2006) ................................................................................. 22

*AILA v. Reno.*,
  199 F.3d 1352 (D.C. Cir. 2000) ................................................................................. 25

*Akins v. U.S.*,
  312 F. App'x 197 (11th Cir. 2009) ............................................................................... 5

*Aposhian v. Barr*,
  374 F. Supp. 3d 1145 (D. Utah 2019) ................................................................. 3, 5, 11, 21

*Aposhian v. Barr*,
  958 F.3d 969 (10th Cir. 2020) ............................................................................. 4, 5, 6

*Arizona v. Thompson*
  281 F.3d 248 (D.C. Cir. 2002) ................................................................................... 17

*Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*,
  515 U.S. 687 (1995) ................................................................................................... 17

*Brown v. Gardner*,
  513 U.S. 115 (1994) ................................................................................................... 14

*Butte Cty. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ................................................................................... 21

*Callanan v. U.S.*,
  364 U.S. 587 (1961) ................................................................................................... 15

*Chevron v. NRDC*,
  467 U.S. 837 (1983) ............................................................................................. 2, 15-19

*DHS v. Regents of the Univ. of Calif.*,
  No. 18-587, 140 S.Ct. 1891 (2020) ............................................................................. 16

*Dist. Hosp. Partners, L.P. v. Sebelius,*
   971 F. Supp. 2d 15 (D.D.C. 2013) ........................................................................ 22

*Edelman v. Lynchburg Coll.,*
   535 U.S. 106 (2002) .............................................................................................. 16

*FCC v. Fox Television Stations,*
   556 U.S. 502 (2009) .............................................................................................. 21

*Fla. Rock Indus., Inc. v. United States,*
   18 F.3d 1560 (Fed. Cir. 1994) .............................................................................. 22

*Guedes v. ATF,*
   356 F. Supp. 3d 109 (D.D.C. 2019) ............................................................. *passim*

*Guedes v. ATF,*
   920 F.3d 1 (D.C. Cir. 2019) ......................................................................... *passim*

*Guedes v. ATF,* No. 19-296,
   140 S. Ct. 789 (Mar. 2, 2020) ........................................................................ 8, 10

*Lingle v. Chevron, U.S.A.,*
   544 U.S. 528 (2005) .............................................................................................. 23

*Little Sisters of the Poor v. Penn.,*
   No. 19-431, --- S. Ct. --- (July 8, 2020) ............................................................... 21

*Lockhart v. United States,*
   136 S. Ct. 958 (2016) ............................................................................................ 15

*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) .............................................................................................. 16

*Loving v. United States,*
   517 U.S. 748 (1996) .............................................................................................. 17

*Maracich v. Spears,*
   570 U.S. 48 (2013) ................................................................................................ 15

*Maryland Shall Issue v. Hogan,*
   --- F.3d --- (4th Cir. June 29, 2020) ..................................................................... 22

*McCutchen v. United States,*
   145 Fed. Cl. 42 (Fed. Cl. 2019) ...................................................................... 22, 24

*Modern Sportsman, LLC v. United States*,
   145 Fed. Cl. 575 (Fed. Cl. 2019) ........................................................ 22

*Moskal v. United States*,
   498 U.S. 103 (1990) ........................................................................... 15

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005) ............................................................... 23

*Oceana, Inc. v. Pritzker*,
   24 F. Supp. 3d 49 (D.D.C. 2014) ..................................................... 25

*Oceana, Inc. v. Ross*,
   920 F.3d 855 (D.C. Cir. 2019) ......................................................... 22

*Ozark Auto. Distrib., Inc. v. NLRB*,
   779 F.3d 576 (D.C. Cir. 2015) ......................................................... 19

*PDK Labs. v. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) ............................................... 17, 18, 19

*Staples v. U.S.*,
   511 U.S. 600 (1994) ........................................................................... 4

*Tate v. Dist. of Columbia*,
   601 F. Supp. 2d 132 (D.D.C. 2009) ................................................. 22

*United States v. Camp*,
   343 F. 3d 743 (5th Cir. 2003) ........................................................... 18

*United States v. Fleischli*,
   305 F.3d 643 (7th Cir. 2002) ....................................................... 14, 18

*United States v. Grimaud*,
   220 U.S. 506 (1911) ........................................................................... 17

*United States v. McDonald*,
   991 F.2d 866 (D.C. Cir. 1993) ......................................................... 21

*United States v. Oakes*,
   564 F.2d 384 (10th Cir. 1977) ........................................................ 4, 6

*United States v. Olofson*,
   563 F.3d 652 (7th Cir. 2009) ............................................................. 4

**Statutes**

iv

18 U.S.C. § 922 ............................................................................................. *passim*

18 U.S.C. § 923 ...................................................................................................... 17

18 U.S.C. § 926 ...................................................................................................... 17

26 U.S.C. § 5845 ......................................................................................... *passim*

26 U.S.C. § 7805 .................................................................................................... 17

Pub. L. 73-474 .......................................................................................................... 2

Pub. L. 90-618, 48 Stat. 1213 ................................................................................ 13

Pub. L. 99-308 .......................................................................................................... 2

**Regulations**

83 FR 66514 ............................................................................................... *passim*

**Other Authorities**

ATF Ruling 2004-5, https://www.atf.gov/firearms/docs/ruling/2004-5-minigun-ruling ............. 14

Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*,
    4 J. Legal Studies 133 (1975) ............................................................................. 6

Oxford English Dict. (1933) .................................................................................... 3

Oxford English Dict. Online (2020) ........................................................................ 3

Rev. Ruling 55-528 (Jan. 1, 1955) ........................................................................ 13

U.S. Army Field Manual, 3-22.68, *Crew-Served Machine Guns 5.56-mm and 7.62-mm* (July
    2006) .................................................................................................................... 9

Webster's New Int'l Dict. (1933) ....................................................................... 3, 9

## INTRODUCTION

This court should grant Defendants' motion for summary judgment which explained that

bump stocks transform ordinary semi-automatic weapons into machine guns, and that the Bureau

of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Department of Justice

(collectively, "the Department" or "DOJ") properly determined that such devices are prohibited by

statute.  *See* Defs. Mot. S.J., *Codrea v. Barr*, 18-cv-3086, ECF No. 38-1; *Guedes v. ATF*, 18-cv-

2988, ECF No. 61-1 ("MSJ Br.").[1]  In their response and cross-motion, Plaintiffs contend that, in

doing so, Defendants incorrectly analyzed the mechanics of the semi-automatic weapons to which

bump stocks are affixed and that Defendants erroneously applied the definition of machine gun to

the sequence by which a shooter uses a bump-stock equipped weapon to shoot automatically.  *See*

*generally* Pls. Opp. and Cross Mot. S.J., 18-cv-3086, ECF No. 39; 18-cv-2988, ECF No. 63 ("Opp.

