## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAMIEN GUEDES, *et al.*,                )
                                        )
      Plaintiffs,                )
                                        )
v.                                      )          Case No. 1:18-cv-02988-DLF
                                        )          The Hon. Judge Friedrich
BUREAU OF ALCOHOL,                      )
TOBACCO, FIREARMS AND                   )
EXPLOSIVES, *et al.*,                   )
                                        )
      Defendants.                )
                                        )
_____ )
                                        )
DAVID CODREA, *et al.*,                 )
                                        )
      Plaintiffs,                )
                                        )          Case No. 1:18-cv-03086-DLF
v.                                      )          The Hon. Judge Friedrich
                                        )
BUREAU OF ALCOHOL,                      )
TOBACCO, FIREARMS AND                   )
EXPLOSIVES, *et al.*,                   )
                                        )
      Defendants.                )
_____ )

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I. THE FINAL RULE CONTRADICTS THE PLAIN STATUTORY DEFINITION OF A
   MACHINEGUN ............................................................................................. 1

    A. The Final Rule's Definitions Are Inconsistent with the Common
   Public Meanings of the Statutory Terms ............................................... 3

    B. The Final Rule's Definitions Make No Sense as Applied to Bump
   Stocks ..................................................................................................... 8

    C. The Final Rule's Definitions Are Overbroad ...................................... 10

    D. Congress in 1968 Ratified a Narrow Reading of the Definition of
   Machinegun .......................................................................................... 13

II. IF THE STATUTE IS AMBIGUOUS, THE FINAL RULE IS INVALID ................. 16

    A. The Rule of Lenity Forecloses Executive Expansion of
   Ambiguous Criminal Statutes .............................................................. 16

    B. *Chevron* Deference Does Not Apply or Was Waived by the
   Government. .......................................................................................... 17

    C. *Chevron* Deference Violates the Constitution .................................... 17

    D. The Final Rule Is Unreasonable, Arbitrary, and Capricious ............... 18

III. APPLICATION OF DEFINITIONAL ISSUES TO SPECIFIC COUNTS .................. 19

    A. Lack of Statutory Authority/Ultra Vires, APA Violation and
   Amnesty. ............................................................................................... 19

    B. Guedes Count II – Separation of Powers and Non-Delegation .......... 19

    C. Due Process and Takings ...................................................................... 19

    D. Guedes Count IV – Ex Post Facto Clause; Codrea Count VI –
   Retroactive Rulemaking and Ex Post Facto Clause ............................ 22

CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019), *aff'd*
   *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) .......................................... 8

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) ............................................... 8

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) ......................... 9

*Brown v. Gardner*, 513 U.S. 115 (1994) .......................................................... 14

*Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed.
   Cir. 1998) ...................................................................................................... 20

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ......................... 19

*First English Evangelical Lutheran Church of Glendale v. Los
   Angeles County*, 482 U.S. 304 (1987) ......................................................... 20

*Guedes v. ATF*, 356 F. Supp.3d 109 (D.D.C. 2019) ..................................... 2, 7

*Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) .................................................... 4

*Horne v. Department of Agric.,* 576 U.S. 350 (2015) ................................... 20

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005) .............................. 20, 22

*Lorillard v. Pons*, 434 U.S. 575 (1978) ......................................................... 14

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ..... 20, 21, 22

*Mugler v. Kansas*, 123 U.S. 623 (1887) ........................................................ 21

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ................................................... 22

*United States v. Calamaro*, 354 U.S. 351 (1957) .......................................... 14

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ......... 22

**Statutes**

18 U.S.C. § 921(a)(23) ...................................................................................... 1

26 U.S.C. § 5845(b) ..................................................................................... 1, 10

**Other Authorities**

ATF Ruling 82-8, https://www.atf.gov/file/58146/download ........................................ 18

Final Rule, 83 Fed. Reg. 66,54 (Dec. 26, 2018) ................................................................. 9

National Firearms Act: Hearings Before the Committee on Ways and
    Means, H.R. 9066, 73rd Cong., 2nd Sess. (1934) ......................................................... 9

Petition, *Guedes v. ATF*, No. 19-296 (U.S., Aug. 29, 2019) ......................................... 18

Rev. Rul. 55-528, 1955-2 C.B. 482, 1955 WL 9410 ...................................................... 13

Sen. Rep. 1501, Gun Control Act of 1968 (Judiciary Comm.,
    September 6, 1968) ...................................................................................................... 14

# INTRODUCTION

Defendants' ever-changing construction of the statutory definition of "machinegun" amply illustrates that their reading is not even plausible, much less the plain or "best" reading of the statute.  At most, their alternative interpretations show only a gross ambiguity and vagueness in the text that would require an improper and unmade delegation of legislative discretion to even begin to cure.  Defendants claim no such delegation, concede that they lacked and did not exercise any legislative discretion during the rulemaking, and thus cannot plausibly prevail if the statute is deemed sufficiently ambiguous to trigger either *Chevron* deference or the rule of lenity.

