## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DAMIEN GUEDES, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS, AND EXPLOSIVES, *et al.*,<br><br>*Defendants*. | No. 18-cv-2988 (DLF) |
| DAVID CODREA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MONTY WILKINSON,[1] Acting Attorney<br>General, *et al.*,<br><br>*Defendants*. | No. 18-cv-3086 (DLF) |

## <u>MEMORANDUM OPINION</u>

On October 1, 2017, a lone gunman opened fire on a concert in Las Vegas, killing 58 people and injuring hundreds more. He used weapons equipped with bump stocks, which allow a semiautomatic gun to fire at a faster rate. Following this tragedy, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) promulgated a rule that classifies weapons equipped with bump stocks as machineguns under the National Firearms Act, 26 U.S.C. §§ 5801–5872,

---

[1] Matthew G. Whitaker was the Acting Attorney General when this suit was filed; Monty Wilkinson, the current Acting Attorney General, was automatically substituted in the case caption. *See* Fed. R. Civ. P. 25(d).

thus rendering them unlawful to possess.  *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514 (Dec. 26, 2018).  The plaintiffs brought suit, in separate cases, to enjoin the rule.  This Court held a hearing on their motion for a preliminary injunction and denied the injunction, *see Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) ("*Guedes I*"); the D.C. Circuit affirmed, *see Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) ("*Guedes II*").  Now before the Court are the defendants' Motions for Summary Judgment, Dkt. 38 (*Codrea*); Dkt. 61 (*Guedes*), and the plaintiffs' Cross Motions for Summary Judgment, Dkt. 44 (*Codrea*), Dkt. 62 (*Guedes*).[2]  For the same reasons articulated in the Court's previous Memorandum Opinion and by the D.C. Circuit, the Court will grant the defendants' motions for summary judgment and deny the plaintiffs' cross-motions.

## I.    BACKGROUND

The Court previously recounted in detail the facts and regulatory history underlying this lawsuit.  *See Guedes I*, 356 F. Supp. 3d at 119–26.  To summarize, the central legal question in this dispute is whether the National Firearm Act's definition of "machinegun" can encompass bump stock devices.  A bump stock replaces a semiautomatic rifle's standard stock—the part of the rifle that rests against the shooter's shoulder—and enables the shooter to achieve a faster firing rate.  To use a bump stock, the shooter must maintain forward pressure on the barrel and, at the same time, pull the trigger and maintain rearward pressure on the trigger.  Once the shooter pulls the trigger, a bump stock harnesses and directs the firearm's recoil energy, thereby forcing

---

[2] The parties filed identical briefs in each of the above-captioned cases.  *See* Defs.' Mot. for Summ. J., Dkt. 38 at 1 n.1 (*Codrea*) (noting the parties' agreement to file identical motions and responses in each case).  Accordingly, the Court addresses the motions together.  In the interest of clarity, the Court will note the accompanying case name in a parenthetical following the citation of a docket entry.

the firearm to shift back and forth, each time "bumping" the shooter's stationary trigger finger. The shooter is thus able to reengage the trigger without additional pulls of the trigger.

The relevant statutes at issue are the National Firearms Act of 1934 (NFA) and the Firearm Owners Protection Act of 1986 (FOPA). The NFA provides the following definition for the term "machinegun":

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). The FOPA generally makes it "unlawful for any person to transfer or possess" a newly manufactured "machinegun," 18 U.S.C. § 922(o), and incorporates the NFA's definition of that term, 18 U.S.C. § 921(a)(23) ("The term 'machinegun' has the meaning given such term in . . . the National Firearms Act."). The FOPA also amended a previous grant of rulemaking authority to provide that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." 18 U.S.C. § 926(a); *see also Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 478 (4th Cir. 1990) (discussing the statutory change).

On March 29, 2018, ATF proposed the rule banning bump stocks and formally provided the public with 90 days, as required by 18 U.S.C. § 926(b), to submit written comments online, by mail, or by facsimile. Bump-Stock-Type Devices, 83 Fed. Reg. at 13442 (proposed Mar. 29, 2018). In the final rule published on December 26, 2018, ATF reversed its earlier position and concluded that a standard bump stock device is a "machinegun" as defined in the NFA. *Id.* at 66543, 66553. ATF interpreted the term "single function of the trigger" to mean a "single pull of

the trigger." *Id.* at 66553.  ATF also interpreted "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger." *Id.*  Based on these definitions, ATF added a sentence to the regulatory definition of "machinegun" to make clear that the term "machinegun" in the NFA includes "bump-stock-type device[s]," which "allow[] a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66553–54.  Under the rule, "current possessors" of bump stocks must either destroy them or abandon them at an ATF office.  *Id.* at 66530.