Br.").[2]  But it is Plaintiffs who err, focusing narrowly on the physical mechanics of a firearm's

trigger rather than on the overall operation of the system in which it joins with a bump stock.

Plaintiffs further allege that the Department's analysis leads to a variety of inconsistencies among

the Department's treatment of various weapons Those arguments underscore both plaintiffs'

fundamental misunderstanding of the statute and the significant differences between bump stocks

and other devices—differences that confirm that bump stocks are properly understood to be

machine guns.  And, as Defendants explained in their opening brief, the final rule they issued,

*Bump-Stock-Type Devices*, 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Rule"), can be affirmed

---

[1] As explained in Defendants' motion, *see* 18-cv-3086, ECF No. 38 at n.1; 18-cv-2988, ECF No. 61 n.1, the parties agreed to combine the summary judgment briefing in the two cases.  Consistent with that approach, the identical version of this Reply is being filed in both cases.

[2] Plaintiffs subsequently filed an amended brief, *see, e.g.*, 18-cv-3086, ECF Nos. 40, 41 & Minute Order (July 8, 2020), the first 40 pages of which are identical to their original brief apart from a minor change in pagination on pages 35-40.  *Compare*, *e.g.*, 18-cv-3086, ECF No. 38 *with* 18-cv-3086, ECF No. 41. For clarity, this brief cites to the original version of Plaintiffs' brief except when addressing the new arguments raised in Plaintiffs' amended brief.

on its face without reliance on the deference accorded certain agency actions under *Chevron v. NRDC*, 467 U.S. 837 (1984), even though this Court and the D.C. Circuit previously relied on such deference.  Accordingly, Plaintiffs' focus on doctrines of deference is misguided and does not aid their case.

Plaintiffs concede that nearly all of their panoply of legal claims hinge on the single question whether the Rule properly classifies bump stocks as machine guns.  Because, as this Court and others correctly concluded in rejecting requests for preliminary relief against the Rule, the Rule is substantively correct, Defendants are entitled to judgment on the claims in the two pending cases.

## ARGUMENT

### A.  Defendants Have Established That the Rule Reasonably Clarifies the Statutory Definition of Machinegun And Logically Applies The Definition to Bump Stocks.

A machine gun is defined in the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. ch. 53) as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).  This definition is carried over into the ban on privately-owned machine guns in 18 U.S.C. § 922(o), part of the Firearm Owners Protection Act of 1986, ("FOPA"), Pub. L. 99-308.

The Rule has two principal components.  First, the Rule sets forth definitions of "single function of the trigger" and "automatically," neither of which receives further explication in the statutory text.  83 FR 66515.  In the Rule, the term "single function of the trigger" is defined as a "single pull of the trigger" as well as "analogous motions."  *Id.* at 66515.  In the context of the

2

statutory definition of machine gun, the term "automatically" is defined in the Rule "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.* at 66554.  The second element of the Rule clarifies for members of the public that "[t]he term 'machine gun' includes a [bump stock]," *id.* at 66554, correcting the Department's prior, erroneous classifications.  A bump stock supplies a "self-regulating" or "self-acting" mechanism that enables a shooter to initiate a continuous back-and-forth cycle of firing by pulling the trigger once, resting the trigger finger on the device's finger ledge, and maintaining forward pressure elsewhere on the rifle.  Because bump stocks assist this automatic firing sequence, they convert otherwise semiautomatic firearms into machine guns and are therefore prohibited under 18 U.S.C. § 922(o).

In their opening brief, Defendants explained that the Rule correctly concluded that its definition is the best interpretation of the statutory text.  *See* MSJ Br. at 11-14.  The Rule supplies the ordinary, accepted definitions of "single function of the trigger" and "automatically," and that those meanings are, as this Court previously recognized, "consistent with their ordinary meaning at the time Congress enacted the statute."   MSJ Br. at 11 (quoting *Guedes v. ATF*, 356 F. Supp. 35 109, 130 (D.D.C. 2019) ("*Guedes I*") (internal quotations omitted)).   "Generally, courts rely on dictionaries from the time statutes became law" to assist in determining the ordinary, accepted meaning, *Guedes I*, 356 F. Supp. 3d 130, and the parties and the Court have all relied on the same dictionaries in their discussions of the definition of "automatically."  *See* MSJ Br. at 11-12 (citing, *e.g.*, *Webster's New International Dictionary* 157 (1933); "automatic," 1 Oxford English Dictionary 574 (1933)); Opp. Br. at 15-16; *Guedes I*, 356 F. Supp. 3d 131.  These definitions are "nearly word-for-word" identical to the definition set forth in the Rule.  *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1151 (D. Utah 2019) ("*Aposhian I*"), *aff'd Aposhian v. Barr*, 958 F.3d 969 (10th

Cir. 2020) ("*Aposhian II*"), Pet. for rehearing & rehearing *en banc*, No. 19-4036 (filed June 19, 2020); *see also Guedes I,* 356 F. Supp. 3d 131; *accord United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009)).

Although dictionary definitions are not as useful in defining a phrase like "single function of the trigger," Defendants explained in their opening brief that the Rule properly adopts the "long-time, common-sense understanding" of this term as a "single pull of the trigger," and other analogous motions.  MSJ Br. at 11.  As this Court recognized at the preliminary injunction stage, this accords with the definition courts have "instinctively" employed in "discussing the statutory definition of 'machinegun.'"  *Guedes I*, 356 F. Supp. 3d 130 (citing *Staples v. U.S.*, 511 U.S. 600, 602 n.1 (1994) and *U.S. v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977)).  These judicial precedents are reinforced by the parallel examples from common usage quoted by Defendants.  *See* MSJ Br. at 11-12 (providing examples from media, dictionaries, and other sources).

Defendants also elaborated on the Rule's explanation of why a bump stock falls within the definition of machine gun.  The Rule explained that a single function of the trigger of a bump stock equipped rifle produces automatic fire because multiple rounds are discharged from a shooter's single impulse to initiate fire, as long as the shooter applies sustained forward pressure with the non-shooting hand and "maintain[s] the trigger finger on the device's extension ledge with constant rearward pressure."  83 FR 66532.  As this Court acknowledged in *Guedes I*, the bump stock's role in this process is to "direct[] the recoil energy of the discharged rounds into the space created by the sliding stock."  *Guedes I* at 132-33.  The bump stock also supplies "constrained linear rearward and forward paths," thereby "ensur[ing] that the firearm moves linearly."  *Id.*  By assisting with these "two tasks the shooter would ordinarily have to perform manually," the bump stock combines with the shooter himself to create a self-acting mechanism in which multiple

rounds are fired, without manual reloading, from the single function of the trigger initiated by the shooter at the outset. *See id.*

Plaintiffs' brief responds to this analysis with several arguments, but none of them are persuasive.