# ARGUMENT

## I.   THE FINAL RULE CONTRADICTS THE PLAIN STATUTORY DEFINITION OF A MACHINEGUN

As with all questions of interpretation, text is first and foremost:

> The term "machinegun" means **any weapon *which shoots***, is designed to shoot, or can be readily restored to shoot, ***automatically more than one shot, without manual reloading, by a single function of the trigger***. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and ***any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person***.

26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(23)  (emphasis added).  The language, structure, and grammar of the text focuses on the "weapon," and describes the weapon's characteristics, not the characteristics of the person operating the weapon.  It also demonstrates that which must occur "automatically" is that the weapon "shoots" more

than one shot as the result of a single defined input: "by a single function of the trigger."
Notably, the statutory language not once mentions an actor – the person operating the
weapon – or that actor's intent.  Rather, it uses a passive construction – the *weapon*
"shoots … automatically more than one shot … by a single function of the trigger" – with
the phrase "by a single function of the trigger" again being trigger-centric,  rather than
saying that the operator can shoot more than one shot by pulling and holding the trigger a
single time.  The words and grammar used are more than sufficient to rebut the non-
textual and unreasonable interpretation offered by Defendants, which adds or changes
words and tenses, fudges the objects of particular words and phrases, and routinely
expands or contracts the scope of their "definitions" as needed with no reference to
language that would support such arbitrary and *ad hoc* line-drawing.  The mere fact that a
"pull" of the trigger is one way (even the most common way) in which the trigger can be
caused to function does not imply it is the only way or that the focus must be from the
user's perspective and depend on the user's state of mind or volition.

   This Court previously held that the statutory words "single function of the trigger"
and "shoot ... automatically" in the above definition were ambiguous, though Plaintiffs
suggest that was overly generous to Defendants.  *Guedes v. ATF*, 356 F. Supp.3d 109,
119, 126-27, 129-31 (D.D.C. 2019).  Beyond the language, structure, and grammar,
numerous other factors confirm that the definitions, properly and narrowly read, are not
ambiguous in a way that leaves room for Defendants' proposed redefinitions, and such
redefinitions are not a reasonable construction under any circumstances.

**A. The Final Rule's Definitions Are Inconsistent with the Common Public Meanings of the Statutory Terms**

Defendants find false comfort in the fact that both sides cite many of the same dictionaries. Def. Reply & Opp. at 3. But they fail to appreciate that the firearm-specific definitions in those dictionaries take precedence over the generic definitions that might be useful in other contexts but whose use here only obscures the ordinary and common understanding from the thirties through today of what constitutes an "automatic" weapon or what it means to shoot automatically more than one shot by a single function of the trigger.

The consequence of Defendants' use of a non-contextual definition of automatic to mean no more than "self-regulating" is that it eliminates a concrete and well-known definition of an automatic pistol or rifle and substitutes an utterly indeterminate concept of a mechanism that need not actually perform the action of "shoot[ing]" more than one shot. Such an "automatic" weapon need only make it easier in some ill-defined way to shoot or control the firearm notwithstanding the need for continuous manual input beyond the initial "single function of the trigger." Firearms that shoot "automatically" were, are, and always have been understood as a far narrower class of firearms that continued to expend available ammunition so long as the trigger remained depressed. Pl. Am. Opp. & Mem. at 13-17 (discussing long-standing definitions of automatic guns as those that continue to fire shots "until ... pressure on the trigger is released," or "until the trigger is released").

Defendants' primary effort to avoid the consequences of such definitions is to reconfigure the notion of "by a single function of the trigger" to mean by an initial volitional act of the operator plus whatever further manual input is required that sets up a "cycle" lasting until the operator elects to stop the cycle.  It is only by incorporating the notion of required and separate volition into the concept of discrete functions of the trigger that Defendants can even pretend to avoid the mechanical fact that once the trigger "is released," by whatever means, that function of the trigger terminates and any subsequent depression of the trigger is a second and separate function of the trigger.