The *Guedes* plaintiffs filed their complaint and moved for a preliminary injunction on December 18, 2018.  *See* No. 18-cv-2988, Dkt. 1, 2.  The *Codrea* plaintiffs filed their complaint on December 27, 2018, *see* No. 18-cv-3086, Dkt. 1, and likewise moved for a preliminary injunction on January 18, 2019.  *See* Dkt. 5 (*Codrea*).  Following hearings on February 6, 2019 (*Guedes*) and February 19, 2019 (*Codrea*), the Court denied the motions for a preliminary injunction because the plaintiffs lacked a reasonable likelihood of success on the merits of their legal theories.  *See Guedes I*, 356 F. Supp. 3d 109 (D.D.C. 2019).  The D.C. Circuit affirmed. *See Guedes II*, 920 F.3d 1.  In relevant part, the D.C. Circuit held that the bump stock rule was a legislative rule, that *Chevron* deference was proper, and that ATF reasonably interpreted the ambiguous statute.  *See generally id.*  The plaintiffs then petitioned the Supreme Court of the United States for a writ of certiorari, which the Court denied.  *See Guedes v. ATF*, No. 19-296,

140 S. Ct. 789 (Mar. 2, 2020).[3]  The cross-motions for summary judgment in the two cases are now ripe for review.

## II.    LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See id.* at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an Administrative Procedure Act case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard

---

[3] Justice Gorsuch filed a Statement with the denial of certiorari explaining his view that *Chevron* deference is inappropriate in this case.  140 S. Ct. 789 (Statement of Justice Gorsuch).

requires that agency rules be reasonable and reasonably explained.").  The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).  When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted).  For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  The party challenging an agency's action as arbitrary and capricious bears the burden of proof.  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

To the extent that an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by the two-step *Chevron* doctrine.  At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue" or instead has delegated to an agency the legislative authority to "elucidate a specific provision of the statute by regulation." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44.  If the latter, a court must reach Step Two, which asks whether the agency action "is based on a permissible construction of the statute" or instead is "manifestly contrary to the statute." *Id.* at 843, 844.

III.    **ANALYSIS**

The plaintiffs bring several claims under the Administrative Procedure Act (APA), 5

U.S.C. § 551 *et seq*.  *See generally* Compl. Dkt. 1 (*Codrea*); Compl. Dkt. 1 (*Guedes*).  The APA

provides that a court must "hold unlawful and set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2).  The plaintiffs principally argue that the bump stock rule cannot be

squared with the statutory definition of a machinegun, that ATF lacked statutory authority to

promulgate the rule as it did, that ATF arbitrarily drew lines in distinguishing bump stocks from

other devices, that ATF should have held a public hearing, that ATF improperly changed its

previous position, and that ATF was unduly influenced by political actors.  *See generally* Am.

Memo. in Supp. of Pls.' Cross Mot. for Summ. J., Dkt. 41 (*Codrea*).  In addition to the APA

claims, the plaintiffs also bring due process, separation of powers, and takings claims.[4]  *Id.*

   **A.  The APA Claims**

1.    *ATF's Statutory Interpretation*

Invoking its general rulemaking authority under § 926(a), ATF promulgated the bump

stock rule based on its interpretation of "single function of the trigger" and "automatically," two

terms that Congress left undefined.  ATF defined the phrase "single function of the trigger" to

mean a "single pull of the trigger and analogous motions."  83 Fed. Reg. at 66553.  And it

defined "automatically" to mean "functioning as the result of a self-acting or self-regulating

---

[4] At the preliminary injunction stage, the plaintiffs also brought a statutory and constitutional
challenge to Matthew Whitaker's designation as Acting Attorney General.  "This case no longer
presents a challenge to the validity of the designation of former Acting Attorney General
Matthew Whitaker," however, as that question "has already been litigated to dismissal in a
separate case before this Court."  Defs.' Mot. for Summ. J. at 8 n.6 (citing *Firearms Policy Coal.
v. Barr*, 419 F. Supp. 3d 118 (D.D.C. 2019)); *see generally* Am. Memo. in Supp. of Pls.' Cross
Mot. for Summ. J. (not raising the Whitaker issue on summary judgment).

mechanism that allows the firing of multiple rounds through a single function of the trigger." *Id.* Applying these definitions, it added a sentence to the regulatory definition of "machinegun" that explicitly states that the term "includes a bump-stock-type device," which "allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *Id.* at 66553–54.

### a.   Whether the *Chevron* Doctrine Applies

Because ATF interpreted a statute in promulgating the bump stock rule, the threshold question is whether the *Chevron* doctrine applies.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The plaintiffs argue that *Chevron* deference does not apply because 1) ATF waived *Chevron*, 2) the rule of lenity should prevent the application of *Chevron*, and 3) *Chevron* is unconstitutional.  The first two arguments have already been addressed in detail by the D.C. Circuit in *Guedes II*, which held that the application of *Chevron* deference in this case was proper, 920 F.3d at 17–22, and the third argument is foreclosed by binding precedent.  The Court will address each in turn.