### B.  The Rule Properly Interprets the Statute From the Perspective of the Shooter.

As this Court recognized in denying Plaintiffs' preliminary injunction motion, the Rule correctly approaches the definition of the term single function of the trigger and the application of the statutory definition to bump stocks "from the perspective of the shooter." *Guedes I* at 130.   In a parallel decision rejecting a request to enjoin the Rule from taking effect, the United States District Court for the District of Utah similarly recognized that a "shooter-focused interpretation" is the "best interpretation" of the statutory definition. *Aposhian I*, 374 F. Supp. 3d at 1151; *see also Aposhian II*, 958 F.3d at 988 (rejecting dissenting argument that the Rule improperly adopts a "trigger finger" focus in its definition of function).

Plaintiffs nevertheless respond that the term single function of the trigger must be interpreted as meaning "each time the trigger moves," and not meaning "each time the shooter" pulls the trigger.  Opp. Br. at 2.  Not so.  Courts have long recognized that the definition of machine gun in the statute is to be interpreted from the point of view of the operator—the "perspective of the shooter," as this Court previously described it.  *Guedes I*, 356 F. Supp. 3d 130; *see also Akins v. United States*, 312 Fed App'x 197, 200 (11th Cir. 2009) (reviewing the application of the statutory definition of machine gun to classify an early, spring-operated bump stock, the Eleventh Circuit described the relevant action as "[a] single application of the trigger by a gunman").  In its recent opinion affirming the denial of a preliminary injunction sought against the Rule, the Tenth Circuit similarly explained that "a shooter's volitional actions" are the

touchstone of "a 'single function of the trigger' under the NFA." *Aposhian II*, 958 F.3d 987.  The court found support in other precedents, including *Oakes*, where the Tenth Circuit looked to whether a "shooter could, by fully pulling the trigger ... obtain automation with a single trigger function." *Oakes*, 564 F.2d at 388.  That court explained that though the shooter's pull of the trigger engaged a second mechanical element besides the principal trigger, automatic fire was nevertheless achieved "with a single trigger function" as understood from the perspective of the shooter. *Id.*

The shooter-focused interpretation accords not only with the text of the statute, but with Congress' approach to enacting the NFA.  Congress did not set out to tax or prohibit a specific mechanical action.  Rather, faced with the scenes of carnage created by criminal gangsters of the Prohibition era, Congress sought to limit the availability of such automatic weapons to the public, limits that have subsequently been tightened.  *See generally* AR004195-AR004350, National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 4-160 (1934) ("NFA Hrgs."); Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Studies 133 (1975).  Indeed, Congress approached the problem of regulating machine guns with the idea of "machinegun" in mind, but insufficient expertise to know how to define such weapons.  *See* AR004285-AR004290; NFA Hrgs. at 95-99 (discussing definitions).  In light of this deficient knowledge, they summoned a number of experts in firearms to testify, including an Olympic champion (who was also the President of the National Rifle Association) and the Assistant Attorney General for the Department's Criminal Division, and adopted, without change, their recommended definitions.  *See* AR004230, AR004287.  Only by recognizing in the proliferation of bump stocks the potential for similar mayhem can Congress's understanding of the original text of the NFA be implemented.

From the perspective of the shooter, Plaintiffs' claim that bump stocks involve "multiple functions" rather than a "single function" is unpersuasive. *See* Opp. Br. at 4 & 9 n.1. Plaintiffs assert that, after the first shot is fired from a bump-stock equipped weapon, each subsequent shot is a "subsequent interaction between the shooter's finger and the trigger . . . not a continuation of the initial" trigger pull. Opp. Br. at 10-11. Yet this is belied by Plaintiffs' own video and the other sources cited in Defendants' opening brief, such as the manufacturers' own description of the firing process. *See* MSJ Br. at 16-17. The very purpose of a bump stock—as well illustrated in the video—is to translate a shooter's single decisive trigger pull into a continuous series of multiple shots, through the assistance of the stock itself, the recoil energy, and the continuing pressure on the trigger ledge and by the non-trigger hand.[3]  *See id.*

This renders Plaintiffs' 3-page, 7-illustration guide to the step-by-step mechanics of an ordinary trigger entirely unnecessary. *See* Opp. Br. at 5-7. Although Plaintiffs' diagrams and descriptions are accurate and may assist the Court, the internal functioning of the trigger mechanism no longer matters to the definition once the trigger is pulled and an external device such as a bump stock is grafted on to the semi-automatic rifle. *See* 83 FR 66516, 66518, 66532 (explaining that bump stocks are machine guns in light of the method of operation of the combined system, not the internal workings of the trigger mechanism); MSJ Br. at 14-17 (same). In such an

---

[3] Plaintiffs assert that Defendants' description of this video as illustrating "a single volitional act to hold the trigger finger stationary" is "pure sophistry," Opp. Br. at 19, and suggest that a trigger finger "that is not in contact with the trigger" cannot still be "pulling the trigger." Opp. Br. at 20. As the Rule explains, however, this neglects the role played by one of the key elements of the bump stock design—the "extension ledge" or "trigger ledge." *See* 83 FR 66516 (explaining that a bump stock "includes an extension ledge . . . on which the shooter places the trigger finger while shooting the firearm"); *id.* at 66518 (describing a bump stock's method of operation as including "maintaining the trigger finger on the device's ledge with constant rearward pressure"). Although the trigger finger may briefly and minutely lose contact with the *trigger*, the bump stock is designed to use continuous contact with the *trigger ledge* as a substitute, as illustrated in the video.

7

assembly, the only reasonable way to assess whether the resulting firearm is automatic is from the perspective of the shooter, and *not* by reference to the mechanistic function of the trigger itself. *See Guedes I*, 356 F. Supp. 3d 123, 130.  Any other approach would mean that Congress has left unregulated any manner of device that replaces the shooter's manual operation of the trigger with an externally-driven, automatic trigger operation: a robotic hand, operated by a switch, that fires a rifle as fast as mechanically possible; an electric motor that installs onto the trigger to maneuver it back and forth once a light switch has been turned on, or the use of a spring to force the trigger back and forward (as in the Akins Accelerator) would all be authorized under plaintiffs' analysis.[4] *See, e.g.*, AR000660 *et seq.* (evaluating the "AutoGlove"); 83 FR 66518 n.5, 83 FR 66534; *accord Guedes II*, 920 F.3d at 43 (recognizing other methods by which a trigger may be operated).