Once again, the shift to a subjective notion of when a function of the trigger ends, rather than a physical notion looking to the movement and operation of the trigger itself, finds no support in the actual text and no line that can be drawn identifying how to determine whether the shooter *chooses* to let the trigger reset verses just passively allowing that to happen.  Indeed, to even attempt such a reconfiguration of the definition, Defendants must alter the statutory sentence structure to use a shooter-focused active voice, rather than the firearm-focused passive construction used in the statute.  *See* Def. Reply & Opp. at 3.  Of course, to do so they not only substitute "pull of the trigger" for "function of the trigger," they also change the form of the word to the shooter "pulling" the trigger, which cannot coherently be translated back to the original language ("by the shooter *functioning* the trigger").  Only a trigger-focused reading can maintain the linguistic integrity of a sentence that defines how the *machinegun* shoots, not how the operator causes it to shoot.   *See Guedes v. ATF*, 920 F.3d 1, 44 n. 13 (D.C. Cir. 2019)

(object of the word "function" is the trigger, not the operator) (Henderson, J., concurring in part and dissenting in part).

Furthermore, Defendants offer no textual or even plausible line for distinguishing where one "single function" ends and a second or subsequent function begins.  The claim that the function only ends when the shooter *chooses* to stop firing has no basis in the language and turns on factors that are impossible for an ordinary person to discern *ex ante*.  For example, a person using a bump-stock equipped firearm can choose to apply sufficient forward pressure to prevent the recoil and release of the trigger and thus only fire a single shot.  *See* Plaintiffs' Statement of Facts ("SOF") ¶ 1 (discussing video and related declaration).   Or the operator could apply limited pressure that would allow the recoil to cause the release of the trigger yet not be enough to cause depress the trigger a second time with a subsequent "bump."  That same shooter, however, could choose to apply medium forward pressure that is less than the recoil force (allowing the trigger to separate from the finger and be reset), but more than the force needed to depress the trigger a second or subsequent time and thus fire an additional shot.  The suggestion that there is no *volitional* act in selecting and adjusting the pressure to allow release of the trigger and subsequent reengagement with the trigger is disingenuous.

In addition, if the only point of the shooter-focus is to insist that a separate volitional act is required before subsequent movements of the trigger will be considered a separate "function of the trigger," then that is already accomplished by the word "automatically, which requires the mechanism to be self-acting after the initial single function of the trigger.  Conversely, there would be no need to say "automatically" if the

words "single function of the trigger already implied only a single volitional act and the absence of further volitional acts to accomplish the specified "more than one shot."

Regarding what it means for a firearm to "shoot[] …automatically more than one shot," Defendants' interpretation continues to mutate beyond any semblance of the statutory language. As noted in the Plaintiffs' opening brief, at 8-10, the relevant statutory phrase of "shoots … automatically more than one shot" explains *what* needs to occur "automatically" – "shooting" – and sets the sole non-automatic activity allowed as part of the process – "by a single function of the trigger." That interpretation readily comports with the dictionary and every other contextual definition of automatic guns, which continue to shoot until pressure on the trigger is released. In that definition, maintaining pressure on the trigger is no more than the continuation of the single function of the trigger, which function ends when pressure on the trigger is released and the trigger resets. It is not, contrary to Defendants' suggestion, some additional or different manual input beyond the initial "pull," it is the *same* single function.

Defendants, at 8, return to the example of an automatic car, thus ignores the adverbial object of *what* must happen automatically and conflates different actions. And an automatic transmission certainly does not require driver input into the *gear box*  in order to change gears.  Even if a bump stock could be said to provide a mechanical assist in maintaining control, aim, or linearity of motion (all things done by a fixed stock as well), those functions are not the "shooting" of more than one shot. They might be aiming, they might be controlling the firearm overall, but they do not cause a round to be expelled from the barrel of the firearm. Just as an automatic transmission automatically

shifts gears by itself but does not drive the car by itself, at most a bump stock might be said to automatically limit the path and distance of recoil, but certainly does not automatically shoot more than one shot.

Overall, the flaw in Defendant's definition is evident in that it cannot distinguish the mechanical assist in control, aim, and linear recoil provided by a *fixed* stock rifle relative to a pistol.  Such a stock likewise channels recoil and assists with aim and control, functions that require far more manual dexterity and involvement for a pistol without a stock attached.  Pl. SOF ¶ 2 (citing Hlebinsky Declaration); *compare* Def. Reply & Opp. at 4 (assisting with "two tasks the shooter would ordinarily have to perform manually" is sufficient to create a "self-acting mechanism").