First, as to waiver,[5] the D.C. Circuit held that "an agency's lawyers . . . cannot waive *Chevron* if the underlying agency action 'manifests its engagement in the kind of interpretive

---

[5] It is not entirely clear that the defendants waived *Chevron* deference before this Court, even if such a waiver were possible.  In the rulemaking itself, ATF explicitly relied on *Chevron*, invoking the doctrine by name and applying traditional two-step *Chevron* analysis.  *Guedes II*, 920 F.3d at 8, 19 (noting that ATF "elaborate[ed] at length as to how *Chevron* applies to the Rule").  When the Court raised the issue of *Chevron* at the preliminary injunction hearing, *see* Transcript of Preliminary Injunction Hearing at 57:12–13, Dkt. 25 (*Codrea*), counsel for the plaintiffs responded that none of the parties had briefed the issue, *id.* at 57:18–20, and counsel for the defendants did not address the issue during the hearing, *see generally id.*  Now, at the

exercise to which review under Chevron generally applies.'"  *Id.* at 23 (citing *SoundExchange,*

*Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018)).  It further held that "[i]n this

case, the Bump-Stock Rule plainly indicates the agency's view that it was engaging in a

rulemaking entitled to Chevron deference."  *Id.*  For example, the agency specifically referenced

the *Chevron* doctrine in its rulemaking.  *See id.* ("[A]nother telltale sign of the agency's belief

that it was promulgating a rule entitled to *Chevron* deference is the Rule's invocation of *Chevron*

by name."); 83 Fed. Reg. at 66,527 (invoking *Chevron*).  Accordingly, any supposed waiver at

the summary judgment stage cannot overcome this conclusion.[6]  Second, the argument that the

rule of lenity should precede *Chevron* deference, or more broadly, that *Chevron* should not apply

---

summary judgment stage, the defendants argue that if the Court *were* to apply *Chevron*, the rule
*should* be upheld on that basis.  Defs.' Reply, Dkt. 42 at 17–18 (*Codrea*).  At oral argument
before the Court of Appeals, however, government counsel informed the Court that "if the Rule's
validity turns on the applicability of *Chevron*, it would prefer that the Rule be set aside rather
than upheld under Chevron."  *Guedes II*, 920 F.3d at 21.  These mixed signals leave some
question as to whether the defendants waived *Chevron* deference.  *Wood v. Milyard*, 566 U.S.
463, 470 n.4 (2012) ("A waived claim or defense is one that a party has knowingly and
intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve."); *see
also Guedes II*, 920 F.3d at 22 (noting that the D.C. Circuit has already held that an agency
cannot *forfeit Chevron* deference if the forfeiture is not consistent with the agency's underlying
actions).  Ultimately, though, the D.C. Circuit's clear holding on waiver in *Guedes II* renders the
question academic.

[6] For this same reason, any argument that ATF was operating under the mistaken assumption that
it lacked discretion to interpret the statutory text does not accord with the administrative record.
*See* Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 36.  In truth, "[t]he agency plainly
believed it was acting in a manner warranting *Chevron* treatment given that it expressly invoked
the *Chevron* framework in the Rule."  *Guedes II*, 920 F.3d at 21.  For example, in response to
comments, ATF explained that it "ha[d] the authority to interpret elements of the definition of
'machinegun' like 'automatically' and 'single function of the trigger,'" and that its "*construction*
of those terms is *reasonable* under *Chevron*." 83 Fed. Reg. at 66,526–27 (emphasis added); *see
Guedes II*, 920 F.3d at 23.  Though ATF also emphasized that the rule's interpretations were
consistent with the plain meaning of those terms, *id.* at 66527, it concluded that, "even if those
terms are ambiguous, this rule rests on a reasonable construction of them."  *Id.*  That ATF
believed (and continues to believe) that its interpretation accords with the best reading of the text
does not mean that the agency labored under an incorrect assumption requiring remand.

in cases involving criminal penalties, is foreclosed by the weight of precedent to the contrary. As the D.C. Circuit discussed at length, the Supreme Court has repeatedly applied *Chevron* to regulations with criminal implications. *Guedes II*, 920 F.3d at 24 (listing examples). Indeed, in the case of *Chevron v. NRDC* itself, the regulation in controversy contained a criminal penalty of up to one year of imprisonment. *Id.* The securities laws, which frequently receive *Chevron* deference despite the criminal implications of securities regulations, provide another compelling example. *Id.* (collecting cases).