## C.   Plaintiffs' Objections to the Application of the Rule's Definitions to Bump Stocks Are Unavailing.

Plaintiffs also contend that Defendants have misapplied the Rule's clarified definitions of the statutory terms to bump stocks, but their analysis is unpersuasive.  First, Plaintiffs contend that "The bump stocks at issue in this case . . . require ongoing human intervention beyond merely keeping the trigger continuously depressed," such that "nothing is accomplished 'automatically.'" Opp. Br. at 4-5.  But use of the term "automatically" to describe a device that includes some degree of manual input and ongoing human intervention is commonplace.  For example, Plaintiffs point to an "automatic car," Opp. Br. at 14, but in such a car, even the gearbox does not operate *without* a driver's intervention.  Rather, by removing the clutch from the process, it relieves a driver from some, but not all, of the burdens of a manual gearbox, while "still requir[ing] considerable drive

---

[4] Plaintiffs concede that "there may be ambiguities and uncertainty as to what counts as the 'trigger' where firing is initiated by electronic or other means," but there is no meaningful distinction between a device that substitutes an electronic switch for a conventional trigger and one that uses an electronic switch or other means to initiate the high-speed manipulation of a conventional trigger.

input into" *the gearbox itself*, *id.*, contrary to Plaintiffs' suggestion.  A bump stock is no different.
In fact, even the type of weapon that no one contests is a machine gun, such as a fully-automatic
M-16, requires continuous control by the operator, including unwavering human guidance and
immense concentration to avoid spraying fire dangerously and randomly.  For this reason, many
military machineguns are designed for use on a fixed or portable mount to reinforce a soldier's
ability to provide sufficient control.  *See generally* U.S. Army Field Manual 3-22.68, *Crew-Served
Machine Guns 5.56-mm and 7.62-mm* (July 2006), *available at* https://go.usa.gov/xfWTx (last
visited July 17, 2020).

Nor is it the case that the dictionary definitions of "automatic gun" or "automatic rifle"
undercut the correctness of the Rule's application of the statutory terms to bump stocks.  Plaintiffs
point to the separate definition of "automatic gun" (alongside that of "automatic"), and suggest that
because an "automatic gun" is defined as one that repeats its firing cycle "until . . . pressure on the
trigger is released," a bump stock is not an "automatic gun."  Opp. Br. at 14-15 (quoting
Webster's New Int'l Dict., 2d ed. 187).  In fact, however, the definition of "automatic gun"
supports classification of a bump stock as a machine gun.  The definition's focus on a shooter's
conscious act to "release[]" the trigger is consonant with the Rule's shooter-focused interpretation
of "single function of the trigger," and no one disputes that the purpose of a bump stock is to
provide a shooter with the means to fire rounds continuously until pressure on the trigger ledge and
corresponding forward pressure on the rifle itself are "released."  A bump stock thus falls
comfortably within the definition of "automatic gun" that Plaintiffs cite.  *See also* Opp. Br. at 15
(citing definition of "automatic pistol, automatic rifle, etc." as a firearm from which "shots are
fired in rapid succession until the trigger is released"); *id.* at 16 n. 5 ("automatic fire" defined as
"continuous fire . . . lasting until pressure on the trigger is released").

Plaintiffs also wrongly contend that the Rule's analysis "makes the concept of a 'semi-automatic' weapon meaningless" because its explanation of the manner in which a bump stock is "self-regulating" purportedly applies equally to a semi-automatic rifle.  Opp. Br. at 17-18. Plaintiffs misunderstand what makes a bump stock equipped weapon "automatic."  The self-acting or self-regulating function provided by a bump stock facilitates the firing of "more than one shot" with a single function of the trigger through the channeling of recoil energy into the small amount of linear motion permitted by the bump stock.  For all the mechanical reasons described in Plaintiffs' detailed examination of the trigger mechanism, *see* Opp. Br. at 5-7, a semi-automatic rifle *without* a bump stock does not itself self-regulate the firing of multiple shots with a single volitional trigger pull.  Rather, the features of a semi-automatic weapon that are "self-regulating" in the sense that they "manage the firing sequence, the stabilization of the barrel, and the control of recoil" are self-regulating *in the service of firing a single shot*.   And although it is true that there are other methods of bump firing—and other aids, such as a rubber band or belt loop, *see* Opp. Br. at 20—those external aids do not transform the basic firing components of a semi-automatic rifle into a self-regulating mechanism for firing *multiple* shots.

It is also not the case that the forward pressure a shooter must apply to the firearm (Plaintiffs describe this as "the manual effort and decision to push the fore-body containing the trigger assembly," Opp. Br. at 21) defeats the self-regulating nature of a bump stock.  The Rule recognizes the importance of "maintaining constant forward pressure with the non-trigger hand," 83 FR 66518, but rejected Plaintiffs' precise contention that this renders the forward push the action "that initiates the next pull."  Opp. Br. at 21.  Rather, the Rule explained that this was one of the multiple inputs within which the bump stock assists in automatic fire:

> The Department disagrees that a shooter repeatedly actuates, functions, or pulls the trigger of a semiautomatic firearm using a bump-stock-type device with the non-trigger hand by

> "pushing the firearm forward.'' In fact, the shooter "pulls" the trigger once and allows the firearm and attached bump-stock-type device to operate until the shooter releases the trigger finger or the constant forward pressure with the non-trigger hand. The non-trigger hand never comes in contact with the trigger and does not actuate, function, or pull it. By maintaining constant forward pressure, a shooter relies on the device to capture and direct recoil energy for each subsequent round and requires no further manipulation of the trigger itself.

83 FR 66532.  For this reason, both this Court and the D.C. Circuit rejected Plaintiffs' argument about forward pressure at the preliminary injunction stage, with the latter explaining that the statutory text does not "foreclos[e] some further degree of manual input such as the constant forward pressure needed to engage the bump stock in the first instance." *Guedes II*, 920 F.3d at 31. As the district court in *Aposhian I* explained in recognizing this as the best interpretation of the statute, "even weapons uncontroversially classified as machine guns require at least some ongoing effort by an operator," including with the non-trigger hand.  374 F. Supp. 3d 1152; *see also Aposhian II*, 958 F.3d 986-87 (rejecting argument that ongoing pressure "by the shooter . . . requires the conclusion that a bump stock does not shoot automatically").  Because Plaintiffs' challenge therefore hinges on the idea that "the statute encompasses machine guns that require some, but not too much, ongoing physical actuation," their request that the Rule be invalidated on this basis is "atextual" and the statute does not provide "any basis for an interpretation that restricts the degree of shooter involvement in an automatic process." *Id*.

### D.  The Rule's Definitions Are Not Overbroad.

Plaintiffs' brief renews the objection they made at the preliminary-relief stage that the Rule's definitions are flawed because belt loops, rubber bands, and "[o]ther simple physical aids" can be used to "facilitate bump firing by constraining movement of the firearm."  Opp. Br. at 23. At the outset, the Rule addressed this issue at length after it was raised by commenters:

> bump-stock-type devices are objectively different from items such as belt loops that are designed for a different primary purpose but can serve an incidental function of

11

assisting with bump firing. To bump fire a firearm using a belt loop or a similar method without a bump-stock-type device, a shooter must put his thumb against the trigger and loop that thumb through a belt loop. With the non-trigger hand, the shooter then pushes the firearm forward until the thumb engages the trigger and the firearm fires. The recoil pushes the firearm backwards as the shooter controls the distance of the recoil, and the trigger resets. The constant forward pressure with the non-trigger hand pushes the firearm forward, again pulling the firearm forward, engaging the trigger, and firing a second round. . . . no device is present to capture and direct the recoil energy; rather, the shooter must do so. . . . [and] the belt loop or a similar manual method requires the shooter to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils.