Perhaps recognizing the incurable vagueness and lack of limits on what constitutes a "self-regulating" mechanism, *Guedes*, 563 F.3d at 658-60; *Guedes*, 356 F. Supp.3d at 131, Defendants argue that a bump-stock-equipped firearm satisfies the more common definition of a "self-acting" mechanism because  the operator should be considered part of the overall system that constitutes the mechanism. Def. Reply & Opp. at 4-5 ("bump stock combines with the shooter himself to create a self-acting mechanism").  Such sophistry eliminates the concept of "self" from self-acting.  A self-acting mechanism refers to the *machine*, not the combined actions of machine and shooter.  Elsewise, *all* firearms would shoot "automatically more than one shot" and that limitation in the text would be entirely meaningless.

Finally, Defendants' reliance, at 5-6, 11, on the district court decision in *Aposhian* is misplaced.  *Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1151 (D. Utah 2019), *aff'd*

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020).  The district court's reasoning in that case on the interpretive question was woefully thin and dealt with few of the arguments raised here.  Furthermore, the Tenth Circuit expressly rejected the district court's assertion that Defendants' construction was corre3ct on its own, held both the pertinent phrases of the definition ambiguous, and was forced to rely on Chevron to uphold the Final Rule.  958 F.3d at 985-88.  Suffice it to say that ambiguity is the best Defendants' can hope for, notwithstanding the conclusory analysis of the *Aposhian* district court.

### B.  The Final Rule's Definitions Make No Sense as Applied to Bump Stocks

Apart from the flaws in Defendants' revised definitions themselves, those definitions cannot be coherently and consistently applied even to bump-stocks themselves. For example, in trying to satisfy the requirement that an automatic firearm continue shooting until pressure on the trigger is released, Defendants claim, at 4, 7 & n. 3, that a bump stock continues to fire through continuous pressure not on the trigger, but rather on the trigger *ledge*.  A person operating a firearm no doubt exerts continuous pressure on many parts of the firearm while shooting, not least so they do not drop the firearm.  What matters is not pressure on *some* part of the device, but, even under Defendants' erroneous definitions, pressure on the *trigger*. Suffice it to say that he trigger ledge is not the trigger, and the trigger-finger's engagement with that ledge actually *prevents* the trigger from being held down.  See Video and Declaration (PAREN).

Furthermore, ATF's discussion of the Final Rule itself notes that the trigger ledge is irrelevant to its analysis, claiming that the removal of the trigger ledge changes nothing

and that even simply holding one's finger still in space supposedly would meet their definition.  See 83 Fed. Reg. 66536-37.

Furthermore, in attempting to deny the volitional nature of subsequent "bumps" resulting from pressure from the forward hand, Defendants inexplicably treat such pressure as a non-volitional background condition that does not count, rather than as a choice to push forward in order to cause the trigger to reengage with a stationary and disconnected trigger-finger.  No ordinary person could be expected to know that such conduct was not "volitional," much less to distinguish that from other conduct Defendants maintain is still legal.

Finally, In attempting to rely on the supposed policy desires of Congress to justify expanding the language of the statute, Defendants, at 6, claim that because bump stocks present a comparable threat of rapid fire they must necessarily fall within the ambit of Congress's understanding.  But there were many things that presented threats that Congress did not cover for a variety of reasons.  Indeed, some members even recognized that the "single function of the trigger" language added a limitation to the original language that might exclude dangerous firearms requiring more than one "function of the trigger."  *See* National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 41 (1934).  Expanding that line now on the theory of furthering the supposed policy of Congress would be improper judicial legislation.  *Cf. Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1749-52 (2020) (rejecting reliance on the expectation of what would happen or the purpose of thenstatute, rather than the meaning of the language itself).

## C. The Final Rule's Definitions Are Overbroad

As described in Plaintiffs' opening brief, at 21-24, Defendants conveniently ignore their own definitions when attempting to distinguish other firearms and devices that they necessarily must claim are *not* machineguns.

Defendants claim that bump firing with the assistance of belt loops and other commonly available aids would not be covered by their definitions because such "devices do not act automatically in directing recoil energy or controlling the distance of movement." Def. Reply & Opp. at 12. But once again, Defendants selectively ignore their own overbroad definitions as well as the facts. Bump firing with a belt loop indeed directs recoil and controls distance by *anchoring* the trigger finger and the firearm in a manner that would require more manual coordination without it. That anchor thus constrains both the direction and the distance of recoil as well as maintains the stationary position of the trigger finger and thus readily meets Defendants' erroneous definitions. Similarly, a shooting vest with slight padding or even a tennis ball at the shoulder constrains both the distance and direction of recoil when bump firing with a fixed stock. Such cushions allow some, but not too much, movement backwards towards the shoulder, thus facilitating linearity and control while bump firing.