To be sure, the Supreme Court has stated that "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). Yet despite this principle, the Supreme Court has never held—in the face of the many examples to the contrary—that *Chevron* does not apply in cases with criminal implications, or that the rule of lenity subsumes *Chevron*. *Guedes II*, 920 F.3d at 27. In fact, as to lenity, "the [Supreme] Court squarely rejected the argument that 'the rule of lenity should foreclose any deference to' the agency's interpretation of a statute simply 'because the statute includes criminal penalties.'" *See id.* at 27 (citing *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18, (1995)). And the D.C. Circuit, relying on *Babbitt*, has done the same. *Competitive Enter. Inst. v. United States Dep't of Transportation*, 863 F.3d 911, 915 n.4 (D.C. Cir. 2017) ("We apply the *Chevron* framework to this facial challenge even though violating § 41706 can bring criminal penalties.") (citing *Babbitt*, 515 U.S. at 704 n.18)). Finally, as for the argument that *Chevron* deference violates the Constitution, this Court is bound by the precedent of *Chevron v. NRDC*, 467 U.S. 837, and must apply the doctrine as precedent dictates.

b. Whether ATF Is Entitled to *Chevron* Deference

Under the familiar *Chevron* framework, "[i]f Congress has directly spoken to [an] issue, that is the end of the matter." *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830

F.3d 552, 558 (D.C. Cir. 2016) (citing *Chevron*, 467 U.S. 837).  "[T]he court, as well [as] the agency, must give effect to the unambiguously expressed intent of Congress." *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 842–43).  But if the text is silent or ambiguous, courts must "determine if the agency's interpretation is permissible, and if so, defer to it." *Confederated Tribes of Grand Ronde Cmty.*, 830 F.3d at 558. To determine "whether a statute is ambiguous" and "ultimately . . . whether [an] agency's interpretation is permissible or instead is foreclosed by the statute," courts "employ all the tools of statutory interpretation." *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014).  Most importantly, courts "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks and alteration omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

The first question, then, is whether the statutory language at issue here is ambiguous. Both this Court at the preliminary injunction stage and the D.C. Circuit on appeal determined that the statutory language was ambiguous.  *See Guedes II*, 920 F.3d at 28–30; *Guedes I*, 356 F. Supp. 3d at 130–32.  In particular, this Court recognized that although "Congress defined 'machinegun' in the NFA to include devices that permit a firearm to shoot 'automatically more than one shot, without manual reloading, by a single function of the trigger,'" *Guedes I*, 356 F. Supp. 3d at 120 (quoting 26 U.S.C. § 5845(b)), "it did not further define the terms single function of the trigger or automatically." *Id.* (internal quotation marks omitted).  This Court went on to employ the ordinary tools of statutory interpretation, including contemporaneous dictionary definitions, to find that the terms "single function of the trigger" and "automatically"

11

in this context are ambiguous. *Guedes I*, 356 F. Supp. 3d at 130–32. The D.C. Circuit likewise held that "the statutory phrase 'single function of the trigger' admits of more than one interpretation." *Guedes II*, 920 F.3d at 29. "It could mean a mechanical act of the trigger," *id.* at 29 (internal quotation marks omitted), an interpretation that would "tend to exclude bump-stock devices," *id.*, *or* it could mean "a single pull of the trigger from the perspective of the shooter," *id.*, which "would tend to include bump-stock devices." *Id.* In other words, the statutory language remains ambiguous.[7]

Thus, the next step is to determine whether or not ATF's interpretation of the statutory language is reasonable. "This inquiry, often called *Chevron* Step Two, does not require the best interpretation, only a reasonable one." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 492 (D.C. Cir. 2016) (internal quotation marks omitted); *see also id.* ("We are bound to uphold agency

---

[7] The plaintiffs attempt to overcome this conclusion by arguing that Congress "ratified" their interpretation of the statutory language to exclude bump stocks. *See* Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 24 (referencing Pub. L. 90-618, 48 Stat. 1213, 1231 (Oct. 22, 1968)). By way of background, in 1955, ATF interpreted the NFA's definition of machinegun to include some Gatling guns while excluding others. Revenue Ruling 55-528, 1955 WL 9410 (Jan. 1, 1955). Thirteen years later, in 1968, Congress reenacted the NFA's definition of machinegun with one change— it removed the phrase "or semiautomatically" from the first sentence. *See* Pub. L. 90-618, 48 Stat. 1213, 1231 (Oct. 22, 1968). The plaintiffs contend that this congressional action implies that bump stocks cannot be included in the current definition. *See* Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 24. No doubt, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute *without change*." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). But that is not the case here. In fact, Congress reenacted the statute (over a decade later) with a major change entirely unrelated to ATF's interpretation on Gatling guns. Further, the plaintiffs point to no evidence that ATF's interpretation on Gatling guns so settled the definition of "machinegun" that it implicitly bound the future Congress. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have *settled* the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.") (emphasis added). In sum, this argument is unpersuasive.

interpretations regardless [of] whether there may be other reasonable, or even more reasonable, views." (internal quotation marks and alteration omitted)).