83 FR 66533. Because these other devices do not act automatically in directing recoil energy or controlling the distance of movement, the fact that these devices are excluded from the definition of machine gun does not require that bump stocks also be excluded.

Second, as Defendants noted in their opening brief, the Rule explained that belt loops and rubber bands are not "designed to be affixed" to a firearm.  MSJ Br. at 18-19 (quoting 83 FR 66516).  Plaintiffs respond in two ways, neither of which casts doubt on the correctness of the Rule.  As to "improved stocks" and other "innovations that make it easier to shoot multiple rounds in a row," Opp. Br. at 21, although it is the case that such devices may relieve shooters of some degree of manual activity, they are specifically designed to facilitate ordinary semi-automatic fire in which a shooter does not intend a continuous shooting cycle initiated by a single impulse to pull the trigger.  Plaintiffs are also wrong in the suggestion that "belt loops" or other manual aids constitute machine guns because the "parts from which a machinegun can be assembled" portion of the statutory definition does not contain the same "designed and intended" language as the previous elements of the definition.  *See* Opp. Br. at 23 (quoting 26 U.S.C. § 5845(b)).  Treating belt loops as "parts" that comprise a machinegun neglects the ordinary meaning of "parts" as, *e.g.*, the "objects that go to make up a machine or instrument," or "a component."  *See, e.g.*, "Part, n.1," ¶ 8, OED Online, www.oed.com/view/Entry/138188 (last visited July 18, 2020).  A belt loop only

assists in bump firing when attached to a pair of pants, and thus, once isolated from those pants as

a "component" of a machine gun, no longer functions to assist in automatic fire.[5]

In a similar vein, Plaintiffs contend that the Rule erroneously distinguishes "binary

triggers" from machine guns because those triggers automatically reset to enable a second function

of the trigger as the trigger is released.  *See* Opp. Br. at 22.  As this Court noted in its previous

opinion, the comparison with binary triggers is another issue that was raised by commenters and

addressed in the Rule itself.  *Guedes I*, 356 F. Supp. 3d 136.  As the D.C. Circuit explained, the

Rule properly focused on the "second act of volition with the trigger finger" in distinguishing

binary triggers from machine guns.  *Guedes II*, 920 F.3d 33 (emphasis omitted); *see* 83 FR 66534

("the shooter *must release* the trigger before another round is fired" from a binary trigger)

(emphasis added).  Thus, as the D.C. Circuit concluded, "the Rule reasonably distinguishes binary-

trigger guns . . . [because] the release of a trigger is a volitional motion."  920 F. 3d 33.

### E. Congress's 1968 Amendment Did Not "Ratify" Plaintiffs' Incorrect Interpretation of the Statute.

In 1955, ATF interpreted the statutory definition of "machinegun" to treat some Gatling

guns—those "employing a cam action to perform the functions of repeatedly cocking and firing the

weapon"—as falling outside the statutory definition, while concluding that other Gatling guns did

constitute machine guns.  Rev. Rul. 55-528, 1955 WL 9410 (Jan. 1, 1955).  In 1968, Congress re-

enacted the NFA's definition of "machinegun" and removed the phrase "or semiautomatically"

from the first sentence of the definition.  *See* Pub. L. 90-618, 48 Stat. 1213, 1231 (Oct. 22, 1968);

Opp. Br. at 26.  Plaintiffs contend that by re-enacting the statutory definition, Congress ratified the

---

[5] Defendants have acknowledged previously that whether a rubber band and a semi-automatic rifle (particularly in conjunction with other parts) constitutes a machine gun is a more difficult question. *See* Tr. of Feb. 26, 2019 Hrg. At 32-33, 18-cv-2988, ECF No. 32.  As the Court recognized, the distinction between a rubber band and a bump stock rests in part on the limited functionality provided by a rubber band, and not exclusively on the "designed to be affixed" distinction.  *See id.*

administrative interpretation excluding Gatling guns from the scope of the statutory definition, and thereby precluded an interpretation of the statutory text as including bump stocks. *See* Opp. Br. at 24-26. Plaintiffs' analysis is not persuasive.

"[R]eenactment [does] not carry the day" in interpreting a statute where the "record of the congressional discussion preceding reenactment makes no reference" to the identified practice, and "there is no other evidence to suggest Congress was even aware" of the agency's actions. *Brown v. Gardner*, 513 U.S. 115, 121 (1994). Plaintiffs have pointed to no evidence, and Defendants are aware of none, that suggests Congress's 1968 statutory reenactment occurred with the Gatling gun ruling in mind. Further, as Plaintiffs' discussion acknowledges implicitly, Congress did not re-enact the statute "without change." *Compare* Opp. Br. at 26 (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)) *with id.* (describing removal of term "or semiautomatically"). ATF acted in 1994 to classify miniguns—electrically-operated multi-barrel military weapons that are "partly comparable to motor-driven Gatling guns"—as machine guns, Opp. Br. at 25-26, demonstrating that Congress's 1968 actions did not bind the agency. *See* ATF Rul. 2004-5, *available at*: https://www.atf.gov/firearms/docs/ ruling/2004-5-minigun-ruling (last visited July 17, 2020). Indeed, in *United States v. Fleischli*, the Seventh Circuit examined a challenge to ATF's earlier classification of miniguns as machine guns, in which the plaintiff contended that a "minigun is akin to a Gatling gun." 305 F.3d 643, 655 (7th Cir. 2002). Rejecting this argument, the Seventh Circuit explained that a minigun "continued to fire until the trigger was released," *i.e.*, until the shooter took a further volitional act to cease firing. *Id.* So too here, where a bump stock enables a shooter to continue firing until the separate volitional act of releasing the trigger. *See Guedes II*, 920 F.3d at 33.

## F.  Plaintiffs' Discussion of Interpretive Canons Does Not Advance Their Argument.

Plaintiffs discuss at great length the rule of lenity and *Chevron* deference, but these issues

14

are of no import to the correctness of the Rule's classification of bump stocks as machine guns.