Defendants further claim that such devices and other technological improvements are not designed for continuous fire and the shooter does not intend such fire. But that adds a limitation not found in the text of the statute. Under the statute, a "machinegun" includes "any *combination* of parts from which a machinegun *can* be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b)

(emphasis added).  This clause contains no requirement of design and intent, and a machine gun is simple a firearm that "shoots" in the defined manner, regardless of design or intent. Furthermore, because any form of bump-firing seems to fit Defendants' conception of a continuous shooting cycle initiated by a single pull of the trigger, an "intent" distinction evaporates the moment a person chooses to bump-fire a weapon, regardless of the presence of a bump-stock.

The only issue then would be whether a given attachment or improvement made the cycle "automatic" by relieving *any* aspect of manual input related to firing or controlling the firearm.[1]  A padded jacket, a pistol grip, and any number of modern improvements to firearms all satisfy that broad definition as well as Defendants' absurd reinterpretation of "self-acting" to include the actions of the shooter in addition to the mechanical operation of the firearm.[2]  Defendants seem to concede, at 12-13 & n. 5, that a potential combination of parts possessed by a firearm owner can satisfy the definition regardless of design or intent, and the operation of the statute would then turn on the degree of assistance such parts provided for bump-firing.  As discussed above, such "assistance" is indeterminate and satisfied by virtually anything under Defendants'

---

[1] And, of course, the relative degree of manual input needed or avoided depends largely on the baseline used – bump-firing a pistol, for example, requires significantly more manual effort and control over recoil than bump-firing a rifle.

[2] Defendants' claim that a belt loop is not a "part" that can be combined to make a machinegun because it is not *attached* to the firearm is incoherent.  The statute requires only a "combination" of parts, not any particular manner in which they are combined or "assembled" together. When used to assist bump-firing, a belt loop on the shooter's pants is indeed combined or assembled with the firearm when connected via the finger joining firearm and belt-loop together.  An auto-glove, which Defendants claim is a covered machinegun, is similarly combined with a firearm by the action of the shooter in transiently putting glove and trigger together while shooting.

overbroad construction.  Defendants simply cannot have it both ways, broadening and narrowing their definitions to reach whatever answer seems convenient.  That the criteria for defining when a firearm is sufficiently automatic are so variable as to lack any objective measures is precisely the problem and precisely why Defendants' definitions should be rejected.

The example of binary triggers reinforces the inconsistency of *Defendants'* approach. Defendants' only relevant claimed distinction is that the release of the trigger is a "second act of volition with the trigger finger."  Def Reply & Opp. at 13.  But the release of a binary trigger is no more or less volitional than the act of applying forward pressure to the forebody of a bump-stock equipped firearm in order to push the trigger into the stationary finger for the second and subsequent shots when bump-firing.[3]  That volitional forward pressure is distinct from the initial "pull" of the trigger finger for the first shot.  But even ignoring that commonality and recognizing that a binary trigger *can* be released via a volitional act on the part of the shooter, it can likewise be released *entirely as a result of recoil* causing the body of the firearm to move back and away from a stationary trigger finger with no further volitional conduct by the shooter.  Under Defendants' definitions, bump-firing an otherwise ordinary firearm equipped with a binary trigger thus would automatically fire two shots with only a single volitional act of initially pulling the trigger. Under Defendants' erroneous shooter-focused definition of "a

---

[3] If anything, merely releasing pressure on the trigger finger might involve less volition than maintaining a constantly titrated amount of forward pressure on the forebody of a bump-stock-equipped firearm.

single function of the trigger, that recoil-driven release would not be a separate

"function" of the trigger.[4]

### D. Congress in 1968 Ratified a Narrow Reading of the Definition of Machinegun

Plaintiffs' noted in their opening brief that the 1955 ruling that certain Gatling

guns were not machineguns was the extant interpretation of the statute at the time it was

reenacted and narrowed by Congress in 1968. Rev. Rul. 55-528, 1955-2 C.B. 482, 1955

WL 9410. Such firearms pre-existed the statutory definition of machinegun by decades

and were based on patents issued from 1862-1893.

Defendants claim, at 14, that reenactment is not ratification of administrative

interpretations where Congress may not have been aware of such interpretations. But

there is ample evidence that Congress was focused both on the breadth and the unwanted

limits of the NFA in general and the machine-gun definition in particular. The removal

of the words "or semi-automatically" from the definition amply demonstrates that

Congress considered the scope of the definition and found it to be overbroad, not unduly

narrow. While that is indeed a change, it is one that would reinforce, not contradict, a

narrow reading of the statute. And the addition elsewhere of restrictions on destructive

---

[4] Defendants have nothing to say about other firearm innovations that make it easier to bump-fire a firearm and are indeed attached to the firearm itself, such as including improved stocks, pistol grips, recoil compensators, adjustable tension for triggers, and improved bipods or tripods, just to name a few. Pl. Am. Opp. & Mem. at 21-22; Pl. SOF ¶ 2 (describing Hlebinsky affidavit discussing evolution of firearms technology). Those examples thus would encompass all such "improved" semi-automatic firearms, thus contradicting other parts of the statute and the 1968 amendments that make clear that semiautomatic firearms are legal.

devices demonstrated that Congress was acutely aware of the limitations of the NFA and its failure to reach other devices of concern.