The interpretation of the phrase "single function of the trigger" is reasonable. *See Guedes II*, 920 F.3d at 31.  Courts have often used the word "pull" when discussing the statutory definition of "machinegun."  The Supreme Court, for example, explained that the statutory definition encompasses a weapon that "fires repeatedly with *a single pull of the trigger*," meaning "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) (emphasis added).  The Court then contrasted automatic machineguns with semiautomatic weapons that "fire[] only one shot with each pull of the trigger" and "require[] no manual manipulation by the operator to place another round in the chamber after each round is fired." *Id.*  And the Eleventh Circuit adopted a similar interpretation when it upheld ATF's decision to treat Akins Accelerators as machineguns because "a single application of the trigger by a gunman"—a single pull—caused the gun with the affixed bump stock to "fire continuously . . . until the gunman release[d] the trigger or the ammunition [wa]s exhausted." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009).  The Tenth Circuit has held that a uniquely designed firearm was "a machine gun within the statutory definition" because "the shooter could, *by fully pulling the trigger*, and it only, at the point of maximum leverage, obtain automation with a single trigger function." *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (emphasis added).  In sum, ATF acted reasonably in defining the phrase "single function of the trigger" to mean a "single pull of the trigger and analogous motions."  83 Fed. Reg. at 66553.

The interpretation of the word "automatically" in this context is also reasonable. *See Guedes II*, 920 F.3d at 31.  ATF reasoned that a bump stock permits a firearm to function

automatically by "directing the recoil energy of the discharged rounds into the space created by the sliding stock . . . in constrained linear rearward and forward paths" so that the shooter can maintain a "continuous firing sequence." *Id.* at 66532 (internal quotation marks omitted).  It is true that a firearm with an affixed bump stock requires *some* manual inputs: the shooter must "maintain[] constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintain[] the trigger finger on the device's extension ledge with constant rearward pressure."  83 Fed. Reg. at 66532 (internal quotation marks omitted).  But the definition of "automatically" does not mean that an automatic device must operate without *any* manual input.  *See Guedes II*, 920 F.3d at 30 ("The term automatically does not require that there be no human involvement to give rise to more than one shot.  Rather, the term can be read to require only that there be limited human involvement to bring about more than one shot." (internal quotation marks omitted)); *Guedes I*, 356 F. Supp. 3d at 131, 133.  As ATF explained, without a bump stock, the shooter would have to "manually capture, harness, or otherwise utilize th[e] [recoil] energy to fire additional rounds" and "bump fire" a gun.  83 Fed. Reg. at 66532.  In other words, the bump stock makes it easier to bump fire because it controls the distance the firearm recoils and ensures that the firearm moves linearly—two tasks the shooter would ordinarily have to perform *manually*.  In this way, a bump stock creates a "self-acting mechanism" that permits "the discharge of multiple rounds" with "a single function of the trigger . . . without manual reloading."  *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (defining the term "automatically" in the NFA's definition of "machinegun").  In conclusion, ATF reasonably interpreted an ambiguous statute, and its interpretation is entitled to deference.

2.    *ATF's Authority to Promulgate the Bump Stock Rule*

For many of the same reasons, the plaintiffs' argument that ATF lacked the authority to state that the NFA's definition of "machinegun" includes bump stocks is unavailing.  *See* Am.

Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 39.  Courts "presume that when an agency-administered statute is ambiguous with respect to what it prescribes, Congress has empowered the agency to resolve the ambiguity."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 315 (2014).  Agencies are therefore entitled to deference when they reasonably define ambiguous terms—including ambiguous terms in a statutory definition—and apply those terms to new circumstances.  *See Loving*, 742 F.3d at 1016.  Courts defer even when agencies "make policy choices in interpreting [a] statute," "as long as [they] stay[] within [Congress'] delegation [of authority]."  *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995); *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 55–56 (2011) ("*Chevron* recognized that the power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." (internal quotation marks and alterations omitted)).

It follows that courts have regularly recognized ATF's authority to interpret and apply the statutes that it administers, including the NFA's definition of "machinegun."  *See, e.g.*, *Akins*, 312 F. App'x at 200 (deferring to ATF's decision to classify the Akins Accelerator as a machinegun); *see also York v. Sec'y of Treasury*, 774 F.2d 417, 419–20 (10th Cir. 1985) (upholding ATF's decision to classify a particular firearm as a machinegun); *cf. Brady*, 914 F.2d at 480 (holding that ATF has discretion to define the term "business premises" in another firearms statute).  The same is true here—the plaintiffs have not established that ATF lacked authority to promulgate the bump stock rule.

3.    *ATF's Procedures and Evaluation of the Evidence*

Even when an interpretation is reasonable under *Chevron*, "agency action is always subject to arbitrary and capricious review under the APA."  *Confederated Tribes of Grand Ronde Cmty.*, 830 F.3d at 559.  An interpretation is arbitrary and capricious if the agency "relied on

factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation" that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). Put simply, "[t]he agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1110 (D.C. Cir. 2019) (quoting *State Farm*, 463 U.S. at 43).