### 1. The Rule of Lenity

Plaintiffs first assert that if the Court again applies *Chevron* and concludes that the statutory language is ambiguous in its application to bump stocks, that "the rule of lenity requires a narrower reading of the statute" that excludes bump stocks. Opp. Br. at 28. Not so. The rule of lenity applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013). Lenity is thus a last resort, one that "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration." *Id.* (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)); *see also Guedes II*, 920 F.3d at 27 ("the rule of lenity applies only 'when the ordinary canons of statutory construction have revealed no satisfactory construction'") (quoting *Lockhart v. United States*, 136 S. Ct. 958, 964 (2016)).[6] Although Plaintiffs contend that a "grievous ambiguity" is not required because only "some cases" relied on by *Maracich* used that specific language, even the cases from which they quote make clear that the rule is a final step to be resorted to "after" all other tools such as "language and structure, legislative history," and even "motivating policies" of a statute are considered. *See, e.g.*, Opp. Br. at 32 (quoting *Moskal v. United States*, 498 U.S. 103 (1990)); *accord United States v. McDonald*, 991 F.2d 866, 870 (D.C. Cir. 1993) ("grievous" ambiguity is "an essential condition for applying" lenity). Because bump stocks plainly fall within the statutory definition of machinegun, Plaintiffs' resort to the rule of

---

[6] Plaintiffs dedicate the bulk of their argument concerning the rule of lenity to making the case that the rule of lenity should be applied instead of, or before, *Chevron* deference. As discussed below, however, it is unnecessary for the Court to invoke *Chevron* deference here where the Rule adopts the correct meaning of the text of the statute. The Court thus need not resolve the question which applies first to the interpretation of the NFA and GCA, which, as the D.C. Circuit noted, the Supreme Court has not addressed. *Guedes II*, 920 F.3d at 27.

lenity is untenable.

### 2. *Chevron* **Deference**.

Deference to the agency is not required to resolve this case: Plaintiffs' arguments cast no doubt on the correctness of the Rule's implementation of the statute. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002) (observing that "there is no occasion to defer and no point in asking what kind of deference, or how much" would apply where the agency has adopted "the position [the court] would adopt" when "interpreting the statute from scratch"). Nothing in the Rule suggests that it adopts anything other than what the Department perceives to be the best interpretation of the statute, and the Government therefore does not rely on *Chevron* deference here. *See Guedes v. ATF*, 140 S. Ct. 789, 789-90 (statement of Gorsuch, J.) (Mar. 2, 2020) ("*Guedes III*"). Nonetheless, if the Court employs this framework, as it and the D.C. Circuit did at the preliminary-injunction stage, Plaintiffs would still not be entitled to relief.

*Chevron* deference applies where Congress has delegated to an agency the authority to fill gaps in a statute or engage in interpretations that will have the force of law. The relevant threshold question is "whether Congress would have intended, and expected, courts to treat an agency's rule, regulation, application of a statute, or other agency action as within, or outside, its delegation to the agency of 'gap-filling' authority." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007). The D.C. Circuit believed that Congress gave the Attorney General the authority to make possession of a bump stock unlawful even if it were not illegal under the plain terms of the statute. *See Guedes*, 920 F.3d at 19. Yet as a general matter, "criminal laws are for courts, not for the Government, to construe." *Abramski v. U.S.*, 573 U.S. 169, 191 (2014).[7] And the Rule does not

_____

[7] When it chooses, Congress may delegate substantial authority to Executive Branch agencies to engage in rulemaking that may lead to criminal consequences. For example, Congress has delegated to the Securities and Exchange Commission the authority to "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent" in connection

suggest that its legality depends on the application of *Chevron* deference, or that the agency believed *Chevron* deference was required to uphold the Rule. *See PDK Laboratories v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (citing, *e.g.*, *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002)). Rather, the Rule repeatedly emphasizes that it is announcing the "best interpretation" of the statutory terms used to define a machinegun, *see* 83 Fed. Reg. at 66517, 66518, 66521; *accord id.* at 66527 (stating the interpretations in the Rule "accord with the plain meaning" of the terms), and explains that the Rule reflects the Department's belief "that bump-stock-type devices must be regulated because they satisfy the statutory definition of 'machinegun,'" *id.* at 66520; *accord id.* at 66529, 66,35. Nor does the fact that the Rule refers to an "effective date" alter the analysis. *See Guedes II*, 920 F.3d at 20. Before mentioning an "effective date," the Rule is explicit that ATF has "misclassified some bump-stock-type devices and therefore initiated this rulemaking," which was "specifically designed to notify the public about changes in ATF's interpretation of the [National Firearms Act] and the [Gun Control Act] and to help the public avoid the unlawful possession of a machinegun." 83 Fed. Reg. 66523; *accord id.* (stating that the Rule is designed to "ensur[e] that the public is aware of the correct classification of bump-stock-type devices under the law").

---

with tender offers. 15 U.S.C. § 78n(e); *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (noting that the Supreme Court has regularly "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal"). And those agency determinations, when issued pursuant to delegated authority, receive deference no less than agency determinations reached in purely civil contexts. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 704 n.18 (1995). But in contrast to other statutes, Congress did not expressly task the Attorney General with determining the scope of the criminal prohibition on machinegun possession. *Compare, e.g.*, 18 U.S.C. § 926(a) and 26 U.S.C. § 7805(a) *with* 18 U.S.C. §§ 922(m), 923 (specifically attaching criminal consequences to the violation of the Attorney General's regulations governing licensing for firearms manufacturers, importers, dealers, and collectors) and *United States v. Grimaud*, 220 U.S. 506, 517-19 (1911) (statute criminalizing "any violation of the provisions of this act or such rules and regulations" issued under the act "indicated [the] will" of Congress to "give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished" in the manner prescribed by Congress).

17

Regardless, even if the Court were to continue to apply *Chevron* deference as it did at the preliminary injunction stage, the Rule should be upheld.  For the same reasons that the Rule represents the correct understanding of the statutory text, there is no ambiguity at the first step of the *Chevron* analysis, and the Court should hold that the Rule is valid.  Plaintiffs' only argument that the statute is ambiguous rests on the claim that "eight decades of supposedly erroneous interpretations" have been overturned by the Rule.  Not so.  Since the enactment of the FOPA, ATF has hewed consistently to the view that the statutory definition of "machinegun"—and thus, the outright ban on private ownership of subsequently-manufactured machine guns under 18 U.S.C. §  922(o)—cannot be circumvented by substituting an alternative mechanism for initiating the firing of the weapon.  *See, e.g.*, *Fleischli*, 305 F.3d 655-56 (validating ATF conclusion regarding electric on-off switch on a minigun); *United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003) (upholding ATF classification of a rifle modified to use a motorized fishing reel as a firing mechanism).  Until ATF reviewed the Akins Accelerator for classification a little over a decade ago, the question whether a bump stock should be treated similarly to such devices had not yet been posed, and, until attention was further focused on bump stocks by the Las Vegas attack, the classification decisions on bump stocks "did not include extensive legal analysis of . . . the terms 'automatically' and 'single function of the trigger.'"  83 FR 66528.  Any error made in these prior classifications is therefore neither longstanding nor persuasive evidence that the statute is ambiguous.

Even assuming ambiguity at Step One of the *Chevron* analysis, however, the Rule at a minimum reflects a permissible reading of the statutory terms for the same reasons that Defendants have explained the Rule represents the best interpretation of the statute.  *See Guedes*, 920 F.3d at 31-32; *but see PDK Labs.*, 362 F.3d at 798 (discussing whether remand is required when an

"agency wrongly believes that [its] interpretation is compelled by Congress") (internal quotations

omitted). This demonstrates that Plaintiffs' focus on *Chevron* deference is misguided: Defendants

should prevail on their interpretation of the statute regardless of the level of deference, if any, that

is applied.