Defendants' suggestion that there is no evidence that Congress was aware of the Gatling Gun ruling when it reenacted and narrowed the definition of machinegun ignores that such knowledge is generally presumed, particularly where Congress engaged in such a detailed and thorough revisiting of the relevant statute. *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]"; "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

Even assuming something more than a presumption of knowledge were required, the Senate Report accompanying the 1968 amendments amply demonstrates that Congress was aware of both judicial and administrative constructions of the NFA in general and the machinegun definition in particular, and added further provisions when it perceived a need. *See* Sen. Rep. 1501, Gun Control Act of 1968 (Judiciary Comm., September 6, 1968), at 42, 45-48. (repeated discussions of administrative and judicial interpretations of multiple provisions involved in the comprehensive overhaul of the NFA). The concern in *Brown v. Gardner*, 513 U.S. 115, 121 (1994) that Congress might not have been aware of a particular ruling is not present in this case. Indeed, the case upon which *Gardner* relied, *United States v. Calamaro*, 354 U.S. 351 (1957), involved a

far more uncertain situation where the "regulation had been in effect for only three years,[] and there is nothing to indicate that it was ever called to the attention of Congress", *id*. at 359.  Given that Congress in 1968 amply demonstrated its comprehensive review of the definitions of firearms and destructive devices, specifically narrowed the definitions of machine gun, specifically broadened the definition of destructive device to catch weapons, such as large-bore firearms, that it felt were improperly excluded, and otherwise demonstrated a keen awareness of the issues of gun safety.  While some subtle tax ruling might have been overlooked in *Gardner*, there is no basis for suggesting that Congress was unaware of Treasury's rulings on the scope of weapons covered by the NFA. And even apart from affirmative ratification, Congress leaving the ruling in place corroborates the existing "public meaning" of the statute at the time of reenactment.

That ATF in 1994 subsequently modified its Gatling gun stance to restrict motor-driven mini-guns, hardly speaks to what Congress understood or ratified in 1968, and there is no suggestion that Congress thereafter ratified such 1994 reversal.  And even a crank-driven Gatling gun, still deemed legal even today, contradicts Defendants' current redefinitions.  While not automatic in the proper sense of the word, such a device satisfies the Final Rule's overbroad definitions of a "self-regulating" or self-acting mechanism: it shoots multiple rounds as a result of the single volitional act of choosing to continuously apply pressure to the crank mechanism, which converts that continuous pressure into rotational force to drive multiple movements of the trigger.

## II.    IF THE STATUTE IS AMBIGUOUS, THE FINAL RULE IS INVALID

As noted in Plaintiffs' opening brief, at 27, courts should not interject arguments not raised by the parties, and it was error for the D.C. Circuit to rely on *Chevron* deference during the earlier appeal in this case.  Defendant still denies that they have discretion regarding the definition or that they exercised such discretion, and thus it would be an abuse of discretion to rule based on such deference.  In any event, deference would be inappropriate even if it had been raised.

### A. The Rule of Lenity Forecloses Executive Expansion of Ambiguous Criminal Statutes

While the above discussion amply demonstrates that Defendant's definitions are unreasonable, even if this Court thought such definitions plausible the arguments above certainly illustrate, at a minimum, gross ambiguity in the statutory language. Furthermore, eight decades of supposedly erroneous interpretations confirm that reasonable persons could not possibly be expected to discern what the Treasury and ATF's own experts and attorneys supposedly got wrong for decades.  The rule of lenity thus would apply.  Defendants only real response is to continue to claim that they are right regarding the meaning of the statute and hence there is no grievous ambiguity justifying lenity.  If they are indeed right, then, indeed, lenity would not come into play. But they are certainly wrong in suggesting the statute is plain and they are wrong is imagining there is no grievous ambiguity forcing reasonable people to guess how much manual input is enough to avoid criminal penalties.  They do not deny that lenity would apply before *Chevron* deference and make no attempt to dispute that if ambiguity is

sufficiently grievous to accord deference here, it is sufficiently grievous to trigger the rule of lenity.  If the Court again recognizes that at a minimum that statute is ambiguous and the Final Rule definitions make it even more so, lenity would kick in and the Final Rule would be contrary to law.