Often the inquiry under *Chevron* Step Two overlaps with arbitrary and capricious review because "under *Chevron* step two, the court asks whether an agency interpretation is arbitrary and capricious in substance." *Agape Church*, 738 F.3d at 410 (alteration omitted) (quoting *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)). At bottom, a reviewing court must decide whether an agency action is "within the scope of [the agency's] lawful authority" and supported by "reasoned decisionmaking." *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006) (internal quotation marks omitted); *see also id.* ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." (internal quotation marks omitted)).

First, the plaintiffs take issue with how ATF distinguished between bump stocks and other devices or techniques. The plaintiffs note, for example, that "[o]ther simple physical aids, like a belt-loop, a rubber band, any fixed stock itself, or a padded shooting jacket, likewise facilitate bump firing by constraining movement of the firearm, maintaining linearity during recoil, controlling the distance of recoil, and myriad other things a shooter otherwise would have do through greater manual effort." Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 23.

But ATF properly considered (and ultimately rejected) this argument raised in the comment period with a response in the rule itself.  *See* 83 Fed. Reg. at 66,532–34; *see also Guedes II*, 920 F.3d at 32.  The rule explained that these other physical aids are distinct from bump stocks because they involve no "self-acting or self-regulating mechanism," 83 Fed. Reg. at 66,532–34, and are not "designed to be affixed" to a semiautomatic weapon.  *Id.* at 66516.  "Bump firing without the aid of a bump-stock-type device is therefore 'more difficult' because it relies solely on the shooter 'to control the distance that the firearm recoils and the movement along the plane on which the firearm recoils.'"  *Guedes II*, 920 F. 3d at 32 (citing 83 Fed. Reg. at 66,533).  So too, ATF adequately considered and responded to the argument that binary trigger guns are arbitrarily excluded from the rule's purview.  A binary trigger gun shoots two rounds—one after the initial pull of the trigger and one when the trigger is released.  *See* 83 Fed. Reg. at 66,534.  The Rule explains that these firearms are not machineguns under ATF's definition because the second round is "the result of a separate function of the trigger."  *Id.*; *see Guedes II*, 920 F.3d at 33 ("the Rule reasonably distinguishes binary-trigger guns on the ground that they require a second act of volition with the trigger finger") (emphasis omitted); *Guedes I*, 356 F. Supp. 3d at 136 ("ATF adequately and reasonably responded to comments arguing that the 'proposed regulatory text encompasses . . . binary triggers'").

Second, the plaintiffs argue that ATF impermissibly relied on political pressure, namely from the President, to promulgate the bump stock rule.  Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 37.  There is no doubt that one impetus for the rule was the political outcry following the Las Vegas mass shooting.  *See Guedes II*, 920 F.3d at 34.  "But that is hardly a reason to conclude that the Rule is arbitrary."  *Id.*  "Presidential administrations are elected to make policy.  And as long as the agency remains within the bounds established by Congress, it is

entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* (internal quotation marks omitted).  In any case, "the agency has articulated a satisfactory explanation for the Bump-Stock Rule. And the administrative record reflects that the agency kept an open mind throughout the notice-and-comment process and final formulation of the Rule." *Id.*

Finally, for the reasons discussed in the Court's previous Memorandum Opinion, ATF was not required to hold a formal public hearing (in addition to its notice-and-comment procedures).  *See Guedes I*, 356 F. Supp. 3d at 136–137.  And ATF's decision not to extend the comment period an extra five days after some users reported initial difficulties in submitting comments (but were eventually successful) was harmless error, at most.  *See id.* (citing *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 239 (1973)); *see also PDK Labs. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If [an] agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

### 4.    *ATF's Change in Position*

The agency's change in position on the question of whether a bump stock is a machinegun does not render its position arbitrary and capricious.  *See Guedes I*, at 133–34. When an agency changes its position, it must "display awareness" of the change, but it is not required to meet a "heightened standard for reasonableness."  *Mary V. Harris Found. v. FCC*, 776 F.3d 21, 24 (D.C. Cir. 2015) (internal quotation marks omitted).  "A reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (internal quotation marks and alteration omitted). But "[s]o long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating that [an] earlier decision should be altered or

abandoned." *New England Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018).  Put differently, the agency need only "show that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" than the previous policy.  *Mary V. Harris Found.*, 776 F.3d at 24–25 (emphasis and internal quotation marks omitted).

It is well established that an agency may change its prior policy if "the new policy [is] permissible under the statute, and the agency . . . acknowledge[s] it is changing its policy and show[s] that there are good reasons for the new policy and that the agency believes it to be better, which the conscious change of course adequately indicates."  *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (emphasis and internal quotation marks omitted); *see also Mary V. Harris Found.*, 776 F.3d at 24 ("What the [agency] did in the past is of no moment . . . if its current approach reflects a permissible interpretation of the statute.").