Plaintiffs' other arguments that the Rule must be held invalid if *Chevron* deference is

applied are incorrect. Plaintiffs assert that *Chevron* deference in the context of a statute defining

crimes would violate the Constitution. Plaintiffs have not briefed these claims in detail, but

instead, merely "preserve[d] the argument[s] for later review" before a Court that has "authority to

overrule *Chevron*," and Defendants therefore need not address these claims beyond explaining that

the D.C. Circuit has set forth counterarguments in *Guedes II*. *See* 920 F.3d at 23-27.

### G.  Contrary to Plaintiffs' Other Theories, The Rule Is Not Arbitrary and Capricious.

Plaintiffs also posit that the Rule is arbitrary and capricious under a number of other

theories, but none of Plaintiffs' arguments requires invalidation of the Rule. First, Plaintiffs

contend that, if the Court concludes the Rule is ambiguous and applies a *Chevron*-based analysis

(which is unnecessary, as explained above), it must also conclude that the Department erroneously

"reject[ed] proposed alternatives" in the Final Rule based on the Department's view that it had "a

lack of discretion" to adopt those alternatives. Opp. Br. at 36. However, Plaintiffs' argument

ignores the harmless error rule under Section 706 of the APA. *See Ozark Auto. Distrib. Inc. v.

NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015). Even if the Department had concluded that the

statutory text contained sufficient ambiguity to make some other interpretation of the statute

"permissible" under the application of deference, that would not have affected the Department's

conclusion that the Rule announces the "best interpretation" of the statute. 83 FR 66521; *but see

PDK Labs.*, 362 F.3d 798 (rejecting argument that the court can "know how the agency would

19

choose to interpret the statute" where agency erred at *Chevron* Step One).  Likewise, given the acute "[t]hreat to public safety" the Department and many commenters reasonably believed that bump stocks posed, *see* 83 FR 66520, there is no reason to think the Department would have left bump stocks unregulated or adopted an alternative that allowed an estimated 520,000 bump stocks to remain in circulation.  *See* 83 FR 66547, 83 FR 66551 (discussing public safety as a reason for rejecting alternatives).  Plaintiffs therefore cannot show that there was "prejudicial error" in the Department's conclusions that rest on the "best interpretation" of the statute.

Nor are Plaintiffs correct to suggest that the Supreme Court's decision in *DHS v. Regents of the Univ. of Cal.*, No. 18-587, 140 S. Ct. 1891 (June 18, 2020) (rejecting rescission of DACA policy) requires remand if the Court concludes that Defendants misapprehended the scope of their discretion.  *See* Opp. Br. at 36.  In contrast to the challenged agency conclusion in *Regents*, Defendants here rested their rejection of alternatives on a variety of considerations.  For example, commenters argued—as Plaintiffs do here—that the Department should have granted an amnesty under which bump stock owners could register their devices.  *See* MSJ Br. at 39; *id.*, Ex. 1 at 211. As Defendants explained in their opening brief, however, ATF has long understood that the FOPA impliedly repealed authority for such an amnesty in 1986, providing a separate basis under which the Department rejected this proposed alternative.  *See id.* at 37-40; AR001394.  Similarly, in response to comments contending that ATF "create a new . . . firearms class" under which bump stocks could be regulated or that licenses be issued for bump stocks to those with "a valid reason for needing" one, the Rule explained that the Department "does not have the authority to add a new class of firearms to the statutory scheme or impose licensing requirements to acquire a firearm." 83 FR 66536.  And in response to comments "suggesting a ban only on future production" of bump stocks, the Rule correctly pointed out that it was Congress that decided in the FOPA not to

20

distinguish between current and future ownership of "machineguns not lawfully possessed on the effective date of 18 U.S.C. § 922(o)," thereby foreclosing the possibility of "restrict[ing] only the future manufacture" of bump stocks.  In light of this fulsome discussion of alternatives, *Regents* has no application here.

Plaintiffs also assert that the Rule is arbitrary and capricious because the outcome of rulemaking was "[p]re-ordained" and "stem[med] from political compulsion."  Opp. Br. at 36-37 (citing *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).   The D.C. Circuit correctly rejected this argument at the preliminary injunction stage, noting that "[p]residential administrations are elected to make policy." *Guedes II*, 920 F.3d at 34; *accord Aposhian I*, 374 F. Supp. 3d 1153 ("the alleged political genesis of the Final Rule" does not "serve to undermine the Final Rule's validity").  And the Supreme Court recently rejected the so-called "open mindednesss test" as inconsistent with the "general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA."  *Little Sisters of the Poor v. Penn.*, No. 19-431, 140 S. Ct. 2367, slip op. at 24-25 (2020).   Further, the Supreme Court has long recognized that it is entirely proper for an agency to directly consider both "Presidential oversight" and "political pressure from Congress" in adopting policy changes.  *See FCC v. Fox Television Stations*, 556 U.S. 502, 523 (2009).  Nor does the President's quoted statement cast doubt on the validity of the rule-making process.  At most, that statement shows that the President considered issuing an order "myself" to classify bump stocks as machine guns, which is insufficient to undercut the evidence in the administrative record that demonstrates that the Rule resulted from a lengthy process of consideration that included not one, but two public solicitations of comments over a year-long period.  *See* 83 FR at 66514-66515; AR001313 *et seq.*[8]

---

[8] Contrary to Plaintiffs' suggestion, "discovery" is not warranted to determine "whether the actual instructions given the agency were improperly excluded from the administrative record."

**H.  Plaintiffs Cannot Establish That the Rule Effects a Taking and Are Not Entitled to Injunctive Relief or an Amnesty Based on a Takings Claim.**

As explained in Defendants' opening brief, no compensable taking within the meaning of the Constitution occurs when "[p]roperty [is] seized and retained pursuant to the police power." *Tate v. Dist. of Columbia*, 601 F. Supp. 2d 132, 136 (D.D.C. 2009).  A prohibition on contraband in interstate commerce, such as the federal machine gun ban, is an activity comparable to "those engaged in by the states under their inherent sovereign powers," *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1568 n. 17 (Fed. Cir. 1994), and thus, is equally exempt from the Takings Clause.  *See Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006).  Applying this reasoning, courts have unanimously rejected Takings Clause challenges to bans on bump stocks.  *See Maryland Shall Issue, Inc. v. Hogan*, --- F.3d ---, 2020 WL 3494322 at *5-*7 (4th Cir. June 29, 2020); *Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575 (2019); *McCutchen v. United States*, 145 Fed. Cl. 42 (2019).