### B. *Chevron* Deference Does Not Apply or Was Waived by the Government.

Defendants briefly attempt, at 16-19, to defend *Chevron* deference in the alternative, while still claiming it is unnecessary.  Before doing so, however, they again concede that *Chevron* is inappropriate here and that ATF did not believe it had any discretion in defining a machinegun when it adopted the Final Rule.  Def. Opp. Mem. at 16-17.  Their only eventual defense, however, is that they believe there is no genuine ambiguity and that their interpretation is the best reading of the statute and hence is reasonable by definition.  In the end, therefore, Defendants make no attempt to rely on deference in the event this Court again finds statutory ambiguity and even seem to concede that the failure to recognize the existence of any "legislative" discretion would render its Final Rule arbitrary and capricious.  Def. Opp. Mem. at 18-19 (citing *PDK Labs.*, 362 F.3d at 798 (discussing whether remand is required when an "agency wrongly believes that [its] interpretation is compelled by Congress") (internal quotations omitted).  One cannot defer to a discretionary choice the agency did not believe it was making.

### C. *Chevron* Deference Violates the Constitution

Plaintiffs continue to preserve their constitutional claims insofar as they may be needed on appeal for a court in position to act upon those claims. *See* Pl. Am. Opp. &

Mem. at 28-32, 34; *Guedes*, 140 S. Ct. at 789-92 (Gorsuch, J., statement respecting the denial of cert.); Petition, *Guedes v. ATF*, No. 19-296 (U.S., Aug. 29, 2019).

### D. The Final Rule Is Unreasonable, Arbitrary, and Capricious

Seeming to admit that the failure to recognize discretion is error, Defendants nonetheless cite the harmless error rule.  But it is impossible to see why it is harmless to fail to exercise discretion.  Even if they believe their interpretation was the best interpretation of the language, they did not claim to consider the policy implications or the alternatives in the even they were not constrained by the statute.  They gave absolutely no consideration to many alternatives that would still be compatible with such an interpretation, for example by grandfathering certain bump stocks in precisely the manner actual machineguns were grandfathered.[5]  Such errors are not harmless in any conceivable sense, and Defendants' current assertion that ATF would have changed nothing if it knew it had discretion is precisely the type of litigation posturing that cannot be used to sustain an otherwise faulty regulation.  Defendants other arguments on how the result would not have changed simply beg the question by assuming a lack of discretion.  For example, a claimed lack of authority to issue an amnesty depends on the assumption that the statute itself necessarily prohibits bump stocks rather than merely giving the agency the option to ban them (or not).  If bump stocks do not *have* to be included in the definition of machinegun, and if the agency has the option of regulating

---

[5] *Cf.* ATF Ruling 82-8 https://www.atf.gov/file/58146/download, at p. 143-144 (SM10 and SM11A1 pistols and the SAC carbine are machine guns as defined in Section 5845(b) of the Act. … [T]his ruling will not be applied to SM10 and SM11A1 pistols and SAC carbines manufactured or assembled before June, 21, 1982.)

prospectively, as it did in this case, then amnesty is not forbidden by an inapplicable statute.  Failure to consider various partial measures if the statute can be construed more narrowly is reversible error. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020).

III.    APPLICATION OF DEFINITIONAL ISSUES TO SPECIFIC COUNTS

**A. Lack of Statutory Authority/Ultra Vires, APA Violation and Amnesty.**

As discussed in Plaintiffs' opening Memorandum, at __, these counts are simply vehicles for, and turn on, the resolution of the statutory definition issues.  They rise or fall accordingly.

**B.  Guedes Count II – Separation of Powers and Non-Delegation**

These counts come into play only to the extent this Court again relies on *Chevron* deference to uphold the Final Rule.  Plaintiffs' overarching objections to application of *Chevron* and the necessity of using the rule of lenity sound equally under constitutional delegation and separation of powers doctrines.  The arguments to such effect are laid out in the cases explaining why deference would be inappropriate in a case such as this one. *See* Pl. Am. Opp. & Mem. at 28-32, 34.

**C. Due Process and Takings**

The dues process issues largely run parallel to the delegation and lenity issues, as discussed in Plaintiffs' opening brief.  No more need be said.

As for the takings claims, Defendants' primarily rely on a supposed "police power" exception to the Taking Clause. Given that the Federal Government lacks a

general police power, presumably defendants mean any power delegated to the Federal Government, but, as explained below, that exception would then swallow the rule and always allow compensation to be avoided in that manner.