Here, ATF acknowledged that it was "reconsider[ing] and rectify[ing]" its previous classification decisions based on its legal analysis of the statutory terms "automatically" and "single function of the trigger."  83 Fed. Reg. at 66516 (quoting *Akins*, 312 F. App'x at 200).  It discussed the history of its regulation of Akins Accelerators and the Eleventh Circuit's decision in *Akins*.  *Id.* at 66517.  It also explained that it had previously determined that "semiautomatic firearms modified with [standard] bump-stock-type devices did not fire 'automatically,' and thus were not 'machineguns.'"  *Id.* at 66516.  The mass shooting in Las Vegas then prompted ATF to reconsider its prior interpretations, *id.* at 66528–29, none of which provided "extensive legal analysis of the statutory terms 'automatically' or 'single function of the trigger,'" *id.* at 66516.  ATF reviewed dictionary definitions of "automatically," relevant judicial decisions—including *Staples*, *Olofson*, and *Akins*—and the NFA's legislative history to determine whether standard

bump stocks constitute machineguns. *Id.* at 66518–19. It then concluded that its previous interpretations "did not reflect the best interpretation of 'machinegun,'" *id.* at 66514, and that the rule's interpretations of "automatically" and "single function of the trigger" better "accord with the plain meaning of those terms," *id.* at 66527. Thus, ATF satisfied its obligation to "reasonably explain[]" its change of position. *New England Power Generators Ass'n*, 879 F.3d at 1201.

### B.  The Takings Claim

The plaintiffs assert that the bump stock rule violates the Takings Clause because it fails to provide compensation to bump stock owners who must destroy or abandon their weapons. They seek injunctive relief or, in the alternative, compensatory damages. Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 41–42.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. It "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 315 (1987). "[I]n general, 'equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to that taking.'" *Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 99 (D.C. Cir. 2001) (alteration omitted) (quoting *United States v. Riverside Bayview Homes*, 474 U.S. 121, 127–28 (1985)). Indeed, "the Fifth Amendment does not require that just compensation be paid in advance of or even contemporaneously with the taking." *Preseault v. ICC*, 494 U.S. 1, 11 (1990). It requires only "the existence of a reasonable, certain and adequate provision for obtaining compensation at the time of the taking." *Id.* (internal quotation marks

omitted).  Because the plaintiffs have made no showing that a suit for compensation is

inadequate to satisfy the demands of the Fifth Amendment—or that any other doctrinal exception

applies, injunctive relief is unavailable.

The plaintiffs also are not entitled to compensatory damages.  In particular, they have not

shown that bump stocks "were taken for a public use" rather than "seized or retained pursuant to

a valid exercise of the government's police power."  *Modern Sportsman, LLC v. United States*,

145 Fed. Cl. 575, 581 (2019).  It is well settled that a "prohibition simply upon the use of

property for purposes that are declared, by valid legislation, to be injurious to the health, morals,

or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of

property for the public benefit."  *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887).  After all,

"[t]he exercise of the police power by the destruction of property which is itself a public

nuisance . . . is very different from taking property for public use, or from depriving a person of

his property without due process of law."  *Id.* at 669.

It is for this reason that "[t]he government may not be required to compensate an owner

for property which it has already *lawfully* acquired under the exercise of governmental authority

other than the power of eminent domain."  *Bennis v. Michigan*, 516 U.S. 442, 452 (1996)

(emphasis added).  And as discussed above, the bump stock rule was promulgated according to

ATF's valid authority under the relevant statutes and in light of the ambiguous statutory text.

*See supra* at 13.  So too, the bump stock rule exercises the federal government's limited police

power as it relates to public safety.  *See Acadia Tech., Inc. v. United States*, 65 Fed. Cl. 425, 429

(2005) ("[I]f [property] is taken to prevent public harm, the government action may be an

exercise of police power."), *aff'd*, 458 F.3d 1327, 1332 (Fed. Cir. 2006); *Modern Sportsman*, 145

Fed. Cl. at 582 (noting that "where the purpose of a regulation which causes interference with

property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required"). "The ATF regulation at issue here was promulgated pursuant to statutory authority and consistent with our nation's 'historical tradition of prohibiting [] dangerous and unusual weapons.'" *McCutchen v. United States*, 145 Fed. Cl. 42, 52 (2019) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (internal quotation marks omitted)). Thus, this case evinces the "paradigmatic example of the exercise of the government's police power, which defeats any entitlement to compensation under the Takings Clause." *Id.* at 52.