Plaintiffs' original filing erred by misapprehending the nature of Congress's classification of certain machine guns, including bump stocks, as contraband.  Although Plaintiffs contend that bump stocks cannot be treated as contraband because many "*actual* machineguns" are lawfully owned, Opp. Br. at 41, and "bump stocks are [no] more dangerous than these lawfully owned machine guns," *id.* at 42, Plaintiffs ignore the fact that Congress has elected to treat machine guns

---

The administrative record contains the instructions from the President directing the Department to engage in and complete the Rule. *See* AR000790.  An agency whose action is challenged "is entitled to a strong presumption of regularity that it properly designated the administrative record." *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F.Supp.2d 15, 20 (D.D.C. 2013).  Plaintiffs have not provided any "non-speculative, concrete evidence" showing that there are "specific documents allegedly missing from the administrative record [that] were directly or indirectly considered by the actual decision makers involved" in promulgating the Rule."  *Id.*  And even if Plaintiffs could meet that standard, they would not be entitled to a "Department lawyer['s] . . . memo providing" legal analysis for the Rule, which would "not [be] part of the administrative record to begin with."  *Oceana, Inc. v. Ross*, 920 F.3d 855, 864 (D.C. Cir. 2019).

differently based on their date of manufacture and purpose of their ownership, declaring as contraband only those machine guns that are either: 1) manufactured after the enactment of the FOPA, aside from those qualifying as made lawfully for federal, state, or local governmental purposes, or 2) those made before the FOPA, but not lawfully registered as of that date.  *See* 18 U.S.C. § 922(o).  Bump stocks are contraband under the first category, regardless of whether other machine guns may still be lawfully owned.  In stressing the relative danger of bump stocks, Plaintiffs misstep by focusing incorrectly on the firepower of machine guns rather than the threat they pose from a law enforcement perspective.  Unlike lawfully-owned machine guns, bump stocks are not registered, lack serial numbers, and thus cannot be easily traced by investigators if they are used in criminal or terrorist activity.  And notwithstanding the suggestion of commenters and the Plaintiffs that this law-enforcement threat would be curable through an amnesty or registration of bump stocks, Congress impliedly repealed the Government's authority to grant an amnesty when it banned machine guns in 1986.  *See* MSJ Br. at 37-42.

   In their revised filing, *see* Case No. 18-3086, ECF No. 40 ("Amended Opp. Br."), Plaintiffs take a slightly different tack.  While asserting that the Rule "would require compensation even if valid" under the Government's theory, Amended Opp. Br. at 41, Plaintiffs contend that if the Court adopts the D.C. Circuit's analysis and treats the Rule as legislative, it may not conclude that bump stocks were "contraband" prior to the Rule's effective date.  *See id.* at 42 (arguing that, "[u]nder such reasoning, bump stocks . . . are not intrinsically contraband").  However, it is not the case that the classification of the Rule as legislative or interpretive affects the takings analysis.  The proper focus of the inquiry into whether the ban on bump stocks acts as a compensable taking is on the "character of the Governmental action" and its connection to the police power.  *Lingle v. Chevron, U.S.A.*, 544 U.S. 528, 538-39 (2005).  Regardless of when the ban on bump stocks took effect, they

23

are prohibited contraband because they fall within the criminal statutory restriction on machine

guns, an exercise of the police power that is not a taking. *See McCutchen*, 145 Fed. Cl. at 42.

Even the decision quoted by Plaintiffs in support of their argument makes clear that the timing of

the prohibition has no bearing on whether the police power exception applies. *See* Amended Opp.

Br. at 43 (quoting *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014)).

In *A&D Auto Sales*, the Federal Circuit determined that the timing of government restrictions is

relevant to whether a party has a property right under the Fifth Amendment—but the Federal

Circuit went on to explain that, nevertheless, "our cases have found no taking where the challenged

government action was of general application" and was an "exercise of the police power." 748

F.3d 1153-54 (citing cases). The court then declined to apply the police power exception because

the government action in *A&D Auto Sales* affected only car dealers of specific manufacturers, and

thus could not be categorized as a "general application" of the police power. *Id.* at 1154. This

illustrates that the police power rationale exception to the Takings Clause applies to new laws as

well as to the Government's enforcement of existing laws, thereby requiring that Plaintiffs' takings

claims be rejected regardless of whether this Court treats the Rule as legislative in character.[9]

**I.   Judgment Should Be Granted on Plaintiffs' Ex Post Facto and Retroactivity Claims Because Those Claims Have Been Conceded or Waived.**

For the reasons set out in Defendants' opening memorandum, the Rule is not impermissibly

retroactive, regardless of whether it is characterized as legislative or interpretive in character. *See*

MSJ Br. at 35-37. In brief, the Rule is "purely prospective" under the D.C. Circuit's analysis of

---

[9] Treatment of the Rule as legislative would likewise make no difference to whether Congress repealed the Attorney General's authority to issue an amnesty or whether Defendants otherwise have the authority to permit registration of bump stocks. If the Rule is understood as legislative, no amnesty would be needed or appropriate for bump stocks while they remained fully lawful, and once the Rule became effective, no amnesty would be possible in light of the repeal of amnesty authority. *See* MSJ Br. at 37-42.

the Rule as a legislative enactment that is creating a new prohibition on bump stocks where no such restriction existed before.  *See Guedes II*, 920 F.3d at 35.  However, treating the Rule as interpretive—as Defendants urge—creates no greater retroactivity issue.  Under Defendants' analysis, the Rule "does not represent a change in the law" at all, merely an authoritative statement of what the law has always meant.  MSJ Br. at 36.  Because the law itself is not being changed, there is nothing retroactive about the Rule's effect, and Plaintiffs' retroactivity and Ex Post Facto Clause claims therefore fail.[10]

Plaintiffs' response concedes that, under Defendants' analysis, "there is no violation" and thus no merit to Plaintiffs' retroactivity and Ex Post Facto Clause claims.  Opp. Br. at 43. Plaintiffs further state that their claims would be "moot" if they prevail on any of their substantive challenges to the Rule and thereby demonstrate that "the Rule is invalid."  *Id.*  As to whether the Rule is retroactive under the D.C. Circuit's legislative analysis, Plaintiffs provide no argument at all (except to suggest that "consequences imposed for past possession of bump stocks" might be an issue in "as applied challenges that might later arise").  By failing to offer any specific arguments in support of these claims, Plaintiffs have waived these claims, or, at a minimum, have withdrawn them from this action pending some future "as applied challenge[]."  *See Oceana v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) (citing *New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005)); *AILA v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("Normally the proper method of preserving an argument . . . is to make it.").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted and Plaintiffs' cross-motion for summary judgment should be denied.

_____

[10] As Defendants also explained, Plaintiffs' retroactivity and Ex Post Facto Clause claims are analytically indistinguishable and should be disposed of on identical grounds.

DATED this 24th day of July, 2020.

Respectfully submitted,

DAVID M. MORRELL
Deputy Assistant Attorney General

MATTHEW J. GLOVER
Counsel

LESLEY FARBY
Assistant Branch Director

/s/ *Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*