As the Supreme Court held in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) , there is a *per se* taking where there is "a direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession.'" (citation omitted).  See also; *Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 539 (2005) (same).  That principle full applies to personal property.  *Horne v. Department of Agric.,* 576 U.S. 350, 358 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

Taking property by declaring it contraband and requiring its destruction does not insulate the government from the duty to provide compensation.  If the Defendants lose on the interpretive issues, then the taking is an *ultra vires* act, would not be for public use, and hence would be an *invalid* taking that can be enjoined and subject to compensation for the temporary and unlawful taking. *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998) ("a court's conclusion that government agents acted unlawfully does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied"); *see also First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 320 (1987) (The government has a "duty to provide compensation for the period during which the taking was effective.").  Partial summary judgment on enjoining retention of confiscated bump-

stocks and finding liability for a temporary or permanent taking thus would be appropriate.

If Defendants prevail based on *Chevron* deference or on the view that the rule is "legislative," then the Rule would still constitute a compensable taking, as that result would necessarily recognize that these items were completely legal personal property prior to the effective date of the Rule and that plaintiffs had a cognizable property interest in their bump stocks protected by the Takings and Due Process Clauses of the Fifth Amendment. See *Lucas*, 505 U.S. at 1027 (the state "may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with").

Defendants' claims that bump stocks are dangerous hardly establishes that they were noxious property when purchased.  Indeed, the same could be said of *all* guns (and many other legal items), yet they can hardly be confiscated without compensation.  For example, in *Lucas*, the Supreme Court rejected the lower court's reliance on *Mugler v. Kansas*, 123 U.S. 623 (1887), for the proposition that no compensation is owing where the regulation "is designed 'to prevent serious public harm.'"  505 U.S. at 1009.  *Lucas* explained that *Mugler* simply was "our early formulation of the police power justification necessary to sustain without compensation *any* regulatory diminution." *Id*. at 1026.  The *Lucas* Court stressed that "the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed." 505 U.S. at 1027. The *Lucas* Court took considerable pains to stress this point, stating "[a]s we have said, a

'State, *by ipse dixit*, may not transform private property into public property without compensation....'" *Lucas*, 505 U.S. at 1031, quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980). Rather, the government "must identify background principles of nuisance and property law that prohibit the uses [the owner] now intends in the circumstances in which the property is presently found." *Lucas*, 505 U.S. at 1031. "Only on this showing can the State fairly claim that, in proscribing all such beneficial uses, the [statute] is taking nothing." *Id*.; *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (restating this test); *Lingle,* 544 U.S. at 538 (same).

Nothing in the Final Rule even attempts to apply to bump stocks any intrinsic "principles of nuisance and property law" that would make them contraband or otherwise unprotected by the Takings Clause.  Declaring them as such, *ipse dixit*, in a rulemaking proceeding, even if a hypothetically a valid exercise of discretion, does not relieve the government of its duty to provide just compensation.

### D.   Guedes Count IV – Ex Post Facto Clause; Codrea Count VI – Retroactive Rulemaking and Ex Post Facto Clause

The Ex Post Facto Clause and retroactivity analyses rise or fall with the definitional analysis.  If this Court, however, relies on *Chevron* deference to uphold a prospective-only incorporation of bump-stocks into the definition of machineguns, it should make clear that such analysis necessarily precludes retroactive application of the rule to conduct that was lawful when undertaken prior to the effective date of the Final Rule.

## CONCLUSION

This Court should deny Defendant's Motion for Summary Judgement, grant Plaintiff's Cross-Motion for Summary Judgment, and resolve the individual counts accordingly, as described above.


Respectfully Submitted,

/s/ Joshua Prince
Joshua Prince
D.D.C. Bar No. PA0081
Joshua@princelaw.com

/s/ Adam Kraut
Adam Kraut
D.D.C. Bar No. PA0080
AKraut@princelaw.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
*Counsel for Guedes Plaintiffs*

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh
D.D.C. Bar No. MS0009
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS 39130
(601) 852-3440
stephen@sdslaw.us

Alan Alexander Beck
D.D.C. Bar No. HI001
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(615) 905-9105
alan.alexander.beck@gmail.com

*Counsel for Codrea Plaintiffs*

Erik S. Jaffe
D.C. Bar No. 440112
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com

*Of Counsel*

**CERTIFICATE OF SERVICE**

I, Adam Kraut, hereby certify that I have filed with the Clerk of this Court, a true and correct copy of the foregoing document or pleading, utilizing this Court's CM/ECF system, which generated a Notice and delivered a copy of this document or pleading to all counsel of record.

Dated: August 21st, 2020.

*/s/ Adam Kraut*
Adam Kraut