Based on these well-settled precedents, every Court to have considered a takings challenge in response to bump stock rules has rejected the claim. *See, e.g.*, *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356 (4th Cir. 2020); *Modern Sportsman*, 145 Fed. Cl. 575 (2019); *McCutchen*, 145 Fed. Cl. 42 (2019); *see also Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) (holding that ATF's revision of its interpretation to include bump stocks did not give rise to a compensable taking because "[p]roperty seized and retained pursuant to the police power is not taken for a public use in the context of the Takings Clause" (internal quotation marks omitted)). This Court will do the same.

### C.  The Remaining Claims

Finally, the plaintiffs raise two additional claims: first, that the bump stock rule violates the Ex Post Facto Clause; and second, that the underlying statutes are void for vagueness.[8]

#### 1.  *The Ex Post Facto Clause*

The plaintiffs assert that the bump stock rule is unlawfully retroactive.  *See* U.S. Const., art. I § 9, cl. 3 ("No . . . ex post facto Law shall be passed.").  The D.C. Circuit recognized that the plaintiffs forfeited this argument by failing to raise it before this Court in the initial proceedings.  *Guedes II*, 920 F.3d at 35.  Even if the argument were properly raised, though, the text of the rule itself forecloses this argument.  The rule establishes that anyone "in possession of a bumpstock type device is not acting unlawfully unless they fail to relinquish or destroy their device *after* the effective date of this regulation."  83 Fed. Reg. at 66,523 (emphasis added).  And the effective date was March 26, 2019, a full ninety days after the rule was promulgated.  83 Fed. Reg. at 66,514.  To alleviate any lingering doubt about the rule's application, ATF made clear

---

[8] The plaintiffs also reference briefly, in one short paragraph, an argument about the separation of powers and the non-delegation doctrine as those doctrines relate to *Chevron*.  *See* Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J at 39 (noting that these counts "exist . . . to ensure that an actual ruling on the constitutional questions is made and thus to facilitate further review").  Although the plaintiffs do not expound on the substance of their argument, the Court interprets this reference to relate to the plaintiffs' earlier argument about the relationship between the rule of lenity and *Chevron* deference, and the argument that *Chevron* violates the Constitution.  *See id.* at 34 (arguing that *Chevron* "deference, particularly in the context of a statute defining crimes, violates the separation of powers [and] the anti-delegation doctrine").  As discussed above, this Court is bound by the precedent of *Chevron* and its progeny.  *See supra* at 10.  The plaintiffs also made the additional argument in their complaint "that the Attorney General allow for an amnesty so as to register these devices as machineguns under the National Firearms Act," Sec. Am. Compl. ¶ 43 (*Codrea*).  The plaintiffs appear to have abandoned this argument on summary judgment, however, as they submit no discussion on amnesty and merely reference it once in a sub-heading list with other topics.  *See* Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 39 ("Guedes Count I – Lack of Statutory Authority to Alter Definition Established by Congress (APA and Article I); Codrea Counts I, II, III, V & VII – Ultra Vires, APA Violation and Amnesty.").

that "criminal liability" attached "only for possessing bump-stock-type devices *after* the effective date of regulation, not for possession before that date." *Id.* at 66,525 (emphasis added); *Guedes II*, 920 F.3d at 8–9. In conclusion, the rule poses no retroactivity issue.

2. *Void for Vagueness*

"The Due Process Clause 'requires the invalidation of laws [or regulations] that are impermissibly vague.'" *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 734 (D.C. Cir. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). The plaintiffs do not brief this argument in detail, but instead conclude that "[i]f the statute is vague enough for *Chevron*, then it is vague enough to require lenity or simply to be void." Am. Memo. in Supp. of Pls.' Cross Mot. for Summ. J. at 41. The D.C. Circuit addressed this argument, holding that "Codrea's challenge is misconceived," as the notice-and-comment procedures provided fair notice of what conduct was prohibited. *Guedes II*, 920 F.3d at 28.

And with good reason. There is much daylight between the statutory ambiguity required to trigger *Chevron* deference and the vagueness required to invalidate a statute or regulation under the Due Process Clause. *See United States v. National Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."). Were this not the case, every regulation entitled to *Chevron* deference would be summarily voided for vagueness. Rather, the void for vagueness doctrine applies where a "conviction or punishment fails to comply with due process [because] the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence *fair notice* of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television Stations*, 567 U.S. at 253 (emphasis added) (internal quotation marks omitted). Here,

24

by contrast, ATF's formal notice-and-comment procedures, as well the final rule itself, provide ample notice of what conduct is prohibited.  *See Guedes II*, 920 F.3d at 28 (holding that "the promulgation of the Bump-Stock Rule through notice-and-comment procedures afforded fair notice of the prohibited conduct" (internal quotation marks omitted)).

## CONCLUSION

For the reasons stated above, and explained further in the Court's earlier Memorandum Opinion in this case, the defendants' Motion for Summary Judgment is granted.  An order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

February 19, 2021